UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ESTADOS UNIDOS MEXICANOS
      Plaintiff,

v.

SMITH & WESSON BRANDS, INC.;
BARRETT FIREARMS MANUFACTURING,          C.A. NO: 1:21-CV-11269-FDS
INC.; BERETTA U.S.A. CORP.; BERETTA
HOLDING S.P.A.; CENTURY
INTERNATIONAL ARMS, INC.; COLT'S
MANUFACTURING COMPANY LLC;
GLOCK, INC.; GLOCK GES.M.B.H.;
STURM, RUGER & CO., INC.;
WITMER PUBLIC SAFETY GROUP, INC.
D/B/A INTERSTATE ARMS,
      Defendants.

**JOINT MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

STANDARD OF REVIEW .................................................................................................. 6

ARGUMENT ....................................................................................................................... 6

I.    Mexico Lacks Article III Standing ................................................................................ 6

    A.    Standing requires the complaint to allege facts showing that the plaintiff's injuries are "fairly traceable" to defendants' allegedly unlawful conduct ................. 6

    B.    The complaint admits facts confirming that Mexico's alleged harms are not fairly traceable to defendants' actions ........................................................................ 9

II.    The Protection of Lawful Commerce in Arms Act Bars all of Mexico's Claims ............. 11

    A.    Congress Enacted the PLCAA To Bar Exactly This Type of Lawsuit ..................... 11

    B.    This Suit Is a "Qualified Civil Liability Action" under the PLCAA ........................ 12

    C.    No PLCAA Exception Applies to Any of Mexico's Claims ................................... 13

        1.    The Predicate Exception Does Not Apply ...................................................... 13

            a)    The predicate exception recognizes only firearms-specific statutes ........ 14

            b)    Mexico has not plausibly alleged a violation of any firearms-specific statute ............................................................................................ 17

            c)    The predicate exception does not allow claims based on generally applicable consumer-protection statutes ................................. 21

            d)    Mexico cannot satisfy PLCAA's proximate-cause requirement ............ 22

        2.    The "Design Defect" Exception Does Not Apply ........................................... 24

        3.    The "Negligence Per Se" Exception Does Not Apply ..................................... 25

    D.    The PLCAA Applies to Claims by Foreign Governments ...................................... 27

        1.    Congress wrote the PLCAA to cover foreign claims ....................................... 28

        2.    This case involves a domestic application of the PLCAA ................................ 29

III.    Mexico Fails to Allege Facts Showing that Defendants' Business Practices Are the "Proximate Cause" of the Injuries Inflicted by Mexican Drug Cartels ........................ 31

    A.    The chain of causation is too attenuated .................................................................... 32

    B.    Intervening intentional criminal acts break the chain of causation ............................ 33

    C.    The Mexican government's alleged harms are derivative of other victims ............... 35

    D.    Apportioning damages and liability would be unworkable ...................................... 37

# <u>TABLE OF CONTENTS</u>
(continued)

                                                                                            **Page**

IV.    Firearms Companies Have No Legal Duty to Protect the Mexican Government
       from Mexican Criminals Who Misuse Firearms in Mexico ............................................... 39

V.     Manufacturing and Selling Firearms Is Not a "Public Nuisance" ..................................... 40

VI.    Mexico Cannot Use Mexican Law to Regulate U.S. Firearms Companies........................ 42

CONCLUSION.......................................................................................................................... 44

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A. H. Phillips, Inc. v. Walling,*
324 U.S. 490 (1945)................................................................................................16

*Adames v. Sheahan,*
909 N.E.2d 742 (Ill. 2009)......................................................................................24

*Akins v. District of Columbia,*
526 A.2d 933 (D.C. 1987)........................................................................................34

*Allen v. Wright,*
468 U.S. 737 (1984)............................................................................................7, 10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................................6, 26

*Bank of Am. Corp. v. City of Miami,*
137 S. Ct. 1296 (2017)..............................................................................................31

*Bank of Augusta v. Earle,*
38 U.S. 519 (1839)....................................................................................................42

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..................................................................................................26

*Bennett v. Spear,*
520 U.S. 154 (1997)....................................................................................................7

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996)............................................................................................40, 43

*Bolduc v. Colt's Mfg. Co.,*
968 F. Supp. 16 (D. Mass. 1997)............................................................................25

*Breeden v. Novartis Pharms. Corp.,*
646 F.3d 43 (D.C. Cir. 2011)..................................................................................34

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.,*
123 F. Supp. 2d 245 (D.N.J. 2000) .........................................................2, 8, 34, 41

*Carney v. Bereault,*
204 N.E.2d 448 (Mass. 1965) ................................................................................39

*Cigna Ins. Co. v. Oy Saunatec, Ltd.,*
241 F.3d 1 (1st Cir. 2001)........................................................................................25

*City of Boston v. Smith & Wesson Corp.,*
No. 199902590, 2000 WL 1473568 (Mass. Super. Ct. July 13, 2000)..................42

*City of Chicago v. Beretta U.S.A. Corp.,*
821 N.E.2d 1099 (Ill. 2004)......................................................................2, 34, 35, 41

*City of New York v. Beretta U.S.A. Corp.,*
524 F.3d 384 (2d Cir. 2008).....................................................................2, 11, 16, 18

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*City of Philadelphia v. Beretta U.S.A., Corp.*,
126 F. Supp. 2d 882 (E.D. Pa. 2000) ..............................................................37, 38

*City of Philadelphia v. Beretta U.S.A. Corp.*,
277 F.3d 415 (3d Cir. 2002).................................................................... *passim*

*Comm'r v. Clark*,
489 U.S. 726 (1989).................................................................................16

*Copithorne v. Framingham Union Hosp.*,
520 N.E.2d 139 (Mass. 1988) ...................................................................33

*Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*,
958 F.3d 38 (1st Cir. 2020)...................................................................8, 9

*Davis v. United States*,
670 F.3d 48 (1st Cir. 2012)...................................................................31

*Deal v. United States*,
508 U.S. 129 (1993)................................................................................15

*Delana v. CED Sales, Inc.*,
486 S.W.3d 316 (Mo. 2016) ....................................................................18

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943)................................................................................20

*Duncan v. Walker*,
533 U.S. 167 (2001)................................................................................17

*Est. of Kim ex rel. Alexander v. Coxe*,
295 P.3d 380 (Alaska 2013)...........................................................2, 11, 18

*Estados Unidos Mexicanos v. DeCoster*,
229 F.3d 332 (1st Cir. 2000)...................................................................36

*Exxon Co., U.S.A. v. Sofec, Inc.*,
517 U.S. 830 (1996)................................................................................33

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ..................................................................40

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004)................................................................................42

*Ganim v. Smith & Wesson Corp.*,
780 A.2d 98 (Conn. 2001) ............................................................... *passim*

*Gidwani v. Wasserman*,
365 N.E.2d 827 (Mass. 1977) ..................................................................33

*Gill v. Gulfstream Park Racing Ass'n*,
399 F.3d 391 (1st Cir. 2005)...................................................................42

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)..........................................................................................31, 32, 33

*Hilton v. Guyot*,
    159 U.S. 113 (1895)...........................................................................................43

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992).........................................................................31, 35, 37, 38

*Ileto v. Glock, Inc.*,
    565 F.3d 1126 (9th Cir. 2009) .................................................................. *passim*

*In re Acad., Ltd.*,
    625 S.W.3d 19 (Tex. 2021).............................................................................11, 30

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
    712 F.3d 21 (1st Cir. 2013)...............................................................................32

*In re Vitamin C Antitrust Litig.*,
    8 F.4th 136 (2d Cir. 2021) ...............................................................................43

*Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*,
    196 F.3d 818 (7th Cir. 1999) ...........................................................................33

*Iwanowa v. Ford Motor Co.*,
    67 F. Supp. 2d 424 (D.N.J. 1999) ...................................................................43

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016) ..............................................................................31

*Jefferies v. District of Columbia*,
    916 F. Supp. 2d 42 (D.D.C. 2013) .........................................................2, 11, 18

*Jupin v. Kask*,
    849 N.E.2d 829 (Mass. 2006) ..........................................................................42

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012)........................................................................7, 9, 42

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ...........................................................................34

*Kinsman Transit Co. v. City of Buffalo*,
    388 F.2d 821 (2d Cir. 1968).............................................................................35

*Lodge v. Arett Sales Corp.*,
    717 A.2d 215 (Conn. 1998) .............................................................................39

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................................6

*Luoni v. Berube*,
    729 N.E.2d 1108 (Mass. 2000) ........................................................................39

**TABLE OF AUTHORITIES**

(continued)

Page(s)

*McCarthy v. Olin Corp.*,
  119 F.3d 148 (2d Cir. 1997)............................................................................25

*McGhee v. Hybrid Logistics, Inc.*,
  No. 12-10771, 2014 WL 11281402 (E.D. Mich. Apr. 4, 2014) ............................34

*Pearsall* v. *Dwight*,
  2 Mass. 84 (1806) ........................................................................................43

*Pehle v. Farm Bureau Life Ins. Co.*,
  397 F.3d 897 (10th Cir. 2005) .........................................................................26

*Penelas v. Arms Tech., Inc.*,
  778 So. 2d 1042 (Fla. Dist. Ct. App. 2001) ...............................................35, 42

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
  761 N.Y.S.2d 192 (N.Y. App. Div. 2003) ............................................2, 34, 35, 41

*Phillips v. Lucky Gunner, LLC*,
  84 F. Supp. 3d 1216 (D. Colo. 2015)..........................................................2, 11, 18

*Republic of Venez. ex rel. Garrido v. Philip Morris Cos.*,
  827 So. 2d 339 (Fla. Dist. Ct. App. 2002) ...............................................3, 35, 39

*RJR Nabisco, Inc. v. Eur. Cmty.*,
  136 S. Ct. 2090 (2016).......................................................................27, 28, 29

*Rosemond v. United States*,
  572 U.S. 65 (2014).............................................................................19, 20

*Ryan v. Hughes-Ortiz*,
  959 N.E.2d 1000 (Mass. App. Ct. 2012) ............................................................24

*SEIU Health & Welfare Fund v. Philip Morris Inc.*,
  249 F.3d 1068 (D.C. Cir. 2001)...............................................................3, 35, 39

*Shipman v. Jennings Firearms, Inc.*,
  791 F.2d 1532 (11th Cir. 1986) .......................................................................25

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976).........................................................................1, 7, 9, 10

*Soto v. Bushmaster Firearms Int'l, LLC*,
  202 A.3d 262 (Conn. 2019) ...........................................................18, 21, 22, 36

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..........................................................................................6

*Staples v. United States*,
  511 U.S. 600 (1994).......................................................................................19

*State ex rel. Hunter v. Johnson & Johnson*,
  No. 118474, 2021 WL 5191372 (Okla. Nov. 9, 2021) .......................................41

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*State of São Paulo of Federative Republic of Braz. v. Am. Tobacco Co.*,
  919 A.2d 1116 (Del. 2007) ........................................................................3, 35, 39

*Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
  171 F.3d 912 (3d Cir. 1999) ......................................................................32

*Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*,
  990 F.3d 31 (1st Cir. 2021) .......................................................................35, 37

*Telnikoff v. Matusevitch*,
  702 A.2d 230 (Md. 1997) ..........................................................................43

*Town of Plainville v. Almost Home Animal Rescue & Shelter, Inc.*,
  187 A.3d 1174 (Conn. App. Ct. 2018) ......................................................26

*Travieso v. Glock Inc.*,
  526 F. Supp. 3d 533 (D. Ariz. 2021) ........................................................24

*Ungaro-Benages v. Dresdner Bank AG*,
  379 F.3d 1227 (11th Cir. 2004) .................................................................43

*United States v. Bishop*,
  926 F.3d 621 (10th Cir. 2019) ...................................................................19

*United States v. Hayes*,
  555 U.S. 415 (2009).....................................................................................15

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010).........................................................................40

*United States v. Peoni*,
  100 F.2d 401 (2d Cir. 1938).......................................................................19

*United States v. Standard Oil Co. of Cal.*,
  332 U.S. 301 (1947).....................................................................................37

*United States v. Williams*,
  553 U.S. 285 (2008).....................................................................................17

*Venezia v. Miller Brewing Co.*,
  626 F.2d 188 (1st Cir. 1980).......................................................................25

*Yakubowicz v. Paramount Pictures Corp.*,
  536 N.E.2d 1067 (Mass. 1989) ..................................................................39, 40

**STATUTES**

15 U.S.C. § 7901 ................................................................................... *passim*

15 U.S.C. § 7902 ................................................................................... *passim*

15 U.S.C. § 7903 ................................................................................... *passim*

18 U.S.C. § 921 .......................................................................................13, 25

18 U.S.C. § 922 .......................................................................................19, 23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

18 U.S.C. § 923 ................................................................................................23

18 U.S.C. § 924 ..........................................................................................18, 23

26 U.S.C. § 5845 ........................................................................................18, 23

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY (11th ed. 2019) ..........................................14, 15, 21

15 C.F.R. § 738.4 ............................................................................................23

27 C.F.R. § 478.39 ..........................................................................................19

Vivian S. Chu, CONG. RSCH. SERV., R42871, *The Protection of Lawful Commerce in Arms Act: An Overview of Limiting Tort Liability of Gun Manufacturers* (2012) .................11

151 CONG. REC. E2162 (2005) ......................................................................15

151 CONG. REC. 19135 (2005) ......................................................................15

H.R. REP. NO. 109-124 (2005) ................................................................12, 30

Timothy D. Lytton, *Tort Claims Against Gun Manufacturers for Crime-Related Injuries*, 65 Mo. L. Rev. 1 (2000) ..........................................................12, 15

PROSSER & KEETON ON THE LAW OF TORTS (5th ed. 1984) ..................31, 33, 39

RESTATEMENT (THIRD) OF TORTS § 14 (2010) ..............................................26

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 (2020) ........41

Story, COMMENTARIES ON THE CONFLICT OF LAWS § 38a (6th ed. 1865) ......43

White House, *FACT SHEET: U.S.-Mexico High-Level Security Dialogue* (Oct. 8, 2021) ....................................................................................................4

## **INTRODUCTION**

Plaintiff, the government of Mexico, seeks to hold defendants—firearm manufacturers and a firearm distributor in the United States—legally responsible for violence inflicted by drug cartels in Mexico. The complaint, however, does not allege that any of the moving defendants, who are law-abiding members of the business community in the United States, sell their firearms to the cartels. Nor does it even allege that they sell to any *others* who sell to the cartels. Instead, Mexico's theory is that a series of third-party intermediaries in the United States legally or illegally sell and resell defendants' firearms, which are then illegally obtained by criminal "straw purchasers," then illegally smuggled across the Mexican border, where they are eventually illegally used by drug cartels to commit criminal violence, which *then* gives rise to various financial harms suffered by the Mexican government. For multiple reasons, the law cannot be stretched to impose liability over this spatial, temporal, and causal gulf.

*First*, Mexico does not have Article III standing to bring this case. It is a cardinal rule of standing that an injury is not fairly traceable to the defendant when it "results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). And here, the complaint admits that all of the Mexican's government's asserted injuries stem from violence committed by third-party criminals in Mexico, mostly using guns the defendants do not manufacture or sell, and which they obtain through a long and attenuated chain of other independent criminal actors. Against this factual backdrop—detailed in the complaint itself—Mexico fails to allege that any of its injuries are fairly traceable to any named defendant.  For this reason alone, the case must be dismissed.

*Second*, even if Mexico had standing, federal law would bar its claims at the threshold. Under the Protection of Lawful Commerce in Arms Act (PLCAA), federally licensed firearms manufacturers and sellers enjoy broad immunity against lawsuits claiming harms "resulting from the criminal or unlawful misuse of a [firearm]" by a "third party." 15 U.S.C. § 7903(5)(A).  With

1

only a few narrow exceptions, no such claim may be "brought" in "any Federal or State court." *Id*. § 7902(a). Although Mexico tries to shoehorn some of its claims into these exceptions, it does not succeed. Instead, its real hope appears to be convincing the Court that the PLCAA does not apply *at all* to protect U.S. firearms companies against foreign plaintiffs. But the plain text of the statute forecloses that theory: It clearly protects U.S. firearms companies from suit in U.S. courts based on their conduct in the U.S. The presence of a foreign plaintiff, if anything, makes Mexico's case even less viable than the numerous cases brought by domestic plaintiffs and rejected under the PLCAA.[1]

*Third*, even if Mexico could overcome these threshold barriers of federal law, its complaint still fails because it does nothing more than put a new coat of paint on a recycled and discredited set of claims. Even before the PLCAA was enacted, many state and local governments within the United States sued the firearms industry based on allegations almost identical to the ones here. And time after time, federal and state courts rejected those claims on the pleadings, holding that firearms companies cannot be held liable for the remote harms caused by third-party acts of criminal violence. *See, e.g.*, *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98 (Conn. 2001).[2] Again, there is no reason that a foreign governmental plaintiff should be able to succeed where those domestic governments failed. The fact that the plaintiff is a foreign sovereign alleging remote foreign injuries inflicted by foreign criminals makes the lack of proximate cause here even more clear.

*Fourth*, those same authorities make clear the firearm industry owes no common-law duty to Mexico. Even where corporations *directly sell* harmful products to foreign citizens,

---

[1] *See, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1137 (9th Cir. 2009); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008); *Est. of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 388-89 (Alaska 2013); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216 (D. Colo. 2015); *Jefferies v. District of Columbia*, 916 F. Supp. 2d 42, 47 (D.D.C. 2013).

[2] *See also City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415 (3d Cir. 2002); *Camden Cnty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245 (D.N.J. 2000); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004); *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192 (N.Y. App. Div. 2003).

courts routinely reject claims that they have any legal duty to protect foreign sovereigns from derivative harms.[3] The absence of duty is especially clear here, where Mexico does not even allege that the defendants make private sales in Mexico.

*Fifth*, Mexico fails to state a "public nuisance" claim. Numerous courts in multiple contexts, including in cases involving firearms, have held that the public-nuisance doctrine does not apply to the manufacture and sale of lawful products. Otherwise, companies would be subject to an endless chain of liability based on the misuse of their lawful and non-defective products by third parties they cannot control.

*Finally*, Mexico cannot invoke Mexican tort law to impose liability that would not be allowed under U.S. law. Under bedrock principles of international law, a foreign nation cannot use its own law to reach across borders and impose liability based on conduct in another country that was lawful when it occurred there. By trying to do so, Mexico is effectively seeking to impose its own gun control policies on U.S. firearms companies in disregard of the choices made by domestic legislatures and embedded in the federal and many state constitutions.

At bottom, this case implicates a clash of national values. Whereas the United States recognizes the right to keep and bear arms, Mexico has all but eliminated private gun ownership. Mexico can, of course, impose gun control within its own borders. But in this case it seeks to reach *outside* its borders and punish firearms sales that are not only lawful but constitutionally protected in the United States. By seeking to bankrupt U.S. gun makers, this gambit not only threatens America's constitutional freedoms, but also the careful balance of firearms regulations set by Congress and state legislatures. It also tries to use the judiciary as a tool for circumventing

---

[3] *See SEIU Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001); *State of São Paulo of Federative Republic of Braz. v. Am. Tobacco Co.*, 919 A.2d 1116, 1126 (Del. 2007); *Republic of Venez. ex rel. Garrido v. Philip Morris Cos.*, 827 So. 2d 339, 341 (Fla. Dist. Ct. App. 2002).

an active diplomatic dispute between the United States and Mexico about the international effects of U.S. firearms policy.[4] This Court need not play along. It should dismiss the complaint.

## <u>BACKGROUND</u>

Unable to control cartel violence within its own borders, Mexico filed this lawsuit seeking to place the blame on seven firearms manufacturers that are incorporated and headquartered in the United States (plus the European affiliates of two of the manufacturers), as well as on a single wholesale firearms dealer. Compl. ¶¶ 31-40.

The theory of the complaint is that the defendants are liable for financial harms that the Mexican government has sustained due to the "epidemic of gun violence in Mexico." *Id.* ¶ 146. Although the complaint lacks detail on the exact chain of events, the broad outline is clear. Defendants lawfully manufacture and sell firearms in the United States to licensed wholesale distributors, who then lawfully resell those firearms to a series of licensed retail dealers, who eventually resell them to domestic retail customers, some of whom allegedly smuggle them into Mexico, where they wind up in the hands of cartels or other criminals, who then use them to commit crimes. *Id.* ¶¶ 378-79, 450-64.

According to the complaint, a "small minority" of the downstream independent retail dealers who sell defendants' products are "[u]nscrupulous," as they know some customers are illegal "straw purchase[r]s." *Id.* ¶¶ 119-22, 269. Some portion of these straw purchasers, in turn, resell their unlawfully purchased firearms to other criminals who will smuggle them into Mexico. *Id.* ¶¶ 146-207. Approximately 2.2% of the firearms manufactured in the United States are smuggled into Mexico, *id.* ¶ 437, and many firearms are smuggled into Mexico "from outside the U.S." *Id.* ¶ 435. The complaint acknowledges that most of the illegal firearms in Mexico are not produced or sold by any of the named defendants. *Id.*

---

[4] *See* White House, *FACT SHEET: U.S.-Mexico High-Level Security Dialogue* (Oct. 8, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/fact-sheet-u-s-mexico-high-levelsecurity-dialogue/ (announcing bilateral framework to negotiate handling illegal drug and weapons trafficking).

The complaint alleges that extensive black markets and smuggling operations in Mexico make firearms available to Mexican drug cartels and other criminals. *Id.* ¶¶ 136-45. Once in possession of the contraband firearms, the cartels and other criminals use them against Mexican citizens and various employees of the Mexican government. *Id*. ¶¶ 447-48. As a result, the Mexican government alleges that it has expended "resources" to address "gun violence" within its own borders. *Id*. ¶ 449. In particular, the government has incurred "costs for providing, for example, extraordinary health care, law enforcement and military and services, criminal justice administration, public assistance, and other social services and public programs." *Id*. ¶ 447. Beyond bearing various "costs" resulting from gun violence, Mexico also alleges various economic "[l]osses" such as "diminished property values in the communities affected by" gun violence, and "decreased efficiency and size of the working population in Mexico." *Id*. ¶ 448.

Based on these diffuse harms, Mexico brings an assortment of claims. As to common-law claims, the complaint asserts simple negligence (Count One), public nuisance (Count Two), defective design (Count Three), negligence per se (Count Four), gross negligence (Count Five), and unjust enrichment (Count Six). *Id.* ¶¶ 506-41. None of these claims alleges that any defendant made any sale to any person that the defendant knew would commit a crime. Instead, the gravamen of the claims is that—despite complying with the panoply of federal, state, and local firearms laws in the United States—defendants were obligated to do more to prevent the cartels from harming the Mexican government. *Id.*

The complaint also asserts statutory claims for "unlawful marketing" against Smith & Wesson and Colt based on the general provisions of the Massachusetts Consumer Protection Act (Chapter 93A) and the Connecticut Unfair Trade Practices Act (CUTPA), respectively. *Id.* ¶¶ 343, 542-56.   According to these claims, these two defendants engaged in unlawful "marketing" by advertising true facts about the semi-automatic rifles they manufacture, which the complaint alleges are "appealing especially to criminals like the cartels." *Id*. ¶ 551; *see id*. ¶

545. These claims are prohibited under the PLCAA but, regardless, the complaint does not allege that any member of a Mexican cartel even saw these advertisements, much less that the advertisements caused the sophisticated criminal syndicates to purchase and use the firearms to commit crimes.

Based on these claims, the complaint seeks billions of dollars in damages. *Id.* ¶ 560.

## STANDARD OF REVIEW

On a motion to dismiss, the court must accept the alleged facts as true but need not accept "conclusory statements" unsupported by any concrete factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To "unlock the doors of discovery," the allegations must show that the defendants' liability is actually "plausible," not merely "conceivable." *Id*. at 678-80. If the facts alleged are "merely consistent with" liability, then the case must be dismissed. *Id*. at 678.

## ARGUMENT

### I.    Mexico Lacks Article III Standing.

Under Article III of the U.S. Constitution, a plaintiff cannot establish standing to sue a defendant for remote and attenuated harms that stem from the independent acts of third parties. And yet, that is all Mexico can muster here: The complaint itself admits that Mexico's alleged injuries flowed from the independent criminal acts of Mexican cartels using various firearms, most of which defendants did not make or sell, and which were acquired only through a long and attenuated chain of events.

#### A.    Standing requires the complaint to allege facts showing that the plaintiff's injuries are "fairly traceable" to defendants' allegedly unlawful conduct.

Under Article III, "the 'irreducible constitutional minimum' of standing" requires the plaintiff to show an injury that is not only concrete and redressable by the courts, but also "fairly traceable to the challenged conduct of the defendant." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Of particular relevance

here, a plaintiff cannot establish standing based on a remote injury that "results from the independent action of some third party not before the court." *Simon*, 426 U.S. at 41-42. As the First Circuit has explained, "[w]hen the injury alleged is the result of actions by some third party, not the defendant, the plaintiff cannot satisfy the causation element of the standing inquiry." *Katz v. Pershing, LLC*, 672 F.3d 64, 76 (1st Cir. 2012). That is especially true when the injury results from the independent acts of "numerous third parties." *Allen v. Wright*, 468 U.S. 737, 757-59 (1984). To overcome this obstacle, the plaintiff must show that the defendant's conduct had a "determinative or coercive effect" that caused the third party to injure the plaintiff. *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

The Supreme Court's seminal decision on this point is *Simon*, where a group of indigent plaintiffs challenged an IRS tax ruling because it supposedly "encouraged" hospitals to turn away indigent patients. 426 U.S. at 42-43. The court held that the plaintiffs lacked standing because it was "purely speculative whether the denials of service . . . fairly can be traced to [the IRS ruling] or instead result from decisions made by the hospitals without regard to the tax implications." *Id.* Since the hospitals' turning away of patients "might have occurred even in the absence of" the tax incentives to do so, it was entirely speculative that the defendant IRS caused the alleged injury. *Id*. at 45 n.25. The plaintiffs did not allege any facts showing that the IRS *forced* the hospitals to turn them away, or that their being turned away was "made possible *only by* the challenged action of the [IRS]." *Id*. (emphasis added). As a result, causation was purely speculative based on "unalleged and unknown facts." *Id*. The complaint was thus "insufficient even to survive a motion to dismiss, for it fail[ed] to allege an injury that fairly can be traced to [the defendant's] challenged action." *Id*.

In 2020, the First Circuit applied the same principle to dismiss a case for lack of Article III standing. In *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc*., a group of shippers sued the Puerto Rico Port Authority to challenge "[e]nhanced [s]ecurity [f]ees" that the

Port Authority imposed on third-party freight companies that the shippers hired to transport goods. *See* 958 F.3d 38, 44 (1st Cir. 2020). The court rejected the suit for lack of standing, holding that the shippers' alleged injury was not "fairly traceable" to the Port Authority, but instead to the "independent" pricing decisions of the third-party freight companies. *Id*. at 48-49. The Port Authority did not "coerce[]" freight companies to charge higher prices to the shippers, and it was purely speculative that the freight companies would have charged any less had the Port Authority not imposed the fees. *Id*. at 49. Indeed, even if the fees had been repealed, the freight companies still could have "injur[ed]" the shippers in the same way by choosing not to "lower the costs they charge." *Id*.

Of particular relevance here, courts have held that even *domestic* governmental entities lack standing to sue firearms companies for remote harms inflicted by third parties engaged in criminal gun violence. In *Ganim*, for example, the city of Bridgeport sued firearms manufacturers claiming that their products "end[ed] up in the hands of unauthorized and unintended users who then misuse them in Bridgeport," causing harm to the city's government. 780 A.2d at 123. But in light of the numerous "links in the factual chain," the court held that the harms inflicted by third-party criminals were too "indirect, remote[,] and derivative," and thus the city "lack[ed] standing." *Id*. The same was true in *Camden County*, where the court held that the county government lacked "constitutional standing" because its asserted injuries resulting from third-party criminal gun violence that were "several steps removed" from the "allegedly wrongful conduct" of the defendant firearms manufacturers. 123 F. Supp. 2d at 257. And as detailed below, multiple courts have reached the same result by applying the doctrine of proximate cause to dismiss claims based on remote harms.

**B.**   **The complaint admits facts confirming that Mexico's alleged harms are not fairly traceable to defendants' actions.**

Mexico admits that all of its alleged injuries stem from the remote acts of third parties, including "drug cartels and other criminals in Mexico," and various sellers and smugglers. Compl. ¶ 1. The theory of the case is that defendants sell firearms in the United States to federally licensed wholesale firearms distributors and retail dealers; the firearms are then resold multiple times by a series of third parties; they are then smuggled across the Mexican border by other third parties; and then third-party "drug cartels" illegally purchase the firearms and use them to commit violent crimes in Mexico. *Id*. ¶ 5. The resulting injury to the Mexican government allegedly consists of the "costs" of providing "health care," "law enforcement," "criminal justice administration," and "other social services and public programs" as a result of cartel violence. *Id*. ¶ 447. The complaint does not allege that any of the defendants *themselves* have ever engaged in or directly facilitated violence in Mexico.

Second, the complaint admits facts showing that the third-party criminal acts in Mexico are "independent" of defendants' allegedly unlawful conduct. *See Simon*, 426 U.S. at 42; *Katz*, 672 F.3d at 76; *Dantzler*, 958 F.3d at 49. As the complaint alleges, drug cartels and other criminals in Mexico have access to millions of illegal firearms to engage in violent crime *regardless of anything defendants have allegedly done wrong*. In particular, there are "more than 13.5 million" illegal firearms in the hands of criminals in Mexico. Compl. ¶ 439. Many of those firearms originated "outside the U.S." *Id*. ¶ 435. Moreover, the complaint admits that defendants' firearms make up *less than* "*half*" of "*all crime guns recovered in Mexico*." *Id*. ¶ 434 (emphasis added). Thus, according to the complaint, Mexican criminals have access to about 6 million firearms that defendants did not even produce or sell. As a result, Mexico cannot allege that gun violence within its own borders was "made possible only by the challenged action of the defendant[s]." *Simon*, 426 U.S. at 45 n.25.

Third, Mexico cannot allege that Mexican criminals would have been unable or unwilling to engage in the same violence regardless of defendants' allegedly unlawful conduct. For example, the complaint alleges that Mexico has recently endured roughly 23,000 homicides per year, some 69% of which involved guns, for a rough annual total of about 16,000 gun-related homicides. Compl. ¶ 451. Even assuming that there really are only about 6 million firearms in Mexico produced by gun makers other than the defendants, the cartels and other criminals still had more than 375 firearms available for *each* homicide, *none* of which were manufactured or sold by the defendants. With so many other firearms available, the complaint cannot plausibly allege that the drug cartels would not have engaged in the same violent attacks regardless of defendants' activities: It is "speculative at best" that the attacks would not "have occurred . . . in the absence of" defendants' alleged violations. *Simon*, 426 U.S. at 42-43, 45 n.25.

Fourth, the lack of fair traceability is especially clear because Mexico's alleged harms stem not only from the independent acts of the third parties illegally using guns, but also from the independent acts of "numerous [other] third parties" who illegally purchase, resell, and ultimately smuggle those guns across the Mexican border. *Wright*, 468 U.S. at 757-59. For Article III purposes, all of these independent third-party actions "break the chain of causation between" Mexico's asserted injuries and defendants' allegedly unlawful conduct. *Id*.

Finally, the lack of traceability is even more clear with respect to the "unlawful marketing" claims under Chapter 93A and the CUTPA. Compl. ¶¶ 343, 542-56. The complaint does not allege that any of the criminals who committed gun crimes in Mexico even *saw* Smith & Wesson's or Colt's marketing or advertising materials. Much less does it plausibly allege that those materials had any impact on the harms that the Mexican drug cartels independently inflicted on Mexico. Thus, the Chapter 93A and CUTPA claims must be dismissed for lack of standing.

II.     __The Protection of Lawful Commerce in Arms Act Bars all of Mexico's Claims.__

This suit is also barred at the threshold by federal statute. In 2005, Congress enacted the Protection of Lawful Commerce in Arms Act to prohibit precisely the type of claims asserted in this case. The PLCAA generally bars any "qualified civil liability action" from being "brought" in "any Federal or State court," including any claim "against a manufacturer or seller of a [firearm]" based on harms "resulting from the criminal or unlawful misuse of a [firearm] by . . . a third party." 15 U.S.C. §§ 7902(a), 7903(5)(A). Congress even took the step of mandating that any such claims pending on the PLCAA's effective date in 2005 "shall be immediately dismissed." *Id.* § 7902(b). Courts across the country have recognized that the PLCAA provides threshold immunity from suit (as opposed to being merely a defense to ultimate liability). *See, e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 398 (2d Cir. 2008) (PLCAA bars "the commencement or the prosecution of qualified civil liability actions.").[5]

A.      __Congress enacted the PLCAA to bar exactly this type of lawsuit.__

"The PLCAA was considered and passed at a time when victims of shooting incidents," along with various government entities, "brought civil suits seeking damages and injunctive relief against out-of-state manufacturers and sellers of firearms." Vivian S. Chu, CONG. RSCH. SERV., R42871, *The Protection of Lawful Commerce in Arms Act: An Overview of Limiting Tort Liability of Gun Manufacturers* 1 (2012). To bring these claims, plaintiffs invoked novel interpretations of generally applicable theories of liability, including "strict liability for abnormally dangerous activities," "strict product liability for defective design," "negligent

---

[5] *See also, e.g.*, *In re Acad., Ltd.*, 625 S.W.3d 19, 32-36 (Tex. 2021) (directing judgment for defendant based on PLCAA immunity from suit, finding that trial "'would defeat the substantive right' granted by the PLCAA."); *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1142 (9th Cir. 2009) (PLCAA "creates a substantive rule of law granting immunity to certain parties against certain types of claims."); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216 (D. Colo. 2015) (dismissing claim that seller violated ban on ammunition sales to users of controlled substances based on PLCAA immunity); *Jefferies v. District of Columbia*, 916 F. Supp. 2d 42, 47 (D.D.C. 2013) (PLCAA reflects congressional intent to "weed out, expeditiously, claims the PLCAA bars."); *Est. of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 388-89 (Alaska 2013) (PLCAA bars any qualified civil liability action not falling within a statutory exception).

marketing," "public nuisance," and "deceptive trade practices." Timothy D. Lytton, *Tort Claims Against Gun Manufacturers for Crime-Related Injuries*, 65 Mo. L. Rev. 1, 6-50 (2000).

In light of this trend, Congress recognized that the firearms industry was "in danger of being overwhelmed by the cost of defending itself against these suits." H.R. REP. NO. 109-124, at 12 (2005). Consequently, Congress enacted the PLCAA to immunize federally licensed firearms manufacturers and sellers from actions seeking "money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. § 7901(a)(3). Congress expressly noted in the law that the manufacture and sale of firearms are already "heavily regulated by Federal, State, and local laws," including "the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act." *Id.* § 7901(a)(4). In light of this existing oversight and control, Congress declared that "[b]usinesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms . . . are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products . . . that function as designed and intended." *Id.* § 7901(a)(5).

**B.     This suit is a "qualified civil liability action" under the PLCAA.**

The PLCAA generally bars any "qualified civil liability action" from being "brought" in "any Federal or State court." 15 U.S.C. § 7902(a). Such actions include claims "brought by any person against a manufacturer or seller of a qualified product . . . for damages . . . resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. . . ." *Id.* § 7903(5)(A). All "firearm[s]" are "qualified product[s]." *Id.* § 7903(4). Likewise, covered "person[s]" include "any governmental entity." *Id.* § 7903(3).

Under the statute, manufacturers and sellers are two distinct categories: Protected "manufacturer[s]" include companies "engaged in the business of manufacturing the product in interstate or foreign commerce" and "licensed" to do so under federal law. *Id.* § 7903(2). By

contrast, protected "seller[s]" include companies "engaged in the business of selling firearms at wholesale or retail" and "licensed" as firearms "dealer[s]" under federal law. *Id.* § 7903(6)(B) (incorporating definition of firearms "dealer[s]" set forth in 18 U.S.C. § 921(a)(11)).

This case is clearly a "qualified civil action" presumptively barred by the PLCAA. First, Mexico is a covered "person" because it falls within the defined category of "*any* governmental entity." *Id.* § 7903(3) (emphasis added). Congress easily could have excluded foreign sovereigns from this broad definition, but it did not. Second, the complaint alleges that defendants are either "manufacturers" or "seller[s]" that have obtained federal "license[s]" to manufacture or sell firearms. Compl. ¶¶ 31-41, 54. And third, all of Mexico's alleged injuries flow from the "widespread epidemic of gun violence" committed in Mexico by the deliberate acts of third-party criminals. *Id.* ¶ 449. Thus, all of the "damages" sought in this case "result[] from" the "criminal or unlawful misuse of" firearms by "third part[ies]." 15 U.S.C. § 7903(5)(A).

Finally, as explained further below, there is no merit to Mexico's claim that the PLCAA does not apply because the alleged harms occurred outside of the United States. By its plain terms, the PLCAA applies to all suits brought in U.S. courts against U.S. defendants for conduct in the U.S., regardless of where the alleged harms occurred.

### C.   No PLCAA exception applies to any of Mexico's claims.

The broad immunity conferred by the PLCAA is subject to narrowly defined exceptions in 15 U.S.C. § 7903(5). Mexico tries to avail itself of three of these exceptions, but fails. The only way it can do so is by construing the exceptions so broadly—and so contrary to their plain meaning—that they would swallow the immunity Congress enacted the PLCAA to provide.

#### 1.   The predicate exception does not apply.

The so-called "predicate exception" allows a manufacturer or seller of firearms to be sued if it "knowingly violated a State or Federal statute *applicable to the sale or marketing of*

*[firearms]*, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii) (emphasis added).

The statute provides examples of the type of firearms-specific statutes Congress considered "applicable to" the sale and marketing of firearms. It identifies laws:

- Requiring manufacturers and sellers to keep "record[s] . . . with respect to [firearms]." *Id*. § 7903(5)(A)(iii)(I).

- Prohibiting manufacturers and sellers from aiding, abetting, or conspiring with any person in making a "false or fictitious . . . statement" that is "material to the lawfulness of the sale or other disposition of a [firearm]." *Id*.

- Prohibiting manufacturers and sellers from aiding, abetting, or conspiring with anyone "to sell or otherwise dispose of a [firearm], knowing, or having reasonable cause to believe, that the actual buyer of the [firearm] was prohibited from possessing or receiving a firearm." *Id*. § 7903(5)(A)(iii)(II).

To satisfy the predicate exception based on an "applicable" firearms law, a plaintiff must show that a defendant knowingly violated a state or federal statute that "appli[es]" specifically to the "sale or marketing of [firearms]." *Id*. § 7903(5)(A)(iii). The statute does not allow claims based on *generally applicable* laws such as public nuisance and consumer-protection statutes, because those are the types of claims that the PLCAA was enacted to foreclose.

### a)      The predicate exception recognizes only firearms-specific statutes.

The plain text, structure, and context of the PLCAA show that the predicate exception applies only to claims based on firearms-specific laws, not laws of general applicability. Read in isolation, there are only two textually permissible readings of a "statute applicable to the sale or marketing of" firearms. 15 U.S.C. § 7903(5)(A)(iii). First, it could refer broadly to all laws that are "[c]apable of being applied" to firearms sales and marketing. *Applicable*, Black's Law Dictionary (11th ed. 2019). Or, more narrowly, the term "applicable" could mean—especially in reference to "a rule, regulation, law, etc."—"affecting or relating to a particular person, group,

14

or situation; having direct relevance." *Id*. On this reading, the predicate exception applies only to claims under laws that specifically regulate firearms *in particular*.

When the predicate exception is read in context, the narrower meaning is clearly the right one. It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993). Here, all of the relevant context—including the statutory structure, purpose, and history—confirm that the predicate exception is narrowly limited to firearms-specific laws.

*First*, a broad reading of the predicate exception would allow precisely the type of claim that Congress sought to bar when it enacted the PLCAA. Congress noted with disapproval that various "[l]awsuits ha[d] been commenced" seeking to hold firearms companies liable for "harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. § 7901(a)(3). The lawsuits that had been commenced at the time were based on generally applicable statutes prohibiting "negligent marketing," "public nuisance," and "deceptive trade practices." *See* Lytton, *supra*, at 6-50. One lawsuit that Congress focused on, in particular, involved statutory claims for public nuisance and negligence in California. *See Ileto*, 565 F.3d at 1137 (noting that Congress considered "this very case as the type of case they meant the PLCAA to preempt"); *see, e.g.*, 151 CONG. REC. E2162-63 (2005) (statement of Rep. Stearns) (describing as a "predatory lawsuit" the "case of *Ileto v. Glock*"); *id.* 19135 (statement of Sen. Craig) ("Another example of a lawsuit captured by this bill is the case of *Ileto v. Glock*."). For this reason, the Ninth Circuit concluded that the predicate exception cannot sensibly be interpreted to "cover[] all state statutes that *could be applied* to the sale or marketing of firearms." *Ileto*, 565 F.3d at 1135-36. That would violate the cardinal rule that statutory provisions should not be read in a way that "would frustrate Congress' manifest purpose." *United States v. Hayes*, 555 U.S. 415, 427 (2009).

The Second Circuit reached the same conclusion, explaining that the predicate exception cannot refer to all general laws that are merely "capable of being applied," because that would make the exception "far too[]broad." *City of New York*, 524 F.3d at 403. It "would allow the predicate exception to swallow the statute, which was intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *Id*.

*Second*, in keeping with the above, the predicate exception should be read narrowly because it is an exception to an intentionally broad rule—that firearms companies should not be held liable for harms caused by the criminal acts of third parties. *See* 15 U.S.C. §§ 7902(a), 7903(5)(A). The Supreme Court has instructed that when Congress enacts "a general statement of policy [that] is qualified by an exception," courts should "read the exception narrowly in order to preserve the primary operation of" the general rule. *Comm'r v. Clark*, 489 U.S. 726, 739 (1989). To apply an exception broadly beyond those situations that are "plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people." *A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945).

*Third*, in the text of the statute itself, Congress concluded that firearms companies should be protected because they are already regulated by an extensive array of *firearms-specific* laws. In particular, Congress noted that firearms sales and manufacturing are already "heavily regulated by Federal, State, and local laws," including "the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act." 15 U.S.C. § 7901(a)(4). After referring to those firearms-specific laws, Congress then stated—in the next sentence—that companies engaged in the "lawful" manufacturing and sale of firearms "are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." *Id*. § 7901(a)(5).

*Fourth*, Congress made the point especially clear by providing three examples in the text of the predicate exception, *all* of which are firearms-specific. As noted above, the examples refer to laws regarding the keeping of firearms-related records; the sale or other disposition of firearms; and knowingly selling or otherwise providing firearms to those prohibited from possessing them. *Id*. § 7903(5)(A)(iii)(I)-(II). In light of these firearms-specific examples, the meaning of the predicate exception is "narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008).

*Finally*, the broad reading of the predicate exception would violate the canon against superfluity. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). For example, if the exception allowed claims based on the violation of any generally applicable statute, then there would be no need for the separate exception for "negligence per se," which occurs when a defendant violates a statute intended for the plaintiff's protection. 15 U.S.C. § 7903(5)(A)(ii).

### b)   Mexico has not plausibly alleged a violation of any firearms-specific statute.

The complaint alleges various theories of liability, but none of them falls within the PLCAA's predicate exception. Most of the claims are based on generally applicable common-law tort theories such as negligence, public nuisance, and unjust enrichment—not firearms-specific statutes. In particular, the complaint alleges simple negligence (Count One), Compl. ¶¶ 507-10, public nuisance (Count Two), *id*. ¶¶ 511-19, strict product liability (Count Three), *id*. ¶¶ 520-22, gross negligence (Count Five), *id*. ¶¶ 527-32, unjust enrichment and restitution (Count Six), *id*. ¶¶ 533-41, and punitive damages (Count Nine), *id*. ¶¶ 557-60. Mexico includes these claims because it believes the PLCAA cannot apply in the first place. But that is incorrect,

17

and there is an overwhelming judicial consensus that these types of general claims do not satisfy the predicate exception.[6]

The only claim in Mexico's complaint that even mentions any potentially relevant statutory violation is the "negligence per se" claim (Count Four), which asserts in vague and conclusory terms that "Defendants violated statutory duties." Compl. ¶ 524. But as explained further below, the PLCAA contains a separate exception for claims of "negligence per se," which is not satisfied here. In any event, while the complaint mentions various firearms-specific statutes, an analysis of each of these assertions shows that the complaint fails to state a plausible claim that defendants violated any of them.

*First*, the complaint asserts that four defendants violated the federal ban on selling fully automatic "machine guns" by selling semi-automatic "AR-15 style weapons" and an "AK-47 style weapon" to the general public. Compl. ¶¶ 307-13. But the federal machinegun ban, 18 U.S.C. § 924(c)(1)(B), applies only to fully automatic weapons—i.e., those that "shoot[], [are] designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," 26 U.S.C. § 5845(b). The complaint admits that the firearms sold by defendants are semi-automatic, not fully automatic, but claims that they are still "machinegun[s]" because they could be made fully automatic through the unlawful "modification or elimination of existing component parts." Compl. ¶ 308. That is wrong as a matter of law. Section 5845(b) unambiguously defines a "machinegun" as a fully automatic firearm that was *originally designed* to fire more than one shot with a single trigger pull, or can be restored to fire fully automatic as it was originally designed to function.  Thus, the Supreme Court has recognized that a commonplace semi-automatic rifle such as the AR-15 is,

---

[6] *See, e.g., Ileto*, 565 F.3d at 1135-37; *City of New York*, 524 F.3d at 403; *Phillips*, 84 F. Supp. 3d at 1223; *Jefferies*, 916 F. Supp. 2d at 46; *Kim*, 295 P.3d at 386; *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 321 (Mo. 2016); *accord Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 311, 325 (Conn. 2019) ("We will assume, without deciding, that . . . the predicate exception cannot be so expansive as to fully encompass laws such as public nuisance statutes insofar as those laws reasonably might be implicated in any civil action arising from gun violence.").

"unless modified, a semiautomatic weapon"—*not* a machinegun. *See Staples v. United States*, 511 U.S. 600, 603 (1994); *accord United States v. Bishop*, 926 F.3d 621, 624-25 (10th Cir. 2019). Accordingly, federal law does not outlaw the sale of standard semi-automatic rifles just because criminals could unlawfully modify them into machineguns.

*Second*, Mexico claims that one defendant (Century Arms) violated federal law by using imported parts to assemble the WASR-10, a semi-automatic rifle that is "not particularly suitable for or readily adaptable to sporting purposes." Compl. ¶¶ 69, 304-05 (quoting 18 U.S.C. § 922(r)). As the complaint acknowledges, however, federal regulations make clear that the ban applies only to firearms that are assembled "using more than 10" imported parts out of a specified list of 20 parts. 27 C.F.R. § 478.39(a). The complaint does not allege that the WASR-10 violates this rule.

*Third*, the complaint vaguely alleges statutory violations committed by *other* licensed firearms dealers, and claims that defendants are somehow "culpable participants" in those remote violations. Compl. ¶ 250. The theory appears to be that the manufacturer defendants violated federal law by making sales to defendant Witmer Public Safety Group ("Witmer"), despite knowing that some (unnamed) dealers, somewhere downstream of Witmer, would violate laws against "straw purchases." *Id*. at ¶¶ 237-50.

This argument fails because federal accomplice liability requires specific intent to facilitate a crime. As Judge Learned Hand put it, the defendant must "associate himself with the [criminal] venture," "participate in it as in something that he wishes to bring about," and "seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938). Thus, a company selling lawful products does not violate federal law just because it knows that some of those products may eventually be put to unlawful use. Indeed, the Supreme Court has distinguished those who "actively participate" in a crime from those (like commercial sellers) who do nothing more than "incidentally facilitate" it. *See Rosemond v. United States*, 572 U.S.

19

65, 77 n.8 (2014). In *Rosemond*, the Court specifically questioned whether there are "any" facts that "would suffice to show" criminal "intent" in the case of a "gun store" that "sells a firearm . . . knowing but not caring" that the buyer will use it in a crime. *Id.* Whatever the answer to that may be, defendants in this case are even further removed from liability: Mexico does not allege that any defendant ever sold a firearm to any buyer that it knew would commit a crime.

*Fourth*, Mexico tries to advance a similar theory, Compl. ¶ 208, based on *Direct Sales Co. v. United States*, 319 U.S. 703 (1943), but that case is entirely inapposite. In *Direct Sales*, the defendant company was convicted of criminal conspiracy for selling morphine to a specific private doctor "in such quantities, so frequently and over so long a period [that] it must have known he could not dispense the amounts received in lawful practice and was therefore distributing the drug illegally." *Id.* at 705. The Court emphasized that the defendant violated federal law only because it had "more than knowledge, acquiescence, carelessness, indifference, [or] lack of concern" about the doctor's unlawful distribution of morphine. *Id.* at 713. Here, by contrast, there is no allegation that defendants sold firearms to any particular buyer in such quantities that the buyer could *only* be reselling them in illegal transactions. After all, Mexico itself alleges that only 2.2% of firearms manufactured and sold in the United States are illegally trafficked in Mexico.  Compl. ¶ 437. And even if defendants were aware that *some* of their firearms might be resold to dealers who might then unwittingly or illegally resell them to straw purchasers, that does not make the *defendants* guilty of conspiracy or aiding and abetting. That is why Budweiser is not liable just because it knows that some of its products will be unlawfully sold to minors or consumed by drunk drivers. This is precisely the type of situation where *Direct Sales* recognized that federal liability is lacking, because even if "the evidence of knowledge [about some future unlawful sales] is clear, yet the further step of finding the required intent cannot be taken." 319 U.S. at 712.

20

*Finally*, Mexico claims that defendants violated (or aided and abetted the violation of) various Mexican statutes. Compl. ¶¶ 55-64. But even putting aside the lack of any factual allegations supporting this claim, the PLCAA's predicate exception does not allow claims based on Mexican statutes, since it allows certain claims based only on "State or Federal statute[s]." 15 U.S.C. § 7903(5)(A). The PLCAA's predicate exception applies only to knowing violations of *U.S.* firearms statutes.

      **c)**      **The predicate exception does not allow claims based on generally applicable consumer-protection statutes.**

With respect to its consumer-protection claims under Chapter 93A and the CUTPA (Counts Seven and Eight), Mexico may seek to rely on *Soto v. Bushmaster Firearms International, LLC*, 202 A.3d 262, 325 (Conn. 2019), in which the Connecticut Supreme Court let stand a claim against gun manufacturers under CUTPA. The court in *Soto* was willing to "assume" that "the predicate exception cannot be so expansive as to fully encompass laws such as public nuisance statutes insofar as those laws reasonably might be implicated in any civil action arising from gun violence." *Id*. at 311-12. But, nevertheless, the court held that the predicate exception was satisfied by a CUTPA "wrongful marketing claim" alleging that "one specific family of firearms sellers advertised one particular line of assault weapons in a uniquely unscrupulous manner, promoting their suitability for illegal, offensive assaults." *Id*. at 312.

*Soto*'s attempt to find a middle-ground reading of the predicate exception is indefensible as a textual matter. As noted above, the phrase "applicable to the sale or marketing of firearms" can be interpreted in only one of two ways: broadly, to refer to any law that is "[c]apable of being applied" to firearms sales or marketing, or narrowly, to cover only those laws that specifically apply to firearms sales or marketing in particular. *Applicable*, BLACK'S LAW DICTIONARY, *supra*. When the phrase is read in context, the narrow meaning is the correct one for the reasons already explained. But if the narrow reading is rejected, there is no logical basis

for limiting the predicate exception to only *some* generally applicable statutes, but not others. If generally applicable consumer protection statutes fit the exception, then so must all other generally applicable statutes—including the public-nuisance statutes and negligence statutes that Congress specifically sought to foreclose. *Ileto*, 565 F.3d at 1137. Accordingly, the only textually permissible way to limit the scope of the predicate exception—and to avoid swallowing the PLCAA's general rule—is to confine the exception to laws that specifically regulate the sale or marketing of firearms in particular.

On this understanding, neither Chapter 93A nor the CUTPA satisfies the predicate exception because both statutes regulate commercial transactions *in general*. Neither contains any provision for firearms in particular.

### d) Mexico cannot satisfy PLCAA's proximate-cause requirement.

Even if Mexico did state a claim based on a statutory violation within the predicate exception, it cannot show that "the [federal or state statutory] violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii).  As explained below, all of Mexico's claims fail due to the overall lack of proximate cause between defendants' alleged conduct and Mexico's alleged injuries.  Even the court in *Soto* concluded that proximate cause would have been lacking there if the plaintiff had been a governmental entity. *See Soto*, 202 A.3d at 291-92.

Beyond that general point, the complaint also fails to show how any specific injury to Mexico was proximately caused *by the violation of a specific statute* recognized by the predicate exception. To make out a winning claim, Mexico cannot merely allege that (1) the defendants violated firearms-specific statutes, and (2) those same defendants, in some manner, proximately caused injury to Mexico. Rather, it must show that its alleged injuries flowed *from* the excepted statutory violations. Congress's chosen language clearly supports this reading. It requires that the

"*violation* [of the statute be] a proximate cause," and not merely that the *violator* of the statute be a proximate cause. 15 U.S.C. § 7903(5)(A)(iii) (emphasis added). And that distinction makes perfect sense. Otherwise, plaintiffs could closely scrutinize firearm manufacturers and distributors for minor statutory violations, and use those violations as Trojan horse to smuggle in a panoply of unrelated (and otherwise barred) general negligence claims. This would entirely defeat the statute's function.

The complaint does not plead the required connection between any alleged statutory violation and any alleged injury. It merely lists statutes that defendants allegedly violated (or aided and abetted in violating), and separately lists various diffuse harms stemming from people using guns in Mexico. Absent are any factual allegations linking any specific statutory violation to any specific injury. For example, the complaint alleges that Smith & Wesson and Colt unlawfully marketed their firearms in violation of Chapter 93A and CUTPA. But the complaint does not even try to offer any plausible theory of how this supposedly unlawful marketing proximately caused any crime in Mexico that injured the Mexican government.

Similarly, the complaint discusses various firearms-export laws, Compl. ¶ 64 (citing 15 C.F.R. § 738.4), regulations on unlicensed sales and straw purchases, *id*. ¶¶ 67-68 (citing 18 U.S.C. §§ 922-924), and regulations on firearm possession by certain individuals, *id*. ¶ 68 (citing 18 U.S.C. § 922(d) & (g)). But it nowhere alleges any facts explaining how any defendant violated these laws in a way that led to any criminal act (or attendant harm) in Mexico. The complaint also cites regulations on semi-automatic firearms, *see id.* (citing 18 U.S.C. § 922(r)) and machineguns, *see id*. ¶ 71 (citing 26 U.S.C. § 5845(b)). But even if defendants somehow violated these provisions, the complaint does not explain any proximate causal connection between those supposed violations and any injury to Mexico.

### 2. The "design defect" exception does not apply.

Mexico also cannot benefit from the design-defect exception. This exception applies only

to claims for injuries

> resulting directly from a defect in design or manufacture of the product,
> when used as intended or in a reasonably foreseeable manner, except that
> where the discharge of the product was caused by a volitional act that
> constituted a criminal offense, then such act shall be considered the sole
> proximate cause of any resulting death, personal injuries or property
> damage[.]

15 U.S.C. § 7903(5)(A)(v). Mexico tries to meet this exception by alleging that defendants

designed their firearms "to be particularly lethal and easily modified into machine guns," Compl.

¶ 336, and further faults defendants for failing to include reasonable security features that would

prevent their firearms from being used by cartels for military-style assaults by cartels, *id.* ¶¶ 353-

66. None of this works.

*First*, all agree that all of Mexico's alleged injuries were "caused by a volitional act that

constituted a criminal offense," 15 U.S.C. § 7903(5)(A)(v)—namely, Mexican criminals

unlawfully shooting people. As a result, defendants cannot be considered the legal "cause" of the

injuries.

*Second*, the PLCAA's design-defect exception applies only in the case of injuries

"resulting *directly* from a defect." 15 U.S.C. § 7903(5)(A)(v) (emphasis added). But as noted

above, Mexico alleges only *indirect*, derivative injuries. Numerous cases have dismissed design-

defect claims under the PLCAA on precisely these grounds.[7]

*Third*, Mexico does not assert a valid design-defect claim because it alleges only the

deliberate misuse of products that function exactly as designed. As the PLCAA makes clear,

---

[7] *See, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009) ("[T]he discharge of the Beretta was caused by a volitional act that constituted a criminal offense . . . . Accordingly, plaintiffs' design defect claims . . . are barred by the PLCAA."); *Ryan v. Hughes-Ortiz*, 959 N.E.2d 1000, 1008-09 (Mass. App. Ct. 2012) (the "unlawful possession of [a] Glock pistol . . . constituted a criminal offense and the design defect exception is therefore not applicable"); *cf. Travieso v. Glock Inc.*, 526 F. Supp. 3d 533 (D. Ariz. 2021) (order) (noting that the design-defect exception is limited and does not allow "claims of information defect or . . . inadequate warning[]").

firearms companies should not be held "liable for the harm caused by those who criminally or unlawfully misuse firearm[s] . . . that function as designed and intended." 15 U.S.C. § 7901(a)(5). More generally, it is well settled that "[t]he deliberate misuse" of a product is a "complete defense to a claim of negligent design." *Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1, 16 (1st Cir. 2001); *see also, e.g.*, *Venezia v. Miller Brewing Co.*, 626 F.2d 188, 191-92 (1st Cir. 1980). In particular, "[a] gun, as an obviously dangerous product, is not defective simply because an injury results from its careless misuse." *Bolduc v. Colt's Mfg. Co.*, 968 F. Supp. 16, 18 (D. Mass. 1997).

On this basis, the Second Circuit has held that a manufacturer of ammunition could not be held liable for a design defect where someone used that ammunition in a mass shooting, because the "very purpose of the Black Talon bullet is to kill or cause severe wounding." *McCarthy v. Olin Corp.*, 119 F.3d 148, 155 (2d Cir. 1997). The bullet "performed precisely as intended by the manufacturer." *Id.*; *see Shipman v. Jennings Firearms, Inc.*, 791 F.2d 1532, 1534 (11th Cir. 1986) (rejecting "theories of strict products liability and negligence" for "a gun manufacturer who produces and distributes weapons that perform as intended and designed").

### 3.     The "negligence per se" exception does not apply.

Mexico also cannot satisfy the PLCAA exception for "negligence per se." 15 U.S.C. § 7903(5)(A)(ii). At the outset, this exception does not apply to the manufacturer defendants, because it covers only those who qualify as "seller[s]." *Id.* (exempting from the definition of qualified civil liability actions only those claims "brought against a *seller* for negligent entrustment or negligence per se" (emphasis added)). As relevant here, a "seller" is a firearms "dealer" (as defined in 18 U.S.C. § 921(a)(11)) who is "licensed to engage in business as such a dealer" under federal law. 15 U.S.C. § 7903(6). This contrasts with "manufacturer[s]," who are "engaged in the business of manufacturing the product in interstate or foreign commerce and who [are] licensed to engage in business as such a manufacturer." *Id.* § 7903(2).

25

In this case, all but one of the defendants are "manufacturers," not "dealers." The complaint does not allege that any manufacturer is a licensed firearms "dealer" as required to be a "seller" under § 7903(6). The only "seller" defendant is Witmer, which the Complaint alleges is engaged in the "gun-wholesaling business." Compl. ¶ 41. Thus no defendant other than Witmer can face a claim for negligence per se under § 7903(5)(A)(ii).

In any event, the Complaint does not satisfy the "negligence per se" exception for other reasons. Negligence per se applies only where a seller "violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the class of persons the statute is designed to protect." RESTATEMENT (THIRD) OF TORTS § 14 (2010). Here, this claim fails because, as noted above, the complaint fails to allege facts plausibly showing that Witmer (or any other defendant) actually violated any particular statute.

Moreover, Mexico does not fall within the "class of persons" that any of the cited statutes were designed to protect. Congress did not enact these federal firearms laws to protect foreign sovereigns, and thus Mexico does on fall within any discrete protected class of individuals. *See Pehle v. Farm Bureau Life Ins. Co*., 397 F.3d 897, 904-05 (10th Cir. 2005) (asking whether "the policy behind the legislative enactment will be appropriately served by using the policy to impose and measure civil damage liability"). Governments do not fall within the "class of persons" that safety statutes protect. *See, e.g.*, *Town of Plainville v. Almost Home Animal Rescue & Shelter, Inc.*, 187 A.3d 1174, 1181 (Conn. App. Ct. 2018) (town cannot bring negligence per se claim against abusive animal shelter for added municipal expense tending to mistreated animals). That this case involves a *foreign* government makes it even easier. The complaint contains nothing more than a conclusory assertion that Mexico "is within the class intended to be protected by the statutes." Compl. ¶ 524. But that is implausible on its face, and, in any event, fails to allege any facts sufficient to satisfy federal pleading standards. *See Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). It therefore fails as a matter of law.

D.       **The PLCAA applies to claims by foreign governments.**

By its terms, the PLCAA bars *any* suit in U.S. courts seeking "damages . . . resulting from the criminal or unlawful misuse of" firearms by "third part[ies]." 15 U.S.C. §§ 7902, 7903(5)(A). The statute says nothing to authorize suits by foreign plaintiffs in U.S. courts alleging injuries inflicted by foreign criminals. To the contrary, the law repeatedly states that its protections apply to firearms companies "in the United States" that are "engaged in interstate *and foreign* commerce." *Id.* §§ 7901(a)(5), (6), (8), (b)(4), 7903(2), (4), (6) (emphasis added). It thus expressly contemplates that companies operating in the United States will be protected against suits alleging harms resulting from their firearms that have been distributed abroad, not just domestically. In addition, the statute focuses on preventing abuse of the American court system, barring suits from being "brought in any Federal or State court." *Id.* § 7902(a). Thus, because this suit arises in a U.S. court against U.S. firearms companies based on their conduct in the U.S., the PLCAA clearly applies.

The Supreme Court has adopted "a two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2101 (2016). "At the first step," courts must ask "whether the statute gives a clear, affirmative indication that it applies" to whatever foreign aspect of the suit is at issue. *Id.* If there is no such clear indication, then the court must examine whether the conduct that is the "focus" of the statute occurred domestically. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *Id.* Here, both steps of this inquiry confirm the PLCAA applies to this case.

### 1.  Congress wrote the PLCAA to cover foreign claims.

Congress made clear that firearms companies operating in the United States should be shielded from lawsuits arising from harms caused by firearms shipped overseas. The statute provides:

> Businesses in the United States that are engaged in interstate *and foreign* commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate *or foreign* commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

15 U.S.C. § 7901(a)(5) (emphasis added). Thus, Congress expressly contemplated that companies operating in the United States should not be held liable for the misuse of their firearms "shipped or transported in . . . *foreign* commerce." *Id*. (emphasis added). This is exactly the type of "clear, affirmative indication" of congressional intent that dispels any doubt about the law's applicability. *RJR Nabisco*, 136 S. Ct. at 2101.

Other aspects of the statutory text confirm the same point. The statute notes that U.S. manufacturers must comply with, among other things, the "Arms Export Control Act," thus contemplating that the law should apply to firearms exported abroad. 15 U.S.C. § 7901(a)(4). The PLCAA also notes that imposing liability on firearms companies could undermine both "interstate and foreign commerce." *Id.* § 7901(a)(5). Similarly, the statute's explicit purposes include avoiding "unreasonable burdens on interstate and foreign commerce." *Id.* § 7901(b)(4). And the definitions of covered "manufacturer[s]," "seller[s]," and "qualified product[s]" likewise all contain references to "foreign commerce." *Id.* § 7903(2), (4), (6).

In addition to all of these explicit references to exports and foreign commerce, the possibility of foreign plaintiffs bringing lawsuits fully implicates Congress's stated concern about tort suits imposing undue burdens on "[b]usinesses in the United States" engaged in the

28

sale and manufacture of firearms. If anything, suits brought against U.S. companies by foreign plaintiffs pose an even *greater* threat than usual because they could potentially expose U.S. companies to the hostile tort law of foreign nations. Allowing such foreign suits would thus blow a gaping hole in the protection that the PLCAA was designed to provide, contradicting both the clear text and purpose of the law.

### 2.   This case involves a domestic application of the PLCAA.

In any event, this case simply does not involve "extraterritorial" application of the PLCAA in the first place, but rather domestic application to a suit in a U.S. court, against U.S. companies, based on their conduct in the U.S. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco*, 136 S. Ct. at 2101. The PLCAA is focused on prohibiting covered lawsuits from being filed in U.S. courts, which Congress determined is "an abuse of the legal system." 15 U.S.C. § 7901(a)(6). The operative provision says that "[a] qualified civil liability action may not be brought in any Federal or State court." *Id*. § 7902. Accordingly, the focus of the statute is preventing this type of lawsuit from being "brought" in a "Federal or State court." Applying the PLCAA to any such lawsuit in a U.S. state or federal court is thus a *domestic* application of the statute, "even if other conduct" relevant to the lawsuit "occurred abroad." *RJR Nabisco*, 136 S. Ct. at 2101.

The point is especially clear because this case not only arises in the U.S. court system, but also targets companies for sales and manufacturing activities *in the United States*. Congress enacted the PLCAA to protect the "interstate and foreign commerce of the United States," and to avoid "imposing liability on [the] entire industry" of firearms sellers and manufacturers in America. 15 U.S.C. § 7901(a)(6). Thus, because this case asks whether the U.S. firearms "industry" should be held liable for their domestic commercial activity, that is yet another reason

why this is a domestic application of the statute that does not raise any concerns about extraterritoriality.

Mexico appears to hang its hopes on the argument that PLCAA applies "only when the [plaintiff's] injury occurred in the U.S. and the criminal's misuse of the gun was unlawful under U.S. domestic law." Compl. ¶ 23. Counsel for Mexico has also publicly argued elsewhere that the PLCAA could not possibly apply in this case because it would require the Court to determine what constitutes "criminal" misuse under Mexican law. But these arguments have no basis in the text of the statute or common sense. First, as noted above, the statute's clear focus is on barring U.S. courts from being used to file suit against U.S. companies for their lawful conduct in the U.S., regardless of where the plaintiff's injury occurred. Second, as to forcing a U.S. court to interpret Mexican criminal laws, there is no need for anything of the kind: The rationale for Mexico's suit is that drug traffickers in Mexico are unlawfully using defendants' products in that country to commit murder. That is clearly criminal misuse under Mexican law, which is not disputed by the parties. Moreover, determining whether the PLCAA predicate exception applies turns on whether defendants violated any specified "State or Federal" statute, which makes Mexican law irrelevant. 15 U.S.C. § 7903(5)(A).

*         *         *

In short, because the PLCAA squarely applies here and Mexico's claims do not fit within any exception, this case must be dismissed at the threshold. Defendants should not be subject to the burdens of litigation or discovery based on these claims, since those are exactly the burdens that Congress was trying to preclude when it enacted the PLCAA. *See* H.R. REP. NO. 109-124, at 12 (2005) (explaining that the firearms industry should not be subject to "the cost of defending itself against these suits."); *In re Acad., Ltd*., 625 S.W.3d at 32-36 (surveying cases recognizing that Congress meant the PLCAA to grant "immunity to firearms manufacturers and dealers from any lawsuit, pending or otherwise, fitting the Act's definition.").

30

III.    **Mexico Fails to Allege Facts Showing that Defendants' Business Practices Are the "Proximate Cause" of the Injuries Inflicted by Mexican Drug Cartels.**

Even if federal law did not bar Mexico's claims, they would fail on their own terms for lack of proximate cause, which imposes an even tighter causation requirement than Article III standing. In particular, the doctrine of proximate cause guards against "open-ended liability for [the] remote effects" of a defendant's conduct, *Davis v. United States*, 670 F.3d 48, 56 (1st Cir. 2012), and so require a "*direct* relation between the injury asserted and the injurious conduct alleged," *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (emphasis added). When a claim "fails plausibly to allege a causal chain sufficient to ground an entitlement to relief, that claim is susceptible to dismissal under Rule 12(b)(6)" for lack of proximate cause. *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 24 (1st Cir. 2016). Here, the complaint concedes that all of the claims require a showing of proximate cause. *See* Compl. ¶¶ 509, 519, 522, 524, 532, 541, 548, 556, 559. But the facts alleged do not satisfy that requirement.

There is no question that every manufacturer of dangerous products knows that end users may use those products unlawfully to harm others. But as the Supreme Court has held in many different contexts, "foreseeability alone does not ensure the close connection that proximate cause requires." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010); *see also Davis*, 670 F.3d at 56 (applying Massachusetts law). This is especially true when the relevant harm results from intervening criminal acts, because the "mere fact that misconduct on the part of another might be foreseen" does not "place the responsibility upon the defendant." PROSSER & KEETON ON THE LAW OF TORTS 305 (5th ed. 1984). After all, car companies know their cars will be used for reckless driving, knife companies know their knives will be used to hurt others, and beer companies know that minors drink, but none of this knowledge makes those companies liable for resulting harms.

31

Here, proximate cause is lacking for several reasons. First, the alleged causal chain is extraordinarily attenuated, consisting of multiple links that make the alleged injuries extremely remote from any of defendants' actions. Second, the links in the chain, by definition, involve intervening criminal acts by *multiple* third parties, creating several layers of superseding causation that breaks the chain of liability. Third, Mexico's alleged injuries are wholly derivative of third-party victims. And fourth, given the remote and diffuse harms alleged, apportioning damages and liability here would be impossible.

### A.     The chain of causation is too attenuated.

The more remote the link between defendant's conduct and the plaintiff's injury, the weaker the case for proximate cause. "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi*, 559 U.S. at 9; *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 39 (1st Cir. 2013) (enough "attenuation" can "eliminate proximate cause"). Accordingly, courts often consider the "sheer number of links" in the causal chain. *Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 930 (3d Cir. 1999).

Here, Mexico cannot establish proximate cause due to the "sheer number" of steps in its theory of causation. *Id*. For the Mexican government to suffer harm:

1. Defendants had to sell firearms to independent federally licensed wholesale distributors.

2. Those distributors had to sell firearms to the separate independent federally licensed retail dealers.

3. Those federally licensed retail dealers had to sell firearms to non-licensed straw buyers with illegal intentions.

4. Those buyers had to illegally sell those firearms to smugglers or themselves smuggle the firearms across the Mexican border (usually through a string of intermediaries).

5. Cartel members had to buy the firearms.

6. Cartel members had to use the firearms in violent attacks.

7.   Those attacks had to injure people and property.

8.   Mexico then had to sustain some derivative financial injury.

To put it mildly, this causal chain is simply too "long and torturous" to sustain liability. *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 423 (3d Cir. 2002). The "causal theory" here "is far more attenuated" than others that courts have "rejected" elsewhere. *See Hemi*, 559 U.S. at 9.

### B.   Intervening intentional criminal acts break the chain of causation.

In addition to causal attenuation, intervening *volitional* acts are a "superseding cause" that typically precludes any finding of proximate cause. In general, there can be no liability if "the injury was actually brought about by a later cause of independent origin." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996). For example, "[t]he food industry puts refined sugar in many products, making them more tasty; as a result some people eat too much (or eat the wrong things) and suffer health problems and early death. No one supposes, however, that . . . chocoholics can[] recover in tort from Godiva Chocolatier." *Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 823 (7th Cir. 1999). The consumer's intervening, intentional decision to overindulge breaks the chain of causation.

Even more clearly, the "intervening criminal act of a third party" is a textbook superseding cause. *Copithorne v. Framingham Union Hosp.*, 520 N.E.2d 139, 141 (Mass. 1988). Normally, an "actor may reasonably proceed upon the assumption that others will obey the criminal law." PROSSER & KEETON, *supra*, at 201. That is why car companies are not held liable for reckless driving or beer companies for underage drinking. The only rare exception is when a defendant itself *directly* exposes a plaintiff to the risk of immediate criminal danger. *See, e.g.*, *Gidwani v. Wasserman*, 365 N.E.2d 827, 831 (Mass. 1977) (landlord disabling burglar alarms).

33

By contrast, more remote third-party crimes caused by independent intervening criminal acts of *multiple* different parties plainly break the chain of liability.[8]

These rules shield firearms companies from liability when they manufacture and sell firearms to federally licensed dealers, even if the firearms eventually find themselves in the hands of *other* third parties who commit crimes. Simply put, the act of manufacturing and selling firearms in a "highly regulated" environment is too "far removed from the downstream, unlawful use of handguns" by criminals, acts that are entirely "out of [the companies'] control." *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 194 (N.Y. App. Div. 2003). As a result, firearms companies "may not be considered a proximate cause of" any "harm to person and property caused directly and principally by the criminal activity of [the] intervening third parties." *Id*. at 201; *see City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1136-37 (Ill. 2004) (no proximate cause because violence committed by third parties was "several times removed from the initial sale of individual weapons"); *Camden Cnty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 264 (D.N.J. 2000) (same).

In this case, the lack of proximate cause is even more clear than in the numerous prior cases rejecting claims against the firearms industry on that ground. Unlike cases in which firearms made by U.S. companies are misused domestically against U.S. citizens, here causation depends on a materially longer chain of unlawful acts requiring (a) straw purchasers unlawfully buying firearms; (b) someone unlawfully smuggling the firearms into Mexico; (c) someone in Mexico unlawfully acquiring those firearms; (d) someone in Mexico unlawfully using the firearms; and then (e) Mexico suffering a financial injury as a result of a particular firearm incident. No case has *ever* found proximate cause on facts like these.

---

[8] *See, e.g.*, *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 393 (7th Cir. 2018) (emphasizing the "numerous criminal intervening acts"); *Breeden v. Novartis Pharms. Corp.*, 646 F.3d 43, 49 (D.C. Cir. 2011) (finding "too many intervening causes"); *Akins v. District of Columbia*, 526 A.2d 933, 935 (D.C. 1987) (multiple "combined" intervening acts); *McGhee v. Hybrid Logistics, Inc.*, No. 12-10771, 2014 WL 11281402, at *7 (E.D. Mich. Apr. 4, 2014), *aff'd*, 599 F. App'x 259 (6th Cir. 2015) ("multiple super[s]eding causes . . . break any causal chain").

### C.     The Mexican government's alleged harms are derivative of other victims.

The proximate cause requirement generally precludes liability "beyond the first step" of injury. *Holmes*, 503 U.S. at 271. That is, a plaintiff cannot sue for injuries that are derivative of "misfortunes visited upon a third person," because it is the "third person"—the direct victim— who is the proper plaintiff. *Id.* at 268. For example, when a ship slips its mooring and breaks a bridge, the bridge's owners can sue—but not the shipping companies that suffer indirect harm due to the blocked waterway. *See Kinsman Transit Co. v. City of Buffalo*, 388 F.2d 821, 824-25 & n.8 (2d Cir. 1968); *see also Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 36 (1st Cir. 2021) (harm too derivative where a defendant company's wrongful conduct deprived a second company of a business license, costing plaintiff—a third company—the opportunity to contract with the second company).

Multiple courts have applied this principle to bar foreign sovereigns from suing for financial harms derivative of injury to their citizens. *See, e.g.*, *SEIU Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001) ("the alleged harm arising from payment of medical expenses by the . . . [foreign] nations is itself derivative of alleged injuries to individual smokers").[9] This includes gun manufacturers: courts have repeatedly applied this principle to bar suits against firearm manufacturers for derivative harms allegedly suffered by domestic government plaintiffs, including, for example, Philadelphia, Chicago, New York, and Miami-Dade County in Florida.[10] The same should certainly hold true for Mexico.

Particularly instructive on this point is *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98 (Conn. 2001). In *Ganim*, a city sued firearm manufacturers and sellers for negligently making

---

[9] *See, e.g.*, *State of São Paulo of Federative Republic of Braz. v. Am. Tobacco Co.*, 919 A.2d 1116, 1126 (Del. 2007) (finding lack of proximate cause, and adding that tobacco companies have "no legal duty to those Foreign Governments"); *Republic of Venez. ex rel. Garrido v. Philip Morris Cos.*, 827 So. 2d 339, 341 (Fla. Dist. Ct. App. 2002).

[10] *See, e.g.*, *City of Philadelphia*, 277 F.3d at 424; *City of Chicago*, 821 N.E.2d at 1136; *Spitzer*, 761 N.Y.S.2d at 201; *Penelas v. Arms Tech., Inc.*, 778 So. 2d 1042, 1045 (Fla. Dist. Ct. App. 2001).

and selling firearms, leading to violence that caused "injuries suffered by the residents of [the city], its police force, emergency services, health and human services, courts, prisons and other agencies and services." *Id*. at 115. The court acknowledged that all of these injuries undoubtedly resulted in "substantial costs" to the city government. *Id*. at 113. It nonetheless dismissed the complaint, because the city's alleged harms were "too derivative of the injuries of others." *Id.* at 129-30. Such injuries, "that are wholly derivative of harm to a third party . . .  are generally deemed indirect and as a consequence too remote, as a matter of law." *Id*. at 122. The Connecticut Supreme Court recently reaffirmed the same point in *Soto v. Bushmaster Firearms International, LLC*, 202 A.3d 262 (Conn. 2019), where it allowed a claim to proceed only because the plaintiffs were *not* governmental entities but rather "*direct victims* of gun violence," and "no private party [was] better situated than [them] to bring the action," *id.* at 291 (emphasis added) (distinguishing *Ganim* on this ground).

Mexico cannot satisfy proximate cause because—as it admits—all of its alleged injuries are derivative of direct victims of gun violence. In *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 336 (1st Cir. 2000), the First Circuit held that the Mexican government does not have *parens patriae* standing to sue based on "its interest in the general health and well-being of" its citizens. *Id*. at 336. Although Mexico could "raise [such concerns] with the United States through diplomatic channels," the courts "are not the appropriate forum for the litigation of Mexico's quasi-sovereign interests" in protecting its citizenry. *Id*. at 342-43.

Mexico concedes that it cannot invoke *parens patriae*. Compl. ¶ 30. Instead, it tries to achieve the same end by relying on its own asserted *fiscal* injuries, alleging that it has to "spend vast funds on a wide range of services to fight the effects of" cartel violence. *Id.* ¶ 447. These costs include "providing healthcare and medical care," "training for military and police," "diminished property values" resulting from violence, and "providing care for children whose

parents were victims" of the cartels. *Id.* ¶ 448. But all of these harms are derivative of *other* cartel victims, which means that Mexico is not the proper plaintiff.

It makes no difference that Mexico alleges "[c]osts associated with the deaths of and substantial injuries to police and military personnel" and "armed attacks on employees of state-owned enterprises and compensation paid to such victims." *Id.* ¶ 448(d), (*l*). In *Ganim*, for example, the injury was too remote despite the city's allegation that it had suffered injury to "its police force." 780 A.2d at 115. The City of Philadelphia faced the same result when it tried to assert claims derivative of city employees who had been shot. *See City of Philadelphia v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 896 (E.D. Pa. 2000), *aff'd*, 277 F.3d 415. And in *United States v. Standard Oil Co. of California*, 332 U.S. 301 (1947), the Supreme Court made clear that the government is not a proper plaintiff to recover for tortious injuries to its employees, even though the government "constantly sustains losses through the tortious or even criminal conduct of persons." *Id*. at 315. It distinguished the government-employee relationship, in which the government has only a fiscal interest, from those rare and "highly personal" relationships giving rise to third-party claims (such as the husband-wife and parent-child relationships). *Id.* at 313. And it noted that government employees have every incentive and ability to sue on their own behalf "without reference to any indemnity for the Government's loss." *Id.* at 310.

> **D.    Apportioning damages and liability would be unworkable.**

Finally, as the First Circuit has held, the court should consider two practical factors bearing on proximate cause. First, the court should assess whether it would be feasible to "ascertain the amount of . . . damages attributable to" each defendant, "as distinct from other, independent, factors." *Sterling Suffolk Racecourse*, 990 F.3d at 36 (citing *Holmes*, 503 U.S. at 269-70). And second, the court should consider the "administrability" of apportioning damages among different victims, to ensure "the avoidance of multiple recoveries." *Id*.

Here both of these factors foreclose any finding of proximate cause. On the face of the complaint, it would be unworkable to (a) attribute fault among the parade of alleged wrongdoers, and (b) avoid multiple recoveries among all the victims in Mexico who are potential plaintiffs.

As to the first issue, how could a particular amount of fault be attributed to the individual defendants as distinct from the cartels, gun smugglers, straw purchasers, allegedly crooked dealers, corrupt Mexican government officials, and all the other criminals who are more directly responsible for gun crimes in Mexico? *See, e.g.*, *City of Philadelphia*, 277 F.3d at 426 (noting difficulty in "apportioning liability among, at minimum, the various gun manufacturers, the distributors, the dealers, the re-sellers, and the shooter"). Other factors come into play too. *Ganim* concluded that the court would have to "blink at reality" to surmount the "enormous difficulty" of separating defendants' conduct from "other, independent factors" leading to gun violence, like "the "scourge of illegal drugs, poverty, illiteracy, inadequacies in the public educational system, the birth rates of unmarried teenagers, [and] the disintegration of family relationships." 780 A.2d at 124.

As to the second issue, this case would also require "complicated rules apportioning damages" between Mexico's alleged derivative harms and numerous direct victims in Mexico. *See Holmes*, 503 U.S. at 269. Municipal suits against the firearm industry present especially "complex apportionment" problems. *See City of Philadelphia*, 126 F. Supp. 2d at 906. There is, of course, the inherent risk of "double recover[y]" when a sovereign collects on behalf of its citizens. *Ganim*, 780 A.2d at 126. But there is also the reality that, in suits by direct victims, "defendants would be entitled to assert various special defenses, based on those plaintiffs' conduct, which would not be available to the defendants" in suits brought by the government. *Id*. Mexico does not explain how this problem could be surmounted.

**IV.    Firearms Companies Have No Legal Duty to Protect the Mexican Government from Mexican Criminals Who Misuse Firearms in Mexico.**

Aside from proximate cause, the complaint must be dismissed for the related reason that defendants do not owe any legal duty to protect Mexico from gun violence committed by criminals within its own borders.  Duty encompasses the "sum total" of "considerations of policy which lead the law to say that the plaintiff is entitled to protection." PROSSER & KEETON, *supra*, at 358-59; *see Luoni v. Berube*, 729 N.E.2d 1108, 1113 (Mass. 2000). Courts determine whether a duty exists by looking to "social values and customs" as well as "appropriate social policy." *Yakubowicz v. Paramount Pictures Corp.*, 536 N.E.2d 1067, 1070 (Mass. 1989). When "the social costs associated with liability are too high to justify its imposition, no duty will be found." *Lodge v. Arett Sales Corp.*, 717 A.2d 215, 226 (Conn. 1998).

Suits like this one, brought by remotely-injured parties against manufacturers, present an especially acute "danger that juries may overlook the nearer causes [of a plaintiff's injury] and wrongly attribute the injury to some antecedent neglect of the manufacturer." *Carney v. Bereault*, 204 N.E.2d 448, 452 (Mass. 1965). For this reason, courts have routinely rejected claims brought by foreign governments, similar to those here, seeking to hold U.S. tobacco companies liable for harms stemming from their citizens' use of tobacco.  Even when companies directly "sell[] their products to citizens of the Foreign Governments who later become injured," the companies "incur[] no legal duty to those Foreign Governments." *State of São Paulo*, 919 A.2d at 1126. Allowing those governments to sue would present "complex and intricate" concerns affecting the "national economy"—concerns "better addressed by the legislature(s), not by courts applying common law principles." *Id.*[11]

Here, it is clear that defendants did not owe any legal duty to Mexico because they are alleged to have done nothing more than legally sell their firearms into the stream of U.S.

---

[11] *See SEIU*, 249 F.3d at 1074; *Republic of Venez.*, 827 So. 2d at 341.

domestic commerce. Unlike the tobacco companies in the cases cited above, defendants did not even make direct sales to consumers in the foreign country whose government is seeking to sue them. And the fact that the plaintiff here is a foreign sovereign, not a direct victim of gun violence in the United States, makes the lack of duty here especially clear.

On the policy side, defendants here have an even stronger argument than tobacco manufacturers, because subjecting the firearm industry to sweeping liability from foreign sovereigns would implicate serious Second Amendment questions. The Second Amendment expressly protects the right to keep and bear arms, which necessarily presupposes the right to produce and sell them to U.S. civilians. *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) ("regulations on the sale of firearms do not fall outside the scope of the Second Amendment"); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (same).

The history of firearms law in the United States is a history of legislation and regulation continually calibrated to protect Americans' constitutional rights while also protecting people from a potentially dangerous product; the Court should not allow that incremental evolution to be upended by a lawsuit filed by a foreign power. Because "[s]tate power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute," *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 n.17 (1996), considerations of "appropriate social policy," *Yakubowicz*, 536 N.E.2d at 1070, counsel against finding a legal duty on facts like these.

## V.   Manufacturing and Selling Firearms Is Not a "Public Nuisance."

Even if the PLCAA somehow did not bar public-nuisance claims, Mexico fails to state a claim for public nuisance. Compl. ¶ 518. The overwhelming weight of authority holds that selling and manufacturing lawful products cannot give rise to a public-nuisance claim, and this case provides no reason to depart from that consensus.

Although various plaintiffs have tried to file public-nuisance claims "against the makers of products that have caused harm, such as tobacco, firearms, and lead paint," those claims have

been squarely "rejected by most courts . . . because the common law of public nuisance is an inapt vehicle." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 cmt. G (2020). The most recent example comes from the Supreme Court of Oklahoma, which canvassed the common law and held that the "public nuisance" doctrine does not apply to "the manufacturing, marketing, and selling of lawful products." *State ex rel. Hunter v. Johnson & Johnson*, No. 118474, 2021 WL 5191372, at *5 (Okla. Nov. 9, 2021) (rejecting claim against prescription opioid manufacturer). That conclusion is firmly grounded in the common law, which limits public nuisance actions to violations of "public rights," which must be "more than an aggregate of private rights by a large number of injured people." *Id*. at *6. As a result, plaintiffs (including governmental entities) cannot bring a public nuisance claim based on "individual injuries sustained from use of a lawful product." *Id*.

Courts have repeatedly applied this principle to the sale and manufacturing of firearms. For example, in *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1116 (Ill. 2004), the Illinois Supreme Court rejected a public-nuisance claim against firearms manufacturers, holding that there is no "public right to be free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality) in a manner that may create a risk of harm to another." *Id*. at 1116. If the rule were otherwise, then "nuisance liability [could] be imposed on an endless list of manufacturers, distributors, and retailers of manufactured products." *Id*. After all, distributing a wide range of products "could be said to contribute to an interference with the public right" to be "free from the threat that others may use a lawful product to break the law." *Id*. But the public-nuisance doctrine cannot rationally extend so far.[12]

---

[12] *See also, e.g.*, *City of Philadelphia*, 277 F.3d at 420-22 ("[T]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented nationwide for an appellate court."); *Camden Cnty. Bd. of Chosen Freeholders*, 273 F.3d at 541 (same); *Sturm, Ruger & Co.*, 761 N.Y.S.2d at 196 (refusing to give "a green light to a common-law public nuisance cause of action" against firearms manufacturers, which would sweep in "a

If there were any doubt, the First Circuit has instructed that federal courts sitting in diversity should not adopt novel theories that would "expand[] state law," as they are "charged with ascertaining state law, not with reshaping it." *Katz*, 672 F.3d at 73-74 (quoting *Gill v. Gulfstream Park Racing Ass'n*, 399 F.3d 391, 402 (1st Cir. 2005)). Twenty years ago, a Massachusetts state trial court allowed a public-nuisance claim against multiple firearm manufacturers. *See City of Boston v. Smith & Wesson Corp.*, No. 199902590, 2000 WL 1473568, at *14 (Mass. Super. Ct. July 13, 2000). But this decision is clearly wrong, an outlier that illustrates the point:  Five years later the Massachusetts Supreme Judicial Court, joining the other courts noted above, refused to "appl[y] a public nuisance theory to the ownership, possession, or storage of a firearm," holding that doctrine inapplicable where the alleged injury results from the "use of . . . gun[s] by a third party." *Jupin v. Kask*, 849 N.E.2d 829, 843-44 (Mass. 2006).

## VI.    <u>Mexico Cannot Use Mexican Law to Regulate U.S. Firearms Companies.</u>

Perhaps sensing that its claims are not viable under U.S. law, Mexico also invokes Mexican tort law to impose liability on defendants. *See* Compl. ¶¶ 60-62. But even assuming Mexican law would allow for such liability (and that the PLCAA would not bar it), this claim fails for a different reason: Under basic principles of international comity, a foreign sovereign cannot use foreign law to regulate the operations of U.S. companies within the United States. That is particularly true when the foreign government is trying to use its law to impose a gun-control policy directly at odds with U.S. law.

It is fundamental that the laws of each nation must be construed to "avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004). U.S. courts thus refuse to apply foreign law when it is "contrary to [the forum state's] policy, or prejudicial to its interests." *Bank of Augusta v. Earle*,

---

wide and varied array of other commercial and manufacturing enterprises and activities"); *Penelas*, 778 So. 2d at 1044-45 (rejecting public-nuisance claim as "an attempt to regulate firearms and ammunition through the medium of the judiciary").

38 U.S. 519, 589 (1839). Because foreign law can be "injurious to [a state's] citizens," any "form of the action" under foreign law must be "conformable to [that state's] laws." *Pearsall* v. *Dwight*, 2 Mass. 84, 90 (1806). In this way, principles of comity determine "how far one country will afford redress for . . . the commission of torts."  Story, COMMENTARIES ON THE CONFLICT OF LAWS § 38a (6th ed. 1865).[13]

Comity precludes a government from "impos[ing] economic sanctions on violators of its laws with the intent of changing [their] lawful conduct" in other jurisdictions, and from punishing defendants for "conduct that was lawful where it occurred." *BMW of N. Am.*, 517 U.S. at 572-73. For this reason, U.S. courts refuse to apply U.S. law to hold foreign companies liable for conduct that was lawful in the country where it occurred, to avoid creating conflicts with foreign law. *See In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 140 (2d Cir. 2021). Comity requires extending U.S. companies the same protection. *Hilton v. Guyot*, 159 U.S. 113, 211 (1895) (applying principles of reciprocity in determining whether to give effect to foreign law).

Mexico invokes various theories of liability. But a "fair and serious reading of the[] complaint," considering the "breadth and gravity of the allegations," *Ganim v.*, 780 A.2d at 127, suggests a simple motive: The Mexican government wants firearms, all firearms, out of Mexico. Compl. ¶ 4. Taking the necessary steps—improving border security, rooting out corruption, and adequately funding police and military, for starters—would require time, resources and the political will to take responsibility for a massive social problem. So Mexico has opted to dry up the "iron river of [firearms]" at its source by trying to expose  U.S. firearm manufacturers to unbounded liability through its own foreign tort law, above and beyond what U.S. law would allow. *Id.* ¶ 166.

---

[13] *See, e.g.*, *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237-41 (11th Cir. 2004) (dismissing U.S. citizens' claims against foreign banks for thefts perpetrated by foreign government); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 490 (D.N.J. 1999) (dismissing foreign nationals' forced-labor claims against U.S. corporation); *Telnikoff v. Matusevitch*, 702 A.2d 230, 239 (Md. 1997) (declining to enforce foreign libel judgment contrary to First Amendment).

Worse, allowing foreign law to apply in this case would invite *other* nations to likewise invoke their own laws to attack the U.S. firearms industry. The Court need not facilitate that endeavor. The scope of liability the complaint suggests well exceeds what any U.S. court would permit at common law, even under strict product liability. And such a pervasive assault on the firearm industry would imperil civilian access to firearms—a right guaranteed by both the U.S. and Massachusetts constitutions.

## **CONCLUSION**

For the foregoing reasons, all of Mexico's claims should be dismissed with prejudice.

Dated: November 22, 2021

Respectfully submitted,

Defendant,
Smith & Wesson Brands, Inc.,
By its attorneys,

_____/s/ Andrew E. Lelling_____
Andrew E. Lelling (BBO No. 631859)
alelling@jonesday.com
100 High Street
JONES DAY
Boston, MA  02110-1781
Phone: (617) 449-6856
Fax: (617) 449-6999

and

Noel J. Francisco (admitted PHV)
njfrancisco@jonesday.com
Anthony J. Dick (admitted PHV)
ajdick@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700

Defendant,
Glock, Inc.,
By its attorneys,

_____/s/ Peter M. Durney_____
Peter M. Durney (BBO No. 139260)
pdurney@cornellgollub.com
Patricia A. Hartnett (BBO No. 568206)
phartnett@cornellgollub.com
CORNELL & GOLLUB
88 Broad Street, Sixth Floor
Boston, MA 02110
Phone: (617) 482-8100
Fax: (617) 482-3917

and

John F. Renzulli (admitted PHV)
Christopher Renzulli (admitted PHV)
Jeffrey Malsch (admitted PHV)
RENZULLI LAW FIRM LLP
One North Broadway, Suite 1005
White Plains, NY 10601
Phone: (914) 285-0700
Fax: (914) 285-1213

Defendant,
Barrett Firearms Manufacturing, Inc.,
By its attorneys,

_____/s/ James W. Porter_____
James W. Porter  (admitted PHV)
jwporterii@pphlaw.net
Warren Kinney (admitted PHV)
wkinney@pphlaw.net
PORTER PORTER & HASSINGER, P.C.
880 Montclair Road
Suite 175
Birmingham, Alabama 35213
Phone: (205) 322-1744

and

James M. Campbell (BBO No. 541882)
jmcampbell@Campbell-trial-lawyers.com
Trevor J. Keenan (BBO No. 652508)
keenan@Campbell-trial-lawyers.com
CAMPBELL CONROY & O'NEIL, P.C.
1 Constitution Wharf, Suite 310
Boston, MA 02129

Defendant,
Beretta U.S.A. Corp.,
By its attorneys,

_____/s/ John McDonald_____
John K. McDonald (PHV motion forthcoming)
JMcDonald@cozen.com
Michael de Leeuw (PHV motion forthcoming)
MdeLeeuw@cozen.com
Michael Savino (BBO No. 568826)
MSavino@cozen.com
COZEN O'CONNOR
1650 Market Street
Suite 2800
Philadelphia, PA 19103
Phone: (215) 864-8046

Defendant,
Sturm, Ruger & Co., Inc.,
By its attorneys,


_____*/s/ Jonathan Handler*_____
Jonathan I. Handler (BBO No. 561475)
jihandler@daypitney.com
Keith H. Bensten (BBO No. 568780)
kbensten@daypitney.com
DAY PITNEY LLP
One Federal Street, 29th Floor
Boston, MA 02110
Phone: (617) 345-4600
Fax: (617) 345-4745


and

James Vogts (admitted PHV)
jvogts@smbtrials.com
SWANSON, MARTIN & BELL LLP
330 N. Wabash Suite 3300
Chicago, IL 60611
Phone: (312) 222-8517
Cell: (630) 258-3987

Defendant,
Colt's Manufacturing Company LLC,
By its attorneys,


_____*/s/ Mike Rice*_____
Mike Rice (admitted PHV)
mikerice@hlawllc.com
Harrison Law LLC
141 West Jackson Boulevard
Suite 2055
Chicago, IL 60604
Phone: (312) 638-8776


and

John G. O'Neill (BBO No. 630272)
oneill@sugarmanrogers.com
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
Phone: (617) 227-3030

Defendant,
Witmer Public Safety Group, Inc.,
By its attorneys,

_____/s/ S. Jan Hueber_____
S. Jan Hueber (admitted PHV)
hueber@litchfieldcavo.com
LITCHFIELD CAVO LLP
100 Throckmorton St., Ste. 500
Fort Worth, Texas 76102
Phone: (817) 945-8025

and

Nora R. Adukonis (BBO No. 675932)
adukonis@litchfieldcavo.com
LITCHFIELD CAVO LLP
6 Kimball Lane, Suite 200
Lynnfield, MA  01940-2682
Phone: (781) 309-1500

Defendant,
Century International Arms, Inc.,
By its attorneys,

_____/s/ Joseph Yannetti_____
Joseph G. Yannetti (BBO No. 669008)
jyannetti@morrisonmahoney.com
MORRISON MAHONEY LLP
250 Summer Street, Boston, MA 02210
Phone: (617) 439-7585

and

Anthony Pisciotti (admitted PHV))
apisciotti@pisciotti.com
Danny Lallis (admitted PHV)
dlallis@pisciotti.com
Ryan Erdreich (admitted PHV)
rerdreich@pisciotti.com
PISCIOTTI LALLIS ERDREICH
30 Columbia Turnpike, Suite 205
Florham Park, NJ 07932
Phone: (973) 245-8100

### CERTIFICATE OF SERVICE

I hereby certify that, on November 22, 2021, the foregoing document was served upon all counsel of record through this Court's electronic filing system as identified in the Notice of Electronic Filing, and paper copies will be sent to those indicated as nonregistered participants.

> */s/ Andrew E. Lelling*
> Andrew E. Lelling (BBO No. 631859)
> alelling@jonesday.com
> 100 High Street
> JONES DAY
> Boston, MA  02110-1781
> Phone: (617) 449-6856
> Fax: (617) 449-6999

49