Exhibit 57

STATE OF WISCONSIN     CIRCUIT COURT     MILWAUKEE COUNTY
                              BRANCH 28
------------------------------------------------------------

BRYAN NORBERG and GRAHAM KUNISCH,

              Plaintiffs,

-vs-                                      Case No. 10-CV-20655

BADGER GUNS, INC., BADGER OUTDOORS, INC.,
ADAM J. ALLAN, WALTER J. ALLAN,
MICK BEATOVIC, WEST BEND MUTUAL INSURANCE
COMPANY, JULIUS C. BURTON and
JACOB D. COLLINS,

              Defendants.

------------------------------------------------------------
                        MOTION HEARING
------------------------------------------------------------
June 9, 2011                        Before THOMAS R. COOPER,
                                    Circuit Judge, Br. 28

APPEARANCES:

        CANNON & DUNPHY, S.C., by PATRICK O. DUNPHY,
ESQ., and BRETT A. ECKSTEIN, ESQ., 595 North Barker Road,
Brookfield, Wisconsin, 53045, appeared on behalf of the
Plaintiffs.

        JONATHAN E. LOWY, ESQ., Brady Center to Prevent
Gun Violence Legal Action Project, 1225 Eye Street, N.W.,
Suite 1100, Washington, D.C., 20005, appeared as co-counsel
for Plaintiffs, pro hac vice.

        VON BRIESEN & ROPER, S.C., by HEIDI L. VOGT,
ESQ., 411 East Wisconsin Avenue, Suite 700, Milwaukee,
Wisconsin, 53202, appeared on behalf of the Defendant, West
Bend Mutual Insurance Company.

        SWANSON, MARTIN & BELL, LLP, by JAMES B. VOGTS,
ESQ., and JAMES S. SMITH ESQ., 330 North Wabash, Suite 3300,
Chicago, Illinois, 60611, appeared on behalf of the
Defendants.

Marsha E. Steadman, Court Reporter



1                 <u>TRANSCRIPT OF PROCEEDINGS</u>

2            THE CLERK:  Calling case 10-CV-20655 Bryan

3 Norberg, et al, versus Badger Guns Incorporated, et al.

4 Appearances,  please.

5            MR. DUNPHY:  Your Honor, the plaintiffs are

6 appearing by Patrick Dunphy and Brett Eckstein of the law

7 firm Cannon & Dunphy.  And John Lowy, who's here pro hac

8 vice and will be arguing the motion on behalf of the

9 plaintiffs.

10            THE COURT:  All right.  Illinois?

11            MR. DUNPHY:  No, no,

12            MR. LOWY:  Washington D.C. Brady Center.

13            THE COURT:  'Cuz if you were from Illinois I'd

14 make you wear a Green Bay Packer hat.

15            MR. VOGTS:  Your Honor, I am from Illinois and

16 my name is James Vogts.

17            THE COURT:  And you know what, the Bears still

18 suck.

19            THE COURT:  Don't worry about the microphones.

20 Speak up.

21            MR. SMITH:  I will typically respond to that but

22 not in a court of law when a judge says it to me, so --

23            THE COURT:  Well, this is a little different

24 'cuz if I'm bantering you can banter back; you can give

25 me the one finger salute if you want to.

1          MR. SMITH:  With me is James Vogts.  Together we

2     represent Badger Guns Incorporated, Badger Outdoors

3     Incorporated, Milton Beatovic, Walter Allan and Adam

4     Allan.

5          MS. VOGT:  And I'm Heidi Vogt, von Briesen &

6     Roper representing West Bend Mutual Insurance Company,

7     and I am an avid Green Bay packer fan.

8          THE COURT:  You're the holder of the checkbook,

9     right?

10          MS. VOGT:  Not this time, your Honor.

11          THE COURT:  Good retort.  All right.  I started

12     making some statements off the record but I wanted to

13     make it -- brought you back on the record so that it's a

14     full and complete record.

15          I have read everything.  I've got a good idea of

16     the issues.  I don't need you to regurgitate everything.

17     I would like you to focus on the exceptions under the law

18     that was passed, the acronym is the PLCAA law, I guess

19     PLCAA.

20          Now, obviously PLCAA, the proponents of PLCAA

21     wanted to create a bullet-proof protection for gun

22     owners.  I mean, there's no question that that's where

23     that's coming from, and with the exceptions then that's

24     where this case with all the various causes of action is

25     I guess where I'm looking at my analysis from 'cuz that's

                                  3

1    really -- that's the important thing.

2         So I'm clearly drawing the legislative intent.

3    God knows what a legislative intent was.  It is an

4    embarrassingly poor, poorly-drafted work of draftsmanship

5    of a statute.  I've never read anything poorer than that

6    one, but there's no constitutional protection from poorly

7    drafted, dumb, stupid, inaccurate laws, but I am starting

8    and if I'm incorrect in my assumption but that's clearly

9    the intent of that law, and the question is to what

10   extent, if any, did they do that.

11        So, and then you wanted a powerpoint

12   presentation; you wanted to bring in visual aides, and

13   I'm old school and I just -- I read the stuff; I'm

14   prepared.  And then I got to say I'll be the judge of

15   that which is my favorite thing to do, so we don't need

16   to do all that.

17        So with that, and this is a motion to dismiss

18   and I'm viewing this as probably only the first step

19   because after we have the motion to dismiss and if the

20   lawsuit continues then there's going to be discovery,

21   then there's going to be summary judgments.  So let's not

22   confuse the standards between summary judgment and

23   motions to dismiss 'cuz they are two distinct ways of

24   evaluation.

25        With that, it's -- Who's the lead?  Are you --

4

1    you're the lead on the motions to dismiss.  Okay.

2             MR. VOGTS:  Thank you, your Honor.  I think the

3    court has correctly identified if Congress intended

4    through what I'll call the PLCAA to provide protection to

5    licensed gun manufacturers and licensed gun sellers from

6    claims arising from the criminal misuse of firearms.

7             And that's the case we have here today.  These

8    two plaintiffs, Milwaukee city police officers, were

9    injured when a criminal shot them, so there's no question

10   that this case fits generally within the --

11            THE COURT:  Let's stop right there.  The statute

12   talks of criminal behavior.  Now you say the only

13   criminal behavior would be of these two lowlifes that

14   ended up doing what they did.  But isn't a violation of

15   the gun registration laws and its requirements, and I

16   assume there's criminal liability that attaches to that;

17   isn't that also criminal behavior that has to be taken

18   into consideration?

19            MR. VOGTS:  Certainly.  The person Jacob Collins

20   who purchased the firearm for Julius Burton who was 18

21   years old did not buy it for himself also acted

22   criminally.  He's in prison.

23            THE COURT:  Can I just ask you questions?  I

24   know the facts, and then I will sit quietly and listen so

25   don't worry about it, counsel.

                              5

1           If the person would have been -- instead of

2     being 18 would have been 21 years old, could that person

3     have purchased -- was he -- if he had been 21 able --

4     would he have been able to purchase that weapon?

5           MR. VOGTS:  Provided he did not fall into any of

6     the other prohibited categories.

7           THE COURT:  Did he have any of those other?  Do

8     we know that?

9           MR. VOGTS:  Not based on what I think we've seen

10    and read.  His only prohibitive characteristic was his

11    age.

12          THE COURT:  Okay.  Well, that's something maybe

13    the Wisconsin State Legislature should think about, but

14    legislation is thinking about it at the present time, but

15    that's again unrelated to this case.

16          MR. VOGTS:  With that general rule that is the

17    PLCA there are exceptions.

18          THE COURT:  Right.

19          MR. VOGTS:  The courts identified those.

20    There's five of which identify potential state law claims

21    that could be brought against licensees, and we're

22    dealing with I believe just two of them in this case.

23          The plaintiffs have pled seven counts against

24    the group I'll call the Badger group, and Badger group is

25    only moving to dismiss two of those seven counts based on

1    preemption grounds under the PLCAA.

2        Those two claims are the common law negligence

3    claim and the public nuisance claim.  None of those five

4    exceptions provide that common law negligence and public

5    nuisance claims can be brought in the face of preemptive

6    effect of a PLCAA.  And it's important to note that the

7    PLCAA provides that none of those five exceptions create

8    causes of action or remedies.

9        All the PLCAA does is preempt certain state law

10   claims.  It does not create claims.  So when the court is

11   examining the plaintiffs' allegations and the plaintiffs'

12   claims, I think it's important to keep in mind that

13   federal law does not dictate to this court that it must

14   recognize a negligence per se claim or that it must

15   recognize a negligent entrustment claim.  It's only

16   allowing for those claims to be filed in court.  And once

17   they're filed it's up to your Honor to apply Wisconsin

18   law to claims that fit within those exceptions.

19       I think that's a very important qualifier that

20   we need to keep in mind.  But coming back to the

21   negligence claim, plaintiffs really don't make a serious

22   effort in their briefs to defend their common law

23   negligence claim, and that's perhaps because appellate

24   courts around the country and now some trial courts have

25   held that it was clear that Congress intended to preempt

1    common law tort claims like negligence and public

2    nuisance.

3         And in fact the court in the <u>Ileto-versus-Glock</u>

4    case, the Ninth Circuit Federal Court of Appeals held

5    that Congress clearly intended to preempt common law

6    claims such as general tort theories of liability

7    including classic negligence claims.

8         Now, rather than arguing that, the Ileto court

9    got it wrong and that other trial courts around the

10   country have gotten it wrong, the plaintiffs have come up

11   with kind of a novel argument, but I think it's

12   ultimately unpersuasive as to why their common law claims

13   nuisance and negligence can go forward.

14        And their argument I believe, if I understand

15   it, is this, that the third exception to preemption,

16   what's been called predicate exception, all the

17   plaintiffs need to do is allege a knowing violation of a

18   statute applicable to the sale or marketing of firearms.

19        THE COURT:  And I think that goes to my

20   question.

21        MR. VOGTS:  Under that third exception and all

22   the protections afforded by the PLCAA disappear and none

23   of the other exceptions are needed.  I think the

24   plaintiffs are improperly elevating that third exception

25   into some sort of super exception that swallows the

8

1    general intent of the rule.

2            Their argument has no support in the law.  It

3    has no support in the plain and ordinary language of the

4    statute, and it flies in the face of perhaps one of the

5    most basic tenets of statutory interpretation, and that

6    is that exceptions -- statutory exceptions to a general

7    rule are to be construed narrowly so as to preserve the

8    operation of that rule.  And if the plaintiffs'

9    interpretation of the third exception, Number 3, is

10   accepted as this super exception, the PLCAA will be

11   swallowed; it will essentially disappear, and that's not

12   the intent of Congress here.

13           THE COURT:  I'm sure that's the hope of a number

14   of people, but --

15           MR. VOGTS:  Well, and I'm sure it is, and that's

16   why the argument's been made.  I think that they're

17   really stretching, they're reaching for some ability to

18   preserve all of their claims, even those that are clearly

19   preempted and do not fall squarely within any of the five

20   exceptions.

21           So I think it's proper for this court to dismiss

22   under the PLCA Count 1, which is the negligence claim,

23   and Count 8, which is the public nuisance claim.

24           Now, the plaintiffs in their briefs attempt to

25   shoehorn their public nuisance claim into the third

9

1    exception by arguing that the Wisconsin public nuisance

2    statute is a statute applicable to the sale or marketing

3    of firearms.  And as the court knows, who having read the

4    briefs and the cases, that argument that statute's a

5    broad application like state nuisance statutes can be

6    viewed as statutes applicable to the sale and marketing

7    of firearms has been soundly rejected by a number of

8    appellate courts across the country.  Those courts have

9    Congress did not intend those kinds of statutes to serve

10   as a predicate statute for that exception.

11           Rather, they envision the statutes to be used

12   in that exception to be those that regulate or implicate

13   firearm sales, and the Wisconsin public nuisance statute

14   does not do that.

15           And as we pointed out in our briefs, your Honor,

16   there's even a stronger case here in Wisconsin defined

17   that the state nuisance statute cannot serve as the

18   predicate statute under Exception 3 because the Wisconsin

19   state nuisance statute does not provide the kind of raw

20   general definition of a nuisance as do state nuisance

21   statutes in other states.

22           Specifically California where Ileto was decided

23   and New York, New York City versus Beretta case was

24   decided.  Wisconsin public nuisance statutes specifically

25   declares certain places; bawdy houses, gambling houses,

10

1     dilapidated warfs, things of that nature, to be

2     nuisances, but it does not specifically declare gun

3     stores or gun sales to be --

4               THE COURT:  Actually Wisconsin Statutes have 28

5     statutorily defined public nuisances.

6               MR. VOGTS:  And gun stores are not one of them.

7               THE COURT:  No, they're not.

8               MR. VOGTS:  And nor are gun sales.  So the

9     statute itself does not --

10              THE COURT:  But if the statute was put in there,

11    then the exception would apply, would it not?

12              MR. VOGTS:  If the statute was put in?

13              THE COURT:  To define public nuisance

14    statutorily as sale of gun sales.

15              MR. VOGTS:  That would be the case, yes.  If the

16    statute specifically said gun sales are public nuisances

17    in this state it would be an easy call, but it doesn't do

18    that.

19              But it also doesn't have this broad,

20    all-encompassing definition that anything injurious to

21    the public health enjoyment and welfare --

22              THE COURT:  Well, there is statutory language

23    like that.

24              MR. VOGTS:  There is court language.

25              THE COURT:  Yeah, you're correct, counsel.

                              11

1          MR. VOGTS:  And the plaintiffs would have to

2     resort to the common law definition of nuisance in order

3     to assert their statutory nuisance claim under the

4     predicate exception, and if the predicate exception

5     Number 3 requires a statutory violation.

6          You can't draft into a statute that doesn't

7     speak to gun sales a common law duty of care and still

8     find yourself within the parameters of Exception 3, and

9     that's what the plaintiffs are attempting to do here and

10    I would think do so improperly.

11         Now, those are the only two claims that

12    defendants claim are preempted under the PLCA and should

13    be dismissed under federal law.

14         We move to the negligence per se claim, and in

15    the plaintiffs' complaint they allege that I believe four

16    or five provisions of Federal Gun Control Act were

17    violated when this gun was sold to Jacob Collins, and

18    that approximately three Wisconsin state firearm statutes

19    were violated at the time of the sale.

20         In Wisconsin there is three elements that the

21    court needs to address in deciding whether a negligence

22    per se claim has been pled, okay.  I'd submit it's a

23    question of law for the court.  No fact discovery is

24    going to change the nature of a negligence per se claim

25    under a statute.

1          No discovery is going to make a qualified civil

2     liability action one that is not.  These are questions of

3     law, and those three elements that the court needs to

4     address are, Number 1, was the harm suffered of the type

5     the statute was designed to prevent?  Two, are the

6     plaintiffs within the class of persons sought to be

7     protected by the statute, and then most importantly the

8     court must find that the legislature clearly and beyond

9     any reasonable doubt intended the statute to serve as a

10    basis for civil liability with language that is clear,

11    unambiguous and preemptory.

12          And, as we told the court in our briefs, the

13    Wisconsin Appellate Court in Olson -- <u>Olson versus Ratzel</u>

14    held that the federal gun control statute, statute which

15    these plaintiffs here rely in part on, is not to be the

16    basis for civil liability because there's no expression

17    of legislative intent that it was to serve as a basis.

18          It's difficult I think for the court, and I

19    think it's impossible for the court to get around the

20    holding in <u>Olson</u>.  The court knows and also dealt with

21    the Wisconsin state firearm statutes and reached a

22    similar conclusion.  Those statutes are not to serve as

23    the basis for civil liability.

24          Wisconsin Supreme Court described the

25    plaintiff's burden in pleading a negligence per se claim

13

1      as a stiff burden, and I don't think the plaintiffs here

2      in this case have come close to meeting that burden.

3      They can't avoid the impact of Wisconsin law on that

4      negligence per se claim.

5              The fourth claim -- substantive claim that goes

6      directly to the actual sale of the gun is the negligent

7      entrustment claim, which again does fall within Exception

8      2 of the PLCAA.  And PLCA defines negligent entrustment

9      very specifically as consistent with Wisconsin court's

10     definition of negligent entrustment, and that is

11     supplying a product by seller for use by another person

12     who the seller knows or reasonably should know that the

13     person to whom the product is supplied is likely and does

14     use the product to cause harm.

15             Now, first of all, the mere fact that a gun was

16     sold to a straw purchaser, a person who's not buying the

17     gun for himself, but for another, is not enough to meet

18     the requirements of negligent entrustment.

19             THE COURT:  I'm not so sure that's the case,

20     especially at the motion to dismiss.  I think that's a

21     discoverable issue, and maybe that's a better argument

22     for summary judgment rather than this motion to dismiss.

23     'Cuz they did a pretty good job of pleading this I think.

24             MR. VOGTS:  Well, I'll get to that, your Honor.

25     I appreciate your comments on that because I don't think

14

1      you even have to get to the sufficiency of the

2      plaintiffs' allegations supporting negligent entrustment

3      to find that they haven't pled a negligent entrustment

4      claim under Wisconsin law because, first and foremost,

5      the person to whom you supply the product, the person to

6      whom I give my car keys to, the person who I may be on

7      notice may not be competent to drive that car, has to be

8      the person who ultimately uses the car and caused harm.

9              It's not enough that that person to whom I've

10     given my car keys to then leaves my presence, gives them

11     to another person who then drives the car to cause harm.

12             THE COURT:  I'll give you a better analogy to

13     that.  That's a drunk driving.  Give you an example.

14     Let's say you're at a bar with three guys; the owner of

15     the car, another driver, and then a guy that's drunk out

16     of his mind.  And the guys that's drunk out of his mind

17     says, hey, I want to drive; get that car, I'll drive you

18     home.  And then the guy who -- intervening guy says can I

19     have your car keys, and the owner of the car says you

20     drive it, you drive the car and don't let him drive it.

21     And the other guy saying oh, come on, let me drive the

22     car; just get the keys, we'll go, and he gives the car

23     keys to that guy.

24             Under that fact scenario for the purposes of a

25     motion to dismiss, don't we have to go forward and have

                              15

1    some extra discovery to find out what exactly happened?

2    Should the person who gave the car keys knowing that

3    another person, the drunk guy wanted to drive it, that

4    there was a strong likelihood or a very good chance that

5    he would drive it?  Doesn't that create liability on his

6    behalf?

7              MR. VOGTS:  Well, your Honor, I think what

8    you're doing in framing that analogy is you're adding

9    facts to the plaintiffs' complaint that haven't been

10   pled.

11             THE COURT:  Okay.

12             MR. VOGTS:  And the Wisconsin Supreme Court

13   tells the trial court you're not to add facts to the

14   complaint --

15             THE COURT:  All right.

16             MR. VOGTS:  -- in deciding motions to dismiss.

17   And I think the fact that you're adding to the scenario

18   we have here in the gun store that's not pled is that

19   Badger Guns even knew about the presence of Julius Burton

20   in the store; that they knew somehow that Julius Burton

21   was going to possess or even wanted to possess the

22   firearm.

23             All that's alleged -- it's kind of telling

24   because the plaintiffs make an allegation that Julius

25   Burton told Jacob Collins "that's the gun I want."

16

1          It would have been very easy for the plaintiffs

2     to plead Julius Burton told Jacob Collins in the presence

3     of the Badger Guns' employee "that's the gun I want," but

4     they didn't plead that.

5          THE COURT:  Well, that's because they were doing

6     it honestly.  They were pleading what they had.

7          MR. VOGTS:  Well, and you know what, and without

8     that connection the court is asked to draw -- add a fact

9     and draw an inference --

10         THE COURT:  But they're -- they're entitled to

11    every reasonable inference.  And, quite frankly, those

12    facts to me when I read that -- I went back and read it;

13    I dug and found it and read it.  Something doesn't smell

14    right.  And, you know, maybe I'm creating new law here,

15    the Cooper principle of something doesn't smell right,

16    but that -- I mean for the purposes of a motion to

17    dismiss they're asking me to draw the inference, Judge,

18    this doesn't smell right; we've got to gather more

19    information, I guess, and that's what I'm thinking.

20         MR. VOGTS:  I'd submit to the court that that's

21    an unreasonable inference because --

22         THE COURT:  Okay.

23         MR. VOGTS:  -- in order to draw that inference

24    you'd have to conclude that whenever two friends enter a

25    gun store where one of whom is intending to buy a gun and

17

1       he buys that gun, that his true purpose in buying that

2       gun was to buy it for his friend who was standing next to

3       him that day because that's really all that's pled here

4       is that they came into the store together and that

5       somehow Badger Guns was supposed to divine from the fact

6       that two people were in the store together this was,

7       Number 1, a straw purchase; Number 2, that the gun was

8       going to go to Burton, and then perhaps most importantly

9       that Burton was likely to use that firearm to cause harm.

10              And merely pleading he was likely to use that

11      firearm to cause harm is just pleading an element of the

12      claim.  It's not providing either the defendants or the

13      court for the basis -- the factual basis of the claim.

14      And I know Wisconsin has a notice pleading standard, but

15      it does not eliminate the requirement of providing some

16      level of factual detail showing the right --

17              THE COURT:  You're asking me to draw an

18      inference.  Maybe I'm being too humorous in this, but

19      that's just the way I am.  You're asking me to draw --

20      remember "Hogan's Heros"?

21              MR. VOGTS:  I do.

22              THE COURT:  Sergeant Schultz?

23              MR. VOGTS:  I do.

24              THE COURT:  I know nothing.  I know nothing.

25      That's another inference that -- I guess that's what

1          you're asking me that unless someone puts it in the face

2          of the owner or the salesman, hey, I'm buying this for

3          somebody -- for this guy, if it's not that clearcut, then

4          they can do whatever they want.  Is that what you're

5          saying?

6                    MR. VOGTS:  I'm not saying that.  I'm saying the

7          plaintiffs haven't pled those circumstances in their

8          complaint.  And notably the plaintiffs cite to the court

9          a handful of cases in which gun sellers have been found

10         criminally responsible for engaging in straw sales.  And

11         if you read those cases, in each of them the gun seller

12         was complicit in making that straw sale.

13                   The gun seller was told by the potential buyer

14         "I'm a felon, I can't buy a gun; what should I do"?  The

15         gun seller said, "go outside and find somebody to come

16         in, fill out the forms and go through the background

17         check."  I mean, those are the best cases the plaintiffs

18         have been able to cite to the court, and they call them

19         analogous to this.  And if you put the complaint

20         side-by-side with the factual situations in those cases

21         they are not analogous in any respect whatsoever.

22                   So I appreciate again that you have a notice

23         pleading standard here, but I think the plaintiffs are in

24         large part shielding themselves behind that notice

25         pleading standard and arguing that despite the

                                19

1    deficiency, what I'll call the structural deficiency in

2    their complaint; namely that the person to whom they sold

3    the gun was not the person who used the gun to cause

4    harm.  That's fatal to their claim right out of the box.

5    We don't even have to parse the factual allegations and

6    the reasonable inferences from which, you know, the court

7    or others could draw to defend their claim.

8          Your Honor, the other claims; conspiracy, aiding

9    and abetting and piercing the corporate veil, all rely

10   upon the merits of those four claims.  There must be, you

11   know, regard to aiding and abetting some active

12   assistance by any of these other defendants in Badger

13   Guns' sale of the pistol to Mr. Collins, and all the

14   plaintiffs plead in their aiding and abetting are

15   conclusions.

16         There's no fact at all in that aiding and

17   abetting count even suggesting that any of these other

18   defendants were somehow involved in transferring this

19   gun.

20         One of those other defendants is a separate

21   corporation who didn't even own the gun and wasn't

22   present physically or otherwise at the premises when it

23   was sold.

24         With regard to the conspiracy, there has to

25   obviously be a conspiracy formed.  Again, the plaintiffs

1    only plead legal conclusions that this conspiracy was

2    formed.

3              And, secondly, there is no intent here to

4    violate the law.  There can be no criminal civil

5    conspiracy to act negligently.  That's black letter law

6    across the country and that's essentially what the

7    plaintiffs have alleged here is that these defendants

8    conspired to exercise less than ordinary care in gun

9    sales, and civil conspiracy claims based on that kind of

10   allegations just don't fly.

11             And I won't even address piercing the corporate

12   veil because I don't think I need to add anything more

13   than what's been said in the briefs, your Honor.

14             And lastly, your Honor, Badger Outdoors

15   Incorporated and its two shareholders, Walter Allen and

16   Milton Beatovic, are named in the negligence count, the

17   public nuisance count, and the negligence per se, and the

18   negligent entrustment count --

19             THE COURT:  Individually.

20             MR. VOGTS:  Individually.

21             THE COURT:  But you're not representing them.

22             MR. VOGTS:  I do represent them, and we have a

23   footnote in our brief separately move to dismiss them

24   from those counts because it's clear from the face of the

25   plaintiffs' complaint that it was Badger Guns Inc. who

                              21

1    sold the gun.  Whether that be negligently or otherwise.

2    Badger Outdoors Inc. did not sell the gun, and obviously

3    it's two shareholders did not sell the gun.

4         So I think alternatively if the court were

5    inclined to allow any of the claims to proceed against

6    Badger Guns, who is the seller of the gun, the

7    corporation who did not sell the gun should be dismissed

8    from those four underlying claims.

9         Now, I understand the plaintiffs allege that

10   Badger Outdoors Inc. and its two shareholders were part

11   of this conspiracy and part of aiding and abetting the

12   tortious conduct.  I'm not asking the court to

13   alternatively dismiss them from those counts.  Just those

14   counts in which it's alleged that a defendant sold the

15   gun improperly, unlawfully or otherwise to Jacob Collins.

16        Clearly Badger Outdoors did not do that, nor did

17   the shareholders.  Thank you, your Honor.

18        THE COURT:  You're -- you're on the same side.

19   Do you have anything to add, counsel?

20        MS. VOGT:  No, I have nothing to add at this

21   time, your Honor.

22        THE COURT:  So it's just "me too," right?

23        MS. VOGT:  Yes, your Honor.

24        THE COURT:  Okay.

25        MR. LOWY:  Thank you, your Honor, John Lowy for

                              22

1          the plaintiffs.

2                  To begin, as your Honor noted, this is a motion

3          to dismiss, and while Mr. Vogts recognized that this is a

4          notice pleading state, I don't think he recognized what

5          degree this is a notice pleading state.  In fact, under

6          Wisconsin law courts --

7                  THE COURT:  Notice pleading, and it's just wild

8          and woolly wild west.  It's liberally construed.

9                  MR. LOWY:  Beyond that, your Honor, even -- I

10         mean, what the Wisconsin courts have said is that fair

11         notice of the claim is all that is required.  Is there

12         enough here for Badger to defend itself?  And the courts

13         have said that discovering the facts, stating the facts

14         is left to motions practice and discovery.

15                 THE COURT:  Interestingly, I've been nicked a

16         couple of times by the Court of Appeals on that -- on

17         that issue, so --

18                 MR. LOWY:  Well, your Honor, and one key point

19         is that the courts in fact can add facts that were not

20         pled.  And I would cite in particular the Morgan case

21         where the Supreme Court of Wisconsin reversed the grant

22         of a motion to dismiss saying that even though the

23         plaintiff did not plead facts which showed the

24         defendant's negligence, the court could imagine what the

25         court said were hypothetical situations where there could

                                        23

1    be liability, and because of that there was a right to
2    proceed to discovery.  So --

3            THE COURT:  Or the courts can use their
4    imagination in determining what inferences exist.

5            MR. LOWY:  Or to see what discovery could
6    possibly come up with.  But you don't even have to go
7    there because Mr. Vogts when he summarized facts and said
8    that's all that's pled here, he left out some rather key
9    facts.

10           One key fact that was left out is that in our
11   allegations Collins went into Badger gun store and when
12   he filled out the Federal Form 4473, and there's a
13   question that said are you the actual buyer of the gun,
14   and I'm paraphrasing now, it said if you aren't we can't
15   sell you the gun because it's illegal.  Collins filled
16   out no, I am not the actual buyer.

17           That is a communication -- direct communication
18   to Badger Guns that where Collins is effectively saying
19   this is an illegal sale.  If you sell the gun to me I am
20   a straw purchaser.  It's illegal to do so, and Badger
21   being an experienced gun dealer knows that the only
22   people who get guns through straw purchases are people
23   who shouldn't have guns who could have been deemed too
24   dangerous to get guns.  That's why it's illegal to engage
25   in straw purchase, because they're either people who are

24

1    prohibited from buying guns because they're deemed too

2    dangerous or because they want to avoid a paper trail

3    because they have criminal intent.

4           Badger knows this.  So you had direct knowledge

5    even in what we know so far before discovery that this

6    was going to be a criminal sale, and then Badger

7    conspired with Collins to change the paperwork to engage

8    in the illegal sale.

9           THE COURT:  And to be fair to them, they'll say

10   that this guy didn't know what he was doing; he made

11   mistakes and he helped him out.

12          MR. LOWY:  But we're at a motion to dismiss

13   stage and, your Honor, the plaintiffs who are here today

14   actually all they want is their right to discover the

15   facts and move forward.  That's all that we're dealing

16   with.  And the question is, can we go to discovery and

17   then find the facts so that your Honor or another judge

18   can determine whether there's a cognizable action.

19          Now, there's no question that the facts I've

20   just described and that are alleged show a knowing

21   violation of law, of gun laws, and that takes this case

22   entirely out of PLCAA.  PLCAA states expressly that it

23   does not apply in a case -- in an action in which a

24   manufacturer or seller knowingly violated a state or

25   federal statute applicable to sale and marketing of the

25

1    product, firearms.  If you know --

2              THE COURT:  Well, they're more specific; any

3    false entry.  It's even more specific.

4              MR. LOWY:  Well, those are examples, your Honor,

5    it says including and then it gives two examples.  So

6    those are not the only possibilities, those are two

7    examples.

8              But, as it happens, Badger knowingly violated

9    those two examples.  You can't get more within this

10   exception than you have in this case.  They -- not only

11   did Badger knowingly violate the gun law, but they

12   violated the two particular examples in Roman Numeral I

13   and Roman Numeral II, and, therefore, the act simply does

14   not apply.

15             And there's good reason for that.  The act is

16   called the "Protection of Lawful Commerce and Arms Act."

17   Does not protect dealers who engage in unlawful commerce,

18   which Badger did here.

19             Now, Mr. Vogts said that's a novel argument.

20   With all due respect, it's far from a novel argument.

21   For one, Court of Appeals of Indiana in the <u>Gary</u> case

22   accepted this argument and held that in that case the

23   plaintiff City of Gary knowingly violated Indiana's

24   public nuisance statute and, therefore, not only did

25   PLCAA --

26

1           THE COURT:  But doesn't Indiana have a broad,

2    fuzzy, all-inclusive definition of public nuisance?

3           MR. LOWY:  Well, not exactly, your Honor.

4    Actually Indiana -- first of all, I'll get to that point,

5    but Indiana's definition of public nuisance is almost

6    identical to Wisconsin's.  The difference is that

7    Indiana's definition is in the statute itself.

8    Wisconsin's incorporates a common law definition into the

9    statute.

10          And so, therefore, while it's true that there's

11   certain things; bawdy houses and others that are listed

12   in the Wisconsin statute, there are other activities like

13   noxious egg farms that have been deemed public nuisances

14   in Wisconsin which aren't listed, but we cite about the

15   egg farm case.  Wisconsin courts held that's a violation

16   of Wisconsin public nuisance law because of the broader

17   definition.

18          THE COURT:  His objection to your analysis is

19   that if I find that there has been violated state or

20   federal statute you want me to say PLCAA's out and all

21   the possible pled causes of action are -- it's open

22   season.  Where a different analysis of that would mean if

23   that's true then that means you overcome the motion to

24   dismiss on the conspiracy charge or the negligent -- the

25   negligent entrustment.  Although that's mentioned.  I

27

1     think that's what he's saying.  He's saying it doesn't

2     throw everything out; it just creates an opening for

3     specific causes of action on specific theories of law.

4            MR. LOWY:  Well, it does throw everything out,

5     and what I was getting to in the Court of Appeals Indiana

6     case in Gary what happened there was the court found that

7     because there was a knowing violation of the public

8     nuisance statute the case came within this exception, and

9     because of that the court allowed not just the public

10    nuisance action to go forward but a negligence and a

11    negligent design action to go forward because the act

12    simply offers no protection to companies that knowingly

13    violate the law.

14           The Eastern District of New York, another case,

15    exact same thing.  The court said -- we quoted the brief

16    because knowing violation of law the act simply does not

17    apply.  And Mr. Vogts knows this is a novel argument

18    because three weeks ago we were down the hall before

19    Judge Dugan arguing a very similar case.

20           THE COURT:  There's Dugan and I'm known as the

21    anti Dugan.  While him and I are perfect and close

22    friends, our philosophies are -- you know -- there's

23    deadlines and non-deadlines.  So we're pretty opposit in

24    how we do things.

25           MR. LOWY:  I think this is one you'll agree on,

28

1      your Honor.  This is very, very similar case.  Actually

2      two other Milwaukee police officers who were shot with

3      another gun that was sold in a straw purchase by Badger.

4             Badger filed almost identical motion to dismiss,

5      almost identical arguments, and Judge Dugan denied the

6      motion to dismiss, allowed with the exception of some

7      claims against some of the individual defendants, but

8      allowed -- but denied the entire motion to dismiss as to

9      Badger Guns.

10            Your Honor, I can leave you the transcript where

11     he gives his decision from the bench.  Don't worry, this

12     is -- a lot of this is Mr. Vogts' words, not the judge's.

13     But so all of these questions were addressed.  So in at

14     least those three cases the courts have held that where

15     there's knowing violation of law the act simply has no

16     application --

17            THE COURT:  Okay.

18            MR. LOWY:  -- whatsoever.  And it makes sense

19     because, your Honor, as to what Congress meant by this

20     law, the congressional intent is crystal clear that they

21     did not intend --

22            THE COURT:  Yeah.  I notice you quoted Senator

23     Craig.

24            MR. LOWY:  Not just Senator --

25            THE COURT:  Do you want to add any other

1      honorable members of Congress?

2              MR. LOWY:  Well, he's the leader of this

3      statute, your Honor.  He was -- I didn't choose it for

4      that reason; I chose it because he was --

5              THE COURT:  I was hoping --

6              MR. LOWY:  -- the champion.

7              THE COURT:  I was looking forward to laying that

8      punchline out there.  Forgive me, I diverge.

9              MR. LOWY:  But he was the champion of this

10     legislation and that's why he was quoted.  If you look in

11     congressional record of it, he does most of the talking

12     about it.  But it's not just Senator Craig.  Senator

13     Hatch said this bill carefully preserves the rights of

14     individuals to have their day in court with civil

15     liability actions where negligence is truly an issue.

16             Senator Baucus said this will not shield the

17     industry from its own wrongdoings.  Senator George Allen

18     said similar thing.  Senator Lindsey Graham and others.

19     It goes on and on.  All the sponsors were in agreement

20     that -- that they wanted to -- what they wanted to do and

21     it was clear that --

22             THE COURT:  Well, if that's what they wanted to,

23     they sure came up with a crummy work product.

24             MR. LOWY:  There is not dispute here.

25             THE COURT:  Look at this pile of cases of judges

30

1    trying to figure out what they were intending to do.

2    It's terrible.  It's a terrible statute.

3            MR. LOWY:  It's -- I live in Washington and

4    you're right, this is one of the worst examples, and

5    there are a lot of bad ones but -- but their intent

6    though is clear that what they were trying to do was to

7    prevent absolute liability cases.

8            THE COURT:  Yeah, they were trying to make a

9    bullet-proof protection.

10           MR. LOWY:  For concern -- for certain sorts of

11   cases, your Honor.  For cases where, and they say this,

12   where a gun company did nothing wrong, and there were

13   such cases.  Gun dealer sells a gun to someone completely

14   reputable, to Mr. Vogts.  Ten years later some -- a

15   criminal ends up with that gun.  Maybe broke into

16   Mr. Vogts' house, maybe he sold it to someone, gun dealer

17   did nothing wrong.

18           THE COURT:  That's a products liability.  I

19   think that goes to the products liability components.

20           MR. LOWY:  There were some cases that were

21   negligence.  There were some cases that plaintiffs

22   brought that said it's negligent to sell like a Saturday

23   Night Special because you should know that criminal's

24   going to use it.  So even if you don't do anything wrong

25   you should have to pay the cost of anything bad that

1       happens with that gun even if you didn't do any

2       negligence, even if you didn't violate the law.

3               Congress wanted to eliminate those sorts of

4       cases and they said that not just legislative history,

5       but they said it in the findings of the act itself.  They

6       said we want to eliminate cases that have no grounding in

7       common law that aren't accepted that aren't -- and they

8       actually specified a few cases in particular which happen

9       to be the cases that Mr. Vogts is relying on, _Ileto_ and

10      other cases.

11              They made clear they do not want to eliminate

12      cases where gun dealers did something wrong.  So our

13      reading of the act, your Honor, is completely in accord

14      with what Congress intended to do.  So what Badger's

15      argument ends up being is that even if we knowingly

16      violated gun laws, knowingly violated Gun Control Act, we

17      should still get special treatment and that that is --

18      there's no support for that in the act and there's no

19      support for that in the case law because actually the

20      cases that Mr. Vogts' relying on they involve no

21      violations of law.

22              The cases he's talking about it does not involve

23      a dealer who violated the gun laws.  The cases where they

24      violated the gun laws accept the interpretation that

25      we're putting forward, so there should be no special

                                32

1     protection if you violate the law as Badger did.

2            But even if you were to say --

3            THE COURT:  What about his foreseeability

4     argument that not only that, not only they violate the

5     law but you had to have foreseeability that by violating

6     that law that there was likely harm?

7            MR. LOWY:  Well, first that's an argument for

8     summary judgment, as your Honor said we don't know.

9            THE COURT:  Okay.

10           MR. LOWY:  I mean, we have a right to go into

11    discovery and see what Badger knew.  The fact is even now

12    we know that Badger as a gun dealer they've been a gun

13    dealer for about 25 years and in fact they've sold

14    thousands of crime guns.  They've been one of the top

15    sellers of crime guns in the nation.

16          THE COURT:  I was wondering how you were going

17    to get that into the record.

18          MR. LOWY:  Well, it goes to their notice.  If

19    there's any dealer in America that knows what can happen

20    to guns when you sell irresponsibly it's Badger Guns.

21    They sell more crime guns than 99.9 percent of the

22    dealers in America, so they know it very well.  And

23    they've been told specifically by ATF, by the federal

24    government and by others that if you do a straw sale, and

25    this is the most classic type of straw sale, that gun is

33

1    likely going to be used in crime for good reason because

2    if you're responsible person going to buy a gun, which

3    are most people who want to buy a gun, you're not going

4    to have a problem with going through the background

5    check.  And so they've had that specific knowledge,

6    they've had it -- they've also had it from their

7    experience of engaging in straw sales and having them be

8    used in crime.  So they know better than anyone.

9         And, your Honor, you mention the Schultz defense

10   from "Hogan's Heros," and you're exactly right that that

11   is no defense not only in this action but even in a

12   criminal case.  And I have to take issue with Mr. Vogts'

13   description of the criminal cases we cite.  If you look

14   at the cases where gun dealers have been convicted

15   criminally of engaging in straw sales, they're usually

16   based entirely on circumstantial evidence, and basically

17   they have dealers who try to raise the "Hogan's Heros"

18   type defense that they knew nothing, and the court said

19   that a dealer cannot ignore the obvious.  And not just

20   being civilly liable but you can be criminally liable and

21   go to prison if you just put your head in the sand and

22   you've got a classic straw purchase staring before you.

23   You can't get more classic than the straw purchaser

24   actually telling the dealer I'm not the actual buyer, I'm

25   a straw purchaser, which is the effective thing that

                              34

1    Collins did by checking no, I'm not the actual buyer on
2    the gun form.

3             So the act should not apply, and even if your
4    Honor were to take a narrow view of the knowing violation
5    exception and disagree with the Court of Appeals of
6    Indiana, disagree with Judge Dugan, disagree with the
7    Eastern District of New York, even so the negligent
8    entrustment, the act allows for negligent entrustment
9    actions.  We allege that.

10            The only -- the only real defense that Badger
11   raises, the negligent entrustment action, is they say
12   that Badger to be liable has to know that the person
13   they're entrusting the gun to would shoot it, or that
14   they would have to know what the actual buyer would do;
15   the person the gun's being bought for would do with it.
16   And that's clearly not the law.

17            I mean, if you -- if that were the case and if
18   somebody went into the Badger Guns and said I'm buying
19   guns Al-Qaida, I want to buy 100 AK-47's, and then what
20   do you know they supply those guns to Al-Qaida.  Well,
21   according to Mr. Vogts' argument Badger would have no
22   liability because, one, they don't know who those guns
23   are going to exactly, they don't know what those people
24   are going to do with them, and for sure the person who
25   bought the guns didn't fire them.

1          Well, that's -- it's -- there's a clear

2     foreseeable risk when you sell to a straw purchaser that

3     that gun is going to be used in crime.  And the Supreme

4     Court of the United States has actually looked at what

5     does use of a firearm mean, and the Supreme Court said

6     using a firearm doesn't just mean shooting it or

7     discharging it.  It means deriving some service from it

8     including like ordering it and certainly transferring it

9     to someone else.  So clearly Collins used the firearm

10    when he transferred it to Burton.

11          And, your Honor, also if you're going to take a

12    narrow view of PLCAA negligence per se would be allowed.

13    The only argument against allowing negligence per se

14    action to go forward is this <u>Olson</u> case, which is from I

15    believe 1979 I think.

16          In that case -- the key thing in that case was

17    that the court held that --

18          THE COURT:  Doesn't there have to be -- doesn't

19    there have to be a statutory definition to get negligence

20    per se?  Isn't that -- doesn't a cause of action from --

21    for negligence per se doesn't that need some sort of

22    statutory or I guess court starting decisive direction

23    from the Supreme Court of the Court of Appeals?

24          MR. LOWY:  Well, there is -- Well, there is a

25    statutory definition of the conduct.  I mean, it's the

36

1       Gun Control Act.  So there is that -- the conduct that

2       we're talking about is defined by the Gun Control Act, so

3       it's clearly there was a violation of a law.

4               Clearly the violation by Badger caused the sort

5       of harm that Congress intended to prohibit.  Clearly the

6       person -- the people that were injured, these officers,

7       are -- were some of the people that were intended to be

8       protected by that law.

9               The only possible weak link is Badger argues,

10      well, Congress did not intend for there to be negligence

11      per se liability for violations of the Gun Control Act,

12      and that's one of the things the court said in Olson.

13      That I believe Olson was incorrect and a number of courts

14      have disagreed with Olson and held that Congress is fine

15      with civil liability for violations of the Gun Control

16      Act.

17              But more to the point, after PLCAA it is

18      indisputable that Congress is fine with civil liability

19      actions for negligence per se, for one because Congress

20      says there's civil liability for negligence per se.

21              Now, Mr. Vogts is correct that PLCAA does not

22      create new causes of action.  However, PLCAA does give

23      the most recent expression of congressional intent, and

24      you can't read PLCAA as saying that Congress believes

25      that there should be civil liability for negligence per

                                  37

1    se except that Congress thinks there should not be civil

2    liability for negligence per se.

3         Clearly there's no question that they did.  Not

4    just the negligence per se exception, but also in the

5    knowing violation exception.  So Congress now has made it

6    clear, if it wasn't clear before, I think it was clear

7    before, but if it wasn't clear then, it is clear now that

8    Congress has no problem with civil liability.  In fact

9    intends there be civil liability for violations of the

10   GCA.

11        And so PLCAA was well after Olson.  In fact the

12   Brady Law was after Olson.  There were -- background

13   checks weren't even required when Olson was decided.  But

14   so the Gun Control Act has changed a lot since Olson.

15        So now, given that there is intent,

16   congressional intent, there's really no basis to dismiss

17   the negligence per se action.

18        So basically, your Honor, I could address the

19   other points, but I'll wrap up.  I mean, again, this is

20   not to say that Badger cannot revisit these arguments.

21   The time to revisit them is after discovery, after

22   there's been a record, after there are facts.  All of

23   these arguments can be brought up again.  I think Badger

24   should lose them then --

25        THE COURT:  Oh, they certainly will.  I'm sure.

38

1    Everybody in the room knows that.

2          MR. LOWY:  But that is the time to bring them

3    where the court will have the record, and then there will

4    be no question whether these actions are cognizable under

5    PLCAA.

6          THE COURT:  Response.  First of all, do you

7    agree that Dugan -- with his analysis of Dugan's

8    decision?

9          MR. VOGTS:  I don't disagree with it entirely

10   but I think Mr. Lowy did overstate Judge Dugan's rulings.

11   Judge Dugan expressed clear -- a clear lack of confidence

12   in some of his rulings specifically with regard to his

13   ruling on negligence per se count, and with regard to his

14   ruling on the public nuisance count.

15         THE COURT:  So he probably he did a we have

16   notice pleading and everything -- everything has to go

17   forward.

18         MR. VOGTS:  That's almost precisely what

19   happened, your Honor.  But I think with all due respect

20   to Judge Dugan, I think he avoided --

21         THE COURT:  As long as nobody has said that

22   about me, with all due respect, Judge Cooper.

23         MR. VOGTS:  Not yet.

24         THE COURT:  Not yet, okay.  It's early.

25         MR. VOGTS:  I believe Judge Dugan could have and

                           39

1    should have made some rulings that were on purely legal

2    matters.  Matters that did not indicate notice pleading.

3    Namely, whether a count, Count 1 as pled as a negligence

4    claim, clearly a classic common law negligence claim fits

5    within the definition of a qualified civil liability

6    action.

7              THE COURT:  But their argument is if there's a

8    violation of the sale that PLCAA's out, it's gone.

9              MR. VOGTS:  And that's what I'd like to turn to

10   because I think --

11             THE COURT:  Yeah, that's -- that's a good one.

12   That's the one you should be interested in.

13             MR. VOGTS:  I'll grant to Mr. Lowy his argument

14   is not novel today, but it was novel as of a number of

15   weeks ago when it was raised in the briefs for the first

16   time.

17             It is important to recognize what the third

18   exception is and what it is not, and if the court looks

19   to the rule of construction, it's a separate paragraph of

20   the PLCAA, it's 7903 (5) (c), it identifies each of those

21   five paragraphs as exceptions.  Exceptions to the

22   definition of a qualified civil liability action.  It

23   treats each of those five identically.

24             One is not raised to the level that the

25   plaintiffs here seek to raise it to in this court as some

                                40

1    all encompassing exception that swallows the general rule

2    that requires the court to disregard the fundamental rule

3    of statutory interpretation and should look at those

4    exceptions narrowly, not broadly, as Mr. Lowy would like

5    you to do.

6         What Number 3 does is, and this is very

7    important distinction.  The predicate exception found in

8    Number 3 is the only exception to preemption that a

9    plaintiff can use to get at a firearms manufacturer in a

10   claim arising from the criminal use of a firearm.  The

11   act defines seller.  Seller is not a manufacturer.

12        What Congress did here was included a second

13   hybrid kind of varied negligence per se.  It was

14   applicable to a manufacturer and it required not just a

15   violation of a statutory standard of care but a knowing

16   violation and a finding of proximate cause

17        So what Section 3 did was create an exception

18   for a manufacturer, and with regard to those kinds of

19   statutes applicable to the sale and marketing of firearms

20   it imposed an even broader protection for sellers like

21   Badger Guns because it required a knowing violation, not

22   just simply an unknowing or accidental violation of law.

23   Which, as the court points out, a negligence per se

24   action is essentially a substitution of the legislature's

25   view what the standard of care should be for what a jury

1    might decide.

2          If the negligence per se case goes to the jury
3    the only question the jury is to answer is was the
4    statute violated?  If so they then consider damages.

5          So I think again the plaintiffs' attempt to
6    elevate the third exception into something that allows
7    them now to just plead the kitchen sink without regard to
8    the definition of a qualified civil liability action and
9    without regard to the narrow parameters of each of the
10   other four exceptions has no basis in the law and
11   particularly no basis in the <u>City of Gary</u> case.

12         The <u>City of Gary</u> case was not decided on this
13   argument whatsoever.  The <u>City of Gary</u> case was decided
14   as it was because before the PLCAA was made into law the
15   Indiana Supreme Court had already ruled in the same case
16   that the plaintiff could proceed under the Indiana public
17   nuisance statute.  So when it got back to the court on
18   the PLCAA there was already law in the case that said the
19   Indiana public nuisance statute is applicable to the sale
20   and the marketing of firearms.

21         They did not get to the argument the third
22   exception somehow swallows the general rule of
23   preemption.  So I think the plaintiffs' argument that
24   somehow --

25         THE COURT:  But, counsel, for your argument to

                              42

1      be supported you would need a nicely drafted, tight,

2      defined statute.

3                  MR. VOGTS:  Well --

4                  THE COURT:  And the PCLA, or whatever it's

5      called, is terrible.

6                  MR. VOGTS:  Well, I think both parties in this

7      case would argue that parts of the statute are tightly

8      drawn enough for their purposes and others are not.  And

9      I think we're being honest when we say that.

10                 THE COURT:  We're lawyers, that's what we do.

11                 MR. VOGTS:  But, you know, when we're struggling

12     with statutory interpretation, as your Honor knows, the

13     first thing you do is you look at the language in the

14     statute.  You don't look to see what Senator Craig may

15     have said or what Senator Hatch may have had to say.

16                 Now, granted, they did say things like you know

17     nobody's going to escape liability for their wrongdoing.

18     You know this statute clearly does say that.  There are

19     exceptions to preemption and there's five of them, and

20     the plaintiffs had to plead within those five.

21                 They attempted to do so within two; negligence

22     per se and negligent entrustment.  They haven't come

23     close on negligence and public nuisance and I think their

24     attempt to elevate this third into something bigger than

25     it is has no basis in the language of the statute or for

                                43

1      the law.

2            Analogies are dangerous things, obviously.  I'm

3      always hesitant to use them because it's easy for anybody

4      listening to find a hole in it.  And I think the Al-Qaida

5      analogy was perhaps unfortunate for plaintiffs here

6      because clearly if somebody comes into a gun store and

7      says I want to buy a hundred AK-47's for Al-Qaida it's

8      public knowledge that Al-Qaida uses guns to kill people

9      and planes to kill people.

10            THE COURT:  I know.  It was a bit of a

11      hyperbole.  I'll give you that.

12            MR. VOGTS:  And in this case, and as I pointed

13      out before, there is nothing pled in this complaint that

14      Badger Guns even knew anything about Julius Burton who

15      ultimately used this gun to shoot and injure the

16      plaintiffs.

17            There's no indication in this complaint that

18      Badger Guns even knew Julius Burton was in the store.

19      And that's the fundamental deficiency in that allegation.

20            You know, just lastly, your Honor, I just point

21      out I know I'm probably swimming upstream on this but,

22      you know, if in fact notice pleading is as broadly

23      applied as the plaintiffs argue in this case, I question

24      why there's even a motion to dismiss statute on the books

25      any longer, and I question why the Wisconsin Supreme

                                44

1    Court --

2           THE COURT:  For billable hours, counsel.

3           MR. VOGTS:  Well, that's the cynical view,

4    perhaps, but that's not why we're here today.  And why is

5    it Wisconsin Supreme Court repeatedly said that notice

6    pleading does not eliminate the obligation to plead some

7    set of facts that show the areas entitled to relief.

8    It's not enough -- If it's enough to say I'm pursuing a

9    negligence claim against you, why aren't complaints just

10    captioned?  Why is there anything pled beneath the

11    caption if it's enough to say my claim is negligent

12    entrustment, here are the three elements, let's go

13    forward, why even have motion to dismiss?  And I think

14    the Wisconsin Supreme Court has told the trial courts

15    there is still some teeth to notice pleading, and we have

16    cited cases to that effect in our brief.

17           THE COURT:  It all depends on who was the

18    majority at a particular time determining that.  I mean

19    we had the lead paint case which is that argument was

20    exactly the point it's like -- but --

21           MR. LOWY:  Your Honor, I think --

22           THE COURT:  No, I've heard enough.  Do you have

23    anything else?  Anything you would like to say?

24           MS. VOGT:  I have nothing to add, your Honor.

25           THE COURT:  All right, the horse died a long

1    time ago.  The interesting argument is that by definition

2    if there's a violation of a state and federal statute

3    everything goes out the window.  That's -- I didn't quite

4    get my hands around that, but Wisconsin clearly,

5    unequivocally and unabashedly is a notice pleading state;

6    that if you have anything remotely resembling a cause of

7    action that that's enough to get over a motion to

8    dismiss.  And that goes directly to what you were just

9    arguing.

10   The answer is I don't know why we have motions

11   to dismiss.  Quite frankly, we don't get many motions to

12   dismiss anymore.  We get more summary judgment motions

13   than we do motions to dismiss.  And I think that's an

14   accurate reflection of the way notice pleading is

15   interpreted the Court of Appeals and the Supreme Court

16   in Wisconsin because it is extremely broad.

17   Plaintiff has accurately said that the court can

18   have hypotheticals and in drawing inferences, and it is

19   not the Sergeant Schultz I know nothing standard, which

20   it may be in other jurisdictions that require more

21   specific pleadings.

22   So I am -- I'll put off the application of the

23   violation of federal statute, the broad disqualification

24   of the statute to later.

25   I am satisfied there is sufficient facts to get

46

1    over a motion to dismiss on negligent entrustment.

2    That's clearly there's enough facts to without even

3    drawing anything as to whether the statute applies.  So

4    I'm dismissing as to Count 2.

5         Count 3 and Count -- 3 I believe there's enough

6    to get over the motion to dismiss.  The assault and

7    battery I don't believe is before the court, which is

8    Count 4.

9         I believe Count 6, civil conspiracy, there's

10   enough facts without disqualifying the federal statute to

11   get over the motion to dismiss.  I believe also aiding

12   and abetting tortious conduct.

13        I do have problems with the public nuisance

14   which is Count 8, and negligence per se which is Count 4

15   I believe.  No, it's Count 5.  I think there needs to be

16   a statutory definition of those two, two causes of action

17   as to statutory definition of or a court-defined cause of

18   action.

19        So I am granting the motion to dismiss on the

20   Count 5 which is negligence per se and on the public

21   nuisance.  Clearly the public nuisance there's all those

22   statutory definitions which constitute a public nuisance,

23   and there's nothing here that gives rise to the

24   definition.

25        I mean, common sense from a neutral person

47

1     rather than an NRA person with a gun control person, the

2     reasonable person you would think there would be a public

3     nuisance, but I think there has to be a statutory

4     definition.  So I'm dismissing those.  That way I don't

5     have the angst that Judge Dugan had on the negligence per

6     se.

7              For the purposes of motion to dismiss I am going

8     to accept the argument by the plaintiff on the fact that

9     if there is a violation of state or federal statute that

10    at least for the purposes of a motion to dismiss the

11    negligence cause of action will go forward.  So I am

12    granting the defense motions on 5 and 8 -- yeah, 5 and 8,

13    denied the motions on all the other counts.

14              MR. VOGTS:  Your Honor, if I may.

15              THE COURT:  Sure.

16              MR. VOGTS:  Defendants made the alternative

17    request for dismissal of the corporate entity who clearly

18    did not sell the gun to Jacob Collins.

19              THE COURT:  I think we need more discovery for

20    that.  That's a very strong summary judgment argument.

21              MR. VOGTS:  Thank you, your Honor.

22              THE COURT:  But I'm not ready to dismiss it at

23    this stage.  So the plaintiff won more so you draft the

24    order.  And, counsels, come on back please.

25              (In-chambers conference had between parties and

                              48

1    court.)

2            THE COURT:  We'll go back on the record.  Quite

3    frankly just for the guys in audience, I took counsels

4    back in chambers really on time because of possible

5    surgeries and my retirement -- upcoming retirement I

6    wanted to tell them what court time is available.

7            The insurance company indicated they're

8    contemplating a bifurcation motion, which I think we can

9    do before I leave for my surgery.

10           And with that, thank you, counsels.  It was very

11   well argued, very well briefed, and it's too bad we had

12   to kill the Amazon Rain Forest with all these federal

13   cases we had.  So thank you very much.

14           MR. VOGTS:  Thank you, your Honor.

15

16               (Proceedings concluded)

17

18

19

20

21

22

23

24

25

1

2

3

4

5

STATE OF WISCONSIN)
6                         )   SS:
MILWAUKEE COUNTY   )

7

8          I, MARSHA E. STEADMAN, Official Reporter of Circuit

9   Court, Milwaukee County, Wisconsin, hereby certify that the

10  foregoing is a true and accurate transcript of my stenograph

11  notes taken in the forgoing proceedings.

12

13          *Marsha E. Steadman*

14          Registered Professional Reporter
            6-24-11

15

16

17

18

19

20

21

22

23

24

25