# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ESTADOS UNIDOS MEXICANOS, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )    C.A. NO: 1:21-CV-11269-FDS |
| | ) |
| SMITH & WESSON BRANDS, INC.; | ) |
| BARRETT FIREARMS MANUFACTURING, | ) |
| INC.; BERETTA U.S.A. CORP.; BERETTA | ) |
| HOLDING S.P.A.; CENTURY | ) |
| INTERNATIONAL ARMS, INC.; COLT'S | ) |
| MANUFACTURING COMPANY LLC; | ) |
| GLOCK, INC.; GLOCK GES.M.B.H.; | ) |
| STURM, RUGER & CO., INC.; | ) |
| WITMER PUBLIC SAFETY GROUP, INC. | ) |
| D/B/A INTERSTATE ARMS, | ) |
| | ) |
| *Defendants.* | ) |

## BRIEF OF PROFESSORS OF TRANSNATIONAL LITIGATION
### AS *AMICI CURIAE*

Scott Harshbarger, Esquire
Senior Counsel
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210
BBO#:  224000

Edward J. Colbert, III, Esquire
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210
BBO#:  566187

*Counsel for Amici Curiae*

January 31, 2022

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

INTEREST OF *AMICI CURIAE* ..................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.      PLCAA does not apply to claims based on foreign law ........................................ 2

II.     International law and international comity do not bar Mexico from applying its law to companies in the United States ................................................................. 8

CONCLUSION .................................................................................................................. 13

APPENDIX ........................................................................................................................ 14

## TABLE OF AUTHORITIES

**Cases**

*Bank of Augusta v. Earle,*
        38 U.S. 519 (1839) .............................................................................................. 12

*BMW of North America, Inc. v. Gore*,
        517 U.S. 559 (1996) ............................................................................................ 10

*Brogie v. Vogel*,
        205 N.E.2d 234 (Mass. 1965) ............................................................................. 12

*Cohen v. McDonnell Douglas Corp.,*
        450 N.E.2d 581 (Mass. 1983) ............................................................................. 12

*EEOC v. Arabian Am. Oil Co. (Aramco)*,
        499 U. S. 244 (1991) .......................................................................................... 6, 7

*F. Hoffmann-La Roche Ltd. V. Empagran S.A.*,
        542 U. S. 155 (2004) ........................................................................................... 11

*Foisie v. Worcester Polytechnic Inst.,*
        967 F.3d 27 (1ˢᵗ Cir. 2020) ................................................................................. 12

*Foley Bros. v. Filardo,*
    336 U.S. 281 (1949) ........................................................................................7

*Hartford Fire Ins. Co. v. California,*
    509 U.S. 764 (1993) ......................................................................................10

*Hilton v. Guyot,*
    159 U.S. 113 (1895) ......................................................................................11

*In Re Vitamin C Antitrust Litig.,*
    8 F.4th 136 (2nd Cir. 2021) ..........................................................................11

*Iwanowa v. Ford Motor Co.,*
    67 F. Supp. 2d 424 (D.N.J. 1999). ...............................................................11

*Jackson v. Anthony,*
    185 N.E. 389 (Mass. 1933) ...........................................................................13

*Kiobel v. Royal Dutch Petroleum*
    569 U.S. 108 (2013) ........................................................................................3

*Klaxon Co. v. Stentor Electric Mfg. Co.,*
    313 U.S. 487 (1941) ......................................................................................12

*Loucks v. Standard Oil Co. of New York,*
    120 N.E. 198 (N.Y. 1918) .............................................................................12

*Morrison v. Nat'l Australia Bank Ltd.,*
    561 U. S. 247 (2010) ...............................................................................3-4, 6-7

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ........................................................................................4

*RJR Nabisco, Inc. v. European Community,*
    579 U.S. 325 (2016) ..............................................................................1-4, 7-8

*Royal Bus. Group, Inc. v. Realist, Inc.,*
    751 F. Supp. 311 (D. Mass. 1990). ...............................................................12

*Small v. United States,*
    544 U.S. 385 (2005) ........................................................................................7

*Smith v. United States,*
    507 UJ. S. 197 (1993) .....................................................................................7

*Steele v. Bulova Watch Co.,*
    344 U. S. 280 (1952)................................................................10

*Telnikoff v. Matusevitch,*
    702 A.2nd 230 (Md. 1997)......................................................11

*Ungaro-Benages v. Dresdner Bank AG,*
    379 F.3d 1227 (11th Cir. 2004) ............................................11

*United States v. Smith,*
    680 F.2d 255 (1st Cir. 1982)....................................................9

*WesternGeco LLC v. ION Geophysical Corp.,*
    138 S. Ct. 2129 (2018)..............................................................4

**Statutes**

Protection of Lawful Commerce in Arms Act,
    15 U.S.C. §§ 7901-7903. ............................................... 1-2, 4-8

16 U.S.C. § 3372(a) ........................................................................5

18 U.S.C. § 922(g)(1) .....................................................................7

19 U.S.C. § 1527(a) ........................................................................5

Mass. Gen. Laws Ann. Ch. 235, § 23A ......................................11

**Other Authorities**

Joseph Story, *Commentaries on the Conflict of Laws* (2d ed. 1841)............................................10

Restatement (Fourth) of the Foreign Relations Law of the United States
    (Am. L. Inst. 2018) ................................................................. 2, 9-10

Restatement (Second) of Conflict of Laws (Am. L. Inst. 1971)....................................12

William S. Dodge, *International Comity in American Law,*
    115 Colum. L. Rev. 2071 (2015) ................................................ 9-10

William S. Dodge, *The New Presumption Against Extraterritoriality,*
    133 Harv. L. Rev. 1582 (2020)...................................................... 2-3

## Interest of *Amici Curiae*[1]

*Amici* (listed in the Appendix) are law professors who write and teach about transnational litigation, including questions of extraterritoriality, international law, and international comity. *Amici* believe their expertise may be useful to the Court in ruling on Defendants' Motion to Dismiss. *Amici* address only two of the questions raised in the Motion to Dismiss: (1) whether the Protection of Lawful Commerce in Arms Act (PLCAA) applies to claims based on foreign law, and (2) whether international law and international comity permit Mexico to apply its law to U.S. companies.

## Summary of Argument

PLCAA does not apply to claims based on foreign law. Under the framework for analyzing extraterritoriality issues adopted by the U.S. Supreme Court, if there is "a clear, affirmative indication" of a statute's scope, a court must apply the statute as Congress indicated. *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 337 (2016). To answer this question, a court must consider both the text and the context of a statute. *Id.* at 340. Here, as in *RJR Nabisco*, "[c]ontext is dispositive." *Id.* PLCAA bars only suits based on "the criminal or unlawful misuse" of firearms, a phrase that in context refers only to U.S. law. PLCAA's text repeatedly mentions federal and state law and never foreign law, it identifies the targeted lawsuits as those brought under U.S. law by governments and others in the United States, and it aims to protect the Second Amendment rights of U.S. citizens in the United States. Nothing in PLCAA indicates that Congress even considered, much less sought to bar, suits under foreign law.

---

[1] No person or entity other than *amici* and their counsel authored the brief in whole or in part. No person or entity other than *amici* and their counsel contributed money intended to fund preparing or submitting the brief.

Nor is the application of foreign law prohibited under international law or international comity, as the Defendants claim. International law recognizes the authority of a state to apply its law to conduct outside its territory that causes substantial effects within its territory. Here, Mexico has alleged substantial effects within its territory. International comity allows each state to decide how much to give effect to another state's law and how much to limit its own. Defendants invoke various U.S. doctrines of international comity, but these U.S. doctrines do not limit the reach of Mexican law and are largely irrelevant to this case. The only U.S. comity doctrine that may ultimately be applicable to this case is choice of law. If, at a later stage of the proceedings, this Court finds that Mexican law governs some of Mexico's claims, it may decline to apply Mexican law only if it violates a fundamental public policy of Massachusetts.

## Argument

### I.     PLCAA does not apply to claims based on foreign law.

In 2005, Congress enacted the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903. PLCAA prohibits bringing a "qualified civil liability action" in any federal or state court. *Id.* § 7902(a). With certain exceptions, Congress defined "qualified civil liability action" to mean a civil action against a gun manufacturer or seller for damages or other relief "resulting from the criminal or unlawful misuse of a qualified product by the person [bringing the action] or a third party." *Id.* § 7903(5)(A).

The Supreme Court has adopted a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 337 (2016); *see also* Restatement (Fourth) of the Foreign Relations Law of the United States § 404 (Am. L. Inst. 2018) (restating the federal presumption against extraterritoriality); William S. Dodge, *The New*

*Presumption Against Extraterritoriality*, 133 Harv. L. Rev. 1582, 1603-23 (2020) (describing the Supreme Court's current approach).[2]

At the first step, a court asks whether the statute gives "a clear, affirmative indication" of its geographic scope. *RJR Nabisco*, 579 U.S. at 337.[3] To answer this question, a court must consider both the text and the "context" of the provision. *Id.* at 340; *see also Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010) ("Assuredly context can be consulted as well."). Context may include the "structure" of a statute, *RJR Nabisco*, 579 U.S. at 340, as well as its "purposes," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117 (2013). In *RJR Nabisco*, for example, the Supreme Court found a clear indication that RICO's criminal provisions apply extraterritorially in that statute's references to predicate offenses that apply extraterritorially. *RJR Nabisco*, 379 U.S. at 338-41. When the scope of a statute is clear, a court must apply the statute as Congress has indicated. *Id.* at 337-38 ("The scope of an extraterritorial statute thus turns on the limits Congress has (or has not) imposed on the statute's foreign application, and not on the statute's 'focus.'").

If there is not a clear indication of geographic scope at step one, then a court determines "whether the case involves a domestic application of the statute … by looking to the statute's 'focus.'" *Id.* at 337. "If the conduct relevant to the statute's focus occurred in the United States,

---

[2] *Amici* address PLCAA's scope as a question of geographic scope subject to the presumption against extraterritoriality because the Motion to Dismiss frames the question that way. But *amici* note that, under any framing of the scope question, the arguments considered at the first step of the extraterritoriality framework would clearly establish that PLCAA does not bar claims under foreign law.

[3] In *RJR Nabisco*, the Supreme Court phrased the first question as "whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* When a statute gives a clear indication that it does *not* apply extraterritorially, it follows *a fortiori* that a court should follow Congress's direction. Because Congress might give a clear indication of either extraterritoriality or non-extraterritoriality, this brief describes step one as asking for a clear indication of geographic scope.

then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* A court may consider the focus of a provision at step two, however, *only* if there is no clear indication of the provision's scope at step one. In *RJR Nabisco*, the Supreme Court refused to consider the defendant's argument that the focus of RICO's criminal provisions limited those provisions to domestic enterprises. "This argument misunderstands *Morrison*," the Court observed. "As explained above, only at the second step of the inquiry do we consider a statute's 'focus.' Here, however, there is a clear indication at step one that RICO applies extraterritorially. We therefore do not proceed to the 'focus' step." *Id.* at 342.[4]

Like RICO, PLCAA's text contains no express statement of geographic scope, but PLCAA does refer to other laws. Specifically, PLCAA bars civil actions for damages or other relief "resulting from the *criminal or unlawful* misuse of a qualified product by the person [bringing the action] or a third party." 15 U.S.C. § 7903(5)(A) (emphasis added). Examining the context of PLCAA, as the Supreme Court has instructed, it is clear that "criminal or unlawful" refers only to U.S. federal and state law and not to foreign law. The first indication is found in Congress's definition of the civil actions that are prohibited, where one finds a series of exceptions, two of which refer explicitly to federal and state law. Section 7903(5)(A)(i) permits

---

[4] *RJR Nabisco* raised the possibility that a court might start at step two "in appropriate cases." *Id.* at 338 n.5. In *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018), the Supreme Court said it would be appropriate to exercise such discretion "if addressing step one would require resolving 'difficult questions' that do not change 'the outcome of the case,' but could have far-reaching effects in future cases." *Id.* at 2136 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009)). When there is a clear indication of geographic scope, beginning at step two would be inappropriate because the first step will not involve difficult questions and because starting at step two could change the outcome of the case.

actions against persons convicted of transferring guns knowing that they will be used in violent crimes or drug crimes in violation of the federal statute, 18 U.S.C. § 924(h), "or a comparable or identical State felony law," whereas Section 7903(5)(A)(iii) permits actions against manufacturers or sellers of guns who "knowingly violated a State or Federal statute applicable to the sale or marketing of the product." If Congress had intended PLCAA to apply to the misuse of guns that is criminal or unlawful under foreign law, Congress would have drafted these exceptions to refer to foreign law as well. *See, e.g.*, 16 U.S.C. § 3372(a)(2)-(3) (referring expressly to foreign law); 19 U.S.C. § 1527(a) (same).

The conclusion that "criminal or unlawful" refers only to federal and state law finds confirmation in Congress's codified findings and purposes. Congress's findings begin by referring twice to the Second Amendment right to bear arms. 15 U.S.C. § 7901(a)(1) & (2). Congress also notes that guns "are heavily regulated by Federal, State, and local laws," *id.* § 7301(a)(4), with no mention of foreign laws. Congress specifically identifies the civil actions with which it is concerned as those "commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States." *Id.* § 7901(a)(7). There is no mention of suits by foreign governments or theories of liability based on foreign law.

Defendants' argument that PLCAA applies to foreign law claims relies almost entirely on the statute's references to "foreign commerce." Motion to Dismiss 28 (quoting 15 U.S.C. §§ 7901(a)(5), 7901(b)(4) & 7903(2), (4), (6)). But the Supreme Court has repeatedly and emphatically rejected reliance on such language to indicate a statute's geographic scope. *See RJR Nabisco*, 579 U.S. at 353 ("[W]e have emphatically rejected reliance on such language, holding

that 'even statutes ... that expressly refer to "foreign commerce" do not apply abroad.'") (quoting *Morrison*, 561 U.S., at 262-63); *EEOC v. Arabian Am. Oil Co. (Aramco)*, 499 U.S. 244, 251 (1991) ("[W]e have repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to 'foreign commerce' do not apply abroad.").

Even if the statute's references to "foreign commerce" were relevant to determining PLCAA's scope, they refer in context only to *imports* of firearms. The finding on which Defendants principally rely says that U.S. businesses "that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, *importation*, or sale to the public of firearms or ammunition products" should not be subject to liability. 15 U.S.C. § 7901(a)(5) (emphasis added). Indeed, the findings and purposes explicitly refer five times to importers or the importation of guns. *Id.* §§ 7901(a)(3), (4), (5) & (b)(1), (6). The sole mention of exports is a reference in one of the findings to the Arms Export Control Act, *id.* § 7901(a)(4), a statute that Congress listed simply as an illustration of the fact that firearms "are heavily regulated by Federal, State, and local laws," *id.* As discussed above, that list of regulations notably does not include foreign law.

Congress's focus on imports with respect to foreign commerce is consistent with Congress's overriding concern with the Second Amendment rights of U.S. citizens. *Id.* §§ 7901(a)(1) & (2). It is PLCAA's stated purpose "[t]o preserve *a citizen's* access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting." 15 U.S.C. § 7901(b)(2) (emphasis added). Congress was simply not concerned with providing access to guns for Mexican citizens in Mexico.

Indeed, the question how to read "criminal and unlawful" in PLCAA's definition of a "qualified civil liability action" is strikingly similar to the question the Supreme Court faced in

*Small v. United States*, 544 U.S. 385 (2005). In that case, a federal statute made it unlawful for a person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" to possess a firearm. 18 U.S.C. § 922(g)(1). The Supreme Court held that "any court" referred only to courts in the United States. It began with the "commonsense notion that Congress generally legislates with domestic concerns in mind," *Small*, 544 U.S. at 388, an understanding the Supreme Court has repeatedly relied on in determining the geographic scope of federal statutes, *see RJR Nabisco*, 579 U.S. at 336 (referring to the "'commonsense notion that Congress generally legislates with domestic concerns in mind.'" (quoting *Smith v. United States*, 507 U.S. 197, 204, n. 5 (1993))); *Morrison*, 561 U.S. at 255 (noting "that Congress ordinarily legislates with respect to domestic, not foreign, matters"); *Aramco*, 499 U.S. at 244 (presuming that Congress "'is primarily concerned with domestic conditions'" (quoting *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949))). The Court in *Small* found confirmation in the statute's exceptions and other references to federal and state laws, *Small*, 544 U.S. at 391-92, similar to the references in PLCAA discussed above. In fact, the argument for applying PLCAA only domestically seems stronger than the argument in *Small* because the statute at issue in that case did not contain the extensive findings and purposes that confirm PLCAA's concern with domestic conditions.

In their Motion to Dismiss, Defendants go on to argue at the second step of the extraterritoriality analysis that this case involves a domestic application of PLCAA because "PLCAA is focused on prohibiting covered lawsuits from being filed in U.S. courts." Motion to Dismiss 29. Of course, this argument begs the question of which lawsuits are "covered" by PLCAA in the first place. As noted above, PLCAA covers suits for damages or other relief "resulting from the criminal or unlawful misuse of a qualified product by the person [bringing

the action] or a third party," *id.* § 7903(5)(A), and "criminal and unlawful" refers only to U.S. federal and state law.

More fundamentally, Defendants' arguments about the "focus" of PLCAA are relevant only if there is no clear indication of the statute's scope. As the Supreme Court made clear in *RJR Nabisco*, when "there is a clear indication at step one" of the extraterritoriality analysis, a court "do[es] not proceed to the 'focus' step." *RJR Nabisco*, 579 U.S. at 342.

In this case, as in *RJR Nabisco*, the "[c]ontext is dispositive." *Id.* at 340. PLCAA refers repeatedly to federal and state law and never to foreign law. The findings identify the targeted lawsuits as those "commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others," with no mention of foreign governments. 15 U.S.C. § 7901(a)(7). And Congress's overriding concern was with protecting the Second Amendment rights of U.S. citizens in the United States, not the access of Mexican citizens to guns in Mexico. *Id.* 7901(a)(1) & (2). Because there is a clear indication that PLCAA applies only to civil actions alleging injury from the use of firearms that is "criminal or unlawful" under U.S. law, *id.* § 7903(5)(A), it does not bar Mexico's claims under Mexican law.[5]

## II.   International law and international comity do not bar Mexico from applying its law to companies in the United States.

Defendants also argue that Mexico cannot use Mexican law to regulate U.S. firearms companies. In the Introduction to their Motion to Dismiss, Defendants assert that "[u]nder bedrock principles of *international law*, a foreign nation cannot use its own law to reach across borders and impose liability based on conduct in another country that was lawful when it

---

[5] *Amici* do not address whether Mexico's claims under U.S. state law fit within any of PLCAA's enumerated exceptions. *See* 15 U.S.C. § 7903(5)(A).

occurred there." Motion to Dismiss 3 (emphasis added). In the argument itself, Defendants invoke *international comity* instead. *Id.* at 42 ("Under basic principles of international comity, a foreign sovereign cannot use foreign law to regulate the operations of U.S. companies within the United States."). International law and international comity are, of course, very different things. *See* Restatement (Fourth), Part IV, Chapter 1, Intro. Note ("International comity … is deference to foreign states that is not required by international law."); *see also* William S. Dodge, *International Comity in American Law*, 115 Colum. L. Rev. 2071, 2120-2124 (2015) (explaining the difference between international law and international comity). But whether the question is posed in terms of international law or international comity, the answer is the same: it is permissible for Mexico to apply its laws to conduct by U.S. companies in the United States that causes substantial effects in Mexico.

Under international law, the authority of a state to make law applicable to persons property or conduct is knows as jurisdiction to prescribe. Restatement (Fourth) § 401(a). Customary international law allows a state to exercise jurisdiction to prescribe if there is a "genuine connection" between the subject of the regulation and the regulating state. *Id.* § 407. There are six traditional bases for jurisdiction to prescribe under international law: territory, effects, nationality (active personality), passive personality, the protective principle, and universal jurisdiction. *See id.* §§ 408-413. In this case, the most relevant basis is effects: "International law recognizes a state's jurisdiction to prescribe law with respect to conduct that has a substantial effect within its territory." *Id.* § 409; *see also United States v. Smith*, 680 F.2d 255, 258 (1st Cir. 1982) (recognizing the effects principle, referred to in that case as the "objective territorial principle," as "including acts done outside a geographic jurisdiction, but which produce detrimental effects within it"). The United States regularly applies its laws

extraterritorially based on effects in the United States. *See, e.g.*, *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) ("[T]he Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."); *Steele v. Bulova Watch Co.*, 344 U.S. 280, 285-87 (1952) (holding that Lanham Act applied to trademark infringement in Mexico on the basis of effects in the United States). There is no question that Mexico has alleged that the Defendants' conduct in the United States caused substantial effects in Mexico. If proved, such effects would be sufficient under international law to justify the application of Mexican law.

International comity is different from international law. In fact, international comity is "deference to foreign states that is *not* required by international law." Restatement (Fourth), Part IV, Chapter 1, Intro. Note (emphasis added). Thus, each nation may decide for itself whether and how to limit the application of its laws and the jurisdiction of its courts as a matter of comity. *See* Joseph Story, Commentaries on the Conflict of Laws § 33, at 38 (2d ed. 1841) ("Every nation must be the final judge for itself, not only of the nature and extent of the duty, but of the occasions on which [comity's] exercise may be justly demanded."); Dodge, *International Comity in American Law*, at 2121 ("From the beginning, international comity has been understood to be a matter for each nation's discretion.").

International comity is the basis for many doctrines of U.S. law, *see* Dodge, *International Comity in American Law*, at 2099-2119, and the Defendants invoke quite a few of them. *See* Motion to Dismiss 42-44.[6] But except for the conflict of laws, discussed below, none of these

---

[6] Defendants even quote one case, *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), that is based on constitutional principles of U.S. federalism and has no application in an international context. *See id.* at 572 ("We think it follows from these principles of *state sovereignty and comity* that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." (emphasis added)).

U.S. comity doctrines could even potentially limit the reach of Mexican law precisely because they are doctrines of U.S. law not doctrines of Mexican law. The principle of "constru[ing] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations," *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004), is a U.S. principle of statutory interpretation applicable only to U.S. law. The same is true of the doctrine of "prescriptive comity" that the Second Circuit applied in *In Re Vitamin C Antitrust Litig.*, 8 F.4th 136, 144 n.8 (2d Cir. 2021) (noting that prescriptive comity is "a form of statutory interpretation"). The doctrine of international comity abstention applied in *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237-41 (11th Cir. 2004), and *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 490 (D.N.J. 1999), limits the jurisdiction of U.S. courts, not the application of foreign law.[7] And because this case does not involve the recognition of a foreign judgment, the Defendants' invocations of *Hilton v. Guyot*, 159 U.S. 113 (1895), and *Telnikoff v. Matusevitch*, 702 A.2d 230 (Md. 1997), are irrelevant.[8]

The one U.S. comity doctrine that is potentially relevant to this case is the conflict of laws. A federal court sitting in diversity is required to follow the conflicts rules of the state in

---

[7] In most Circuits, this doctrine applies only if there is a parallel proceeding pending abroad. *See* Restatement (Fourth) § 424 reporters' note 9 (collecting cases). The First Circuit has not adopted a doctrine of international comity abstention, although District Courts in Massachusetts have sometimes stayed or dismissed cases in favor of pending foreign actions based on international comity. *See Hyewoong Yoon v. Seyeon Lee*, 433 F. Supp. 3d 18, 28 (D. Mass. 2019). In this case there is no parallel proceeding pending abroad.

[8] International comity generally does not require reciprocity. *See* Dodge, *International Comity in American Law*, at 2081 n.49. Even for foreign judgments, most states today do not impose a reciprocity requirement. *See* Restatement (Fourth) § 484 reporters' note 10 (discussing reciprocity as a requirement for recognizing foreign judgments). Massachusetts is one of the few states that has adopted a reciprocity requirement for foreign judgments. *See* Mass. Gen. Laws Ann. ch. 235, § 23A ("A foreign judgment shall not be recognized if … (7) judgments of this state are not recognized in the courts of the foreign state."). But it bears repeating that this case does not involve the recognition or enforcement of a foreign judgment.

which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 41 (1st Cir. 2020) ("When resolving disagreements about which state's law applies, we employ the choice-of-law principles of the forum state (here, Massachusetts)."). "Massachusetts has adopted a 'hybrid' approach to choice of law determinations in tort actions, applying the law of the place where the injury occurred unless a different jurisdiction has a more significant interest." *Royal Bus. Group, Inc. v. Realist, Inc.*, 751 F. Supp. 311, 315 (D. Mass. 1990), *aff'd*, 933 F.2d 1056 (1st Cir. 1991)); *see also Cohen v. McDonnell Douglas Corp.*, 450 N.E.2d 581, 585 (Mass. 1983) ("The law of Massachusetts is that ordinarily 'the substantive law governing an action of tort for physical injury is that of the place where the injury occurred.'" (quoting *Brogie v. Vogel*, 205 N.E.2d 234, 236 (Mass. 1965))). In their Motion to Dismiss, the Defendants do not address choice of law, but it is certainly possible that this Court would find that Massachusetts's choice of law rules dictate the application of Mexican law.

Defendants allude briefly to the possibility that Mexican law might violate the public policy of the forum. *See* Motion to Dismiss 42-43 (quoting *Bank of Augusta v. Earle*, 38 U.S. 519, 589 (1839)). As a general matter, "[n]o action will be entertained on a foreign cause of action the enforcement of which is contrary to the strong public policy of the forum." Restatement (Second) of Conflict of Laws § 90 (Am. L. Inst. 1971). But the threshold for the public policy exception is a high one. As the Restatement (Second) of Conflicts explains, "[a] court should not refuse to entertain such a suit unless to do so, in the words of Judge Cardozo, 'would violate some fundamental principle of justice, some prevalent conception of morals, some deep-seated tradition of the commonwealth.'" *Id.* cmt. c (quoting *Loucks v. Standard Oil Co. of New York*, 120 N.E. 198, 202 (N.Y. 1918)). Massachusetts appears to have adopted a

similarly high threshold. *See Jackson v. Anthony*, 185 N.E. 389, 392 (Mass. 1933) (asking whether foreign law "is offensive to good morals, creative of injustice or contrary to the sound public policy of Massachusetts").

At a later point in this litigation, this Court will have to determine what law governs Mexico's claims. But Defendants have not addressed that question. For purposes of the Motion to Dismiss, therefore, it is sufficient to note that no U.S. doctrine of international comity can limit the application of Mexican law unless Mexican law is ultimately found to be contrary to the public policy of Massachusetts.

## III.     Conclusion

For the reasons above, this Court should reject Defendant's arguments that PLCAA bars claims by foreign governments based on foreign law and that international law or international comity preclude the application of Mexican law.

Respectfully submitted,

*/s/ L. Scott Harshbarger*
L. Scott Harshbarger, Esquire (BBO# 224000)
Edward V. Colbert, III, Esquire (BBO# 566187)
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210
harshbarger@casneredwards.com
colbert@casneredwards.com

January 31, 2022

13

Appendix

George A. Bermann is the Jean Monnet Professor of European Union Law, Walter Gellhorn Professor of Law, and Director of the Center for International Commercial and Investment Arbitration at Columbia Law School. He served as Chief Reporter for the American Law Institute's *Restatement of the U.S. Law of International Commercial and Investor-State Arbitration* (Proposed Final Draft 2019).

Pamela Bookman is Associate Professor of Law at Fordham University School of Law. Her articles on transnational litigation have appeared in the *Notre Dame Law Review*, the *Stanford Law Review*, and the *Virginia Law Review* among other journals.

Ronald A. Brand is Chancellor Mark A. Nordenberg University Professor and John E. Murray Faculty Scholar at the University of Pittsburgh School of Law. He has represented the United States at the Hague Conference on Private International Law and is a member of the State Department's Advisory Committee on Private International Law. He has written widely on transnational litigation, including *International Civil Dispute Resolution* (West 2d ed. 2008).

Zachary D. Clopton is Professor of Law at Northwestern University, Pritzker School of Law. His articles on transnational litigation have appeared in the *Boston University Law Review*, the *Stanford Law Review*, and the *University of Chicago Law Review* among other journals.

William S. Dodge is John D. Ayer Chair at the University of California, Davis, School of Law. He served as Counselor on International Law to the Legal Adviser at the U.S. Department of State from 2011 to 2012 and as Co-Reporter for the American Law Institute's *Restatement (Fourth) of the Foreign Relations Law of the United States* (2018) from 2012 to 2018.

Katherine J. Florey is Martin Luther King, Jr. Professor of Law at the University of California, Davis, School of Law. Her articles on transnational litigation have appeared in the

*Boston University Law Review*, the *Notre Dame Law Review*, and the *Virginia Law Review* among other journals.

Robert D. Sloane is Professor of Law & R. Gordon Butler Scholar in International Law at Boston University School of Law. He holds a high-level diploma in public international law from the Hague Academy of International Law. He is the author of *Foreign Affairs Federalism* (Oxford University Press 2016).

David L. Sloss is the John A. and Elizabeth H. Sutro Professor of Law at Santa Clara University. His articles on transnational litigation and foreign relations law have appeared in the *Cornell Law Review*, the *Stanford Law Review*, the *Harvard International Law Journal*, and the *Yale Journal of International Law* among other journals.

Aaron D. Simowitz is Assistant Professor at Willamette University College of Law, an Affiliated Scholar at the Classical Liberal Institute at New York University, and a former Chair of the American Association of Law Schools Conflict of Laws Section. His work on transnational litigation has appeared in the *Fordham Law Review*, the *Southern California Law Review*, and the *NYU Law Review* among other journals.

Ralph G. Steinhardt is Professor of Law and the Lobingier Professor of Comparative Law and Jurisprudence at George Washington University Law School. He is Co-Director of the Oxford-GW Program in International Human Rights Law at New College, Oxford and a member of the International Commission of Jurists' Panel of Experts on Corporate Complicity in International Crimes.

Beth Stephens is a Distinguished Professor of Law at Rutgers Law School. She served as an Adviser for the *Restatement (Fourth) of the Foreign Relations Law*. Her articles on

transnational litigation have appeared in the *Fordham Law Review*, the *Notre Dame Law Review*, and the *William & Mary Law Review* among other journals.

Symeon C. Symeonides is Dean Emeritus and Alex L. Parks Distinguished Chair in Law at the Willamette University College of Law. He is one of the world's leading authorities on conflict of laws. His publications include *Conflict of Laws* (West 6th ed. 2018) and *Oxford Commentaries on American Law: Choice of Law* (Oxford University Press 2016).

Carlos M. Vázquez is the Scott K. Ginsburg Professor of Law at Georgetown University Law Center. He was an Adviser to the *Restatement (Fourth) of Foreign Relations Law* and is currently a member of the Members Consultative Group for the *Restatement (Third) of the Conflict of Laws*. He has written extensively about extraterritoriality and conflict of laws, and his articles have appeared in the *California Law Review*, the *Harvard Law Review*, and the *Virginia Law Review* among other journals.

Yanbai Andrea Wang is Assistant Professor of Law at the University of Pennsylvania Carey Law School. Her writing on transnational litigation has appeared in the *University of Chicago Law Review.*

Christopher A. Whytock is Vice Dean and Professor of Law and Political Science at the University of California, Irvine. He currently serves as an Associate Reporter for the American Law Institute's *Restatement (Third) of the Conflict of Laws*.

Ingrid B. Wuerth is Helen Strong Curry Chair in International Law and Director of the Cecil D. Branstetter Litigation & Dispute Resolution Program at Vanderbilt Law School. She served as Co-Reporter for the *Restatement (Fourth) of Foreign Relations Law* from 2012 to 2018 and is the incoming Co-Editor-in-Chief of the *American Journal of International Law*.