# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ESTADOS UNIDOS MEXICANOS, <br><br>     *Plaintiff,* <br><br> v. <br><br> SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS MANUFACTURING, INC.; BERETTA U.S.A. CORP.; BERETTA HOLDING S.P.A.; CENTURY INTERNATIONAL ARMS, INC.; COLT'S MANUFACTURING COMPANY LLC; GLOCK, INC.; GLOCK GES.M.B.H.; STURN, RUGER & CO., INC.; WITMER PUBLIC SAFETY GROUP, INC. D/B/A INTERSTATE ARMS <br><br>     *Defendants.* | Civil Action No. 1:21-cv-11269-FDS |

**[PROPOSED] AMICI CURIAE BRIEF OF SCHOLARS OF INTERNATIONAL LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..................................................................................1

I.        INTRODUCTION ..............................................................................................1

II.       ARGUMENT .....................................................................................................2

          A.     Public international law and the rules on conflict of laws do not
                 prohibit foreign law from governing the tort liability of U.S.
                 companies for damage caused abroad.............................................2

          B.     The application of the law of the place of damage in cross-border
                 tort claims is commonplace in international litigation practice. .................4

                 1.     Policy Considerations for the Application of the Law of the
                        Place of Damage ...........................................................5

                 2.     Canada (Excluding Quebec) ............................................6

                 3.     United Kingdom..............................................................7

                 4.     Australia .......................................................................9

                 5.     European Union: The Rome II Regulation .....................10

                        a.     The General Rule for Torts and Complex Torts:
                               Article 4 of the Rome II Regulation ...................12

                        b.     A Specific Rule for Products Liability: Article 5 of
                               the Rome II Regulation......................................13

                 6.     The 1973 Hague Convention on the Law Applicable to
                        Products Liability.........................................................18

                 7.     Codified Conflict of Laws Rules in Other Jurisdictions...............20

                        a.     General Rules in Torts ......................................20

                        b.     Specific Rules for Products Liability Cases......................20

                 8.     Specific Conflict of Laws Rules on Products Liability:
                        Comparative Conclusions ..............................................23

III.      CONCLUSION................................................................................24

          APPENDIX.................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amaca Pty Ltd. v Frost*,
   [2006] NSWCA 173 (Austrl.)................................................................10

*British Columbia v. Imperial Tobacco Canada Ltd.*,
   (2004) 239 DLR (4th) 412, 2004 BCCA 269 (Can.) ...........................7

*Distillers Co. (Bio-Chemicals) Ltd v. Thompson*,
   [1971] 1 AC 464 (Privy Council) (UK).............................................9, 10

ECJ C-127/ 04 *Declan O´Byrne v Sanofi Pasteur MSD Ltd.*,
   [2006] ECR I-1313 (UK)....................................................................16

*Edmunds v. Simmonds*,
   [2001] 1 WLR 1003 (UK).....................................................................9

*Hanlan v. Sernesky*,
   (1998) 38 OR 3d 479 (Can.) .................................................................7

*Hilton v. Guyot*,
   159 U.S. 113 (1895)...............................................................................3

*Moran v. Pyle National (Canada) Ltd.*,
   [1975] 1 S.C.R. 393 (Can.) ...................................................................7

*Ostroski v. Global Upholstery Co.*,
   [1996] ACWS (3d) 990 (Can.)...............................................................7

*Pfeiffer v. Rogerson*,
   [2000] HCA 36, (2000) 203 CLR 503 (Austl.)................................9, 10

*Regie National des Usines Renault SA v. Zhang*,
   [2002] HCA 10, (2002) 210 CLR 491 (Austl.).....................................9

*Sophocleous v. Secretary of State for Foreign and Commonwealth Affairs*,
   [2018] EWCA Civ 2167 (Eng.) .............................................................9

*Tolofson v. Jensen*,
   [1994] 3 SCR 1022 (Can.) ..................................................................6, 7

*Trafigura Beheer BV v. Kookmin Bank Co.*,
   [2006] EWHC 1450 (Comm) (UK) ........................................................9

*Wong v. Lee*,
(2002) 58 OR (3d) 398 (Can.)..................................................................................7

**Foreign Statutes**

Chinese Statute of Application of Law to Foreign Civil Relations (adopted at the
17th session of the Standing Committee of the 11th National People's
Congress on 28 October 2010, effective 1 April 2011)........................................21

Civil Code of the Russian Federation (as amended by Federal Law No 260-FZ on
30 September 2013) ............................................................................................21

Civil Codes of Québec (L.Q. 1991) .............................................................................21

Code of Private International Law (Law No 98-97 of 27 November 1998),
Official Journal of the Republic of Tunisia, 1 December .....................................21

Japanese Act on General Rules for Application of Laws (Hōno Tekiyō ni Kansuru
Tsūsokuhō, Law No 10 of 1898, as newly titled and amended by Act No 78 of
21 June 2006) .....................................................................................................21

Law No 218-Z of 7 December 1998 (Belarus) ............................................................21

Private International Law (Choice of Law in Tort) Act 2017 (New Zealand)
(2017)..................................................................................................................7

Private International Law (Miscellaneous Provisions) Act 1995 (UK)......................7, 8

Swiss Private International Law Act (*Bundesgesetz über das Internationale
Privatrecht* of 18 December 1987, 1988 BBl I 5, as amended)..............................21

**European Union**

European Commission, *Proposal for a Regulation of the European Parliament
and the Council on the Law Applicable to Non- Contractual Obligations
("Rome II")*, COM(2003) 427 final......................................................................16

Regulation (EC) No. 864/2007 of the European Parliament and of the Council of
11 July 2007 on the Law Applicable to Non-Contractual Obligations (Rome
II)............................................................................................................ *passim*

Treaty on the Functioning of the European Union (Oct. 26, 2012).............................11

**International Treaties**

Hague Convention, Convention on the Law Applicable to Products Liability (2
October 1973) ...............................................................................................18, 19

## Other Authorities

Alex Mills, *Private Interests and Private Law Regulation in Public International Law Jurisdiction*, *in* Stephen Allen et al., *Oxford Handbook of Jurisdiction in International Law* (2019) ................................................................................................ 3

Alex Mills, *Rethinking Jurisdiction in International Law*, 84 Br. Yearbook Int'l L. 187 (2014) .................................................................................................................... 2

Emmanuel Guinchard, *Rome I and Rome II in Practice* (1st ed. 2020) ........................ 11

James Crawford, *Brownlie's Principles of Public International Law* (9th ed. 2019) ..................... 2

Restatement (Fourth) of Foreign Relations Law (2018) .................................................. 2

Restatement (Second) of Conflict of Laws (1971) .......................................................... 4

Symeon C. Symeonides, *Codifying Choice of Law Around the World* (2014) ................................ 4

Thomas Kadner Graziano, *Gemeineuropäisches Internationales Privatrecht - Harmonisierung des IPR durch Wissenschaft und Lehre (am Beispiel der ausservertraglichen Haftung für Schäden)* (2002) ...................................................... 13, 16, 17

Thomas Kadner Graziano, *Products Liability*, *in* Jürgen Basedow et al., *Encyclopedia of Private International Law* (2017) ........................................... 16, 17

Thomas Kadner Graziano, *Torts*, *in* Jürgen Basedow et al., *Encyclopedia of Private International Law* (2017) ........................................................................... 20

## INTEREST OF AMICUS CURIAE

Amici (listed in the Appendix) are professors of international law who research, publish, and teach in the fields of public international law and/or the conflict of laws (private international law). Amici believe their expertise will be useful to the Court in ruling on the Defendant's Motion to Dismiss. In this brief, Amici conduct an analysis of comparative material to address only one issue in the Defendants' Motion to Dismiss: whether the law of Mexico, as the place of the alleged damage, can apply to a tort law claim against U.S. firearms companies (Motion to Dismiss, Part VI).[1]

## I.    INTRODUCTION

The application of Mexican law in the circumstances of this case would not be contrary to accepted principles of public international law or the conflict of laws and would be consistent with the practice of other states. The claim in Defendants' Motion to Dismiss (p. 42) that "[u]nder basic principles of international comity, a foreign sovereign cannot use foreign law to regulate the operations of U.S. companies within the United States" is inaccurate or at best misleading. It is commonplace for courts to apply the law of the place of damage in cross-border tort claims, even if that involves applying foreign law to local defendants. Product liability cases present distinct policy challenges, and are sometimes regulated by specific rules, but these rules also often select the law of the place of damage or of the place where the victim had its habitual residence when it suffered the damage, particularly where it was foreseeable that the product would be used in that territory, as alleged in the complaint in this case. The application of Mexican law on the facts as alleged would not be inconsistent with international law or practice.

---

[1] No person or entity other than the amici authored this brief in whole or in part. No person or entity provided payment or any other benefit to the amici for preparing or submitting this brief.

## II.  ARGUMENT

**A.  Public international law and the rules on conflict of laws do not prohibit foreign law from governing the tort liability of U.S. companies for damage caused abroad.**

The application of a state's law to persons or events outside its territory is regulated by two fields of law.

The first are public international law rules governing prescriptive jurisdiction, which provide a general framework for limiting state exercises of regulatory authority.[2] The primary basis for the exercise of lawful regulatory authority by a state is a territorial connection—a state has jurisdiction to regulate within its territory, including events, persons, or things in its territory. Where an event crosses borders, such as where a wrongful act in one state causes damage in another state, this ground of jurisdiction is further understood to authorise both 'subjective territorial jurisdiction' and 'objective territorial jurisdiction'—both the state where the act occurred and the state where the damage occurred have lawful jurisdiction. The 'effects doctrine', under which a state may regulate extraterritorially where the relevant conduct causes harmful effects within its territory, has increasingly been accepted as an application or expansion of objective territorial jurisdiction. The application of Mexican law to a claim arising from harm allegedly caused in Mexico by foreign companies would be entirely consistent with these well-established rules of international law.

The second are rules of the conflict of laws, also known as private international law. This area of law includes more detailed 'choice of law' rules which determine the application of each state's rules of private law, particularly in cases in which more than one state's laws may purport to apply consistently with rules of public international law. In the context of private law,

---

[2] *See generally* Restatement (Fourth) of Foreign Relations Law pt. IV (2018); James Crawford, *Brownlie's Principles of Public International Law* ch. 21 (9th ed. 2019) (attached as Ex. 1); Alex Mills, *Rethinking Jurisdiction in International Law*, 84 Br. Yearbook Int'l L. 187 (2014) (attached as Ex. 2).

questions of adjudicative jurisdiction and the applicable law are disaggregated, so it is common for state courts to assert jurisdiction but apply foreign law.[3] This is unexceptional, for example, where claims are brought in the home state of the defendant but relate to the defendant's extraterritorial activities.

Defendants' Motion to Dismiss argues (at p. 42) that "[u]nder basic principles of international comity, a foreign sovereign cannot use foreign law to regulate the operations of U.S. companies within the United States". As is well known, 'comity' has been defined by the U.S. Supreme Court as:

> neither a matter of absolute obligation, on the one hand, nor of mere courtesy and goodwill, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons was are under the protection of its laws.[4]

Comity does not *prohibit* foreign law from applying to U.S. companies, but rather provides a *justification* for U.S. courts to apply foreign law (including to U.S. companies) in cases which are connected to foreign states. Choice of law rules give concrete effect to comity, consistent with broader principles of public international law. In this case, Mexico as Plaintiff is not 'using foreign law to regulate the operations of U.S. companies', it is merely arguing that a U.S. court should find that Mexican law applies to its claims in tort, based on the harm suffered in and to Mexico.

The principal focus of this brief is on this choice of law question, and its primary argument is that, in the circumstances of this case, the application of Mexican law by a

---

[3] *See also* Alex Mills, *Private Interests and Private Law Regulation in Public International Law Jurisdiction*, in Stephen Allen et al., *Oxford Handbook of Jurisdiction in International Law* (2019) (attached as Ex. 3).

[4] *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895).

Massachusetts court would be consistent with the practice of other states. Where claims are brought in tort, states commonly apply the law of the place of the tort, and in cross-border torts this is often understood to mean the place of the damage. In the European Union, particularised choice of law rules has been adopted for product liability cases, which exclude in some cases the law of the place of the damage, but here these rules would still be likely to lead to the application of Mexican law.

**B.    The application of the law of the place of damage in cross-border tort claims is commonplace in international litigation practice.**

The predominant choice of law rules applicable to tort claims is the law of the place of the tort, also known as the *lex loci delicti* rule. Professor Symeon Symeonides, a leading international comparativist in the field, observed in 2014 that "[o]utside the United States, virtually all codifications enacted in the last 50 years continue to follow the *lex loci delicti* rule as the basic rule for tort conflicts".[5] This brief cannot purport to be comprehensive, but the sample of practice it examines below should be sufficient to demonstrate that the application of the law of the place of the tort, including the place of the damage in cross-border torts, is commonplace in international litigation practice. Courts invariably retain a safeguard to refuse application of foreign law where it is contrary to domestic public policy, but these safeguards are applied only in exceptional cases involving a fundamental principle of justice or morality.[6]

The analysis below considers the applicable choice of law rules in Canada, the United Kingdom, Australia, the European Union (with the Rome II Regulation providing uniform choice of law rules for the EU), the ten Member States of the 1973 Hague Convention on the Law Applicable to Products Liability, and in other states which have modern national codifications on

---

[5] Symeon C. Symeonides, *Codifying Choice of Law Around the World*, at 52 (2014) (attached as Ex. 4).

[6] See Restatement (Second) of Conflict of Laws § 90 (1971).

choice of law. Before this practice is examined, this section begins with a brief note on the policy considerations which are behind the rules adopted.

### 1.     Policy Considerations for the Application of the Law of the Place of Damage

Numerous arguments are put forward for the application of the law of the place of injury in general and to complex torts in particular (rather than the law of the place where the tortfeasor had acted), which has the consequence that a person causing damage in a foreign country must conform to the liability rules of the country in which his actions produce their effects. Every actor must take into consideration the potential victims' legitimate expectations to be protected according to the level of protection provided by the law of the state where his goods and interests are located and the injury occurs. Moreover, from a prevention and deterrence perspective, the law of the place where the damage occurred is the most appropriate, in that national tort laws are in principle directed at behavior that has its effects within the territory of the state in question. This means that actions with consequences in another country ought to be governed by the tort law rules in force in the place where the damage occurs. The preventive function of the substantive tort law of this country would be lost if persons acting from abroad had to comply only with the rules of the country in which they are acting. Accordingly, both the compensatory and the preventive functions of tort law favor application of the law of the place where the damage occurs. For these reasons, the place of injury rule has gained acceptance in many jurisdictions worldwide over the last centuries and recent decades.

In product liability cases, the person claimed to be liable has often acted in a place other than where the person claiming compensation has suffered injury: a product is designed and manufactured in one place and marketed and purchased in others. Once acquired, the product is carried to yet other places, with or without the consent of the manufacturer. It may ultimately cause damage there to the person who acquired it, to persons close to the purchaser, or to

innocent bystanders. Given the high mobility of many products, and for the purpose of avoiding inadequate and fortuitous results, some jurisdictions have enacted specific conflict of laws rules governing the law applicable to products liability. These rules seek to balance the interests of manufacturers in managing liability risk through control over distribution of their products with the interests of injured parties who rely on the protection of their local law against defective or dangerous products. As discussed further below, this balancing of interests may be struck in different ways, but one common balance is to apply the law of the place of injury subject to a requirement that it was foreseeable to the manufacturer that the product would be used in that place.

### 2.       Canada (Excluding Quebec)

The modern common law rule for choice of law in tort in Canada was adopted by the Supreme Court in *Tolofson v. Jensen*.[7] Although the case concerned an inter-provincial tort, the court addressed the choice of law rules to be applied in both internal and international disputes. It held that "it is to the underlying reality of the international legal order . . . that we must turn if we are to structure a rational and workable system of private international law",[8] and that "on the international plane, the relevant underlying reality is the territorial limits of law under the international legal order".[9] The *lex loci delicti* rule was held to be applicable in both inter-provincial and international tort disputes. The court acknowledged the possibility of a flexible exception in international cases, where, for example, both parties were from a common home

---

[7] [1994] 3 SCR 1022 (Can.), *available at* https://scc-csc.lexum.com/scc-csc/scc-csc/en/item/1209/index.do.

[8] *Id.* at 1047–48.

[9] *Id.* at 1047.

state but the tort occurred in a foreign state,[10] but this is only applied exceptionally in practice.[11] On the question of localising a cross-border tort, the court observed that:

> There are situations, of course, notably where an act occurs in one place but the consequences are directly felt elsewhere, when the issue of where the tort takes place itself raises thorny issues. In such a case, it may well be that the consequences would be held to constitute the wrong.[12]

The *lex loci delicti* rule is applied in product liability cases, generally in favour of the law of the place of the damage, as it is damage which establishes the tort.[13] In complex cases where manufacture, distribution and injury may occur in different locations, there is authority that localises the tort at the place of the injury if "it is reasonably foreseeable that the product would be used or consumed where the plaintiff used or consumed it".[14] We note that Plaintiff alleges foreseeability of injury in Mexico in this case, evidenced by the design of products to appeal to Mexican residents.

### 3.    United Kingdom

Since 2009, choice of law in tort in the United Kingdom has been regulated by a European Union instrument, the Rome II Regulation, which has also been retained as law despite the withdrawal of the United Kingdom from the European Union. The Rome II Regulation is discussed below. Prior to this regulation, choice of law in tort in the United Kingdom was regulated by the Private International Law (Miscellaneous Provisions) Act 1995.[15] The Act also

---

[10] *Id.* at 1057; *see also Hanlan v. Sernesky*, (1998) 38 OR 3d 479 (Can.).

[11] *See, e.g.*, *Wong v. Lee*, (2002) 58 OR (3d) 398 (Can.).

[12] *Tolofson*, 3 SCR 1022 at 1050.

[13] *See, e.g.*, *British Columbia v. Imperial Tobacco Canada Ltd.*, (2004) 239 DLR (4th) 412, 2004 BCCA 269 (Can.).

[14] *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393 (Can.); *see also Ostroski v. Global Upholstery Co.*, [1996] ACWS (3d) 990 (Can.) (applying *Moran*).

[15] *See also* Private International Law (Choice of Law in Tort) Act 2017 (New Zealand) (2017).

continues to apply in cases falling outside the temporal or subject matter scope of the Regulation.

The key provision is as follows:

> Section 11 – Choice of applicable law: the general rule.
>
> (1) The general rule is that the applicable law is the law of the country in which the events constituting the tort or delict in question occur.
>
> (2) Where elements of those events occur in different countries, the applicable law under the general rule is to be taken as being—
>
>> (a) for a cause of action in respect of personal injury caused to an individual or death resulting from personal injury, the law of the country where the individual was when he sustained the injury;
>>
>> (b) for a cause of action in respect of damage to property, the law of the country where the property was when it was damaged; and
>>
>> (c) in any other case, the law of the country in which the most significant element or elements of those events occurred.
>
> (3) In this section "personal injury" includes disease or any impairment of physical or mental condition.

This rule thus clearly provides for the application of the law of the place of the tort and specifies that, for personal injury claims involving a wrongful act in one place and damage in another place, this is the law of the place of injury. This rule is also applied in product liability cases and would ordinarily point to application of the law of the place of injury.

The rule is subject to a flexible exception under Section 12 of the 1995 Act, which allows the court to apply another law if it would be "substantially more appropriate". The threshold to apply this exception is, however, not easily met, and in practice it has been used in cases where

the claimant and respondent have a common residence,[16] or in cases where there is an underlying contractual relationship between the parties connecting the tort to a different system of law.[17]

### 4.    Australia

The modern choice of law rule for tort in Australia was established by the High Court of Australia in *Pfeiffer v. Rogerson*.[18] In a case connected to more than one Australian law area (analogous to an inter-state case within the United States), the court held that the structure of Australian federalism implied a *lex loci delicti* rule for choice of law in tort. In *Regie National des Usines Renault SA v. Zhang*,[19] the *lex loci delicti* rule was extended to international torts, based on a general preference for the predictability and territoriality of the *lex loci delicti* rule, and the pragmatic basis that it is better to have a consistent single approach for both internal and international choice of law disputes.[20] The rule does not have a flexible exception, in either domestic or international cases, and extends to product liability disputes.

In cross-border torts, where the wrongful act and place of the damage occur in different places, the courts identify the place of the tort by asking "where in substance did this cause of action arise?"[21] The English courts, commenting on this test (which remains part of English law for certain purpose), have observed, "In personal injury cases this is, in general, the place where the injury is suffered".[22] The test derives from an earlier decision, *Distillers v. Thompson*, a product liability case arising from a drug which caused harmful side effects. The court located

---

[16] *Edmunds v. Simmonds*, [2001] 1 WLR 1003 (UK).

[17] *Trafigura Beheer BV v. Kookmin Bank Co.*, [2006] EWHC 1450 (Comm) (UK).

[18] *Pfeiffer v. Rogerson*, [2000] HCA 36, (2000) 203 CLR 503 (Austl.).

[19] *Regie National des Usines Renault SA v. Zhang*, [2002] HCA 10, (2002) 210 CLR 491 (Austl.).

[20] *Id.* ¶¶ 125–32 (Kirby, J.).

[21] *Distillers Co. (Bio-Chemicals) Ltd v. Thompson*, [1971] 1 AC 464 (Privy Council) (UK).

[22] *Sophocleous v. Secretary of State for Foreign and Commonwealth Affairs*, [2018] EWCA Civ 2167 (Eng.).

the tort at the place of injury, which was also identified as the place where the defendants failed to warn about the potential side effects.[23] The place of injury has also been applied in product liability cases.[24] In *Pfeiffer*, the High Court acknowledged, however, that in complex cases "the place of the tort may be ambiguous or diverse".[25] The court further observed, "Difficulty will arise in locating the tort when an action is brought, for example, for product liability and the product is made in State A, sold in State B and consumed or used by the plaintiff in State C".[26] It is not clear under Australian law whether the court would apply Mexican law in equivalent facts to the present case, but it is certainly not unusual for the choice of law rule in tort to lead to the application of the law of the place of the damage.

5.      **European Union: The Rome II Regulation**

The present case raises the question of the law applicable to a complex tort, i.e., a tort where the act that allegedly caused the damage (manufacturing of guns, marketing and distribution of these guns) has taken place in one country or jurisdiction (the USA and possibly other countries) and the injury to the legally protected interest (the killing or injuring of citizen) occurred in another jurisdiction (here, Mexico). The case thus raises the question of the law applicable to so-called complex torts, *délits à distance, Distanzdelikte*, *ilícitos a distancia*, etc.).

In the European Union, the Private International Law rules for tort claims are to be found in the Rome II Regulation.[27] The Rome II Regulation applies in 26 of the current 27 EU Member States (with the exception of Denmark).

---

[23] *Distillers*, 1 AC 464.

[24] *Amaca Pty Ltd. v Frost*, [2006] NSWCA 173 (Austrl.).

[25] *Pfeiffer*, 203 CLR 503.

[26] *Id.*

[27] Regulation (EC) No. 864/2007 of the European Parliament and of the Council of 11 July 2007 on the Law Applicable to Non-Contractual Obligations (Rome II), *available at* https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32007R0864&from=EN.

The Rome II Regulation establishes uniform conflict of laws rules for the entire European Union (except Denmark). They leave no space for any national legislation in this field and are to be applied uniformly throughout the entire EU. Should a court in a Member State have doubts regarding the interpretation of a provision of the regulation, it may submit the question to the Court of Justice of the European Union (CJEU) for a preliminary ruling. Courts of last instance are obliged to submit questions of doubt to the CJEU for interpretation.[28]

For the analysis in the present case, the relevant provisions can be found in the general rule in Art. 4 of the Rome II Regulation, and in the rule on products liability in Art. 5 of Rome II.

It is generally perceived in Europe that the text of both provisions is rather clear.[29] As a consequence, there is no published case-law yet of the CJEU on Art. 5 of the Rome II Regulation (the rule on products liability), nor any decision on Art. 4 Rome II (the general rule for torts) of relevance in the present context.[30] (As far as products liability is concerned, the CJEU has rather dealt with issues of jurisdiction under the Brussels I Regulation, rather than with applicable law.)

Regarding the national courts in the EU Member States, more than 250 decisions on the application of the Rome II Regulation have been published in the Netherlands, 200 in Germany, 50 in Austria, 48 in the UK, 30 in Italy, 7 in Portugal, etc. Very few of them concerned products liability cases; none of them is directly applicable to the present case and provide clarification beyond the *text* and the *rationale* of Articles 4 and 5.[31]

---

[28] *See* Treaty on the Functioning of the European Union at Art. 267 lit. b (Oct. 26, 2012), *available at* https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:12012E/TXT&from=EN.

[29] This is generally confirmed in many of the country reports published in the study by Emmanuel Guinchard, *Rome I and Rome II in Practice* (1st ed. 2020).

[30] *See also* Thomas Kadner Graziano & Michel Reymond, *The Application of the Rome I and Rome II Regulations Before the Court of Justice of the European Union*, *in* Guinchard, *supra*, at 327–48 (attached as Ex. 5).

[31] See the country reports in Guinchard, *supra*.

### a.   The General Rule for Torts and Complex Torts: Article 4 of the Rome II Regulation

According to Art. 4(1) 1st sent. of the Rome II Regulation, cross-border torts are, in general, governed by the law of the country where the damage occurred (*lex loci delicti*-rule). With respect to personal injury or death caused to an individual, this leads to the application of the law at the place where the victim was when he or she suffered the injury. Recital 17 of the Rome II regulation states that "in cases of personal injury or damage to property, the country in which the damage occurs should be the country where the injury was sustained or the property was damaged respectively".

When the event giving rise to the damage occurred in one jurisdiction and the victim suffered the injury in another, the law of the latter jurisdiction applies (see Art. 4(1) 1st sent. *in fine* according to which the law at the place of damage applies "irrespective of the country in which the event giving rise to the damage occurred").

Even before the Rome II Regulation was adopted, the *lex loci delicti rule* was firmly recognized in the legislation of 20 European jurisdictions; in eight others it was recognized by case law. Regarding *complex torts*, before the Rome II Regulation was enacted, some jurisdictions in Europe applied the law of the place of injury (the Netherlands, Romania; beyond the EU: Switzerland, Turkey, except where this law was unforeseeable), in others the law more favorable to the victim was applied (Portugal, Hungary), in yet others the victim could opt for the law which was more favorable to him or her (Germany, Estonia). In the second half of the 20th century, very few jurisdictions in Europe continued applying the law of the place of acting to complex torts (Lichtenstein and Austria, however the courts applied in practice the law at the

place of injury whenever that place was foreseeable). These national Private International Law rules have now all been replaced by the provisions of the Rome II Regulation.[32]

The Rome II Regulation provides for two limited and clearly defined exceptions to the *lex loci delicti* rule. According to Art. 4(2), "Where the person claimed to be liable and the person sustaining damage both have their habitual residence in the same country at the time when the damage occurs, the law of that country shall apply". Art. 4(3) contains a very limited general exception clause that applies first and foremost where the parties are in a contractual relationship "that is closely connected with the tort/delict in question". In that case the law applicable to the contract also governs a claim in tort (*rattachement accessoire*). Finally, the parties may also determine the applicable law by their common consent (Art. 14 of the Rome II Regulation).

### b.    A Specific Rule for Products Liability: Article 5 of the Rome II Regulation

In the present case, the injury was allegedly caused by a product manufactured and marketed by the defendant company. Given the high mobility of many products, and for the purpose of avoiding inadequate and fortuitous results, some jurisdictions have enacted specific Conflict of Laws rules governing the law applicable to products liability. This is also the case for the European Union with Art. 5 of the Rome II Regulation. Where Art. 5 applies, it is *lex specialis* and prevails over the general rule in Art. 4 of the Rome II Regulation.

Art. 5 offers a cascade of connecting factors. At every stage of the analysis, two connecting factors that must be present for determining the applicable tort law. Art. 5 of the Rome II Regulation provides:

---

[32] *See* Thomas Kadner Graziano, *Gemeineuropäisches Internationales Privatrecht – Harmonisierung des IPR durch Wissenschaft und Lehre (am Beispiel der ausservertraglichen Haftung für Schäden)* 131–149 (2002) (attached as Ex. 6) (addressing torts in general); *id.* at 194–235 (addressing complex torts).

Article 5 (Product liability) (1) Without prejudice to Article 4(2), the law applicable to a non-contractual obligation arising out of damage caused by a product shall be:

(a) the law of the country in which the person sustaining the damage had his or her habitual residence when the damage occurred, if the product was marketed in that country; or, failing that,

(b) the law of the country in which the product was acquired, if the product was marketed in that country; or, failing that,

(c) the law of the country in which the damage occurred, if the product was marketed in that country.

However, the law applicable shall be the law of the country in which the person claimed to be liable is habitually resident if he or she could not reasonably foresee the marketing of the product, or a product of the same type, in the country the law of which is applicable under (a), (b) or (c). 2.

(2) Where it is clear from all the circumstances of the case that the tort/delict is manifestly more closely connected with a country other than that indicated in paragraph 1, the law of that other country shall apply. A manifestly closer connection with another country might be based in particular on a pre-existing relationship between the parties, such as a contract, that is closely connected with the tort/delict in question.

According to the Rome II Regulation, the relevant criteria for determining the law applicable to a products liability claim thus include:

a) *party autonomy*: under Art. 14 of the Rome II Regulation, the parties may determine the applicable law by their common consent. This may however not be relevant in the present case.

b) applying the law governing a *pre-existing relationship* between the parties (so-called *rattachement accessoire*), Art. 5(2) of the Rome II Regulation; this is not relevant in the present case either;

c) applying the law of the *parties' common habitual residence*, Art. 5(1) wit Art. 4(2) of the Rome II Regulation, again not relevant in the present case;

d) applying the law of the *injured party's habitual residence* provided that the *precise product was, or the manufacturer's products of the same kind were, marketed there*, Art. 5(1)(a) of the

14

Rome II Regulation. This rule applies both to members of the chain of sales and purchases and to mere third-parties having suffered damage (so-called *innocent bystanders*);

e) applying the law of the *place of marketing and purchase* of the product that caused the damage, Art. 5(1)(b) of the Rome II Regulation.

f) applying the law of the *country of injury* if the product was *marketed there*, Art. 5(1)(c) of the Rome II Regulation.

It can be observed that, according to Art. 5(1)(a)–(c), the *place of marketing of the product* plays a key role for determining the applicable law under the Rome II Regulation, as under many other modern PIL statutes, often in combination with, cumulatively, another connecting factor, such as

- the injured party's habitual residence, Art. 5(1)(a),

- the *place of purchase* of the product that caused the damage, Art. 5(1)(b), or

- the *country of injury*, Art. 5(1)(c) of the Rome II Regulation.

In the present case, the *injured party's (or parties') habitual residence* (lit. a) was Mexico, and the *injuries caused by the weapons* (lit. c) occurred in Mexico. The question then is whether the availability of the weapons in Mexico was *attributable to the defendant manufacturer* at the Conflict of Laws level. According to the Rome II Regulation, this is the case if the product was *marketed* in Mexico.

When interpreting EU law, courts in Europe including the European Court of Justice start with the *wording* of the statute, examine the *purpose* (or telos) of the rule, its *history*, and the *systematic* positioning of the rule in the regulation (grammatical, teleological, historic, and systematic interpretations). The starting point is the wording, often followed by what is, by far, the most important method of interpretation: the teleological interpretation, searching for the purpose of the rule.

15

The Rome II Regulation contains no definition of the notion of *marketing*. However, according to ECJ case law, a product is marketed when it is offered to the public for use or consumption.[33] The ECJ held in relation to the interpretation of the Products Liability Directive that 'a product is put into circulation when it is taken out of the manufacturing process operated by the producer and enters a marketing process in the form in which it is offered to the public in order to be used or consumed'.

There are several purposes, or rationales, for the rules in Art. 5(1)-(c) Rome II Regulation. On the one hand, Article 5(1) aims at *protecting the person sustaining damage*. Application of the law of the victim's habitual residence (lit. a) or of the law of the place where the victim suffered the damage (lit. c), which is often also the place of purchase, is the simplest and, in principle, the least costly solution for the person having suffered damage. On the other hand, it is also *fair for the persons claimed to be liable*, in that these persons are making a profit from the distribution of their products in this country and ought reasonably to expect the law of a country in which their products are distributed to apply when these products cause damage there.[34]

The application of that law is also *foreseeable for the manufacturer*: Manufacturers who have their products marketed in a foreign country must take into account the potential for their products to cause damage there, and that an injured person would expect the law of this country to apply. Using the law of the place of marketing and of acquisition promotes legal certainty, and

---

[33] *See* ECJ C-127/ 04 *Declan O'Byrne v Sanofi Pasteur MSD Ltd.*, [2006] ECR I-1313 (UK).

[34] *See* European Commission, *Proposal for a Regulation of the European Parliament and the Council on the Law Applicable to Non- Contractual Obligations ("Rome II")* at 16, COM(2003) 427 final, *available at* https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=COM:2003:0427:FIN:EN:PDF; *see also* Graziano, *Gemeineuropäisches Internationales Privatrecht*, *supra*, at 266–70, 282–86; Thomas Kadner Graziano, *Products Liability*, *in* Jürgen Basedow et al., 2 *Encyclopedia of Private International Law* at 1415 (2017) (attached as Ex. 7).

finally, applying this law is equally acceptable for both the manufacturer and the purchaser and it is in conformity with their expectations.[35]

Finally, according to Art. 5(1) *in fine* Rome II Regulation, the application of a law designated under the previous rules shall not be applicable and 'the law applicable shall be the law of the country in which the person claimed to be liable is habitually resident if he or she could not reasonably foresee the marketing of the product, or a product of the same kind, in the country the law of which is applicable under (a), (b) or (c)'.

Article 5(1) *in fine* reiterates the requirement that the applicable law be foreseeable for the manufacturer, which already underlies the marketing requirement. In the European case-law on international torts dating from the period before and after the entry into force of the Rome II Regulation, there is no single published case in which a court concluded that the injury in the country in which it occurred was not reasonably foreseeable for the person claimed to be liable.[36] In fact, most products are today distributed on an international or even global scale, and can freely circulate across borders, as is well known to manufacturers and distributors.

In the present case, according to the facts as alleged, Mexican law prohibited importing the weapons manufactured by the defendant. Marketing them in Mexico was, by legal means, technically impossible. However, according to the statement of claim, Defendants designed their weapons to attract customers specially in Mexico, and it hereby *targeted the Mexican market*. One gun carried the brand name "El Jefe" ("The Boss"), another the name "El Grito" ("The Cry"), and yet another the name of "Emiliano Zapata 1911", engraved with an image of the Mexican revolutionary Emiliano Zapata on one side of the barrel and a phrase attributed to him

---

[35] Graziano, *Products Liability*, *supra*, at 1415.

[36] *Compare* Graziano, *Gemeineuropäisches Internationales Privatrecht*, *supra*, at 224.

on the other (in Spanish): "It is better to die standing than to live on your knees". The weapons were marketed near the Mexican border or via the Internet but targeted for the Mexican market. According to the claim, they reached the Mexican market in large numbers—i.e., the market for which they were designed and which Defendants targeted for their distribution and use.

Consequently, applying Mexican law would be perfectly in line with the rationale of Art. 5 of the Rome II Regulation which is to apply, wherever possible, the law of the country where the injured party had its habitual residence (Art. 5(1) lit. a) and/or where it suffered the injury (Art. 5(1) lit. c) provided that this law was *foreseeable* to the manufacturer, which is generally the case if the product was marketed there, or—as arguably in the present case—could not be marketed there but was targeted at and indeed reached that market.

### 6.      The 1973 Hague Convention on the Law Applicable to Products Liability

The Hague Convention on the Law Applicable to Products Liability[37] was adopted in 1973 and entered into force in 1977. The Contracting States are Croatia, Finland, France, Luxemburg, Montenegro, The Netherlands, North Macedonia, Serbia, Slovenia, and Spain. In its Contracting States, it prevails over the Rome II Regulation, see Art. 28(1) of Rome II. In states that are not EU Member States, it prevails over the national Conflict of Laws rules.

The Hague Products Liability Convention combines four criteria, of which two generally need to be met in order to find the applicable law (the injured party's habitual residence, the place of establishment of the person claimed to be liable, the place of injury, and the place where the product was acquired). The different combinations of criteria apply in a hierarchical order.

---

[37] Hague Convention, Convention on the Law Applicable to Products Liability (2 October 1973), *available at* https://www.hcch.net/en/instruments/conventions/full-text/?cid=84.

*First*, according to Art. 5 of the 1973 Hague Convention "the applicable law shall be the internal law of the State of the habitual residence of the person directly suffering damage, if that State is also a) the principal place of business of the person claimed to be liable, or b) the place where the product was acquired by the person directly suffering damage".

In the case under examination, the victims and the defendant did not have their habitual residence and principal place of business in the same country (lit. a), nor had the victims themselves purchased the defendant's weapons there (lit. b). It is thus necessary to climb to the next, second step of the ladder of connecting factors.

*Second*, pursuant to Art. 4 of the 1973 Hague Convention "The applicable law shall be the internal law of the State of the place of injury, if State is also – a) the place of the habitual residence of the person directly suffering damage, or b) the principal place of business of the person claimed to be liable, or c) the place where the product was acquired by the person directly suffering damage".

In the Hague Convention, the place of injury thus appears at an earlier stage than in the Rome II Regulation. In the case under examination, the injuries happened in Mexico where the injured parties also had their habitual residences. Art. 4 lit. a) of the Hague Products Liability Convention would thus straightforwardly lead to the application of Mexican law in the present case.

In a French products liability case which was decided by the Appellate Court of Chambéry (*Cour d'appel de Chambéry*) on 13 March 2014, France was the place of injury and the place of the victim's habitual residence. The court applied French law, pursuant to Art. 4 lit.

a) of the Hague Products Liability Convention, and rightly so, despite the fact that the product that caused the damage had apparently not been marketed there at all.[38]

### 7.    Codified Conflict of Laws Rules in Other Jurisdictions

#### a.    General Rules in Torts

For the reasons mentioned above, the *lex loci delicti* rule has become a general principle of almost worldwide importance in codified private international law/conflict of laws systems.[39] Most jurisdictions that have codified their private international law in recent years have also followed the example of the EU in submitting claims resulting from *complex torts* to the law of the place of injury, rather than the law of the place where the tortfeasor has acted, see in particular Art. 17 of the Japanese PILA, Art. 133(2) 2nd sent. of the Swiss PILA (the unforeseeability clause has never been applied), Art. 1219 section 1 2nd sentence of the Russian Civil Code.

Applying the foreign law that is in force at the place where the victim suffered injury (rather than the law of the place where the tortfeasor has acted), i.e., Mexican law rather than the tort law of a state in the US, would thus far from being surprising from a European perspective or the perspective of any other codified system of PIL.

#### b.    Specific Rules for Products Liability Cases

A certain number of jurisdictions have enacted modern, *specific codified rules on the law applicable to products liability* over the recent decades. This is the case for *Switzerland*, which has the most comprehensive Private International Law Act worldwide, with more than 200 articles (1987, in force since 1989); *Quebec*, which has codified its Conflicts of Laws rules in its

---

[38] Cour d'appel de Chambéry, 13 March 2014, No. 13/01863, reported (in English) by Marie-Elodie Ancel, in Guinchard, *supra*, at 217, *available at* https://www.doctrine.fr/d/CA/Chambery/2014/R7A41A9936949A0967787.

[39] For numerous references, see Thomas Kadner Graziano, *Torts*, *in* Basedow et al., *supra*, at 1710–11 (attached as Ex. 8).

Civil Code, largely taking inspiration from the Swiss model (1991); *Tunisia*, which is the most advanced African country with a codified system of Private International Law (1998); Russia (which integrated modern Conflict of Laws rules into Part 3 of its Civil Code in 2013); Belarus (with a codification of 1998); Japan (with a recodification of its Conflict of Laws rules in 2006), and China (with a new act of 2010).[40]

Once the injury has occurred, most of these instruments (with the exception of the Civil Codes of Québec and Belarus) leave it to the parties to determine the applicable law if they wish to do so (Art. 132 Swiss PILA; Art. 1223.1 section 1 Russian CC; Art. 21 Japanese PILA; Art. 44 3rd sentence Chinese PILA, Art. 71 Tunisian PILA). They all permit a choice *ex post*, which is limited to the *lex fori* in Switzerland, Russia and Tunisia.

In the absence of a choice by the parties, the law of the parties' domicile or residence is applicable provided both parties are domiciled in the same country (Art. 133 section 1 Swiss PILA; Art. 3126 section 2 Civil Code of Quebec; Art. 1219 section 2 Russian CC; Art. 20 Japanese PILA; Art. 44 2nd sentence Chinese PILA; Art. 70 section 3 Tunisian PILA). Some codes or statutes provide for the application of the law governing a pre-existing relationship

---

[40] For precise references, see Switzerland: Swiss Private International Law Act (*Bundesgesetz über das Internationale Privatrecht* of 18 December 1987, 1988 BBl 1 5, as amended, henceforth Swiss PILA), available in the original version: https://www.fedlex.admin.ch/eli/cc/1988/1776_1776_1776/de; in English: https://www.fedlex.admin.ch/eli/cc/1988/1776_1776_1776/en; Tunisia: Code of Private International Law (Law No 98-97 of 27 November 1998), Official Journal of the Republic of Tunisia, 1 December, p 2332, henceforth Tunisian PILA), available in French in: http://www.droit-afrique.com/upload/doc/tunisie/Tunisie-Code-2010-droit-international-prive.pdf; the Civil Codes of Québec (L.Q. 1991, ch 64), in French: http://www.legisquebec.gouv.qc.ca/fr/document/lc/ccq-1991, in English: http://www.legisquebec.gouv.qc.ca/en/document/cs/ccq-1991; Russia: Civil Code of the Russian Federation (as amended by Federal Law No 260-FZ on 30 September 2013, henceforth Russian CC), in English: https://new.fips.ru/en/documents/documents.php (book 3); Belarus: Law No 218-Z of 7 December 1998, available in English in: https://wipolex.wipo.int/en/legislation/details/16850; the Japanese Act on General Rules for Application of Laws (Hōno Tekiyō ni Kansuru Tsūsokuhō, Law No 10 of 1898, as newly titled and amended by Act No 78 of 21 June 2006, henceforth Japanese PILA, original version available in: http://www.pilaj.jp/text/tsusokuho.html, in English translation: http://www.pilaj.jp/text/tsusokuho_e.html; the Chinese Statute of Application of Law to Foreign Civil Relations (adopted at the 17th session of the Standing Committee of the 11th National People's Congress on 28 October 2010, effective 1 April 2011, henceforth Chinese PILA), original version: https://bit.ly/33YxoCd, in English: https://www.wipo.int/edocs/lexdocs/laws/en/cn/cn173en.pdf.

between the parties, in particular where they are in a contractual relationship (Art. 133 section 3 Swiss PILA; Art. 3127 Civil Code of Québec; Art. 20 Japanese PILA).

All of the above-mentioned codes and acts further contain specific rules with *objective connecting factors for products liability claims*. Absent an agreement on the applicable law, the person having suffered damage can choose between the law of the state where the manufacturer has its establishment or residence and the law of the state where the good was acquired, Art. 135 section 1 Swiss PILA, Art. 3128 Civil Codes of Québec, Art. 1221 section 1 nos. 1 and 3 Russian CC, Art. 1130 Civil Code of Belarus, Art. 72 of the Tunisian PILA. Under the Swiss PILA and the Russian CC, applying the law of the place of acquisition is excluded if the persons held liable prove that the product was marketed there without their consent. The Civil Codes of Russia, Belarus, and Tunisia further allow the choice of the law of the country where the injured party is domiciled or has its principal activity (Art. 1221 section 1 no. 2 Russian Civil Code, Art. 1130 section 1 Civil Code of Belarus, Art. 72 no. 4 Tunisian PILA).

Under Art. 45 1st sentence Chinese PILA, the law of the country of the habitual residence of the person having suffered the damage applies to product liability, without further requirements. The victim may instead choose the law applicable at the principal place of business of the person claimed to be liable or at the place where the injury occurred. According to Art. 45 2nd sentence Chinese PILA, if the victim chooses the law of the place where the damage occurs, or if the tortfeasor does not engage in any business activity in the victim's habitual residence, the law of "the place where the damage occurs shall be applied". (If the victim chooses the law of the place of tortfeasor's principal place of business instead, that law shall apply.)

The law of the place of injury or of the place of the victim's habitual residence can also be chosen by the victim under Art. 72 no 3 and 4 of the Tunisian PILA.

In the present case, under the Chinese PILA, the case would be governed by Mexican law, given that the defendant's products were designed for, and targeted, the Mexican market (Art. 45 1st sent. Chinese PILA) or, otherwise, under Art. 45 2nd sentence Chinese PILA, given that the damage occurred in Mexico; under the Civil Codes of Russia, Belarus, and Tunisia the victims could opt for the application of Mexican law, i.e. the law of the country where the injured party is domiciled, has its habitual residence, or its principal activity; under the Swiss PIL Act and the Civil Code of Québec, much would depend on the interpretation of the place of acquisition for goods illegally imported into the country.

### 8.    Specific Conflict of Laws Rules on Products Liability: Comparative Conclusions

The comparative analysis of the EU Rome II Regulation, the 1973 Hague Products Liability Convention, and specific rules on products liability in national Private International Law statutes from around the world shows that the application of Mexican law in the present case would be far from surprising under most PIL systems:

- In some jurisdictions (Switzerland, Quebec) the outcome would depend on the interpretation of the notion "place of acquisition" in cases of the illegal import of goods into a market;

- In other jurisdictions, the PIL provisions would lead straightforward to the application of Mexican law (the Hague Convention, the Chinese PILA);

- In others applying Mexican law would be perfectly in line with the rationale of the specific PIL rule on Products liability (the Rome II Regulation);

- In a last group of jurisdictions, the victim would have the opportunity to opt for the application of Mexican law (Russia, Belarus, and Tunisia).

### III.    CONCLUSION

For the reasons outlined above, the application of Mexican law in the circumstances of this case would not be contrary to accepted principles of public international law or the conflict of laws and would be consistent with the practice of other states.


Dated: January 31, 2022                          Respectfully submitted,


_____
Thomas Kadner Graziano
Professor of Law, University of Geneva


_____
Alex Mills
Professor of Public and Private International
Law, University College London

## APPENDIX

Thomas Kadner Graziano is Professor of Law at the University of Geneva, where he acts as Director of the Programme on Transnational Law and Director of the Department of Private International Law. He has served as a member of the Swiss delegation to the Hague Conference on Private International Law and as a member of the Working Group and Drafting Committee on International Contracts at the Hague Conference. He is the author of books and articles on European and comparative Private International Law and comparative contract and tort law. He is co-founder and Council-member of the European Association of Private International Law (EAPIL), and has served as expert on Private International Law and comparative contract and tort law for the European Parliament, foreign governments, and in foreign courts and international arbitration proceedings.

Alex Mills is Professor of Public and Private International Law at University College London. He is a member of the International Law Association Committee on the Protection of Privacy in Private International and Procedural Law and sits on the Editorial Board of the *International and Comparative Law Quarterly*. He has served as an expert on matters of English and European private international law and has published books and articles on public and private international law. He is the author of *Party Autonomy in Private International Law* (Cambridge: Cambridge University Press, 2018) and co-author of *Cheshire North and Fawcett's Private International Law* (15th edition, Oxford: Oxford University Press, 2017).

# EXHIBIT 1

**OXFORD**

# BROWNLIE'S PRINCIPLES OF
# PUBLIC INTERNATIONAL
# LAW



**9TH EDITION**

## JAMES CRAWFORD

## OXFORD
UNIVERSITY PRESS

Great Clarendon Street, Oxford, OX2 6DP,
United Kingdom

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and in certain other countries

© Estate of Sir Ian Brownlie and James Crawford 2019

The moral rights of the author have been asserted

Sixth edition 2003
Seventh edition 2008
Eighth edition 2012

Impression: 1

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the
prior permission in writing of Oxford University Press, or as expressly permitted
by law, by licence or under terms agreed with the appropriate reprographics
rights organization. Enquiries concerning reproduction outside the scope of the
above should be sent to the Rights Department, Oxford University Press, at the
address above

You must not circulate this work in any other form
and you must impose this same condition on any acquirer

Public sector information reproduced under Open Government Licence v3.0
(http://www.nationalarchives.gov.uk/doc/open-government-licence/open-government-licence.htm)

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America

British Library Cataloguing in Publication Data
Data available

Library of Congress Control Number: 2018964838

ISBN 978-0-19-257702-3

Printed in Great Britain by
Bell & Bain Ltd., Glasgow

Links to third party websites are provided by Oxford in good faith and
for information only. Oxford disclaims any responsibility for the materials
contained in any third party website referenced in this work.

OXFORD PUBLIC INTERNATIONAL LAW

# Oxford Scholarly Authorities on International Law

## Part VII State jurisdiction, 21 Jurisdictional competence

### James Crawford SC, FBA

From: Brownlie's Principles of Public International Law (9th Edition)
James Crawford

### Previous Edition (8 ed.)

**Content type:** Book content
**Product:** Oxford Scholarly Authorities on International Law [OSAIL]
**Published in print:** 09 July 2019
**ISBN:** 9780198737445

**Subject(s):**

Jurisdiction of states, domestic — Jurisdiction of states, prescriptive — Jurisdiction of states, territoriality principle — Jurisdiction of states, nationality principle — Jurisdiction of states, universality principle — Jurisdiction of states, extra-territorial — US Alien Tort Statute — Jurisdiction of states, enforcement

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

## (p. 440) 21  Jurisdictional competence

### 1.  Overview

Jurisdiction is an aspect of sovereignty: it refers to a state's competence under international law to regulate the conduct of natural and juridical persons.[1] The notion of regulation includes the activity of all branches of government: legislative, executive, and judicial.[2]

Although the state is conceived of in international law as a single unit, for the purposes of analysing jurisdiction and its limits some distinctions are usually made. On the one hand, is the power to make laws, decisions, or rules (*prescriptive* jurisdiction); on the other, is the power to take executive or judicial action in pursuance of or consequent on the making of decisions or rules (respectively *enforcement* or *adjudicative* jurisdiction).[3]

The starting point in this part of the law is the presumption that jurisdiction (in all its forms) is territorial, and may not be exercised extraterritorially without some specific basis in international law.[4] However, the territorial theory has been refined in the light of experience and what amounts to extraterritorial jurisdiction is increasingly (p. 441) a matter of appreciation. If there is a cardinal principle emerging, it is that of genuine connection between the subject matter of jurisdiction and the territorial base or reasonable interests of the state in question.[5] It should be stressed that this sufficiency of grounds for jurisdiction is normally considered relative to the rights of other states. Thus, jurisdiction may be exercised over stateless persons, or over non-nationals by agreement with the state of nationality; jurisdiction can also be exercised over foreign nationals on other grounds. There is no assumption (even in criminal cases) that individuals or corporations can be regulated only once, and situations of multiple jurisdictional competence occur frequently. In such situations, there is no 'natural' regulator and the consequences of multiple laws applying to the same transaction are managed rather than avoided—double taxation being a case in point.[6]

### 2.  Prescriptive Jurisdiction over Crimes

### (A)  General bases of jurisdiction

The discussion which follows concerns the general principles for determining whether a state may prescribe acts as criminal under municipal law.[7] The question emerged as a distinct one only after about 1870,[8] and the appearance of clear principles has been retarded by the prominence in the sources of municipal decisions, which exhibit empiricism and adherence to national policies. The early structure of prescriptive criminal jurisdiction was provided by the Permanent Court in *Lotus*. That case concerned a collision on the high seas between a French steamer and a Turkish collier which then sank and Turkish crew members and passengers lost their lives. The French steamer having put into port in Turkey for repairs, the officers of the watch were tried and convicted of involuntary manslaughter. On the question of jurisdiction in general, the Permanent Court said:

> Far from laying down a general prohibition to the effect that States may not extend the application of their laws and the jurisdiction of their courts to persons, property or acts outside their territory, [international law] leaves them in this respect a wide measure of discretion which is only limited in certain cases by prohibitive rules; as regards other cases, every State remains free to adopt the principles which it regards as best and most suitable.[9]

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

(p. 442) This passage has been much criticized.[10] The Court's specific decision was reversed by treaty.[11] Its general emphasis on plenary state discretion is contradicted by the approach taken in *Anglo-Norwegian Fisheries*[12] and *Nottebohm*,[13] which concerned comparable competences of states, respectively, to delimit the territorial sea and to confer nationality on individuals: we may call them regulatory competences. Following *Arrest Warrant*,[14] there are hints that *Lotus* has been reversed: if a state wishes to project its prescriptive jurisdiction extraterritorially, it must find a recognized basis in international law for doing so. This shift in focus is, however, largely cosmetic, and in general the Permanent Court's statement that 'all that can be required of a State is that it should not overstep the limits which international law places upon its jurisdiction; within these limits, its title to exercise jurisdiction rests in its sovereignty' remains correct.[15]

### (i)  The territorial principle

The principle that the courts of the place where the crime is committed may exercise jurisdiction is universally recognized.[16] It is a reflection of the essential territoriality of sovereignty. In the case of crime, the principle has a number of practical advantages, including the convenience of the forum and the presumed involvement of the interests of the state where the crime was committed. The territorial principle has been given an extensive application. In the first place, there is *subjective* territoriality, which creates jurisdiction over crimes commenced within the state even if completed or consummated abroad.[17] Generally accepted and often applied is the *objective* territorial principle, according to which jurisdiction is founded when any essential constituent element of a crime is consummated on the forum state's territory.[18] The classic illustration is the firing of a gun across a border causing death on the territory of the forum, but the principle can be employed to found jurisdiction in cases of conspiracy[19] or violation (p. 443) of antitrust[20] or immigration laws[21] by activity abroad, and in many other fields of policy.[22] The effect of the two principles combined is that whenever the constituent elements of a crime occur across an interstate boundary both states have jurisdiction.

The objective principle received general support in the *Lotus*; what was controversial was its application to collisions in international waters. France contended that the flag state alone had jurisdiction over acts performed on board on the high seas. Turkey argued, inter alia, that vessels on the high seas were to be considered part of the territory of the flag state. By the casting vote of the President, the Court decided that Turkey had not acted in conflict with the principles of international law by exercising criminal jurisdiction. The basis of the majority view (with which Judge Moore concurred) was the principle of objective territorial jurisdiction. The principle was familiar but to apply it the Court had to assimilate the Turkish vessel to Turkish national territory.[23] This crucial step did not attract a majority, and is out of line with subsequent developments.

### (ii)  The nationality principle

Nationality, as a mark of allegiance and an aspect of sovereignty, is also recognized as a basis for jurisdiction over extraterritorial acts.[24] The application of the principle may be extended by reliance on residence[25] and other connections as evidence of allegiance owed by aliens,[26] and also by ignoring changes of nationality.[27] For example, the UK legislature has conferred jurisdiction on its courts in respect of, inter alia, treason,[28] (p. 444) murder,[29] bigamy,[30] soccer hooliganism,[31] child sexual abuse,[32] and breaches of the Official Secrets Acts[33] wherever committed by British nationals or residents.

The territorial and nationality principles (as well as the increasing incidence of dual nationality) create parallel jurisdictions and possible double jeopardy, and many states place limitations on the nationality principle,[34] for example, by confining it to serious offences.[35] But such limitations are not required by international law.[36] Nationality provides

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

the primary criterion for criminal acts in locations such as Antarctica, where the 'territorial' criterion is not generally recognized.[37]

For nationality jurisdiction, it is often asserted that the person over whom the state purports to exercise its prescriptive jurisdiction must have been a national at the time of the offence. Otherwise, it is argued, a violation of the principle of *nullum crimen sine lege* could occur. However, state practice is varied, with some states providing for nationality jurisdiction over persons who subsequently acquire their nationality.[38]

### *(iii)  The passive personality principle*

If the nationality head of jurisdiction may be characterized as one of 'active personality', the reverse of the coin is 'passive personality'.[39] According to this principle, aliens may be punished for acts abroad harmful to nationals of the forum. This is considerably more controversial, as a general principle, than the territorial and nationality principles. In *Cutting*, a Mexican court exercised jurisdiction in respect of the publication by a US citizen in a Texas newspaper of matter defamatory of a Mexican citizen. The (p. 445) court applied the passive nationality principle among others. This led to diplomatic protests from the US, although the outcome was inconclusive.[40]

In *Lotus*, the Turkish penal code provided for punishment of acts abroad by foreigners against Turkish nationals; in effect, it was a comprehensive exercise of passive personality jurisdiction. The Court declined to assess the law as such. The question was whether or not the specific factual situation fell within Turkish jurisdiction;[41] it held that it did, invoking the protective principle.[42] Judge Moore, in a separate opinion, agreed with the majority as to the outcome but expressly rejected the protective principle.[43]

The US Antiterrorism Act of 1991[44] provides for the jurisdiction of US district courts for injuries caused to US citizens by acts of international terrorism.[45] Yet, courts have understood that after *Daimler*[46] a substantial amount of business in the forum jurisdiction is not enough. In *Waldman*, the Second Circuit articulated the test as whether the defendant can be 'fairly regarded as at home' in the forum and found that the Palestinian Authority's promotional activities in Washington DC were not sufficient for this purpose. The court also declined to find specific personal jurisdiction for activities outside the US 'which affected US citizens only as victims of indiscriminate violence abroad'.[47]

The passive personality principle has been much criticized.[48] One early complaint was that it served no wider goal of criminal justice: it did not correspond to a domestic conceptualization of jurisdiction, would not close an enforcement gap and lacked any social aim of repression.[49] There is also concern that it could expose individuals to a large number of jurisdictions.[50] Such objections have not, however, prevented the development of something approaching a consensus on the use of passive personality in certain cases, often linked to international terrorism.[51] Moreover, *aut dedere aut (p. 446) judicare* provisions in most criminal law treaties authorize the use of passive personality jurisdiction as between states parties.[52]

### *(iv)  The protective or security principle*

Nearly all states assume jurisdiction over aliens for acts done abroad which affect the internal or external security or other key interests of the state,[53] a concept which takes in a variety of offences not necessarily confined to political acts.[54] Currency, immigration, and economic offences are frequently punished. The UK and the US allow significant exceptions to the doctrine of territoriality, although without express reliance on the protective principle. Thus, courts have punished aliens for acts on the high seas concerning illegal immigration,[55] and perhaps considerations of security helped the House of Lords in *Joyce v Director of Public Prosecutions*[56] to decide that an alien who left the country in possession of a British passport owed allegiance and was accordingly guilty of treason when he subsequently broadcast propaganda for Germany in wartime. Insofar as the protective

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

principle rests on the protection of concrete interests, it is sensible enough, but the interpretation of the concept of 'protection' may vary widely. For example, the protective principle was invoked in the *Eichmann* case in relation to the Jewish victims of the accused,[57] despite the fact that Israel was not a state when the offences in question occurred.[58]

The categories of what may be considered a vital interest for the purposes of protective jurisdiction are not closed,[59] and no criteria exist for determining such interests beyond a vague sense of gravity. Ultimately, the identification of exorbitant jurisdiction may be a matter of knowing it when one sees it.[60]

### (p. 447) (v)  The effects doctrine

In addition, it has been suggested that there exists a further head of prescriptive jurisdiction, the so-called 'effects doctrine'.[61] This may gain traction where an extraterritorial offence causes some harmful effect in the prescribing state, without actually meeting the criteria of territorial jurisdiction or representing an interest sufficiently vital to the internal or external security of the state in question to justify invoking the protective principle.

While controversial, the doctrine is not objectionable in all cases.[62] It was at least acknowledged by the majority in the *Lotus*[63] and by certain members of the International Court in *Arrest Warrant*.[64] Today, 'effects' or 'impact' jurisdiction is practised largely by the US and, with greater qualifications, by the EU.[65] In *Alcoa*, for example, Judge Learned Hand stated that it was 'settled law' that 'any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders which has consequences within its borders which the state reprehends',[66] a position since followed extensively in US antitrust jurisprudence.[67]

Since *Alcoa*, the effects doctrine and its expansion have, in many cases, been driven by the US approach to jurisdiction. Whereas previously this resembled closely the conception of various heads of prescriptive jurisdiction, it has now changed its perspective; it is possible to speak of antitrust jurisdiction, tort jurisdiction, and taxation jurisdiction, with some of these having a broader extraterritorial reach than others. This has the potential to muddy the waters, resulting in the uncertain position of the effects doctrine within international law as either a head of prescription in its own right, or a subject-driven application of the territorial or protective principles with unusual reach. These policies have provoked reactions from a number of foreign governments. The UK[68] and other states, as well as the EU,[69] have enacted legislation to provide defensive (p. 448) measures against US policy. Similar episodes have arisen as a result of the application of the US Export Administration Act, for example, in the face of US measures directed against non-US corporations involved in contracts relating to the construction of the West Siberian pipeline.[70] Both the European Community[71] and the UK[72] protested and asserted the illegality of the actions of US authorities intended to prevent the re-export of machinery of US origin and the supply of products derived from US data. But it must be noted that competition legislation in several European states is based on principles similar to those adopted in the US.[73] Moreover, the Court of Justice has applied a principle similar to the US 'effects doctrine' in respect of company subsidiaries[74] and the Advocate-General espoused this view in his Opinion in the *Woodpulp Cases*.[75] In any event, US legislation has continued to provoke protests from the EU and from individual states.[76] This legislation includes the Cuban Democracy Act (1992),[77] the D'Amato–Kennedy Act (1996),[78] and the Helms–Burton Act (1996).[79]

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

Subscriber: Gujarat National Law University; date: 27 June 2021

### (p. 454) (iv)  Treaty-based quasi-universal jurisdiction

Another, more restricted, form of quasi-universal jurisdiction arises from *sui generis* treaty regimes incorporating penal characteristics.[116] These regimes have for the most part been developed in order to respond to particular conduct viewed as undesirable; they require states parties to exercise mandatory prescriptive jurisdiction over certain individuals within their territories, independent of any ordinary nexus. They are frequently characterized by the obligation of *aut dedere aut judicare*, which will compel a state party to either try the accused or extradite to a state that is willing to do so.[117]

An example[118] arises in the context of the Convention for the Suppression of Unlawful Seizure of Aircraft (Hague Convention).[119] This provides in Article 4(2) that:

> Each Contracting State shall likewise take such measures as may be necessary to establish its jurisdiction over the offence in the case where the alleged offender is present in its territory and it does not extradite him pursuant to Article 8 to any of the States mentioned in paragraph 1 of this Article.

This formula has been applied, more or less identically, in a considerable number of conventions. Early examples include the *aut dedere aut judicare* obligations also appeared in the Geneva Conventions in 1949.[120] Chief amongst the more recent treaties are the various 'sectoral' anti-terrorism agreements which were developed when it became clear that meaningful agreement on a generic definition of 'terrorism' was unreachable.[121]

To describe the jurisdictional regime established by these treaties as 'universal' is a misnomer.[122] As Ryngaert notes:

> The operation of the *aut dedere* requirement is indeed limited to States Parties, which pool their sovereignty and explicitly authorize each other to exercise jurisdiction over crimes committed by their nationals or on their territory.[123]

(p. 455) That, however, has not prevented certain states from insisting on the application of *sui generis* bases of jurisdiction to nationals of non-states parties to the treaties in question. The US is notable in this regard, often exercising jurisdiction over suspected terrorists who are nationals of states not party to the relevant sectoral agreements.[124] In *Yunis*, for example, a Lebanese national was prosecuted with respect to the hijacking of Royal Jordanian Airlines Flight 402 from Beirut to Amman. The plane carried several US nationals but was registered in Jordan, flew the Jordanian flag, and never landed on US territory or flew over US airspace. The court found that it had universal jurisdiction to prosecute with respect to the act of hijacking and the taking of hostages by the accused. Although jurisdiction was grounded on the fact that Lebanon was a state party to The Hague and Montreal Conventions, the court further held that jurisdiction was also furnished by the provisions of the Hostages Convention, despite the fact that Lebanon and Jordan were not parties to it.[125]

## 3.  Civil Prescriptive Jurisdiction

There are different views as to the law concerning civil jurisdiction. On one view, exorbitant assertions of civil jurisdiction could lead to international responsibility. Further, as civil jurisdiction is ultimately reinforced by criminal sanctions through contempt of court, there is in principle no great difference between the problems created by assertion of civil and criminal jurisdiction over aliens.[126] In particular, antitrust legislation (the source of many of the difficulties in practice) involves a process which, though formally 'civil', is in substance coercive and penal, as is the field of securities regulation.[127] On another view, there is little by way of limitation on a state's exercise of civil jurisdiction in what are effectively private

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

law matters; different states assert jurisdiction on different grounds, but deference to foreign law through conflicts rules mitigates any exorbitant elements.

## (A)  The basis of civil jurisdiction in different legal traditions

Notwithstanding broad similarities, the different legal traditions conceive of the civil jurisdiction to prescribe in different ways. This division is particularly apparent when considering the willingness of municipal courts to exercise jurisdiction over a foreign party as an actualization of prescriptive jurisdiction.

(p. 456) In order to satisfy international law standards in regard to the treatment of aliens, a state must in normal circumstances maintain a system of courts empowered to decide civil cases and, in doing so, be prepared to apply private international law where appropriate in cases containing a foreign element.[128] Municipal courts may be reluctant to assume jurisdiction in cases concerning a foreign element, adhering to the territorial principle conditioned by the *situs* of the facts in issue, and supplemented by criteria relating to the concepts of allegiance or domicile and doctrines of submission to the jurisdiction (including tacit submission on the basis of ownership of property in the forum state).[129]

As a general rule, the common law systems will assert jurisdiction over a foreign defendant who can be served with originating process.[130] Under the most basic formulation, a writ may be served whenever the defendant sets foot[131] or establishes a commercial presence[132] in the jurisdiction, no matter how temporarily. This exercise of jurisdiction is based on territorial sovereignty: since states have authority over persons present in their territory, common law courts exercise jurisdiction 'as of right' over defendants served with originating process within the territory.[133]

Where the defendant has no such presence, a writ may nonetheless be served outside the jurisdiction in certain cases.[134] In such cases, an originating summons may only be issued with leave of the court; leave depends on an assessment of the existence and strength of a territorial nexus to the subject matter of the cause of action.[135] Jurisdiction will ordinarily be exercised, for example, where property in the territory forms the subject matter of the dispute or the defendant is domiciled or ordinarily resident there.

Though civil lawyers complain of the perceived exorbitance of the service rule,[136] common lawyers point out that the defendant may challenge the exercise of the jurisdiction on the basis that the appropriate forum for the hearing of the dispute is elsewhere.

(p. 457) Some common law jurisdictions have extended the concept of jurisdiction further still. In the US, 'minimum [territorial] contacts'[137] have in the past sufficed for the purpose of finding jurisdiction over the defendant. The mere presence of a subsidiary of a foreign corporation in the US provided the necessary minimum contact for the parent corporation. However, this doctrine has been significantly curtailed by *Daimler AG v Bauman*, where the Supreme Court held that it would exercise jurisdiction over claims arising outside the US only against foreign corporations that are incorporated in the US or have their principal place of business there.[138]

In contrast, the civil law approach to the exercise of jurisdiction is predicated on the principle that, where possible, the defendant ought to be sued in its domicile. This may be seen in EC Regulation 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the Brussels I Regulation),[139] Article 2 of which provides that, '[s]ubject to this Regulation, persons domiciled in a Member State [of the EU] shall, whatever their nationality, be sued in the courts of that Member State.'[140] The Regulation, however, provides alternative bases of jurisdiction that are not so rigorously territorial where the defendant is already domiciled in the EU, including, inter alia, the *locus delicti* in cases of tort (Art 5(3)), in cases of contract, the place of performance of the obligation which has been breached (Art 5(1)(a)), the place of delivery of goods or

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

performance of services (Art 5(1)(b)), or, as regards commercial disputes arising out of the operations of a branch, agency, or other establishment, the place in which the branch, agency, or other establishment is situated (Art 5(5)).[141]

In a further significant difference with the common law, the notion of discretionary refusal of jurisdiction is anathema to the civil law. As a general rule, if properly seised, a court is unable to decline jurisdiction unless expressly authorized to do so by the terms of the Regulation.[142] For example, under Article 27, in the event of *lis pendens*, the court second seised must stay the proceedings before it in favour of the court first seised unless the latter determines that it lacks jurisdiction.[143]

(p. 458) Whilst this approach has the virtue of certainty and consistency, its rigidity may lead to unfortunate practical consequences. In *Owusu*,[144] for example, a single English defendant and five Jamaican defendants were sued in the English courts with respect to an alleged tort taking place in Jamaica. Although the *forum conveniens* was clearly Jamaica, the mandatory wording of Article 2 and the English domicile of one of the defendants prevented the court from declining jurisdiction.

## (B)  Jurisdiction and the conflict of laws

Conflict of laws, also known as private international law, is concerned with issues of the jurisdiction of national courts, the municipal law applicable to disputes with foreign elements, and the cross-border enforcement of judgments.[145] It is usually considered to be merely municipal law, and a bright line is drawn between its study and the study of public international law. If it must be considered international law, the argument runs, then it is international only in the sense that it involves competing and horizontal 'inter-national' claims.

According to Mills, the adoption of an international systemic perspective on the conflict of laws reveals an 'essential confluence' of public and private international law, sharing as they do similar intellectual progenitors.[146] Nationality, for example, is the defining jurisdictional principle for civil legal systems. Article 15 of the French Civil Code provides that 'French persons may be called before a court of France for obligations contracted by them in a foreign country, even with an alien'. Passive personality is also the focus of article 14 of the French Civil Code, which permits a foreign person to be called before the French courts with respect to obligations entered into with a French national.

The influence of the territoriality principle in private international law is likewise pervasive, notably in common law systems where the presence of the defendant within the jurisdiction is sufficient to ground the court's adjudicative power. This is controversial, for under the public international law conception of territoriality, the act or thing which is the subject of adjudicative power must be done within the jurisdiction; the subsequent presence of the defendant will be insufficient. That said, this perceived overreach is reduced by the use of *forum non conveniens* to decline jurisdiction where another forum is better suited to hear the matter; in the US, consideration of 'reasonableness' may also come into play.[147] Territoriality is also (less controversially) present in Article 22(1) of the Brussels I Regulation, which provides for the exclusive jurisdiction for certain courts, regardless of the defendant's domicile, where the proceedings in question have as their object rights *in rem* in immovable property or tenancies in immovable property.

## (p. 459) (C)  The alien tort statute and cognate legislation

The universality principle, as expressed in the *Eichmann* case, is most often associated with the prosecution of heinous crimes.[148] Only a few states assert universal *civil* jurisdiction, that is, prescriptive jurisdiction absent any minimal territorial or national nexus to the

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

delict in question.[149] The example par excellence is the US Alien Tort Claims Act 1789, now codified as the Alien Tort Statute (ATS).[150]

The ATS provides in its relevant part that '[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.' Apparently enacted for the purpose of providing a recourse in tort for acts of piracy or the violation of safe conduct or of the rights of ambassadors,[151] the statute fell dormant for almost two centuries before gaining modern importance in *Filartiga v Peña-Irala*,[152] where the Second Circuit Court of Appeals held that it was to be read as *incorporating* current customary international law protective of individual rights.

An actionable ATS violation will occur only where (1) the plaintiff is an alien, (2) the individual defendant[153] is responsible for a tort, and (3) the tort in question violates international law.[154] Not every violation of international law will, however, be considered actionable: the Supreme Court in *Sosa v Alvarez-Machain*, while falling short of articulating a coherent category, limited the scope of the statute to 'norm[s] of an international character accepted by the civilized world'.[155] In this sense, the ATS draws its legitimacy at least to some extent from the same well-spring as universal criminal jurisdiction over genocide, war crimes, and crimes against humanity.[156]

Perhaps because of its prescriptive and procedural limitations, the ATS has been the subject of surprisingly little opposition.[157] Whilst European states may prefer criminal or administrative remedies for gross human rights violations, they do not (p. 460) seem resistant in principle to 'universal' tort jurisdiction of this type, although they remain opposed to the perceived exorbitance of the US regime of civil jurisdiction *in personam*.[158]

The extraterritorial reach of the ATS was significantly reduced by the Supreme Court in *Kiobel*. Relying on the presumption against extraterritoriality, the Court determined that the ATS would apply to a claim based on extraterritorial conduct only if it could be shown to 'touch and concern' the US. Further, the Court held that:

> even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application.[159]

The 'mere corporate presence' of the defendants in the US was held to be insufficient to meet this test in a case where the conduct complained of occurred in Nigeria only. Beyond this, *Kiobel* offers no further clarification as to the circumstances that would meet the 'touch and concern' with 'sufficient force' test.[160] This leaves open the extent to which the ATS has been narrowed. *Kiobel* has been strongly criticized, and is certainly not the last word.[161]

In *RJR Nabisco*,[162] the Supreme Court said that the presumption against extraterritoriality applies regardless 'of whether there is a risk of conflict between the American statute and a foreign law' and (obiter) 'of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction'. The Court held that the Racketeer Influenced and Corrupt Organizations Act (RICO) can apply to some foreign racketeering activity, and thus the presumption was overcome regarding the Act's substantive provisions.[163]

## 4.  The Separateness of the Grounds of Jurisdiction

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

### (A)  The relationship between the separate grounds

The various principles held to justify jurisdiction over aliens are commonly listed as independent and cumulative,[164] although some may be labelled 'subsidiary' to (p. 461) others.[165] However, it must be remembered that the 'principles' are in substance generalizations of a mass of national provisions which by and large do not reflect categories of jurisdiction specifically recognized by international law. It may be that each individual principle is only evidence of the reasonableness of the exercise of jurisdiction.[166] The various principles often interweave in practice. Thus, the objective applications of the territorial principle and also the passive personality principle have strong similarities to the protective or security principle. Nationality and security may go together, or, in the case of the alien, factors such as residence may support an ad hoc notion of allegiance. These features of the practice have led some jurists to formulate a broad principle resting on some genuine or effective link between the crime and the state of the forum.[167]

### (B)  Consequences of excess of prescriptive jurisdiction

#### (i)  The legal position

If enforcement action is taken in a case of exorbitant jurisdiction with consequent injury, an international wrong will presumably have been committed.[168] The consequences of the mere *passage* of legislation asserting exorbitant jurisdiction remain an open question.

#### (ii)  Practical consequences

As a practical matter, whilst states may protest the use of exorbitant prescriptive jurisdiction, unless the prescribing state attempts to enforce the jurisdiction claimed, it is unlikely that any action will be taken. At the same time, a prescriptive statement—even absent immediate enforcement action—is fundamentally a threat, which may compel foreign nationals to alter their behaviour.[169] This may cause the other state to respond through a 'blocking statute', a law enacted to obstruct the extra-jurisdictional application or effect of a law enacted in another jurisdiction.[170]

## (p. 462) 5.  Enforcement Jurisdiction

### (A)  The basic principle

As with prescriptive jurisdiction, a state's use of enforcement jurisdiction within its own territory is uncontroversial.[171] By contrast, the unilateral and extraterritorial use of enforcement jurisdiction is impermissible. As the Permanent Court said in the *Lotus*:

> [T]he first and foremost restriction imposed by international law upon a state is that —failing the exercise of a permissive rule to the contrary—it may not exercise its power in any form in the territory of another State. In this sense jurisdiction is certainly territorial; it cannot be exercised by a State outside its territory except by virtue of a permissive rule derived from international custom or a convention.[172]

The governing principle of enforcement jurisdiction is that a state cannot take measures on the territory of another state by way of enforcement of its laws without the consent of the latter.[173] Persons may not be arrested, a summons may not be served, police or tax investigations may not be mounted, and orders for production of documents may not be executed on the territory of another state, except under the terms of a treaty or other consent given.[174] One key example of such consent is a Status of Mission or Status of Forces Agreement (SOMA or SOFA), whereby one state consents to the presence of another's troops on its territory and to related military jurisdiction.[175]

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

## (B)  Enforcement with respect to extraterritorial activities

The principle of territoriality is not infringed just because a state takes action within its own borders with respect to acts carried out in another state. But the correctness of this position has not prevented controversy from arising. This is especially the case when considering the use by US courts of the 'effects doctrine' to promote certain prescriptive objectives in the field of economic regulation, especially antitrust law. US courts in, for example, *Alcoa*[176] and *Watchmakers of Switzerland*,[177] have taken the view that (p. 463) whenever activity abroad has consequences or effects within the US which are contrary to local legislation then the courts may make orders requiring the disposition of patent rights and other property of foreign corporations, the reorganization of industry in another country, the production of documents, and so on. The US doctrine appears to be restricted to agreements abroad intended to have material effects within the US and actually having such effects.[178] US courts have, in the past, adopted a principle of the balancing of the various national interests involved, which, though unhelpfully vague, could mitigate the cruder aspects of the 'effects doctrine'.[179]

The courts, the US government, and foreign governments in reacting to US measures, assume that there are *some* limits to enforcement jurisdiction, but there is no consensus on what those limits are.[180] Those limits were tested in *Hoffman-La Roche*,[181] where there had been a significant foreign anti-competitive conduct with an adverse domestic effect and an independent foreign effect. The Supreme Court found that it had jurisdiction to entertain a claim by a purchaser in the US based on domestic injury, but not by a purchaser abroad based on foreign harm. Among other considerations, the Supreme Court understood that it must construe ambiguous statutes to avoid unreasonable interference with sovereign authority and assume that the US Congress ordinarily seeks to follow the principles of customary international law.

The UK view appears to be that a state 'acts in excess of its own jurisdiction when its measures purport to regulate acts which are done outside its territorial jurisdiction by persons who are not its own nationals and which have no, or no substantial, effect within its territorial jurisdiction'.[182] Jennings has stated the principle 'that extra-territorial jurisdiction may not be exercised in such a way as to contradict the local law at the place where the alleged offence was committed'.[183] In the case of corporations with complex structures and foreign-based subsidiaries, a principle of substantial or effective connection could be applied as a basis for jurisdiction.[184] This approach would accord with the relevant notions of the conflict of laws, in particular, the 'proper law' of a transaction. The present position is probably this: a state has enforcement jurisdiction abroad only to the extent necessary (p. 464) to enforce its legislative jurisdiction. This latter rests on the existing principles of jurisdiction and these, it has been suggested, are close to the principle of substantial connection.

## (C)  Recognition and enforcement abroad

### (i)  Criminal jurisdiction

In a criminal context, enforcement jurisdiction will ordinarily entail the pursuit and arrest of the accused, detention and trial, and the carrying out of any sentence.

With respect to extraterritorial enforcement action leading to the capture of the accused, state consent can be given on ad hoc basis, but in circumstances where movement between two states is relatively regular and straightforward, bi- or multilateral agreements may be entered into in order to provide standing orders for enforcement jurisdiction between states. The most notable of these is the Schengen Convention[185] between some members of the EU. Article 40(1) provides that where the officials of one contracting party are keeping under surveillance a person suspected of an extraditable offence, they may request that surveillance is continued in the territory of another contracting party by officials of that

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

party. Article 40(2) further provides that in circumstances where, for particularly urgent reasons, authorization cannot be requested from the other contracting party, the officials carrying out the surveillance may be authorized to continue the surveillance in the territory of the other contracting party. On similar lines, Article 41 permits the officials to engage in hot pursuit of a subject across state borders, where due to the urgency of the situation, the permission of the other contracting state cannot be obtained.

More generally, Article 39(1) provides that, subject to the requirements of municipal law, the police authorities of each contracting party undertake to assist each other for the purpose of detecting and preventing criminal offences, though this does not expressly mandate extraterritorial enforcement. Article 39 is supplemented in this respect by the Convention on Mutual Assistance in Criminal Matters between the member states of the European Union.[186] Treaties of mutual criminal assistance, like enforcement agreements, can also be concluded on a bilateral or multilateral basis.[187]

Unlike activities connected to surveillance of an accused, arrest, trial, and incarceration are rarely carried out in an extraterritorial capacity, particularly in circumstances not linked to a SOMA or SOFA. But when the Libyan government refused to extradite those thought to be responsible for the 1988 bombing of Pan Am Flight 103 over Lockerbie, Scotland, unless they were tried in a neutral country, the UK and the Netherlands (p. 465) entered into an agreement to permit a Scottish court applying Scottish criminal law to sit in a former US Air Force base in the Netherlands to try the accused.[188]

Provision is also made by treaty for the enforcement of foreign criminal judgments. Here, there is generally a divide between the civil and common law approaches to the subject, with the latter rejecting in principle the enforcement of the penal law of another state.[189] Civil law systems are less averse to the concept, as witness the European Convention on the International Validity of Criminal Judgments.[190]

Apart from trial *in absentia*, an unsatisfactory procedure, states have to depend on the cooperation of the other states in order to obtain surrender of suspected criminals or convicted criminals who are, or have fled, abroad. Where this cooperation rests on a procedure of request and consent, regulated by certain general principles, the form of international judicial assistance is called extradition.[191] Due to the profusion of extradition treaties, it is possible to speak of an international law of extradition, a term which does not imply the existence of custom, but of a significant corpus of conventional law exhibiting certain common elements. Such treaties are usually bilateral,[192] but the European Convention on Extradition (ECE)[193] is in effect between EU member states (although it has been largely replaced by the European arrest warrant (EAW), which combines elements of arrest and extradition).[194] The UN has also issued a Model Treaty on Extradition (UNMTE).[195] Common conditions include double criminality (the act in question must be criminal under the laws of both the requesting and requested states),[196] non-extradition for 'political offences',[197] and the rule of (p. 466) speciality which prevents prosecution founded on a treaty-based extradition from proceeding on any basis other than that on which the request was founded.[198] Another significant limitation is the rule *ne bis in idem*, which precludes extradition of persons already tried for the same offence. Finally, many states reserve the right to refuse extradition owing to human rights concerns, for example, where extradition may mean that the accused is liable to torture[199] or the death penalty.[200]

Since the attacks by al-Qaeda on the US in 2001, there has been an increase in 'informal' extradition or rendition, though the practice is not new.[201] If it takes place with the consent of the 'sending' state, there is no transgression of international law standards.[202] If, however, there is no extradition of any kind—informal or otherwise—but the suspect is simply seized by the agents of the receiving state in the absence of any legal process, then there is clearly a breach of international law.[203] This, described generally as 'extraordinary rendition', has been practised by the US since 2001. Depending on the legal system in

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

question, the attendant illegality may not prevent the trial of the suspect, an application of the maxim *male captus bene detentus*.[204]

### (ii) Civil and administrative jurisdiction

With respect to civil and administrative jurisdiction, extraterritorial enforcement revolves largely around the recognition and enforcement of judgments and orders abroad. This is one of the central preoccupations of private international law. In general, the field is parochial, with each state developing its own process and criteria for recognition and enforcement. The Brussels I Regulation seeks to unify the procedures (p. 467) for the recognition of judgments between EU member states.[205] The judgment of a court of a member state is subject to automatic recognition (Art 36) and enforcement (Art 39) by the courts of other member states, with the onus on the defendant to contest enforcement according to a limited number of clearly defined exceptions.[206]

However, the need to approach the court of the jurisdiction where enforcement is sought is circumvented—in form if not in substance—when considering certain orders issued by common law courts (notably in England but also the US) which act *in personam* on the conscience of a party properly before the court to restrain its dealings with assets or processes outside the jurisdiction. The first of these, the so-called 'freezing injunction',[207] acts *in personam* to prevent a defendant from moving, hiding, or otherwise dissipating its assets so as to render itself judgment-proof.[208] The injunction neither creates, transfers, nor revokes property rights; it merely affects the capacity of the defendant to exercise them freely. But what the freezing injunction lacks in extraterritorial form, it makes up for in extraterritorial effect. The scope of the order has been expanded considerably. First, by virtue of its *in personam* operation, the injunction can be granted with respect to assets which are not within the jurisdiction of the court granting the order.[209] Further, it can be given effect against foreign third parties, normally multinational banks with a branch within the jurisdiction granting the order. Finally, it can be granted in aid of foreign proceedings even where no proceedings are on foot before the court granting the order.[210]

The second example is the anti-suit injunction, which acts to restrain a party subject to the jurisdiction of the court from launching or continuing proceedings in a foreign court injurious to the defendant in those proceedings.[211] Ordinarily, the claimant in the foreign proceedings must be already before the court,[212] though the relief may be granted autonomously of any domestic proceedings where the subject matter of the proceedings[213] or the relationship between the parties[214] is such as to give the granting court exclusive (p. 468) jurisdiction.[215] Although the order is usually granted where the claimant in the foreign proceedings has commenced them in a manner which is somehow objectionable, it may also be granted where the foreign claimant has apparently acted without blame.[216]

The perceived exorbitance of the common law jurisdictions in respect of these orders is often criticized on the basis of 'comity'.[217] Comity arises from the horizontal arrangement of state jurisdictions in private international law and the field's lack of a hierarchical system of norms. It plays the role of a somewhat uncertain umpire: as a concept, it is far from a binding norm, but it is more than mere courtesy exercised between state courts. The Supreme Court of Canada said in *Morguard v De Savoye*,[218] citing the US Supreme Court in *Hilton v Guyot*,[219] that:

> Comity is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its law.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

Common lawyers have been anxious to justify the development of the freezing and anti-suit injunctions on the basis of comity.[220] For this reason, as with the doctrine of *forum non conveniens*, whilst the jurisdiction to grant the remedy may be easily established, the claimant must nonetheless persuade the court to exercise its discretion. A substantial body of jurisprudence has built up around these remedies to guide the court in its use of discretion. But so far these efforts at justification have fallen on deaf European ears: the European Court has repeatedly disqualified such injunctive measures as inconsistent with full faith and credit as between EU member state courts, however dilatory or parochial the latter may be.[221]

## 6. Conclusion

A general view of the law is difficult to obtain, given the extent and diversity of the practice and the pull of different legal traditions. But it might include the following propositions:

First, the exercise of civil jurisdiction in respect of aliens presents essentially the same problems as the exercise of criminal jurisdiction over them, though in (p. 469) practical terms there are differences, both procedurally and in the reactions that can be expected.

Secondly, the two generally recognized bases for prescriptive jurisdiction of all types are the territorial and nationality principles, but their application is complemented by the operation of other principles, especially in certain fields. The use of the passive personality principle in cases of international terrorism appears to be accepted and, over time, opposition to the use of the effects doctrine by the US and EU in the pursuit of certain competition law objectives is diminishing. As a general rule, however, it remains true that if a state wishes to avoid international criticism over its exercise of extraterritorial jurisdiction, it is better to base the prescriptive elements on territoriality or nationality.

Thirdly, extraterritorial acts can lawfully be the object of prescriptive jurisdiction only if certain general principles are observed:

(1)  There should be a real and not colourable connection between the subject matter and the source of the jurisdiction (leaving aside rare cases of universal jurisdiction).

(2)  The principle of non-intervention in the territorial jurisdiction of other states should be observed, notably in an enforcement context. [222]

(3)  Elements of accommodation, mutuality, and proportionality should be duly taken into account. Thus, nationals resident abroad should not be constrained to violate the law of their place of residence.

(4)  These basic principles do not apply or do not apply very helpfully to (a) certain cases of concurrent jurisdiction, and (b) crimes against international law within the ambit of universal jurisdiction. In these areas, special rules have evolved. Special regimes also apply to the high seas, continental shelf, EEZ, outer space, and Antarctica.

(5)  Jurisdiction is often concurrent and there is no hierarchy of bases for jurisdiction. However, an area of exclusivity may be established by treaty, as in the case of offences committed on board aircraft in flight.

## Footnotes:

[1]  Generally: Akehurst (1972–3) 46 *BY* 145; Bowett (1982) 53 *BY* 1; Lowe, *Extraterritorial Jurisdiction* (1983); Meessen (ed) *Extra-Territorial Jurisdiction in Theory and Practice* (1996); Oxman, 'Jurisdiction of States' (2007) *MPEPIL*; Simma & Müller in Crawford & Koskenniemi (eds), *Cambridge Companion to International Law* (2012) 134; Kamminga, 'Extraterritoriality' (2012) *MPEPIL*; Colangelo (2013–14) 99 *Cornell LR* 1303; Ryngaert,

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

*Jurisdiction in International Law* (2nd edn, 2015); Orakhelashvili, *Research Handbook on Jurisdiction and Immunities in International Law* (2015). On jurisdiction over the Internet: Kulesza, *International Internet Law* (2012) ch 1; Coughlan et al, *Law Beyond Borders* (2014) ch 5; Gillespie, *Cybercrime: Key Issues and Debates* (2015) ch 2.

**2**  In the US, see *Restatement Third* §401. Also see the draft *Restatement Fourth* (2017) §101.

**3**  On adjudicative jurisdiction (also referred to as *judicial* or *curial* jurisdiction): Akehurst (1972–3) 46 *BY* 145, 152–78; Oxman, 'Jurisdiction of States' (2007) *MPEPIL*; Colangelo (2013) 28 *Md JIL* 65. This refers to the competence of a municipal court to sit in judgment over a foreign national and may be better seen as a manifestation of prescriptive jurisdiction: the application of municipal law by the court is, in effect, the actualization of prescription, although the carrying out of any judgment or sentence is an expression of enforcement jurisdiction: O'Keefe (2004) 2 *JICJ* 735, 737. But the different elements may be difficult to separate out in this way.

**4**  Ryngaert (2nd edn, 2015) ch 5. To this end, there is a presumption against extraterritoriality: draft *Restatement Fourth* (2017) §203; Ryngaert (2nd edn, 2015) 68–73; Bradley (2nd edn, 2015) 179–86. For the application of the presumption: *R v Jameson* [1896] 2 QB 425; *Morrison v National Australia Bank Ltd*, 561 US 247, 250–1 (2010); *Kiobel v Royal Dutch Petroleum Co*, 569 US 108 (2013); *US v Vilar*, 729 F3d 62, 72 (2d Cir, 2013).

**5**  Cf the doctrine stated in *Nottebohm (Liechtenstein v Guatemala)*, ICJ Reports 1955 p 4; *Kingdom of Greece v Julius Bär and Co* (1956) 23 ILR 195; *Guardianship of Infants (Netherlands v Sweden)*, ICJ Reports 1958 p 55, 109 (Judge Moreno Quintana). Also Ryngaert (2nd edn, 2015) 156–7.

**6**  E.g. OECD Model Tax Convention on Income and Capital (9th edn, 2015); UN Model Double Taxation Convention between Developed and Developing Countries (2011).

**7**  Harvard Research (1935) 29 *AJIL Supp* 439; Higgins, *Problems and Process* (1994) ch 4; Oxman, 'Jurisdiction of States' (2007) *MPEPIL*; Ryngaert (2nd edn, 2015) ch 4; Farbiarz (2016) 114 *Mich LR* 507; Liivoja, *Criminal Jurisdiction over Armed Forces Abroad* (2017). Some US courts have suggested that the presumption against extraterritoriality does not apply to criminal law: *US v Siddiqui*, 699 F3d 690 (2d Cir, 2012).

**8**  An early *cause célèbre* was *R v Keyn (The Franconia)* (1878) 2 Ex D 63, concerning criminal jurisdiction over the German captain of a German merchant ship which collided with a British vessel in the UK territorial sea. The court denied jurisdiction (on a vote of 8–7), a decision promptly reversed by statute: Territorial Waters Jurisdiction Act 1878. Further: Crawford (1980) 51 *BY* 1, 48–61.

**9**  (1927) PCIJ Ser A No 10, 19.

**10**  E.g. Brierly (1936) 58 Hague *Recueil* 1, 146–8, 183–4; Basdevant (1936) 58 Hague *Recueil* 471, 594–7; Fitzmaurice (1957) 92 Hague *Recueil* 1, 56–7; Lauterpacht, 1 *International Law* (1970) 488–9; Higgins, *Problems and Process* (1994) 76–7; Cameron, *The Protective Principle of International Criminal Jurisdiction* (1994) 319; Ryngaert (2nd edn, 2015) 33–8; Hertogen (2015) 26 *EJIL* 901.

**11**  See now UN Convention on the Law of the Sea (UNCLOS) Art 92, and see further: chapter 15.

**12**  *Fisheries (UK v Norway)*, ICJ Reports 1951 p 116, 131–4.

**13**  ICJ Reports 1955 p 4, 20. Also chapter 23.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

[14] *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)*, ICJ Reports 2002 p 3, 78 (Judges Higgins, Kooijmans, and Buergenthal), 169 (Judge ad hoc van den Wyngaert).

[15] *SS Lotus* (1927) PCIJ Ser A No 10, 19.

[16] Buxbaum (2009) 57 *AJCL* 631; Ireland-Piper (2013) 9(4) *Utrecht LR* 68, 72; Bassiouni, *International Extradition* (6th edn, 2014) 364–405; Scott (2014) 62 *AJCL* 87; Ryngaert (2nd edn, 2015) ch 3; Cormier (2015) 13 *JICJ* 895; Farbiarz (2016) 114 *Mich LR* 507.

[17] Harvard Research (1935) 29 *AJIL Supp* 439, 480, 484–7. In the US, see e.g. 18 USC §956(a)(1).

[18] Ryngaert (2009) 9 *Int Crim LR* 187, 188 ('[I]t is domestic law, rather than international law, which defines the constituent elements of a particular offence').

[19] *Board of Trade v Owen* [1957] AC 602, 634 (Lord Tucker); *R v Cox* [1968] 1 All ER 410, 413; *DPP v Doot* [1973] AC 807, 817 (Lord Wilberforce); *DPP v Stonehouse* [1977] 2 All ER 909, 916 (Lord Diplock); *Liangsiripraset v US* [1991] 1 AC 225. Under US law, conspiracy can be seen as either an inchoate or independent crime, allowing the protective principle and effects doctrine to found jurisdiction independently: *Ford v US*, 273 US 593 (1927); *Iannelli v US*, 420 US 770 (1975); *US v Leija-Sanchez*, 820 F3d 899 (7th Cir, 2016). Generally: Ryngaert (2009) 9 *Int Crim LR* 187, 194–7.

[20] *US v Aluminum Co of America*, 148 F2d 416 (2d Cir, 1945). In US antitrust cases, wide extension of the territorial principle might be explained by, though it is not expressed in terms of, a principle of protection. It can also be described in terms of the effects doctrine: Ryngaert (2nd edn, 2015) 82–4. See Alford (1992) 33 *Va JIL* 1; Botteman & Patsa (2012) 8 *Eu Comp J* 365; Buxbaum & Michaels in Basedow, Francq, & Idot (eds), *International Antitrust Litigation* (2012) 225–44. However, US jurisdiction on antitrust matters does not extend to the foreign effects of anti-competitive conduct. *See Hoffmann-La Roche Ltd v Empagran SA*, 542 US 155 (2004).

[21] Cf Ryan & Mitsilegas, *Extraterritorial Immigration Control* (2010); den Heijer, *Europe and Extra-Territorial Asylum* (2011) 239–42.

[22] The European approach is notable; as soon as one of the constituent elements of an offence is committed in a state's territory, the state will ordinarily have jurisdiction: Ryngaert (2009) 9 *Int Crim LR* 187, 197–202.

[23] (1927) PCIJ Ser A No 10, 23.

[24] *SS Lotus*, 92 (Judge Moore); *The Queen v Klassen*, ILDC 941 (2008). Further: Harvard Research (1935) 29 *AJIL Supp* 519; Jennings (1957) 33 *BY* 146, 153; Chehtman, *The Philosophical Foundations of Extraterritorial Punishment* (2010) 59–67; Ireland-Piper (2012) 13 *Melb JIL* 122, 131–4; Ryngaert (2nd edn, 2015) 76–8; Guilfoyle, *International Criminal Law* (2016) 32–3. See also *Restatement Third* §403(2)(b) and the draft *Restatement Fourth* (2017) §201(1)(c); *Blackmer v US*, 284 US 421 (1932); *Al-Skeini v Secretary of State for Defence* [2008] 1 AC 153; *Smith v Ministry of Defence* [2013] UKSC 41, [46]–[48]. Also Bassiouni (6th edn, 2014) 406–8.

[25] E.g. Penal Law 1977, as amended in 1994 (Israel), s16(a); War Crimes Act 1991 (UK), s2(b); Terrorism Act 2000 (UK), ss63B, 63C. In Australia: War Crimes Act 1945, as amended in 2001, s11; *XYZ v Commonwealth* [2006] HCA 25. See also: *R v Moti* (2009) 235 FLR 320.

[26] *Public Prosecutor v Drechsler* (1946) 13 ILR 73; *Re Penati* (1946) 13 ILR 74; *In re Bittner* (1949) 16 ILR 95; cf *DPP v Joyce* [1946] AC 347; *Re P (GE) (an infant)* [1964] 3 All

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

ER 977. The Canadian Criminal Code RSC 1985 C-46 operates against persons 'ordinarily resident': ss7(3.72), (3.73), (3.74). See also: Liivoja (2010) 11 *Melb JIL* 309, 324–9.

**27** *In re Mittermaier* (1946) 13 ILR 69; *In re SS Member Ahlbrecht* (1947) 14 ILR 196, 200–1; *Ram Narain v Central Bank of India* (1951) 18 ILR 207.

**28** Treason Act 1351, sII; further: *R v Lynch* [1903] 1 KB 444; *R v Casement* [1917] 1 KB 98; Lew (1978) 27 *ICLQ* 168.

**29** Offences Against the Person Act 1861, s9.

**30** Ibid, s57.

**31** Football Spectators Act 1989, s22.

**32** Sexual Offences Act 2003, s72, Sch 2.

**33** Official Secrets Act 1989, s15.

**34** Harvard Research (1935) 29 *AJIL Supp 439,* 519; Ryngaert (2nd edn, 2015) 105.

**35** E.g. UKMIL (2006) 77 *BY* 597, 756; 18 USC §2423(c). Naturally, this will depend on the definition of 'serious': cf Misuse of Drugs Act (Singapore), ss8A, 33, 33A, Schs 2 and 4. Note also: Penal Code (France), arts 113-6, 113-7 (creating extraterritorial jurisdiction for misdemeanours punishable by imprisonment).

**36** Ryngaert (2nd edn, 2015) 105–6. The practice of limiting the use of nationality jurisdiction to serious offences is largely common law in origin, with civil law countries applying a more expansive approach: e.g. Bosnia/Herzegovina Criminal Code, Art 12(2) ('The criminal legislation of Bosnia and Herzegovina shall be applied to a citizen of Bosnia and Herzegovina who, outside the territory of Bosnia and Herzegovina, perpetrates a criminal offence').

**37** Antarctic Treaty, 1 December 1959, 402 UNTS 71, Art VIII(1); see e.g. Antarctic Act 1994 (UK), s21. Further: Molenaar & Elferink, *The International Legal Regime of Areas beyond National Jurisdiction* (2010) 115–16. The same situation subsists with respect to criminal jurisdiction on the International Space Station, although the governing instrument also provides for subsidiary territorial and passive personality jurisdiction in certain cases: Agreement Concerning Cooperation on the Civil International Space Station, 29 January 1998, TIAS 12927, Art 22. The position is not replicated with respect to the earlier Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies, 27 January 1967, 610 UNTS 205: Art 8 provides that when a state party launches an object into outer space, it retains jurisdiction over that object and over any personnel—a species of flag state jurisdiction.

**38** E.g. Swedish Penal Code, ch 2, s2. Further: Harvard Research (1935) 29 *AJIL* 439, 535; Ryngaert (2nd edn, 2015) 104.

**39** Harvard Research (1953) 29 *AJIL Supp* 439, 443, 445, 573, 579; Ireland-Piper (2012) 13 *Melb JIL* 122, 134–6; Echle (2013) 9(4) *Utrecht LR* 56; Bassiouni (6th edn, 2014) 408–11; Ryngaert (2nd edn, 2015) 110–13.

**40** Moore, 2 *Digest* 228–42; *Foreign Relations of the United States* (1887) 751–867.

**41** (1927) PCIJ Ser A No 10, 15.

**42** Lauterpacht (1947) 9 *CLJ* 330, 343. Cf Bassiouni (6th edn, 2014) 408–9.

**43** (1927) PCIJ Ser A No 10, 89–94 (Judge Moore, diss). Also *Flatow v Islamic Republic of Iran*, 999 F Supp 1, 15–16 (DCC, 1998), see also *Cicippio-Puleo v Islamic Republic of Iran*, 353 F3d 1024, 1033 (DCC, 2004); *Owens v Republic of Sudan*, 864 F3d 751 (DCC, 2017).

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

Subscriber: Gujarat National Law University; date: 27 June 2021

For comment on the extension of jurisdiction with respect to terrorism: Higgins (1994) 66–7 (US law); Wiffen (2012–13) 59 *Crim LQ* 47 (Canadian law).

**44** Antiterrorism Act of 1991, 106 Stat 4506 (1992). The Act had the purpose of expanding US courts' jurisdiction in terrorism cases beyond the scope of admiralty. See *Klinghoffer v SNC Achille Lauro*, 739 F Supp 854, 856 (SDNY, 1990).

**45** 18 USC §2333(a).

**46** *Daimler AG v Bauman*, 134 S Ct 746 (2014).

**47** *Waldman v Palestine Liberation Organization*, 835 F3d 317, 322, 336–7 (2d Cir, 2016), cert den, __ US ___ (2018); noted (2017) 111 *AJIL* 504.

**48** Harvard Research (1935) 29 *AJIL Supp* 439, 578–9; Ireland-Piper (2012) 13 *Melb JIL* 122, 134–6; Echle (2013) 9(4) *Utrecht LR* 56, 60–1; Ryngaert (2nd edn, 2015) 110.

**49** Donnedieu de Vabres, *Les Principes modernes du droit penal international* (1928) 170. Also Ryngaert (2nd edn, 2015) 110–11.

**50** Brierly (1928) 44 *LQR* 154, 161; Echle (2013) 9(4) *Utrecht LR* 56.

**51** E.g. *Arrest Warrant*, ICJ Report 2002 p 3, 76–7 (Judges Higgins, Kooijmans, and Buergenthal): 'Passive personality jurisdiction, for so long regarded as controversial, is reflected not only in the legislation of various countries … and today meets with relatively little opposition, at least so far as a particular category of offences is concerned'. Also Ryngaert (2nd edn, 2015) 111; ILC *Ybk* 2006/II(2), 527. For example, in domestic legislation: Criminal Code Amendment (Offences against Australians) Act 2002 (Australia); Penal Code (France), arts 113–117; 18 USC §2332F(*b*)(2)(B); Organic Law 1/2009 (3 November 2009) (Spain) art 23(4), (5). In the US, passive personality was rejected by the *Restatement Second* (1965) §30(2) but it was accepted in *Restatement Third* §402(2).

**52** E.g. Convention on Offences Committed on Board Aircraft, 14 September 1963, 704 UNTS 219, Art 4(b); Convention Against Torture, 10 December 1984, 1485 UNTS 85, Art 5(1)(c).

**53** Harvard Research (1935) 29 *AJIL Supp* 439, 543; Cameron, 'International Criminal Jurisdiction, Protective Principle' (2007) *MPEPIL*; Ryngaert (2nd edn, 2015) 114–20; Guilfoyle (2016) 35–6. For a critique: Bialostozky (2013–14) 52 *Col JTL* 617. See also *Restatement Third* §402(3); draft *Restatement Fourth* (2017) §201(1)(e).

**54** *Nusselein v Belgian State* (1950) 17 ILR 136; *Public Prosecutor v L* (1951) 18 ILR 206; *Re van den Plas* (1955) 22 ILR 205; *Rocha v US*, 288 F2d 545 (9th Cir, 1961); *Italian South Tyrol Terrorism Case* (1970) 71 ILR 242; *US v Peterson*, 812 F2d 486, 494 (9th Cir, 1987) ('Protective jurisdiction is proper if the activity threatens the security or government functions of the United States.'); *US v Yousef*, 327 F3d 56, 112 (2d Cir, 2003); *US v Davis*, 905 F2d 245, 249 (9th Cir, 1990); *US v Cardales*, 168 F3d 548, 553 (1st Cir, 1999), cf *US v Bustos-Useche*, 273 F3d 622 (5th Cir, 2001); *Arrest Warrant*, ICJ Reports 2002 p 3, 37 (President Guillaume), 92 (Judge Rezek); *US v Al Kassar*, 660 F3d 108, 118 (2d Cir, 2011).

**55** *Molvan v AG for Palestine* [1948] AC 351; *Giles v Tumminello* (1969) 38 ILR 120.

**56** [1946] AC 347 (on which see Lauterpacht, 3 *International Law* (1977), 221). Also *Board of Trade v Owen* [1957] AC 602, 634 (Lord Tucker).

**57** (1962) 36 ILR 5, 18, 54–7 (Dist Ct), 304 (Sup Ct).

**58** Notwithstanding this, the District Court of Jerusalem felt able to say that the law under which Eichmann was prosecuted 'conforms to the best traditions of the law of nations': (1962) 36 ILR 5, 18, 25. Also the statement of the Supreme Court, ibid, 287.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**59** E.g. the US asserts jurisdiction over foreigners on the high seas on the basis of the protective principle, arguing that the illegal trade in narcotics is sufficiently prejudicial to its national interest: *US v Gonzalez*, 776 F2d 931 (11th Cir, 1985); *US v Davis*, 905 F2d 245 (1st Cir, 1990); *US v Saac*, 632 F3d 1203 (11th Cir, 2011). Maritime Drug Law Enforcement Act 1986; Murphy (2003) 97 *AJIL* 183. Further: Papastavridis, *The Interception of Vessels on the High Seas* (2013) 248–51.

**60** *Jacobellis v Ohio,* 378 US 184, 197 (1964) (Stewart J).

**61** Coppel (1993) 6 *LJIL* 73; O'Keefe (2004) 2 *JICJ* 735, 739.

**62** E.g. in respect of inchoate conspiracies to murder or import illegal narcotics, where these offences are almost certainly illegal in those countries in which the plotting took place. In other areas, notably the fields of antitrust/competition law, such illegality cannot be assumed, and the validity of the doctrine remains uncertain: ibid, 739.

**63** (1927) PCIJ Ser A No 10, 23.

**64** ICJ Reports 2002 p 3, 77 (Judges Higgins, Kooijmans, and Buergenthal).

**65** In the US: *Restatement Third* §402(1)(c), draft *Restatement Fourth* §201(1)(b); *Morrison v National Australia Bank Ltd*, 130 S Ct 2869, 2877 (2010) (articulating a 'substantial effects' test); Dodge (2011) 40 *Southwestern LR* 687. In the EU: e.g. Case T-102/96 *Gencor Ltd v Commission* [1999] ECR II-753; Case T-286/09 *Intel Corp v European Commission*, ECLI:EU:T:2014:547. Further: Agreement between the European Communities and the Government of the United States on the Application of Positive Comity Principles in the Enforcement of their Competition Laws, 4 June 1998 [1998] OJ L173/28; Jaiswal (2015) 12 *Manchester JIEL* 344; Ryngaert (2nd edn, 2015) 83–4.

**66** *US v Aluminum Co of America*, 148 F2d 416, 443 (2d Cir, 1945).

**67** *Hartford Fire Insurance Co v California*, 509 US 764, 796 (1993); *Hoffman-La Roche Ltd v Empagran SA*, 542 US 155, 165 (2004); *Minn-Chem Inc v Agrium Inc*, 683 F3d 845 (7th Cir, 2012); *Carrier Corp v Outokumpu Oyj*, 673 F3d 430 (6th Cir, 2012). Generally: Raymond (1967) 61 *AJIL* 558; Metzger (1967) 61 *AJIL* 1015; Norton (1979) 28 *ICLQ* 575; Kelley (1991) 23 *U Miami IA LR* 195; Buxbaum & Michaels in Basedow, Francq, & Idot (eds), *International Antitrust Litigation* (2012) 225–44. Further Basedow, 'Antitrust or Competition Law, International' (2014) *MPEPIL*.

**68** Shipping Contracts and Commercial Documents Act 1964 (UK).

**69** Regulation (EC) 2271/96, amended by Regulation (EU) 2018/1100, and see Regulation (EU) 2018/1101 laying down criteria for its application.

**70** Lowe (1984) 27 *GYIL* 54; Kuyper, ibid, 72; Meessen, ibid, 97.

**71** Cf the Note dated 12 August 1982 and comment, Lowe (1983) 197.

**72** Note dated 18 October 1982, UKMIL (1982) 53 *BY* 337, 453; Lowe (1983) 212.

**73** Herdegen, *Principles of International Economic Law* (2013) 90; Ryngaert (2nd edn, 2015) 83–4.

**74** *ICI v EEC Commission* (1972) 48 ILR 106, 121–3.

**75** (1988) 96 ILR 174. However, the Court based its decision on 'the territoriality principle as universally recognized in public international law': ibid, 196–7.

**76** E.g. UKMIL (1992) 63 *BY* 615, 724–9; UKMIL (1993) 64 *BY* 579, 643–5; UKMIL (1995) 66 *BY* 583, 669–71; UKMIL (1996) 67 *BY* 683, 763–5; UKMIL (1998) 69 *BY* 433, 534; UKMIL (2001) 72 *BY* 551, 627, 631; UKMIL (2013) 83 *BY* 298, 461–2. Further: Supplemental Brief of the European Commission on Behalf of the European Union as Amicus Curiae in Support

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

of Neither Party, *Kiobel v Royal Dutch Petroleum Co*, 569 US 108 (2013). On the EU approach to the effects test more generally: Scott (2014) 62 *AJCL* 87, 92–3, 95–6.

**77**   22 USC §6001.

**78**   Iran and Libya Sanctions Act, 110 Stat 1541.

**79**   Cuban Liberty and Democratic Solidarity (Libertad) Act, 22 USC §6021.

**80**   Gidel, 2 *Le Droit international public de la mer* (1932) 39–252; Jessup, *Law of Territorial Waters and Maritime Jurisdiction* (1927) 144–208; Harvard Research (1929) 23 *AJIL Supp* 241, 307–28; Harvard Research (1935) 29 *AJIL Supp* 508; McDougal & Burke, *The Public Order of the Oceans* (1962) 161–73; Churchill & Lowe, *The Law of the Sea* (3rd edn, 1999) 65–9; Marten, *Port State Jurisdiction and the Regulation of Merchant Shipping* (2014); Molenaar, 'Port State Jurisdiction' (2014) MPEPIL; Kopela (2016) 47 *ODIL* 89; Rothwell & Stephens, *The International Law of the Sea* (3rd edn, 2016) 47–8; Rayfuse in Warner & Kaye (eds), *Routledge Handbook of Maritime Regulation and Enforcement* (2016) 71, 72–4.

**81**   Also *Lauritzen v Larsen*, 345 US 571, 584–6 (1953). See also *Reino de España v American Bureau of Shipping Inc*, 729 F Supp 2d 635 (SDNY, 2010); Churchill & Lowe (3rd edn, 1999) 66–7; Tanaka (2nd edn, 2015) 157–160; Baterman in Warner & Kaye (2016) 45–7.

**82**   Further: UNCLOS, 10 December 1982, 1833 UNTS 3, Arts 91–94; UN Convention on the Conditions of Registration of Ships, 7 February 1986, 26 ILM 1229; *M/V Saiga (No 2)* (1999) 120 ILR 143; Baterman in Warner & Kaye (2016) 43–53.

**83**   Molenaar (1998) 187; Churchill & Lowe (3rd edn, 1999) 68; Rothwell & Stephens, *The International Law of the Sea* (2010) 56. No general right of port access exists under customary international law: Rayfuse in Warner & Kaye (2016) 73.

**84**   *US v Flores*, 289 US 137 (1933); *Re Bianchi* (1957) 24 ILR 173; Rayfuse in Warner & Kaye (2016) 72.

**85**   2 Gidel (1932) 204, 246; Churchill & Lowe (3rd edn, 1999) 65–6.

**86**   McNair, 2 *Opinions* 194.

**87**   Churchill & Lowe (3rd edn, 1999) 66–7; Bardin (2002) 14 *Pace ILR* 27, 31. For a US perspective on crimes at the sea, see Roach in Franckx & Gautier (eds), *The Exercise of Jurisdiction over Vessels* (2011) 151; for a European perspective, see Anderson in Franckx & Gautier (2011) 171. Also Shearer in Rothwell (ed), *Law of the Sea* (2013) 320, 327.

**88**   Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the Conservation and Management of Straddling Fish Stocks and Highly Migratory Fish Stocks, 4 August 1995, 2167 UNTS 3.

**89**   2 November 2001, 2562 UNTS 3 (58 parties). Further: Rau (2006) 6 *MPUNYB* 387.

**90**   *R v Martin* [1956] 2 QB 272, 285–6 (Devlin J); *R v Naylor* [1962] 2 QB 527.

**91**   14 September 1963, 704 UNTS 219.

**92**   Convention for the Suppression of Unlawful Seizure of Aircraft, 16 December 1970, 860 UNTS 105; Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, 23 September 1971, 974 UNTS 178; Convention on the Suppression of Unlawful Acts Relating to International Civil Aviation, 10 September 2010, International Civil Aviation Organization (ICAO) Doc 9960 (not yet in force).

**93**   Harvard Research (1935) 29 *AJIL Supp* 439, 563; Bowett (1982) 53 *BY* 1, 11–14; Higgins (1994) 56–65; *The Princeton Principles on Universal Jurisdiction* (2001); Reydams, *Universal Jurisdiction* (2003); Ryngaert (2nd edn, 2015) 120–42. Further: Langer (2011) 105 *AJIL* 1; Nyst (2012) 8 *JIL & Int Rel* 36, 39–43; Schabas (2013) 26 *LJIL* 667, 687–93; Bassiouni (6th edn, 2014) 425–73; Lett (2015) 23 *Mich St ILR* 545; Kapelańska-Pręgowska

(2015) 17 *Int Comm LR* 413, 425–9; O'Keefe, *International Criminal Law* (2015) 371–5; Trouille (2016) 14 *JICJ* 195; Mennecke in Jalloh (ed), *The International Criminal Court and Africa* (2017) 10; O'Sullivan, *Universal Jurisdiction in International Criminal Law* (2017). There is a Working Group of the Sixth Committee on the scope and application of universal jurisdiction: see GA Res 72/120, 18 December 2017.

**94**  La Pradelle in Ascensio, Decaux, & Pellet (eds), *Droit International Pénal* (2005) 905; Guilfoyle (2016) 37.

**95**  O'Keefe (2004) 2 *JICJ* 735, 745.

**96**  Baxter (1951) 28 *BY* 382. Cf Röling (1960) 100 Hague *Recueil* 323, 357–62. Also *Re Sharon and Yaron* (2003) 127 ILR 110; *Javor* (1996) 127 ILR 126; *Munyeshyaka* (1998) 127 ILR 134.

**97**  Higgins (1994) 58. See also *Arrest Warrant*, ICJ Reports 2002 p 3, 81 (Judges Higgins, Kooijmans, and Buergenthal); *R v Bow Street Stipendiary Magistrate, ex p Pinochet Ugarte (No 3)* [1999] 2 All ER 97, 176 (Lord Millett).

**98**  (1961) 36 ILR 5, 26.

**99**  This can be explained by the fact that no state could exercise territorial jurisdiction: e.g. *SS Lotus* (1927) PCIJ Ser A No 10, 51 (Judge Finlay, diss), 70–1 (Judge Moore, diss), 95 (Judge Altamira, diss); *Arrest Warrant*, ICJ Reports 2002 p 3, 37–8, 42 (President Guillaume), 55–6 (Judge Ranjeva), 78–9, 81 (Judges Higgins, Kooijmans, and Buergenthal). On piracy: UNCLOS, Art 105, and chapter 13; Hodgkinson in Scharf, Newton, & Sterio (eds), *Prosecuting Maritime Piracy* (2015). Also: *US v Shibin*, 722 F3d 233 (4th Cir, 2013).

**100**  E.g. *SS Lotus* (1927) PCIJ Ser A No 10, 95 (Judge Altamira, diss); *Arrest Warrant*, ICJ Reports 2002 p 3, 61–2 (Judge Koroma); Trouille (2016) 14 *JICJ* 195; van der Wilt (2016) 14 *JICJ* 269.

**101**  Ryngaert (2nd edn, 2015) 127–8; *US v Bellaizac-Hurtado*, 700 F3d 1245, 1253–4 (11th Cir, 2012) (holding enforcement of an anti-drug trafficking law unconstitutional as applied to conduct in the territorial waters of another country, drug trafficking being 'not a violation of customary international law'). But see *US v Macias*, 654 Fed Appx 458 (11th Cir, 2016), (holding that the prosecution for drug-trafficking crimes committed on board a stateless vessel in international waters is a constitutional exercise of extraterritorial jurisdiction).

**102**  *Jorgic v Germany* [2007] ECtHR 74613/01, [69]. Institut de Droit International, Seventeenth Commission, *Universal Jurisdiction Over Genocide, Crimes Against Humanity and War Crimes* (2005) 2. Generally: Kreß (2006) 4 *JICJ* 561; Reydams (2003) 1 *JICJ* 428; cf Reydams (2003) 1 *JICJ* 679; Ryngaert (2007) *Hague JJ* 85. This has become the position despite the fact that the Genocide Convention, 9 December 1948, 78 UNTS 277, Art VI reserves universal jurisdiction in the case of genocide for an international court: cf *In re Koch* (1966) 30 ILR 496; *Jorgic v Germany* [1997] ECtHR 74613/01 (alternative interpretation of Genocide Convention, Art VI, which permits universal jurisdiction for states); Schabas (2003) 1 *JICJ* 39.

**103**  Higgins (1994) 61; Van Elst (2000) 13 *LJIL* 815; Ryngaert (2007) *Hague JJ* 85; Carrillo & Nelson (2013–14) 46 *G Wash ILR* 481.

**104**  *R v Bow Street Metropolitan Stipendiary Magistrate, ex p Pinochet Ugarte (No 3)* [2000] 1 AC 147, 275 (Lord Millett); *Furundžija* (2002) 121 ILR 213, 262. Cf *Jones v Saudi Arabia* [2006] UKHL 26, [34] (rejecting the existence of universal tort jurisdiction over torture).

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**105** Resolution ICC-ASP/16/Res.5, 14 December 2017; ICC Statute, 17 July 1998, 2187 UNTS 3, Arts 8*bis*, 15*bis*, 15*ter*, inserted by Resolution RC/Res.6 of 11 June 2010. See also Kreß & Barriga, *The Crime of Aggression: A Commentary* (2017).

**106** Ryngaert (2nd edn, 2015) 127.

**107** E.g. in Spain: Moltó (2015) 13 *JICJ* 1121, 1122–31.

**108** Generally: Winants (2003) 16 *LJIL* 491; Rabinovitch (2004) 28 *Fordham ILJ* 500. O'Keefe (2004) 2 *JICJ* 735; Goldmann, 'Arrest Warrant Case (Democratic Republic of Congo v Belgium)' (2009) *MPEPIL*.

**109** Cf also the dissenting opinion of Judge Oda: ICJ Reports 2002 p 3, 51.

**110** President Guillaume took a conservative stance on universal jurisdiction holding that under customary international law it only applied with respect to piracy and within the confines of certain *sui generis* treaty regimes: ibid, 37–8.

**111** Ibid, 94.

**112** Ibid, 55–7 (Judge Ranjeva), 121–6 (Judge ad hoc Bula-Bula).

**113** Reydams (2003) 55, 74, 88–9, 156, 177, 222, 224, 226–7. For comment on universal jurisdiction *in absentia*: Colangelo (2005) 36 *Geo JIL* 537; Poels (2005) 23 *NQHR* 65; Ryngaert (2nd edn, 2015) 133–5.

**114** O'Keefe (2004) 2 *JICJ* 735, 750.

**115** Ibid, 750–1; O'Keefe (2015) 573–5; Guilfoyle (2016) 40. Cf Ryngaert (2nd edn, 2015) 123–5.

**116** Generally: Reydams (2003) ch 3; Scharf, '*Aut dedere aut iudicare*' (2008) *MPEPIL*; Guilfoyle (2016) 44–52.

**117** The concept again comes from Grotius, who found the notion of a fugitive arriving on the territory of a state and there remaining to enjoy the fruits of his iniquity offensive: Grotius, *De iure belli ac pacis* (1625, Tuck 2005) II.xxi, §4.1. The position was later reversed by Enlightenment philosophers who sought to restrict the prescriptive jurisdiction of states to territorial concerns alone: e.g, Beccaria, *Traité des délits et des peines* (1764) §21. Further: *Arrest Warrant*, ICJ Reports 2002 p 3, 36–40 (President Guillaume).

**118** In the modern era, the concept first appeared in the International Convention for the Suppression of Counterfeiting Currency, 20 April 1929, 112 LNTS 371, Art 9.

**119** 16 December 1970, 860 UNTS 105, Art 4(1).

**120** E.g. Geneva Convention Relative to the Treatment of Prisoners of War, 75 UNTS 135, Art 129.

**121** Generally: Saul, *Defining Terrorism in International Law* (2006); Schmid (2012) 6 *Perspectives on Terrorism* 158; Easson & Schmid in Schmid (ed), *Routledge Handbook of Terrorism Research* (2011) 99–157; Cohen (2013) 20 *Mich St ILR* 219, 229–33; O'Keefe (2015) 160, 266–74; Brennan in McCorquodale & Gauci (eds), *British Influences on International Law* (2016) 417–35. Cf Cassese, *International Law* (3rd edn, 2013) ch 8.

**122** Higgins (1994) 64 ('Although these treaties seek to provide wide alternative bases of jurisdiction, they are not examples of universal jurisdiction. Universal jurisdiction, properly called, allows *any* state to assert jurisdiction over an offence').

**123** Ryngaert (2nd edn, 2015) 124. Also Guilfoyle (2016) 46.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**124**  E.g. *US v Rezaq*, 134 F3d 1121 (DC Cir, 1998); *US v Wang Kun Lue*, 134 F3d 79 (2d Cir, 1998); *US v Lin*, 101 F3d 760 (DC Cir, 1996). For commentary on the US position: Scharf (2001) 64 *LCP* 67.

**125**  *US v Yunis*, 681 F Supp 896, 901 (DDC, 1988) and *US v Yunis*, 924 F2d 1086 (DCC, 1991).

**126**  Akehurst (1972–3) 46 *BYIL* 145, 170; Vagias, *The Territorial Jurisdiction of the International Criminal Court* (2014) 181–2; Kohl in Tsagourias & Buchan (eds), *Research Handbook on International Law and Cyberspace* (2015) 31–3. There are many specialized areas, e.g. those relating to conscription and taxation. On the former: Parry (1954) 31 *BY* 437; 8 Whiteman 540–72. On the latter: Mann (1964) 111 Hague *Recueil* 1, 109–19; Martha, *The Jurisdiction to Tax in International Law* (1989).

**127**  Ryngaert (2nd edn, 2015) 32, 82–4, 89–94. Also Ryngaert, *Jurisdiction over Antitrust Violations in International Law* (2008).

**128**  On the relations of public and private international law: Mills, *Confluence of Public and Private International Law* (2009); Boer (2010) 57 *NILR* 183; Mills (2014) 84 *BYIL* 187; Ryngaert (2nd edn, 2015) 16–22.

**129**  Beale (1922–3) 36 *Harv LR* 241. For a different view see Akehurst (1972–3) 46 *BY* 145, 170–7; and see *Derby & Co Ltd v Larsson* [1976] 1 WLR 202, noted (1976–7) 48 *BY* 333, 352. Also *Thai-Europe Tapioca Service v Government of Pakistan* [1975] 1 WLR 1485, 1491–2 (Lord Denning); Putnam, *Courts without Borders* (2016) ch 2.

**130**  *Russell & Co v Cayzer, Irvine Ltd* [1916] 2 AC 298, 302; *ANZ Grindlays Bank plc v Fattah* (1991) 4 WAR 296, 299–300. Further: *Dicey, Morris & Collins on the Conflict of Laws* (15th edn, 2012) 411.

**131**  E.g. *Maharanee of Baroda v Wildenstein* [1972] 2 QB 283. Sime, *A Practical Approach to Civil Procedure* (17th edn, 2014) 117.

**132**  E.g. *Dunlop Ltd v Cudell & Co* [1902] 1 KB 342; *Cleveland Museum of Art v Capricorn International SA* [1990] 2 Lloyd's Rep 166. In civil claims against corporations in US courts, a 'commercial presence' is no longer sufficient to establish jurisdiction: *Daimler AG v Bauman*, 134 S Ct 746 (2014); *Bristol-Myers Squibb Co v Superior Court of California, San Francisco County*, 137 S Ct 1773 (2017).

**133**  McConville in Scott (ed), *Torture as Tort* (2001) 160.

**134**  E.g. *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460; *Airbus Industrie GIE v Patel* [1999] 1 AC 119; *Lubbe v Cape plc* [2000] 1 WLR 1545. Generally: Sime (17th edn, 2014) 124–5; Fentiman, *International Commercial Litigation* (2nd edn, 2015) chs 8–9, 12.

**135**  Where the defendant has a territorial connection with England sufficient to allow the writ to be served directly, the court may decline jurisdiction on the basis that England is *forum non conveniens*: *VTB Capital plc v Nutritek International Corp* [2013] 2 AC 337.

**136**  E.g. Ehrenzweig (1956) 65 *Yale LJ* 289. Relations between common law and civil law countries on the service of process have been a source of difficulty: e.g. *Decision concerning Service of Punitive Damage Claims* (1995) 34 ILM 975.

**137**  *International Shoe Co v Washington*, 326 US 310, 316 (1945). Also *World-Wide Volkswagen Corp v Woodson*, 444 US 286, 297 (1980); *Goodyear Dunlop Tyres Operations SA v Brown*, 564 US 915 (2011).

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**138**  134 S Ct 746, 761 (2014) (uprooting the corporate presence doctrine). For comment: Ji (2015) 23 *Mich St ILR* 397; Cavanagh (2016) 68 *Maine LR* 287. See also *Gucci America Inc v Weixing Li*, 768 F3d 122 (2d Cir, 2017).

**139**  [2001] OJ L12/1, an elaboration on the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, Brussels, 27 September 1968, 1262 UNTS 153 As an EU member, the UK is bound by the Brussels I Regulation. To the extent that the Regulation does not apply, the common law rules of jurisdiction will have residual effect: Brussels I Regulation, Art 4. Also of note is EC Regulation 593/2008 on the law applicable to contractual relations [2008] OJ L177/6 (Rome I Regulation). Generally: Briggs, *Civil Jurisdiction and Judgments* (6th edn, 2015) ch 2; van Calster, *European Private International Law* (2nd edn, 2016) ch 2.

**140**  The Brussels I Regulation permits certain exceptions to this principle based on questions of subject matter and the relationship between the parties: e.g. Arts 5(1) (matters relating to a contract), 5(3) (matters relating to a tort or delict), 5(5) (matters relating to a dispute arising from the activities of a branch, agent, or other establishment); 22 (exclusive jurisdiction), 23 (jurisdiction agreements), and 27 and 28 (*lis pendens* and related actions).

**141**  Further: Kaeb & Scheffer (2013) 107 *AJIL* 852, 854–5; Fentiman (2nd edn, 2015) ch 9.

**142**  Cf Brussels I Regulation, Art 28.

**143**  E.g. because the court second seised is the beneficiary of an exclusive jurisdiction agreement between the parties (Art 23) or the subject matter of the dispute is something within the exclusive jurisdiction of the court second seised (Art 22).

**144**  Case C-281/02 *Owusu v Jackson* [2005] ECR I-1383 (ECJ). Also Case C-159/02 *Turner v Grovit* [2005] ECR I-3565 (ECJ); Case C-116/02 *Erich Gasser GmbH v MISAT srl* [2003] ECR I-14693 (ECJ); Case C-185/07, *Allianz SpA v West Tankers Inc* [2009] ECR I-663; *Ferrexpo AG v Gilson Investment Ltd* [2012] EWHC 721 (Comm). Further: Rodger (2006) 2 *JPIL* 71; De Verneuil Smith, Lasserson, & Rymkiewicz (2012) 8 *JPIL* 389.

**145**  Mills, *The Confluence of Public and Private International Law* (2009); Ryngaert (2nd edn, 2015) ch 1.

**146**  Mills (2009) 298.

**147**  E.g. *Timberlane Lumber Co v Bank of America*, 549 F2d 597 (9th Cir, 1976); *Asahi Metal Industry Co v Superior Court of California*, 480 US 102 (1987);

cf *Hartford Fire Ins Co v California*, 509 US 764 (1993). Further: Oakley & Amar, *American Civil Procedure* (2009) 116; Grossi, *The US Supreme Court and the Modern Common Law Approach* (2015) 144, 166–8, 171.

**148**  Steinhardt & D'Amato (eds), *The Alien Tort Claims Act* (1999); Paust (2004) 16 *Florida JIL* 249; Ku (2013) 107 *AJIL* 835–7; Ryngaert (2nd edn, 2015) 135–42; Seibert-Fohr, 'United States Alien Tort Statute' (2015) *MPEPIL*.

**149**  Reydams (2008) 126–7; Cassese (3rd edn, 2013) 278–81.

**150**  28 USC §1350. After the 'rediscovery' of the Alien Tort Claims Act, the Torture Victims Protection Act of 1991 was passed: it provides a cause of action for any victim of torture or extrajudicial killing wherever committed: 106 Stat 73.

**151**  These are the offences against the law of nations described by Blackstone as addressed by the criminal law of England. See *Sosa v Alvarez-Machain*, 542 US 692, 725 (2004). The origins of the original statute are obscure: Paust (2004) 16 *Florida JIL* 249; Seibert-Fohr, 'United States Alien Tort Statute' (2015) *MPEPIL*.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**152**  630 F2d 876, 881 (2d Cir, 1980).

**153**  There is no nationality requirement imposed on the defendant by the ATS; accordingly, US companies were named as defendants in many cases, converting ATS into a corporate social responsibility tool: e.g. *Doe v Unocal*, 395 F3d 932 (9th Cir, 2002). But corporations that have a 'mere corporate presence' in the US have been held not to fall within the Act: *Kiobel v Royal Dutch Petroleum Co*, 569 US 108 (2013), and the Supreme Court has held that foreign corporations may not be defendants in ATS cases: *Jesner v Arab Bank Plc*, 584 US __ (2018). The scope of the ATS is thus further reduced.

**154**  Ryngaert (2nd edn, 2015) 71, 106.

**155**  542 US 692, 749 (2004).

**156**  Ryngaert (2003) 38 *NYIL* 3, 35–8.

**157**  E.g. *Arrest Warrant*, ICJ Reports 2002 p 3, 77 (Judges Higgins, Kooijmans, and Buergenthal) ('[w]hile this unilateral exercise of the function of guardian of international values has been much commented on, it has not attracted the approbation of States generally'). Cf Ramsay (2009) 50 *Harv ILJ* 271.

**158**  Ryngaert (2nd edn, 2015) 137; Kaeb & Scheffer (2013) 107 *AJIL* 852.

**159**  *Kiobel v Royal Dutch Petroleum Co*, 569 US 108, 14 (2013) (Chief Justice Roberts, joined by Justices Scalia, Alito, Thomas, and Kennedy).

**160**  See *Mujica v AirScan Inc*, 771 F3d 580, 594 (9th Cir, 2014) (stating that '*Kiobel* (quite purposely) did not enumerate the specific kinds of connections to the United States that could establish ATS claims "touch and concern" this country').

**161**  Stephens (2013) 28 *Md JIL* 256; Chander (2013) 107 *AJIL* 829; Ku (2013) 107 *AJIL* 835.

**162**  *RJR Nabisco, Inc v European Community*, 136 S Ct 2090, 2100–1 (2016).

**163**  But the presumption was not overcome regarding the private right of action, for which domestic injury must be alleged and proved. See *RJR Nabisco, Inc v European Community*, 136 S Ct 2090, 2105–11 (2016).

**164**  Ireland-Piper (2013) 9(4) *Utrecht LR* 68, 73; Currie & Coughlan (2007) 11 *Can Crim LR* 141, 148. E.g. *Janković*, Decision on Art 11*bis* referral (ICTY Appeals Chamber, Case No IT-96-23/2-AR11*bis*.2, 15 November 2005), para 34.

**165**  E.g. *Eichmann* (1962) 36 ILR 277, 302; *Arrest Warrant*, ICJ Reports 2002 p 3, 80 (Judges Higgins, Kooijmans, and Buergenthal) (arguing that universal jurisdiction can only be exercised once the territorial state has declined to take action).

**166**  Further: Ryngaert (2nd edn, 2015) ch 5.

**167**  Mann (1964) 111 Hague *Recueil* 9, 43–51, 82–126; Ryngaert (2nd edn, 2015) 156–7. For the Canadian approach, requiring 'a real and substantial link': *Queen v Klassen* 2008 BCSC 1762; ILDC 941; *Club Resorts Ltd v Van Breda* [2012] 1 SCR 572, and see Monestier (2013) 36 *Fordham ILJ* 396.

**168**  Ryngaert (2nd edn, 2015) ch 2; Kamminga, 'Extraterritoriality' (2012) *MPEPIL*; Piraino (2012) 40 *Hofstra LR* 1099.

**169**  Donovan & Roberts (2006) 100 *AJIL* 142, 142; Mills (2014) 84 *BY* 187, 202.

**170**  E.g. Protection of Trading Interests Act 1980 (UK) (which has, however, been little used). Also EC Regulation 2271/96, enacted in response to the Helms–Burton and D'Amato–Kennedy Acts. On restricting the reach of state jurisdictions over online data: Woods (2016) 68 *Stanford LR* 729, 779–80. On blocking investigations under the US Foreign Corrupt

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

Practices Act: Liakopoulos & Marsilia, *The Regulation of Transnational Mergers in International and European Law* (2009) 17; Robert-Ritter (2012) 8 *IL & Man R* 89.

**171** Mann (1964) 13 *ICLQ* 1460; Jennings (1957) 33 *BY* 146; 6 Whiteman 118–83; Akehurst (1972–3) 46 *BY* 145, 179–212 Meessen (ed), *Extra-Territorial Jurisdiction in Theory and Practice* (1996); Milanovic, *Extraterritorial Application of Human Rights Treaties* (2011) 23–6; Colangelo (2014) 99 *Cornell LR* 1303; Ryngaert (2nd edn, 2015) 31; Schabas (ed), *The Cambridge Companion to International Criminal Law* (2016) 161, 218, 220–6.

**172** (1927) PCIJ Ser A No 10, 18–19.

**173** E.g. *Armed Activities on the Territory of the Congo (DRC v Uganda)*, ICJ Reports 2005 p 168, 196–9; *R v Hape* [2007] 2 SCR 292. Further: Stigall (2013) 3 *Notre Dame JICL* 1, 9.

**174** *SS Lotus* (1927) PCIJ Ser A No 10, 18.

**175** E.g. Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces, 19 June 1951, 199 UNTS 67, Art VII; Agreement between the Democratic Republic of East Timor and the United Nations concerning the Status of the United Nations Mission of Support in East Timor, 20 May 2002, 2185 UNTS 368, Arts 43–44. Further: chapter 22.

**176** *US v Aluminum Co of America*, 148 F2d 416 (2d Cir, 1945).

**177** *US v Watchmakers of Switzerland Information Center Inc*, 133 F Supp 40 (SDNY, 1955); 134 F Supp 710 (SDNY, 1955).

**178** Intention was not a prominent requirement in *US v ICI*, 100 F Supp 504 (SDNY, 1951); 105 F Supp 215 (SDNY, 1952), and in many circumstances it can be inferred.

**179** *Timberlane Lumber Co v Bank of America*, 549 F2d 597 (9th Cir, 1976); *Mannington Mills Inc v Congoleum Corp*, 595 F2d 1287 (3d Cir, 1979). The 'balancing' approach was criticized in *Laker Airways Ltd v Sabena*, 731 F2d 909 (DC Cir, 1984). *Hartford Fire Insurance v California*, 509 US 764 (1993) ignored almost all the balancing factors and held that US courts should exercise jurisdiction where there is a substantial effect within the US and there is no conflict, i.e. no foreign law requires that a party act or not act in a certain manner contrary to US laws. Further: Ryngaert (2nd edn, 2015) 155–6; Duns, Duke, & Sweeney (eds), *Comparative Competition Law* (2015) 356–60.

**180** *Barcelona Traction*, Second Phase, ICJ Reports 1970 p 3, 103–6 (Judge Fitzmaurice).

**181** *Hoffman-La Roche Ltd v Empagran SA*, 542 US 155 (2004). See also *Restatement Third* §403(1) and (2); draft *Restatement Fourth* (2017) §101.

**182** *BPIL* (1964) 146, 153.

**183** (1957) 33 *BY* 146, 151. Also *British Nylon Spinners Ltd v ICI Ltd* [1952] 2 All ER 780; [1954] 3 All ER 88; Kahn-Freund (1955) 18 *MLR* 65.

**184** *Carron Iron Co v Maclaren* (1855) 5 HLC 416, 442 (Lord Cranworth); *The Tropaioforos* [1962] 1 Lloyd's Rep 410.

**185** Convention implementing the Schengen Agreement of 14 June 1985 [2000] OJ L239/19.

**186** [2001] OJ C 197/1. Also: Convention on the Establishment of a European Police Office [1995] OJ C 316/2. Further: McClean (2002) 167–8, 224–37.

**187** The UN has sponsored a series of treaties designed to secure greater cooperation in criminal matters: UN Model Treaty on Mutual Assistance in Criminal Matters, 14 December 1990, A/RES/45/117, amended by A/RES/53/112, 20 January 1999; Model Treaty on the Transfer of Proceedings in Criminal Matters, 14 December 1990, A/RES/45/118; UN Convention Against Transnational Organized Crime, 15 November 2000, A/RES/55/25

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

(Annex I). Further: *Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v France)*, ICJ Reports 2008 p 117.

**188**  UK–Netherlands, Agreement concerning a Scottish trial in the Netherlands, 18 September 1998, 2062 UNTS 81. This approach was approved in SC Res 1192 (1998). Further: Aust (2000) 49 *ICLQ* 278; Plachta (2001) 12 *EJIL* 125. Also: UK–New Zealand, Agreement concerning trials under Pitcairn law in New Zealand, 11 October 2002, 2219 UNTS 57; Pitcairn Trials Act 2002 (NZ); *R v Seven Named Accused* (2004) 127 ILR 232; *Christian v R* [2007] 2 WLR 120.

**189**  E.g. *Wisconsin v Pelican Insurance Co*, 127 US 265 (1887); *Huntington v Attrill* [1893] AC 150; *US v Inkley* [1989] QB 255 (CA). Further: Zeynalova (2013) 31 *Berkeley JIL* 150, 163–8.

**190**  28 May 1970, ETS No 70.

**191**  Generally: Nicholls & Montgomery, *The Law of Extradition and Mutual Assistance* (2nd edn, 2007); Stein, 'Extradition' (2011) *MPEPIL*. On reciprocity as a basis for extradition: Rezek (1981) 52 *BY* 171; Duffy, *The 'War on Terror' and the Framework of International Law* (2nd edn, 2015) 162–5.

**192**  E.g. UK–USA, Extradition Treaty, 31 March 2003, Cm 5821.

**193**  13 December 1957, 359 UNTS 273. Also: Additional Protocol to the European Convention on Extradition, 15 October 1975, CETS No 86; Second Additional Protocol to the European Convention on Extradition, 17 March 1978, CETS No 98.

**194**  Cf EC Framework Decision of 13 June 2002 on the European arrest warrant and surrender procedures between member states [2002] OJ L190/1; and see *Assange v Swedish Prosecution Authority* [2012] UKSC 22. But cf *Assange (Sweden and the UK)* (2015) 175 ILR 475 (UN Working Group on Arbitrary Detention).

**195**  A/RES/45/116, 14 December 1990. The UNMTE has been supplemented by a UN Model Law on Extradition: 10 May 2004, E/EN.15/2004/CRP.10.

**196**  E.g. UNMTE, Art 2. Older treaties phrased this requirement in terms of an exhaustive list of offences for which extradition could be requested: ECE, Art 2, but cf Art 2(4). The EAW does away with this entirely with respect to certain serious offences, including those deemed to be crimes under the ICC Statute: EAW, Art 2(2).

**197**  E.g. UNMTE, Art 3(a), ECE, Art 3. Also the European Convention on Extradition, 13 December 1957, 359 UNTS 273, Art 3, supplemented by Additional Protocol, 15 October 1975, 1161 UNTS 450, Art 1. On the non-refoulement principle and the prosecution of crimes committed extraterritorially: Gilbert & Rüsch (2014) 12 *JICJ* 1093.

**198**  E.g. UNMTE, Art 14, ECE, Art 14.

**199**  E.g. UNMTE, Art 3(f). Additionally, the European Court of Human Rights (ECtHR) has held that parties could not knowingly extradite an individual where that individual would be in danger of torture: *Soering v UK* (1989) 98 ILR 270. Cf *Netherlands v Short* (1990) 29 ILM 1375; *Ng v Canada* (1993) 98 ILR 497; Aylor (1993) 100 ILR 664; *US v Burns* (2001) 124 ILR 298; *Mamatkulov v Turkey* (2005) 134 ILR 230; *Ahmad v UK* [2012] ECtHR 24027/07, [166]–[179]. This rule has been applied in other jurisdictions: e.g. *Lamas Puccio v Peru*, ILDC 1886 (2011); *Minister of Home Affairs v Tsebe*, 2012 (5) SA 467. Further: Beltrán de Felipe & Nieto Martín (2012) 10 *JICJ* 581; Stover (2014) 45 *Col HRLR* 325. See also Southern African Development Community, Protocol on Extradition (2006), Art 5(j).

**200**  E.g. UNMTE, Art 3(d), ECE, Art 11.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**201**  Cf *Eichmann* (1962) 36 ILR 5. There, the accused was abducted from Argentina, drugged, and dressed as a flight attendant for rendition to Israel. Further: Fawcett (1962) 38 *BY* 181; Schabas (2013) 26 *LJIL* 667. The US courts recognize as a general rule that law enforcement officers of one country can exercise powers in another country only with the permission of the latter. See *Société Nationale Industrielle Aerospatiale v US DC for Southern District of Iowa*, 482 US 522 (1987); *Williams v Wisconsin*, 336 F3d 576 (7th Cir, 2003).

**202**  Including human rights standards: *Öcalan v Turkey* [2005] ECtHR 46221/99 (irregular rendition not automatically contrary to ECHR Art 5(1)).

**203**  Further: Parry (2005) 6 *Melb JIL* 516; Weissbrodt & Bergquist (2006) 19 *Harv HRJ* 123; Sands in Roberts (ed), *Mélanges Salmon* (2007) 1074; Messineo (2009) 7 *JICJ* 1023; Jensen & Jenks (2010) 1 *Harv NSJ* 171; McDermott (2014) 1 *J Use of Force & IL* 299.

**204**  *US v Alvarez-Machain*, 504 US 655 (1992). But cf *R v Horseferry Road Magistrates' Court, ex p Bennett* [1994] 1 AC 42; *S v Ebrahim* (1991) 95 ILR 417. Traditionally European jurisdictions would ordinarily accept jurisdiction in exorbitant circumstances, but this has changed with the ECtHR: *Re Argoud* (1964) 45 ILR 90; cf *Stockë v Germany* (1991) 95 ILR 350. Also: *Prosecutor v Nikolić*, Legality of Arrest, ICTY, IT-94-2-AR73, 5 June 2003, paras 23, 55–7. Further: Schabas (2013) 3 *LJIL* 667, 687–93.

**205**  As of 10 January 2015, the (recast) Brussels I Regulation applies: Regulation (EU) No 1215/2012. Further: Beaumont & Walker (2015) 11 *JPIL* 31.

**206**  Brussels I Regulation (recast), Art 45. In the US: Stephan (ed), *Foreign Court Judgments and the United States Legal System* (2014).

**207**  *Mareva Compania Naviera SA v International Bulkcarriers SA* [1975] 2 Lloyd's Rep 509; and cf generally: Fentiman (2nd edn, 2015) ch 17.

**208**  *Ashtiani v Kashi* [1987] QB 888.

**209**  E.g. *Babanaft International Co v Bassatne* [1990] Ch 13; *Derby & Co Ltd v Weldon* [1990] Ch 48 (CA).

**210**  E.g. *Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818; *Republic of Haiti v Duvalier* [1990] 1 QB 202; *Refco v Eastern Trading Co* [1999] 1 Lloyd's Rep 159 (CA); *Ryan v Friction Dynamics* [2001] CP Rep 75; *Motorola Credit Corp v Uzan* [2004] 1 WLR 113.

**211**  *Castanho v Brown & Root* [1981] AC 557, 573; *Airbus Industrie GIE v Patel* [1999] 1 AC 119, 133; *Amchem Products Inc v British Columbia Workers Compensation Board* (1993) 102 DLR (4th) 96, 119; *Turner v Grovit* [2002] 1 WLR 107. Generally: Fentiman (2nd edn, 2015) 532–40; Chan (2016) 79 *MLR* 341.

**212**  *Masri v Consolidated Contractors International (UK) Ltd (No 3)* [2009] QB 503, 533. This also includes cases where the foreign claimant is prevented from re-litigating previous proceedings: e.g. *Royal Bank of Scotland plc v Hicks & Gillette* [2010] EWHC 2579 (Ch).

**213**  E.g. *Midland Bank plc v Laker Airways Ltd* [1986] QB 689; cf *Siskina (Owners of cargo lately laden on board) v Distos Compania Naviera SA* [1979] AC 210.

**214**  Notably where the parties have concluded an exclusive jurisdiction agreement in favour of the injuncting court: e.g. *Donohue v Armco Ltd* [2002] 1 Lloyd's Rep 425.

**215**  Jääskinen & Sikora in Cremona, Thies, & Wessel (eds), *The European Union and International Dispute Settlement* (2017) 101–11.

**216**  As was the case in *Société Nationale Industrielle Aérospatiale v Lee Kui Jak* [1987] AC 871 (PC).

---

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**217**  Generally: Maier (1982) 76 *AJIL* 280; Paul (1991) 32 *Harv JIL* 1; Collins in Fawcett (ed), *Reform and Development of Private International Law* (2002) 89; Chan (2016) 79 *MLR* 341.

**218**  [1990] 3 SCR 1077, 1096.

**219**  159 US 113, 164 (1895).

**220**  E.g. in relation to anti-suit injunctions, *Turner v Grovit* [2002] 1 WLR 107, [28] (Lord Hobhouse); *Sanofi-Aventis Deutschland GmbH v Genentech Inc*, 716 F3d 586, 591 (2013); *Nike Inc v Cardarelli*, 2015 WL 853008 (D Or, 2015). Further: Sim (2013) 62 *ICLQ* 703; Fentiman (2nd edn, 2015) ch 16. In relation to freezing injunctions: *Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818; *Refco v Eastern Trading Co* [1999] 1 Lloyd's Rep 159. On comity generally: Dodge (2015) 115 *Col LR* 2071.

**221**  E.g. *Turner v Grovit* [2005] ECR I-3565; *Erich Gasser GmbH v MISAT srl* [2003] ECR I-14693; *Allianz SpA v West Tankers Inc* [2009] ECR I-663.

**222**  E.g. *Buck v Attorney-General* [1965] Ch 745, 770–2 (Diplock LJ); *Lauritzen v Larsen*, 345 US 571, 584–6 (1953); *Rio Tinto Zinc Corp v Westinghouse* [1978] AC 547, 607 (Lord Wilberforce), 618 (Lord Dilhorne); *R v Hape* [2007] 2 SCR 292, paras 45–6, 57, 65, 68. Cf *Aérospatiale v District Court*, 482 US 522, 554–61 (1987) (Blackmun J, diss).

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

# EXHIBIT 2

*The British Yearbook of International Law* © The Author 2014. Published by Oxford University Press. This is an Open Access article distributed under the terms of the Creative Commons Attribution Non-Commercial License (http://creativecommons.org/licenses/by-nc/4.0/), which permits non-commercial re-use, distribution, and reproduction in any medium, provided the original work is properly cited. For commercial re-use, please contact journals.permissions@oup.com
doi:10.1093/bybil/bru003
Advance Access published on 14 September 2014

# Rethinking Jurisdiction in International Law

## *By* Alex Mills*

### Abstract

Jurisdiction has traditionally been considered in international law as purely a question of the rights and powers of states. Conceived in this way, the rules on jurisdiction serve the important function of delimiting (while accepting some overlap of) state regulatory authority – the question of when a person or event may be subject to national regulation – a function which is shared with the cognate discipline of private international law. This article suggests that the idea and the rules of jurisdiction in international law require reconceptualisation in light of three developments. The first is the growing recognition that in a range of circumstances the exercise of national jurisdiction may, under international law, be a question of duty or obligation rather than right. The second development is the increased acceptance that such jurisdictional duties may in some circumstances be owed not only to other states but also to private parties, particularly through the emergence and strengthening of the doctrines of denial of justice and access to justice. The third development is the widely recognised phenomenon known as party autonomy, under which private parties in civil disputes have the power to confer jurisdiction on national courts and to determine themselves which law governs their relationships. In combination, these developments suggest the necessity of rethinking the concept of jurisdiction in international law, to reflect the more complex realities of an international legal order under which states possess both jurisdictional rights and obligations and are no longer the exclusive actors.

*Keywords*: Jurisdiction, universal jurisdiction, sovereignty, denial of justice, access to justice, party autonomy, state immunity, forum of necessity.

*Reader in Public and Private International Law, Faculty of Laws, University College London, a.mills@ucl.ac.uk. Earlier versions of this article were presented at the Cambridge Journal of International and Comparative Law Conference in May 2012, as part of the Scrymgeour Seminar Series at the University of Dundee in November 2012, at the American Society of International Law Research Forum in November 2013, and as part of the International Law Association British Branch lecture series in February 2014. I would like to record my gratitude to the organisers of each event and to the Editors of the British Yearbook of International Law.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

30

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

## I. Introduction

The regulation of the jurisdiction of states is an important aspect of international law. This article argues, however, that it is also underdeveloped. It is important because it is at the heart of an international legal order which seeks to provide for the lawful co-existence of sovereigns. Rules of jurisdiction reflect fundamental requirements in the international system which flow from the acceptance by states that there are limits on their own regulatory authority, and that exercises of regulatory authority by foreign sovereigns are themselves legitimate. These rules do not pretend to eliminate entirely the possibility of overlapping regulation. Some limited risk of potentially conflicting exercises of public authority remains an accepted feature of international law, while the risk of overlapping exercises of authority in questions of private law is reduced through the closely related field of private international law.[1] But without rules of jurisdiction such risk of overlap would be much increased, and no dispute over whose regulatory authority should apply to a person or event would be capable of being resolved through law.

Despite the centrality of rules of jurisdiction in the international order, the subject has not received very extensive scholarly attention. Moreover, such attention as it does receive tends to involve a fairly ritualised account of the standard 'heads' of jurisdiction, principally based on territoriality and nationality, which are traditionally the major grounds on which a state may (at its discretion) exercise regulatory authority, as explored in section III. The origins of this approach to jurisdiction may be found particularly in the scholarship of early private international lawyers, also examined in section III, who viewed themselves as working in a single discipline of 'international law'. Rules of private international law can also be understood as partially implementing public international law jurisdictional constraints in the context of private law disputes and relations. This account of jurisdiction has not changed greatly since the nineteenth century – aside from a temporary and regrettable digression into a 'positivist' model of plenary jurisdiction, as discussed in section II – although debates have continued concerning its boundaries, and some of its details have been progressively clarified.

In contrast with this relatively static account of the rules of jurisdiction, international law has changed in fundamental ways during this period, in particular through the rise in recognition and importance of non-state actors, including individuals as bearers of human rights. Arguments are increasingly made that the foundations of international

---

[1] On the relationship between public and private international law, see generally Alex Mills, *The Confluence of Public and Private International Law: Justice, Pluralism and Subsidiarity in the International Constitutional Ordering of Private Law* (CUP 2009).

law have fundamentally shifted from state sovereignty to a greater con-
cern with 'humanity',[2] or from sovereignty as 'right' to sovereignty as
'responsibility'.[3] As expressed by the International Criminal Tribunal
for the former Yugoslavia:

. . . the impetuous development and propagation in the international community
of human rights doctrines, particularly after the adoption of the Universal
Declaration of Human Rights in 1948, has brought about significant changes
in international law, notably in the approach to problems besetting the world
community. A State-sovereignty-oriented approach has been gradually sup-
planted by a human-being-oriented approach. Gradually the maxim of
Roman law *hominum causa omne jus constitutum est* (all law is created for the
benefit of human beings) has gained a firm foothold in the international com-
munity as well.[4]

Private international law has equally undergone dramatic changes in the
modern era, not least through a parallel increased recognition of the
rights, interests and autonomy of private parties. These developments
invite consideration of the question whether jurisdiction in international
law itself requires rethinking.

Sections IV and V of this article focus on three main developments in
international law, public and private, arguing that they have potentially
significant implications for the international law of jurisdiction. First,
the growing recognition that states not only have regulatory power in
international law, they also have regulatory duties. Second, the increased
acceptance that such jurisdictional obligations may in a range of circum-
stances be owed not only to other states but also to private parties,
reflecting the increasing role of individual actors in international law,
in particular under the international legal doctrines of denial of justice
and access to justice. Third, the related and widely recognised phenom-
enon of party autonomy, under which private parties have the power to
confer jurisdiction on national courts in civil disputes and to choose
which law governs their legal relationships. In combination, these devel-
opments suggest the necessity of rethinking the concept of jurisdiction in
international law, to reflect the more complex realities of an international

[2]  See e.g. Ruti Teitel, *Humanity's Law* (OUP 2011); Anne Peters, 'Humanity as the a and Ω of
Sovereignty' (2009) 20 EJIL 513; Fernando R Tesón, 'The Kantian Theory of International Law'
(1992) 92 Columbia Law Review 53; Louis B Sohn, 'The New International Law: Protection of the
Rights of Individuals Rather Than States' (1982) 32 American University Law Review 1.

[3]  See further e.g. 'The Responsibility to Protect', Report of the International Commission on
Intervention and State Sovereignty (2001) available at <http://responsibilitytoprotect.org/
ICISS%20Report.pdf> accessed 18 August 2014; Kofi Annan, 'Two Concepts of Sovereignty'
(1999), The Economist, 16 September 1999 (available at www.economist.com/node/324795)
('States are now widely understood to be instruments at the service of their peoples, and not vice
versa. . . . When we read the Charter today, we are more than ever conscious that its aim is to protect
individual human beings, not to protect those who abuse them.').

[4]  *Prosecutor v Tadić* (Jurisdictional Phase), Appeals Chamber, International Criminal Tribunal
for the former Yugoslavia, Decision of 2 October 1995, [97] available at www.icty.org/x/cases/tadic/
acdec/en/51002.htm accessed 18 August 2014.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

legal order under which states possess both jurisdictional rights and obligations and are no longer the exclusive actors.

## II.  THE LOTUS CASE ANOMALY: JURISDICTION AND THE LEGAL LIMITS OF SOVEREIGNTY

Before examining the generally accepted traditional law of jurisdiction, it is important to consider the apparent anomaly of the 1927 decision of the Permanent Court of International Justice in the *Lotus Case*.[5] In that case, the PCIJ (in)famously held that:

Far from laying down a general prohibition to the effect that States may not extend the application of their laws and the jurisdiction of their courts to persons, property or acts outside their territory, it leaves them in this respect a wide measure of discretion which is only limited in certain cases by prohibitive rules; as regards other cases, every State remains free to adopt the principles which it regards as best and most suitable.[6]

This statement appears to suggest that jurisdiction in international law is plenary, but subject to defined prohibitions, rather than being based on limited 'heads'. Some scholars have found creative ways to interpret the statement so that it accords with the generally accepted principles of international jurisdiction, under which jurisdiction is based on limited defined grounds. For example, it has been suggested that it relates only to the plenary nature of territorial jurisdiction, or that it was intended only to suggest that there are a range of grounds for extraterritorial jurisdiction.[7] These interpretations are perhaps assisted by the Court's further conclusion, shortly after the above passage, that:

all that can be required of a State is that it should not overstep the limits which international law places upon its jurisdiction; within these limits, its title to exercise jurisdiction rests in its sovereignty.[8]

Such interpretations do, however, have an air of revisionism about them, and it may reasonably be concluded that the Court's findings cannot be read down so generously. While it should be noted that the decision was adopted by only six out of the twelve judges on the Court, with the President's vote in its favour being decisive, it would, however, equally be wrong to conclude that the Court was simply 'mistaken' in its conclusions, even if its decision was out of step with approaches to international

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

---

[5] *SS 'Lotus' (France v Turkey)* (1927) PCIJ Ser A, No 10.

[6] Ibid, 18-19.

[7] See e.g. F A Mann, 'The Doctrine of Jurisdiction in International Law', in *Studies in International Law* (Clarendon Press, 1973) 27 (previously published in (1964-I) 111 Recueil des Cours 1).

[8] *SS 'Lotus' (France v Turkey)* (1927) PCIJ Ser A, No 10, p.19.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

jurisdiction both before[9] and after[10] the judgment. Rather, the decision can best be characterised as the 'high water mark' of a briefly dominant but still highly influential theoretical approach to international law, generally known as international legal positivism.[11]

The origins of this approach are commonly identified in the work of the nineteenth century legal philosopher, John Austin, although they are also (less accurately) associated with his teacher, Jeremy Bentham.[12] Internally, as a matter of domestic law, Austin viewed sovereignty as a question of fact in that the power of the sovereign was above and beyond the law, as the source of all legal authority lay in sovereign commands. Externally, Austin viewed sovereignty as a question of fact in that 'obligations' on the international plane could only derive from the voluntary acts of sovereigns: thus Austin rejected the idea that international law, properly considered, was law.[13]

Although Austin denied that international law was a legal system, an approach to international law nevertheless subsequently developed based on the premises of his approach, viewing international law as a distinct but 'primitive' form of law – the rules voluntarily adopted by and between sovereign states. This theory of international law is generally, although somewhat unfortunately, known as the 'positivist' perspective on international law. The terminology is unfortunate because the name reflects only the claimed methodological approach of those who developed the theory, rather than characterising the theory itself – the claim that their approach was empirical, inductive, and practice-oriented, rather than following the natural law, deductive, theory-oriented approach which had historically dominated thinking in international law. There are of course many who adopt a modern positivist *methodology* to the study of international law (that is, inductive and empirical), without adhering to what is usually described as 'positivist' theory. Indeed it is arguable that any genuinely 'positivist' methodological approach to analysis of the contemporary practice of states is incompatible with the so-called 'positivist' theoretical approach.[14] This is because positivist international law theory can no longer lay claim to

---

[9] See e.g. the 1883 Resolution of the Institut de Droit Internationale, 'Règles relatives aux conflits des lois pénales en matière de compétence', available at <http://www.idi-iil.org/idiF/resolutionsF/1883_mun_04_fr.pdf> accessed August 2014; *Nationality Decrees Issued in Tunis and Morocco (Advisory Opinion)* (1924) PCIJ Series B, No. 4.

[10] See also e.g. the 'Draft Convention on Jurisdiction with Respect to Crime' (1935) 29 AJIL Supplement 435; *Barcelona Traction, Light and Power Company (Belgium v Spain)* [1970] ICJ 3, 103ff (Separate Opinion of Judge Fitzmaurice).

[11] '[T]he dictum represents the high water mark of laissez-faire in international relations, and an era that has been significantly overtaken by other tendencies': *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal, at [51].

[12] See e.g. MW Janis, 'Jeremy Bentham and the Fashioning of "International Law"' (1984) 78 AJIL 405.

[13] John Austin, *The Province of Jurisprudence Determined* (1832, reprinted Hackett Publishing 1998) 201.

[14] See further Mills, The Confluence of Public and Private International Law, 37ff, 74ff.

being based on observation of current practice. While international legal positivism has tended to describe itself as empirical and anti-theoretical, the reality is that legal positivism itself became a theoretical construct which led to conclusions which were (and are increasingly) out of step with the accepted practice of states.

Although the tradition of positivist international law theory (as distinguished from methodology) may encompass a range of beliefs, it entails a commitment to certain essential ideas. States are viewed as the key actors in international law, and are formally independent, free, equal, and perhaps most importantly 'sovereign'. 'Sovereignty' has of course become a greatly contested term, but the idea of state sovereignty in positivist international law theory is that states possess at least some unrestricted freedoms as an *a priori* consequence of their statehood. This freedom is said to exist 'prior' to the law – thus, positivists argue that international law can only exist where it is a voluntary expression of sovereign will. Consequently, positivism emphasises individual state will as the sole source of legal principles and their authority. As Oppenheim put it in 1905:

The Law of Nations is a law for the intercourse of States with one another...As, however, there cannot be a sovereign authority above the single sovereign states, the Law of Nations is a law between, not above, the single States, and is, therefore, since Bentham, also called 'International Law.'[15]

According to Oppenheim, Bentham's invention of the term 'international law' was more than a semantic innovation in that it implied (correctly, in Oppenheim's view) that the subject concerns only the law which applies *between* sovereign states.

As jurisdiction is closely related to or even 'an aspect of sovereignty',[16] the only limits on jurisdiction which may apply under a traditional positivist theoretical approach are those voluntarily adopted by states themselves. The starting point is that jurisdiction, like sovereignty itself, is plenary and discretionary – the position adopted by the PCIJ in the *Lotus Case*. Again, to put this in Oppenheim's words:

States possessing independence and territorial as well as personal supremacy can naturally extend or restrict their jurisdiction as far as they like.[17]

[15] Lassa Oppenheim, *International Law* (1st edn, Longmans Green & Co 1905) Chapter 1, s.1.
[16] James Crawford, *Brownlie's Principles of Public International Law* (8th edn, OUP 2012) 456. See similarly D W Bowett, 'Jurisdiction: Changing Patterns of Authority Over Activities and Resources' (1982) 53 BYIL 1, 1, describing jurisdiction as 'a manifestation of State sovereignty'.
[17] Oppenheim, International Law, Chapter 1, s.143. Even Oppenheim, however, followed this by stating that 'as members of the Family of Nations and International Persons, the States must exercise self-restraint in the exercise of this natural power in the interest of one another', and (implicitly recognising the disparity between the 'positivist' perspective and accepted practice) went on to treat jurisdiction as based strictly on territoriality and nationality (with the exception of piracy), arguing that even passive personality was an impermissible extension of jurisdiction.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

This 'positivist' conception of sovereignty as an *a priori* value, above international law, has fairly been described as 'the quicksand on which the foundations of traditional international law are built'.[18] Because jurisdiction is an aspect of this *a priori* sovereignty, this approach means that the overlap between the regulatory powers of states is equally unlimited – leaving resolution of conflicting jurisdictions to extra-legal factors, principal among which will be the relative power of the concerned states.

If the positivist idea of sovereignty was ever tenable – and there is good reason to doubt that it ever was – this is no longer the case. International law scholars have increasingly taken the view that the term 'sovereignty' means all and only those attributes which are given to a state under international law – descriptive of the scope of state freedom as a legal rather than factual matter.[19] Sovereignty, in this conception, does not define, but is defined by, the legal powers of a state within an international society of states. It does not exist prior to law, but as a set of attributes of the legal construct that is the state, existing as a consequence of law. As one scholar expressed it, sovereignty is nothing more or less than 'the legal competence which states have in general'.[20] Even Oppenheim's text on international law reflects this position in its modern version, in a manner which is irreconcilable with the first edition, stating as follows:

There is...increasing acceptance that the rules of international law are the foundation upon which the rights of states rest, and no longer merely limitations upon states' rights which, in the absence of a rule of law to the contrary, are unlimited. Although there are extensive areas in which international law accords to states a large degree of freedom of action...it is important that freedom is derived from a legal right and not from an assertion of unlimited will, and is subject ultimately to regulation within the legal framework of the international community.[21]

Under this conception of sovereignty as a *product of* (and not *prior to*) law, the regulatory authority of states in international law is recognised as the product of, and subject to, limits defined by public international law rules of jurisdiction – indeed, this recognition also existed prior to the *Lotus Case* and the era of positivist theory. The rules of international jurisdiction authorise an exercise of regulatory authority in limited and defined circumstances – an authorisation which can only be necessary because a regulatory act would be prohibited in its absence. This is not to deny that there may be additional limiting rules on jurisdiction

---

[18] Philip C Jessup, *A Modern Law of Nations* (Macmillan 1948) 2.

[19] Thus, 'we can only know which states are sovereign, and what the extent of their sovereignty is, when we know what the rules are' – HLA Hart, *The Concept of Law* (2nd edn, Clarendon 1994) 223.

[20] Ian Brownlie, *Principles of Public International Law* (7th edn, OUP 2008) 291.

[21] Robert Jennings and Arthur Watts, *Oppenheim's International Law* (9th edn, vol. 1, OUP 1992) 12.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

36

('prohibitive rules', to use the expression from the *Lotus Case*): international law recognises a range of immunities and restrictions which limit the exercise of what would otherwise be lawful jurisdiction. It is also not to deny that overlapping jurisdiction remains under these rules; the overlap is, however, defined and limited by international law.

## III. The Modern International Law of Jurisdiction: Limited Rights of States

This section introduces the 'standard' account of jurisdiction in international law, under which state power is generally conditioned on the existence of a territorial or personal connection that is considered to justify the imposition of a state's regulatory authority, as a matter of state discretion. It first considers the contours of these rules in public international law, before turning to examine their close but perhaps under-appreciated relationship with rules of private international law.

### A. Public international law

In public international law, the 'sovereignty' of states has (despite *Lotus*) become understood to be reflected in and constrained by rules of jurisdiction which define the limits of the powers of coexisting 'sovereigns', in particular, the scope of regulatory authority of states in international law. In public international law the term jurisdiction is used in a much broader sense than it is used domestically or in private international law, essentially encompassing any exercise of regulatory power – although the general domestic sense of 'jurisdiction', relating specifically to the powers of courts, is also (somewhat confusingly) used in international legal scholarship to discuss the distinct issue of the regulatory power of international courts and tribunals, which is not the subject of this article.[22]

In the context of the rules on the regulatory authority of states, three types of public international law jurisdiction are usually distinguished.[23] These may overlap and thus the distinction is not always easy to

---

[22] The concept of 'jurisdiction' in the field of human rights law has also developed its own independent meaning, not considered in this article, which recognises that states may have extra-territorial human rights obligations based on effective control over territory or persons. A state in unlawful occupation of territory may thus be subject to jurisdictional *obligations* under human rights law, even though it lacks jurisdictional *rights* as a matter of general international law. See generally e.g. Marko Milanovic, *Extraterritorial Application of Human Rights Treaties: Law, Principles, and Policy* (OUP 2011).

[23] See generally Christopher Staker, 'Jurisdiction', in Malcolm D. Evans (ed), *International Law* (4th edn, OUP 2014); Crawford, Brownlie's Principles of Public International Law, 456; *Third Restatement (Foreign Relations)* (1986) s.401; F A Mann, 'The Doctrine of Jurisdiction Revisited After Twenty Years' (1984-III) 186 Recueil des Cours 19; Mann, The Doctrine of Jurisdiction in International Law; Michael Akehurst, 'Jurisdiction in International Law' (1972-3) 46 BYIL 145.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

maintain, nor is it universally accepted as reflecting international law, but it nevertheless represents the generally accepted foundation of the modern approach. The first type of jurisdiction is jurisdiction to pre-scribe or legislate, or (roughly) the limits on the law-making powers of government – the permissible scope of application of the laws of each state.[24] The second is jurisdiction to adjudicate, or (roughly) the limits on the powers of the judicial branch of government.[25] Although some international lawyers have questioned the need for a separate category of 'adjudicative jurisdiction', few if any would maintain that adjudicative jurisdiction is unregulated in international law – rather, it can be argued that the conduct of the judiciary may be characterised as either prescrip-tive (if the judge is participating in law-making, including through interpretation of the scope of application of the law or development of a common law system) or enforcement (if the judge is ordering the seiz-ure of a person or assets).[26] The third is jurisdiction to enforce, or (roughly) the limits on the executive branch of government responsible for implementing law, such as law enforcement agencies.[27] Enforcement jurisdiction is, in international law, almost exclusively territorial – the police or similar forces of a given state may only operate within its territory (including its coastal waters), in the absence of the authorisation of other states or a special permissive rule under international law.[28]

The territorial character of enforcement jurisdiction is well estab-lished, and an important reflection of the principle of non-intervention in the internal affairs of other states. This article does not suggest any need to re-examine this aspect of international jurisdiction, but rather focuses on jurisdiction to prescribe and to adjudicate (excluding the enforcement aspects of adjudication). It should be noted, however, that while these aspects of jurisdiction are theoretically distinct, they are not necessarily unrelated in practice – restrictions on the possibility of effectively enforcing national laws or judgments might, for example, be taken into consideration by a national legislature or court in deter-mining whether to exercise prescriptive or adjudicative jurisdiction. A state might, for example, have a policy against criminal proceedings

---

[24] These may be exercised by any law-making body, which may include the legislature, judiciary, or executive. See e.g. *Third Restatement (Foreign Relations)* (1986) ss.402-403.

[25] See e.g. *Third Restatement (Foreign Relations)* (1986) ss.421-423.

[26] See further e.g. Roger O'Keefe, 'Universal Jurisdiction: Clarifying the Basic Concept' (2004) 2 Journal of International Criminal Justice 735, 737.

[27] The definition of enforcement jurisdiction in the *Third Restatement (Foreign Relations)* (1986) s.431 is somewhat broader than this, encompassing also local measures designed to induce a foreign party into compliance. It therefore does not view such measures as strictly territorial in application, although it does not contemplate enforcement action taking place outside the territory. See *infra* n 39 and accompanying text.

[28] A well-known illustration of permission to enforce extra-territorially is the Scottish criminal trial which took place on Dutch territory following the Lockerbie bombing, authorised under the Agreement between the Government of the Kingdom of the Netherlands and the Government of the United Kingdom of Great Britain and Northern Ireland concerning a Scottish Trial in the Netherlands, 24 August 1998, UKTS No. 43 (1999). See further discussion in O'Keefe, Universal Jurisdiction, 740.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

*in absentia*, because an exercise of prescriptive jurisdiction in the absence of the possibility of enforcement jurisdiction may be considered futile. But the distinction between the categories of jurisdiction remains important, even if it is not always clearly recognised in practice.[29] In relation to civil disputes, prescriptive and adjudicative jurisdiction are also addressed through rules of private international law, as discussed further below. Questions of jurisdiction in the public international law sense are implemented in private international law both through rules of 'jurisdiction' (in the domestic sense) – determining when a court will hear a case and thus exercise its prescriptive (and enforcement) powers – and through rules of 'choice of law' – determining which law should govern a dispute and thereby the scope of application of that law.

The boundaries of public international law prescriptive jurisdiction are a matter of some controversy, but there is broad agreement on the general framework. Principally, states are recognised as having prescriptive jurisdiction based on one of two types of connecting factors – territoriality, reflecting the intimate connection between territorial control and statehood in international law, and nationality, reflecting ideas of individual subjectivity to sovereign power.[30] Arguments have also been made for jurisdiction regarding matters of essential national interest,[31] and for universal jurisdiction in respect of matters which are of fundamental concern to the international community as a whole,[32] although many of these remain somewhat controversial.[33]

The primary source of regulatory authority for states in public international law is usually considered to be territorial. A state has jurisdiction to regulate within its territory, including in respect of events, persons or things in its territory (including cross-border events which are only partially in its territory[34]), and, more controversially, external acts which have 'effects' within its territory.[35] As noted above,

[29] See further O'Keefe, Universal Jurisdiction.

[30] See e.g. Staker, Jurisdiction, 313ff; Crawford, Brownlie's Principles of Public International Law, 458ff; *Third Restatement (Foreign Relations)* (1986) s.402; Bowett, Jurisdiction: Changing Patterns of Authority, 4ff; Akehurst, Jurisdiction in International Law, 152ff.

[31] See e.g. Staker, Jurisdiction, 321; Crawford, Brownlie's Principles of Public International Law, 462; *Third Restatement (Foreign Relations)* (1986) s.402(3); Bowett, Jurisdiction: Changing Patterns of Authority, 10; Akehurst, Jurisdiction in International Law, 157ff; see further *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, Separate Opinion of President Guillaume, at [6].

[32] Staker, Jurisdiction, 322; Crawford, Brownlie's Principles of Public International Law, 467ff; *Third Restatement (Foreign Relations)* (1986) s.404; Bowett, Jurisdiction: Changing Patterns of Authority, 11; Akehurst, Jurisdiction in International Law, 16off.

[33] See e.g. O'Keefe, Universal Jurisdiction; *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, particularly the Separate Opinion of President Guillaume and the Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal.

[34] A distinction is often drawn between 'subjective' territorial jurisdiction, which is based on the location of the 'subject' of an act (the actor), and 'objective' territorial jurisdiction, which is based on the location of the 'object' of the act – both are generally recognised under international law.

[35] See generally Staker, Jurisdiction, 317-8; Crawford, Brownlie's Principles of Public International Law, 462ff; Austen Parrish, 'The Effects Test: Extraterritoriality's Fifth Business'

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

39

territoriality particularly dominates in the context of jurisdiction to enforce, where it is normally considered to be the exclusive basis for jurisdiction in the absence of special consensual arrangements. In the context of jurisdiction to prescribe or adjudicate, territoriality is supplemented by other bases of jurisdiction (including as discussed below), but the dominant way in which state authority is defined and justified, that is, by which the division of international regulatory authority is organised, is by reference to territorial criteria. The idea that territoriality should be the main basis of jurisdiction is often reflected in a domestic legal presumption against the extraterritorial application of legislation, re-articulated by the US Supreme Court in *Morrison v National Australia Bank* (2010)[36], although a broader presumption against 'extra-jurisdictionality' (presuming that the reach of domestic legislation comports with international law limits) is also sometimes applied.[37] The primacy of territorial regulation is coming under challenge as a result of (arguably) 'de-territorialised' communications technologies, in particular the internet, although the extent to which such developments pose more than a complex problem of application for the existing legal framework remains contentious.[38] Another important challenge for jurisdictional rules, beyond the scope of this article, is where a state uses territorial rules to project its regulatory power extraterritorially in a more 'informal' way – for example, by making access to local markets conditional on compliance with certain norms.[39]

(2008) 61 Vanderbilt Law Review 1455; *Third Restatement (Foreign Relations)* (1986) s.402(1); Akehurst, Jurisdiction in International Law, 153ff. Effects jurisdiction may in many cases be more simply viewed as an example of objective territorial jurisdiction – a price fixing agreement outside the United States between companies exporting goods to the United States may be regulated under US law if it is directed to raising prices for goods within US territory. The doctrine is, however, sometimes viewed as permitting jurisdiction over foreign events with only indirect consequences in the United States, and in this form it would be an expansion of traditionally accepted objective territorial jurisdiction.

[36] 561 US 247 (2010). The presumption was controversially applied to the Alien Tort Statute in the case of *Kiobel v Royal Dutch Petroleum*, 569 US ___, 133 S.Ct. 1659 (2013). See further e.g. Mann, The Doctrine of Jurisdiction in International Law, 21ff.

[37] This is part of a broader presumption of compliance with international law (known in the United States as the 'Charming Betsy doctrine', after *Murray v The Charming Betsy*, 6 US (2 Cranch) 64 (1804)), which includes compliance with the jurisdictional rules of international law. The presumption against extra-jurisdictionality was clearly expressed in Story J's judgment in *The Appollon*, 22 US 362 (1824), which held (at 370) that 'however general and comprehensive the phrases used in our municipal laws may be, they must always be restricted in construction to places and persons, upon whom the legislature has authority and jurisdiction'. See further e.g. John H Knox, 'A Presumption against Extrajurisdictionality' (2010) 104 AJIL 351; *United States v Aluminum Co. of America*, 148 F 2d 416, 443 (1945); *United States v Palmer*, 16 US 610, 631 (1818) ('general words must . . . be limited to cases within the jurisdiction of the state').

[38] See generally e.g. Mills, The Confluence of Public and Private International Law, 244ff (with numerous further references); Paul Schiff Bermann, 'The Globalization of Jurisdiction' (2002) 151 University of Pennsylvania Law Review 311; David R. Johnson and David G. Post, 'Law and Borders – The Rise of Law in Cyberspace' (1996) 48 Stanford Law Review 1367.

[39] See further Joanne Scott, 'Extraterritoriality and Territorial Extension in EU Law' (2014) 62 American Journal of Comparative Law 87.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Although international law rules on jurisdiction are traditionally dominated by ideas of territoriality, there is also a strong role for ideas and rules which are based on the personal identity of the parties, generally through nationality. Under this approach, state regulatory power is viewed as connected not with territorial control but with the relationship between an individual (typically as a subject) and a sovereign. This conception of jurisdiction thus implies that state authority does not end at the national border, but attaches to people and effectively travels with them. Where one state's citizens are in the territory of a foreign state, international law thus clearly recognises and accepts the possibility of overlapping (and even inconsistent) jurisdiction, but that possibility is at least minimised by requiring a territorial or nationality basis for the exercise of jurisdiction.

The most straightforward aspect of nationality-based jurisdiction is the public international law rule that a state may exercise jurisdiction over the conduct of its nationals, regardless of their territorial location (sometimes referred to as the 'active personality' doctrine).[40] Such jurisdiction is typically exercised in the context of criminal law, where a state criminalises conduct by its nationals (who may be natural or legal persons) regardless of where their acts take place.[41] The power to regulate nationals extra-territorially is, however, usually only exercised in the context of particularly serious crimes – suggesting a degree of deference to the primacy of territorial jurisdiction. Jurisdiction based on nationality is also evident in the assertion by some states (most prominently, the United States) of a right to tax nationals living and working outside the territory of the state.[42]

The connecting factor of nationality also operates as a basis for jurisdiction in international law through the doctrine of 'passive personality'.[43] This is the rule that a state may assert regulatory authority in protection of its own nationals, for example, in respect of crimes committed or directed *against* its nationals by foreigners outside its

---

[40] See generally Staker, Jurisdiction, 318; Crawford, Brownlie's Principles of Public International Law, 459-60; *Third Restatement (Foreign Relations)* (1986) s.402(2); Bowett, Jurisdiction: Changing Patterns of Authority, 7ff; Akehurst, Jurisdiction in International Law, 156ff.

[41] See e.g. Offences Against the Person Act 1861 (UK) ss.9, 57; Sexual Offenders Act 1997 (UK) s.7; Anti-terrorism, Crime and Security Act 2001 (UK) s.109 (extending prescriptive jurisdiction where 'a national of the United Kingdom or a body incorporated under the law of any part of the United Kingdom [commits a corruption offence] in a country or territory outside the United Kingdom'); Crimes (Child Sex Tourism) Act 1994 (Australia). Some states have also asserted extra-territorial jurisdiction in relation to crimes committed by their permanent residents – see e.g. Akehurst, Jurisdiction in International Law, 156-7.

[42] *Third Restatement (Foreign Relations)* (1986) ss.411-12.

[43] See e.g. Staker, Jurisdiction, 326ff; Crawford, Brownlie's Principles of Public International Law, 461; *Third Restatement (Foreign Relations)* (1986) s.402(2) (see further Comment (g) and Reporters' Note 3); O'Keefe, Universal Jurisdiction, 739.

territory.[44] Such an entitlement has traditionally been controversial, but has been increasingly accepted by states, particularly in the context of acts of terrorism which essentially target a state through targeting its nationals.[45]

These different aspects of the public international law rules on jurisdiction have two key criteria in common. First, they all recognise that jurisdiction is limited by positive grounds, and thus that an act of regulation must be justifiable based on a positive rule conferring jurisdiction. This contrasts with the approach under the *Lotus Case*, discussed above, in which only the 'absence of a prohibition' is required for a regulatory act to be lawful. Second, they treat jurisdiction as a question of state power and right. The state is the exclusive agent recognised in these rules, and within the boundaries they define (the permitted territorial or personal justificatory criteria), the exercise of jurisdiction is entirely a matter left to the discretion of each individual state – 'Jurisdiction involves a State's *right* to exercise certain of its powers'.[46]

The various grounds of jurisdiction recognised in public international law clearly accept the possibility of overlapping regulation – not only where a state's citizens are in a foreign territory, but also, for example, where more than one state might have territorial jurisdiction (one 'subjective', and one 'objective'), or where more than one state might have personality jurisdiction (one 'active', and one 'passive'). It is clear that this reflects a collective policy decision by states that there are situations in which more than one state has a legitimate regulatory interest which should be recognised as compatible with international law. Potentially overlapping and even conflicting regulation[47] is thus simply a part of the reality of international law, albeit one which is much more limited under

---

[44] Note e.g. the Comprehensive Crime Control Act (1984) 18 USC 1203 (US); Omnibus Diplomatic Security and Antiterrorism Act (1986) 18 USC 2332 (US); Criminal Code Amendment (Offences Against Australians) Act 2002 (Australia).

[45] See e.g. International Convention for the Suppression of Terrorist Bombings (1997) Art 6(2)(a). The Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal in *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3 notes (at [47]) that 'Passive personality jurisdiction, for so long regarded as controversial, is now reflected . . . in the legislation of various countries . . . and today meets with relatively little opposition, at least so far as a particular category of offences is concerned.'

[46] Mann, The Doctrine of Jurisdiction in International Law, 3 (emphasis in original). Similarly, '[A] State is not required to legislate up to the full scope of the jurisdiction allowed by international law' – *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal, at [45].

[47] Differing views may be taken on what is necessary for two regulations to 'conflict'. The most strict approach is that a conflict only exists where it is impossible to comply with two sets of rules. Such an approach, however, tends not to acknowledge sufficiently that the decision to impose limited or even no regulation on a particular field may itself be a regulatory decision – the absence of regulation from one state may reflect a policy in favour of *non-regulation* or *deregulation*, which may indeed come into conflict with *any* regulation from another state, even though compliance with both sets of rules would be perfectly possible. A conflict of 'regulation' therefore does not necessarily require a direct conflict between 'rules'. There is a related and equally mistaken tendency in US 'interest analysis' approaches to private international law to consider that there is never a true 'conflict of laws' where only one state has sought to regulate an issue. See further Alex Mills, 'The Identities of Private International Law – Lessons from the US and EU Revolutions' (2013)

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

accepted jurisdictional rules than it would be under the *Lotus Case* approach. This is not to deny that overlapping jurisdiction may be problematic, and that it would be helpful to develop principles of priority in such cases. One such potential principle is the rule of 'reasonableness' which is accepted as part of US law, but not widely accepted as part of international law, which requires comparing the strength of connections which a person or activity has to different states, before determining which state might most 'reasonably' impose its regulatory authority.[48]

## B. *Private international law*

As noted above, matters of 'jurisdiction' in the public international law sense are implemented in the field of private legal relations through rules of private international law, including both rules of 'jurisdiction' – determining when a court will hear a case – and rules of 'choice of law' – determining which law governs a disputed issue and thereby the scope of application of that law. The connection between public and private international law was obscured around the beginning of the 20th century by the focus in public international law on inter-state relations, and the focus in private international law on private rights and interests.[49] As the scope of public international law has increasingly encompassed the regulation of the relationship between states and individuals, there has also been increasing recognition of the functional and doctrinal overlap between public and private international law – that private international law constitutes a hidden ('private') dimension of international law.[50]

Although the existence of public international law limits on the exercise of jurisdiction or the application of a particular law in civil

---

23 Duke Journal of Comparative and International Law 445, 459, 467; Brainerd Currie, *Selected Essays on the Conflict of Laws* (Duke University Press 1963).

48 *Third Restatement (Foreign Relations)* (1986) s.403; see further e.g. Cedric Ryngaert, *Jurisdiction in International Law* (OUP 2008); Bowett, Jurisdiction: Changing Patterns of Authority, 14ff.

49 See generally Mills, The Identities of Private International Law.

50 See generally Mills, The Confluence of Public and Private International Law, Chapter 5; Alex Mills, 'Rediscovering the Public Dimension of Private International Law' [2011] Hague Yearbook of International Law; (2012) 30 The Netherlands Journal of Private International Law, Nederland Internationaal Privaatrecht (NIPR) 371. See further e.g. Lucy Reed, 'Mixed Private and Public Law Solutions to International Cases' (2003) 306 Recueil des Cours 177; Pascal Vareilles-Sommières, *La Compétence Internationale de L'État en Matière de Droit Privé* (LGDJ 1997); Andrew L Strauss, 'Beyond National Law: The Neglected Role of the International Law of Personal Jurisdiction in Domestic Courts' (1995) 36 Harvard International Law Journal 373; Campbell McLachlan, 'The Influence of International Law on Civil Jurisdiction' (1993) 6 Hague Yearbook of International Law 125; Mann, The Doctrine of Jurisdiction Revisited After Twenty Years, 28; Harold G Maier, 'Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law' (1982) 76 AJIL 280; A F Lowenfeld, 'Public law in the international arena: conflict of laws, international law, and some suggestions for their interaction' (1979-II) 163 Recueil des Cours 311; Mann, The Doctrine of Jurisdiction in International Law, 10ff; John R Stevenson, 'The Relationship of Private International Law to Public International Law' (1952) 5 Columbia Law Review 561.

Downloaded from https://academic.oup.com/byblil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

proceedings has occasionally been doubted,[51] there is little in practice or policy to support the idea that an assertion of jurisdiction or governing law in civil proceedings is anything other than an exercise of state regulatory power which falls to be restricted by public international rules on jurisdiction. The application of private law, no less than public law, constrains and compels individual behaviour in pursuit of national policy interests, and is ultimately backed up by the coercive power of the state. The seizure of property to pay a debt is not characteristically distinct from the seizure of property to pay a fine or tax; the choice by a state to deal with, for example, defamation or competition law through either criminal law or private law, a practice which varies significantly, does not affect the fact that in either case the rules are performing an important public regulatory function.[52] While it is sometimes argued that state practice suggests a lack of 'interest' in the jurisdictional rules applicable to civil disputes, there are clear examples of such interventions,[53] and a lack of sufficient governmental interest to intervene in specific cases should not be mistaken for a lack of state concern with the effectiveness of its law and courts.

The efforts toward the international harmonisation of private international law through treaties, spearheaded by the Hague Conference on Private International Law,[54] should be taken to reflect rather than deny an underlying and deeper connection between public and private international law.[55] Such efforts are more analogous to the codification of

[51] See e.g. Akehurst, Jurisdiction in International Law, 177, 182; for further examples see e.g. Mann, The Doctrine of Jurisdiction in International Law, 14.

[52] See e.g. Bowett, Jurisdiction: Changing Patterns of Authority, 2 ('the formalistic labelling of certain proceedings as criminal, and others as civil, simply conceals the similarity in nature and purpose of the different legislative provisions'). Bowett, however, problematically suggests that public international law jurisdictional restraints should not apply to 'areas of civil jurisdiction concerned solely with the enforcement of private rights' (at 4), failing to recognise the well-known (in private international law) circularity of such a 'vested rights' approach, which arises from the fact that (unless the rights derive from an international or supranational source) it is national law which determines whether such private rights in fact exist – itself a question of state public policy. See further e.g. Mills, The Confluence of Public and Private International Law, 57; Mills, The Identities of Private International Law, at 450ff.

[53] For a recent example see e.g. the *amicus* submissions of the European Commission and (jointly) the United Kingdom and the Netherlands in the *Kiobel* case, *infra* n 165 and n 166. See further e.g. Uta Kohl, 'Corporate Human Rights Accountability: The Objections of Western Governments to the Alien Tort Statute' (2014) 63 ICLQ 665; Roger O'Keefe, 'Domestic Courts as Agents of Development of the International Law of Jurisdiction' (2013) 26 Leiden Journal of International Law 541, 551ff; Mills, The Confluence of Public and Private International Law, 262ff; Joseph Halpern, '"Exorbitant Jurisdiction" and the Brussels Convention: Toward a Theory of Restraint' (1983) 9 Yale Journal of World Public Order 369; L I De Winter, 'Excessive Jurisdiction in Private International Law' (1968) 17 ICLQ 706; Kurt H. Nadelmann, 'Jurisdictionally Improper Fora', in HE Yntema et al. (eds), *Twentieth Century Comparative and Conflicts Law - Legal Essays in Honor of Hessel E. Yntema* (A W Sijthoff, 1961), 321.

[54] See further generally www.hcch.net.

[55] See further e.g. Mills, The Confluence of Public and Private International Law, 215ff; Alex Mills and Geert de Baere, 'TMC Asser and Public and Private International Law: The life and legacy of "a practical legal statesman"' (2011) 42 Netherlands Yearbook of International Law 3.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

44

rules of state immunity[56] (an area of international law which has similarly been developed principally through the practice of national courts and legislatures[57]) than, for example, the harmonisation of rules of national contract law (which do not possess a similar underlying international character). Rules of private international law are national in their source, but nevertheless directly affect a state's compliance with its international obligations.

Whether or not an exercise of jurisdiction (in the international sense) is permitted or compelled by *national* rules of private international law, the question which generally concerns domestic courts, must of course be carefully distinguished from the question of whether such an exercise of jurisdiction is permitted as a matter of *international* law. National courts may take a range of distinct policy considerations into account in determining whether domestic 'jurisdiction' may or should be exercised, including factors which are not reflected in international rules of jurisdiction. Domestic law might even compel a national court to breach international limits, giving rise to non-compliance with international law. But the presence of additional domestic considerations does not deny the relevance of international limits, and the existence of those limits has shaped and continues to shape national rules of private international law.

Rules of private international law were in fact one of the most important foundations for the development of international law's rules on jurisdiction, reflecting the historical interdependence of public and private international law.[58] The idea of territoriality was expressed, for example, in the first two 'maxims' of the Dutch eighteenth century private international law scholar Ulrich Huber:

(1)  The laws of each state have force within the limits of that government and bind all subject to it, but not beyond.
(2)  All persons within the limits of a government, whether they live there permanently or temporarily, are deemed to be subjects thereof.[59]

This approach viewed territoriality as the sole connecting factor which would justify the exercise of jurisdiction, subsuming the idea of the

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

---

[56]  For example, under the United Nations Convention on the Jurisdictional Immunity of States and Their Property (2004) (Adopted by the General Assembly of the United Nations on 2 December 2004. Not yet in force. See General Assembly resolution 59/38, annex, Official Records of the General Assembly, Fifty-ninth Session, Supplement No. 49 (A/59/49).).

[57]  This phenomenon may be analysed as an example of horizontal 'peer governance' – see further Alex Mills, 'Variable Geometry, Peer Governance, and the Public International Perspective on Private International Law', in Diego Fernandez Arroyo and Horatia Muir Watt (eds), *Private International Law as Global Governance* (OUP forthcoming 2014).

[58]  See further e.g. Alex Mills, 'The Private History of International Law' (2006) 55 ICLQ 1; Mills, The Confluence of Public and Private International Law, Chapter 2; Mann, The Doctrine of Jurisdiction in International Law, 16ff.

[59]  Cited and translated in Ernest G Lorenzen, 'Huber's De Conflictu Legum' (1919) 13 Illinois Law Review 375, 403.

'subject' (national) within the concept of living permanently or temporarily within the (territorial) limits of a government.

The influence of territoriality is as pervasive in private international law as it is in public international law, although subject to the same possible challenges in light of de-territorialised communications technologies.[60] The accepted grounds for the exercise of jurisdiction or application of law in private law disputes before national courts are predominantly territorial, although these can take a number of different forms.[61] While territoriality is behind a variety of private international law rules, these rules may thus reflect a range of interpretations of what territoriality means in practice and in different contexts, and different views on the extent to which legislatures should decide these questions generally or leave them to the courts to resolve on a case by case basis.

Traditional approaches to 'jurisdiction' in private international law, referring to the adjudicatory power of national courts, have also at least principally conceived of jurisdiction as a question of territorial power and right for each state, like the approach taken in public international law (as analysed in the previous section). Perhaps the most obvious (and controversial) example of this idea of 'jurisdiction as power' is found in the common law approach, under which a party who is physically present in the territory at the time proceedings are commenced against them is thereby considered to be potentially subject to the jurisdiction of the courts.[62] Jurisdiction is, in this conception, both a question of (territorial) control over the person of the defendant,[63] as well as a matter of state right, as such an assertion of jurisdiction is a matter of discretion for the courts, exercised through the doctrine of *forum non conveniens*.[64] This approach is, however, rightly considered to be controversial, because the mere presence of the defendant subsequent to an alleged wrong does not necessarily establish any connection between the dispute or defendant and the territory which would support the exercise of jurisdiction as a matter of public international law.[65] Jurisdiction based on presence in

[60] See generally e.g. Thomas Schultz, 'Carving up the Internet: Jurisdiction, Legal Orders, and the Private/Public International Law Interface' (2008) 19 EJIL 799; Andrea Slane, 'Tales, Techs, and Territories: Private International Law, Globalization, and the Legal Construction of Borderlessness on the Internet' (2008) 71 Law and Contemporary Problems 129.

[61] See further generally Mills, The Confluence of Public and Private International Law, 236ff.

[62] See classically e.g. *Maharanee of Baroda v Wildenstein* [1972] 2 QB 283; in the US see e.g. *Burnham v Superior Court of California*, 495 US 604 (1989); *Grace v MacArthur*, 170 F Supp 442 (1959) (in which presence in State airspace was considered sufficient to found territorial jurisdiction). Mere presence would, however, no longer be considered to satisfy constitutional due process limits on the exercise of jurisdiction in the United States.

[63] The term 'jurisdiction' is even sometimes used to mean simply 'territory' – for the purposes of the Civil Procedure Rules of the English courts, according to the definition in Part 2, '"jurisdiction" means, unless the context requires otherwise, England and Wales and any part of the territorial waters of the United Kingdom adjoining England and Wales'.

[64] See classically e.g. *The Spiliada* [1987] AC 460.

[65] See Crawford, Brownlie's Principles of Public International Law, 474-5; Mills, The Confluence of Public and Private International Law, 237ff. Note also the ALI/UNIDROIT Principles of Transnational Civil Procedure, adopted in 2004, available at <http://www.unidroit.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

46

this way is an anachronistic product of the fact that the presence of the defendant was historically necessary to permit civil jurisdiction under the common law, because such jurisdiction was based on the physical seizure of the person of the defendant. The issue has, however, reduced in significance because in practice, through the doctrine of *forum non conveniens*, jurisdiction based on bare presence will not generally be exercised.

Other less controversial common law territorial grounds for jurisdiction (in the private international law sense) include claims 'for an injunction ordering the defendant to do or refrain from doing an act within the jurisdiction', or 'in respect of a breach of contract committed within the jurisdiction', or 'in tort where . . . damage was sustained within the jurisdiction; or . . . resulted from an act committed within the jurisdiction'.[66] Jurisdiction may be exercised where a dispute concerns moveable or immovable property in the territory,[67] but (regardless of other connections) may generally not be exercised where a dispute directly concerns title to foreign immovable property.[68] The territorial connection which is recognised and relied on in each of these rules is based on the subject-matter of the dispute, similar to the grounds of 'specific jurisdiction' under US law,[69] and similar territorial bases of jurisdiction are also commonly recognised under civil law systems.[70] A different form of territorial jurisdiction, usually referred to as 'general jurisdiction', arises where the power to regulate the defendant is based on their being 'present',[71] 'domiciled',[72] 'resident',[73] or 'at home'[74] in the territory. This jurisdiction is based on the connection between the defendant (rather than the dispute) and the territory, and may extend to the defendant's extraterritorial activities. Choice of law rules – reflecting principles of prescriptive jurisdiction – also frequently rely on territorial

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

---

org/instruments/transnational-civil-procedure> accessed August 2014, which state (in Comment P-2B) that 'Mere physical presence as a basis of jurisdiction within the American federation has historical justification that is inapposite in modern international disputes.'

[66] Civil Procedure Rules, Practice Direction 6B, Rule 3.1(2), (7) and (9). 'Jurisdiction' in this context is defined to mean 'territory'.

[67] Civil Procedure Rules, Practice Direction 6B, Rule 3.1(11).

[68] *British South Africa Co. v Companhia de Moçambique* [1893] AC 602; see similarly the French Code of Civil Procedure, Article 44; Council Regulation (EC) No 44/2001 of 22 December 2000 on Jurisdiction and the Recognition and Enforcement of Judgements in Civil and Commercial Matters, EU OJ L 12, 16 January 2001 (henceforth, 'Brussels I Regulation (2001)'), Article 22.

[69] *J. McIntyre Machinery, Ltd. v Nicastro*, 564 US ___, 131 S. Ct. 2780 (2011); *Burger King Corp. v Rudzewicz*, 471 US 462 (1985).

[70] See e.g. the French Code of Civil Procedure, Article 46.

[71] *Adams v Cape Industries* [1990] Ch 433.

[72] Brussels I Regulation (2001), Articles 2, 59 and 60.

[73] See e.g. the French Code of Civil Procedure, Articles 42-43.

[74] *Goodyear Dunlop Tires Operations, S. A. v Brown*, 564 US ___, 131 S. Ct. 2846 (2011); *Daimler AG v Bauman*, 134 S. Ct. 746 (2014). The *Bauman* decision is concerned with the constitutional limits of jurisdiction under Due Process, rather than the grounds for jurisdiction, but in practice the two questions are conflated in the case because Californian courts (like those of many other US states) 'may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States' – California Code of Civil Procedure §410.10.

connecting factors to determine the law which governs a private law relationship, such as applying the law of the place of an alleged tort (the *lex loci delicti*),[75] or the law of the location of movable or immovable property (the *lex situs*).[76]

Huber's strictly territorial approach to jurisdiction was, however, somewhat out of step with the practice of states – at least since the medieval period it had been recognised that states could pass 'personal' laws which purported to affect their subjects extraterritorially[77] – and short-lived as a theoretical construct. His maxims were modified in the work of Joseph Story in the early nineteenth century, who instead proposed the following foundations for the law of international jurisdiction:

the laws of one country can have no intrinsic force...except within the territorial limits and jurisdiction of that country. They can bind only its own subjects, and others, who are within its jurisdictional limits; and the latter only while they remain there.[78]

This did not quite exclude the possibility of extraterritorial regulation which might purport to affect a state's own nationals – it is only regulation of non-subjects which is strictly territorial in this formulation. Story's maxims of private international law were, correspondingly, a subtle modification of Huber:

every nation possesses an exclusive sovereignty and jurisdiction within its own territory;[79]
...
no state or nation can, by its laws, directly affect, or bind property out of its own territory, or persons not resident therein;[80]
...
every nation has the right to bind its own subjects by its own laws in every other place[81]

These rules set out the very clearly recognisable foundations of the modern law of jurisdiction in international law, which accepts both territorial and nationality-based prescriptive regulation (although it is notable that Story's maxims do not precisely distinguish jurisdiction based on nationality and residence).

---

[75] For example, Regulation (EC) No 864/2007 of the European Parliament and of the Council on the law applicable to non-contractual obligations (Rome II), EU OJ L 199, 31 July 2007 (henceforth, 'Rome II Regulation (2007)'), Art.4(1).

[76] See e.g. *Winkworth v Christie, Manson & Woods* [1980] Ch 496; *Glencore International A/G v Metro Trading* [2001] All ER (Comm) 103; *French Civil Code*, Article 3.

[77] See further e.g. Mills, The Confluence of Public and Private International Law, 32ff.

[78] Joseph Story, *Commentary on the Conflict of Laws* (Hilliard, Gray and Co 1834), s.7. See similarly Story's judgment on behalf of the Supreme Court in *The Appollon*, 22 US 362, 370 (1824).

[79] Ibid, s.18.

[80] Ibid, s.20.

[81] Ibid, s.21.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Public international law principles of 'personality', like those of territoriality, provide limited justifications for the exercise of regulatory authority by states which are also reflected in private international law rules of 'jurisdiction'.[82] These jurisdictional rules once again view states as the exclusive actors, and jurisdiction as a limited but discretionary domain for state regulation, in accordance with classical public international law principles. Some states have traditionally asserted jurisdiction based on the nationality of the defendant, reflecting a civil implementation of the public international law 'active personality' jurisdiction which is more commonly asserted in the criminal context.[83] Some states also, perhaps more hesitantly, assert jurisdiction based on the nationality of the claimant, reflecting again a civil implementation of public international law jurisdiction, this time of the more controversial 'passive personality' doctrine.[84] Choice of law rules – reflecting principles of prescriptive jurisdiction – will also sometimes be based on personal connecting factors of the parties (such as a tort being governed by the law of common habitual residence of the parties),[85] although nationality is little used as a connecting factor in the common law tradition. Indeed, nationality appears to be generally declining as a connecting factor in private international law, as it may be seen as contrary to other obligations which require states not to treat parties differently on the basis of their nationality. Obligations of non-discrimination on the grounds of nationality arise under the law of the European Union (between Member States only)[86] and European Convention on Human Rights,[87] for example, and may also arise under international investment treaties.[88]

Private international law jurisdiction based on nationality is the most straightforward implementation of public international law 'personality' jurisdiction. It may also be identified as strongly reflecting

---

[82] See further generally Mills, The Confluence of Public and Private International Law, 248ff.

[83] See e.g. French Civil Code, Article 15.

[84] See e.g. French Civil Code, Article 14; Akehurst, Jurisdiction in International Law, 172ff. The benefit of this rule is extended by Article 4(2) of the Brussels I Regulation (2001) to apply to all nationals of EU Member States who are domiciled in France.

[85] For example, under the Rome II Regulation (2007), Art.4(2); *Babcock v Jackson* (1963) 191 NE 2d 279 (NY).

[86] Article 18, Treaty on European Union (consolidated version, OJ C 115/1, 9 May 2008). This is the reason for Article 4(2) of the Brussels I Regulation (2001).

[87] Article 14. This obligation only requires non-discrimination in the protection of other rights under the Convention. An argument could be made that national rules of civil jurisdiction which discriminate on the grounds of nationality, such as the special right of access provided under French law to French nationals, could in fact violate the Convention because they might discriminate in providing 'access to justice' in circumstances covered by the Convention – see further *infra* section IV.B.2. In most such cases jurisdiction would, however, be governed by the Brussels I Regulation (2001), which effectively excludes any role for nationality in claims brought by or against EU domiciled parties (see Articles 2 and 4(2)).

[88] Investment treaties often provide for obligations of non-discrimination (or 'no less favourable treatment') on the basis of the nationality of the investor, which could be breached by the application of a nationality-based choice of law rule – see e.g. Federico Ortino, 'Non-Discriminatory Treatment in Investment Disputes', in P-M Dupuy, EU Petersmann and F Francioni (eds), *Human Rights in Investment Law and Arbitration* (OUP 2009).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

the traditional conception of public international jurisdiction as a matter of state right and power, as it is states which set the conditions for the conferral of nationality on individuals. In the context of private international law, however, this picture is complicated by the existence of competing ideas of 'residence' and 'domicile' as personal identifying or connecting factors,[89] the latter traditionally much preferred in the common law in particular. While definitions of these factors may vary, each involves a connection between a person and a place which reflects some kind of habitual presence in and personal link with a territory. The fact that these connecting factors are used and widely accepted in private international law itself suggests that the treatment of territory and nationality as discrete grounds for jurisdiction in traditional formulations of international law jurisdiction is too restrictive. The practice of states instead supports the idea that jurisdiction may be based on a flexible combination of both territorial and personal connecting factors – connections between a person and a place which do not depend on nationality, such as domicile or habitual residence.

The use of domicile or residence as a connecting factor in private international law also raises a further important issue with respect to conceptions of jurisdiction in public international law. Determinations of domicile and residence usually involve considering facts which are more within the control of individuals than questions of nationality, which are governed strictly by the state itself. A person's domicile or place of residence may to some extent reflect an individual choice about where to live or permanently settle. Of course, states exert at least some control over where individuals are permitted to live, and the reality is that the supposed benefits of globalised free movement across state boundaries only exist for a tiny privileged minority (with most 'migrant workers' working outside their home state by economic necessity and at risk of exploitation[90]). But within those boundaries, a limited possibility remains for individuals to choose what 'jurisdiction' they are under. Dual passport holders may, for example, freely decide whether to be domiciled or resident in either state of nationality, thus (if these connecting factors are relied on instead of nationality) partially determining which court or courts may have jurisdiction over them, or which law will govern their relationships or disputes. In practice, companies may change their place of registration or central administration even more readily. In the increased use of these criteria as connecting factors, instead of the state-controlled criteria of nationality, we may perhaps already see evidence for the contention, explored further below, that

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

---

[89] See further generally Mills, The Confluence of Public and Private International Law, 250ff; Bowett, Jurisdiction: Changing Patterns of Authority, 8-9.

[90] See generally e.g. the United Nations International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families (1990), monitored by the Committee on Migrant Workers <http://www.ohchr.org/EN/HRBodies/CMW/Pages/CMWIndex.aspx> accessed 18 August 2014.

individual autonomy is increasingly recognised as playing an important role in questions of jurisdiction.

As noted, private international law rules on jurisdiction may recognise that certain subject matters are so closely connected with a single state that the courts of that state should have exclusive jurisdiction. In general, however, rules of private international law function within a public international law context in which overlapping jurisdiction is permitted, because more than one state may have a basis for exercising jurisdiction on territorial or personal grounds. Rules of private international law similarly accept a wide range of grounds for national courts to exercise jurisdiction over private law disputes, and thus readily accept the possibility that more than one court may have jurisdiction based on territorial or personal connections with the parties or the subject matter of their dispute. Equally, more than one state might purport to apply its private law to a dispute or relationship, based on territorial or personal connections. But private international law has also given rise to distinct approaches to dealing with the conflicts which might potentially arise from such overlaps,[91] through the development of principles of jurisdictional priority which seek to limit or resolve such potential parallel proceedings. Where proceedings can be commenced in more than one state, courts may exercise jurisdictional deference, either because another court is considered to be clearly more appropriate,[92] or because the other court was first seised of the dispute.[93] Where foreign courts have already determined an issue, their judgment will frequently be given an estoppel effect which will function to prevent re-litigation of the issues, and (if applicable) permit local enforcement of the foreign award, thus further preventing potentially conflicting exercises of jurisdiction.[94] And finally, perhaps most distinctively, rules on choice of law generally require courts to apply *foreign* substantive law where that law is most closely connected to the dispute,[95] and strive to harmonise choice of law rules so that different courts will apply the same law[96] – thereby both recognising

---

[91] See *supra* n 47.

[92] As under the common law – see, for example, *The Abidin Daver* [1984] AC 398; *De Dampierre v De Dampierre* [1988] AC 92; *Cleveland Museum of Art v Capricorn Art International* [1990] 2 LLR 166.

[93] As under the Brussels I Regulation (2001), Articles 27-28.

[94] See generally e.g. *Adams v Cape Industries* [1990] Ch 433; Brussels I Regulation (2001), Articles 32-56.

[95] This principle was particularly influential under the common law 'proper law of the contract' approach. Some doubts may be expressed as to whether this approach is reflected in recent European codifications of choice of law rules, which (arguably problematically) tend to favour more rigid and incidental connecting factors rather than looking to the system of law most closely connected to the dispute, in the interests of predictability and certainty, and in the service of the efficient functioning of the internal market. See, for example, Article 4 of Regulation (EC) No 593/2008 of the European Parliament and of the Council of 17 June 2008 on the law applicable to contractual obligations (Rome I), EU OJ L 177, 4 July 2008 (henceforth, 'Rome I Regulation (2008)'); Mills, The Identities of Private International Law, 470.

[96] See e.g. Rome I Regulation (2008), Recital 6; Rome II Regulation (2007), Recital 6. The possible application of domestic public policy as a safety net to these rules does not undermine

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

a foreign state's greater claim to substantive regulatory authority, and aspiring to an objective of decisional harmony which would prevent a substantive 'conflict of laws' from arising, even where more than one court might have (private international law) jurisdiction.

It does not particularly matter whether this is viewed as an application or enforcement by one state of another's prescriptive jurisdiction, or whether it is simply the forum state choosing to exercise its own prescriptive jurisdiction to give effect to foreign law (a long-standing matter of debate in private international law theory). In either case, the exercise of international jurisdiction by each state aspires to avoid a conflict through openness to the application of foreign rules which have a greater 'connection' to the dispute at hand, as determined and shaped by public and private international law rules and principles. None of the conflict avoidance techniques of private international law has been universally accepted, nor does any form a clear part of the international law on jurisdiction. But they show that in the private law context states have engaged with the principles and problems of (potentially overlapping) international jurisdiction in a more sophisticated and nuanced way than is generally seen in the context of public international law.

## IV. Jurisdiction as a Duty of States

The remainder of this article considers challenges which have arisen to the traditional idea of jurisdiction as a matter of right and power of states under international law, based principally on connections of territoriality or nationality. These challenges have come from developments in both public international law and private international law, particularly through the increased recognition given to individual actors in both (closely related) fields. In order to highlight the connection between developments in public and private international law, the focus of the remaining sections is largely on adjudicative jurisdiction – as discussed above, the sense in which the term jurisdiction is used in private international law – and on the prescriptive rather than enforcement components of judicial proceedings. To understand the background to these developments, it is first important to note another challenge to the traditional approach to jurisdiction in international law – the growing recognition that in some circumstances the exercise of national jurisdiction may, under international law, be a question of duty or obligation rather than right or discretion.[97] To put this another way, the regulation of jurisdiction in international law needs to be reconceived as not merely a 'ceiling', defining the maximum limits of state power, but also (in some

---

their general character, particularly as the application of public policy should (and does) generally reflect principles of proximity and relativity – see Alex Mills, 'Dimensions of Public Policy in Private International Law' (2008) 4 Journal of Private International Law 201.

[97] See *supra* n 46.

contexts) as a 'floor', reflecting minimum requirements for the exercise of regulatory power by states in order to satisfy their international obligations.

## *A. Jurisdictional duties owed to other states*

States have increasingly agreed to various obligations under international law under which they have constrained their traditional jurisdictional discretion – either by prohibiting or mandating certain forms of regulation. This is particularly the case in the context of obligations to criminalise certain conduct and to submit individuals to prosecution which exist across a range of international criminal law treaties, and perhaps even (albeit more controversially[98]) as part of customary international law. These treaties also (expressly or implicitly) require states to pass domestic laws permitting or facilitating the exercise of such jurisdiction, similarly fettering the discretionary nature of national prescriptive jurisdiction.

These obligations usually include the exercise of jurisdiction in relation to a state's own territory or nationals. They are obligations to exercise the recognised grounds of jurisdiction in international law, as examined above, which are thereby transformed from jurisdictional rights to duties. In some cases, the obligations go further, requiring exercise of jurisdiction over any person found within the territory, regardless of their nationality or of where the alleged crime was committed. For example, Article 7(1) of the Convention Against Torture requires that '[t]he State Party in the territory under whose jurisdiction a person alleged to have committed any offence referred to in article 4 is found shall in the cases contemplated in article 5, if it does not extradite him, submit the case to its competent authorities for the purpose of prosecution.' The obligation to exercise enforcement jurisdiction over any person accused of certain conduct who is found in the territory implies an obligation to exercise prescriptive jurisdiction over the conduct in question.[99] Such obligations are thus effectively treaty-based obligations of universal prescriptive jurisdiction, conditional on the presence of the defendant in the territory, which thereby extend the

---

[98]  The International Court of Justice elected not to comment on the customary status of the obligation to extradite or prosecute in reference to crimes against humanity, in *Questions relating to the Obligation to Prosecute or Extradite (Belgium v Senegal)* [2012] ICJ Reports 422. For the view that it is not customary, see e.g. the Separate Opinion of President Guillaume, *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, at [12]; for the view that it is, see e.g. 'Interlocutory Decision on the Applicable Law: Terrorism, Conspiracy, Homicide, Perpetration, Cumulative Charging', Appeals Chamber, Special Tribunal for Lebanon, STL-11-01/I/AC/R176bis, 16 February 2011, at [102]. See further Kimberley N Trapp, *State Responsibility for International Terrorism* (OUP 2011) 84.

[99]  Trapp, State Responsibility for International Terrorism, 83, 101-3; see further Michael A Newton, 'Terrorist crimes and the *aut dedere aut judicare* obligation', in L van den Herik and N Schrijver (eds), *Counter-Terrorism Strategies in a Fragmented International Legal Order* (CUP 2013).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

53

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

traditionally accepted boundaries of the jurisdiction of states.[100] To put this another way, the 'floor' provided by treaty-based jurisdictional duties may in fact, in such circumstances, be higher than the traditional 'ceiling' provided by the general international law limitations on jurisdictional rights.

Such jurisdictional duties, particularly although not only where they expand the scope of accepted jurisdictional principles, may also come into (apparent) conflict with traditional prohibitive rules on jurisdiction, such as rules of immunity, which would normally require that jurisdictional powers not be exercised. In such cases, the collective agreement to establish an obligation to exercise jurisdiction may constitute an implied determination that state immunity should not be applicable. This is indeed the best interpretation of the decision of the House of Lords in *R v Bow Street Metropolitan Stipendiary Magistrate, ex p Pinochet Ugarte (No. 3)* (2000),[101] which held that state immunity did not prevent extradition proceedings against the former Chilean head of state Pinochet, who was present at the time in the territory, in relation to allegations of torture unconnected to the United Kingdom.[102] The treaty-based obligation to exercise universal jurisdiction, triggered by Pinochet's territorial presence, was held to exclude the possibility that state immunity would prevent such an exercise of jurisdiction. Since the Convention Against Torture defines torture as conduct performed or instigated by a state official,[103] recognising immunity for acts of torture would have effectively negated the Convention's obligation of universal jurisdiction.

Through accepting jurisdictional obligations, states have increasingly accepted the idea of jurisdiction as a matter of duty rather than right, particularly (although not exclusively[104]) in the criminal context. In international criminal law, many states have accepted the related idea that a failure to submit those suspected of international crimes to prosecution will lead to forfeiture of national jurisdiction, to be replaced by obligations to transfer suspects to the International Criminal Court,

---

[100] See Staker, Jurisdiction, 323. The Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal in *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, notes (at [46]) that:

> There are, moreover, certain indications that a universal criminal jurisdiction for certain international crimes is clearly not regarded as unlawful. The duty to prosecute under those treaties which contain the *aut dedere aut prosequi* provisions opens the door to a jurisdiction based on the heinous nature of the crime rather than on links of territoriality or nationality (whether as perpetrator or victim). The 1949 Geneva Conventions lend support to this possibility, and are widely regarded as today reflecting customary international law.

See further ibid, at [28]–[41]; Separate Opinion of President Guillaume, at [7]–[9].
[101] [2000] 1 AC 147.
[102] See further discussion in *Jones v Saudi Arabia* [2006] UKHL 26.
[103] Article 1(1), *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (1984).
[104] See further section B below.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

under the principle of complementarity.[105] Obligations which affect the exercise of jurisdiction are not new – international law has long included some obligations on states which (positively) require an 'internal' exercise of their jurisdiction, or (negatively) limit their discretion to exercise jurisdiction. The venerable rules on protection of diplomats and embassies, for example, are generally considered to require the enactment and enforcement of domestic legislation which should deter and punish harm to either. Conversely, it has long been recognised that states may not under international law exercise their jurisdiction (territorially or otherwise) in relation to parties who have a recognised basis of international immunity – as noted, this is one of the important 'prohibitive rules' which constrain the exercise of jurisdiction under international law, and which may even appear to conflict with positive jurisdictional duties. Similarly, while a state may generally have extraterritorial jurisdiction over its nationals, it could not legislate to require them to act in a manner which would breach rules of international law, for example, by interfering in the internal affairs of a foreign state.[106]

While rules of international law which affect the exercise of jurisdiction may not be new, the fact that (particularly positive) jurisdictional obligations have been recognised with growing frequency and scope supports the thesis of a broader shift in international law. International law increasingly requires states to regulate not only their own (usually executive) conduct, which does not necessarily require any exercise of prescriptive or enforcement jurisdiction,[107] but also the conduct of natural and legal persons within the state's territory, which will often necessitate (and sometimes prohibit) an exercise of jurisdictional powers which were previously discretionary. It is, of course, possible to quarantine the law of jurisdiction from these developments – to argue that, while obligations may indeed have arisen in other areas of international law, as a matter of *jurisdiction* states still possess discretionary powers. If jurisdictional obligations were few and far between, there would be a reasonable case for such an approach. But as international law pervades the fabric of state law-making increasingly broadly and deeply, such an approach would leave the law of jurisdiction artificially disconnected from reality – this is indeed the condition which has generally afflicted accounts of the law of international jurisdiction.[108] International law is no longer only the law of, for, or between states: it also regulates the relations between states and individuals, particularly but not only those in a state's territory, through a combination of rights, duties and prohibitions. As a consequence, the idea of jurisdiction in international law

---

[105] Rome Statute of the International Criminal Court (1998), Article 17.

[106] See further e.g. Akehurst, Jurisdiction in International Law, 188ff.

[107] For example, the general prohibition on the use of force.

[108] A comparable critique is suggested in Daniel Bethlehem, 'The End of Geography: The Changing Nature of the International System and the Challenge to International Law' (2014) 25 EJIL 9, 22.

as a matter of state discretion should no longer be the starting point of thinking on the subject, but should be replaced by an idea of state jurisdiction as a mixture of discretionary, mandatory and prohibitive elements.

This idea of jurisdiction as a duty most typically arises in the context of criminal law obligations, or in the context of obligations of human rights protection. This means that such jurisdictional duties between states tend to conceive of individuals as 'objects' of state jurisdiction,[109] and in that sense as passive.[110] The jurisdictional obligations on states to bring their prescriptive and adjudicative authority to bear on questions of individual responsibility for violations of international criminal law, for example, are obligations owed by states to each other, *in respect of* individuals, not *to* individuals. They do not challenge the authority of state public power, but rather operate through its mechanisms, to that extent implicitly reinforcing them. This is not to say that such jurisdictional duties are not innovative – they are frequently concerned with the regulation by a state of matters within its own territory (for example, obligations to criminalise certain territorial conduct), which is in itself a departure from the older idea of international law as concerned only with relations between sovereign states. Jurisdictional duties, even owed by states to each other, are part of the recognition that international law is also concerned with the relations between states and individuals.

## B. *Jurisdictional duties owed to individuals*

The increasing acceptance that international law concerns the regulation of individuals and not only states has raised a further challenge – the question whether individuals should be recognised as active agents or 'subjects' rather than passive 'objects' of regulation.[111] There has been an apparent 'drift' in the conception of the status of individuals under

[109] 'But what is the real position of individuals in International Law, if they are not subjects thereof? The answer can only be that they are objects of the Law of Nations.' – Oppenheim, International Law, 344.
[110] It should be noted that individuals might be able to participate in judicial review of decisions as to whether or not prosecutorial discretion is exercised: see e.g. *The Chili Komitee Nederland (CKN, Dutch branch of the Chile Committee) v Public Prosecutor, the Netherlands*, Court of Appeal of Amsterdam, 4 January 1995, (1997) 28 Netherlands Yearbook of International Law 363.
[111] The validity and utility of the distinction between 'subjects' and 'objects' of international law has long been debated – see e.g. Kate Parlett, *The Individual in the International Legal System* (CUP 2011) 353ff; Jean D'Aspremont (ed), *Participants in the International Legal System: Multiple Perspectives on Non-State Actors in International Law* (Routledge 2011); Rosalyn Higgins, *Problems and Process: International Law and How We Use It* (Clarendon Press 1994) 48ff. In my view it is conceptually helpful to distinguish between active rights-holders and passive objects of international law regulation, but it should be understood that this defines a spectrum rather than a dichotomy, and that entities may fall along different points in the spectrum in different contexts. The International Court of Justice long ago affirmed the possibility of such variation in legal 'subjectivity' in its acknowledgement that 'The subjects of law in any legal system are not necessarily identical in their nature or in the extent of their rights' – *Reparations for Injuries Suffered in the Service of the United Nations*, Advisory Opinion, [1949] ICJ Reports 174, 178.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

international law.[112] Indeed Hersch Lauterpacht had already argued in 1946 that:

The individual is the ultimate unit of all law, international and municipal, in the double sense that the obligations of international law are ultimately addressed to him and that the development, the well-being, and the dignity of the individual human being are a matter of direct concern to international law.[113]

Lauterpacht attributed this view to Grotius, arguing that it was part of the 'Grotian tradition'. Whatever the truth of this (somewhat dubious) claim, there is little doubt that individuals have become a focus of concern – that international law is no longer merely about inter-state rights and obligations. One aspect of this broader phenomenon is that it is increasingly (although not universally) recognised that individuals may have 'direct rights' under international law[114] – or to put this another way, states may owe obligations not just *in respect of* individuals but also *to* individuals. These obligations have arisen most prominently in two discrete areas of international law which will be examined in turn, parts of which also particularly affect the topic of jurisdiction – first, the law applicable to the treatment of foreign nationals, in particular, the rules concerning the delict of 'denial of justice'; and second, human rights law, in particular, the right of access to justice.

### 1. *Denial of justice to foreign nationals*

It has long been recognised that states owe obligations to meet a 'minimum standard of treatment' in respect of their dealings with each other's nationals. The standard of treatment includes a requirement for states to afford 'adequate judicial protection and effective legal remedies for repairing invasions of rights'[115] for foreigners, whether natural or legal persons, typically through access to domestic courts.[116] A breach

---

[112] For a comprehensive analysis see Parlett, The Individual in the International Legal System; see also Robert McCorquodale, 'The Individual and the International Legal System', in Malcolm D Evans (ed), *International Law* (4th edn, OUP 2014); and more generally Roland Portmann, *Legal Personality in International Law* (CUP 2010); Janne Elisabeth Nijman, *The Concept of International Legal Personality: An Inquiry into the History and Theory of International Law* (T M C Asser Press 2004).

[113] Hersch Lauterpacht, 'The Grotian Tradition in International Law' (1946) 23 BYIL 1, 27.

[114] The point has been made most clearly by the International Court of Justice in relation to rights of consular assistance – see *LaGrand (Germany v US)* [2001] ICJ Reports 466, at [77]; *Avena and Other Mexican Nationals (Mexico v US)* (Judgment) [2004] ICJ Reports 12, at [40].

[115] Andreas Hans Roth, *The Minimum Standard of International Law Applied to Aliens* (A W Sijthoff 1949) 49.

[116] The classical definition is provided by Emmerich de Vattel, *The Law of Nations* (1758), Book II, Chapter XVIII, s.350, stating that 'a refusal to hear your complaints or those of your subjects, or to admit them to establish their right before the ordinary tribunals' establishes a 'denial of justice'. According to Article 9 of the Harvard Research Draft of 1929:

A State is responsible if an injury to an alien results from a denial of justice. Denial of justice exists when there is a denial, unwarranted delay or obstruction of access to courts, gross deficiency in the administration of judicial or remedial process, failure to provide those

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

of this standard is considered to give rise to an international delict of 'denial of justice' – an established idea which has received new prominence. The obligations of states are thus not limited to substantive standards of treatment towards foreign nationals, but also include *adjudicative* obligations of providing access to redress for violations.[117]

As a counterpart to these obligations, foreign nationals were traditionally expected to exhaust local remedies in the courts of the host state before international claims could be brought.[118] Although individuals have not historically been considered as bearers of 'rights', in a sense these jurisdictional requirements function mutually as between states and individuals – the state is required to afford access to courts, and the individual is expected to exercise it, before the state of nationality may make any complaint about their treatment. Access to a court may be required not only where the individual is mistreated by the state (typically leading to public law-style proceedings, such as judicial review), but also where the individual is mistreated by another private party (typically leading to a civil law claim, such as in contract or tort). Where a claim is brought by a foreign national complaining about their treatment by the host state itself, any failure of those local remedial processes may constitute an additional international wrong, compounding the initial wrongful treatment by the state. Where a foreign national suffers harm due to the wrongful conduct of a private party, that wrong would not ordinarily constitute a breach of the state's international obligations because it would not be attributable to the state, but the failure to remedy it through the actions or inactions of domestic courts could itself be a breach of the international minimal standard. In such cases, a denial of justice may be the only delict committed by the host state.

In either case, the test is not whether local law has been complied with but whether an international standard of 'justice' has been met – a denial of justice may be caused by a failure to exercise adjudicative jurisdiction where a power to do so exists, but also by a failure to exercise adjudicative jurisdiction because the courts are denied the power to hear the claim of the injured party under local law. A state cannot limit its responsibilities to foreign nationals by limiting the powers of its own courts. It must not only comply with its own rules of jurisdiction, but those rules must also comply with minimum standards of international law – standards which are admittedly yet to be fully and clearly articulated. In the civil context, to put this simply, 'A denial of justice may arise from the

guarantees which are generally considered indispensable to the proper administration of justice, or a manifestly unjust judgment.

(1929) 23 AJIL Special Supplement 173. See also Alwyn Vernon Freeman, *The International Responsibility of States for Denial of Justice* (Longmans Green & Co 1938).

[117] See generally e.g. F V Garcia Amador, 'Second Report on International Responsibility', UN Doc A/CN.4/106 (1957), at 110ff.

[118] See further e.g. Chittharanjan Felix Amerasinghe, *Local Remedies in International Law* (2nd edn, CUP 2004).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

application of domestic notions of private international law where these conflict with public international law rules'.[119]

Traditionally, the obligations of treatment of foreign nationals have operated through the international law framework of diplomatic protection, and claims for violations of the standards in respect of any individual may only be made at the inter-state level and only by the state of nationality. Thus, the Permanent Court of International Justice held that:

It is an elementary principle of international law that a State is entitled to protect its subjects, when injured by acts contrary to international law committed by another State, from whom they have been unable to obtain satisfaction through the ordinary channels. By taking up the case of one of its subjects and by resorting to diplomatic action or international judicial proceedings on his behalf, a State is in reality asserting its own rights – its rights to ensure, in the person of its subjects, respect for the rules of international law.[120]

Similarly, the International Court of Justice has held that:

within the limits prescribed by international law, a State may exercise diplomatic protection by whatever means and to whatever extent it thinks fit, for it is its own right that the State is asserting.[121]

Thus formulated, the rules concerning denial of justice, and the standard of treatment of foreign nationals more generally, are merely a further example of jurisdictional duties which states owe to each other *in respect of* individuals, not obligations owed directly *to* individuals. Under these rules, 'a person's protection depended on the conduct of his state', and 'stateless persons were entitled to no protection whatsoever'.[122] Because a state is asserting its own rights, the possibility for individuals to receive compensation for losses suffered due to violations of international law by a foreign state is dependent on their home state being able and willing to bring proceedings and to pass on any damages obtained – matters which international law leaves to the discretion of individual states.

In the particular context of the treatment of foreign investors, this traditional idea has however come under challenge through the rapid development of international investment law and arbitration. States across the world have entered into thousands of bilateral investment treaties,[123] which generally serve two functions. First, they define the

---

[119] Ben Atkinson Wortley, 'The Interaction of Public and Private International Law Today' (1954-I) 85 Recueil des Cours 237, 310.

[120] *Mavrommatis Palestine Concessions Case* (1924) PCIJ Series A, No. 2, 12. See also, similarly, *Factory at Chorzow* (1928) PCIJ Series A, No.17; *Panevezys-Saldutiskis Railway Case* (1939) PCIJ Series A/B, No.76.

[121] *Barcelona Traction, Light and Power Co. Case (Belgium v Spain)* [1970] ICJ Reports 3, [78].

[122] Sohn, The New International Law, 9.

[123] See e.g. United Nations Conference on Trade and Development, *World Investment Report 2013*, x, <http://unctad.org/en/PublicationsLibrary/wir2013_en.pdf> accessed 18 August 2014, (noting 3,196 international investment agreements).

substantive standards of treatment applicable to each state in respect of foreign investors from the other state – these may reflect, clarify or go beyond customary international law minimum standards. Second, and more importantly for present purposes, they establish procedures under which such investors may bring claims directly against the host state in respect of their investment. Investors may thereby have their complaints heard by an independent ('private'[124]) arbitral tribunal, instead of through national courts – and there have been hundreds of investor-state arbitrations.[125]

Allegations of a denial of justice have been increasingly invoked in claims arising under investment treaties, in particular as part of the standard treaty requirement that 'fair and equitable treatment' must be given to foreign investors, a test which is also sometimes taken to be reflective of customary international law minimum standards of treatment.[126] The issue in these cases is whether a foreign investor has been denied genuine or effective access to a remedy, in relation to violations of their rights by either public or private parties. Few investment treaties require exhaustion of local remedies, so an investor may directly commence arbitral proceedings against a state for breaches of their rights by a public authority of that state. If the investor is harmed by a private party, or chooses (or is required) to bring domestic proceedings against a public authority, denial of a remedy may mean that international arbitration can still be pursued as a secondary claim arising out of denial of justice.[127]

Although formally bilateral investment treaties apply between two states, the imposition of obligations on those states with respect to private investors, together with the creation of arbitral mechanisms for investors to enforce those obligations directly, means that international investment law appears to create internationalised private rights which are opposable to the state.[128] Indeed, there is significant (albeit

---

[124]  On the public/private dimensions in the characterisation of international investment arbitration, see further Alex Mills, 'Antinomies of Public and Private at the Foundations of International Investment Law and Arbitration' (2011) 14 Journal of International Economic Law 469.

[125]  See e.g. United Nations Conference on Trade and Development, 'Recent Developments in Investor–State Dispute Settlement, IIA Issues Note No. 1 (2013)', <http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d3_en.pdf> accessed August 2014, 1 (noting 514 known international investment arbitrations).

[126]  See generally e.g. Francesco Francioni, 'Access to Justice, Denial of Justice and International Investment Law' (2009) 20 EJIL 729; Jan Paulsson, *Denial of Justice in International Law* (CUP 2005); Andrea K. Bjorklund, 'Reconciling State Sovereignty and Investor Protection in Denial of Justice Claims' (2005) 45 Virginia Journal of International Law 810.

[127]  See Francioni, Access to Justice, Denial of Justice and International Investment Law, 731ff. The term 'access to justice' was also historically associated with this international standard – while it is now much more commonly used in the distinct context of human rights law, there has been a degree of cross-fertilisation between the two fields.

[128]  Whether a 'right' *can only* exist where the individual has control over the subject of the right (eg through a means of individually vindicating the right) is a much-debated jurisprudential question – see generally Kenneth Campbell, 'Legal Rights' (2013) Stanford Encyclopaedia of Philosophy available at <http://plato.stanford.edu/entries/legal-rights/> accessed 18 August 2014. The present article focuses on developments in international law under which individuals are given direct means

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

contested) authority for the view that this has the effect of 'conferring or creating direct rights in international law in favour of investors'.[129] When combined with the idea of 'denial of justice', this means that individual investors may successfully demand that a state exercise adjudicative or prescriptive jurisdiction to protect their rights, and may directly pursue compensation to the extent that this is not done.[130] The effect, if not the form, is to internationalize these rights.

This development suggests the need to rethink the idea of jurisdiction in international law. To the extent that states have agreed to individually enforceable rights for foreign investors which extend to a right of access to civil or administrative remedies in respect of their treatment by the state, they have apparently agreed that they owe jurisdictional obligations not only to foreign states but also to individuals. It is true that these rights may be considered as products of state consent through treaties or even (more controversially) customary international law, suggesting that the individual 'rights' thus created can be accommodated within the existing framework of jurisdictional rules. It can nevertheless also be argued that

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

of enforcement, as it is much less controversial to conclude that individuals bear rights in such circumstances, but it should not be taken to argue that international rights are limited to such cases. The International Court of Justice concluded that individuals have direct rights of consular access, even in the absence of means through which individuals might vindicate those rights (other than those provided by national courts): *LaGrand (Germany v US)* [2001] ICJ Reports 466, at [77].

[129] *Occidental Exploration & Production Company v Republic of Ecuador* [2005] EWCA Civ 1116 (UK), at [18]. See also *Corn Products International v Mexico*, Decision on Responsibility, 15 January 2008, ICSID Case No. ARB(AF)/04/01, finding (at [168]-[169]) that 'It is now clear that States are not the only entities which can hold rights under international law; individuals and corporations may also possess rights under international law' and that 'In the case of Chapter XI of the NAFTA, the Tribunal considers that the intention of the Parties was to confer substantive rights directly upon investors. That follows from the language used and is confirmed by the fact that Chapter XI confers procedural rights upon them'. In *Corn Products*, the tribunal suggested (although not without ambiguity) that this was always the case even under the traditional rules of diplomatic protection, concluding (at [170]) that 'It has long been the case that international lawyers have treated as a fiction the notion that in diplomatic protection cases the State was asserting a right of its own', finding instead (at [173]) that 'when a State claimed for a wrong done to its national it was in reality acting on behalf of that national, rather than asserting a right of its own'. But for an opposing view see e.g. *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc v Mexico*, Award, 21 November 2007, ICSID Case No. ARB(AF)/04/05, holding (at [169]) that 'the investor may bring the host State to an international arbitration in order to request compensation, but the investor will be in reality stepping into the shoes and asserting the rights of the home State'; *Loewen v United States*, Award, 26 June 2003, ICSID Case No. ARB(AF)/98/3, holding (at [233]) that '[t]here is no warrant for transferring rules derived from private law into a field of international law where claimants are permitted for convenience to enforce what are in origin the rights of Party states'. See further e.g. Patrick Dumberry and Erik Labelle-Eastaugh, 'Non-state actors in international investment law', in Jean d'Aspremont (ed), *Participants in the International Legal System* (Routledge 2011); Zachary Douglas, 'The Hybrid Foundations of Investment Treaty Arbitration' (2003) 74 BYIL 151, 160ff.

[130] Or, similarly, may pursue compensation to the extent that a state exercises adjudicative jurisdiction beyond the permitted grounds under international law – see e.g. Vaughan Lowe, 'Expert Opinion on International Law Issues, in re: Yukos Oil Company, Case No. 04-47742-H3-11', published in (2005) 2(3) Transnational Dispute Management <www.transnational-dispute-management.com/art icle.asp?key=495> accessed August 2014; see further discussion in Giuditta Cordero Moss, 'Between Private and Public International Law: Exorbitant Jurisdiction as Illustrated by the Yukos Case' (2007) 4(5) Transnational Dispute Management <www.transnational-dispute-management.com/article. asp?key=1130> accessed August 2014 and (2007) 32 Review of Central and East European Law 1.

61

through the recognition of individuals as positive actors and jurisdictional rights-bearers, the idea of jurisdiction as purely an expression of the rights and powers of sovereign states requires reconceptualisation.

## 2. *Human rights and access to justice*

Alongside the development of obligations which relate to the treatment of foreign nationals, particularly investors, international law has also developed obligations on states which relate to the treatment of *all* persons – including each state's own nationals – principally in the form of human rights. These rights were largely developed and articulated in the aftermath of the Second World War (and particularly the Holocaust), as a consequence of the realisation that it was unacceptable that 'a state's own citizens were almost completely at its mercy, and international law had little to say about mistreatment of persons by their own government'.[131] They have also included rights which relate to a state's exercise of adjudicative jurisdiction, generally under the rubric of rights of 'access to justice',[132] as well as access to an 'effective remedy' for violations of other rights.[133] A right of access to justice, including a right of access to a court or tribunal, is an important feature of modern human rights law, generally considered to apply even if no other human rights are at stake, although its importance is enhanced where the substantive concerns involve violations of other human rights. The European Court of Justice has, for example, repeatedly emphasised the importance of rights of access to justice in the context of sanctions against those suspected of direct or indirect involvement in terrorist activities, finding that such rights may not be displaced, within the European constitutional order, even by a Chapter VII resolution of the Security Council.[134] Like the rules concerning denial of justice, the standard of what 'access to justice' actually requires is (and must be) international – a state cannot limit its international obligations through restricting the capacity of its courts as a matter of domestic law, and thus mere compliance with national rules of jurisdiction will not necessarily be sufficient to satisfy international jurisdictional obligations.[135]

---

[131] Sohn, The New International Law, 9.

[132] See generally e.g. Francesco Francioni (ed), *Access to Justice as a Human Right* (OUP 2007); see further the Italian counter-memorial in *Jurisdictional Immunities of the State* (*Germany v Italy: Greece intervening*), 22 December 2009, 73ff. The term 'denial of justice' is sometimes used in this context to refer to a failure to provide access to justice, although the term is more closely associated with the rules concerning the treatment of foreign nationals which developed independently from human rights law – as noted, there has been a degree of cross-fertilisation between the two fields.

[133] See e.g. ICCPR Art.2(3).

[134] *Kadi v Council & Commission (Common foreign & security policy)* [2008] EUECJ C-402/05 (03 September 2008); *Yassin Abdullah Kadi, Re* [2013] EUECJ C-584/10 (18 July 2013).

[135] See e.g. *Ashingdane v United Kingdom* (8225/78) [1985] ECHR 8, holding (at [56]-[57]) that:

The applicant did have access to the High Court and then to the Court of Appeal, only to be told that his actions were barred by operation of law . . . To this extent, he thus had access to the remedies that existed within the domestic system. . . . This of itself does not necessarily exhaust the requirements of Article 6 para. 1 (art. 6-1). It must still be established that the

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Rights of access to justice have again been traditionally viewed as obligations owed by states to each other, in *respect of* individuals, rather than rights owed *to* individuals. Increasingly, however, the argument is made that individuals are, or are becoming, recognised as the bearers of direct rights – as 'international legal persons' – under international law,[136] in a manner equivalent to the recognition which has been arguably accorded to foreign investors. International human rights law, which is premised to some extent on a distrust of the treatment of individuals by states and governments, tends to be similarly distrustful of mechanisms which would leave the enforcement of human rights entirely in the hands of those same states and governments, and (as noted) having a means of enforcement is often closely associated with the possession of a legal right.[137] Under the European Convention on Human Rights, for example, the rights granted include the undertaking that 'In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law'[138] – establishing not merely a right to a fair hearing, but a right of access to justice, exercisable both through national courts and potentially through proceedings before the European Court of Human Rights.[139] The American Convention on Human Rights similarly provides that 'Everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the constitution or laws of the state concerned or by this Convention',[140] and provides for individual access to justice through the Inter-American Commission on

degree of access afforded under the national legislation was sufficient to secure the individual's 'right to a court', having regard to the rule of law in a democratic society

[136]   'States have had to concede to ordinary human beings the status of subjects of international law, to concede that individuals are no longer mere objects, mere pawns in the hands of states.' – Sohn, The New International Law, 1.

[137]   The International Court of Justice has long drawn a link between international legal personality and the possession of a means of vindicating rights – finding, for example, with respect to the United Nations, that 'if the Organization is recognized as having [international] personality, it is an entity capable of availing itself of obligations incumbent upon its Members' (178), and that 'the Court has come to the conclusion that the Organization is an international legal person . . . [i.e.] that it is a subject of international law and capable of possessing international rights and duties, and that it has capacity to maintain its rights by bringing international claims' (179): *Reparations for Injuries Suffered in the Service of the United Nations*, Advisory Opinion, [1949] ICJ Reports 174. It is at least arguable that these contentions should also operate conversely – that the possession of enforceable rights should imply the existence of legal personality.

[138]   Article 6(1).

[139]   See further e.g. *Golder v United Kingdom* (4451/70) [1975] 1 EHRR 524 (finding, at [35], that 'The principle whereby a civil claim must be capable of being submitted to a judge ranks as one of the universally 'recognised' fundamental principles of law; the same is true of the principle of international law which forbids the denial of justice.'); *Airey v Ireland* (6289/73) [1979] ECHR 3 (finding, at [24], that 'The Convention is intended to guarantee not rights that are theoretical or illusory but rights that are practical and effective . . . This is particularly so of the right of access to the courts in view of the prominent place held in a democratic society by the right to a fair trial').

[140]   Article 25(1).

Human Rights and Inter-American Court of Human Rights.[141] In the Convention Against Torture, there is an obligation on each state to 'ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation'.[142] These developments signal at least a partial recognition of jurisdiction as a matter of international legal obligation owed to individuals.

The idea of access to justice is having a range of further effects on private international law rules on jurisdiction. Traditionally, such rules have focused on avoiding two potential harmful outcomes which could be caused by exorbitant regulation – conflicts with foreign states, and unfairness to defendants. These objectives are achieved through constraining the exercise of jurisdictional power by states, thus conceiving of jurisdiction as a matter of limited state discretion. Increasingly, however, the counter-balancing concern of ensuring access to justice for claimants, conceiving of jurisdiction as a matter of individual right, is playing an important role in private international law.[143] The influence of access to justice is reshaping private international law in three distinct ways which will be addressed in turn.

### a. The design of jurisdictional rules

The first aspect of the increasing influence of 'access to justice' on private international law is its impact on the development of jurisdictional rules – the question of when national courts are considered to have adjudicative authority over a civil dispute. This may be illustrated by the Legislative Proposal,[144] published by the European Commission on 14 December 2010, for reforming the Brussels I Regulation on Jurisdiction and the Recognition and Enforcement of Judgments.[145] The proposed reforms not only addressed a range of issues and concerns with the functioning of the existing regime, but also suggested an important change in principle, with significant emphasis placed on access to

---

[141]  The Inter-American Court of Human Rights has even made the bold claim that 'Access to justice is a peremptory norm of international law' (*Case of Goiburú et al. v Paraguay*, Judgment of September 22, 2006 (Merits, Reparations and Costs), Series C, No. 153, at [131]), although perhaps in context this is limited to the (still bold) claim that access to justice is peremptory if the norm breached is peremptory. See further *Juridical status and human rights of the child*, Advisory Opinion of August 28, 2002, Series A, No. 17, Concurring Opinion of Judge A. A. Cançado Trindade, [21]-[22] – 'The recognition of the individual as subject of both domestic law and international law, represents a true juridical revolution. ... This rendering of accounts would simply not have been possible without the crystallization of the right of individual petition.'

[142]  Article 14(1), *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (1984). See further *infra* text accompanying n 156.

[143]  See further generally J J Fawcett, 'The Impact of Article 6(1) of the ECHR on Private International Law' (2007) 56 ICLQ 1. See also Amnesty International, 'Injustice incorporated: Corporate abuses and the human right to remedy' (2014), POL 30/001/2014 available at <http://www.amnesty.org/en/library/info/POL30/001/2014/en> accessed 18 August 2014.

[144]  Proposal for a Regulation of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (Recast), COM(2010) 748 final, 2010/0383 (COD), <http://ec.europa.eu/justice/policies/civil/docs/com_2010_748_en.pdf> accessed 18 August 2014.

[145]  Brussels I Regulation (2001) (*supra* n 68).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

justice, alongside previously dominant considerations of internal market efficiency and fairness to defendants. This had practical implications, in particular the proposed introduction of a 'forum of necessity' rule, providing (subject to certain conditions) that 'Where no court of a Member State has jurisdiction under this Regulation, the courts of a Member State may, on an exceptional basis, hear the case if the right to a fair trial or the right to access to justice so requires'.[146] Although this reform was not adopted in the final version of the recast Brussels I Regulation,[147] this was not because it was particularly rejected, but because the general idea of enlarging the scope of the Regulation to cover non-EU domiciled defendants was at least deferred, and a forum of necessity rule is not considered to be required for defendants domiciled within the European Union, because at least one Member State court will always have jurisdiction under the Regulation, and that court will be presumed to be capable of delivering justice because its procedures must comply with the European Convention on Human Rights. It may be anticipated that a forum of necessity rule would form a part of any future proposals on these questions within the European Union. Similar 'forum of necessity' rules form part of the law of at least ten Member States,[148] including France, Germany, Austria,[149] Belgium,[150] the Netherlands,[151] and Switzerland,[152] and the rule has been included

---

[146] See *supra* n 144, Article 26.

[147] Recast Brussels I Regulation, No. 1215/2012, OJ L 351/1, 20 December 2012 (effective January 2015).

[148] See further generally Arnaud Nuyts, 'Study on Residual Jurisdiction: General Report' (2007), 64ff available at <http://ec.europa.eu/civiljustice/news/docs/study_residual_jurisdiction_en.pdf> accessed 18 August 2014. Chilenye Nwapi, 'Jurisdiction by Necessity and the Regulation of the Transnational Corporate Actor' (2014) 30 Utrecht Journal of International and European Law 24.

[149] The rule in France, Germany and Austria is based on case law – see Nuyts, Study on Residual Jurisdiction, 66.

[150] Article 11 of the Belgian Code of Private International Law, 16 July 2004, provides that:

> Notwithstanding the other provisions of the present statute, the Belgian courts will exceptionally have jurisdiction when the subject matter presents close connections with Belgium and proceedings abroad seem impossible or when it would be unreasonable to demand that the action be brought abroad.

[151] Article 9 of the Dutch Code of Civil Procedure provides that:

> When Articles 2 up to and including 8 indicate that Dutch courts have no jurisdiction, then they nevertheless have if: (a) the case concerns a legal relationship that only affects the interests of the involved parties themselves and the defendant or a party with an interest in the legal proceedings has appeared in court, not exclusively or with the intention to dispute the jurisdiction of the Dutch court, unless there is no reasonable interest to conclude that the Dutch court has jurisdiction; (b) a civil case outside the Netherlands appears to be impossible; or (c) the legal proceedings, which are to be initiated by a writ of summons, have sufficient connection with the Dutch legal sphere and it would be unacceptable to demand from the plaintiff that he submits the case to a judgment of a foreign court.

[152] Article 3 of the Swiss Federal Act on Private International Law of 18 December 1987 provides that:

> When this Act does not provide for jurisdiction in Switzerland and proceedings in a foreign country are impossible or cannot reasonably be required, the Swiss judicial or

Downloaded from https://academic.oup.com/byblil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

in another proposed EU Regulation dealing with matrimonial property.[153] The idea that jurisdiction may be justified on the basis of a 'forum of necessity' rule, even in the absence of the factual connections traditionally considered necessary to justify the assertion of state power, has also received legislative and judicial support in Canada.[154]

At the international level, the Convention Against Torture imposes an obligation of access to justice on state parties in relation to victims of torture. This obligation is subject to a disagreement as to whether it is limited to acts of torture committed in the territory of the forum state, or possibly by or against nationals of the forum state.[155] The Committee against Torture, which supervises compliance with the Convention, has consistently taken the view that the obligation does not depend on traditional jurisdictional connections of territory or nationality, particularly where 'a victim is unable to exercise the rights guaranteed under article 14 in the territory where the violation took place'.[156] This might be understood as an argument in favour of universal civil jurisdiction (in the form of an obligation rather than a right[157]), subject to a requirement to exhaust local remedies, or as a forum of necessity rule. In practice, there is little significance in the distinction between these two positions, aside from the possibility that a forum of necessity rule might have further limitations based on the need for a 'sufficient connection'.

Each of the 'forum of necessity' rules discussed above supports an assertion of jurisdictional power (and even duty) to protect the rights

administrative authorities at the place with which the case has a sufficient connection have jurisdiction.

[153] Proposal for a Council Regulation on jurisdiction, applicable law and the recognition and enforcement of decisions in matters of matrimonial property regimes, COM(2011) 126 final, 2011/0059 (CNS), 16 March 2011, Article 7:

Where no court of a Member State has jurisdiction under Articles 3, 4, 5 and 6, the courts of a Member State may, exceptionally and if the case has a sufficient connection with that Member State, rule on a matrimonial property regime case if proceedings would be impossible or cannot reasonably be brought or conducted in a third State.

[154] See e.g. *Van Breda v Village Resorts Limited* [2010] ONCA 84 at [54], [100]; *Uniform Court Jurisdiction and Proceedings Transfer Act* s.6 available at <http://www.ulcc.ca/en/uniform-acts-new-order/current-uniform-acts/739-jurisdiction/civil-jurisdiction/1730-court-jurisdiction-proceedings-transfer-act> accessed August 2014, adopted in British Columbia and Nova Scotia; Quebec Civil Code, Article 3136. See further John P McEvoy, 'Forum of Necessity in Quebec Private International Law: CcQ Article 3136' (2005) 35 Review General 61.

[155] See e.g. *Jones v Saudi Arabia* [2006] UKHL 26, at [20]-[25]; but see Committee against Torture, Conclusions and recommendations, 34th Session, 2-20 May 2005, UN Doc. CAT/C/CR/34/CAN, 7 July 2005, paras 4(g), 5(f)).

[156] General Comment No. 3 of the Committee against Torture, 19 November 2012, UN Doc. CAT/C/GC/3, at [22]. The Comment also clearly states (at [22]) that 'The Committee considers that the application of article 14 is not limited to victims who were harmed in the territory of the State party or by or against nationals of the State party', and (at [43]) that 'The Committee considers reservations which seek to limit the application of article 14 to be incompatible with the object and purpose of the Convention.'

[157] Curiously, the United States appears to take the position that while it does not have an *obligation* of universal jurisdiction in respect of civil proceedings arising from torture (having expressly objected to this reading of the Torture Convention), it has at least a conditional *right* of universal jurisdiction, exercised through the Torture Victim Protection Act of 1991 – see *infra* text accompanying n 170.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

of private parties in the absence of the connections of territory or nationality which would traditionally be required under private or public international law rules of jurisdiction. As in the context of treaty-based universal jurisdiction, the 'floor' provided by jurisdictional duties (here, to ensure access to justice) may be higher than the traditional 'ceiling' of jurisdictional rules – requiring an additional evolution in our understanding of traditional jurisdiction.

These rules do not, however, necessarily suggest a 'pure' universal civil jurisdiction: they may rely on some other factual connection in order to justify the exercise of jurisdiction. Among EU Member States, only the Dutch forum of necessity rule expressly provides that no connection whatsoever with the Netherlands is required (where 'a civil case outside the Netherlands appears to be impossible').[158] Under Swiss law, for example, it is necessary that the case has 'a sufficient connection' with Switzerland for the court to exercise 'forum of necessity' jurisdiction.[159] There are a range of reasons why 'pure' universal civil jurisdiction would be undesirable, not least the costs this would impose on certain legal systems, the risks of overlapping and inconsistent exercises of jurisdiction (although these might be reduced by rules of jurisdictional priority or deference), the opportunities which would be created for forum shopping, and the related risk that an exercise of jurisdiction becomes a form of 'neo-colonial' power which denies a state the ability to resolve disputes which are internal or most closely connected to it.[160] However, a subsidiary forum of necessity jurisdiction could be (and indeed commonly is) recognised in a more limited form. A national and resident of State A, a state which does not adhere to the rule of law, seriously injured by the brother of the President, subsequently fleeing in fear to State B, might have no possibility to claim damages under traditional jurisdictional grounds. In this context, the courts of State B might exercise forum of necessity jurisdiction based on the subsequent residence of the claimant in their territory. This factor is indeed the connection most commonly relied on in EU Member States which permit the assertion of forum of necessity jurisdiction based on a

---

[158]   Dutch Code of Civil Procedure, Article 9.

[159]   Swiss Federal Act on Private International Law, Article 3. Article 3136 of the Quebec Civil Code similarly provides that 'Even though a Quebec authority has no jurisdiction to hear a dispute, it may hear it if the dispute has *a sufficient connection with Quebec*, where proceedings cannot possibly be instituted outside Quebec or where the institution of such proceedings outside Quebec cannot reasonably be required' (emphasis added). See also e.g. the Belgian rule, *supra* n 150, which applies only 'when the subject matter presents close connections with Belgium'. See also similarly the ALI/UNIDROIT Principles of Transnational Civil Procedure, adopted in 2004 (see *supra* n 65), Principle 2.2.

[160]   See further e.g. Donald Francis Donovan and Anthea Roberts, 'The Emerging Recognition of Universal Civil Jurisdiction' (2006) 100 AJIL 142. Another way of understanding these concerns is through the idea that rules of private international law should adopt and reflect a principle of horizontal subsidiarity – see further Alex Mills, 'Federalism in the European Union and the United States: Subsidiarity, Private Law and the Conflict of Laws' (2010) 32 University of Pennsylvania Journal of International Law 369, 406ff; Ryngaert, Jurisdiction in International Law, 211ff.

'sufficient connection'.[161] Such an approach enlarges traditional juris-
diction in the service of ensuring access to justice and avoiding impunity,
but maintains deference to the primacy of traditional jurisdictional rules.
Forum of necessity jurisdiction in this form is a secondary or subsidiary
basis for exercising regulatory authority. Access to justice does not ne-
cessarily mean abandoning existing jurisdictional rules altogether, nor a
global jurisdictional 'free for all'.[162]

A similar 'forum of necessity'-based expansion of civil jurisdiction was
contemplated, and indeed advocated by the European Commission,
before the US Supreme Court in *Kiobel v Royal Dutch Petroleum*
(2013).[163] The Commission's *amicus* brief argued that an exercise of
universal civil jurisdiction, not based on any traditional jurisdictional
grounds, would meet international jurisdictional standards where it
was necessary to prevent a 'denial of justice' (because no effective alter-
native forum was available, or where possible local remedies had been
exhausted).[164] Such an approach, the Commission suggested, would be
'consistent with the growing recognition in the international community
that an effective remedy for repugnant crimes in violation of fundamen-
tal human rights includes, as an essential component, civil reparations to
the victims.'[165] The joint *amicus* brief of the United Kingdom and the
Netherlands argued, however, that the Alien Tort Statute should be
interpreted consistently with existing jurisdictional principles, 'princi-
pally based on territoriality and nationality'.[166] Ultimately, the Supreme

---

[161] See further Nuyts, Study on Residual Jurisdiction, 66.

[162] The *Preliminary Draft Convention on Jurisdiction and Foreign Judgments in Civil and
Commercial Matters* (2000) prepared for the Hague Conference on Private International Law, avail-
able at <http://www.hcch.net/upload/wop/jdgmpd11.pdf> accessed 18 August 2014, included a
controversial Article 18(3) permitting states to exercise 'universal' civil jurisdiction in respect of
serious international crimes. But this included a proposed qualification suggesting that such juris-
diction could only be exercised 'if the party seeking relief is exposed to a risk of a denial of justice
because proceedings in another State are not possible or cannot reasonably be required'. The rule
thus implicitly recognised the primacy of the traditional grounds for jurisdiction.

[163] 133 S.Ct. 1659 (2013). The possibility of adopting a forum of necessity rule was discussed in
oral pleadings – see <http://www.supremecourt.gov/oral_arguments/argument_transcripts/10-
1491rearg.pdf> accessed 18 August 2014, (at 13 and 46).

[164] The two tests might differ if 'exhaustion of local remedies' is defined purely territorially. If a
national of state A commits a wrong in state B then travels to state C, the absence of an available
forum in state B might not preclude an exercise of universal jurisdiction by state C which was
conditional only on the exhaustion of 'local' remedies in state B, but forum of necessity jurisdiction
conditional on the absence of *any* alternative forum might still not be available (because state A
might have nationality-based jurisdiction). The difference between these two positions was poten-
tially decisive in the *Kiobel* case, in which it might have been possible to conclude that the Nigerian
courts were not an available forum, but proceedings could have been brought in the UK or the
Netherlands (the home jurisdictions of Royal Dutch Shell). The European Commission adopted the
position that 'exhaustion of 'local' remedies requires a demonstration by the claimant that those
states with a traditional jurisdictional nexus to the conduct are unwilling or unable to proceed',
making the two approaches identical, and thus suggesting that the exercise of jurisdiction in *Kiobel*
would not have been permissible under international law.

[165] At p.18 available at <http://www.americanbar.org/content/dam/aba/publications/supreme_
court_preview/briefs/10-1491_neither_amcu_eu.authcheckdam.pdf> accessed August 2014.

[166] 'The Governments strongly believe that such allegations of human rights violations should be
dealt with in an appropriate forum, respecting international law principles of jurisdiction. In relation

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Court decided to adopt an even more conservative approach, based on a presumption against the extraterritorial application of the Alien Tort Statute,[167] and thus did not directly address the scope of US jurisdiction as a matter of international law, or whether the US constitution would permit a forum of necessity approach.[168] An approach similar to a 'forum of necessity' rule is, however, notably adopted in the Torture Victim Protection Act of 1991,[169] which essentially provides for the possibility of universal civil jurisdiction for claims arising out of torture, subject to the rule that 'A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.'[170] As noted above, a rule of universal jurisdiction which is subject to the exhaustion of local remedies is functionally equivalent to a forum of necessity rule which is subject to the non-availability of a traditional forum. In either case, such a ground of jurisdiction goes clearly beyond traditional international grounds, in service of enhancing individual access to justice.

### b. The exercise of jurisdictional discretion

The second effect of access to justice on private international law is in the context of jurisdictional discretion (in legal systems which accept such a discretion, such as those in the common law tradition) – the question of whether a court will in fact *exercise* adjudicatory authority. While this discretion is consistent with the traditional view of jurisdiction as a state right, the increasing influence of access to justice as an international requirement suggests a shift toward viewing jurisdiction as an obligation.

English courts, for example, have increasingly considered the availability of an alternative forum before which the claimant can practically

---

to claims of a civil nature, the bases for the exercise of civil jurisdiction under international law are generally well-defined. They are principally based on territoriality and nationality. The basic principles of international law have never included civil jurisdiction for claims by foreign nationals against other foreign nationals for conduct abroad that have no sufficiently close connection with the forum State.' (at 6)

available at <www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs/10-1491_neutralamcunetherlands-uk-greatbritain-andirelandgovs.authcheckdam.pdf> accessed August 2014.

[167] 569 US ___, 133 S.Ct. 1659 (2013). It should be noted, however, that the court left open the possibility that extraterritorial jurisdiction might be asserted under the statute where 'the claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application' (slip opinion, 14). The minority suggested instead an approach which arguably drew on the alternative 'presumption against extra-jurisdictionality' but did not develop this approach in detail. See further e.g. Alex Mills, 'Kiobel Insta-Symposium: A Tale of Two Presumptions', *Opinio Juris*, 18 April 2013, available at <http://opiniojuris.org/2013/04/18/kiobel-insta-symposium-a-tale-of-two-presumptions> accessed August 2014.

[168] There is very little support for a doctrine of forum of necessity in US law – indeed allowing such a doctrine based on contacts between the claimant and the forum (as permitted under various EU Member States) would seem to be inconsistent with the general approach that the constitutionality of an exercise of jurisdiction under the Due Process clause has 'never been based on the plaintiff's relationship to the forum.' *Goodyear Dunlop Tires Operations, S. A. v Brown*, 564 US ___, 131 S. Ct. 2846 (2011), at 2857 n.5.

[169] 28 USC §1350 Notes.

[170] Section 2(b).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

achieve justice to be one of the central questions in exercising the *forum non conveniens* discretion.[171] In the absence of such an alternative forum English proceedings are highly likely to continue, to ensure that the claimant has 'access to justice'. In the United States, courts must consider whether the exercise of jurisdiction is 'reasonable' as part of the test for determining whether jurisdiction is compatible with constitutional due process requirements, which also involves determining whether there is an available alternative forum, as part of considering 'the plaintiff's interest in obtaining convenient and effective relief'.[172] Even if jurisdiction is constitutional, courts may decline to exercise it on the basis of *forum non conveniens* (or possibly venue transfer rules if the alternative forum is within the United States[173]), which again takes into consideration, at least in principle, the need to ensure that another forum is available in which the plaintiff might obtain a remedy.[174] The absence of a foreign court through which the claimant could obtain justice will strongly increase the likelihood of an exercise of jurisdiction.

*c. Access to justice and immunities*

The effect of the development of principles of access to justice in international law also has implications when it comes to prohibitive rules on jurisdiction in the form of the immunities recognised in international law (which may be general state immunity, the personal immunity of heads of state and other senior governmental officials, or the immunity of diplomats, consular officials or representatives of or to international organisations). Traditionally these immunities have been understood as

[171] See e.g. *Amin Rasheed v Kuwait Insurance Co* [1984] AC 50; *The Spiliada* [1987] AC 460; *Connelly v RTZ* [1998] AC 854; *Lubbe v Cape Plc* [2000] UKHL 41; *Cherney v Deripaska* [2009] EWCA Civ 849.

[172] *World-Wide Volkswagen Corp. v Woodson*, 444 US 286, 292 (1980). Note also *McGee v International Life Ins. Co.*, 355 US 220, 223 (1957) observing that 'When claims were small or moderate, individual claimants frequently could not afford the cost of bringing an action in a foreign forum – thus in effect making the company judgment-proof'.

[173] 28 USC §1404(a).

[174] See e.g. *Gulf Oil Corp. v Gilbert*, 330 US 501, 506-7 (1947), holding that 'In all cases in which the doctrine of *forum non conveniens* comes into play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes criteria for choice between them. ...[Jurisdictional statutes] are drawn with a necessary generality, and usually give a plaintiff a choice of courts, so that he may be quite sure of some place in which to pursue his remedy.' While the courts will not ordinarily refuse to stay proceedings merely because foreign law is less advantageous to the plaintiff, 'if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice' – *Piper Aircraft Co. v Reyno*, 454 US 235, 254 (1981). It has been debated whether the courts actually take such considerations into account sufficiently, or whether 'the forum non conveniens doctrine creates an access-to-justice gap in transnational cases': Donald Earl Childress III, 'Forum Conveniens: The Search for a Convenient Forum in Transnational Cases' (2013) 53 Virginia Journal of International Law 157, 168 (suggesting at 178 that 'many cases that are dismissed in favor of a foreign forum are now being filed and tried successfully to judgment in a foreign court'); Christopher A Whytock, 'The Evolving Forum Shopping System' (2011) 96 Cornell Law Review 481; David W Robertson, 'Forum Non Conveniens in America and England: "A Rather Fantastic Fiction"' (1987) 103 Law Quarterly Review 398.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

'minimal' standards for when a state may not assert jurisdiction – because the exercise of jurisdiction was understood to be a discretionary matter of state right, there was no reason why a state might not give *more* immunity than required under the rules of international law. The development of principles of access to justice, however, requires a state to exercise its jurisdictional powers, and perhaps to expand those jurisdictional powers as a matter of domestic law to encompass internationally permitted grounds for jurisdiction, or even to go beyond traditional territorial or nationality-based jurisdiction.

It has long been debated whether these considerations should also affect or override those of state immunity, particularly where the right of access to justice arose from a violation of a peremptory norm of international law.[175] The general conclusion has been that access to justice does not require or permit states to exercise jurisdiction contrary to the international law of state immunity – this approach has been adopted by most national courts and tribunals, and also by the International Court of Justice.[176] States however still find themselves caught between the two opposing international legal forces of access to justice and immunity law. Where both come into play, the effect is that states must give immunity when *required* by international law, but must not go *beyond* what is required by international law – they must otherwise exercise their jurisdiction.[177] To exercise too little jurisdiction would be to deny access to justice; to exercise too much would be to infringe state immunity.

By way of illustration, the UK Employment Appeal Tribunal held that the immunity extended to foreign states under the State Immunity Act 1978 in relation to suits under employment contracts went beyond what was required under international law – and even (controversially) went so far as to find that the Act should be set aside

[175] Compare, for example, Roger O'Keefe, 'State Immunity and Human Rights: Heads and Walls, Hearts and Minds' (2011) 44 Vanderbilt Journal of Transnational Law 999; Beth Stephens, 'Abusing the Authority of the State: Denying Foreign Official Immunity for Egregious Human Rights Abuses' (2011) 44 Vanderbilt Journal of Transnational Law 1163. On the tension between access to justice and state immunity see further e.g. Christopher A Whytock, 'Foreign State Immunity and the Right to Court Access' (2013) 93 Boston University Law Review 2033.

[176] See generally *Jurisdictional Immunities of the State* (*Germany v Italy: Greece intervening*), 22 December 2009. For critical comment see Alex Mills and Kimberley Trapp, 'Smooth Runs the Water Where the Brook is Deep: The Obscured Complexities of *Germany v Italy*' (2012) 1 Cambridge Journal of International and Comparative Law 153. If access to justice does indeed not 'trump' immunity, the better view is that this is not because access to justice is not engaged where immunity exists (the view adopted by the House of Lords in *Holland v Lampen-Wolfe* [2000] UKHL 40 and *Jones v Saudi Arabia* [2006] UKHL 26), but because compliance with immunity obligations provides a sufficient reason for non-compliance with access to justice obligations (the view adopted by the European Court of Human Rights in *Al-Adsani v United Kingdom* (2001) 34 EHRR 273). While the two approaches would lead to the same outcome, the former approach wrongly suggests a hierarchy between the two international obligations, while the latter accepts their equivalence but interprets them to be compatible. For an alternative approach to reconciling the two norms, see Whytock, 'Foreign State Immunity and the Right to Court Access'.

[177] *Al-Adsani v United Kingdom* (2001) 34 EHRR 273 (ECHR); *Jones v Saudi Arabia* [2006] UKHL 26; *Jones v United Kingdom* (2014) Case nos. 34356/06, 40528/06 (14 January 2014).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

to the extent that it went beyond the requirements of international law, because of the new status of the right of 'access to justice' as part of EU law since the Lisbon Treaty.[178] A conflict between immunity law and access to justice was only avoided because of this claimed power to set aside the State Immunity Act 1978.[179] Without that power and if the Act does indeed exceed international requirements, the United Kingdom would be in breach of EU law and the European Convention on Human Rights. At least where state immunities are involved, the law of jurisdiction has become less of a discretionary field and more of a tightrope walk.

### d. Access to justice, jurisdiction, and 'sovereignty'

The idea that individuals have a directly enforceable right of access to justice, explored here in a variety of contexts, has implications for the idea of jurisdiction in international law. It implies that jurisdiction is no longer exclusively a right of states, or even an obligation owed by states to each other, but is at least to some extent a matter of individual right, that is, an obligation owed to individuals. This would represent a fundamental challenge to traditional conceptions of jurisdiction, one which cannot be met simply by an enlargement of the recognised grounds for the exercise of state jurisdiction.

Since public international law rules on jurisdiction are reflective of the idea of 'sovereignty', this challenge requires us to reconsider that idea too. In particular, it suggests the recognition, much debated in political and legal theory, of the idea of a 'sovereignty of the individual'[180] alongside the sovereignty of states. If this were to be accepted, rules of jurisdiction in international law could not continue to be characterised purely as rules regulating the co-existence of sovereign states, seeking to minimise overlapping exercises of their authority. Rules of jurisdiction would remain concerned with co-existing 'sovereigns', but would require a broader recognition that this encompasses individuals who may have a

---

[178] *Benkharbouche v Embassy of the Republic of Sudan (Jurisdictional Points: State immunity)* [2013] UKEAT 0401_12_0410 (4 October 2013) (currently under appeal).

[179] Such a conflict might also be avoided through interpretation – if a court of an ECHR state were to apply the common presumption that a statute should be interpreted to be in compliance with international law, this should (to the extent that the text permits such an interpretation) lead to an immunity statute being understood to confer immunity as far as required by international law but no further.

[180] This idea has a long history; see e.g. Hersch Lauterpacht, *International Law and Human Rights* (Stevens & Sons 1950) arguing (at 70) that 'International law, which has excelled in punctilious insistence on the respect owed by one sovereign State to another, henceforth acknowledges the sovereignty of man'; James M Buchanan, *The Economics and the Ethics of Constitutional Order* (University of Michigan Press 1991), arguing (at 227) that 'The central premise of *individuals as sovereigns*...denies legitimacy to all social-organizational arrangements that negate the role of individuals as either sovereigns or as principals' (emphasis in original); Annan, 'Two Concepts of Sovereignty' – '[I]ndividual sovereignty—by which I mean the fundamental freedom of each individual, enshrined in the charter of the UN and subsequent international treaties—has been enhanced by a renewed and spreading consciousness of individual rights'.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

right to demand assertions of regulatory authority by states on their behalf.

## V.  PARTY AUTONOMY AND INDIVIDUAL POWER OVER JURISDICTION

This analysis of the challenges presented to the traditional understanding of jurisdiction in international law by the increasing focus on individual rights may be taken a step further through consideration of another important development in domestic rules of (private international law) jurisdiction and choice of law.[181] In private law disputes, states very widely assert jurisdiction on the sole basis of the consent of the parties, in relation to disputes which themselves have little or no connection to the state.[182] In some cases, this consent may be in the form of a joint agreement to submit an existing dispute to a particular court,[183] and in such cases this form of jurisdiction might perhaps loosely be characterised as based on their territorial 'presence' before the court. This is, however, something of a legal fiction, and in other cases jurisdiction may be based only on a choice of court clause in a contract which one party subsequently refuses to accept, recognise or perform, a situation which cannot be so easily subsumed under existing jurisdictional principles.[184] Similarly, states will generally apply the law chosen by the parties to govern their contractual relationship, even if that relationship is otherwise unconnected with the parties or their dispute.[185] In private international law terms, these are aspects of the almost universally recognised principle of 'party autonomy',[186] which has traditionally functioned in the context of commercial contractual disputes, and increasingly is also applied beyond this, such as in tort law[187] and even family law.[188] The international status of party autonomy in the context of jurisdiction has arguably been confirmed by the Hague Choice of Court Convention

[181]  See also Mills, The Confluence of Public and Private International Law, 291ff.
[182]  See e.g. *Zelger v Salinitri* [1980] ECR 89, in relation to the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, Sept. 27, 1968, 1998 O.J. (C 27) 1 (consolidated version) (now Brussels I Regulation (2001)).
[183]  See e.g. the Brussels I Regulation (2001), Article 24.
[184]  See e.g. the Brussels I Regulation (2001), Article 23.
[185]  In the EU, this follows by implication from Articles 3(1) and 3(3) of the Rome I Regulation (2008).
[186]  Party autonomy was recognised by the PCIJ as early as the *Serbian and Brazilian Loans* cases, *France v Yugoslavia; France v Brazil* (1929) PCIJ Ser A, Nos 20-21, Judgments 14-15, p.41. See generally e.g. Peter Nygh, *Autonomy in International Contracts* (OUP 1999); Giesela Ruehl, 'Party Autonomy in the Private International Law of Contracts', in Gottschalk et al (eds), *Conflict of Laws in a Globalized World* (CUP 2007); Mattias Lehmann, 'Liberating the Individual from Battles Between States: Justifying Party Autonomy in Conflict of Laws' (2008) 41 Vanderbilt Journal of Transnational Law 381; Horatia Muir Watt, '"Party Autonomy" in international contracts: from the makings of a myth to the requirements of global governance' (2010) 6 European Review of Contract Law 250.
[187]  For example, under the Rome II Regulation (2007), Article 14.
[188]  See e.g. Janeen Carruthers, 'Party Autonomy in the Legal Regulation of Adult Relationships: What Place for Party Choice in Private International Law?' (2012) 61 ICLQ 881.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

(2005), prepared by the Hague Conference on Private International Law.[189] An equivalent acceptance of the status of party autonomy in the context of choice of law in contract may be suggested by the Draft Hague Principles on Choice of Law in International Commercial Contracts, also being prepared under the auspices of the Hague Conference.[190]

Historically, party autonomy has been viewed as a problem for theorists who have sought to reconcile rules of private international law with public international law. If jurisdiction in public international law is (as it has been traditionally viewed) about state rights and powers, how can individuals give or take away the powers of states? Many courts and commentators have sought to accommodate party autonomy and traditional state sovereignty by finding that party choices are not themselves effective to confer or oust jurisdiction, but that courts should nevertheless almost always give effect to genuine party choices as a matter of state policy, particularly (in the commercial context) for the sake of 'international trade and commerce'. Party intentions are, in this view, merely a factual connection on which states have decided to rely in determining the forum or the applicable law. There is no real autonomy under this approach, although there is still an expansion of traditional international jurisdictional grounds to accept 'party intentions' alongside territory or nationality as sufficient grounds for jurisdiction in the context of private law disputes and relationships. But it is not clear whether even this expansion provides a convincing explanation of what appears to be state recognition of the autonomy of private parties, rather than a contingent choice by states to give effect to party intentions.

Party autonomy can function in two fundamentally different ways, each of which has a distinct impact on ideas of public international law 'jurisdiction'. As states have accepted and adopted rules of party autonomy, it has sometimes been required that there be an 'objective' connection between the parties or their dispute and the forum or law chosen by the parties in order for that choice to be valid.[191] Under this conception, party autonomy does not function as a new basis of jurisdiction, but rather as a rule of jurisdictional priority.[192] Where more than one state

---

[189] Concluded on 30 June 2005; not yet in force. Available at <http://www.hcch.net/index_en.php?act=conventions.text&cid=98> accessed August 2014.

[190] The most recent version is Prel. Doc. No 6, March 2014, prepared for the attention of the Council of April 2014 on General Affairs and Policy of the Conference. Available at <http://www.hcch.net/upload/wop/gap2014pd06_en.pdf> accessed August 2014.

[191] For example, the Restatement (Second) of Conflict of Laws (1969), s.187(2)(a), provides that the parties' choice need not be given effect if 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice' (although it is unclear whether neutrality might itself be considered a reasonable basis in some circumstances). A similar position was also traditionally adopted in the Uniform Commercial Code in the United States, but see *infra* n 193.

[192] This assumes that the objective connection required for a choice of law or court to be valid is a traditional territorial or personal link, which is generally the case in states which have adopted this approach.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

might have 'jurisdiction' (in the public international sense) on traditional grounds, it is the parties' choice which determines whose jurisdiction prevails – which court gets to hear the case, and which law is applied. Party autonomy is thus defined as a limited choice between those jurisdictional powers recognised by and between states – a position which balances recognition of state sovereignty and individual autonomy.

Other states have not adopted such a restrictive view, and even those states which did initially take a restrictive approach have tended to move away from it.[193] Under the common law and under EU rules, for example, there is no requirement for a connection between the parties or their dispute and the forum or law they have chosen. Article 3 of the Rome I Regulation (2007) and Article 23 of the Brussels I Regulation (2001) are not rules determining priority between other grounds of choice of law or jurisdiction: they trump the general rules of choice of law or jurisdiction based on territorial or personal connections.[194] The same position is adopted in the Draft Hague Principles on Choice of Law in International Commercial Contracts, which expressly state that 'No connection is required between the law chosen and the parties or their transaction.'[195] Under this conception, party autonomy is an *additional* basis of jurisdiction (in the international sense) which supersedes traditional territorial or personal jurisdictional grounds. Such grounds continue to apply, but only in default of party choice. Party autonomy in this view is not merely another accepted basis of jurisdiction, it is a new jurisdictional ground with priority over the others.[196]

Because jurisdiction based on a choice of court agreement thus generally requires no other connection between the parties or their dispute and the state asserting jurisdiction, and a choice of applicable law similarly may be entirely independent of the parties or the subject matter of their dispute, some private international lawyers have traditionally viewed party autonomy as indicating that the only limits on the national

[193] The 2001 revisions to the Uniform Commercial Code removed any requirement for an 'objective connection' for a valid exercise of party autonomy (s.1-301(c)), except in respect of consumer contracts. The change was, however, controversial, has not been universally implemented, and was reversed in 2008 amendments to the Code. See further, e.g., Patrick Joseph Borchers, 'Categorical Exceptions to Party Autonomy in Private International Law' (2008) 82 Tulane Law Review 1645; Dennis Solomon, 'The Private International Law of Contracts in Europe: Advances and Retreats' (2008) 82 Tulane Law Review 1709, 1723ff; Mo Zhang, 'Party Autonomy and Beyond: An International Perspective of Contractual Choice of Law' (2007) 20 Emory International Law Review 511.

[194] While there are some important but narrow limitations which apply to party autonomy – such as Article 3(3) and (4) of the Rome I Regulation (2008), and Article 22 of the Brussels I Regulation (2001) – these do not undermine the general priority of party autonomy over traditional jurisdictional grounds.

[195] Article 2(4).

[196] While this is clearly recognised under the common law and Brussels I Regulation (2001), it is not entirely uncontroversial – as reflected in Article 19 of the Choice of Court Convention (2005), which provides that 'A State may declare that its courts may refuse to determine disputes to which an exclusive choice of court agreement applies if, except for the location of the chosen court, there is no connection between that State and the parties or the dispute.'

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

regulation of private international law are those concerned with private justice or fairness – concerns which are met if the defendant has freely agreed in advance to the jurisdiction or law, even if there are no other objective connections. If a state exercises jurisdiction or applies its law in civil proceedings based purely on consent by the parties, this is difficult to reconcile with the traditional public international law requirement that jurisdiction must be justified by a substantial objective connection, typically territoriality or nationality. Faced with this argument, it might seem that there are only two alternatives: first, rejecting the idea that private international law is about the allocation of regulatory authority between states (denying any connection between public and private international law, thus rejecting the application of public international law jurisdictional rules to civil disputes, leaving them unrestricted except under national law), or second, making (unrealistic) arguments against party autonomy, a response notoriously taken under the First Restatement of Conflict of Laws.[197]

The broader developments in international law examined here provide a simpler explanation. If an acknowledgement is made of an 'individual sovereignty' which is balanced against that of the state, the widespread recognition of party autonomy is clearly compatible with an argument that the foundations of private international law lie in broader international norms.[198] The apparent incompatibility arises only as a result of outmoded conceptions of public international law, which conceive of jurisdiction as purely a matter of (territorial or nationality-based) state rights and powers. Party autonomy provides a further demonstration of an evolution which incorporates the idea of jurisdiction as a matter of individual right. The right to be subject to jurisdiction only in accordance with traditional international law limitations is a right which may be waived, not only by states, but by individuals themselves. Almost universally, states have accepted that individuals may confer adjudicative

---

[197] Under Beale's *First Restatement (Conflicts)* (1934), party autonomy was rejected because otherwise individuals were acting as 'legislators' (a direct rejection of the idea of 'individual sovereignty'). That theory was out of step with practice encouraged scepticism about private international law rules more generally, contributing to the rise of the American 'realist' challenge to private international law (see generally Mills, 'The Identities of Private International Law'). The status of party autonomy in US law remains, however, underdeveloped – choice of forum agreements have generally been approved in respect of federal question or admiralty jurisdiction (*The Bremen v Zapata Off-Shore Co.*, 407 US 1 (1972)), but some state courts remain sceptical, and it is unclear when or whether federal courts exercising diversity jurisdiction ought to follow federal or state law on this question.

[198] The deference to party autonomy in private international law was described as reflecting 'the sovereign will of the parties' by Judge Bustamente in his separate opinion in *Serbian and Brazilian Loans Cases, France v Yugoslavia; France v Brazil* (1929) PCIJ Ser A, Nos 20-21, Judgments 14-15, p.53. Nygh argues that party autonomy itself has the status of a rule of customary international law: Nygh, 'Autonomy in International Contracts', 45. Note the recognition of the affinity between international norms and private international law rules on party autonomy in the resolution of the Institute of International Law on 'The Autonomy of the Parties in International Contracts Between Private Persons or Entities' (1991) (see <http://www.idi-iil.org/idiE/resolutionsE/1991_bal_02_en. PDF> accessed August 2014.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

jurisdiction on a state of their choice, and may also, by making that choice exclusive, detract from the jurisdiction that other states would ordinarily be entitled to assert over them.[199]

These developments are compatible with a view of the international system in which states and individuals are both recognised as, at least to some extent, sovereigns. This is not to say that such individual sovereignty must be unrestricted – the 'sovereignty' of individuals is, no less than that of states, prescribed by law. This does, however, require accepting an active role for individuals in questions of the jurisdictional power of states.

A further fundamental issue concerning party autonomy should be noted, although it is beyond the scope of this article. There is also very widespread agreement among states – principally in the form of the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards – that parties should be free to grant exclusive jurisdiction over their private disputes to *non-state* methods of dispute resolution, such as arbitral tribunals, to the (at least partial) exclusion of state judicial jurisdiction. This development is subject to two contrasting and incompatible readings, each widely adopted and heavily contested. The first is that it simply reflects the acceptance by states of arbitration as a form of alternative dispute resolution, backed up by state courts, but lacking any normative power of its own. The second is the more radical proposition that it implies the acceptance by states of a non-state form of ordering, alongside and competing with national courts – that arbitral tribunals are privately constituted courts, sometimes even applying privately constituted (non-state) private law.[200] This would certainly represent a further challenge to traditional conceptions of jurisdiction, recognising individual party freedom not just between state laws or adjudicative bodies, but beyond them, through the recognition of private (non-state) legal forms of ordering, or of legal pluralism beyond the state.[201] It would also be a serious challenge to the idea that 'jurisdiction' is only concerned with the powers of states, as it would

---

[199] When combined with the idea of access to justice, accepting that parties may generate jurisdictional exclusivity arguably also requires accepting an *obligation* to exercise that exclusive jurisdiction, otherwise no forum will be available to the claimant.

[200] Note the acceptance of a possible choice of non-state law in the Draft Hague Principles on Choice of Law in International Commercial Contracts, Article 3. Although a choice of non-state law is not (currently) permitted under the Rome I Regulation (2008), English courts will recognise and enforce arbitral awards based on non-state law, under the Arbitration Act 1996, s.46; see e.g. *Deutsche Schachtbau- und Tiefbohrgesellschaft mbH at al. v The Government of the State of R'as Al Khaimah and The R'as Al Khaimah Oil Company* ('Rakoil') [1987] 2 All ER, pp. 769-784 (reversed on other grounds at [1990] 1 AC 295); *Channel Tunnel Group Ltd v Balfour Beatty Constructions Ltd* [1993] AC 334; *Musawi v R.E. International (UK) Ltd* [2007] EWHC 2981 (Ch); *Dallah Real Estate & Tourism Holding Co v Pakistan* [2010] UKSC 46.

[201] See generally e.g. Thomas Schultz, *Transnational Legality: Stateless Law and International Arbitration* (OUP 2014); Paul Schiff Berman, *Global Legal Pluralism: A Jurisprudence of Law Beyond Borders* (CUP 2012); Peer Zumbansen, 'Transnational Legal Pluralism' (2010) 1 Transnational Legal Theory 141; Emmanuel Gaillard, *Legal Theory of International Arbitration* (Nijhoff 2010).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

involve accepting not just individual jurisdictional power to choose be-
tween state laws or courts, but jurisdictional power conferred on private
institutions, or exercised by individuals in the creation of private rules. If
it becomes accepted that private parties can make laws with a status equal
to those of states, then there may be little doubt that they possess a form
of sovereignty. Whether this is indeed taking place remains one of the
great contested issues of the international legal order.

## VI.  Conclusions

This article has sought to reconsider the idea of 'jurisdiction' in light of
broader changes in international law, including the emerging influence of
individual rights and powers. Individuals have traditionally been con-
sidered passive objects of international legal regulation, which is
analysed exclusively as a matter of state right or power based principally
on links of territory or personal identity. This approach has been
reflected in domestic rules of jurisdiction as a matter of private interna-
tional law, which similarly have approached jurisdiction principally as a
question of territorial or personal control.

   At both the international and national level, these approaches are under
challenge and ripe for reconceptualisation. Prescriptive and adjudicative
jurisdiction at the international level is, in a variety of contexts, accepted
as a matter of obligation between states rather than state rights – the
approach to jurisdiction needs to be reconceived not merely as a ceiling,
but also as a floor. Even more significantly, in the context of the devel-
opment of ideas of the international delict of 'denial of justice' in relation
to the treatment of foreign nationals, and of the idea of 'access to justice'
in the context of human rights law, there is increasing recognition that
states may owe obligations to exercise prescriptive and particularly adju-
dicative jurisdiction (according to international not domestic standards)
directly to individuals. Some states take the view that access to justice
may even require exercising forum of necessity jurisdiction if no other
forum is available for the claimant, even if there is no connection between
the state and the parties or their dispute which would justify jurisdiction
on traditional grounds. Further, there is widespread recognition that jur-
isdiction may be at least partially conferred on states and withdrawn from
states, by private parties in civil or commercial matters, through the ex-
ercise of party autonomy. All these developments appear to signify a shift
in the status of individuals in relation to jurisdiction at both international
and national levels, from passive objects of international law regulation to
active rights-holders. The rules on jurisdiction in international law
should thus be rethought as concerned not only with state rights but
also with state responsibilities – a combination of state rights, obligations
and prohibitions as well as individual rights which reflects the more
complex reality of modern international law.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

   Of course it remains true that it is states that have recognised these rights and perhaps even conferred them on individuals, and an explanation may be made of this phenomenon in derivative terms which fit within a model of international law in which states retain their traditional position as exclusive sovereigns, and international law is merely concerned with relations between sovereign states – that individuals are, for example, merely exercising the contingently delegated authority of states, which could also be taken away. Courts themselves have often striven to find such explanations, in an effort to accommodate both individual rights and state sovereignty. But the recognition of the individual in international law reflects both the moral strength of individual claims to justice and autonomy and the reality of the power wielded by private actors in protection of their property and interests. In practical terms, it has become difficult for any state wishing to engage with the international community to ignore individual rights of access to justice, or the powers of commercial parties to choose the laws and forums under which their relationships are regulated. Individual personality and autonomy has become entrenched in reality, if not yet entirely in theory. The rules giving effect to choice of law clauses, choice of court agreements, and arbitration agreements may take the form of national or supra-national (for example, EU) laws or treaties, but it hardly seems realistic to suggest that they could be repealed or repudiated given the power and influence of the corporations which rely on these rules (remembering that, at least according to one study, there are more corporations than states in the list of the 100 largest economies in the world[202]), not to mention the arbitration and litigation industries which depend on them. One might be reminded of the character called 'the king' in Chapter 10 of the novella 'Le Petit Prince' by Antoine de Saint Exupéry, who suffers from the delusion that the sun rises and sets each day because (after consulting an almanac) he commands it to do so at the specified time, asserting his 'sovereign' power over it.[203] States may well believe that private parties exercise power only because of their consent, and may even legislate to this effect, but this may not provide an accurate account of where power lies in the global political and legal order. In any event, while there remain points of controversy concerning the limits of party autonomy, there is little or no sense that party autonomy as a principle is merely contingent.

---

[202] Institute for Policy Studies, 'Top 200: The Rise of Corporate Global Power', 4 December 2000, available at <http://www.ips-dc.org/top_200_the_rise_of_corporate_global_power/> accessed 18 August 2014.

[203] '"You shall have your sunset. I shall command it. But, according to my science of government, I shall wait until conditions are favorable."

"When  will that be?" inquired the little prince.

"Hum! Hum!" replied the king; and before saying anything else he consulted a bulky almanac. "Hum! Hum! That will be about–about–that will be this evening about twenty minutes to eight. And you will see how well I am obeyed!"'

These phenomena suggest an important development in the conception of jurisdiction, and the limits of state sovereignty, but one which has received insufficient attention in the international law literature. I have argued that this development indicates a partial acceptance of a 'sovereignty of the individual' in the public and private international law of jurisdiction, and thus perhaps the emergence of a more 'cosmopolitan' conception of sovereignty, which attempts to accommodate the normative value of both state and individual actors. The issues which arise in the context of jurisdiction are in many ways a microcosm of one of the great challenges facing international law – how to move beyond the traditional dominance of states, to the reconciliation of a range of normative interests, from individual, to state, to international society as a whole.

In law, as in science, a theoretical model may only be stretched so far in response to evidence before a paradigm shift occurs, replacing the basic assumptions of the system with a new set of foundational principles.[204] The theme underlying this analysis is that international law is (at least potentially) in the midst of such a shift. Both theoretical models may be broadly feasible at present, but as the recognition of individuals grows in international law and practice, Occam's razor challenges the persuasiveness of the traditional perspective. But descriptive economy is not the only value at stake in choosing a theoretical perspective. Law and the social sciences are fundamentally different from the natural sciences in that the adoption of a theoretical perspective does not merely describe, but may also change its subject. The move from Newtonian to relativistic physics did not change the reality of the world, it simply described it better. But the development of classical international law did not merely describe movements in international relations, it has helped to shape them by shaping the thinking and behaviour of the actors who in turn influenced events. The choice of a theoretical paradigm in law is not only a question of its descriptive accuracy, but also a question of its normative implications.

This leaves us with perhaps the most fundamental question – a question beyond the scope of this article – whether or not the transformation in jurisdiction described in this paper is desirable. Not all change is progress. Enthusiasm for a more 'cosmopolitan sovereignty' must be tempered by the recognition that it comes with the danger that the empowerment of some private actors, particularly corporations, may put at risk the rights of others, or the collective goods traditionally protected by the normative authority of states. Recognising individual jurisdictional powers might embrace not just access to justice for victims of human rights violations, or freedom for individuals to choose which system of law should govern their personal relations, or freedom for companies doing business internationally to choose the most appropriate

---

[204] See most famously Thomas Kuhn, *The Structure of Scientific Revolutions* (University of Chicago Press 1962).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

or efficient legal order to govern their relations, leading to potentially healthy jurisdictional competition. The recognition of jurisdictional autonomy may also provide a means through which individuals or markets evade the regulatory influence of states and the protection of national public interests – concerns which are particularly prevalent in the rights granted to foreign investors (whose complaints are heard by international arbitral tribunals, largely applying international not national law), and in the scope of recognition of party autonomy. 'Liberating the individual from battles between states'[205] may sound virtuous, but liberation may also mean 'regulatory escape'.

   It must also be remembered that the traditional jurisdictional rules of international law were themselves developed with the protection of certain values and interests in mind – for example, to reduce regulatory conflict, for the sake of the peaceful coexistence of states. An increase in the range of jurisdictional grounds in international law might serve the interests of individuals in achieving access to justice, but overlapping jurisdiction between states may also give rise to systemic conflict that outweighs the benefits provided to particular claimants. As Judges Higgins, Kooijmans and Buergenthal noted in their Joint Separate Opinion in the Arrest Warrant Case:

One of the challenges of present-day international law is to provide for stability of international relations and effective international intercourse while at the same time guaranteeing respect for human rights. The difficult task that international law today faces is to provide that stability in international relations by a means other than the impunity of those responsible for major human rights violations.[206]

These are the sorts of difficult decisions which courts and law-makers are increasingly faced with, in the context of the scope of extraterritorial or universal jurisdiction, or balancing freedom of arbitration against national policy interests, or where claims come up against traditional restrictions on jurisdiction such as foreign state immunity. In each case, the concerns of access to justice for individuals square up against concerns of limiting state regulatory power on traditional grounds, to minimise the possibility of regulatory conflict between states, or exercises of jurisdiction which might lead to inefficient resolution of disputes, or even amount to 'neo-colonial' assertions of extraterritorial power.[207] The range of cases and contexts in which these types of

---

[205] To quote from the title of Lehmann, 'Liberating the Individual from Battles Between States: Justifying Party Autonomy in Conflict of Laws'.

[206] *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal, at [5].

[207] These are analogous to the concerns raised in the Separate Opinion of President Guillaume in *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, arguing (at [15]) that universal jurisdiction would 'risk creating total judicial chaos. It would also be to encourage the arbitrary, for the benefit of the powerful, purportedly acting as agent for an ill-defined "international community".'

Case 1:21-cv-11269-FDS   Document 112-1   Filed 01/31/22   Page 116 of 262

problems arise are not a series of isolated and disconnected incidents, but rather like localised 'tremors' which signal pressure points in the slow drift of tectonic plates. If international law is under a process of trans-formation, then more of these types of collisions must be anticipated. The deeper challenge for international lawyers is whether the door can be opened to recognition of the normative authority of individuals without losing sight of the other interests and values, national and inter-national, which have traditionally been protected by the law, and whose protection we may need to preserve.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

# EXHIBIT 3



EDITED BY

STEPHEN
ALLEN

DANIEL
COSTELLOE

MALGOSIA
FITZMAURICE

PAUL
GRAGL

EDWARD
GUNTRIP

# The Oxford Handbook *of*
## JURISDICTION IN
## INTERNATIONAL LAW

OXFORD
UNIVERSITY PRESS

Great Clarendon Street, Oxford, OX2 6DP,
United Kingdom

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and in certain other countries

© The Several Contributors 2019

The moral rights of the authors have been asserted

First Edition published in 2019

Impression: 1

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the
prior permission in writing of Oxford University Press, or as expressly permitted
by law, by licence or under terms agreed with the appropriate reprographics
rights organization. Enquiries concerning reproduction outside the scope of the
above should be sent to the Rights Department, Oxford University Press, at the
address above

You must not circulate this work in any other form
and you must impose this same condition on any acquirer

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America

British Library Cataloguing in Publication Data
Data available

Library of Congress Control Number: 2019941381

ISBN 978–0–19–878614–6

Printed and bound by
CPI Group (UK) Ltd, Croydon, CR0 4YY

Links to third party websites are provided by Oxford in good faith and
for information only. Oxford disclaims any responsibility for the materials
contained in any third party website referenced in this work.

CHAPTER 14

........................................................

# PRIVATE INTERESTS AND PRIVATE LAW REGULATION IN PUBLIC INTERNATIONAL LAW JURISDICTION

........................................................

## ALEX MILLS

|     |                                                                                |     |
| --- | ------------------------------------------------------------------------------ | --- |
| I.  | The State-Centric and Public Law Focus of Jurisdiction                         | 331 |
| II. | Traditional Jurisdictional Grounds: Territoriality, Nationality, Universality   | 332 |
| III.| Private Interests in Public Law Regulation                                      | 336 |
| IV. | Private Law Regulation                                                          | 337 |
|     | IV.1. Private Interests in Private Law Regulation                               | 340 |
|     | IV.2. The Separation of Adjudicative and Prescriptive Jurisdiction              | 344 |
|     | IV.3. Additional Connecting Factors                                            | 349 |
|     | IV.4. Techniques to Manage Potentially Conflicting Regulation                   | 351 |
| V.  | Conclusions                                                                    | 354 |

# I. The State-Centric and Public Law Focus of Jurisdiction

This chapter responds to two related but distinct limitations of the dominant accounts of the modern law of jurisdiction. The first is that most discussion of jurisdiction is situated within the classical framework of international law under which states are the only actors. Jurisdiction is, in this conception, only about inter-state relations—a matter of defining the limits on state regulatory power, based principally on territorial or personal connecting factors (as outlined in Section II of this chapter). Within those limits, the exercise of that power is viewed as a matter of state discretion. Consequentially, the constraints on jurisdiction are enforced through inter-state processes, such as state protests against excesses of jurisdiction by other states. The law of jurisdiction does not therefore account for private actors and their interests. Jurisdiction is naturally focused on states and their regulatory powers, as it provides in turn for regulation of those powers (i.e. international regulation of national regulation). It is however striking that some of the 'objects' of that regulation—private parties—are missing from traditional accounts of the law, although they are now widely recognized as 'subjects' of international law, at least for certain purposes.[1] This lacuna is discussed further in Sections III and IV of this chapter.

The second is that questions of private law have been generally marginalized in modern discussions of the law of jurisdiction, as the focus has instead been on criminal and other public regulatory law. It has sometimes been questioned whether private law regulation is actually subject to public international law jurisdictional constraints at all.[2] This is regrettable, because it means that public international lawyers have tended to underestimate the significance of private law regulation, and thus of the public international law regulation of that regulation. Private law jurisdictional questions should receive greater attention for three reasons. First, they are undoubtedly significant not only for private actors themselves, but for the public interests which they engage. The regulation of contracts is, for example, not just about bilateral bargains, but also provides the basis for the global financial arrangements which underpin (and occasionally undermine) the functioning of the global economy. Claims in tort may, to give another example, not only regulate behaviour as an alternative to criminal law, but may also determine public resource allocation (where private compensation is not available, public support such as national healthcare may have to provide), and may further be relied on to enforce and protect public norms such as human rights. The second reason why private law regulation should receive greater attention is that it highlights some of the most important

---

[1]  See generally e.g. Kate Parlett, *The Individual in the International Legal System* (Cambridge University Press, 2011); Jean D'Aspremont (ed.), *Participants in the International Legal System: Multiple Perspectives on Non-State Actors in International Law* (Abingdon: Routledge, 2011).

[2]  See e.g. Michael Akehurst, 'Jurisdiction in International Law', *British Yearbook of International Law* 46 (1972–3): 145, 177, 182; for further examples see e.g. F. A. Mann, 'The Doctrine of Jurisdiction in International Law', in *Studies in International Law* (Oxford: Clarendon Press, 1973), 14.

general issues of the law of jurisdiction, as discussed in Section IV of this chapter, including but not limited to the potential influence of private interests. The third reason is that private law regulation raises some distinctive jurisdictional issues, and potentially offers some distinctive solutions, also as discussed in Section IV. In a private law context, for example, the courts of one state may apply the substantive law of another state, thus separating the questions of adjudicative and prescriptive jurisdiction. In relation to both adjudicative and prescriptive jurisdiction, a proliferation of connecting factors has also been recognized in the private law context, as has a further range of techniques to manage the potential for conflicting regulation.

## II. Traditional Jurisdictional Grounds: Territoriality, Nationality, Universality

The traditional law of jurisdiction needs relatively little introduction here.[3] A clear preliminary distinction must be drawn between prescriptive jurisdiction (application of law)[4] and enforcement jurisdiction (exercise of coercive power),[5] the latter being strictly territorial in the absence of consent or a special permissive rule. Adjudicative jurisdiction, often posited as a third mode of exercise of regulatory power,[6] involves elements of both prescription and enforcement, and will be an important focus of later analysis in this chapter. The law on prescriptive jurisdiction has traditionally focused on the identification of connecting factors between the regulating state and the object of its regulation, principally based on territoriality and nationality (a state may apply its law to any person or event in its territory, and may also apply its law extraterritorially to its nationals and potentially to events causing harm to its nationals). The existence of such limits reflects a recognition that sovereign states coexist in the international legal order and thus that an exercise of jurisdiction which relates to a person or event in another state's territory requires particular justification. Universal jurisdiction has also increasingly been recognized as a feature of certain aspects of international law, focused primarily on regulation of international crimes, where states have collectively (through the formation of customary

---

[3] See also e.g. Alex Mills, 'Rethinking Jurisdiction in International Law', *British Yearbook of International Law* 84 (2014): 187; Christopher Staker, 'Jurisdiction', in Malcolm D. Evans (ed.), *International Law*, 4th edn (Oxford University Press, 2014); F. A. Mann, 'The Doctrine of Jurisdiction Revisited after Twenty Years', *Recueil des Cours* 186 (1984): 19; Mann (n. 2).

[4] This may be exercised by any law-making body, which may include the legislature, judiciary, or executive. See e.g. Restatement (Fourth) of Foreign Relations Law, § 401 (Comment).

[5] See e.g. *ibid.*, § 432.

[6] See e.g. *ibid.*, §§ 421–3. The Restatement (Fourth) of Foreign Relations Law takes the (controversial) new position that 'With the significant exception of various forms of immunity, modern customary international law generally does not impose limits on jurisdiction to adjudicate' (Part IV, Chapter 2, Introductory Note). This is discussed further in Section IV of this chapter.

international law or through treaty practice) accepted that the interests of ending impunity outweigh the need for traditional regulatory constraints.[7] States generally comply with these limits in one of two ways. First, through express limits adopted as part of legislation—a criminal statute may state, for example, that it is an offence to commit murder in the territory, or for a national of the state to commit murder anywhere in the world.[8] Second, where statutory presumptions are relied on to equivalent effect, such as the presumption against extraterritoriality[9] or the more expansive presumption against extra-jurisdictionality[10] (which may encompass extraterritorial regulation where permitted under international law rules of jurisdiction).[11] An exercise of jurisdiction beyond recognized limits would constitute an internationally wrongful act.

Within the boundaries of these limits or justifications, both prescriptive and enforcement jurisdiction have been approached traditionally as a question of state discretionary power, reflecting a state's sovereign control over the exercise of its regulatory authority. It has, however, also been recognized as part of international law that states must comply with a minimum standard of treatment in relation to foreign nationals in their territory.[12] This provides a constraint not only on how jurisdiction may be exercised, but also on *whether* jurisdiction may be exercised. It may, for example, be a denial of justice if the perpetrator of a crime against a foreign national in a state's territory is not arrested, or goes unpunished, or (arguably) if fundamental harmful acts against a foreign national are not criminalized at all.[13] Thus in at least some circumstances a failure to exercise enforcement, adjudicative or prescriptive jurisdiction may also constitute an internationally wrongful act. An example of the various elements of this traditional framework of jurisdiction is represented diagrammatically in Figure 14.1.

It is a feature of this framework that it readily accepts some possibility of overlapping and conflicting exercises of prescriptive jurisdiction. This is possible even within the domain of territorial jurisdiction, as a wrongful act committed in one territory which causes direct harm in another territory may give rise to territorial jurisdiction in each state. The possibility of conflicting prescriptive jurisdiction is further multiplied by

---

[7] See generally e.g. Roger O'Keefe, 'Universal Jurisdiction: Clarifying the Basic Concept', *Journal of International Criminal Justice* 2 (2004): 735; Restatement (Fourth) of Foreign Relations Law, § 413.

[8] See e.g. Offences Against the Person Act 1861 (UK), s. 9.

[9] See e.g. *Morrison v National Australia Bank*, 561 US 247 (2010); Restatement (Fourth) of Foreign Relations Law, § 404.

[10] In this context, meaning a presumption that a law does not exceed international law's jurisdictional limitations. See e.g. John H. Knox, 'A Presumption against Extrajurisdictionality', *American Journal of International Law* 104 (2010): 351; Restatement (Fourth) of Foreign Relations Law, § 406.

[11] See e.g. *Alexander Murray, Esq. v Schooner Charming Betsy*, 6 US 64 (1804); *The Appollon*, 22 US 362, 370 (1824) ('however general and comprehensive the phrases used in our municipal laws may be, they must always be restricted in construction to places and persons, upon whom the legislature has authority and jurisdiction').

[12] See generally e.g. Martins Paparinskis, *The International Minimum Standard and Fair and Equitable Treatment* (Oxford University Press, 2013).

[13] See e.g. Jan Paulsson, *Denial of Justice in International Law* (Cambridge University Press, 2005); Francesco Francioni, 'Access to Justice, Denial of Justice and International Investment Law', *European Journal of International Law* 20 (2009): 729.



- French criminal injures German victim
- UK courts prosecute
- If UK courts have no recognised basis of jurisdiction, breach of international law in respect of France
- If UK courts have jurisdiction and refuse to exercise, may be breach of international law in respect of Germany

FIGURE 14.1  Traditional framework of jurisdiction

the existence of nationality-based jurisdiction, which may alternatively be based on the nationality of the defendant (active personality) or, slightly more controversially, the victim (passive personality). An even further possibility for overlapping regulation arises in relation to universal jurisdiction, although the possibility of conflicting regulation is diminished by the fact that this only arises in respect of internationally recognized crimes. Such jurisdictional overlaps are limited principally (but often ineffectively) by the rule that territoriality is the exclusive basis of enforcement jurisdiction. The state which controls the exercise of power over the person or property subject to exercises of prescriptive jurisdiction may thus ultimately be in the primary position to give effect to its criminal law. For legal or natural persons with property in more than one territory, however, the possibility of enforcement against their assets may render them effectively subject to the prescriptive jurisdiction of multiple states. A 'rule of reasonableness' has also been proposed (e.g. in the US Restatement (Third) of Foreign Relations Law,[14] and in a more developed form in the work of Cedric Ryngaert[15]) as a limitation on the exercise of prescriptive jurisdiction, requiring that it take into consideration the relative strengths of the connections which the issue has with different states. This is, however, not widely accepted to form part of current international law on jurisdiction, and in the Restatement (Fourth) of Foreign Relations Law has been downgraded to 'a matter of prescriptive comity'.[16]

---

[14]  Restatement (Third) of Foreign Relations Law, § 403.

[15]  Cedric Ryngaert, *Jurisdiction in International Law*, 2nd edn (Oxford University Press, 2015).

[16]  Restatement (Fourth) of Foreign Relations Law, § 405.

The limited recognized grounds of jurisdiction have traditionally served as a significant constraint on state regulation. However, two developments suggest that the existence of only limited possibilities for regulation beyond a state's own territory may be failing to fulfil this function. The first is the rise in what may be called 'extra-territorial projection', where territorial regulation is relied on to project the effect of regulation extraterritorially.[17] For example, a state may condition entry of goods into its territory on the state of origin's compliance with human rights law, environmental regulation, or labour standards. The regulation is territorial, but its effect is not—and thus public international law does not constrain a state from leveraging its economic influence to regulate matters which do not occur on its territory or involve its nationals. The primary concern here is perhaps not so much the increasing prospect of conflicting regulation, but the potential for international jurisdictional rules to be complicit in economic coercion—however well-intentioned much of it may be. The second development is the rise in cross-border activity which may engage numerous territorial connections. This includes a wide variety of commercial and non-commercial activity, but perhaps the most prominent example is conduct on the internet.[18] Despite initial idealistic conceptions of the internet as a 'free zone' beyond state regulatory control, it is instead becoming a site of over-regulation, as even territorially targeted state laws impacting on online activity will frequently have global implications. In some cases, this may lead to conflicting regulatory policies, as, for example, the free-speech rights favoured by one state are diminished by the limitations on free speech imposed by another.[19] In unusual cases, it may even lead to directly contradictory regulation. The US Supreme Court was, for example, recently faced with deciding whether a search warrant issued in New York against Microsoft should extend to emails held on servers in Ireland.[20] The case was rendered moot by the US enactment of the Clarifying Lawful Overseas Use of Data Act (CLOUD Act),[21] to provide expressly that the relevant orders may have extraterritorial effect. Microsoft and other similar cloud service providers are thus potentially in the unenviable position of having to choose between breaching US criminal law or EU data protection law.[22]

[17]  See further e.g. Alex Mills, 'Private International Law and EU External Relations: Think Local Act Global, or Think Global Act Local?', *International and Comparative Law Quarterly* 65 (2016): 541; Joanne Scott, 'Extraterritoriality and Territorial Extension in EU Law', *American Journal of Comparative Law* 62 (2014): 87; Joanne Scott, 'The New EU "Extraterritoriality"', *Common Market Law Review* 51 (2014): 1343.

[18]  See generally e.g. Dan Jerker B. Svantesson, *Solving the Internet Jurisdiction Puzzle* (Oxford University Press, 2017).

[19]  See e.g. Alex Mills, 'The Law Applicable to Cross-Border Defamation on Social Media: Whose Law Governs Free Speech in "Facebookistan"?', *Journal of Media Law* 7 (2015): 1, 19.

[20]  *United States v Microsoft Corp.*, 584 US (2018).

[21]  Pub. L. 115–141, amending the Stored Communications Act, 18 USC 2701.

[22]  See further e.g. the various *amicus* briefs available at http://www.scotusblog.com/case-files/cases/united-states-v-microsoft-corp/.

Distinct questions may also be raised about the continuing utility of nationality as a basis for the extraterritorial exercise of jurisdiction. It raises legitimacy concerns, as a national of one state who has long lived in another state may not be able to participate in the law-making processes to which they are subject (e.g. they may be unable to vote in the elections of their state of nationality).[23] It also presents interpretive problems for corporate entities whose place of 'legal foundation' may not reflect the reality of their activities, although the complementary exercise of territorial jurisdiction may present at least a partial response to these concerns. These issues are discussed further below.

# III.  Private Interests in Public Law Regulation

As noted herein, a defining feature of modern international law is that it is no longer just the law which applies between states, but also the law of individual rights which may be opposable to states, including but not limited to human rights. States are under obligations not just to respect rights, but to protect them and to provide for their fulfilment through domestic law.[24] These developments have a direct impact on questions of jurisdiction, particularly (but not only) in an adjudicative context in which the exercise of prescriptive jurisdiction is actualized through an exercise of enforcement jurisdiction. For an accused perpetrator of a crime, for example, the exercise of jurisdiction may be affected by rights of due process[25] and the principle of legality—including the requirement that it be readily ascertainable in advance which law will govern conduct, which may reinforce jurisdictional limits.[26] For a victim of crime, the exercise of adjudicative and enforcement jurisdiction by a state over the accused perpetrator may be mandated by rights of access to justice.[27] More generally, the obligation on states to protect human rights requires a broad exercise of prescriptive jurisdiction. A state could only be compliant with its obligations to protect human rights through the use of criminal law (and possibly, as discussed later, civil law) to prohibit and punish violations of human rights, particularly given the requirements of the principle of legality.

[23]  See e.g. discussion in *Shindler v Chancellor of the Duchy of Lancaster* [2016] EWCA Civ. 469, in relation to UK non-resident voting rules and the Brexit referendum.

[24]  See e.g. http://www.ohchr.org/EN/Issues/Pages/WhatareHumanRights.aspx; http://www.un.org/en/sections/universal-declaration/foundation-international-human-rights-law/index.html ('Through ratification of international human rights treaties, Governments undertake to put into place domestic measures and legislation compatible with their treaty obligations and duties. The domestic legal system, therefore, provides the principal legal protection of human rights guaranteed under international law.').

[25]  See e.g. International Covenant on Civil and Political Rights, Art. 14.

[26]  See further analysis in Kimberley N. Trapp, Ch. 15 of this Handbook.

[27]  See generally e.g. Francesco Francioni, *Access to Justice as a Human Right* (Oxford University Press, 2007); *Golder v United Kingdom* (4451/70) [1975] 1 EHRR 524; see further discussion in Mills (n. 3).



- French criminal injures German victim
- UK courts prosecute
- UK may owe obligations of due process to criminal and access to justice to
  victim which restrict or require the exercise of jurisdiction

**FIGURE 14.2** Jurisdictional framework—impact of private actors

The key point for present purposes is that these rights, and the recognition of individual agency in international law, complicate the dynamics of an exercise of jurisdiction. Instead of jurisdiction being purely a matter of state discretion, with the sole interests under consideration being those of other states, the exercise of jurisdiction is affected by the interests of a variety of private actors, both in terms of compelling jurisdiction and imposing additional jurisdictional constraints. An illustrative example of this dynamic is represented diagrammatically in Figure 14.2.

This dynamic has a particularly significant impact on the exercise of jurisdiction in relation to private law matters, as discussed in the following section.

## IV. Private Law Regulation

A further problematic feature of most modern accounts of the law of jurisdiction in international law is the exclusion or at least the marginalization of private law regulation. This is problematic for a number of reasons. As discussed earlier, it is normatively undesirable because private law rules may be important forms of state regulation. The marginalization of these rules has left public international lawyers relatively blind to the significance of private law, although this has undoubtedly changed in recent years.[28]

---

[28] See further generally e.g. Duncan French, Kasey McCall-Smith, and Veronica Ruiz Abou-Nigm (eds.), *Linkages and Boundaries in Private and Public International Law* (Oxford: Hart, 2018).

The exclusion of matters of private law from public international regulatory constraints would also be inconsistent with state practice. Although states intervene in particular private law disputes relatively infrequently, this does not establish a lack of state interest in private law regulation in general. Such an interest is indeed demonstrated by state interventions in some important private law cases. Perhaps the most significant recent example is the well-known *Kiobel v Royal Dutch Petroleum* litigation in the US Supreme Court, relating to the interpretation of the Alien Tort Claims Act.[29] Although the proceedings were purely between private actors, several state (or quasi-state) actors intervened, including the European Commission (on behalf of the European Union) and (jointly) the United Kingdom and the Netherlands.[30] While these submissions diverged on certain points (as noted later), they each adopted as a starting premise that the exercise of adjudicative jurisdiction by states in matters of private law is regulated by the same general constraints which apply in matters of public law—the need, absent exceptional circumstances, for a recognized connection (such as a territorial or nationality-based link) to justify the exercise of adjudicative jurisdiction. It is a matter of great regret that the recent Restatement (Fourth) of Foreign Relations Law in the United States appears to has departed from the approach previously recognized under US law, and suggests that customary international law does not constrain the exercise of adjudicative jurisdiction at all.[31] In the context of private law regulation, states generally do not give effect to these limitations through reliance on express statutory provisions as to scope or through statutory presumptions (which, as noted earlier, they typically do in the context of public law regulation). Instead, rules of private law are generally themselves silent on their scope of application, which is instead determined through application of rules of private international law, as discussed later in this chapter.

A further reason why private law matters should not be excluded from the scope of public international law jurisdictional regulation is that this would be historically anomalous. Private law regulation has in fact played an important role in the historical development of the international law of jurisdiction, including through the close historical connection between public and private international law. Both public and private international law developed over the course of centuries as part of a single 'law of

---

[29] *Kiobel v Royal Dutch Petroleum Co.*, 133 S. Ct 1659 (2013).

[30] All *amicus curiae* briefs are available at http://www.scotusblog.com/case-files/cases/kiobel-v-royal-dutch-petroleum/.

[31] See e.g. the recent discussion in http://opiniojuris.org/2018/02/26/u-s-v-microsoft-microsoft-ireland-implications-for-international-lawmaking/ and http://opiniojuris.org/2018/03/08/the-customary-international-law-of-jurisdiction-in-the-restatement-fourth-of-foreign-relations-law/. See further Austen Parrish, 'Judicial Jurisdiction: The Transnational Difference', *Virginia Journal of International Law* 59 (forthcoming, 2019). The Restatement approach appears to be premised on the outdated assumption that the exercise of jurisdiction is permitted unless a specific prohibition can be identified—see Mills (n. 3). It might instead have been asked: is there state practice and *opinio juris* to support the claim that states can exercise adjudicative jurisdiction in the absence of any connection to the dispute? This is evidently not the case—as discussed later, states do not assert such jurisdiction (setting aside claims of universal civil jurisdiction arising from international crimes), although the range of connecting factors on which states rely in the context of private law disputes is broader than those commonly recognized in criminal law.

nations', reflecting the key principles of international social organization based on personal/tribal loyalties (reflected in the role of nationality in modern law) as well as territorial state power.[32] In the fifteenth century, for example, the 'statutists'[33] had already articulated what for them an exhaustive account of the possible forms of exercise of state regulatory power—operating territorially over all persons regardless of nationality, or operating personally over all nationals regardless of their location. These coexisting territorial and personal conceptions of state regulatory authority formed the basis of modern (public and private) international law[34] through the lineage of Ulrik Huber in the seventeenth century and his powerful influence on Joseph Story in the nineteenth century.[35] Although the modern international law of jurisdiction has focused on public law, this was never intended to exclude private law regulation from jurisdictional constraints.[36] One possible explanation for the marginalization of private law issues in the modern law on jurisdiction is that it is a consequence of the focus of the highly influential[37] 1935 Harvard Draft Convention (itself influenced by preparatory work carried out by the League of Nations Codification Committee) exclusively on criminal law.[38] However, the justification for this decision was not any uncertainty as to the international regulation of private law matters, but rather the parallel consideration of aspects of private international law in both the League of Nations Codification Committee and other fora.[39]

[32] See further e.g. Martti Koskenniemi, 'Expanding Histories of International Law', *American Journal of Legal History* 56 (2016): 104; Ryngaert (n. 15); Alex Mills, *The Confluence of Public and Private International Law* (Cambridge University Press, 2009), ch. 2; Alex Mills, 'The Private History of International Law', *International and Comparative Law Quarterly* 55 (2006): 1.

[33] A group of legal scholars who offered an early response to the question of what jurisdictional effect a statute should have—generally, they classified statutes into two categories, the first being territorial in application, and the second being personal and thus attaching to a citizen regardless of territorial location. See further discussion in Mills, *Confluence* (n. 32) and Mills, 'The Private History of International Law' (n. 32).

[34] See e.g. Georg Friedrich von Martens, *The Law of Nations*, 4th edn (London: William Cobbett, 1829), book III, ch. III (examining both public and private international law questions).

[35] See e.g. Joseph Story, *Commentary on the Conflict of Laws* (Boston: Hilliard, Gray and Co., 1834), s. 7. It is unclear whether Huber adopted a purely territorialist approach to state regulation—it might be argued that he recognized both territorial and nationality based prescriptive jurisdiction, but only territorial enforcement jurisdiction, consistent with modern law.

[36] See e.g. Joseph H. Beale, 'The Jurisdiction of a Sovereign State', *Harvard Law Review* 36 (1923): 241.

[37] For criticism of this influence see Dan Jerker B. Svantesson, 'A New Jurisprudential Framework for Jurisdiction: Beyond the Harvard Draft', *American Journal of International Law* 109 Unbound (2015): 69.

[38] The full title of the draft is the Draft Convention on Jurisdiction with Respect to Crime: see *American Journal of International Law* 29 Supp. 1 (1935): 439. The Convention drew on the work of the League of Nations Committee of Experts for the Progressive Codification of International Law, which examined both public and private international law topics, but did so separately. For the work of the Committee on jurisdiction, see League of Nations Committee of Experts for the Progressive Codification of International Law, 'Criminal Competence of States in Respect of Offences Committed Outside their Territory', *American Journal of International Law* 20 Supp. (1926): 252.

[39] See e.g. 'First Session of the Committee of Experts for the Progressive Codification of International Law', *American Journal of International Law* 20 Supp. (1926): 12.

## IV.1.   Private Interests in Private Law Regulation

The exercise of jurisdiction in the context of private law is affected by many of the same considerations which complicate the modern law of jurisdiction in public law, as discussed earlier. For example, the exercise of adjudicative jurisdiction may be restricted by considerations of (respondent) rights of due process. Although these are most commonly considered to affect the procedures through which jurisdiction is exercised (such as requiring sufficient notice to be given a defendant)[40] rather than the exercise of jurisdiction itself, US courts have long conceptualized US constitutional due process constraints as affecting whether adjudicative jurisdiction can be exercised by US states in civil matters at all,[41] and this reasoning could be applied by analogy at the international level based on equivalent human rights constraints. Conversely, the exercise of adjudicative jurisdiction may be positively affected by (claimant) rights of access to justice and the doctrine of denial of justice as part of the minimum standard of treatment under international law. The establishment of private law rights, and the exercise of civil jurisdiction which actualizes these rights, may be as much a matter of obligation in international law as equivalent public law rights and their enforcement. As a consequence, the exercise of public international law jurisdiction in the context of private law may equally be a matter of obligation rather than discretion for states. This might evidently also have an impact on national law doctrines, particularly those relating to adjudicative jurisdiction which (i) present the exercise of jurisdiction as a matter of discretion, or (ii) provide for grounds on which jurisdiction might not be recognized or exercised (such as immunities or the act of state doctrine).

In relation to the first issue, the English courts have long taken into account the rights of access to justice of a claimant as part of the discretionary *forum conveniens* and *forum non conveniens* tests under the expansively defined common law rules on civil jurisdiction. Permission will be given to commence English proceedings (or a stay of English proceedings will be refused), even if the case has relatively minimal connections with England, where the claimant would be denied justice if denied access to the courts.[42] English domestic law has thus evolved consistently with the international developments discussed earlier, and recognizes that it may be necessary to exercise jurisdiction to give effect to the rights of claimants.

A recent illustration of the second issue is provided by the *Benkharbouche* litigation in the UK Supreme Court, which arose from employment claims relating to the Embassies

---

[40] See e.g. Regulation (EU) No. 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast), OJ L 351/1 ('Brussels I Regulation Recast'), Art. 45(1)(b).

[41] Although this influence declined over the course of the twentieth century: see e.g. Alex Mills, 'Federalism in the European Union and the United States: Subsidiarity, Private Law and the Conflict of Laws', *University of Pennsylvania Journal of International Law* 32 (2010): 369, 442 *et seq*. See further Restatement (Fourth) of Foreign Relations Law, § 422.

[42] See generally e.g. *The Spiliada* [1987] AC 460; *The Vishva Ajay* [1989] 2 Lloyd's Rep. 558; *Connelly v RTZ* [1998] AC 854; *Vedanta v Lungowe* [2019] UKSC 20.

of Sudan and Libya in London.[43] The question in this case was whether the UK courts could grant immunity to the defendants, giving effect to the terms of the State Immunity Act 1978, in a claim brought to vindicate rights under EU and UK employment law. The Supreme Court held that the claimants' rights of access to justice under the European Convention on Human Rights (ECHR) required that immunity be granted only to the extent required under international law, and (in respect of the claims based on EU law) set aside the State Immunity Act to the extent that it provided for greater immunity than international law mandates.[44] An evident premise behind this decision is that, under the influence of human rights law, it was the non-exercise of jurisdiction which required justification, rather than the exercise of jurisdiction being a matter of discretion (as in the traditional account of jurisdiction). The Court specifically held that despite the structure of the State Immunity Act (which presumes immunity unless an exception applies), under customary international law the position is that no immunity exists except where there is a rule requiring it. In civil proceedings brought pursuant to employment law, falling outside the scope of state sovereign activity, no such immunity applied, and the rights of access to justice of the claimants were held to compel the exercise of state adjudicative jurisdiction.

Thus far the case law on these issues has focused on the question of whether adjudicative jurisdiction which is provided for under national law should be exercised, where that jurisdiction is a matter of discretion or where potential immunities might prevent its exercise. A major issue which remains untested is whether rights of access to justice under international law might in some circumstances require the expansion of existing grounds of adjudicative jurisdiction. Although the question is somewhat hypothetical, there seems little cause to doubt that a legal system which did not provide for widely recognized territorial grounds of jurisdiction (such as jurisdiction over torts committed in its territory) would not be considered to meet its human rights obligations of access to justice for claimants, at least under the broadly constructed ECHR conception of those obligations. There are, however, a wide variety of approaches to civil jurisdiction under national legal systems, and it is very difficult to identify which jurisdictional grounds might be considered matters of international obligation. The continuing work of the Hague Conference on Private International Law in preparing a treaty on recognition and enforcement of civil judgments, which also involves articulating internationally standardized grounds of civil jurisdiction, has the potential to be a highly influential source in this respect.[45]

A further unresolved question is whether rights of access to justice for claimants might require the exercise of jurisdiction in the absence of recognized territorial or

---

[43] *Benkharbouche v Secretary of State for Foreign and Commonwealth Affairs* [2017] UKSC 62.

[44] The power to set aside the Act derived from the status of the Charter of Fundamental Rights as EU Treaty law. The claim also concerned rights which were not based on EU law—for those, the court made a declaration that the State Immunity Act 1978 was incompatible with human rights, pursuant to the Human Rights Act 1998.

[45] See https://www.hcch.net/en/projects/legislative-projects/judgments.

personal connections in some circumstances. This question is frequently framed in two distinct forms, which are very closely related but may give rise to distinct consequences.[46] The first is the idea of a 'forum of necessity' rule of jurisdiction, under which a court may hear a claim despite the absence of a traditional jurisdictional justification where no other forum is available to the claimant, potentially subject to conditions which establish that the forum has some interest in the dispute (such as a connection with the claimant). Such a rule exists, for example, as part of the law of a number of EU Member States.[47] The second is the concept of 'universal civil jurisdiction', which equally recognizes that adjudicative jurisdiction may be exercised, at least in certain circumstances, in the absence of traditional jurisdictional justifications,[48] although usually subject to the exhaustion of potential remedies in courts with traditional jurisdictional links. One difference between these two approaches is that those advocating a forum-of-necessity rule tend to view it as a general rule of jurisdiction, giving effect to claimant rights of access to justice which apply regardless of the substantive nature of their claim, while those advocating a rule of universal civil jurisdiction tend to view it as justified by the nature of the substantive proceedings, and thus limited to civil claims arising out of the most serious international wrongs, such as torture. It may, for example, be argued that such claims should not be subject to the usual jurisdictional constraints because a state is not exercising its own prescriptive jurisdiction but rather acting on behalf of internationally agreed norms.[49] The *amicus* brief of the European Commission in the *Kiobel* case gave its support to a rule of universal civil jurisdiction, 'but only when the conduct at issue could also give rise to universal criminal jurisdiction'.[50] It should be noted that this received much more limited support in the joint brief of the United Kingdom and the Netherlands, despite the fact that the Netherlands actually has a forum-of-necessity law under which jurisdiction may be exercised in the absence of traditional connections (as the brief acknowledged).[51]

States Parties to the Convention against Torture are subject to an obligation to provide civil remedies to victims of torture, which would necessitate the exercise of prescriptive jurisdiction and the provision of a basis of adjudicative jurisdiction which can be invoked by such victims.[52] The Committee against Torture has consistently but controversially

---

[46]  See further Mills (n. 3), 225.

[47]  See *ibid*., 222 *et seq*.; Arnaud Nuyts, 'Study on Residual Jurisdiction: General Report' (2007), 64 *et seq*., http://ec.europa.eu/civiljustice/news/docs/study_residual_jurisdiction_en.pdf.

[48]  See e.g. Donald Francis Donovan and Anthea Roberts, 'The Emerging Recognition of Universal Civil Jurisdiction', American Journal of International Law 100 (2006): 142.

[49]  See e.g. the *amicus* brief of Argentina in the *Kiobel* litigation, http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs/10-1491_petitioneramcugovtofargentinerepublic.pdf.

[50]  Seehttps://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs/10-1491_neither_amcu_eu.authcheckdam.pdf, 4.

[51]  Dutch Code of Civil Procedure, Art. 9.

[52]  Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984), Art. 14(1).

expressed the view that this obligation applies regardless of where the torture is committed, at least in the absence of compensation from the courts of the territorial state,[53] which would appear to necessitate a basis of universal civil jurisdiction (in parallel with the uncontroversial basis of universal criminal jurisdiction in the Convention). The United Kingdom[54] and the United States[55] have long resisted the idea that their courts are under any obligation to ensure compensation for victims of torture committed outside their territory. The United States has, however, given its courts the power to do so (subject to exhaustion of local remedies) through the Torture Prevention Act 1991,[56] apparently taking the view that universal civil jurisdiction may be exercised as a matter of right rather than obligation. Practice on these points however is limited, controversial, and presently inconclusive in determining whether international law requires or even permits the exercise of universal civil jurisdiction, in the context of torture or otherwise.[57] The collective international interest in ending criminal impunity, which has been recognized to establish universal criminal jurisdiction, would not necessarily justify an equivalent collective interest in ensuring civil redress to victims of international crimes. It is open to argument whether an equivalent collective interest exists in ensuring that those would conduct or authorize torture face the civil consequences of their wrongdoing.

To this point, the issues raised by exercises of civil jurisdiction closely parallel those raised by exercises of criminal jurisdiction or other forms of public law power. Although in the exercise of criminal jurisdiction the victim is not a party to the proceedings, their rights of access to justice may nevertheless affect the exercise of jurisdiction in the same way as the rights of a claimant in civil proceedings. The analysis of an exercise of jurisdiction is, however, more complicated in the private law context than in the public law context, for three main reasons examined in turn below: (1) the separation of adjudicative jurisdiction and prescriptive jurisdiction; (2) the use in practice of additional connecting factors which go beyond or hybridize personal and territorial connections; and (3) the development of a range of distinctive techniques to limit overlapping exercises of jurisdiction.

---

[53] See e.g. General Comment No. 3 of the Committee against Torture, 19 November 2012, UN Doc. CAT/C/GC/3. In support of this view see e.g. Christopher Keith Hall, 'The Duty of States Parties to the Convention against Torture to Provide Procedures Permitting Victims to Recover Reparations for Torture Committed Abroad', *European Journal of International Law* 18 (2007): 921.

[54] See e.g. the recent discussion in *Belhaj v Straw* [2017] UKSC 3; *Jones v Saudi Arabia* [2006] UKHL 26.

[55] The US made a declaration at the time of ratification of the Convention, providing (*inter alia*) 'That it is the understanding of the United States that article 14 requires a State Party to provide a private right of action for damages only for acts of torture committed in territory under the jurisdiction of that State Party.'

[56] 28 USC, § 1350.

[57] An obligation to exercise universal civil jurisdiction in the context of torture was, however, recently rejected in a Grand Chamber decision of the European Court of Human Rights, *Nait-Liman v Switzerland*, App. No. 51357/07 (15 March 2018), although with a note that 'given the dynamic nature of this area, the Court does not rule out the possibility of developments in the future' (at [220]).

18

## IV.2.  The Separation of Adjudicative and Prescriptive Jurisdiction

Absent some highly unusual arrangement, it has long been accepted (although under occasional academic protest) that in matters of public law a national court always applies its own law.[58] To put this another way, in criminal and other public law cases when a court exercises adjudicative jurisdiction it is also actualizing the exercise of prescriptive jurisdiction by the forum state, giving particular effect to its general prescriptions. The presence of the defendant in the territory will usually be a precondition for this, which makes it possible for the state to also exercise enforcement jurisdiction over the defendant before, during, or after the proceedings.[59] Unusually, a trial may be held *in absentia* which will involve purely the application of prescriptive rather than enforcement jurisdiction, generally with the aim of obtaining the extradition of the defendant (after which a rehearing may be required to ensure compatibility with the rights of the defendant).[60]

In matters of private law, by contrast, there is a possible split between the question of adjudicative jurisdiction and prescriptive jurisdiction, because a court will not necessarily apply its own law. This added complexity in the exercise of civil jurisdiction is represented diagrammatically in Figure 14.3.

In private law disputes, issues of 'jurisdiction' (in the international law sense) must therefore involve a careful distinction between the exercise of judicial process (generally referred to, somewhat unhelpfully, as the question of 'jurisdiction') and the applicable law which is actualized through that process (generally referred to as the question of 'choice of law').

In the context of private law claims, a court may take 'jurisdiction' over the defendant based on a variety of connections. In the common law, for example, these include the mere presence of the defendant in the territory at the time of commencement of proceedings,[61] as well as a wide range of grounds of jurisdiction over non-present defendants, such as where a tort is committed in the territory or a contract is breached in the territory.[62] In some cases, states assert jurisdiction on grounds which are considered by other states as problematic—this is usually described as an 'exorbitant' jurisdiction, which reflects questions about whether the exercise of jurisdiction is contrary to under-lying principles of international law. Commonly cited examples include the practice of the English courts exercising jurisdiction based on the mere transient presence of the defendant in the territory,[63] the fact that a contract under dispute was entered into in

---

[58]  See e.g. William Dodge, 'Breaking the Public Law Taboo', *Harvard International Law Journal* 43 (2002): 161; *The United States Securities and Exchange Commission v Manterfield* [2009] EWCA Civ. 27; *Huntington v Attrill* [1893] AC 150.

[59]  See e.g. Restatement (Fourth) of Foreign Relations Law, § 427.

[60]  See e.g. *Colozza v Italy* [1985] ECHR 1.

[61]  See e.g. *Adams v Cape Industries* [1990] 2 WLR 657.

[62]  See e.g. Civil Procedure Rules (England and Wales), Practice Direction 6B.

[63]  See e.g. *Maharanee of Baroda v Wildenstein* [1972] 2 QB 283.



- French and German companies enter into a contract governed by Belgian law
- German company sues French company for breach of contract in England
- Jurisdiction could be based on eg domicile, involvement of English branch, choice of court agreement, place of breach
- Belgian law will be applied by the English courts to govern the substantive dispute

**FIGURE 14.3** Jurisdictional framework—civil jurisdiction

the territory, or the fact that a contract under dispute is governed by English law.[64] Although such exercises of jurisdiction do invite an occasional mild critical comment,[65] it is rare for states to directly criticize the grounds of jurisdiction exercised by other states in civil matters, and this might be viewed as acquiescence in such expansive grounds of jurisdiction. This in turn could raise doubts about whether traditional international law jurisdictional constraints genuinely limit the exercise of state adjudicative authority in civil law matters.[66]

Such doubts would, however, have less to support them than may initially appear to be the case. The first point to note is that the exercise of exorbitant grounds of jurisdiction is relatively uncommon and is likely to depend on other factors. The English courts, for example, will rarely exercise jurisdiction over a case solely on the basis of the connections above, and the exercise of such jurisdiction is discretionary. On the other hand, the main factors taken into account in the exercise of this discretion are (i) the efficient conduct of the litigation, and (ii) protecting the rights of access to justice of a claimant, as discussed further herein.[67] This might suggest that the decision on whether to exercise jurisdiction is not focused on the existence of a connection between the dispute and the forum which justifies the exercise of power, but rather on (i) the practicalities of dispute

[64] See Civil Procedure Rules (England and Wales), Practice Direction 6B, r. 3.1(6).

[65] See e.g. Kevin M. Clermont and John R. B. Palmer, 'Exorbitant Jurisdiction', *Maine Law Review* 58 (2006): 474.

[66] As in the Restatement (Fourth) of Foreign Relations Law, discussed in Section II of this chapter.

[67] See n. 35; Paul Torremans *et al.* (eds.), *Cheshire, North, and Fawcett: Private International Law*, 15th edn (Oxford University Press, 2017), 351 *et seq.*, 392 *et seq.*

resolution in the interests of the parties, and (ii) the rights of claimants. This does appear to represent a more significant challenge to the traditional public international law approach to jurisdiction, which is focused on the powers of states rather than the interests of the parties.

A second point to note is that although a court may hear a claim over a defendant who is not present in the territory in many cases, the enforcement powers of the court remain strictly territorial, even in civil matters. Civil jurisdiction over a defendant who is not present in the territory and not subject to enforcement jurisdiction might be considered as a form of jurisdiction *in absentia*. In such cases, the exercise of enforcement jurisdiction would ordinarily require the cooperation of foreign courts, through the rules on the recognition and enforcement of foreign judgments, which are likely not to recognize judgments based on an exorbitant exercise of jurisdiction (and thereby express their disapproval of that exercise).[68] The projection of regulatory authority over absent defendants may thus be ineffective. However, this will not be the case where a defendant has assets in the territory which are vulnerable to seizure, even if those assets are unconnected to the dispute. There are also examples of the English courts using the technique of extraterritorial projection (discussed in Section II of this chapter) in this context. Where a defendant is subject to the jurisdiction of the courts (in the sense of being properly a defendant in English substantive proceedings), the court may, for example, purport to freeze assets of the defendant around the world.[69] Although the English courts cannot of course enforce such orders outside the territory directly, compliance may be indirectly enforced through the fact that breach of such orders will constitute contempt of court, potentially leading to a default judgment and perhaps even criminal liability. For defendants with assets in England, the vulnerability of their assets to seizure is likely to lead to compliance with these orders around the world—thus, local enforcement jurisdiction is used to project regulatory power extraterritorially. The courts have recognized that such action, even if consistent with international law jurisdictional constraints, raises comity concerns.[70] However, if the defendant and their assets remain outside the territory, enforcement of these orders will also require the cooperation of foreign courts. If the English courts award a default judgment for violation of a freezing order, it equally remains open to foreign courts to review whether that judgment should be enforced.[71] The effectiveness of exercises of civil jurisdiction thus remains constrained by public international law limits on enforcement jurisdiction.

Despite these points, the fact that the grounds of jurisdiction in civil matters are framed more broadly than those traditionally exercised in criminal matters, encompassing a variety of connecting factors (as discussed further later), might nevertheless present a challenge to the view that the exercise of civil jurisdiction is limited by public international law. This is particularly because jurisdiction based on the territorial or

---

[68] See generally e.g. Torremans *et al.* (n. 67), chs. 17–18.

[69] See e.g. *Banco Nacional de Comercio Exterior SNC v Empresa de Telecomunicationes de Cuba SA* [2007] EWCA Civ. 622; *Motorola Credit Corp v Uzan (No. 6)* [2003] EWCA Civ. 752.

[70] See e.g. *Mobil Cerro Negro Ltd v Petroleos De Venezuela SA* [2008] EWHC 532 (Comm).

[71] See e.g. Case C-619/10 *Trade Agency Ltd v Seramico Investments Ltd*, EU:C:2012:531.

personal connections of the defendant—the territorial presence of the defendant, or the domicile of the defendant—is typically evaluated as at the time the proceedings are commenced.[72] It is unclear that these connections should justify the actualization of prescriptive jurisdiction over events which took place prior to those connections existing. For example, a French party responsible for a tort in France with another French party may subsequently decide to move to England, and become subject to the civil jurisdiction of the English courts, but it is problematic to suggest that this ought to justify the retrospective application of English tort law to events which were at the time entirely unconnected with England.

The major response to these concerns in the context of private law is, as noted, the separation of the questions of adjudicative and prescriptive jurisdiction through choice-of-law rules. A court may take jurisdiction over the proceedings, but apply foreign rules of private law. To put this another way, in the context of private law adjudication courts may actualize another state's exercise of prescriptive jurisdiction. In private law, the scope of application of the rules of different states is generally not addressed as part of the rules themselves—unlike a criminal statute, which may set out its territorial or personal scope of application, rules of national contract law do not generally contain provisions delimiting their territorial scope of application. The scope of application of rules of private law is rather determined indirectly through the application of choice-of-law rules. The analysis must then turn to whether those choice-of-law rules are consistent with international jurisdictional constraints. One important point to note is that the connections which are examined in the choice-of-law process are considered as they were at the time the cause of action arose, not at the time the proceedings were commenced. When looking at personal connecting factors under EU choice-of-law rules in tort, for example, the focus is not on the current domicile of the defendant (as it is under the law of jurisdiction) but on the habitual residence of the defendant at the time of an alleged tort.[73] The connections examined as part of the choice-of-law process more clearly also reflect traditional jurisdictional constraints, as they are focused on the objective connections between the parties or their dispute and a particular state rather than, for example, the question of efficient dispute-resolution. Where a state is exercising what might be viewed as exorbitant jurisdiction over a dispute with a limited territorial connection to the forum, it is likely that the court will in fact apply foreign substantive law. The analysis of whether an exercise of civil jurisdiction is compatible with international constraints thus has to take into consideration the fact that the adjudicative and prescriptive elements are potentially separated in civil proceedings.

This does not mean, of course, that the exercise of civil prescriptive jurisdiction is not subject to international constraints. A court which applied its own law in a case arising out of events which were solely foreign-connected would arguably be actualizing its

---

[72]  See e.g. *Ministry of Defence for Iran v Faz Aviation* [2007] EWHC 1042 (Comm).

[73]  See e.g. Regulation (EC) No. 864/2007 of the European Parliament and of the Council on the law applicable to non-contractual obligations (Rome II), OJ L 199, Art. 4(2): 'where the person claimed to be liable and the person sustaining damage both have their habitual residence in the same country at the time when the damage occurs, the law of that country shall apply'.

prescriptive jurisdiction in a way which was contrary to international law. It would be less clear how to analyse a case in which a court applied a foreign law in circumstances which were unjustifiable—the court would not be extending its own prescriptive jurisdiction, but the state whose law is applied could hardly be responsible for the application of its law beyond jurisdictional limits by a foreign court. This problem is, however, more theoretical than real—in general, choice-of-law rules rely on personal or territorial connections which would satisfy public international law jurisdictional limitations, although the following section notes some ways in which the connecting factors relied on may present a challenge.

Where a court is applying foreign law, the question of whether its exercise of adjudicative jurisdiction (in this context, meaning purely the question of jurisdiction in a private international law sense) is consistent with public international law constraints thus becomes more complex but may also appear less significant. A court will apply its own procedural rules, regardless of whether foreign substantive law governs,[74] but these essentially regulate the local conduct of proceedings rather than impose legal rules on potentially foreign conduct as a matter of prescriptive jurisdiction. If the exercise of adjudicative jurisdiction does not involve, or does not necessarily involve, the exercise of prescriptive jurisdiction, this raises the possibility that adjudicative jurisdiction in civil matters could be governed by distinct constraints. As discussed earlier, the practice of the English courts, for example, suggests that the interests of the parties have a greater role to play here, although jurisdiction is also frequently based on traditional territorial connections.

A further question may be raised, however, concerning statutory mandatory rules—rules of the forum state which (exceptionally) are applied regardless of whether foreign substantive law governs the proceedings.[75] These appear to be actualized by the mere exercise of adjudicative jurisdiction, and their application may therefore raise greater concerns regarding the compatibility of private international law rules with international jurisdictional constraints. These are rules which exceptionally establish a link between adjudicative jurisdiction, in the private international law sense, and the exercise of prescriptive jurisdiction, because they circumvent the usual choice-of-law process under which foreign substantive law may govern. These concerns might be addressed through principles of statutory interpretation, such as a presumption against extraterritoriality or extra-jurisdictionality in the scope of application of mandatory rules, under which statutory mandatory rules may thus be 'self-limiting'.[76] In the absence of such limits, the potential existence of mandatory rules suggests that the exercise of adjudicative jurisdiction in private law matters, although limited in effect because of the possible application

---

[74] See generally e.g. Richard Garnett, *Substance and Procedure in Private International Law* (Oxford University Press, 2012).

[75] See generally e.g. Alex Mills, *Party Autonomy in Private International Law* (Cambridge University Press, 2018), ch. 9; Torremans *et al.* (n. 67), 143 *et seq.*

[76] See classically e.g. Kurt Lipstein, 'Inherent Limitations in Statutes and the Conflict of Laws', *International and Comparative Law Quarterly* 26 (1977): 884; see further the Restatement (Fourth) of Foreign Relations Law, discussed in Section II of this chapter.

of foreign substantive law, should nevertheless be constrained by public international jurisdictional principles because it entails the exercise of a limited prescriptive jurisdiction in the form of such rules.

## IV.3.  Additional Connecting Factors

A second factor which distinguishes state practice in the context of private law from that of public law is the emergence of connecting factors which go beyond or which hybridize the traditional territorial and nationality-based factors recognized in public international law rules of jurisdiction.

As already noted, states may, for example, rely on connections of domicile, residence, or habitual residence as factors both in the exercise of jurisdiction and in the determination of the applicable law. Unlike the concept of nationality, these factors are not based on a legal connection between a person and a state. The exact definitions of domicile, residence, or habitual residence may vary between legal systems, but they generally involve an examination of the factual connections between the person and territory (such as the duration of physical presence). In some cases, these factors may also require consideration of not just factual but also psychological connections, such as whether the person intends to live indefinitely in the territory—a factor which has a particularly strong influence on the common law conception of domicile.[77] What is distinctive about each of these factors is that regulating a party based on their domicile or residence is not a matter of regulating the person (based on nationality) or the events (based on territoriality), but rather based on the territorial connections of the person, fusing traditional conceptions of state authority in international law. In the exercise of criminal jurisdiction, states almost invariably rely on territory or nationality as a connecting factor, although there are rare examples of residence being used[78] which may suggest that the greater flexibility of connecting factors in the context of civil jurisdiction is also influencing practice in the context of public law.

The application of a test of 'nationality' to a legal entity is not necessarily straightforward, but has been viewed as most closely analogous to the concept of the law of incorporation (or the equivalent concept of legal formation).[79] This approach was developed in the context of diplomatic protection, which also relies on a link of 'nationality', but may equally apply in the context of jurisdiction. In private law disputes, concepts of domicile or residence are also applied to corporate parties, providing that jurisdiction or the applicable law may be determined based on factors other than the law of incorporation, such as the central administration or principal place of business of the company.[80] Like residence, these are connecting factors which are based on the territorial connections

---

[77]  See e.g. *Mark v Mark* [2006] 1 AC 98; *Holliday v Musa* [2010] EWCA Civ. 335.

[78]  See e.g. Terrorism Act 2000 (UK), ss. 63A, 63B, and 63C (exercising both active and passive personality jurisdiction based on residence).

[79]  See generally e.g. *Barcelona Traction, Light and Power Co. Ltd (Belgium v Spain)* [1970] ICJ Rep. 3.

[80]  See e.g. Brussels I Regulation Recast, Art. 63.

of the company and its business activities, rather than the territorial location of the events under dispute or the legal connection between the company and a state. Additional connecting factors may also be recognized, such as where a dispute arises out of the activities of a branch—the location of the branch may also potentially be relied on as a basis on which to establish jurisdiction or to determine the applicable law,[81] even if the acts underling the claim occurred in a foreign territory.[82] In each case, the connecting factor is a further hybridization of territorial and personal aspects, but with the added complexity that private international law can look beyond the single legal personality of a company to examine the factual connections which a branch may have with the dispute, and attribute jurisdiction or determine the applicable law based on the location of the branch.

A further innovation in the context of private law is the widespread emergence of party autonomy as a connecting factor in the context of both jurisdiction and applicable law, potentially allowing parties to choose which court may hear their disputes or which law will govern their relationship.[83] In jurisdiction, there is also the related doctrine of submission, under which a defendant may accept the jurisdiction of a court after proceedings have been commenced.[84] In the context of choice of law, perhaps analogously, common law courts may default to forum law if the parties fail to plead the content of foreign law.[85] The emergence of party autonomy and these related doctrines is particularly significant for present purposes because it is widely (although not universally) accepted that the parties may choose (or subsequently consent to) a forum or law unconnected with them or their dispute. Under these developments, the regulation of jurisdiction or choice of law has arguably shifted to give even further emphasis to the interests of private parties, although not without some constraints. The emergence of party autonomy as a doctrine is a complex phenomenon which requires its own detailed examination[86]—for present purposes, it is sufficient to note that it is subject to contested readings. On the one hand, party autonomy may be viewed as reflecting an agreement by states that the allocation of regulatory authority in the context of private law should not be subject to traditional public international law jurisdictional constraints, but rather should be at least primarily focused on serving the private interests of the parties—questions which the parties themselves are generally best placed to determine. On the other hand, party autonomy may be viewed as a more fundamental challenge to the jurisdictional power of states themselves, as it appears to recognize a power for private parties to determine the regulatory authority to which they are subject—it may thus be

---

[81] See e.g. *ibid.*, Art. 7(5); Regulation (EC) No. 593/2008 of the European Parliament and of the Council of 17 June 2008 on the law applicable to contractual obligations (Rome I), OJ L 177, Art. 19.

[82] *Lloyds Register of Shipping v Campenon* [1995] ECR I 961.

[83] See generally e.g. Peter Nygh, *Autonomy in International Contracts* (Oxford University Press, 1999); Mills (n. 75).

[84] See e.g. Brussels I Regulation Recast, Art. 26.

[85] See e.g. Torremans *et al.* (n. 67), ch. 7; Richard Fentiman, *Foreign Law in English Courts: Pleading, Proof and Choice of Law* (Oxford University Press, 1998).

[86] See generally Mills (n. 75).

read as a partial privatization of the allocative function of public international law rules of jurisdiction. This is potentially a more radical reading of the influence of private interests in public international law jurisdiction. An even more radical possibility which has been widely discussed but rarely adopted by states is that private parties might determine that their legal relationship is governed by non-state law—thus privatizing not just the allocative function of rules of jurisdiction, but also the regulatory function of rules of private law.[87]

## IV.4.  Techniques to Manage Potentially Conflicting Regulation

A third innovative aspect of the regulation of jurisdiction in the context of private law is the development by states of techniques which manage the possibility of conflicting regulation—seeking to avoid the 'conflict of laws' which gives the discipline of private international law its alternative name. The existence of additional connecting factors in private international law, as discussed earlier, might be viewed as increasing this risk, as a consequence of increasing the possibility for extraterritorial regulation. If, for example, the applicable law may legitimately be determined based on the domicile or residence of the defendant, as well as a variety of other territorial connecting factors such as the location of the events giving rise to the cause of action, this would appear to multiply the possibilities for more than one state to legitimately view its law as extending to those events. This could incentivize the commencement of proceedings based on strategic considerations rather than based on the most efficient resolution of the dispute, a practice generally disparaged as 'forum-shopping'.[88] Private international law has, however, responded to these concerns, in two primary ways.

The first is provided by a traditional objective of private international law, made possible by the separation of adjudicative and prescriptive jurisdiction—the international unification of choice-of-law rules in pursuit of an objective of decisional harmony.[89] Although more than one court may potentially have jurisdiction (in the private international law sense) over the proceedings, if each court is to apply the same governing law this greatly reduces the risk of inconsistent regulation arising. This is true only in respect of substantive rather than procedural questions (as each state will apply its own procedural law), but it is no coincidence that in the European Union the pursuit of harmonized rules of private international law has included an expanded conception of what questions count

[87]   See e.g. Mills (n. 75), ch. 10; Michael A. Helfand (ed.), *Negotiating State and Non-State Law* (Cambridge University Press, 2015); note esp. e.g. the Hague Principles on Choice of Law in International Commercial Contracts, Art. 3, https://www.hcch.net/en/instruments/conventions/full-text/?cid=135.

[88]   See generally e.g. Andrew Bell, *Forum Shopping and Venue in Transnational Litigation* (Oxford University Press, 2003).

[89]   See further e.g. Mills, *Confluence* (n. 32), 16 *et seq.*

as 'substantive'.[90] Some theorists have doubted the utility of pursuing these objectives, at least internationally, and argued that private international law should be conceived as a purely domestic subject, with rules adopted purely in pursuit of domestic objectives.[91] The discipline would, however, be greatly diminished if this approach were adopted. The fact that cross-border disputes engage the regulatory interests of foreign states, and thus questions of public international law jurisdiction, should not be ignored and has in practice formed an important part of most traditions of private international law thinking.[92] Private international law has long recognized the virtue of consistency between states in choice-of-law rules, because internationalism has been and remains an important and influential aspect of the discipline. The harmonization of choice-of-law rules across the EU exemplifies this public systemic conceptualization of private international law, as does the important and ongoing work of the Hague Conference on Private International Law (the preeminent international organization responsible for the international harmonization of private international law[93]). International consistency is of course not the only value in choice of law—states may have different views on *which* law is most appropriate to apply—which is what makes harmonization a challenging project. But the fact that harmonization is recognized as a goal and a virtue in private international law reflects an acknowledgement of its international dimension and of its potential to manage the risk of conflicting regulation.

The second way in which private international law has distinctively responded to concerns about overlapping exercises of regulatory authority is provided by constraints on the exercise of adjudicative jurisdiction. These have developed as a response to particular issues arising in the adjudication of private law disputes. In criminal law, as noted earlier, the major constraint on the exercise of jurisdiction is the need for the presence of the defendant in the territory in order for the possibility of enforcement jurisdiction to arise, which is generally a condition for the exercise of adjudicative jurisdiction. In the absence of the defendant, a state may seek to rely on extradition law, but this possibility will only emerge where a prosecution has not been carried out in another territory. The risk of double-criminality—being prosecuted twice for the same conduct—is generally dealt with by foreign double-jeopardy rules (in civil law, *ne bis in idem*). The fact that a person can only be in one territory at one time thus serves as a natural constraint on the potentially conflicting exercise of adjudicative criminal jurisdiction—although it does not address the risk of conflicting prescriptive jurisdiction. In civil law disputes, enforcement generally attaches not (or not only) to the defendant but to their assets, greatly increasing the possibility that more than one state might be able to exercise effective enforcement jurisdiction (without depending on the rules on the recognition and

---

[90]   Cf. e.g. the Rome II Regulation, Art. 15, with the previous position in England under *Harding v Wealands* [2006] UKHL 32.

[91]   See e.g. Friedrich K. Juenger, 'Jurisdiction, Choice of Law and the Elusive Goal of Decisional Harmony', *Netherlands International Law Review* 39 (1992): 137.

[92]   See e.g. Alex Mills, 'The Identities of Private International Law: Lessons from the US and EU Revolutions', *Duke Journal of Comparative and International Law* 23 (2013): 445.

[93]   See generally http://www.hcch.net.

enforcement of foreign judgments). A defendant with assets in more than one jurisdiction might readily find that a single act or event could be subject to adjudication in each jurisdiction, with the real prospect of that jurisdiction being effectively enforced. This is exacerbated by the fact that (unlike in the criminal context) proceedings can generally be brought both in positive and negative forms, seeking a determination of liability or a declaration of non-liability.[94] Thus, in a cross-border dispute between parties from different states, each is potentially subject to suit in its home jurisdiction and in the jurisdiction where the events giving rise to the cause of action arose. Even if each state would apply the same substantive applicable law—which will of course, not always be the case, as decisional harmony is an objective or value rather than always a reality of choice of law—the subjection to multiple exercises of adjudicative jurisdiction is itself potentially not only inconvenient, but may in its expense frustrate the pursuit of a legitimate claim.

There are a variety of techniques which have been developed as part of private international law to respond to these concerns, addressed to the question of adjudicative jurisdiction. In some contexts, rules of exclusive jurisdiction may be recognized, under which a single forum is viewed as having such a strong connection to the dispute that no possibility of parallel proceedings should arise.[95] In other contexts, as already noted herein, proceedings may be stayed where a foreign court is clearly more appropriate to resolve the dispute, including but not limited to where proceedings are already pending before that foreign court.[96] Alternatively, a more strict *lis pendens* rule may apply under which the court second seized of a dispute may be obliged to defer to the court first seized.[97] Where a decision has already been reached in a foreign court, it will frequently be given a *res judicata* or estoppel effect, precluding further local proceedings, through the rules on the recognition of foreign judgments. In each case, the rule is designed (potentially among other things) to avoid the risk of parallel proceedings from arising and/or the possibility of conflicting regulation. The interaction between these rules and questions of access to justice raises a complex issue, as courts may have to evaluate whether foreign legal proceedings are able to deliver justice to the parties.[98] Where the rules prioritize the court first seized, a further complexity is that such rules may potentially incentivize strategic litigation, commencing proceedings in an inconvenient court—even one which does not have jurisdiction—in order to frustrate the resolution of the dispute. This is a problem which has particularly arisen under EU jurisdictional regulation in the context of jurisdiction agreements, where the priority between the rules giving effect to party autonomy and those giving effect to *lis pendens* has proven

---

[94]  See e.g. discussion in *Citigroup Global Markets Ltd v Amatra Leveraged Feeder Holdings Ltd* [2012] EWHC 1331 (Comm); *Messier-Dowty Ltd v Sabena SA* [2000] EWCA Civ. 48; Andrew Bell, 'The Negative Declaration in Transnational Litigation', *Law Quarterly Review* 111 (1995): 674.

[95]  See e.g. the Brussels I Regulation Recast, Art. 24.

[96]  See e.g. Torremans *et al* (2017), 392 *et seq.*

[97]  See generally e.g. *ibid.*, 442 *et seq.*; Campbell McLachlan, *Lis Pendens in International Litigation* (Leiden: Brill, 2009).

[98]  See e.g. the Brussels I Regulation Recast, Arts. 33 and 34 and Recitals 23 and 24.

highly contentious and provoked reform.[99] The key point for present purposes, however, is not to note the difficulties which may arise in regulating the management of parallel proceedings, but to note that private international law has developed distinctive rules for avoiding the possibility of conflicting regulation. This may be viewed at least in part as a response to the fact that in the context of private law jurisdiction the proliferation of connecting factors recognized, as well as the possibility for enforcement jurisdiction against the assets rather than the person of the defendant, might otherwise significantly increase the risk of such conflicts.

# V.  Conclusions

The regulation of jurisdiction in international law has traditionally marginalized its 'private' dimensions—both in terms of the interests which it has taken into consideration, and in terms of the types of exercises of jurisdiction which have been studied. This is regrettable, as it has left the law of jurisdiction isolated from broader developments in the international legal order, and left public international lawyers relatively disengaged in the analysis of private law regulation. This chapter has argued for two developments in response. First, that the law of jurisdiction should recognize the significance of private actors and their rights and interests, which potentially require or constrain the exercise of jurisdiction by states in the context of both public and private law regulation. The exercise of jurisdiction should be understood within the more complex context of a modern international legal order under which individuals are recognized as subjects of international law with rights opposable to states. Second, that public international lawyers should engage more seriously with the distinctive issues raised by jurisdiction in the context of private law regulation, and the distinctive practice which has emerged in that context—in particular, the separation of adjudicative and prescriptive jurisdiction, the emergence of connecting factors which hybridize or add to the traditional connections of territory and nationality, and the development of techniques to manage the risk of potentially conflicting exercises of jurisdiction. The analysis of these private law dimensions to jurisdiction is complex, and the practice of states is in certain respects difficult to reconcile with the traditional public international law framework, and in other respects undoubtedly challenges that framework. This does not, however, mean that public international lawyers should view these private dimensions as falling outside the scope of the domain of the regulation of international jurisdiction (or indeed their professional interest)—rather, they should recognize and accept this complexity and, mindful of the fundamental significance of private law regulation in the contemporary global legal order, be open to the lessons it provides and the challenges it offers.

[99]  See e.g. David Kenny and Rosemary Hennigan, 'Choice-of-Court Agreements, the Italian Torpedo, and the Recast of the Brussels I Regulation', *International and Comparative Law Quarterly* 64 (2015): 197; Ian Bergson, 'The Death of the Torpedo Action? The Practical Operation of the Recast's Reforms to Enhance the Protection for Exclusive Jurisdiction Agreements within the European Union', *Journal of Private International Law* 11 (2015): 1.

# EXHIBIT 4

# Codifying Choice of Law Around the World

AN INTERNATIONAL COMPARATIVE ANALYSIS

Symeon C. Symeonides

Foreword by Lord Collins of Mapesbury



OXFORD
UNIVERSITY PRESS

EBSCOhost - printed on 1/31/2022 4:14 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

# OXFORD
## UNIVERSITY PRESS

*Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide.*

Oxford    New York

Auckland   Cape Town   Dar es Salaam   Hong Kong   Karachi   Kuala Lumpur   Madrid   Melbourne
Mexico City   Nairobi   New Delhi   Shanghai   Taipei   Toronto

With offices in

Argentina   Austria   Brazil   Chile   Czech Republic   France   Greece   Guatemala   Hungary
Italy   Japan   Poland   Portugal   Singapore   South Korea   Switzerland   Thailand
Turkey   Ukraine   Vietnam

Oxford is a registered trademark of Oxford University Press in the UK and certain other countries.

Published in the United States of America by
Oxford University Press
198 Madison Avenue, New York, NY 10016

© Oxford University Press 2014

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, without the prior permission in writing of Oxford University Press, or as expressly permitted by law, by license, or under terms agreed with the appropriate reproduction rights organization. Inquiries concerning reproduction outside the scope of the above should be sent to the Rights Department, Oxford University Press, at the address above.

You must not circulate this work in any other form
and you must impose this same condition on any acquirer.

Library of Congress Cataloging-in-Publication Data

Symeonides, Symeon, 1949- author.
    Codifying choice of law around the world : an international comparative analysis / Symeon C. Symeonides ;
Foreword by Lord Collins of Mapesbury.
        pages cm
    Includes bibliographical references and index.
    ISBN 978-0-19-936084-0 ((hardback) : alk. paper)
1. Comparative law. 2. Conflict of laws. I. Title.
    K583.S96 2014
    340.9—dc23
                                                                                          2013040833

9 8 7 6 5 4 3 2 1

Printed in the United States of America on acid-free paper

**Note to Readers**

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is based upon sources believed to be accurate and reliable and is intended to be current as of the time it was written. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional person should be sought. Also, to confirm that the information has not been affected or changed by recent developments, traditional legal research techniques should be used, including checking primary sources where appropriate.

*(Based on the Declaration of Principles jointly adopted by a Committee of the
American Bar Association and a Committee of Publishers and Associations.)*

**You may order this or any other Oxford University Press publication
by visiting the Oxford University Press website at www.oup.com.**

EBSCOhost - printed on 1/31/2022 4:14 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

common-domicile cases (cases 1–2 in Table 2.1). In these conflicts, the distinction between conduct regulation and loss distribution makes a difference:

(a) In loss-distribution conflicts, all the American courts that joined the revolution have almost unanimously applied the law of the common domicile, thus switching from territoriality to personality.

(b) In contrast, in conduct-regulation conflicts, American courts continue to apply the law of the state of conduct and injury (*See* the cells with the horizontal lines in Table 2.1).

In *Babcock v. Jackson*,[53] the seminal case that launched the revolution, the New York Court of Appeals thought that the basic question was whether "the place of the tort [should] *invariably* govern the availability of relief for the tort."[54] More than four decades later, 42 state supreme courts, including the *Babcock* court, have answered the question in the negative. However, although none of the 42 courts profess categorical adherence to the *lex loci* rule *as such*, the only categorical exception from it is the application of the law of the common domicile in loss-distribution conflicts.[55] One wonders whether a revolution was necessary for such a relatively minor change.

## III. The *Lex Loci Delicti* Rule in the Codifications of the Last 50 Years

### A. GENERAL INVENTORY

Outside the United States, virtually all codifications enacted in the last 50 years, continue to follow the *lex loci delicti* rule as the basic rule for tort conflicts. The difference from the previous generation of codifications is that now the *lex loci* rule is subject to express exceptions. Table 2.2 below presents a panoramic picture of the status of the *lex loci* rule and its exceptions, in the codifications of the last 50 years. In perusing this table (as well as subsequent tables in this chapter), the reader should keep in mind that:

- The table does not include 16 codifications that, because of their limited scope, do not contain rules for tort conflicts.[56] The table does include four draft codifications: Argentina, Puerto Rico, Serbia, and Uruguay.
- The table includes the 19 European Union countries that have enacted a choice-of-law codification in the last 50 years,[57] although the Rome II Regulation (which is

---

[53] 191 N.E.2d 279 (N.Y. 1963).

[54] *Id.* at 280–281 (emphasis in original).

[55] Less categorical exceptions are the application of the law of the state of conduct in certain cross-border torts (*see supra*) and the availability of general escapes for atypical cases.

[56] The omitted codifications are those of: Burkina Faso, Chad, Congo-Brazzaville, Costa Rica, Ecuador, El Salvador, Finland, Guatemala, Mexico, Panama, Paraguay, Panama, Paraguay, Rwanda, Senegal, and Togo.

[57] Sixteen of those codifications were adopted before Rome II, whereas the Czech, Dutch, and Polish codifications were enacted after Rome II and incorporate its provisions by reference.

Copyright 2014. Oxford University Press.
All rights reserved. May not be reproduced in any form without permission from the publisher, except fair uses permitted under U.S. or applicable copyright law.

EBSCO Publishing : eBook Collection (EBSCOhost) - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM
AN: 749014 ; Dean Symeon C. Symeonides.; Codifying Choice of Law Around the World : An International Comparative Analysis
Account: uamster.main.ehost

also included in the table) preempts these codifications with regard to most tort conflicts.[58] The table does not include the remaining nine EU countries, which (except for Denmark) are bound by Rome II, but which have not enacted a codification in the last 50 years.[59]

- The table depicts only the rules that apply to torts in general, rather than to specific torts, such as defamation, products liability, etc. Many codifications contain separate rules (or exceptions) for these and other specific torts.[60]

## B.   THE *LEX LOCI* STILL RULES

As Table 2.2 graphically shows, the *lex loci* rule is very much alive and well; indeed it continues to be the dominant rule in the codifications of the last 50 years.

The only codifications in which the *lex loci* is not the *basic* rule—although it is one of the rules—are those of Louisiana and Oregon, which were described earlier, and those of Belgium, Puerto Rico, Serbia, and Switzerland, which are discussed later.

- The only codification in which the *lex loci* is neither the basic rule nor one of the rules is the Yemeni codification, which has unequivocally adopted the *lex fori* without any exceptions.[61]
- The only codifications in which the *lex loci* rule is *not* subject to any express exceptions, other than the *ordre public* exception, are those of Burundi, the Central African Republic, Cuba, Gabon, Latvia, Madagascar, Mauritania, and Spain.[62]
- Thirty codifications have an intentionally flexible definition of the *locus delicti*, which affects the outcome in cross-border torts because it authorizes the application of the law of either the state of conduct or the state of injury, whichever favors the victim (*favor laesi*).[63]

---

[58] The second-to-last row ("Total I") counts Rome II as simply one codification, and also includes the 19 EU countries that have enacted choice-of-law codifications in the last 50 years. The last row ("Total II") shows how the totals would change if one were to exclude the 19 codifications and give 28 "votes" to Rome II (i.e., one for each country in which it is in force).

[59] Besides Denmark (which is not bound by Rome II and many other EU Regulations), these countries are: Cyprus, Finland, France, Greece, Ireland, Luxembourg, Malta, and Sweden. The book covers Finland only with regard to subjects, such as family law, matrimonial property, and successions, for which it enacted detailed statutes.

[60] *See infra* VII–VIII.

[61] *See* Yemeni codif. art. 32 (providing that torts occurring outside Yemen are governed by Yemeni law). The former Arab Republic of Yemen (North Yemen) had adopted the same rule (*see* North Yemen codif. art. 31), whereas the People's Republic of Yemen (South Yemen) allowed the tort victim to choose between the law of the place of conduct and the law the forum state.

[62] *See* Burundi codif. art. 9; Central African Republic codif. art. 42.2; Cuban codif. art. 16; Gabon codif. art. 41; Latvian codif. art. 20; Madagascar codif. art. 30.2; Mauritania codif. art. 11; and Spanish codif. art. 10.9. The Spanish codification is superseded by Rome II, which contains several exceptions to the *lex loci* rule.

[63] For documentation and discussion, *see infra* at III.C.

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

TABLE 2.2.  THE *LEX LOCI DELICTI* RULE AND ITS EXCEPTIONS

| | *Lex Loci* rule | *Favor laesi* | Bilateral Exceptions | | | | *Lex fori* Exceptions | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Common domicile | Preexisting relationship | Closer connection | "Conduct & safety" | Double actionability | Damages | Forum domic. |
| Afghanistan | x | | | | | | x | | |
| Albania | x | | x | x | x | x | | | |
| Algeria | x | | | | | | x | | |
| Angola | x | x | x | | | x | | | |
| Argentina | x | | x | | x | | | | |
| Armenia | x | | | | | | | | |
| Azerbaijan | x | | x* | | | | | | |
| Belarus | x | | x* | | | | x | | |
| Burundi | x | | | | | | | | |
| Centr. Afric. Rep. | x | | | | | | | | |
| Cape Verde | x | x | x | | | x | | | |
| China | x | x | x | | | | | | |
| Cuba | x | | | | | | | | |
| East Timor | x | x | x | | | x | | | |
| FYROM | x | x | | | x | | | | |
| Gabon | x | | | | | | | | |
| Georgia | x | x | x | | | | | | |
| Guinea-Bissau | x | x | x | | | x | | | |

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

| | *Lex Loci* rule | *Favor laesi* | Bilateral Exceptions | | | | *Lex fori* Exceptions | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Common domicile | Preexisting relationship | Closer connection | "Conduct & safety" | Double actionability | Damages | Forum domic. |
| Japan | x | x | x | x | x | | x | x | |
| Jordan | x | | | | | | x | | |
| Kazakhstan | x | | x* | | | | x | | |
| Korea, North | x | | | | | | x | x | |
| Korea, South | x | x | x | x | | | | x | |
| Kyrgyzstan | x | | x* | | | | x | | |
| Liechtenstein | x | | | | x | | | | |
| Louisiana | x | | x | | x | x | | | |
| Macau | x | x | x | | | x | | | |
| Madagascar | x | | | | | | | | |
| Mauritania | x | | | | | | | | |
| Moldova | x | | | | | | | | |
| Mongolia | x | | | | | | | | x |
| Mozambique | x | x | x | | | x | | | |
| Oregon | x | x | x | | x | x | | | |
| Peru | x | x | | | | | | | |
| Puerto Rico | x | | x | | x | x | | | |
| Qatar | x | | | | | | x | | |
| Quebec | x | x | x | | x | | | | |
| Russia | x | x | x* | | | | | | |

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

| | *Lex Loci* rule | *Favor laesi* | Bilateral Exceptions | | | | *Lex fori* Exceptions | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Common domicile | Preexisting relationship | Closer connection | "Conduct & safety" | Double actionability | Damages | Forum domic. |
| Serbia | x | | x | x | x | x | | | |
| Somalia | x | | | | | | x | | |
| Sudan | x | | | | | | x | | |
| Switzerland | x | x | x | x | x | x | | | |
| Taiwan | x | | | | x | | | | |
| Tajikistan | x | | x* | | | | x | | |
| Tunisia | x | x | x | | | x | | | |
| Turkey | x | | | | x | | | | |
| Ukraine | x | | x* | | | | x | | |
| U. Arab Emirates | x | | | | | | x | | |
| Uruguay | x | x | x | | | | | | |
| Uzbekistan | x | | x* | | | | x | | |
| Venezuela | x | x | | | | | | | |
| Vietnam | x | x | x* | | | | | | x |
| Yemen | | | | | | | | | |
| *Subtotal non-EU* 53 | **52** | **20** | **30** | **5** | **13** | **13** | **15** | **3** | **2** |
| **EUROPEAN UNION** | | | | | | | | | |
| ***Rome II*** | x | | x | x | x | x | | | |
| Austria | x | | x | x | x | x | | | |
| Belgium | x | | x | x | x | x | | | |

| | *Lex Loci* rule | *Favor laesi* | Bilateral Exceptions | | | | *Lex fori* Exceptions | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Common domicile | Preexisting relationship | Closer connection | "Conduct & safety" | Double actionability | Damages | Forum domic. |
| Bulgaria | x | | x | | x | x | | | |
| Croatia | x | x | | | | | | | |
| Czech Rep. | x | x | | | | | | | |
| Estonia | x | x | x | x | x | | | x | |
| Germany | x | x | x | x | x | | | x | |
| Hungary | x | x | x | | | x | | x | |
| Italy | x | x | x | | | | | | |
| Latvia | x | | | | | | | | |
| Lithuania | x | x | x | | x | | | | |
| Netherlands | x | | x | x | x | x | | | |
| Poland | x | | x | x | x | x | | | |
| Portugal | x | x | x | | | x | | | |
| Romania | x | | | | | x | | | |
| Slovakia | x | x | | | | | | | |
| Slovenia | x | x | | | x | | | | |
| Spain | x | | | | | | | | |
| United Kingdom | x | | | | x | | | | |
| **Total I 73** | **72** | **30** | **41** | **12** | **24** | **22** | **15** | **6** | **2** |
| Total II 80 | 79 | 20 | 57 | 29 | 40 | 40 | 15 | 3 | 2 |

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

- The most common of the *lex loci* exceptions is the common-domicile exception, which is present in 41 codifications. It provides that, if the tortfeasor and the victim affiliate with the same state (through nationality, domicile, or residence), the law of that state displaces the *lex loci delicti*.[64] In nine of those codifications, marked with an asterisk, the common domicile exception applies only to foreign torts.[65]

- Twenty-four codifications provide for a "closer connection" exception. This means that if the case has a closer connection with a state other than that of the presumptively applicable law, the law of the state with the closer connection applies. This exception operates primarily against the *lex loci delicti*, but in some codifications, it also operates against the laws of other states, such as the state of the common domicile or the state of the preexisting relationship.[66]

- Twelve codifications contain a preexisting relationship exception, usually phrased as an example of the closer-relation concept. This exception means that, if the tortfeasor and the victim are parties to a preexisting factual or legal relationship, such as a contract, the law that governs that relationship will also govern a related tort.[67]

- Twenty-two codifications provide that, if a state other than the state of conduct (e.g., the state of injury or the state of the common domicile) governs the tort, the court should nevertheless "take into account," or apply, the rules of "conduct and safety" of the state of conduct.[68]

- Fifteen codifications subject foreign torts to the "double actionability" requirement, according to which a tort governed by a foreign law does not entitle the victim to recovery unless the tortfeasor's conduct is actionable under both the foreign law and the law of the forum qua forum.[69]

- Six codifications impose a unilateral *lex fori* exception affecting the level or type of recoverable damages. These codifications provide that, for torts governed by foreign law, the plaintiff may not recover higher or different damages than those available under the *lex fori*.[70]

- Finally, in addition to Yemen, which applies the *lex fori* to all torts, foreign and domestic, the codifications of Mongolia and Vietnam apply the *lex fori* to foreign torts involving domestic defendants.[71]

---

[64] This exception is discussed at IV.C, *infra*.

[65] The codifications comprising this group are those of: Azerbaijan, Belarus, Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine, Uzbekistan, and Vietnam. For citations and discussion, *see infra* at IV.C.2.c.

[66] In the Lithuanian codification, this exception applies only if it is impossible to determine the place of conduct or the place of injury. *See* Lithuanian codif. art. 1.43(2).

[67] For documentation and discussion, *see infra* at IV.E.

[68] For documentation and discussion, *see infra* at V.

[69] For documentation and discussion, *see infra* at IV.F. One of those codifications, the Mongolian, imposes this requirement only in favor of Mongolian defendants. *See id.*

[70] For documentation and discussion, *see infra* at IV.G.

[71] *See id.*

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

C. Defining the *locus delicti* in cross-border
torts: the *favor laesi* principle

Before discussing the exceptions to the *lex loci delicti* rule, it would be helpful to examine
how recent codifications define the *locus delicti*. This definition affects the outcome in
cases in which (1) the two constituent elements of a tort, the injurious conduct and the
resulting injury, are located in different states—namely, in *cross-border* (as opposed to
intra-state) torts; and (2) the way those states' laws differ in result. Obviously, cross-border
torts have become far more frequent in the last 50 years than before.[72]

Unlike the first American Restatement, which categorically defined the *locus delicti* as the
place of injury (*lex loci damni*),[73] many recent codifications either refrain from defining it[74] or
opt for constructive ambiguity, which in turn provides flexibility. For example, at least a dozen
codifications use phrases such as "the fact that gives rise" to the obligation,[75] which arguably
can be *either* the injurious conduct or the resulting injury. About a dozen codifications define
the *locus delicti* as the place of conduct,[76] and an equal number as the place of injury,[77] although
in many of those codifications the definitions leave room for contrary arguments.

However, a plurality of codifications avoids potentially interminable localization argu-
ments by providing a direct *substantive* solution to this dilemma. Following a principle known
as *favor laesi*,[78] they directly authorize the application of the law of *either* the place of con-
duct or the place of injury, whichever favors the victim.[79] They do so by either choosing the
more favorable of the two laws or allowing the tort victim to choose between them. Table 2.3
below lists these codifications, and the following text provides the necessary explanations.

---

[72] *See* Symeonides, *Cross-Border Torts*, 339–341.

[73] *See supra* note 8.

[74] *See, e.g.,* Burundi codif. art. 6; Central African Republic codif. art. 42.2; Madagascar codif. art. 30; Puerto Rico codif. art. 40.

[75] *See* Afghanistan codif. art. 29.1; Algerian codif. art. 20(1); Cuban codif. art 16; Jordanian codif. art. 22; Latvia codif. art. 20; Somalian codif. art. 21.1; Spanish codif. art. 10.9; Sudanese codif. art. 11.14a; U.A.E. codif. art. 20(1); Ukrainian codif. art. 49.1; Uzbekistan codif. art. 1194.

[76] *See, e.g.,* Austrian codif. art. 48(2); Armenian codif. art. 1289; Azerbaijan codif. art. 26.1; Belarus codif. art. 1129(1); Chinese codif. art. 44; Kazakhstan codif. art. 117.1; North Korean codif. art. 31; South Korean codif. art. 31; Kyrgyzstan codif. art. 1203(1); Qatar codif. art. 30.

[77] *See, e.g.,* Rome II art. 4(1); Albanian codif. art. 56.1; Argentinean draft codif. art. 2657; Belgium art. 99.2.1; Bulgarian codif. art. 105(1); Gabon codif. art. 41; Italian codif. art. 62; Liechtenstein codif. art. 52(1); Mongolian codif. art.551.1; Netherlands art. 157; Polish codif. art. 33; United Kingdom Codif. § 11. The codi- fications of Moldova (art. 1615.3), Romania (arts. 107–108), and Turkey (art. 34.2) provide that the law of the state of injury governs cross-border torts.

[78] For a discussion of this principle in comparative conflicts law, *see* Symeonides, *Progress or Regress?* 57–59. *See also* Nygh, *Reasonable Expectations* 292–293 (1995); F. Vischer, General Course on Private International Law, 232 *Recueil des cours* 9, 119 (1992).

[79] *See* Angolan codif. art. 45.2; Cape Verde codif. art. 45.2; Croatian codif. art. 28.1; Estonian codif. art. 50; FYROM codif. art. 33; German codif. art. 40; Hungarian codif. art. 32; Italian codif. art. 62; Japanese codif. art. 17; Lithuanian codif. art. 1.43.1; Macau codif. art. 44.1; Mozambique codif. art. 45.2; Peruvian codif. art. 2097; Portuguese codif. art. 45.2; Quebec codif. art. 3126; Russian codif. art. 1219; Slovenian codif. art. 30.1; Swiss codif. art. 133.2; Taiwanese codif. art. 25; Tunisian codif. art. 70; Uruguay codif. art. 52.1; Venezuelan codif. art. 32; Vietnam codif. art. 773.1.

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

TABLE 2.3.  THE *FAVOR LAESI* PRINCIPLE IN CROSS-BORDER TORTS

| For all cross-border torts (29) | Express (21) | (a) **Victim's choice:** Estonia, FYROM, Germany, Italy, Lithuania, Oregon, Tunisia, Uruguay, Venezuela (9). |
| | | (b) **Court's choice:** Angola, Cape Verde, Croatia, East Timor, Georgia, Guinea-Bissau, Hungary, Macau, Mozambique, Peru, Portugal, Slovenia (12). |
| | Implied (6) | China, Japan, South Korea, Quebec, Russia, Switzerland (6). |
| | Discretionary (2) | Slovakia, Vietnam. |
| Express for some cross-border torts (23) | Albania, Austria, Azerbaijan, Belarus, Belgium, Bulgaria, Czech Republic, Kazakhstan, Kyrgyzstan, Louisiana, Moldova, Poland, Puerto Rico, Romania, Rome II, Russia, Serbia, Switzerland, Taiwan, Tajikistan, Turkey, Ukraine, Uzbekistan. | |

## 1.  Express *Favor Laesi* Rule

Twenty-one codifications contain an express rule applicable to all cross-border torts; it allows the court or the victim to choose between the laws of the state of conduct and the state of injury.[80] Specifically:

(a)  Nine codifications directly authorize the victim to choose the applicable law. For example, the German codification provides that, although torts are generally governed by the law of the state of conduct, "[t]he injured party can demand that instead of this law, the law of the country in which the injury occurred is to be applied."[81] The codifications of Estonia,[82] Italy,[83] Lithuania,[84] Tunisia,[85] Uruguay,[86]

---

[80]  In addition, the idea of allowing the tort victim to choose between the laws of the place of conduct and the place of injury has also been adopted in draft legislation pending in Mexico (2006 Draft). *See* C. Fresnedo de Aguirre & D. Fernández Arroyo, A Quick Latin American Look at the Rome II Regulation, 9 *Ybk. Priv. Int'l L.* 193, 197–198 (2007).

[81]  German codif. art. 40.1. This principle, known as *Gunstigkeitsprinzip*, is traceable to an 1888 decision of the German Reichsgericht. *See* the decision of 20 November 1888, 23 Entscheidungen des Reichsgerichts in Zivilsachen [RGZ] 305 (1888).

[82]  *See* Estonian codif. art. 50 (providing for the application of the law of the state of conduct, unless the victim requests the application of the law of the state of injury).

[83]  *See* Italian codif. art. 62 (providing that torts are governed by the law of the state of injury, but "the person suffering damage may request the application of the law of the State in which the event causing the injury took place.")

[84]  Lithuanian codif. art. 1.43(1). *See also id.* art. 1.45 (defamation by mass media: victim's choice from among the laws of the victim's domicile, the tortfeasor's domicile or place of business, or the state of injury).

[85]  *See* Tunisian codif. art. 70 (providing for the application of the law of the state of conduct, unless the victim requests the application of the law of the state of injury).

[86]  *See* Uruguayan draft codif. art. 52(1) (providing that torts are governed by the law of the state of conduct or the state of injury "at the option of the injured.").

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

and Venezuela[87] give the tort victim the same choice. The Oregon codification gives the same choice but only if the activities of the tortfeasor were "such as to make foreseeable the occurrence of injury in that state."[88] The FYROM codification also subjects the victim's choice to a similar foreseeability proviso.[89]

(b) Twelve codifications authorize the court to choose the law that is more favorable to the victim. For example, the Croatian codification provides that the law of the place of conduct or the law of place of injury governs torts, "depending on which is most favorable for the injured party."[90] Again, there is no foreseeability proviso for the defendant. The same is true of the corresponding provisions of the codifications of Georgia,[91] Hungary,[92] and Slovenia.[93] In contrast, the Peruvian codification provides that if the tortfeasor is not liable under the law of the state of conduct but is liable under the law of the state of injury, the law of the latter state governs, provided that the tortfeasor should have foreseen the occurrence of the injury in that state as a result of his conduct.[94] The Portuguese codification, as well as the codifications of Angola, Cape Verde, East Timor, Guinea-Bissau, Macau, and Mozambique that are based on it, contain a substantially identical provision.[95]

---

[87] *See* Venezuelan codif. art. 32 (providing for the application of the law of the state of injury, unless the victim requests the application of the law of the state of conduct).

[88] Or. Rev. Stat. 15.440(3)(c). In order to avoid an inappropriate dépeçage, this provision states that the victim's request for the application of the law of the state of "shall be deemed to encompass all claims and issues" against the particular defendant. *Id.* This provision is subject to an exception if a party demonstrates that the application of the law of another state to a disputed issue is "substantially more appropriate under the principles of [Or. Rev. Stat. 15.445]" (which articulates the codification's residual choice-of-law approach), in which case the law of the other state applies to that issue. For a discussion of this provision by its drafter and its differences from the corresponding provisions of other codifications, *see* S. Symeonides, *Oregon Torts Exegesis,* 1022–1032.

[89] *See* FYROM codif. art. 33 (providing for the application of the law of the state of conduct, but also providing that the injured party may request the application of the law of the state of injury if the tortfeasor could and should have foreseen the occurrence of the injury in that state).

[90] Croatian codif. art. 28.1. Serbia has the same rule (*see* art. 28.1 of the (Yugoslav) Law of 15 July 1982 Concerning Conflicts with Foreign Laws, which is still in force in Serbia), but the 2012 Serbian draft adopted the *favor laesi* principle only with regard to environmental torts, restrictions to competition, and defamation.

[91] *See* Georgian codif. art. 42.1.

[92] *See* Hungarian codif. art. 33(2) (choice between the laws of the place of conduct and the place of injury). *See also id.* art. 32(4) (choice between the laws of the place of conduct and the tortfeasor's personal law for issues of culpability); *id.* art. 10(3) (choice between the *lex loci* and the *lex fori* for damages in cases of violation of personal rights). Article 32 was deleted by Act IX of 2009 as inconsistent with Rome II but it remains applicable for torts occurring before that year/

[93] *See* Slovenian codif. art. 30(1).

[94] Peruvian codif. art 2097(2).

[95] *See* Portuguese codif. art. 45.2 (providing for the application of the law of the place of conduct, but "[i]f the law of the state of injury holds the actor liable but the law of the state of conduct does not, the law of the former state shall apply, provided the actor could foresee the occurrence of damage in that country as a consequence of his act or omission."); Angola codif. art. 45.2; Cape Verde codif. art. 45.2; East Timor codif. art. 44.2, Guinea-Bissau codif. art. 45.2; Macau codif. art. 44.2; Mozambique codif. art. 45.2.

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

### 2. Implied *Favor Laesi*

In China[96] and South Korea,[97] the courts have interpreted the applicable statutory provisions as authorizing the application of the law most favorable to the victim.

The codifications of Japan, Quebec, Russia, and Switzerland contain a rule, also applicable to all cross-border torts, which provides that the law of the state of injury displaces the law of the state conduct, if the occurrence of the injury in the former state was objectively foreseeable.[98] Obviously, the foreseeability proviso is meaningful only if the law of the state of injury is more favorable to the victim than the law of the state of conduct.

### 3. Discretionary *Favor Laesi*

The Slovakian and Vietnamese codifications allow the court to choose between the laws of the state of conduct and the state of injury without specifying whether the choice must favor the victim.[99] It would not be surprising if this factor proves determinative in most cases.

### 4. Partial *Favor Laesi*

Twenty-three codifications, including Rome II, which is applicable to 27 EU countries, contain an express *favor laesi* rule applicable only to the cross-border torts shown in parentheses:

- Albania (environmental torts, infringement of rights of personality, and certain cases involving anticompetitive restrictions);[100]
- Austria (nuclear damage);[101]

---

[96] Article 187 of the Opinions of the Supreme People's Court on Several Questions Regarding the Implementation of the General Principles of Civil Law (1988) provides that the *lex loci delicti* includes the law of the place of conduct and the law of the place of injury, and that in cross-border torts, a court may choose either law. For discussion, *see* W. Chen, *Chinese Report*; Q. He, Recent Developments with Regard to Choice of Law in China, 11 *Ybk. Priv. Int'l L.* 211 (2009); Xu Donggen, Chronique de jurisprudence chinoise, *J. dr. int'l* 191 (1994). Article 44 of the Chinese codification of 2010 provides that the applicable law is the law of the state in which the "tortious act" occurred. It remains to be seen whether the quoted phrase will be interpreted to mean either the place of conduct or the place of injury.

[97] *See* K. Hyun Suk, The New Conflict of Laws Act of the Republic of Korea, 5 *Ybk. Priv. Int'l L.* 99, 127 n.45 (2003) (describing supreme court cases allowing choice of law most favorable to victim).

[98] *See* Japanese codif. art. 17; Quebec codif. art. 3126; Russian codif. art. 1219.1; Swiss codif. art. 133.2.

[99] *See* Slovak codif. art. 15; Vietnam codif. art. 773(1).

[100] *See* Albanian codif. art. 66.2 (environmental torts; applying the law of the state of injury, unless the plaintiff opts for the law of the place of conduct), art. 67 (infringement of rights of personality; the victim may choose from among the laws of the place of injury, or the victim's or the defendant's domicile), art. 64.5–6 (allowing the plaintiff to choose between the otherwise applicable law and the law of the forum in certain cases involving anticompetitive restrictions).

[101] *See* Liability for Nuclear Damage Act § 231(1), discussed in C. Wendehorst, *Austrian Report* at III. *See also id.* describing judicial decisions allowing such a choice in other cases under the stronger connection escape of codif. art. 48(2).

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

- Azerbaijan (products liability);[102]
- Belarus (products liability);[103]
- Belgium (defamation and direct actions against insurers);[104]
- Bulgaria (defamation, environmental torts, and direct action against insurer);[105]
- Czech Republic (violation of privacy and defamation);[106]
- Kazakhstan (products liability);[107]
- Kyrgyzstan (products liability);[108]
- Louisiana (conduct-regulation issues other than punitive damages);[109]
- Moldova (injury to rights of personality and products liability);[110]
- Poland (injury to rights of personality);[111]
- Puerto Rico (conduct regulation issues);[112]
- Romania (defamation, unfair competition, and products liability);[113]

---

[102] *See* Azerbaijan codif. art. 27 (victim may choose from among the laws of the victim's or the defendant's domicile, or the place of the product's acquisition).

[103] *See* Belarus codif. art. 1130 (victim may choose from among the laws of the victim's or the defendant's domicile, or the place of the product's acquisition).

[104] *See* Belgian codif. art. 99(2) (1) (applicable to defamation; allowing plaintiff to choose between the laws of the state of conduct and, subject to a foreseeability proviso, the state of injury); art. 106 (applicable to direct actions against the tortfeasor's insurer, providing that the action will be allowed if it is allowed by either the law governing the tort or the law governing the insurance contract).

[105] *See* Bulgarian codif. art. 108 (defamation: victim's choice among laws of victim's or tortfeasor's habitual residence or place of injury); art. 109 (environmental torts: victim's choice between laws of place of conduct or place of injury); and 116 (direct action against insurer: victim's choice between the law that governs the tort and the law that governs the insurance contract).

[106] See Czech codif. art. 101 (victim may choose the law of her or the defendant's habitual residence or registered office or of the place of foreseeable injury).

[107] *See* Kazakhstan codif. art. 1118 (victim may choose from among the laws of the victim's or the defendant's domicile, or the place of the product's acquisition).

[108] *See* Kyrgyzstan codif. art. 1204 (victim may choose from among the laws of the victim's or the defendant's domicile, or the place of the product's acquisition).

[109] *See* Louisiana codif. art. 3543 (law of state of conduct applies unless injury occurred in another state imposing a higher standard of conduct and the occurrence of the injury in that state was objectively foreseeable).

[110] *See* Moldova codif. art. 1617 (injury to rights of personality; victim may choose from among the laws of the victim's or the defendant's domicile, or place of injury), art. 1618 (products liability; victim may choose between the law of the victim's domicile or, subject to a foreseeability proviso, the law of the place of the product's acquisition).

[111] *See* Polish codif. art. 16 (victim may choose between the law of the place of conduct and the law of the place of injury).

[112] *See* Puerto Rico draft codif. art. 40 (law of state of conduct applies unless injury occurred in another state imposing a higher standard of conduct and the occurrence of the injury in that state was objectively foreseeable).

[113] *See* Romanian codif. art. 112 (applicable to defamation; allowing victim to choose between the laws of the defendant's domicile or residence and, subject to a foreseeability proviso, the plaintiff's domicile or residence, or the state of injury); arts. 117–118 (applicable to unfair competition; applying the law of the state of injury but also allowing the victim to choose another law in certain cases); art. 114 (products liability).

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

- Rome II (environmental torts, direct actions against insurers, and certain cases involving anticompetitive restrictions);[114]
- Russia (products liability);[115]
- Serbia (environmental torts and defamation);[116]
- Switzerland (injuries from emissions, injury to rights of personality, and products liability);[117]
- Taiwan (products liability, unfair competition, and direct actions against tortfeasor's insurer);[118]
- Tajikistan (products liability);[119]
- Turkey (defamation, direct actions against insurer, and products liability);[120]
- Ukraine (products liability);[121] and
- Uzbekistan (products liability).[122]

---

[114] *See* Rome II art. 7 (environmental torts; applying the law of the state of injury, unless the plaintiff opts for the law of the place of conduct); art. 6(3)(b) (allowing the plaintiff to choose between the otherwise applicable law and the law of the forum in certain cases involving anticompetitive restrictions); art.18 (authorizing a direct action against the insurer if such action is allowed by either the law applicable to the tort or the law applicable to the insurance contract).

[115] *See* Russian codif. art. 1221 (victim may choose from among the laws of the victim's or the defendant's domicile, or the place of the product's acquisition).

[116] *See* Serbian draft codif. art. 165 (applicable to environmental torts: allowing victim to choose between the laws of the state of conduct and the state of injury), and art. 170 (applicable to defamation: allowing plaintiff to choose between the laws of the defendant's habitual residence and, subject to a foreseeability proviso, the states of the victim's domicile or injury). *See also id.* art. 164 (applicable to cases involving anticompetitive restrictions: allowing choice of forum law if the forum's market is one of the affected markets).

[117] *See* Swiss codif. art. 138 (applicable to emissions: allowing victim to choose between the laws of the state of conduct and the state of injury); art. 139 (injury to rights of personality: giving victims a choice from among the laws of the tortfeasor's habitual residence or place of business, and, subject to a foreseeability defense, the victim's habitual residence or the place of the injury); art. 135 (products liability).

[118] *See* Taiwanese codif. art. 26 (products liability: choice from among the laws of the manufacturer's or the victim's nationality, the place of injury, or the place of the product's acquisition), art. 27 (unfair competition: choice between the law governing the tort or the contract, if any), art. 29 (choice between the law governing the tort and the law governing the insurance contract).

[119] *See* Tajikistan codif. art. 1227 (victim may choose from among the laws of the victim's or the defendant's domicile, or the place of the product's acquisition).

[120] *See* Turkish codif. art. 35 (applicable to defamation: allowing plaintiff to choose between the laws of the defendant's habitual residence or place of business and, subject to a foreseeability proviso, the states of the victim's domicile or injury); art. 34(4) (applicable to direct actions against the tortfeasor's insurer, providing that the action will be allowed if it is allowed by either the law governing the tort or the law governing the insurance contract); art. 36 (products liability).

[121] *See* Ukrainian codif. art. 50 (victim may choose from among the laws of the victim's or the defendant's domicile, or the place of the product's acquisition).

[122] *See* Uzbekistan codif. art. 1195 (victim may choose from among the laws of the victim's or the defendant's domicile, or the place of the product's acquisition).

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

5. Summary and Comparison

To summarize, of the 73 choice-of-law codifications surveyed in this chapter:

- 29 codifications follow the *favor laesi* principle for all cross-border torts; and
- 23 codifications, including Rome II, which is in force in 27 EU countries, follow the same principle in some categories of cross-border torts.
- In sum, 52 out of 73 codifications (or 71 percent) follow the *favor laesi* principle and apply whichever of the two laws favors the tort victim (Chart 2.2).

As noted earlier in this chapter, in 86 percent of the cases involving cross-border torts other than products liability, American courts have applied the law of either the state of conduct or the state of injury, whichever favored the tort victim.[123] Although a handful of these cases were decided under the "better-law" approach, which can be analogized to the *favor laesi* principle,[124] most other cases were decided under approaches that considered the policies and interests of the involved states in deterring wrongful conduct and preventing injuries from occurring, as well as other factors. In other words, the courts applied a pro-plaintiff law not necessarily because they subscribed to the pursuit of "material justice," but rather in order to achieve what they considered to be "conflicts justice." Although plaintiffs as a class have been the beneficiaries of these choice-of-law decisions, the individual plaintiffs were not the *stated* reason for these choices.[125] Nevertheless, the results were quite similar to the results reached in 71 percent of codifications of the last 50 years.

Admittedly, the comparison between codifications on the one hand and individual judicial decisions on the other hand is, in many respects, a comparison of apples and oranges. It is also an incomplete comparison in that: (1) the American side of the comparison does not include product liability conflicts in which American courts applied a pro-plaintiff law in only 52 percent of the cases;[126] and (2) the codification side of the comparison does not take account of escape clauses and other available exceptions.

Nevertheless, there is something intriguing and perhaps instructive in seeing that comparable percentages of legislative decision-makers in diverse countries and judicial decision-makers in a plurilegal country have arrived at the same results. Although it is true that there is a significant degree of mutual influence among the decision-makers of the first group, there is no evidence of any influence between the two groups, namely between American judges on the one hand and foreign codifiers on the other.

---

[123] *See supra* II.C.3.

[124] *See* J. von Hein, Something Old and Something Borrowed, but Nothing New? Rome II and the European Choice-of-Law Evolution, 82 *Tul. L. Rev.* 1663, 1682 (2008) (characterizing the *favor laesi* principle as a "cousin of the better law approach.").

[125] *See* Symeonides, *Cross-Border Torts*, 391.

[126] *See supra* II.C.4.

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use



CHART 2.2.  Applicable Law in Cross-Border Tort Conflicts

All of this suggests the intrinsic soundness of applying pro-victim law in cross-border torts. By definition, these torts involve conflicting value judgments of at least two societies as to who should bear the social and economic losses caused by injurious conduct that at least one state considers tortious. In another publication, this author has explained why the application of pro-victim law is appropriate from the perspective of policy analysis.[127] This result is equally defensible from the perspective of fairness to the parties involved. In the final analysis, of the two parties involved in the conflict, the tortfeasor is the one who is in a better position to avert the injury. All other factors being equal, it is not unfair to place the resulting loss on the tortfeasor.

If the application of the pro-victim law by the court is appropriate, does the same hold true for giving that choice directly to the plaintiff, as many codifications do? Substantively, the answer is no. From the defendant's perspective, it makes no difference because the outcome would be the same. The same is true from the plaintiff's perspective. The only difference, then, is from the court's perspective. When the choice is given to the court, the court has to determine and explain why one state's law is more favorable than the other state's law. Surprisingly, perhaps, this is not always easy, and an erroneous determination would be a ground for appeal.

---

[127]  *See* Symeonides, *Cross-Border Torts*, 391, 405–411.

EBSCOhost - printed on 1/31/2022 4:17 PM via UNIVERSITEIT VAN AMSTERDAM. All use subject to https://www.ebsco.com/terms-of-use

# EXHIBIT 5

# ROME I AND ROME II
# IN PRACTICE

*Edited by*
Emmanuel GUINCHARD






INTERSENTIA

Cambridge – Antwerp – Chicago

# THE APPLICATION OF THE ROME I AND ROME II REGULATIONS IN FRANCE

Marie-Elodie Ancel[*]

1. The National Landscape . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
    1.1. Application of Rome I and Rome II in General . . . . . . . . . . . . . . . . . 192
    1.2. Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
    1.3. Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
2. The Operation of Rome I and Rome II in Practice . . . . . . . . . . . . . . . . . . . 196
    2.1. Lois de police . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
        2.1.1. Identification of French lois de police . . . . . . . . . . . . . . . . . . . 196
        2.1.2. Effects to be Given to Foreign lois de police . . . . . . . . . . . . . . 200
    2.2. Party Autonomy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
        2.2.1. Party Autonomy under Rome I . . . . . . . . . . . . . . . . . . . . . . . . 201
        2.2.2. Party Autonomy under Rome II . . . . . . . . . . . . . . . . . . . . . . . 202
    2.3. Absence of Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
        2.3.1. Fixed Rules under Rome I . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
        2.3.2. Escape Clauses under Rome I . . . . . . . . . . . . . . . . . . . . . . . . . 204
        2.3.3. Fixed Rules under Rome II . . . . . . . . . . . . . . . . . . . . . . . . . . . 206
        2.3.4. Escape Clause under Rome II . . . . . . . . . . . . . . . . . . . . . . . . . 208
    2.4. Specific Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
        2.4.1. Carriage of Goods under Rome I . . . . . . . . . . . . . . . . . . . . . . 209
        2.4.2. Carriage of Passengers under Rome I . . . . . . . . . . . . . . . . . . . 210
        2.4.3. Consumer Contracts under Rome I . . . . . . . . . . . . . . . . . . . . 210
        2.4.4. Individual Employment Contracts under Rome I . . . . . . . . . 211
        2.4.5. Unfair Competition and Acts Restricting Free
                Competition under Rome II . . . . . . . . . . . . . . . . . . . . . . . . . . 212
    2.5. Scope of Applicable Law and Characterisation Issues . . . . . . . . . . . 213
    2.6. Foreign Law and ordre public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214
        2.6.1. Foreign Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214
        2.6.2. Ordre public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
    2.7. Relations with International Conventions . . . . . . . . . . . . . . . . . . . . . 216

* The author hereby wishes to express her sincere thanks to Mr Jean-Thomas Brière, for his linguistic revision of this contribution.

115

Marie-Elodie Ancel

3.   General Evaluation ............................................. 218
     3.1.   The Courts' Approach and Comparison with Previous Regimes..... 218
     3.2.   Taxonomy and Gaps in Rome I and Rome II................... 219
4.   Conclusion..................................................... 219
     4.1.   Summary of Findings ................................... 219
            4.1.1.   General Findings................................. 219
            4.1.2.   Rome I ........................................ 220
            4.1.3.   Rome II........................................ 221
     4.2.   Main Recommendations................................... 221

# 1.   THE NATIONAL LANDSCAPE

## 1.1.   APPLICATION OF ROME I AND ROME II IN GENERAL

The two Regulations, though eagerly anticipated and discussed by French legal scholars, have not stirred particular concern from the Ministry of Justice or from the Parliament. No particular measure aimed at facilitating the implementation of the two Regulations, which are directly applicable in the French legal order, has been enacted. Significantly, the French Ministry of Justice has not issued any circular on this topic. Under the aegis of the European Judicial Network in Civil and Commercial Matters, a national point of contact is instituted at the Department of Civil Affairs of the Ministry of Justice. There is also a local point of contact in each court of appeal and another one at the Cour de cassation level. However, no specific difficulty relating to the content of the two Regulations has been reported so far – but this does not mean there is none, as it will be shown hereafter. According to the judge designated as the national point of contact, references mostly come from abroad and relate to the French rules regarding road traffic accidents and compensation of personal and material damages.

To the author's knowledge, some French legislation mentions the Rome I Regulation (but none mentions the Rome II Regulation). Several provisions enacted in the field of prevention and resolution of banking crises are expressly characterised by the *Code monétaire et financier* as *lois de police* within the meaning of Article 9 of the Rome I Regulation (Article L. 613-50-4 and Article L. 613-45-1). A ministerial ruling regarding a national collective agreement also mentions the Rome I Regulation (along with the Rome Convention) in order to consider one paragraph as contrary to Article 8 (Article 1, arrêté du 21 août 2008 refusing to extend Article 3.11.3 of the national collective agreement on independent private education). Yet such a reference remains within the material limits of the Rome I Regulation because the contrary paragraph is included in a provision dedicated to the regime for employment contracts. Furthermore, a circular from the

Intersentia

France

Ministry of Justice recommends (subject to the assessment of the courts) that the measures taken in France to alleviate the legal consequences of the lockdown provoked by the COVID-19 crisis should be regarded as *lois de police* within the meaning of the Rome I Regulation.[1]

## 1.2. CASE LAW

French case law provides more insight into the implementation of the two Regulations. Not many cases have reached the Cour de cassation thus far (less than 20 by the end of July 2020[2] plus five more rendered in October 2018 but related to the same case),[3] though courts of appeal have issued more than a hundred decisions up to May 2017 (with some exceptions, decisions of the lower courts after this date are not examined in this contribution). In decreasing order of frequency, the most commonly applied provisions of the Rome I Regulation are Articles 8, 9, 3, 5 and 4. So far, the application of the Rome II Regulation has mostly focused on Articles 4 and 6.

Lower courts seem to be well aware of the existence of the Regulations. For instance, the temporal application of the Rome I Regulation is frequently examined in relation to employment contracts and usually correctly established.[4] Courts seldom refuse to apply the European instruments for incorrect reasons; however, some unjustified grounds for refusal can be found. For instance, a court

---

[1] French Ministry of Justice, Circular, 17 April 2020, referring to the Ordinance No. 2020-427.

[2] Cass. 1re civ, 30 April 2014, No. 13-11932 (Rome II); Cass. com., 1 March 2016, No. 14-22608 (Rome I); Cass. com., 2 November 2016, No. 15-10296 (Rome I); Cass. soc., 19 January 2017, No. 15-20095 (Rome I); Cass. soc., 1 February 2017, No. 15-23723 (Rome I); Cass. com., 4 May 2017, No. 15-22712 (Rome I); Cass. com., 8 November 2017, No. 16-10850 (Rome II); Cass. 1re civ., 24 January 2018, No. 17-10959 (Rome II); Cass. 1re civ., 5 September 2018, No. 16-24109 (Rome II); Cass. soc., 5 December 2018, No. 17-11224; Cass. 1re civ., 19 December 2018, No. 17-26663 (Rome I); Cass. soc., 20 February 2019, Nos. 17-20532, 17-20536 (Rome I); Cass. com., 7 May 2019, No. 17-15340 (Rome I and Rome II); Cass. com., 7 May 2019, No. 17-27229 (Rome II); Civ. 2e civ., 16 May 2019, No. 18-12005 (Rome I); Cass. 2e civ., 16 May 2019, No. 18-12006 (Rome I); Cass. com., 15 January 2020, No. 17-22295 (Rome II); Cass. com., 8 July 2020, No. 17-31536 (Rome I and Rome II). Also worth mentioning, Conseil d'Etat, 15 June 2019, No. 417837 (Rome I).

[3] Applying the Rome II Regulation, Cass. 1re civ., 5 October 2018, No. 17-14401; Cass. 1re civ., 5 October 2018, No. 16-19430; Cass. 1re civ., 5 October 2018, Nos. 15-26115, 15-26.388; Cass. 1re civ., 5 October 2018, No. 15-28531; Cass. 1re civ., 5 October 2018, No. 15-28891.

[4] Colmar, 31 March 2016, No. 15/05844; Paris, 2 June 2015, No. 13/01874; Paris, 21 May 2015, No. 12/09680; Douai, 20 February 2015, No. 14/01536; Colmar, 7 February 2013, No. 11/04065; Colmar, 12 January 2012, No. 11/01146 (all explaining that the Rome I Regulation shall not be applied to an employment contract concluded before 17 December 2009). See also Grenoble, 21 May 2015, No. 14/03912. Following another line of reasoning, some courts applied the Rome I Regulation to cases regarding contracts concluded before 2009 because employer and employee agreed on its application (Aix-en-Provence, 27 April 2017, No. 16/06204; Chambéry, 29 September 2016, No. 16/0025) or because the employee did not challenge its application (Lyon, 26 January 2016, No. 14/06457).

**117**

Marie-Elodie Ancel

of appeal refused to apply the Rome I Regulation to a contract entered into by parties who had their habitual residence in Switzerland because this state is not a member of the EU.[5] Even more surprisingly, another court ruled out the Rome I Regulation, holding that it is not applicable when the parties have chosen the law of their contract.[6]

French lower courts often struggle to decide which Regulation they should apply or whether they should give precedence to other sets of rules. Probably because the Rome I Regulation replaces the rather well-known Rome Convention, court practice seems to be more familiar with this Regulation than with the Rome II Regulation. For instance, in a May 2016 decision, the Aix-en-Provence Court of Appeal correctly applied the Rome I Regulation to validate the choice of the law applicable to an insurance contract, but appeared to be unaware of Article 18 of the Rome II Regulation. Regarding the admissibility of a direct action brought by the victim against the insurer of the liable person, the Court based its decision on prior French case law, which points solely to the law of the place of damage.[7] In another decision, the Nîmes Court of Appeal rightly held that the Rome I Regulation was not applicable *ratione temporis* (to an action brought by a French consumer against a German company which had manufactured the car that the consumer had bought in France from a reseller), whereas the issue should have been characterised as non-contractual, thus leading to the application of the Rome II Regulation.[8] However, in a dispute between two competitors, the Paris Court of Appeal was confronted with unfair competition activities initiated before 11 January 2009 but giving rise to ongoing alleged damages. The Rome II Regulation was held to be applicable to the dispute in its entirety.[9] Similarly, the Aix-en-Provence Court of Appeal applied exclusively the Rome II Regulation to a series of harmful events that took place between 1997 and 2010.[10] The Cour de cassation upheld its decision on the ground that previous French case law was identical to Article 4 of the Rome II Regulation (which is questionable) and that both rules were to be applied in that case.[11]

---

5    Chambéry, 8 December 2015, No. 15/01124.

6    Orléans, 9 April 2015, No. 13/03196.

7    Aix-en-Provence, 12 May 2016, No. 13/06987. To be compared with Versailles, 2 May 2017, No. 16/01166, correctly applying Article 18 of the Rome II Regulation.

8    Nîmes, 5 March 2015, No. 14/01736: the characterisation of the case as contractual comes from French case law.

9    Paris, 1 December 2015, No. 14/02708. This holding has not been challenged before the Cour de cassation (Cass. com., 8 November 2017, No. 16-10850).

10   Aix-en-Provence, 2 July 2015, No. 13/22482.

11   Cass. 1re civ., 5 October 2018, No. 17-14401 (Rome II); Cass. 1re civ., 5 October 2018, No. 16-19430 (Rome II); Cass. 1re civ., 5 October 2018, No. 15-26115-15-26.388 (Rome II); Cass. 1re civ., 5 October 2018, No. 15-28531 (Rome II); Cass. 1re civ., 5 October 2018, No. 15-28891 (Rome II).

France

In fact, the Regulations are more often invoked *outside* their scope of application rather than ignored. There are various reasons for this tropism. Firstly, many French courts base their decisions on the Rome I Regulation and simply overlook the fact that the cases under consideration fall outside its temporal scope.[12] Secondly, in at least two instances, the Rome I Regulation has been deliberately used as *ratio scripta*. In 2013, the Paris Court of Appeal used Article 4(1)(f) to identify the characteristic performance of a distribution agreement according to Article 4(2) of the Rome Convention.[13] A few days before, the Lyon Court of Appeal had based its construction of Article 6(1) of the Rome Convention (referring to 'mandatory rules') on the new wording of Article 8(1) of the Rome I Regulation (referring to 'provisions that cannot be derogated from by agreement').[14] Thirdly, in other cases, courts highlighted that the rules set out by the Rome Convention (held to be applicable to the pending cases) are confirmed, replicated or reinforced by the Rome I Regulation.[15] Finally, regarding the Rome II Regulation, it seems to have been wrongly applied (i) twice in lieu of the 1971 Hague Convention on the Law Applicable to Traffic

---

[12]   Paris (International Commercial Chamber), 5 March 2019, No. 18/04137, about a contract concluded in 2001, on the erroneous ground that it was terminated in 2011; Cass. soc., 20 February 2019, Nos. 17-20532, 17-20536 (having asked the lower court to apply the Rome I Regulation, a party cannot claim before the Cour de cassation the application of the Rome Convention); Metz, 17 May 2016, No. 14/00973, about a personal guarantee concluded in 1999 – Article 9 of the Rome I Regulation is mentioned together with Article 3 of the French Civil Code and Article 7 of the Rome Convention; Orléans, 3 March 2016, No. 15/01485, for an agency contract concluded 'in 2007 or 2008'; Lyon, 9 February 2016, No. 13/03208, for a contract concluded in 2008; Pau, 9 September 2015, No. 15/03304, about a publishing contract concluded in November 2008; Pau, 13 July 2015, No. 15/2847, about a framework contract concluded in 2007 with litigious operations concluded on 9 October 2009 and 9 December 2009; Versailles, 22 October 2014, No. 13/01771, on an employment contract concluded in 2003; Lyon, 22 April 2014, No. 12/00822, on a contract concluded in 2008; Poitiers, 28 September 2012, No. 10/03643; Douai, 29 June 2012, No. 12/00975, on a contract concluded in 1999, modified in 2008, with references to the Rome Convention too; Metz, 15 May 2012, No. 10/04280, on a contract concluded in 2008.
On the contrary some courts have rightly applied the Rome Convention: Nîmes, 2 October 2014, No. 13/00118; Versailles, 14 May 2013, No. 12/00913; Paris, 4 June 2013, No. 12/15944; Colmar, 30 March 2012, No. 11/04490; Aix-en-Provence, 14 September 2011, No. 09/22729; Colmar, 15 June 2011, No. 08/02971.
[13]   Paris, 4 June 2013, No. 12/15944.
[14]   Lyon, 28 May 2013, No. 12/05631.
[15]   Nîmes, 5 March 2015, No. 14/01736 (Article 4 of both texts); Montpellier, 11 May 2011, No. 10/06887 (Article 4(4) of the Rome Convention and Article 5 of the Rome I Regulation); Metz, 8 April 2014, No. 14/00294; Nancy, 26 October 2012, No. 12/00890 (Article 6 of the Rome Convention and Article 8 of the Rome I Regulation). More loosely, applying both the Rome Convention and the Rome I Regulation to an employment contract concluded in 2012, Aix-en-Provence, 21 May 2015, No. 13/22838.

Marie-Elodie Ancel

Accidents;[16] (ii) once in lieu of national conflict-of-law rules and the Rome I Regulation;[17] (iii) once in lieu of national conflict-of-law rules.[18]

## 1.3.   ARBITRATION

In France, arbitration appears to be a less fertile ground for the application of the two Regulations than litigation. No award referring to the Regulations has been recorded by the Association Française d'Arbitrage (AFA, also known as the Association for Arbitration). According to the International Arbitration Court of the ICC based in Paris, only two awards had applied the Rome Regulations by the end of 2013. One, rendered by an arbitral tribunal seated in Helsinki, is of very great interest because it thoroughly applied and discussed the two Regulations.[19] The dispute arose out of the sudden termination of a distribution contract, binding a Finnish manufacturer and its distributor for Greece. Finnish law expressly governed the contract. The distributor argued that its claims were non-contractual and should be adjudicated under Greek law, viewed as the law of the market affected and/or as the law of the place where the damages had occurred. Because the defendant was domiciled in the EU (as was the claimant), the arbitral tribunal found it appropriate to resort to the two Regulations.[20] The content of the award will be examined in further detail below.

## 2.   THE OPERATION OF ROME I AND ROME II IN PRACTICE

### 2.1.   *LOIS DE POLICE*

#### 2.1.1.   *Identification of French* lois de police

The interference of French overriding mandatory rules (*lois de police*) is often discussed before courts, since French case law traditionally tends to recognise such rules in contractual and non-contractual matters. For instance, in a 2006 decision, the Cour de cassation held that a provision of the French *Code de la*

---

16    See section 2.7.
17    Cass. 1re civ., 24 January 2018: lower court judges applied Article 18 of the Rome II Regulation whereas the insured obligations were contractual.
18    Cass. 1re civ., 24 September 2018, No. 16-24109: lower court judges applied the Rome II Regulation whereas the event giving rise to the damage occurred in 2006. See also, for a partial over-application, the above-mentioned decision of the Aix-en-Provence Court of Appeal, 2 July 2015, No. 13/22482.
19    ICC Award No. 16981 rendered in May 2012 and published in the ICC Dispute Resolution Bulletin 2016.
20    Even if the terminated agreement appears to have been entered into in 2000.

France

*consommation* was a *loi de police*. Further, in 2007, the Court held that the French provisions protecting sub-contractors (which give them a direct legal action against employers for payment) were also *lois de police*, to be applied whenever the building was located in France, although this reasoning was not obvious for all the judges.[21] Regarding non-contractual obligations, acts that create national funds for compensating victims of terrorism or of other specific torts are also considered *lois de police*.[22]

However, the enactment of the Rome I Regulation and the drafting of Article 9(1) seem to have reduced the judicial characterisation of *lois de police*. Under the Rome Convention, the Cour de cassation decided in 2010 that the French provision that gives carriers a direct claim for payment against recipients of the goods[23] is not a *loi de police*.[24] Consequently, for lower courts, such a direct action is admissible only if French law governs the contract for the carriage of goods.[25] The Cour de cassation also refused to label as *lois de police* the provisions of the *Code de la consommation* protecting individuals who act as personal guarantors for the benefit of a bank.[26] Under the Rome I Regulation, lower courts now follow this ruling.[27] More surprisingly, the Cour de cassation recently decided, again under the Rome Convention, that the French legislation transposing the Directive No. 86/653/EEC on commercial agents is not a *loi de police*.[28] Conversely, the *Conseil d'Etat* (the supreme administrative jurisdiction in France,) labelled as *loi de police* the French provision prohibiting the hiring

---

[21]   Cass. Ch. mixte, 30 November 2007, No. 06-14006.

[22]   For instance, Cass. 2e civ., 25 January 2007, No. 06-10514. However, they could also be considered to be public law matters.

[23]   *Code de commerce*, Article L. 132-8: 'The bill of lading shall form a contract between the consignor, the carrier and the recipient or between the consignor, the recipient, the agent on commission and the carrier. Carriers shall therefore have a direct claim for payment of their services against the consignor and the recipient, both of whom shall guarantee payment of the transport cost. Any clause to the contrary shall be deemed unwritten'.

[24]   Cass. com., 13 July 2010, No. 10-12154.

[25]   Angers, 8 September 2015, No. 13/01460; Versailles, 6 January 2015, No. 14/02383.

[26]   Cass. 1re civ., 16 September 2015, No. 14-10373.

[27]   About Articles L. 341-1, L. 341-2, L. 341-3 and L. 341-6 of the *Code de la consommation*: Metz, 17 May 2016, No. 14/00973; Douai, 28 January 2016, No. 15/00343. The position adopted by the Cour de cassation in September 2015 was anticipated earlier that year by the Metz Court of Appeal (16 April 2015, No. 12/03750).

[28]   Cass. com., 5 January 2016, No. 14-10628. Such a decision is at first sight hard to reconcile with the *Ingmar* and *Unamar* rulings (Case C-381/98, *Ingmar GB Ltd v. Eaton Leonard Technologies Inc.*, ECLI:EU:C:2000:605; Case C-184/12, *United Antwerp Maritime Agencies (Unamar) NV v. Navigation Maritime Bulgare*, ECLI:EU:C:2013:663). However its practical result is that the agent is only entitled to the compensation provided by the chosen law, i.e. German law, which happens to be the law of the country where the agent had to act on behalf of his French principal. The compensation due to the agent has therefore to be determined only by the German transposition of the Directive.

121

Marie-Elodie Ancel

of a foreigner who is not authorised to carry out a salaried activity in France (Article L. 8251-1, *Code du travail*).[29]

French provisions regulating practices that restrict competition are more difficult to assess.[30] Article L. 442-6, I, 5° (now Article L. 442-1, II) of the *Code de commerce* allows a party to an 'established business relationship' to seek compensation from its counterpart if the latter abruptly breaks off the relationship. Since the CJEU's 2016 ruling in *Granarolo*,[31] a claim based on Article L. 442-6, I, 5° has to be considered as raising a contractual issue if an at least tacit long-standing contract has been terminated. Before this ruling, French courts tended to classify the issue as either a matter of tort or delict (this was the often-repeated position of the Commercial Court of the Cour de cassation)[32] or sometimes as a *loi de police*.[33] In fact, the two approaches often resulted in the application of Article L. 442-6, I, 5°. Indeed, the damage had often occurred in France[34] or the case was considered to fall within the spatial scope of the French *loi de police*. The *Granarolo* ruling now prohibits the 'non-contractual' approach in many cases.[35] This could theoretically give more strength to the approach in terms of overriding mandatory rules, meaning that French courts still could hold Article L. 442-6, I, 5° applicable. Nonetheless, given the restrictive conception of *loi de police* now adopted by the Cour de cassation in other fields, it seems more likely that the abrupt termination of a long-standing contract (whether tacit or express) will remain under the

---

29  Conseil d'Etat, 15 June 2019, No. 417837.
30  It is worth noting that the French Senate recently proposed to expressly indicate in Articles L. 441-7 and L. 442-6 of the *Code de commerce* are *lois de police* the meaning of Article 9 of the Rome I Regulation (Sénat, Article 10 *bis* A of the Draft Law for the balance of trade relations in the agricultural and food sector and for healthy, sustainable and accessible food for all, 2 July 2018). However, the Government opposed such a mention on various grounds. First, it held that *loi de police* is 'a notion defined by international conventions and applied by courts' and that it is not up to legislative characterisation. Secondly, and more convincingly, the Government insisted on the fact that French provisions had already been applied by courts in international situations and that a legislative characterisation of specific French provisions might impede a judicial characterisation of other provisions (Assemblée nationale, Report on the Draft Law for the balance of trade relations in the agricultural and food sector and for healthy, sustainable and accessible food for all, 18 July 2018).
31  Case C-196/15, *Granarolo SpA v. Ambrosi Emmi France SA*, ECLI:EU:C:2016:559.
32  For instance, Cass. com., 13 December 2011, No. 11-12024. See also Paris, 3 April 2014, No. 13/09590.
33  Grenoble, 28 May 2015, No. 12/02016 (applying Article 7 of the Rome Convention).
34  Or the *escape clause* enshrined in Article 4(3) of the Rome II Regulation could be used to revert to French law: Paris, 30 September 2016, No. 14/04908.
35  Paris, 10 May 2017, No. 14/15261 (French law is applicable to the breaking off of a tacit contract aiming at the distribution of products in France, on the ground of Article 4(1)(f) of the Rome I Regulation); Paris (International Commercial Chamber), 5 March 2019, No. 18/04137 (breaking off governed by French law, which applies by virtue of Article 4(4) of the Rome I Regulation).

*lex contractus*.[36] In May 2019, the Cour de cassation again avoided taking a position by approving the application of Article L. 442-6, I, 5° both on the basis of the Rome I Regulation and the Rome II Regulation, adding that to argue that the French provision was a *loi de police* was overabundant.[37]

Article L. 442-6, I, 2° and Article L. 442-6, II (d) of the *Code de commerce* were also confronted with Article 9(1) of the Rome I Regulation in the *Expedia* case lodged at the Paris lower courts. As permitted by Article L. 442-6, III, the Minister for Economic Affairs asked for the cancellation of parity clauses included in contracts governed by English law and entered into by an Internet platform and owners of hotels located in France. These clauses were challenged on the basis of Article L. 442-6, II (d), which prohibits most-favoured-customer clauses, and of Article L. 442-6, I, 2°, which requires protection against significant imbalance in the rights and obligations of the parties. According to the Minister for Economic Affairs, the case was non-contractual by nature and, in any event, the whole Article L. 442-6 was a *loi de police*. The Paris Commercial Court decided differently in May 2015.[38] First of all, it characterised the case as contractual and thus as falling under the Rome I Regulation: the choice of English law was therefore totally admissible. The Court added that Article 9 requires a cautious approach, each provision having to be examined closely and separately. On this basis, the *loi de police* label was denied to Article L. 442-6, II (d) because this provision is specific to sectors where several small suppliers face one large buyer. On the other hand, Article L. 442-6, I, 2° could be a *loi de police* because the need for rebalancing a contract is generic and systemic. Such an analysis, based on the economic facet of the provision (specific sectors versus systemic value) under examination, is not entirely convincing.[39] The Minister for Economic Affairs successfully appealed against the Paris Commercial Court's judgment. In June 2017 the Paris Court of Appeal decided that his claims were tortious by nature and that the Rome II Regulation had to be applied.[40] As a consequence, English law was disregarded, on the grounds of Article 14 of the Regulation, because the Minister was not bound by the choice-of-law clauses. Article 4 thus led to French law as the law of the country where the damage had occurred.

---

[36] Paris (International Commercial Chamber), 3 June 2020, No. 19/03758. In the ICC Award No. 16981, the majority of the arbitral tribunal was not convinced that Article 18A of Greek Law 146/1914, also prohibiting the sudden and unjustified termination of long-term commercial relationships where one party is in a position of economic dependence on the other, is a *loi d'application immédiate* (in other words, an overriding mandatory rule). In particular, according to the arbitrators' views, 'the protection of a weaker party in contracts does not as such in all and every circumstance amount to an essential policy'.

[37] Cass. com., 7 May 2019, No. 17-15340.

[38] Trib. com. Paris, 7 May 2015, No. 2015000040, *Ministère de l'Economie et de l'Industrie et du Numérique v. Expedia, Inc. et al.; Ministère de l'Economie et de l'Industrie et du Numérique v. Hotels.com LP.*

[39] Especially because it is not in line with the *Unamar* ruling.

[40] Paris, 21 June 2017, No. 15/18784.

Marie-Elodie Ancel

Resorting to *lois de police* was therefore unnecessary, but this did not prevent the Paris Court of Appeal from stating in an *obiter dictum* that both Articles L. 442-6, II (d) and L. 442-6, I, 2° are overriding mandatory provisions, within the meaning of Article 16 of the Rome II Regulation, because they promote 'equality of arms and faithfulness between economic partners'. This rationale was recently endorsed by the Cour de cassation.[41] Furthermore, in 2016, the French contract law reform introduced into the Civil Code the prohibition of significant imbalance,[42] broadening its range considerably. However, it is unlikely, of the provisions in the Civil Code, that this one in particular will ultimately be labelled as a *loi de police*. Were this to be the case, it would cause much uncertainty in international contractual relationships.

### 2.1.2.  *Effects to be Given to Foreign* lois de police

To the present author's knowledge, only one case has been rendered by a French court regarding third states' *lois de police* in the context of the Rome I Regulation.[43] The treatment that was given to foreign overriding mandatory provisions does not appear completely satisfactory. In 2015, the Paris Court of Appeal had to adjudicate a claim brought by an Iranian agent against the French subsidiary of a US company.[44] Their contractual relationships were governed by French law but, because of US federal legislation prohibiting trade with Iran, the French subsidiary was prevented by its parent company from doing further business with its Iranian partner. The Court of Appeal refused 'to give effect' to the federal provisions, taking the view that the provisions did not originate from the state of the place of performance, as referred to in Article 9(3) of the Rome I Regulation. As a consequence, the French subsidiary was held to be contractually liable. Nevertheless, the Court of Appeal drew some legal consequences from the existence of the embargo in assessing the damages invoked by the Iranian party. The Court dismissed any loss of chance claimed by the agent, holding that 'because of the embargo on Iran decided by the U.S. government since 1995, the continuation of commercial relations [between the French subsidiary and the Iranian partner] was not serious' (under French law, any loss of chance has

---

41   Cass. com., 8 July 2020, No. 17-31536. It remains to be seen whether this judgment will reactivate a wider use of *lois de police* in business relationships.

42   Civil Code, Article 1171: any term of a standard form contract that creates a significant imbalance in the rights and obligations of the parties to the contract is deemed not written.

43   ICC Award No. 16981 needs to be treated separately because arbitral tribunals are not faced with *lois de police* of their own forum. In the case at hand, the arbitral tribunal felt to have only 'a duty' to enforce national overriding mandatory rules contained in the law chosen by the parties. Nevertheless, it hypothetically took the Greek provision invoked by the distributor as a *loi de police* and examined the consequences of its application or non-application. It concluded that the consequences of its non-application would be 'minimal, considering that Finnish law recognises and protects the same policy'.

44   Paris, 25 February 2015, No. 12/23757.

France

to be **serious** to be compensated). This shows that at least the existence of the US **overriding** mandatory rules was used as a fact that shaped the reasonable expectations of the Iranian **partner. However,** the Paris Court of Appeal's ruling could also have taken into **consideration the th**reat to trade with Iran represented by the US embargo in assessing the validity of the contractual **relatio**nships on the ground of the French governing law.[45] The CJEU's 2016 *Nikiforidis* ruling will probably foster further analysis and examination of foreign *lois de police* in the light of the law of the contract.[46]

## 2.2.   PARTY AUTONOMY

### 2.2.1.   *Party Autonomy under Rome I*

Party autonomy has been acknowledged for more than a century in French conflict of laws on contracts. Contemporary case law shows that the express choice of law is unproblematic[47] and *dépeçage* almost non-existent.[48] When no express choice is made, tacit or implicit consensus is quite easily accepted[49] (except in employment contracts).[50] For instance, the Metz Court of Appeal has considered, on the ground of Article 3(1) of the Rome I Regulation, that where both parties base their written submissions on French law, it clearly demonstrates a choice of that law.[51] Such a characterisation could be discussed because reference to French law could have been limited to the issue at stake before that Court in relation to the differing temporal reach of each agreement. In instances where the parties can assign or waive the rights available in disputes (*droits disponibles*), the parties can choose the law that a French court will apply. However, they are relieved of this choice as soon as the dispute is solved (this is why this kind of agreement is called *accord procédural*). Party autonomy under the Rome I Regulation binds both parties without a time limit, unless they both decide to change their initial choice. Nonetheless, in the Metz Court of Appeal decision, such a distinction was not really material because the sales contract at issue was very simple and no other dispute was likely to arise.

---

45    Compare with Poitiers, 29 November 2011, No. 10/03500 (on the grounds of the Rome Convention and French law), where it was decided that a contract for carriage of goods violating a Ghanaian embargo **was void because it had as its object an impossible** thing.
46    Case C-135/15, *Republik Griechenland v. Grigorios Nikiforidis*, ECLI:EU:C:2016:774.
47    For **instance,** Paris, 11 October 2012, **No. 11/20657 (express choice of English law) or, improperly grounded on French prior** case law, Orléans, 25 **April 2015, No. 13/03196. However,** choice of **non-state law provisions** remains a blind spot **before French courts.**
48    **Cass. soc.,** 4 December 2012, **No. 11-22166** (on the ground **of the Rome Convention,** regarding **an employment** contract).
49    Paris (International **Commercial** Chamber), 3 June 2020, No. 19/03758.
50    See section 2.4.3.
51    Metz, 26 November 2015, No. 15/00561 (implicit choice of French law).

Marie-Elodie Ancel

Tacit or implicit choice is also very often relied on for personal guarantees. In this context, various elements can serve as evidence. In one case, the Metz Court of Appeal held that the parties had made an implicit choice of Luxembourg law because of their choice of the Court of Luxembourg City, supported by the reference in the contract to two provisions of the Luxembourg Civil Code. Even though the French Civil Code once included the same provisions, the Court underlined that at the time of the conclusion of the contract these provisions had been relocated in the French Civil Code under a different number.[52] In another case, an Austrian company guaranteed the debt of another Austrian company that had bought wood from a French municipality.[53] Sales of wood by French public entities are strictly regulated under the French Forestry Code and, in this case, the sales contract was expressly submitted to French law. Moreover, the French Forestry Code requires that, when payment is deferred, an approved body must give a personal guarantee. The guarantee given by the Austrian company mentioned that specific provision and was written in French (although it was signed in Austria). Considering all these elements and given the ancillary nature of personal guarantees, the Metz Court of Appeal concluded that French law also implicitly governed the contract at issue. In yet another case, the Douai Court of Appeal decided, in a short reasoning, that because Belgian law expressly governed the guaranteed contract, it should also govern the guarantee. The Court may have felt the weakness of the argument and tried, not very convincingly, to conclude that Belgian law was applicable to the guarantee under Article 4 of the Rome I Regulation.[54]

### 2.2.2.   Party Autonomy under Rome II

Party autonomy has not been completely ignored in tort matters, but until the Rome II Regulation the parties' choice could only stem from an *accord procédural* reached by the parties once they were litigating in a French court. Under the Rome II Regulation, party autonomy is theoretically wider; however, no such case has yet been brought in French court practice.

So far, Article 14 principally appears in the aforementioned ICC Award No. 16981.[55] The distribution contract at issue included a choice-of-law clause stating that the 'agreement shall be governed by and construed in accordance with Finnish law'. However, the distributor presented its claim for sudden

---

52   Metz, 16 April 2015, No. 12/03750.
53   Pau, 22 March 2016, No. 16/01183.
54   Douai, 28 January 2016, No. 15/00343. See section 2.3.2.
55   In the dispute between the Internet platform and owners of hotels in France (the *Expedia* case, see section 2.1.1), the Paris Court of Appeal noted that the Minister for Economic Affairs had not given its consent to the contractual clauses choosing English law. Therefore, his claims, characterised as tortious, were not governed by this law (Paris, 21 June 2017, No. 15/18784).

termination of the contract as tortious in nature, relying on elements of its counterpart's behaviour 'which made the relevant acts tort'. Because the arbitral tribunal had jurisdiction to adjudicate contractual and non-contractual claims, it had to decide whether the choice of Finnish law for the contract deserved to be extended to a claim that was allegedly tortious in nature. Firstly, the majority of the arbitral tribunal disagreed with the distributor, considering that its claims derived 'from the performance of the contract and [were] therefore contractual by nature'. Secondly, 'for the sake of completeness', the arbitrators addressed the issue of the law governing these claims, had the distributor's claims been characterised as tortious. The majority of the arbitral tribunal was satisfied that the conditions provided under Article 14 were fulfilled:

> 'the Parties, which both pursue a commercial activity, entered into a clear and written choice of law before the event giving rise to the alleged damage occurred; and the record does not evidence that the choice of law was not "freely negotiated" at the time it was made'.

However, readers are left with the impression that the arbitrators overlooked one point: was a choice of Finnish law for non-contractual claims related to the distribution contract really 'demonstrated with reasonable certainty by the circumstances of the case'? At an earlier stage of its reasoning, the majority of the arbitral tribunal had noted that:

> 'it is well established in international arbitration that, except where otherwise provided, it may generally be assumed that the parties agreed on an all-encompassing reference to the chosen substantive law, i.e. such reference includes not only contractual claims in the strict sense of the term but also e.g. tort claims arising out of and in connection with the contract containing the choice-of-law clause'.

Because this contention is grounded in a general assumption and not in the circumstances of the case, the award appears to be a little fragile when it comes to this aspect.[56]

## 2.3.   ABSENCE OF CHOICE OF LAW

### 2.3.1.   Fixed Rules under Rome I

Regarding contractual matters, French courts are comfortable with fixed rules. The method echoes national case law that was, under the influence of Batiffol, based on presumptions. In this favourable context, fixed rules enshrined in the

---

[56]   See also Paris (International Commercial Chamber), 3 June 2020, No. 19/03758.

Marie-Elodie Ancel

Rome I Regulation have been used to determine the law applicable to a great variety of contracts: to an auction held in France,[57] to medical surgery performed in Belgium by a doctor established in France,[58] to the rental and setting up of tents for memorial ceremonies on the D-Day beaches in Normandy,[59] etc.

### 2.3.2. Escape Clauses under Rome I

So far, only a few decisions have addressed escape clauses under the Rome I Regulation and it is difficult to draw any consistent conclusion from them. However, it should be noted that escape clauses are not used in order to systematically revert to French law. **Personal** guarantees, carriage of goods and employment contracts offer the most **relevant** examples.

With regard to personal guarantees, absent a choice of law by the parties, French courts historically tended to presume that they were submitted to the law governing the secured obligation. Article 4(2) of the Rome Convention challenged this presumption and the Cour de cassation seemed to hesitate between a restrictive[60] and a looser[61] usage of the escape clause. The aforementioned decision rendered by the Douai Court of Appeal in 2016 seems to pick up the former presumption again.[62] The Court's reasoning is a bit confused: it appears only to rely **on Article** 4(2) of the Rome I Regulation, but in reality it ended up placing the guarantee concluded by two French nationals with their habitual residence in France **under Bel**gian law, which expressly governed the main contract.[63] In any event, **nowhere** does the Court seem to realise that the escape clause under Article 4(3) of the Rome I Regulation should be used more sparingly than under the Rome Convention. Conversely, the Paris Court of Appeal ruled that a comfort letter granted by a Luxembourg parent company to the French Post Office to guarantee the debts of its French or other subsidiaries should remain under Luxembourg law. The Court insisted on the limited use to be made of Article 4(3) of the Regulation.[64]

---

[57] Paris, 15 January 2013, No. 12/01720 (Article 4(1)(g)).
[58] Paris, 15 May 2014, No. 13/02356.
[59] Poitiers, 28 September 2012, No. 10/03643 (whether a pure provision of contract or a renting contract, the contract is to be governed by French law on the grounds of Article 4(1)(b) or (2)).
[60] Cass. com., 8 March 2011, No. 09-11751.
[61] Cass. 1re civ., 16 September 2015, No. 14-10373.
[62] See section 2.2.1: Douai, 28 January 2016, No. 15/00343.
[63] It is hard to tell whether the Court improperly applied Article 4(2) by confusing the 'characteristic performance' under the main contract and the one of the personal guarantee; or if it tried to align with the outcome of the decision rendered by the Cour de cassation on 16 September 2015.
[64] Paris (International Commercial Chamber), 10 September 2019, No. 19/06981.

204

France

The escape clause spelled out in Article 5(3) of the Rome I Regulation for the carriage of goods was at play in a decision rendered by the Cour de cassation.[65] A French company was responsible for the operation of the carriage of goods within France as part of the goods' longer journey to their ultimate destination, Italy. Judges held that a single contract had been entered into with several carriers but parties did not choose the applicable law. Because the place of receipt (France) and the place of delivery (Italy) or the habitual residence of the consignor (France) were not situated in the country of the habitual residence of the main carrier (Switzerland), Article 5(1) led the judges towards the law of the country where the place of delivery was situated, as agreed by the parties (Italy). However, pursuant to Article 5(3), the French carrier argued that manifestly closer links existed with France. This position was sternly rebutted by the Court of Appeal and, afterwards, by the Cour de cassation. Furthermore, when the habitual residence of the carrier and the place of delivery are located in the same country, French judges are very reluctant to apply the escape clause.[66]

Finally, two decisions relate to Article 8(4). In the first case, a captain was hired to sail in the Western Mediterranean and it was impossible to identify one location where he habitually carried out his work.[67] The connection with the country of the place of business of his employer (a company incorporated in the Isle of Man) was weak, since the captain had never sailed in this region. The Aix-en-Provence Court of Appeal held that closest links, within the meaning of Article 8(4), existed with France, where the captain was domiciled during the contract and where from time to time he sailed the boat in performance of the contract. In a later case, the parties had expressly submitted an employment contract to Lebanese law, though the employee was to carry out his activities in Algeria.[68] The Aix-en-Provence Court of Appeal had to examine whether a closer link existed with France, because both parties were French, the salary was paid in euros and the employer had organised the employee's return to France. These circumstances were not considered sufficient to establish a closer link with France. As a principle, when an employee carries out his activities exclusively or almost exclusively in one country, French judges do not tend to depart from the law of this country.[69]

---

[65] Cass. com., 1 March 2016, No. 14-22608 (it should be noted that judges mentioned Article 5(2) by mistake).
[66] See section 2.4.1.
[67] Aix-en-Provence, 22 January 2016, No. 15/02788.
[68] Aix-en-Provence, 2 June 2016, No. 14/21676.
[69] Sticking to the law of the place where the activities are carried out: Colmar, 29 April 2016, No. 14/02955; Colmar, 19 January 2016, No. 14/01854 and 14/01853; Douai, 19 December 2014, No. 14/01422.

129

Marie-Elodie Ancel

### 2.3.3. *Fixed Rules under Rome II*

With respect to non-contractual issues, courts are keen to rely on Article 4 of the Rome II Regulation whenever the dispute is about non-material[70] or material[71] damages or personal injury.[72] Compared to contracts, the move towards fixed rules is more dramatic because, previously, the law applicable to non-contractual relationships whose elements are spread across different countries (*délits complexes*) was mostly determined on a case-by-case basis, which resulted in judicial uncertainty.[73] Against this background, the guidance provided by Article 4 of the Rome II Regulation seems to be appreciated.[74]

Still, factual constellations that occurred before and after 11 January 2009 can be problematic.[75] For instance, an important case involved thousands of victims of defective breast prostheses, who were domiciled in many countries, and various foreign distributors that operated on behalf of the French company producing the prostheses.[76] One action was specifically brought against an organisation incorporated in Germany and its French subsidiary, which were both in charge of assessing the medical devices between 1997 and 2010. The Aix-en-Provence Court of Appeal held that, pursuant to Article 4 of the Rome II Regulation, only one law was applicable to the claims:

> 'the tort/delict occurred in the French factories of [the producer] situated in [city X] where the audits took place, the responsibility of [the French subsidiary of the German organisation], a company governed by French law, was sought by the respondents and interveners. It follows, therefore, from [Article 4], from the facts and from the procedure described above, that French law is applicable to the present proceedings'.

It may be that the manifestly closest connection existed with France, but the Court of Appeal was not willing to go into further detail. Notably, it did not mention that decisions (related to the issue of compliance certificates, their

---

70   For the non-material injury caused to a French national who had married a woman in Tunisia but who suffered from the deliberate refusal of his wife to join him in France after the wedding: Douai, 8 January 2015, No. 13/07208; for the damage caused to a woman deserted by a husband, Paris, 30 June 2016, No. 14/09535.
71   Versailles, 2 May 2017, No. 16/01166.
72   Aix-en-Provence, 24 May 2017, No. 16/06254.
73   Cass. com., 25 March 2014, No. 12-29534; Cass. com., 4 November 2014, No. 12-27072.
74   See, using Article 4(1) of the Rome II Regulation as support for the case-by-case search for the law applicable to a situation falling outside the temporal scope of the Regulation, Montpellier, 21 June 2011, No. 10/03569.
75   See section 1.2.
76   Aix-en-Provence, 2 July 2015, No. 13/22482.

France

maintenance and renewal, for instance) had been taken in Germany.[77] Then the claimants, split into five groups, challenged the decision of the Court of Appeal on various procedural and substantive aspects. In turn, the German and French firms in charge of the monitoring of the products asked for the application of German law. This is how the Cour de cassation was led to hold that both the previous case-by-case approach and Article 4 of the Rome II Regulation were applicable and that, fortunately,[78] they conciliated in designating French law. However, the reading of the Aix-en-Provence Court of Appeal decision by the Cour de cassation required to reintroduce clearer references to paragraphs 1 and 3 of Article 4 of the Rome II Regulation:

> 'the judgment states, first, that [the German firm's] liability is sought on the basis of shortcomings both in the conduct of the certification procedure and in the implementation of the monitoring and recertification, provided for in Directive 93/42, in particular during surveillance inspections of the quality carried out in the premises of the [French company], located in France; (…) it then notes that the [German firm's] actions took place from 1997 to 2010; that in the current state of these statements and findings, the Court of Appeal was able to conclude that the damage had occurred in the [French company's] plants where the defective breast implants had been manufactured and inspections carried out, indicating that the fact that the tort/delict also had the closest links with France, within the meaning of Article 4(3) of the Rome II Regulation'.

Naturally, torts committed through the Internet make the localisation of direct damage difficult. In a September 2016 decision, the Rennes Court of Appeal made a considerable effort to justify that French law was applicable to a claim brought by a French company on the ground of denigration against a Japanese competitor, which had published a press release on its website alleging that the claimant was a patent infringer.[79] According to the Court, the Japanese defendant had deliberately caused damage in France to the French claimant. The Court highlighted that (i) the press release was published in English by the Japanese firm on its '.com' website, (ii) it clearly mentioned that the French company was involved in infringement proceedings initiated in Germany, and (iii) it had been shared many times in a highly competitive sector and relied on by customers

---

[77]   Under previous case law, such kind of decisions had been taken into account or even held decisive for the determination of the applicable law: Cass, 1re civ., 19 May 1999, No. 97-13972; Cass. 1re civ., 27 March 2007, No. 05-10480 (to be compared with Cass. 1re civ., 27 May 2010, No. 09-65906).

[78]   Luck favours the bold: very few French scholars would agree with the Cour de cassation on its assertion that 'Article 3 of the Civil Code' has been 'interpreted consistently' before the entry into force of the Rome II Regulation.

[79]   Rennes, 13 September 2016, No. 15/05875. However, Article 4 was improperly applied to this dispute that fell under Article 6(2).

131

Marie-Elodie Ancel

of the French company. Clearly, in this case, the Court used 'targeting' as a criterion to localise damages allegedly caused through the Internet.

Financial disputes are another source of difficulty, as a Paris Court of Appeal decision illustrates.[80] In 2006, a French bank invested several million euros in hedge funds established under Cayman Islands law by a French investment firm. Two days after the collapse of Lehman Brothers, the bank started to secure its investments and, by 2009, it had taken over all the assets of the 'master' hedge fund. At the end of that year, the French firm and the master fund initiated proceedings in France. They blamed the bank for its abrupt withdrawal, which, according to the claimants, amounted to the French tort of abuse of right. The bank contended that Cayman Islands law should be applied. It argued that the Cayman Islands-incorporated hedge fund was the direct victim and that, because Cayman Islands law governed the contract between the bank and the hedge fund, the escape clause could not lead to any other law. However, the Court decided that French law was applicable to the case. First, it held that two of the parties (one of the claimants and the defendant) were French and that all the natural persons involved were also French. This may sound like a slightly distorted echo of Article 4(2) of the Rome II Regulation. Second, it analysed the damage claimed by the French investment firm as the loss of its fees combined with a forced standby, which had to be localised in France. The Court considered that the damages claimed by the master fund were indirect, because they were a consequence of the damage first suffered by the other fund (the so-called 'feed' fund), which was not a party to the proceedings. Thirdly, the Paris Court of Appeal rebutted any recourse to the escape clause, holding (a bit too quickly perhaps) that, because the claim had no contractual basis, the governing law of the contract did not matter. In another decision, the Paris Court of Appeal had to decide on the liability of a British bank for failure to fulfil its obligations of supervision and vigilance regarding an account opened in its books by a company, which had 'lost' the funds entrusted by a French investor. English law is held applicable on the ground of Article 4(1) of the Rome II Regulation. Again, the Paris Court of Appeal rebutted any recourse to the escape clause, **holding** that the sole circumstance that the funds had **been invested** through a **transfer** order made from an account opened in France **did not suffice** to justify the application of French law.[81]

### 2.3.4.   *Escape Clause under Rome II*

Generally speaking, the escape clause included in Article 4(3) does not seem to be overused.[82] In the dispute between the French and Japanese competitors,

---

[80]   Paris, 26 March 2013, No. 12/02707.
[81]   Paris (International Commercial Court), 12 November 2019, No. 19/03149.
[82]   See section 2.3.3: Aix-en-Provence, 2 July 2015, No. 13/22482.

France

the Japanese defendant tried to argue that German law should apply to the case.[83] It argued that the denigration proceedings before the French court were related to the infringement claim first brought in Germany and that the parties' counsels had previously exchanged correspondence, so there was 'a pre-existing relationship between the parties' within the meaning of Article 4(3) of the Rome II Regulation. The Rennes Court of Appeal found that this was insufficient grounds to maintain that 'a manifestly closer connection' existed as required by Article 4(3).[84]

Of course, the Court's self-restraint in this case and in similar ones[85] might result from the fact that French courts considered that fixed rules led to French law and were not willing to move away from this analysis. However, the decision handed down in favour of British law by the Paris Court of Appeal about the liability of a British bank shows that the escape clause is not manipulated to designate French law.[86]

## 2.4.   SPECIFIC RULES

### 2.4.1.   *Carriage of Goods under Rome I*

When faced with a carrier that has its central administration in France and goods delivered in France, French courts readily follow Article 5(1) of the Rome I Regulation and are happy to apply French law.[87] In one decision, the Douai Court of Appeal even completely denied the existence of the escape clause in Article 5.[88] Nevertheless, when courts are confronted with the opposite situation (a carrier based in a foreign country and delivery – or receipt – in the same country), the foreign law is equally held applicable because of the convergence of some of the factors listed in Article 5(1).[89] Furthermore, under such circumstances, recourse to the escape clause does not appear to be an option. For instance, in a case relating to the delivery of goods in Chile by a Chilean carrier, even though French law governed the commission contract related to this carriage, French judges did not consider the possibility of submitting the contract for the carriage of goods to French law.[90]

---

[83]   See section 2.3.3: Rennes, 13 September 2016, No. 15/05875.
[84]   Nevertheless, it has to be reminded that Article 4 was improperly applied to this dispute that fell under Article 6(2).
[85]   See section 2.3.3: Paris, 26 March 2013, No. 12/02707.
[86]   Paris (International Commercial Court), 12 November 2019, No. 19/03149.
[87]   Versailles, 6 January 2015, No. 14/02383; Angers, 8 September 2015, No. 13/01460.
[88]   Douai, 2 July 2015, No. 14/04317.
[89]   Versailles, 19 May 2015, No. 14/04111.
[90]   Paris, 29 September 2016, No. 14/21772.

**133**

Marie-Elodie Ancel

Moreover, commission contracts for the carriage of goods are still problematic despite the CJEU's *ICF* and *Haeger* rulings.[91] In a very unclear decision, the Versailles Court of Appeal tried to draw on the *Haeger & Schmidt* ruling, but it is impossible to understand whether the Court tried to apply Article 5(1) and (3) or Article 4(3) of the Rome I Regulation.[92]

### 2.4.2.   Carriage of Passengers under Rome I

Article 5(2) only appears in the background of a case rendered by the Cour de cassation in 2018.[93] An Israeli resident had taken a flight, operated by an Israeli airline company, from France to Israel. However the flight landed more than three hours late. The French first instance court directly applied EU Regulation No. 261/2004 on compensation and assistance to passengers in the event of, among others, long delay of flights. Before the Cour de cassation, the airline company contended that Israeli law was applicable by virtue of Article 5(2) of the Rome I Regulation. However, the Cour de cassation rightfully upheld that the EU Regulation directly applies in such a case (i.e. in the case of a flight departure from a Member State), the determination of the law governing the contract being irrelevant. Curiously though, the Cour added that it had not been argued that Israeli compensation would have been 'at least equivalent' to the one resulting from the EU Regulation, as if it might have changed the outcome.

### 2.4.3.   Consumer Contracts under Rome I

Only two cases are directly related to Article 6 of the Rome I Regulation. They both involve consumers with their habitual residence in France when the proceedings were initiated and professionals established abroad, in Belgium and in Germany respectively. The amounts at issue were rather high, around 15,000 euros. Quite surprisingly, no choice of law had been made and the main difficulty was to determine whether the consumers were entitled to the protection provided by Article 6(1). In the first case, the question was easily solved: a German firm had sold a fitted kitchen to a couple living in Alsace in the context of a commercial fair in Strasbourg;[94] as a consequence, French law was held to be applicable. The second case was more complicated. A consumer, allegedly living in Luxembourg at the time of the conclusion of the contract, hired a Belgian firm

---

91   Case C-133/08, *Intercontainer Interfrigo SC (ICF) v. Balkenende Oosthuizen BV and MIC Operations BV*, ECLI:EU:C:2009:617; Case C-305/13, *Haeger & Schmidt GmbH v. Mutuelles du Mans assurances IARD (MMA IARD) and Others*, ECLI:EU:C:2014:2320.
92   Versailles, 1 March 2016, No. 14/08465.
93   Cass. 1re civ., 19 December 2018, No. 17-26663.
94   Colmar, 19 October 2015, No. 14/02375.

**134**

France

to install frames, blinds and rolling shutters in his house in France.[95] The Metz Court of Appeal merely noted that the Belgian firm had agreed to perform its obligation in France, from which it inferred that it had 'directed its activities to France', where, meanwhile, the consumer had (apparently) transferred his habitual residence. One cannot help thinking that the application of the protective regime could have been more carefully thought through.

### 2.4.4.   Individual Employment Contracts under Rome I

Article 8 is the most commonly applied provision of the Rome I Regulation. Case law essentially points to two findings.[96] First, French courts tend to be reluctant to characterise a tacit choice of law. Second, they still have to improve the comparison process of the chosen law (when there is one) with the objectively applicable law.

On the first topic, several decisions follow more or less the same pattern: when references to foreign provisions are included in employment contracts, a tacit choice of the foreign law has been considered not to be 'clearly demonstrated' pursuant to Article 3(1) (to which Article 8(1) refers) because of other connecting factors pointing to France. For instance, in a 2015 Orléans Court of Appeal decision, French law was applied to an employment contract drafted in Polish, entered into by Polish parties and including many references to Polish law provisions (notably on the duration of work, vacation, notice of departure) because these connections with Poland were outweighed by several other connections with France: the French residence of the employee, the performance of the work in France, the salary paid in euros, payslips worded in French, and the express reference to a French collective agreement.[97] The Orléans Court of Appeal was cautious enough to add that even if there were a choice of Polish law, French provisions on redundancy should apply by virtue of Article 8(2). In other cases, express reference to foreign labour provisions (from Belgium in one case, from Luxembourg in the others), only identified by their date (reference was made to 'the act dated …') and not by the state from which they emanated, was not considered to demonstrate the clear intention of the French employees to accept the application of foreign law. Because the contract had to be performed in France, French law was therefore held to be applicable on the grounds of Article 8(2).[98]

---

[95]   Metz, 8 March 2016, Nos. 15/00060, 16/00064.
[96]   Regarding the escape clause enshrined in Article 8(4), see section 2.3.2; on the scope of application of the governing law, see Cass. soc., 20 February 2019, Nos. 17-20532, 17-20536 (the status of co-employer is governed by the law applicable to the employment contract).
[97]   Orléans, 17 September 2015, No. 14/02920.
[98]   Douai, 29 May 2015, No. 14/0297; Metz, 13 October 2015, Nos. 15/00477 to 15/00485.

135

Marie-Élodie Ancel

Regarding the comparison between the chosen law and the objectively applicable law (most of the time, the law of the country where the employee carries out his work),[99] the Cour de cassation had to provide some guidance to judges and parties on Article 6 of the Rome Convention. In a decision rendered in January 2017, the highest judges held that the employee at least had to allege that the objectively applicable law was more protective than the chosen law in relation to the legal basis of his claims.[100] It was not up to the judges hearing the case to make this point. In a second decision rendered in February 2017, the Cour de cassation underlined that judges have to demonstrate that French mandatory rules, and especially the provisions on fixed-term contracts and redundancy, give employees better protection than the chosen law (in this case, the law of St Vincent and the Grenadines).[101] It is true that the reasoning of French decisions is not always very clear on this aspect.[102] The comparison was better made in a decision, based on the Rome I Regulation, in which the judges relied on a legal study comparing French and English laws. The study, provided by the employee who was challenging his dismissal, pointed out that for some aspects of the redundancy procedure French law was more employee-protective. However, in a spill-over effect, all the employee's claims, and not merely the ones directly relating to the procedure of dismissal, were adjudicated on the basis of French law.[103]

### 2.4.5.   Unfair Competition and Acts Restricting Free Competition under Rome II

Of the rules on specific torts and delicts, only Article 6 of the Rome II Regulation has been applied,[104] and it has rarely happened.[105] In a 2014 decision, the Paris

---

99   Cass. soc., 5 December 2018, No. 17-11224: the Cour de cassation denies any relevance to the E101 certificate issued on the basis of Regulation (EEC) No. 1408/71 to establish the place where the employee habitually carries out his work. It holds the same within the meaning of Article 19 of the Brussels I Regulation (Cass. soc., 29 September 2014, No. 13-15802; Cass. soc., 10 June 2015, No. 13-27799).

100  Cass. soc., 19 January 2017, No. 15-20095. Already on this line, Aix-en-Provence, 2 June 2016, No. 14/21676.

101  Cass. soc., 1 February 2017, No. 15-23723.

102  Chambéry, 7 April 2016, No. 15/01583: French provisions on redundancy protection prevail over the chosen law but no indication is given on the lesser protection provided by this law.

103  Aix-en-Provence, 27 April 2017, No. 16/06204, upheld by Cass. soc., 20 February 2019, Nos. 17-20532, 17-20536.

104  In case of copyright infringement, French courts do not have recourse to Article 8 of the Rome II Regulation because Article 5(2) of the 1886 Berne Convention for the Protection of Literary and Artistic Works is read as a choice-of-law rule and takes precedence over the Regulation pursuant to its Article 28 (see for instance Cass. com., 8 November 2017, No. 16-10850).

105  Rennes, 13 September 2016, No. 15/05875, for a missed opportunity (denigration); in the Expedia case, application of Article 6 of the Rome II Regulation to claims based on practices restricting competition was not seriously discussed (Paris, 21 June 2017, No. 15/18784).

Court of Appeal correctly refused to resort to Article 6(2) and, from there, to Article 4.[106] According to the Court, the alleged activities (unfair competition and passing off related to a likelihood of confusion on the part of the public) had a collective impact, which required them to be governed by the law of the place where the market was affected. Because the website at issue had an URL ending with '/fr' and offered a magazine written in French for download, French law was applied pursuant to Article 6(1). In another case, also based on unfair competition and passing off, the same court also relied on Article 6(1) and held that Singaporean law was applicable.[107] The Court noted that the defendant had no commercial activities in France and that the acts at issue could not have taken place outside of Singapore; as a consequence, Singapore was the country where competitive relations and the market had been affected.

However, the interface between Article 6(2) and Article 4 of the Rome II Regulation is not always so well handled. As an example, the Cour de cassation recently overturned a ruling (again rendered by the Paris Court of Appeal) applying, on the ground of Articles 6(2) and 4(2), French law between two French companies, which were competing in Japan. According to the Cour de cassation, in order to do so, the lower court should have ascertained that the disputed conduct was not likely to affect the Japanese market.[108]

## 2.5.   SCOPE OF APPLICABLE LAW AND CHARACTERISATION ISSUES

For many years, the sudden termination of an established business relationship, which is regulated by a specific provision in the French *Code de commerce* (and also under Greek law),[109] has raised a characterisation issue when the dispute has an international dimension. One could contend that it recognises a tortious relationship on the grounds that, as the Advocate General Kokott put it in relation to the *Granarolo* case:

> 'the basis for the claim is not to be found in the agreements of the parties, but in a statutory provision which, for the purposes of ensuring order in economic life, reproves any abrupt termination of business relationships and provides in such cases for claims for damages by the former business partner'.[110]

---

[106]   Paris, 9 May 2014, No. 12/10744.
[107]   Paris, 1 December 2015, No. 14/02708.
[108]   Cass. com., 15 January 2020, No. 17-22295.
[109]   See section 2.1.1.
[110]   Case C-196/15, Opinion of Advocate General Kokott delivered on 23 December 2015.

Marie-Elodie Ancel

Hence, regarding the applicable law, the Rome II Regulation would have been the relevant instrument. However, the CJEU expressed a different view in its 2016 ruling in *Granarolo*. Provided that a contract exists between the parties (and such a contract can be tacit, simply relying on a body of consistent evidence), the Court considered that its termination, whatever the circumstances and the alleged statutory basis for the claim, falls under contractual matters. If the *Granarolo* ruling is adequately taken into account by French judges, it should in general lead to the application of the Rome I Regulation.

A distinct characterisation issue is raised by the action that the Minister for Economic Affairs can take to request an injunction to cease practices restricting competition, a declaration of nullity of illegal clauses or contracts and the recovery of the mistaken payments on the basis of Article L. 442-6, III of the *Code de commerce*. As the above reported *Expedia* case shows,[111] in its 2015 judgment, the Paris First Instance Commercial Court characterised such an action as pertaining to contractual matters and discussed the possible existence of *lois de police* within the meaning of the Rome I Regulation. Two years later, the Paris Court of Appeal characterised the same claims as tortious and applied Article 4 of the Rome II Regulation.[112] According to the CJEU's 2016 *VKI v. Amazon* ruling, characterisation should probably be refined.[113] In the light of this ruling, the existence of the action brought by the Minister for Economic Affairs should be determined in accordance with Article 6(1) of the Rome II Regulation, whereas the law applicable to the assessment of a particular contractual term should continue to be determined pursuant to the Rome I Regulation.

Another issue concerns the law applicable to the prescription and limitation of actions. Although Article 12(1)(d) is now formally echoed in the French Civil Code (Article 2221), the Cour de cassation had to reaffirm that the prescription of a contractual obligation, along with the claim that the contract is void, is to be governed by the law applicable to this contract and not by the *lex fori*.[114]

## 2.6.   FOREIGN LAW AND *ORDRE PUBLIC*

### 2.6.1.   *Foreign Law*

The treatment of foreign law rests on a key distinction in French law: are the rights in dispute available (*disponibles*) or not? If they are and they usually are when contracts and torts are involved and proceedings have begun – parties

---

111    Trib. com. Paris, 7 May 2015, No. 2015000040. See section 2.1.1.
112    Paris, 21 June 2017, no. 15/18784. See section 2.1.1.
113    Case C-191/15, *Verein für Konsumenteninformation v. Amazon EU Sàrl*, ECLI:EU:C:2016:612.
114    Cass. 2e civ., 16 May 2019, No. 18-12005; Cass. 2e civ., 16 May 2019, No. 18-12006.

France

can ask, either expressly or even implicitly, French courts not to apply the relevant conflict-of-law rules. This is the aforementioned *accord procédural*.[115] Moreover, if the international dimension of the case is not taken into account during the proceedings before the lower court judges, the Cour de cassation will not overturn their decision. On the other hand, if one party specifically asks for the application of foreign law, lower court judges are legally required to determine the applicable law.[116] In addition, if the parties do not plead foreign law, lower court judges are free to raise the choice-of-law issue of their own motion, provided that the adversarial principle is observed (litigants being called to enter into a debate on the applicability and the content of foreign law).

Given the universal application of the two Regulations, French courts can be required, or can decide, to apply foreign law. However, numerous practical elements may restrict this outcome. Firstly, as stated above, litigants (or their counsel) might be interested in applying French law instead of the foreign law designated pursuant to the relevant Regulation.[117] This is understandable, since French provisions are obviously more familiar to counsel pleading in France, whichever side they are on. Courts are not hostile to this kind of agreement, because it also greatly simplifies the judges' task. Secondly, when faced with employment contracts, French courts, whose jurisdiction usually results from the performance of work in France, show a tendency to resort to French law. This trend, however, may be explained by the judicial aversion to party autonomy in this field.[118] Thirdly, one might expect parties and the court in proceedings related to torts committed through the Internet to try to apply a single law, even if it is foreign, because this is easier to manage than the application of multiple laws.[119]

In practice, when foreign law is declared to be applicable, French judges bear the final burden of proof regarding establishing its content. As a consequence, they cannot reject a claim governed by a foreign law because the claimant has not established its content or because the claimant based their claim on another foreign law.[120]

Most of the time, litigants will contribute to the ascertainment of the applicable foreign law by providing *certificats de coutume* supplied by a consular

---

115  See section 2.2.2.
116  Cass. com., 2 November 2016, No. 15-10296 (one party asked for the application of Spanish law).
117  See section 2.2.1.
118  See section 2.4.3.
119  See Paris, 1 December 2015, No. 14/02708 (it is plausible that other markets than the Singapore one were affected by the litigious activities of the competitor).
120  Cass. com., 4 May 2017, No. 15-22712 (Portuguese law applicable pursuant to Article 5 of the Rome I Regulation).

139

Marie-Elodie Ancel

authority or a foreign lawyer. Judges can also rely on their personal knowledge, or commission an expert's report, or resort to international cooperation (notably thanks to the London Convention on Information on Foreign Law). The European Judicial Network can also play a role in the determination of the content of an EU Member State's law. However, these means of access to foreign law are clearly underused by French courts.

### 2.6.2.   Ordre public

On several occasions, parties have tried to challenge, before French courts, the applicable law for the reason that its application to the case would have been inconsistent with international *ordre public* of the forum. So far, this attempt has never been successful. For instance, in a case related to the non-competition clause in an employment contract, the employee criticised the chosen law (Swiss law) as being contrary to 'essential values, such as the protection of the employee and the principles of free trade and industry'. However, this contention was considered too imprecise.[121] Besides, a law that does not offer carriers a direct action against recipients for payment (whereas the *Code de commerce* does) is not contrary to French international *ordre public*.[122] From another standpoint, in ICC Award No. 16981, the majority of the arbitral tribunal found no reason to consider the Greek provision prohibiting the sudden termination of a long-term commercial relationship to be international public policy. In particular, the arbitrators noted:

'that the Greek legislator enacted this provision in 1913, then repealed it and last re-established it in 2005. It is difficult to accept that the objective and effects of a law could be that fundamental for the Greek State if it seems hesitant about its adequacy in the first place'.

## 2.7.   RELATIONS WITH INTERNATIONAL CONVENTIONS

Conflict with international conventions is addressed by the two Regulations. As far as matters covered by either of the Regulations are concerned, a pre-existing convention laying down choice-of-law rules and binding one or more Member States with third states will prevail over the Regulations. Otherwise, the relevant Regulation has to be applied by the court hearing the case. In France, several

---

121   Chambéry, 29 September 2016, No. 16/00025.
122   Douai, 2 July 2015, No. 14/04317.

Inter**140**

France

conventions are relevant, most notably the Hague Conventions.[123] However, the effectiveness of Article 28 of the Rome II Regulation and Article 25 of the Rome I Regulation should be carefully set out.

On the one hand, the 1955 Hague Convention on the Law Applicable to International Sales of Goods seems to be frequently ignored by litigants and French courts in favour of Article 4(1)(a) of the Rome I Regulation.[124]

On the other hand, the Hague Conventions on torts are more important in French courts. For instance, one of the decisions that the Cour de cassation expressly rendered on the Regulations is related to the application of the 1971 Hague Convention.[125] In this case, the lower court judges had tried to solve the conflict between the Convention and the Rome II Regulation, and they did so in favour of the Regulation. As a result, because the claimant and defendant both had their habitual residence in France, the lower court judges declared French law to be applicable on the grounds of Article 4(2) of the Rome II Convention, instead of Article 3 of the 1971 Hague Convention, which designated the law of the state where the accident occurred (i.e. Spain). Their judgment was overturned only because they misunderstood and misapplied Article 28,[126] not because they had completely ignored the 1971 Hague Convention.[127] In another case, which came before the Chambéry Court of Appeal, the 1973 Hague Convention on the Law Applicable to Product Liability was given precedence over the Rome II Regulation.[128] French law was held to be applicable pursuant to Article 4(a) of the Convention (France was the place of injury and the place of the habitual residence of the person who directly suffered damage). A different outcome would have been reached under Article 5(1) of the Rome II Regulation because the defective product had apparently not been marketed in France. Case law clearly shows that the persistence of the 1971 and 1973 Hague Conventions in the French legal order is not devoid of consequences.

---

[123]   See Notifications under Article 26(1) of Regulation (EC) No. 593/2008 of the European Parliament and of the Council on the law applicable to contractual obligations (Rome I) [2010] OJ C 343/4; Notifications under Article 29(1) of Regulation (EC) No. 864/2007 on the law applicable to non-contractual obligations (Rome II) [2010] OJ C 343/5.

[124]   Paris, 26 June 2014, No. 12/15277; Paris, 3 June 2014, No. 13/23508; Lyon, 22 April 2014, No. 12/00822. See also Nancy, 4 April 2012, No. 11/00422, resorting to Article 19 of the Rome I Regulation to assess the domestic nature of the sale of goods in dispute.

[125]   Cass. 1re civ, 30 April 2014, No. 13-11932.

[126]   According to them, the Rome II Regulation should prevail because the dispute had contacts with two EU Member States.

[127]   For another mistake, Aix-en-Provence, 6 April 2017, No. 16/09190 (according to which the 1971 Hague Convention did not apply because Italy – the state where the accident occurred – is not bound by this Convention).

[128]   Chambéry, 13 March 2014, No. 13/01863.

141

Marie-Elodie Ancel

## 3.   GENERAL EVALUATION

### 3.1.   THE COURTS' APPROACH AND COMPARISON WITH PREVIOUS REGIMES

French case law is still in the early years of the application of the two Regulations and, so far, the Cour de cassation has not had many opportunities to provide guidance. In such circumstances, it remains difficult to assess the innovations brought in by the Rome I and Rome II Regulations.

As far as the Rome I Regulation is concerned, French courts may feel a false sense of familiarity and not be sufficiently aware of the changes effected by the new instrument. For instance, the application of escape clauses – which are formulated more strictly under the Rome I Regulation than under the Rome Convention – is still uncertain, particularly when related contracts are at stake. As observed above, personal guarantees are often placed under the aegis of the law applicable to the secured obligation, whereas a commission for the carriage of goods tends to remain apart from the law governing the contract for the carriage of goods. By contrast, Article 9(1) of the Rome I Regulation seems to have had a huge influence on French judges, who are now less prone to labelling French law provisions as *lois de police*. This anti-*lois de police* trend has been reinforced by the refusal to give effect to Article 9(3) in the case pertaining to the US embargo against Iran. Because the *Unamar* and *Nikiforidis* rulings are more accommodating, French courts will have to improve the handling of (alleged) overriding mandatory rules, be they French or foreign.

The situation of the Rome II Regulation is different, as it directly replaces French case law. Courts appreciate the clarity and the legal certainty it brings to the field.[129] Nevertheless, many innovations (such as Articles 9–14) have not yet been 'tested' in French courts.

On the whole, French courts appear to be comfortable with private international law legislative instruments such as EU Regulations: written rules provide legal certainty, whereas, under the previous national private international law regime (an anomaly in the French legal order), lower court judges may have considered case law too subtle and too fragmentary. It is indicative of this trust in black-letter rules (sometimes based on a misunderstanding) that, so far, no French court, either high or low, has made a request to the CJEU for a

---

[129] Despite the Cour de cassation complimenting itself for the consistent interpretation of Article 3 of the Code civil in the field of torts/delicts: Cass. 1re civ., 5 October 2018, No. 17-14401; Cass. 1re civ., 5 October 2018, No. 16-19430; Cass. 1re civ., 5 October 2018, No. 15-26115-15-26.388; Cass. 1re civ., 5 October 2018, No. 15-28531; Cass. 1re civ., 5 October 2018, No. 15-28891. See section 2.3.3.

France

preliminary ruling on the Rome I or Rome II Regulations. However, judges often rely on CJEU rulings about the application of the Brussels I Regulation: it seems to satisfy their need for consistency.

An intermediate conclusion would be that uniformity is progressing. This optimistic view needs to be put into perspective, firstly because of the precedence that the Hague Conventions still have (at least in the field of non-contractual matters; by contrast, the 1955 Hague Convention seems to have fallen in disuse), and secondly because of the *accord procédural* that will quite often allow resort to be had to French law.

## 3.2.   TAXONOMY AND GAPS IN ROME I AND ROME II

Under the Rome I Regulation, commission contracts for the carriage of goods appear to be difficult to handle. It is possible that the *ICF* and *Haeger & Schmidt* rulings have not explained with sufficient clarity how commission contracts for the carriage of goods are to be distinguished from the carriage of goods itself under the Rome Convention. The silence of the Rome I Regulation on this topic (apart from Recital 20) does not help. In terms of characterisation and coordination, other contracts, like framework and implementation contracts, could create difficulties; however, such cases have yet to be brought before French courts.

Given the limited application of the Rome II Regulation, French courts have been confronted most of all with the handling of the taxonomy used in Article 6 and its relationship with Article 4. Proceedings between members of a group of contracts can also be problematic because, under French rules, judges are used to reasoning on contractual grounds. The cases discussed above also show that localising financial and Internet-caused damages is not an easy task. However, the CJEU rulings on Article 5(3) of the Brussels I Regulation and Article 7(2) of the Brussels Ia Regulation may be of some use to judges.

## 4.   CONCLUSION

## 4.1.   SUMMARY OF FINDINGS

### 4.1.1.   General Findings

French authorities are under the impression that the Regulations are not revolutionary and that they will bring clarity and simplification in their respective fields.

Marie-Elodie Ancel

French courts are quite aware of the existence of the Regulations. Whether for good or bad reasons, these EU instruments are more often invoked *outside* their scope of application rather than ignored. However, the persistence of the 1971 and 1973 Hague Conventions in the French legal order has significant consequences.

Only one published ICC award on claims related to the sudden termination of a long-term contract appears worthy of interest because arbitrators thoroughly applied and discussed the two Regulations.

Characterisation issues exist but can generally be solved by reference to the rulings of the CJEU. Unfortunately, for issues that have not yet been addressed, French courts are not prone to making requests for preliminary rulings related to the Rome I and Rome II Regulations.

When foreign law is declared applicable, its procedural regime is rather favourable. Moreover, *ordre public* has not been a successful defence so far. Nevertheless, an accommodating vision of *accord procédural* allows resort, from time to time, to French law.

### 4.1.2.   Rome I

The provisions of the Rome I Regulation most commonly applied by French courts are, in order, Articles 8, 9, 3, 5 and 4.

The enactment of the Rome I Regulation and the drafting of Article 9(1) seem to have reduced, at least during the first period, the judicial characterisation of *lois de police*. Besides, only one case was rendered by a French court regarding third states' *lois de police* and, in appearance only, the court denied any influence to overriding mandatory provisions emanating from a state not directly related to the performance of the contract.

French courts usually give effect to express choice of law and they rarely encounter *dépeçage*. When no express choice is made, they quite readily accept tacit or implicit choice, except in employment contracts.

French courts are comfortable with fixed rules; only a few decisions have addressed escape clauses under the Rome I Regulation and it is difficult to draw any consistent conclusion from these decisions.

While cases pertaining to Article 6 are infrequent, several decisions have been rendered on the grounds of Article 5. French courts seem to be at ease with Article 5(1) and reluctant to fall back on the escape clause, probably because the grouping of contracts that the former involves makes the latter less relevant.

Regarding employment contracts, as stated above, French courts tend to be reluctant to characterise a tacit choice of law. They also have to improve the process of comparing the chosen law (when there is one) with the objectively applicable law.

### 4.1.3. *Rome II*

At present, the application of the Rome II Regulation is mostly focused on Articles 4 and 6. Under the Rome II Regulation, only one significant occurrence of *loi de police* has been found.[130]

Compared to pre-Rome II case law, which was characterised by legal uncertainty, the guidance provided by Article 4 of the Regulation seems to be appreciated. Still, **difficulties** remain in terms of the **localisation of the place** of direct damage. **Moreover,** French courts seem to **have difficulty identifying** whether they should apply Article 4 or Article 6 and **under what circumstances** Article 6(2) enables them to apply Article 4 (i.e. when 'an act of unfair competition affects exclusively the interests of a specific competitor'). Generally speaking, the escape clause included in Article 4(3) does not seem to be overused.

### 4.2. MAIN RECOMMENDATIONS

So far, no specific changes to the two Regulations are recommended. More time should be allowed for the development and analysis of national case law. Room should also be left for preliminary rulings by the CJEU.

At the national level, some efforts could be made to improve the judicial application of the Regulations. For instance, the Ministry of Justice could issue a circular aiming to at least clarify the temporal, material and spatial scopes of the two Regulations. Furthermore, there have been exchanges between the Cour de cassation and the CJEU, which is highly valuable, but the benefits of this relationship should flow more systematically towards lower court judges.

Finally, the question arises whether, for the sake of uniformity, France should denounce the 1955 Hague Convention on the Law Applicable to International Sales of Goods and the 1973 Hague Convention on the Law Applicable to Product Liability.

---

[130]   Cass. com., 8 July 2020, No. 17-31536, based on both Article 9 of the Rome I Regulation and Article 16 of the Rome II Regulation.

# EXHIBIT 6

Thomas Kadner Graziano

# Gemeineuropäisches
# Internationales Privatrecht

Harmonisierung des IPR durch Wissenschaft und Lehre
(am Beispiel der außervertraglichen Haftung für Schäden)



BFDA 125/73

A
31.9 g
KADN
2002

Mohr Siebeck

Zwölftes Kapitel: Konsequenzen der Zersplitterung und Einfluss konkurrierender Zuständigkeiten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   462

    I. Internationale Zuständigkeit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   463
   II. Fallbeispiele . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   466
  III. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   483


Dreizehntes Kapitel: Gesamtwürdigung . . . . . . . . . . . . . . . . . . . . . . . . . .   485

    I. Entwicklung und Stand des europäischen
       Deliktskoordinationsrechts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   485
   II. Folgerungen aus der europäischen Bestandsaufnahme und der
       Auseinandersetzung mit dem Vorgefundenen . . . . . . . . . . . . . . . . . .   489
  III. Schlussfolgerungen für eine europäische Lehre . . . . . . . . . . . . . . . . .   492


Teil 3: Musterkapitel eines europäischen Lehrbuches: . . . . . . . . . . . .   495

»Europäisches Internationales Privatrecht« . . . . . . . . . . . . . . . . . . . . . . . .   496

Vorwort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   496

Außervertragliche Schuldverhältnisse: Haftung für Schäden . . . . . . . . . . .   503

     I. Fallkonstellationen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   503
    II. Ausgangslage im europäischen *materiellen* Haftungsrecht . . . . . . . . .   506
   III. Ausgangslage im IPR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   512
   IV. Grundregel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   513
    V. Konkretisierungen: Die Problematik der Distanzdelikte . . . . . . . . . . .   525
   VI. Differenzierung nach Fallgruppen . . . . . . . . . . . . . . . . . . . . . . . . . .   534
  VII. Ausnahmen von der Tatortregel . . . . . . . . . . . . . . . . . . . . . . . . . . .   579
 VIII. Abweichung von der Tatortregel bei Vorbehalten gegenüber dem
       ausländischen materiellen Recht . . . . . . . . . . . . . . . . . . . . . . . . . . .   589
   IX. Anwendungsbereich des Deliktsstatuts . . . . . . . . . . . . . . . . . . . . . . .   592
    X. Problemfälle der Qualifikation . . . . . . . . . . . . . . . . . . . . . . . . . . . .   597
   XI. Delikte im Gesamtsystem des IPR: Umfang der Verweisung,
       Renvoi und die Folgen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   601
  XII. Übungsfälle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   605
 XIII. Leitsätze für ein gemeineuropäisches Deliktskoordinationsrecht . . . .   607


Anhang: Gesetzestexte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   609

Schrifttum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   645

Stichwortverzeichnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   681

# Inhaltsverzeichnis

Vorwort .......................................................... VII

Abkürzungsverzeichnis ............................................ XXV


Einleitung ........................................................ 1

   I. Ausgangslage: Nationalisierung und Fragmentarisierung des IPR in
      Europa ...................................................... 1
  II. Gegenstand und Ziel der Untersuchung: wissenschaftliche
      Fundierung einer Lehre aus gesamteuropäischer Perspektive ...... 7
 III. Gründe für eine Europäisierung der Lehre des IPR ............. 10
     1. Anforderungen der praktischen Arbeit mit dem IPR .......... 10
     2. Europäisierung der Studentenschaft ....................... 11
     3. Schaffung eines gemeinsamen europäischen Rechtsbewusstseins
       und Wegbereitung für einen europäischen Ausbildungsmarkt .. 12
     4. Harmonisierung des Rechts ............................... 14
       a) Vorteile der Harmonisierung im Wege übernationaler Lehre ..... 14
       b) Gründe für die Harmonisierung .......................... 17
  IV. Gang der Untersuchung und Auswahl des exemplarisch
      behandelten Gebietes ....................................... 21
     1. Gang der Untersuchung ................................... 21
     2. Auswahl des Gebietes .................................... 22


Teil 1: Grundlagen ............................................... 25

Erstes Kapitel: Methode .......................................... 26

   I. Rechtsvergleichung aus europäischer Perspektive ............... 26
  II. Vorbilder .................................................. 29


Zweites Kapitel: Terminologie .................................... 33

   I. Bezeichnung des Rechtsgebietes .............................. 33
  II. Gegenstand des IPR, Kollisions- oder Koordinationsrechts ........ 37

167

Drittes Kapitel: Rechtsordnungen für den Vergleich . . . . . . . . . . . . . . . . .   41

Viertes Kapitel: Rechtsgeschichtlicher Hintergrund . . . . . . . . . . . . . . . . .   45

  I. Situation im *materiellen* Privatrecht . . . . . . . . . . . . . . . . . . . . . . . . .   46
  II. Situation im Kollisionsrecht . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48
    1. Ursprünge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48
    2. Entwicklung im 19. Jahrhundert . . . . . . . . . . . . . . . . . . . . . . .   52
      a) Internationalität des Diskurses . . . . . . . . . . . . . . . . . . . . .   52
      b) Völkerrechtliche Theorie des IPR . . . . . . . . . . . . . . . . . . .   57
      c) Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59
    3. Tendenzen zur Nationalisierung der Perspektive: Die
       Kontroverse zwischen *Ludwig von Bar* und *Theodor Niemeyer* am
       Übergang ins 20. Jahrhundert . . . . . . . . . . . . . . . . . . . . . . . .   59
      a) *Ludwig von Bar* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60
      b) *Theodor Niemeyer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62
    4. Entwicklungen im 20. **Jahrhundert** . . . . . . . . . . . . . . . . . . . . .   66
      a) Untergang der völker**rechtlichen** Theorie und der internationalen
       **Be**handlung des **Kollisions**rechts . . . . . . . . . . . . . . . . . . . .   66
      b) **Alter**native: Positivi**smus und** Nationalisierung der Behandlung des
       Kollisionsrechts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69
      c) Situation im Common Law . . . . . . . . . . . . . . . . . . . . . . . .   70
      d) **Ursachen** für den Wandel . . . . . . . . . . . . . . . . . . . . . . . . .   72
      e) **Erschei**nungsformen der Nationalisierung . . . . . . . . . . . . .   79
      f) Résumé . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82
  III. Lehren aus der Geschichte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   83
    1. Vielfalt der Sprachen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   83
    2. Nationale Kodifikationen . . . . . . . . . . . . . . . . . . . . . . . . . . .   85
    3. **Zeitgeist** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   86
    4. Ske**psis** bezüglich legislatorischer Rechtsvereinheitlichung . . . . .   87
    5. Spezifisch nationale Interessen . . . . . . . . . . . . . . . . . . . . . . . .   87
    6. **Anforderungen** der Arbeit am Detail . . . . . . . . . . . . . . . . . . .   87
    7. **Interdependenz** von (nationalem) materiellen Recht und IPR . .   88
    8. Materialfülle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   88
    9. »Vernachlässigung des positiven Prinzips« . . . . . . . . . . . . . . . .   89
    10. Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   89

Fünftes Kapitel: Stand der Kodifikation in Europa . . . . . . . . . . . . . . . . .   90

  I. Kurzer Überblick zur Geschichte der Kodifikation . . . . . . . . . . . . .   90
    1. Anfänge und Entwicklungen im 19. Jahrhundert . . . . . . . . . . . .   90
    2. Entwicklungen im 20. Jahrhundert . . . . . . . . . . . . . . . . . . . . .   94
      a) Anfänge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94
      b) Kodifikationswelle in der zweiten Hälfte des Jahrhunderts . . . . . . .   95
  II. Systematisierungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98
  III. Kodifikation durch Staatsverträge . . . . . . . . . . . . . . . . . . . . . . . . .   100

Teil 2: Außervertragliche Schadenshaftung ........................ 103

Erstes Kapitel: Ausgangslage im europäischen *materiellen* Haftungsrecht . 105

I. Ausgangspositionen und Konvergenzen ......................... 105
II. Divergenzen ............................................. 107
   1. Strikte Haftung ..................................... 107
     a) Im Allgemeinen ................................. 107
     b) Haftung des Halters einer Sache .................... 109
     c) Produkthaftung ................................. 110
   2. Haftung für mittelbare Schäden ....................... 111
   3. Haftung für immaterielle Schäden ..................... 111
   4. Angehörigenschmerzensgeld .......................... 113
   5. »Ersatz« über den eigentlichen Schaden hinaus .......... 115
   6. Haftung Minderjähriger ............................. 116
   7. Verjährung ........................................ 117
   8. Weitere wichtige Unterschiede (Überblick) ............. 120
III. Fazit ................................................. 121

Zweites Kapitel: Ausgangslage im IPR .......................... 123

I. Überblick der wichtigsten Fallkonstellationen .................. 123
   1. Straßenverkehrsunfälle ............................... 123
   2. Unfälle mit anderen Verkehrsmitteln als Autos .......... 124
   3. Unfälle im Freizeitbereich ........................... 124
   4. Konstellationen des Internationalen Wirtschaftsrechts .... 125
   5. Fälle aus dem Umwelthaftungs-, Produkthaftungs-,
     Wettbewerbsrecht und Recht des Persönlichkeitsschutzes ... 126
   6. Klassische Straftaten, insbesondere Vorsatzdelikte ........ 126
II. Koordinationsrechtliche Grundlagen ......................... 127
   1. Europäische Terminologie ............................ 127
   2. Rechtsvereinheitlichung ............................. 128

Drittes Kapitel: Gemeinsamer Ausgangspunkt .................... 131

I. Ursprünge ............................................. 131
II. Aktuelle Situation ...................................... 134
III. Weiterer Gang der Untersuchung ........................... 137

Viertes Kapitel: Geltungsgründe der Tatortregel .................. 138

I. Ursprünge ............................................. 138
II. Moderne Begründungen .................................. 140
   1. Einzelne Geltungsgründe ............................. 142
   2. Die Geltungsgründe im konkreten Fall ................. 146

III. Kritik . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   147

Fünftes Kapitel:  Alternativen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   150

  I. Beurteilung nach der Lex Fori . . . . . . . . . . . . . . . . . . . . . . . . . . . .   151
      1. Theorie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   151
      2. Reaktionen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   153
  II. Kombination von Lex Fori und Lex Loci Delicti: Die Lösung der
      englischen Rechtsprechung . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   155
      1. »Double Actionability Rule« . . . . . . . . . . . . . . . . . . . . . . . . . . .   156
          a) *The Halley* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   156
          b) *Phillips* v. *Eyre* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   157
          c) *Boys* v. *Chaplin* und *Red Sea Insurance Co. Ltd.* v. *Bouyges SA* . . . . . .   158
      2. Begründungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   159
      3. Kritik . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   160
      4. Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   163
  III. »The Proper Law of a Tort« . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   164
      1. Ausgangspunkt: Kritik der Tatortregel . . . . . . . . . . . . . . . . . . .   164
      2. Gegenstand der Theorie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   165
      3. Reaktionen in Europa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   166
          a) Übernahme der Theorie in Irland? . . . . . . . . . . . . . . . . . . . .   166
          b) Reaktionen in anderen Ländern . . . . . . . . . . . . . . . . . . . . . .   167
      4. Proper Law – eine Alternative für Europa ? . . . . . . . . . . . . . . .   168
  IV. Parteiautonomie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   170
      1. Rechtswahl als Grundprinzip . . . . . . . . . . . . . . . . . . . . . . . . . .   170
      2. Wahlmöglichkeiten de lege lata . . . . . . . . . . . . . . . . . . . . . . . . .   171
          a) Umfassende Wahlmöglichkeiten . . . . . . . . . . . . . . . . . . . . . .   172
          b) Einschränkungen beim Zeitpunkt der Rechtswahl . . . . . . . . . . . . .   173
          c) Einschränkungen der wählbaren Rechte . . . . . . . . . . . . . . . .   175
          d) Exkurs: weitere Wege zur Lex Fori . . . . . . . . . . . . . . . . . . . .   175
          e) Form der Rechtswahl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   177
          f) Schlüssige Rechtswahl im Prozess? . . . . . . . . . . . . . . . . . . . .   178
              aa) Rechtslage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   178
              bb) Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   180
      3. Praktische Bedeutung der Rechtswahl in der europäischen
         Rechtsprechung . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   180
      4. Perspektiven: Parteiautonomie als Grundprinzip – eine
         Alternative für Europa? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   181
          a) Parteiinteressen an der Wahl des Haftungsrechts . . . . . . . . .   182
              aa) Rechtswahl ex post . . . . . . . . . . . . . . . . . . . . . . . . . . . .   183
              bb) Rechtswahl ex ante . . . . . . . . . . . . . . . . . . . . . . . . . . . .   185
              cc) Zwischenergebnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   186
          b) Vereinbarkeit mit Partei- und Drittinteressen . . . . . . . . . . . .   186
              aa) Parteiinteressen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   186
              bb) Drittinteressen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   189
      5. Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   190

a) Rechtslage .................................................... 190
b) Perspektiven ................................................. 191
V. Alternativen: Gesamtergebnis ................................... 192

Sechstes Kapitel: Konkretisierungen: Distanzdelikte .................. 194

I. Einführung ...................................................... 194
II. Lösungen im geltenden Recht .................................... 196
   1. Ort der schädigenden Handlung ............................... 196
   2. Ort der Verletzung des geschützten Interesses ............... 199
   3. Ubiquitätslösung und Wahlrecht oder Günstigkeitsprinzip ..... 203
   4. Varianten (Auswahl) ......................................... 206
   5. Bildung spezieller Fallgruppen .............................. 208
   6. Ort des Eintritts weiterer Verletzungsfolgen (Folgeschäden) .. 208
   7. Résumé ...................................................... 212
III. Begründungen und Perspektiven ................................. 213
   1. Relevanz und Aktualität der Frage ........................... 213
   2. Handlungsort ................................................ 214
   3. Ort der Rechtsgutverletzung (»Erfolgsort«) .................. 216
      a) Zufälligkeit der Anknüpfung an den »Erfolgsort«? ......... 216
      b) Schwierigkeiten der Bestimmbarkeit des »Erfolgsortes«? ... 217
      c) Vorteile des Erfolgsortes bei mehraktigen Delikten ....... 218
      d) Ausrichtung an der Person des Geschädigten statt an derjenigen des
         Schädigers .............................................. 218
      e) Verhaltenssteuerungsfunktion des materiellen Haftungsrechts ..... 219
      f) Ausgleichsfunktion des materiellen Haftungsrechts und
         Interessenlage der Beteiligten .......................... 222
      g) Fazit .................................................... 223
   4. Voraussehbarkeit für den Schädiger als Korrektiv? ........... 224
      a) Rechtslage ............................................... 224
      b) Perspektiven ............................................. 225
   5. Ubiquitätslösung ............................................ 227
      a) Begründung ............................................... 227
      b) Kritik .................................................. 228
         aa) Zu den Argumenten der Befürworter dieser Lösung ...... 228
         bb) Weitere Gegenargumente ............................... 232
IV. Fazit ........................................................... 234

Siebtes Kapitel: Differenzierung nach Fallgruppen ................... 236

I. Umweltschäden .................................................. 236
   1. Rechtslage .................................................. 239
      a) Qualifikation ........................................... 239
      b) Ansprüche auf Schadensersatz ............................ 240
         aa) Rechtswahl ........................................... 240
         bb) Recht am Handlungsort? ............................... 241

cc) Ubiquitätslösungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242
dd) Recht am »Erfolgsort« . . . . . . . . . . . . . . . . . . . . . . . . . . 244
c) Unterlassungsanspruch und Wirkungen verwaltungsrechtlicher
Genehmigungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248
aa) Anknüpfung des Unterlassungsanspruchs . . . . . . . . . . . . . . 248
bb) Wirkungen verwaltungsrechtlicher Genehmigungen . . . . . . . . 250

2. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 252
a) Ersatzanspruch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 252
b) Unterlassungsanspruch und Wirkungen verwaltungsrechtlicher
Genehmigungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256

II. Schäden durch Produkte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258
1. Rechtslage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258
a) Qualifikation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258
b) Ausgangslage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
c) Lösungen im europäischen Koordinationsrecht . . . . . . . . . . . . . 261
aa) Rechtswahl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
bb) Kombination mehrerer Kriterien . . . . . . . . . . . . . . . . . . . 262
cc) Ubiquitätslösungen . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
dd) Recht des Marktortes . . . . . . . . . . . . . . . . . . . . . . . . . . 266
ee) Recht am Sitz des Schädigers . . . . . . . . . . . . . . . . . . . . . 270
ff) Gesamtabwägung aller Umstände . . . . . . . . . . . . . . . . . . . 270
d) Ansichten der Literatur (Auswahl) . . . . . . . . . . . . . . . . . . . . 270
e) Unterschiede bezüglich des geschädigten Personenkreises . . . . . . . 272
aa) Haftung gegenüber dem direkten Vertragspartner . . . . . . . . . 272
bb) Haftung gegenüber Dritten . . . . . . . . . . . . . . . . . . . . . . 273
f) Einfluss des Europarechts . . . . . . . . . . . . . . . . . . . . . . . . . 274
g) Zwischenergebnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277

2. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278
a) Zweiteilung der Fallkonstellationen . . . . . . . . . . . . . . . . . . . 278
aa) Standardfälle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279
bb) Fälle mit weitergehenden Auslandskontakten . . . . . . . . . . . . 279
i) Fallkonstellationen . . . . . . . . . . . . . . . . . . . . . . . . . 279
ii) Besondere Problematik . . . . . . . . . . . . . . . . . . . . . . . 281
b) Ausweg: Beurteilung nach dem Recht des Erwerbsortes . . . . . . . . 282
c) Kein Ausweg: Herkunftslandprinzip und (europarechtswidrige)
Ubiquitätslösungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286
aa) Herkunftslandprinzip . . . . . . . . . . . . . . . . . . . . . . . . . 286
bb) Ubiquitätslösungen . . . . . . . . . . . . . . . . . . . . . . . . . . 286
d) Erwerbsort bei Distanzkäufen . . . . . . . . . . . . . . . . . . . . . . 289
e) Erforderlichkeit der Vorhersehbarkeit des maßgeblichen Rechts für
den Hersteller? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

3. Résumé . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293

III. Beeinträchtigungen der Persönlichkeit durch Massenmedien
(am Beispiel der Presse) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294
1. Rechtslage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295
a) Qualifikation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295
b) Ausgangslage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297
c) Anknüpfungen im geltenden Recht . . . . . . . . . . . . . . . . . . . . 299

      aa) Sitz des Herausgebers bzw. Erscheinungsort des
           Presseerzeugnisses . . . . . . . . . . . . . . . . . . . . . . 299
      bb) Ubiquitätslösungen . . . . . . . . . . . . . . . . . . . . . 299
      cc) Verbreitungsort . . . . . . . . . . . . . . . . . . . . . . . 303
      dd) Kumulative Anwendung des Rechts am Verbreitungsort und
           der Lex Fori . . . . . . . . . . . . . . . . . . . . . . . . 306
      ee) Gewöhnlicher Aufenthalt der Betroffenen . . . . . . . . . . 308
    d) Recht auf Gegendarstellung . . . . . . . . . . . . . . . . . . . . 310
    e) Ergebnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311
      aa) Bandbreite der Lösungen . . . . . . . . . . . . . . . . . . 311
      bb) Übereinstimmungen . . . . . . . . . . . . . . . . . . . . . 313
  2. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314
  3. Verbreitungs- oder Erwerbsort? . . . . . . . . . . . . . . . . . . 319
  4. Verbreitungsort und internationale Zuständigkeit . . . . . . . . . . . 320
IV. Unlauterer Wettbewerb . . . . . . . . . . . . . . . . . . . . . . . . . 324
  1. Rechtslage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325
    a) Gemeinsamkeiten . . . . . . . . . . . . . . . . . . . . . . . . 325
    b) »Ausreißer« . . . . . . . . . . . . . . . . . . . . . . . . . . . 328
    c) Einfluss des Europarechts . . . . . . . . . . . . . . . . . . . . 330
    d) Unterschiede . . . . . . . . . . . . . . . . . . . . . . . . . . 333
      aa) Ort der »Ein-« oder der »Auswirkung« . . . . . . . . . . . 333
      bb) Möglichkeit der Rechtswahl . . . . . . . . . . . . . . . . . 335
      cc) Auslandswett**bewerb** unter Inländern . . . . . . . . . . . . 336
      dd) Nicht markt**gerichte**te Maßnahmen gegen einzelne
           Konkurrenten . . . . . . . . . . . . . . . . . . . . . . . . 338
      ee) Akzessorische Anknüpfung . . . . . . . . . . . . . . . . . . 338
  2. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339
V. Reine Vermögensschäden . . . . . . . . . . . . . . . . . . . . . . . . 341
  1. Ortsdelikte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342
  2. Distanzdelikte: Lösungen im geltenden Recht . . . . . . . . . . . . 343
    a) Rechtswahl der Parteien . . . . . . . . . . . . . . . . . . . . . 344
    b) Handlungsort des Schädigers . . . . . . . . . . . . . . . . . . 345
    c) Ort der Entgegennahme unrichtiger Erklärungen und
      Handlungsort des Ge**sch**ädigten . . . . . . . . . . . . . . . . 346
    d) Ort der Ausführung von Handlungen, zu denen der Schädiger
      angestiftet hat . . . . . . . . . . . . . . . . . . . . . . . . . 348
    e) Ubiqu**it**ätslösungen . . . . . . . . . . . . . . . . . . . . . . . 349
    f) **Lageort** des beeinträchtigten Vermögens oder »Vermögenszentrale«
      des Geschädigten . . . . . . . . . . . . . . . . . . . . . . . . 350
  3. Fazit und Perspektiven . . . . . . . . . . . . . . . . . . . . . . . 352
VI. Schlussfolgerungen . . . . . . . . . . . . . . . . . . . . . . . . . . . 357
  1. Schwerpunkte der Anknüpfung . . . . . . . . . . . . . . . . . . . 357
  2. Gemeinsame Anknüpfung an den Marktort? . . . . . . . . . . . . . 359
  3. Sonderregelungen für spezielle Fallgruppen? . . . . . . . . . . . . . 360

Achtes Kapitel: Ausnahmen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 363

  I. Ausgangspunkt: Kritik der Tatortregel . . . . . . . . . . . . . . . . . . . . . . 364
  II. Reaktionen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365
    1. Ausnahmslose Beibehaltung der Tatortregel . . . . . . . . . . . . . 365
      a) Rechtslage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365
      b) Begründungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369
      c) Relativierungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 370
    2. Dépeçage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372
      a) Benelux-Entwurf von 1950 und 1969 . . . . . . . . . . . . . . . . 372
      b) Dépeçage im geltenden Recht . . . . . . . . . . . . . . . . . . . . . . . 374
      c) Reaktionen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377
      d) Berücksichtigung faktischer Gegebenheiten . . . . . . . . . . . . . . . . 378
    3. Ausnahmen bei gemeinsamem gewöhnlichen Aufenthalt oder
       gemeinsamer Staatsangehörigkeit . . . . . . . . . . . . . . . . . . . . . 379
      a) Anknüpfung ausschließlich an die gemeinsame Staatsangehörigkeit . 379
      b) Gemeinsame Staatsangehörigkeit und gewöhnlicher Aufenthalt im
        selben Staat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 380
      c) Gewöhnlicher Aufenthalt im selben Staat . . . . . . . . . . . . . . . . . 382
      d) Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 387
    4. Allgemeine Ausweichklauseln . . . . . . . . . . . . . . . . . . . . . . . . . 389
    5. Ausnahmsweise Anknüpfung an den Zulassungsstaat: Die
      Regelung im Haager Verkehrsunfallübereinkommen . . . . . . . . . . 390
      a) Grundzüge der Anknüpfung . . . . . . . . . . . . . . . . . . . . . . . . 391
      b) Kritik . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392
    6. Akzessorische Anknüpfung . . . . . . . . . . . . . . . . . . . . . . . . . . . 394
      a) Anknüpfung an das Vertragsstatut . . . . . . . . . . . . . . . . . . . 396
      b) Sonstige . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400
      c) Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400
  III. Gesamtergebnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

Neuntes Kapitel: Abweichung von der Tatortregel bei Vorbehalten ge-
gen das ausländische Recht . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406

  I. Allgemeine Vorbehaltsklauseln . . . . . . . . . . . . . . . . . . . . . . . . . . . 406
  II. Spezielle Vorbehalte im Internationalen Deliktsrecht . . . . . . . . . . . 412
    1. Umfassende Vorbehalte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412
    2. Korrekturen auf der Tatbestandsebene . . . . . . . . . . . . . . . . . . 413
    3. Vorbehalte auf der Rechtsfolgenseite . . . . . . . . . . . . . . . . . . . 414
    4. Fazit und Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 416

Zehntes Kapitel: Anwendungsbereich des Deliktsstatuts und Fragen der
Qualifikation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

  I. Anwendungsbereich . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418
    1. Gemeinsamkeiten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

   2. Unterschiede .................................................... 421
     a) Deliktsfähigkeit ............................................ 421
     b) Schadensbemessung ........................................ 422
     c) Beweislast ................................................ 423
     d) Direktanspruch **gegen** Haftpflichtversicherer .................. 425
     e) Gesetzlicher Üb**ergang** des Anspruchs auf den Versicherer
       (Subrogation) ............................................. 429
     f) Vererblichkeit deliktischer Ansprüche ........................ 433
   3. Verhaltensnormen und Sicherheitsstandards am Handlungsort .. 434
   4. Fazit ......................................................... 435
  II. Qualifikation ..................................................... 435
    1. Schädigungen im Vorfeld eines Vertragsschlusses ............... 435
    2. Schädigungen nach Vertragsschluss: Qualifikations- und
     Konkurrenzfragen im Grenzbereich zwischen Vertrags- und
     Deliktsrecht .................................................. 437
     a) Ausgangslage ............................................. 437
     b) Grundsatz: Qualifikation *lege fori* .......................... 439
     c) Problemfälle .............................................. 442
     d) Lösungswege im geltenden Recht ............................ 445
       aa) Ebene der Qualifikation ................................ 445
       bb) Ebene der Konkurrenzen ............................... 447
     e) Beachtlichkeit vertraglicher Haftungsausschlüsse ............... 449
       aa) Beurteilung nach dem Deliktsstatut ...................... 449
       bb) Beurteilung nach dem Vertragsstatut ..................... 449
     f) Fazit und Perspektiven ..................................... 450
    3. Weitere Fälle ................................................. 451
     a) Unbekannte Institute des ausländischen Rechts ................ 451
     b) Sonstige .................................................. 452

**Elftes Kapitel: Delikte im Gesamtsystem des IPR – Umfang der
Verweisung, Renvoi und die Folgen** ................................. 454

  I. Rechtslage ...................................................... 455
    1. Reine Sachnormverweisungen ................................. 455
    2. Differenzierende Lösungen ................................... 456
    3. Gesamtverweisungen ........................................ 457
  II. Fazit und Perspektiven ........................................... 459

**Zwölftes Kapitel: Konsequenzen der Zersplitterung** .................. 462

  I. Internationale Zuständigkeit ..................................... 463
  II. Fallbeispiele .................................................... 466
    1. Straßenverkehrsunfälle ....................................... 466
     a) Entscheidung in Frankreich ................................ 467
       aa) Lösung nach französischem Richterrecht .................. 467
       bb) Lösung nach dem Haager Übereinkommen ................ 469

  b) Entscheidung in Deutschland . . . . . . . . . . . . . . . . . . . . . . . . . . . . 471
  c) Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 472
  d) Varianten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 473
 2. Skiunfälle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 474
  a) Ausgangsfall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 474
  b) Varianten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475
 3. Umweltschäden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 477
  a) Internationale Zuständigkeit . . . . . . . . . . . . . . . . . . . . . . . . . . . 477
  b) Anwendbares Recht . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 478
 4. Produkthaftung . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 479
  a) Ausgangsfall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 479
  b) Variante . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 480
 5. Verletzung von Persönlichkeitsrechten durch Massenmedien . . . 481
 III. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483


Dreizehntes Kapitel: Gesamtwürdigung . . . . . . . . . . . . . . . . . . . . . . . . 485

 I. Entwicklung und Stand des europäischen
    Deliktskoordinationsrechts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 485
 II. Folgerungen aus der europäischen Bestandsaufnahme und der
    Auseinandersetzung mit dem Vorgefundenen . . . . . . . . . . . . . . . . . 489
  1. Klare Ausgangspositionen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 489
  2. Klärungsbedarf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 490
  3. Leitsätze für ein gemeineuropäisches Internationales
     Deliktsrecht . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 491
 III. Schlussfolgerungen für eine europäische Lehre . . . . . . . . . . . . . . . 492


Teil 3:  Musterkapitel eines europäischen Lehrbuches: . . . . . . . . . . . . 495


Europäisches Internationales Privatrecht
Vorwort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 496

Außervertragliche Schuldverhältnisse: Haftung für Schäden . . . . . . . . . 503

 I. Fallkonstellationen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 503
 II. Ausgangslage im europäischen *materiellen* Haftungsrecht . . . . . . . . 506
 III. Ausgangslage im IPR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512
 IV. Grundregel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 513
  1. Übereinstimmungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 513
  2. Geltungsgründe der Tatortregel und Kritik . . . . . . . . . . . . . . . 515
  3. Alternativen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 517
   a) Geltung der Lex Fori . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 517
   b) Kumulative Anwendung von Tatortrecht und Lex Fori . . . . . . . 518
   c) Geltung eines »Proper Law of a Tort« . . . . . . . . . . . . . . . . . . 519
   d) Rechtswahl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 520

aa)  Situation de lege lata ............................. 520
bb)  Perspektiven ................................... 523
e)  Alternativen: Fazit und Perspektiven ................. 525
V.  Konkretisierungen: Die Problematik der Distanzdelikte .......... 525
1.  Rechtslage .......................................... 525
2.  Begründungen und Perspektiven ....................... 530
VI.  Differenzierung nach Fallgruppen ......................... 534
1.  Umweltschäden ..................................... 535
a)  Rechtslage ..................................... 535
b)  Perspektiven ................................... 540
2.  Schäden durch Produkte .............................. 541
a)  Rechtslage ..................................... 542
b)  Perspektiven ................................... 550
3.  Beeinträchtigung von Persönlichkeitsrechten durch
Massenmedien (am Beispiel der Presse) ................. 554
a)  Rechtslage ..................................... 555
b)  Perspektiven ................................... 561
4.  Unlauterer Wettbewerb .............................. 564
a)  Rechtslage ..................................... 565
b)  Perspektiven ................................... 572
5.  Reine Vermögensschäden ............................. 572
a)  Rechtslage ..................................... 573
b)  Perspektiven ................................... 576
6.  Fazit .............................................. 577
VII.  Ausnahmen von der Tatortregel .......................... 579
VIII.  Abweichung von der Tatortregel bei Vorbehalten gegen das
ausländische Recht .................................... 589
IX.  Anwendungsbereich des Deliktsstatuts ..................... 592
X.  Problemfälle der Qualifikation ........................... 597
XI.  Delikte im Gesamtsystem des IPR: Umfang der Verweisung,
Renvoi und die Folgen ................................. 601
XII.  Übungsfälle .......................................... 605
Fall 1:  Straßenverkehrsunfall ............................ 605
Fall 2:  Unfall beim Freizeitsport ......................... 606
Fall 3:  Schädigungen auf dem Weg über die Umwelt .......... 606
Fall 4:  Produkthaftung ................................. 606
Fall 5:  Beeinträchtigung von Persönlichkeitsrechten durch die
Presse ......................................... 607
XIII.  Leitsätze für ein gemeineuropäisches Deliktskoordinationsrecht .... 607

Anhang: Gesetzestexte ...................................... 609

Schrifttum ................................................ 645

Stichwortverzeichnis ........................................ 681

*2. Kapitel: Ausgangslage im IPR*

Im September 199**8 verabschi**edete die Expertengruppe »Groupe Européen de Droit International **Privé/Europ**ean Groupe for Private International Law« einen Vorschlag für eine umfassende internationale Regelung des IPR der außer**vertragli**chen Haftung[43], der inzwischen als Grundlage für die weiteren Über**legungen** dient.

All diese neueren Vorhaben reichen bislang nicht über das Stadium von Diskussionsvorschlägen bzw. Vorentwürfen hinaus[44]. Wie das materielle Haftungsrecht, so ist auch das IPR der Delikte gegenwärtig in weiten Bereichen nationales Recht[45].

---

vom 26.– 28. 11. 1998 in Würzburg vorlag. Für Informationen über das Vorhaben und die Diskussionspunkte siehe *Rolf Wagner*, EuZW 1999, 709; siehe auch *Strikwerda*, WPNR 2000, 774.

[43] Proposition pour une convention européene sur la loi applicable aux obligations non contractuelles, Texte adopté lors de la réunion de Luxembourg du 25–27 septembre 1998 (in französischer und englischer Fassung); die englische Fassung ist abgedruckt in NILR 1998, 465; ERPL 1999, 46; WPNR 2000, 778, die französische in IPRax 1999, 286. Zu dem Entwurf *Jayme*, IPRax 1999, 298; *Fallon*, ERPL 1999, 45.

[44] In der Begründung der Bundesregierung zur Ergänzung des EGBGB von 1999 um Regelungen zum Deliktskollisionsrecht, BT-Drs.14/343, S. 6, heißt es zu den Erfolgsaussichten des Vorhabens des Rates der EU: »Mit einem alsbaldigen Abschluss dieser Verhandlungen, deren Ausgang offen ist, ist jedoch nicht zu rechnen«. Das vorläufige Scheitern der Bemühungen der Europäischen Union um ein Grünbuch zur Verordnung »Rom II« scheint diese Einschätzung **zu** bestätigen.

[45] Die vorliegende Untersuchung bezieht neben den Lösungen der beiden Haager Übereinkommen und der nationalen Rechte auch die erwähnten Entwürfe ein, wurden sie doch jeweils von international besetzten Gremien auf rechtsvergleichender Grundlage erarbeitet und sind insofern Indiz für einen möglichen übernationalen Konsens oder zumindest Kompromiss.

# Drittes Kapitel:

# Gemeinsamer Ausgangspunkt

> »A première vue, il pourrait sembler que ce sujet ne
> soulève pas des grandes difficultés, puisque la compé-
> tence législative aussi bien que juridictionnelle dans le
> domaine des actes illicites obéit à des règles générale-
> ment admises en droit international privé.«
>
> *Bernard Dutoit*[1]

## I. Ursprünge[2]

Von den Anfängen bis weit ins 20. Jahrhundert hinein bestand im europäischen
Kollisionsrecht der außervertraglichen Schadenshaftung über das Grundprinzip ei-
ne bemerkenswerte Einigkeit. Delikte wurden über die Jahrhunderte nach dem
Recht des Ortes beurteilt, an dem sie begangen worden waren (*Lex Loci Delicti*).
Die Tatortregel wurde nach heute herrschender Ansicht bereits im 12. und 13.
Jahrhundert, also der Frühzeit des europäischen Kollisionsrechts, entwickelt und
gehört somit zu dessen ältesten Regeln[3]. (Zuvor hatte bei Streitigkeiten von Perso-
nen verschiedener Rechtszugehörigkeit die Lex Fori dominiert, sofern man dem

---

[1] Mémorandum relatif aux actes illicites en droit international privé, S. 9 Ziff. 2, in: Conférence de La
Haye de droit international privé, Actes et documents de la Onzième session du 7 au 26 octobre 1968,
Tome III, La Haye 1970; siehe dann aber das oben, eingangs des 2. Teils wiedergegebene Ergebnis seiner
Studie; ebenso (der erste Blick täuscht vollständig) *Broggini*, Riv. dir. int. priv. proc. 1995, 241 (248f.)
und sein oben, S. 103 Fn. 1, wieder**gegeb**enes Zitat.

[2] Siehe zu den Anfängen die **hervorra**genden Darstellungen von *Erauw*, De onrechtmatige daad in
het internationaal privaatrecht, 1982, S. 25ff.; *Hohloch*, Das Deliktsstatut, 1984, S. 7ff.; *Rohe*, Zu den
Geltungsgründen des Deliktsstatuts, 1995, S. 6ff., jeweils m. zahlr. w. Nachw.

[3] *Batiffol*, Anmerkung zum Fall *Lautour c. veuve Guiraut*, Rev. crit. 1949, 89 (92): »la solution est une
des plus anciennes du droit international privé«; *Batiffol/Lagarde*, DIP, I, No. 216, 285; *Pierre Mayer*, DIP,
No. 678: »solution traditionelle en jurisprudence et en doctrine depuis le Moyen Age«; *Bourel*, Rec. des
Cours, Vol. 214 (1989-II), S. 251 (261); *De Boer*, AA 1992, 521 (522): »Sinds jaar en dag gold in Nede-
land en elders in de wereld de notie dat **een** internationale onrechtmatige daad wordt beheerst door het
recht van het land waar de schadeveroorzakende gebeurtenis zich voordeed: de *lex loci delicti*.«; *Pérez Be-
vía*, in: *Aguilar Benítez de Lugo* u.a. (Hg.), Lecciones, S. 299; *Mádl/Vékás*, Law of Conflicts, 228; aus der
älteren Lit. *Gutzwiller*, Geschichte, S. 26f., er zählt die Lex Loci Delicti zu den Fundamenten des IPR,
die bereits in der Frühphase zwischen 1150 und 1338 gelegt wurden; *Rabel*, Conflict of Laws, II, S. 235,
bezeichnete die Lex Loci als »The principle unanimously established by the canonists and later the statu-
tists since the 13th century«. – Siehe für eine Gegenauffassung *Ehrenzweig*, Int. Enc. Comp. L. Vol. III,
Ch. 32, S. 3ff.

Fremden überhaupt Rechts- und Prozessfähigkeit zubilligte[4].) Bei den Erwägungen zum Kollisionsrecht der Delikte stand (wie im materiellen Deliktsrecht) allerdings lange Zeit die Strafsanktion im Vordergrund[5]. Äußerungen in der europäischen kollisionsrechtlichen Literatur, die sich speziell auf die zivilrechtliche Seite der Delikte bezogen, blieben über die Jahrhunderte ausgesprochen selten[6]. Selbst im Werk *Joseph Storys* zum Conflict of Laws, dessen erste Auflage 1834 erschien, fehlte das private IPR der Delikte noch völlig[7]. In der ersten Auflage des »Traité de droit international privé« von *Jean-Jacques Gaspard Foelix* aus dem Jahre 1843 sind die Überlegungen zum zivilrechtlichen Schadensausgleich noch stark von strafrechtlichen Vorstellungen überlagert[8].

Ein wirklich eigenständiger Charakter des zivilen Koordinationsrechts für Delikte entwickelte sich erst, als Ende des 18. und vor allem im 19. Jahrhundert die großen Zivilrechtskodifikationen geschaffen wurden, mit ihnen eine Entpönalisierung der Delikte einsetzte und gleichzeitig das Fallmaterial grenzüberschreitender Delikte reicher wurde[9].

Ein frühes Beispiel dafür, wie sich im 19. Jahrhundert die privatrechtliche langsam von der strafrechtlichen Tatortregel löste, findet sich in einem Urteil des *OAG München* aus dem Jahre 1829. In einem Fall des außerehelichen Beischlafes (neben den Briefdelikten[10] die praxisrelevanteste Materie des Internationalen Deliktsrechts jener Zeit[11]) heißt es, dieser stehe zwar nicht mehr unter Strafe, stelle sich aber »immer noch als eine unerlaubte, verwerfliche Handlung dar«, weshalb guter Grund

---

[4] Näher *Hohloch*, Deliktsstatut, S. 9ff., 16f.; *Erauw*, Onrechtmatige daad, S. 31; siehe auch *Batiffol/Lagarde*, DIP, I, No. 215. *Hohloch*, S. 241, verweist darauf, dass lange Zeit nicht die Frage im Vordergrund stand, ob und inwieweit im Inland ausländisches Recht zur Anwendung kommen soll, sondern die Frage, inwieweit der Richter das eigene Recht auf Auswärtige anwenden durfte, die in seinem Gerichtsbereich delinquiert hatten. Auch die Tatortregel habe also zunächst der Durchsetzung der Lex Fori gedient.

[5] *Hohloch*, Deliktsstatut, S. 8, 17, 21f., 24ff.; *Erauw*, Onrechtmatige daad, S. 41; *Rohe*, Geltungsgründe, S. 39ff., 48.

[6] *Hohloch*, Deliktsstatut, S. 17ff. (für die Zeit ab dem 12. Jahrhundert) und S. 24 (für die Zeit vom 14. bis zum beginnenden 19. Jahrhundert): »Während die Regeln des internationalen Strafrechts […] verfeinert und kompliziert werden […], herrscht weiterhin Stille auf dem parallelen Gebiet des privatrechtlichen Deliktsstatuts«, mit Nachw. S. 25ff.; zur Vermischung strafrechtlicher mit zivilrechtlichen Fragen etwa bei d'Argentré (1519–1590) *Rohe*, Geltungsgründe, S. 53, 55f.

[7] Siehe schon Morris (*McClean*), Conflict of Laws, S. 353: »For centuries the law of torts was a neglected topic in the conflict of laws. Story did not refer to it at all.« Allein in Chapter XIV (Remedies) und XVI (Penal Laws and offences) finden Ansprüche aus Delikt Berücksichtigung.

[8] Ebenso *Foelix*, Traité du droit international privé, 2e éd, 1852, S. 538ff.

[9] *Hohloch*, Deliktsstatut, S. 8: »es sind kaum zweihundert Jahre, dass die Frage geprüft wird, nach welchem Recht sich *Schadensersatzansprüche* bestimmen. Nur in diesem begrenzten zeitlichen Rahmen kann von internationalem Deliktsrecht gesprochen werden«, siehe auch die zusammenfassende Feststellung auf S. 29; *Rohe*, Geltungsgründe, S. 54, erst im 19. Jahrhundert »erfolgt erstmals eine Trennung von Straf- und Zivildeliktskollisionsrechte.

[10] Siehe als frühes Beispiel *OAG München* 16.3. 1847, SeuffA 3 Nr. 295.

[11] So schon *Savigny*, System, VIII, S. 279; *Hohloch*, Deliktsstatut, S. 30, 37ff. Der Fall hatte im Laufe des 18. Jahrhunderts die strafrechtliche Sanktion weitgehend verloren und erlangte nun im Zivilrecht Bedeutung. (Hohloch verweist auch darauf, dass die Literatur zur Statutenlehre vor 1800 keine Hinweise auf Entscheidungen zum Deliktskollisionsrecht enthält, S. 39); *Rohe*, Geltungsgründe, 238.

*I. Ursprünge*                                                                133

bestehe, »die für die Übertretung der Strafgesetze hinsichtlich der Statutencollision geltende Regel *hier in analoge Anwendung zu bringen*«[12]. In späteren Urteilen wird die Lex Loci Delicti für **den zivilrechtlichen** Schadensausgleich gelegentlich als gemeinrechtliche Regel bezeichnet, und man bemüht sich kaum mehr um ihre besondere Begründung[13].

Die großen zivilrechtlichen Kodifikationen des 19. Jahrhunderts wurden überwiegend im Sinne der Tatortregel interpretiert[14], und auch die folgende Rechtsprechung ging überwiegend von der Geltung der Tatortregel aus[15]. Im 19. Jahrhundert war man sich in Europa über die Geltung dieser Regel also weitgehend einig. Gegen Ende des Jahrhunderts, als die völkerrechtliche Theorie des IPR auf dem europäischen Kontinent ihren Höhepunkt erlebte[16], wurde die Tatortregel gelegentlich sogar zum völkerrechtlichen Grundbestand des IPR gerechnet.

Eine wichtige Ausnahme bildete England, dessen Rechtsprechung – ebenfalls von der Tatortregel ausgehend – in der zweiten Hälfte des 19. Jahrhunderts eine eigene Lösung entwickelte[17].

Im 20. Jahrhundert wurde die Auffassung von der uneingeschränkten Geltung der Tatortregel in Gesetzgebung und Rechtsprechung zunächst beibehalten und die Lex Loci Delicti galt »als einer der wenigen feststehenden Grundsätze des Grenzrechts fast aller kontinental-europäischen und südamerikanischen Staaten«[18]. In der ersten Hälfte des 20. Jahrhunderts ergingen in vielen europäischen Staaten grundlegende Urteile zur Geltung der Tatortregel im IPR[19] und auch die weiteren

[12] 1. 12. 1929, SeuffA 1 Nr. 153 (Hervorh. d.d. *Verf.*); ebenso *OAG Jena* 1835 und 1839 (ohne genaues Datum), SeuffA 2 Nr. 118; *OAG Celle* 28. 5. 1850, SeuffA 8 Nr. 7; siehe zu allen bereits *Hohloch*, Deliktsstatut, S. 37 f.

[13] Nachweise der älteren Rspr. auch bei *Bourel*, Conflits de lois, S. 24 Fn. 41.

[14] Siehe *Hohloch*, Deliktsstatut, für den französischen Code civil, S. 32 ff., und das österreichische ABGB, S. 34 m. Nachw.; ob Art. 9 Abs. 2 des *italienischen* Codice civile von 1865 tatsächlich die Tatortregel enthielt, war nicht unumstritten, vgl. etwa den Hinweis *Rabels*, Conflict of Laws, II, S. 236, Fn 20 auf *Fedozzi*.

[15] Wobei in den frühen französischen Urteilen oft unklar blieb, ob sie bei Inlandstaten die Lex Fori oder die Lex Loci Delicti anwendeten, vgl. *Hohloch*, Deliktsstatut, S. 33 und Fn. 150; *Rohe*, Geltungsgründe, S. 67. Wirklich unmissverständlich ist erst die Entscheidung der *Cour de Cassation* 25. 5. 1948 im Fall *Lautour c. Veuve Guinant*, Rev. crit. 1949, 89 Anm. *Batiffol*; siehe aus der schweizerischen Rspr. *BG* 10. 4. 1896, BGE 22, 471 (486) und aus dem frühen 20. Jahrhundert z. B. *BG* 14. 7. 1909, BGE 35 II 477 (1909); *BG* 15. 6. 1917, 43 II 309 (316).

[16] Vergleiche oben, S. 57 ff.

[17] Zu ihr unten, S. 155 ff.

[18] So *Frankenstein*, IPR, II (1929) S. 358 m. zahlr. Nachw.; *Rabel*, Conflict of Laws, II, S. 235: »The principle [...] generally adopted today« und S. 253: »The advantages of the principle of the lex loci delicti committi are strong enough to have secured to it an almost universal adherence.«; *Batiffol*, Annerkung zu *Latour c. veuve Guiraud*, Rev. crit. 1949, 89 (92): »accord à peu près unanime«; *Hohloch*, Deliktsstatut, S. 53 f. m. zahlr. w. Nachw.

[19] *Rabel*, Conflict of Laws, II, S. 235 f. und Fn. 20 zitiert Urteile aus *Österreich* (1910, 1913), *Belgien* (1907, 1908), *Dänemark* (1905), *Frankreich* (1936, »the first formal confirmation of the rule [...] which was certain«, Rabel verweist aber auch auf Urteile von 1905 und 1888), *Deutschland* (seit 1829 ständige Praxis), *Ungarn* (1905, 1926, 1937), *Italien* (1938), den *Niederlanden* (1927, 1931), *Norwegen* (1905), *Schweden* (1933, 1935) und der *Schweiz* (1896, 1909, 1917, 1925 etc.).

Gesetze und Gesetzesvorschläge gingen einhellig von ihrer Maßgeblichkeit aus[20]. In ihr »erschöpfte sich dieses Teilgebiet des Kollisionsrechts beinahe«[21].

## II. Aktuelle Situation

In den IPR-Gesetzen aus der zweiten Hälfte des 20. Jahrhunderts, der aktuellen Rechtsprechung fast aller europäischen Länder sowie den internationalen Übereinkommen auf diesem Gebiet bildet die Anknüpfung an den Tatort nach wie vor den Ausgangspunkt oder findet das am Tatort geltende Recht jedenfalls subsidiär Berücksichtigung, wenn keine speziellere Anknüpfung eingreift[22]. In 23 europäischen Rechtsordnungen dient die Anknüpfung an den Tatort als Grundregel.

So in Art 40 Abs. 1 des *deutschen* EGBGB, § 48 Abs. 1 des *österreichischen*, Art. 52 des *liechtensteinischen* und Art. 62 des *italienischen* IPR-Gesetzes, Art. 10 Abs. 9 des *spanischen* und Art. 45 des *portugiesischen* Código civil, Art. 167 Abs. 1 der Grundlagen für die Zivilgesetzgebung der UdSSR und der Unionsrepubliken in der Fassung von 1991, die in *Russland* bis zu einer eigenen gesetzlichen Regelung in Kraft sind[23], Art. 31 § 1 des *polnischen*, § 15 des *tschechischen* und des *slowakischen*, Art. 19 des *albanischen* und Art. 107 des *rumänischen*[24] IPR-Gesetzes, Art. 28 des *jugoslawischen* IPR-Gesetzes, das außer in der Republik Jugoslawien in den selbständigen Nachfolgestaaten *Slowenien, Mazedonien, Kroatien* und *Bosnien-Herzegowina* in Kraft ist[25], Art. 620 Abs. 1 des *litauischen* ZGB, § 164 Abs. 1 des *estnischen* Gesetzes über die Grundsätze des ZGB, Art. 1128 des *weißrussischen* ZGB, Art. 26 des *griechischen* ZGB und Art. 25 des *türkischen* IPR-Gesetzes. Sie gilt seit Inkrafttreten des Private International Law (Miscellaneous Provisions) Act 1995 am 1. Mai 1995 auch wieder in *England* und *Schottland*, was angesichts der Ausnahmestellung, die das Deliktskollisionsrecht der englischsprachigen Länder Europas für 100 Jahre einnahm, bemerkenswert ist.

In acht Rechtsordnungen, in denen die Materie nicht kodifiziert ist, gilt die Lex Loci Delicti nach der (meist höchstrichterlichen und ständigen) Rechtsprechung ebenfalls als Grundregel.

---

[20] *Rabel*, Conflict of Laws, II, verweist auf § 14 des *tschechoslowakischen* Entwurfes von 1931, Art. 31 des *griechischen* ZGB von 1940, Art. 25 Abs. 2 der diposizioni preliminari des *italienischen* Codice civile, Art. 11 des *polnischen* IPR.G, Art. 793 des C.c. von *Montenegro*, Art. 674 des *portugiesischen* C.com.

[21] *Hohloch*, Deliktsstatut, S. 1.

[22] *Kegel/Schurig*, IPR, § 18 IV 1.a); Morris (*McClean*), Conflict of Laws, S. 355: »The application of the *lex loci delicti* is the prevailing doctrine on the continent of Europe today and was the prevailing doctrine in the United States until yesterday«.

[23] Siehe zuvor schon Art. 126–4 der Grundlagen von 1961 i.d.F. von 1977. Die Grundlagen dienten als Vorbild für entsprechende Regelungen in den ZGB der Sowjetrepubliken, vgl. etwa *Boguslavskii*, Rec. des Cours, Vol. 170 (1981–I), S. 331 (336); *derselbe*, IPRax 1992, 401, so für das Internationale Deliktsrecht etwa für Art. 566–4 des *russischen* ZGB. Die Neufassung der »Grundlagen« trat wegen des Erlöschens der UdSSR als Völkerrechtssubjekt nicht mehr in Kraft, vgl. *Weishaupt*, IPRax 1994, 311; Staudinger/*von Hoffmann*, Art. 38 Rn. 83. Russland hat sie bis zu einer eigenen Neuregelung für anwendbar erklärt, vgl. *Boguslavskii*, PIL, in: *Ginsburgs/Barry/Simons*, Revival of Private Law in Central and Eastern Europe, S. 421 (423); *Bogdanowa*, Rev. crit. 1997, 139 (141) m. w. Nachw.

[24] Ferner Art. 141 Abs. 1 und 144 Abs. 1 (für die Haftung bei Schiffskollisionen und für Schäden, die durch Luftfahrzeuge am Boden verursacht werden).

[25] Nachweis bei Staudinger/*von Hoffmann*, Art. 38 Rn. 87 Fn. ★★.

Es handelt sich um *Frankreich*[26], *Belgien, Luxemburg, Schweden, Norwegen, Dänemark, Bulgarien* sowie um den Kleinstaat *Andorra*[27]. In *Finnland* herrscht ebenfalls Einigkeit über die Geltung der Lex Loci Delicti, wenn auch noch keine entsprechende Gesetzgebung oder (höchstrichterliche) Rechtsprechung existiert[28].

Die aktuellen Gesetzgebungsvorschläge sehen ebenfalls fast alle diese Lösung vor.

So der Vorschlag der *niederländischen* Staatscommissie voor IPR von 1996[29] und der auf ihm beruhende niederländische Regierungsentwurf von 1999[30], der Entwurf eines III. Teils des Zivilkodex der *Russischen* Föderation von 1996[31] und schließlich der Vorentwurf des Ministerrates der EU für ein EU-weites IPR der außervertraglichen Haftung[32].

Nach dem IPR-Gesetz der *Schweiz*, der *ungarischen* Gesetzesverordnung zum IPR und der gegenwärtigen *niederländischen* Rechtsprechung[33] gilt die Tatortregel

---

[26] Auch der Vorentwurf für eine gesetzliche Fassung des *französischen* IPR von 1970 (»Projet de loi complétant le code civil en matière de droit international privé«) von 1970, Text: Rev. crit. 1970, 832, sah in Art. 2312 die Tatortregel vor: »Les obligations non contractuelles sont régies par la loi du lieu où est survenu le fait dont elles résultent«.

[27] *Frankreich:* ständige Rechtsprechung, bestätigt durch *französische Cour de Cassation* 25. 5. 1948, Rev. crit. 1949, 89 (*Lautour c. veuve Guiraut*) = *Ancel/Lequette*, Grands arrêts de dip, No. 19 (S. 147ff.) sowie unlängst durch *Cour de Cassation (1re Ch. civ.)* 14. 1. 1997 (*Soc. Gordon and Breach Publishers et autres c. Association The American Institute of Physics et autres*), Rev. crit. 1997, 504 Anm. *Bischoff* = D.1997, 177; w. Nachw. bei *Batiffol/Lagarde*, DIP, II, Rn. 557 und Fn. 2; *Belgien:* ständige Rechtsprechung., ausdrücklich z.B. *Hof van Cassatie* 17. 5. 1957 (*Bologne c. Sainte*), Pas., 1957, I, 1111 = Rev. crit. 1958, 339 Anm. *Loussouarn* und unlängst wieder *Hof van Cassatie* 29. 4. 1996, Rechtsk. Weekbl. 1996/97, 812 Anm. *Meeusen*; *Luxemburg: Cour d'appel lux.* 22. 12. 1916, Pas. lux. 10. 14; *Trib. Luxembourg* 14. 7. 1959, Pas. lux. 17. 501; *Trib. Luxembourg* 7. 4. 1965, Pas. lux. 19. 549; aus der Lit.: *Schockweiler*, DIP luxembourgeois, S. 148ff.; *Huss*, Clunet, 1971, 140 (148f.); *Bernecker*, RabelsZ 27 (1962/63), 263 (307 Fn. 334 m. zahlr. Nachw.); *Schweden: Högsta Domstol* 20. 9. 1933, NJA 1933, 364 = RabelsZ 1933, 931: Verkehrsunfall zwischen Schweden in Norwegen, nach norwegischem Tatortrecht beurteilt; ebenso *HD* 2. 12. 1935, NJA 1935, 585 = RabelsZ 1936, 624; ferner *HD* 18. 4. 1936, NJA 1936, 291 = RabelsZ 1940/41, 834: Zusammenstoß zwischen schwedischem und dänischem Schiff auf der Themse; siehe aus der Lit. *Seth*, Internationalla affärstvister, 1989, S. 33f.; *Witte*, Landesbericht Schweden, S. 13, in: *Ch. von Bar* (Hg.), Deliktsrecht in Europa; *Norwegen: Obergericht Christiana* 15. 12. 1905, Clunet 1907, 852; *Dänemark: Oberster Gerichtshof* 30. 6. 1956, U 1954, 772 = RabelsZ 20 (1955), 509f.: Verkehrsunfall in Belgien; *See- und Handelsgericht Kopenhagen* 23. 1. 1956, Clunet 1960, 495; 1982, U 1982, S. 886 (Appellationsgericht); aus der Lit. *Loofkovsky*, Danish Private international Law, S. 497, in: *Dahl/Melchior/Rehof/Tamm*, Danish Law in a European Perspective; *Siesby*, Laerebog I, International privatret, S. 121ff.; *Allan*, Dansk international privat- och procesret, S. 340ff.; *Bulgarien: Popov*, RabelsZ 41 (1977), 726 (734); *Andorra: JDA* 5. 7. 1984, zit. nach *Rau*, RabelsZ 53 (1989), 207 (223).

[28] *Klami*, PIL in Finnland, 1986, 38f.

[29] Art. 1 Abs. 1 des Entwurfes, anders noch Art. 95 der niederländischen »Schets van een algemene wet betreffende het internationaal privaatrecht«, die die Tatortregel subsidiär vorsahen; siehe zu deren vorläufigem Charakter etwa *Kokkini-Iatridou/Boele-Woelki*, NIPR 1992, 524.

[30] Art. 3 Abs. 1.

[31] Art. 1259 des *russischen* Entwurfes; schon Art. 126 Abs. 4 des Gesetzes über die Grundlagen der Zivilgesetzgebung der UdSSR sah die Geltung des Tatortrechts vor.

[32] Art. 3 Abs. 1 des Vorentwurfes.

[33] Es gilt – seit der Entscheidung des *Hoge Raad* 18. 3. 1938, NJ 1939, 69 (*Ooievaar*) unzweifelhaft – die Tatortregel, nach der Entscheidung des *Hoge Raad* 19. 11. 1993, NJ 1994, 622 (*COVA-arrest*) aber wohl subsidiär; siehe aus der Lit. *De Boer*, AA 1992, 521 (522f.): Der Tatort stehe an dritter Stelle der

subsidiär[34]. Auch die »Europäische Gruppe für IPR« hat den Tatort in ihrem Vor-schlag für eine europäische Konvention zum IPR der außervertraglichen Haftung von 1998 »erst« an die zweite Stelle der Anknüpfungspunkte gesetzt[35].

Angesichts dieser weitreichenden Übereinstimmung verwundert nicht, dass die Tatortregel schließlich auch in den beiden *Haager* Übereinkommen zum Interna-tionalen Deliktsrecht eine zentrale Rolle spielt. Nach Art. 3 des Verkehrsunfall-übereinkommens gilt grundsätzlich das Recht des Unfallortes und nach Art. 4 des Produkthaftungsübereinkommens ist der Verletzungsort maßgeblich, allerdings in Kombination mit einem weiteren Anknüpfungspunkt[36].

Schließlich war in Art. 10 des Vorentwurfes der EG-Kommission von 1972 für die außer-vertragliche Haftung grundsätzlich die Beurteilung nach dem Recht des Staates vorgesehen, »in dem das Ereignis eingetreten ist«.

Allein im *irischen* IPR scheint man der Tatortregel keine hervorgehobene Stel-lung einräumen zu wollen[37].

Die Beurteilung außervertraglicher Schadensersatzansprüche nach dem Recht des Tatortes ist also eine wahrlich gemeineuropäische Lösung.

Wird das Internationale Deliktsrecht der einzelnen Länder näher betrachtet, so findet die Gemeinsamkeit heute allerdings schnell ein Ende. Bezüglich der ange-messenen Lösung einzelner Probleme und der Behandlung ganzer Fallgruppen exi-stieren im Internationalen Deliktsrecht der Gegenwart erhebliche Unterschiede, und das Spektrum an Lösungen ist vielfältig. Trotz des meist einheitlichen Aus-gangspunktes weisen die Internationalen Deliktsrechte in Europa im Einzelnen ei-ne Vielfalt auf, die derjenigen der materiellen (Delikts-) Rechte kaum nachsteht. »Wie der Gletscher von weitem gangbar und zusammenhängend erscheint, in der Nähe aber tausend tückische Spalten zeigt, so wächst der Eindruck der Zerklüftung des positiven internationalen Privatrechts bei näherem Anschauen.« Diese Feststel-lung *Theodor Niemeyers* aus dem Jahre 1894[38], welche die damaligen Unterschiede im IPR Europas noch überzeichnete[39], beschreibt die Gegebenheiten im Interna-tionalen Deliktsrecht – trotz der fortbestehenden Übereinstimmung im Ausgangs-punkt – heute völlig zutreffend. In der Literatur wurde daher auch für diejenigen Länder, in denen die Tatortregel in den Gesetzen als Grundregel vorgesehen ist,

---

Anknüpfung, a.A. *van Rooij/Polak/Steffens*, PIL in the Netherlands, Suppl., S.78: »lex loci delicti has kept its position as the principal rule in Dutch private international law in torts despite all the criticism«.

[34] Art. 133 Abs. 2 des *schweizerischen* und Art. 28 des *jugoslawischen* IPR-Gesetzes, § 32 der *ungarischen* GesetzesVO zum IPR.

[35] Art. 3 Abs. 3 des Vorschlages.

[36] Zu den Gründen für diese »Einschränkung« im Internationalen Produkthaftungsrecht unten, S. 262ff., 278ff.

[37] Näher unten, S. 166f.

[38] *Niemeyer*, Zur Methodik des IPR, 1894, S. 21.

[39] Siehe aber die Unterschiede der Internationalen Privatrechte, auf die *Niemeyer*, Zur Methodik des IPR, S. 11ff., hinweist.

konstatiert, tatsächlich sei sie »bloß noch ein von vielerlei Ausnahmen durchbrochener Ausgangspunkt für die Arbeit am außervertraglichen Haftungsrecht«[40].

## III. Weiterer Gang der Untersuchung

In der zweiten Hälfte des 20. Jahrhunderts wurde immer wieder Unbehagen und Unzufriedenheit mit der Tatortregel geäußert. Angesichts dieser Kritik gilt es zunächst zu klären, welche Gründe es für die Tatortregel und ihre bemerkenswerte Verbreitung gibt[41], ob Alternativen existieren, welche Erfahrungen mit diesen im geltenden Recht bislang gemacht wurden und welche Zukunft sie in Europa besitzen könnten[42].

Als besonders schwierig hat sich die Konkretisierung der Tatortregel bei den sogenannten Distanzdelikten erwiesen. Wird der Tatort in den einzelnen Rechtsordnungen unterschiedlich konkretisiert, so beeinträchtigt dies die Einheitlichkeit der Lösungen im europäischen Rechtsraum. Gleiches gilt, wenn in den Rechtsordnungen unter unterschiedlichen Voraussetzungen Ausnahmen von der Tatortregel gemacht werden. Eine Betrachtung, die ein gesamteuropäisches Bild aufzuzeigen sucht, hat sich daher zentral mit diesen Fragen auseinander zu setzen[43].

Differenzen bei der Anknüpfung können sich ferner ergeben, wenn dem Deliktsstatut in den einzelnen Ländern ein unterschiedlicher Anwendungsbereich eingeräumt wird, unterschiedlich qualifiziert wird, und – was die Anknüpfung im Ergebnis betrifft – eine unterschiedliche Haltung zum Umfang der Verweisung eingenommen wird. Die weiteren Kapitel sind daher diesen Fragen gewidmet[44].

Im Anschluss kann auf Grundlage der rechtsvergleichenden Erkenntnisse in einigen Fallstudien gezeigt werden, welche Konsequenzen die Zersplitterung des europäischen Deliktskollisionsrechts in Einzelfällen heute hat[45].

Am Ende des zweiten Teils der Untersuchung erfolgt eine Gesamtwürdigung, in der die Ergebnisse der europäischen Bestandsaufnahme zusammengefasst und Folgerungen aus dem Vorgefundenen für eine gesamteuropäische wissenschaftliche Behandlung und Lehre des Gebietes gezogen werden[46].

---

[40] So für das deutsche IPR *Ch. von Bar*, IPR, II, Rn. 652; siehe auch *Kropholler*, IPR, § 53 V 5.: faktisch »dürfte die Maßgeblichkeit des Ortsrechts allerdings am häufigsten sein«, insofern könne weiterhin von der »Grundregel« der Anknüpfung an den Tatort gesprochen werden.
[41] 4. Kapitel (S. 138ff.).
[42] 5. Kapitel (S. 150ff.).
[43] 6. bis 9. Kapitel (S. 194ff.).
[44] 10. und 11. Kapitel (S. 418ff.).
[45] 12. Kapitel (S. 462ff.).
[46] 13. Kapitel (S. 485ff.).

# Viertes Kapitel:

## Geltungsgründe der Tatortregel

Die Begründung der Tatortregel hat lange Schwierigkeiten bereitet. In einer viel beachteten Monographie zum Internationalen Deliktsrecht aus dem Jahre 1961 heißt es etwa, es herrsche größte Unsicherheit über den Sinn dieser Anknüpfung[1]. In einer aktuellen Gesamtdarstellung des IPR ist zu lesen, »[z]ur sachlichen Begründung der Tatortregel lässt sich [...] auch (oder gerade) im Bewusstsein ihres Alters und ihres internationalen Verbreitungsgrades erstaunlich wenig vorbringen«[2]. Andere bezeichnen die Anknüpfung an den Tatort als bloße Verlegenheitslösung[3].

## I. Ursprünge

Wie erwähnt, standen bei grenzüberschreitenden Delikten lange Zeit strafrechtliche Überlegungen im Vordergrund und wurde der zivilrechtliche Schadensausgleich als Annex zur strafrechtlichen Beurteilung der Delikte angesehen. Die strafund mit ihr die zivilrechtliche Würdigung einer Handlung wurde bereits früh nach dem Recht des Ortes vorgenommen, an dem die Handlung begangen worden war. Dies wurde als gerecht und als den beteiligten Ordnungsinteressen angemessen angesehen.

Als *gerecht* wurde es empfunden, weil man einerseits annahm, dass der Täter erwarten konnte und damit rechnen musste, dass seine Handlung nach dem Recht des Ortes beurteilt würde, an dem er sie begangen hatte. Andererseits sollte er sich darauf verlassen können, dass nur das als Delikt angesehen würde, was am Ort der Tat unerlaubt war. Um dem Ortsfremden gerecht zu werden, wurden in der mittelalterlichen und neuzeitlichen Statutenlehre Übergangsfristen gewährt, innerhalb derer der Fremde von bestimmten, im Rechtsvergleich ungewöhnlichen Straftatbeständen am Tatort ausgenommen blieb (Konzept der *iusta ignorantia*). Nach Ab-

---

[1] *Bourel*, Les conflits de lois en matière d'obligations extracontractuelles, Paris 1961, S. 269: »la plus grande incertitude règne au sein de la doctrine sur le sens de ce rattachement«.

[2] *Ch. von Bar*, IPR, II, Rn. 655.

[3] *Kropholler*, RabelsZ 33 (1969), 601 (609f.): »Als *rechtspolitisches Ideal* ist die Maßgeblichkeit des Ortsrechts schwer zu begründen. [...] Allein eine hilfsweise Anwendung der Lex Loci liegt im Parteiinteresse; nur sofern keine anderen klaren Anknüpfungspunkte gegeben sind, müssen die Betroffenen mit der Anwendung des Ortsrechts rechnen«; *Ch. von Bar*, IPR, II, Rn. 656: »Verlegenheitslösung«; *Hohloch*, JuS 1980, 18 (21). – Dagegen (nicht bloß Verlegenheitslösung) etwa *Rohe*, Geltungsgründe, S. 236; *Looschelders*, VersR 1999, 1316.

lauf der Übergangsfristen wurde von ihm erwartet, dass er die lokalen Verbotstatbestände kannte[4].

Den *beteiligten Ordnungsinteressen* entsprach die Tatortregel nach weit verbreiteter Auffassung, weil Delikte am ehesten den inneren Frieden des Ortes bedrohten, an dem sie begangen wurden. Es wurde daher als angemessen empfunden, die Regeln des Deliktsrechts, die am Tatort galten, ausnahmsweise ohne Rücksicht auf die Herkunft der Beteiligten anzuwenden[5].

Später kamen Argumente der *territorialen Souveränität* hinzu. Hiernach hatte jeder Staat ein legitimes Interesse daran, ein Recht und sogar eine Pflicht, die Recht- oder Unrechtmäßigkeit von Handlungen festzulegen, die auf seinem Boden began- gen wurden. Nach der Auffassung von *Foelix* war der Staat, auf dessen Territorium eine Rechtsverletzung erfolgt war, geradezu verpflichtet, die Verletzung zu verfol- gen, wollte er seine Souveränität nicht einbüßen (»sous peine de cesser d'être sou- verain«)[6]. Spiegelbildlich findet sich das Souveränitätsargument etwa bei *Ludwig von Bar*. Er begründete die Tatortregel u.a. damit, die Souveränität eines Staates würde verletzt, wenn eine Handlung auf seinem Territorium »vollkommen erlaubt« sei, in einem anderen Staat dann aber Haftungsfolgen an sie geknüpft würden[7]. Eine mo- dernere Variante legte die Betonung auf das Interesse des Tatortstaates, den Geschä- digten zu schützen, die Sozialbeziehungen am Tatort zu regeln und zu diesem Zweck zivilrechtliche Sanktionen für Regelverstöße zu bestimmen[8].

Im anglo-amerikanischen Raum wurde die Tatortregel zeitweise damit begründet, das Recht, Schadensersatz zu verlangen, könne einer Person allein durch das Recht des Ortes verliehen werden, an dem sich die Handlung ereignet hatte. Insbesondere in den USA hatte diese Auffassung als Variante der Theorie der *vested-rights* im 19. und Anfang des 20. Jahr- hunderts viele Anhänger[9].

---

[4] *Rohe*, Geltungsgründe, S. 229 m. w. Nachw.

[5] In den Anfängen wurde dafür die Fiktion herangezogen, der Fremde habe sich der Geltung des De- liktsrechts am Tatort freiwillig unterworfen (Idee des »subditus temporarius«), *Rohe*, Geltungsgründe, S. 237 m. w. Nachw.

[6] *Foelix*, Traité, 1e éd., S. 553, das gesamte Zitat lautet: »le pouvoir souverain de cet Etat est nécessai- rement en droit de réprimer la violation de ces lois, sous peine de cesser d'être souverain«.

[7] Theorie und Praxis, II, 2. Aufl. 1889, S. 116f.

[8] Nachweise bei *Rabel*, Conflict of Laws, II, 1rst ed., S. 252 (er verweist auf *Laurent, Rolin, Lerebours- Pigeonnière, Bartin, Poullet*); zu diesem Aspekt in der aktuellen Lit. *Miaja de la Muela*, DIP, II, S. 396 (*Bouza Vidal*).

[9] Vergleiche Morris (*McClean*), Conflict of Laws, S. 355f.; *Binchy*, Irish Conflicts of Law, S. 568f.; *Miaja de la Muela*, DIP, II, S. 396 (*Bouza Vidal*); *Bourel*, Conflits de lois, S. 51; *Hohloch*, Deliktsstatut, S. 87ff. oder *Rabel*, Conflict of Laws, II, S. 251. Siehe für England etwa Justice *Willes* in der Leitentschei- dung in *Phillips* v. *Eyre* (1870) L.R. 6 Q.B. 1, 28: »the civil liability out of a wrong derives its birth from the law of the place, and its character is determined by that law«; für die USA Justice *Holmes* in *Slater v. Mexican National Ry. Co.* [1904] 194 U.S. 120, 126: »[…] the only source of this obligation is the law of the place of the act […]«; ähnlich in *Western Union Telegraph Co. v. Brown* [1914] 234 U.S. 542, 547; Justice *Cardozo* in *Loucks* v. *Standard Oil Co. of New York* [1918] 224 N.Y. 99 = 120 N.E. 198; krit. zu dieser Auf- fassung etwa *Binchy*, Irish Conflicts of Law, S. 569: »conclusion expressed as a premise« oder *Rabel*, Con- flict of Laws, II, S. 251 m. w. Nachw.; in den USA wurde diese Theorie längst aufgegeben.

Als sich das zivile Deliktskollisionsrecht im 19. Jahrhundert vom Strafrecht emanzipierte, wurde kaum problematisiert, ob hieraus Konsequenzen zu ziehen waren. Die Geltung der Tatortregel auch im Zivilrecht wurde als »selbstverständlich angesehen«[10]. Das Fehlen einer eigenständigen Begründung wurde in der Literatur geradezu als der »Geburtsfehler« der zivilrechtlichen Deliktskollisionsregel bezeichnet[11].

Die lange Prägung durch das Strafrecht spiegelt sich nicht zuletzt in der Auffassung wider, die deliktsrechtlichen Vorschriften wahrten den *Ordre Public* und dienten wie das Strafrecht der Aufrechterhaltung der öffentlichen Sicherheit und des inneren Friedens am Tatort. Diese Überzeugung und das Fehlen einer spezifisch zivilrechtlichen Begründung findet in der Meinung Ausdruck, die Vorschriften des Deliktsrecht zählten zu den »lois de sûreté et de police« im Sinne des Art. 3 Abs. 1 des Code civil, die von der *französischen Cour de Cassation*[12], dem *belgischen Hof van Cassatie*[13] und der *luxemburgischen* Rechtsprechung[14] noch heute vertreten wird.


## II.  Moderne Begründungen

In einigen Ländern wirkten die Einflüsse des Strafrechts im IPR der Delikte bis in die zweite Hälfte des 20. Jahrhunderts fort, und es finden sich selbst in dieser Zeit noch höchstgerichtliche Urteile, die mit Parallelen zum Strafrecht argumentieren[15]. Aus gesamteuropäischer Perspektive betrachtet ist die Dominanz des Strafrechts heute jedoch überwunden. Stellvertretend für den heutigen Stand der Entwicklung stehen etwa Urteile des *belgischen Hof van Cassatie*, der *Cour d'appel d'Anvers* oder des *OLG Wien*, in denen die Gerichte jeweils ausdrücklich festhalten, dass zivilrechtli-

---

[10]  *Hohloch*, Deliktsstatut, z.B. S. 260.

[11]  *Rohe*, Geltungsgründe, S. 238.

[12]  Siehe zur Verortung der Problematik in Art. 3 des Code civil erst unlängst wieder *Cour de Cass.* (1re *Ch. civ.*) 14. 1. 1997, Rev. crit. 1997, 504: »Vu l'article 3 du code civil; – [...]«; siehe aus der Lit. *Batiffol/Lagarde*, DIP, II, No.557 und Fn. 1; *Bourel*, Conflits de lois, S. 22. – Krit. z.B. *Loussouarn/Bourel*, DIP, No.179: »La réglementation du délit ne rentre pas dans la catégorie des lois de police visées par l'article 3, alinéa 1, du Code civil«; *Pierre Mayer*, DIP, No.678: »L'article 3, alinéa 1 du Code civil ne s'est guère révélé utile.«. Siehe auch *Hohloch*, Deliktsstatut, S. 32f. m. zahlr. Nachw.; *Rohe*, Geltungsgründe, S. 62ff.

[13]  *Belgische Hof van Cassatie* 17.5. 1957, Pas.1957, I, 1111 (*Bologne c. Sainte*), ständige Rspr., siehe etwa *Hof van Cassatie* 30.10. 1981, Pas.1982, I, 306 (*Groupe Josi c. Faes*); und unlängst *Hof van Cassatie* 29.4. 1996, Rechtsk. Weekbl. 1996/97, 812 Anm. *Meeusen* (Skiunfall); weitere umfangreiche Nachw. bei *Rigaux/Fallon*, DIP, II, No.1528, die diese Rspr. kritisieren; krit. auch *Erauw*, Beginselen, S. 246f

[14]  Siehe *Schockweiler*, DIP luxembourgeois, S. 23, 26, 148.

[15]  Siehe etwa das Urteil des *schweizerischen BG* 11.5. 1950 (*Braendli gegen Copex Expeditionsbedrijf G.A.*), BGE 76 II 110 (112), in dem es zur Anknüpfung der Distanzdelikte heißt, diese könne »heute [...] nicht mehr zweifelhaft sein, nachdem das StGB in Art. 7 Abs. 1 als Begehungsort des Delikts sowohl den Ort der Ausführung als auch denjenigen des Erfolgseintritts festlegt. [...] Es würde zu unerträglichen Widersprüchen führen, wenn man die nämliche Tat bezüglich der Strafbarkeit als an beiden Orten begangen, bezüglich der Verpflichtung zum Schadensersatz als nur an einem Ort begangen betrachten und dementsprechend international verschiedenen Rechten unterstellen müsste«. Erheblich vorsichtiger und zurückhaltender mit solchen Parallelen dagegen schon das *deutsche RG* 18. 10. 1909, RGZ 72, 41 (43).

che Ansprüche ungeachtet parallel verlaufender Strafverfahren und dem dort angewendeten Recht anzuknüpfen sind[16].

Zur Lösung des zivilen Delikts- vom Strafrecht und zur Suche nach eigenständigen Geltungsgründen trug nicht zuletzt die veränderte Rolle bei, die dem zivilrechtlichen Schadensausgleichs im 20. Jahrhundert zukam[17]: Am Übergang vom 19. ins 20. Jahrhundert veränderte sich der Schwerpunkt des materiellen Deliktsrechts und, mit einer gewissen Verzögerung, auch derjenige des Deliktskoordinationsrechts. Statt der Vorsatzdelikte überwogen nun die Fahrlässigkeitstaten und wurden zahlreiche und praktisch wichtige verschuldensunabhängige Haftungsgründe geschaffen[18]. Als neue Akteure betraten die Haftpflichtversicherer die Bühne und der kollektive Schadensausgleich geriet zunehmend ins Blickfeld. Diese Veränderungen im materiellen Deliktsrecht spiegelten sich im Fallmaterial des Internationalen Deliktsrecht wider. Statt der Ansprüche aus außerehelichem Geschlechtsverkehr und Briefdelikten stehen heute – wie eingangs gesehen[19] -- Straßenverkehrsdelikte im Vordergrund, Unfälle im Freizeitbereich, Fälle aus dem internationalen Wirtschaftsrecht, insbesondere Produkthaftungsfälle und Wettbewerbsverstöße, Pressedelikte und Umwelthaftungsfälle. Mit der Haftung für immer fernere Schäden ergaben sich für das IPR neue Probleme der Distanzdelikte. Dies alles machte eine neue, für das Zivilrecht eigenständige Begründung der Tatortregel erforderlich, die im 19. Jahrhundert noch nicht geleistet worden war.

Seither wurden in Europa eine ganze Reihe von Argumenten für die Tatortregel angeführt. In den aktuellen europäischen Gesamtdarstellungen finden sie allerdings kaum noch Erwähnung. Zum Teil wird die Tatortregel einfach vorausgesetzt, zum Teil wird sie mit dem Hinweis auf ihre allgemeine Akzeptanz legitimiert, zum Teil werden einzelne Gründe für ihre Geltung angegeben, und man geht schnell zu speziellen Problemen, insbesondere dem der Distanzdelikte über[20].

---

[16] *Hof van Cassatie*17. 5. 1957 (*Bologne c. Sainte*), Pas.1957 I 1111 (die **Vorinst**anz hatte wegen der Nähe des Zivil- zum Strafverfahren noch das im Strafverfahren maßgebli**che Recht** auch im Zivilverfahren angewendet); *Cour d'appel d'Anvers* 4. 2. 1987, Pas.1987 **II** 66 (in Belgien wurde ein Strafverfahren wegen Ehebruchs eingeleitet; dessen ungeachtet wurden die zivilrechtlichen Ansprüche nach dem niederländischem Heimatrecht der Eheleute beurteilt); *OLG Wien* **17.9.** 1984, IPRE 2/84 (Strafverfahren wegen Körperverletzung in Österreich durchgeführt, zivilrechtliche Ansprüche dessen ungeachtet nach tschechoslowakischem Tatortrecht beurteilt). Siehe aus der Lit. stellvertretend *Strikwerda*, Inleiding, Rn. 179 f.; Morris (*McClean*), Conflict of Laws, S. 354; *Loussouarn/Bourel*, DIP, No.179; *Miaja de la Muela*, DIP, II, S. 395 (*Bouza Vidal*).

[17] Siehe stellvertr. *Loussouarn/Bourel*, DIP, No.179.

[18] Siehe zu dem Wandel des Fallmaterials im Internationalen Deliktsrecht im 20. Jahrhundert stellvertr. Morris (*McClean*), Conflict of Laws, S. 353; *Strikwerda*, Inleiding, Rn. 180, *Miaja de la Muela*, DIP, II, S. 395 (*Bouza Vidal*); *Ch. von Bar*, IPR, II, Rn. 653; *Hohloch*, Deliktsstatut, S. 53, 109, *Rohe*, Geltungsgründe, S. 238.

[19] S. 123 f.

[20] Überlegungen zu den Geltungsgründen der Tatortregel finden sich v.a. in den englischsprachigen Lehrbüchern etwa von Morris (*McClean*), Conflict of Laws, S. 355 f., und *Binchy*, Irish Conflict of Laws, S. 567 ff.; aus der kontinentaleuropäischen Lit. ausführlicher zu den Geltungsgründen v.a. *Miaja de la Muela*, DIP, II, S. 394 ff. (*Bouza Vidal*); ferner (sehr krit.) *Ch. von Bar*, IPR, II, Rn. 655 f.; knapper, auf die Frage aber immerhin eingehend die französischen Lehrbücher; ausführlich die Monographien von *Hohloch*, Deliktsstatut, und *Rohe*, Geltungsgründe.

Wird heute nach den Geltungsgründen der Tatortregel gefragt, so ist erstens fest-zustellen, dass sich diese Regel nicht auf einen einzigen, überragenden und allum-fassenden Geltungsgrund zurückführen lässt[21]. Zu ihrer Begründung dienen eine Vielzahl einzelner, einander überschneidender Argumente. Das Fehlen eines sol-chen hervorragenden Geltungsgrundes dürfte nicht zuletzt auch die Ursache der eingangs schon zitierten Unsicherheiten hinsichtlich der Berechtigung dieser Grundregel sein.

Zweitens sind die Geltungsgründe, die in den verschiedenen Rechtsordnungen für die Tatortregel angeführt werden, unabhängig davon, wie die Haftungsrechte im Einzelnen ausgestaltet sind. Die Tatortregel wird also systemneutral begründet[22]. Die Suche nach ihren Geltungsgründen kann daher ohne weiteres als gesamteuro-päische angegangen werden.

## 1.  Einzelne Geltungsgründe

Im Einzelnen werden heute folgende Geltungsgründe der Tatortregel genannt[23]:

*a) Beste der denkbaren Lösungen, Neutralität.* Für die Tatortregel wird angeführt, sie sei unter allen in Betracht kommenden Lösungen die beste. Da die Parteien in der Regel vor dem schädigenden Ereignis nicht in Kontakt miteinander stünden und ihre Interessen sich am Tatort erstmals kreuzten, sei der Tatort der einzige Bezugs-punkt für die kollisionsrechtliche Anknüpfung[24]; die Anknüpfung an den Tatort werde der Zufälligkeit der deliktischen Interessenkollision der Beteiligten am be-sten gerecht[25].

Eine wirkliche Alternative gebe es nicht[26]. Trotz des übereinstimmenden Inter-esses beider Parteien an einer schnellen und kostengünstigen Streiterledigung scheide insbesondere eine ausschließliche Beurteilung nach der *Lex Fori* aus zahl-reichen Gründen aus[27]. Gegenüber der Beurteilung des Falles nach dem Recht des Schädigers oder des Geschädigten zeichne sich die Tatortregel durch ihre Neutrali-tät aus[28].

---

[21]  So schon *Rabel,* Conflict of Laws, II, S. 251; *Bourel,* Conflits de lois, S. 53.

[22]  So auch eines der Ergebnisse der Untersuchung von *Rohe,* Geltungsgründe, S. 217.

[23]  Die folgenden Literaturnachweise stehen wiederum stellvertretend für viele.

[24]  *Busch,* Ubiquitätsregel, z. B. S. 192.

[25]  Nachdrücklich *Busch,* Ubiquitätsregel, z. B. S. 192 f.: »Es wäre wichtig, von der inhaltsleeren Nega-tivbedeutung der Zufälligkeit im internationalen Privatrecht wegzukommen, um den Weg frei zu ma-chen für eine Argumentation, die in der Zufälligkeit der Interessenkollision eine Rechtfertigung für die Anknüpfung an den Tatort erblickt«.

[26]  Siehe etwa *Batiffol/Lagarde,* DIP, I, No. 285: »ce rattachement est, de manière générale, le seul qu'offre objectivement la matière«, II, No. 556; in gleichem Sinne z. B. *Machado,* Lições, No. 116 (S. 367); ähnlich *Rohe,* Geltungsgründe, S. 236, der davon spricht, »dass Tatortrecht aus faktischen Gründen – mangels Vorliegen anderer Anknüpfungspunkte – häufig zu Recht eingreift«. – Krit. *Hohloch,* Delikts-statut, S. 267 f.

[27]  Dazu ausführlich unten, S. 151 ff.

*b) Einfachheit, Praktikabilität, Effizienz:* Auch ihre Einfachheit, Praktikabilität und Effizienz spreche für diese Regel. Meist sei es unproblematisch, den Tatort zu bestimmen[29]. Da in Europa meist eine besondere Zuständigkeit des Gerichtes am Tatort bestehe[30], führe die Tatortregel häufig zu einer Anwendung der Lex Fori; die Regel ermögliche so einen Gleichlauf von Zuständigkeit und anwendbarem Recht und erlaube den Gerichten, das bekannte eigene Recht anzuwenden[31]. Daher sei die Anknüpfung an den Tatort in der Regel die am wenigsten aufwendige, kostengünstigste und effizienteste Lösung. Zugleich sei es die Lösung, bei der die fehlerlose Anwendung des materiellen Rechts am wahrscheinlichsten sei. (Garantiert ist der Gleichlauf von internationaler Zuständigkeit und anwendbarem Recht allerdings nicht, da die Klage auch am allgemeinen Gerichtsstand des Beklagten erhoben werden kann und dieser Ort mit dem Tatort nicht identisch sein muss.)

*c) Rechtssicherheit.* In der Vielzahl der Fälle führt die Tatortregel dazu, dass man, sobald man sich im Gebiet eines Landes bewegt, bereits unmittelbar nach und sogar schon vor einer eventuellen unerlaubten Handlung weiß, nach welchem Recht Ansprüche aus einem Haftungsfall zu beurteilen sind[32]. Die meisten anderen Lösungen sind dagegen von Unwägbarkeiten abhängig, etwa der − vor dem schädigenden Ereignis ungewissen − Herkunft der Beteiligten, dem Ort der Registrierung der beteiligten Verkehrsmittel, dem Ort, an dem geklagt wird[33] oder dem ungewissen Ausgang einer Gesamtabwägung aller Umstände[34]. Würde etwa an die Herkunft einer der Parteien angeknüpft, so wäre das maßgebliche Recht für die andere Partei nicht vorhersehbar[35] und es könnte zu Deckungslücken kommen, gegen die möglicherweise nicht angemessen Vorsorge getroffen wurde. Lösungen, die mit der Kombination verschiedener Kriterien arbeiten, sind in der Regel unüber-

---

[28] *Pierre Mayer*, DIP, No.678; *Batiffol/Lagarde*, DIP, II, No.556; *Miaja de la Muela*, DIP, II, S. 396 (*Bouza Vidal*); *Meeusen*, Anm. zu Hof van Cassatie 29. 4. 1996, Rechtsk. Weekbl. 1996/97, 812 (814). −Krit. zum Argument der Neutralität *Rohe*, Geltungsgründe, S. 236.

[29] *Loussouarn/Bourel*, DIP, No.179 und schon *Rabel*, Conflict of Laws, II, S. 253; aus der Rspr. etwa BGH 7.7. 1992, BGHZ 119, 137 (*Türkeiurlauber*).

[30] Siehe z.B. Art. 5 Ziff. 3 EuGVÜ, Art. 46 des französischen Nouv. Code de Proc. Civ, § 32 der deutschen ZPO usw.

[31] *Pierre Mayer*, DIP, No.678; vgl. *Ch. von Bar*, DIP, II Rn. 655: ein »wichtiger Grund für ihr Beharrungsvermögen«.

[32] Bei mehreren Gerichtsständen setzt dies natürlich voraus, dass die Tatortregel an allen Gerichtsständen befolgt wird.

[33] So bei der Theorie, die das materielle Haftungsrecht des Forums anwenden will, dazu unten, S. 151 ff.

[34] Siehe zum Argument der Rechtssicherheit stellvertr. BGH 8. 3. 1983, BGHZ 87, 95 (97); aus der Lit. etwa *Miaja de la Muela*, DIP, II, S. 396 (*Bouza Vidal*), und − trotz krit. Haltung gegenüber dieser Regel − *Ch. von Bar*, IPR, II, Rn. 656; siehe aus der älteren Lit. stellvertr. bereits *C. L. von Bar*, Theorie und Praxis, II, S. 115, 118. In der Diskussion der neueren Theorien aus den USA wird in Europa regelmäßig darauf verwiesen, dass für die Tatortregel gerade die große Rechtssicherheit spreche, zu der sie führe. − Krit. zum Argument der Rechtssicherheit *Rohe*, Geltungsgründe, S. 223 ff., 226, der diesem Argument nur »einen der hinteren Ränge bei der Interessengewichtung« zuweisen möchte; ähnlich schon *Batiffol/ Lagarde*, DIP, II, No.556: »L'idee intervient donc, mais à titre subsidiaire«.

[35] Zum »Schädigerheimatrecht als Anknüpfungspunkt« *Rohe*, Geltungsgründe, S. 227 ff., 262 ff.

sichtlich und ihre Ergebnisse schwer zu überschauen. Ansätze, die sich auf Gesamtabwägungen stützen[36], gehen einher mit Rechtsunsicherheit.

    *d) Interessen des Tatortstaates an der Durchsetzung der Ziele des inländischen Haftungsrechts.* Auch im 20. Jahrhundert ist in Europa die Auffassung verbreitet, der Tatortstaat könne ein Interesse daran haben, dass Delikte auf seinem Territorium nach seinem Recht beurteilt werden.

    Sei eine Handlung sowohl straf- als auch zivilrechtlich relevant, so könne es zu Überschneidungen in den Funktionen von Straf- und Zivilrecht kommen. Jedenfalls in manchen Fällen diene es dem Rechtsfrieden und werde jedenfalls von Laien erwartet, dass sie einheitlich nach dem Recht des Tatortes beurteilt würden[37].

    Die Konsequenzen eines Deliktes berührten in der Regel in erster Linie den Staat, auf dessen Territorium sie verursacht wurden[38]. Der Tatortstaat habe ein Interesse daran, im Inland verletzte Interessen nach seinen Maßstäben zu schützen. Neben dem Schadensausgleich sei wichtiger Zweck des Haftungsrechts, die Sozialbeziehungen der Menschen zu ordnen und Gesetzesverletzungen zu verhindern. Solche ordnenden und präventiven Effekte gingen auch von zivilrechtlichen Haftungsnormen aus. Zudem würden durch eine Haftungsanordnung oder den Verzicht auf sie individuelle Freiheitsräume gegeneinander abgegrenzt[39]. Um diese Effekte zu erreichen, sei der einzelne Staat darauf angewiesen, Delikte auf seinem Territorium unabhängig von der Herkunft der Beteiligten nach seinem Recht zu beurteilen.

    Jeder Staat sei letztlich nicht nur am intensivsten interessiert, sondern auch am besten in der Lage, die Verhältnisse und Gegebenheiten auf seinem Territorium zu regeln und Haftungsnormen zu schaffen, die diesen Verhältnissen angemessen seien. Dabei müsse keineswegs immer der Gedanke abstrakter Gerechtigkeit maßgeblich sein. Vor allem bei der modernen verschuldensunabhängigen Haftung sei ausschlaggebend, wie nützlich die Haftungsregelung für die Ordnung der Verhältnisse im Tatortstaat sei[40].

    Staatliche Ordnungsinteressen seien ferner dort zu vermuten, wo Personen mit ständigem Aufenthalt im Inland im materiellen Recht durch Haftungshöchstbeträge oder auf andere Weise vor einer als übermäßig empfundenen Inanspruchnahme geschützt werden sollen[41].

    Schließlich bestünden in einigen, wirtschaftlich relevanten Teilmaterien des Deliktsrechts spezielle staatliche Interessen daran, Taten, die sich auf dem eigenen

---

[36] Zu einem solchen Ansatz näher unten, S. 164 ff.

[37] *Rohe*, Geltungsgründe, S. 239 ff., der aber z. B. Straßenverkehrsunfälle hiervon ausnehmen möchte, S. 254.

[38] *Pierre Mayer*, DIP, No. 678; Cheshire and North *(North/Fawcett)*, PIL (12th ed.), S. 529.

[39] Zur »Abgrenzung von Freiheitsräumen« als sozialer Funktion des Deliktsrechts *Esser/Weyers*, Schuldrecht, II, BT, Teilband 2, § 53 3.

[40] So schon *L. von Bar*, Theorie und Praxis, II, 1889, S. 118.

[41] *Rohe*, Geltungsgründe, S. 221.

Staatsgebiet auswirken, nach dem eigenen Haftungsrecht zu beurteilen, so insbesondere im Internationalen Wettbewerbsrecht[42].

*e) Parteierwartungen und Parteiinteressen, Gerechtigkeit.* Die Anwendung des Rechts am Tatort entspreche schließlich am besten den legitimen Erwartungen der Parteien und sei für sie die gerechteste und vernünftigste Lösung[43].

Wie schon in den Frühzeiten des Deliktskollisionsrechts, so wird heute argumentiert, jeder habe die Gesetze und Standards des Landes und sozialen Umfeldes zu beachten, in dem er sich aufhalte. Zum Zeitpunkt der Schädigung handle die Person im Geltungsbereich dieses Rechts, den Anforderungen dieses Rechts (aber auch nur dieses Rechts) müssten ihre Handlungen genügen und gerecht werden. Wer sich ins Ausland begebe, nehme die eigenen Haftungsstandards nicht mit, sondern habe sich auf die im Aufenthaltsstaat geltenden Maßstäbe auch der außervertraglichen Haftung einzustellen. Dies werde von den Beteiligten auch allgemein erwartet, akzeptiert und als gerecht empfunden[44].

Der Einzelne habe ein erhebliches Interesse daran, »dass jeder sein Verhalten so einrichtet, wie es der Rechtsordnung des Tatortstaates entspricht«[45]. Er besitzt so einerseits einen sicheren Maßstab für die an ihn gestellten Erwartungen und die eigenen Haftungsrisiken, andererseits erhält er eine sichere Leitlinie für seine Erwartungen bezüglich des Verhaltens und einer möglichen Haftung seiner Mitmenschen[46].

Eine Beurteilung z.B. nach dem Recht der Herkunft eines der Beteiligten statt nach dem Recht des Tatortes sei ungerecht. Würden Personen mit auswärtiger Herkunft nach ihrem Heimatrecht beurteilt und sie von der Haftung ausgenommen oder müssten sie im Gegenteil schärfer als Inländer haften, oder würden Opfer aus dem Ausland anders als inländische Opfer einer unerlaubten Handlung behandelt, so würden sie ein mit dem allgemeinen Rechtsbewusstsein und der Rechtssicherheit unverträgliches Privileg oder eine ebenso unverträgliche Belastung erfahren[47].

Gegen die Beurteilung nach einem anderen als dem Tatortrecht wurde schließlich schon früh eingewandt, es wäre ungerecht und mit der erforderlichen Rechtssicherheit unvereinbar, wenn derjenige, der am Tatort »vollkommen erlaubt« handelt, damit rechnen müsse, »dass irgendein auswärtiger Staat mit Bezug auf einen ihm

---

[42] Zu diesem unten, S. 324 ff.

[43] Siehe (wiederum stellvertr.) Morris (*McClean*), Conflict of Laws, S. 356; Cheshire and North (*North/Fawcett*), PIL (12th ed.), S. 529: »seems eminently reasonable«; *Miaja de la Muela*, DIP, II, S. 396 (*Bouza Vidal*): »innegable justitia«; *von Hein*, Günstigkeitsprinzip, S. 38 f.

[44] In diesem Sinne z.B. *Anton/Beaumont*, PIL, S. 296; Cheshire and North (*North/Fawcett*), PIL (12th ed.), S. 529; siehe auch schon *Rabel*, Conflict of Laws, II, S. 252.

[45] *Kegel/Schurig*, IPR, § 18 IV 1. a).

[46] Vergleiche nur *Miaja de la Muela*, DIP, II, 396 (*Bouza Vidal*) oder *Binchy*, Irish Conflicts of Law, S. 569.

[47] *Anton/Beaumont*, PIL, S. 396; Cheshire and North (*North/Fawcett*), PIL (12th ed.), S. 529; ähnlich *Loussouarn/Bourel*, DIP, No. 179 und *Batiffol/Lagarde*, DIP, II, No. 556; siehe auch schon *L. von Bar*, Theorie und Praxis, II, S. 118. Für eine stärkere Berücksichtigung des Rechts des *Schädigers* bei der Verschuldenshaftung dagegen *Rohe*, Geltungsgründe, S. 227 ff., 236, 252, zu dieser Ansicht im Rahmen der Distanzdelikte unten, S. 206 f.

Angehörigen – dem die Staatsangehörigkeit doch auch nicht immer im Gesicht oder auf dem Rücken geschrieben steht – an diesem Handeln Anstoß nimmt«[48] und an das Verhalten eine Haftung knüpft. Der Schädiger müsse Gelegenheit gehabt haben, sich auf die (haftungsrechtlichen) Anforderungen an sein Handeln einzustellen[49]. Der Geschädigte dagegen müsse darauf vertrauen dürfen, dass seine Rechtsgüter mindestens in dem Umfang geschützt werden, wie dies am Ort ihrer »Belegenheit« zum Zeitpunkt der Schädigung der Fall sei[50]. Die Tatortregel führe zu einer solchen haftungsrechtlichen Gleichbehandlung aller, die im gesellschaftlichen und sozialen Umfeld am Tatort agierten, und sei daher eminent gerecht.

## 2. Die Geltungsgründe im konkreten Fall

Die genannten Geltungsgründe sollen kurz anhand zweier Standardfälle aus dem europäischen Haftpflichtrecht überprüft werden:

Im ersten Fall kollidieren in England ein von einem Dänen gesteuerter und ein von einem Deutschen gesteuerter Pkw[51]. Die Fahrzeuge sind in den jeweiligen Heimatländern der Fahrer zugelassen und versichert. Dem Verursacher des Unfalles kann kein Verschulden nachgewiesen werden. Der Geschädigte begehrt den Ausgleich von Sach- und leichten Personenschäden.

Im zweiten Fall ereignet sich beim Skifahren (oder beim Bergsteigen)[52] in Österreich ein schwerer Unfall, bei dem ein Schweizer und ein Franzose zu Tode kommen. Einer von beiden hat den Unfall fahrlässig verursacht. Die Angehörigen des anderen verlangen Schmerzensgeld wegen des Verlustes.

Die Tatortregel führt in beiden Fällen dazu, dass weder das Heimatrecht der einen noch der anderen Partei zur Anwendung gelangt, auf *kollisionsrechtlicher* Ebene also keine Partei durch die Geltung des gewohnten Rechts bevorzugt oder benachteiligt wird. Die Tatortregel ist insoweit neutral. Bei solchen reinen Ortsdelikten ist der Tatort leicht zu bestimmen und herrscht über das anwendbare Recht ohne weiteres Klarheit. Das maßgebliche Recht könnte sogar schon vor einem eventuellen Haftpflichtfall vorausgesehen werden, die Parteien also (in beiden Fällen allerdings wohl nur theoretisch) versuchen, sich gegen eventuelle Deckungslücken am Unfallort im Vorhinein zu versichern. Die Beurteilung eines Verkehrsunfalles, der sich in England ereignete, nach englischem und eines Freizeitunfalles, der sich in Österreich zutrug, nach österreichischem Recht wird die Parteien kaum überraschen, wird leicht akzeptiert und nicht als ungerecht empfunden. Die Tatortregel führt in solchen Standardfällen also tatsächlich zu kollisionsrechtlicher Gerechtigkeit.

[48]   *L. von Bar*, Theorie und Praxis, II, S. 117, 119; ähnlich schon *Brocher*, Nouveau Traité de DIP, No. 127.
[49]   *Busch*, Ubiquitätsregel, z. B. S. 192.
[50]   *Busch*, Ubiquitätsregel, z. B. S. 192.
[51]   Zur zentralen Bedeutung dieser Fallgruppe für das Internationale Deliktsrecht oben, S. 123 f. mit zahlr. Hinw. auf europäische Leitentscheidungen.
[52]   Siehe zu Unfällen im Freizeitbereich die Nachw. oben, S. 124 f.

Ob die Tatortregel einen Gleichlauf von Zuständigkeit und anwendbarem Recht zur Folge hat und auch insofern zur praktisch effizientesten, einfachsten und kostengünstigsten Lösung führt, hängt davon ab, ob im Streitfall in England oder Österreich geklagt würde oder sich die Geschädigten zu einer Klage im näher gelegenen Wohnsitzstaat des Schädigers entschließen.

Ob tatsächlich Interessen des Tatortstaates an der Durchsetzung des inländischen Haftungsrechts bestehen und welche dies sein sollen, ist bei Unfällen zwischen Personen mit gewöhnlichem Aufenthalt außerhalb des Tatortstaates dagegen ausgesprochen zweifelhaft. Aspekte der Wahrung des Rechtsfriedens und vor allem der Gleichbehandlung mit anderen inländischen Unfällen dürften erst bei Beteiligung mindestens eines Inländers einschlägig werden; der Versorgungsaspekt des Haftungsrechts ist bei ausländischem gewöhnlichen Aufenthalt der Beteiligten sowie angesichts der materiellrechtlichen Standards, die in den für die Beurteilung des Falles in Betracht kommenden ausländischen Haftungsrechten herrschen, für den Tatortstaat ohne Bedeutung.

Insgesamt spricht in Standardfällen aber tatsächlich vieles für die Tatortregel.

## III. Kritik

Dennoch wurde gegen die meisten der genannten Geltungsgründe auch in Europa Kritik vorgebracht[53]:

So wurde die Tatortregel als zu starr und unflexibel angesehen, um den zahlreichen unterschiedlichen Fallkonstellationen der außervertraglichen Haftung gerecht werden zu können[54]. Bei Unfällen auf einer Reise durch mehrere Länder oder bei nur kurzfristigem Aufenthalt im Ausland könne sie zu zufälligen oder sogar willkürlichen Ergebnissen führen, insbesondere wenn beide Parteien aus demselben Heimatland stammten[55]. Die Neutralität der Regel wurde in Frage gestellt, weil sie bei Delikten, die sich über mehrere Länder erstreckten, den sogenannten »Distanzdelikten«, meist doch zur Wahl zwischen dem Heimatrecht des Schädigers und demjenigen des Geschädigten zwinge[56]. Auch gegen das Argument der Einfachheit

---

[53] Überblick etwa bei Morris (*McClean*), Conflict of Laws, S. 356; *Binchy*, Irish Conflicts of Law, S. 569; *Miaja de la Muela*, DIP, II, S. 396ff. (*Bouza Vidal*); zur verbreiteten Kritik in den USA und der Diskussion dort siehe die gesammelten Aufsätze in *Shreve* (Hg.), A Conflict-of-Laws Anthology, Cincinnati/Ohio 1997; ausführlich zur » »Krise« des Tatortprinzips« und den Entwicklungen in den USA *Hohloch*, Deliktsstatut, S. 121ff., 126ff.

[54] Grundlegend *Morris*, 64 Harv.L.Rev. 881 (884f.); siehe ferner (wiederum stellvertr.) die starke Kritik, die der *spanische* Gesetzgeber hinnehmen musste, als er bei der Reform des Código civil im Jahre 1974 eine Tatortregel ohne Ausnahmen vorsah, dazu unten, S. 368f., m. Nachw. und *Miaja de la Muela*, DIP, II, S. 396f. (*Bouza Vidal*).

[55] *Morris* (*McClean*), Conflict of Laws, S. 356: »may lead to results which shock one's common sense«; *Binchy*, Irish Conflicts of Law, S. 569; *Miaja de la Muela*, DIP, II, S. 397 (*Bouza Vidal*); aus der Anfangsphase der Diskussion *Morris*, 64 Harv.L.Rev. 881 (z.B. 885); *Binder*, RabelsZ 20 (1955), 401; *Bourel*, Conflits de lois, S. 45f.

[56] *Rohe*, Geltungsgründe, S. 236.

wurden Fallkonstellationen angeführt, in denen sich das Delikt über mehrere Länder ausdehnte und der Tatort durchaus nicht ohne Schwierigkeiten zu bestimmen war[57]. Rechtssicherheit bestehe bei der Tatortregel nur, solange der Tatort feststehe oder zumindest feststellbar sei, was bei reinen Vermögensdelikten und manchen Distanzdelikten nicht unbedingt gewährleistet sei.

Ob ein Gleichlauf von Zuständigkeit und anwendbarem Recht erstrebenswert und im Internationalen Deliktsrecht für die Bestimmung des anwendbaren Haftungsrechts wirklich maßgeblich sein kann, ist höchst fraglich. Hielte man ihn für vorteilhaft, ließe er sich am konsequentesten, zuverlässigsten und ehrlichsten statt durch die Tatortregel durch eine grundsätzliche Anwendung der *Lex Fori* erreichen.

Gegen die Argumentation mit den öffentlichen Interessen des Tatortstaates wurde eingewandt, dass der Tatortstaat keineswegs immer ein Interesse daran haben muss, dass die zivilrechtlichen Folgen eines Deliktes, das sich auf seinem Territorium ereignete, nach seinem Recht beurteilt werden. Ein solches öffentliches Interesse ist – wie in beiden Beispielsfällen gesehen – insbesondere zweifelhaft, wenn eine unerlaubte Handlung zwischen Personen stattfindet, die sich nur kurzfristig im Inland aufhalten.

Ob ein Staat durch die Geltung des eigenen **Haftungs**rechts in Fällen mit Auslandsberührung tatsächlich Verhaltenssteu**erung bewirkt**, wurde in Frage gestellt und für viele Fälle als bloße Fiktion bezeichnet[58].

Schließlich ließe die Tatortregel die materielle Rechtslage, die in den einzelnen Rechtsordnungen herrsche, außer Betracht. Sie sei zwar an kollisionsrechtlicher Gerechtigkeit orientiert, eine »Ergebnisverantwortung« übernehme sie aber nicht[59].

Diese letzte Kritik lässt sich anhand der Beispielsfälle verdeutlichen. In beiden Fällen ist die Haftung nach dem Tatortrecht zu verneinen, obwohl die Schädiger sowohl nach ihrem eigenen als auch dem Heimatrecht des Geschädigten hätten haften müssen:

Wie im Kapitel zur *materiellrechtlichen* Ausgangsposition im europäischen Haftungsrecht gesehen[60], hängt die Haftung für Verkehrsunfallschäden in England

---

[57] *Morris*, 64 Harv.L.Rev. 881 (887f.); Morris (*McClean*), Conflict of Laws, S. 356; *Binchy*, Irish Conflicts of Law, S. 569; *Miaja de la Muela*, DIP, II, S. 397f. (*Bouza Vidal*).

[58] In diesem Sinne *Binchy*, Irish Conflicts of Law, S. 569; differenzierend *Rohe*, Geltungsgründe, S. 224f.; zu der Frage, ob sich durch Haftungsrecht überhaupt Verhaltenssteuerung bewirken lässt, z. B. Esser/*Weyers*, Schuldrecht, II, BT, Teilband 2, § 53 4. b).

[59] *Ch. von Bar*, IPR, II, Rn. 656. Ausgehend von der Kritik, das IPR übernehme mit der Tatortregel keine Ergebnisverantwortung, schlägt von Bar vor, bei Delikten zwischen Personen, die ihren gewöhnlichen Aufenthalt in anderen Ländern als dem Tatortstaat haben, Ersatz nicht *über* das Maß dessen zu gewähren, was nach den Heimatrechten aller Beteiligter geschuldet wäre. Die Fallbeispiele im Text machen deutlich, dass auch daran zu denken ist, nicht *weniger* zu gewähren, als das, was nach den Heimatrechten geschuldet wäre. Mit einer solchen Lösung ließe sich die Einzelfallgerechtigkeit tatsächlich steigern. Allein: Die Rechtslage und die Aufgabe des Richters würden durch einen solchen doppelten Vorbehalt erheblich komplizierter.

[60] Oben, S. 105 ff.

noch immer vom Verschulden ab. Dagegen würde der Halter (in Deutschland auch der Fahrer) in Dänemark und Deutschland, also in den Heimatländern der Beteiligten des ersten Falles, verschuldensunabhängig haften[61]. Im zweiten Fall, in dem es um die Tötung eines Menschen ging, bestünde sowohl nach dem schweizerischem als auch nach dem französischem Heimatrecht der Beteiligten ein Anspruch der Hinterbliebenen wegen ihrer immateriellen Verluste – nicht dagegen nach dem österreichischen Tatortrecht[62].

Von den *materiellrechtlichen* Ergebnissen her gesehen begünstigt die Anwendung des Tatortrechts in beiden Beispielsfällen also den Schädiger und stellt den Geschädigten schlechter, als er nach den Heimatrechten *beider* Beteiligter gestanden hätte.

Hätte sich der zweite Fall (der folgenschwere Freizeitunfall) dagegen in der Schweiz zwischen einem Österreicher und einem Deutschen ereignet, so stünde den Angehörigen bei Beurteilung nach dem schweizerischen Tatortrecht ein »Angehörigenschmerzensgeld« zu, obwohl ein solches weder nach dem deutschem noch dem österreichischem Heimatrecht der Parteien existiert.

In Europa wurden in den vergangenen zwei Jahrhunderten mehrfach Versuche unternommen, grundsätzliche Alternativen zu der Anknüpfung an den Tatort zu entwickeln. Im Hinblick auf immer wieder geäußerte Kritik an der Tatortregel sollen im folgenden Kapitel die Alternativen und die inzwischen reichen Erfahrungen, die mit ihnen in Europa gewonnen wurden, betrachtet werden. Im europäischen Rechtsunterricht hilft der Blick auf die gewonnenen Erfahrungen, den Wert der Anknüpfung an den Tatort im Vergleich mit denkbaren Alternativen zu ermessen.

---

[61] Siehe §101 des *dänischen* Gesetzes von 1986 über den Straßenverkehr (Bekendtgørelse nr. 58 af 17.2. 1986 af Færdselslov) und für die verschuldensabhängige Haftung des Fahrers §104 Abs.2; dazu *Nørgaard/Vagner*, Landesbericht Dänemark, in: *Ch. von Bar* (Hg.), Deliktsrecht in Europa, S.27ff.; für Deutschland §§7, 18 des Straßenverkehrsgesetzes.

[62] Siehe für die europäische Rechtslage oben, S.113ff. m.w. Nachw.

Der BGH und die drei Oberlandesgerichte hielten zunächst jeweils die Maßgeblichkeit der Ubiquitätslösung fest[147]. Als Handlungsort wurde, wie im schweizerischen, italienischen und estnischen IPR, der Sitz des Produzenten angesehen, wo die Ware hergestellt und von wo aus der Vertrieb organisiert worden war[148]. Als Erfolgsorte galten im Fall des fehlerhaften Fahrrades und der defekten Sicherungsklemme die Unfallorte, an denen die Betroffenen ihre Verletzungen erlitten hatten, und im Falle des unwirksamen Schädlingsbekämpfungsmittels der Ort des Einsatzes des Produktes, bei dem dieses versagt hatte und daher das Eigentum des Verwenders geschädigt wurde[149].

Der Fall der gebrochenen Fahrradgabel wurde nach dem Recht des inländischen »Erfolgsortes« beurteilt, nach dem der Anspruch bereits in vollem Umfang begründet war. In den anderen Fällen hatten die Kläger (ausdrücklich oder stillschweigend) für die Geltung des heimatlichen Rechts optiert, was dreimal zur Anwendung der Lex Fori führte und einmal, nämlich im Falle des OLG München – erstmals im deutschen IPR der Produkthaftung – zur Anwendung des ausländischen (hier: italienischen) Haftungsrechts[150].

### dd) *Recht des Marktortes*

In den von den deutschen Gerichten entschiedenen Fällen trat die Rechtsgutverletzung im Land des Erwerbes des Produktes ein. Vom *Ergebnis* her betrachtet gelangten sowohl der BGH als auch das OLG Düsseldorf und das OLG Köln in den genannten Fällen daher jeweils auch zum Recht des *Vertriebs-* und *Erwerbsortes*. (Im Falle des OLG München dürfte es sich um einen Distanzkauf gehandelt haben. Auf die sich dort ergebende spezielle Problematik wird an etwas späterer Stelle zurückzukommen sein[151].)

Nach der Rechtsprechung des *österreichischen OGH* sind internationale Produkthaftungsfälle von vornherein nach dem Recht des Marktes zu beurteilen, für den das Produkt bestimmt war und auf dem es der Geschädigte erworben hat.

In der Leitentscheidung hatte ein deutsches Unternehmen Geräte zur Sterilisation von Fruchtsäften (Plattenwär**maustau**scher) produziert. Die Geräte wurden von der für Österreich zuständigen Gener**alvertret**erin an Händler in Österreich geliefert. Dort erwarb eine

---

[147] *BGH* 17. 3. 1981, IPRax 1982, 13; *OLG Düsseldorf* 28. 4. 1978, NJW 1980, 533 (534); *OLG Köln* 11. 12. 1991, IPRspr. 1992/53 (S. 110); *OLG München* 9. 8. 1995, IPRspr. 1995/38 (S. 67).

[148] Zum ersten Aspekt der *BGH* und das *OLG Köln*, zu beiden das *OLG München* (alle vorige Fn.).

[149] *OLG Düsseldorf*, *BGH* und *OLG München* (Nachw. alle soeben). In prozessualem Zusammenhang ebenso *AG Neustadt* 23. 2. 1984, IPRspr. 1984/133: eine fehlerhaft konstruierte Felge verursacht einen Unfall. »Das Gericht geht davon aus, dass als der Erfolgsort [...] der Unfallort anzusehen ist, da sich an diesem Ort [...] der Reifen von der Felge gelöst hat und dadurch der Unfall herbeigeführt wurde, der einen Totalschaden an dem Fahrzeug bewirkte. [...] Der Schadenserfolg [...] wäre nicht bereits mit dem Erwerb des Pkw eingetreten [...]«.

[150] Hinzu kommen eine Reihe von Produkthaftungsfällen mit Auslandsberührung, bei denen das Kollisionsrecht von den Gerichten übergangen wurde, siehe hierzu *Wandt*, Int. Produkthaftung, Rn. 311 ff.

[151] Unten, S. 289 f.

österreichische Herstellerin von Fruchtsaft ein solches Gerät. Da es mit Konstruktions- und Produktionsmängeln behaftet war, wurde der Fruchtsaft nicht ordnungsgemäß sterilisiert und die Käuferin erlitt Produktionsausfälle, für die sie von der deutschen Produzentin Ersatz verlangte.

Der *OGH* führte – obiter dictum – zunächst aus, bei einer unmittelbaren vertraglichen Beziehung zwischen Produzent und Käufer seien deliktische Ansprüche akzessorisch an das Vertragsstatut anzuknüpfen[152]. Seien Produzent und Käufer dagegen nur über eine Veräußerungskette miteinander verbunden, wie dies in concreto der Fall war, gelte für die deliktischen Ansprüche das »Recht des Marktes […], für den das Produkt bestimmt war und an dem es erworben wurde.«

Der Marktort wurde dabei nicht als Handlungsort des Produzenten angesehen (in diesem Fall wäre § 48 Abs. 1 S. 1 des österreichischen IPR-Gesetzes einschlägig gewesen). Der OGH gelangte zur Anknüpfung an den Marktort stattdessen über die Ausweichklausel des § 48 Abs. 1 S. 2 des österreichischen IPR-Gesetzes[153].

Auch aus dem *niederländischen* Recht sind Fälle bekannt, die – jedenfalls im Ergebnis – nach dem Recht des Vertriebs- und Erwerbsortes entschieden wurden, so etwa der Fall *Iglo-Ola B. V.* t. *Akzo Chemie GmbH*:

Das niederländische Unternehmen Iglo-Ola B. V. setzte für den Transport seiner Produkte Kühlwagen ein. Diese wurden von einem anderen niederländischen Unternehmen mit einer Kühlflüssigkeit versehen, die es über einen niederländischen Importeur von der Produzentin, der Akzo Chemie GmbH aus Deutschland, bezogen hatte.
Bei einem der Transporte gelangte **Kühlflüssig**keit in den **Frachtraum** der **Kühlwagen** und kam mit den transportierten Lebensmitteln in Berührung. Die **Waren** wurden **dennoch** vermarktet und die Konsumenten erlitten starke Übelkeit, einige verstarben sogar. Die Nachfrage nach Iglo-Produkten ging in den Niederlanden daraufhin stark zurück und stieg erst nach **umfangreichen Aufklärungs- und Werbekampagnen** wieder an.
**Das niederländische Unternehmen Iglo B. V. verlangte von** der deutschen Produzentin der **Kühlflüssigkeit Schadensersatz**, da diese nicht vor dem **hohen** toxischen Gehalt der Flüssigkeit gewarnt hatte.

Die *Rechtbank Utrecht* und in zweiter Instanz der *Hof Amsterdam* gelangten in Anwendung des **niederländischen** IPR[154] zur Beurteilung nach niederländischem Recht[155]. In den **Niederlanden** war das Produkt vermarktet und von der Vertragspartnerin der Geschädigten erworben worden[156].

[152] Dazu ausführlicher unten, S. 397.

[153] *OGH* 29. 10. 1987, IPRE 2/87 (Fall einer »stärkeren Beziehung« im Sinne des § 48 Abs. 1 S. 2 IPRG) = IPRax 1988, 363 (364); so auch die h.M. in Österreich, Rummel/*Schwimann*, § 48 IPRG Rn. 4 m. w. Nachw.

[154] Nach dem Haager Produkthaftungsübereinkommen wäre ebenso zu entscheiden gewesen, Art. 5 lit. b) (Problem: kein Erwerb durch den Geschädigten selbst) oder jedenfalls Art. 4 lit. a) (Ort der Verletzung und Sitz der geschädigten Person in den Niederlanden).

[155] *Rechtbank Utrecht* 8. 4. 1992 und *Hof Amsterdam* 12. 10. 1995, NIPR 1997 Nr. 92 (allerdings mit sehr knappen Ausführungen zum Koordinationsrecht).

[156] Ob dies oder der Umstand, dass auch die Rechtsgutverletzung in den Niederlanden eingetreten war, letztlich ausschlaggebend war, wird von den Gerichten leider nicht mitgeteilt. *Duintjer Tebbens*, NILR 1981, 65, weist in einer Anmerkung zu zwei anderen Entscheidungen darauf hin: »Where liability

Schließlich sprachen sich auch die *englischen* Gerichte für die Maßgeblichkeit des Marktortes aus, auf dem die Produkte jeweils vertrieben und von den Geschädigten bzw. ihnen nahestehenden Personen erworben worden waren – in der ersten Leitentscheidung jedenfalls im Ergebnis, in der zweiten dann auch ausdrücklich. Die Entscheidungen ergingen jeweils im Rahmen der internationalen Zuständigkeit, für die noch englischem Internationalen Zivilprozessrecht maßgeblich war, wo sich das Delikt im Wesentlichen ereignet hatte. (Im IPR galt nach damaliger Rechtslage die »Double Actionability Rule«[157].) Nachdem seit der Neufassung des englischen Internationalen Deliktsrechts durch den Private International Law Act von 1995 wieder die reine Tatortregel gilt, sind die folgenden Entscheidungen mit ihren Überlegungen zur Verortung des Tatortes für die englische Internationale Produkthaftung noch interessanter geworden:

Im Fall *Distillers Co. (Bio-Chemical) Ltd.* v. *Thompson (by her next friend Arthur Leslie Thompson)*[158] hatte ein englisches Chemieunternehmen Beruhigungsmittel hergestellt, die es über eine australische Vertriebsgesellschaft auf dem dortigen Markt verkaufte. In der Packungsbeilage war das Medikament als harmlos, sicher und ohne jegliche Nebeneffekte bezeichnet worden. Tatsächlich waren mit einer Einnahme des Medikamentes während der Schwangerschaft jedoch erhebliche Gefahren verbunden. Eine Frau erwarb das Medikament in Australien, nahm es während der Schwangerschaft ein und brachte ihre Tochter ohne Arme und mit beeinträchtigtem Augenlicht zur Welt. Die Tochter machte wegen ihrer Gesundheitsschäden gegen den englischen Produzenten der Medikamente Ansprüche aus dem Tort »negligence« geltend.

Der *Privy Council* verortete das Delikt in Australien unter dem Gesichtspunkt, dass die erforderliche Warnung dort hätte erteilt werden müssen und sie dort unterblieben war. Die Anknüpfung an die maßgebliche Unterlassung bereitete allerdings Schwierigkeiten, da argumentiert werden konnte, die Warnung hätte in England in die Packungsbeilage aufgenommen werden müssen. Das Gericht behalf sich damit, die Warnung hätte ebensogut durch Mitteilung an die Verkäufer in Australien erfolgen können, worauf sich die Klägerin berufen dürfe[159]. Der Sache nach handelte es sich bereits in dieser Entscheidung um eine Verortung des Deliktes am bestimmungsgemäßen Vertriebsort, an dem das Produkt mit den unzulänglichen Produktinformationen von der Mutter der Geschädigten erworben worden war.

Die zweite englische Leitentscheidung stammt aus dem Jahre 1980 und erging im Fall *(Jayne Susan) Castree* v. *E R Squibb & Sons Ltd. and another*[160]:

Ein deutsches Unternehmen stellte Zentrifugen her, die es in England von einem dort ansässigen Vertriebsunternehmen vertreiben ließ. Als eine englische Abnehmerin eine Zentrifuge in ihrem Unternehmen in England einsetzte, löste sich diese in ihre Bestandteile auf und verletzte eine Arbeitnehmerin. Die verletzte Arbeitnehmerin verlangte von ihrer Arbeitge-

---

arising from imported products is at stake, the foreign origin of the product appears less weightily for choice of law purposes than its destiny, i.e. the country on whose market it was introduced«.

[157] Zu ihr oben, S. 155 ff.

[158] 19. 1. 1971 [1971] 1 All ER 694 (*PC*).

[159] 1 All ER 694 (700 f.).

[160] 24. 4. 1980 [1980] 2 All ER 589 (*CA*).

berin Schadensersatz, und diese begehrte wegen eigener Rückgriffsansprüche im Wege einer »third party notice« eine Einbeziehung des deutschen Produzenten in das Verfahren. Im Rahmen der internationalen Zuständigkeit stellte sich wiederum die Frage nach dem Begehungsort der unerlaubten Handlung. Das deutsche Unternehmen berief sich darauf, dass die Zentrifuge in Deutschland entworfen und hergestellt worden und lediglich die Rechtsgutverletzung in England eingetreten sei. Ein Delikt sei – wenn überhaupt – in Deutschland begangen worden.

Der *Court of Appeal* entschied, maßgeblich sei weder der Ort der Herstellung des Produkts, da es sich hierbei um eine unbeachtliche Vorbereitungshandlung handle (»the mere manufacture of the defective machinery is not […] even the beginning of tort«[161]), noch der Eintrittsort der Rechtsgutverletzung, der in Produkthaftungssachen keinen hinreichenden Anknüpfungspunkt schaffe. Als maßgeblich wurde vielmehr angesehen, wo die defekte Zentrifuge auf den Markt gebracht wurde. Die entscheidende Passage im Urteil lautet: »The substantial wrongdoing in this case alleged to have been committed by the appellants is putting on the English market a defective machine with no warning as to its defects.«[162]

Interessant ist auch die Unterscheidung, die das Gericht zwischen diesem Fall und dem Präjudiz aus dem Fall *George Munroe Ltd.* v. *American Cuanamid and Chemical Corporation*[163] traf, in dem ein inländischer (englischer) Tatort verneint worden war. Der entscheidende Unterschied lag nach Ansicht des Gerichts darin, dass das fehlerhafte Produkt in jenem Fall in den USA hergestellt und auch vermarktet worden war, und allein die Rechtsgutverletzung in England eingetreten war. (»Thus everything which the company had done […] had occurred in America.«)[164] Hier dagegen hatte der Produzent sein Erzeugnis über die Vertriebsgesellschaft in England auf den Markt gebracht und damit den entscheidenden Inlandsbezug hergestellt. Damit sprach der Court of Appeal ein deutliches Bekenntnis zur Maßgeblichkeit des Marktortes aus.

Die englische und schottische Law Commission optierte in ihren vorbereitenden Gutachten zum III. Teil des Private International Law Act von 1995 gegen eine spezielle gesetzliche Regelung zum IPR der Produkthaftung. Nach Inkrafttreten dieses Gesetzes gelten dessen allgemeine Regeln also auch für die Produkthaftung. Nach Sect.11 (2) (a) des Gesetzes ist bei Körperverletzungen zwar grundsätzlich der Ort der Rechtsgutverletzung maßgeblich; da der Erwerbsort und der Ort der Rechtsgutverletzung im selben Staat lagen, wären die Fälle *Distillers* v. *Thompson* und *Castree* v. *Squibb* auf der Ebene des IPR heute wie seinerzeit zu entscheiden. Bei einem Auseinanderfallen des Ortes von Vermarktung und Vertrieb und des Ortes der Rechtsgutverletzung dürfte aber auch heute der Marktort den Ausschlag geben. So wird im Werk von *Dicey and Morris* der Fall, dass ein fehlerhaftes Produkt auf einer Urlaubsreise ins Ausland mitgenommen wird und dort Schaden verur-

[161] 2 All ER 589 (592).
[162] 2 All ER 589 (592).
[163] [1944] 1 All ER 386.
[164] 2 All ER 589 (591).

sacht, als Fall für die Ausweichklausel in Sect. 12 des PIL Act 1995 genannt[165]. Statt des Ortes der Rechtsgutverletzung wäre wiederum der Absatzort entscheidend.

### ee) Recht am Sitz des Schädigers

Das Recht am Sitz des Schädigers steht bei der *schweizerischen, italienischen* und *estnischen* Ubiquitätslösung zur Wahl des Geschädigten[166]. In keiner Rechtsordnung werden Produkthaftungsansprüche ausschließlich nach diesem Recht beurteilt.

### ff) Gesamtabwägung aller Umstände

Es war ein internationaler Produkthaftungsfall, in dem der *irische Supreme Court* – obiter dictum – die Ansicht entwickelte, die Entscheidung über das anwendbare Haftungsrecht solle im Wege einer Gesamtabwägung aller Umstände des Einzelfalles erfolgen[167]. Da es im konkreten Fall um die Frage der internationalen Zuständigkeit ging und das Gericht insoweit jeden signifikanten Inlandsbezug ausreichen ließ, konnte der Supreme Court die Frage, wie diese Gesamtabwägung bezüglich des anwendbaren Haftungsrechts aussehen könnte, noch offen lassen.

### d) Ansichten der Literatur (Auswahl)[168]

Die Vielzahl der Lösungen des geltenden Rechts wird durch die in der Literatur anzutreffende Meinungsvielfalt noch deutlich übertroffen. So existiert insbesondere in der deutschen Literatur ein von manchen als verwirrend[169], von anderen als chaotisch[170] bezeichnete Vielzahl an Überlegungen und Vorschlägen, die selbst in der an Meinungsvielfalt gewöhnten deutschen Rechtswissenschaft ihresgleichen sucht.

In Übereinstimmung mit der **deutschen Rechtsprechung** und denjenigen Rechtsordnungen, in denen die Materie in IPR-Gesetzen speziell geregelt wurde, befürworten manche Autoren für das IPR der Produkthaftung eine Ubiquitätslö-

---

[165] Dicey and Morris (Gen. ed: *Collins*), Conflict of Laws, Vol. 2, Rn. 35–100; siehe für dieses Beispiel auch schon Lord *Pearson* in *Distillers* v. *Thompson,* 1 All ER 694 (699). Bei einer Rechtsgutverletzung in einem Land, in dem das Produkt vertrieben wurde, bleibt es dagegen bei der Anknüpfung der Sect. 11 (2) (a) PIL Act 1995; siehe hierfür die Beispiele bei Dicey and Morris (Gen. ed.: *Collins*), Rn. 35–089, Fall 5 und 6, wo der Fall der fehlerhaften Zentrifuge (*Castree* v. *Squibb*) – mit englischer Höflichkeit – als solcher einer Lieferung von England nach Deutschland statt – wie im wirklichen Leben – von Deutschland nach England geschildert wird.

[166] Art. 135 Abs. 1 lit. a) des *schweizerischen* und Art. 63 1. Alt. des *italienischen* IPR-Gesetzes sowie § 166 Abs. 2 der *estnischen* Grundsätze.

[167] *Patrick Grehan* v. *Medical Incorporated and Valley Pines Associates,* [1986] ILRM 627 (638) (*SC*); zu diesem Urteil ausführlicher oben, S. 166f.

[168] Siehe zur Systematisierung der literarischen Vielfalt v. a. *Wandt,* Int. Produkthaftung, Rn. 329ff.

[169] *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 298 (303); *Wandt,* Int. Produkthaftung, Rn. 8: »verwirrende Meinungsvielfalt«, Rn. 323: »ausufernde Meinungsvielfalt«.

[170] *Mayer,* DAR 1991, 84 Fn. 39: »chaotisches Bild«.

sung[171]. Es ist in der Literatur allerdings umstritten, welcher der in Betracht kommenden Orte Handlungsort sein soll[172] und ob ein oder mehrere Handlungsorte nebeneinander als maßgeblich anzusehen sind. Die Unsicherheit, die insofern herrscht, ist groß[173]. Den »Erfolgsort« wollen manche im Rahmen einer Ubiquitätslösung berücksichtigen, andere schlagen ihn als ausschließliches Anknüpfungskriterium vor[174]. Unter den Vertretern beider Auffassungen ist streitig, ob der »Erfolgsort« am Ort der Rechtsgutverletzung zu lokalisieren ist[175], oder ob stattdessen der Marktort – bzw. konkreter: der Ort des bestimmungsgemäßen Vertriebes oder der (mit diesem oft identische) Ort des Erwerbes durch den Endabnehmer – maßgeblich sein soll, wie dies nach den geschilderten nationalen IPR-Gesetzen der Fall ist (im Haager Übereinkommen finden, wie gesehen, sowohl der Ort der Rechtsgutverletzung als auch derjenige des Erwerbes Berücksichtigung)[176].

---

[171] So etwa *Maxl*, JBl. 1992, 156 (166): Wahlrecht zwischen Recht des Herstellers und Recht des Marktortes; *Fawcett*, M.L.R. 1985, 439 (446 f.); *Prager*, Produkte-Haftpflicht im IPR, S. 306 f., 308 f.; aus der deutschen Lit. z. B. MünchKomm/*Kreuzer*, Art. 38 EGBGB Rn. 203 m. w. Nachw. in Rn. 201a und Fn. 672; Staudinger/*von Hoffmann*, Art. 38 EGBGB Rn. 460; *Kropholler*, IPR, § 53 VI 3.; *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 298 (337); differenzierend *von Hein*, Günstigkeitsprinzip, S. 413 ff., 419 ff., 422, der eine Ubiquitätslösung und ein Wahlrecht zwischen den Rechten am ersten Erwerbsort und dem Ort der Rechtsgutverletzung nur für Ansprüche solcher Produktbenutzer empfiehlt, die nicht Ersterwerber sind.

[172] Nachweise jeweils stellvertr.: Ort der Herstellung der Ware (meist neben anderen Handlungsorten): *Kropholler*, IPR, § 53 VI 3.; MünchKomm/*Kreuzer*, Art. 38 Rn. 203; *Maxl*, JBl. 1992, 166; Sitz oder Hauptniederlassung des Herstellers: *Kropholler*, IPR, § 53 VI 3.; Staudinger/*von Hoffmann*, Art. 38 EGBGB Rn. 461 f.; *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 298 (329 f.); *Schönberger*, Tatortprinzip, S. 73 f.; *Prager*, Produkte-Haftpflicht im IPR, S. 308 f.; Ort des Inverkehrbringens der Ware: *Posch*, in: *Schwind* (Hg.), Österreichs Weg, S. 262 f.; *Maxl*, JBl. 1992, 156 (166); *Kropholler*, IPR, § 53 VI 3.; *Ch. von Bar*, IPR, II, Rn. 666; MünchKomm/*Kreuzer*, Art. 38 Rn. 203; Erwerbsort: z. B. *Kropholler*, IPR, § 53 VI 3.; *Overstake*, Rev. trim dr. civ. 1972, 485 (529); Ort, an dem das Produkt außer Kontrolle gerät oder seinen Dienst versagt: *Ch. v. Bar*, IPR, II, Rn. 666 (Handlungs- und Erfolgsort in einem).

[173] So schon *Wandt*, Int. Produkthaftung, Rn. 621 m. Nachw.

[174] Für die ausschließliche Anknüpfung etwa *Lüderitz*, IPR, Rn. 301; *Taschner/Frietsch*, Produkthaftungsgesetz, Einführung, Rn. 184.

[175] So *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 298 (337).

[176] Für die Anknüpfung an den Markort bzw. den Vertriebs- oder den Erwerbsort etwa *Duintjer Tebbens*, Int'l. Product Liability, 1979, insbes. S. 323 ff., 370 ff. (Kapitelüberschrift: »The market as central concept«), 381; aufgrund umfangreicher vergleichender Analysen auch *Kozyris*, Am. J. Comp. L. 1990, 475 (501 ff.); *Overstake*, Rev. trim dr. civ. 1972, 485 (529); *Ch. von Bar*, IPR, II, Rn. 666 (Vertriebs- und Erwerbsort, zusätzlich zum Verletzungsort); *Kropholler*, IPR, § 53 VI 3.; *Soergel/Lüderitz*, Art. 38 Rn. 62 (Absatzort); Staudinger/*von Hoffmann*, Art. 38 EGBGB Rn. 465 f. (Erwerbsort); *von Hoffmann*, § 11 Rn. 49 (Erwerbsort); *Wandt*, Int. Produkthaftung, Rn. 725: »Anknüpfung an den Marktstaat als eine spezifische Ausformung der allgemeinen Anknüpfung an den Erfolgsort«, Rn. 1231: »Recht des Staates, in dem das schädigende Produkt an den ersten Endabnehmer vermarktet wurde«, gemeint ist jeweils der Erwerbsort; *Siehr*, RIW 1972, 385; *Sack*, FS Ulmer, 1973, S. 500 ff. (Vertriebsort); ebenso Palandt/*Heldrich*, Art. 38 Rn. 17; *Wilde*, in: *von Westphalen* (Hg.), Produkthaftungshandbuch, II, § 100 Rn. 11; für die Anknüpfung an den Markort auch die h.M. in Österreich, etwa *Rummel/Schwimann*, § 48 IPRG Rn. 4a m. zahlr. w. Nachw.; siehe aus der schweizerischen Lit. *Thümann*, IPR der Deliktsobligationen, S. 167 ff. (allerdings unter dem Vorbehalt der Vorhersehbarkeit für den Produzenten); im Wesentlichen auch *Stoll*, FS Kegel, 1977, 127 ff.; *ders.*, FS Ferid, S. 410.

oder geben ihm die Möglichkeit nachzuweisen, dass der Vertrieb am Erwerbsort ohne sein Einverständnis erfolgte[218]. Greift dieser Vorbehalt ein, wird eine Alternative für die Anknüpfung erforderlich. Die kollisionsrechtliche Entscheidung wird hierdurch insgesamt erheblich komplizierter. Obwohl sich jedenfalls zwei der nationalen Gesetzgeber im Grundsatz ablehnend gegenüber einer Ubiquitätslösung und einem Wahlrecht des Geschädigten verhalten, sahen sie im Produkthaftungsrecht offenbar keine andere Möglichkeit, als auf eine Ubiquitätslösung zurückzugreifen. Der deutsche Rat für IPR sah, wie erwähnt, »angesichts stark divergierender Meinungen« letztendlich ganz von einer besonderen Empfehlung zur Anknüpfung der Produkthaftung ab[219].

Die Ursache für all diese Komplikationen liegt in der durch die hohe Mobilität vieler Produkte bedingten Problematik von »Drittlandkontakten« und der durch sie ausgelösten Furcht vor »Zufallsergebnissen«.

### b) Ausweg: Beurteilung nach dem Recht des Erwerbsortes

Der Ausweg aus den Komplikationen könnte darin liegen, der Neigung zur Anknüpfung an den Marktort zu folgen, die sich bei der europäischen Bestandsaufnahme gezeigt hat und die auch in der Literatur vorherrscht, und die Bedenken aufzugeben, die gegen diese Anknüpfung als *alleiniger* Lösung derzeit noch bestehen. Unter dem Erwerbsort ist derjenige Ort zu verstehen, an dem das Produkt im gewerblichen Handel durch den ersten Endabnehmer erworben wurde[220].

Die Anknüpfung an den Erwerbsstaat weist eine ganze Reihe von Vorzügen auf, so dass ihre weite europäische Verbreitung nicht verwundert:

Für den *Produzenten* schafft die Anknüpfung an den Erwerbsort Rechtssicherheit[221], und das Problem der Vorhersehbarkeit des anwendbaren Rechts ist bei dieser Lösung deutlich entschärft: Der Hersteller weiß bei dieser Lösung oft frühzeitig und schon bei Planung, Produktion und Vertrieb der Ware, auf welches Haftungsrecht (oder welche Haftungsrechte) er sich einzustellen hat[222]. Anders als bei der Anknüpfung an den Ort der Rechtsgutverletzung ist bei Maßgeblichkeit des Erwerbsortes ausgeschlossen, dass der Produzent nach dem Recht eines Staates haftet, in dem das Produkt überhaupt nicht im Handel war und an den es lediglich von einem Erwerber oder Besitzer mitgenommen wurde.

Am Erwerbsort setzt der Abnehmer seine Rechtsgüter in der Regel erstmals der Gefahr einer Schädigung durch das Produkt aus. Der Erwerbsort ist damit gleichsam

---

aller Regel nur solche Rechte, die für den Produzenten vorhersehbar sind, vgl. schon *Wandt*, Int. Produkthaftung, Rn. 564 und Fn. 12.

[218] Siehe Art. 7 des Haager Übereinkommens und Art. 135 lit.b) des *schweizerischen*, Art. 63 des *italienischen* und Art. 114 lit.b des *rumänischen* IPR-Gesetzes.

[219] *von Caemmerer*, in: Vorschläge und Gutachten, S. 22; siehe auch *Lorenz*, IPRax 1988, 373 (374).

[220] Dies kann auch ein gewerblicher Endabnehmer sein, der das Produkt weiterverarbeitet und hierbei Schaden erleidet, vgl. *Duintjer Tebbens*, Int'l. Product Liability, S. 375.

[221] Vergleiche nur *Saravalle*, Responsabilità del produttore e dip, S. 217; zu den Grenzen sogleich, e).

[222] Zum entsprechenden Interesse des Herstellers etwa *Fawcett*, Rec. des Cours, Vol. 238 (1993-I), S. 9 (123f.).

vorverlagerter »Erfolgsort«[223]. Wo sich die Gefahr schließlich realisiert, kann vom Hersteller nicht mehr beeinflusst werden und ist aus seiner Sicht zufällig[224]. Die Anknüpfung an den Erwerbsort ist dagegen weitgehend frei von Zufälligkeiten. Dort wurde die Ware auf dem Markt angeboten, dort kam es zum Kauf. Hersteller, deren Produkte im Ausland vertrieben werden, müssen damit rechnen, dass es dort zu Schäden kommen kann und dass der Geschädigte die Beurteilung nach dem dort geltenden Recht erwartet; gleiches gilt für die Versicherer des Herstellers[225].

Die Anknüpfung an den Erwerbsort besitzt für den Produzenten weitere Vorzüge: Indem diese Lösung Konkurrenten verwehrt, sich gegenüber den Geschädigten auf die eventuell günstigeren Produkthaftungsstandards ihres Heimatlandes zu berufen, vermeidet sie diejenigen Wettbewerbsverzerrungen, die mit dem Herkunftslandprinzip verbunden sein können, und trägt insofern zur Wettbewerbsgleichheit mit anderen Anbietern auf demselben Markt bei. Die Nachteile im Wettbewerb, die mit dem Erwerbslandprinzip verbunden sind[226], sind vergleichsweise gering, so dass dieses Prinzip den Handel im Vergleich mit den denkbaren Alternativen weitestmöglich schont[227].

Unter dem Gesichtspunkt der Rechtssicherheit und Vorhersehbarkeit des anwendbaren Rechts noch günstiger wäre für den Produzenten zwar eine Lösung, die statt an den tatsächlichen Ort des *Erwerbes* an denjenigen Ort anknüpft, an dem der Hersteller das Produkt selbst angeboten oder über Vertragspartner hat vertreiben lassen (*Vertriebsort*). Die Anknüpfung an den Ort des **Vertriebes** durch den Hersteller und seine Vertriebsorganisationen hat gegenüber der **Anknüpfung** an den Erwerbsort aber entscheidende Nachteile:

Fallen Vertriebs- und Erwerbsort auseinander, so ist bei in mehreren Ländern vertriebenen Produkten fraglich, welcher der Vertriebsorte maßgeblich sein soll. Gerade in komplizierteren Konstellationen weist die Anknüpfung an den Vertriebsort somit Schwächen auf und werden wiederum Hilfsanknüpfungen erforderlich.

Der irische Fall *Patrick Grehan* v. *Medical Incorporated and Valley Pines Associates*[228] macht zudem deutlich, dass der Vertriebsort erst bei Kenntnis der Abreden zwischen Hersteller und Händlern zu bestimmen ist. Sollten die Händler die Herzklappen in diesem Fall nur in den USA vertreiben, so lag der »Vertriebsort« allein dort. Waren die Händler dagegen zu einem weltweiten Vertrieb autorisiert, so war jeder Ort des Erwerbes zugleich Vertriebsort. Diese **Abhängigkeit** des anwendbaren Rechts von internen Vereinbarungen zwischen dem Produzenten und seinen Vertragspartnern schafft Unsicherheit, die mit dem Bedürfnis nach einer

---

[223] So *von Hoffmann*, IPR, §11 Rn.31.

[224] *Duintjer Tebbens*, Int'l. Product Liability, S.374; *Saravalle*, Responsabilità del produttore e DIP, S.216; Staudinger/*von Hoffmann*, Art.38 Rn.465.

[225] *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S.301.

[226] Zu ihnen oben, I.f).

[227] Ähnlich schon *W.-H. Roth*, RabelsZ 55 (1991), 623 (668); für dieses Ergebnis daher z.B. auch *Duintjer Tebbens*, NILR 1997, 442 (444); *Wandt*, Int. Produkthaftung, z.B. Rn.734, Rn.1043ff.; zur Anknüpfung an den Marktort und zum Aspekt der Wettbewerbsgleichheit auch schon *Sack*, FS Ulmer, S.500ff.; *Siehr*, RIW 1972, 385; Staudinger/*von Hoffmann*, Art.38 Rn.465; zur Europarechtskonformität dieser Lösung ausführlich *Höpping*, Auswirkungen der Warenverkehrsfreiheit, S.156ff. – Gegen die Berücksichtigung des Aspekts der Wettbewerbsgleichheit, weil es im Produkthaftungsrecht um den Schutz des Publikums, nicht die Chancengleichheit der Wettbewerber ginge, *Winkelmann*, Produkthaftung, S.224.

[228] [1986] ILRM 627, Sachverhalt oben, S.166.

klaren Anknüpfung im Internationalen Produkthaftungsrecht unvereinbar ist. Statt des Vertriebsortes muss also der Ort des tatsächlichen Erwerbs im gewerblichen Handel maßgeblich sein.

Auch den Interessen und berechtigten Erwartungen des *Erwerbers* wird diese Lösung gerecht: In aller Regel erwirbt der Endabnehmer das Produkt in dem Staat, in dem er seinen gewöhnlichen Aufenthalt hat[229]. Die Geltung des Rechts am Erwerbsort führt dann zur Maßgeblichkeit desjenigen Rechts, das dem Erwerber am vertrautesten ist oder über das er sich jedenfalls am einfachsten und kostengünstigsten Auskunft verschaffen kann. Rechtsirrtümer und andere Nachteile der Geltung ausländischen Rechts (etwa das Versäumen von Verjährungsfristen eines ausländischen Haftungsrechts, welche die europäischen Gerichte im IPR so oft beschäftigen[230]) lassen sich so vermeiden. Die Haftungsfolgen werden bei dieser Lösung also oft nach demjenigen Recht zu bemessen sein, das in der Lebensumwelt des Geschädigten gilt. Indem diese Anknüpfung Verbrauchern die Geltung des Rechts des Erwerbsortes garantiert und sie Herstellern die Berufung auf ein günstigeres Recht ihres Heimatlandes verwehrt, trägt sie zum Verbraucherschutz bei, ohne Produzenten über Gebühr zu belasten.

Erwirbt der Abnehmer das Produkt dagegen im Geltungsbereich einer anderen als seiner heimischen Rechtsordnung, so rechnet er damit, dass der Produzent – wie allen anderen Erwerbern so auch ihm – nach den Standards dieser Rechtsordnung haftet, wenn sich das Produkt als schadensträchtig erweist[231]. Die Anknüpfung an den Erwerbsort entspricht dieser Erwartung und bedeutet auch für den Erwerber Rechtssicherheit. Nimmt der Erwerber das Produkt vom Erwerbsort in ein Drittland (oder auch sein Heimatland) mit, schafft er also selbst einen weiteren Auslandskontakt, so ist dagegen nicht ersichtlich, weshalb der Produzent nach dem Recht dieses weiteren Landes haften und der Erwerber ein entsprechendes berechtigtes Vertrauen besitzen soll[232].

Die Geltung des Rechts des »Erfolgs« statt des Erwerbsortes wäre aufgrund der leichten Beweglichkeit vieler Produkte auch für den Erwerber mit Misslichkeiten verbunden, jedenfalls dann, wenn er das Produkt in ein Land mit niedrigeren Haftungsstandards (etwa ein Urlaubsland) mitnimmt und er dort durch das Produkt Schaden an seiner Person oder seinem Eigentum erleidet.

Ein hoher Produkthaftungsstandard ist nicht kostenlos zu erhalten. Schärfere Haftungsstandards führen zu höheren Kosten für den Hersteller, zu entsprechend höheren Versicherungsprämien und letztlich auch zu höheren Produktpreisen. Er-

---

[229] Siehe die oben angeführten Beispiele aus der europäischen Rspr.; aus der Lit. stellvertr. *Kropholler*, IPR, §53 VI 3.

[230] Vergleiche oben, S. 117ff. m. zahlreichen Bsp. und Nachw.

[231] *Fawcett*, Rec. des Cours, Vol. 238 (1993-I), S. 9 (122); Staudinger/*von Hoffmann*, Art. 38 Rn. 465; gegen die Fiktion, der Erwerber eines Produktes aus einem bestimmten Land (»Made in France«) vertraue auf die Geltung der im Herkunftsland geltenden Haftungsstandards, was eine entsprechende Anknüpfung erforderlich mache, überzeugend z.B. *Höpping*, Auswirkungen der Warenverkehrsfreiheit, S. 175ff.

[232] So z.B. schon *Duintjer Tebbens*, Int'l. Product Liability, S. 377.

wirbt der Abnehmer das Produkt in einem Land mit niedrigen Haftungsstandards (und entsprechend niedrigeren Preisen) und erleidet er in einem anderen Land mit höheren Haftungsstandards einen Schaden, so würde er bei Geltung der dortigen Haftungsstandards gegenüber den anderen Erwerbern einen Vorteil erlangen, für den er keinen entsprechenden Preis entrichtet hat. Reichen die Produkthaftungsstandards am »Erfolgsort« dagegen weniger weit, so entgeht im bei Geltung des dortigen Rechts ein Vorteil, für den er einen Preis gezahlt hat[233].

Die Beurteilung des Falles nach dem Haftungsrecht am Erwerbsort ist Schädiger wie Geschädigtem also gleichermaßen zumutbar[234], sie wird von beiden Seiten – wie sich gezeigt hat: mit guten Gründen – erwartet, und sie wird kaum einmal als ungerecht oder unfair angesehen[235].

Der *Marktortstaat* schließlich hat ein beachtliches Interesse daran, die Sicherheit der auf seinem Territorium in den Verkehr gebrachten Produkte zu regeln. Ausdruck findet dieses Interesse darin, dass das öffentliche Produktsicherheitsrecht für alle auf dem Territorium des Marktstaates in Verkehr gebrachten Produkte gilt, unabhängig von ihrem Herkunftsland (ein Grundsatz, der durch das Herkunftslandprinzip innerhalb der EU nun zwar eine wichtige Ausnahme erfahren hat, die aber von einer Grundangleichung der nationalen Rechte begleitet war und durch diese erst möglich wurde). Ein Grund für die Regelungskompetenz des Marktstaates liegt darin, dass die erforderliche Produktsicherheit von den Gegebenheiten des einzelnen Marktes abhängt und vom Gesetzgeber des Marktstaates am besten beurteilt werden kann. Ein anderer Grund kann darin liegen, dass der einzelne Gesetzgeber die im Inland ansässige Bevölkerung möglichst effektiv vor Produktgefahren schützen will und ihm dies kaum verwehrt werden kann. (Verbindliche Sicherheitsanforderungen des Herstellungslandes für Produkte, die für den Export vorgesehen sind, sind dagegen äußerst selten[236].) Die Sicherheit von Produkten wird aber nicht allein durch das öffentliche Produktsicherheitsrecht, sondern – über dessen präventive Wirkung – auch durch das private Haftungsrecht bestimmt. Nur durch die Geltung des Rechts des Erwerbslandes wird für alle Erwerbsgeschäfte auf dem Territorium des Marktstaates sichergestellt, dass für alle Anbieter die von dem materiellen Recht des Marktortstaates ausgehenden Verhaltensgebote und für alle Erwerber die hiervon ausgehenden Schutz- und Versorgungsstandards maßgeblich sind. Allein die Beurteilung nach dem Haftungsrecht des Marktstaates verwirklicht die Verhalten steuernde Funktion des dort geltenden materiellen Produkthaftungsrechts optimal. (Das Internationale Produkthaftungsrecht widerlegt so eindrucksvoll die These, die Verhalten steuernde Funktion des Haftungsrechts gebiete die Beurteilung nach dem Recht an der Verhaltenszentrale des Schädigers[237]).

[233] Zu diesem Aspekt schon *von Hein*, Günstigkeitsprinzip, S. 404f.
[234] Sie ist insofern »neutral«, vgl. *Saravalle*, Responsabilità del produttore e DIP, S. 217.
[236] Vergleiche die Ergebnisse der Untersuchung von *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 301.
[236] Ausführlich *Wandt*, Int. Produkthaftung, Rn. 648ff. mit Beispielen aus dem deutschen Recht.
[237] Gegen diese These schon oben, S. 219ff. und – für das Int. Produkthaftungsrecht – *Wandt*, Int. Produkthaftung, Rn. 716ff.

Es spricht somit alles für eine Beurteilung nach dem Recht des Marktortes, konkretisiert auf den Erwerbsort im gewerblichen Handel[238].

### c) Kein Ausweg: Herkunftslandprinzip und (europarechtswidrige) Ubiquitätslösungen

#### aa) Herkunftslandprinzip

Das Herkunftslandprinzip stellt für das IPR zwar ebenfalls eine europarechtskonforme Lösung dar[239] und kann für den Produzenten mit gewissen Erleichterungen verbunden sein[240]. Es kann für ihn aber auch eine Belastung bedeuten, wenn nämlich die Heimatrechte einzelner Konkurrenten schwächere Haftungsstandards vorsehen und diese sich auf diese schwächeren Standards berufen können[241] oder wenn ihm das Recht seines Herkunftslandes zwar günstiger ist, die Verbraucher den Umstand, dass er als ausländischer Hersteller in geringerem Umfang haftet, bei ihrer Kaufentscheidung aber zu seinen Lasten berücksichtigen[242].

Im geltenden IPR Europas herrscht für die Anknüpfung der Distanzdelikte zwar eine beachtliche Vielfalt an Lösungen. Nirgendwo werden (oder wurden in der Vergangenheit) Distanzdelikte aber ausschließlich an das Herkunftsland des Schädigers angeknüpft – und dies in Hinblick auf die Interessen des Geschädigten mit guten Gründen. Im geltenden IPR der Produkthaftung ist das Herkunftsland des Schädigers nur vereinzelt maßgeblich und dann nur entweder in Verbindung mit einem anderen Anknüpfungspunkt (so im Haager Übereinkommen), oder es steht für den Geschädigten ein weiteres Recht zur Wahl (so im *schweizerischen* und im *italienischem* IPR-Gesetz). Das Herkunftslandprinzip, das dem Produzenten die Möglichkeit eröffnet, sich gegebenenfalls auf die milderen Haftungsstandards seines Herkunftslandes zu berufen, stellt für die Anknüpfung im IPR keine wirkliche Alternative und Perspektive dar[243].

#### bb) Ubiquitätslösungen

Im Hinblick auf das in Europa bereits geltende IPR der Produkthaftung scheint die Alternative zu einer Anknüpfung an das Recht des Marktortes in erster Linie in Ubiquitätslösungen zu liegen, die dem Geschädigten die Wahl zwischen dem

---

[238] So auch *Wandt*, Int. Produkthaftung, Rn. 712ff.; – kritisch dagegen *W. Lorenz*, RabelsZ 57 (1993), 175 (198) unter Hinweis auf die Beratungen zum Haager Übereinkommen.

[239] Dazu etwa *Höpping*, Auswirkungen der Warenverkehrsfreiheit, S. 103f.

[240] Aus Sicht des Herstellers spricht *für* diese Anknüpfung, dass ein ihm vertrautes Recht zur Anwendung gelangt, ihm die Kosten der Ermittlung verschiedener Rechte erspart bleiben, das Risiko eines Rechtsirrtums minimiert würde, sowie, dass er in allen Fällen mit der Beurteilung nach dem selben Recht rechnen dürfte, siehe zu diesen Aspekten *Höpping*, Auswirkungen der Warenverkehrsfreiheit, S. 148f. und 112ff.

[241] Vergleiche schon *W.-H. Roth*, RabelsZ 55 (1991), 623 (669).

[242] *von Hein*, Günstigkeitsprinzip, S. 432, spricht dann von einem »Pyrrhussieg des Herstellers«.

[243] Ebenso *von Hein*, Günstigkeitsprinzip, S. 432.

Recht am (wiederum stark konkretisierungsbedürftigen) »Handlungsort« und dem Recht am (wie auch immer zu konkretisierenden) »Erfolgsort« eröffnen[244].

Sowohl die Anknüpfung an den »Erfolgs-« als auch diejenige an den »Handlungsort« weisen bei der Produkthaftung jedoch Schwächen auf:

Gegen die Anknüpfung an den *Handlungsort* sind alle Bedenken zu erheben, die generell gegen die Geltung des Rechts am Handlungsort sprechen[245]. Die Anknüpfung an den *»Erfolgsort«* ist der Anknüpfung an den Marktort aus den genannten Gründen unterlegen und wird im geltenden Recht daher nahezu überall relativiert oder gleich durch eine Anknüpfung an den Marktort ersetzt. Handlungs- und »Erfolgsort« taugen für die Anknüpfung im Internationalen Produkthaftungsrecht, wie dargelegt, nur dann, wenn sie jeweils auf den Erwerbsort konkretisiert werden, was in manchen Fallkonstellationen nicht ohne Künstlichkeit möglich ist. Stattdessen sollte gleich an den Erwerbsort angeknüpft werden.

Gegen die ubiquitäre Anknüpfung im Internationalen Produkthaftungsrecht sprechen zudem diejenigen Argumente, die schon im Allgemeinen gegen eine alternative Anknüpfung und die Geltung des strengeren unter mehreren in Betracht kommenden Rechten angeführt wurden[246].

Wenn für die Ubiquitätslösung im Internationalen Produkthaftungsrecht zuweilen angeführt wird, die kollisionsrechtliche Begünstigung des Geschädigten entspreche einer international verbreiteten Begünstigungstendenz im materiellen Produkthaftungsrecht, so ist dies nicht überzeugende Begründung, sondern vage bleibende Reaktion auf die allgemein herrschende Verlegenheit bei der Begründung der Ubiquitätslösung. Im materiellen Recht haben die Regeln der Produkthaftung nicht die Begünstigung des Geschädigten zum Ziel, sondern stellen einen oft schwierigen Kompromiss zwischen den verschiedenen, gegenläufigen Interessen der Beteiligten dar[247].

Ubiquitätslösungen benachteiligen den Produzenten durch die Geltung des strengsten unter mehreren Rechten, ohne dass dies durch die Interessen des Geschädigten oder sonstige Interessen geboten ist. Wie gesehen, wird dem durch ein Produkt Geschädigten die Beurteilung nach dem Recht des Erwerbsortes vollauf gerecht; er hat in aller Regel kein legitimes Interesse an der (alternativen) Anwendung eines anderen Rechts.

Ubiquitätslösungen können den ausländischen Hersteller zwingen, bereits in seine Entscheidung für die Herstellung oder den Export von Waren die Standards mehrerer Rechte einzubeziehen (in der Regel diejenigen an seinem Sitz sowie, kumulativ, diejenigen der potentiellen Absatzmärkte oder möglicher »Erfolgsorte«).

---

[244] Im Rahmen der aktuellen Diskussion über die Auswirkungen der Warenverkehrsfreiheit auf das IPR hat der Vorschlag von Ubiquitätslösungen eine neue Blüte erlebt – allerdings nicht zugunsten des Geschädigten, sondern zugunsten des ausländischen Produzenten. Siehe v.a. *Basedow*, RabelsZ 59 (1995), 1 (49ff.) und näher unten, c), m. w. Nachw.

[245] Oben, S. 214ff., 216ff.

[246] Siehe schon oben, S. 228ff. Zur Rechtsunsicherheit, die mit alternativen Anknüpfungen verbunden ist, speziell für die Produkthaftung stellvertr. *Duintjer Tebbens*, Int'l. Product Liability, S. 367.

[247] Siehe schon *Duintjer Tebbens*, Int'l. Product Liability, S. 364f.

# EXHIBIT 7

PRODUCTS LIABILITY   1413

different from the place where the person claiming compensation has suffered injury: a product is designed and manufactured in one place and marketed and purchased in others. Once acquired, the product is carried to yet other places where it ultimately causes damage to the person who acquired it, to persons close to the purchaser, or to third parties (so-called 'innocent bystanders'). Given the high mobility of many products, the place of manufacturing, purchase and injury may be located in two or more countries. Hence the great potential for complex transnational torts scenarios in the field of products liability (for other complex torts see → Torts).

In the EU, the substantive law on products liability is to some extent harmonised by the Products Liability Directive (Council Directive 85/374/EEC of 25 July 1985 on the approximation of the laws, regulations and administrative provisions of the Member States concerning liability for defective products [1985] OJ L210/29). The harmonising effect of this Directive is however limited, in that according to art 9 Products Liability Directive, damage to property is covered only if the product was intended for private use, and pure economic loss is not covered at all. Cases that are beyond the scope of application of the Directive continue to be governed by national liability laws that differ from each other in many respects. Consequently, the outcome in a given case often depends on the applicable law.

In Europe, the law applicable to products liability cases that present a foreign element is determined either by the → Rome II Regulation (Regulation (EC) No 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (Rome II), [2007] OJ L 199/40) or by the Hague Products Liability Convention (Hague Convention of 2 October 1973 on the law applicable to products liability, 1056 UNTS 191). In countries that are neither EU Member States nor contracting states to the Hague Products Liability Convention (such as → Switzerland), the law applicable to products liability is determined by their domestic private international law.

Given the limited number of contracting states to the Hague Products Liability Convention (see below III.1.), the Rome II Regulation is by far the most important instrument in Europe when it comes to determining the law applicable to products liability.

# Products liability

## I. Introduction

Products liability is the field of law that deals with the extra-contractual liability of manufacturers, distributors, suppliers, retailers, and other persons for damage caused by products they have made available to the public. The answer to the question of which person in a chain of distribution is ultimately responsible for the damage caused by a defective product depends on the applicable law.

In products liability cases the person claimed to be liable has often acted in a place that is

WOLFGANG HAU / THOMAS KADNER GRAZIANO

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

146

1414   ENCYCLOPEDIA OF PRIVATE INTERNATIONAL LAW

Before entry into force of the Rome II Regulation, there was a broad variety of solutions in Europe regarding the law applicable to products liability (see the overview in Thomas Kadner Graziano, 'The Law Applicable to Product Liability: The Present State of the Law in Europe and Current Proposals for Reform' (2005) ICLQ 475, 478–9). Given the mobility of many products, there has however been a widespread consensus that applying the law of the place where the injury occurred, ie the *lex loci delicti* (→ Torts), would often be inadequate and lead to fortuitous results in products liability scenarios. Thus persons living in country A might buy a product in country B and take it to country C (on vacation or on a business trip) which might be any (distant) country in the world. While using it there, they might suffer damage due to a defect of the product. To apply the law of country C where the injury occurred would often not constitute a sensible solution for the manufacturer of the product, who would not know in advance to which country in the world the user might carry the product before the damage occurs, or for the victim who will, in general, expect the application of the law of a country with which they have a closer connection.

## II. The applicable law according to the Rome II Regulation

Faced with the difficulty of finding a satisfactory solution for the applicable law in products liability cases, art 5 Rome II Regulation combines various criteria which achieve a finely tuned determination of the applicable law. The criteria are arranged in a hierarchy or cascading system of connecting factors, so that if the criteria for applying the first rule are not met, then the second applies (and so on). These steps will now be analysed in sequence.

### 1. Party autonomy (art 14)

Under the Rome II Regulation, it first needs to be determined whether the parties have agreed on the applicable law: art 14(1) allows for a choice of the applicable law in torts *ex post* and, under certain conditions, also *ex ante* (→ Torts).

In the case-law on products liability dating from before the Rome II Regulation, when the parties pleaded in court proceedings according to the law of the forum, the courts occasionally deduced that they thereby impliedly chose

the law of the forum as the applicable law (see eg the German case: German Federal Court of Justice (BGH), 17 March 1981 *Apfelschorf (apple scrap)* [1982] IPRax 13).

According to art 14(1) 2nd sentence Rome II Regulation '[t]he choice [of law] shall be expressed or demonstrated with reasonable certainty by the circumstances of the case'. Contrary to the above case-law, mere silence is thus insufficient, and the Rome II Regulation requires that the parties either make an express choice of applicable law or make an implied choice which is however 'demonstrated with reasonable certainty by the circumstances'.

### 2. Pre-existing relationship – rattachement accessoire *(art 5(2))*

If the parties have not chosen the applicable law but are in a pre-existing relationship with each other, such as a contractual relationship that is closely connected with the tort or delict in question, then the law applicable to this relationship will also apply to the tort claim (so-called *rattachement accessoire*). Article 5(2) Rome II Regulation thus restates a principle that is already expressed more generally in art 4(3) Rome II Regulation (for the rationale of *rattachement accessoire* see → Torts).

### 3. Application of the law of the parties' common habitual residence *(art 5(1) in conjunction with art 4(2) Rome II Regulation)*

The next step on the cascade of connecting factors is art 5(1), 1st part, in conjunction with art 4(2) Rome II Regulation: if 'the person claimed to be liable and the person sustaining damage both have their habitual residence in the same country at the time when the damage occurs', then the law of this country applies (for the reasons behind applying the law of the parties' common habitual residence see → Torts).

### 4. Application of the law of the injured party's habitual residence *(art 5(1)(a))*

The next step, often relevant in practice, is found in art 5(1)(a) Rome II Regulation: 'the law of the country in which the person sustaining the damage had his or her habitual residence when the damage occurred' applies, providing that 'the product was marketed in that country'.

Thomas Kadner Graziano

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

147

PRODUCTS LIABILITY   1415

The Rome II Regulation contains no definition of the notion of marketing. However, according to ECJ case-law a product is marketed when it is offered to the public for use or consumption (ECJ C-127/04 *Declan O'Byrne v Sanofi Pasteur and others* [2006] ECR I-1313). The ECJ held in relation to the interpretation of the Products Liability Directive that 'a product is put into circulation when it is taken out of the manufacturing process operated by the producer and enters a marketing process in the form in which it is offered to the public in order to be used or consumed'.

For art 5(1)(a) Rome II Regulation to be applicable, it is not necessary that the precise product that caused the damage was actually bought in the country of the injured person's habitual residence, but rather it is sufficient that this line of products was marketed in that country (see art 5(1), 2nd sentence Rome II Regulation: 'the marketing of the product, or a product of the same type'). This is particularly relevant for bystanders injured by a product that they did not purchase.

Article 5(1)(a) applies both in situations where the persons whose liability is claimed have marketed the product in this country themselves, and where it was marketed there by an independent retailer or distributor. This follows among others from the fact that the Rome II Regulation requires that the marketing of the product in the country in question must have been foreseeable, as opposed to requiring that the persons alleged to be liable must themselves have marketed it there, or that they had been in control of the marketing process there (see the 2nd sentence of art 5(1) Rome II Regulation).

Given that the Rome II Regulation applies both to victims domiciled in the EU and those domiciled in third countries, the law of the country of the injured party's habitual residence applies irrespective of whether this is an EU Member State or a third country.

Article 5(1)(a) Rome II Regulation aims at protecting the person sustaining damage. Application of the law of the victim's habitual residence is the simplest and, in principle, the least costly solution for the person having suffered damage. It is also fair for the persons claimed to be liable, in that these persons are making a profit from the distribution of their products in this country and ought reasonably to expect the law of a country in which their products are distributed to apply when these products cause damage there (see European

Commission, 'Proposal for a Regulation of the European Parliament and the Council on the Law Applicable to Non-Contractual Obligations ("Rome II")' COM(2003) 427 final, p 16, and Thomas Kadner Graziano, *Gemeineuropäisches Internationales Privatrecht – Harmonisierung des IPR durch Wissenschaft und Lehre (am Beispiel der ausservertraglichen Haftung für Schäden)* (Mohr Siebeck 2002), 278 *et seq*).

A particular strength of art 5(1)(a) Rome II Regulation is that it is effective for both new and second-hand products. In addition, the rule applies and achieves reasonable results, both in proceedings brought by the purchaser of a product and those brought by third parties that are not in relationship with the buyer but suffered damage from the product (so-called 'innocent bystanders').

## 5. Application of the law of the place of marketing and purchase (art 5(1)(b))

If products such as the one that caused the damage were not marketed in the country in which the injured person had her habitual residence, then pursuant to art 5(1)(b) Rome II Regulation, 'the law of the country in which the product was [actually] acquired' will apply 'if the product was marketed in that country'.

There are numerous arguments for applying the law of the country of marketing and acquisition. Manufacturers who have their products sold in a foreign country must take into account the potential for their products to cause damage there, and that an injured person would expect the law of this country to apply. Additionally, applying the law of the place of acquisition makes the same rules applicable to all suppliers that have their products sold there, thereby favouring equality between competitors in this market. Using the law of the place of marketing and of acquisition also promotes legal certainty, and finally, applying this law is equally acceptable for both the manufacturer and the purchaser and it is in conformity with their expectations. Consequently, academic opinion in Europe has long argued for the application of the law of the place of acquisition of the product, see eg Harry Duintjer Tebbens, *International Product Liability* (Kluwer 1981) 381 *et seq*; Alberto Saravalle, *Responsabilità del produttore* (CEDAM 1991) 217 *et seq*; Manfred Wandt, *Internationale Produkthaftung* (Fachmedien Recht und Wirtschaft in Deutscher Fachverlag GmbH 1995) no 1086 *et seq*, 1100, 1231; Thomas Kadner Graziano (2005) ICLQ

Thomas Kadner Graziano

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

148

1416   ENCYCLOPEDIA OF PRIVATE INTERNATIONAL LAW

475; id, *Gemeineuropäisches Internationales Privatrecht* (Mohr Siebeck 2002) 278 ff.

However, using the place of acquisition may not be appropriate where the damage was suffered by an innocent bystander who has not acquired the product. Instead, the next rule on the cascade of connecting factors, ie the place of injury rule set out in art 5(1)(c) Rome II Regulation should apply to damage suffered by bystanders (if the case does not fall under art 5(1)(a) already).

### 6. Application of the law of the place of injury (art 5(1)(c))

As provided by art 5(1)(c) Rome II Regulation, if the product was neither marketed in the injured person's country of habitual residence nor in the country in which it was actually bought, products liability will be governed by 'the law of the country in which the damage occurred, if the product was marketed in that country'.

Under the Rome II Regulation, the place of damage thus occupies a merely subsidiary position in the list of connecting factors for determining the applicable products liability law, and rightly so. In fact, given the high mobility of many products, the risk of reaching fortuitous and arbitrary results is considerable when the law of the place of injury is used with respect to persons who have purchased the product in another country. The application of the law of the place of injury, if not accompanied by other factors, may often be neither in the interest of the person whose liability is claimed nor in the interest of the injured person (see the example above I. *in fine*). On the other hand, the place of injury rule often works well where the damage was suffered by an innocent bystander.

### 7. Foreseeability clause

According to art 5(1) *in fine* Rome II Regulation, 'the law applicable shall be the law of the country in which the person claimed to be liable is habitually resident if he or she could not reasonably foresee the marketing of the product, or a product of the same kind, in the country the law of which is applicable under (a), (b) or (c)'.

Article 5(1) *in fine* provides the only 'foreseeability clause' in the Rome II Regulation. In the European case-law on international torts dating from the period before entry into force of the Rome II Regulation, there is no single published case in which a court concluded that the injury in the country in which it occurred was not reasonably foreseeable for the person claimed to be liable (compare Thomas Kadner Graziano, *Gemeineuropäisches Internationales Privatrecht – Harmonisierung des IPR durch Wissenschaft und Lehre (am Beispiel der ausservertraglichen Haftung für Schäden)* (Mohr Siebeck 2002) 224). In fact, most products are today distributed on an international or even global scale, and can freely circulate across borders, as is well known to manufacturers and distributors. The foreseeability clause in art 5(1) Rome II Regulation *in fine* will thus rarely if ever be relevant in practice.

### III. The 1973 Hague Convention on the law applicable to products liability

#### 1. Relationship between the Rome II Regulation and the Hague Products Liability Convention

Products liability is the subject matter of a second Hague Convention in the field of torts, namely the Hague Products Liability Convention (text and status table available at <www.hcch.net>). The Convention is currently in force in 11 countries, including seven EU Member States (→ France, the → Netherlands, → Luxembourg, → Finland, → Spain, → Slovenia and → Croatia; it is also in force in → Norway, → Macedonia, FYR, → Serbia and → Montenegro).

As with the Hague Traffic Accident Convention (Hague Convention of 4 May 1971 on the law applicable to traffic accidents, 965 UNTS 415), the Rome II Regulation does not affect application of the Hague Products Liability Convention, pursuant to its art 28(1). In the EU Member States in which the Convention is in force, the applicable law in products liability cases will thus be determined by the Hague Products Liability Convention, as opposed to the Rome II Regulation. As with traffic accidents, this may be seen as an unsatisfactory situation which could very well be remedied (→ Traffic accidents).

#### 2. The applicable law according to the Hague Products Liability Convention

Just like the Hague Traffic Accident Convention, the Hague Products Liability Convention provides no rules on → choice of law by the parties (→ party autonomy) nor on pre-existing

Thomas Kadner Graziano

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

149

relationship (*rattachement accessoire*). Neither were on the agenda in the early 1970s.

The Hague Products Liability Convention combines four criteria, of which two generally need to be met in order to find the applicable law. The different combinations of criteria apply in a hierarchical order.

First, the law of the country of habitual residence of the party having suffered the damage applies, provided that the person claimed to be liable is also established there or the claimant has purchased the product in this country (art 5 Hague Products Liability Convention). The first of these two alternatives corresponds to a widespread rule in the private international law of torts, ie to apply the law of the country where both parties have their habitual residence or establishment. Incidentally the Rome II Regulation uses the same criterion, provided there is no choice of law by the parties and no case for an accessory connection, see art 5(1) with art 4(2) Rome II Regulation, and II.3. above. The second alternative corresponds largely to art 5(1)(a) Rome II Regulation. However, under Rome II it is sufficient that the product was marketed in the country of the injured person's habitual residence, whereas the Hague Products Liability Convention requires a purchase by that person in this country.

Second, the law of the country where the injury occurred, ie where the legally protected interest was initially harmed, applies, provided that this is also 'a) the place of the habitual residence of the person directly suffering damage, or b) the principal place of business of the person claimed to be liable, or c) the place where the product was acquired by the person directly suffering damage' (art 4 Hague Products Liability Convention). The place of injury thus appears at an earlier stage than in the Rome II Regulation. However, the law of the place of injury applies only when this place coincides with the place of the injured party's habitual residence, which might frequently be the case, or with the principal place of business of the person claimed to be liable, or with the place where the victim has purchased the product (the Rome II Regulation focuses instead on the place of marketing and purchase, and has recourse to the place of injury only as a last resort in products liability cases, see II.6. above).

Finally, where the conditions of none of the above rules are met, the law of the country of the principal place of business of the person claimed to be liable applies, but the victim may opt instead for the law of the country where the injury occurred (art 6 Hague Products Liability Convention).

## IV.  Private international law rules on products liability in other jurisdictions

Further specific rules on the law applicable to products liability are found in the private international law acts of → Switzerland (Swiss Private international law Act (*Bundesgesetz über das Internationale Privatrecht* of 18 December 1987, 1988 BBl I 5, as amended, henceforth Swiss PILA)) and → Tunisia (Code of Private international law (Law No 98-97 of 27 November 1998), Official Journal of the Republic of Tunisia, 1 December, p 2332, henceforth Tunisian PILA))), in the Civil Codes of Québec (L.Q. 1991, ch 64), Russia (Civil Code of the → Russian Federation (as amended by Federal Law No 260-FZ on 30 September 2013, henceforth Russian CC)) and → Belarus (Law No 218-Z of 7 December 1998), in the Japanese Act on General Rules for Application of Laws (Hōno Tekiyō ni Kansuru Tsūsokuhō, Law No 10 of 1898, as newly titled and amended by Act No 78 of 21 June 2006, henceforth Japanese PILA) and the Chinese Statute of Application of Law to Foreign Civil Relations (adopted at the 17th session of the Standing Committee of the 11th National People's Congress on 28 October 2010, effective 1 April 2011, henceforth Chinese PILA).

Once the injury has occurred, most of these instruments (with the exception of the Civil Codes of Québec and Belarus) leave it to the parties to determine the applicable law if they wish to do so (art 133 section 1 Swiss PILA; art 1219 section 3 Russian CC; art 21 Japanese PILA; art 44 2nd sentence Chinese PILA, art 71 Tunisian PILA). They all permit a choice *ex post*, which is limited to the *lex fori* in Switzerland, Russia and Tunisia.

In the absence of a choice by the parties, the law of the parties' domicile or residence (→ Domicile, habitual residence and establishment) is applicable provided both parties are domiciled in the same country (art 133 section 1 Swiss PILA; art 3126 section 2 Civil Code of Quebec; art 1219 section 2 *in fine* Russian CC; art 20 Japanese PILA; art 44 2nd alternative Chinese PILA; art 70 section 3 Tunisian PILA). Some codes or statutes provide for the application of the law governing a pre-existing relationship between the parties, in particular

Thomas Kadner Graziano

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

1418   ENCYCLOPEDIA OF PRIVATE INTERNATIONAL LAW

where they are in a contractual relationship (art 133 section 3 Swiss PILA; art 3127 Civil Code of Québec; art 20 Japanese PILA).

All of the above-mentioned codes and acts further contain specific rules with objective connecting factors for products liability claims. Absent an agreement on the applicable law, the person having suffered damage can choose between the law of the state where the manufacturer has its establishment or residence and the law of the state where the good was acquired, art 135 Swiss PILA, art 3128 Civil Codes of Québec, art 1221 section 1 Russian CC, art 1130 Civil Code of Belarus, art 72 of the Tunisian PILA. Under the Swiss PILA and the Russian CC, applying the law of the place of acquisition is excluded if the persons held liable prove that the product was marketed there without their consent. The Civil Codes of Russia, Belarus, and Tunisia further allow the choice of the law of the country where the injured party is domiciled or has its principal activity.

Under art 45 Chinese PILA, the law of the country of the habitual residence of the person having suffered the damage applies to product liability, without further requirements. The victim may instead choose the law applicable at the principal place of business of the person claimed to be liable or at the place where the injury occurred. The law of the place of injury can also be chosen by the victim under art 72 no 2 of the Tunisian PILA.

In contrast, according to art 18 Japanese PILA, a claim against the producer following an injury to life, body, or property 'caused by the defect of a delivered product … shall be governed by the law of the place where the injured person has been delivered the product. However, where the delivery of the product to that place could not usually be foreseen, the law of the principal place of business of the producer applies'.

In products liability, in order to facilitate compensation, the courts in the → USA tend to focus on the law most favourable to the victim. Some courts applied the law in force at the consumer's domicile even in cases in which neither the injury was suffered nor the product sold there, see eg *Phillips v General Motors Corp.*, 995 P.2d 1002 (Montana 2000); *Kasel v Remington Arms Co*, 24 Cal.App. 3d 711 (California 1972); *Stephen v Sears, Roebuck & Co*, 266 A. 2d 855 (New Hampshire 1970). These courts emphasized the interest in protecting the consumer or any other user, and they assumed that the state of the consumer's

domicile had the most significant contact and interest in having its law applied, at least when this facilitated recovery.

Other courts in the USA applied the law of the manufacturer's federal state, which was often particularly favourable to foreign victims. In these decisions the courts emphasized the interest in deterring a manufacturer's improper conduct and/or the interest in providing incentives for producing the safest products possible, *Reyno v Piper Aircraft Corp,* 639 F.2d 149, 168 (3d Cir 1980), reviewed on another issue, 454 U.S. 235, 102 S.Ct. 252; *Gantes v Kason Corp*, 145 N.J. 478. 679 A.2d 106 (1996); *Baird v Bell Helicopter Textron*, 491 F.Supp. 1129, 1141 (ND Texas 1980); *Johnson v Spider Staging Corp*, Wash. 2d 577, 555 P.2d 997, 1002 (1976).

In other cases the courts applied the law of the victim's country of domicile even though it was less favourable to the plaintiff, *Harrison v Wyeth Laboratories*, 510 F.Supp. 1 (E D Pennsylvania 1980), affirmed 676 F.2d 685 (3d Circ 1982). In this case, a woman was injured in the United Kingdom by oral contraceptives manufactured there under the licence of a Pennsylvania-based company. The court reasoned that the UK had a greater interest than Pennsylvania in the control of drugs distributed and consumed in the UK. This led to the application of English law, less favourable to the claimant than that of Pennsylvania.

## V.  Case scenarios

In the following chapter, the rules presented above will be illustrated using selected case scenarios:

*Scenario 1*

A product (eg a bicycle) is designed and manufactured by X in country A and dispatched from its factory. The product is then distributed through an independent chain of distribution in countries A, B, C. Y purchases the product in country B, where he has his habitual residence. Due to a defect in the product (eg a defective bicycle fork) it causes physical injury and damage to property

(i)   to Y in country B where he has his habitual residence;
(ii)  to Y in country C where he spent his vacation taking the product with him;
(iii) to Z1, a family member of Y, in country B;
(iv) to Z2, an innocent bystander in country C

THOMAS KADNER GRAZIANO

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

where he has his habitual residence.
(v)  Variation:  Y  with  domicile/habitual  residence  in  country  B  purchases  the  product  in  country  C  but  suffers  damage  in  B.

In  Scenario  1(i)  the  parties  have  not  chosen  the  applicable  law,  they  are  not  in  a  contractual  relationship  with  each  other,  and  they  have  their  habitual  residence  in  different  countries.  According  to  all  of  the  above-mentioned  instruments,  as  well  as  some  US  American  caselaw,  the  law  of  country  B,  where  Y  has  his  habitual  residence  and  where  he  has  purchased  the  product  would  ultimately  be  applicable  (references  above,  II.–IV.).  Under  the  rules  applicable  in  →  Switzerland,  Russia  (→  Russian  Federation),  →  Belarus,  Québec,  →  China  and  →  Tunisia  the  victim  could  instead  choose  the  law  of  country  A  where  the  manufacturer  is  established.

In  Scenario  1(ii)  the  injury  occurred  in  a  country  which  is  different  from  the  one  where  the  injured  person  is  habitually  resident  and  where  the  product  was  purchased.  In  none  of  the  abovementioned  private  international  law  systems  does  the  place  of  injury  play  a  central  role  in  product  liability.  This  scenario  would  thus  be  solved  in  the  same  way  as  the  first  scenario,  and  the  law  of  country  B,  where  Y  has  his  habitual  residence  and  where  he  has  purchased  the  products  would  be  applicable.  Under  the  rules  applicable  in  Switzerland,  Québec,  Russia,  Belarus  and  China  the  victim  could  choose  the  law  of  country  A  instead  of  where  the  manufacturer  is  established.  It  is  only  under  the  Chinese  Act  and  under  the  Tunisian  Act  that  the  victim  would  have  a  further  option  in  favour  of  the  law  of  the  country  of  injury,  ie  country  C  (see  II.–IV.  above).

The  same  solution  as  in  Scenario  1(i)  should  arguably  apply  in  Scenario  1(iii)  where  the  victim  is  a  person  who  is  close  to  the  purchaser  of  the  defective  product.

In  Scenario  1(iv)  the  damage  is  suffered  by  an  innocent  bystander.  He  has  his  habitual  residence  in  country  C  where  products  such  as  the  one  that  caused  the  damage  were  marketed.  According  to  art  5(1)(a)  Rome  II  Regulation,  the  law  of  country  C  thus  applies.  The  same  is  true  under  the  Hague  Products  Liability  Convention,  since  C  is  the  country  where  the  injury  occurred  and  where  Z2  has  his  habitual  residence  (art  4  Hague  Products  Liability  Convention).  According  to  the  Chinese  PILA,  the  law  of  country  C  would  also  apply  given  that  the  victim  has  his  habitual  residence  there;

under  Chinese  law  the  person  having  suffered  the  injury  could  however  opt  for  the  law  of  country  A  where  the  manufacturer  is  established.

Under  the  other  systems,  the  law  applicable  to  claims  brought  by  bystanders  is  less  clear:  applying  the  law  of  the  country  of  purchase  is  not  appropriate  for  claims  by  bystanders,  and  applying  the  law  of  the  principal  place  of  business  of  the  manufacturer  arguably  does  not  suit  either  for  victims  who  are  not  involved  in  the  purchasing  process  (and  are  not  closely  related  to  the  purchaser).  According  to  the  rules  applicable  in  →  Russia,  →  Belarus  and  →  Tunisia,  C  could  however  opt  for  the  law  of  country  C  where  he  is  domiciled.

In  Scenario  1(v)  Y  purchases  the  product  in  country  C  but  suffers  damage  in  B,  the  country  of  his  habitual  residence  where  the  product  was  also  marketed:  according  to  art  5(1)(a)  Rome  II  Regulation,  the  law  of  country  B  would  apply,  given  that  Y  has  his  habitual  residence  there  and  products  such  as  the  one  that  caused  the  damage  are  marketed  there.  Under  art  4  Hague  Products  Liability  Convention,  the  law  of  country  B  would  also  apply  since  Y  has  his  habitual  residence  and  suffered  the  damage  there.  Under  the  Chinese  PILA,  Y  would  have  the  choice  between  the  laws  of  country  A  (principal  place  of  business  of  the  manufacturer)  and  B  (Y's  habitual  residence;  place  where  the  injury  occurred).

Under  the  rules  applicable  in  Switzerland,  Québec,  Russia,  Belarus  and  Tunisia,  the  victim  would  have  the  choice  between  the  laws  of  countries  A  (the  country  of  establishment  of  the  manufacturer)  and  C  (the  country  of  purchase).  Under  the  Civil  Codes  of  Russia,  Belarus  and  Tunisia,  he  would  additionally  have  the  option  to  choose  the  law  of  country  B  (where  he,  the  injured  party,  was  domiciled).  Finally,  under  the  Japanese  PILA,  the  law  of  country  C  where  the  product  was  delivered  would  arguably  apply.

Scenario  1(v)  illustrates  that  in  cases  where  the  places  of  purchase  on  the  one  hand  and  of  the  victim's  habitual  residence  and  of  injury  on  the  other  are  located  in  different  countries,  the  solutions  vary  considerably.  However,  Scenarios  1(i)–(iv)  show  that  in  many  standard  cases,  the  rules  presented  above  often  eventually  lead  in  principle  to  similar  results,  but  in  some  jurisdictions  with  different  options  for  the  person  who  suffered  injury.

*Scenario 2*

X,  a  company  established  in  country  A,  designs  and  manufactures  prosthetic  hips  or  breast

THOMAS KADNER GRAZIANO

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

implants there. They are distributed to doctors and hospitals through independent chains of distribution in countries A, B and many others. Y has an implant in country B. Due to defects of the implant, Y suffers damage and brings a claim against the manufacturer X.

Given that Y has her habitual residence in country B and that the defective implants were marketed to hospitals and doctors there, art 5(1)(a) Rome II Regulation leads directly to the application of the law of country B. Under this rule, it is immaterial that it was not Y, but her doctors or the hospital, who purchased the defective product in country B. On the other hand, under the Hague Products Liability Convention, in order to apply the law of the country of the victim's habitual residence, it is in principle required that the claimant herself purchased the product in this country (art 5 and above, III.2.). However, art 4 of the Hague Products Liability Convention would eventually also lead to the application of the law of country B since Y suffered the injury in country B and had her habitual residence there. In systems that focus exclusively on the country where the victims themselves purchased the defective product, such as the Japanese PILA, the solution to Scenario 2 is less clear.

### Scenario 3

A product is manufactured by a US American company and marketed eg in → France, but not eg in → Belgium. One item is sold in France to X, who is not a retailer. He takes it to Belgium and there sells it to Y. Y is injured in Belgium and brings a claim there against the US American manufacturer.

Belgium is not a contracting state to the 1973 Hague Convention. Belgian courts will thus determine the applicable law according to the Rome II Regulation. The parties have not chosen the applicable law and they are not in a contractual relationship, so there is no case for accessory connection. Neither art 5(1)(a) nor (b) Rome II Regulation lead to the applicable law, in that Y is habitually resident in Belgium but the product was not marketed there, and it was not marketed in Belgium where Y acquired it from X. Finally, art 5(1)(c) Rome II Regulation does not determine the applicable law either: Y suffered injury in Belgium but the product was not marketed there.

The Rome II Regulation thus does not provide a rule for cases where the product was not marketed in the country of the victim's habitual residence, of purchase, or of injury. In legal doctrine it is suggested that the law of the place of injury be applied in such scenarios (in Scenario 3: Belgian law) under the general rule in art 4(1) Rome II Regulation (Trevor Hartley, 'Choice of Law for Non-contractual Liability: Selected Problems under the Rome II Regulation' (2008) ICLQ 899, 906; Adam Rushworth and Andrew Scott, 'Rome II Regulation: Choice of Law for Non-contractual Obligations' (2008) LMCLQ, 274 at 284). However, in order to apply the law of the country where the injury occurred, Rome II expressly requires in art 5(1)(c) Rome II Regulation that the product was marketed there. It is therefore suggested to fill the gap by applying the law of the place of marketing that has the closest connection to the facts of the case. This would be in line with the fact that the European legislator used the place of marketing in art 5(1)(a), (b) and (c) Rome II Regulation as a central and indispensable connecting factor. In Scenario 3 this should arguably lead to the application of French law. The same outcome could be reached under art 5(1)(b) Rome II Regulation if the original acquisition by X (instead of Y) were regarded as the relevant purchase in Scenario 3.

If this case were brought before the courts of a contracting state to the Hague Products Liability Convention, art 5 Hague Products Liability Convention might lead to the application of Belgian law: Belgium was the country of the habitual residence of the victim, who had purchased the product there. If, however, a purchase in a professional chain of distribution were required, art 5 Hague Products Liability Convention would not apply. Then art 4 Hague Products Liability Convention would also lead to Belgian law, since this was the country where the injury occurred and where the person directly suffering damage had his or her habitual residence.

## VI.   Jurisdiction

In EU Member States, jurisdiction in product liability cases is governed by the Brussels I Regulation (recast) (Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement

Thomas Kadner Graziano

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

of judgments in civil and commercial matters (recast), [2012] OJ L 351/1; → Brussels I (Convention and Regulation)) or, where applicable, by the → Lugano Convention (Lugano Convention of 30 October 2007 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, [2007] OJ L 339/3). According to art 4(1) Brussels I Regulation (recast)/2(1) Lugano Convention, persons domiciled in a Member/contracting State will be sued in the courts of that Member/contracting State. A claim for products liability can also be brought, if the claimant so chooses, 'in the courts for the place where the harmful event occurred or may occur' (art 7(2) Brussels I Regulation (recast)/art 5(3) Lugano Convention). According to well-established ECJ case-law, this special jurisdiction is available both at the place where the person claimed to be liable acted and the place where the damage occurred (ie where the protected interest was initially harmed), ECJ C-21/76 *SCJEC Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* [1976] ECR 1735 (→ Torts).

### 1.  Place of acting of the person claimed to be liable

With respect to the 'place of acting' in products liability claims, the ECJ decided that 'in the case where a manufacturer faces a claim of liability for a defective product, the place of the event giving rise to the damage is the place where the product in question was manufactured', ECJ C-45/13 *Andreas Kainz v Pantherwerke AG* [2014] OJ C 85/10. The ECJ reasoned with regard to the rationale of this special jurisdiction that a forum at the place where the product was manufactured 'facilitates, on the grounds of, *inter alia*, the possibility of gathering evidence in order to establish the defect in question, the efficacious conduct of proceedings and, therefore, the sound administration of justice'.

It should be noted that the ECJ did not locate the place of acting at the place where the product was marketed, although this would have been in line with the central role that the place of marketing plays (as 'place of acting') under the Rome II Regulation. The *Kainz* decision thus confirms the restrictive interpretation and the exceptional character of the rules on special jurisdiction in art 7 Brussels I Regulation (recast)/art 5 Lugano Convention. It also emphasizes the independent interpretation of

the same legal terms (in the present case: the 'place of acting') for purposes of jurisdiction on the one hand and for purposes of determining the applicable law on the other.

### 2.  Place where the damage occurred

The leading products liability case concerning the location of the place of damage under the Brussels I Regulation/Lugano Convention is ECJ C-189/08 *Zuid-Chemie v Philippo's Mineralenfabriek NV/SA* [2009] ECR I-6917: a Dutch company *Zuid-Chemie* used ingredients in its factory in the Netherlands to produce fertilizer, which it then sold and delivered to its customers. *Zuid-Chemie* had purchased the ingredients from another company which in turn had acquired them from a third company, *Philippo's*. *Philippo's* had ordered some raw materials for producing the ingredients from a fourth company. All companies were established in the Netherlands.

*Philippo's* manufactured the ingredients in its factory in Belgium where the final purchaser, *Zuid-Chemie*, came to take delivery of them. It transpired that the raw materials *Philippo's* had purchased from the fourth company were defective, rendering the ingredients produced by *Philippo's* in Belgium, and ultimately the fertilizer produced by *Zuid-Chemie* in the Netherlands, unusable. *Zuid-Chemie* accordingly claimed → damages for the resulting loss from *Philippo's* on an extra-contractual basis.

The parties did not dispute that place of acting of *Philippos's* was to be located in Belgium, where this company had manufactured the defective ingredient and where it had been delivered to the claimant. The question was rather where to locate the place where the claimant's damage had occurred.

The ECJ held that 'the place where the damage occurred cannot be any other than Zuid-Chemie's factory in the Netherlands where the [ingredient], which is the defective product, was processed into fertiliser, causing substantial damage to that fertiliser which was suffered by Zuid-Chemie and which went beyond the damage to the [ingredient] itself'.

### VII.  Conclusions

Designating the applicable law in product liability cases has always been regarded as particularly difficult, and the range of solutions that were applied in the different jurisdictions

THOMAS KADNER GRAZIANO

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

1422   ENCYCLOPEDIA OF PRIVATE INTERNATIONAL LAW

before the entry into force of the Rome II Regulation was particularly broad. Article 5 of the Rome II Regulation combines several criteria that must be fulfilled in order to arrive at the applicable law and thereby reaches finely tuned and well-balanced results. In the field of products liability, as in many others, the Rome II Regulation has thus brought much needed clarifications thereby contributing to legal certainty and predictability of the applicable law.

Thomas Kadner Graziano

**Literature**

(see also → Torts; → Rome II Regulation (non-contractual obligations))

James J Fawcett, 'Products Liability in Private international law: A European Perspective' (1993-I) 238 Rec. des Cours 9; Trevor Hartley, 'Choice of Law for Non-contractual Liability: Selected Problems under the Rome II Regulation' (2008) ICLQ 899; Martin Illmer, 'The New European Private international law of Product Liability – Steering Through Troubled Waters' (2009) 73 RabelsZ 269; Thomas Kadner Graziano and Matthias Erhardt, 'Cross-Border Damage Caused by Genetically Modified Organisms: Jurisdiction and Applicable Law' in Bernhard Koch (ed), *Damage Caused by Genetically Modified Organisms* (De Gruyter 2010) 784; Thomas Kadner Graziano, 'The Law Applicable to Product Liability: The Present State of the Law in Europe and Current Proposals for Reform' (2005) ICLQ 475; Thomas Kadner Graziano, 'Le nouveau droit international privé communautaire en matière de responsabilité extracontractuelle' (2008) Rev. crit.DIP 445; Thomas Kadner Graziano, *La responsabilité délictuelle en droit international privé européen* (Helbing Lichtenhahn – Bruylant – L.G.D.J. 2004) 61; Thomas Kadner Graziano, *Europäisches Internationales Deliktsrecht* (Mohr Siebeck 2003) 63; Thomas Kadner Graziano, *Gemeineuropäisches Internationales Privatrecht – Harmonisierung des IPR durch Wissenschaft und Lehre (am Beispiel der ausservertraglichen Haftung für Schäden)* (Mohr Siebeck 2002) 258; P John Kozyris, 'Values and Methods in Choice of Law for Products Liability: A Comparative Comment on Statutory Solutions' (1990) 38 Am.J.Comp.L. 475; Jan Kropholler and others, *Aussereuropäische IPR-Gesetze*, (Deutsches Notarinstitut/Max-Planck-Institut für ausländisches und internationales Privatrecht 1999); Willis LM Reese, 'The Hague Convention on the Law Applicable to Products Liability' (1974) 8 Int'l Law. 606; Willis LM Reese, 'Further Comments on The Hague Convention on the Law Applicable to Products Liability' (1978) 8 Ga.J.Int'l.& Comp.L. 311; Symeon C Symeonides, 'Choice of Law for Products Liability: The 1990s and Beyond' (2004) Tul.L.Rev. 1247; Symeon Symeonides, 'Party Choice in Product-Liability Conflicts' (2004) Willamette J. Int'l L. & Disp. Resol. 263; Russel Weintraub, *Commentary on the Conflict of Laws* (6th edn, Foundation Press/ThomsonReuters 2010) § 6.31 *et seq*; see also the references in <www.hcch.net/index_de.php?act=conventions.publications&dtid=1&cid=84>.

Thomas Kadner Graziano / Alexander Layton and Albert Dinelli

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:45:53AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

155

# EXHIBIT 8

# Torts

## I. Introduction

On the substantive law level, rules on extra-contractual liability, tort or delict vary considerably between countries (for detailed information on the substantive tort law regimes, see the publications of the European Group on Tort Law, available at <www.egtl.org> and of the European Centre of Tort and Insurance Law (ECTIL), and in particular the Digests and Yearbooks on European Tort Law, available at <www.ectil.org>; see also Christian von Bar, Eric Clive and Hans Schulte-Nölke (eds), *Principles, Definitions and Model Rules of European Private Law: Draft Common Frame of Reference*, vol 4 (Sellier 2009); Walter van Gerven, Pierre Larouche and Jeremy Lever, *Cases, Materials and Text on National, Supranational and International Tort Law* (Hart Publishing 2000); Cees van Dam, *European Tort Law* (2nd edn, OUP 2013)). Thus it is often crucial in cross-border tort cases to know which national liability system applies. In private international law, the law of torts was for a long time overshadowed by criminal liability and for centuries remained a neglected topic. However, this changed drastically in the second half of the 20th century as the number of cross-border situations involving non-contractual liability multiplied. Road traffic accidents abroad (→ Traffic accidents), sports accidents in foreign countries, damage caused by defective products (→ Products liability), cross-border environmental damage (→ Environmental liability),

acts restricting free competition in an international context, cross-border infringements of intellectual property rights (→ Intellectual property, applicable law), as well as infringements of privacy rights by media (printed or online) have multiplied and have come into the focus of private international law. Following the multiplication of situations raising issues of applicable law, the private international law rules on torts became more differentiated and more specific rules were introduced in numerous countries, either by means of legislation or through case-law. These rules differed from one jurisdiction to another in many respects (see Thomas Kadner Graziano, *Gemeineuropäisches Internationales Privatrecht (am Beispiel der ausservertraglichen Haftung für Schäden)* (Mohr Siebeck 2002); Thomas Kadner Graziano, *Europäisches Internationales Deliktsrecht* (Mohr Siebeck 2003); Thomas Kadner Graziano, *La responsabilité délictuelle en droit international privé européen* (Helbing Lichtenhahn 2004)). On a European scale, the existence of rules designating different applicable laws meant that the outcome of a particular case could vary according to the forum in which the case was brought. This in turn led to considerable uncertainty and a lack of predictability of the applicable law. In such circumstances, claimants and their lawyers had the opportunity to assess their options and choose the most favourable forum, engaging in what is termed 'forum shopping' (→ Forum (and law) shopping).

This state of the law was considered unsatisfactory and initiatives were taken to unify private international law rules in the field of torts, initially by the → Hague Conference on Private international law, then by the EC and later the EU.

Two Hague Conventions were adopted, one on the law applicable to traffic accidents (Hague Convention of 4 May 1971 on the law applicable to traffic accidents, 965 UNTS 415, Hague Traffic Accident Convention), the other designating the law applicable to products liability (Hague Convention of 2 October 1973 on the law applicable to products liability, 1056 UNTS 191, Hague Products Liability Convention; text and status charts available at <www.hcch.net>). While the Hague Traffic Accident Convention has been highly successful with 21 contracting states (→ Traffic accidents), the Hague Products Liability Convention has been less so, with 11 contracting states (→ Products liability).

TOSHIYUKI KONO / THOMAS KADNER GRAZIANO

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:46:43AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

In 2009, the → Rome II Regulation (Regulation (EC) No 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (Rome II), [2007] OJ L 199/40) entered into force in the EU Member States. It has universal application and so applies even when the designated law is not that of an EU Member State. The Rome II Regulation introduced, for the first time in modern history, common rules setting out the applicable law in non-contractual matters in all EU Member States except Denmark. It designates the same national law, irrespective of the country where the case is brought. For the issues covered, Rome II establishes foreseeability of the outcome, creates legal certainty as to the applicable law, and eliminates forum shopping within Europe.

However, according to art 28(1) of the Rome II Regulation, the two Hague Conventions on traffic accidents (→ Traffic accidents) and product liability (→ Products liability) prevail over the Regulation in their respective contracting states. With respect to traffic accidents and to products liability, two different sets of private international law rules thus coexist within Europe. For these two areas of considerable practical importance, the unification of private international law rules by the Rome II Regulation so far remains only partial.

## II. General principles of private international law of torts

Specific chapters in this Encyclopedia are dedicated to the Rome II Regulation, to traffic accidents and to product liability. This chapter will instead focus on general principles of private international law of torts, as they have evolved over the centuries (see II.1. below) or during the second half of the 20th century (see II.2. to II.4. below).

### 1. The lex loci delicti commissi *rule*

The first principle of almost global importance to be identified in the private international law of tort is the application of the law of the place where the tort was committed, the so-called *lex loci delicti commissi* rule. From the beginning of private international law in the 12th and 13th centuries until well into the 20th century, the *lex loci delicti rule* was seen on the European continent as the (only) reasonable rule to follow in torts. It thus ranks among the oldest rules of private international law. However, until the mid-19th century, the legal analysis often focused on the question of which law to apply to criminal sanctions, while compensation was regarded as a secondary issue, governed by the law applicable in criminal law. In the 19th and the 20th centuries, when accident and compensation law was emancipated from criminal law, new statutes and case-law endorsed the *lex loci delicti* rule for compensatory tort claims in continental Europe and eg South America. Before the entry into force of the → Rome II Regulation, and despite modern tendencies towards more specific or more flexible rules, the *lex loci* rule was in force in almost all European countries from → Poland to → Portugal, from the → Netherlands to → Greece, and from England (→ United Kingdom) to the Baltic States (→ Estonia, → Latvia, → Lithuania) and Russia (→ Russian Federation). The same is true for the private international law of torts in many jurisdictions around the world. The Hague Traffic Accident Convention (→ Traffic accidents) and the → Rome II Regulation also retain the place of the accident as a central criterion for determining the law applicable in torts.

The place where the tort was committed is currently used as the general rule, for example, in art 4(1) Rome II Regulation, art 3 Hague Traffic Accident Convention, art 1219(1) Russian Civil Code (The Civil Code of the Russian Federation of 26 November 2001, No 146-FZ – Part 3, as amended by Federal Law No 260-FZ of 30 September 2013, henceforth Russian CC), art 1129(1) Civil Code of Belarus (Law No 218-Z of 7 December 1998, henceforth Belarus CC), art 17(1) Japanese Act on General Rules for Application of Laws (Hōno Tekiyō ni Kansuru Tsūsokuhō, Law No 10 of 1898, as newly titled and amended by Act No 78 of 21 June 2006, henceforth Japanese PILA), art 44 Law of the People's Republic of China on the Laws Applicable to Foreign-Related Civil Relations (Statute of Application of Law to Foreign Civil Relations adopted at the 17th session of the Standing Committee of the 11th National People's Congress on 28 October 2010, effective 1 April 2011, henceforth Chinese PILA). Other examples are art 3126(1) Civil Code of Québec (L.Q. 1991, ch 64, henceforth Québec CC); art 21 first sentence Civil Code of Egypt (Law No 131/1948 of 16 July 1948, al qānūn al

Thomas Kadner Graziano

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:46:43AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

madanī); arts 70 and 73(1) Tunisian Code of Private international law (Law No 98-97 of 27 November 1998, Official Journal of the Republic of Tunisia, 1 December, p 2332, henceforth Tunisian PILA); art 20(1) Civil Code of Algeria (Ordonnance No 75-58 du 20 Ramadhan correspondant au 26 septembre 1975 portant code civil, modifiée et complétée) and § 13 Civil Foreign Relations Act of South Korea (Law No 966 of 15 January 1962 and Law No 6465 of 7 April 2001, Amending the Conflict of Laws Act of the Republic of Korea). In other jurisdictions, the *lex loci delicti* is applied as a default rule, used where no other, more specific → connecting factors apply. This is the case in art 133(2) Swiss Private international law Act (Bundesgesetz über das Internationale Privatrecht of 18 December 1987, 1988 BBl I 5, as amended, henceforth Swiss PILA). In the USA, the *lex loci* rule was followed unanimously until the mid-1960s.

There is a strong rationale for the *lex loci delicti* rule. First, in situations where the parties had no contact with each other before the damaging event occurred, which is the case eg in many road traffic accidents or sports accidents, the place of the accident is the only link between them. Second, the law of the place of the tort or accident is simple to apply, efficient and favours legal certainty. Parties know even before a tort is committed which law will apply to potential liability, and they might adapt their insurance cover accordingly. Third, application of the *lex loci delicti* is a neutral solution favouring neither party. Fourth, it is in conformity with the interests of the state in which the damage occurred to have certain victims of accidents compensated, particularly those resident there. Lastly, this solution generally corresponds to the parties' expectations and interests, and is usually fair and recognized as such by the parties.

## 2. Exceptions to the lex loci delicti *rule*

A second general principle common to almost all modern systems on private international law of torts is that, under certain circumstances, exceptions are made to the *lex loci delicti* rule. In a series of influential publications from the 1950s onwards, proposals were made to deviate from the *lex loci delicti* in cases where the victim on the one hand and the person claimed to be liable on the other originated from the same

jurisdiction or lived in the same legal environment, distinct from the one in force at the place of the tort (see JHC Morris, 'The Proper Law of Tort' [1951] Harv.L.Rev. 881–95; Heinz Binder, 'Zur Auflockerung des Deliktsstatuts (1955) 20 RabelsZ 401–99; Pierre Bourel, *Les conflits de lois en matière d'obligations extracontractuelles* (Bruylant 1961), 45 *et seq*; Jan Kropholler, 'Ein Anknüpfungssystem für das Deliktsstatut' (1969) 33 RabelsZ 601–53).

The single most famous case illustrating this development is certainly the New York Court of Appeals case *Babcock v Jackson*, 191 N.E.2d 279 (NY 1963). The *Jacksons*, a couple from New York, went with a friend, *Babcock*, on a trip by car from New York to Ontario, Canada, where they had a traffic accident. *Babcock* sued *Jackson*, the driver of the car, before the courts in New York, claiming that *Jackson* had negligently caused the accident. The law of Ontario, ie the law of the place of the accident, prohibited a passenger from suing the driver, so that under the *lex loci delicti* rule, then applicable in New York, the claim would have failed. The law of New York, on the contrary, provided no such → immunity. The court found that the parties lacked a substantial connection with Ontario and that application of the *lex loci delicti* under the circumstances would be fortuitous and unfair. Accordingly the court held that the jurisdiction most closely connected to the case was New York and applied New York law.

In later years, exceptions were made in the large majority of European jurisdictions, either through legislation or case-law. Only a few countries (such as → France, → Spain, → Greece, → Sweden and → Denmark) continued to apply the *lex loci delicti* rule without exception. In other countries, deviations from the *lex loci* rule were made particularly in cases where the parties had their habitual residence in the same jurisdiction when the damage occurred, or where the parties were linked in a close relationship, such as by contract, which the tort violated; in this case, the law governing this relationship was also applied to tortious liability (the so-called *rattachement accessoire* or accessory connection mechanism).

The → Rome II Regulation follows these examples and provides for exceptions to the *lex loci delicti* rule pursuant to art 4(2) where the parties have their habitual residence in the same country, or pursuant to art 4(3) where there is a manifestly closer connection with another country, in particular a pre-existing

THOMAS KANDER GRAZIANO

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:46:43AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

relationship between the parties, such as a contractual relationship.

An exception where the parties have their habitual residence in the same state was already made in art 133(1) Swiss PILA, and is today also to be found for example in art 1219(2) Russian CC, art 20 Japanese PILA, art 44 2 Chinese PILA, art 3126(2) Québec CC and in art 70(3) Tunisian PILA. Thus, the common habitual residence exception is today a standard feature of modern codifications, whereas the *rattachement accessoire* is less widespread, and exists for example in art 133(3) of the Swiss PILA, art 20 Japanese PILA, and in art 3127 Québec CC.

There are good reasons for making exceptions to the *lex loci delicti* principle. A rule designating the law of the parties' common habitual residence has the advantage that the applicable tort rules are familiar to parties by virtue of their both living in this jurisdiction. Additionally, this is the jurisdiction in which the parties will bear the consequences of the tort. Under the exception rule, the accident is thus treated as though it had occurred in the state in which the parties are habitually resident. The more superficial the link between the parties and the place of accident, the more justified this exception to the *lex loci delicti* rule appears.

There is also a strong rationale for applying the law governing contractual relations to a potential claim in torts, ie to practise *rattachement accessoire*. Many national tort law regimes, such as English, German, Swiss or Italian law, allow concurrent actions in contract and tort. In domestic law, the systems of contractual and extra-contractual liability are usually well-coordinated. Given that the private international law rules for tortious and contractual matters differ (for example, the habitual residence of the seller or service provider in contractual matters, and the *lex loci delicti* in tort), the application of different private international law rules in contract and tort may lead to contract and tort claims between the parties being governed by different laws, even though they are based on the same facts and events. This risks undermining the balance that exists in each national system between claims in contracts and torts. On the other hand, the accessory connection mechanism leads to the application of one single law for all claims between the parties and avoids friction between the two liability systems. Lastly, this exception is generally in line with the parties' expectation

that their relationships will be governed by the law of a single jurisdiction.

In Europe, the conditions for making exceptions to the *lex loci* rule are thus clearly defined. The development took another direction in the USA. Following scenarios such as that in *Babcock v Jackson*, the *lex loci* rule was replaced in many states by a flexible, policy-oriented case-by-case analysis taking into consideration a wide range of interests and policies. Accordingly, § 6(2) Restatement (Second) of Conflict of Laws (American Law Institute, Restatement of the Law, Second: Conflict of Laws 2d, St. Paul 1971; → Restatement (First and Second) of Conflict of Laws) provides that

> [t]he factors relevant to the choice of the applicable law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

The price of such an open-ended approach in US private international law is a considerable lack of foreseeability regarding the law applicable in torts.

### 3. Party autonomy

Since the late 1970s, → party autonomy has occupied an ever-increasing place in statutory provisions in the European private international law of tort. Practically all modern European statutes that expressly addressed this issue from the 1980s onwards allowed to a certain extent the parties to choose the applicable law in tort. Some national systems provided the choice only after the tort had occurred (→ Germany, → Belgium, → Lithuania, Russia, and outside Europe the Tunisian PILA). The Swiss PILA and the Japanese PILA allow an *ex post* choice of the *lex fori*.

In other countries, the parties were free to choose the applicable law both *ex ante* and *ex post*, ie before or after the injury occurred, provided they were already in contact at that time (→ Austria, → Liechtenstein and the → Netherlands). Article 14 Rome II Regulation follows this development. Under the Rome II Regulation, the parties are free to choose *ex*

THOMAS KADNER GRAZIANO

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:46:43AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

*post* and under certain circumstances also *ex ante*. They may choose the law of the forum or any law they consider appropriate to govern their relationships (→ Rome II Regulation). Consequently, when applying Rome II, the first question to be asked is whether the parties have agreed on the applicable law.

Some scholars have predicted that rules on party autonomy will turn out to remain dead letter in the field of torts given that the chosen law would necessarily favour one party so that the other would never agree to the choice. However, European case-law proves the contrary. In what is probably the most famous case in the European private international law of torts (Rechtbank Rotterdam, 23 September 1988, *Bier v Mines de Potasse d'Alsace* [1989] NJ 743, [1989] RabelsZ 699; Case C-21/76 *SCJEC Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* [1976] ECR 1735), the *Mines de potasse d'Alsace*, situated in France, had released saline residue into the Rhine. A Dutch horticultural company which used water from the river for irrigation purposes was consequently forced to install a water purification system. The Dutch claimants brought a claim for → damages and an injunction against the *Mines de Potasse d'Alsace* before the Dutch courts. At the first stage of proceedings, each party wanted the law of its own country to apply. However, the parties eventually agreed on the application of Dutch law. This was because application of a foreign law could not be appealed against before the Dutch courts, so that by choosing Dutch law the parties left open the possibility of a review of the application of the substantive law by the higher courts.

This case illustrates that choosing the applicable law, particularly the law of the forum, may constitute an attractive option for parties, largely for reasons of procedure and practical convenience. Even parties for whom the chosen substantive law initially appears somewhat unfavourable may have good reason to agree upon the choice. This is the case, for example, if the chosen law can be more quickly, easily and reliably established than the law which would apply in the absence of choice, thus reducing the costs of litigation, or it may provide specific presumptions that ease a party's → burden of proof. Choosing the law of the forum is also an attractive option when, as in *Bier*, application of a foreign law cannot be appealed against. Consequently, for practical purposes, reaching agreement on the applicable law may be an attractive option in almost all cases where the private international law of the forum would lead to application of a foreign law.

There are good reasons to extend the party freedom of choice to a choice *ex ante*, as provided under certain circumstances in art 14(1)(b) Rome II Regulation. Where there is a pre-tortious relationship between the parties, in particular where they are bound by a contract (such as a complex construction contract or where they are in an ongoing business relationship), they may have an interest in determining in advance the law applicable to all their relationships, including future extra-contractual liability. An *ex ante* choice of the applicable law means that the parties are clear on the applicable liability law from the outset. The parties will consequently have the possibility to submit all their legal relations, contractual and non-contractual, to a single law.

It is true that the *rattachement accessoire*, or accessory connection mechanism (see II.2. above), often also indirectly leads to the result that the law governing the contractual relationship between the parties will eventually apply to their liability in tort. It therefore has been questioned whether there is a need to also permit *ex ante* choice of law in tort and delict.

However, a rule that extends → party autonomy in tort to the choice of the applicable law *ex ante* and that clearly defines the limits of this freedom is preferable to introducing party autonomy only 'through the backdoor'. Such a rule provides the parties with precise information necessary for them to organize their relationships efficiently and also reinforces legal certainty. Finally, rules on the *ex ante* choice of law in tort are needed where the parties' contractual relations are governed by international uniform contract law, in particular by the United Nations Convention on Contracts for the International Sale of Goods (United Nations Convention of 11 April 1980 on Contracts for the International Sale of Goods, 1489 UNTS 3; → CISG), or where the parties have agreed to submit their contractual relations to non-state rules such as the European Principles of Contract Law or the UNIDROIT Principles of International Commercial Contracts (International Institute for the Unification of Private Law/Institut international pour l'unification du droit privé (ed), UNIDROIT Principles of International Commercial Contracts 2010 (3rd edn, UNIDROIT 2010)). In the future, the same need could arise where parties choose to apply a future EU instrument

THOMAS KANDER GRAZIANO

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:46:43AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

on contract law. Given that neither the → CISG nor these non-state rules contain provisions on tort or delict, an accessory connection is ruled out when these contractual regimes apply. Finally, given that the injured party always has the possibility to decide whether to bring a claim at all and that parties can compromise and settle out of court, the injured party should also be able to determine the applicable law in agreement with the person claimed to be liable. Ultimately, the parties are best placed to know which applicable law would most effectively protect their interests and lead to the desired outcome. Hence, there are indeed good reasons for party autonomy in the private international law of torts.

Before entry into force of the Rome II Regulation, when parties argued in the course of the proceedings on the basis of the *lex fori*, courts in some jurisdictions inferred from this an implied tacit choice in favour of the law of the forum. Article 14(1) second sentence Rome II Regulation requires that the choice of law 'shall be expressed or demonstrated with reasonable certainty by the circumstances of the case', ruling out such a practice, and rightly so. In reality, courts and lawyers still often overlook the impact of private international law and, in particular, the potential application of a foreign law. Inferring a choice of law from mere silence would therefore constitute a sheer fiction with no relation to actual party intentions in many cases.

Finally, modern statutes accepting party autonomy in torts expressly state that the choice of the applicable law may not prejudice third-party rights. These provisions relate in particular to the insurer of the tortfeasor, see for example art 14(1) *in fine* Rome II Regulation or art 21 second sentence Japanese PILA.

### 4.  Complex torts

A fourth significant development in the private international law of torts took place in the last decades of the 20th century regarding so-called 'complex torts'.

In the absence of a choice of the applicable law by the parties (see II.3. above), tortious liability is generally governed by the law of the place where the tort was committed, the *lex loci delicti* (see II.1. above). In the most common cases of extra-contractual liability, the place where the person committing a tort or delict either acts, or refrains from acting, is also the place where the damage occurs. This is true of road traffic accidents (→ Traffic accidents) and of sports accidents. In other situations, there is a distance in time and space between one person's behaviour and the resulting damage to another. When the event giving rise to damage takes place entirely or partly in one jurisdiction but the damage occurs in one or several other jurisdictions, we speak of a 'double or multiple locality case', 'multilocal tort' or 'complex tort' (*Distanzdelikt*, *délit à distance*, *illeciti complessi* or *a distanza*, *afstandsdelicten*, *ilícitos a distancia*). Determining the law that is to govern complex torts has proven to be one of the most difficult issues in the private international law of torts in the 20th century.

#### a)  Complex torts in general

When the event giving rise to damage takes place in one jurisdiction and the damage occurs in another, the question is whether (i) the law of the place where the person claimed to be liable acted should apply, or rather (ii) the law of the place where the injury to the protected interest occurred, or alternatively (iii) whether both criteria should be combined and the tort localized at both places (so-called rule of ubiquity), and the law most favourable to the victim be applied. The second fundamental question is whether the criteria for torts in general should apply to all categories of complex torts, or whether, for different categories of complex torts, separate and more specific rules are needed (below, II.4.b)).

In the late 19th and early 20th centuries, applying the law of the place of acting was so widespread on the European continent that it was considered 'the civil law rule' for complex torts (Ernst Rabel, *The Conflict of Laws: A Comparative Study*, vol 2 (2nd edn, University of Michigan Press 1960) 303–304). On the other hand, from the 1880s onwards, German courts applied a rule of ubiquity, leading to the application of the law most favourable to the victim. In the 20th century, jurisdictions in central and eastern European countries applied similar ubiquity rules. In 1976, the ubiquity rule was adopted by the ECJ in the seminal *Bier* case (Case C-21/76, [1976] ECR 1735) for the purpose of jurisdiction under what is now art 7(2) of the Brussels I Regulation (recast) (Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and

Thomas Kadner Graziano

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:46:43AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

commercial matters (recast), [2012] OJ L 351/
1; → Brussels I (Convention and Regulation)).
With respect to the applicable law, however, in
the second half of the 20th century, applying the
law of the place of injury became increasingly
widespread in Europe, and this solution was
eventually adopted in the Rome II Regulation:
according to art 4(1) Rome II Regulation, com-
plex torts are ordinarily to be governed by the
law 'of the country in which the damage occurs
irrespective of the country in which the event
giving rise to the damage occurred and irrespec-
tive of the country or countries in which the
indirect consequences of the event occur'. If
the damage occurs in several countries, the laws
of these countries will be applied to the dam-
age that occurred in each country respectively
(the so-called *application distributive* or mosaic
principle).

There are numerous reasons for applying the
law of the place of injury as opposed to that
of the place of acting or a rule of ubiquity: a
person causing damage in a foreign country
must conform to the rules of the country in
which his actions produce their effects. In fact,
every actor must take into consideration the
potential victims' legitimate expectations to be
protected according to the level of protection
provided by the law of the state where his goods
and interests are located and the injury occurs.
Moreover, from a prevention and deterrence
perspective, the law of the place where the dam-
age occurred is the most appropriate, in that
national tort laws are in principle directed at
behaviour that has its effects within the territory
of the state in question. This means that actions
with consequences in another country ought to
be governed by the tort law rules in force in the
place where the damage occurs. The preventive
function of the substantive tort law of this
country would be lost if persons acting from
abroad had to comply only with the rules of the
country in which they are acting. Accordingly,
both the compensatory and the preventive func-
tions of tort law favour application of the law
of the place where the damage occurs.

For these reasons, the place of injury rule (as
opposed to the place of acting rule or ubiquity
rules) is also gaining wider acceptance in other
jurisdictions worldwide, for example it was re-
cently adopted in art 17 Japanese PILA and in
art 44 of the Chinese PILA.

For cross-border torts caused by omission,
this signifies that the determining factor is to
be not the place where the alleged tortfeasor

ought to have acted, but rather the place where
the damage he ought to have prevented occurs.

In Europe, there has always been a wide-
spread consensus that neither the place where
purely preparatory acts took place nor the place
where consequential damage occurred are to be
taken into consideration when determining jur-
isdiction and the applicable law in tort. If, for
example, an Italian citizen undergoes surgery
in Hungary, and complications occur after his
return to Italy entailing further medical treat-
ment, then the place of injury relevant for
determining jurisdiction and the law applicable
for a claim in tort is Hungary, and not Italy
where the consequential damage occurred (see
for the purpose of jurisdiction also: Case C-
364/93 *Antonio Marinari v Lloyd's Bank plc and
Zubaidi Trading Co* [1995] ECR I-2719; Case
C-220/88 *Dumez France SA and Tracoba SARL
v Hessische Landesbank* [1990] ECR I-49; art
4(1) *in fine* of the Rome II Regulation). If, in
Spain, a motor boat driven by a Belgian col-
lides with a Frenchman who is harpoon fishing,
leading to amputation of the victim's arm or
leg, and if the victim is subsequently hospital-
ized in Nice where he later dies as a result of
the accident, then Spanish courts (as opposed
to French) would have jurisdiction under art 7
no 2 of the Brussels I Regulation (recast), and a
claim brought by the widow in tort for damages
to herself and any children would be governed
by Spanish (as opposed to French) law, ie by the
law of the place of the accident and of the ini-
tial injury (compare the scenario of the French
case – Cour de Cassation, 21 October 1981,
Bull. civ., I., no 303).

*b) Specific rules for specific torts*
Complex torts occur frequently in cases of
products liability, environmental damage,
violations of privacy and other → personal-
ity rights (in particular by mass media and/
or via the Internet), unfair competition and
infringements of intellectual property rights.
In these categories of cases, the criteria of
the 'place where the damage occurred' is, as
a → connecting factor, frequently vague. It is,
for example, far from clear where the damage
is to be localized for violations of personal-
ity rights through mass media, infringements
of intellectual property rights or in situations
of cross-border unfair competition. For sev-
eral specific categories of complex torts, the
place of the tort (the *locus delicti*) either needs

THOMAS KANDER GRAZIANO

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:46:43AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

1716 ENCYCLOPEDIA OF PRIVATE INTERNATIONAL LAW

further specification or is simply inadequate, as in the case of products liability (→ Products liability).

In the second half of the 20th century, the conviction that certain categories of complex torts need to be governed by specific rules has gained ground in many jurisdictions. Introducing such specific rules became one of the most important developments in the private international law of torts. The development started with the Swiss PILA, which provides specific rules for products liability, unfair competition, restrictions of trade, damage to the environment, violations of personality rights and infringements of intellectual property rights. Before the entry into force of the Rome II Regulation, specific rules for complex torts were also introduced in varying numbers in → Austria, → Belgium, → Italy, → Liechtenstein, the → Netherlands, → Spain, and in many central and eastern European countries, such as → Lithuania, → Estonia, → Romania, Russia (→ Russian Federation) and → Belarus (for references, see Marc Fallon, 'The Law Applicable to Specific Torts' in Jürgen Basedow, Harald Baum and Yuko Nishitani (eds), *Japanese and European Private international law in Comparative Perspective* (Mohr Siebeck 2008) 261–77; Thomas Kadner Graziano, *Europäisches Internationales Deliktsrecht* (Mohr Siebeck 2003) 55–109; Thomas Kadner Graziano, *La responsabilité délictuelle en droit international privé européen* (Helbing Lichtenhahn 2004) 54–103; Thomas Kadner Graziano, 'General Principles of Private international law of Tort in Europe' in Jürgen Basedow, Harald Baum and Yuko Nishitani (eds), *Japanese and European Private international law in Comparative Perspective* (Mohr Siebeck 2008) 254–6).

In countries that did not adopt specific rules for the various categories of complex torts, eg → France, considerable uncertainty persisted before entry into force of the Rome II Regulation with respect to the law applicable to complex torts.

With a view to improving predictability and legal certainty regarding the applicable law, and in accordance with the above-mentioned trend towards specific rules for different categories of complex torts, arts 5 to 9 Rome II Regulation provide rules for products liability (→ Products liability), unfair competition and acts restricting free competition, environmental damage, infringement of intellectual property rights and industrial action (→ Rome II Regulation). The Regulation thereby contributes significantly to predictability of the applicable law and to legal certainty.

On the other hand, no agreement could be reached on the intricate question of which law to apply to infringements of personality rights, including infringements via the Internet. The Rome II Regulation currently expressly excludes this issue from its scope of application, pursuant to art 1(1)(g). Consequently, the traditional private international law rules on torts continue to apply in each country (for these rules, varying considerably between countries, see with references, Thomas Kadner Graziano, *Europäisches Internationales Deliktsrecht* (Mohr Siebeck 2003) 79–90; Thomas Kadner Graziano, *La responsabilité délictuelle en droit international privé européen* (Helbing Lichtenhahn 2004) 75–86).

In other parts of the world, legislatures also took the position that at least some specific torts need to be governed by specific rules. Both the new Japanese PILA and the new Chinese PILA provide specific rules for the two most difficult issues of complex torts, ie product liability (art 19 Japanese PILA; art 45 Chinese PILA) and defamation (art 20 Japanese PILA; art 46 Chinese PILA). The Chinese Act further contains specific rules on infringements of intellectual property rights (arts 48–50). Special rules on products liability are further found in art 1221 Russian CC, art 1130 Belarus CC, art 3128 Québec CC and in art 72 of the Tunisian PILA. Article 1222 of the Russian CC further contains a rule on unfair competition.

**III. Conclusions**

For many centuries, the *lex loci delicti* rule was considered the only reasonable rule to follow in the private international law of torts. From the 1950s onwards, in certain situations the *lex loci* rule was considered too rigid. In many countries, deviations from the *lex loci* rule were made, particularly in cases where the parties both had their habitual residence in the same country when the damage occurred, or where the parties were in a close relationship, such as a contractual relationship, which the tort violated. In these situations, the law governing this relationship was also applied to tortious liability.

From the 1980s onwards, → party autonomy gained ground in the European private international law of torts. Initially an *ex post*

Thomas Kadner Graziano

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:46:43AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING

choice of the applicable law was recognized. Later, in situations where the parties were in contact before the damaging event occurred, the option to choose the applicable law in tort *ex ante* was, under certain circumstances, accepted.

Other important developments took place with regard to complex torts. In the early 20th century, many courts in Europe applied the law of the place of acting to potential liability in tort. In other countries the tort was located both at the place where the alleged tortfeasor had acted and the place where the protected interest suffered injury. This so-called ubiquity rule continues to apply with respect to jurisdiction under the Brussels I Regulation (recast) (→ Brussels I (Convention and Regulation)) and the → Lugano Convention (Lugano Convention of 30 October 2007 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, [2007] OJ L 339/3). With regard to the applicable law, in a growing number of jurisdictions and under the Rome II Regulation, complex torts are for many good reasons governed by the law of the place where the injury occurred (as opposed to the place where the alleged tortfeasor has acted). In the second half of the 20th century, introducing special rules for separate categories of complex torts became a further and possibly the most important development in the private international law of torts.

All these developments have led to numerous clarifications and principled refinement of the rules in torts, thereby contributing to legal certainty. The Rome II Regulation adopted all of these modern developments. Since its entry into force, the discussions and deliberations in this field take place on a higher, more sophisticated level, allowing the achievement of more justice and fairness in transnational tort cases.

Thomas Kadner Graziano

**Literature**

Jürgen Basedow, Harald Baum and Yuko Nishitani (eds), *Japanese and European Private international law in Comparative Perspective* (Mohr Siebeck 2008); William Binchy and John Ahern (eds), *The Rome II Regulation on the Law Applicable to Non-Contractual Obligations: A New Tort Litigation Regime* (Martinus Nijhoff 2009); Andrew Dickinson, *The Rome II Regulation on the Law Applicable to Non-Contractual Obligations* (OUP 2008); Marc Fallon, 'The Law Applicable to Specific Torts' in Jürgen Basedow, Harald Baum and Yuko Nishitani (eds), *Japanese and European Private international law in Comparative Perspective* (Mohr Siebeck 2008) 261; Jan von Hein, 'Protecting Victims of Cross-Border Torts under Article 7 No. 2 Brussels I *bis*: Towards a More Differentiated and Balanced Approach' [2014/2015] YbPIL 241; Jin Huang and others, 'The Chinese Private international law Act: Some Selected Issues' [2012/2013] YbPIL 269; Thomas Kadner Graziano, *Gemeineuropäisches Internationales Privatrecht (am Beispiel der ausservertraglichen Haftung für Schäden)* (Mohr Siebeck 2002); Thomas Kadner Graziano, *Europäisches Internationales Deliktsrecht* (Mohr Siebeck 2003); Thomas Kadner Graziano, *La responsabilité délictuelle en droit international privé européen* (Helbing Lichtenhahn 2004); Thomas Kadner Graziano, 'General Principles of Private international law of Tort in Europe' in Jürgen Basedow, Harald Baum and Yuko Nishitani (eds), *Japanese and European Private international law in Comparative Perspective* (Mohr Siebeck 2008) 243; Thomas Kadner Graziano, 'Freedom to Choose the Applicable Law in Tort: Articles 14 and 4(3) of the Rome II Regulation' in William Binchy and John Ahern (eds), *The Rome II Regulation on the Law Applicable to Non-Contractual Obligations* (Martinus Nijhoff 2009) 113; Jan Kropholler and others, *Aussereuropäische IPR-Gesetze, Textausgabe* (Deutsches Notarinstitut und Max-Planck-Institut für ausländisches und Internationales Privatrecht 1999); JHC Morris, 'The Proper Law of Tort' [1951] Harv.L.Rev. 881; Yasuhiro Okuda, 'New Provisions on International Jurisdiction of Japanese Courts' [2011] YbPIL 367; Michel Reymond, *La Compétence internationale en cas d'atteinte à la personalité par Internet* (Schwethness 2015); Symeon Symeonides, 'Rome II and Tort Conflicts: A Missed Opportunity' [2008] Am.J.Comp.L. 173; Symeon Symeonides, 'Party Autonomy in Rome I and II from a Comparative Perspective' in Katharina Boele-Woelki and others (eds), *Convergence and Divergence in Private international law: Liber Amicorum Kurt Siehr* (Schulthess 2010) 513; also published in [2010] *Nederlands Internationaal Privaatrecht* 191; Russell J Weintraub, *Commentary on the Conflict of Laws* (6th edn, Foundation Press/Thomson Reuters 2010) ch 6.

Jürgen Basedow, Giesela Rühl, Franco Ferrari and Pedro de Miguel Asensio - 9781782547228
Downloaded from Elgar Online at 10/20/2017 09:46:43AM by info@e-elgar.co.uk
via Material in Copyright strictly NOT FOR DISTRIBUTION, SHARING or POSTING