# EXHIBIT 1

OXFORD

# BROWNLIE'S PRINCIPLES OF
# PUBLIC INTERNATIONAL
# LAW



## 9TH EDITION

# JAMES CRAWFORD

## OXFORD
### UNIVERSITY PRESS

Great Clarendon Street, Oxford, OX2 6DP,
United Kingdom

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and in certain other countries

© Estate of Sir Ian Brownlie and James Crawford 2019

The moral rights of the author have been asserted

Sixth edition 2003
Seventh edition 2008
Eighth edition 2012

Impression: 1

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the
prior permission in writing of Oxford University Press, or as expressly permitted
by law, by licence or under terms agreed with the appropriate reprographics
rights organization. Enquiries concerning reproduction outside the scope of the
above should be sent to the Rights Department, Oxford University Press, at the
address above

You must not circulate this work in any other form
and you must impose this same condition on any acquirer

Public sector information reproduced under Open Government Licence v3.0
(http://www.nationalarchives.gov.uk/doc/open-government-licence/open-government-licence.htm)

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America

British Library Cataloguing in Publication Data
Data available

Library of Congress Control Number: 2018964838

ISBN 978–0–19–257702–3

Printed in Great Britain by
Bell & Bain Ltd., Glasgow

Links to third party websites are provided by Oxford in good faith and
for information only. Oxford disclaims any responsibility for the materials
contained in any third party website referenced in this work.

Material com direitos autorais

**Part VII State jurisdiction, 21 Jurisdictional competence**

**James Crawford SC, FBA**

From: Brownlie's Principles of Public International Law (9th Edition)
James Crawford

**Previous Edition (8 ed.)**

**Content type:** Book content
**Product:** Oxford Scholarly Authorities on International Law [OSAIL]
**Published in print:** 09 July 2019
**ISBN:** 9780198737445

**Subject(s):**

Jurisdiction of states, domestic — Jurisdiction of states, prescriptive — Jurisdiction of states, territoriality principle — Jurisdiction of states, nationality principle — Jurisdiction of states, universality principle — Jurisdiction of states, extra-territorial — US Alien Tort Statute — Jurisdiction of states, enforcement

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

# (p. 440) 21  Jurisdictional competence

## 1.  Overview

Jurisdiction is an aspect of sovereignty: it refers to a state's competence under international law to regulate the conduct of natural and juridical persons.[1] The notion of regulation includes the activity of all branches of government: legislative, executive, and judicial.[2]

Although the state is conceived of in international law as a single unit, for the purposes of analysing jurisdiction and its limits some distinctions are usually made. On the one hand, is the power to make laws, decisions, or rules (*prescriptive* jurisdiction); on the other, is the power to take executive or judicial action in pursuance of or consequent on the making of decisions or rules (respectively *enforcement* or *adjudicative* jurisdiction).[3]

The starting point in this part of the law is the presumption that jurisdiction (in all its forms) is territorial, and may not be exercised extraterritorially without some specific basis in international law.[4] However, the territorial theory has been refined in the light of experience and what amounts to extraterritorial jurisdiction is increasingly (p. 441) a matter of appreciation. If there is a cardinal principle emerging, it is that of genuine connection between the subject matter of jurisdiction and the territorial base or reasonable interests of the state in question.[5] It should be stressed that this sufficiency of grounds for jurisdiction is normally considered relative to the rights of other states. Thus, jurisdiction may be exercised over stateless persons, or over non-nationals by agreement with the state of nationality; jurisdiction can also be exercised over foreign nationals on other grounds. There is no assumption (even in criminal cases) that individuals or corporations can be regulated only once, and situations of multiple jurisdictional competence occur frequently. In such situations, there is no 'natural' regulator and the consequences of multiple laws applying to the same transaction are managed rather than avoided—double taxation being a case in point.[6]

## 2.  Prescriptive Jurisdiction over Crimes

### (A)  General bases of jurisdiction

The discussion which follows concerns the general principles for determining whether a state may prescribe acts as criminal under municipal law.[7] The question emerged as a distinct one only after about 1870,[8] and the appearance of clear principles has been retarded by the prominence in the sources of municipal decisions, which exhibit empiricism and adherence to national policies. The early structure of prescriptive criminal jurisdiction was provided by the Permanent Court in *Lotus*. That case concerned a collision on the high seas between a French steamer and a Turkish collier which then sank and Turkish crew members and passengers lost their lives. The French steamer having put into port in Turkey for repairs, the officers of the watch were tried and convicted of involuntary manslaughter. On the question of jurisdiction in general, the Permanent Court said:

> Far from laying down a general prohibition to the effect that States may not extend the application of their laws and the jurisdiction of their courts to persons, property or acts outside their territory, [international law] leaves them in this respect a wide measure of discretion which is only limited in certain cases by prohibitive rules; as regards other cases, every State remains free to adopt the principles which it regards as best and most suitable.[9]

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

(p. 442) This passage has been much criticized.[10] The Court's specific decision was reversed by treaty.[11] Its general emphasis on plenary state discretion is contradicted by the approach taken in *Anglo-Norwegian Fisheries*[12] and *Nottebohm*,[13] which concerned comparable competences of states, respectively, to delimit the territorial sea and to confer nationality on individuals: we may call them regulatory competences. Following *Arrest Warrant*,[14] there are hints that *Lotus* has been reversed: if a state wishes to project its prescriptive jurisdiction extraterritorially, it must find a recognized basis in international law for doing so. This shift in focus is, however, largely cosmetic, and in general the Permanent Court's statement that 'all that can be required of a State is that it should not overstep the limits which international law places upon its jurisdiction; within these limits, its title to exercise jurisdiction rests in its sovereignty' remains correct.[15]

### (i) The territorial principle

The principle that the courts of the place where the crime is committed may exercise jurisdiction is universally recognized.[16] It is a reflection of the essential territoriality of sovereignty. In the case of crime, the principle has a number of practical advantages, including the convenience of the forum and the presumed involvement of the interests of the state where the crime was committed. The territorial principle has been given an extensive application. In the first place, there is *subjective* territoriality, which creates jurisdiction over crimes commenced within the state even if completed or consummated abroad.[17] Generally accepted and often applied is the *objective* territorial principle, according to which jurisdiction is founded when any essential constituent element of a crime is consummated on the forum state's territory.[18] The classic illustration is the firing of a gun across a border causing death on the territory of the forum, but the principle can be employed to found jurisdiction in cases of conspiracy[19] or violation (p. 443) of antitrust[20] or immigration laws[21] by activity abroad, and in many other fields of policy.[22] The effect of the two principles combined is that whenever the constituent elements of a crime occur across an interstate boundary both states have jurisdiction.

The objective principle received general support in the *Lotus*; what was controversial was its application to collisions in international waters. France contended that the flag state alone had jurisdiction over acts performed on board on the high seas. Turkey argued, inter alia, that vessels on the high seas were to be considered part of the territory of the flag state. By the casting vote of the President, the Court decided that Turkey had not acted in conflict with the principles of international law by exercising criminal jurisdiction. The basis of the majority view (with which Judge Moore concurred) was the principle of objective territorial jurisdiction. The principle was familiar but to apply it the Court had to assimilate the Turkish vessel to Turkish national territory.[23] This crucial step did not attract a majority, and is out of line with subsequent developments.

### (ii) The nationality principle

Nationality, as a mark of allegiance and an aspect of sovereignty, is also recognized as a basis for jurisdiction over extraterritorial acts.[24] The application of the principle may be extended by reliance on residence[25] and other connections as evidence of allegiance owed by aliens,[26] and also by ignoring changes of nationality.[27] For example, the UK legislature has conferred jurisdiction on its courts in respect of, inter alia, treason,[28] (p. 444) murder,[29] bigamy,[30] soccer hooliganism,[31] child sexual abuse,[32] and breaches of the Official Secrets Acts[33] wherever committed by British nationals or residents.

The territorial and nationality principles (as well as the increasing incidence of dual nationality) create parallel jurisdictions and possible double jeopardy, and many states place limitations on the nationality principle,[34] for example, by confining it to serious offences.[35] But such limitations are not required by international law.[36] Nationality provides

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

the primary criterion for criminal acts in locations such as Antarctica, where the 'territorial' criterion is not generally recognized.[37]

For nationality jurisdiction, it is often asserted that the person over whom the state purports to exercise its prescriptive jurisdiction must have been a national at the time of the offence. Otherwise, it is argued, a violation of the principle of *nullum crimen sine lege* could occur. However, state practice is varied, with some states providing for nationality jurisdiction over persons who subsequently acquire their nationality.[38]

### *(iii) The passive personality principle*

If the nationality head of jurisdiction may be characterized as one of 'active personality', the reverse of the coin is 'passive personality'.[39] According to this principle, aliens may be punished for acts abroad harmful to nationals of the forum. This is considerably more controversial, as a general principle, than the territorial and nationality principles. In *Cutting*, a Mexican court exercised jurisdiction in respect of the publication by a US citizen in a Texas newspaper of matter defamatory of a Mexican citizen. The (p. 445) court applied the passive nationality principle among others. This led to diplomatic protests from the US, although the outcome was inconclusive.[40]

In *Lotus*, the Turkish penal code provided for punishment of acts abroad by foreigners against Turkish nationals; in effect, it was a comprehensive exercise of passive personality jurisdiction. The Court declined to assess the law as such. The question was whether or not the specific factual situation fell within Turkish jurisdiction;[41] it held that it did, invoking the protective principle.[42] Judge Moore, in a separate opinion, agreed with the majority as to the outcome but expressly rejected the protective principle.[43]

The US Antiterrorism Act of 1991[44] provides for the jurisdiction of US district courts for injuries caused to US citizens by acts of international terrorism.[45] Yet, courts have understood that after *Daimler*[46] a substantial amount of business in the forum jurisdiction is not enough. In *Waldman*, the Second Circuit articulated the test as whether the defendant can be 'fairly regarded as at home' in the forum and found that the Palestinian Authority's promotional activities in Washington DC were not sufficient for this purpose. The court also declined to find specific personal jurisdiction for activities outside the US 'which affected US citizens only as victims of indiscriminate violence abroad'.[47]

The passive personality principle has been much criticized.[48] One early complaint was that it served no wider goal of criminal justice: it did not correspond to a domestic conceptualization of jurisdiction, would not close an enforcement gap and lacked any social aim of repression.[49] There is also concern that it could expose individuals to a large number of jurisdictions.[50] Such objections have not, however, prevented the development of something approaching a consensus on the use of passive personality in certain cases, often linked to international terrorism.[51] Moreover, *aut dedere aut (p. 446) judicare* provisions in most criminal law treaties authorize the use of passive personality jurisdiction as between states parties.[52]

### *(iv) The protective or security principle*

Nearly all states assume jurisdiction over aliens for acts done abroad which affect the internal or external security or other key interests of the state,[53] a concept which takes in a variety of offences not necessarily confined to political acts.[54] Currency, immigration, and economic offences are frequently punished. The UK and the US allow significant exceptions to the doctrine of territoriality, although without express reliance on the protective principle. Thus, courts have punished aliens for acts on the high seas concerning illegal immigration,[55] and perhaps considerations of security helped the House of Lords in *Joyce v Director of Public Prosecutions*[56] to decide that an alien who left the country in possession of a British passport owed allegiance and was accordingly guilty of treason when he subsequently broadcast propaganda for Germany in wartime. Insofar as the protective

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

principle rests on the protection of concrete interests, it is sensible enough, but the interpretation of the concept of 'protection' may vary widely. For example, the protective principle was invoked in the *Eichmann* case in relation to the Jewish victims of the accused,[57] despite the fact that Israel was not a state when the offences in question occurred.[58]

The categories of what may be considered a vital interest for the purposes of protective jurisdiction are not closed,[59] and no criteria exist for determining such interests beyond a vague sense of gravity. Ultimately, the identification of exorbitant jurisdiction may be a matter of knowing it when one sees it.[60]

### (p. 447) (v) The effects doctrine

In addition, it has been suggested that there exists a further head of prescriptive jurisdiction, the so-called 'effects doctrine'.[61] This may gain traction where an extraterritorial offence causes some harmful effect in the prescribing state, without actually meeting the criteria of territorial jurisdiction or representing an interest sufficiently vital to the internal or external security of the state in question to justify invoking the protective principle.

While controversial, the doctrine is not objectionable in all cases.[62] It was at least acknowledged by the majority in the *Lotus*[63] and by certain members of the International Court in *Arrest Warrant*.[64] Today, 'effects' or 'impact' jurisdiction is practised largely by the US and, with greater qualifications, by the EU.[65] In *Alcoa*, for example, Judge Learned Hand stated that it was 'settled law' that 'any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders which has consequences within its borders which the state reprehends',[66] a position since followed extensively in US antitrust jurisprudence.[67]

Since *Alcoa*, the effects doctrine and its expansion have, in many cases, been driven by the US approach to jurisdiction. Whereas previously this resembled closely the conception of various heads of prescriptive jurisdiction, it has now changed its perspective; it is possible to speak of antitrust jurisdiction, tort jurisdiction, and taxation jurisdiction, with some of these having a broader extraterritorial reach than others. This has the potential to muddy the waters, resulting in the uncertain position of the effects doctrine within international law as either a head of prescription in its own right, or a subject-driven application of the territorial or protective principles with unusual reach. These policies have provoked reactions from a number of foreign governments. The UK[68] and other states, as well as the EU,[69] have enacted legislation to provide defensive (p. 448) measures against US policy. Similar episodes have arisen as a result of the application of the US Export Administration Act, for example, in the face of US measures directed against non-US corporations involved in contracts relating to the construction of the West Siberian pipeline.[70] Both the European Community[71] and the UK[72] protested and asserted the illegality of the actions of US authorities intended to prevent the re-export of machinery of US origin and the supply of products derived from US data. But it must be noted that competition legislation in several European states is based on principles similar to those adopted in the US.[73] Moreover, the Court of Justice has applied a principle similar to the US 'effects doctrine' in respect of company subsidiaries[74] and the Advocate-General espoused this view in his Opinion in the *Woodpulp Cases*.[75] In any event, US legislation has continued to provoke protests from the EU and from individual states.[76] This legislation includes the Cuban Democracy Act (1992),[77] the D'Amato–Kennedy Act (1996),[78] and the Helms–Burton Act (1996).[79]

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

### (p. 454) (iv)  Treaty-based quasi-universal jurisdiction

Another, more restricted, form of quasi-universal jurisdiction arises from *sui generis* treaty regimes incorporating penal characteristics.[116] These regimes have for the most part been developed in order to respond to particular conduct viewed as undesirable; they require states parties to exercise mandatory prescriptive jurisdiction over certain individuals within their territories, independent of any ordinary nexus. They are frequently characterized by the obligation of *aut dedere aut judicare*, which will compel a state party to either try the accused or extradite to a state that is willing to do so.[117]

An example[118] arises in the context of the Convention for the Suppression of Unlawful Seizure of Aircraft (Hague Convention).[119] This provides in Article 4(2) that:

> Each Contracting State shall likewise take such measures as may be necessary to establish its jurisdiction over the offence in the case where the alleged offender is present in its territory and it does not extradite him pursuant to Article 8 to any of the States mentioned in paragraph 1 of this Article.

This formula has been applied, more or less identically, in a considerable number of conventions. Early examples include the *aut dedere aut judicare* obligations also appeared in the Geneva Conventions in 1949.[120] Chief amongst the more recent treaties are the various 'sectoral' anti-terrorism agreements which were developed when it became clear that meaningful agreement on a generic definition of 'terrorism' was unreachable.[121]

To describe the jurisdictional regime established by these treaties as 'universal' is a misnomer.[122] As Ryngaert notes:

> The operation of the *aut dedere* requirement is indeed limited to States Parties, which pool their sovereignty and explicitly authorize each other to exercise jurisdiction over crimes committed by their nationals or on their territory.[123]

(p. 455) That, however, has not prevented certain states from insisting on the application of *sui generis* bases of jurisdiction to nationals of non-states parties to the treaties in question. The US is notable in this regard, often exercising jurisdiction over suspected terrorists who are nationals of states not party to the relevant sectoral agreements.[124] In *Yunis*, for example, a Lebanese national was prosecuted with respect to the hijacking of Royal Jordanian Airlines Flight 402 from Beirut to Amman. The plane carried several US nationals but was registered in Jordan, flew the Jordanian flag, and never landed on US territory or flew over US airspace. The court found that it had universal jurisdiction to prosecute with respect to the act of hijacking and the taking of hostages by the accused. Although jurisdiction was grounded on the fact that Lebanon was a state party to The Hague and Montreal Conventions, the court further held that jurisdiction was also furnished by the provisions of the Hostages Convention, despite the fact that Lebanon and Jordan were not parties to it.[125]

## 3.  Civil Prescriptive Jurisdiction

There are different views as to the law concerning civil jurisdiction. On one view, exorbitant assertions of civil jurisdiction could lead to international responsibility. Further, as civil jurisdiction is ultimately reinforced by criminal sanctions through contempt of court, there is in principle no great difference between the problems created by assertion of civil and criminal jurisdiction over aliens.[126] In particular, antitrust legislation (the source of many of the difficulties in practice) involves a process which, though formally 'civil', is in substance coercive and penal, as is the field of securities regulation.[127] On another view, there is little by way of limitation on a state's exercise of civil jurisdiction in what are effectively private

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

law matters; different states assert jurisdiction on different grounds, but deference to foreign law through conflicts rules mitigates any exorbitant elements.

## (A)  The basis of civil jurisdiction in different legal traditions

Notwithstanding broad similarities, the different legal traditions conceive of the civil jurisdiction to prescribe in different ways. This division is particularly apparent when considering the willingness of municipal courts to exercise jurisdiction over a foreign party as an actualization of prescriptive jurisdiction.

(p. 456) In order to satisfy international law standards in regard to the treatment of aliens, a state must in normal circumstances maintain a system of courts empowered to decide civil cases and, in doing so, be prepared to apply private international law where appropriate in cases containing a foreign element.[128] Municipal courts may be reluctant to assume jurisdiction in cases concerning a foreign element, adhering to the territorial principle conditioned by the *situs* of the facts in issue, and supplemented by criteria relating to the concepts of allegiance or domicile and doctrines of submission to the jurisdiction (including tacit submission on the basis of ownership of property in the forum state).[129]

As a general rule, the common law systems will assert jurisdiction over a foreign defendant who can be served with originating process.[130] Under the most basic formulation, a writ may be served whenever the defendant sets foot[131] or establishes a commercial presence[132] in the jurisdiction, no matter how temporarily. This exercise of jurisdiction is based on territorial sovereignty: since states have authority over persons present in their territory, common law courts exercise jurisdiction 'as of right' over defendants served with originating process within the territory.[133]

Where the defendant has no such presence, a writ may nonetheless be served outside the jurisdiction in certain cases.[134] In such cases, an originating summons may only be issued with leave of the court; leave depends on an assessment of the existence and strength of a territorial nexus to the subject matter of the cause of action.[135] Jurisdiction will ordinarily be exercised, for example, where property in the territory forms the subject matter of the dispute or the defendant is domiciled or ordinarily resident there.

Though civil lawyers complain of the perceived exorbitance of the service rule,[136] common lawyers point out that the defendant may challenge the exercise of the jurisdiction on the basis that the appropriate forum for the hearing of the dispute is elsewhere.

(p. 457) Some common law jurisdictions have extended the concept of jurisdiction further still. In the US, 'minimum [territorial] contacts'[137] have in the past sufficed for the purpose of finding jurisdiction over the defendant. The mere presence of a subsidiary of a foreign corporation in the US provided the necessary minimum contact for the parent corporation. However, this doctrine has been significantly curtailed by *Daimler AG v Bauman*, where the Supreme Court held that it would exercise jurisdiction over claims arising outside the US only against foreign corporations that are incorporated in the US or have their principal place of business there.[138]

In contrast, the civil law approach to the exercise of jurisdiction is predicated on the principle that, where possible, the defendant ought to be sued in its domicile. This may be seen in EC Regulation 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the Brussels I Regulation),[139] Article 2 of which provides that, '[s]ubject to this Regulation, persons domiciled in a Member State [of the EU] shall, whatever their nationality, be sued in the courts of that Member State.'[140] The Regulation, however, provides alternative bases of jurisdiction that are not so rigorously territorial where the defendant is already domiciled in the EU, including, inter alia, the *locus delicti* in cases of tort (Art 5(3)), in cases of contract, the place of performance of the obligation which has been breached (Art 5(1)(a)), the place of delivery of goods or

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

performance of services (Art 5(1)(b)), or, as regards commercial disputes arising out of the operations of a branch, agency, or other establishment, the place in which the branch, agency, or other establishment is situated (Art 5(5)).[141]

In a further significant difference with the common law, the notion of discretionary refusal of jurisdiction is anathema to the civil law. As a general rule, if properly seised, a court is unable to decline jurisdiction unless expressly authorized to do so by the terms of the Regulation.[142] For example, under Article 27, in the event of *lis pendens*, the court second seised must stay the proceedings before it in favour of the court first seised unless the latter determines that it lacks jurisdiction.[143]

(p. 458) Whilst this approach has the virtue of certainty and consistency, its rigidity may lead to unfortunate practical consequences. In *Owusu*,[144] for example, a single English defendant and five Jamaican defendants were sued in the English courts with respect to an alleged tort taking place in Jamaica. Although the *forum conveniens* was clearly Jamaica, the mandatory wording of Article 2 and the English domicile of one of the defendants prevented the court from declining jurisdiction.

## (B) Jurisdiction and the conflict of laws

Conflict of laws, also known as private international law, is concerned with issues of the jurisdiction of national courts, the municipal law applicable to disputes with foreign elements, and the cross-border enforcement of judgments.[145] It is usually considered to be merely municipal law, and a bright line is drawn between its study and the study of public international law. If it must be considered international law, the argument runs, then it is international only in the sense that it involves competing and horizontal 'inter-national' claims.

According to Mills, the adoption of an international systemic perspective on the conflict of laws reveals an 'essential confluence' of public and private international law, sharing as they do similar intellectual progenitors.[146] Nationality, for example, is the defining jurisdictional principle for civil legal systems. Article 15 of the French Civil Code provides that 'French persons may be called before a court of France for obligations contracted by them in a foreign country, even with an alien'. Passive personality is also the focus of article 14 of the French Civil Code, which permits a foreign person to be called before the French courts with respect to obligations entered into with a French national.

The influence of the territoriality principle in private international law is likewise pervasive, notably in common law systems where the presence of the defendant within the jurisdiction is sufficient to ground the court's adjudicative power. This is controversial, for under the public international law conception of territoriality, the act or thing which is the subject of adjudicative power must be done within the jurisdiction; the subsequent presence of the defendant will be insufficient. That said, this perceived overreach is reduced by the use of *forum non conveniens* to decline jurisdiction where another forum is better suited to hear the matter; in the US, consideration of 'reasonableness' may also come into play.[147] Territoriality is also (less controversially) present in Article 22(1) of the Brussels I Regulation, which provides for the exclusive jurisdiction for certain courts, regardless of the defendant's domicile, where the proceedings in question have as their object rights *in rem* in immovable property or tenancies in immovable property.

## (p. 459) (C) The alien tort statute and cognate legislation

The universality principle, as expressed in the *Eichmann* case, is most often associated with the prosecution of heinous crimes.[148] Only a few states assert universal *civil* jurisdiction, that is, prescriptive jurisdiction absent any minimal territorial or national nexus to the

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

delict in question.[149] The example par excellence is the US Alien Tort Claims Act 1789, now codified as the Alien Tort Statute (ATS).[150]

The ATS provides in its relevant part that '[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.' Apparently enacted for the purpose of providing a recourse in tort for acts of piracy or the violation of safe conduct or of the rights of ambassadors,[151] the statute fell dormant for almost two centuries before gaining modern importance in *Filartiga v Peña-Irala*,[152] where the Second Circuit Court of Appeals held that it was to be read as *incorporating* current customary international law protective of individual rights.

An actionable ATS violation will occur only where (1) the plaintiff is an alien, (2) the individual defendant[153] is responsible for a tort, and (3) the tort in question violates international law.[154] Not every violation of international law will, however, be considered actionable: the Supreme Court in *Sosa v Alvarez-Machain*, while falling short of articulating a coherent category, limited the scope of the statute to 'norm[s] of an international character accepted by the civilized world'.[155] In this sense, the ATS draws its legitimacy at least to some extent from the same well-spring as universal criminal jurisdiction over genocide, war crimes, and crimes against humanity.[156]

Perhaps because of its prescriptive and procedural limitations, the ATS has been the subject of surprisingly little opposition.[157] Whilst European states may prefer criminal or administrative remedies for gross human rights violations, they do not (p. 460) seem resistant in principle to 'universal' tort jurisdiction of this type, although they remain opposed to the perceived exorbitance of the US regime of civil jurisdiction *in personam*.[158]

The extraterritorial reach of the ATS was significantly reduced by the Supreme Court in *Kiobel*. Relying on the presumption against extraterritoriality, the Court determined that the ATS would apply to a claim based on extraterritorial conduct only if it could be shown to 'touch and concern' the US. Further, the Court held that:

> even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application.[159]

The 'mere corporate presence' of the defendants in the US was held to be insufficient to meet this test in a case where the conduct complained of occurred in Nigeria only. Beyond this, *Kiobel* offers no further clarification as to the circumstances that would meet the 'touch and concern' with 'sufficient force' test.[160] This leaves open the extent to which the ATS has been narrowed. *Kiobel* has been strongly criticized, and is certainly not the last word.[161]

In *RJR Nabisco*,[162] the Supreme Court said that the presumption against extraterritoriality applies regardless 'of whether there is a risk of conflict between the American statute and a foreign law' and (obiter) 'of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction'. The Court held that the Racketeer Influenced and Corrupt Organizations Act (RICO) can apply to some foreign racketeering activity, and thus the presumption was overcome regarding the Act's substantive provisions.[163]

## 4. The Separateness of the Grounds of Jurisdiction

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

## (A)  The relationship between the separate grounds

The various principles held to justify jurisdiction over aliens are commonly listed as independent and cumulative,[164] although some may be labelled 'subsidiary' to (p. 461) others.[165] However, it must be remembered that the 'principles' are in substance generalizations of a mass of national provisions which by and large do not reflect categories of jurisdiction specifically recognized by international law. It may be that each individual principle is only evidence of the reasonableness of the exercise of jurisdiction.[166] The various principles often interweave in practice. Thus, the objective applications of the territorial principle and also the passive personality principle have strong similarities to the protective or security principle. Nationality and security may go together, or, in the case of the alien, factors such as residence may support an ad hoc notion of allegiance. These features of the practice have led some jurists to formulate a broad principle resting on some genuine or effective link between the crime and the state of the forum.[167]

## (B)  Consequences of excess of prescriptive jurisdiction

### (i)  The legal position

If enforcement action is taken in a case of exorbitant jurisdiction with consequent injury, an international wrong will presumably have been committed.[168] The consequences of the mere *passage* of legislation asserting exorbitant jurisdiction remain an open question.

### (ii)  Practical consequences

As a practical matter, whilst states may protest the use of exorbitant prescriptive jurisdiction, unless the prescribing state attempts to enforce the jurisdiction claimed, it is unlikely that any action will be taken. At the same time, a prescriptive statement—even absent immediate enforcement action—is fundamentally a threat, which may compel foreign nationals to alter their behaviour.[169] This may cause the other state to respond through a 'blocking statute', a law enacted to obstruct the extra-jurisdictional application or effect of a law enacted in another jurisdiction.[170]

# (p. 462) 5.  Enforcement Jurisdiction

## (A)  The basic principle

As with prescriptive jurisdiction, a state's use of enforcement jurisdiction within its own territory is uncontroversial.[171] By contrast, the unilateral and extraterritorial use of enforcement jurisdiction is impermissible. As the Permanent Court said in the *Lotus*:

> [T]he first and foremost restriction imposed by international law upon a state is that —failing the exercise of a permissive rule to the contrary—it may not exercise its power in any form in the territory of another State. In this sense jurisdiction is certainly territorial; it cannot be exercised by a State outside its territory except by virtue of a permissive rule derived from international custom or a convention.[172]

The governing principle of enforcement jurisdiction is that a state cannot take measures on the territory of another state by way of enforcement of its laws without the consent of the latter.[173] Persons may not be arrested, a summons may not be served, police or tax investigations may not be mounted, and orders for production of documents may not be executed on the territory of another state, except under the terms of a treaty or other consent given.[174] One key example of such consent is a Status of Mission or Status of Forces Agreement (SOMA or SOFA), whereby one state consents to the presence of another's troops on its territory and to related military jurisdiction.[175]

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

## (B)  Enforcement with respect to extraterritorial activities

The principle of territoriality is not infringed just because a state takes action within its own borders with respect to acts carried out in another state. But the correctness of this position has not prevented controversy from arising. This is especially the case when considering the use by US courts of the 'effects doctrine' to promote certain prescriptive objectives in the field of economic regulation, especially antitrust law. US courts in, for example, *Alcoa*[176] and *Watchmakers of Switzerland*,[177] have taken the view that (p. 463) whenever activity abroad has consequences or effects within the US which are contrary to local legislation then the courts may make orders requiring the disposition of patent rights and other property of foreign corporations, the reorganization of industry in another country, the production of documents, and so on. The US doctrine appears to be restricted to agreements abroad intended to have material effects within the US and actually having such effects.[178] US courts have, in the past, adopted a principle of the balancing of the various national interests involved, which, though unhelpfully vague, could mitigate the cruder aspects of the 'effects doctrine'.[179]

The courts, the US government, and foreign governments in reacting to US measures, assume that there are *some* limits to enforcement jurisdiction, but there is no consensus on what those limits are.[180] Those limits were tested in *Hoffman-La Roche*,[181] where there had been a significant foreign anti-competitive conduct with an adverse domestic effect and an independent foreign effect. The Supreme Court found that it had jurisdiction to entertain a claim by a purchaser in the US based on domestic injury, but not by a purchaser abroad based on foreign harm. Among other considerations, the Supreme Court understood that it must construe ambiguous statutes to avoid unreasonable interference with sovereign authority and assume that the US Congress ordinarily seeks to follow the principles of customary international law.

The UK view appears to be that a state 'acts in excess of its own jurisdiction when its measures purport to regulate acts which are done outside its territorial jurisdiction by persons who are not its own nationals and which have no, or no substantial, effect within its territorial jurisdiction'.[182] Jennings has stated the principle 'that extra-territorial jurisdiction may not be exercised in such a way as to contradict the local law at the place where the alleged offence was committed'.[183] In the case of corporations with complex structures and foreign-based subsidiaries, a principle of substantial or effective connection could be applied as a basis for jurisdiction.[184] This approach would accord with the relevant notions of the conflict of laws, in particular, the 'proper law' of a transaction. The present position is probably this: a state has enforcement jurisdiction abroad only to the extent necessary (p. 464) to enforce its legislative jurisdiction. This latter rests on the existing principles of jurisdiction and these, it has been suggested, are close to the principle of substantial connection.

## (C)  Recognition and enforcement abroad

### (i)  Criminal jurisdiction

In a criminal context, enforcement jurisdiction will ordinarily entail the pursuit and arrest of the accused, detention and trial, and the carrying out of any sentence.

With respect to extraterritorial enforcement action leading to the capture of the accused, state consent can be given on ad hoc basis, but in circumstances where movement between two states is relatively regular and straightforward, bi- or multilateral agreements may be entered into in order to provide standing orders for enforcement jurisdiction between states. The most notable of these is the Schengen Convention[185] between some members of the EU. Article 40(1) provides that where the officials of one contracting party are keeping under surveillance a person suspected of an extraditable offence, they may request that surveillance is continued in the territory of another contracting party by officials of that

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

party. Article 40(2) further provides that in circumstances where, for particularly urgent reasons, authorization cannot be requested from the other contracting party, the officials carrying out the surveillance may be authorized to continue the surveillance in the territory of the other contracting party. On similar lines, Article 41 permits the officials to engage in hot pursuit of a subject across state borders, where due to the urgency of the situation, the permission of the other contracting state cannot be obtained.

More generally, Article 39(1) provides that, subject to the requirements of municipal law, the police authorities of each contracting party undertake to assist each other for the purpose of detecting and preventing criminal offences, though this does not expressly mandate extraterritorial enforcement. Article 39 is supplemented in this respect by the Convention on Mutual Assistance in Criminal Matters between the member states of the European Union.[186] Treaties of mutual legal assistance, like enforcement agreements, can also be concluded on a bilateral or multilateral basis.[187]

Unlike activities connected to surveillance of an accused, arrest, trial, and incarceration are rarely carried out in an extraterritorial capacity, particularly in circumstances not linked to a SOMA or SOFA. But when the Libyan government refused to extradite those thought to be responsible for the 1988 bombing of Pan Am Flight 103 over Lockerbie, Scotland, unless they were tried in a neutral country, the UK and the Netherlands (p. 465) entered into an agreement to permit a Scottish court applying Scottish criminal law to sit in a former US Air Force base in the Netherlands to try the accused.[188]

Provision is also made by treaty for the enforcement of foreign criminal judgments. Here, there is generally a divide between the civil and common law approaches to the subject, with the latter rejecting in principle the enforcement of the penal law of another state.[189] Civil law systems are less averse to the concept, as witness the European Convention on the International Validity of Criminal Judgments.[190]

Apart from trial *in absentia*, an unsatisfactory procedure, states have to depend on the cooperation of the other states in order to obtain surrender of suspected criminals or convicted criminals who are, or have fled, abroad. Where this cooperation rests on a procedure of request and consent, regulated by certain general principles, the form of international judicial assistance is called extradition.[191] Due to the profusion of extradition treaties, it is possible to speak of an international law of extradition, a term which does not imply the existence of custom, but of a significant corpus of conventional law exhibiting certain common elements. Such treaties are usually bilateral,[192] but the European Convention on Extradition (ECE)[193] is in effect between EU member states (although it has been largely replaced by the European arrest warrant (EAW), which combines elements of arrest and extradition).[194] The UN has also issued a Model Treaty on Extradition (UNMTE).[195] Common conditions include double criminality (the act in question must be criminal under the laws of both the requesting and requested states),[196] non-extradition for 'political offences',[197] and the rule of (p. 466) speciality which prevents prosecution founded on a treaty-based extradition from proceeding on any basis other than that on which the request was founded.[198] Another significant limitation is the rule *ne bis in idem*, which precludes extradition of persons already tried for the same offence. Finally, many states reserve the right to refuse extradition owing to human rights concerns, for example, where extradition may mean that the accused is liable to torture[199] or the death penalty.[200]

Since the attacks by al-Qaeda on the US in 2001, there has been an increase in 'informal' extradition or rendition, though the practice is not new.[201] If it takes place with the consent of the 'sending' state, there is no transgression of international law standards.[202] If, however, there is no extradition of any kind—informal or otherwise—but the suspect is simply seized by the agents of the receiving state in the absence of any legal process, then there is clearly a breach of international law.[203] This, described generally as 'extraordinary rendition', has been practised by the US since 2001. Depending on the legal system in

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

question, the attendant illegality may not prevent the trial of the suspect, an application of the maxim *male captus bene detentus*.[204]

### (ii) Civil and administrative jurisdiction

With respect to civil and administrative jurisdiction, extraterritorial enforcement revolves largely around the recognition and enforcement of judgments and orders abroad. This is one of the central preoccupations of private international law. In general, the field is parochial, with each state developing its own process and criteria for recognition and enforcement. The Brussels I Regulation seeks to unify the procedures (p. 467) for the recognition of judgments between EU member states.[205] The judgment of a court of a member state is subject to automatic recognition (Art 36) and enforcement (Art 39) by the courts of other member states, with the onus on the defendant to contest enforcement according to a limited number of clearly defined exceptions.[206]

However, the need to approach the court of the jurisdiction where enforcement is sought is circumvented—in form if not in substance—when considering certain orders issued by common law courts (notably in England but also the US) which act *in personam* on the conscience of a party properly before the court to restrain its dealings with assets or processes outside the jurisdiction. The first of these, the so-called 'freezing injunction',[207] acts *in personam* to prevent a defendant from moving, hiding, or otherwise dissipating its assets so as to render itself judgment-proof.[208] The injunction neither creates, transfers, nor revokes property rights; it merely affects the capacity of the defendant to exercise them freely. But what the freezing injunction lacks in extraterritorial form, it makes up for in extraterritorial effect. The scope of the order has been expanded considerably. First, by virtue of its *in personam* operation, the injunction can be granted with respect to assets which are not within the jurisdiction of the court granting the order.[209] Further, it can be given effect against foreign third parties, normally multinational banks with a branch within the jurisdiction granting the order. Finally, it can be granted in aid of foreign proceedings even where no proceedings are on foot before the court granting the order.[210]

The second example is the anti-suit injunction, which acts to restrain a party subject to the jurisdiction of the court from launching or continuing proceedings in a foreign court injurious to the defendant in those proceedings.[211] Ordinarily, the claimant in the foreign proceedings must be already before the court,[212] though the relief may be granted autonomously of any domestic proceedings where the subject matter of the proceedings[213] or the relationship between the parties[214] is such as to give the granting court exclusive (p. 468) jurisdiction.[215] Although the order is usually granted where the claimant in the foreign proceedings has commenced them in a manner which is somehow objectionable, it may also be granted where the foreign claimant has apparently acted without blame.[216]

The perceived exorbitance of the common law jurisdictions in respect of these orders is often criticized on the basis of 'comity'.[217] Comity arises from the horizontal arrangement of state jurisdictions in private international law and the field's lack of a hierarchical system of norms. It plays the role of a somewhat uncertain umpire: as a concept, it is far from a binding norm, but it is more than mere courtesy exercised between state courts. The Supreme Court of Canada said in *Morguard v De Savoye*,[218] citing the US Supreme Court in *Hilton v Guyot*,[219] that:

> Comity is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its law.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

Common lawyers have been anxious to justify the development of the freezing and anti-suit injunctions on the basis of comity.[220] For this reason, as with the doctrine of *forum non conveniens*, whilst the jurisdiction to grant the remedy may be easily established, the claimant must nonetheless persuade the court to exercise its discretion. A substantial body of jurisprudence has built up around these remedies to guide the court in its use of discretion. But so far these efforts at justification have fallen on deaf European ears: the European Court has repeatedly disqualified such injunctive measures as inconsistent with full faith and credit as between EU member state courts, however dilatory or parochial the latter may be.[221]

## 6. Conclusion

A general view of the law is difficult to obtain, given the extent and diversity of the practice and the pull of different legal traditions. But it might include the following propositions:

First, the exercise of civil jurisdiction in respect of aliens presents essentially the same problems as the exercise of criminal jurisdiction over them, though in (p. 469) practical terms there are differences, both procedurally and in the reactions that can be expected.

Secondly, the two generally recognized bases for prescriptive jurisdiction of all types are the territorial and nationality principles, but their application is complemented by the operation of other principles, especially in certain fields. The use of the passive personality principle in cases of international terrorism appears to be accepted and, over time, opposition to the use of the effects doctrine by the US and EU in the pursuit of certain competition law objectives is diminishing. As a general rule, however, it remains true that if a state wishes to avoid international criticism over its exercise of extraterritorial jurisdiction, it is better to base the prescriptive elements on territoriality or nationality.

Thirdly, extraterritorial acts can lawfully be the object of prescriptive jurisdiction only if certain general principles are observed:

(1) There should be a real and not colourable connection between the subject matter and the source of the jurisdiction (leaving aside rare cases of universal jurisdiction).

(2) The principle of non-intervention in the territorial jurisdiction of other states should be observed, notably in an enforcement context. [222]

(3) Elements of accommodation, mutuality, and proportionality should be duly taken into account. Thus, nationals resident abroad should not be constrained to violate the law of their place of residence.

(4) These basic principles do not apply or do not apply very helpfully to (a) certain cases of concurrent jurisdiction, and (b) crimes against international law within the ambit of universal jurisdiction. In these areas, special rules have evolved. Special regimes also apply to the high seas, continental shelf, EEZ, outer space, and Antarctica.

(5) Jurisdiction is often concurrent and there is no hierarchy of bases for jurisdiction. However, an area of exclusivity may be established by treaty, as in the case of offences committed on board aircraft in flight.

## Footnotes:

[1] Generally: Akehurst (1972–3) 46 *BY* 145; Bowett (1982) 53 *BY* 1; Lowe, *Extraterritorial Jurisdiction* (1983); Meessen (ed), *Extra-Territorial Jurisdiction in Theory and Practice* (1996); Oxman, 'Jurisdiction of States' (2007) *MPEPIL*; Simma & Müller in Crawford & Koskenniemi (eds), *Cambridge Companion to International Law* (2012) 134; Kamminga, 'Extraterritoriality' (2012) *MPEPIL*; Colangelo (2013–14) 99 *Cornell LR* 1303; Ryngaert,

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

*Jurisdiction in International Law* (2nd edn, 2015); Orakhelashvili, *Research Handbook on Jurisdiction and Immunities in International Law* (2015). On jurisdiction over the Internet: Kulesza, *International Internet Law* (2012) ch 1; Coughlan et al, *Law Beyond Borders* (2014) ch 5; Gillespie, *Cybercrime: Key Issues and Debates* (2015) ch 2.

**2**  In the US, see *Restatement Third* §401. Also see the draft *Restatement Fourth* (2017) §101.

**3**  On adjudicative jurisdiction (also referred to as *judicial* or *curial* jurisdiction): Akehurst (1972–3) 46 *BY* 145, 152–78; Oxman, 'Jurisdiction of States' (2007) *MPEPIL*; Colangelo (2013) 28 *Md JIL* 65. This refers to the competence of a municipal court to sit in judgment over a foreign national and may be better seen as a manifestation of prescriptive jurisdiction: the application of municipal law by the court is, in effect, the actualization of prescription, although the carrying out of any judgment or sentence is an expression of enforcement jurisdiction: O'Keefe (2004) 2 *JICJ* 735, 737. But the different elements may be difficult to separate out in this way.

**4**  Ryngaert (2nd edn, 2015) ch 5. To this end, there is a presumption against extraterritoriality: draft *Restatement Fourth* (2017) §203; Ryngaert (2nd edn, 2015) 68–73; Bradley (2nd edn, 2015) 179–86. For the application of the presumption: *R v Jameson* [1896] 2 QB 425; *Morrison v National Australia Bank Ltd*, 561 US 247, 250–1 (2010); *Kiobel v Royal Dutch Petroleum Co*, 569 US 108 (2013); *US v Vilar*, 729 F3d 62, 72 (2d Cir, 2013).

**5**  Cf the doctrine stated in *Nottebohm (Liechtenstein v Guatemala)*, ICJ Reports 1955 p 4; *Kingdom of Greece v Julius Bär and Co* (1956) 23 ILR 195; *Guardianship of Infants (Netherlands v Sweden)*, ICJ Reports 1958 p 55, 109 (Judge Moreno Quintana). Also Ryngaert (2nd edn, 2015) 156–7.

**6**  E.g. OECD Model Tax Convention on Income and Capital (9th edn, 2015); UN Model Double Taxation Convention between Developed and Developing Countries (2011).

**7**  Harvard Research (1935) 29 *AJIL Supp* 439; Higgins, *Problems and Process* (1994) ch 4; Oxman, 'Jurisdiction of States' (2007) *MPEPIL*; Ryngaert (2nd edn, 2015) ch 4; Farbiarz (2016) 114 *Mich LR* 507; Liivoja, *Criminal Jurisdiction over Armed Forces Abroad* (2017). Some US courts have suggested that the presumption against extraterritoriality does not apply to criminal law: *US v Siddiqui*, 699 F3d 690 (2d Cir, 2012).

**8**  An early *cause célèbre* was *R v Keyn (The Franconia)* (1878) 2 Ex D 63, concerning criminal jurisdiction over the German captain of a German merchant ship which collided with a British vessel in the UK territorial sea. The court denied jurisdiction (on a vote of 8–7), a decision promptly reversed by statute: Territorial Waters Jurisdiction Act 1878. Further: Crawford (1980) 51 *BY* 1, 48–61.

**9**  (1927) PCIJ Ser A No 10, 19.

**10**  E.g. Brierly (1936) 58 Hague *Recueil* 1, 146–8, 183–4; Basdevant (1936) 58 Hague *Recueil* 471, 594–7; Fitzmaurice (1957) 92 Hague *Recueil* 1, 56–7; Lauterpacht, 1 *International Law* (1970) 488–9; Higgins, *Problems and Process* (1994) 76–7; Cameron, *The Protective Principle of International Criminal Jurisdiction* (1994) 319; Ryngaert (2nd edn, 2015) 33–8; Hertogen (2015) 26 *EJIL* 901.

**11**  See now UN Convention on the Law of the Sea (UNCLOS) Art 92, and see further: chapter 15.

**12**  *Fisheries (UK v Norway)*, ICJ Reports 1951 p 116, 131–4.

**13**  ICJ Reports 1955 p 4, 20. Also chapter 23.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**14** *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)*, ICJ Reports 2002 p 3, 78 (Judges Higgins, Kooijmans, and Buergenthal), 169 (Judge ad hoc van den Wyngaert).

**15** *SS Lotus* (1927) PCIJ Ser A No 10, 19.

**16** Buxbaum (2009) 57 *AJCL* 631; Ireland-Piper (2013) 9(4) *Utrecht LR* 68, 72; Bassiouni, *International Extradition* (6th edn, 2014) 364–405; Scott (2014) 62 *AJCL* 87; Ryngaert (2nd edn, 2015) ch 3; Cormier (2015) 13 *JICJ* 895; Farbiarz (2016) 114 *Mich LR* 507.

**17** Harvard Research (1935) 29 *AJIL Supp* 439, 480, 484–7. In the US, see e.g. 18 USC §956(a)(1).

**18** Ryngaert (2009) 9 *Int Crim LR* 187, 188 ('[I]t is domestic law, rather than international law, which defines the constituent elements of a particular offence').

**19** *Board of Trade v Owen* [1957] AC 602, 634 (Lord Tucker); *R v Cox* [1968] 1 All ER 410, 413; *DPP v Doot* [1973] AC 807, 817 (Lord Wilberforce); *DPP v Stonehouse* [1977] 2 All ER 909, 916 (Lord Diplock); *Liangsiripraset v US* [1991] 1 AC 225. Under US law, conspiracy can be seen as either an inchoate or independent crime, allowing the protective principle and effects doctrine to found jurisdiction independently: *Ford v US*, 273 US 593 (1927); *Iannelli v US*, 420 US 770 (1975); *US v Leija-Sanchez*, 820 F3d 899 (7th Cir, 2016). Generally: Ryngaert (2009) 9 *Int Crim LR* 187, 194–7.

**20** *US v Aluminum Co of America*, 148 F2d 416 (2d Cir, 1945). In US antitrust cases, wide extension of the territorial principle might be explained by, though it is not expressed in terms of, a principle of protection. It can also be described in terms of the effects doctrine: Ryngaert (2nd edn, 2015) 82–4. See Alford (1992) 33 *Va JIL* 1; Botteman & Patsa (2012) 8 *Eu Comp J* 365; Buxbaum & Michaels in Basedow, Francq, & Idot (eds), *International Antitrust Litigation* (2012) 225–44. However, US jurisdiction on antitrust matters does not extend to the foreign effects of anti-competitive conduct. *See Hoffmann-La Roche Ltd v Empagran SA*, 542 US 155 (2004).

**21** Cf Ryan & Mitsilegas, *Extraterritorial Immigration Control* (2010); den Heijer, *Europe and Extra-Territorial Asylum* (2011) 239–42.

**22** The European approach is notable; as soon as one of the constituent elements of an offence is committed in a state's territory, the state will ordinarily have jurisdiction: Ryngaert (2009) 9 *Int Crim LR* 187, 197–202.

**23** (1927) PCIJ Ser A No 10, 23.

**24** *SS Lotus*, 92 (Judge Moore); *The Queen v Klassen*, ILDC 941 (2008). Further: Harvard Research (1935) 29 *AJIL Supp* 519; Jennings (1957) 33 *BY* 146, 153; Chehtman, *The Philosophical Foundations of Extraterritorial Punishment* (2010) 59–67; Ireland-Piper (2012) 13 *Melb JIL* 122, 131–4; Ryngaert (2nd edn, 2015) 76–8; Guilfoyle, *International Criminal Law* (2016) 32–3. See also *Restatement Third* §403(2)(b) and the draft *Restatement Fourth* (2017) §201(1)(c); *Blackmer v US*, 284 US 421 (1932); *Al-Skeini v Secretary of State for Defence* [2008] 1 AC 153; *Smith v Ministry of Defence* [2013] UKSC 41, [46]–[48]. Also Bassiouni (6th edn, 2014) 406–8.

**25** E.g. Penal Law 1977, as amended in 1994 (Israel), s16(a); War Crimes Act 1991 (UK), s2(b); Terrorism Act 2000 (UK), ss63B, 63C. In Australia: War Crimes Act 1945, as amended in 2001, s11; *XYZ v Commonwealth* [2006] HCA 25. See also: *R v Moti* (2009) 235 FLR 320.

**26** *Public Prosecutor v Drechsler* (1946) 13 ILR 73; *Re Penati* (1946) 13 ILR 74; *In re Bittner* (1949) 16 ILR 95; cf *DPP v Joyce* [1946] AC 347; *Re P (GE) (an infant)* [1964] 3 All

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

ER 977. The Canadian Criminal Code RSC 1985 C-46 operates against persons 'ordinarily resident': ss7(3.72), (3.73), (3.74). See also: Liivoja (2010) 11 *Melb JIL* 309, 324–9.

**27** *In re Mittermaier* (1946) 13 ILR 69; *In re SS Member Ahlbrecht* (1947) 14 ILR 196, 200–1; *Ram Narain v Central Bank of India* (1951) 18 ILR 207.

**28** Treason Act 1351, sII; further: *R v Lynch* [1903] 1 KB 444; *R v Casement* [1917] 1 KB 98; Lew (1978) 27 *ICLQ* 168.

**29** Offences Against the Person Act 1861, s9.

**30** Ibid, s57.

**31** Football Spectators Act 1989, s22.

**32** Sexual Offences Act 2003, s72, Sch 2.

**33** Official Secrets Act 1989, s15.

**34** Harvard Research (1935) 29 *AJIL Supp 439,* 519; Ryngaert (2nd edn, 2015) 105.

**35** E.g. UKMIL (2006) 77 *BY* 597, 756; 18 USC §2423(c). Naturally, this will depend on the definition of 'serious': cf Misuse of Drugs Act (Singapore), ss8A, 33, 33A, Schs 2 and 4. Note also: Penal Code (France), arts 113-6, 113-7 (creating extraterritorial jurisdiction for misdemeanours punishable by imprisonment).

**36** Ryngaert (2nd edn, 2015) 105–6. The practice of limiting the use of nationality jurisdiction to serious offences is largely common law in origin, with civil law countries applying a more expansive approach: e.g. Bosnia/Herzegovina Criminal Code, Art 12(2) ('The criminal legislation of Bosnia and Herzegovina shall be applied to a citizen of Bosnia and Herzegovina who, outside the territory of Bosnia and Herzegovina, perpetrates a criminal offence').

**37** Antarctic Treaty, 1 December 1959, 402 UNTS 71, Art VIII(1); see e.g. Antarctic Act 1994 (UK), s21. Further: Molenaar & Elferink, *The International Legal Regime of Areas beyond National Jurisdiction* (2010) 115–16. The same situation subsists with respect to criminal jurisdiction on the International Space Station, although the governing instrument also provides for subsidiary territorial and passive personality jurisdiction in certain cases: Agreement Concerning Cooperation on the Civil International Space Station, 29 January 1998, TIAS 12927, Art 22. The position is not replicated with respect to the earlier Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies, 27 January 1967, 610 UNTS 205: Art 8 provides that when a state party launches an object into outer space, it retains jurisdiction over that object and over any personnel—a species of flag state jurisdiction.

**38** E.g. Swedish Penal Code, ch 2, s2. Further: Harvard Research (1935) 29 *AJIL* 439, 535; Ryngaert (2nd edn, 2015) 104.

**39** Harvard Research (1953) 29 *AJIL Supp* 439, 443, 445, 573, 579; Ireland-Piper (2012) 13 *Melb JIL* 122, 134–6; Echle (2013) 9(4) *Utrecht LR* 56; Bassiouni (6th edn, 2014) 408–11; Ryngaert (2nd edn, 2015) 110–13.

**40** Moore, 2 *Digest* 228–42; *Foreign Relations of the United States* (1887) 751–867.

**41** (1927) PCIJ Ser A No 10, 15.

**42** Lauterpacht (1947) 9 *CLJ* 330, 343. Cf Bassiouni (6th edn, 2014) 408–9.

**43** (1927) PCIJ Ser A No 10, 89–94 (Judge Moore, diss). Also *Flatow v Islamic Republic of Iran*, 999 F Supp 1, 15–16 (DCC, 1998), see also *Cicippio-Puleo v Islamic Republic of Iran*, 353 F3d 1024, 1033 (DCC, 2004); *Owens v Republic of Sudan*, 864 F3d 751 (DCC, 2017).

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

For comment on the extension of jurisdiction with respect to terrorism: Higgins (1994) 66–7 (US law); Wiffen (2012–13) 59 *Crim LQ* 47 (Canadian law).

**44** Antiterrorism Act of 1991, 106 Stat 4506 (1992). The Act had the purpose of expanding US courts' jurisdiction in terrorism cases beyond the scope of admiralty. See *Klinghoffer v SNC Achille Lauro*, 739 F Supp 854, 856 (SDNY, 1990).

**45** 18 USC §2333(a).

**46** *Daimler AG v Bauman*, 134 S Ct 746 (2014).

**47** *Waldman v Palestine Liberation Organization*, 835 F3d 317, 322, 336–7 (2d Cir, 2016), cert den, __ US ___ (2018); noted (2017) 111 *AJIL* 504.

**48** Harvard Research (1935) 29 *AJIL Supp* 439, 578–9; Ireland-Piper (2012) 13 *Melb JIL* 122, 134–6; Echle (2013) 9(4) *Utrecht LR* 56, 60–1; Ryngaert (2nd edn, 2015) 110.

**49** Donnedieu de Vabres, *Les Principes modernes du droit penal international* (1928) 170. Also Ryngaert (2nd edn, 2015) 110–11.

**50** Brierly (1928) 44 *LQR* 154, 161; Echle (2013) 9(4) *Utrecht LR* 56.

**51** E.g. *Arrest Warrant*, ICJ Report 2002 p 3, 76–7 (Judges Higgins, Kooijmans, and Buergenthal): 'Passive personality jurisdiction, for so long regarded as controversial, is reflected not only in the legislation of various countries … and today meets with relatively little opposition, at least so far as a particular category of offences is concerned'. Also Ryngaert (2nd edn, 2015) 111; ILC *Ybk* 2006/II(2), 527. For example, in domestic legislation: Criminal Code Amendment (Offences against Australians) Act 2002 (Australia); Penal Code (France), arts 113–117; 18 USC §2332F(*b*)(2)(B); Organic Law 1/2009 (3 November 2009) (Spain) art 23(4), (5). In the US, passive personality was rejected by the *Restatement Second* (1965) §30(2) but it was accepted in *Restatement Third* §402(2).

**52** E.g. Convention on Offences Committed on Board Aircraft, 14 September 1963, 704 UNTS 219, Art 4(b); Convention Against Torture, 10 December 1984, 1485 UNTS 85, Art 5(1)(c).

**53** Harvard Research (1935) 29 *AJIL Supp* 439, 543; Cameron, 'International Criminal Jurisdiction, Protective Principle' (2007) *MPEPIL*; Ryngaert (2nd edn, 2015) 114–20; Guilfoyle (2016) 35–6. For a critique: Bialostozky (2013–14) 52 *Col JTL* 617. See also *Restatement Third* §402(3); draft *Restatement Fourth* (2017) §201(1)(e).

**54** *Nusselein v Belgian State* (1950) 17 ILR 136; *Public Prosecutor v L* (1951) 18 ILR 206; *Re van den Plas* (1955) 22 ILR 205; *Rocha v US*, 288 F2d 545 (9th Cir, 1961); *Italian South Tyrol Terrorism Case* (1970) 71 ILR 242; *US v Peterson*, 812 F2d 486, 494 (9th Cir, 1987) ('Protective jurisdiction is proper if the activity threatens the security or government functions of the United States.'); *US v Yousef*, 327 F3d 56, 112 (2d Cir, 2003); *US v Davis*, 905 F2d 245, 249 (9th Cir, 1990); *US v Cardales*, 168 F3d 548, 553 (1st Cir, 1999), cf *US v Bustos-Useche*, 273 F3d 622 (5th Cir, 2001); *Arrest Warrant*, ICJ Reports 2002 p 3, 37 (President Guillaume), 92 (Judge Rezek); *US v Al Kassar*, 660 F3d 108, 118 (2d Cir, 2011).

**55** *Molvan v AG for Palestine* [1948] AC 351; *Giles v Tumminello* (1969) 38 ILR 120.

**56** [1946] AC 347 (on which see Lauterpacht, 3 *International Law* (1977), 221). Also *Board of Trade v Owen* [1957] AC 602, 634 (Lord Tucker).

**57** (1962) 36 ILR 5, 18, 54–7 (Dist Ct), 304 (Sup Ct).

**58** Notwithstanding this, the District Court of Jerusalem felt able to say that the law under which Eichmann was prosecuted 'conforms to the best traditions of the law of nations': (1962) 36 ILR 5, 18, 25. Also the statement of the Supreme Court, ibid, 287.

**59** E.g. the US asserts jurisdiction over foreigners on the high seas on the basis of the protective principle, arguing that the illegal trade in narcotics is sufficiently prejudicial to its national interest: *US v Gonzalez*, 776 F2d 931 (11th Cir, 1985); *US v Davis*, 905 F2d 245 (1st Cir, 1990); *US v Saac*, 632 F3d 1203 (11th Cir, 2011). Maritime Drug Law Enforcement Act 1986; Murphy (2003) 97 *AJIL* 183. Further: Papastavridis, *The Interception of Vessels on the High Seas* (2013) 248–51.

**60** *Jacobellis v Ohio,* 378 US 184, 197 (1964) (Stewart J).

**61** Coppel (1993) 6 *LJIL* 73; O'Keefe (2004) 2 *JICJ* 735, 739.

**62** E.g. in respect of inchoate conspiracies to murder or import illegal narcotics, where these offences are almost certainly illegal in those countries in which the plotting took place. In other areas, notably the fields of antitrust/competition law, such illegality cannot be assumed, and the validity of the doctrine remains uncertain: ibid, 739.

**63** (1927) PCIJ Ser A No 10, 23.

**64** ICJ Reports 2002 p 3, 77 (Judges Higgins, Kooijmans, and Buergenthal).

**65** In the US: *Restatement Third* §402(1)(c), draft *Restatement Fourth* §201(1)(b); *Morrison v National Australia Bank Ltd*, 130 S Ct 2869, 2877 (2010) (articulating a 'substantial effects' test); Dodge (2011) 40 *Southwestern LR* 687. In the EU: e.g. Case T-102/96 *Gencor Ltd v Commission* [1999] ECR II-753; Case T-286/09 *Intel Corp v European Commission*, ECLI:EU:T:2014:547. Further: Agreement between the European Communities and the Government of the United States on the Application of Positive Comity Principles in the Enforcement of their Competition Laws, 4 June 1998 [1998] OJ L173/28; Jaiswal (2015) 12 *Manchester JIEL* 344; Ryngaert (2nd edn, 2015) 83–4.

**66** *US v Aluminum Co of America*, 148 F2d 416, 443 (2d Cir, 1945).

**67** *Hartford Fire Insurance Co v California*, 509 US 764, 796 (1993); *Hoffman-La Roche Ltd v Empagran SA*, 542 US 155, 165 (2004); *Minn-Chem Inc v Agrium Inc*, 683 F3d 845 (7th Cir, 2012); *Carrier Corp v Outokumpu Oyj*, 673 F3d 430 (6th Cir, 2012). Generally: Raymond (1967) 61 *AJIL* 558; Metzger (1967) 61 *AJIL* 1015; Norton (1979) 28 *ICLQ* 575; Kelley (1991) 23 *U Miami IA LR* 195; Buxbaum & Michaels in Basedow, Francq, & Idot (eds), *International Antitrust Litigation* (2012) 225–44. Further Basedow, 'Antitrust or Competition Law, International' (2014) *MPEPIL*.

**68** Shipping Contracts and Commercial Documents Act 1964 (UK).

**69** Regulation (EC) 2271/96, amended by Regulation (EU) 2018/1100, and see Regulation (EU) 2018/1101 laying down criteria for its application.

**70** Lowe (1984) 27 *GYIL* 54; Kuyper, ibid, 72; Meessen, ibid, 97.

**71** Cf the Note dated 12 August 1982 and comment, Lowe (1983) 197.

**72** Note dated 18 October 1982, UKMIL (1982) 53 *BY* 337, 453; Lowe (1983) 212.

**73** Herdegen, *Principles of International Economic Law* (2013) 90; Ryngaert (2nd edn, 2015) 83–4.

**74** *ICI v EEC Commission* (1972) 48 ILR 106, 121–3.

**75** (1988) 96 ILR 174. However, the Court based its decision on 'the territoriality principle as universally recognized in public international law': ibid, 196–7.

**76** E.g. UKMIL (1992) 63 *BY* 615, 724–9; UKMIL (1993) 64 *BY* 579, 643–5; UKMIL (1995) 66 *BY* 583, 669–71; UKMIL (1996) 67 *BY* 683, 763–5; UKMIL (1998) 69 *BY* 433, 534; UKMIL (2001) 72 *BY* 551, 627, 631; UKMIL (2013) 83 *BY* 298, 461–2. Further: Supplemental Brief of the European Commission on Behalf of the European Union as Amicus Curiae in Support

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

of Neither Party, *Kiobel v Royal Dutch Petroleum Co*, 569 US 108 (2013). On the EU approach to the effects test more generally: Scott (2014) 62 *AJCL* 87, 92–3, 95–6.

**77**  22 USC §6001.

**78**  Iran and Libya Sanctions Act, 110 Stat 1541.

**79**  Cuban Liberty and Democratic Solidarity (Libertad) Act, 22 USC §6021.

**80**  Gidel, 2 *Le Droit international public de la mer* (1932) 39–252; Jessup, *Law of Territorial Waters and Maritime Jurisdiction* (1927) 144–208; Harvard Research (1929) 23 *AJIL Supp* 241, 307–28; Harvard Research (1935) 29 *AJIL Supp* 508; McDougal & Burke, *The Public Order of the Oceans* (1962) 161–73; Churchill & Lowe, *The Law of the Sea* (3rd edn, 1999) 65–9; Marten, *Port State Jurisdiction and the Regulation of Merchant Shipping* (2014); Molenaar, 'Port State Jurisdiction' (2014) MPEPIL; Kopela (2016) 47 *ODIL* 89; Rothwell & Stephens, *The International Law of the Sea* (3rd edn, 2016) 47–8; Rayfuse in Warner & Kaye (eds), *Routledge Handbook of Maritime Regulation and Enforcement* (2016) 71, 72–4.

**81**  Also *Lauritzen v Larsen*, 345 US 571, 584–6 (1953). See also *Reino de España v American Bureau of Shipping Inc*, 729 F Supp 2d 635 (SDNY, 2010); Churchill & Lowe (3rd edn, 1999) 66–7; Tanaka (2nd edn, 2015) 157–160; Baterman in Warner & Kaye (2016) 45–7.

**82**  Further: UNCLOS, 10 December 1982, 1833 UNTS 3, Arts 91–94; UN Convention on the Conditions of Registration of Ships, 7 February 1986, 26 ILM 1229; *M/V Saiga (No 2)* (1999) 120 ILR 143; Baterman in Warner & Kaye (2016) 43–53.

**83**  Molenaar (1998) 187; Churchill & Lowe (3rd edn, 1999) 68; Rothwell & Stephens, *The International Law of the Sea* (2010) 56. No general right of port access exists under customary international law: Rayfuse in Warner & Kaye (2016) 73.

**84**  *US v Flores*, 289 US 137 (1933); *Re Bianchi* (1957) 24 ILR 173; Rayfuse in Warner & Kaye (2016) 72.

**85**  2 Gidel (1932) 204, 246; Churchill & Lowe (3rd edn, 1999) 65–6.

**86**  McNair, 2 *Opinions* 194.

**87**  Churchill & Lowe (3rd edn, 1999) 66–7; Bardin (2002) 14 *Pace ILR* 27, 31. For a US perspective on crimes at the sea, see Roach in Franckx & Gautier (eds), *The Exercise of Jurisdiction over Vessels* (2011) 151; for a European perspective, see Anderson in Franckx & Gautier (2011) 171. Also Shearer in Rothwell (ed), *Law of the Sea* (2013) 320, 327.

**88**  Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the Conservation and Management of Straddling Fish Stocks and Highly Migratory Fish Stocks, 4 August 1995, 2167 UNTS 3.

**89**  2 November 2001, 2562 UNTS 3 (58 parties). Further: Rau (2006) 6 *MPUNYB* 387.

**90**  *R v Martin* [1956] 2 QB 272, 285–6 (Devlin J); *R v Naylor* [1962] 2 QB 527.

**91**  14 September 1963, 704 UNTS 219.

**92**  Convention for the Suppression of Unlawful Seizure of Aircraft, 16 December 1970, 860 UNTS 105; Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, 23 September 1971, 974 UNTS 178; Convention on the Suppression of Unlawful Acts Relating to International Civil Aviation, 10 September 2010, International Civil Aviation Organization (ICAO) Doc 9960 (not yet in force).

**93**  Harvard Research (1935) 29 *AJIL Supp* 439, 563; Bowett (1982) 53 *BY* 1, 11–14; Higgins (1994) 56–65; *The Princeton Principles on Universal Jurisdiction* (2001); Reydams, *Universal Jurisdiction* (2003); Ryngaert (2nd edn, 2015) 120–42. Further: Langer (2011) 105 *AJIL* 1; Nyst (2012) 8 *JIL & Int Rel* 36, 39–43; Schabas (2013) 26 *LJIL* 667, 687–93; Bassiouni (6th edn, 2014) 425–73; Lett (2015) 23 *Mich St ILR* 545; Kapelańska-Pręgowska

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

(2015) 17 *Int Comm LR* 413, 425–9; O'Keefe, *International Criminal Law* (2015) 371–5; Trouille (2016) 14 *JICJ* 195; Mennecke in Jalloh (ed), *The International Criminal Court and Africa* (2017) 10; O'Sullivan, *Universal Jurisdiction in International Criminal Law* (2017). There is a Working Group of the Sixth Committee on the scope and application of universal jurisdiction: see GA Res 72/120, 18 December 2017.

**94** La Pradelle in Ascensio, Decaux, & Pellet (eds), *Droit International Pénal* (2005) 905; Guilfoyle (2016) 37.

**95** O'Keefe (2004) 2 *JICJ* 735, 745.

**96** Baxter (1951) 28 *BY* 382. Cf Röling (1960) 100 Hague *Recueil* 323, 357–62. Also *Re Sharon and Yaron* (2003) 127 ILR 110; *Javor* (1996) 127 ILR 126; *Munyeshyaka* (1998) 127 ILR 134.

**97** Higgins (1994) 58. See also *Arrest Warrant*, ICJ Reports 2002 p 3, 81 (Judges Higgins, Kooijmans, and Buergenthal); *R v Bow Street Stipendiary Magistrate, ex p Pinochet Ugarte (No 3)* [1999] 2 All ER 97, 176 (Lord Millett).

**98** (1961) 36 ILR 5, 26.

**99** This can be explained by the fact that no state could exercise territorial jurisdiction: e.g. *SS Lotus* (1927) PCIJ Ser A No 10, 51 (Judge Finlay, diss), 70–1 (Judge Moore, diss), 95 (Judge Altamira, diss); *Arrest Warrant*, ICJ Reports 2002 p 3, 37–8, 42 (President Guillaume), 55–6 (Judge Ranjeva), 78–9, 81 (Judges Higgins, Kooijmans, and Buergenthal). On piracy: UNCLOS, Art 105, and chapter 13; Hodgkinson in Scharf, Newton, & Sterio (eds), *Prosecuting Maritime Piracy* (2015). Also: *US v Shibin*, 722 F3d 233 (4th Cir, 2013).

**100** E.g. *SS Lotus* (1927) PCIJ Ser A No 10, 95 (Judge Altamira, diss); *Arrest Warrant*, ICJ Reports 2002 p 3, 61–2 (Judge Koroma); Trouille (2016) 14 *JICJ* 195; van der Wilt (2016) 14 *JICJ* 269.

**101** Ryngaert (2nd edn, 2015) 127–8; *US v Bellaizac-Hurtado*, 700 F3d 1245, 1253–4 (11th Cir, 2012) (holding enforcement of an anti-drug trafficking law unconstitutional as applied to conduct in the territorial waters of another country, drug trafficking being 'not a violation of customary international law'). But see *US v Macias*, 654 Fed Appx 458 (11th Cir, 2016), (holding that the prosecution for drug-trafficking crimes committed on board a stateless vessel in international waters is a constitutional exercise of extraterritorial jurisdiction).

**102** *Jorgic v Germany* [2007] ECtHR 74613/01, [69]. Institut de Droit International, Seventeenth Commission, *Universal Jurisdiction Over Genocide, Crimes Against Humanity and War Crimes* (2005) 2. Generally: Kreß (2006) 4 *JICJ* 561; Reydams (2003) 1 *JICJ* 428; cf Reydams (2003) 1 *JICJ* 679; Ryngaert (2007) *Hague JJ* 85. This has become the position despite the fact that the Genocide Convention, 9 December 1948, 78 UNTS 277, Art VI reserves universal jurisdiction in the case of genocide for an international court: cf *In re Koch* (1966) 30 ILR 496; *Jorgic v Germany* [1997] ECtHR 74613/01 (alternative interpretation of Genocide Convention, Art VI, which permits universal jurisdiction for states); Schabas (2003) 1 *JICJ* 39.

**103** Higgins (1994) 61; Van Elst (2000) 13 *LJIL* 815; Ryngaert (2007) *Hague JJ* 85; Carrillo & Nelson (2013–14) 46 *G Wash ILR* 481.

**104** *R v Bow Street Metropolitan Stipendiary Magistrate, ex p Pinochet Ugarte (No 3)* [2000] 1 AC 147, 275 (Lord Millett); *Furundžija* (2002) 121 ILR 213, 262. Cf *Jones v Saudi Arabia* [2006] UKHL 26, [34] (rejecting the existence of universal tort jurisdiction over torture).

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**105**  Resolution ICC-ASP/16/Res.5, 14 December 2017; ICC Statute, 17 July 1998, 2187 UNTS 3, Arts 8*bis*, 15*bis*, 15*ter*, inserted by Resolution RC/Res.6 of 11 June 2010. See also Kreß & Barriga, *The Crime of Aggression: A Commentary* (2017).

**106**  Ryngaert (2nd edn, 2015) 127.

**107**  E.g. in Spain: Moltó (2015) 13 *JICJ* 1121, 1122–31.

**108**  Generally: Winants (2003) 16 *LJIL* 491; Rabinovitch (2004) 28 *Fordham ILJ* 500. O'Keefe (2004) 2 *JICJ* 735; Goldmann, 'Arrest Warrant Case (Democratic Republic of Congo v Belgium)' (2009) *MPEPIL*.

**109**  Cf also the dissenting opinion of Judge Oda: ICJ Reports 2002 p 3, 51.

**110**  President Guillaume took a conservative stance on universal jurisdiction holding that under customary international law it only applied with respect to piracy and within the confines of certain *sui generis* treaty regimes: ibid, 37–8.

**111**  Ibid, 94.

**112**  Ibid, 55–7 (Judge Ranjeva), 121–6 (Judge ad hoc Bula-Bula).

**113**  Reydams (2003) 55, 74, 88–9, 156, 177, 222, 224, 226–7. For comment on universal jurisdiction *in absentia*: Colangelo (2005) 36 *Geo JIL* 537; Poels (2005) 23 *NQHR* 65; Ryngaert (2nd edn, 2015) 133–5.

**114**  O'Keefe (2004) 2 *JICJ* 735, 750.

**115**  Ibid, 750–1; O'Keefe (2015) 573–5; Guilfoyle (2016) 40. Cf Ryngaert (2nd edn, 2015) 123–5.

**116**  Generally: Reydams (2003) ch 3; Scharf, '*Aut dedere aut iudicare*' (2008) *MPEPIL*; Guilfoyle (2016) 44–52.

**117**  The concept again comes from Grotius, who found the notion of a fugitive arriving on the territory of a state and there remaining to enjoy the fruits of his iniquity offensive: Grotius, *De iure belli ac pacis* (1625, Tuck 2005) II.xxi, §4.1. The position was later reversed by Enlightenment philosophers who sought to restrict the prescriptive jurisdiction of states to territorial concerns alone: e.g, Beccaria, *Traité des délits et des peines* (1764) §21. Further: *Arrest Warrant*, ICJ Reports 2002 p 3, 36–40 (President Guillaume).

**118**  In the modern era, the concept first appeared in the International Convention for the Suppression of Counterfeiting Currency, 20 April 1929, 112 LNTS 371, Art 9.

**119**  16 December 1970, 860 UNTS 105, Art 4(1).

**120**  E.g. Geneva Convention Relative to the Treatment of Prisoners of War, 75 UNTS 135, Art 129.

**121**  Generally: Saul, *Defining Terrorism in International Law* (2006); Schmid (2012) 6 *Perspectives on Terrorism* 158; Easson & Schmid in Schmid (ed), *Routledge Handbook of Terrorism Research* (2011) 99–157; Cohen (2013) 20 *Mich St ILR* 219, 229–33; O'Keefe (2015) 160, 266–74; Brennan in McCorquodale & Gauci (eds), *British Influences on International Law* (2016) 417–35. Cf Cassese, *International Law* (3rd edn, 2013) ch 8.

**122**  Higgins (1994) 64 ('Although these treaties seek to provide wide alternative bases of jurisdiction, they are not examples of universal jurisdiction. Universal jurisdiction, properly called, allows *any* state to assert jurisdiction over an offence').

**123**  Ryngaert (2nd edn, 2015) 124. Also Guilfoyle (2016) 46.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved. Subscriber: Gujarat National Law University; date: 27 June 2021

**124**  E.g. *US v Rezaq*, 134 F3d 1121 (DC Cir, 1998); *US v Wang Kun Lue*, 134 F3d 79 (2d Cir, 1998); *US v Lin*, 101 F3d 760 (DC Cir, 1996). For commentary on the US position: Scharf (2001) 64 *LCP* 67.

**125**  *US v Yunis*, 681 F Supp 896, 901 (DDC, 1988) and *US v Yunis*, 924 F2d 1086 (DCC, 1991).

**126**  Akehurst (1972–3) 46 *BYIL* 145, 170; Vagias, *The Territorial Jurisdiction of the International Criminal Court* (2014) 181–2; Kohl in Tsagourias & Buchan (eds), *Research Handbook on International Law and Cyberspace* (2015) 31–3. There are many specialized areas, e.g. those relating to conscription and taxation. On the former: Parry (1954) 31 *BY* 437; 8 Whiteman 540–72. On the latter: Mann (1964) 111 Hague *Recueil* 1, 109–19; Martha, *The Jurisdiction to Tax in International Law* (1989).

**127**  Ryngaert (2nd edn, 2015) 32, 82–4, 89–94. Also Ryngaert, *Jurisdiction over Antitrust Violations in International Law* (2008).

**128**  On the relations of public and private international law: Mills, *Confluence of Public and Private International Law* (2009); Boer (2010) 57 *NILR* 183; Mills (2014) 84 *BYIL* 187; Ryngaert (2nd edn, 2015) 16–22.

**129**  Beale (1922–3) 36 *Harv LR* 241. For a different view see Akehurst (1972–3) 46 *BY* 145, 170–7; and see *Derby & Co Ltd v Larsson* [1976] 1 WLR 202, noted (1976–7) 48 *BY* 333, 352. Also *Thai-Europe Tapioca Service v Government of Pakistan* [1975] 1 WLR 1485, 1491–2 (Lord Denning); Putnam, *Courts without Borders* (2016) ch 2.

**130**  *Russell & Co v Cayzer, Irvine Ltd* [1916] 2 AC 298, 302; *ANZ Grindlays Bank plc v Fattah* (1991) 4 WAR 296, 299–300. Further: *Dicey, Morris & Collins on the Conflict of Laws* (15th edn, 2012) 411.

**131**  E.g. *Maharanee of Baroda v Wildenstein* [1972] 2 QB 283. Sime, *A Practical Approach to Civil Procedure* (17th edn, 2014) 117.

**132**  E.g. *Dunlop Ltd v Cudell & Co* [1902] 1 KB 342; *Cleveland Museum of Art v Capricorn International SA* [1990] 2 Lloyd's Rep 166. In civil claims against corporations in US courts, a 'commercial presence' is no longer sufficient to establish jurisdiction: *Daimler AG v Bauman*, 134 S Ct 746 (2014); *Bristol-Myers Squibb Co v Superior Court of California, San Francisco County*, 137 S Ct 1773 (2017).

**133**  McConville in Scott (ed), *Torture as Tort* (2001) 160.

**134**  E.g. *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460; *Airbus Industrie GIE v Patel* [1999] 1 AC 119; *Lubbe v Cape plc* [2000] 1 WLR 1545. Generally: Sime (17th edn, 2014) 124–5; Fentiman, *International Commercial Litigation* (2nd edn, 2015) chs 8–9, 12.

**135**  Where the defendant has a territorial connection with England sufficient to allow the writ to be served directly, the court may decline jurisdiction on the basis that England is *forum non conveniens*: *VTB Capital plc v Nutritek International Corp* [2013] 2 AC 337.

**136**  E.g. Ehrenzweig (1956) 65 *Yale LJ* 289. Relations between common law and civil law countries on the service of process have been a source of difficulty: e.g. *Decision concerning Service of Punitive Damage Claims* (1995) 34 ILM 975.

**137**  *International Shoe Co v Washington*, 326 US 310, 316 (1945). Also *World-Wide Volkswagen Corp v Woodson*, 444 US 286, 297 (1980); *Goodyear Dunlop Tyres Operations SA v Brown*, 564 US 915 (2011).

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**138** 134 S Ct 746, 761 (2014) (uprooting the corporate presence doctrine). For comment: Ji (2015) 23 *Mich St ILR* 397; Cavanagh (2016) 68 *Maine LR* 287. See also *Gucci America Inc v Weixing Li*, 768 F3d 122 (2d Cir, 2017).

**139** [2001] OJ L12/1, an elaboration on the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, Brussels, 27 September 1968, 1262 UNTS 153 As an EU member, the UK is bound by the Brussels I Regulation. To the extent that the Regulation does not apply, the common law rules of jurisdiction will have residual effect: Brussels I Regulation, Art 4. Also of note is EC Regulation 593/2008 on the law applicable to contractual relations [2008] OJ L177/6 (Rome I Regulation). Generally: Briggs, *Civil Jurisdiction and Judgments* (6th edn, 2015) ch 2; van Calster, *European Private International Law* (2nd edn, 2016) ch 2.

**140** The Brussels I Regulation permits certain exceptions to this principle based on questions of subject matter and the relationship between the parties: e.g. Arts 5(1) (matters relating to a contract), 5(3) (matters relating to a tort or delict), 5(5) (matters relating to a dispute arising from the activities of a branch, agent, or other establishment); 22 (exclusive jurisdiction), 23 (jurisdiction agreements), and 27 and 28 (*lis pendens* and related actions).

**141** Further: Kaeb & Scheffer (2013) 107 *AJIL* 852, 854–5; Fentiman (2nd edn, 2015) ch 9.

**142** Cf Brussels I Regulation, Art 28.

**143** E.g. because the court second seised is the beneficiary of an exclusive jurisdiction agreement between the parties (Art 23) or the subject matter of the dispute is something within the exclusive jurisdiction of the court second seised (Art 22).

**144** Case C-281/02 *Owusu v Jackson* [2005] ECR I-1383 (ECJ). Also Case C-159/02 *Turner v Grovit* [2005] ECR I-3565 (ECJ); Case C-116/02 *Erich Gasser GmbH v MISAT srl* [2003] ECR I-14693 (ECJ); Case C-185/07, *Allianz SpA v West Tankers Inc* [2009] ECR I-663; *Ferrexpo AG v Gilson Investment Ltd* [2012] EWHC 721 (Comm). Further: Rodger (2006) 2 *JPIL* 71; De Verneuil Smith, Lasserson, & Rymkiewicz (2012) 8 *JPIL* 389.

**145** Mills, *The Confluence of Public and Private International Law* (2009); Ryngaert (2nd edn, 2015) ch 1.

**146** Mills (2009) 298.

**147** E.g. *Timberlane Lumber Co v Bank of America*, 549 F2d 597 (9th Cir, 1976); *Asahi Metal Industry Co v Superior Court of California*, 480 US 102 (1987);

cf *Hartford Fire Ins Co v California*, 509 US 764 (1993). Further: Oakley & Amar, *American Civil Procedure* (2009) 116; Grossi, *The US Supreme Court and the Modern Common Law Approach* (2015) 144, 166–8, 171.

**148** Steinhardt & D'Amato (eds), *The Alien Tort Claims Act* (1999); Paust (2004) 16 *Florida JIL* 249; Ku (2013) 107 *AJIL* 835–7; Ryngaert (2nd edn, 2015) 135–42; Seibert-Fohr, 'United States Alien Tort Statute' (2015) *MPEPIL*.

**149** Reydams (2008) 126–7; Cassese (3rd edn, 2013) 278–81.

**150** 28 USC §1350. After the 'rediscovery' of the Alien Tort Claims Act, the Torture Victims Protection Act of 1991 was passed: it provides a cause of action for any victim of torture or extrajudicial killing wherever committed: 106 Stat 73.

**151** These are the offences against the law of nations described by Blackstone as addressed by the criminal law of England. See *Sosa v Alvarez-Machain*, 542 US 692, 725 (2004). The origins of the original statute are obscure: Paust (2004) 16 *Florida JIL* 249; Seibert-Fohr, 'United States Alien Tort Statute' (2015) *MPEPIL*.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**152**  630 F2d 876, 881 (2d Cir, 1980).

**153**  There is no nationality requirement imposed on the defendant by the ATS; accordingly, US companies were named as defendants in many cases, converting ATS into a corporate social responsibility tool: e.g. *Doe 1 v Unocal*, 395 F3d 932 (9th Cir, 2002). But corporations that have a 'mere corporate presence' in the US have been held not to fall within the Act: *Kiobel v Royal Dutch Petroleum Co*, 569 US 108 (2013), and the Supreme Court has held that foreign corporations may not be defendants in ATS cases: *Jesner v Arab Bank Plc*, 584 US __ (2018). The scope of the ATS is thus further reduced.

**154**  Ryngaert (2nd edn, 2015) 71, 106.

**155**  542 US 692, 749 (2004).

**156**  Ryngaert (2003) 38 *NYIL* 3, 35–8.

**157**  E.g. *Arrest Warrant*, ICJ Reports 2002 p 3, 77 (Judges Higgins, Kooijmans, and Buergenthal) ('[w]hile this unilateral exercise of the function of guardian of international values has been much commented on, it has not attracted the approbation of States generally'). Cf Ramsay (2009) 50 *Harv ILJ* 271.

**158**  Ryngaert (2nd edn, 2015) 137; Kaeb & Scheffer (2013) 107 *AJIL* 852.

**159**  *Kiobel v Royal Dutch Petroleum Co*, 569 US 108, 14 (2013) (Chief Justice Roberts, joined by Justices Scalia, Alito, Thomas, and Kennedy).

**160**  See *Mujica v AirScan Inc*, 771 F3d 580, 594 (9th Cir, 2014) (stating that '*Kiobel* (quite purposely) did not enumerate the specific kinds of connections to the United States that could establish ATS claims "touch and concern" this country').

**161**  Stephens (2013) 28 *Md JIL* 256; Chander (2013) 107 *AJIL* 829; Ku (2013) 107 *AJIL* 835.

**162**  *RJR Nabisco, Inc v European Community*, 136 S Ct 2090, 2100–1 (2016).

**163**  But the presumption was not overcome regarding the private right of action, for which domestic injury must be alleged and proved. See *RJR Nabisco, Inc v European Community*, 136 S Ct 2090, 2105–11 (2016).

**164**  Ireland-Piper (2013) 9(4) *Utrecht LR* 68, 73; Currie & Coughlan (2007) 11 *Can Crim LR* 141, 148. E.g. *Janković*, Decision on Art 11*bis* referral (ICTY Appeals Chamber, Case No IT-96-23/2-AR11*bis*.2, 15 November 2005), para 34.

**165**  E.g. *Eichmann* (1962) 36 ILR 277, 302; *Arrest Warrant*, ICJ Reports 2002 p 3, 80 (Judges Higgins, Kooijmans, and Buergenthal) (arguing that universal jurisdiction can only be exercised once the territorial state has declined to take action).

**166**  Further: Ryngaert (2nd edn, 2015) ch 5.

**167**  Mann (1964) 111 Hague *Recueil* 9, 43–51, 82–126; Ryngaert (2nd edn, 2015) 156–7. For the Canadian approach, requiring 'a real and substantial link': *Queen v Klassen* 2008 BCSC 1762; ILDC 941; *Club Resorts Ltd v Van Breda* [2012] 1 SCR 572, and see Monestier (2013) 36 *Fordham ILJ* 396.

**168**  Ryngaert (2nd edn, 2015) ch 2; Kamminga, 'Extraterritoriality' (2012) *MPEPIL*; Piraino (2012) 40 *Hofstra LR* 1099.

**169**  Donovan & Roberts (2006) 100 *AJIL* 142, 142; Mills (2014) 84 *BY* 187, 202.

**170**  E.g. Protection of Trading Interests Act 1980 (UK) (which has, however, been little used). Also EC Regulation 2271/96, enacted in response to the Helms–Burton and D'Amato–Kennedy Acts. On restricting the reach of state jurisdictions over online data: Woods (2016) 68 *Stanford LR* 729, 779–80. On blocking investigations under the US Foreign Corrupt

Practices Act: Liakopoulos & Marsilia, *The Regulation of Transnational Mergers in International and European Law* (2009) 17; Robert-Ritter (2012) 8 *IL & Man R* 89.

**171** Mann (1964) 13 *ICLQ* 1460; Jennings (1957) 33 *BY* 146; 6 Whiteman 118–83; Akehurst (1972–3) 46 *BY* 145, 179–212 Meessen (ed), *Extra-Territorial Jurisdiction in Theory and Practice* (1996); Milanovic, *Extraterritorial Application of Human Rights Treaties* (2011) 23–6; Colangelo (2014) 99 *Cornell LR* 1303; Ryngaert (2nd edn, 2015) 31; Schabas (ed), *The Cambridge Companion to International Criminal Law* (2016) 161, 218, 220–6.

**172** (1927) PCIJ Ser A No 10, 18–19.

**173** E.g. *Armed Activities on the Territory of the Congo (DRC v Uganda)*, ICJ Reports 2005 p 168, 196–9; *R v Hape* [2007] 2 SCR 292. Further: Stigall (2013) 3 *Notre Dame JICL* 1, 9.

**174** *SS Lotus* (1927) PCIJ Ser A No 10, 18.

**175** E.g. Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces, 19 June 1951, 199 UNTS 67, Art VII; Agreement between the Democratic Republic of East Timor and the United Nations concerning the Status of the United Nations Mission of Support in East Timor, 20 May 2002, 2185 UNTS 368, Arts 43–44. Further: chapter 22.

**176** *US v Aluminum Co of America*, 148 F2d 416 (2d Cir, 1945).

**177** *US v Watchmakers of Switzerland Information Center Inc*, 133 F Supp 40 (SDNY, 1955); 134 F Supp 710 (SDNY, 1955).

**178** Intention was not a prominent requirement in *US v ICI*, 100 F Supp 504 (SDNY, 1951); 105 F Supp 215 (SDNY, 1952), and in many circumstances it can be inferred.

**179** *Timberlane Lumber Co v Bank of America*, 549 F2d 597 (9th Cir, 1976); *Mannington Mills Inc v Congoleum Corp*, 595 F2d 1287 (3d Cir, 1979). The 'balancing' approach was criticized in *Laker Airways Ltd v Sabena*, 731 F2d 909 (DC Cir, 1984). *Hartford Fire Insurance v California*, 509 US 764 (1993) ignored almost all the balancing factors and held that US courts should exercise jurisdiction where there is a substantial effect within the US and there is no conflict, i.e. no foreign law requires that a party act or not act in a certain manner contrary to US laws. Further: Ryngaert (2nd edn, 2015) 155–6; Duns, Duke, & Sweeney (eds), *Comparative Competition Law* (2015) 356–60.

**180** *Barcelona Traction*, Second Phase, ICJ Reports 1970 p 3, 103–6 (Judge Fitzmaurice).

**181** *Hoffman-La Roche Ltd v Empagran SA*, 542 US 155 (2004). See also *Restatement Third* §403(1) and (2); draft *Restatement Fourth* (2017) §101.

**182** *BPIL* (1964) 146, 153.

**183** (1957) 33 *BY* 146, 151. Also *British Nylon Spinners Ltd v ICI Ltd* [1952] 2 All ER 780; [1954] 3 All ER 88; Kahn-Freund (1955) 18 *MLR* 65.

**184** *Carron Iron Co v Maclaren* (1855) 5 HLC 416, 442 (Lord Cranworth); *The Tropaioforos* [1962] 1 Lloyd's Rep 410.

**185** Convention implementing the Schengen Agreement of 14 June 1985 [2000] OJ L239/19.

**186** [2001] OJ C 197/1. Also: Convention on the Establishment of a European Police Office [1995] OJ C 316/2. Further: McClean (2002) 167–8, 224–37.

**187** The UN has sponsored a series of treaties designed to secure greater cooperation in criminal matters: UN Model Treaty on Mutual Assistance in Criminal Matters, 14 December 1990, A/RES/45/117, amended by A/RES/53/112, 20 January 1999; Model Treaty on the Transfer of Proceedings in Criminal Matters, 14 December 1990, A/RES/45/118; UN Convention Against Transnational Organized Crime, 15 November 2000, A/RES/55/25

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

(Annex I). Further: *Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v France)*, ICJ Reports 2008 p 117.

**188** UK–Netherlands, Agreement concerning a Scottish trial in the Netherlands, 18 September 1998, 2062 UNTS 81. This approach was approved in SC Res 1192 (1998). Further: Aust (2000) 49 *ICLQ* 278; Plachta (2001) 12 *EJIL* 125. Also: UK–New Zealand, Agreement concerning trials under Pitcairn law in New Zealand, 11 October 2002, 2219 UNTS 57; Pitcairn Trials Act 2002 (NZ); *R v Seven Named Accused* (2004) 127 ILR 232; *Christian v R* [2007] 2 WLR 120.

**189** E.g. *Wisconsin v Pelican Insurance Co*, 127 US 265 (1887); *Huntington v Attrill* [1893] AC 150; *US v Inkley* [1989] QB 255 (CA). Further: Zeynalova (2013) 31 *Berkeley JIL* 150, 163–8.

**190** 28 May 1970, ETS No 70.

**191** Generally: Nicholls & Montgomery, *The Law of Extradition and Mutual Assistance* (2nd edn, 2007); Stein, 'Extradition' (2011) *MPEPIL*. On reciprocity as a basis for extradition: Rezek (1981) 52 *BY* 171; Duffy, *The 'War on Terror' and the Framework of International Law* (2nd edn, 2015) 162–5.

**192** E.g. UK–USA, Extradition Treaty, 31 March 2003, Cm 5821.

**193** 13 December 1957, 359 UNTS 273. Also: Additional Protocol to the European Convention on Extradition, 15 October 1975, CETS No 86; Second Additional Protocol to the European Convention on Extradition, 17 March 1978, CETS No 98.

**194** Cf EC Framework Decision of 13 June 2002 on the European arrest warrant and surrender procedures between member states [2002] OJ L190/1; and see *Assange v Swedish Prosecution Authority* [2012] UKSC 22. But cf *Assange (Sweden and the UK)* (2015) 175 ILR 475 (UN Working Group on Arbitrary Detention).

**195** A/RES/45/116, 14 December 1990. The UNMTE has been supplemented by a UN Model Law on Extradition: 10 May 2004, E/EN.15/2004/CRP.10.

**196** E.g. UNMTE, Art 2. Older treaties phrased this requirement in terms of an exhaustive list of offences for which extradition could be requested: ECE, Art 2, but cf Art 2(4). The EAW does away with this entirely with respect to certain serious offences, including those deemed to be crimes under the ICC Statute: EAW, Art 2(2).

**197** E.g. UNMTE, Art 3(a), ECE, Art 3. Also the European Convention on Extradition, 13 December 1957, 359 UNTS 273, Art 3, supplemented by Additional Protocol, 15 October 1975, 1161 UNTS 450, Art 1. On the non-refoulement principle and the prosecution of crimes committed extraterritorially: Gilbert & Rüsch (2014) 12 *JICJ* 1093.

**198** E.g. UNMTE, Art 14, ECE, Art 14.

**199** E.g. UNMTE, Art 3(f). Additionally, the European Court of Human Rights (ECtHR) has held that parties could not knowingly extradite an individual where that individual would be in danger of torture: *Soering v UK* (1989) 98 ILR 270. Cf *Netherlands v Short* (1990) 29 ILM 1375; *Ng v Canada* (1993) 98 ILR 497; *Aylor* (1993) 100 ILR 664; *US v Burns* (2001) 124 ILR 298; *Mamatkulov v Turkey* (2005) 134 ILR 230; *Ahmad v UK* [2012] ECtHR 24027/07, [166]–[179]. This rule has been applied in other jurisdictions: e.g. *Lamas Puccio v Peru*, ILDC 1886 (2011); *Minister of Home Affairs v Tsebe*, 2012 (5) SA 467. Further: Beltrán de Felipe & Nieto Martín (2012) 10 *JICJ* 581; Stover (2014) 45 *Col HRLR* 325. See also Southern African Development Community, Protocol on Extradition (2006), Art 5(j).

**200** E.g. UNMTE, Art 3(d), ECE, Art 11.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**201** Cf *Eichmann* (1962) 36 ILR 5. There, the accused was abducted from Argentina, drugged, and dressed as a flight attendant for rendition to Israel. Further: Fawcett (1962) 38 *BY* 181; Schabas (2013) 26 *LJIL* 667. The US courts recognize as a general rule that law enforcement officers of one country can exercise powers in another country only with the permission of the latter. See *Société Nationale Industrielle Aerospatiale v US DC for Southern District of Iowa*, 482 US 522 (1987); *Williams v Wisconsin*, 336 F3d 576 (7th Cir, 2003).

**202** Including human rights standards: *Öcalan v Turkey* [2005] ECtHR 46221/99 (irregular rendition not automatically contrary to ECHR Art 5(1)).

**203** Further: Parry (2005) 6 *Melb JIL* 516; Weissbrodt & Bergquist (2006) 19 *Harv HRJ* 123; Sands in Roberts (ed), *Mélanges Salmon* (2007) 1074; Messineo (2009) 7 *JICJ* 1023; Jensen & Jenks (2010) 1 *Harv NSJ* 171; McDermott (2014) 1 *J Use of Force & IL* 299.

**204** *US v Alvarez-Machain*, 504 US 655 (1992). But cf *R v Horseferry Road Magistrates' Court, ex p Bennett* [1994] 1 AC 42; *S v Ebrahim* (1991) 95 ILR 417. Traditionally European jurisdictions would ordinarily accept jurisdiction in exorbitant circumstances, but this has changed with the ECtHR: *Re Argoud* (1964) 45 ILR 90; cf *Stockë v Germany* (1991) 95 ILR 350. Also: *Prosecutor v Nikolić*, Legality of Arrest, ICTY, IT-94-2-AR73, 5 June 2003, paras 23, 55–7. Further: Schabas (2013) 3 *LJIL* 667, 687–93.

**205** As of 10 January 2015, the (recast) Brussels I Regulation applies: Regulation (EU) No 1215/2012. Further: Beaumont & Walker (2015) 11 *JPIL* 31.

**206** Brussels I Regulation (recast), Art 45. In the US: Stephan (ed), *Foreign Court Judgments and the United States Legal System* (2014).

**207** *Mareva Compania Naviera SA v International Bulkcarriers SA* [1975] 2 Lloyd's Rep 509; and cf generally: Fentiman (2nd edn, 2015) ch 17.

**208** *Ashtiani v Kashi* [1987] QB 888.

**209** E.g. *Babanaft International Co v Bassatne* [1990] Ch 13; *Derby & Co Ltd v Weldon* [1990] Ch 48 (CA).

**210** E.g. *Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818; *Republic of Haiti v Duvalier* [1990] 1 QB 202; *Refco v Eastern Trading Co* [1999] 1 Lloyd's Rep 159 (CA); *Ryan v Friction Dynamics* [2001] CP Rep 75; *Motorola Credit Corp v Uzan* [2004] 1 WLR 113.

**211** *Castanho v Brown & Root* [1981] AC 557, 573; *Airbus Industrie GIE v Patel* [1999] 1 AC 119, 133; *Amchem Products Inc v British Columbia Workers Compensation Board* (1993) 102 DLR (4th) 96, 119; *Turner v Grovit* [2002] 1 WLR 107. Generally: Fentiman (2nd edn, 2015) 532–40; Chan (2016) 79 *MLR* 341.

**212** *Masri v Consolidated Contractors International (UK) Ltd (No 3)* [2009] QB 503, 533. This also includes cases where the foreign claimant is prevented from re-litigating previous proceedings: e.g. *Royal Bank of Scotland plc v Hicks & Gillette* [2010] EWHC 2579 (Ch).

**213** E.g. *Midland Bank plc v Laker Airways Ltd* [1986] QB 689; cf *Siskina (Owners of cargo lately laden on board) v Distos Compania Naviera SA* [1979] AC 210.

**214** Notably where the parties have concluded an exclusive jurisdiction agreement in favour of the injuncting court: e.g. *Donohue v Armco Ltd* [2002] 1 Lloyd's Rep 425.

**215** Jääskinen & Sikora in Cremona, Thies, & Wessel (eds), *The European Union and International Dispute Settlement* (2017) 101–11.

**216** As was the case in *Société Nationale Industrielle Aérospatiale v Lee Kui Jak* [1987] AC 871 (PC).

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.
Subscriber: Gujarat National Law University; date: 27 June 2021

**217** Generally: Maier (1982) 76 *AJIL* 280; Paul (1991) 32 *Harv JIL* 1; Collins in Fawcett (ed), *Reform and Development of Private International Law* (2002) 89; Chan (2016) 79 *MLR* 341.

**218** [1990] 3 SCR 1077, 1096.

**219** 159 US 113, 164 (1895).

**220** E.g. in relation to anti-suit injunctions, *Turner v Grovit* [2002] 1 WLR 107, [28] (Lord Hobhouse); *Sanofi-Aventis Deutschland GmbH v Genentech Inc*, 716 F3d 586, 591 (2013); *Nike Inc v Cardarelli*, 2015 WL 853008 (D Or, 2015). Further: Sim (2013) 62 *ICLQ* 703; Fentiman (2nd edn, 2015) ch 16. In relation to freezing injunctions: *Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818; *Refco v Eastern Trading Co* [1999] 1 Lloyd's Rep 159. On comity generally: Dodge (2015) 115 *Col LR* 2071.

**221** E.g. *Turner v Grovit* [2005] ECR I-3565; *Erich Gasser GmbH v MISAT srl* [2003] ECR I-14693; *Allianz SpA v West Tankers Inc* [2009] ECR I-663.

**222** E.g. *Buck v Attorney-General* [1965] Ch 745, 770–2 (Diplock LJ); *Lauritzen v Larsen*, 345 US 571, 584–6 (1953); *Rio Tinto Zinc Corp v Westinghouse* [1978] AC 547, 607 (Lord Wilberforce), 618 (Lord Dilhorne); *R v Hape* [2007] 2 SCR 292, paras 45–6, 57, 65, 68. Cf *Aérospatiale v District Court*, 482 US 522, 554–61 (1987) (Blackmun J, diss).