# EXHIBIT 2

*The British Yearbook of International Law* © The Author 2014. Published by Oxford University Press. This is an Open Access article distributed under the terms of the Creative Commons Attribution Non-Commercial License (http://creativecommons.org/licenses/by-nc/4.0/), which permits non-commercial re-use, distribution, and reproduction in any medium, provided the original work is properly cited. For commercial re-use, please contact journals.permissions@oup.com
doi:10.1093/bybil/bru003
Advance Access published on 14 September 2014

# Rethinking Jurisdiction in International Law

## *By* Alex Mills*

### Abstract

Jurisdiction has traditionally been considered in international law as purely a question of the rights and powers of states. Conceived in this way, the rules on jurisdiction serve the important function of delimiting (while accepting some overlap of) state regulatory authority – the question of when a person or event may be subject to national regulation – a function which is shared with the cognate discipline of private international law. This article suggests that the idea and the rules of jurisdiction in international law require reconceptualisation in light of three developments. The first is the growing recognition that in a range of circumstances the exercise of national jurisdiction may, under international law, be a question of duty or obligation rather than right. The second development is the increased acceptance that such jurisdictional duties may in some circumstances be owed not only to other states but also to private parties, particularly through the emergence and strengthening of the doctrines of denial of justice and access to justice. The third development is the widely recognised phenomenon known as party autonomy, under which private parties in civil disputes have the power to confer jurisdiction on national courts and to determine themselves which law governs their relationships. In combination, these developments suggest the necessity of rethinking the concept of jurisdiction in international law, to reflect the more complex realities of an international legal order under which states possess both jurisdictional rights and obligations and are no longer the exclusive actors.

*Keywords*: Jurisdiction, universal jurisdiction, sovereignty, denial of justice, access to justice, party autonomy, state immunity, forum of necessity.

*Reader in Public and Private International Law, Faculty of Laws, University College London, a.mills@ucl.ac.uk. Earlier versions of this article were presented at the Cambridge Journal of International and Comparative Law Conference in May 2012, as part of the Scrymgeour Seminar Series at the University of Dundee in November 2012, at the American Society of International Law Research Forum in November 2013, and as part of the International Law Association British Branch lecture series in February 2014. I would like to record my gratitude to the organisers of each event and to the Editors of the British Yearbook of International Law.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

30

## I. Introduction

The regulation of the jurisdiction of states is an important aspect of international law. This article argues, however, that it is also underdeveloped. It is important because it is at the heart of an international legal order which seeks to provide for the lawful co-existence of sovereigns. Rules of jurisdiction reflect fundamental requirements in the international system which flow from the acceptance by states that there are limits on their own regulatory authority, and that exercises of regulatory authority by foreign sovereigns are themselves legitimate. These rules do not pretend to eliminate entirely the possibility of overlapping regulation. Some limited risk of potentially conflicting exercises of public authority remains an accepted feature of international law, while the risk of overlapping exercises of authority in questions of private law is reduced through the closely related field of private international law.[1] But without rules of jurisdiction such risk of overlap would be much increased, and no dispute over whose regulatory authority should apply to a person or event would be capable of being resolved through law.

Despite the centrality of rules of jurisdiction in the international order, the subject has not received very extensive scholarly attention. Moreover, such attention as it does receive tends to involve a fairly ritualised account of the standard 'heads' of jurisdiction, principally based on territoriality and nationality, which are traditionally the major grounds on which a state may (at its discretion) exercise regulatory authority, as explored in section III. The origins of this approach to jurisdiction may be found particularly in the scholarship of early private international lawyers, also examined in section III, who viewed themselves as working in a single discipline of 'international law'. Rules of private international law can also be understood as partially implementing public international law jurisdictional constraints in the context of private law disputes and relations. This account of jurisdiction has not changed greatly since the nineteenth century – aside from a temporary and regrettable digression into a 'positivist' model of plenary jurisdiction, as discussed in section II – although debates have continued concerning its boundaries, and some of its details have been progressively clarified.

In contrast with this relatively static account of the rules of jurisdiction, international law has changed in fundamental ways during this period, in particular through the rise in recognition and importance of non-state actors, including individuals as bearers of human rights. Arguments are increasingly made that the foundations of international

---

[1] On the relationship between public and private international law, see generally Alex Mills, *The Confluence of Public and Private International Law: Justice, Pluralism and Subsidiarity in the International Constitutional Ordering of Private Law* (CUP 2009).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

law have fundamentally shifted from state sovereignty to a greater concern with 'humanity',[2] or from sovereignty as 'right' to sovereignty as 'responsibility'.[3] As expressed by the International Criminal Tribunal for the former Yugoslavia:

. . . the impetuous development and propagation in the international community of human rights doctrines, particularly after the adoption of the Universal Declaration of Human Rights in 1948, has brought about significant changes in international law, notably in the approach to problems besetting the world community. A State-sovereignty-oriented approach has been gradually supplanted by a human-being-oriented approach. Gradually the maxim of Roman law *hominum causa omne jus constitutum est* (all law is created for the benefit of human beings) has gained a firm foothold in the international community as well.[4]

Private international law has equally undergone dramatic changes in the modern era, not least through a parallel increased recognition of the rights, interests and autonomy of private parties. These developments invite consideration of the question whether jurisdiction in international law itself requires rethinking.

Sections IV and V of this article focus on three main developments in international law, public and private, arguing that they have potentially significant implications for the international law of jurisdiction. First, the growing recognition that states not only have regulatory power in international law, they also have regulatory duties. Second, the increased acceptance that such jurisdictional obligations may in a range of circumstances be owed not only to other states but also to private parties, reflecting the increasing role of individual actors in international law, in particular under the international legal doctrines of denial of justice and access to justice. Third, the related and widely recognised phenomenon of party autonomy, under which private parties have the power to confer jurisdiction on national courts in civil disputes and to choose which law governs their legal relationships. In combination, these developments suggest the necessity of rethinking the concept of jurisdiction in international law, to reflect the more complex realities of an international

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

---

[2] See e.g. Ruti Teitel, *Humanity's Law* (OUP 2011); Anne Peters, 'Humanity as the a and Ω of Sovereignty' (2009) 20 EJIL 513; Fernando R Tesón, 'The Kantian Theory of International Law' (1992) 92 Columbia Law Review 53; Louis B Sohn, 'The New International Law: Protection of the Rights of Individuals Rather Than States' (1982) 32 American University Law Review 1.

[3] See further e.g. 'The Responsibility to Protect', Report of the International Commission on Intervention and State Sovereignty (2001) available at <http://responsibilitytoprotect.org/ICISS%20Report.pdf> accessed 18 August 2014; Kofi Annan, 'Two Concepts of Sovereignty' (1999), The Economist, 16 September 1999 (available at www.economist.com/node/324795) ('States are now widely understood to be instruments at the service of their peoples, and not vice versa. . . . When we read the Charter today, we are more than ever conscious that its aim is to protect individual human beings, not to protect those who abuse them.').

[4] *Prosecutor v Tadić* (Jurisdictional Phase), Appeals Chamber, International Criminal Tribunal for the former Yugoslavia, Decision of 2 October 1995, [97] available at www.icty.org/x/cases/tadic/acdec/en/51002.htm accessed 18 August 2014.

legal order under which states possess both jurisdictional rights and obligations and are no longer the exclusive actors.

## II. THE LOTUS CASE ANOMALY: JURISDICTION AND THE LEGAL LIMITS OF SOVEREIGNTY

Before examining the generally accepted traditional law of jurisdiction, it is important to consider the apparent anomaly of the 1927 decision of the Permanent Court of International Justice in the *Lotus Case*.[5] In that case, the PCIJ (in)famously held that:

Far from laying down a general prohibition to the effect that States may not extend the application of their laws and the jurisdiction of their courts to persons, property or acts outside their territory, it leaves them in this respect a wide measure of discretion which is only limited in certain cases by prohibitive rules; as regards other cases, every State remains free to adopt the principles which it regards as best and most suitable.[6]

This statement appears to suggest that jurisdiction in international law is plenary, but subject to defined prohibitions, rather than being based on limited 'heads'. Some scholars have found creative ways to interpret the statement so that it accords with the generally accepted principles of international jurisdiction, under which jurisdiction is based on limited defined grounds. For example, it has been suggested that it relates only to the plenary nature of territorial jurisdiction, or that it was intended only to suggest that there are a range of grounds for extraterritorial jurisdiction.[7] These interpretations are perhaps assisted by the Court's further conclusion, shortly after the above passage, that:

all that can be required of a State is that it should not overstep the limits which international law places upon its jurisdiction; within these limits, its title to exercise jurisdiction rests in its sovereignty.[8]

Such interpretations do, however, have an air of revisionism about them, and it may reasonably be concluded that the Court's findings cannot be read down so generously. While it should be noted that the decision was adopted by only six out of the twelve judges on the Court, with the President's vote in its favour being decisive, it would, however, equally be wrong to conclude that the Court was simply 'mistaken' in its conclusions, even if its decision was out of step with approaches to international

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

---

[5] *SS 'Lotus' (France v Turkey)* (1927) PCIJ Ser A, No 10.

[6] Ibid, 18-19.

[7] See e.g. F A Mann, 'The Doctrine of Jurisdiction in International Law', in *Studies in International Law* (Clarendon Press, 1973) 27 (previously published in (1964-I) 111 Recueil des Cours 1).

[8] *SS 'Lotus' (France v Turkey)* (1927) PCIJ Ser A, No 10, p.19.

jurisdiction both before[9] and after[10] the judgment. Rather, the decision can best be characterised as the 'high water mark' of a briefly dominant but still highly influential theoretical approach to international law, generally known as international legal positivism.[11]

The origins of this approach are commonly identified in the work of the nineteenth century legal philosopher, John Austin, although they are also (less accurately) associated with his teacher, Jeremy Bentham.[12] Internally, as a matter of domestic law, Austin viewed sovereignty as a question of fact in that the power of the sovereign was above and beyond the law, as the source of all legal authority lay in sovereign commands. Externally, Austin viewed sovereignty as a question of fact in that 'obligations' on the international plane could only derive from the voluntary acts of sovereigns: thus Austin rejected the idea that international law, properly considered, was law.[13]

Although Austin denied that international law was a legal system, an approach to international law nevertheless subsequently developed based on the premises of his approach, viewing international law as a distinct but 'primitive' form of law – the rules voluntarily adopted by and between sovereign states. This theory of international law is generally, although somewhat unfortunately, known as the 'positivist' perspective on international law. The terminology is unfortunate because the name reflects only the claimed methodological approach of those who developed the theory, rather than characterising the theory itself – the claim that their approach was empirical, inductive, and practice-oriented, rather than following the natural law, deductive, theory-oriented approach which had historically dominated thinking in international law. There are of course many who adopt a modern positivist *methodology* to the study of international law (that is, inductive and empirical), without adhering to what is usually described as 'positivist' theory. Indeed it is arguable that any genuinely 'positivist' methodological approach to analysis of the contemporary practice of states is incompatible with the so-called 'positivist' theoretical approach.[14] This is because positivist international law theory can no longer lay claim to

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

---

[9] See e.g. the 1883 Resolution of the Institut de Droit Internationale, 'Règles relatives aux conflits des lois pénales en matière de compétence', available at <http://www.idi-iil.org/idiF/resolutionsF/1883_mun_04_fr.pdf> accessed August 2014; *Nationality Decrees Issued in Tunis and Morocco (Advisory Opinion)* (1924) PCIJ Series B, No. 4.

[10] See also e.g. the 'Draft Convention on Jurisdiction with Respect to Crime' (1935) 29 AJIL Supplement 435; *Barcelona Traction, Light and Power Company* (*Belgium v Spain*) [1970] ICJ 3, 103ff (Separate Opinion of Judge Fitzmaurice).

[11] '[T]he dictum represents the high water mark of laissez-faire in international relations, and an era that has been significantly overtaken by other tendencies': *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal, at [51].

[12] See e.g. MW Janis, 'Jeremy Bentham and the Fashioning of "International Law"' (1984) 78 AJIL 405.

[13] John Austin, *The Province of Jurisprudence Determined* (1832, reprinted Hackett Publishing 1998) 201.

[14] See further Mills, The Confluence of Public and Private International Law, 37ff, 74ff.

being based on observation of current practice. While international legal positivism has tended to describe itself as empirical and anti-theoretical, the reality is that legal positivism itself became a theoretical construct which led to conclusions which were (and are increasingly) out of step with the accepted practice of states.

Although the tradition of positivist international law theory (as distinguished from methodology) may encompass a range of beliefs, it entails a commitment to certain essential ideas. States are viewed as the key actors in international law, and are formally independent, free, equal, and perhaps most importantly 'sovereign'. 'Sovereignty' has of course become a greatly contested term, but the idea of state sovereignty in positivist international law theory is that states possess at least some unrestricted freedoms as an *a priori* consequence of their statehood. This freedom is said to exist 'prior' to the law – thus, positivists argue that international law can only exist where it is a voluntary expression of sovereign will. Consequently, positivism emphasises individual state will as the sole source of legal principles and their authority. As Oppenheim put it in 1905:

The Law of Nations is a law for the intercourse of States with one another...As, however, there cannot be a sovereign authority above the single sovereign states, the Law of Nations is a law between, not above, the single States, and is, therefore, since Bentham, also called 'International Law.'[15]

According to Oppenheim, Bentham's invention of the term 'international law' was more than a semantic innovation in that it implied (correctly, in Oppenheim's view) that the subject concerns only the law which applies *between* sovereign states.

As jurisdiction is closely related to or even 'an aspect of sovereignty',[16] the only limits on jurisdiction which may apply under a traditional positivist theoretical approach are those voluntarily adopted by states themselves. The starting point is that jurisdiction, like sovereignty itself, is plenary and discretionary – the position adopted by the PCIJ in the *Lotus Case*. Again, to put this in Oppenheim's words:

States possessing independence and territorial as well as personal supremacy can naturally extend or restrict their jurisdiction as far as they like.[17]

---

[15] Lassa Oppenheim, *International Law* (1st edn, Longmans Green & Co 1905) Chapter 1, s.1.

[16] James Crawford, *Brownlie's Principles of Public International Law* (8th edn, OUP 2012) 456. See similarly D W Bowett, 'Jurisdiction: Changing Patterns of Authority Over Activities and Resources' (1982) 53 BYIL 1, 1, describing jurisdiction as 'a manifestation of State sovereignty'.

[17] Oppenheim, International Law, Chapter 1, s.143. Even Oppenheim, however, followed this by stating that 'as members of the Family of Nations and International Persons, the States must exercise self-restraint in the exercise of this natural power in the interest of one another', and (implicitly recognising the disparity between the 'positivist' perspective and accepted practice) went on to treat jurisdiction as based strictly on territoriality and nationality (with the exception of piracy), arguing that even passive personality was an impermissible extension of jurisdiction.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

This 'positivist' conception of sovereignty as an *a priori* value, above international law, has fairly been described as 'the quicksand on which the foundations of traditional international law are built'.[18] Because jurisdiction is an aspect of this *a priori* sovereignty, this approach means that the overlap between the regulatory powers of states is equally unlimited – leaving resolution of conflicting jurisdictions to extra-legal factors, principal among which will be the relative power of the concerned states.

If the positivist idea of sovereignty was ever tenable – and there is good reason to doubt that it ever was – this is no longer the case. International law scholars have increasingly taken the view that the term 'sovereignty' means all and only those attributes which are given to a state under international law – descriptive of the scope of state freedom as a legal rather than factual matter.[19] Sovereignty, in this conception, does not define, but is defined by, the legal powers of a state within an international society of states. It does not exist prior to law, but as a set of attributes of the legal construct that is the state, existing as a consequence of law. As one scholar expressed it, sovereignty is nothing more or less than 'the legal competence which states have in general'.[20] Even Oppenheim's text on international law reflects this position in its modern version, in a manner which is irreconcilable with the first edition, stating as follows:

There is...increasing acceptance that the rules of international law are the foundation upon which the rights of states rest, and no longer merely limitations upon states' rights which, in the absence of a rule of law to the contrary, are unlimited. Although there are extensive areas in which international law accords to states a large degree of freedom of action...it is important that freedom is derived from a legal right and not from an assertion of unlimited will, and is subject ultimately to regulation within the legal framework of the international community.[21]

Under this conception of sovereignty as a *product of* (and not *prior to*) law, the regulatory authority of states in international law is recognised as the product of, and subject to, limits defined by public international law rules of jurisdiction – indeed, this recognition also existed prior to the *Lotus Case* and the era of positivist theory. The rules of international jurisdiction authorise an exercise of regulatory authority in limited and defined circumstances – an authorisation which can only be necessary because a regulatory act would be prohibited in its absence. This is not to deny that there may be additional limiting rules on jurisdiction

---

[18] Philip C Jessup, *A Modern Law of Nations* (Macmillan 1948) 2.

[19] Thus, 'we can only know which states are sovereign, and what the extent of their sovereignty is, when we know what the rules are' – HLA Hart, *The Concept of Law* (2nd edn, Clarendon 1994) 223.

[20] Ian Brownlie, *Principles of Public International Law* (7th edn, OUP 2008) 291.

[21] Robert Jennings and Arthur Watts, *Oppenheim's International Law* (9th edn, vol. 1, OUP 1992) 12.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

('prohibitive rules', to use the expression from the *Lotus Case*): international law recognises a range of immunities and restrictions which limit the exercise of what would otherwise be lawful jurisdiction. It is also not to deny that overlapping jurisdiction remains under these rules; the overlap is, however, defined and limited by international law.

## III.   THE MODERN INTERNATIONAL LAW OF JURISDICTION: LIMITED RIGHTS OF STATES

This section introduces the 'standard' account of jurisdiction in international law, under which state power is generally conditioned on the existence of a territorial or personal connection that is considered to justify the imposition of a state's regulatory authority, as a matter of state discretion. It first considers the contours of these rules in public international law, before turning to examine their close but perhaps under-appreciated relationship with rules of private international law.

### *A. Public international law*

In public international law, the 'sovereignty' of states has (despite *Lotus*) become understood to be reflected in and constrained by rules of jurisdiction which define the limits of the powers of coexisting 'sovereigns', in particular, the scope of regulatory authority of states in international law. In public international law the term jurisdiction is used in a much broader sense than it is used domestically or in private international law, essentially encompassing any exercise of regulatory power – although the general domestic sense of 'jurisdiction', relating specifically to the powers of courts, is also (somewhat confusingly) used in international legal scholarship to discuss the distinct issue of the regulatory power of international courts and tribunals, which is not the subject of this article.[22]

In the context of the rules on the regulatory authority of states, three types of public international law jurisdiction are usually distinguished.[23] These may overlap and thus the distinction is not always easy to

---

[22] The concept of 'jurisdiction' in the field of human rights law has also developed its own independent meaning, not considered in this article, which recognises that states may have extraterritorial human rights obligations based on effective control over territory or persons. A state in unlawful occupation of territory may thus be subject to jurisdictional *obligations* under human rights law, even though it lacks jurisdictional *rights* as a matter of general international law. See generally e.g. Marko Milanovic, *Extraterritorial Application of Human Rights Treaties: Law, Principles, and Policy* (OUP 2011).

[23] See generally Christopher Staker, 'Jurisdiction', in Malcolm D. Evans (ed), *International Law* (4th edn, OUP 2014); Crawford, Brownlie's Principles of Public International Law, 456; *Third Restatement (Foreign Relations)* (1986) s.401; F A Mann, 'The Doctrine of Jurisdiction Revisited After Twenty Years' (1984-III) 186 Recueil des Cours 19; Mann, The Doctrine of Jurisdiction in International Law; Michael Akehurst, 'Jurisdiction in International Law' (1972-3) 46 BYIL 145.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

maintain, nor is it universally accepted as reflecting international law, but it nevertheless represents the generally accepted foundation of the modern approach. The first type of jurisdiction is jurisdiction to pre-scribe or legislate, or (roughly) the limits on the law-making powers of government – the permissible scope of application of the laws of each state.[24] The second is jurisdiction to adjudicate, or (roughly) the limits on the powers of the judicial branch of government.[25] Although some international lawyers have questioned the need for a separate category of 'adjudicative jurisdiction', few if any would maintain that adjudicative jurisdiction is unregulated in international law – rather, it can be argued that the conduct of the judiciary may be characterised as either prescrip-tive (if the judge is participating in law-making, including through interpretation of the scope of application of the law or development of a common law system) or enforcement (if the judge is ordering the seiz-ure of a person or assets).[26] The third is jurisdiction to enforce, or (roughly) the limits on the executive branch of government responsible for implementing law, such as law enforcement agencies.[27] Enforcement jurisdiction is, in international law, almost exclusively territorial – the police or similar forces of a given state may only operate within its territory (including its coastal waters), in the absence of the authorisation of other states or a special permissive rule under international law.[28]

The territorial character of enforcement jurisdiction is well estab-lished, and an important reflection of the principle of non-intervention in the internal affairs of other states. This article does not suggest any need to re-examine this aspect of international jurisdiction, but rather focuses on jurisdiction to prescribe and to adjudicate (excluding the enforcement aspects of adjudication). It should be noted, however, that while these aspects of jurisdiction are theoretically distinct, they are not necessarily unrelated in practice – restrictions on the possibility of effectively enforcing national laws or judgments might, for example, be taken into consideration by a national legislature or court in deter-mining whether to exercise prescriptive or adjudicative jurisdiction. A state might, for example, have a policy against criminal proceedings

[24] These may be exercised by any law-making body, which may include the legislature, judiciary, or executive. See e.g. *Third Restatement (Foreign Relations)* (1986) ss.402-403.

[25] See e.g. *Third Restatement (Foreign Relations)* (1986) ss.421-423.

[26] See further e.g. Roger O'Keefe, 'Universal Jurisdiction: Clarifying the Basic Concept' (2004) 2 Journal of International Criminal Justice 735, 737.

[27] The definition of enforcement jurisdiction in the *Third Restatement (Foreign Relations)* (1986) s.431 is somewhat broader than this, encompassing also local measures designed to induce a foreign party into compliance. It therefore does not view such measures as strictly territorial in application, although it does not contemplate enforcement action taking place outside the territory. See *infra* n 39 and accompanying text.

[28] A well-known illustration of permission to enforce extra-territorially is the Scottish criminal trial which took place on Dutch territory following the Lockerbie bombing, authorised under the Agreement between the Government of the Kingdom of the Netherlands and the Government of the United Kingdom of Great Britain and Northern Ireland concerning a Scottish Trial in the Netherlands, 24 August 1998, UKTS No. 43 (1999). See further discussion in O'Keefe, Universal Jurisdiction, 740.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

*in absentia*, because an exercise of prescriptive jurisdiction in the absence of the possibility of enforcement jurisdiction may be considered futile. But the distinction between the categories of jurisdiction remains important, even if it is not always clearly recognised in practice.[29] In relation to civil disputes, prescriptive and adjudicative jurisdiction are also addressed through rules of private international law, as discussed further below. Questions of jurisdiction in the public international law sense are implemented in private international law both through rules of 'jurisdiction' (in the domestic sense) – determining when a court will hear a case and thus exercise its prescriptive (and enforcement) powers – and through rules of 'choice of law' – determining which law should govern a dispute and thereby the scope of application of that law.

The boundaries of public international law prescriptive jurisdiction are a matter of some controversy, but there is broad agreement on the general framework. Principally, states are recognised as having prescriptive jurisdiction based on one of two types of connecting factors – territoriality, reflecting the intimate connection between territorial control and statehood in international law, and nationality, reflecting ideas of individual subjectivity to sovereign power.[30] Arguments have also been made for jurisdiction regarding matters of essential national interest,[31] and for universal jurisdiction in respect of matters which are of fundamental concern to the international community as a whole,[32] although many of these remain somewhat controversial.[33]

The primary source of regulatory authority for states in public international law is usually considered to be territorial. A state has jurisdiction to regulate within its territory, including in respect of events, persons or things in its territory (including cross-border events which are only partially in its territory[34]), and, more controversially, external acts which have 'effects' within its territory.[35] As noted above,

[29] See further O'Keefe, Universal Jurisdiction.

[30] See e.g. Staker, Jurisdiction, 313ff; Crawford, Brownlie's Principles of Public International Law, 458ff; *Third Restatement (Foreign Relations)* (1986) s.402; Bowett, Jurisdiction: Changing Patterns of Authority, 4ff; Akehurst, Jurisdiction in International Law, 152ff.

[31] See e.g. Staker, Jurisdiction, 321; Crawford, Brownlie's Principles of Public International Law, 462; *Third Restatement (Foreign Relations)* (1986) s.402(3); Bowett, Jurisdiction: Changing Patterns of Authority, 10; Akehurst, Jurisdiction in International Law, 157ff; see further *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, Separate Opinion of President Guillaume, at [6].

[32] Staker, Jurisdiction, 322; Crawford, Brownlie's Principles of Public International Law, 467ff; *Third Restatement (Foreign Relations)* (1986) s.404; Bowett, Jurisdiction: Changing Patterns of Authority, 11; Akehurst, Jurisdiction in International Law, 16off.

[33] See e.g. O'Keefe, Universal Jurisdiction; *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, particularly the Separate Opinion of President Guillaume and the Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal.

[34] A distinction is often drawn between 'subjective' territorial jurisdiction, which is based on the location of the 'subject' of an act (the actor), and 'objective' territorial jurisdiction, which is based on the location of the 'object' of the act – both are generally recognised under international law.

[35] See generally Staker, Jurisdiction, 317-8; Crawford, Brownlie's Principles of Public International Law, 462ff; Austen Parrish, 'The Effects Test: Extraterritoriality's Fifth Business'

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

territoriality particularly dominates in the context of jurisdiction to enforce, where it is normally considered to be the exclusive basis for jurisdiction in the absence of special consensual arrangements. In the context of jurisdiction to prescribe or adjudicate, territoriality is supplemented by other bases of jurisdiction (including as discussed below), but the dominant way in which state authority is defined and justified, that is, by which the division of international regulatory authority is organised, is by reference to territorial criteria. The idea that territoriality should be the main basis of jurisdiction is often reflected in a domestic legal presumption against the extraterritorial application of legislation, re-articulated by the US Supreme Court in *Morrison v National Australia Bank* (2010)[36], although a broader presumption against 'extra-jurisdictionality' (presuming that the reach of domestic legislation comports with international law limits) is also sometimes applied.[37] The primacy of territorial regulation is coming under challenge as a result of (arguably) 'de-territorialised' communications technologies, in particular the internet, although the extent to which such developments pose more than a complex problem of application for the existing legal framework remains contentious.[38] Another important challenge for jurisdictional rules, beyond the scope of this article, is where a state uses territorial rules to project its regulatory power extraterritorially in a more 'informal' way – for example, by making access to local markets conditional on compliance with certain norms.[39]

(2008) 61 Vanderbilt Law Review 1455; *Third Restatement (Foreign Relations)* (1986) s.402(1); Akehurst, Jurisdiction in International Law, 153ff. Effects jurisdiction may in many cases be more simply viewed as an example of objective territorial jurisdiction – a price fixing agreement outside the United States between companies exporting goods to the United States may be regulated under US law if it is directed to raising prices for goods within US territory. The doctrine is, however, sometimes viewed as permitting jurisdiction over foreign events with only indirect consequences in the United States, and in this form it would be an expansion of traditionally accepted objective territorial jurisdiction.

[36]  561 US 247 (2010). The presumption was controversially applied to the Alien Tort Statute in the case of *Kiobel v Royal Dutch Petroleum*, 569 US ___, 133 S.Ct. 1659 (2013). See further e.g. Mann, The Doctrine of Jurisdiction in International Law, 21ff.

[37]  This is part of a broader presumption of compliance with international law (known in the United States as the 'Charming Betsy doctrine', after *Murray v The Charming Betsy*, 6 US (2 Cranch) 64 (1804)), which includes compliance with the jurisdictional rules of international law. The presumption against extra-jurisdictionality was clearly expressed in Story J's judgment in *The Appollon*, 22 US 362 (1824), which held (at 370) that 'however general and comprehensive the phrases used in our municipal laws may be, they must always be restricted in construction to places and persons, upon whom the legislature has authority and jurisdiction'. See further e.g. John H Knox, 'A Presumption against Extrajurisdictionality' (2010) 104 AJIL 351; *United States v Aluminum Co. of America*, 148 F 2d 416, 443 (1945); *United States v Palmer*, 16 US 610, 631 (1818) ('general words must … be limited to cases within the jurisdiction of the state').

[38]  See generally e.g. Mills, The Confluence of Public and Private International Law, 244ff (with numerous further references); Paul Schiff Bermann, 'The Globalization of Jurisdiction' (2002) 151 University of Pennsylvania Law Review 311; David R. Johnson and David G. Post, 'Law and Borders – The Rise of Law in Cyberspace' (1996) 48 Stanford Law Review 1367.

[39]  See further Joanne Scott, 'Extraterritoriality and Territorial Extension in EU Law' (2014) 62 American Journal of Comparative Law 87.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

40

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Although international law rules on jurisdiction are traditionally dominated by ideas of territoriality, there is also a strong role for ideas and rules which are based on the personal identity of the parties, generally through nationality. Under this approach, state regulatory power is viewed as connected not with territorial control but with the relationship between an individual (typically as a subject) and a sovereign. This conception of jurisdiction thus implies that state authority does not end at the national border, but attaches to people and effectively travels with them. Where one state's citizens are in the territory of a foreign state, international law thus clearly recognises and accepts the possibility of overlapping (and even inconsistent) jurisdiction, but that possibility is at least minimised by requiring a territorial or nationality basis for the exercise of jurisdiction.

The most straightforward aspect of nationality-based jurisdiction is the public international law rule that a state may exercise jurisdiction over the conduct of its nationals, regardless of their territorial location (sometimes referred to as the 'active personality' doctrine).[40] Such jurisdiction is typically exercised in the context of criminal law, where a state criminalises conduct by its nationals (who may be natural or legal persons) regardless of where its acts take place.[41] The power to regulate nationals extra-territorially is, however, usually only exercised in the context of particularly serious crimes – suggesting a degree of deference to the primacy of territorial jurisdiction. Jurisdiction based on nationality is also evident in the assertion by some states (most prominently, the United States) of a right to tax nationals living and working outside the territory of the state.[42]

The connecting factor of nationality also operates as a basis for jurisdiction in international law through the doctrine of 'passive personality'.[43] This is the rule that a state may assert regulatory authority in protection of its own nationals, for example, in respect of crimes committed or directed *against* its nationals by foreigners outside its

---

[40] See generally Staker, Jurisdiction, 318; Crawford, Brownlie's Principles of Public International Law, 459-60; *Third Restatement (Foreign Relations)* (1986) s.402(2); Bowett, Jurisdiction: Changing Patterns of Authority, 7ff; Akehurst, Jurisdiction in International Law, 156ff.

[41] See e.g. Offences Against the Person Act 1861 (UK) ss.9, 57; Sexual Offenders Act 1997 (UK) s.7; Anti-terrorism, Crime and Security Act 2001 (UK) s.109 (extending prescriptive jurisdiction where 'a national of the United Kingdom or a body incorporated under the law of any part of the United Kingdom [commits a corruption offence] in a country or territory outside the United Kingdom'); Crimes (Child Sex Tourism) Act 1994 (Australia). Some states have also asserted extra-territorial jurisdiction in relation to crimes committed by their permanent residents – see e.g. Akehurst, Jurisdiction in International Law, 156-7.

[42] *Third Restatement (Foreign Relations)* (1986) ss.411-12.

[43] See e.g. Staker, Jurisdiction, 326ff; Crawford, Brownlie's Principles of Public International Law, 461; *Third Restatement (Foreign Relations)* (1986) s.402(2) (see further Comment (g) and Reporters' Note 3); O'Keefe, Universal Jurisdiction, 739.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

territory.[44] Such an entitlement has traditionally been controversial, but has been increasingly accepted by states, particularly in the context of acts of terrorism which essentially target a state through targeting its nationals.[45]

These different aspects of the public international law rules on jurisdiction have two key criteria in common. First, they all recognise that jurisdiction is limited by positive grounds, and thus that an act of regulation must be justifiable based on a positive rule conferring jurisdiction. This contrasts with the approach under the *Lotus Case*, discussed above, in which only the 'absence of a prohibition' is required for a regulatory act to be lawful. Second, they treat jurisdiction as a question of state power and right. The state is the exclusive agent recognised in these rules, and within the boundaries they define (the permitted territorial or personal justificatory criteria), the exercise of jurisdiction is entirely a matter left to the discretion of each individual state – 'Jurisdiction involves a State's *right* to exercise certain of its powers'.[46]

The various grounds of jurisdiction recognised in public international law clearly accept the possibility of overlapping regulation – not only where a state's citizens are in a foreign territory, but also, for example, where more than one state might have territorial jurisdiction (one 'subjective', and one 'objective'), or where more than one state might have personality jurisdiction (one 'active', and one 'passive'). It is clear that this reflects a collective policy decision by states that there are situations in which more than one state has a legitimate regulatory interest which should be recognised as compatible with international law. Potentially overlapping and even conflicting regulation[47] is thus simply a part of the reality of international law, albeit one which is much more limited under

---

[44] Note e.g. the Comprehensive Crime Control Act (1984) 18 USC 1203 (US); Omnibus Diplomatic Security and Antiterrorism Act (1986) 18 USC 2332 (US); Criminal Code Amendment (Offences Against Australians) Act 2002 (Australia).

[45] See e.g. International Convention for the Suppression of Terrorist Bombings (1997) Art 6(2)(a). The Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal in *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3 notes (at [47]) that 'Passive personality jurisdiction, for so long regarded as controversial, is now reflected . . . in the legislation of various countries . . . and today meets with relatively little opposition, at least so far as a particular category of offences is concerned.'

[46] Mann, The Doctrine of Jurisdiction in International Law, 3 (emphasis in original). Similarly, '[A] State is not required to legislate up to the full scope of the jurisdiction allowed by international law' – *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal, at [45].

[47] Differing views may be taken on what is necessary for two regulations to 'conflict'. The most strict approach is that a conflict only exists where it is impossible to comply with two sets of rules. Such an approach, however, tends not to acknowledge sufficiently that the decision to impose limited or even no regulation on a particular field may itself be a regulatory decision – the absence of regulation from one state may reflect a policy in favour of *non-regulation* or *deregulation*, which may indeed come into conflict with *any* regulation from another state, even though compliance with both sets of rules would be perfectly possible. A conflict of 'regulation' therefore does not necessarily require a direct conflict between 'rules'. There is a related and equally mistaken tendency in US 'interest analysis' approaches to private international law to consider that there is never a true 'conflict of laws' where only one state has sought to regulate an issue. See further Alex Mills, 'The Identities of Private International Law – Lessons from the US and EU Revolutions' (2013)

accepted jurisdictional rules than it would be under the *Lotus Case* approach. This is not to deny that overlapping jurisdiction may be problematic, and that it would be helpful to develop principles of priority in such cases. One such potential principle is the rule of 'reasonableness' which is accepted as part of US law, but not widely accepted as part of international law, which requires comparing the strength of connections which a person or activity has to different states, before determining which state might most 'reasonably' impose its regulatory authority.[48]

## B. *Private international law*

As noted above, matters of 'jurisdiction' in the public international law sense are implemented in the field of private legal relations through rules of private international law, including both rules of 'jurisdiction' – determining when a court will hear a case – and rules of 'choice of law' – determining which law governs a disputed issue and thereby the scope of application of that law. The connection between public and private international law was obscured around the beginning of the 20th century by the focus in public international law on inter-state relations, and the focus in private international law on private rights and interests.[49] As the scope of public international law has increasingly encompassed the regulation of the relationship between states and individuals, there has also been increasing recognition of the functional and doctrinal overlap between public and private international law – that private international law constitutes a hidden ('private') dimension of international law.[50]

Although the existence of public international law limits on the exercise of jurisdiction or the application of a particular law in civil

---

23 Duke Journal of Comparative and International Law 445, 459, 467; Brainerd Currie, *Selected Essays on the Conflict of Laws* (Duke University Press 1963).

⁴⁸ *Third Restatement (Foreign Relations)* (1986) s.403; see further e.g. Cedric Ryngaert, *Jurisdiction in International Law* (OUP 2008); Bowett, Jurisdiction: Changing Patterns of Authority, 14ff.

⁴⁹ See generally Mills, The Identities of Private International Law.

⁵⁰ See generally Mills, The Confluence of Public and Private International Law, Chapter 5; Alex Mills, 'Rediscovering the Public Dimension of Private International Law' [2011] Hague Yearbook of International Law; (2012) 30 The Netherlands Journal of Private International Law, Nederland Internationaal Privaatrecht (NIPR) 371. See further e.g. Lucy Reed, 'Mixed Private and Public Law Solutions to International Cases' (2003) 306 Recueil des Cours 177; Pascal Vareilles-Sommières, *La Compétence Internationale de L'État en Matière de Droit Privé* (LGDJ 1997); Andrew L Strauss, 'Beyond National Law: The Neglected Role of the International Law of Personal Jurisdiction in Domestic Courts' (1995) 36 Harvard International Law Journal 373; Campbell McLachlan, 'The Influence of International Law on Civil Jurisdiction' (1993) 6 Hague Yearbook of International Law 125; Mann, The Doctrine of Jurisdiction Revisited After Twenty Years, 28; Harold G Maier, 'Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law' (1982) 76 AJIL 280; A F Lowenfeld, 'Public law in the international arena: conflict of laws, international law, and some suggestions for their interaction' (1979-II) 163 Recueil des Cours 311; Mann, The Doctrine of Jurisdiction in International Law, 10ff; John R Stevenson, 'The Relationship of Private International Law to Public International Law' (1952) 5 Columbia Law Review 561.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

proceedings has occasionally been doubted,[51] there is little in practice or policy to support the idea that an assertion of jurisdiction or governing law in civil proceedings is anything other than an exercise of state regulatory power which falls to be restricted by public international rules on jurisdiction. The application of private law, no less than public law, constrains and compels individual behaviour in pursuit of national policy interests, and is ultimately backed up by the coercive power of the state. The seizure of property to pay a debt is not characteristically distinct from the seizure of property to pay a fine or tax; the choice by a state to deal with, for example, defamation or competition law through either criminal law or private law, a practice which varies significantly, does not affect the fact that in either case the rules are performing an important public regulatory function.[52] While it is sometimes argued that state practice suggests a lack of 'interest' in the jurisdictional rules applicable to civil disputes, there are clear examples of such interventions,[53] and a lack of sufficient governmental interest to intervene in specific cases should not be mistaken for a lack of state concern with the effectiveness of its law and courts.

The efforts toward the international harmonisation of private international law through treaties, spearheaded by the Hague Conference on Private International Law,[54] should be taken to reflect rather than deny an underlying and deeper connection between public and private international law.[55] Such efforts are more analogous to the codification of

[51] See e.g. Akehurst, Jurisdiction in International Law, 177, 182; for further examples see e.g. Mann, The Doctrine of Jurisdiction in International Law, 14.

[52] See e.g. Bowett, Jurisdiction: Changing Patterns of Authority, 2 ('the formalistic labelling of certain proceedings as criminal, and others as civil, simply conceals the similarity in nature and purpose of the different legislative provisions'). Bowett, however, problematically suggests that public international law jurisdictional restraints should not apply to 'areas of civil jurisdiction concerned solely with the enforcement of private rights' (at 4), failing to recognise the well-known (in private international law) circularity of such a 'vested rights' approach, which arises from the fact that (unless the rights derive from an international or supranational source) it is national law which determines whether such private rights in fact exist – itself a question of state public policy. See further e.g. Mills, The Confluence of Public and Private International Law, 57; Mills, The Identities of Private International Law, at 450ff.

[53] For a recent example see e.g. the *amicus* submissions of the European Commission and (jointly) the United Kingdom and the Netherlands in the *Kiobel* case, *infra* n 165 and n 166. See further e.g. Uta Kohl, 'Corporate Human Rights Accountability: The Objections of Western Governments to the Alien Tort Statute' (2014) 63 ICLQ 665; Roger O'Keefe, 'Domestic Courts as Agents of Development of the International Law of Jurisdiction' (2013) 26 Leiden Journal of International Law 541, 551ff; Mills, The Confluence of Public and Private International Law, 262ff; Joseph Halpern, '"Exorbitant Jurisdiction" and the Brussels Convention: Toward a Theory of Restraint' (1983) 9 Yale Journal of World Public Order 369; L I De Winter, 'Excessive Jurisdiction in Private International Law' (1968) 17 ICLQ 706; Kurt H. Nadelmann, 'Jurisdictionally Improper Fora', in HE Yntema et al. (eds), *Twentieth Century Comparative and Conflicts Law - Legal Essays in Honor of Hessel E. Yntema* (A W Sijthoff, 1961), 321.

[54] See further generally www.hcch.net.

[55] See further e.g. Mills, The Confluence of Public and Private International Law, 215ff; Alex Mills and Geert de Baere, 'TMC Asser and Public and Private International Law: The life and legacy of "a practical legal statesman"' (2011) 42 Netherlands Yearbook of International Law 3.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

rules of state immunity[56] (an area of international law which has similarly been developed principally through the practice of national courts and legislatures[57]) than, for example, the harmonisation of rules of national contract law (which do not possess a similar underlying international character). Rules of private international law are national in their source, but nevertheless directly affect a state's compliance with its international obligations.

Whether or not an exercise of jurisdiction (in the international sense) is permitted or compelled by *national* rules of private international law, the question which generally concerns domestic courts, must of course be carefully distinguished from the question of whether such an exercise of jurisdiction is permitted as a matter of *international* law. National courts may take a range of distinct policy considerations into account in determining whether domestic 'jurisdiction' may or should be exercised, including factors which are not reflected in international rules of jurisdiction. Domestic law might even compel a national court to breach international limits, giving rise to non-compliance with international law. But the presence of additional domestic considerations does not deny the relevance of international limits, and the existence of those limits has shaped and continues to shape national rules of private international law.

Rules of private international law were in fact one of the most important foundations for the development of international law's rules on jurisdiction, reflecting the historical interdependence of public and private international law.[58] The idea of territoriality was expressed, for example, in the first two 'maxims' of the Dutch eighteenth century private international law scholar Ulrich Huber:

(1) The laws of each state have force within the limits of that government and bind all subject to it, but not beyond.
(2) All persons within the limits of a government, whether they live there permanently or temporarily, are deemed to be subjects thereof.[59]

This approach viewed territoriality as the sole connecting factor which would justify the exercise of jurisdiction, subsuming the idea of the

---

[56] For example, under the United Nations Convention on the Jurisdictional Immunity of States and Their Property (2004) (Adopted by the General Assembly of the United Nations on 2 December 2004. Not yet in force. See General Assembly resolution 59/38, annex, Official Records of the General Assembly, Fifty-ninth Session, Supplement No. 49 (A/59/49).).

[57] This phenomenon may be analysed as an example of horizontal 'peer governance' – see further Alex Mills, 'Variable Geometry, Peer Governance, and the Public International Perspective on Private International Law', in Diego Fernandez Arroyo and Horatia Muir Watt (eds), *Private International Law as Global Governance* (OUP forthcoming 2014).

[58] See further e.g. Alex Mills, 'The Private History of International Law' (2006) 55 ICLQ 1; Mills, The Confluence of Public and Private International Law, Chapter 2; Mann, The Doctrine of Jurisdiction in International Law, 16ff.

[59] Cited and translated in Ernest G Lorenzen, 'Huber's De Conflictu Legum' (1919) 13 Illinois Law Review 375, 403.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

'subject' (national) within the concept of living permanently or temporarily within the (territorial) limits of a government.

The influence of territoriality is as pervasive in private international law as it is in public international law, although subject to the same possible challenges in light of de-territorialised communications technologies.[60] The accepted grounds for the exercise of jurisdiction or application of law in private law disputes before national courts are predominantly territorial, although these can take a number of different forms.[61] While territoriality is behind a variety of private international law rules, these rules may thus reflect a range of interpretations of what territoriality means in practice and in different contexts, and different views on the extent to which legislatures should decide these questions generally or leave them to the courts to resolve on a case by case basis.

Traditional approaches to 'jurisdiction' in private international law, referring to the adjudicatory power of national courts, have also at least principally conceived of jurisdiction as a question of territorial power and right for each state, like the approach taken in public international law (as analysed in the previous section). Perhaps the most obvious (and controversial) example of this idea of 'jurisdiction as power' is found in the common law approach, under which a party who is physically present in the territory at the time proceedings are commenced against them is thereby considered to be potentially subject to the jurisdiction of the courts.[62] Jurisdiction is, in this conception, both a question of (territorial) control over the person of the defendant,[63] as well as a matter of state right, as such an assertion of jurisdiction is a matter of discretion for the courts, exercised through the doctrine of *forum non conveniens*.[64] This approach is, however, rightly considered to be controversial, because the mere presence of the defendant subsequent to an alleged wrong does not necessarily establish any connection between the dispute or defendant and the territory which would support the exercise of jurisdiction as a matter of public international law.[65] Jurisdiction based on presence in

---

[60] See generally e.g. Thomas Schultz, 'Carving up the Internet: Jurisdiction, Legal Orders, and the Private/Public International Law Interface' (2008) 19 EJIL 799; Andrea Slane, 'Tales, Techs, and Territories: Private International Law, Globalization, and the Legal Construction of Borderlessness on the Internet' (2008) 71 Law and Contemporary Problems 129.

[61] See further generally Mills, The Confluence of Public and Private International Law, 236ff.

[62] See classically e.g. *Maharanee of Baroda v Wildenstein* [1972] 2 QB 283; in the US see e.g. *Burnham v Superior Court of California*, 495 US 604 (1989); *Grace v MacArthur*, 170 F Supp 442 (1959) (in which presence in State airspace was considered sufficient to found territorial jurisdiction). Mere presence would, however, no longer be considered to satisfy constitutional due process limits on the exercise of jurisdiction in the United States.

[63] The term 'jurisdiction' is even sometimes used to mean simply 'territory' – for the purposes of the Civil Procedure Rules of the English courts, according to the definition in Part 2, '"jurisdiction" means, unless the context requires otherwise, England and Wales and any part of the territorial waters of the United Kingdom adjoining England and Wales'.

[64] See classically e.g. *The Spiliada* [1987] AC 460.

[65] See Crawford, Brownlie's Principles of Public International Law, 474-5; Mills, The Confluence of Public and Private International Law, 237ff. Note also the ALI/UNIDROIT Principles of Transnational Civil Procedure, adopted in 2004, available at <http://www.unidroit.

this way is an anachronistic product of the fact that the presence of the defendant was historically necessary to permit civil jurisdiction under the common law, because such jurisdiction was based on the physical seizure of the person of the defendant. The issue has, however, reduced in significance because in practice, through the doctrine of *forum non conveniens*, jurisdiction based on bare presence will not generally be exercised.

Other less controversial common law territorial grounds for jurisdiction (in the private international law sense) include claims 'for an injunction ordering the defendant to do or refrain from doing an act within the jurisdiction', or 'in respect of a breach of contract committed within the jurisdiction', or 'in tort where … damage was sustained within the jurisdiction; or … resulted from an act committed within the jurisdiction'.[66] Jurisdiction may be exercised where a dispute concerns moveable or immovable property in the territory,[67] but (regardless of other connections) may generally not be exercised where a dispute directly concerns title to foreign immovable property.[68] The territorial connection which is recognised and relied on in each of these rules is based on the subject-matter of the dispute, similar to the grounds of 'specific jurisdiction' under US law,[69] and similar territorial bases of jurisdiction are also commonly recognised under civil law systems.[70] A different form of territorial jurisdiction, usually referred to as 'general jurisdiction', arises where the power to regulate the defendant is based on their being 'present',[71] 'domiciled',[72] 'resident',[73] or 'at home'[74] in the territory. This jurisdiction is based on the connection between the defendant (rather than the dispute) and the territory, and may extend to the defendant's extraterritorial activities. Choice of law rules – reflecting principles of prescriptive jurisdiction – also frequently rely on territorial

org/instruments/transnational-civil-procedure> accessed August 2014, which state (in Comment P-2B) that 'Mere physical presence as a basis of jurisdiction within the American federation has historical justification that is inapposite in modern international disputes.'

[66] Civil Procedure Rules, Practice Direction 6B, Rule 3.1(2), (7) and (9). 'Jurisdiction' in this context is defined to mean 'territory'.

[67] Civil Procedure Rules, Practice Direction 6B, Rule 3.1(11).

[68] *British South Africa Co. v Companhia de Moçambique* [1893] AC 602; see similarly the French Code of Civil Procedure, Article 44; Council Regulation (EC) No 44/2001 of 22 December 2000 on Jurisdiction and the Recognition and Enforcement of Judgements in Civil and Commercial Matters, EU OJ L 12, 16 January 2001 (henceforth, 'Brussels I Regulation (2001)'), Article 22.

[69] *J. McIntyre Machinery, Ltd. v Nicastro*, 564 US ___, 131 S. Ct. 2780 (2011); *Burger King Corp. v Rudzewicz*, 471 US 462 (1985).

[70] See e.g. the French Code of Civil Procedure, Article 46.

[71] *Adams v Cape Industries* [1990] Ch 433.

[72] Brussels I Regulation (2001), Articles 2, 59 and 60.

[73] See e.g. the French Code of Civil Procedure, Articles 42-43.

[74] *Goodyear Dunlop Tires Operations, S.A. v Brown*, 564 US ___, 131 S. Ct. 2846 (2011); *Daimler AG v Bauman*, 134 S. Ct. 746 (2014). The *Bauman* decision is concerned with the constitutional limits of jurisdiction under Due Process, rather than the grounds for jurisdiction, but in practice the two questions are conflated in the case because Californian courts (like those of many other US states) 'may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States' – California Code of Civil Procedure §410.10.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

connecting factors to determine the law which governs a private law relationship, such as applying the law of the place of an alleged tort (the *lex loci delicti*),[75] or the law of the location of movable or immovable property (the *lex situs*).[76]

Huber's strictly territorial approach to jurisdiction was, however, somewhat out of step with the practice of states – at least since the medieval period it had been recognised that states could pass 'personal' laws which purported to affect their subjects extraterritorially[77] – and short-lived as a theoretical construct. His maxims were modified in the work of Joseph Story in the early nineteenth century, who instead proposed the following foundations for the law of international jurisdiction:

the laws of one country can have no intrinsic force ... except within the territorial limits and jurisdiction of that country. They can bind only its own subjects, and others, who are within its jurisdictional limits; and the latter only while they remain there.[78]

This did not quite exclude the possibility of extraterritorial regulation which might purport to affect a state's own nationals – it is only regulation of non-subjects which is strictly territorial in this formulation. Story's maxims of private international law were, correspondingly, a subtle modification of Huber:

every nation possesses an exclusive sovereignty and jurisdiction within its own territory;[79]
...
no state or nation can, by its laws, directly affect, or bind property out of its own territory, or persons not resident therein;[80]
...
every nation has the right to bind its own subjects by its own laws in every other place[81]

These rules set out the very clearly recognisable foundations of the modern law of jurisdiction in international law, which accepts both territorial and nationality-based prescriptive regulation (although it is notable that Story's maxims do not precisely distinguish jurisdiction based on nationality and residence).

---

[75] For example, Regulation (EC) No 864/2007 of the European Parliament and of the Council on the law applicable to non-contractual obligations (Rome II), EU OJ L 199, 31 July 2007 (henceforth, 'Rome II Regulation (2007)'), Art.4(1).

[76] See e.g. *Winkworth v Christie, Manson & Woods* [1980] Ch 496; *Glencore International A/G v Metro Trading* [2001] All ER (Comm) 103; *French Civil Code*, Article 3.

[77] See further e.g. Mills, The Confluence of Public and Private International Law, 32ff.

[78] Joseph Story, *Commentary on the Conflict of Laws* (Hilliard, Gray and Co 1834), s.7. See similarly Story's judgment on behalf of the Supreme Court in *The Appollon*, 22 US 362, 370 (1824).

[79] Ibid, s.18.

[80] Ibid, s.20.

[81] Ibid, s.21.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Public international law principles of 'personality', like those of territoriality, provide limited justifications for the exercise of regulatory authority by states which are also reflected in private international law rules of 'jurisdiction'.[82] These jurisdictional rules once again view states as the exclusive actors, and jurisdiction as a limited but discretionary domain for state regulation, in accordance with classical public international law principles. Some states have traditionally asserted jurisdiction based on the nationality of the defendant, reflecting a civil implementation of the public international law 'active personality' jurisdiction which is more commonly asserted in the criminal context.[83] Some states also, perhaps more hesitantly, assert jurisdiction based on the nationality of the claimant, reflecting again a civil implementation of public international law jurisdiction, this time of the more controversial 'passive personality' doctrine.[84] Choice of law rules – reflecting principles of prescriptive jurisdiction – will also sometimes be based on personal connecting factors of the parties (such as a tort being governed by the law of common habitual residence of the parties),[85] although nationality is little used as a connecting factor in the common law tradition. Indeed, nationality appears to be generally declining as a connecting factor in private international law, as it may be seen as contrary to other obligations which require states not to treat parties differently on the basis of their nationality. Obligations of non-discrimination on the grounds of nationality arise under the law of the European Union (between Member States only)[86] and European Convention on Human Rights,[87] for example, and may also arise under international investment treaties.[88]

Private international law jurisdiction based on nationality is the most straightforward implementation of public international law 'personality' jurisdiction. It may also be identified as strongly reflecting

[82] See further generally Mills, The Confluence of Public and Private International Law, 248ff.

[83] See e.g. French Civil Code, Article 15.

[84] See e.g. French Civil Code, Article 14; Akehurst, Jurisdiction in International Law, 172ff. The benefit of this rule is extended by Article 4(2) of the Brussels I Regulation (2001) to apply to all nationals of EU Member States who are domiciled in France.

[85] For example, under the Rome II Regulation (2007), Art.4(2); *Babcock v Jackson* (1963) 191 NE 2d 279 (NY).

[86] Article 18, Treaty on European Union (consolidated version, OJ C 115/1, 9 May 2008). This is the reason for Article 4(2) of the Brussels I Regulation (2001).

[87] Article 14. This obligation only requires non-discrimination in the protection of other rights under the Convention. An argument could be made that national rules of civil jurisdiction which discriminate on the grounds of nationality, such as the special right of access provided under French law to French nationals, could in fact violate the Convention because they might discriminate in providing 'access to justice' in circumstances covered by the Convention – see further *infra* section IV.B.2. In most such cases jurisdiction would, however, be governed by the Brussels I Regulation (2001), which effectively excludes any role for nationality in claims brought by or against EU domiciled parties (see Articles 2 and 4(2)).

[88] Investment treaties often provide for obligations of non-discrimination (or 'no less favourable treatment') on the basis of the nationality of the investor, which could be breached by the application of a nationality-based choice of law rule – see e.g. Federico Ortino, 'Non-Discriminatory Treatment in Investment Disputes', in P-M Dupuy, EU Petersmann and F Francioni (eds), *Human Rights in Investment Law and Arbitration* (OUP 2009).

the traditional conception of public international jurisdiction as a matter of state right and power, as it is states which set the conditions for the conferral of nationality on individuals. In the context of private international law, however, this picture is complicated by the existence of competing ideas of 'residence' and 'domicile' as personal identifying or connecting factors,[89] the latter traditionally much preferred in the common law in particular. While definitions of these factors may vary, each involves a connection between a person and a place which reflects some kind of habitual presence in and personal link with a territory. The fact that these connecting factors are used and widely accepted in private international law itself suggests that the treatment of territory and nationality as discrete grounds for jurisdiction in traditional formulations of international law jurisdiction is too restrictive. The practice of states instead supports the idea that jurisdiction may be based on a flexible combination of both territorial and personal connecting factors – connections between a person and a place which do not depend on nationality, such as domicile or habitual residence.

The use of domicile or residence as a connecting factor in private international law also raises a further important issue with respect to conceptions of jurisdiction in public international law. Determinations of domicile and residence usually involve considering facts which are more within the control of individuals than questions of nationality, which are governed strictly by the state itself. A person's domicile or place of residence may to some extent reflect an individual choice about where to live or permanently settle. Of course, states exert at least some control over where individuals are permitted to live, and the reality is that the supposed benefits of globalised free movement across state boundaries only exist for a tiny privileged minority (with most 'migrant workers' working outside their home state by economic necessity and at risk of exploitation[90]). But within those boundaries, a limited possibility remains for individuals to choose what 'jurisdiction' they are under. Dual passport holders may, for example, freely decide whether to be domiciled or resident in either state of nationality, thus (if these connecting factors are relied on instead of nationality) partially determining which court or courts may have jurisdiction over them, or which law will govern their relationships or disputes. In practice, companies may change their place of registration or central administration even more readily. In the increased use of these criteria as connecting factors, instead of the state-controlled criteria of nationality, we may perhaps already see evidence for the contention, explored further below, that

---

[89] See further generally Mills, The Confluence of Public and Private International Law, 250ff; Bowett, Jurisdiction: Changing Patterns of Authority, 8-9.

[90] See generally e.g. the United Nations International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families (1990), monitored by the Committee on Migrant Workers <http://www.ohchr.org/EN/HRBodies/CMW/Pages/CMWIndex.aspx> accessed 18 August 2014.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

individual autonomy is increasingly recognised as playing an important role in questions of jurisdiction.

As noted, private international law rules on jurisdiction may recognise that certain subject matters are so closely connected with a single state that the courts of that state should have exclusive jurisdiction. In general, however, rules of private international law function within a public international law context in which overlapping jurisdiction is permitted, because more than one state may have a basis for exercising jurisdiction on territorial or personal grounds. Rules of private international law similarly accept a wide range of grounds for national courts to exercise jurisdiction over private law disputes, and thus readily accept the possibility that more than one court may have jurisdiction based on territorial or personal connections with the parties or the subject matter of their dispute. Equally, more than one state might purport to apply its private law to a dispute or relationship, based on territorial or personal connections. But private international law has also given rise to distinct approaches to dealing with the conflicts which might potentially arise from such overlaps,[91] through the development of principles of jurisdictional priority which seek to limit or resolve such potential parallel proceedings. Where proceedings can be commenced in more than one state, courts may exercise jurisdictional deference, either because another court is considered to be clearly more appropriate,[92] or because the other court was first seised of the dispute.[93] Where foreign courts have already determined an issue, their judgment will frequently be given an estoppel effect which will function to prevent re-litigation of the issues, and (if applicable) permit local enforcement of the foreign award, thus further preventing potentially conflicting exercises of jurisdiction.[94] And finally, perhaps most distinctively, rules on choice of law generally require courts to apply *foreign* substantive law where that law is most closely connected to the dispute,[95] and strive to harmonise choice of law rules so that different courts will apply the same law[96] – thereby both recognising

[91] See *supra* n 47.

[92] As under the common law – see, for example, *The Abidin Daver* [1984] AC 398; *De Dampierre v De Dampierre* [1988] AC 92; *Cleveland Museum of Art v Capricorn Art International* [1990] 2 LLR 166.

[93] As under the Brussels I Regulation (2001), Articles 27-28.

[94] See generally e.g. *Adams v Cape Industries* [1990] Ch 433; Brussels I Regulation (2001), Articles 32-56.

[95] This principle was particularly influential under the common law 'proper law of the contract' approach. Some doubts may be expressed as to whether this approach is reflected in recent European codifications of choice of law rules, which (arguably problematically) tend to favour more rigid and incidental connecting factors rather than looking to the system of law most closely connected to the dispute, in the interests of predictability and certainty, and in the service of the efficient functioning of the internal market. See, for example, Article 4 of Regulation (EC) No 593/2008 of the European Parliament and of the Council of 17 June 2008 on the law applicable to contractual obligations (Rome I), EU OJ L 177, 4 July 2008 (henceforth, 'Rome I Regulation (2008)'); Mills, The Identities of Private International Law, 470.

[96] See e.g. Rome I Regulation (2008), Recital 6; Rome II Regulation (2007), Recital 6. The possible application of domestic public policy as a safety net to these rules does not undermine

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

a foreign state's greater claim to substantive regulatory authority, and aspiring to an objective of decisional harmony which would prevent a substantive 'conflict of laws' from arising, even where more than one court might have (private international law) jurisdiction.

It does not particularly matter whether this is viewed as an application or enforcement by one state of another's prescriptive jurisdiction, or whether it is simply the forum state choosing to exercise its own prescriptive jurisdiction to give effect to foreign law (a long-standing matter of debate in private international law theory). In either case, the exercise of international jurisdiction by each state aspires to avoid a conflict through openness to the application of foreign rules which have a greater 'connection' to the dispute at hand, as determined and shaped by public and private international law rules and principles. None of the conflict avoidance techniques of private international law has been universally accepted, nor does any form a clear part of the international law on jurisdiction. But they show that in the private law context states have engaged with the principles and problems of (potentially overlapping) international jurisdiction in a more sophisticated and nuanced way than is generally seen in the context of public international law.

## IV. Jurisdiction as a Duty of States

The remainder of this article considers challenges which have arisen to the traditional idea of jurisdiction as a matter of right and power of states under international law, based principally on connections of territoriality or nationality. These challenges have come from developments in both public international law and private international law, particularly through the increased recognition given to individual actors in both (closely related) fields. In order to highlight the connection between developments in public and private international law, the focus of the remaining sections is largely on adjudicative jurisdiction – as discussed above, the sense in which the term jurisdiction is used in private international law – and on the prescriptive rather than enforcement components of judicial proceedings. To understand the background to these developments, it is first important to note another challenge to the traditional approach to jurisdiction in international law – the growing recognition that in some circumstances the exercise of national jurisdiction may, under international law, be a question of duty or obligation rather than right or discretion.[97] To put this another way, the regulation of jurisdiction in international law needs to be reconceived as not merely a 'ceiling', defining the maximum limits of state power, but also (in some

their general character, particularly as the application of public policy should (and does) generally reflect principles of proximity and relativity – see Alex Mills, 'Dimensions of Public Policy in Private International Law' (2008) 4 Journal of Private International Law 201.

[97] See *supra* n 46.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

52

contexts) as a 'floor', reflecting minimum requirements for the exercise of regulatory power by states in order to satisfy their international obligations.

### A. Jurisdictional duties owed to other states

States have increasingly agreed to various obligations under international law under which they have constrained their traditional jurisdictional discretion – either by prohibiting or mandating certain forms of regulation. This is particularly the case in the context of obligations to criminalise certain conduct and to submit individuals to prosecution which exist across a range of international criminal law treaties, and perhaps even (albeit more controversially[98]) as part of customary international law. These treaties also (expressly or implicitly) require states to pass domestic laws permitting or facilitating the exercise of such jurisdiction, similarly fettering the discretionary nature of national prescriptive jurisdiction.

These obligations usually include the exercise of jurisdiction in relation to a state's own territory or nationals. They are obligations to exercise the recognised grounds of jurisdiction in international law, as examined above, which are thereby transformed from jurisdictional rights to duties. In some cases, the obligations go further, requiring exercise of jurisdiction over any person found within the territory, regardless of their nationality or of where the alleged crime was committed. For example, Article 7(1) of the Convention Against Torture requires that '[t]he State Party in the territory under whose jurisdiction a person alleged to have committed any offence referred to in article 4 is found shall in the cases contemplated in article 5, if it does not extradite him, submit the case to its competent authorities for the purpose of prosecution.' The obligation to exercise enforcement jurisdiction over any person accused of certain conduct who is found in the territory implies an obligation to exercise prescriptive jurisdiction over the conduct in question.[99] Such obligations are thus effectively treaty-based obligations of universal prescriptive jurisdiction, conditional on the presence of the defendant in the territory, which thereby extend the

---

[98]  The International Court of Justice elected not to comment on the customary status of the obligation to extradite or prosecute in reference to crimes against humanity, in *Questions relating to the Obligation to Prosecute or Extradite (Belgium v Senegal)* [2012] ICJ Reports 422. For the view that it is not customary, see e.g. the Separate Opinion of President Guillaume, *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, at [12]; for the view that it is, see e.g. 'Interlocutory Decision on the Applicable Law: Terrorism, Conspiracy, Homicide, Perpetration, Cumulative Charging', Appeals Chamber, Special Tribunal for Lebanon, STL-11-01/I/AC/R176bis, 16 February 2011, at [102]. See further Kimberley N Trapp, *State Responsibility for International Terrorism* (OUP 2011) 84.

[99]  Trapp, State Responsibility for International Terrorism, 83, 101-3; see further Michael A Newton, 'Terrorist crimes and the *aut dedere aut judicare* obligation', in L van den Herik and N Schrijver (eds), *Counter-Terrorism Strategies in a Fragmented International Legal Order* (CUP 2013).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

53

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

traditionally accepted boundaries of the jurisdiction of states.[100] To put this another way, the 'floor' provided by treaty-based jurisdictional duties may in fact, in such circumstances, be higher than the traditional 'ceiling' provided by the general international law limitations on jurisdictional rights.

Such jurisdictional duties, particularly although not only where they expand the scope of accepted jurisdictional principles, may also come into (apparent) conflict with traditional prohibitive rules on jurisdiction, such as rules of immunity, which would normally require that jurisdictional powers not be exercised. In such cases, the collective agreement to establish an obligation to exercise jurisdiction may constitute an implied determination that state immunity should not be applicable. This is indeed the best interpretation of the decision of the House of Lords in *R v Bow Street Metropolitan Stipendiary Magistrate, ex p Pinochet Ugarte (No. 3)* (2000),[101] which held that state immunity did not prevent extradition proceedings against the former Chilean head of state Pinochet, who was present at the time in the territory, in relation to allegations of torture unconnected to the United Kingdom.[102] The treaty-based obligation to exercise universal jurisdiction, triggered by Pinochet's territorial presence, was held to exclude the possibility that state immunity would prevent such an exercise of jurisdiction. Since the Convention Against Torture defines torture as conduct performed or instigated by a state official,[103] recognising immunity for acts of torture would have effectively negated the Convention's obligation of universal jurisdiction.

Through accepting jurisdictional obligations, states have increasingly accepted the idea of jurisdiction as a matter of duty rather than right, particularly (although not exclusively[104]) in the criminal context. In international criminal law, many states have accepted the related idea that a failure to submit those suspected of international crimes to prosecution will lead to forfeiture of national jurisdiction, to be replaced by obligations to transfer suspects to the International Criminal Court,

---

[100]  See Staker, Jurisdiction, 323. The Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal in *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, notes (at [46]) that:

> There are, moreover, certain indications that a universal criminal jurisdiction for certain international crimes is clearly not regarded as unlawful. The duty to prosecute under those treaties which contain the *aut dedere aut prosequi* provisions opens the door to a jurisdiction based on the heinous nature of the crime rather than on links of territoriality or nationality (whether as perpetrator or victim). The 1949 Geneva Conventions lend support to this possibility, and are widely regarded as today reflecting customary international law.

See further ibid, at [28]-[41]; Separate Opinion of President Guillaume, at [7]-[9].

[101]  [2000] 1 AC 147.

[102]  See further discussion in *Jones v Saudi Arabia* [2006] UKHL 26.

[103]  Article 1(1), *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (1984).

[104]  See further section B below.

under the principle of complementarity.[105] Obligations which affect the exercise of jurisdiction are not new – international law has long included some obligations on states which (positively) require an 'internal' exercise of their jurisdiction, or (negatively) limit their discretion to exercise jurisdiction. The venerable rules on protection of diplomats and embassies, for example, are generally considered to require the enactment and enforcement of domestic legislation which should deter and punish harm to either. Conversely, it has long been recognised that states may not under international law exercise their jurisdiction (territorially or otherwise) in relation to parties who have a recognised basis of international immunity – as noted, this is one of the important 'prohibitive rules' which constrain the exercise of jurisdiction under international law, and which may even appear to conflict with positive jurisdictional duties. Similarly, while a state may generally have extraterritorial jurisdiction over its nationals, it could not legislate to require them to act in a manner which would breach rules of international law, for example, by interfering in the internal affairs of a foreign state.[106]

While rules of international law which affect the exercise of jurisdiction may not be new, the fact that (particularly positive) jurisdictional obligations have been recognised with growing frequency and scope supports the thesis of a broader shift in international law. International law increasingly requires states to regulate not only their own (usually executive) conduct, which does not necessarily require any exercise of prescriptive or enforcement jurisdiction,[107] but also the conduct of natural and legal persons within the state's territory, which will often necessitate (and sometimes prohibit) an exercise of jurisdictional powers which were previously discretionary. It is, of course, possible to quarantine the law of jurisdiction from these developments – to argue that, while obligations may indeed have arisen in other areas of international law, as a matter of *jurisdiction* states still possess discretionary powers. If jurisdictional obligations were few and far between, there would be a reasonable case for such an approach. But as international law pervades the fabric of state law-making increasingly broadly and deeply, such an approach would leave the law of jurisdiction artificially disconnected from reality – this is indeed the condition which has generally afflicted accounts of the law of international jurisdiction.[108] International law is no longer only the law of, for, or between states: it also regulates the relations between states and individuals, particularly but not only those in a state's territory, through a combination of rights, duties and prohibitions. As a consequence, the idea of jurisdiction in international law

---

[105] Rome Statute of the International Criminal Court (1998), Article 17.
[106] See further e.g. Akehurst, Jurisdiction in International Law, 188ff.
[107] For example, the general prohibition on the use of force.
[108] A comparable critique is suggested in Daniel Bethlehem, 'The End of Geography: The Changing Nature of the International System and the Challenge to International Law' (2014) 25 EJIL 9, 22.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

as a matter of state discretion should no longer be the starting point of thinking on the subject, but should be replaced by an idea of state jurisdiction as a mixture of discretionary, mandatory and prohibitive elements.

This idea of jurisdiction as a duty most typically arises in the context of criminal law obligations, or in the context of obligations of human rights protection. This means that such jurisdictional duties between states tend to conceive of individuals as 'objects' of state jurisdiction,[109] and in that sense as passive.[110] The jurisdictional obligations on states to bring their prescriptive and adjudicative authority to bear on questions of individual responsibility for violations of international criminal law, for example, are obligations owed by states to each other, *in respect of* individuals, not *to* individuals. They do not challenge the authority of state public power, but rather operate through its mechanisms, to that extent implicitly reinforcing them. This is not to say that such jurisdictional duties are not innovative – they are frequently concerned with the regulation by a state of matters within its own territory (for example, obligations to criminalise certain territorial conduct), which is in itself a departure from the older idea of international law as concerned only with relations between sovereign states. Jurisdictional duties, even owed by states to each other, are part of the recognition that international law is also concerned with the relations between states and individuals.

## B. *Jurisdictional duties owed to individuals*

The increasing acceptance that international law concerns the regulation of individuals and not only states has raised a further challenge – the question whether individuals should be recognised as active agents or 'subjects' rather than passive 'objects' of regulation.[111] There has been an apparent 'drift' in the conception of the status of individuals under

---

[109] 'But what is the real position of individuals in International Law, if they are not subjects thereof? The answer can only be that they are objects of the Law of Nations.' – Oppenheim, *International Law*, 344.

[110] It should be noted that individuals might be able to participate in judicial review of decisions as to whether or not prosecutorial discretion is exercised: see e.g. *The Chili Komitee Nederland (CKN, Dutch branch of the Chile Committee) v Public Prosecutor, the Netherlands*, Court of Appeal of Amsterdam, 4 January 1995, (1997) 28 Netherlands Yearbook of International Law 363.

[111] The validity and utility of the distinction between 'subjects' and 'objects' of international law has long been debated – see e.g. Kate Parlett, *The Individual in the International Legal System* (CUP 2011) 353ff; Jean D'Aspremont (ed), *Participants in the International Legal System: Multiple Perspectives on Non-State Actors in International Law* (Routledge 2011); Rosalyn Higgins, *Problems and Process: International Law and How We Use It* (Clarendon Press 1994) 48ff. In my view it is conceptually helpful to distinguish between active rights-holders and passive objects of international law regulation, but it should be understood that this defines a spectrum rather than a dichotomy, and that entities may fall along different points in the spectrum in different contexts. The International Court of Justice long ago affirmed the possibility of such variation in legal 'subjectivity' in its acknowledgement that 'The subjects of law in any legal system are not necessarily identical in their nature or in the extent of their rights' – *Reparations for Injuries Suffered in the Service of the United Nations*, Advisory Opinion, [1949] ICJ Reports 174, 178.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

international law.[112] Indeed Hersch Lauterpacht had already argued in 1946 that:

The individual is the ultimate unit of all law, international and municipal, in the double sense that the obligations of international law are ultimately addressed to him and that the development, the well-being, and the dignity of the individual human being are a matter of direct concern to international law.[113]

Lauterpacht attributed this view to Grotius, arguing that it was part of the 'Grotian tradition'. Whatever the truth of this (somewhat dubious) claim, there is little doubt that individuals have become a focus of concern – that international law is no longer merely about inter-state rights and obligations. One aspect of this broader phenomenon is that it is increasingly (although not universally) recognised that individuals may have 'direct rights' under international law[114] – or to put this another way, states may owe obligations not just *in respect of* individuals but also *to* individuals. These obligations have arisen most prominently in two discrete areas of international law which will be examined in turn, parts of which also particularly affect the topic of jurisdiction – first, the law applicable to the treatment of foreign nationals, in particular, the rules concerning the delict of 'denial of justice'; and second, human rights law, in particular, the right of access to justice.

### 1. *Denial of justice to foreign nationals*

It has long been recognised that states owe obligations to meet a 'minimum standard of treatment' in respect of their dealings with each other's nationals. The standard of treatment includes a requirement for states to afford 'adequate judicial protection and effective legal remedies for repairing invasions of rights'[115] for foreigners, whether natural or legal persons, typically through access to domestic courts.[116] A breach

---

[112] For a comprehensive analysis see Parlett, The Individual in the International Legal System; see also Robert McCorquodale, 'The Individual and the International Legal System', in Malcolm D Evans (ed), *International Law* (4th edn, OUP 2014); and more generally Roland Portmann, *Legal Personality in International Law* (CUP 2010); Janne Elisabeth Nijman, *The Concept of International Legal Personality: An Inquiry into the History and Theory of International Law* (T M C Asser Press 2004).

[113] Hersch Lauterpacht, 'The Grotian Tradition in International Law' (1946) 23 BYIL 1, 27.

[114] The point has been made most clearly by the International Court of Justice in relation to rights of consular assistance – see *LaGrand (Germany v US)* [2001] ICJ Reports 466, at [77]; *Avena and Other Mexican Nationals (Mexico v US)* (Judgment) [2004] ICJ Reports 12, at [40].

[115] Andreas Hans Roth, *The Minimum Standard of International Law Applied to Aliens* (A W Sijthoff 1949) 49.

[116] The classical definition is provided by Emmerich de Vattel, *The Law of Nations* (1758), Book II, Chapter XVIII, s.350, stating that 'a refusal to hear your complaints or those of your subjects, or to admit them to establish their right before the ordinary tribunals' establishes a 'denial of justice'. According to Article 9 of the Harvard Research Draft of 1929:

A State is responsible if an injury to an alien results from a denial of justice. Denial of justice exists when there is a denial, unwarranted delay or obstruction of access to courts, gross deficiency in the administration of judicial or remedial process, failure to provide those

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

of this standard is considered to give rise to an international delict of 'denial of justice' – an established idea which has received new prominence. The obligations of states are thus not limited to substantive standards of treatment towards foreign nationals, but also include *adjudicative* obligations of providing access to redress for violations.[117]

As a counterpart to these obligations, foreign nationals were traditionally expected to exhaust local remedies in the courts of the host state before international claims could be brought.[118] Although individuals have not historically been considered as bearers of 'rights', in a sense these jurisdictional requirements function mutually as between states and individuals – the state is required to afford access to courts, and the individual is expected to exercise it, before the state of nationality may make any complaint about their treatment. Access to a court may be required not only where the individual is mistreated by the state (typically leading to public law-style proceedings, such as judicial review), but also where the individual is mistreated by another private party (typically leading to a civil law claim, such as in contract or tort). Where a claim is brought by a foreign national complaining about their treatment by the host state itself, any failure of those local remedial processes may constitute an additional international wrong, compounding the initial wrongful treatment by the state. Where a foreign national suffers harm due to the wrongful conduct of a private party, that wrong would not ordinarily constitute a breach of the state's international obligations because it would not be attributable to the state, but the failure to remedy it through the actions or inactions of domestic courts could itself be a breach of the international minimal standard. In such cases, a denial of justice may be the only delict committed by the host state.

In either case, the test is not whether local law has been complied with but whether an international standard of 'justice' has been met – a denial of justice may be caused by a failure to exercise adjudicative jurisdiction where a power to do so exists, but also by a failure to exercise adjudicative jurisdiction because the courts are denied the power to hear the claim of the injured party under local law. A state cannot limit its responsibilities to foreign nationals by limiting the powers of its own courts. It must not only comply with its own rules of jurisdiction, but those rules must also comply with minimum standards of international law – standards which are admittedly yet to be fully and clearly articulated. In the civil context, to put this simply, 'A denial of justice may arise from the

---

guarantees which are generally considered indispensable to the proper administration of justice, or a manifestly unjust judgment.

(1929) 23 AJIL Special Supplement 173. See also Alwyn Vernon Freeman, *The International Responsibility of States for Denial of Justice* (Longmans Green & Co 1938).

[117] See generally e.g. F V Garcia Amador, 'Second Report on International Responsibility', UN Doc A/CN.4/106 (1957), at 110ff.

[118] See further e.g. Chittharanjan Felix Amerasinghe, *Local Remedies in International Law* (2nd edn, CUP 2004).

application of domestic notions of private international law where these conflict with public international law rules'.[119]

Traditionally, the obligations of treatment of foreign nationals have operated through the international law framework of diplomatic protection, and claims for violations of the standards in respect of any individual may only be made at the inter-state level and only by the state of nationality. Thus, the Permanent Court of International Justice held that:

It is an elementary principle of international law that a State is entitled to protect its subjects, when injured by acts contrary to international law committed by another State, from whom they have been unable to obtain satisfaction through the ordinary channels. By taking up the case of one of its subjects and by resorting to diplomatic action or international judicial proceedings on his behalf, a State is in reality asserting its own rights – its rights to ensure, in the person of its subjects, respect for the rules of international law.[120]

Similarly, the International Court of Justice has held that:

within the limits prescribed by international law, a State may exercise diplomatic protection by whatever means and to whatever extent it thinks fit, for it is its own right that the State is asserting.[121]

Thus formulated, the rules concerning denial of justice, and the standard of treatment of foreign nationals more generally, are merely a further example of jurisdictional duties which states owe to each other *in respect of* individuals, not obligations owed directly *to* individuals. Under these rules, 'a person's protection depended on the conduct of his state', and 'stateless persons were entitled to no protection whatsoever'.[122] Because a state is asserting its own rights, the possibility for individuals to receive compensation for losses suffered due to violations of international law by a foreign state is dependent on their home state being able and willing to bring proceedings and to pass on any damages obtained – matters which international law leaves to the discretion of individual states.

In the particular context of the treatment of foreign investors, this traditional idea has however come under challenge through the rapid development of international investment law and arbitration. States across the world have entered into thousands of bilateral investment treaties,[123] which generally serve two functions. First, they define the

---

[119] Ben Atkinson Wortley, 'The Interaction of Public and Private International Law Today' (1954-I) 85 Recueil des Cours 237, 310.

[120] *Mavrommatis Palestine Concessions Case* (1924) PCIJ Series A, No. 2, 12. See also, similarly, *Factory at Chorzow* (1928) PCIJ Series A, No.17; *Panevezys-Saldutiskis Railway Case* (1939) PCIJ Series A/B, No.76.

[121] *Barcelona Traction, Light and Power Co. Case (Belgium v Spain)* [1970] ICJ Reports 3, [78].

[122] Sohn, The New International Law, 9.

[123] See e.g. United Nations Conference on Trade and Development, *World Investment Report 2013*, x, <http://unctad.org/en/PublicationsLibrary/wir2013_en.pdf> accessed 18 August 2014, (noting 3,196 international investment agreements).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

substantive standards of treatment applicable to each state in respect of foreign investors from the other state – these may reflect, clarify or go beyond customary international law minimum standards. Second, and more importantly for present purposes, they establish procedures under which such investors may bring claims directly against the host state in respect of their investment. Investors may thereby have their complaints heard by an independent ('private'[124]) arbitral tribunal, instead of through national courts – and there have been hundreds of investor-state arbitrations.[125]

Allegations of a denial of justice have been increasingly invoked in claims arising under investment treaties, in particular as part of the standard treaty requirement that 'fair and equitable treatment' must be given to foreign investors, a test which is also sometimes taken to be reflective of customary international law minimum standards of treatment.[126] The issue in these cases is whether a foreign investor has been denied genuine or effective access to a remedy, in relation to violations of their rights by either public or private parties. Few investment treaties require exhaustion of local remedies, so an investor may directly commence arbitral proceedings against a state for breaches of their rights by a public authority of that state. If the investor is harmed by a private party, or chooses (or is required) to bring domestic proceedings against a public authority, denial of a remedy may mean that international arbitration can still be pursued as a secondary claim arising out of denial of justice.[127]

Although formally bilateral investment treaties apply between two states, the imposition of obligations on those states with respect to private investors, together with the creation of arbitral mechanisms for investors to enforce those obligations directly, means that international investment law appears to create internationalised private rights which are opposable to the state.[128] Indeed, there is significant (albeit

[124] On the public/private dimensions in the characterisation of international investment arbitration, see further Alex Mills, 'Antinomies of Public and Private at the Foundations of International Investment Law and Arbitration' (2011) 14 Journal of International Economic Law 469.

[125] See e.g. United Nations Conference on Trade and Development, 'Recent Developments in Investor–State Dispute Settlement, IIA Issues Note No. 1 (2013)', <http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d3_en.pdf> accessed August 2014, 1 (noting 514 known international investment arbitrations).

[126] See generally e.g. Francesco Francioni, 'Access to Justice, Denial of Justice and International Investment Law' (2009) 20 EJIL 729; Jan Paulsson, *Denial of Justice in International Law* (CUP 2005); Andrea K. Bjorklund, 'Reconciling State Sovereignty and Investor Protection in Denial of Justice Claims' (2005) 45 Virginia Journal of International Law 810.

[127] See Francioni, Access to Justice, Denial of Justice and International Investment Law, 731ff. The term 'access to justice' was also historically associated with this international standard – while it is now much more commonly used in the distinct context of human rights law, there has been a degree of cross-fertilisation between the two fields.

[128] Whether a 'right' *can only* exist where the individual has control over the subject of the right (eg through a means of individually vindicating the right) is a much-debated jurisprudential question – see generally Kenneth Campbell, 'Legal Rights' (2013) Stanford Encyclopaedia of Philosophy available at <http://plato.stanford.edu/entries/legal-rights/> accessed 18 August 2014. The present article focuses on developments in international law under which individuals are given direct means

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

contested) authority for the view that this has the effect of 'conferring or creating direct rights in international law in favour of investors'.[129] When combined with the idea of 'denial of justice', this means that individual investors may successfully demand that a state exercise adjudicative or prescriptive jurisdiction to protect their rights, and may directly pursue compensation to the extent that this is not done.[130] The effect, if not the form, is to internationalize these rights.

This development suggests the need to rethink the idea of jurisdiction in international law. To the extent that states have agreed to individually enforceable rights for foreign investors which extend to a right of access to civil or administrative remedies in respect of their treatment by the state, they have apparently agreed that they owe jurisdictional obligations not only to foreign states but also to individuals. It is true that these rights may be considered as products of state consent through treaties or even (more controversially) customary international law, suggesting that the individual 'rights' thus created can be accommodated within the existing framework of jurisdictional rules. It can nevertheless also be argued that

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

of enforcement, as it is much less controversial to conclude that individuals bear rights in such circumstances, but it should not be taken to argue that international rights are limited to such cases. The International Court of Justice concluded that individuals have direct rights of consular access, even in the absence of means through which individuals might vindicate those rights (other than those provided by national courts): *LaGrand (Germany v US)* [2001] ICJ Reports 466, at [77].

[129]  *Occidental Exploration & Production Company v Republic of Ecuador* [2005] EWCA Civ 1116 (UK), at [18]. See also *Corn Products International v Mexico*, Decision on Responsibility, 15 January 2008, ICSID Case No. ARB(AF)/04/01, finding (at [168]-[169]) that 'It is now clear that States are not the only entities which can hold rights under international law; individuals and corporations may also possess rights under international law' and that 'In the case of Chapter XI of the NAFTA, the Tribunal considers that the intention of the Parties was to confer substantive rights directly upon investors. That follows from the language used and is confirmed by the fact that Chapter XI confers procedural rights upon them'. In *Corn Products*, the tribunal suggested (although not without ambiguity) that this was always the case even under the traditional rules of diplomatic protection, concluding (at [170]) that 'It has long been the case that international lawyers have treated as a fiction the notion that in diplomatic protection cases the State was asserting a right of its own', finding instead (at [173]) that 'when a State claimed for a wrong done to its national it was in reality acting on behalf of that national, rather than asserting a right of its own'. But for an opposing view see e.g. *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc v Mexico*, Award, 21 November 2007, ICSID Case No. ARB(AF)/04/05, holding (at [169]) that 'the investor may bring the host State to an international arbitration in order to request compensation, but the investor will be in reality stepping into the shoes and asserting the rights of the home State'; *Loewen v United States*, Award, 26 June 2003, ICSID Case No. ARB(AF)/98/3, holding (at [233]) that '[t]here is no warrant for transferring rules derived from private law into a field of international law where claimants are permitted for convenience to enforce what are in origin the rights of Party states'. See further e.g. Patrick Dumberry and Erik Labelle-Eastaugh, 'Non-state actors in international investment law', in Jean d'Aspremont (ed), *Participants in the International Legal System* (Routledge 2011); Zachary Douglas, 'The Hybrid Foundations of Investment Treaty Arbitration' (2003) 74 BYIL 151, 160ff.

[130]  Or, similarly, may pursue compensation to the extent that a state exercises adjudicative jurisdiction beyond the permitted grounds under international law – see e.g. Vaughan Lowe, 'Expert Opinion on International Law Issues, in re: Yukos Oil Company, Case No. 04-47742-H3-11', published in (2005) 2(3) Transnational Dispute Management <www.transnational-dispute-management.com/article.asp?key=495> accessed August 2014; see further discussion in Giuditta Cordero Moss, 'Between Private and Public International Law: Exorbitant Jurisdiction as Illustrated by the Yukos Case' (2007) 4(5) Transnational Dispute Management <www.transnational-dispute-management.com/article.asp?key=1130> accessed August 2014 and (2007) 32 Review of Central and East European Law 1.

through the recognition of individuals as positive actors and jurisdictional rights-bearers, the idea of jurisdiction as purely an expression of the rights and powers of sovereign states requires reconceptualisation.

2. *Human rights and access to justice*

Alongside the development of obligations which relate to the treatment of foreign nationals, particularly investors, international law has also developed obligations on states which relate to the treatment of *all* persons – including each state's own nationals – principally in the form of human rights. These rights were largely developed and articulated in the aftermath of the Second World War (and particularly the Holocaust), as a consequence of the realisation that it was unacceptable that 'a state's own citizens were almost completely at its mercy, and international law had little to say about mistreatment of persons by their own government'.[131] They have also included rights which relate to a state's exercise of adjudicative jurisdiction, generally under the rubric of rights of 'access to justice',[132] as well as access to an 'effective remedy' for violations of other rights.[133] A right of access to justice, including a right of access to a court or tribunal, is an important feature of modern human rights law, generally considered to apply even if no other human rights are at stake, although its importance is enhanced where the substantive concerns involve violations of other human rights. The European Court of Justice has, for example, repeatedly emphasised the importance of rights of access to justice in the context of sanctions against those suspected of direct or indirect involvement in terrorist activities, finding that such rights may not be displaced, within the European constitutional order, even by a Chapter VII resolution of the Security Council.[134] Like the rules concerning denial of justice, the standard of what 'access to justice' actually requires is (and must be) international – a state cannot limit its international obligations through restricting the capacity of its courts as a matter of domestic law, and thus mere compliance with national rules of jurisdiction will not necessarily be sufficient to satisfy international jurisdictional obligations.[135]

---

[131]   Sohn, The New International Law, 9.

[132]   See generally e.g. Francesco Francioni (ed), *Access to Justice as a Human Right* (OUP 2007); see further the Italian counter-memorial in *Jurisdictional Immunities of the State* (*Germany v Italy: Greece intervening*), 22 December 2009, 73ff. The term 'denial of justice' is sometimes used in this context to refer to a failure to provide access to justice, although the term is more closely associated with the rules concerning the treatment of foreign nationals which developed independently from human rights law – as noted, there has been a degree of cross-fertilisation between the two fields.

[133]   See e.g. ICCPR Art.2(3).

[134]   *Kadi v Council & Commission (Common foreign & security policy)* [2008] EUECJ C-402/05 (03 September 2008); *Yassin Abdullah Kadi, Re* [2013] EUECJ C-584/10 (18 July 2013).

[135]   See e.g. *Ashingdane v United Kingdom* (8225/78) [1985] ECHR 8, holding (at [56]-[57]) that:

   The applicant did have access to the High Court and then to the Court of Appeal, only to be told that his actions were barred by operation of law...To this extent, he thus had access to the remedies that existed within the domestic system. ...This of itself does not necessarily exhaust the requirements of Article 6 para. 1 (art. 6-1). It must still be established that the

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Rights of access to justice have again been traditionally viewed as obligations owed by states to each other, in *respect of* individuals, rather than rights owed *to* individuals. Increasingly, however, the argument is made that individuals are, or are becoming, recognised as the bearers of direct rights – as 'international legal persons' – under international law,[136] in a manner equivalent to the recognition which has been arguably accorded to foreign investors. International human rights law, which is premised to some extent on a distrust of the treatment of individuals by states and governments, tends to be similarly distrustful of mechanisms which would leave the enforcement of human rights entirely in the hands of those same states and governments, and (as noted) having a means of enforcement is often closely associated with the possession of a legal right.[137] Under the European Convention on Human Rights, for example, the rights granted include the undertaking that 'In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law'[138] – establishing not merely a right to a fair hearing, but a right of access to justice, exercisable both through national courts and potentially through proceedings before the European Court of Human Rights.[139] The American Convention on Human Rights similarly provides that 'Everyone has the right to simple and prompt recourse, or any other effective recourse, to a competent court or tribunal for protection against acts that violate his fundamental rights recognized by the constitution or laws of the state concerned or by this Convention',[140] and provides for individual access to justice through the Inter-American Commission on

---

degree of access afforded under the national legislation was sufficient to secure the individual's 'right to a court', having regard to the rule of law in a democratic society

[136] 'States have had to concede to ordinary human beings the status of subjects of international law, to concede that individuals are no longer mere objects, mere pawns in the hands of states.' – Sohn, The New International Law, 1.

[137] The International Court of Justice has long drawn a link between international legal personality and the possession of a means of vindicating rights – finding, for example, with respect to the United Nations, that 'if the Organization is recognized as having [international] personality, it is an entity capable of availing itself of obligations incumbent upon its Members' (178), and that 'the Court has come to the conclusion that the Organization is an international legal person . . . [i.e.] that it is a subject of international law and capable of possessing international rights and duties, and that it has capacity to maintain its rights by bringing international claims' (179): *Reparations for Injuries Suffered in the Service of the United Nations*, Advisory Opinion, [1949] ICJ Reports 174. It is at least arguable that these contentions should also operate conversely – that the possession of enforceable rights should imply the existence of legal personality.

[138] Article 6(1).

[139] See further e.g. *Golder v United Kingdom* (4451/70) [1975] 1 EHRR 524 (finding, at [35], that 'The principle whereby a civil claim must be capable of being submitted to a judge ranks as one of the universally 'recognised' fundamental principles of law; the same is true of the principle of international law which forbids the denial of justice.'); *Airey v Ireland* (6289/73) [1979] ECHR 3 (finding, at [24], that 'The Convention is intended to guarantee not rights that are theoretical or illusory but rights that are practical and effective . . . This is particularly so of the right of access to the courts in view of the prominent place held in a democratic society by the right to a fair trial').

[140] Article 25(1).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Human Rights and Inter-American Court of Human Rights.[141] In the Convention Against Torture, there is an obligation on each state to 'ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation'.[142] These developments signal at least a partial recognition of jurisdiction as a matter of international legal obligation owed to individuals.

The idea of access to justice is having a range of further effects on private international law rules on jurisdiction. Traditionally, such rules have focused on avoiding two potential harmful outcomes which could be caused by exorbitant regulation – conflicts with foreign states, and unfairness to defendants. These objectives are achieved through constraining the exercise of jurisdictional power by states, thus conceiving of jurisdiction as a matter of limited state discretion. Increasingly, however, the counter-balancing concern of ensuring access to justice for claimants, conceiving of jurisdiction as a matter of individual right, is playing an important role in private international law.[143] The influence of access to justice is reshaping private international law in three distinct ways which will be addressed in turn.

### a. The design of jurisdictional rules

The first aspect of the increasing influence of 'access to justice' on private international law is its impact on the development of jurisdictional rules – the question of when national courts are considered to have adjudicative authority over a civil dispute. This may be illustrated by the Legislative Proposal,[144] published by the European Commission on 14 December 2010, for reforming the Brussels I Regulation on Jurisdiction and the Recognition and Enforcement of Judgments.[145] The proposed reforms not only addressed a range of issues and concerns with the functioning of the existing regime, but also suggested an important change in principle, with significant emphasis placed on access to

[141] The Inter-American Court of Human Rights has even made the bold claim that 'Access to justice is a peremptory norm of international law' (*Case of Goiburú et al. v Paraguay*, Judgment of September 22, 2006 (Merits, Reparations and Costs), Series C, No. 153, at [131]), although perhaps in context this is limited to the (still bold) claim that access to justice is peremptory if the norm breached is peremptory. See further *Juridical status and human rights of the child*, Advisory Opinion of August 28, 2002, Series A, No. 17, Concurring Opinion of Judge A. A. Cançado Trindade, [21]-[22] – 'The recognition of the individual as subject of both domestic law and international law, represents a true juridical revolution. ... This rendering of accounts would simply not have been possible without the crystallization of the right of individual petition.'

[142] Article 14(1), *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (1984). See further *infra* text accompanying n 156.

[143] See further generally J J Fawcett, 'The Impact of Article 6(1) of the ECHR on Private International Law' (2007) 56 ICLQ 1. See also Amnesty International, 'Injustice incorporated: Corporate abuses and the human right to remedy' (2014), POL 30/001/2014 available at <http://www.amnesty.org/en/library/info/POL30/001/2014/en> accessed 18 August 2014.

[144] Proposal for a Regulation of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (Recast), COM(2010) 748 final, 2010/0383 (COD), <http://ec.europa.eu/justice/policies/civil/docs/com_2010_748_en.pdf> accessed 18 August 2014.

[145] Brussels I Regulation (2001) (*supra* n 68).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

64

justice, alongside previously dominant considerations of internal market efficiency and fairness to defendants. This had practical implications, in particular the proposed introduction of a 'forum of necessity' rule, providing (subject to certain conditions) that 'Where no court of a Member State has jurisdiction under this Regulation, the courts of a Member State may, on an exceptional basis, hear the case if the right to a fair trial or the right to access to justice so requires'.[146] Although this reform was not adopted in the final version of the recast Brussels I Regulation,[147] this was not because it was particularly rejected, but because the general idea of enlarging the scope of the Regulation to cover non-EU domiciled defendants was at least deferred, and a forum of necessity rule is not considered to be required for defendants domiciled within the European Union, because at least one Member State court will always have jurisdiction under the Regulation, and that court will be presumed to be capable of delivering justice because its procedures must comply with the European Convention on Human Rights. It may be anticipated that a forum of necessity rule would form a part of any future proposals on these questions within the European Union. Similar 'forum of necessity' rules form part of the law of at least ten Member States,[148] including France, Germany, Austria,[149] Belgium,[150] the Netherlands,[151] and Switzerland,[152] and the rule has been included

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

---

[146] See *supra* n 144, Article 26.

[147] Recast Brussels I Regulation, No. 1215/2012, OJ L 351/1, 20 December 2012 (effective January 2015).

[148] See further generally Arnaud Nuyts, 'Study on Residual Jurisdiction: General Report' (2007), 64ff available at <http://ec.europa.eu/civiljustice/news/docs/study_residual_jurisdiction_en.pdf> accessed 18 August 2014. Chilenye Nwapi, 'Jurisdiction by Necessity and the Regulation of the Transnational Corporate Actor' (2014) 30 Utrecht Journal of International and European Law 24.

[149] The rule in France, Germany and Austria is based on case law – see Nuyts, Study on Residual Jurisdiction, 66.

[150] Article 11 of the Belgian Code of Private International Law, 16 July 2004, provides that:

Notwithstanding the other provisions of the present statute, the Belgian courts will exceptionally have jurisdiction when the subject matter presents close connections with Belgium and proceedings abroad seem impossible or when it would be unreasonable to demand that the action be brought abroad.

[151] Article 9 of the Dutch Code of Civil Procedure provides that:

When Articles 2 up to and including 8 indicate that Dutch courts have no jurisdiction, then they nevertheless have if: (a) the case concerns a legal relationship that only affects the interests of the involved parties themselves and the defendant or a party with an interest in the legal proceedings has appeared in court, not exclusively or with the intention to dispute the jurisdiction of the Dutch court, unless there is no reasonable interest to conclude that the Dutch court has jurisdiction; (b) a civil case outside the Netherlands appears to be impossible; or (c) the legal proceedings, which are to be initiated by a writ of summons, have sufficient connection with the Dutch legal sphere and it would be unacceptable to demand from the plaintiff that he submits the case to a judgment of a foreign court.

[152] Article 3 of the Swiss Federal Act on Private International Law of 18 December 1987 provides that:

When this Act does not provide for jurisdiction in Switzerland and proceedings in a foreign country are impossible or cannot reasonably be required, the Swiss judicial or

in another proposed EU Regulation dealing with matrimonial property.[153] The idea that jurisdiction may be justified on the basis of a 'forum of necessity' rule, even in the absence of the factual connections traditionally considered necessary to justify the assertion of state power, has also received legislative and judicial support in Canada.[154]

At the international level, the Convention Against Torture imposes an obligation of access to justice on state parties in relation to victims of torture. This obligation is subject to a disagreement as to whether it is limited to acts of torture committed in the territory of the forum state, or possibly by or against nationals of the forum state.[155] The Committee against Torture, which supervises compliance with the Convention, has consistently taken the view that the obligation does not depend on traditional jurisdictional connections of territory or nationality, particularly where 'a victim is unable to exercise the rights guaranteed under article 14 in the territory where the violation took place'.[156] This might be understood as an argument in favour of universal civil jurisdiction (in the form of an obligation rather than a right[157]), subject to a requirement to exhaust local remedies, or as a forum of necessity rule. In practice, there is little significance in the distinction between these two positions, aside from the possibility that a forum of necessity rule might have further limitations based on the need for a 'sufficient connection'.

Each of the 'forum of necessity' rules discussed above supports an assertion of jurisdictional power (and even duty) to protect the rights

administrative authorities at the place with which the case has a sufficient connection have jurisdiction.

[153] Proposal for a Council Regulation on jurisdiction, applicable law and the recognition and enforcement of decisions in matters of matrimonial property regimes, COM(2011) 126 final, 2011/0059 (CNS), 16 March 2011, Article 7:

Where no court of a Member State has jurisdiction under Articles 3, 4, 5 and 6, the courts of a Member State may, exceptionally and if the case has a sufficient connection with that Member State, rule on a matrimonial property regime case if proceedings would be impossible or cannot reasonably be brought or conducted in a third State.

[154] See e.g. *Van Breda v Village Resorts Limited* [2010] ONCA 84 at [54], [100]; *Uniform Court Jurisdiction and Proceedings Transfer Act* s.6 available at <http://www.ulcc.ca/en/uniform-acts-new-order/current-uniform-acts/739-jurisdiction/civil-jurisdiction/1730-court-jurisdiction-proceedings-transfer-act> accessed August 2014, adopted in British Columbia and Nova Scotia; Quebec Civil Code, Article 3136. See further John P McEvoy, 'Forum of Necessity in Quebec Private International Law: CcQ Article 3136' (2005) 35 Review General 61.

[155] See e.g. *Jones v Saudi Arabia* [2006] UKHL 26, at [20]-[25]; but see Committee against Torture, Conclusions and recommendations, 34th Session, 2-20 May 2005, UN Doc. CAT/C/CR/34/CAN, 7 July 2005, paras 4(g), 5(f)).

[156] General Comment No. 3 of the Committee against Torture, 19 November 2012, UN Doc. CAT/C/GC/3, at [22]. The Comment also clearly states (at [22]) that 'The Committee considers that the application of article 14 is not limited to victims who were harmed in the territory of the State party or by or against nationals of the State party', and (at [43]) that 'The Committee considers reservations which seek to limit the application of article 14 to be incompatible with the object and purpose of the Convention.'

[157] Curiously, the United States appears to take the position that while it does not have an *obligation* of universal jurisdiction in respect of civil proceedings arising from torture (having expressly objected to this reading of the Torture Convention), it has at least a conditional *right* of universal jurisdiction, exercised through the Torture Victim Protection Act of 1991 – see *infra* text accompanying n 170.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

of private parties in the absence of the connections of territory or nationality which would traditionally be required under private or public international law rules of jurisdiction. As in the context of treaty-based universal jurisdiction, the 'floor' provided by jurisdictional duties (here, to ensure access to justice) may be higher than the traditional 'ceiling' of jurisdictional rules – requiring an additional evolution in our understanding of traditional jurisdiction.

These rules do not, however, necessarily suggest a 'pure' universal civil jurisdiction: they may rely on some other factual connection in order to justify the exercise of jurisdiction. Among EU Member States, only the Dutch forum of necessity rule expressly provides that no connection whatsoever with the Netherlands is required (where 'a civil case outside the Netherlands appears to be impossible').[158] Under Swiss law, for example, it is necessary that the case has 'a sufficient connection' with Switzerland for the court to exercise 'forum of necessity' jurisdiction.[159] There are a range of reasons why 'pure' universal civil jurisdiction would be undesirable, not least the costs this would impose on certain legal systems, the risks of overlapping and inconsistent exercises of jurisdiction (although these might be reduced by rules of jurisdictional priority or deference), the opportunities which would be created for forum shopping, and the related risk that an exercise of jurisdiction becomes a form of 'neo-colonial' power which denies a state the ability to resolve disputes which are internal or most closely connected to it.[160] However, a subsidiary forum of necessity jurisdiction could be (and indeed commonly is) recognised in a more limited form. A national and resident of State A, a state which does not adhere to the rule of law, seriously injured by the brother of the President, subsequently fleeing in fear to State B, might have no possibility to claim damages under traditional jurisdictional grounds. In this context, the courts of State B might exercise forum of necessity jurisdiction based on the subsequent residence of the claimant in their territory. This factor is indeed the connection most commonly relied on in EU Member States which permit the assertion of forum of necessity jurisdiction based on a

[158] Dutch Code of Civil Procedure, Article 9.

[159] Swiss Federal Act on Private International Law, Article 3. Article 3136 of the Quebec Civil Code similarly provides that 'Even though a Quebec authority has no jurisdiction to hear a dispute, it may hear it if the dispute has *a sufficient connection with Quebec*, where proceedings cannot possibly be instituted outside Quebec or where the institution of such proceedings outside Quebec cannot reasonably be required' (emphasis added). See also e.g. the Belgian rule, *supra* n 150, which applies only 'when the subject matter presents close connections with Belgium'. See also similarly the ALI/UNIDROIT Principles of Transnational Civil Procedure, adopted in 2004 (see *supra* n 65), Principle 2.2.

[160] See further e.g. Donald Francis Donovan and Anthea Roberts, 'The Emerging Recognition of Universal Civil Jurisdiction' (2006) 100 AJIL 142. Another way of understanding these concerns is through the idea that rules of private international law should adopt and reflect a principle of horizontal subsidiarity – see further Alex Mills, 'Federalism in the European Union and the United States: Subsidiarity, Private Law and the Conflict of Laws' (2010) 32 University of Pennsylvania Journal of International Law 369, 406ff; Ryngaert, Jurisdiction in International Law, 211ff.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

'sufficient connection'.[161] Such an approach enlarges traditional juris-
diction in the service of ensuring access to justice and avoiding impunity,
but maintains deference to the primacy of traditional jurisdictional rules.
Forum of necessity jurisdiction in this form is a secondary or subsidiary
basis for exercising regulatory authority. Access to justice does not ne-
cessarily mean abandoning existing jurisdictional rules altogether, nor a
global jurisdictional 'free for all'.[162]

A similar 'forum of necessity'-based expansion of civil jurisdiction was
contemplated, and indeed advocated by the European Commission,
before the US Supreme Court in *Kiobel v Royal Dutch Petroleum*
(2013).[163] The Commission's *amicus* brief argued that an exercise of
universal civil jurisdiction, not based on any traditional jurisdictional
grounds, would meet international jurisdictional standards where it
was necessary to prevent a 'denial of justice' (because no effective alter-
native forum was available, or where possible local remedies had been
exhausted).[164] Such an approach, the Commission suggested, would be
'consistent with the growing recognition in the international community
that an effective remedy for repugnant crimes in violation of fundamen-
tal human rights includes, as an essential component, civil reparations to
the victims.'[165] The joint *amicus* brief of the United Kingdom and the
Netherlands argued, however, that the Alien Tort Statute should be
interpreted consistently with existing jurisdictional principles, 'princi-
pally based on territoriality and nationality'.[166] Ultimately, the Supreme

---

[161] See further Nuyts, Study on Residual Jurisdiction, 66.

[162] The *Preliminary Draft Convention on Jurisdiction and Foreign Judgments in Civil and Commercial Matters* (2000) prepared for the Hague Conference on Private International Law, available at <http://www.hcch.net/upload/wop/jdgmpd11.pdf> accessed 18 August 2014, included a controversial Article 18(3) permitting states to exercise 'universal' civil jurisdiction in respect of serious international crimes. But this included a proposed qualification suggesting that such jurisdiction could only be exercised 'if the party seeking relief is exposed to a risk of a denial of justice because proceedings in another State are not possible or cannot reasonably be required'. The rule thus implicitly recognised the primacy of the traditional grounds for jurisdiction.

[163] 133 S.Ct. 1659 (2013). The possibility of adopting a forum of necessity rule was discussed in oral pleadings – see <http://www.supremecourt.gov/oral_arguments/argument_transcripts/10-1491rearg.pdf> accessed 18 August 2014, (at 13 and 46).

[164] The two tests might differ if 'exhaustion of local remedies' is defined purely territorially. If a national of state A commits a wrong in state B then travels to state C, the absence of an available forum in state B might not preclude an exercise of universal jurisdiction by state C which was conditional only on the exhaustion of 'local' remedies in state B, but forum of necessity jurisdiction conditional on the absence of *any* alternative forum might still not be available (because state A might have nationality-based jurisdiction). The difference between these two positions was potentially decisive in the *Kiobel* case, in which it might have been possible to conclude that the Nigerian courts were not an available forum, but proceedings could have been brought in the UK or the Netherlands (the home jurisdictions of Royal Dutch Shell). The European Commission adopted the position that 'exhaustion of 'local' remedies requires a demonstration by the claimant that those states with a traditional jurisdictional nexus to the conduct are unwilling or unable to proceed', making the two approaches identical, and thus suggesting that the exercise of jurisdiction in *Kiobel* would not have been permissible under international law.

[165] At p.18 available at <http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs/10-1491_neither_amcu_eu.authcheckdam.pdf> accessed August 2014.

[166] 'The Governments strongly believe that such allegations of human rights violations should be dealt with in an appropriate forum, respecting international law principles of jurisdiction. In relation

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Court decided to adopt an even more conservative approach, based on a presumption against the extraterritorial application of the Alien Tort Statute,[167] and thus did not directly address the scope of US jurisdiction as a matter of international law, or whether the US constitution would permit a forum of necessity approach.[168] An approach similar to a 'forum of necessity' rule is, however, notably adopted in the Torture Victim Protection Act of 1991,[169] which essentially provides for the possibility of universal civil jurisdiction for claims arising out of torture, subject to the rule that 'A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.'[170] As noted above, a rule of universal jurisdiction which is subject to the exhaustion of local remedies is functionally equivalent to a forum of necessity rule which is subject to the non-availability of a traditional forum. In either case, such a ground of jurisdiction goes clearly beyond traditional international grounds, in service of enhancing individual access to justice.

## b. The exercise of jurisdictional discretion

The second effect of access to justice on private international law is in the context of jurisdictional discretion (in legal systems which accept such a discretion, such as those in the common law tradition) – the question of whether a court will in fact *exercise* adjudicatory authority. While this discretion is consistent with the traditional view of jurisdiction as a state right, the increasing influence of access to justice as an international requirement suggests a shift toward viewing jurisdiction as an obligation.

English courts, for example, have increasingly considered the availability of an alternative forum before which the claimant can practically

to claims of a civil nature, the bases for the exercise of civil jurisdiction under international law are generally well-defined. They are principally based on territoriality and nationality. The basic principles of international law have never included civil jurisdiction for claims by foreign nationals against other foreign nationals for conduct abroad that have no sufficiently close connection with the forum State.' (at 6)

available   at     <www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs/10-1491_neutralamcunetherlands-uk-greatbritain-andirelandgovs.authcheckdam.pdf> accessed August 2014.

[167] 569 US ___, 133 S.Ct. 1659 (2013). It should be noted, however, that the court left open the possibility that extraterritorial jurisdiction might be asserted under the statute where 'the claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application' (slip opinion, 14). The minority suggested instead an approach which arguably drew on the alternative 'presumption against extra-jurisdictionality' but did not develop this approach in detail. See further e.g. Alex Mills, 'Kiobel Insta-Symposium: A Tale of Two Presumptions', *Opinio Juris*, 18 April 2013, available at <http://opiniojuris.org/2013/04/18/kiobel-insta-symposium-a-tale-of-two-presumptions> accessed August 2014.

[168] There is very little support for a doctrine of forum of necessity in US law – indeed allowing such a doctrine based on contacts between the claimant and the forum (as permitted under various EU Member States) would seem to be inconsistent with the general approach that the constitutionality of an exercise of jurisdiction under the Due Process clause has 'never been based on the plaintiff's relationship to the forum.' *Goodyear Dunlop Tires Operations, S. A. v Brown*, 564 US ___, 131 S. Ct. 2846 (2011), at 2857 n.5.

[169] 28 USC §1350 Notes.

[170] Section 2(b).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

achieve justice to be one of the central questions in exercising the *forum non conveniens* discretion.[171] In the absence of such an alternative forum English proceedings are highly likely to continue, to ensure that the claimant has 'access to justice'. In the United States, courts must consider whether the exercise of jurisdiction is 'reasonable' as part of the test for determining whether jurisdiction is compatible with constitutional due process requirements, which also involves determining whether there is an available alternative forum, as part of considering 'the plaintiff's interest in obtaining convenient and effective relief'.[172] Even if jurisdiction is constitutional, courts may decline to exercise it on the basis of *forum non conveniens* (or possibly venue transfer rules if the alternative forum is within the United States[173]), which again takes into consideration, at least in principle, the need to ensure that another forum is available in which the plaintiff might obtain a remedy.[174] The absence of a foreign court through which the claimant could obtain justice will strongly increase the likelihood of an exercise of jurisdiction.

*c. Access to justice and immunities*

The effect of the development of principles of access to justice in international law also has implications when it comes to prohibitive rules on jurisdiction in the form of the immunities recognised in international law (which may be general state immunity, the personal immunity of heads of state and other senior governmental officials, or the immunity of diplomats, consular officials or representatives of or to international organisations). Traditionally these immunities have been understood as

---

[171] See e.g. *Amin Rasheed v Kuwait Insurance Co* [1984] AC 50; *The Spiliada* [1987] AC 460; *Connelly v RTZ* [1998] AC 854; *Lubbe v Cape Plc* [2000] UKHL 41; *Cherney v Deripaska* [2009] EWCA Civ 849.

[172] *World-Wide Volkswagen Corp. v Woodson*, 444 US 286, 292 (1980). Note also *McGee v International Life Ins. Co.*, 355 US 220, 223 (1957) observing that 'When claims were small or moderate, individual claimants frequently could not afford the cost of bringing an action in a foreign forum – thus in effect making the company judgment-proof'.

[173] 28 USC §1404(a).

[174] See e.g. *Gulf Oil Corp. v Gilbert*, 330 US 501, 506-7 (1947), holding that 'In all cases in which the doctrine of *forum non conveniens* comes into play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes criteria for choice between them. ...[Jurisdictional statutes] are drawn with a necessary generality, and usually give a plaintiff a choice of courts, so that he may be quite sure of some place in which to pursue his remedy.' While the courts will not ordinarily refuse to stay proceedings merely because foreign law is less advantageous to the plaintiff, 'if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice' – *Piper Aircraft Co. v Reyno*, 454 US 235, 254 (1981). It has been debated whether the courts actually take such considerations into account sufficiently, or whether 'the forum non conveniens doctrine creates an access-to-justice gap in transnational cases': Donald Earl Childress III, 'Forum Conveniens: The Search for a Convenient Forum in Transnational Cases' (2013) 53 Virginia Journal of International Law 157, 168 (suggesting at 178 that 'many cases that are dismissed in favor of a foreign forum are now being filed and tried successfully to judgment in a foreign court'); Christopher A Whytock, 'The Evolving Forum Shopping System' (2011) 96 Cornell Law Review 481; David W Robertson, 'Forum Non Conveniens in America and England: "A Rather Fantastic Fiction"' (1987) 103 Law Quarterly Review 398.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

'minimal' standards for when a state may not assert jurisdiction – because the exercise of jurisdiction was understood to be a discretionary matter of state right, there was no reason why a state might not give *more* immunity than required under the rules of international law. The development of principles of access to justice, however, requires a state to exercise its jurisdictional powers, and perhaps to expand those jurisdictional powers as a matter of domestic law to encompass internationally permitted grounds for jurisdiction, or even to go beyond traditional territorial or nationality-based jurisdiction.

It has long been debated whether these considerations should also affect or override those of state immunity, particularly where the right of access to justice arose from a violation of a peremptory norm of international law.[175] The general conclusion has been that access to justice does not require or permit states to exercise jurisdiction contrary to the international law of state immunity – this approach has been adopted by most national courts and tribunals, and also by the International Court of Justice.[176] States however still find themselves caught between the two opposing international legal forces of access to justice and immunity law. Where both come into play, the effect is that states must give immunity when *required* by international law, but must not go *beyond* what is required by international law – they must otherwise exercise their jurisdiction.[177] To exercise too little jurisdiction would be to deny access to justice; to exercise too much would be to infringe state immunity.

By way of illustration, the UK Employment Appeal Tribunal held that the immunity extended to foreign states under the State Immunity Act 1978 in relation to suits under employment contracts went beyond what was required under international law – and even (controversially) went so far as to find that the Act should be set aside

[175] Compare, for example, Roger O'Keefe, 'State Immunity and Human Rights: Heads and Walls, Hearts and Minds' (2011) 44 Vanderbilt Journal of Transnational Law 999; Beth Stephens, 'Abusing the Authority of the State: Denying Foreign Official Immunity for Egregious Human Rights Abuses' (2011) 44 Vanderbilt Journal of Transnational Law 1163. On the tension between access to justice and state immunity see further e.g. Christopher A Whytock, 'Foreign State Immunity and the Right to Court Access' (2013) 93 Boston University Law Review 2033.

[176] See generally *Jurisdictional Immunities of the State* (*Germany v Italy: Greece intervening*), 22 December 2009. For critical comment see Alex Mills and Kimberley Trapp, 'Smooth Runs the Water Where the Brook is Deep: The Obscured Complexities of *Germany v Italy*' (2012) 1 Cambridge Journal of International and Comparative Law 153. If access to justice does indeed not 'trump' immunity, the better view is that this is not because access to justice is not engaged where immunity exists (the view adopted by the House of Lords in *Holland v Lampen-Wolfe* [2000] UKHL 40 and *Jones v Saudi Arabia* [2006] UKHL 26), but because compliance with immunity obligations provides a sufficient reason for non-compliance with access to justice obligations (the view adopted by the European Court of Human Rights in *Al-Adsani v United Kingdom* (2001) 34 EHRR 273). While the two approaches would lead to the same outcome, the former approach wrongly suggests a hierarchy between the two international obligations, while the latter accepts their equivalence but interprets them to be compatible. For an alternative approach to reconciling the two norms, see Whytock, 'Foreign State Immunity and the Right to Court Access'.

[177] *Al-Adsani v United Kingdom* (2001) 34 EHRR 273 (ECHR); *Jones v Saudi Arabia* [2006] UKHL 26; *Jones v United Kingdom* (2014) Case nos. 34356/06, 40528/06 (14 January 2014).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

to the extent that it went beyond the requirements of international law, because of the new status of the right of 'access to justice' as part of EU law since the Lisbon Treaty.[178] A conflict between immunity law and access to justice was only avoided because of this claimed power to set aside the State Immunity Act 1978.[179] Without that power and if the Act does indeed exceed international requirements, the United Kingdom would be in breach of EU law and the European Convention on Human Rights. At least where state immunities are involved, the law of jurisdiction has become less of a discretionary field and more of a tightrope walk.

### d. Access to justice, jurisdiction, and 'sovereignty'

The idea that individuals have a directly enforceable right of access to justice, explored here in a variety of contexts, has implications for the idea of jurisdiction in international law. It implies that jurisdiction is no longer exclusively a right of states, or even an obligation owed by states to each other, but is at least to some extent a matter of individual right, that is, an obligation owed to individuals. This would represent a fundamental challenge to traditional conceptions of jurisdiction, one which cannot be met simply by an enlargement of the recognised grounds for the exercise of state jurisdiction.

Since public international law rules on jurisdiction are reflective of the idea of 'sovereignty', this challenge requires us to reconsider that idea too. In particular, it suggests the recognition, much debated in political and legal theory, of the idea of a 'sovereignty of the individual'[180] alongside the sovereignty of states. If this were to be accepted, rules of jurisdiction in international law could not continue to be characterised purely as rules regulating the co-existence of sovereign states, seeking to minimise overlapping exercises of their authority. Rules of jurisdiction would remain concerned with co-existing 'sovereigns', but would require a broader recognition that this encompasses individuals who may have a

---

[178] *Benkharbouche v Embassy of the Republic of Sudan (Jurisdictional Points: State immunity)* [2013] UKEAT 0401_12_0410 (4 October 2013) (currently under appeal).

[179] Such a conflict might also be avoided through interpretation – if a court of an ECHR state were to apply the common presumption that a statute should be interpreted to be in compliance with international law, this should (to the extent that the text permits such an interpretation) lead to an immunity statute being understood to confer immunity as far as required by international law but no further.

[180] This idea has a long history; see e.g. Hersch Lauterpacht, *International Law and Human Rights* (Stevens & Sons 1950) arguing (at 70) that 'International law, which has excelled in punctilious insistence on the respect owed by one sovereign State to another, henceforth acknowledges the sovereignty of man'; James M Buchanan, *The Economics and the Ethics of Constitutional Order* (University of Michigan Press 1991), arguing (at 227) that 'The central premise of *individuals as sovereigns* . . . denies legitimacy to all social-organizational arrangements that negate the role of individuals as either sovereigns or as principals' (emphasis in original); Annan, 'Two Concepts of Sovereignty' – '[I]ndividual sovereignty—by which I mean the fundamental freedom of each individual, enshrined in the charter of the UN and subsequent international treaties—has been enhanced by a renewed and spreading consciousness of individual rights'.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

right to demand assertions of regulatory authority by states on their behalf.

## V. Party Autonomy and Individual Power Over Jurisdiction

This analysis of the challenges presented to the traditional understanding of jurisdiction in international law by the increasing focus on individual rights may be taken a step further through consideration of another important development in domestic rules of (private international law) jurisdiction and choice of law.[181] In private law disputes, states very widely assert jurisdiction on the sole basis of the consent of the parties, in relation to disputes which themselves have little or no connection to the state.[182] In some cases, this consent may be in the form of a joint agreement to submit an existing dispute to a particular court,[183] and in such cases this form of jurisdiction might perhaps loosely be characterised as based on their territorial 'presence' before the court. This is, however, something of a legal fiction, and in other cases jurisdiction may be based only on a choice of court clause in a contract which one party subsequently refuses to accept, recognise or perform, a situation which cannot be so easily subsumed under existing jurisdictional principles.[184] Similarly, states will generally apply the law chosen by the parties to govern their contractual relationship, even if that relationship is otherwise unconnected with the parties or their dispute.[185] In private international law terms, these are aspects of the almost universally recognised principle of 'party autonomy',[186] which has traditionally functioned in the context of commercial contractual disputes, and increasingly is also applied beyond this, such as in tort law[187] and even family law.[188] The international status of party autonomy in the context of jurisdiction has arguably been confirmed by the Hague Choice of Court Convention

---

[181] See also Mills, The Confluence of Public and Private International Law, 291ff.

[182] See e.g. *Zelger v Salinitri* [1980] ECR 89, in relation to the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, Sept. 27, 1968, 1998 O.J. (C 27) 1 (consolidated version) (now Brussels I Regulation (2001)).

[183] See e.g. the Brussels I Regulation (2001), Article 24.

[184] See e.g. the Brussels I Regulation (2001), Article 23.

[185] In the EU, this follows by implication from Articles 3(1) and 3(3) of the Rome I Regulation (2008).

[186] Party autonomy was recognised by the PCIJ as early as the *Serbian and Brazilian Loans* cases, *France v Yugoslavia; France v Brazil* (1929) PCIJ Ser A, Nos 20-21, Judgments 14-15, p.41. See generally e.g. Peter Nygh, *Autonomy in International Contracts* (OUP 1999); Giesela Ruehl, 'Party Autonomy in the Private International Law of Contracts', in Gottschalk et al (eds), *Conflict of Laws in a Globalized World* (CUP 2007); Mattias Lehmann, 'Liberating the Individual from Battles Between States: Justifying Party Autonomy in Conflict of Laws' (2008) 41 Vanderbilt Journal of Transnational Law 381; Horatia Muir Watt, '"Party Autonomy" in international contracts: from the makings of a myth to the requirements of global governance' (2010) 6 European Review of Contract Law 250.

[187] For example, under the Rome II Regulation (2007), Article 14.

[188] See e.g. Janeen Carruthers, 'Party Autonomy in the Legal Regulation of Adult Relationships: What Place for Party Choice in Private International Law?' (2012) 61 ICLQ 881.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

(2005), prepared by the Hague Conference on Private International Law.[189] An equivalent acceptance of the status of party autonomy in the context of choice of law in contract may be suggested by the Draft Hague Principles on Choice of Law in International Commercial Contracts, also being prepared under the auspices of the Hague Conference.[190]

Historically, party autonomy has been viewed as a problem for theorists who have sought to reconcile rules of private international law with public international law. If jurisdiction in public international law is (as it has been traditionally viewed) about state rights and powers, how can individuals give or take away the powers of states? Many courts and commentators have sought to accommodate party autonomy and traditional state sovereignty by finding that party choices are not themselves effective to confer or oust jurisdiction, but that courts should nevertheless almost always give effect to genuine party choices as a matter of state policy, particularly (in the commercial context) for the sake of 'international trade and commerce'. Party intentions are, in this view, merely a factual connection on which states have decided to rely in determining the forum or the applicable law. There is no real autonomy under this approach, although there is still an expansion of traditional international jurisdictional grounds to accept 'party intentions' alongside territory or nationality as sufficient grounds for jurisdiction in the context of private law disputes and relationships. But it is not clear whether even this expansion provides a convincing explanation of what appears to be state recognition of the autonomy of private parties, rather than a contingent choice by states to give effect to party intentions.

Party autonomy can function in two fundamentally different ways, each of which has a distinct impact on ideas of public international law 'jurisdiction'. As states have accepted and adopted rules of party autonomy, it has sometimes been required that there be an 'objective' connection between the parties or their dispute and the forum or law chosen by the parties in order for that choice to be valid.[191] Under this conception, party autonomy does not function as a new basis of jurisdiction, but rather as a rule of jurisdictional priority.[192] Where more than one state

---

[189] Concluded on 30 June 2005; not yet in force. Available at <http://www.hcch.net/index_en.php?act=conventions.text&cid=98> accessed August 2014.

[190] The most recent version is Prel. Doc. No 6, March 2014, prepared for the attention of the Council of April 2014 on General Affairs and Policy of the Conference. Available at <http://www.hcch.net/upload/wop/gap2014pd06_en.pdf> accessed August 2014.

[191] For example, the Restatement (Second) of Conflict of Laws (1969), s.187(2)(a), provides that the parties' choice need not be given effect if 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice' (although it is unclear whether neutrality might itself be considered a reasonable basis in some circumstances). A similar position was also traditionally adopted in the Uniform Commercial Code in the United States, but see *infra* n 193.

[192] This assumes that the objective connection required for a choice of law or court to be valid is a traditional territorial or personal link, which is generally the case in states which have adopted this approach.

might have 'jurisdiction' (in the public international sense) on traditional grounds, it is the parties' choice which determines whose jurisdiction prevails – which court gets to hear the case, and which law is applied. Party autonomy is thus defined as a limited choice between those jurisdictional powers recognised by and between states – a position which balances recognition of state sovereignty and individual autonomy.

Other states have not adopted such a restrictive view, and even those states which did initially take a restrictive approach have tended to move away from it.[193] Under the common law and under EU rules, for example, there is no requirement for a connection between the parties or their dispute and the forum or law they have chosen. Article 3 of the Rome I Regulation (2007) and Article 23 of the Brussels I Regulation (2001) are not rules determining priority between other grounds of choice of law or jurisdiction: they trump the general rules of choice of law or jurisdiction based on territorial or personal connections.[194] The same position is adopted in the Draft Hague Principles on Choice of Law in International Commercial Contracts, which expressly state that 'No connection is required between the law chosen and the parties or their transaction.'[195] Under this conception, party autonomy is an *additional* basis of jurisdiction (in the international sense) which supersedes traditional territorial or personal jurisdictional grounds. Such grounds continue to apply, but only in default of party choice. Party autonomy in this view is not merely another accepted basis of jurisdiction, it is a new jurisdictional ground with priority over the others.[196]

Because jurisdiction based on a choice of court agreement thus generally requires no other connection between the parties or their dispute and the state asserting jurisdiction, and a choice of applicable law similarly may be entirely independent of the parties or the subject matter of their dispute, some private international lawyers have traditionally viewed party autonomy as indicating that the only limits on the national

---

[193] The 2001 revisions to the Uniform Commercial Code removed any requirement for an 'objective connection' for a valid exercise of party autonomy (s.1-301(c)), except in respect of consumer contracts. The change was, however, controversial, has not been universally implemented, and was reversed in 2008 amendments to the Code. See further, e.g., Patrick Joseph Borchers, 'Categorical Exceptions to Party Autonomy in Private International Law' (2008) 82 Tulane Law Review 1645; Dennis Solomon, 'The Private International Law of Contracts in Europe: Advances and Retreats' (2008) 82 Tulane Law Review 1709, 1723ff; Mo Zhang, 'Party Autonomy and Beyond: An International Perspective of Contractual Choice of Law' (2007) 20 Emory International Law Review 511.

[194] While there are some important but narrow limitations which apply to party autonomy – such as Article 3(3) and (4) of the Rome I Regulation (2008), and Article 22 of the Brussels I Regulation (2001) – these do not undermine the general priority of party autonomy over traditional jurisdictional grounds.

[195] Article 2(4).

[196] While this is clearly recognised under the common law and Brussels I Regulation (2001), it is not entirely uncontroversial – as reflected in Article 19 of the Choice of Court Convention (2005), which provides that 'A State may declare that its courts may refuse to determine disputes to which an exclusive choice of court agreement applies if, except for the location of the chosen court, there is no connection between that State and the parties or the dispute.'

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

regulation of private international law are those concerned with private justice or fairness – concerns which are met if the defendant has freely agreed in advance to the jurisdiction or law, even if there are no other objective connections. If a state exercises jurisdiction or applies its law in civil proceedings based purely on consent by the parties, this is difficult to reconcile with the traditional public international law requirement that jurisdiction must be justified by a substantial objective connection, typically territoriality or nationality. Faced with this argument, it might seem that there are only two alternatives: first, rejecting the idea that private international law is about the allocation of regulatory authority between states (denying any connection between public and private international law, thus rejecting the application of public international law jurisdictional rules to civil disputes, leaving them unrestricted except under national law), or second, making (unrealistic) arguments against party autonomy, a response notoriously taken under the First Restatement of Conflict of Laws.[197]

The broader developments in international law examined here provide a simpler explanation. If an acknowledgement is made of an 'individual sovereignty' which is balanced against that of the state, the widespread recognition of party autonomy is clearly compatible with an argument that the foundations of private international law lie in broader international norms.[198] The apparent incompatibility arises only as a result of outmoded conceptions of public international law, which conceive of jurisdiction as purely a matter of (territorial or nationality-based) state rights and powers. Party autonomy provides a further demonstration of an evolution which incorporates the idea of jurisdiction as a matter of individual right. The right to be subject to jurisdiction only in accordance with traditional international law limitations is a right which may be waived, not only by states, but by individuals themselves. Almost universally, states have accepted that individuals may confer adjudicative

---

[197] Under Beale's *First Restatement (Conflicts)* (1934), party autonomy was rejected because otherwise individuals were acting as 'legislators' (a direct rejection of the idea of 'individual sovereignty'). That theory was out of step with practice encouraged scepticism about private international law rules more generally, contributing to the rise of the American 'realist' challenge to private international law (see generally Mills, 'The Identities of Private International Law'). The status of party autonomy in US law remains, however, underdeveloped – choice of forum agreements have generally been approved in respect of federal question or admiralty jurisdiction (*The Bremen v Zapata Off-Shore Co.*, 407 US 1 (1972)), but some state courts remain sceptical, and it is unclear when or whether federal courts exercising diversity jurisdiction ought to follow federal or state law on this question.

[198] The deference to party autonomy in private international law was described as reflecting 'the sovereign will of the parties' by Judge Bustamente in his separate opinion in *Serbian and Brazilian Loans Cases*, *France v Yugoslavia; France v Brazil* (1929) PCIJ Ser A, Nos 20-21, Judgments 14-15, p.53. Nygh argues that party autonomy itself has the status of a rule of customary international law: Nygh, 'Autonomy in International Contracts', 45. Note the recognition of the affinity between international norms and private international law rules on party autonomy in the resolution of the Institute of International Law on 'The Autonomy of the Parties in International Contracts Between Private Persons or Entities' (1991) (see <http://www.idi-iil.org/idiE/resolutionsE/1991_bal_02_en. PDF> accessed August 2014.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

jurisdiction on a state of their choice, and may also, by making that choice exclusive, detract from the jurisdiction that other states would ordinarily be entitled to assert over them.[199]

These developments are compatible with a view of the international system in which states and individuals are both recognised as, at least to some extent, sovereigns. This is not to say that such individual sovereignty must be unrestricted – the 'sovereignty' of individuals is, no less than that of states, prescribed by law. This does, however, require accepting an active role for individuals in questions of the jurisdictional power of states.

A further fundamental issue concerning party autonomy should be noted, although it is beyond the scope of this article. There is also very widespread agreement among states – principally in the form of the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards – that parties should be free to grant exclusive jurisdiction over their private disputes to *non-state* methods of dispute resolution, such as arbitral tribunals, to the (at least partial) exclusion of state judicial jurisdiction. This development is subject to two contrasting and incompatible readings, each widely adopted and heavily contested. The first is that it simply reflects the acceptance by states of arbitration as a form of alternative dispute resolution, backed up by state courts, but lacking any normative power of its own. The second is the more radical proposition that it implies the acceptance by states of a non-state form of ordering, alongside and competing with national courts – that arbitral tribunals are privately constituted courts, sometimes even applying privately constituted (non-state) private law.[200] This would certainly represent a further challenge to traditional conceptions of jurisdiction, recognising individual party freedom not just between state laws or adjudicative bodies, but beyond them, through the recognition of private (non-state) legal forms of ordering, or of legal pluralism beyond the state.[201] It would also be a serious challenge to the idea that 'jurisdiction' is only concerned with the powers of states, as it would

---

[199] When combined with the idea of access to justice, accepting that parties may generate jurisdictional exclusivity arguably also requires accepting an *obligation* to exercise that exclusive jurisdiction, otherwise no forum will be available to the claimant.

[200] Note the acceptance of a possible choice of non-state law in the Draft Hague Principles on Choice of Law in International Commercial Contracts, Article 3. Although a choice of non-state law is not (currently) permitted under the Rome I Regulation (2008), English courts will recognise and enforce arbitral awards based on non-state law, under the Arbitration Act 1996, s.46; see e.g. *Deutsche Schachtbau- und Tiefbohrgesellschaft mbH at al. v The Government of the State of R'as Al Khaimah and The R'as Al Khaimah Oil Company* ('Rakoil') [1987] 2 All ER, pp. 769-784 (reversed on other grounds at [1990] 1 AC 295); *Channel Tunnel Group Ltd v Balfour Beatty Constructions Ltd* [1993] AC 334; *Musawi v R.E. International (UK) Ltd* [2007] EWHC 2981 (Ch); *Dallah Real Estate & Tourism Holding Co v Pakistan* [2010] UKSC 46.

[201] See generally e.g. Thomas Schultz, *Transnational Legality: Stateless Law and International Arbitration* (OUP 2014); Paul Schiff Berman, *Global Legal Pluralism: A Jurisprudence of Law Beyond Borders* (CUP 2012); Peer Zumbansen, 'Transnational Legal Pluralism' (2010) 1 Transnational Legal Theory 141; Emmanuel Gaillard, *Legal Theory of International Arbitration* (Nijhoff 2010).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

involve accepting not just individual jurisdictional power to choose be-tween state laws or courts, but jurisdictional power conferred on private institutions, or exercised by individuals in the creation of private rules. If it becomes accepted that private parties can make laws with a status equal to those of states, then there may be little doubt that they possess a form of sovereignty. Whether this is indeed taking place remains one of the great contested issues of the international legal order.

## VI. Conclusions

This article has sought to reconsider the idea of 'jurisdiction' in light of broader changes in international law, including the emerging influence of individual rights and powers. Individuals have traditionally been con-sidered passive objects of international legal regulation, which is analysed exclusively as a matter of state right or power based principally on links of territory or personal identity. This approach has been reflected in domestic rules of jurisdiction as a matter of private interna-tional law, which similarly have approached jurisdiction principally as a question of territorial or personal control.

At both the international and national level, these approaches are under challenge and ripe for reconceptualisation. Prescriptive and adjudicative jurisdiction at the international level is, in a variety of contexts, accepted as a matter of obligation between states rather than state rights – the approach to jurisdiction needs to be reconceived not merely as a ceiling, but also as a floor. Even more significantly, in the context of the devel-opment of ideas of the international delict of 'denial of justice' in relation to the treatment of foreign nationals, and of the idea of 'access to justice' in the context of human rights law, there is increasing recognition that states may owe obligations to exercise prescriptive and particularly adju-dicative jurisdiction (according to international not domestic standards) directly to individuals. Some states take the view that access to justice may even require exercising forum of necessity jurisdiction if no other forum is available for the claimant, even if there is no connection between the state and the parties or their dispute which would justify jurisdiction on traditional grounds. Further, there is widespread recognition that jur-isdiction may be at least partially conferred on states and withdrawn from states, by private parties in civil or commercial matters, through the ex-ercise of party autonomy. All these developments appear to signify a shift in the status of individuals in relation to jurisdiction at both international and national levels, from passive objects of international law regulation to active rights-holders. The rules on jurisdiction in international law should thus be rethought as concerned not only with state rights but also with state responsibilities – a combination of state rights, obligations and prohibitions as well as individual rights which reflects the more complex reality of modern international law.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Of course it remains true that it is states that have recognised these rights and perhaps even conferred them on individuals, and an explanation may be made of this phenomenon in derivative terms which fit within a model of international law in which states retain their traditional position as exclusive sovereigns, and international law is merely concerned with relations between sovereign states – that individuals are, for example, merely exercising the contingently delegated authority of states, which could also be taken away. Courts themselves have often striven to find such explanations, in an effort to accommodate both individual rights and state sovereignty. But the recognition of the individual in international law reflects both the moral strength of individual claims to justice and autonomy and the reality of the power wielded by private actors in protection of their property and interests. In practical terms, it has become difficult for any state wishing to engage with the international community to ignore individual rights of access to justice, or the powers of commercial parties to choose the laws and forums under which their relationships are regulated. Individual personality and autonomy has become entrenched in reality, if not yet entirely in theory. The rules giving effect to choice of law clauses, choice of court agreements, and arbitration agreements may take the form of national or supra-national (for example, EU) laws or treaties, but it hardly seems realistic to suggest that they could be repealed or repudiated given the power and influence of the corporations which rely on these rules (remembering that, at least according to one study, there are more corporations than states in the list of the 100 largest economies in the world[202]), not to mention the arbitration and litigation industries which depend on them. One might be reminded of the character called 'the king' in Chapter 10 of the novella 'Le Petit Prince' by Antoine de Saint Exupéry, who suffers from the delusion that the sun rises and sets each day because (after consulting an almanac) he commands it to do so at the specified time, asserting his 'sovereign' power over it.[203] States may well believe that private parties exercise power only because of their consent, and may even legislate to this effect, but this may not provide an accurate account of where power lies in the global political and legal order. In any event, while there remain points of controversy concerning the limits of party autonomy, there is little or no sense that party autonomy as a principle is merely contingent.

[202] Institute for Policy Studies, 'Top 200: The Rise of Corporate Global Power', 4 December 2000, available at <http://www.ips-dc.org/top_200_the_rise_of_corporate_global_power/> accessed 18 August 2014.
[203] '"You shall have your sunset. I shall command it. But, according to my science of government, I shall wait until conditions are favorable."
"When  will that be?" inquired the little prince.
"Hum! Hum!" replied the king; and before saying anything else he consulted a bulky almanac. "Hum! Hum! That will be about–about–that will be this evening about twenty minutes to eight. And you will see how well I am obeyed!"'

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

These phenomena suggest an important development in the conception of jurisdiction, and the limits of state sovereignty, but one which has received insufficient attention in the international law literature. I have argued that this development indicates a partial acceptance of a 'sovereignty of the individual' in the public and private international law of jurisdiction, and thus perhaps the emergence of a more 'cosmopolitan' conception of sovereignty, which attempts to accommodate the normative value of both state and individual actors. The issues which arise in the context of jurisdiction are in many ways a microcosm of one of the great challenges facing international law – how to move beyond the traditional dominance of states, to the reconciliation of a range of normative interests, from individual, to state, to international society as a whole.

In law, as in science, a theoretical model may only be stretched so far in response to evidence before a paradigm shift occurs, replacing the basic assumptions of the system with a new set of foundational principles.[204] The theme underlying this analysis is that international law is (at least potentially) in the midst of such a shift. Both theoretical models may be broadly feasible at present, but as the recognition of individuals grows in international law and practice, Occam's razor challenges the persuasiveness of the traditional perspective. But descriptive economy is not the only value at stake in choosing a theoretical perspective. Law and the social sciences are fundamentally different from the natural sciences in that the adoption of a theoretical perspective does not merely describe, but may also change its subject. The move from Newtonian to relativistic physics did not change the reality of the world, it simply described it better. But the development of classical international law did not merely describe movements in international relations, it has helped to shape them by shaping the thinking and behaviour of the actors who in turn influenced events. The choice of a theoretical paradigm in law is not only a question of its descriptive accuracy, but also a question of its normative implications.

This leaves us with perhaps the most fundamental question – a question beyond the scope of this article – whether or not the transformation in jurisdiction described in this paper is desirable. Not all change is progress. Enthusiasm for a more 'cosmopolitan sovereignty' must be tempered by the recognition that it comes with the danger that the empowerment of some private actors, particularly corporations, may put at risk the rights of others, or the collective goods traditionally protected by the normative authority of states. Recognising individual jurisdictional powers might embrace not just access to justice for victims of human rights violations, or freedom for individuals to choose which system of law should govern their personal relations, or freedom for companies doing business internationally to choose the most appropriate

---

[204] See most famously Thomas Kuhn, *The Structure of Scientific Revolutions* (University of Chicago Press 1962).

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022

or efficient legal order to govern their relations, leading to potentially healthy jurisdictional competition. The recognition of jurisdictional autonomy may also provide a means through which individuals or markets evade the regulatory influence of states and the protection of national public interests – concerns which are particularly prevalent in the rights granted to foreign investors (whose complaints are heard by international arbitral tribunals, largely applying international not national law), and in the scope of recognition of party autonomy. 'Liberating the individual from battles between states'[205] may sound virtuous, but liberation may also mean 'regulatory escape'.

It must also be remembered that the traditional jurisdictional rules of international law were themselves developed with the protection of certain values and interests in mind – for example, to reduce regulatory conflict, for the sake of the peaceful coexistence of states. An increase in the range of jurisdictional grounds in international law might serve the interests of individuals in achieving access to justice, but overlapping jurisdiction between states may also give rise to systemic conflict that outweighs the benefits provided to particular claimants. As Judges Higgins, Kooijmans and Buergenthal noted in their Joint Separate Opinion in the Arrest Warrant Case:

One of the challenges of present-day international law is to provide for stability of international relations and effective international intercourse while at the same time guaranteeing respect for human rights. The difficult task that international law today faces is to provide that stability in international relations by a means other than the impunity of those responsible for major human rights violations.[206]

These are the sorts of difficult decisions which courts and law-makers are increasingly faced with, in the context of the scope of extraterritorial or universal jurisdiction, or balancing freedom of arbitration against national policy interests, or where claims come up against traditional restrictions on jurisdiction such as foreign state immunity. In each case, the concerns of access to justice for individuals square up against concerns of limiting state regulatory power on traditional grounds, to minimise the possibility of regulatory conflict between states, or exercises of jurisdiction which might lead to inefficient resolution of disputes, or even amount to 'neo-colonial' assertions of extraterritorial power.[207] The range of cases and contexts in which these types of

[205] To quote from the title of Lehmann, 'Liberating the Individual from Battles Between States: Justifying Party Autonomy in Conflict of Laws'.

[206] *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal, at [5].

[207] These are analogous to the concerns raised in the Separate Opinion of President Guillaume in *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v Belgium)* [2002] ICJ Reports 3, arguing (at [15]) that universal jurisdiction would 'risk creating total judicial chaos. It would also be to encourage the arbitrary, for the benefit of the powerful, purportedly acting as agent for an ill-defined "international community".'

problems arise are not a series of isolated and disconnected incidents, but rather like localised 'tremors' which signal pressure points in the slow drift of tectonic plates. If international law is under a process of transformation, then more of these types of collisions must be anticipated. The deeper challenge for international lawyers is whether the door can be opened to recognition of the normative authority of individuals without losing sight of the other interests and values, national and international, which have traditionally been protected by the law, and whose protection we may need to preserve.

Downloaded from https://academic.oup.com/bybil/article/84/1/187/2262836 by Universiteit van Amsterdam user on 30 January 2022