# EXHIBIT 3



EDITED BY

STEPHEN
**ALLEN**

DANIEL
**COSTELLOE**

MALGOSIA
**FITZMAURICE**

PAUL
**GRAGL**

EDWARD
**GUNTRIP**

# The Oxford Handbook *of*
# JURISDICTION IN
# INTERNATIONAL LAW

OXFORD
UNIVERSITY PRESS

Great Clarendon Street, Oxford, OX2 6DP,
United Kingdom

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and in certain other countries

© The Several Contributors 2019

The moral rights of the authors have been asserted

First Edition published in 2019

Impression: 1

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the
prior permission in writing of Oxford University Press, or as expressly permitted
by law, by licence or under terms agreed with the appropriate reprographics
rights organization. Enquiries concerning reproduction outside the scope of the
above should be sent to the Rights Department, Oxford University Press, at the
address above

You must not circulate this work in any other form
and you must impose this same condition on any acquirer

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America

British Library Cataloguing in Publication Data
Data available

Library of Congress Control Number: 2019941381

ISBN 978–0–19–878614–6

Printed and bound by
CPI Group (UK) Ltd, Croydon, CR0 4YY

Links to third party websites are provided by Oxford in good faith and
for information only. Oxford disclaims any responsibility for the materials
contained in any third party website referenced in this work.

4

CHAPTER 14

........................................................................................

# PRIVATE INTERESTS AND PRIVATE LAW REGULATION IN PUBLIC INTERNATIONAL LAW JURISDICTION

........................................................................................

## ALEX MILLS

| | |
|---|---|
| I. The State-Centric and Public Law Focus of Jurisdiction | 331 |
| II. Traditional Jurisdictional Grounds: Territoriality, Nationality, Universality | 332 |
| III. Private Interests in Public Law Regulation | 336 |
| IV. Private Law Regulation | 337 |
| IV.1. Private Interests in Private Law Regulation | 340 |
| IV.2. The Separation of Adjudicative and Prescriptive Jurisdiction | 344 |
| IV.3. Additional Connecting Factors | 349 |
| IV.4. Techniques to Manage Potentially Conflicting Regulation | 351 |
| V. Conclusions | 354 |

# I. The State-Centric and
# Public Law Focus of Jurisdiction

This chapter responds to two related but distinct limitations of the dominant accounts of the modern law of jurisdiction. The first is that most discussion of jurisdiction is situated within the classical framework of international law under which states are the only actors. Jurisdiction is, in this conception, only about inter-state relations—a matter of defining the limits on state regulatory power, based principally on territorial or personal connecting factors (as outlined in Section II of this chapter). Within those limits, the exercise of that power is viewed as a matter of state discretion. Consequentially, the constraints on jurisdiction are enforced through inter-state processes, such as state protests against excesses of jurisdiction by other states. The law of jurisdiction does not therefore account for private actors and their interests. Jurisdiction is naturally focused on states and their regulatory powers, as it provides in turn for regulation of those powers (i.e. international regulation of national regulation). It is however striking that some of the 'objects' of that regulation—private parties—are missing from traditional accounts of the law, although they are now widely recognized as 'subjects' of international law, at least for certain purposes.[1] This lacuna is discussed further in Sections III and IV of this chapter.

The second is that questions of private law have been generally marginalized in modern discussions of the law of jurisdiction, as the focus has instead been on criminal and other public regulatory law. It has sometimes been questioned whether private law regulation is actually subject to public international law jurisdictional constraints at all.[2] This is regrettable, because it means that public international lawyers have tended to underestimate the significance of private law regulation, and thus of the public international law regulation of that regulation. Private law jurisdictional questions should receive greater attention for three reasons. First, they are undoubtedly significant not only for private actors themselves, but for the public interests which they engage. The regulation of contracts is, for example, not just about bilateral bargains, but also provides the basis for the global financial arrangements which underpin (and occasionally undermine) the functioning of the global economy. Claims in tort may, to give another example, not only regulate behaviour as an alternative to criminal law, but may also determine public resource allocation (where private compensation is not available, public support such as national healthcare may have to provide), and may further be relied on to enforce and protect public norms such as human rights. The second reason why private law regulation should receive greater attention is that it highlights some of the most important

---

[1]  See generally e.g. Kate Parlett, *The Individual in the International Legal System* (Cambridge University Press, 2011); Jean D'Aspremont (ed.), *Participants in the International Legal System: Multiple Perspectives on Non-State Actors in International Law* (Abingdon: Routledge, 2011).

[2]  See e.g. Michael Akehurst, 'Jurisdiction in International Law', *British Yearbook of International Law* 46 (1972–3): 145, 177, 182; for further examples see e.g. F. A. Mann, 'The Doctrine of Jurisdiction in International Law', in *Studies in International Law* (Oxford: Clarendon Press, 1973), 14.

general issues of the law of jurisdiction, as discussed in Section IV of this chapter, including but not limited to the potential influence of private interests. The third reason is that private law regulation raises some distinctive jurisdictional issues, and potentially offers some distinctive solutions, also as discussed in Section IV. In a private law context, for example, the courts of one state may apply the substantive law of another state, thus separating the questions of adjudicative and prescriptive jurisdiction. In relation to both adjudicative and prescriptive jurisdiction, a proliferation of connecting factors has also been recognized in the private law context, as has a further range of techniques to manage the potential for conflicting regulation.

## II. Traditional Jurisdictional Grounds: Territoriality, Nationality, Universality

The traditional law of jurisdiction needs relatively little introduction here.[3] A clear preliminary distinction must be drawn between prescriptive jurisdiction (application of law)[4] and enforcement jurisdiction (exercise of coercive power),[5] the latter being strictly territorial in the absence of consent or a special permissive rule. Adjudicative jurisdiction, often posited as a third mode of exercise of regulatory power,[6] involves elements of both prescription and enforcement, and will be an important focus of later analysis in this chapter. The law on prescriptive jurisdiction has traditionally focused on the identification of connecting factors between the regulating state and the object of its regulation, principally based on territoriality and nationality (a state may apply its law to any person or event in its territory, and may also apply its law extraterritorially to its nationals and potentially to events causing harm to its nationals). The existence of such limits reflects a recognition that sovereign states coexist in the international legal order and thus that an exercise of jurisdiction which relates to a person or event in another state's territory requires particular justification. Universal jurisdiction has also increasingly been recognized as a feature of certain aspects of international law, focused primarily on regulation of international crimes, where states have collectively (through the formation of customary

[3] See also e.g. Alex Mills, 'Rethinking Jurisdiction in International Law', *British Yearbook of International Law* 84 (2014): 187; Christopher Staker, 'Jurisdiction', in Malcolm D. Evans (ed.), *International Law*, 4th edn (Oxford University Press, 2014); F. A. Mann, 'The Doctrine of Jurisdiction Revisited after Twenty Years', *Recueil des Cours* 186 (1984): 19; Mann (n. 2).

[4] This may be exercised by any law-making body, which may include the legislature, judiciary, or executive. See e.g. Restatement (Fourth) of Foreign Relations Law, § 401 (Comment).

[5] See e.g. *ibid.*, § 432.

[6] See e.g. *ibid.*, §§ 421–3. The Restatement (Fourth) of Foreign Relations Law takes the (controversial) new position that 'With the significant exception of various forms of immunity, modern customary international law generally does not impose limits on jurisdiction to adjudicate' (Part IV, Chapter 2, Introductory Note). This is discussed further in Section IV of this chapter.

international law or through treaty practice) accepted that the interests of ending impunity outweigh the need for traditional regulatory constraints.[7] States generally comply with these limits in one of two ways. First, through express limits adopted as part of legislation—a criminal statute may state, for example, that it is an offence to commit murder in the territory, or for a national of the state to commit murder anywhere in the world.[8] Second, where statutory presumptions are relied on to equivalent effect, such as the presumption against extraterritoriality[9] or the more expansive presumption against extra-jurisdictionality[10] (which may encompass extraterritorial regulation where permitted under international law rules of jurisdiction).[11] An exercise of jurisdiction beyond recognized limits would constitute an internationally wrongful act.

Within the boundaries of these limits or justifications, both prescriptive and enforcement jurisdiction have been approached traditionally as a question of state discretionary power, reflecting a state's sovereign control over the exercise of its regulatory authority. It has, however, also been recognized as part of international law that states must comply with a minimum standard of treatment in relation to foreign nationals in their territory.[12] This provides a constraint not only on how jurisdiction may be exercised, but also on *whether* jurisdiction may be exercised. It may, for example, be a denial of justice if the perpetrator of a crime against a foreign national in a state's territory is not arrested, or goes unpunished, or (arguably) if fundamental harmful acts against a foreign national are not criminalized at all.[13] Thus in at least some circumstances a failure to exercise enforcement, adjudicative or prescriptive jurisdiction may also constitute an internationally wrongful act. An example of the various elements of this traditional framework of jurisdiction is represented diagrammatically in Figure 14.1.

It is a feature of this framework that it readily accepts some possibility of overlapping and conflicting exercises of prescriptive jurisdiction. This is possible even within the domain of territorial jurisdiction, as a wrongful act committed in one territory which causes direct harm in another territory may give rise to territorial jurisdiction in each state. The possibility of conflicting prescriptive jurisdiction is further multiplied by

---

[7] See generally e.g. Roger O'Keefe, 'Universal Jurisdiction: Clarifying the Basic Concept', *Journal of International Criminal Justice* 2 (2004): 735; Restatement (Fourth) of Foreign Relations Law, § 413.

[8] See e.g. Offences Against the Person Act 1861 (UK), s. 9.

[9] See e.g. *Morrison v National Australia Bank*, 561 US 247 (2010); Restatement (Fourth) of Foreign Relations Law, § 404.

[10] In this context, meaning a presumption that a law does not exceed international law's jurisdictional limitations. See e.g. John H. Knox, 'A Presumption against Extrajurisdictionality', *American Journal of International Law* 104 (2010): 351; Restatement (Fourth) of Foreign Relations Law, § 406.

[11] See e.g. *Alexander Murray, Esq. v Schooner Charming Betsy*, 6 US 64 (1804); *The Appollon*, 22 US 362, 370 (1824) ('however general and comprehensive the phrases used in our municipal laws may be, they must always be restricted in construction to places and persons, upon whom the legislature has authority and jurisdiction').

[12] See generally e.g. Martins Paparinskis, *The International Minimum Standard and Fair and Equitable Treatment* (Oxford University Press, 2013).

[13] See e.g. Jan Paulsson, *Denial of Justice in International Law* (Cambridge University Press, 2005); Francesco Francioni, 'Access to Justice, Denial of Justice and International Investment Law', *European Journal of International Law* 20 (2009): 729.



- French criminal injures German victim
- UK courts prosecute
- If UK courts have no recognised basis of jurisdiction, breach of international law in respect of France
- If UK courts have jurisdiction and refuse to exercise, may be breach of international law in respect of Germany

FIGURE 14.1  Traditional framework of jurisdiction

the existence of nationality-based jurisdiction, which may alternatively be based on the nationality of the defendant (active personality) or, slightly more controversially, the victim (passive personality). An even further possibility for overlapping regulation arises in relation to universal jurisdiction, although the possibility of conflicting regulation is diminished by the fact that this only arises in respect of internationally recognized crimes. Such jurisdictional overlaps are limited principally (but often ineffectively) by the rule that territoriality is the exclusive basis of enforcement jurisdiction. The state which controls the exercise of power over the person or property subject to exercises of prescriptive jurisdiction may thus ultimately be in the primary position to give effect to its criminal law. For legal or natural persons with property in more than one territory, however, the possibility of enforcement against their assets may render them effectively subject to the prescriptive jurisdiction of multiple states. A 'rule of reasonableness' has also been proposed (e.g. in the US Restatement (Third) of Foreign Relations Law,[14] and in a more developed form in the work of Cedric Ryngaert[15]) as a limitation on the exercise of prescriptive jurisdiction, requiring that it take into consideration the relative strengths of the connections which the issue has with different states. This is, however, not widely accepted to form part of current international law on jurisdiction, and in the Restatement (Fourth) of Foreign Relations Law has been downgraded to 'a matter of prescriptive comity'.[16]

[14]  Restatement (Third) of Foreign Relations Law, § 403.
[15]  Cedric Ryngaert, *Jurisdiction in International Law*, 2nd edn (Oxford University Press, 2015).
[16]  Restatement (Fourth) of Foreign Relations Law, § 405.

The limited recognized grounds of jurisdiction have traditionally served as a significant constraint on state regulation. However, two developments suggest that the existence of only limited possibilities for regulation beyond a state's own territory may be failing to fulfil this function. The first is the rise in what may be called 'extra-territorial projection', where territorial regulation is relied on to project the effect of regulation extraterritorially.[17] For example, a state may condition entry of goods into its territory on the state of origin's compliance with human rights law, environmental regulation, or labour standards. The regulation is territorial, but its effect is not—and thus public international law does not constrain a state from leveraging its economic influence to regulate matters which do not occur on its territory or involve its nationals. The primary concern here is perhaps not so much the increasing prospect of conflicting regulation, but the potential for international jurisdictional rules to be complicit in economic coercion—however well-intentioned much of it may be. The second development is the rise in cross-border activity which may engage numerous territorial connections. This includes a wide variety of commercial and non-commercial activity, but perhaps the most prominent example is conduct on the internet.[18] Despite initial idealistic conceptions of the internet as a 'free zone' beyond state regulatory control, it is instead becoming a site of over-regulation, as even territorially targeted state laws impacting on online activity will frequently have global implications. In some cases, this may lead to conflicting regulatory policies, as, for example, the free-speech rights favoured by one state are diminished by the limitations on free speech imposed by another.[19] In unusual cases, it may even lead to directly contradictory regulation. The US Supreme Court was, for example, recently faced with deciding whether a search warrant issued in New York against Microsoft should extend to emails held on servers in Ireland.[20] The case was rendered moot by the US enactment of the Clarifying Lawful Overseas Use of Data Act (CLOUD Act),[21] to provide expressly that the relevant orders may have extraterritorial effect. Microsoft and other similar cloud service providers are thus potentially in the unenviable position of having to choose between breaching US criminal law or EU data protection law.[22]

[17] See further e.g. Alex Mills, 'Private International Law and EU External Relations: Think Local Act Global, or Think Global Act Local?', *International and Comparative Law Quarterly* 65 (2016): 541; Joanne Scott, 'Extraterritoriality and Territorial Extension in EU Law', *American Journal of Comparative Law* 62 (2014): 87; Joanne Scott, 'The New EU "Extraterritoriality"', *Common Market Law Review* 51 (2014): 1343.

[18] See generally e.g. Dan Jerker B. Svantesson, *Solving the Internet Jurisdiction Puzzle* (Oxford University Press, 2017).

[19] See e.g. Alex Mills, 'The Law Applicable to Cross-Border Defamation on Social Media: Whose Law Governs Free Speech in "Facebookistan"?', *Journal of Media Law* 7 (2015): 1, 19.

[20] *United States v Microsoft Corp.*, 584 US (2018).

[21] Pub. L. 115–141, amending the Stored Communications Act, 18 USC 2701.

[22] See further e.g. the various *amicus* briefs available at http://www.scotusblog.com/case-files/cases/united-states-v-microsoft-corp/.

Distinct questions may also be raised about the continuing utility of nationality as a basis for the extraterritorial exercise of jurisdiction. It raises legitimacy concerns, as a national of one state who has long lived in another state may not be able to participate in the law-making processes to which they are subject (e.g. they may be unable to vote in the elections of their state of nationality).[23] It also presents interpretive problems for corporate entities whose place of 'legal foundation' may not reflect the reality of their activities, although the complementary exercise of territorial jurisdiction may present at least a partial response to these concerns. These issues are discussed further below.

# III. Private Interests in Public Law Regulation

As noted herein, a defining feature of modern international law is that it is no longer just the law which applies between states, but also the law of individual rights which may be opposable to states, including but not limited to human rights. States are under obligations not just to respect rights, but to protect them and to provide for their fulfilment through domestic law.[24] These developments have a direct impact on questions of jurisdiction, particularly (but not only) in an adjudicative context in which the exercise of prescriptive jurisdiction is actualized through an exercise of enforcement jurisdiction. For an accused perpetrator of a crime, for example, the exercise of jurisdiction may be affected by rights of due process[25] and the principle of legality—including the requirement that it be readily ascertainable in advance which law will govern conduct, which may reinforce jurisdictional limits.[26] For a victim of crime, the exercise of adjudicative and enforcement jurisdiction by a state over the accused perpetrator may be mandated by rights of access to justice.[27] More generally, the obligation on states to protect human rights requires a broad exercise of prescriptive jurisdiction. A state could only be compliant with its obligations to protect human rights through the use of criminal law (and possibly, as discussed later, civil law) to prohibit and punish violations of human rights, particularly given the requirements of the principle of legality.

---

[23] See e.g. discussion in *Shindler v Chancellor of the Duchy of Lancaster* [2016] EWCA Civ. 469, in relation to UK non-resident voting rules and the Brexit referendum.

[24] See e.g. http://www.ohchr.org/EN/Issues/Pages/WhatareHumanRights.aspx; http://www.un.org/en/sections/universal-declaration/foundation-international-human-rights-law/index.html ('Through ratification of international human rights treaties, Governments undertake to put into place domestic measures and legislation compatible with their treaty obligations and duties. The domestic legal system, therefore, provides the principal legal protection of human rights guaranteed under international law.').

[25] See e.g. International Covenant on Civil and Political Rights, Art. 14.

[26] See further analysis in Kimberley N. Trapp, Ch. 15 of this Handbook.

[27] See generally e.g. Francesco Francioni, *Access to Justice as a Human Right* (Oxford University Press, 2007); *Golder v United Kingdom* (4451/70) [1975] 1 EHRR 524; see further discussion in Mills (n. 3).



- French criminal injures German victim
- UK courts prosecute
- UK may owe obligations of due process to criminal and access to justice to victim which restrict or require the exercise of jurisdiction

FIGURE 14.2  Jurisdictional framework—impact of private actors

The key point for present purposes is that these rights, and the recognition of individual agency in international law, complicate the dynamics of an exercise of jurisdiction. Instead of jurisdiction being purely a matter of state discretion, with the sole interests under consideration being those of other states, the exercise of jurisdiction is affected by the interests of a variety of private actors, both in terms of compelling jurisdiction and imposing additional jurisdictional constraints. An illustrative example of this dynamic is represented diagrammatically in Figure 14.2.

This dynamic has a particularly significant impact on the exercise of jurisdiction in relation to private law matters, as discussed in the following section.

# IV.  Private Law Regulation

A further problematic feature of most modern accounts of the law of jurisdiction in international law is the exclusion or at least the marginalization of private law regulation. This is problematic for a number of reasons. As discussed earlier, it is normatively undesirable because private law rules may be important forms of state regulation. The marginalization of these rules has left public international lawyers relatively blind to the significance of private law, although this has undoubtedly changed in recent years.[28]

---

[28]  See further generally e.g. Duncan French, Kasey McCall-Smith, and Veronica Ruiz Abou-Nigm (eds.), *Linkages and Boundaries in Private and Public International Law* (Oxford: Hart, 2018).

The exclusion of matters of private law from public international regulatory constraints would also be inconsistent with state practice. Although states intervene in particular private law disputes relatively infrequently, this does not establish a lack of state interest in private law regulation in general. Such an interest is indeed demonstrated by state interventions in some important private law cases. Perhaps the most significant recent example is the well-known *Kiobel v Royal Dutch Petroleum* litigation in the US Supreme Court, relating to the interpretation of the Alien Tort Claims Act.[29] Although the proceedings were purely between private actors, several state (or quasi-state) actors intervened, including the European Commission (on behalf of the European Union) and (jointly) the United Kingdom and the Netherlands.[30] While these submissions diverged on certain points (as noted later), they each adopted as a starting premise that the exercise of adjudicative jurisdiction by states in matters of private law is regulated by the same general constraints which apply in matters of public law—the need, absent exceptional circumstances, for a recognized connection (such as a territorial or nationality-based link) to justify the exercise of adjudicative jurisdiction. It is a matter of great regret that the recent Restatement (Fourth) of Foreign Relations Law in the United States appears to has departed from the approach previously recognized under US law, and suggests that customary international law does not constrain the exercise of adjudicative jurisdiction at all.[31] In the context of private law regulation, states generally do not give effect to these limitations through reliance on express statutory provisions as to scope or through statutory presumptions (which, as noted earlier, they typically do in the context of public law regulation). Instead, rules of private law are generally themselves silent on their scope of application, which is instead determined through application of rules of private international law, as discussed later in this chapter.

A further reason why private law matters should not be excluded from the scope of public international law jurisdictional regulation is that this would be historically anomalous. Private law regulation has in fact played an important role in the historical development of the international law of jurisdiction, including through the close historical connection between public and private international law. Both public and private international law developed over the course of centuries as part of a single 'law of

[29] *Kiobel v Royal Dutch Petroleum Co.*, 133 S. Ct 1659 (2013).

[30] All *amicus curiae* briefs are available at http://www.scotusblog.com/case-files/cases/kiobel-v-royal-dutch-petroleum/.

[31] See e.g. the recent discussion in http://opiniojuris.org/2018/02/26/u-s-v-microsoft-microsoft-ireland-implications-for-international-lawmaking/ and http://opiniojuris.org/2018/03/08/the-customary-international-law-of-jurisdiction-in-the-restatement-fourth-of-foreign-relations-law/. See further Austen Parrish, 'Judicial Jurisdiction: The Transnational Difference', *Virginia Journal of International Law* 59 (forthcoming, 2019). The Restatement approach appears to be premised on the outdated assumption that the exercise of jurisdiction is permitted unless a specific prohibition can be identified—see Mills (n. 3). It might instead have been asked: is there state practice and *opinio juris* to support the claim that states can exercise adjudicative jurisdiction in the absence of any connection to the dispute? This is evidently not the case—as discussed later, states do not assert such jurisdiction (setting aside claims of universal civil jurisdiction arising from international crimes), although the range of connecting factors on which states rely in the context of private law disputes is broader than those commonly recognized in criminal law.

nations', reflecting the key principles of international social organization based on personal/tribal loyalties (reflected in the role of nationality in modern law) as well as territorial state power.[32] In the fifteenth century, for example, the 'statutists'[33] had already articulated what for them an exhaustive account of the possible forms of exercise of state regulatory power—operating territorially over all persons regardless of nationality, or operating personally over all nationals regardless of their location. These coexisting territorial and personal conceptions of state regulatory authority formed the basis of modern (public and private) international law[34] through the lineage of Ulrik Huber in the seventeenth century and his powerful influence on Joseph Story in the nineteenth century.[35] Although the modern international law of jurisdiction has focused on public law, this was never intended to exclude private law regulation from jurisdictional constraints.[36] One possible explanation for the marginalization of private law issues in the modern law on jurisdiction is that it is a consequence of the focus of the highly influential[37] 1935 Harvard Draft Convention (itself influenced by preparatory work carried out by the League of Nations Codification Committee) exclusively on criminal law.[38] However, the justification for this decision was not any uncertainty as to the international regulation of private law matters, but rather the parallel consideration of aspects of private international law in both the League of Nations Codification Committee and other fora.[39]

[32]  See further e.g. Martti Koskenniemi, 'Expanding Histories of International Law', *American Journal of Legal History* 56 (2016): 104; Ryngaert (n. 15); Alex Mills, *The Confluence of Public and Private International Law* (Cambridge University Press, 2009), ch. 2; Alex Mills, 'The Private History of International Law', *International and Comparative Law Quarterly* 55 (2006): 1.

[33]  A group of legal scholars who offered an early response to the question of what jurisdictional effect a statute should have—generally, they classified statutes into two categories, the first being territorial in application, and the second being personal and thus attaching to a citizen regardless of territorial location. See further discussion in Mills, *Confluence* (n. 32) and Mills, 'The Private History of International Law' (n. 32).

[34]  See e.g. Georg Friedrich von Martens, *The Law of Nations*, 4th edn (London: William Cobbett, 1829), book III, ch. III (examining both public and private international law questions).

[35]  See e.g. Joseph Story, *Commentary on the Conflict of Laws* (Boston: Hilliard, Gray and Co., 1834), s. 7. It is unclear whether Huber adopted a purely territorialist approach to state regulation—it might be argued that he recognized both territorial and nationality based prescriptive jurisdiction, but only territorial enforcement jurisdiction, consistent with modern law.

[36]  See e.g. Joseph H. Beale, 'The Jurisdiction of a Sovereign State', *Harvard Law Review* 36 (1923): 241.

[37]  For criticism of this influence see Dan Jerker B. Svantesson, 'A New Jurisprudential Framework for Jurisdiction: Beyond the Harvard Draft', *American Journal of International Law* 109 Unbound (2015): 69.

[38]  The full title of the draft is the Draft Convention on Jurisdiction with Respect to Crime: see *American Journal of International Law* 29 Supp. 1 (1935): 439. The Convention drew on the work of the League of Nations Committee of Experts for the Progressive Codification of International Law, which examined both public and private international law topics, but did so separately. For the work of the Committee on jurisdiction, see League of Nations Committee of Experts for the Progressive Codification of International Law, 'Criminal Competence of States in Respect of Offences Committed Outside their Territory', *American Journal of International Law* 20 Supp. (1926): 252.

[39]  See e.g. 'First Session of the Committee of Experts for the Progressive Codification of International Law', *American Journal of International Law* 20 Supp. (1926): 12.

## IV.1.  Private Interests in Private Law Regulation

The exercise of jurisdiction in the context of private law is affected by many of the same considerations which complicate the modern law of jurisdiction in public law, as discussed earlier. For example, the exercise of adjudicative jurisdiction may be restricted by considerations of (respondent) rights of due process. Although these are most commonly considered to affect the procedures through which jurisdiction is exercised (such as requiring sufficient notice to be given a defendant)[40] rather than the exercise of jurisdiction itself, US courts have long conceptualized US constitutional due process constraints as affecting whether adjudicative jurisdiction can be exercised by US states in civil matters at all,[41] and this reasoning could be applied by analogy at the international level based on equivalent human rights constraints. Conversely, the exercise of adjudicative jurisdiction may be positively affected by (claimant) rights of access to justice and the doctrine of denial of justice as part of the minimum standard of treatment under international law. The establishment of private law rights, and the exercise of civil jurisdiction which actualizes these rights, may be as much a matter of obligation in international law as equivalent public law rights and their enforcement. As a consequence, the exercise of public international law jurisdiction in the context of private law may equally be a matter of obligation rather than discretion for states. This might evidently also have an impact on national law doctrines, particularly those relating to adjudicative jurisdiction which (i) present the exercise of jurisdiction as a matter of discretion, or (ii) provide for grounds on which jurisdiction might not be recognized or exercised (such as immunities or the act of state doctrine).

In relation to the first issue, the English courts have long taken into account the rights of access to justice of a claimant as part of the discretionary *forum conveniens* and *forum non conveniens* tests under the expansively defined common law rules on civil jurisdiction. Permission will be given to commence English proceedings (or a stay of English proceedings will be refused), even if the case has relatively minimal connections with England, where the claimant would be denied justice if denied access to the courts.[42] English domestic law has thus evolved consistently with the international developments discussed earlier, and recognizes that it may be necessary to exercise jurisdiction to give effect to the rights of claimants.

A recent illustration of the second issue is provided by the *Benkharbouche* litigation in the UK Supreme Court, which arose from employment claims relating to the Embassies

---

[40] See e.g. Regulation (EU) No. 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast), OJ L 351/1 ('Brussels I Regulation Recast'), Art. 45(1)(b).

[41] Although this influence declined over the course of the twentieth century: see e.g. Alex Mills, 'Federalism in the European Union and the United States: Subsidiarity, Private Law and the Conflict of Laws', *University of Pennsylvania Journal of International Law* 32 (2010): 369, 442 *et seq*. See further Restatement (Fourth) of Foreign Relations Law, § 422.

[42] See generally e.g. *The Spiliada* [1987] AC 460; *The Vishva Ajay* [1989] 2 Lloyd's Rep. 558; *Connelly v RTZ* [1998] AC 854; *Vedanta v Lungowe* [2019] UKSC 20.

of Sudan and Libya in London.[43] The question in this case was whether the UK courts could grant immunity to the defendants, giving effect to the terms of the State Immunity Act 1978, in a claim brought to vindicate rights under EU and UK employment law. The Supreme Court held that the claimants' rights of access to justice under the European Convention on Human Rights (ECHR) required that immunity be granted only to the extent required under international law, and (in respect of the claims based on EU law) set aside the State Immunity Act to the extent that it provided for greater immunity than international law mandates.[44] An evident premise behind this decision is that, under the influence of human rights law, it was the non-exercise of jurisdiction which required justification, rather than the exercise of jurisdiction being a matter of discretion (as in the traditional account of jurisdiction). The Court specifically held that despite the structure of the State Immunity Act (which presumes immunity unless an exception applies), under customary international law the position is that no immunity exists except where there is a rule requiring it. In civil proceedings brought pursuant to employment law, falling outside the scope of state sovereign activity, no such immunity applied, and the rights of access to justice of the claimants were held to compel the exercise of state adjudicative jurisdiction.

Thus far the case law on these issues has focused on the question of whether adjudicative jurisdiction which is provided for under national law should be exercised, where that jurisdiction is a matter of discretion or where potential immunities might prevent its exercise. A major issue which remains untested is whether rights of access to justice under international law might in some circumstances require the expansion of existing grounds of adjudicative jurisdiction. Although the question is somewhat hypothetical, there seems little cause to doubt that a legal system which did not provide for widely recognized territorial grounds of jurisdiction (such as jurisdiction over torts committed in its territory) would not be considered to meet its human rights obligations of access to justice for claimants, at least under the broadly constructed ECHR conception of those obligations. There are, however, a wide variety of approaches to civil jurisdiction under national legal systems, and it is very difficult to identify which jurisdictional grounds might be considered matters of international obligation. The continuing work of the Hague Conference on Private International Law in preparing a treaty on recognition and enforcement of civil judgments, which also involves articulating internationally standardized grounds of civil jurisdiction, has the potential to be a highly influential source in this respect.[45]

A further unresolved question is whether rights of access to justice for claimants might require the exercise of jurisdiction in the absence of recognized territorial or

---

[43] *Benkharbouche v Secretary of State for Foreign and Commonwealth Affairs* [2017] UKSC 62.

[44] The power to set aside the Act derived from the status of the Charter of Fundamental Rights as EU Treaty law. The claim also concerned rights which were not based on EU law—for those, the court made a declaration that the State Immunity Act 1978 was incompatible with human rights, pursuant to the Human Rights Act 1998.

[45] See https://www.hcch.net/en/projects/legislative-projects/judgments.

personal connections in some circumstances. This question is frequently framed in two distinct forms, which are very closely related but may give rise to distinct consequences.[46] The first is the idea of a 'forum of necessity' rule of jurisdiction, under which a court may hear a claim despite the absence of a traditional jurisdictional justification where no other forum is available to the claimant, potentially subject to conditions which establish that the forum has some interest in the dispute (such as a connection with the claimant). Such a rule exists, for example, as part of the law of a number of EU Member States.[47] The second is the concept of 'universal civil jurisdiction', which equally recognizes that adjudicative jurisdiction may be exercised, at least in certain circumstances, in the absence of traditional jurisdictional justifications,[48] although usually subject to the exhaustion of potential remedies in courts with traditional jurisdictional links. One difference between these two approaches is that those advocating a forum-of-necessity rule tend to view it as a general rule of jurisdiction, giving effect to claimant rights of access to justice which apply regardless of the substantive nature of their claim, while those advocating a rule of universal civil jurisdiction tend to view it as justified by the nature of the substantive proceedings, and thus limited to civil claims arising out of the most serious international wrongs, such as torture. It may, for example, be argued that such claims should not be subject to the usual jurisdictional constraints because a state is not exercising its own pre-scriptive jurisdiction but rather acting on behalf of internationally agreed norms.[49] The *amicus* brief of the European Commission in the *Kiobel* case gave its support to a rule of universal civil jurisdiction, 'but only when the conduct at issue could also give rise to universal criminal jurisdiction'.[50] It should be noted that this received much more limited support in the joint brief of the United Kingdom and the Netherlands, despite the fact that the Netherlands actually has a forum-of-necessity law under which jurisdiction may be exercised in the absence of traditional connections (as the brief acknowledged).[51]

States Parties to the Convention against Torture are subject to an obligation to provide civil remedies to victims of torture, which would necessitate the exercise of prescriptive jurisdiction and the provision of a basis of adjudicative jurisdiction which can be invoked by such victims.[52] The Committee against Torture has consistently but controversially

[46] See further Mills (n. 3), 225.
[47] See *ibid*., 222 *et seq*.; Arnaud Nuyts, 'Study on Residual Jurisdiction: General Report' (2007), 64 *et seq*., http://ec.europa.eu/civiljustice/news/docs/study_residual_jurisdiction_en.pdf.
[48] See e.g. Donald Francis Donovan and Anthea Roberts, 'The Emerging Recognition of Universal Civil Jurisdiction', American Journal of International Law 100 (2006): 142.
[49] See e.g. the *amicus* brief of Argentina in the *Kiobel* litigation, http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs/10-1491_petitioneramcugovtofargentinerepublic.pdf.
[50] Seehttps://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs/10-1491_neither_amcu_eu.authcheckdam.pdf, 4.
[51] Dutch Code of Civil Procedure, Art. 9.
[52] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984), Art. 14(1).

expressed the view that this obligation applies regardless of where the torture is committed, at least in the absence of compensation from the courts of the territorial state,[53] which would appear to necessitate a basis of universal civil jurisdiction (in parallel with the uncontroversial basis of universal criminal jurisdiction in the Convention). The United Kingdom[54] and the United States[55] have long resisted the idea that their courts are under any obligation to ensure compensation for victims of torture committed outside their territory. The United States has, however, given its courts the power to do so (subject to exhaustion of local remedies) through the Torture Prevention Act 1991,[56] apparently taking the view that universal civil jurisdiction may be exercised as a matter of right rather than obligation. Practice on these points however is limited, controversial, and presently inconclusive in determining whether international law requires or even permits the exercise of universal civil jurisdiction, in the context of torture or otherwise.[57] The collective international interest in ending criminal impunity, which has been recognized to establish universal criminal jurisdiction, would not necessarily justify an equivalent collective interest in ensuring civil redress to victims of international crimes. It is open to argument whether an equivalent collective interest exists in ensuring that those would conduct or authorize torture face the civil consequences of their wrongdoing.

To this point, the issues raised by exercises of civil jurisdiction closely parallel those raised by exercises of criminal jurisdiction or other forms of public law power. Although in the exercise of criminal jurisdiction the victim is not a party to the proceedings, their rights of access to justice may nevertheless affect the exercise of jurisdiction in the same way as the rights of a claimant in civil proceedings. The analysis of an exercise of jurisdiction is, however, more complicated in the private law context than in the public law context, for three main reasons examined in turn below: (1) the separation of adjudicative jurisdiction and prescriptive jurisdiction; (2) the use in practice of additional connecting factors which go beyond or hybridize personal and territorial connections; and (3) the development of a range of distinctive techniques to limit overlapping exercises of jurisdiction.

---

[53] See e.g. General Comment No. 3 of the Committee against Torture, 19 November 2012, UN Doc. CAT/C/GC/3. In support of this view see e.g. Christopher Keith Hall, 'The Duty of States Parties to the Convention against Torture to Provide Procedures Permitting Victims to Recover Reparations for Torture Committed Abroad', *European Journal of International Law* 18 (2007): 921.

[54] See e.g. the recent discussion in *Belhaj v Straw* [2017] UKSC 3; *Jones v Saudi Arabia* [2006] UKHL 26.

[55] The US made a declaration at the time of ratification of the Convention, providing (*inter alia*) 'That it is the understanding of the United States that article 14 requires a State Party to provide a private right of action for damages only for acts of torture committed in territory under the jurisdiction of that State Party.'

[56] 28 USC, § 1350.

[57] An obligation to exercise universal civil jurisdiction in the context of torture was, however, recently rejected in a Grand Chamber decision of the European Court of Human Rights, *Nait-Liman v Switzerland*, App. No. 51357/07 (15 March 2018), although with a note that 'given the dynamic nature of this area, the Court does not rule out the possibility of developments in the future' (at [220]).

## IV.2.  The Separation of Adjudicative and Prescriptive Jurisdiction

Absent some highly unusual arrangement, it has long been accepted (although under occasional academic protest) that in matters of public law a national court always applies its own law.[58] To put this another way, in criminal and other public law cases when a court exercises adjudicative jurisdiction it is also actualizing the exercise of prescriptive jurisdiction by the forum state, giving particular effect to its general prescriptions. The presence of the defendant in the territory will usually be a precondition for this, which makes it possible for the state to also exercise enforcement jurisdiction over the defendant before, during, or after the proceedings.[59] Unusually, a trial may be held *in absentia* which will involve purely the application of prescriptive rather than enforcement jurisdiction, generally with the aim of obtaining the extradition of the defendant (after which a rehearing may be required to ensure compatibility with the rights of the defendant).[60]

In matters of private law, by contrast, there is a possible split between the question of adjudicative jurisdiction and prescriptive jurisdiction, because a court will not necessarily apply its own law. This added complexity in the exercise of civil jurisdiction is represented diagrammatically in Figure 14.3.

In private law disputes, issues of 'jurisdiction' (in the international law sense) must therefore involve a careful distinction between the exercise of judicial process (generally referred to, somewhat unhelpfully, as the question of 'jurisdiction') and the applicable law which is actualized through that process (generally referred to as the question of 'choice of law').

In the context of private law claims, a court may take 'jurisdiction' over the defendant based on a variety of connections. In the common law, for example, these include the mere presence of the defendant in the territory at the time of commencement of proceedings,[61] as well as a wide range of grounds of jurisdiction over non-present defendants, such as where a tort is committed in the territory or a contract is breached in the territory.[62] In some cases, states assert jurisdiction on grounds which are considered by other states as problematic—this is usually described as an 'exorbitant' jurisdiction, which reflects questions about whether the exercise of jurisdiction is contrary to underlying principles of international law. Commonly cited examples include the practice of the English courts exercising jurisdiction based on the mere transient presence of the defendant in the territory,[63] the fact that a contract under dispute was entered into in

---

[58]  See e.g. William Dodge, 'Breaking the Public Law Taboo', *Harvard International Law Journal* 43 (2002): 161; *The United States Securities and Exchange Commission v Manterfield* [2009] EWCA Civ. 27; *Huntington v Attrill* [1893] AC 150.

[59]  See e.g. Restatement (Fourth) of Foreign Relations Law, § 427.

[60]  See e.g. *Colozza v Italy* [1985] ECHR 1.

[61]  See e.g. *Adams v Cape Industries* [1990] 2 WLR 657.

[62]  See e.g. Civil Procedure Rules (England and Wales), Practice Direction 6B.

[63]  See e.g. *Maharanee of Baroda v Wildenstein* [1972] 2 QB 283.



- French and German companies enter into a contract governed by Belgian law
- German company sues French company for breach of contract in England
- Jurisdiction could be based on eg domicile, involvement of English branch, choice of court agreement, place of breach
- Belgian law will be applied by the English courts to govern the substantive dispute

FIGURE 14.3  Jurisdictional framework—civil jurisdiction

the territory, or the fact that a contract under dispute is governed by English law.[64] Although such exercises of jurisdiction do invite an occasional mild critical comment,[65] it is rare for states to directly criticize the grounds of jurisdiction exercised by other states in civil matters, and this might be viewed as acquiescence in such expansive grounds of jurisdiction. This in turn could raise doubts about whether traditional international law jurisdictional constraints genuinely limit the exercise of state adjudicative authority in civil law matters.[66]

Such doubts would, however, have less to support them than may initially appear to be the case. The first point to note is that the exercise of exorbitant grounds of jurisdiction is relatively uncommon and is likely to depend on other factors. The English courts, for example, will rarely exercise jurisdiction over a case solely on the basis of the connections above, and the exercise of such jurisdiction is discretionary. On the other hand, the main factors taken into account in the exercise of this discretion are (i) the efficient conduct of the litigation, and (ii) protecting the rights of access to justice of a claimant, as discussed further herein.[67] This might suggest that the decision on whether to exercise jurisdiction is not focused on the existence of a connection between the dispute and the forum which justifies the exercise of power, but rather on (i) the practicalities of dispute

[64]  See Civil Procedure Rules (England and Wales), Practice Direction 6B, r. 3.1(6).
[65]  See e.g. Kevin M. Clermont and John R. B. Palmer, 'Exorbitant Jurisdiction', *Maine Law Review* 58 (2006): 474.
[66]  As in the Restatement (Fourth) of Foreign Relations Law, discussed in Section II of this chapter.
[67]  See n. 35; Paul Torremans *et al.* (eds.), *Cheshire, North, and Fawcett: Private International Law*, 15th edn (Oxford University Press, 2017), 351 *et seq.*, 392 *et seq.*

resolution in the interests of the parties, and (ii) the rights of claimants. This does appear to represent a more significant challenge to the traditional public international law approach to jurisdiction, which is focused on the powers of states rather than the interests of the parties.

A second point to note is that although a court may hear a claim over a defendant who is not present in the territory in many cases, the enforcement powers of the court remain strictly territorial, even in civil matters. Civil jurisdiction over a defendant who is not present in the territory and not subject to enforcement jurisdiction might be considered as a form of jurisdiction *in absentia*. In such cases, the exercise of enforcement jurisdiction would ordinarily require the cooperation of foreign courts, through the rules on the recognition and enforcement of foreign judgments, which are likely not to recognize judgments based on an exorbitant exercise of jurisdiction (and thereby express their disapproval of that exercise).[68] The projection of regulatory authority over absent defendants may thus be ineffective. However, this will not be the case where a defendant has assets in the territory which are vulnerable to seizure, even if those assets are unconnected to the dispute. There are also examples of the English courts using the technique of extraterritorial projection (discussed in Section II of this chapter) in this context. Where a defendant is subject to the jurisdiction of the courts (in the sense of being properly a defendant in English substantive proceedings), the court may, for example, purport to freeze assets of the defendant around the world.[69] Although the English courts cannot of course enforce such orders outside the territory directly, compliance may be indirectly enforced through the fact that breach of such orders will constitute contempt of court, potentially leading to a default judgment and perhaps even criminal liability. For defendants with assets in England, the vulnerability of their assets to seizure is likely to lead to compliance with these orders around the world—thus, local enforcement jurisdiction is used to project regulatory power extraterritorially. The courts have recognized that such action, even if consistent with international law jurisdictional constraints, raises comity concerns.[70] However, if the defendant and their assets remain outside the territory, enforcement of these orders will also require the cooperation of foreign courts. If the English courts award a default judgment for violation of a freezing order, it equally remains open to foreign courts to review whether that judgment should be enforced.[71] The effectiveness of exercises of civil jurisdiction thus remains constrained by public international law limits on enforcement jurisdiction.

Despite these points, the fact that the grounds of jurisdiction in civil matters are framed more broadly than those traditionally exercised in criminal matters, encompassing a variety of connecting factors (as discussed further later), might nevertheless present a challenge to the view that the exercise of civil jurisdiction is limited by public international law. This is particularly because jurisdiction based on the territorial or

[68] See generally e.g. Torremans *et al.* (n. 67), chs. 17–18.
[69] See e.g. *Banco Nacional de Comercio Exterior SNC v Empresa de Telecomunicationes de Cuba SA* [2007] EWCA Civ. 622; *Motorola Credit Corp v Uzan (No. 6)* [2003] EWCA Civ. 752.
[70] See e.g. *Mobil Cerro Negro Ltd v Petroleos De Venezuela SA* [2008] EWHC 532 (Comm).
[71] See e.g. Case C-619/10 *Trade Agency Ltd v Seramico Investments Ltd*, EU:C:2012:531.

personal connections of the defendant—the territorial presence of the defendant, or the domicile of the defendant—is typically evaluated as at the time the proceedings are commenced.[72] It is unclear that these connections should justify the actualization of prescriptive jurisdiction over events which took place prior to those connections existing. For example, a French party responsible for a tort in France with another French party may subsequently decide to move to England, and become subject to the civil jurisdiction of the English courts, but it is problematic to suggest that this ought to justify the retrospective application of English tort law to events which were at the time entirely unconnected with England.

The major response to these concerns in the context of private law is, as noted, the separation of the questions of adjudicative and prescriptive jurisdiction through choice-of-law rules. A court may take jurisdiction over the proceedings, but apply foreign rules of private law. To put this another way, in the context of private law adjudication courts may actualize another state's exercise of prescriptive jurisdiction. In private law, the scope of application of the rules of different states is generally not addressed as part of the rules themselves—unlike a criminal statute, which may set out its territorial or personal scope of application, rules of national contract law do not generally contain provisions delimiting their territorial scope of application. The scope of application of rules of private law is rather determined indirectly through the application of choice-of-law rules. The analysis must then turn to whether those choice-of-law rules are consistent with international jurisdictional constraints. One important point to note is that the connections which are examined in the choice-of-law process are considered as they were at the time the cause of action arose, not at the time the proceedings were commenced. When looking at personal connecting factors under EU choice-of-law rules in tort, for example, the focus is not on the current domicile of the defendant (as it is under the law of jurisdiction) but on the habitual residence of the defendant at the time of an alleged tort.[73] The connections examined as part of the choice-of-law process more clearly also reflect traditional jurisdictional constraints, as they are focused on the objective connections between the parties or their dispute and a particular state rather than, for example, the question of efficient dispute-resolution. Where a state is exercising what might be viewed as exorbitant jurisdiction over a dispute with a limited territorial connection to the forum, it is likely that the court will in fact apply foreign substantive law. The analysis of whether an exercise of civil jurisdiction is compatible with international constraints thus has to take into consideration the fact that the adjudicative and prescriptive elements are potentially separated in civil proceedings.

This does not mean, of course, that the exercise of civil prescriptive jurisdiction is not subject to international constraints. A court which applied its own law in a case arising out of events which were solely foreign-connected would arguably be actualizing its

---

[72]  See e.g. *Ministry of Defence for Iran v Faz Aviation* [2007] EWHC 1042 (Comm).

[73]  See e.g. Regulation (EC) No. 864/2007 of the European Parliament and of the Council on the law applicable to non-contractual obligations (Rome II), OJ L 199, Art. 4(2): 'where the person claimed to be liable and the person sustaining damage both have their habitual residence in the same country at the time when the damage occurs, the law of that country shall apply'.

prescriptive jurisdiction in a way which was contrary to international law. It would be less clear how to analyse a case in which a court applied a foreign law in circumstances which were unjustifiable—the court would not be extending its own prescriptive jurisdiction, but the state whose law is applied could hardly be responsible for the application of its law beyond jurisdictional limits by a foreign court. This problem is, however, more theoretical than real—in general, choice-of-law rules rely on personal or territorial connections which would satisfy public international law jurisdictional limitations, although the following section notes some ways in which the connecting factors relied on may present a challenge.

Where a court is applying foreign law, the question of whether its exercise of adjudicative jurisdiction (in this context, meaning purely the question of jurisdiction in a private international law sense) is consistent with public international law constraints thus becomes more complex but may also appear less significant. A court will apply its own procedural rules, regardless of whether foreign substantive law governs,[74] but these essentially regulate the local conduct of proceedings rather than impose legal rules on potentially foreign conduct as a matter of prescriptive jurisdiction. If the exercise of adjudicative jurisdiction does not involve, or does not necessarily involve, the exercise of prescriptive jurisdiction, this raises the possibility that adjudicative jurisdiction in civil matters could be governed by distinct constraints. As discussed earlier, the practice of the English courts, for example, suggests that the interests of the parties have a greater role to play here, although jurisdiction is also frequently based on traditional territorial connections.

A further question may be raised, however, concerning statutory mandatory rules— rules of the forum state which (exceptionally) are applied regardless of whether foreign substantive law governs the proceedings.[75] These appear to be actualized by the mere exercise of adjudicative jurisdiction, and their application may therefore raise greater concerns regarding the compatibility of private international law rules with international jurisdictional constraints. These are rules which exceptionally establish a link between adjudicative jurisdiction, in the private international law sense, and the exercise of prescriptive jurisdiction, because they circumvent the usual choice-of-law process under which foreign substantive law may govern. These concerns might be addressed through principles of statutory interpretation, such as a presumption against extraterritoriality or extra-jurisdictionality in the scope of application of mandatory rules, under which statutory mandatory rules may thus be 'self-limiting'.[76] In the absence of such limits, the potential existence of mandatory rules suggests that the exercise of adjudicative jurisdiction in private law matters, although limited in effect because of the possible application

[74]  See generally e.g. Richard Garnett, *Substance and Procedure in Private International Law* (Oxford University Press, 2012).

[75]  See generally e.g. Alex Mills, *Party Autonomy in Private International Law* (Cambridge University Press, 2018), ch. 9; Torremans *et al.* (n. 67), 143 *et seq.*

[76]  See classically e.g. Kurt Lipstein, 'Inherent Limitations in Statutes and the Conflict of Laws', *International and Comparative Law Quarterly* 26 (1977): 884; see further the Restatement (Fourth) of Foreign Relations Law, discussed in Section II of this chapter.

of foreign substantive law, should nevertheless be constrained by public international jurisdictional principles because it entails the exercise of a limited prescriptive jurisdiction in the form of such rules.

## IV.3.  Additional Connecting Factors

A second factor which distinguishes state practice in the context of private law from that of public law is the emergence of connecting factors which go beyond or which hybridize the traditional territorial and nationality-based factors recognized in public international law rules of jurisdiction.

   As already noted, states may, for example, rely on connections of domicile, residence, or habitual residence as factors both in the exercise of jurisdiction and in the determination of the applicable law. Unlike the concept of nationality, these factors are not based on a legal connection between a person and a state. The exact definitions of domicile, residence, or habitual residence may vary between legal systems, but they generally involve an examination of the factual connections between the person and territory (such as the duration of physical presence). In some cases, these factors may also require consideration of not just factual but also psychological connections, such as whether the person intends to live indefinitely in the territory—a factor which has a particularly strong influence on the common law conception of domicile.[77] What is distinctive about each of these factors is that regulating a party based on their domicile or residence is not a matter of regulating the person (based on nationality) or the events (based on territoriality), but rather based on the territorial connections of the person, fusing traditional conceptions of state authority in international law. In the exercise of criminal jurisdiction, states almost invariably rely on territory or nationality as a connecting factor, although there are rare examples of residence being used[78] which may suggest that the greater flexibility of connecting factors in the context of civil jurisdiction is also influencing practice in the context of public law.

The application of a test of 'nationality' to a legal entity is not necessarily straightforward, but has been viewed as most closely analogous to the concept of the law of incorporation (or the equivalent concept of legal formation).[79] This approach was developed in the context of diplomatic protection, which also relies on a link of 'nationality', but may equally apply in the context of jurisdiction. In private law disputes, concepts of domicile or residence are also applied to corporate parties, providing that jurisdiction or the applicable law may be determined based on factors other than the law of incorporation, such as the central administration or principal place of business of the company.[80] Like residence, these are connecting factors which are based on the territorial connections

---

[77]  See e.g. *Mark v Mark* [2006] 1 AC 98; *Holliday v Musa* [2010] EWCA Civ. 335.

[78]  See e.g. Terrorism Act 2000 (UK), ss. 63A, 63B, and 63C (exercising both active and passive personality jurisdiction based on residence).

[79]  See generally e.g. *Barcelona Traction, Light and Power Co. Ltd (Belgium v Spain)* [1970] ICJ Rep. 3.

[80]  See e.g. Brussels I Regulation Recast, Art. 63.

of the company and its business activities, rather than the territorial location of the events under dispute or the legal connection between the company and a state. Additional connecting factors may also be recognized, such as where a dispute arises out of the activities of a branch—the location of the branch may also potentially be relied on as a basis on which to establish jurisdiction or to determine the applicable law,[81] even if the acts underling the claim occurred in a foreign territory.[82] In each case, the connecting factor is a further hybridization of territorial and personal aspects, but with the added complexity that private international law can look beyond the single legal personality of a company to examine the factual connections which a branch may have with the dispute, and attribute jurisdiction or determine the applicable law based on the location of the branch.

A further innovation in the context of private law is the widespread emergence of party autonomy as a connecting factor in the context of both jurisdiction and applicable law, potentially allowing parties to choose which court may hear their disputes or which law will govern their relationship.[83] In jurisdiction, there is also the related doctrine of submission, under which a defendant may accept the jurisdiction of a court after proceedings have been commenced.[84] In the context of choice of law, perhaps analogously, common law courts may default to forum law if the parties fail to plead the content of foreign law.[85] The emergence of party autonomy and these related doctrines is particularly significant for present purposes because it is widely (although not universally) accepted that the parties may choose (or subsequently consent to) a forum or law unconnected with them or their dispute. Under these developments, the regulation of jurisdiction or choice of law has arguably shifted to give even further emphasis to the interests of private parties, although not without some constraints. The emergence of party autonomy as a doctrine is a complex phenomenon which requires its own detailed examination[86]—for present purposes, it is sufficient to note that it is subject to contested readings. On the one hand, party autonomy may be viewed as reflecting an agreement by states that the allocation of regulatory authority in the context of private law should not be subject to traditional public international law jurisdictional constraints, but rather should be at least primarily focused on serving the private interests of the parties—questions which the parties themselves are generally best placed to determine. On the other hand, party autonomy may be viewed as a more fundamental challenge to the jurisdictional power of states themselves, as it appears to recognize a power for private parties to determine the regulatory authority to which they are subject—it may thus be

---

[81] See e.g. *ibid*., Art. 7(5); Regulation (EC) No. 593/2008 of the European Parliament and of the Council of 17 June 2008 on the law applicable to contractual obligations (Rome I), OJ L 177, Art. 19.

[82] *Lloyds Register of Shipping v Campenon* [1995] ECR I 961.

[83] See generally e.g. Peter Nygh, *Autonomy in International Contracts* (Oxford University Press, 1999); Mills (n. 75).

[84] See e.g. Brussels I Regulation Recast, Art. 26.

[85] See e.g. Torremans *et al.* (n. 67), ch. 7; Richard Fentiman, *Foreign Law in English Courts: Pleading, Proof and Choice of Law* (Oxford University Press, 1998).

[86] See generally Mills (n. 75).

read as a partial privatization of the allocative function of public international law rules of jurisdiction. This is potentially a more radical reading of the influence of private interests in public international law jurisdiction. An even more radical possibility which has been widely discussed but rarely adopted by states is that private parties might determine that their legal relationship is governed by non-state law—thus privatizing not just the allocative function of rules of jurisdiction, but also the regulatory function of rules of private law.[87]

## IV.4.  Techniques to Manage Potentially Conflicting Regulation

A third innovative aspect of the regulation of jurisdiction in the context of private law is the development by states of techniques which manage the possibility of conflicting regulation—seeking to avoid the 'conflict of laws' which gives the discipline of private international law its alternative name. The existence of additional connecting factors in private international law, as discussed earlier, might be viewed as increasing this risk, as a consequence of increasing the possibility for extraterritorial regulation. If, for example, the applicable law may legitimately be determined based on the domicile or residence of the defendant, as well as a variety of other territorial connecting factors such as the location of the events giving rise to the cause of action, this would appear to multiply the possibilities for more than one state to legitimately view its law as extending to those events. This could incentivize the commencement of proceedings based on strategic considerations rather than based on the most efficient resolution of the dispute, a practice generally disparaged as 'forum-shopping'.[88] Private international law has, however, responded to these concerns, in two primary ways.

The first is provided by a traditional objective of private international law, made possible by the separation of adjudicative and prescriptive jurisdiction—the international unification of choice-of-law rules in pursuit of an objective of decisional harmony.[89] Although more than one court may potentially have jurisdiction (in the private international law sense) over the proceedings, if each court is to apply the same governing law this greatly reduces the risk of inconsistent regulation arising. This is true only in respect of substantive rather than procedural questions (as each state will apply its own procedural law), but it is no coincidence that in the European Union the pursuit of harmonized rules of private international law has included an expanded conception of what questions count

[87]  See e.g. Mills (n. 75), ch. 10; Michael A. Helfand (ed.), *Negotiating State and Non-State Law* (Cambridge University Press, 2015); note esp. e.g. the Hague Principles on Choice of Law in International Commercial Contracts, Art. 3, https://www.hcch.net/en/instruments/conventions/full-text/?cid=135.

[88]  See generally e.g. Andrew Bell, *Forum Shopping and Venue in Transnational Litigation* (Oxford University Press, 2003).

[89]  See further e.g. Mills, *Confluence* (n. 32), 16 *et seq.*

as 'substantive'.[90] Some theorists have doubted the utility of pursuing these objectives, at least internationally, and argued that private international law should be conceived as a purely domestic subject, with rules adopted purely in pursuit of domestic objectives.[91] The discipline would, however, be greatly diminished if this approach were adopted. The fact that cross-border disputes engage the regulatory interests of foreign states, and thus questions of public international law jurisdiction, should not be ignored and has in practice formed an important part of most traditions of private international law thinking.[92] Private international law has long recognized the virtue of consistency between states in choice-of-law rules, because internationalism has been and remains an important and influential aspect of the discipline. The harmonization of choice-of-law rules across the EU exemplifies this public systemic conceptualization of private international law, as does the important and ongoing work of the Hague Conference on Private International Law (the preeminent international organization responsible for the international harmonization of private international law[93]). International consistency is of course not the only value in choice of law—states may have different views on *which* law is most appropriate to apply—which is what makes harmonization a challenging project. But the fact that harmonization is recognized as a goal and a virtue in private international law reflects an acknowledgement of its international dimension and of its potential to manage the risk of conflicting regulation.

The second way in which private international law has distinctively responded to concerns about overlapping exercises of regulatory authority is provided by constraints on the exercise of adjudicative jurisdiction. These have developed as a response to particular issues arising in the adjudication of private law disputes. In criminal law, as noted earlier, the major constraint on the exercise of jurisdiction is the need for the presence of the defendant in the territory in order for the possibility of enforcement jurisdiction to arise, which is generally a condition for the exercise of adjudicative jurisdiction. In the absence of the defendant, a state may seek to rely on extradition law, but this possibility will only emerge where a prosecution has not been carried out in another territory. The risk of double-criminality—being prosecuted twice for the same conduct—is generally dealt with by foreign double-jeopardy rules (in civil law, *ne bis in idem*). The fact that a person can only be in one territory at one time thus serves as a natural constraint on the potentially conflicting exercise of adjudicative criminal jurisdiction—although it does not address the risk of conflicting prescriptive jurisdiction. In civil law disputes, enforcement generally attaches not (or not only) to the defendant but to their assets, greatly increasing the possibility that more than one state might be able to exercise effective enforcement jurisdiction (without depending on the rules on the recognition and

---

[90] Cf. e.g. the Rome II Regulation, Art. 15, with the previous position in England under *Harding v Wealands* [2006] UKHL 32.

[91] See e.g. Friedrich K. Juenger, 'Jurisdiction, Choice of Law and the Elusive Goal of Decisional Harmony', *Netherlands International Law Review* 39 (1992): 137.

[92] See e.g. Alex Mills, 'The Identities of Private International Law: Lessons from the US and EU Revolutions', *Duke Journal of Comparative and International Law* 23 (2013): 445.

[93] See generally http://www.hcch.net.

enforcement of foreign judgments). A defendant with assets in more than one jurisdiction might readily find that a single act or event could be subject to adjudication in each jurisdiction, with the real prospect of that jurisdiction being effectively enforced. This is exacerbated by the fact that (unlike in the criminal context) proceedings can generally be brought both in positive and negative forms, seeking a determination of liability or a declaration of non-liability.[94] Thus, in a cross-border dispute between parties from different states, each is potentially subject to suit in its home jurisdiction and in the jurisdiction where the events giving rise to the cause of action arose. Even if each state would apply the same substantive applicable law—which will of course, not always be the case, as decisional harmony is an objective or value rather than always a reality of choice of law—the subjection to multiple exercises of adjudicative jurisdiction is itself potentially not only inconvenient, but may in its expense frustrate the pursuit of a legitimate claim.

There are a variety of techniques which have been developed as part of private international law to respond to these concerns, addressed to the question of adjudicative jurisdiction. In some contexts, rules of exclusive jurisdiction may be recognized, under which a single forum is viewed as having such a strong connection to the dispute that no possibility of parallel proceedings should arise.[95] In other contexts, as already noted herein, proceedings may be stayed where a foreign court is clearly more appropriate to resolve the dispute, including but not limited to where proceedings are already pending before that foreign court.[96] Alternatively, a more strict *lis pendens* rule may apply under which the court second seized of a dispute may be obliged to defer to the court first seized.[97] Where a decision has already been reached in a foreign court, it will frequently be given a *res judicata* or estoppel effect, precluding further local proceedings, through the rules on the recognition of foreign judgments. In each case, the rule is designed (potentially among other things) to avoid the risk of parallel proceedings from arising and/or the possibility of conflicting regulation. The interaction between these rules and questions of access to justice raises a complex issue, as courts may have to evaluate whether foreign legal proceedings are able to deliver justice to the parties.[98] Where the rules prioritize the court first seized, a further complexity is that such rules may potentially incentivize strategic litigation, commencing proceedings in an inconvenient court—even one which does not have jurisdiction—in order to frustrate the resolution of the dispute. This is a problem which has particularly arisen under EU jurisdictional regulation in the context of jurisdiction agreements, where the priority between the rules giving effect to party autonomy and those giving effect to *lis pendens* has proven

---

[94] See e.g. discussion in *Citigroup Global Markets Ltd v Amatra Leveraged Feeder Holdings Ltd* [2012] EWHC 1331 (Comm); *Messier-Dowty Ltd v Sabena SA* [2000] EWCA Civ. 48; Andrew Bell, 'The Negative Declaration in Transnational Litigation', *Law Quarterly Review* 111 (1995): 674.

[95] See e.g. the Brussels I Regulation Recast, Art. 24.

[96] See e.g. Torremans *et al* (2017), 392 *et seq.*

[97] See generally e.g. *ibid.*, 442 *et seq.*; Campbell McLachlan, *Lis Pendens in International Litigation* (Leiden: Brill, 2009).

[98] See e.g. the Brussels I Regulation Recast, Arts. 33 and 34 and Recitals 23 and 24.

highly contentious and provoked reform.[99] The key point for present purposes, however, is not to note the difficulties which may arise in regulating the management of parallel proceedings, but to note that private international law has developed distinctive rules for avoiding the possibility of conflicting regulation. This may be viewed at least in part as a response to the fact that in the context of private law jurisdiction the proliferation of connecting factors recognized, as well as the possibility for enforcement jurisdiction against the assets rather than the person of the defendant, might otherwise significantly increase the risk of such conflicts.

# V.  Conclusions

The regulation of jurisdiction in international law has traditionally marginalized its 'private' dimensions—both in terms of the interests which it has taken into consideration, and in terms of the types of exercises of jurisdiction which have been studied. This is regrettable, as it has left the law of jurisdiction isolated from broader developments in the international legal order, and left public international lawyers relatively disengaged in the analysis of private law regulation. This chapter has argued for two developments in response. First, that the law of jurisdiction should recognize the significance of private actors and their rights and interests, which potentially require or constrain the exercise of jurisdiction by states in the context of both public and private law regulation. The exercise of jurisdiction should be understood within the more complex context of a modern international legal order under which individuals are recognized as subjects of international law with rights opposable to states. Second, that public international lawyers should engage more seriously with the distinctive issues raised by jurisdiction in the context of private law regulation, and the distinctive practice which has emerged in that context—in particular, the separation of adjudicative and prescriptive jurisdiction, the emergence of connecting factors which hybridize or add to the traditional connections of territory and nationality, and the development of techniques to manage the risk of potentially conflicting exercises of jurisdiction. The analysis of these private law dimensions to jurisdiction is complex, and the practice of states is in certain respects difficult to reconcile with the traditional public international law framework, and in other respects undoubtedly challenges that framework. This does not, however, mean that public international lawyers should view these private dimensions as falling outside the scope of the domain of the regulation of international jurisdiction (or indeed their professional interest)—rather, they should recognize and accept this complexity and, mindful of the fundamental significance of private law regulation in the contemporary global legal order, be open to the lessons it provides and the challenges it offers.

[99]   See e.g. David Kenny and Rosemary Hennigan, 'Choice-of-Court Agreements, the Italian Torpedo, and the Recast of the Brussels I Regulation', *International and Comparative Law Quarterly* 64 (2015): 197; Ian Bergson, 'The Death of the Torpedo Action? The Practical Operation of the Recast's Reforms to Enhance the Protection for Exclusive Jurisdiction Agreements within the European Union', *Journal of Private International Law* 11 (2015): 1.