# EXHIBIT 5

# ROME I AND ROME II
# IN PRACTICE

*Edited by*
Emmanuel GUINCHARD






INTERSENTIA

Cambridge – Antwerp – Chicago

114

# THE APPLICATION OF THE ROME I AND ROME II REGULATIONS IN FRANCE

Marie-Elodie ANCEL*

1. The National Landscape . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
   1.1. Application of Rome I and Rome II in General . . . . . . . . . . . . . . . . . 192
   1.2. Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
   1.3. Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
2. The Operation of Rome I and Rome II in Practice . . . . . . . . . . . . . . . . . . . 196
   2.1. Lois de police . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
       2.1.1. Identification of French lois de police . . . . . . . . . . . . . . . . . . . 196
       2.1.2. Effects to be Given to Foreign lois de police . . . . . . . . . . . . . . 200
   2.2. Party Autonomy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
       2.2.1. Party Autonomy under Rome I . . . . . . . . . . . . . . . . . . . . . . . . 201
       2.2.2. Party Autonomy under Rome II . . . . . . . . . . . . . . . . . . . . . . . 202
   2.3. Absence of Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
       2.3.1. Fixed Rules under Rome I . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
       2.3.2. Escape Clauses under Rome I . . . . . . . . . . . . . . . . . . . . . . . . . . 204
       2.3.3. Fixed Rules under Rome II . . . . . . . . . . . . . . . . . . . . . . . . . . . 206
       2.3.4. Escape Clause under Rome II . . . . . . . . . . . . . . . . . . . . . . . . . . 208
   2.4. Specific Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
       2.4.1. Carriage of Goods under Rome I . . . . . . . . . . . . . . . . . . . . . . . 209
       2.4.2. Carriage of Passengers under Rome I . . . . . . . . . . . . . . . . . . . 210
       2.4.3. Consumer Contracts under Rome I . . . . . . . . . . . . . . . . . . . . . 210
       2.4.4. Individual Employment Contracts under Rome I . . . . . . . . . 211
       2.4.5. Unfair Competition and Acts Restricting Free
              Competition under Rome II . . . . . . . . . . . . . . . . . . . . . . . . . . 212
   2.5. Scope of Applicable Law and Characterisation Issues . . . . . . . . . . . . 213
   2.6. Foreign Law and ordre public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214
       2.6.1. Foreign Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214
       2.6.2. Ordre public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
   2.7. Relations with International Conventions . . . . . . . . . . . . . . . . . . . . . . 216

* The author hereby wishes to express her sincere thanks to Mr Jean-Thomas Brière, for his linguistic revision of this contribution.

115

Marie-Elodie Ancel

3.      General Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .218
        3.1.    The Courts' Approach and Comparison with Previous Regimes . . . . .218
        3.2.    Taxonomy and Gaps in Rome I and Rome II . . . . . . . . . . . . . . . . . . . .219
4.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .219
        4.1.    Summary of Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .219
                4.1.1.    General Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .219
                4.1.2.    Rome I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .220
                4.1.3.    Rome II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .221
        4.2.    Main Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .221

## 1.    THE NATIONAL LANDSCAPE

### 1.1.    APPLICATION OF ROME I AND ROME II IN GENERAL

The two Regulations, though eagerly anticipated and discussed by French legal scholars, have not stirred particular concern from the Ministry of Justice or from the Parliament. No particular measure aimed at facilitating the implementation of the two Regulations, which are directly applicable in the French legal order, has been enacted. Significantly, the French Ministry of Justice has not issued any circular on this topic. Under the aegis of the European Judicial Network in Civil and Commercial Matters, a national point of contact is instituted at the Department of Civil Affairs of the Ministry of Justice. There is also a local point of contact in each court of appeal and another one at the Cour de cassation level. However, no specific difficulty relating to the content of the two Regulations has been reported so far – but this does not mean there is none, as it will be shown hereafter. According to the judge designated as the national point of contact, references mostly come from abroad and relate to the French rules regarding road traffic accidents and compensation of personal and material damages.

To the author's knowledge, some French legislation mentions the Rome I Regulation (but none mentions the Rome II Regulation). Several provisions enacted in the field of prevention and resolution of banking crises are expressly characterised by the *Code monétaire et financier* as *lois de police* within the meaning of Article 9 of the Rome I Regulation (Article L. 613-50-4 and Article L. 613-45-1). A ministerial ruling regarding a national collective agreement also mentions the Rome I Regulation (along with the Rome Convention) in order to consider one paragraph as contrary to Article 8 (Article 1, arrêté du 21 août 2008 refusing to extend Article 3.11.3 of the national collective agreement on independent private education). Yet such a reference remains within the material limits of the Rome I Regulation because the contrary paragraph is included in a provision dedicated to the regime for employment contracts. Furthermore, a circular from the

Intersentia

France

Ministry of Justice recommends (subject to the assessment of the courts) that the measures taken in France to alleviate the legal consequences of the lockdown provoked by the COVID-19 crisis should be regarded as *lois de police* within the meaning of the Rome I Regulation.[1]

## 1.2. CASE LAW

French case law provides more insight into the implementation of the two Regulations. Not many cases have reached the Cour de cassation thus far (less than 20 by the end of July 2020[2] plus five more rendered in October 2018 but related to the same case),[3] though courts of appeal have issued more than a hundred decisions up to May 2017 (with some exceptions, decisions of the lower courts after this date are not examined in this contribution). In decreasing order of frequency, the most commonly applied provisions of the Rome I Regulation are Articles 8, 9, 3, 5 and 4. So far, the application of the Rome II Regulation has mostly focused on Articles 4 and 6.

Lower courts seem to be well aware of the existence of the Regulations. For instance, the temporal application of the Rome I Regulation is frequently examined in relation to employment contracts and usually correctly established.[4] Courts seldom refuse to apply the European instruments for incorrect reasons; however, some unjustified grounds for refusal can be found. For instance, a court

---

[1] French Ministry of Justice, Circular, 17 April 2020, referring to the Ordinance No. 2020-427.
[2] Cass. 1re civ, 30 April 2014, No. 13-11932 (Rome II); Cass. com., 1 March 2016, No. 14-22608 (Rome I); Cass. com., 2 November 2016, No. 15-10296 (Rome I); Cass. soc., 19 January 2017, No. 15-20095 (Rome I); Cass. soc., 1 February 2017, No. 15-23723 (Rome I); Cass. com., 4 May 2017, No. 15-22712 (Rome I); Cass. com., 8 November 2017, No. 16-10850 (Rome II); Cass. 1re civ., 24 January 2018, No. 17-10959 (Rome II); Cass. 1re civ., 5 September 2018, No. 16-24109 (Rome II); Cass. soc., 5 December 2018, No. 17-11224; Cass. 1re civ., 19 December 2018, No. 17-26663 (Rome I); Cass. soc., 20 February 2019, Nos. 17-20532, 17-20536 (Rome I); Cass. com., 7 May 2019, No. 17-15340 (Rome I and Rome II); Cass. com., 7 May 2019, No. 17-27229 (Rome II); Civ. 2e civ., 16 May 2019, **No. 18-12005 (Rome I); Cass. 2e civ.,** 16 May 2019, No. 18-12006 (Rome I); Cass. com., **15 January 2020, No.**17-22295 **(Rome II);** Cass. com., 8 July 2020, No. 17-31536 (Rome I **and Rome II). Also worth** mentioning, Conseil d'Etat, 15 June 2019, No. 417837 **(Rome I).**
[3] Applying the Rome II Regulation, Cass. 1re civ., 5 October 2018, No. 17-14401; Cass. 1re civ., 5 October 2018, No. 16-19430; Cass. 1re civ., 5 October 2018, Nos. 15-26115, 15-26.388; Cass. 1re civ., 5 October 2018, No. 15-28531; Cass. 1re civ., 5 October 2018, No. 15-28891.
[4] Colmar, 31 March 2016, No. 15/05844; Paris, 2 June 2015, No. 13/01874; Paris, 21 May 2015, No. 12/09680; Douai, 20 February 2015, No. 14/01536; Colmar, 7 February 2013, No. 11/04065; Colmar, 12 January 2012, No. 11/01146 (all explaining that the Rome I Regulation shall not be applied to an employment contract concluded before 17 December 2009). See also Grenoble, 21 May 2015, No. 14/03912. Following another line of reasoning, some courts applied the Rome I Regulation to cases regarding contracts concluded before 2009 because employer and employee agreed on its application (Aix-en-Provence, 27 April 2017, No. 16/06204; Chambéry, 29 September 2016, No. 16/0025) or because the employee did not challenge its application (Lyon, 26 January 2016, No. 14/06457).

**117**

Marie-Elodie Ancel

of appeal refused to apply the Rome I Regulation to a contract entered into by parties who had their habitual residence in Switzerland because this state is not a member of the EU.[5] Even more surprisingly, another court ruled out the Rome I Regulation, holding that it is not applicable when the parties have chosen the law of their contract.[6]

French lower courts often struggle to decide which Regulation they should apply or whether they should give precedence to other sets of rules. Probably because the Rome I Regulation replaces the rather well-known Rome Convention, court practice seems to be more familiar with this Regulation than with the Rome II Regulation. For instance, in a May 2016 decision, the Aix-en-Provence Court of Appeal correctly applied the Rome I Regulation to validate the choice of the law applicable to an insurance contract, but appeared to be unaware of Article 18 of the Rome II Regulation. Regarding the admissibility of a direct action brought by the victim against the insurer of the liable person, the Court based its decision on prior French case law, which points solely to the law of the place of damage.[7] In another decision, the Nîmes Court of Appeal rightly held that the Rome I Regulation was not applicable *ratione temporis* (to an action brought by a French consumer against a German company which had manufactured the car that the consumer had bought in France from a reseller), whereas the issue should have been characterised as non-contractual, thus leading to the application of the Rome II Regulation.[8] However, in a dispute between two competitors, the Paris Court of Appeal was confronted with unfair competition activities initiated before 11 January 2009 but giving rise to ongoing alleged damages. The Rome II Regulation was held to be applicable to the dispute in its entirety.[9] Similarly, the Aix-en-Provence Court of Appeal applied exclusively the Rome II Regulation to a series of harmful events that took place between 1997 and 2010.[10] The Cour de cassation upheld its decision on the ground that previous French case law was identical to Article 4 of the Rome II Regulation (which is questionable) and that both rules were to be applied in that case.[11]

---

5   Chambéry, 8 December 2015, No. 15/01124.

6   Orléans, 9 April 2015, No. 13/03196.

7   Aix-en-Provence, 12 May 2016, No. 13/06987. To be compared with Versailles, 2 May 2017, No. 16/01166, correctly applying Article 18 of the Rome II Regulation.

8   Nîmes, 5 March 2015, No. 14/01736: the characterisation of the case as contractual comes from French case law.

9   Paris, 1 December 2015, No. 14/02708. This holding has not been challenged before the Cour de cassation (Cass. com., 8 November 2017, No. 16-10850).

10  Aix-en-Provence, 2 July 2015, No. 13/22482.

11  Cass. 1re civ., 5 October 2018, No. 17-14401 (Rome II); Cass. 1re civ., 5 October 2018, No. 16-19430 (Rome II); Cass. 1re civ., 5 October 2018, No. 15-26115-15-26.388 (Rome II); Cass. 1re civ., 5 October 2018, No. 15-28531 (Rome II); Cass. 1re civ., 5 October 2018, No. 15-28891 (Rome II).

France

In fact, the Regulations are more often invoked *outside* their scope of application rather than ignored. There are various reasons for this tropism. Firstly, many French courts base their decisions on the Rome I Regulation and simply overlook the fact that the cases under consideration fall outside its temporal scope.[12] Secondly, in at least two instances, the Rome I Regulation has been deliberately used as *ratio scripta*. In 2013, the Paris Court of Appeal used Article 4(1)(f) to identify the characteristic performance of a distribution agreement according to Article 4(2) of the Rome Convention.[13] A few days before, the Lyon Court of Appeal had based its construction of Article 6(1) of the Rome Convention (referring to 'mandatory rules') on the new wording of Article 8(1) of the Rome I Regulation (referring to 'provisions that cannot be derogated from by agreement').[14] Thirdly, in other cases, courts highlighted that the rules set out by the Rome Convention (held to be applicable to the pending cases) are confirmed, replicated or reinforced by the Rome I Regulation.[15] Finally, regarding the Rome II Regulation, it seems to have been wrongly applied (i) twice in lieu of the 1971 Hague Convention on the Law Applicable to Traffic

---

[12] Paris (International Commercial Chamber), 5 March 2019, No. 18/04137, about a contract concluded in 2001, on the erroneous ground that it was terminated in 2011; Cass. soc., 20 February 2019, Nos. 17-20532, 17-20536 (having asked the lower court to apply the Rome I Regulation, a party cannot claim before the Cour de cassation the application of the Rome Convention); Metz, 17 May 2016, No. 14/00973, about a personal guarantee concluded in 1999 – Article 9 of the Rome I Regulation is mentioned together with Article 3 of the French Civil Code and Article 7 of the Rome Convention; Orléans, 3 March 2016, No. 15/01485, for an agency contract concluded 'in 2007 or 2008'; Lyon, 9 February 2016, No. 13/03208, for a contract concluded in 2008; Pau, 9 September 2015, No. 15/03304, about a publishing contract concluded in November 2008; Pau, 13 July 2015, No. 15/2847, about a framework contract concluded in 2007 with litigious operations concluded on 9 October 2009 and 9 December 2009; Versailles, 22 October 2014, No. 13/01771, on an employment contract concluded in 2003; Lyon, 22 April 2014, No. 12/00822, on a contract concluded in 2008; Poitiers, 28 September 2012, No. 10/03643; Douai, 29 June 2012, No. 12/00975, on a contract concluded in 1999, modified in 2008, with references to the Rome Convention too; Metz, 15 May 2012, No. 10/04280, on a contract concluded in 2008.
On the contrary some courts have rightly applied the Rome Convention: Nîmes, 2 October 2014, No. 13/00118; Versailles, 14 May 2013, No. 12/00913; Paris, 4 June 2013, No. 12/15944; Colmar, 30 March 2012, No. 11/04490; Aix-en-Provence, 14 September 2011, No. 09/22729; Colmar, 15 June 2011, No. 08/02971.
[13] Paris, 4 June 2013, No. 12/15944.
[14] Lyon, 28 May 2013, No. 12/05631.
[15] Nîmes, 5 March 2015, No. 14/01736 (Article 4 of both texts); Montpellier, 11 May 2011, No. 10/06887 (Article 4(4) of the Rome Convention and Article 5 of the Rome I Regulation); Metz, 8 April 2014, No. 14/00294; Nancy, 26 October 2012, No. 12/00890 (Article 6 of the Rome Convention and Article 8 of the Rome I Regulation). More loosely, applying both the Rome Convention and the Rome I Regulation to an employment contract concluded in 2012, Aix-en-Provence, 21 May 2015, No. 13/22838.

Marie-Elodie Ancel

Accidents;[16] (ii) once in lieu of national conflict-of-law rules and the Rome I Regulation;[17] (iii) once in lieu of national conflict-of-law rules.[18]

## 1.3.   ARBITRATION

In France, arbitration appears to be a less fertile ground for the application of the two Regulations than litigation. No award referring to the Regulations has been recorded by the Association Française d'Arbitrage (AFA, also known as the Association for Arbitration). According to the International Arbitration Court of the ICC based in Paris, only two awards had applied the Rome Regulations by the end of 2013. One, rendered by an arbitral tribunal seated in Helsinki, is of very great interest because it thoroughly applied and discussed the two Regulations.[19] The dispute arose out of the sudden termination of a distribution contract, binding a Finnish manufacturer and its distributor for Greece. Finnish law expressly governed the contract. The distributor argued that its claims were non-contractual and should be adjudicated under Greek law, viewed as the law of the market affected and/or as the law of the place where the damages had occurred. Because the defendant was domiciled in the EU (as was the claimant), the arbitral tribunal found it appropriate to resort to the two Regulations.[20] The content of the award will be examined in further detail below.

## 2.   THE OPERATION OF ROME I AND ROME II IN PRACTICE

### 2.1.   *LOIS DE POLICE*

#### 2.1.1.   Identification of French lois de police

The interference of French overriding mandatory rules (*lois de police*) is often discussed before courts, since French case law traditionally tends to recognise such rules in contractual and non-contractual matters. For instance, in a 2006 decision, the Cour de cassation held that a provision of the French *Code de la*

---

16   See section 2.7.
17   Cass. 1re civ., 24 January 2018: lower court judges applied Article 18 of the Rome II Regulation whereas the insured obligations were contractual.
18   Cass. 1re civ., 24 September 2018, No. 16-24109: lower court judges applied the Rome II Regulation whereas the event giving rise to the damage occurred in 2006. See also, for a partial over-application, the above-mentioned decision of the Aix-en-Provence Court of Appeal, 2 July 2015, No. 13/22482.
19   ICC Award No. 16981 rendered in May 2012 and published in the ICC Dispute Resolution Bulletin 2016.
20   Even if the terminated agreement appears to have been entered into in 2000.

Intersentia   **120**

*consommation* was a *loi de police*. Further, in 2007, the Court held that the French provisions protecting sub-contractors (which give them a direct legal action against employers for payment) were also *lois de police*, to be applied whenever the building was located in France, although this reasoning was not obvious for all the judges.[21] Regarding non-contractual obligations, acts that create national funds for compensating victims of terrorism or of other specific torts are also considered *lois de police*.[22]

However, the enactment of the Rome I Regulation and the drafting of Article 9(1) seem to have reduced the judicial characterisation of *lois de police*. Under the Rome Convention, the Cour de cassation decided in 2010 that the French provision that gives carriers a direct claim for payment against recipients of the goods[23] is not a *loi de police*.[24] Consequently, for lower courts, such a direct action is admissible only if French law governs the contract for the carriage of goods.[25] The Cour de cassation also refused to label as *lois de police* the provisions of the *Code de la consommation* protecting individuals who act as personal guarantors for the benefit of a bank.[26] Under the Rome I Regulation, lower courts now follow this ruling.[27] More surprisingly, the Cour de cassation recently decided, again under the Rome Convention, that the French legislation transposing the Directive No. 86/653/EEC on commercial agents is not a *loi de police*.[28] Conversely, the *Conseil d'Etat* (the supreme administrative jurisdiction in France,) labelled as *loi de police* the French provision prohibiting the hiring

---

[21]   Cass. Ch. mixte, 30 November 2007, No. 06-14006.
[22]   For instance, Cass. 2e civ., 25 January 2007, No. 06-10514. However, they could also be considered to be public law matters.
[23]   *Code de commerce*, Article L. 132-8: 'The bill of lading shall form a contract between the consignor, the carrier and the recipient or between the consignor, the recipient, the agent on commission and the carrier. Carriers shall therefore have a direct claim for payment of their services against the consignor and the recipient, both of whom shall guarantee payment of the transport cost. Any clause to the contrary shall be deemed unwritten'.
[24]   Cass. com., 13 July 2010, No. 10-12154.
[25]   Angers, 8 September 2015, No. 13/01460; Versailles, 6 January 2015, No. 14/02383.
[26]   Cass. 1re civ., 16 September 2015, No. 14-10373.
[27]   About Articles L. 341-1, L. 341-2, L. 341-3 and L. 341-6 of the *Code de la consommation*: Metz, 17 May 2016, No. 14/00973; Douai, 28 January 2016, No. 15/00343. The position adopted by the Cour de cassation in September 2015 was anticipated earlier that year by the Metz Court of Appeal (16 April 2015, No. 12/03750).
[28]   Cass. com., 5 January 2016, No. 14-10628. Such a decision is at first sight hard to reconcile with the *Ingmar* and *Unamar* rulings (Case C-381/98, *Ingmar GB Ltd v. Eaton Leonard Technologies Inc.*, ECLI:EU:C:2000:605; Case C-184/12, *United Antwerp Maritime Agencies (Unamar) NV v. Navigation Maritime Bulgare*, ECLI:EU:C:2013:663). However its practical result is that the agent is only entitled to the compensation provided by the chosen law, i.e. German law, which happens to be the law of the country where the agent had to act on behalf of his French principal. The compensation due to the agent has therefore to be determined only by the German transposition of the Directive.

Marie-Elodie Ancel

of a foreigner who is not authorised to carry out a salaried activity in France (Article L. 8251-1, *Code du travail*).[29]

French provisions regulating practices that restrict competition are more difficult to assess.[30] Article L. 442-6, I, 5° (now Article L. 442-1, II) of the *Code de commerce* allows a party to an 'established business relationship' to seek compensation from its counterpart if the latter abruptly breaks off the relationship. Since the CJEU's 2016 ruling in *Granarolo*,[31] a claim based on Article L. 442-6, I, 5° has to be considered as raising a contractual issue if an at least tacit long-standing contract has been terminated. Before this ruling, French courts tended to classify the issue as either a matter of tort or delict (this was the often-repeated position of the Commercial Court of the Cour de cassation)[32] or sometimes as a *loi de police*.[33] In fact, the two approaches often resulted in the application of Article L. 442-6, I, 5°. Indeed, the damage had often occurred in France[34] or the case was considered to fall within the spatial scope of the French *loi de police*. The *Granarolo* ruling now prohibits the 'non-contractual' approach in many cases.[35] This could theoretically give more strength to the approach in terms of overriding mandatory rules, meaning that French courts still could hold Article L. 442-6, I, 5° applicable. Nonetheless, given the restrictive conception of *loi de police* now adopted by the Cour de cassation in other fields, it seems more likely that the abrupt termination of a long-standing contract (whether tacit or express) will remain under the

---

29    Conseil d'Etat, 15 June 2019, No. 417837.
30    It is worth noting that the French Senate recently proposed to expressly indicate in Articles L. 441-7 and L. 442-6 of the *Code de commerce* are *lois de police* the meaning of Article 9 of the Rome I Regulation (Sénat, Article 10 *bis* A of the Draft Law for the balance of trade relations in the agricultural and food sector and for healthy, sustainable and accessible food for all, 2 July 2018). However, the Government opposed such a mention on various grounds. First, it held that *loi de police* is 'a notion defined by international conventions and applied by courts' and that it is not up to legislative characterisation. Secondly, and more convincingly, the Government insisted on the fact that French provisions had already been applied by courts in international situations and that a legislative characterisation of specific French provisions might impede a judicial characterisation of other provisions (Assemblée nationale, Report on the Draft Law for the balance of trade relations in the agricultural and food sector and for healthy, sustainable and accessible food for all, 18 July 2018).
31    Case C-196/15, *Granarolo SpA v. Ambrosi Emmi France SA*, ECLI:EU:C:2016:559.
32    For instance, Cass. com., 13 December 2011, No. 11-12024. See also Paris, 3 April 2014, No. 13/09590.
33    Grenoble, 28 May 2015, No. 12/02016 (applying Article 7 of the Rome Convention).
34    Or the escape clause enshrined in Article 4(3) of the Rome II Regulation could be used to revert to French law: Paris, 30 September 2016, No. 14/04908.
35    Paris, 10 May 2017, No. 14/15261 (French law is applicable to the breaking off of a tacit contract aiming at the distribution of products in France, on the ground of Article 4(1)(f) of the Rome I Regulation); Paris (International Commercial Chamber), 5 March 2019, No. 18/04137 (breaking off governed by French law, which applies by virtue of Article 4(4) of the Rome I Regulation).

Intersentia

France

*lex contractus*.[36] In May 2019, the Cour de cassation again avoided taking a position by approving the application of Article L. 442-6, I, 5° both on the basis of the Rome I Regulation and the Rome II Regulation, adding that to argue that the French provision was a *loi de police* was overabundant.[37]

Article L. 442-6, I, 2° and Article L. 442-6, II (d) of the *Code de commerce* were also confronted with Article 9(1) of the Rome I Regulation in the *Expedia* case lodged at the Paris lower courts. As permitted by Article L. 442-6, III, the Minister for Economic Affairs asked for the cancellation of parity clauses included in contracts governed by English law and entered into by an Internet platform and owners of hotels located in France. These clauses were challenged on the basis of Article L. 442-6, II (d), which prohibits most-favoured-customer clauses, and of Article L. 442-6, I, 2°, which requires protection against significant imbalance in the rights and obligations of the parties. According to the Minister for Economic Affairs, the case was non-contractual by nature and, in any event, the whole Article L. 442-6 was a *loi de police*. The Paris Commercial Court decided differently in May 2015.[38] First of all, it characterised the case as contractual and thus as falling under the Rome I Regulation: the choice of English law was therefore totally admissible. The Court added that Article 9 requires a cautious approach, each provision having to be examined closely and separately. On this basis, the *loi de police* label was denied to Article L. 442-6, II (d) because this provision is specific to sectors where several small suppliers face one large buyer. On the other hand, Article L. 442-6, I, 2° could be a *loi de police* because the need for rebalancing a contract is generic and systemic. Such an analysis, based on the economic facet of the provision (specific sectors versus systemic value) under examination, is not entirely convincing.[39] The Minister for Economic Affairs successfully appealed against the Paris Commercial Court's judgment. In June 2017 the Paris Court of Appeal decided that his claims were tortious by nature and that the Rome II Regulation had to be applied.[40] As a consequence, English law was disregarded, on the grounds of Article 14 of the Regulation, because the Minister was not bound by the choice-of-law clauses. Article 4 thus led to French law as the law of the country where the damage had occurred.

---

[36]   Paris (International Commercial Chamber), 3 June 2020, No. 19/03758. In the ICC Award No. 16981, the majority of the arbitral tribunal was not convinced that Article 18A of Greek Law 146/1914, also prohibiting the sudden and unjustified termination of long-term commercial relationships where one party is in a position of economic dependence on the other, is a *loi d'application immédiate* (in other words, an overriding mandatory rule). In particular, according to the arbitrators' views, 'the protection of a weaker party in contracts does not as such in all and every circumstance amount to an essential policy'.

[37]   Cass. com., 7 May 2019, No. 17-15340.

[38]   Trib. com. Paris, 7 May 2015, No. 2015000040, *Ministère de l'Economie et de l'Industrie et du Numérique v. Expedia, Inc. et al.; Ministère de l'Economie et de l'Industrie et du Numérique v. Hotels.com LP.*

[39]   Especially because it is not in line with the *Unamar* ruling.

[40]   Paris, 21 June 2017, No. 15/18784.

123

Marie-Elodie Ancel

Resorting to *lois de police* was therefore unnecessary, but this did not prevent the Paris Court of Appeal from stating in an *obiter dictum* that both Articles L. 442-6, II (d) and L. 442-6, I, 2° are overriding mandatory provisions, within the meaning of Article 16 of the Rome II Regulation, because they promote 'equality of arms and faithfulness between economic partners'. This rationale was recently endorsed by the Cour de cassation.[41] Furthermore, in 2016, the French contract law reform introduced into the Civil Code the prohibition of significant imbalance,[42] broadening its range considerably. However, it is unlikely, of the provisions in the Civil Code, that this one in particular will ultimately be labelled as a *loi de police*. Were this to be the case, it would cause much uncertainty in international contractual relationships.

### 2.1.2.   *Effects to be Given to Foreign* lois de police

To the present author's knowledge, only one case has been rendered by a French court regarding third states' *lois de police* in the context of the Rome I Regulation.[43] The treatment that was given to foreign overriding mandatory provisions does not appear completely satisfactory. In 2015, the Paris Court of Appeal had to adjudicate a claim brought by an Iranian agent against the French subsidiary of a US company.[44] Their contractual relationships were governed by French law but, because of US federal legislation prohibiting trade with Iran, the French subsidiary was prevented by its parent company from doing further business with its Iranian partner. The Court of Appeal refused 'to give effect' to the federal provisions, taking the view that the provisions did not originate from the state of the place of performance, as referred to in Article 9(3) of the Rome I Regulation. As a consequence, the French subsidiary was held to be contractually liable. Nevertheless, the Court of Appeal drew some legal consequences from the existence of the embargo in assessing the damages invoked by the Iranian party. The Court dismissed any loss of chance claimed by the agent, holding that 'because of the embargo on Iran decided by the U.S. government since 1995, the continuation of commercial relations [between the French subsidiary and the Iranian partner] was not serious' (under French law, any loss of chance has

---

41    Cass. com., 8 July 2020, No. 17-31536. It remains to be seen whether this judgment will reactivate a wider use of *lois de police* in business relationships.

42    Civil Code, Article 1171: any term of a standard form contract that creates a significant imbalance in the rights and obligations of the parties to the contract is deemed not written.

43    ICC Award No. 16981 needs to be treated separately because arbitral tribunals are not faced with *lois de police* of their own forum. In the case at hand, the arbitral tribunal felt to have only 'a duty' to enforce national overriding mandatory rules contained in the law chosen by the parties. Nevertheless, it hypothetically took the Greek provision invoked by the distributor as a *loi de police* and examined the consequences of its application or non-application. It concluded that the consequences of its non-application would be 'minimal, considering that Finnish law recognises and protects the same policy'.

44    Paris, 25 February 2015, No. 12/23757.

France

to be **serious** to be compensated). This shows that at least the existence of the US **overriding** mandatory rules was used as a fact that shaped the reasonable expectations of the Iranian **partner. However,** the Paris Court of Appeal's ruling could also have taken into **consideration the th**reat to trade with Iran represented by the US embargo in assessing the validity of the contractual **relatio**nships on the ground of the French governing law.[45] The CJEU's 2016 *Nikiforidis* ruling will probably foster further analysis and examination of foreign *lois de police* in the light of the law of the contract.[46]

## 2.2. PARTY AUTONOMY

### 2.2.1. *Party Autonomy under Rome I*

Party autonomy has been acknowledged for more than a century in French conflict of laws on contracts. Contemporary case law shows that the express choice of law is unproblematic[47] and *dépeçage* almost non-existent.[48] When no express choice is made, tacit or implicit consensus is quite easily accepted[49] (except in employment contracts).[50] For instance, the Metz Court of Appeal has considered, on the ground of Article 3(1) of the Rome I Regulation, that where both parties base their written submissions on French law, it clearly demonstrates a choice of that law.[51] Such a characterisation could be discussed because reference to French law could have been limited to the issue at stake before that Court in relation to the differing temporal reach of each agreement. In instances where the parties can assign or waive the rights available in disputes (*droits disponibles*), the parties can choose the law that a French court will apply. However, they are relieved of this choice as soon as the dispute is solved (this is why this kind of agreement is called *accord procédural*). Party autonomy under the Rome I Regulation binds both parties without a time limit, unless they both decide to change their initial choice. Nonetheless, in the Metz Court of Appeal decision, such a distinction was not really material because the sales contract at issue was very simple and no other dispute was likely to arise.

---

45   Compare with Poitiers, 29 November 2011, No. 10/03500 (on the grounds of the Rome Convention and French law), where it was decided that a contract for carriage of goods violating a Ghanaian embargo was void because it had as its object an impossible thing.
46   Case C-135/15, *Republik Griechenland v. Grigorios Nikiforidis*, ECLI:EU:C:2016:774.
47   For instance, Paris, 11 October 2012, No. 11/20657 (express choice of English law) or, improperly grounded on French prior case law, Orléans, 25 April 2015, No. 13/03196. However, choice of non-state law provisions remains a blind spot before French courts.
48   Cass. soc., 4 December 2012, No. 11-22166 (on the ground of the Rome Convention, regarding an employment contract).
49   Paris (International Commercial Chamber), 3 June 2020, No. 19/03758.
50   See section 2.4.3.
51   Metz, 26 November 2015, No. 15/00561 (implicit choice of French law).

Marie-Elodie Ancel

Tacit or implicit choice is also very often relied on for personal guarantees. In this context, various elements can serve as evidence. In one case, the Metz Court of Appeal held that the parties had made an implicit choice of Luxembourg law because of their choice of the Court of Luxembourg City, supported by the reference in the contract to two provisions of the Luxembourg Civil Code. Even though the French Civil Code once included the same provisions, the Court underlined that at the time of the conclusion of the contract these provisions had been relocated in the French Civil Code under a different number.[52] In another case, an Austrian company guaranteed the debt of another Austrian company that had bought wood from a French municipality.[53] Sales of wood by French public entities are strictly regulated under the French Forestry Code and, in this case, the sales contract was expressly submitted to French law. Moreover, the French Forestry Code requires that, when payment is deferred, an approved body must give a personal guarantee. The guarantee given by the Austrian company mentioned that specific provision and was written in French (although it was signed in Austria). Considering all these elements and given the ancillary nature of personal guarantees, the Metz Court of Appeal concluded that French law also implicitly governed the contract at issue. In yet another case, the Douai Court of Appeal decided, in a short reasoning, that because Belgian law expressly governed the guaranteed contract, it should also govern the guarantee. The Court may have felt the weakness of the argument and tried, not very convincingly, to conclude that Belgian law was applicable to the guarantee under Article 4 of the Rome I Regulation.[54]

### 2.2.2.  Party Autonomy under Rome II

Party autonomy has not been completely ignored in tort matters, but until the Rome II Regulation the parties' choice could only stem from an *accord procédural* reached by the parties once they were litigating in a French court. Under the Rome II Regulation, party autonomy is theoretically wider; however, no such case has yet been brought in French court practice.

So far, Article 14 principally appears in the aforementioned ICC Award No. 16981.[55] The distribution contract at issue included a choice-of-law clause stating that the 'agreement shall be governed by and construed in accordance with Finnish law'. However, the distributor presented its claim for sudden

---

52  Metz, 16 April 2015, No. 12/03750.
53  Pau, 22 March 2016, No. 16/01183.
54  Douai, 28 January 2016, No. 15/00343. See section 2.3.2.
55  In the dispute between the Internet platform and owners of hotels in France (the *Expedia* case, see section 2.1.1), the Paris Court of Appeal noted that the Minister for Economic Affairs had not given its consent to the contractual clauses choosing English law. Therefore, his claims, characterised as tortious, were not governed by this law (Paris, 21 June 2017, No. 15/18784).

France

termination of the contract as tortious in nature, relying on elements of its counterpart's behaviour 'which made the relevant acts tort'. Because the arbitral tribunal had jurisdiction to adjudicate contractual and non-contractual claims, it had to decide whether the choice of Finnish law for the contract deserved to be extended to a claim that was allegedly tortious in nature. Firstly, the majority of the arbitral tribunal disagreed with the distributor, considering that its claims derived 'from the performance of the contract and [were] therefore contractual by nature'. Secondly, 'for the sake of completeness', the arbitrators addressed the issue of the law governing these claims, had the distributor's claims been characterised as tortious. The majority of the arbitral tribunal was satisfied that the conditions provided under Article 14 were fulfilled:

> 'the Parties, which both pursue a commercial activity, entered into a clear and written choice of law before the event giving rise to the alleged damage occurred; and the record does not evidence that the choice of law was not "freely negotiated" at the time it was made'.

However, readers are left with the impression that the arbitrators overlooked one point: was a choice of Finnish law for non-contractual claims related to the distribution contract really 'demonstrated with reasonable certainty by the circumstances of the case'? At an earlier stage of its reasoning, the majority of the arbitral tribunal had noted that:

> 'it is well established in international arbitration that, except where otherwise provided, it may generally be assumed that the parties agreed on an all-encompassing reference to the chosen substantive law, i.e. such reference includes not only contractual claims in the strict sense of the term but also e.g. tort claims arising out of and in connection with the contract containing the choice-of-law clause'.

Because this contention is grounded in a general assumption and not in the circumstances of the case, the award appears to be a little fragile when it comes to this aspect.[56]

## 2.3. ABSENCE OF CHOICE OF LAW

### 2.3.1. Fixed Rules under Rome I

Regarding contractual matters, French courts are comfortable with fixed rules. The method echoes national case law that was, under the influence of Batiffol, based on presumptions. In this favourable context, fixed rules enshrined in the

---

[56]   See also Paris (International Commercial Chamber), 3 June 2020, No. 19/03758.

Marie-Elodie Ancel

Rome I Regulation have been used to determine the law applicable to a great variety of contracts: to an auction held in France,[57] to medical surgery performed in Belgium by a doctor established in France,[58] to the rental and setting up of tents for memorial ceremonies on the D-Day beaches in Normandy,[59] etc.

### 2.3.2.    Escape Clauses under Rome I

So far, only a few decisions have addressed escape clauses under the Rome I Regulation and it is difficult to draw any consistent conclusion from them. However, it should be noted that escape clauses are not used in order to systematically revert to French law. **Personal** guarantees, carriage of goods and employment contracts offer the most **relevant** examples.

With regard to personal guarantees, absent a choice of law by the parties, French courts historically tended to presume that they were submitted to the law governing the secured obligation. Article 4(2) of the Rome Convention challenged this presumption and the Cour de cassation seemed to hesitate between a restrictive[60] and a looser[61] usage of the escape clause. The aforementioned decision rendered by the Douai Court of Appeal in 2016 seems to pick up the former pre**sumption** again.[62] The Court's reasoning is a bit confused: it appears only to rely **on Article** 4(2) of the Rome I Regulation, but in reality it ended up placing the guarantee concluded by two French nationals with their habitual residence in France **under Bel**gian law, which expressly governed the main contract.[63] In any event, **nowhere** does the Court seem to realise that the escape clause under Article 4(3) of the Rome I Regulation should be used more sparingly than under the Rome Convention. Conversely, the Paris Court of Appeal ruled that a comfort letter granted by a Luxembourg parent company to the French Post Office to guarantee the debts of its French or other subsidiaries should remain under Luxembourg law. The Court insisted on the limited use to be made of Article 4(3) of the Regulation.[64]

---

[57]   Paris, 15 January 2013, No. 12/01720 (Article 4(1)(g)).
[58]   Paris, 15 May 2014, No. 13/02356.
[59]   Poitiers, 28 September 2012, No. 10/03643 (whether a pure provision of contract or a renting contract, the contract is to be governed by French law on the grounds of Article 4(1)(b) **or (2)).**
[60]   Cass. com., 8 March 2011, No. 09-11751.
[61]   Cass. 1re civ., 16 September 2015, No. 14-10373.
[62]   See section 2.2.1: Douai, 28 January 2016, No. 15/00343.
[63]   It is hard to tell whether the Court improperly applied Article 4(2) by confusing the 'characteristic performance' under the main contract and the one of the personal guarantee; or if it tried to align with the outcome of the decision rendered by the Cour de cassation on 16 September 2015.
[64]   Paris (International Commercial Chamber), 10 September 2019, No. 19/06981.

204

France

The escape clause spelled out in Article 5(3) of the Rome I Regulation for the carriage of goods was at play in a decision rendered by the Cour de cassation.[65] A French company was responsible for the operation of the carriage of goods within France as part of the goods' longer journey to their ultimate destination, Italy. Judges held that a single contract had been entered into with several carriers but parties did not choose the applicable law. Because the place of receipt (France) and the place of delivery (Italy) or the habitual residence of the consignor (France) were not situated in the country of the habitual residence of the main carrier (Switzerland), Article 5(1) led the judges towards the law of the country where the place of delivery was situated, as agreed by the parties (Italy). However, pursuant to Article 5(3), the French carrier argued that manifestly closer links existed with France. This position was sternly rebutted by the Court of Appeal and, afterwards, by the Cour de cassation. Furthermore, when the habitual residence of the carrier and the place of delivery are located in the same country, French judges are very reluctant to apply the escape clause.[66]

Finally, two decisions relate to Article 8(4). In the first case, a captain was hired to sail in the Western Mediterranean and it was impossible to identify one location where he habitually carried out his work.[67] The connection with the country of the place of business of his employer (a company incorporated in the Isle of Man) was weak, since the captain had never sailed in this region. The Aix-en-Provence Court of Appeal held that closest links, within the meaning of Article 8(4), existed with France, where the captain was domiciled during the contract and where from time to time he sailed the boat in performance of the contract. In a later case, the parties had expressly submitted an employment contract to Lebanese law, though the employee was to carry out his activities in Algeria.[68] The Aix-en-Provence Court of Appeal had to examine whether a closer link existed with France, because both parties were French, the salary was paid in euros and the employer had organised the employee's return to France. These circumstances were not considered sufficient to establish a closer link with France. As a principle, when an employee carries out his activities exclusively or almost exclusively in one country, French judges do not tend to depart from the law of this country.[69]

---

[65] Cass. com., 1 March 2016, No. 14-22608 (it should be noted that judges mentioned Article 5(2) by mistake).
[66] See section 2.4.1.
[67] Aix-en-Provence, 22 January 2016, No. 15/02788.
[68] Aix-en-Provence, 2 June 2016, No. 14/21676.
[69] Sticking to the law of the place where the activities are carried out: Colmar, 29 April 2016, No. 14/02955; Colmar, 19 January 2016, No. 14/01854 and 14/01853; Douai, 19 December 2014, No. 14/01422.

129

Marie-Elodie Ancel

### 2.3.3.   Fixed Rules under Rome II

With respect to non-contractual issues, courts are keen to rely on Article 4 of the Rome II Regulation whenever the dispute is about non-material[70] or material[71] damages or personal injury.[72] Compared to contracts, the move towards fixed rules is more dramatic because, previously, the law applicable to non-contractual relationships whose elements are spread across different countries (*délits complexes*) was mostly determined on a case-by-case basis, which resulted in judicial uncertainty.[73] Against this background, the guidance provided by Article 4 of the Rome II Regulation seems to be appreciated.[74]

Still, factual constellations that occurred before and after 11 January 2009 can be problematic.[75] For instance, an important case involved thousands of victims of defective breast prostheses, who were domiciled in many countries, and various foreign distributors that operated on behalf of the French company producing the prostheses.[76] One action was specifically brought against an organisation incorporated in Germany and its French subsidiary, which were both in charge of assessing the medical devices between 1997 and 2010. The Aix-en-Provence Court of Appeal held that, pursuant to Article 4 of the Rome II Regulation, only one law was applicable to the claims:

'the tort/delict occurred in the French factories of [the producer] situated in [city X] where the audits took place, the responsibility of [the French subsidiary of the German organisation], a company governed by French law, was sought by the respondents and interveners. It follows, therefore, from [Article 4], from the facts and from the procedure described above, that French law is applicable to the present proceedings'.

It may be that the manifestly closest connection existed with France, but the Court of Appeal was not willing to go into further detail. Notably, it did not mention that decisions (related to the issue of compliance certificates, their

---

70   For the non-material injury caused to a French national who had married a woman in Tunisia but who suffered from the deliberate refusal of his wife to join him in France after the wedding: Douai, 8 January 2015, No. 13/07208; for the damage caused to a woman deserted by a husband, Paris, 30 June 2016, No. 14/09535.
71   Versailles, 2 May 2017, No. 16/01166.
72   Aix-en-Provence, 24 May 2017, No. 16/06254.
73   Cass. com., 25 March 2014, No. 12-29534; Cass. com., 4 November 2014, No. 12-27072.
74   See, using Article 4(1) of the Rome II Regulation as support for the case-by-case search for the law applicable to a situation falling outside the temporal scope of the Regulation, Montpellier, 21 June 2011, No. 10/03569.
75   See section 1.2.
76   Aix-en-Provence, 2 July 2015, No. 13/22482.

maintenance and renewal, for instance) had been taken in Germany.[77] Then the claimants, split into five groups, challenged the decision of the Court of Appeal on various procedural and substantive aspects. In turn, the German and French firms in charge of the monitoring of the products asked for the application of German law. This is how the Cour de cassation was led to hold that both the previous case-by-case approach and Article 4 of the Rome II Regulation were applicable and that, fortunately,[78] they conciliated in designating French law. However, the reading of the Aix-en-Provence Court of Appeal decision by the Cour de cassation required to reintroduce clearer references to paragraphs 1 and 3 of Article 4 of the Rome II Regulation:

> 'the judgment states, first, that [the German firm's] liability is sought on the basis of shortcomings both in the conduct of the certification procedure and in the implementation of the monitoring and recertification, provided for in Directive 93/42, in particular during surveillance inspections of the quality carried out in the premises of the [French company], located in France; (…) it then notes that the [German firm's] actions took place from 1997 to 2010; that in the current state of these statements and findings, the Court of Appeal was able to conclude that the damage had occurred in the [French company's] plants where the defective breast implants had been manufactured and inspections carried out, indicating that the fact that the tort/delict also had the closest links with France, within the meaning of Article 4(3) of the Rome II Regulation'.

Naturally, torts committed through the Internet make the localisation of direct damage difficult. In a September 2016 decision, the Rennes Court of Appeal made a considerable effort to justify that French law was applicable to a claim brought by a French company on the ground of denigration against a Japanese competitor, which had published a press release on its website alleging that the claimant was a patent infringer.[79] According to the Court, the Japanese defendant had deliberately caused damage in France to the French claimant. The Court highlighted that (i) the press release was published in English by the Japanese firm on its '.com' website, (ii) it clearly mentioned that the French company was involved in infringement proceedings initiated in Germany, and (iii) it had been shared many times in a highly competitive sector and relied on by customers

---

[77]   Under previous case law, such kind of decisions had been taken into account or even held decisive for the determination of the applicable law: Cass. 1re civ., 19 May 1999, No. 97-13972; Cass. 1re civ., 27 March 2007, No. 05-10480 (to be compared with Cass. 1re civ., 27 May 2010, No. 09-65906).

[78]   Luck favours the bold: very few French scholars would agree with the Cour de cassation on its assertion that 'Article 3 of the Civil Code' has been 'interpreted consistently' before the entry into force of the Rome II Regulation.

[79]   Rennes, 13 September 2016, No. 15/05875. However, Article 4 was improperly applied to this dispute that fell under Article 6(2).

Marie-Elodie Ancel

of the French company. Clearly, in this case, the Court used 'targeting' as a criterion to localise damages allegedly caused through the Internet.

Financial disputes are another source of difficulty, as a Paris Court of Appeal decision illustrates.[80] In 2006, a French bank invested several million euros in hedge funds established under Cayman Islands law by a French investment firm. Two days after the collapse of Lehman Brothers, the bank started to secure its investments and, by 2009, it had taken over all the assets of the 'master' hedge fund. At the end of that year, the French firm and the master fund initiated proceedings in France. They blamed the bank for its abrupt withdrawal, which, according to the claimants, amounted to the French tort of abuse of right. The bank contended that Cayman Islands law should be applied. It argued that the Cayman Islands-incorporated hedge fund was the direct victim and that, because Cayman Islands law governed the contract between the bank and the hedge fund, the escape clause could not lead to any other law. However, the Court decided that French law was applicable to the case. First, it held that two of the parties (one of the claimants and the defendant) were French and that all the natural persons involved were also French. This may sound like a slightly distorted echo of Article 4(2) of the Rome II Regulation. Second, it analysed the damage claimed by the French investment firm as the loss of its fees combined with a forced standby, which had to be localised in France. The Court considered that the damages claimed by the master fund were indirect, because they were a consequence of the damage first suffered by the other fund (the so-called 'feed' fund), which was not a party to the proceedings. Thirdly, the Paris Court of Appeal rebutted any recourse to the escape clause, holding (a bit too quickly perhaps) that, because the claim had no contractual basis, the governing law of the contract did not matter. In another decision, the Paris Court of Appeal had to decide on the liability of a British bank for failure to fulfil its obligations of supervision and vigilance regarding an account opened in its books by a company, which had 'lost' the funds entrusted by a French investor. English law is held applicable on the ground of Article 4(1) of the Rome II Regulation. Again, the Paris Court of Appeal rebutted any recourse to the escape clause, holding that the sole circumstance that the funds had **been invested** through a **transfer** order made from an account opened in France **did not suffice** to justify the application of French law.[81]

### 2.3.4.   *Escape Clause under Rome II*

Generally speaking, the escape clause included in Article 4(3) does not seem to be overused.[82] In the dispute between the French and Japanese competitors,

---

80    Paris, 26 March 2013, No. 12/02707.
81    Paris (International Commercial Court), 12 November 2019, No. 19/03149.
82    See section 2.3.3: Aix-en-Provence, 2 July 2015, No. 13/22482.

France

the Japanese defendant tried to argue that German law should apply to the case.[83] It argued that the denigration proceedings before the French court were related to the infringement claim first brought in Germany and that the parties' counsels had previously exchanged correspondence, so there was 'a pre-existing relationship between the parties' within the meaning of Article 4(3) of the Rome II Regulation. The Rennes Court of Appeal found that this was insufficient grounds to maintain that 'a manifestly closer connection' existed as required by Article 4(3).[84]

Of course, the Court's self-restraint in this case and in similar ones[85] might result from the fact that French courts considered that fixed rules led to French law and were not willing to move away from this analysis. However, the decision handed down in favour of British law by the Paris Court of Appeal about the liability of a British bank shows that the escape clause is not manipulated to designate French law.[86]

## 2.4.   SPECIFIC RULES

### 2.4.1.   Carriage of Goods under Rome I

When faced with a carrier that has its central administration in France and goods delivered in France, French courts readily follow Article 5(1) of the Rome I Regulation and are happy to apply French law.[87] In one decision, the Douai Court of Appeal even completely denied the existence of the escape clause in Article 5.[88] Nevertheless, when courts are confronted with the opposite situation (a carrier based in a foreign country and delivery – or receipt – in the same country), the foreign law is equally held applicable because of the convergence of some of the factors listed in Article 5(1).[89] Furthermore, under such circumstances, recourse to the escape clause does not appear to be an option. For instance, in a case relating to the delivery of goods in Chile by a Chilean carrier, even though French law governed the commission contract related to this carriage, French judges did not consider the possibility of submitting the contract for the carriage of goods to French law.[90]

---

[83]   See section 2.3.3: Rennes, 13 September 2016, No. 15/05875.
[84]   Nevertheless, it has to be reminded that Article 4 was improperly applied to this dispute that fell under Article 6(2).
[85]   See section 2.3.3: Paris, 26 March 2013, No. 12/02707.
[86]   Paris (International Commercial Court), 12 November 2019, No. 19/03149.
[87]   Versailles, 6 January 2015, No. 14/02383; Angers, 8 September 2015, No. 13/01460.
[88]   Douai, 2 July 2015, No. 14/04317.
[89]   Versailles, 19 May 2015, No. 14/04111.
[90]   Paris, 29 September 2016, No. 14/21772.

**133**

Marie-Elodie Ancel

Moreover, commission contracts for the carriage of goods are still problematic despite the CJEU's *ICF* and *Haeger* rulings.[91] In a very unclear decision, the Versailles Court of Appeal tried to draw on the *Haeger & Schmidt* ruling, but it is impossible to understand whether the Court tried to apply Article 5(1) and (3) or Article 4(3) of the Rome I Regulation.[92]

### 2.4.2.    Carriage of Passengers under Rome I

Article 5(2) only appears in the background of a case rendered by the Cour de cassation in 2018.[93] An Israeli resident had taken a flight, operated by an Israeli airline company, from France to Israel. However the flight landed more than three hours late. The French first instance court directly applied EU Regulation No. 261/2004 on compensation and assistance to passengers in the event of, among others, long delay of flights. Before the Cour de cassation, the airline company contended that Israeli law was applicable by virtue of Article 5(2) of the Rome I Regulation. However, the Cour de cassation rightfully upheld that the EU Regulation directly applies in such a case (i.e. in the case of a flight departure from a Member State), the determination of the law governing the contract being irrelevant. Curiously though, the Cour added that it had not been argued that Israeli compensation would have been 'at least equivalent' to the one resulting from the EU Regulation, as if it might have changed the outcome.

### 2.4.3.    Consumer Contracts under Rome I

Only two cases are directly related to Article 6 of the Rome I Regulation. They both involve consumers with their habitual residence in France when the proceedings were initiated and professionals established abroad, in Belgium and in Germany respectively. The amounts at issue were rather high, around 15,000 euros. Quite surprisingly, no choice of law had been made and the main difficulty was to determine whether the consumers were entitled to the protection provided by Article 6(1). In the first case, the question was easily solved: a German firm had sold a fitted kitchen to a couple living in Alsace in the context of a commercial fair in Strasbourg;[94] as a consequence, French law was held to be applicable. The second case was more complicated. A consumer, allegedly living in Luxembourg at the time of the conclusion of the contract, hired a Belgian firm

---

[91]    Case C-133/08, *Intercontainer Interfrigo SC (ICF) v. Balkenende Oosthuizen BV and MIC Operations BV*, ECLI:EU:C:2009:617; Case C-305/13, *Haeger & Schmidt GmbH v. Mutuelles du Mans assurances IARD (MMA IARD) and Others*, ECLI:EU:C:2014:2320.
[92]    Versailles, 1 March 2016, No. 14/08465.
[93]    Cass. 1re civ., 19 December 2018, No. 17-26663.
[94]    Colmar, 19 October 2015, No. 14/02375.

**134**

France

to install frames, blinds and rolling shutters in his house in France.[95] The Metz Court of Appeal merely noted that the Belgian firm had agreed to perform its obligation in France, from which it inferred that it had 'directed its activities to France', where, meanwhile, the consumer had (apparently) transferred his habitual residence. One cannot help thinking that the application of the protective regime could have been more carefully thought through.

### 2.4.4.   Individual Employment Contracts under Rome I

Article 8 is the most commonly applied provision of the Rome I Regulation. Case law essentially points to two findings.[96] First, French courts tend to be reluctant to characterise a tacit choice of law. Second, they still have to improve the comparison process of the chosen law (when there is one) with the objectively applicable law.

On the first topic, several decisions follow more or less the same pattern: when references to foreign provisions are included in employment contracts, a tacit choice of the foreign law has been considered not to be 'clearly demonstrated' pursuant to Article 3(1) (to which Article 8(1) refers) because of other connecting factors pointing to France. For instance, in a 2015 Orléans Court of Appeal decision, French law was applied to an employment contract drafted in Polish, entered into by Polish parties and including many references to Polish law provisions (notably on the duration of work, vacation, notice of departure) because these connections with Poland were outweighed by several other connections with France: the French residence of the employee, the performance of the work in France, the salary paid in euros, payslips worded in French, and the express reference to a French collective agreement.[97] The Orléans Court of Appeal was cautious enough to add that even if there were a choice of Polish law, French provisions on redundancy should apply by virtue of Article 8(2). In other cases, express reference to foreign labour provisions (from Belgium in one case, from Luxembourg in the others), only identified by their date (reference was made to 'the act dated …') and not by the state from which they emanated, was not considered to demonstrate the clear intention of the French employees to accept the application of foreign law. Because the contract had to be performed in France, French law was therefore held to be applicable on the grounds of Article 8(2).[98]

---

[95]   Metz, 8 March 2016, Nos. 15/00060, 16/00064.
[96]   Regarding the escape clause enshrined in Article 8(4), see section 2.3.2; on the scope of application of the governing law, see Cass. soc., 20 February 2019, Nos. 17-20532, 17-20536 (the status of co-employer is governed by the law applicable to the employment contract).
[97]   Orléans, 17 September 2015, No. 14/02920.
[98]   Douai, 29 May 2015, No. 14/0297; Metz, 13 October 2015, Nos. 15/00477 to 15/00485.

135

Marie-Elodie Ancel

Regarding the comparison between the chosen law and the objectively applicable law (most of the time, the law of the country where the employee carries out his work),[99] the Cour de cassation had to provide some guidance to judges and parties on Article 6 of the Rome Convention. In a decision rendered in January 2017, the highest judges held that the employee at least had to allege that the objectively applicable law was more protective than the chosen law in relation to the legal basis of his claims.[100] It was not up to the judges hearing the case to make this point. In a second decision rendered in February 2017, the Cour de cassation underlined that judges have to demonstrate that French mandatory rules, and especially the provisions on fixed-term contracts and redundancy, give employees better protection than the chosen law (in this case, the law of St Vincent and the Grenadines).[101] It is true that the reasoning of French decisions is not always very clear on this aspect.[102] The comparison was better made in a decision, based on the Rome I Regulation, in which the judges relied on a legal study comparing French and English laws. The study, provided by the employee who was challenging his dismissal, pointed out that for some aspects of the redundancy procedure French law was more employee-protective. However, in a spill-over effect, all the employee's claims, and not merely the ones directly relating to the procedure of dismissal, were adjudicated on the basis of French law.[103]

### 2.4.5.   Unfair Competition and Acts Restricting Free Competition under Rome II

Of the rules on specific torts and delicts, only Article 6 of the Rome II Regulation has been applied,[104] and it has rarely happened.[105] In a 2014 decision, the Paris

---

99    Cass. soc., 5 December 2018, No. 17-11224; the Cour de cassation denies any relevance to the E101 certificate issued on the basis of Regulation (EEC) No. 1408/71 to establish the place where the employee habitually carries out his work. It holds the same within the meaning of Article 19 of the Brussels I Regulation (Cass. soc., 29 September 2014, No. 13-15802; Cass. soc., 10 June 2015, No. 13-27799).

100   Cass. soc., 19 January 2017, No. 15-20095. Already on this line, Aix-en-Provence, 2 June 2016, No. 14/21676.

101   Cass. soc., 1 February 2017, No. 15-23723.

102   Chambéry, 7 April 2016, No. 15/01583: French provisions on redundancy protection prevail over the chosen law but no indication is given on the lesser protection provided by this law.

103   Aix-en-Provence, 27 April 2017, No. 16/06204, upheld by Cass. soc., 20 February 2019, Nos. 17-20532, 17-20536.

104   In case of copyright infringement, French courts do not have recourse to Article 8 of the Rome II Regulation because Article 5(2) of the 1886 Berne Convention for the Protection of Literary and Artistic Works is read as a choice-of-law rule and takes precedence over the Regulation pursuant to its Article 28 (see for instance Cass. com., 8 November 2017, No. 16-10850).

105   Rennes, 13 September 2016, No. 15/05875, for a missed opportunity (denigration); in the Expedia case, application of Article 6 of the Rome II Regulation to claims based on practices restricting competition was not seriously discussed (Paris, 21 June 2017, No. 15/18784).

212                                                                    Intersen**136**

France

Court of Appeal correctly refused to resort to Article 6(2) and, from there, to Article 4.[106] According to the Court, the alleged activities (unfair competition and passing off related to a likelihood of confusion on the part of the public) had a collective impact, which required them to be governed by the law of the place where the market was affected. Because the website at issue had an URL ending with '/fr' and offered a magazine written in French for download, French law was applied pursuant to Article 6(1). In another case, also based on unfair competition and passing off, the same court also relied on Article 6(1) and held that Singaporean law was applicable.[107] The Court noted that the defendant had no commercial activities in France and that the acts at issue could not have taken place outside of Singapore; as a consequence, Singapore was the country where competitive relations and the market had been affected.

However, the interface between Article 6(2) and Article 4 of the Rome II Regulation is not always so well handled. As an example, the Cour de cassation recently overturned a ruling (again rendered by the Paris Court of Appeal) applying, on the ground of Articles 6(2) and 4(2), French law between two French companies, which were competing in Japan. According to the Cour de cassation, in order to do so, the lower court should have ascertained that the disputed conduct was not likely to affect the Japanese market.[108]

## 2.5.  SCOPE OF APPLICABLE LAW AND CHARACTERISATION ISSUES

For many years, the sudden termination of an established business relationship, which is regulated by a specific provision in the French *Code de commerce* (and also under Greek law),[109] has raised a characterisation issue when the dispute has an international dimension. One could contend that it recognises a tortious relationship on the grounds that, as the Advocate General Kokott put it in relation to the *Granarolo* case:

> 'the basis for the claim is not to be found in the agreements of the parties, but in a statutory provision which, for the purposes of ensuring order in economic life, reproves any abrupt termination of business relationships and provides in such cases for claims for damages by the former business partner'.[110]

---

[106] Paris, 9 May 2014, No. 12/10744.
[107] Paris, 1 December 2015, No. 14/02708.
[108] Cass. com., 15 January 2020, No. 17-22295.
[109] See section 2.1.1.
[110] Case C-196/15, Opinion of Advocate General Kokott delivered on 23 December 2015.

Marie-Elodie Ancel

Hence, regarding the applicable law, the Rome II Regulation would have been the relevant instrument. However, the CJEU expressed a different view in its 2016 ruling in *Granarolo*. Provided that a contract exists between the parties (and such a contract can be tacit, simply relying on a body of consistent evidence), the Court considered that its termination, whatever the circumstances and the alleged statutory basis for the claim, falls under contractual matters. If the *Granarolo* ruling is adequately taken into account by French judges, it should in general lead to the application of the Rome I Regulation.

A distinct characterisation issue is raised by the action that the Minister for Economic Affairs can take to request an injunction to cease practices restricting competition, a declaration of nullity of illegal clauses or contracts and the recovery of the mistaken payments on the basis of Article L. 442-6, III of the *Code de commerce*. As the above reported *Expedia* case shows,[111] in its 2015 judgment, the Paris First Instance Commercial Court characterised such an action as pertaining to contractual matters and discussed the possible existence of *lois de police* within the meaning of the Rome I Regulation. Two years later, the Paris Court of Appeal characterised the same claims as tortious and applied Article 4 of the Rome II Regulation.[112] According to the CJEU's 2016 *VKI v. Amazon* ruling, characterisation should probably be refined.[113] In the light of this ruling, the existence of the action brought by the Minister for Economic Affairs should be determined in accordance with Article 6(1) of the Rome II Regulation, whereas the law applicable to the assessment of a particular contractual term should continue to be determined pursuant to the Rome I Regulation.

Another issue concerns the law applicable to the prescription and limitation of actions. Although Article 12(1)(d) is now formally echoed in the French Civil Code (Article 2221), the Cour de cassation had to reaffirm that the prescription of a contractual obligation, along with the claim that the contract is void, is to be governed by the law applicable to this contract and not by the *lex fori*.[114]

## 2.6.   FOREIGN LAW AND *ORDRE PUBLIC*

### 2.6.1.   *Foreign Law*

The treatment of foreign law rests on a key distinction in French law: are the rights in dispute available (*disponibles*) or not? If they are and they usually are when contracts and torts are involved and proceedings have begun – parties

---

[111]   Trib. com. Paris, 7 May 2015, No. 2015000040. See section 2.1.1.
[112]   Paris, 21 June 2017, no. 15/18784. See section 2.1.1.
[113]   Case C-191/15, *Verein für Konsumenteninformation v. Amazon EU Sàrl*, ECLI:EU:C:2016:612.
[114]   Cass. 2e civ., 16 May 2019, No. 18-12005; Cass. 2e civ., 16 May 2019, No. 18-12006.

France

can ask, either expressly or even implicitly, French courts not to apply the relevant conflict-of-law rules. This is the aforementioned *accord procédural*.[115] Moreover, if the international dimension of the case is not taken into account during the proceedings before the lower court judges, the Cour de cassation will not overturn their decision. On the other hand, if one party specifically asks for the application of foreign law, lower court judges are legally required to determine the applicable law.[116] In addition, if the parties do not plead foreign law, lower court judges are free to raise the choice-of-law issue of their own motion, provided that the adversarial principle is observed (litigants being called to enter into a debate on the applicability and the content of foreign law).

Given the universal application of the two Regulations, French courts can be required, or can decide, to apply foreign law. However, numerous practical elements may restrict this outcome. Firstly, as stated above, litigants (or their counsel) might be interested in applying French law instead of the foreign law designated pursuant to the relevant Regulation.[117] This is understandable, since French provisions are obviously more familiar to counsel pleading in France, whichever side they are on. Courts are not hostile to this kind of agreement, because it also greatly simplifies the judges' task. Secondly, when faced with employment contracts, French courts, whose jurisdiction usually results from the performance of work in France, show a tendency to resort to French law. This trend, however, may be explained by the judicial aversion to party autonomy in this field.[118] Thirdly, one might expect parties and the court in proceedings related to torts committed through the Internet to try to apply a single law, even if it is foreign, because this is easier to manage than the application of multiple laws.[119]

In practice, when foreign law is declared to be applicable, French judges bear the final burden of proof regarding establishing its content. As a consequence, they cannot reject a claim governed by a foreign law because the claimant has not established its content or because the claimant based their claim on another foreign law.[120]

Most of the time, litigants will contribute to the ascertainment of the applicable foreign law by providing *certificats de coutume* supplied by a consular

---

[115] See section 2.2.2.
[116] Cass. com., 2 November 2016, No. 15-10296 (one party asked for the application of Spanish law).
[117] See section 2.2.1.
[118] See section 2.4.3.
[119] See Paris, 1 December 2015, No. 14/02708 (it is plausible that other markets than the Singapore one were affected by the litigious activities of the competitor).
[120] Cass. com., 4 May 2017, No. 15-22712 (Portuguese law applicable pursuant to Article 5 of the Rome 1 Regulation).

139

Marie-Elodie Ancel

authority or a foreign lawyer. Judges can also rely on their personal knowledge, or commission an expert's report, or resort to international cooperation (notably thanks to the London Convention on Information on Foreign Law). The European Judicial Network can also play a role in the determination of the content of an EU Member State's law. However, these means of access to foreign law are clearly underused by French courts.

### 2.6.2.   Ordre public

On several occasions, parties have tried to challenge, before French courts, the applicable law for the reason that its application to the case would have been inconsistent with international *ordre public* of the forum. So far, this attempt has never been successful. For instance, in a case related to the non-competition clause in an employment contract, the employee criticised the chosen law (Swiss law) as being contrary to 'essential values, such as the protection of the employee and the principles of free trade and industry'. However, this contention was considered too imprecise.[121] Besides, a law that does not offer carriers a direct action against recipients for payment (whereas the *Code de commerce* does) is not contrary to French international *ordre public*.[122] From another standpoint, in ICC Award No. 16981, the majority of the arbitral tribunal found no reason to consider the Greek provision prohibiting the sudden termination of a long-term commercial relationship to be international public policy. In particular, the arbitrators noted:

'that the Greek legislator enacted this provision in 1913, then repealed it and last re-established it in 2005. It is difficult to accept that the objective and effects of a law could be that fundamental for the Greek State if it seems hesitant about its adequacy in the first place'.

## 2.7.   RELATIONS WITH INTERNATIONAL CONVENTIONS

Conflict with international conventions is addressed by the two Regulations. As far as matters covered by either of the Regulations are concerned, a pre-existing convention laying down choice-of-law rules and binding one or more Member States with third states will prevail over the Regulations. Otherwise, the relevant Regulation has to be applied by the court hearing the case. In France, several

---

121   Chambéry, 29 September 2016, No. 16/00025.
122   Douai, 2 July 2015, No. 14/04317.

conventions are relevant, most notably the Hague Conventions.[123] However, the effectiveness of Article 28 of the Rome II Regulation and Article 25 of the Rome I Regulation should be carefully set out.

On the one hand, the 1955 Hague Convention on the Law Applicable to International Sales of Goods seems to be frequently ignored by litigants and French courts in favour of Article 4(1)(a) of the Rome I Regulation.[124]

On the other hand, the Hague Conventions on torts are more important in French courts. For instance, one of the decisions that the Cour de cassation expressly rendered on the Regulations is related to the application of the 1971 Hague Convention.[125] In this case, the lower court judges had tried to solve the conflict between the Convention and the Rome II Regulation, and they did so in favour of the Regulation. As a result, because the claimant and defendant both had their habitual residence in France, the lower court judges declared French law to be applicable on the grounds of Article 4(2) of the Rome II Convention, instead of Article 3 of the 1971 Hague Convention, which designated the law of the state where the accident occurred (i.e. Spain). Their judgment was overturned only because they misunderstood and misapplied Article 28,[126] not because they had completely ignored the 1971 Hague Convention.[127] In another case, which came before the Chambéry Court of Appeal, the 1973 Hague Convention on the Law Applicable to Product Liability was given precedence over the Rome II Regulation.[128] French law was held to be applicable pursuant to Article 4(a) of the Convention (France was the place of injury and the place of the habitual residence of the person who directly suffered damage). A different outcome would have been reached under Article 5(1) of the Rome II Regulation because the defective product had apparently not been marketed in France. Case law clearly shows that the persistence of the 1971 and 1973 Hague Conventions in the French legal order is not devoid of consequences.

---

[123] See Notifications under Article 26(1) of Regulation (EC) No. 593/2008 of the European Parliament and of the Council on the law applicable to contractual obligations (Rome I) [2010] OJ C 343/4; Notifications under Article 29(1) of Regulation (EC) No. 864/2007 on the law applicable to non-contractual obligations (Rome II) [2010] OJ C 343/5.

[124] Paris, 26 June 2014, No. 12/15277; Paris, 3 June 2014, No. 13/23508; Lyon, 22 April 2014, No. 12/00822. See also Nancy, 4 April 2012, No. 11/00422, resorting to Article 19 of the Rome I Regulation to assess the domestic nature of the sale of goods in dispute.

[125] Cass. 1re civ., 30 April 2014, No. 13-11932.

[126] According to them, the Rome II Regulation should prevail because the dispute had contacts with two EU Member States.

[127] For another mistake, Aix-en-Provence, 6 April 2017, No. 16/09190 (according to which the 1971 Hague Convention did not apply because Italy – the state where the accident occurred – is not bound by this Convention).

[128] Chambéry, 13 March 2014, No. 13/01863.

Marie-Elodie Ancel

## 3.   GENERAL EVALUATION

### 3.1.   THE COURTS' APPROACH AND COMPARISON
###         WITH PREVIOUS REGIMES

French case law is still in the early years of the application of the two Regulations and, so far, the Cour de cassation has not had many opportunities to provide guidance. In such circumstances, it remains difficult to assess the innovations brought in by the Rome I and Rome II Regulations.

As far as the Rome I Regulation is concerned, French courts may feel a false sense of familiarity and not be sufficiently aware of the changes effected by the new instrument. For instance, the application of escape clauses – which are formulated more strictly under the Rome I Regulation than under the Rome Convention – is still uncertain, particularly when related contracts are at stake. As observed above, personal guarantees are often placed under the aegis of the law applicable to the secured obligation, whereas a commission for the carriage of goods tends to remain apart from the law governing the contract for the carriage of goods. By contrast, Article 9(1) of the Rome I Regulation seems to have had a huge influence on French judges, who are now less prone to labelling French law provisions as *lois de police*. This anti-*lois de police* trend has been reinforced by the refusal to give effect to Article 9(3) in the case pertaining to the US embargo against Iran. Because the *Unamar* and *Nikiforidis* rulings are more accommodating, French courts will have to improve the handling of (alleged) overriding mandatory rules, be they French or foreign.

The situation of the Rome II Regulation is different, as it directly replaces French case law. Courts appreciate the clarity and the legal certainty it brings to the field.[129] Nevertheless, many innovations (such as Articles 9–14) have not yet been 'tested' in French courts.

On the whole, French courts appear to be comfortable with private international law legislative instruments such as EU Regulations: written rules provide legal certainty, whereas, under the previous national private international law regime (an anomaly in the French legal order), lower court judges may have considered case law too subtle and too fragmentary. It is indicative of this trust in black-letter rules (sometimes based on a misunderstanding) that, so far, no French court, either high or low, has made a request to the CJEU for a

---

[129] Despite the Cour de cassation complimenting itself for the consistent interpretation of Article 3 of the Code civil in the field of torts/delicts: Cass. 1re civ., 5 October 2018, No. 17-14401; Cass. 1re civ., 5 October 2018, No. 16-19430; Cass. 1re civ., 5 October 2018, No. 15-26115-15-26.388; Cass. 1re civ., 5 October 2018, No. 15-28531; Cass. 1re civ., 5 October 2018, No. 15-28891. See section 2.3.3.

France

preliminary ruling on the Rome I or Rome II Regulations. However, judges often rely on CJEU rulings about the application of the Brussels I Regulation: it seems to satisfy their need for consistency.

An intermediate conclusion would be that uniformity is progressing. This optimistic view needs to be put into perspective, firstly because of the precedence that the Hague Conventions still have (at least in the field of non-contractual matters; by contrast, the 1955 Hague Convention seems to have fallen in disuse), and secondly because of the *accord procédural* that will quite often allow resort to be had to French law.

## 3.2.   TAXONOMY AND GAPS IN ROME I AND ROME II

Under the Rome I Regulation, commission contracts for the carriage of goods appear to be difficult to handle. It is possible that the *ICF* and *Haeger & Schmidt* rulings have not explained with sufficient clarity how commission contracts for the carriage of goods are to be distinguished from the carriage of goods itself under the Rome Convention. The silence of the Rome I Regulation on this topic (apart from Recital 20) does not help. In terms of characterisation and coordination, other contracts, like framework and implementation contracts, could create difficulties; however, such cases have yet to be brought before French courts.

Given the limited application of the Rome II Regulation, French courts have been confronted most of all with the handling of the taxonomy used in Article 6 and its relationship with Article 4. Proceedings between members of a group of contracts can also be problematic because, under French rules, judges are used to reasoning on contractual grounds. The cases discussed above also show that localising financial and Internet-caused damages is not an easy task. However, the CJEU rulings on Article 5(3) of the Brussels I Regulation and Article 7(2) of the Brussels Ia Regulation may be of some use to judges.

## 4.   CONCLUSION

### 4.1.   SUMMARY OF FINDINGS

#### 4.1.1.   *General Findings*

French authorities are under the impression that the Regulations are not revolutionary and that they will bring clarity and simplification in their respective fields.

**143**

Marie-Elodie Ancel

French courts are quite aware of the existence of the Regulations. Whether for good or bad reasons, these EU instruments are more often invoked *outside* their scope of application rather than ignored. However, the persistence of the 1971 and 1973 Hague Conventions in the French legal order has significant consequences.

Only one published ICC award on claims related to the sudden termination of a long-term contract appears worthy of interest because arbitrators thoroughly applied and discussed the two Regulations.

Characterisation issues exist but can generally be solved by reference to the rulings of the CJEU. Unfortunately, for issues that have not yet been addressed, French courts are not prone to making requests for preliminary rulings related to the Rome I and Rome II Regulations.

When foreign law is declared applicable, its procedural regime is rather favourable. Moreover, *ordre public* has not been a successful defence so far. Nevertheless, an accommodating vision of *accord procédural* allows resort, from time to time, to French law.

### 4.1.2. *Rome I*

The provisions of the Rome I Regulation most commonly applied by French courts are, in order, Articles 8, 9, 3, 5 and 4.

The enactment of the Rome I Regulation and the drafting of Article 9(1) seem to have reduced, at least during the first period, the judicial characterisation of *lois de police*. Besides, only one case was rendered by a French court regarding third states' *lois de police* and, in appearance only, the court denied any influence to overriding mandatory provisions emanating from a state not directly related to the performance of the contract.

French courts usually give effect to express choice of law and they rarely encounter *dépeçage*. When no express choice is made, they quite readily accept tacit or implicit choice, except in employment contracts.

French courts are comfortable with fixed rules; only a few decisions have addressed escape clauses under the Rome I Regulation and it is difficult to draw any consistent conclusion from these decisions.

While cases pertaining to Article 6 are infrequent, several decisions have been rendered on the grounds of Article 5. French courts seem to be at ease with Article 5(1) and reluctant to fall back on the escape clause, probably because the grouping of contracts that the former involves makes the latter less relevant.

Regarding employment contracts, as stated above, French courts tend to be reluctant to characterise a tacit choice of law. They also have to improve the process of comparing the chosen law (when there is one) with the objectively applicable law.

220

### 4.1.3.   *Rome II*

At present, the application of the Rome II Regulation is mostly focused on Articles 4 and 6. Under the Rome II Regulation, only one significant occurrence of *loi de police* has been found.[130]

Compared to pre-Rome II case law, which was characterised by legal uncertainty, the guidance provided by Article 4 of the Regulation seems to be appreciated. Still, **difficulties** remain in terms of the **localisation of the place** of direct damage. **Moreover,** French courts seem to **have difficulty identifying** whether they should apply Article 4 or Article 6 and **under what circumstances** Article 6(2) enables them to apply Article 4 (i.e. when 'an act of unfair competition affects exclusively the interests of a specific competitor'). Generally speaking, the escape clause included in Article 4(3) does not seem to be overused.

## 4.2.   MAIN RECOMMENDATIONS

So far, no specific changes to the two Regulations are recommended. More time should be allowed for the development and analysis of national case law. Room should also be left for preliminary rulings by the CJEU.

At the national level, some efforts could be made to improve the judicial application of the Regulations. For instance, the Ministry of Justice could issue a circular aiming to at least clarify the temporal, material and spatial scopes of the two Regulations. Furthermore, there have been exchanges between the Cour de cassation and the CJEU, which is highly valuable, but the benefits of this relationship should flow more systematically towards lower court judges.

Finally, the question arises whether, for the sake of uniformity, France should denounce the 1955 Hague Convention on the Law Applicable to International Sales of Goods and the 1973 Hague Convention on the Law Applicable to Product Liability.

---

[130]   Cass. com., 8 July 2020, No. 17-31536, based on both Article 9 of the Rome I Regulation and Article 16 of the Rome II Regulation.