# EXHIBIT 6

Thomas Kadner Graziano

# Gemeineuropäisches Internationales Privatrecht

Harmonisierung des IPR durch Wissenschaft und Lehre
(am Beispiel der außervertraglichen Haftung für Schäden)



BFDA 125/73

A
31.9 g
KADN
2002

Mohr Siebeck

Zwölftes Kapitel: Konsequenzen der Zersplitterung und Einfluss kon-
kurrierender Zuständigkeiten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   462

    I. Internationale Zuständigkeit . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   463
   II. Fallbeispiele . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   466
  III. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   483


Dreizehntes Kapitel: Gesamtwürdigung . . . . . . . . . . . . . . . . . . . . . . . . . .   485

    I. Entwicklung und Stand des europäischen
       Deliktskoordinationsrechts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   485
   II. Folgerungen aus der europäischen Bestandsaufnahme und der
       Auseinandersetzung mit dem Vorgefundenen . . . . . . . . . . . . . . . . . .   489
  III. Schlussfolgerungen für eine europäische Lehre . . . . . . . . . . . . . . . . . .   492


Teil 3: Musterkapitel eines europäischen Lehrbuches: . . . . . . . . . . . .   495

»Europäisches Internationales Privatrecht« . . . . . . . . . . . . . . . . . . . . . . . . .   496

Vorwort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   496

Außervertragliche Schuldverhältnisse: Haftung für Schäden . . . . . . . . . . .   503

     I. Fallkonstellationen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   503
    II. Ausgangslage im europäischen *materiellen* Haftungsrecht . . . . . . . . . .   506
   III. Ausgangslage im IPR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   512
   IV. Grundregel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   513
    V. Konkretisierungen: Die Problematik der Distanzdelikte . . . . . . . . . . .   525
   VI. Differenzierung nach Fallgruppen . . . . . . . . . . . . . . . . . . . . . . . . . .   534
  VII. Ausnahmen von der Tatortregel . . . . . . . . . . . . . . . . . . . . . . . . . . .   579
 VIII. Abweichung von der Tatortregel bei Vorbehalten gegenüber dem
       ausländischen materiellen Recht . . . . . . . . . . . . . . . . . . . . . . . . . . .   589
   IX. Anwendungsbereich des Deliktsstatuts . . . . . . . . . . . . . . . . . . . . . . .   592
    X. Problemfälle der Qualifikation . . . . . . . . . . . . . . . . . . . . . . . . . . . .   597
   XI. Delikte im Gesamtsystem des IPR: Umfang der Verweisung,
       Renvoi und die Folgen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   601
  XII. Übungsfälle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   605
 XIII. Leitsätze für ein gemeineuropäisches Deliktskoordinationsrecht . . . .   607


Anhang: Gesetzestexte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   609

Schrifttum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   645

Stichwortverzeichnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   681

# Inhaltsverzeichnis

Vorwort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   VII

Abkürzungsverzeichnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   XXV

Einleitung . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

   I. Ausgangslage: Nationalisierung und Fragmentarisierung des IPR in
     Europa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
  II. Gegenstand und Ziel der Untersuchung: wissenschaftliche
     Fundierung einer Lehre aus gesamteuropäischer Perspektive . . . . . .   7
 III. Gründe für eine Europäisierung der Lehre des IPR . . . . . . . . . . . . .   10
     1. Anforderungen der praktischen Arbeit mit dem IPR . . . . . . . . . .   10
     2. Europäisierung der Studentenschaft . . . . . . . . . . . . . . . . . . . . . . . .   11
     3. Schaffung eines gemeinsamen europäischen Rechtsbewusstseins
       und Wegbereitung für einen europäischen Ausbildungsmarkt . .   12
     4. Harmonisierung des Rechts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
       a) Vorteile der Harmonisierung im Wege übernationaler Lehre . . . . .   14
       b) Gründe für die Harmonisierung . . . . . . . . . . . . . . . . . . . . . . . . .   17
  IV. Gang der Untersuchung und Auswahl des exemplarisch
     behandelten Gebietes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
     1. Gang der Untersuchung . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
     2. Auswahl des Gebietes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

Teil 1: Grundlagen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

Erstes Kapitel: Methode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

   I. Rechtsvergleichung aus europäischer Perspektive . . . . . . . . . . . . . . . .   26
  II. Vorbilder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

Zweites Kapitel: Terminologie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

   I. Bezeichnung des Rechtsgebietes . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
  II. Gegenstand des IPR, Kollisions- oder Koordinationsrechts . . . . . . . .   37

Drittes Kapitel: Rechtsordnungen für den Vergleich . . . . . . . . . . . . . . . . .   41

Viertes Kapitel: Rechtsgeschichtlicher Hintergrund . . . . . . . . . . . . . . . .   45

I. Situation im *materiellen* Privatrecht . . . . . . . . . . . . . . . . . . . . . . .   46
II. Situation im Kollisionsrecht . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48
   1. Ursprünge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48
   2. Entwicklung im 19. Jahrhundert . . . . . . . . . . . . . . . . . . . . . . . . .   52
     a) Internationalität des Diskurses . . . . . . . . . . . . . . . . . . . . .   52
     b) Völkerrechtliche Theorie des IPR . . . . . . . . . . . . . . . . .   57
     c) Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59
   3. Tendenzen zur Nationalisierung der Perspektive: Die
     Kontroverse zwischen *Ludwig von Bar* und *Theodor Niemeyer* am
     Übergang ins 20. Jahrhundert . . . . . . . . . . . . . . . . . . . . . . . .   59
     a) *Ludwig von Bar* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60
     b) *Theodor Niemeyer* . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62
   4. Entwicklungen im 20. Jahrhundert . . . . . . . . . . . . . . . . . . . . .   66
     a) Untergang der völkerrechtlichen Theorie und der internationalen
       Behandlung des Kollisionsrechts . . . . . . . . . . . . . . . . . .   66
     b) Alternative: Positivismus und Nationalisierung der Behandlung des
       Kollisionsrechts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69
     c) Situation im Common Law . . . . . . . . . . . . . . . . . . . . .   70
     d) Ursachen für den Wandel . . . . . . . . . . . . . . . . . . . . . .   72
     e) Erscheinungsformen der Nationalisierung . . . . . . . . . . .   79
     f) Résumé . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82
III. Lehren aus der Geschichte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   83
   1. Vielfalt der Sprachen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   83
   2. Nationale Kodifikationen . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85
   3. Zeitgeist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   86
   4. Skepsis bezüglich legislatorischer Rechtsvereinheitlichung . . . . .   87
   5. Spezifisch nationale Interessen . . . . . . . . . . . . . . . . . . . . . . . . .   87
   6. Anforderungen der Arbeit am Detail . . . . . . . . . . . . . . . . . . .   87
   7. Interdependenz von (nationalem) materiellen Recht und IPR . .   88
   8. Materialfülle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   88
   9. »Vernachlässigung des positiven Prinzips« . . . . . . . . . . . . . . .   89
  10. Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   89

Fünftes Kapitel: Stand der Kodifikation in Europa . . . . . . . . . . . . . . .   90

I. Kurzer Überblick zur Geschichte der Kodifikation . . . . . . . . . . .   90
   1. Anfänge und Entwicklungen im 19. Jahrhundert . . . . . . . . . . .   90
   2. Entwicklungen im 20. Jahrhundert . . . . . . . . . . . . . . . . . . . . .   94
     a) Anfänge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94
     b) Kodifikationswelle in der zweiten Hälfte des Jahrhunderts . . . . .   95
II. Systematisierungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98
III. Kodifikation durch Staatsverträge . . . . . . . . . . . . . . . . . . . . . . . .   100

Teil 2: Außervertragliche Schadenshaftung ..................... 103

Erstes Kapitel: Ausgangslage im europäischen *materiellen* Haftungsrecht . 105

I. Ausgangspositionen und Konvergenzen ..................... 105
II. Divergenzen .................................................. 107
   1. Strikte Haftung ........................................ 107
     a) Im Allgemeinen ..................................... 107
     b) Haftung des Halters einer Sache ................... 109
     c) Produkthaftung ..................................... 110
   2. Haftung für mittelbare Schäden ....................... 111
   3. Haftung für immaterielle Schäden ..................... 111
   4. Angehörigenschmerzensgeld ............................ 113
   5. »Ersatz« über den eigentlichen Schaden hinaus ....... 115
   6. Haftung Minderjähriger ............................... 116
   7. Verjährung ........................................... 117
   8. Weitere wichtige Unterschiede (Überblick) ........... 120
III. Fazit ...................................................... 121

Zweites Kapitel: Ausgangslage im IPR .......................... 123

I. Überblick der wichtigsten Fallkonstellationen ............. 123
   1. Straßenverkehrsunfälle ............................... 123
   2. Unfälle mit anderen Verkehrsmitteln als Autos ....... 124
   3. Unfälle im Freizeitbereich ........................... 124
   4. Konstellationen des Internationalen Wirtschaftsrechts . 125
   5. Fälle aus dem Umwelthaftungs-, Produkthaftungs-,
     Wettbewerbsrecht und Recht des Persönlichkeitsschutzes ... 126
   6. Klassische Straftaten, insbesondere Vorsatzdelikte ... 126
II. Koordinationsrechtliche Grundlagen ....................... 127
   1. Europäische Terminologie ............................. 127
   2. Rechtsvereinheitlichung .............................. 128

Drittes Kapitel: Gemeinsamer Ausgangspunkt .................... 131

I. Ursprünge .................................................. 131
II. Aktuelle Situation ........................................ 134
III. Weiterer Gang der Untersuchung .......................... 137

Viertes Kapitel: Geltungsgründe der Tatortregel .............. 138

I. Ursprünge .................................................. 138
II. Moderne Begründungen ...................................... 140
   1. Einzelne Geltungsgründe .............................. 142
   2. Die Geltungsgründe im konkreten Fall ................ 146

III. Kritik ................................................................. 147

Fünftes Kapitel:  Alternativen ................................................ 150

I. Beurteilung nach der Lex Fori ........................................... 151
   1. Theorie ............................................................... 151
   2. Reaktionen ........................................................... 153
II. Kombination von Lex Fori und Lex Loci Delicti: Die Lösung der
   englischen Rechtsprechung ............................................. 155
   1. »Double Actionability Rule« ......................................... 156
      a) *The Halley* ..................................................... 156
      b) *Phillips* v. *Eyre* ............................................. 157
      c) *Boys* v. *Chaplin* und *Red Sea Insurance Co. Ltd.* v. *Bouyges SA* ...... 158
   2. Begründungen ........................................................ 159
   3. Kritik .............................................................. 160
   4. Fazit ............................................................... 163
III. »The Proper Law of a Tort« ............................................ 164
   1. Ausgangspunkt: Kritik der Tatortregel ............................... 164
   2. Gegenstand der Theorie .............................................. 165
   3. Reaktionen in Europa ................................................ 166
      a) Übernahme der Theorie in Irland? ................................. 166
      b) Reaktionen in anderen Ländern ................................... 167
   4. Proper Law – eine Alternative für Europa ? .......................... 168
IV. Parteiautonomie ........................................................ 170
   1. Rechtswahl als Grundprinzip ......................................... 170
   2. Wahlmöglichkeiten de lege lata ...................................... 171
      a) Umfassende Wahlmöglichkeiten ..................................... 172
      b) Einschränkungen beim Zeitpunkt der Rechtswahl .................... 173
      c) Einschränkungen der wählbaren Rechte ............................. 175
      d) Exkurs: weitere Wege zur Lex Fori ................................ 175
      e) Form der Rechtswahl .............................................. 177
      f) Schlüssige Rechtswahl im Prozess? ................................ 178
         aa) Rechtslage ................................................. 178
         bb) Perspektiven .............................................. 180
   3. Praktische Bedeutung der Rechtswahl in der europäischen
      Rechtsprechung ....................................................... 180
   4. Perspektiven: Parteiautonomie als Grundprinzip – eine
      Alternative für Europa? .............................................. 181
      a) Parteiinteressen an der Wahl des Haftungsrechts .................. 182
         aa) Rechtswahl ex post ........................................ 183
         bb) Rechtswahl ex ante ........................................ 185
         cc) Zwischenergebnis .......................................... 186
      b) Vereinbarkeit mit Partei- und Drittinteressen ................... 186
         aa) Parteiinteressen .......................................... 186
         bb) Drittinteressen ........................................... 189
   5. Fazit ............................................................... 190

| | | |
|---|---|---|
| a) Rechtslage | | 190 |
| b) Perspektiven | | 191 |
| V. Alternativen: Gesamtergebnis | | 192 |

| | |
|---|---|
| Sechstes Kapitel: Konkretisierungen: Distanzdelikte | 194 |

| | |
|---|---|
| I. Einführung | 194 |
| II. Lösungen im geltenden Recht | 196 |
|     1. Ort der schädigenden Handlung | 196 |
|     2. Ort der Verletzung des geschützten Interesses | 199 |
|     3. Ubiquitätslösung und Wahlrecht oder Günstigkeitsprinzip | 203 |
|     4. Varianten (Auswahl) | 206 |
|     5. Bildung spezieller Fallgruppen | 208 |
|     6. Ort des Eintritts weiterer Verletzungsfolgen (Folgeschäden) | 208 |
|     7. Résumé | 212 |
| III. Begründungen und Perspektiven | 213 |
|     1. Relevanz und Aktualität der Frage | 213 |
|     2. Handlungsort | 214 |
|     3. Ort der Rechtsgutverletzung (»Erfolgsort«) | 216 |
|       a) Zufälligkeit der Anknüpfung an den »Erfolgsort«? | 216 |
|       b) Schwierigkeiten der Bestimmbarkeit des »Erfolgsortes«? | 217 |
|       c) Vorteile des Erfolgsortes bei mehraktigen Delikten | 218 |
|       d) Ausrichtung an der Person des Geschädigten statt an derjenigen des Schädigers | 218 |
|       e) Verhaltenssteuerungsfunktion des materiellen Haftungsrechts | 219 |
|       f) Ausgleichsfunktion des materiellen Haftungsrechts und Interessenlage der Beteiligten | 222 |
|       g) Fazit | 223 |
|     4. Voraussehbarkeit für den Schädiger als Korrektiv? | 224 |
|       a) Rechtslage | 224 |
|       b) Perspektiven | 225 |
|     5. Ubiquitätslösung | 227 |
|       a) Begründung | 227 |
|       b) Kritik | 228 |
|         aa) Zu den Argumenten der Befürworter dieser Lösung | 228 |
|         bb) Weitere Gegenargumente | 232 |
| IV. Fazit | 234 |

| | |
|---|---|
| Siebtes Kapitel: Differenzierung nach Fallgruppen | 236 |

| | |
|---|---|
| I. Umweltschäden | 236 |
|     1. Rechtslage | 239 |
|       a) Qualifikation | 239 |
|       b) Ansprüche auf Schadensersatz | 240 |
|         aa) Rechtswahl | 240 |
|         bb) Recht am Handlungsort? | 241 |

XVIII

*Inhaltsverzeichnis*

cc) Ubiquitätslösungen ........................................ 242
dd) Recht am »Erfolgsort« ..................................... 244
c) Unterlassungsanspruch und Wirkungen verwaltungsrechtlicher
    Genehmigungen .............................................. 248
    aa) Anknüpfung des Unterlassungsanspruchs ................ 248
    bb) Wirkungen verwaltungsrechtlicher Genehmigungen ....... 250

2. Perspektiven ................................................ 252
    a) Ersatzanspruch .......................................... 252
    b) Unterlassungsanspruch und Wirkungen verwaltungsrechtlicher
        Genehmigungen ......................................... 256

II. Schäden durch Produkte ...................................... 258
    1. Rechtslage .............................................. 258
        a) Qualifikation ...................................... 258
        b) Ausgangslage ....................................... 260
        c) Lösungen im europäischen Koordinationsrecht ........ 261
            aa) Rechtswahl ................................... 261
            bb) Kombination mehrerer Kriterien ............... 262
            cc) Ubiquitätslösungen ........................... 263
            dd) Recht des Marktortes ......................... 266
            ee) Recht am Sitz des Schädigers ................. 270
            ff) Gesamtabwägung aller Umstände ................ 270
        d) Ansichten der Literatur (Auswahl) .................. 270
        e) Unterschiede bezüglich des geschädigten Personenkreises .. 272
            aa) Haftung gegenüber dem direkten Vertragspartner .. 272
            bb) Haftung gegenüber Dritten .................... 273
        f) Einfluss des Europarechts .......................... 274
        g) Zwischenergebnis ................................... 277
    2. Perspektiven ............................................ 278
        a) Zweiteilung der Fallkonstellationen ............... 278
            aa) Standardfälle ............................... 279
            bb) Fälle mit weitergehenden Auslandskontakten ... 279
                i) Fallkonstellationen ...................... 279
                ii) Besondere Problematik ................... 281
        b) Ausweg: Beurteilung nach dem Recht des Erwerbsortes . 282
        c) Kein Ausweg: Herkunftslandprinzip und (europarechtswidrige)
            Ubiquitätslösungen ............................... 286
            aa) Herkunftslandprinzip ........................ 286
            bb) Ubiquitätslösungen .......................... 286
        d) Erwerbsort bei Distanzkäufen ...................... 289
        e) Erforderlichkeit der Vorhersehbarkeit des maßgeblichen Rechts für
            den Hersteller? ................................. 291
    3. Résumé ................................................. 293

III. Beeinträchtigungen der Persönlichkeit durch Massenmedien
    (am Beispiel der Presse) .................................. 294
    1. Rechtslage .............................................. 295
        a) Qualifikation ...................................... 295
        b) Ausgangslage ....................................... 297
        c) Anknüpfungen im geltenden Recht .................... 299

aa) Sitz des Herausgebers bzw. Erscheinungsort des
   Presseerzeugnisses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299
bb) Ubiquitätslösungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299
cc) Verbreitungsort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 303
dd) Kumulative Anwendung des Rechts am Verbreitungsort und
   der Lex Fori . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306
ee) Gewöhnlicher Aufenthalt der Betroffenen . . . . . . . . . . . . . . 308
d) Recht auf Gegendarstellung . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310
e) Ergebnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311
   aa) Bandbreite der Lösungen . . . . . . . . . . . . . . . . . . . . . . . . . 311
   bb) Übereinstimmungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 313
2. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314
3. Verbreitungs- oder Erwerbsort? . . . . . . . . . . . . . . . . . . . . . . . . . . 319
4. Verbreitungsort und internationale Zuständigkeit . . . . . . . . . . . . 320
IV. Unlauterer Wettbewerb . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324
1. Rechtslage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325
   a) Gemeinsamkeiten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325
   b) »Ausreißer« . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328
   c) Einfluss des Europarechts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330
   d) Unterschiede . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333
      aa) Ort der »Ein-« oder der »Auswirkung« . . . . . . . . . . . . . . . 333
      bb) Möglichkeit der Rechtswahl . . . . . . . . . . . . . . . . . . . . . . . 335
      cc) Auslandswettbewerb unter Inländern . . . . . . . . . . . . . . . . 336
      dd) Nicht marktgerichtete Maßnahmen gegen einzelne
         Konkurrenten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338
      ee) Akzessorische Anknüpfung . . . . . . . . . . . . . . . . . . . . . . . 338
2. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339
V. Reine Vermögensschäden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341
1. Ortsdelikte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342
2. Distanzdelikte: Lösungen im geltenden Recht . . . . . . . . . . . . . . . 343
   a) Rechtswahl der Parteien . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 344
   b) Handlungsort des Schädigers . . . . . . . . . . . . . . . . . . . . . . . . . . 345
   c) Ort der Entgegennahme unrichtiger Erklärungen und
      Handlungsort des Geschädigten . . . . . . . . . . . . . . . . . . . . . . . 346
   d) Ort der Ausführung von Handlungen, zu denen der Schädiger
      angestiftet hat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348
   e) Ubiquitätslösungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 349
   f) Lageort des beeinträchtigten Vermögens oder »Vermögenszentrale«
      des Geschädigten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350
3. Fazit und Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352
VI. Schlussfolgerungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357
1. Schwerpunkte der Anknüpfung . . . . . . . . . . . . . . . . . . . . . . . . . . 357
2. Gemeinsame Anknüpfung an den Marktort? . . . . . . . . . . . . . . . . 359
3. Sonderregelungen für spezielle Fallgruppen? . . . . . . . . . . . . . . . . 360

Achtes Kapitel: Ausnahmen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 363

  I. Ausgangspunkt: Kritik der Tatortregel . . . . . . . . . . . . . . . . . . . . . . . 364
  II. Reaktionen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365
    1. Ausnahmslose Beibehaltung der Tatortregel . . . . . . . . . . . . . . 365
      a) Rechtslage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365
      b) Begründungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369
      c) Relativierungen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 370
    2. Dépeçage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372
      a) Benelux-Entwurf von 1950 und 1969 . . . . . . . . . . . . . . . . 372
      b) Dépeçage im geltenden Recht . . . . . . . . . . . . . . . . . . . . . . 374
      c) **Reaktionen** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377
      d) Berücksichtigung faktischer Gegebenheiten . . . . . . . . . . . . 378
    3. **Ausnahmen bei** gemeinsamem gewöhnlichen Aufenthalt oder
      gemeinsamer **Staatsangehörigkeit** . . . . . . . . . . . . . . . . . . . . . . 379
      a) **Anknüpfung ausschließlich an die gemeinsame Staatsangehörigkeit** . 379
      b) **Gemeinsame Staatsangehörigkeit und gewöhnlicher Aufenthalt im**
        selben Staat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 380
      c) Gewöhnlicher Aufenthalt im selben Staat . . . . . . . . . . . . . 382
      d) Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 387
    4. Allgemeine Ausweichklauseln . . . . . . . . . . . . . . . . . . . . . . . . . 389
    5. Ausnahmsweise Anknüpfung an den Zulassungsstaat: Die
      Regelung im Haager Verkehrsunfallübereinkommen . . . . . . . . . 390
      a) Grundzüge der Anknüpfung . . . . . . . . . . . . . . . . . . . . . . . . 391
      b) Kritik . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392
    6. Akzessorische Anknüpfung . . . . . . . . . . . . . . . . . . . . . . . . . . . 394
      a) Anknüpfung an das Vertragsstatut . . . . . . . . . . . . . . . . . . . 396
      b) Sonstige . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400
      c) Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400
  III. Gesamtergebnis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

Neuntes Kapitel: Abweichung von der Tatortregel bei Vorbehalten gegen das ausländische Recht . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406

  I. Allgemeine **Vorbehalts**klauseln . . . . . . . . . . . . . . . . . . . . . . . . . . . 406
  II. Spezielle **Vorbehalte** im Internationalen Deliktsrecht . . . . . . . . . . . 412
    1. Umfassende Vorbehalte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412
    2. Korrekturen auf der Tatbestandsebene . . . . . . . . . . . . . . . . . . . 413
    3. Vorbehalte auf der Rechtsfolgenseite . . . . . . . . . . . . . . . . . . . 414
    4. Fazit und Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 416

Zehntes Kapitel: Anwendungsbereich des Deliktsstatuts und Fragen der Qualifikation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

  I. Anwendungsbereich . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418
    1. Gemeinsamkeiten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

2. Unterschiede ............................................ 421
   a) Deliktsfähigkeit .................................... 421
   b) Schadensbemessung ............................... 422
   c) Beweislast ........................................ 423
   d) Direktanspruch **gegen** Haftpflichtversicherer ....... 425
   e) Gesetzlicher Üb**ergang** des Anspruchs auf den Versicherer
     (Subrogation) ...................................... 429
   f) Vererblichkeit deliktischer Ansprüche ............... 433
3. Verhaltensnormen und Sicherheitsstandards am Handlungsort .. 434
4. Fazit .................................................... 435
II. Qualifikation ............................................. 435
   1. Schädigungen im Vorfeld eines Vertragsschlusses ........... 435
   2. Schädigungen nach Vertragsschluss: Qualifikations- und
     Konkurrenzfragen im Grenzbereich zwischen Vertrags- und
     Deliktsrecht .............................................. 437
     a) Ausgangslage ...................................... 437
     b) Grundsatz: Qualifikation *lege fori* ................. 439
     c) Problemfälle ...................................... 442
     d) Lösungswege im geltenden Recht .................... 445
       aa) Ebene der Qualifikation ....................... 445
       bb) Ebene der Konkurrenzen ...................... 447
     e) Beachtlichkeit vertraglicher Haftungsausschlüsse ...... 449
       aa) Beurteilung nach dem Deliktsstatut ............ 449
       bb) Beurteilung nach dem Vertragsstatut ........... 449
     f) Fazit und Perspektiven ............................ 450
   3. Weitere Fälle .......................................... 451
     a) Unbekannte Institute des ausländischen Rechts ........ 451
     b) Sonstige .......................................... 452

Elftes Kapitel: Delikte im Gesamtsystem des IPR – Umfang der
Verweisung, Renvoi und die Folgen .............................. 454

I. Rechtslage ............................................... 455
   1. Reine Sachnormverweisungen .......................... 455
   2. Differenzierende Lösungen ............................. 456
   3. Gesamtverweisungen ................................... 457
II. Fazit und Perspektiven .................................... 459

Zwölftes Kapitel: Konsequenzen der Zersplitterung .............. 462

I. Internationale Zuständigkeit ............................... 463
II. Fallbeispiele ............................................. 466
   1. Straßenverkehrsunfälle ................................. 466
     a) Entscheidung in Frankreich ........................ 467
       aa) Lösung nach französischem Richterrecht .......... 467
       bb) Lösung nach dem Haager Übereinkommen ......... 469

b) Entscheidung in Deutschland . . . . . . . . . . . . . . . . . . . . 471
c) Fazit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 472
d) Varianten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 473
2. Skiunfälle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 474
a) Ausgangsfall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 474
b) Varianten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475
3. Umweltschäden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 477
a) Internationale Zuständigkeit . . . . . . . . . . . . . . . . . . . 477
b) Anwendbares Recht . . . . . . . . . . . . . . . . . . . . . . . . . . 478
4. Produkthaftung . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 479
a) Ausgangsfall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 479
b) Variante . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 480
5. Verletzung von Persönlichkeitsrechten durch Massenmedien . . . 481
III. Perspektiven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Dreizehntes Kapitel:  Gesamtwürdigung . . . . . . . . . . . . . . . . . . . . 485

I. Entwicklung und Stand des europäischen
Deliktskoordinationsrechts . . . . . . . . . . . . . . . . . . . . . . . . . 485
II. Folgerungen aus der europäischen Bestandsaufnahme und der
Auseinandersetzung mit dem Vorgefundenen . . . . . . . . . . . . 489
1. Klare Ausgangspositionen . . . . . . . . . . . . . . . . . . . . . . . 489
2. Klärungsbedarf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 490
3. Leitsätze für ein gemeineuropäisches Internationales
Deliktsrecht . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 491
III. Schlussfolgerungen für eine europäische Lehre . . . . . . . . . . . . 492

Teil 3:  Musterkapitel eines europäischen Lehrbuches: . . . . . . . . . . . 495

Europäisches Internationales Privatrecht
Vorwort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 496

Außervertragliche Schuldverhältnisse: Haftung für Schäden . . . . . . . . 503

I. Fallkonstellationen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 503
II. Ausgangslage im europäischen *materiellen* Haftungsrecht . . . . . . . 506
III. Ausgangslage im IPR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512
IV. Grundregel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 513
1. Übereinstimmungen . . . . . . . . . . . . . . . . . . . . . . . . . . . 513
2. Geltungsgründe der Tatortregel und Kritik . . . . . . . . . . . 515
3. Alternativen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 517
a) Geltung der Lex Fori . . . . . . . . . . . . . . . . . . . . . . . . . 517
b) Kumulative Anwendung von Tatortrecht und Lex Fori . . . . 518
c) Geltung eines »Proper Law of a Tort« . . . . . . . . . . . . . 519
d) Rechtswahl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 520

|  |  |  |  |
| --- | --- | --- | --- |
| | aa) | Situation de lege lata | 520 |
| | bb) | Perspektiven | 523 |
| | e) | Alternativen: Fazit und Perspektiven | 525 |
| V. | | Konkretisierungen: Die Problematik der Distanzdelikte | 525 |
| | 1. | Rechtslage | 525 |
| | 2. | Begründungen und Perspektiven | 530 |
| VI. | | Differenzierung nach Fallgruppen | 534 |
| | 1. | Umweltschäden | 535 |
| | | a) Rechtslage | 535 |
| | | b) Perspektiven | 540 |
| | 2. | Schäden durch Produkte | 541 |
| | | a) Rechtslage | 542 |
| | | b) Perspektiven | 550 |
| | 3. | Beeinträchtigung von Persönlichkeitsrechten durch Massenmedien (am Beispiel der Presse) | 554 |
| | | a) Rechtslage | 555 |
| | | b) Perspektiven | 561 |
| | 4. | Unlauterer Wettbewerb | 564 |
| | | a) Rechtslage | 565 |
| | | b) Perspektiven | 572 |
| | 5. | Reine Vermögensschäden | 572 |
| | | a) Rechtslage | 573 |
| | | b) Perspektiven | 576 |
| | 6. | Fazit | 577 |
| VII. | | Ausnahmen von der Tatortregel | 579 |
| VIII. | | Abweichung von der Tatortregel bei Vorbehalten gegen das ausländische Recht | 589 |
| IX. | | Anwendungsbereich des Deliktsstatuts | 592 |
| X. | | Problemfälle der Qualifikation | 597 |
| XI. | | Delikte im Gesamtsystem des IPR: Umfang der Verweisung, Renvoi und die Folgen | 601 |
| XII. | | Übungsfälle | 605 |
| | | Fall 1: Straßenverkehrsunfall | 605 |
| | | Fall 2: Unfall beim Freizeitsport | 606 |
| | | Fall 3: Schädigungen auf dem Weg über die Umwelt | 606 |
| | | Fall 4: Produkthaftung | 606 |
| | | Fall 5: Beeinträchtigung von Persönlichkeitsrechten durch die Presse | 607 |
| XIII. | | Leitsätze für ein gemeineuropäisches Deliktskoordinationsrecht | 607 |
| Anhang: Gesetzestexte | | | 609 |
| Schrifttum | | | 645 |
| Stichwortverzeichnis | | | 681 |

177

*2. Kapitel: Ausgangslage im IPR*

Im September 1998 verabschiedete die Expertengruppe »Groupe Européen de Droit International Privé/European Groupe for Private International Law« einen Vorschlag für eine umfassende internationale Regelung des IPR der außervertraglichen Haftung[43], der inzwischen als Grundlage für die weiteren Überlegungen dient.

All diese neueren Vorhaben reichen bislang nicht über das Stadium von Diskussionsvorschlägen bzw. Vorentwürfen hinaus[44]. Wie das materielle Haftungsrecht, so ist auch das IPR der Delikte gegenwärtig in weiten Bereichen nationales Recht[45].

---

vom 26.– 28. 11. 1998 in Würzburg vorlag. Für Informationen über das Vorhaben und die Diskussionspunkte siehe *Rolf Wagner*, EuZW 1999, 709; siehe auch *Strikwerda*, WPNR 2000, 774.

[43] Proposition pour une convention européene sur la loi applicable aux obligations non contractuelles, Texte adopté lors de la réunion de Luxembourg du 25–27 septembre 1998 (in französischer und englischer Fassung); die englische Fassung ist abgedruckt in NILR 1998, 465; ERPL 1999, 46; WPNR 2000, 778, die französische in IPRax 1999, 286. Zu dem Entwurf *Jayme*, IPRax 1999, 298; *Fallon*, ERPL 1999, 45.

[44] In der Begründung der Bundesregierung zur Ergänzung des EGBGB von 1999 um Regelungen zum Deliktskollisionsrecht, BT-Drs.14/343, S. 6, heißt es zu den Erfolgsaussichten des Vorhabens des Rates der EU: »Mit einem alsbaldigen Abschluss dieser Verhandlungen, deren Ausgang offen ist, ist jedoch nicht zu rechnen«. Das vorläufige Scheitern der Bemühungen der Europäischen Union um ein Grünbuch zur Verordnung »Rom II« scheint diese Einschätzung zu bestätigen.

[45] Die vorliegende Untersuchung bezieht neben den Lösungen der beiden Haager Übereinkommen und der nationalen Rechte auch die erwähnten Entwürfe ein, wurden sie doch jeweils von international besetzten Gremien auf rechtsvergleichender Grundlage erarbeitet und sind insofern Indiz für einen möglichen übernationalen Konsens oder zumindest Kompromiss.

# Drittes Kapitel:

# Gemeinsamer Ausgangspunkt

> »A première vue, il pourrait sembler que ce sujet ne
> soulève pas des grandes difficultés, puisque la compé-
> tence législative aussi bien que juridictionnelle dans le
> domaine des actes illicites obéit à des règles générale-
> ment admises en droit international privé.«
>
> *Bernard Dutoit*[1]

## I. Ursprünge[2]

Von den Anfängen bis weit ins 20. Jahrhundert hinein bestand im europäischen
Kollisionsrecht der außervertraglichen Schadenshaftung über das Grundprinzip ei-
ne bemerkenswerte Einigkeit. Delikte wurden über die Jahrhunderte nach dem
Recht des Ortes beurteilt, an dem sie begangen worden waren (*Lex Loci Delicti*).
Die Tatortregel wurde nach heute herrschender Ansicht bereits im 12. und 13.
Jahrhundert, also der Frühzeit des europäischen Kollisionsrechts, entwickelt und
gehört somit zu dessen ältesten Regeln[3]. (Zuvor hatte bei Streitigkeiten von Perso-
nen verschiedener Rechtszugehörigkeit die Lex Fori dominiert, sofern man dem

---

[1] Mémorandum relatif aux actes illicites en droit international privé, S. 9 Ziff. 2, in: Conférence de La
Haye de droit international privé, Actes et documents de la Onzième session du 7 au 26 octobre 1968,
Tome III, La Haye 1970; siehe dann aber das oben, eingangs des 2. Teils wiedergegebene Ergebnis seiner
Studie; ebenso (der erste Blick täuscht vollständig) *Broggini*, Riv. dir. int. priv. proc. 1995, 241 (248f.)
und sein oben, S. 103 Fn. 1, wie**dergegeb**enes Zitat.

[2] Siehe zu den Anfängen die **hervorra**genden Darstellungen von *Erauw*, De onrechtmatige daad in
het internationaal privaatrecht, 1982, S. 25ff.; *Hohloch*, Das Deliktsstatut, 1984, S. 7ff.; *Rohe*, Zu den
Geltungsgründen des Deliktsstatuts, 1995, S. 6ff., jeweils m. zahlr. w. Nachw.

[3] *Batiffol*, Anmerkung zum Fall *Lautour c. veuve Guiraut*, Rev. crit. 1949, 89 (92): »la solution est une
des plus anciennes du droit international privé«; *Batiffol/Lagarde*, DIP, I, No. 216, 285; *Pierre Mayer*, DIP,
No. 678: »solution traditionelle en jurisprudence et en doctrine depuis le Moyen Age«; *Bourel*, Rec. des
Cours, Vol. 214 (1989-II), S. 251 (261); *De Boer*, AA 1992, 521 (522): »Sinds jaar en dag gold in Nede-
land en elders in de wereld de notie dat **een** internationale onrechtmatige daad wordt beheerst door het
recht van het land waar de schadeveroorzakende gebeurtenis zich voordeed: de *lex loci delicti*.«; *Pérez Be-
vía*, in: *Aguilar Benítez de Lugo* u.a. (Hg.), Lecciones, S. 299; *Mádl/Vékás*, Law of Conflicts, 228; aus der
älteren Lit. *Gutzwiller*, Geschichte, S. 26f., er zählt die Lex Loci Delicti zu den Fundamenten des IPR,
die bereits in der Frühphase zwischen 1150 und 1338 gelegt wurden; *Rabel*, Conflict of Laws, II, S. 235,
bezeichnete die Lex Loci als »The principle unanimously established by the canonists and later the statu-
tists since the 13th century«. – Siehe für eine Gegenauffassung *Ehrenzweig*, Int. Enc. Comp. L. Vol. III,
Ch. 32, S. 3ff.

Fremden überhaupt Rechts- und Prozessfähigkeit zubilligte[4].) Bei den Erwägungen zum Kollisionsrecht der Delikte stand (wie im materiellen Deliktsrecht) allerdings lange Zeit die Strafsanktion im Vordergrund[5]. Äußerungen in der europäischen kollisionsrechtlichen Literatur, die sich speziell auf die zivilrechtliche Seite der Delikte bezogen, blieben über die Jahrhunderte ausgesprochen selten[6]. Selbst im Werk *Joseph Storys* zum Conflict of Laws, dessen erste Auflage 1834 erschien, fehlte das private IPR der Delikte noch völlig[7]. In der ersten Auflage des »Traité de droit international privé« von *Jean-Jacques Gaspard Foelix* aus dem Jahre 1843 sind die Überlegungen zum zivilrechtlichen Schadensausgleich noch stark von strafrechtlichen Vorstellungen überlagert[8].

Ein wirklich eigenständiger Charakter des zivilen Koordinationsrechts für Delikte entwickelte sich erst, als Ende des 18. und vor allem im 19. Jahrhundert die großen Zivilrechtskodifikationen geschaffen wurden, mit ihnen eine Entpönalisierung der Delikte einsetzte und gleichzeitig das Fallmaterial grenzüberschreitender Delikte reicher wurde[9].

Ein frühes Beispiel dafür, wie sich im 19. Jahrhundert die privatrechtliche langsam von der strafrechtlichen Tatortregel löste, findet sich in einem Urteil des *OAG München* aus dem Jahre 1829. In einem Fall des außerehelichen Beischlafes (neben den Briefdelikten[10] die praxisrelevanteste Materie des Internationalen Deliktsrechts jener Zeit[11]) heißt es, dieser stehe zwar nicht mehr unter Strafe, stelle sich aber »immer noch als eine unerlaubte, verwerfliche Handlung dar«, weshalb guter Grund

---

[4] Näher *Hohloch*, Deliktsstatut, S. 9ff., 16f.; *Erauw*, Onrechtmatige daad, S. 31; siehe auch *Batiffol/Lagarde*, DIP, 1, No. 215. *Hohloch*, S. 241, verweist darauf, dass lange Zeit nicht die Frage im Vordergrund stand, ob und inwieweit im Inland ausländisches Recht zur Anwendung kommen soll, sondern die Frage, inwieweit der Richter das eigene Recht auf Auswärtige anwenden durfte, die in seinem Gerichtsbereich delinquiert hatten. Auch die Tatortregel habe also zunächst der Durchsetzung der Lex Fori gedient.

[5] *Hohloch*, Deliktsstatut, S. 8, 17, 21f., 24ff.; *Erauw*, Onrechtmatige daad, S. 41; *Rohe*, Geltungsgründe, S. 39ff., 48.

[6] *Hohloch*, Deliktsstatut, S. 17ff. (für die Zeit ab dem 12. Jahrhundert) und S. 24 (für die Zeit vom 14. bis zum beginnenden 19. Jahrhundert): »Während die Regeln des internationalen Strafrechts [...] verfeinert und kompliziert werden [...], herrscht weiterhin Stille auf dem parallelen Gebiet des privatrechtlichen Deliktsstatuts«, mit Nachw. S. 25ff.; zur Vermischung strafrechtlicher mit zivilrechtlichen Fragen etwa bei d'Argentré (1519–1590) *Rohe*, Geltungsgründe, S. 53, 55f.

[7] Siehe schon Morris (*McClean*), Conflict of Laws, S. 353: »For centuries the law of torts was a neglected topic in the conflict of laws. Story did not refer to it at all.« Allein in Chapter XIV (Remedies) und XVI (Penal Laws and offences) finden Ansprüche aus Delikt Berücksichtigung.

[8] Ebenso *Foelix*, Traité du droit international privé, 2e éd, 1852, S. 538ff.

[9] *Hohloch*, Deliktsstatut, S. 8: »es sind kaum zweihundert Jahre, dass die Frage geprüft wird, nach welchem Recht sich *Schadensersatzansprüche* bestimmen. Nur in diesem begrenzten zeitlichen Rahmen kann von internationalem Deliktsrecht gesprochen werden«, siehe auch die zusammenfassende Feststellung auf S. 29; *Rohe*, Geltungsgründe, S. 54, erst im 19. Jahrhundert »erfolgt erstmals eine Trennung von Straf- und Zivildeliktskollisionsrechte.

[10] Siehe als frühes Beispiel *OAG München* 16. 3. 1847, SeuffA 3 Nr. 295.

[11] So schon *Savigny*, System, VIII, S. 279; *Hohloch*, Deliktsstatut, S. 30, 37ff. Der Fall hatte im Laufe des 18. Jahrhunderts die strafrechtliche Sanktion weitgehend verloren und erlangte nun im Zivilrecht Bedeutung. (Hohloch verweist auch darauf, dass die Literatur zur Statutenlehre vor 1800 keine Hinweise auf Entscheidungen zum Deliktskollisionsrecht enthält, S. 39); *Rohe*, Geltungsgründe, 238.

bestehe, »die für die Übertretung der Strafgesetze hinsichtlich der Statutencollision geltende Regel *hier in analoge Anwendung zu bringen*«[12]. In späteren Urteilen wird die Lex Loci Delicti für **den zivilrechtlichen** Schadensausgleich gelegentlich als gemeinrechtliche Regel bezeichnet, und man bemüht sich kaum mehr um ihre besondere Begründung[13].

Die großen zivilrechtlichen Kodifikationen des 19. Jahrhunderts wurden überwiegend im Sinne der Tatortregel interpretiert[14], und auch die folgende Rechtsprechung ging überwiegend von der Geltung der Tatortregel aus[15]. Im 19. Jahrhundert war man sich in Europa über die Geltung dieser Regel also weitgehend einig. Gegen Ende des Jahrhunderts, als die völkerrechtliche Theorie des IPR auf dem europäischen Kontinent ihren Höhepunkt erlebte[16], wurde die Tatortregel gelegentlich sogar zum völkerrechtlichen Grundbestand des IPR gerechnet.

Eine wichtige Ausnahme bildete England, dessen Rechtsprechung – ebenfalls von der Tatortregel ausgehend – in der zweiten Hälfte des 19. Jahrhunderts eine eigene Lösung entwickelte[17].

Im 20. Jahrhundert wurde die Auffassung von der uneingeschränkten Geltung der Tatortregel in Gesetzgebung und Rechtsprechung zunächst beibehalten und die Lex Loci Delicti galt »als einer der wenigen feststehenden Grundsätze des Grenzrechts fast aller kontinental-europäischen und südamerikanischen Staaten«[18]. In der ersten Hälfte des 20. Jahrhunderts ergingen in vielen europäischen Staaten grundlegende Urteile zur Geltung der Tatortregel im IPR[19] und auch die weiteren

---

[12] 1. 12. 1929, SeuffA 1 Nr. 153 (Hervorh. d.d. *Verf.*); ebenso *OAG Jena* 1835 und 1839 (ohne genaues Datum), SeuffA 2 Nr. 118; *OAG Celle* 28. 5. 1850, SeuffA 8 Nr. 7; siehe zu allen bereits *Hohloch*, Deliktsstatut, S. 37 f.

[13] Nachweise der älteren Rspr. auch bei *Bourel*, Conflits de lois, S. 24 Fn. 41.

[14] Siehe *Hohloch*, Deliktsstatut, für den französischen Code civil, S. 32 ff., und das österreichische ABGB, S. 34 m. Nachw.; ob Art. 9 Abs. 2 des *italienischen* Codice civile von 1865 tatsächlich die Tatortregel enthielt, war nicht unumstritten, vgl. etwa den Hinweis *Rabels*, Conflict of Laws, II, S. 236, Fn 20 auf *Fedozzi*.

[15] Wobei in den frühen französischen Urteilen oft unklar blieb, ob sie bei Inlandstaten die Lex Fori oder die Lex Loci Delicti anwendeten, vgl. *Hohloch*, Deliktsstatut, S. 33 und Fn. 150; *Rohe*, Geltungsgründe, S. 67. Wirklich unmissverständlich ist erst die Entscheidung der *Cour de Cassation* 25. 5. 1948 im Fall *Lautour c. Veuve Guinant*, Rev. crit. 1949, 89 Anm. *Batiffol*; siehe aus der schweizerischen Rspr. *BG* 10. 4. 1896, BGE 22, 471 (486) und aus dem frühen 20. Jahrhundert z. B. *BG* 14. 7. 1909, BGE 35 II 477 (1909); *BG* 15. 6. 1917, 43 II 309 (316).

[16] Vergleiche oben, S. 57 ff.

[17] Zu ihr unten, S. 155 ff.

[18] So *Frankenstein*, IPR, II (1929) S. 358 m. zahlr. Nachw.; *Rabel*, Conflict of Laws, II, S. 235: »The principle [...] generally adopted today« und S. 253: »The advantages of the principle of the lex loci delicti committi are strong enough to have secured to it an almost universal adherence.«; *Batiffol*, Annerkung zu *Lautour c. veuve Guiraud*, Rev. crit. 1949, 89 (92): »accord à peu près unanime«; *Hohloch*, Deliktsstatut, S. 53 f. m. zahlr. w. Nachw.

[19] *Rabel*, Conflict of Laws, II, S. 235 f. und Fn. 20 zitiert Urteile aus *Österreich* (1910, 1913), *Belgien* (1907, 1908), *Dänemark* (1905), *Frankreich* (1936, »the first formal confirmation of the rule [...] which was certain«, Rabel verweist aber auch auf Urteile von 1905 und 1888), *Deutschland* (seit 1829 ständige Praxis), *Ungarn* (1905, 1926, 1937), *Italien* (1938), den *Niederlanden* (1927, 1931), *Norwegen* (1905), *Schweden* (1933, 1935) und der *Schweiz* (1896, 1909, 1917, 1925 etc.).

Gesetze und Gesetzesvorschläge gingen einhellig von ihrer Maßgeblichkeit aus[20]. In ihr »erschöpfte sich dieses Teilgebiet des Kollisionsrechts beinahe«[21].

## II. Aktuelle Situation

In den IPR-Gesetzen aus der zweiten Hälfte des 20. Jahrhunderts, der aktuellen Rechtsprechung fast aller europäischen Länder sowie den internationalen Übereinkommen auf diesem Gebiet bildet die Anknüpfung an den Tatort nach wie vor den Ausgangspunkt oder findet das am Tatort geltende Recht jedenfalls subsidiär Berücksichtigung, wenn keine speziellere Anknüpfung eingreift[22]. In 23 europäischen Rechtsordnungen dient die Anknüpfung an den Tatort als Grundregel.

So in Art 40 Abs. 1 des *deutschen* EGBGB, § 48 Abs. 1 des *österreichischen*, Art. 52 des *liechtensteinischen* und Art. 62 des *italienischen* IPR-Gesetzes, Art. 10 Abs. 9 des *spanischen* und Art. 45 des *portugiesischen* Código civil, Art. 167 Abs. 1 der Grundlagen für die Zivilgesetzgebung der UdSSR und der Unionsrepubliken in der Fassung von 1991, die in *Russland* bis zu einer eigenen gesetzlichen Regelung in Kraft sind[23], Art. 31 § 1 des *polnischen*, § 15 des *tschechischen* und des *slowakischen*, Art. 19 des *albanischen* und Art. 107 des *rumänischen*[24] IPR-Gesetzes, Art. 28 des *jugoslawischen* IPR-Gesetzes, das außer in der Republik Jugoslawien in den selbständigen Nachfolgestaaten *Slowenien, Mazedonien, Kroatien* und *Bosnien-Herzegowina* in Kraft ist[25], Art. 620 Abs. 1 des *litauischen* ZGB, § 164 Abs. 1 des *estnischen* Gesetzes über die Grundsätze des ZGB, Art. 1128 des *weißrussischen* ZGB, Art. 26 des *griechischen* ZGB und Art. 25 des *türkischen* IPR-Gesetzes. Sie gilt seit Inkrafttreten des Private International Law (Miscellaneous Provisions) Act 1995 am 1. Mai 1995 auch wieder in *England* und *Schottland*, was angesichts der Ausnahmestellung, die das Deliktskollisionsrecht der englischsprachigen Länder Europas für 100 Jahre einnahm, bemerkenswert ist.

In acht Rechtsordnungen, in denen die Materie nicht kodifiziert ist, gilt die Lex Loci Delicti nach der (meist höchstrichterlichen und ständigen) Rechtsprechung ebenfalls als Grundregel.

---

[20] *Rabel*, Conflict of Laws, II, verweist auf § 14 des *tschechoslowakischen* Entwurfes von 1931, Art. 31 des *griechischen* ZGB von 1940, Art. 25 Abs. 2 der diposizioni preliminari des *italienischen* Codice civile, Art. 11 des *polnischen* IPR.G, Art. 793 des C.c. von *Montenegro*, Art. 674 des *portugiesischen* C.com.

[21] *Hohloch*, Deliktsstatut, S. 1.

[22] *Kegel/Schurig*, IPR, § 18 IV 1.a); Morris (*McClean*), Conflict of Laws, S. 355: »The application of the *lex loci delicti* is the prevailing doctrine on the continent of Europe today and was the prevailing doctrine in the United States until yesterday«.

[23] Siehe zuvor schon Art. 126–4 der Grundlagen von 1961 i.d.F. von 1977. Die Grundlagen dienten als Vorbild für entsprechende Regelungen in den ZGB der Sowjetrepubliken, vgl. etwa *Boguslavskii*, Rec. des Cours, Vol. 170 (1981–I), S. 331 (336); *derselbe*, IPRax 1992, 401, so für das Internationale Deliktsrecht etwa für Art. 566–4 des *russischen* ZGB. Die Neufassung der »Grundlagen« trat wegen des Erlöschens der UdSSR als Völkerrechtssubjekt nicht mehr in Kraft, vgl. *Weishaupt*, IPRax 1994, 311; Staudinger/*von Hoffmann*, Art. 38 Rn. 83. Russland hat sie bis zu einer eigenen Neuregelung für anwendbar erklärt, vgl. *Boguslavskii*, PIL, in: *Ginsburgs/Barry/Simons*, Revival of Private Law in Central and Eastern Europe, S. 421 (423); *Bogdanova*, Rev. crit. 1997, 139 (141) m. w. Nachw.

[24] Ferner Art. 141 Abs. 1 und 144 Abs. 1 (für die Haftung bei Schiffskollisionen und für Schäden, die durch Luftfahrzeuge am Boden verursacht werden).

[25] Nachweis bei Staudinger/*von Hoffmann*, Art. 38 Rn. 87 Fn. **.

Es handelt sich um *Frankreich*[26], *Belgien, Luxemburg, Schweden, Norwegen, Dänemark, Bulgarien* sowie um den Kleinstaat *Andorra*[27]. In *Finnland* herrscht ebenfalls Einigkeit über die Geltung der Lex Loci Delicti, wenn auch noch keine entsprechende Gesetzgebung oder (höchstrichterliche) Rechtsprechung existiert[28].

Die aktuellen Gesetzgebungsvorschläge sehen ebenfalls fast alle diese Lösung vor.

So der Vorschlag der *niederländischen* Staatscommissie voor IPR von 1996[29] und der auf ihm beruhende niederländische Regierungsentwurf von 1999[30], der Entwurf eines III. Teils des Zivilkodex der *Russischen* Föderation von 1996[31] und schließlich der Vorentwurf des Ministerrates der EU für ein EU-weites IPR der außervertraglichen Haftung[32].

Nach dem IPR-Gesetz der *Schweiz*, der *ungarischen* Gesetzesverordnung zum IPR und der gegenwärtigen *niederländischen* Rechtsprechung[33] gilt die Tatortregel

---

[26] Auch der Vorentwurf für eine gesetzliche Fassung des *französischen* IPR von 1970 (»Projet de loi complétant le code civil en matière de droit international privé«) von 1970, Text: Rev. crit. 1970, 832, sah in Art. 2312 die Tatortregel vor: »Les obligations non contractuelles sont régies par la loi du lieu où est survenu le fait dont elles résultent«.

[27] *Frankreich:* ständige Rechtsprechung, bestätigt durch *französische Cour de Cassation* 25. 5. 1948, Rev. crit. 1949, 89 (*Lautour c. veuve Guiraut*) = *Ancel/Lequette*, Grands arrêts de dip, No. 19 (S. 147ff.) sowie unlängst durch *Cour de Cassation (1re Ch. civ.)* 14. 1. 1997 (*Soc. Gordon and Breach Publishers et autres c. Association The American Institute of Physics et autres*), Rev. crit. 1997, 504 Anm. *Bischoff* = D.1997, 177; w. Nachw. bei *Batiffol/Lagarde*, DIP, II, Rn. 557 und Fn. 2; *Belgien:* ständige Rechtsprechung., ausdrücklich z.B. *Hof van Cassatie* 17. 5. 1957 (*Bologne c. Sainte*), Pas., 1957, I, 1111 = Rev. crit. 1958, 339 Anm. *Loussouarn* und unlängst wieder *Hof van Cassatie* 29. 4. 1996, Rechtsk. Weekbl. 1996/97, 812 Anm. *Meeusen*; *Luxemburg: Cour d'appel lux.* 22. 12. 1916, Pas. lux. 10. 14; *Trib. Luxembourg* 14. 7. 1959, Pas. lux. 17.501; *Trib. Luxembourg* 7. 4. 1965, Pas. lux. 19.549; aus der Lit.: *Schockweiler*, DIP luxembourgeois, S. 148ff.; *Huss*, Clunet, 1971, 140 (148f.); *Bernecker*, RabelsZ 27 (1962/63), 263 (307 Fn. 334 m. zahlr. Nachw.); *Schweden:* Högsta Domstol 20. 9. 1933, NJA 1933, 364 = RabelsZ 1933, 931: Verkehrsunfall zwischen Schweden in Norwegen, nach norwegischem Tatortrecht beurteilt; ebenso *HD* 2. 12. 1935, NJA 1935, 585 = RabelsZ 1936, 624; ferner *HD* 18. 4. 1936, NJA 1936, 291 = RabelsZ 1940/41, 834: Zusammenstoß zwischen schwedischem und dänischem Schiff auf der Themse; siehe aus der Lit. *Seth*, Internationalla affärstvister, 1989, S. 33f.; *Witte*, Landesbericht Schweden, S. 13, in: *Ch. von Bar* (Hg.), Deliktsrecht in Europa; *Norwegen: Obergericht Christiana* 15. 12. 1905, Clunet 1907, 852; *Dänemark: Oberster Gerichtshof* 30. 6. 1956, U 1954, 772 = RabelsZ 20 (1955), 509f.: Verkehrsunfall in Belgien; *See- und Handelsgericht Kopenhagen* 23. 1. 1956, Clunet 1960, 495; 1982, U 1982, S. 886 (Appellationsgericht); aus der Lit. *Loofkovsky*, Danish Private international Law, S. 497, in: *Dahl/Melchior/Rehof/Tamm*, Danish Law in a European Perspective; *Siesby*, Laerebog I, International privatret, S. 121ff.; *Allan*, Dansk international privat- och procesret, S. 340ff.; *Bulgarien: Popov*, RabelsZ 41 (1977), 726 (734); *Andorra: JDA* 5. 7. 1984, zit. nach *Rau*, RabelsZ 53 (1989), 207 (223).

[28] *Klami*, PIL in Finnland, 1986, 38f.

[29] Art. 1 Abs. 1 des Entwurfes, anders noch Art. 95 der niederländischen »Schets van een algemene wet betreffende het internationaal privaatrecht«, die die Tatortregel subsidiär vorsahen; siehe zu deren vorläufigem Charakter etwa *Kokkini-Iatridou/Boele-Woelki*, NIPR 1992, 524.

[30] Art. 3 Abs. 1.

[31] Art. 1259 des *russischen* Entwurfes; schon Art. 126 Abs. 4 des Gesetzes über die Grundlagen der Zivilgesetzgebung der UdSSR sah die Geltung des Tatortrechts vor.

[32] Art. 3 Abs. 1 des Vorentwurfes.

[33] Es gilt – seit der Entscheidung des *Hoge Raad* 18. 3. 1938, NJ 1939, 69 (*Ooievaar*) unzweifelhaft – die Tatortregel, nach der Entscheidung des *Hoge Raad* 19. 11. 1993, NJ 1994, 622 (*COVA-arrest*) aber wohl subsidiär; siehe aus der Lit. *De Boer*, AA 1992, 521 (522f.): Der Tatort stehe an dritter Stelle der

subsidiär[34]. Auch die »Europäische Gruppe für IPR« hat den Tatort in ihrem Vorschlag für eine **europäische Konvent**ion zum IPR der außer**vertragli**chen Haftung von 1998 »erst« **an die** zwe**ite Stelle** der Anknüpfungspunkte **gesetzt**[35].

Angesichts dieser weitreichenden Übereinstimmung verwundert nicht, dass die Tatortregel schließlich auch in den beiden *Haager* Übereinkommen zum Internationalen Deliktsrecht eine zentrale Rolle spielt. Nach Art. 3 des Verkehrsunfallübereinkommens gilt grundsätzlich das Recht des Unfallortes und nach Art. 4 des Produkthaftungsübereinkommens ist der Verletzungsort maßgeblich, allerdings in Kombination mit einem weiteren Anknüpfungspunkt[36].

Schließlich war in Art. 10 des Vorentwurfes der EG-Kommission von 1972 für die außervertragliche Haftung grundsätzlich die Beurteilung nach dem Recht des Staates vorgesehen, »in dem das Ereignis eingetreten ist«.

Allein im *irischen* IPR scheint man der Tatortregel keine hervorgehobene Stellung einräumen zu wollen[37].

Die Beurteilung außervertraglicher Schadensersatzansprüche nach dem Recht des Tatortes ist also eine wahrlich gemeineuropäische Lösung.

Wird das Internationale Deliktsrecht der einzelnen Länder näher betrachtet, so findet die Gemeinsamkeit heute allerdings schnell ein Ende. Bezüglich der angemessenen Lösung einzelner Probleme und der Behandlung ganzer Fallgruppen existieren im Internationalen Deliktsrecht der Gegenwart erhebliche Unterschiede, und das Spektrum an Lösungen ist vielfältig. Trotz des meist einheitlichen Ausgangspunktes weisen die Internationalen Deliktsrechte in Europa im Einzelnen eine Vielfalt auf, die derjenigen der materiellen (Delikts-) Rechte kaum nachsteht. »Wie der Gletscher von weitem gangbar und zusammenhängend erscheint, in der Nähe aber tausend tückische Spalten zeigt, so wächst der Eindruck der Zerklüftung des positiven internationalen Privatrechts bei näherem Anschauen.« Diese Feststellung *Theodor Niemeyers* aus dem Jahre 1894[38], welche die damaligen Unterschiede im IPR Europas noch überzeichnete[39], beschreibt die Gegebenheiten im Internationalen Deliktsrecht – trotz der fortbestehenden Übereinstimmung im Ausgangspunkt – heute völlig **zutreffend**. In der Literatur wurde daher auch für diejenigen Länder, in denen die **Tatortregel** in den Gesetzen als Grundregel vorgesehen ist,

---

Anknüpfung, a. A. *van Rooij/Polak/Steffens*, PIL in the Netherlands, Suppl., S. 78: »lex loci delicti has kept its position as the principal rule in Dutch private international law in torts despite all the criticism«.

[34] Art. 133 Abs. 2 des *schweizerischen* und Art. 28 des *jugoslawischen* IPR-Gesetzes, § 32 der *ungarischen* GesetzesVO zum IPR.

[35] Art. 3 Abs. 3 des Vorschlages.

[36] Zu den Gründen für diese »Einschränkung« im Internationalen Produkthaftungsrecht unten, S. 262ff., 278ff.

[37] Näher unten, S. 166f.

[38] *Niemeyer*, Zur Methodik des IPR, 1894, S. 21.

[39] Siehe aber die Unterschiede der Internationalen Privatrechte, auf die *Niemeyer*, Zur Methodik des IPR, S. 11ff., hinweist.

konstatiert, tatsächlich sei sie »bloß noch ein von vielerlei Ausnahmen durchbrochener Ausgangspunkt für die Arbeit am außervertraglichen Haftungsrecht«[40].

## III.  Weiterer Gang der Untersuchung

In der zweiten Hälfte des 20. Jahrhunderts wurde immer wieder Unbehagen und Unzufriedenheit mit der Tatortregel geäußert. Angesichts dieser Kritik gilt es zunächst zu klären, welche Gründe es für die Tatortregel und ihre bemerkenswerte Verbreitung gibt[41], ob Alternativen existieren, welche Erfahrungen mit diesen im geltenden Recht bislang gemacht wurden und welche Zukunft sie in Europa besitzen könnten[42].

Als besonders schwierig hat sich die Konkretisierung der Tatortregel bei den sogenannten Distanzdelikten erwiesen. Wird der Tatort in den einzelnen Rechtsordnungen unterschiedlich konkretisiert, so beeinträchtigt dies die Einheitlichkeit der Lösungen im europäischen Rechtsraum. Gleiches gilt, wenn in den Rechtsordnungen unter unterschiedlichen Voraussetzungen Ausnahmen von der Tatortregel gemacht werden. Eine Betrachtung, die ein gesamteuropäisches Bild aufzuzeigen sucht, hat sich daher zentral mit diesen Fragen auseinander zu setzen[43].

Differenzen bei der Anknüpfung können sich ferner ergeben, wenn dem Deliktsstatut in den einzelnen Ländern ein unterschiedlicher Anwendungsbereich eingeräumt wird, unterschiedlich qualifiziert wird, und – was die Anknüpfung im Ergebnis betrifft – eine unterschiedliche Haltung zum Umfang der Verweisung eingenommen wird. Die weiteren Kapitel sind daher diesen Fragen gewidmet[44].

Im Anschluss kann auf Grundlage der rechtsvergleichenden Erkenntnisse in einigen Fallstudien gezeigt werden, welche Konsequenzen die Zersplitterung des europäischen Deliktskollisionsrechts in Einzelfällen heute hat[45].

Am Ende des zweiten Teils der Untersuchung erfolgt eine Gesamtwürdigung, in der die Ergebnisse der europäischen Bestandsaufnahme zusammengefasst und Folgerungen aus dem Vorgefundenen für eine gesamteuropäische wissenschaftliche Behandlung und Lehre des Gebietes gezogen werden[46].

---

[40] So für das deutsche IPR *Ch. von Bar*, IPR, II, Rn. 652; siehe auch *Kropholler*, IPR, § 53 V 5.: faktisch »dürfte die Maßgeblichkeit des Ortsrechts allerdings am häufigsten sein«, insofern könne weiterhin von der »Grundregel« der Anknüpfung an den Tatort gesprochen werden.
[41] 4. Kapitel (S. 138ff.).
[42] 5. Kapitel (S. 150ff.).
[43] 6. bis 9. Kapitel (S. 194ff.).
[44] 10. und 11. Kapitel (S. 418ff.).
[45] 12. Kapitel (S. 462ff.).
[46] 13. Kapitel (S. 485ff.).

## Viertes Kapitel:

# Geltungsgründe der Tatortregel

Die Begründung der Tatortregel hat lange Schwierigkeiten bereitet. In einer viel beachteten Monographie zum Internationalen Deliktsrecht aus dem Jahre 1961 heißt es etwa, es herrsche größte Unsicherheit über den Sinn dieser Anknüpfung[1]. In einer aktuellen Gesamtdarstellung des IPR ist zu lesen, »[z]ur sachlichen Begründung der Tatortregel lässt sich [...] auch (oder gerade) im Bewusstsein ihres Alters und ihres internationalen Verbreitungsgrades erstaunlich wenig vorbringen«[2]. Andere bezeichnen die Anknüpfung an den Tatort als bloße Verlegenheitslösung[3].

## I. Ursprünge

Wie erwähnt, standen bei grenzüberschreitenden Delikten lange Zeit strafrechtliche Überlegungen im Vordergrund und wurde der zivilrechtliche Schadensausgleich als Annex zur strafrechtlichen Beurteilung der Delikte angesehen. Die strafund mit ihr die zivilrechtliche Würdigung einer Handlung wurde bereits früh nach dem Recht des Ortes vorgenommen, an dem die Handlung begangen worden war. Dies wurde als gerecht und als den beteiligten Ordnungsinteressen angemessen angesehen.

Als *gerecht* wurde es empfunden, weil man einerseits annahm, dass der Täter erwarten konnte und damit rechnen musste, dass seine Handlung nach dem Recht des Ortes beurteilt würde, an dem er sie begangen hatte. Andererseits sollte er sich darauf verlassen können, dass nur das als Delikt angesehen würde, was am Ort der Tat unerlaubt war. Um dem Ortsfremden gerecht zu werden, wurden in der mittelalterlichen und neuzeitlichen Statutenlehre Übergangsfristen gewährt, innerhalb derer der Fremde von bestimmten, im Rechtsvergleich ungewöhnlichen Straftatbeständen am Tatort ausgenommen blieb (Konzept der *iusta ignorantia*). Nach Ab-

---

[1] *Bourel*, Les conflits de lois en matière d'obligations extracontractuelles, Paris 1961, S. 269: »la plus grande incertitude règne au sein de la doctrine sur le sens de ce rattachement«.

[2] *Ch. von Bar*, IPR, II, Rn. 655.

[3] *Kropholler*, RabelsZ 33 (1969), 601 (609f.): »Als *rechtspolitisches Ideal* ist die Maßgeblichkeit des Ortsrechts schwer zu begründen. [...] Allein eine hilfsweise Anwendung der Lex Loci liegt im Parteiinteresse; nur sofern keine anderen klaren Anknüpfungspunkte gegeben sind, müssen die Betroffenen mit der Anwendung des Ortsrechts rechnen«; *Ch. von Bar*, IPR, II, Rn. 656: »Verlegenheitslösung«; *Hohloch*, JuS 1980, 18 (21). – Dagegen (nicht bloß Verlegenheitslösung) etwa *Rohe*, Geltungsgründe, S. 236; *Looschelders*, VersR 1999, 1316.

lauf der Übergangsfristen wurde von ihm erwartet, dass er die lokalen Verbotstatbestände kannte[4].

Den *beteiligten Ordnungsinteressen* entsprach die Tatortregel nach weit verbreiteter Auffassung, weil Delikte am ehesten den inneren Frieden des Ortes bedrohten, an dem sie begangen wurden. Es wurde daher als angemessen empfunden, die Regeln des Deliktsrechts, die am Tatort galten, ausnahmsweise ohne Rücksicht auf die Herkunft der Beteiligten anzuwenden[5].

Später kamen Argumente der *territorialen Souveränität* hinzu. Hiernach hatte jeder Staat ein legitimes Interesse daran, ein Recht und sogar eine Pflicht, die Recht- oder Unrechtmäßigkeit von Handlungen festzulegen, die auf seinem Boden began- gen wurden. Nach der Auffassung von *Foelix* war der Staat, auf dessen Territorium eine Rechtsverletzung erfolgt war, geradezu verpflichtet, die Verletzung zu verfol- gen, wollte er seine Souveränität nicht einbüßen (»sous peine de cesser d'être sou- verain«)[6]. Spiegelbildlich findet sich das Souveränitätsargument etwa bei *Ludwig von Bar*. Er begründete die Tatortregel u. a. damit, die Souveränität eines Staates würde verletzt, wenn eine Handlung auf seinem Territorium »vollkommen erlaubt« sei, in einem anderen Staat dann aber Haftungsfolgen an sie geknüpft würden[7]. Eine mo- dernere Variante legte die Betonung auf das Interesse des Tatortstaates, den Geschä- digten zu schützen, die Sozialbeziehungen am Tatort zu regeln und zu diesem Zweck zivilrechtliche Sanktionen für Regelverstöße zu bestimmen[8].

Im anglo-amerikanischen Raum wurde die Tatortregel zeitweise damit begründet, das Recht, Schadensersatz zu verlangen, könne einer Person allein durch das Recht des Ortes verliehen werden, an dem sich die Handlung ereignet hatte. Insbesondere in den USA hatte diese Auffassung als Variante der Theorie der *vested-rights* im 19. und Anfang des 20. Jahr- hunderts viele Anhänger[9].

---

[4] *Rohe*, Geltungsgründe, S. 229 m. w. Nachw.

[5] In den Anfängen wurde dafür die Fiktion herangezogen, der Fremde habe sich der Geltung des De- liktsrechts am Tatort freiwillig unterworfen (Idee des »subditus temporarius«), *Rohe*, Geltungsgründe, S. 237 m. w. Nachw.

[6] *Foelix*, Traité, 1e éd., S. 553, das gesamte Zitat lautet: »le pouvoir souverain de cet Etat est nécessai- rement en droit de réprimer la violation de ces lois, sous peine de cesser d'être souverain«.

[7] Theorie und Praxis, II, 2. Aufl. 1889, S. 116f.

[8] Nachweise bei *Rabel*, Conflict of Laws, II, 1rst ed., S. 252 (er verweist auf *Laurent, Rolin, Lerebours- Pigeonnière, Bartin, Poullet*); zu diesem Aspekt in der aktuellen Lit. *Miaja de la Muela*, DIP, II, S. 396 (*Bouza Vidal*).

[9] Vergleiche Morris (*McClean*), Conflict of Laws, S. 355f.; *Binchy*, Irish Conflicts of Law, S. 568f.; *Miaja de la Muela*, DIP, II, S. 396 (*Bouza Vidal*); *Bourel*, Conflits de lois, S. 51; *Hohloch*, Deliktsstatut, S. 87ff. oder *Rabel*, Conflict of Laws, II, S. 251. Siehe für England etwa Justice *Willes* in der Leitentschei- dung in *Phillips* v. *Eyre* (1870) L. R. 6 Q. B. 1, 28: »the civil liability out of a wrong derives its birth from the law of the place, and its character is determined by that law«; für die USA Justice *Holmes* in *Slater v. Mexican National Ry. Co.* [1904] 194 U.S. 120, 126: »[…] the only source of this obligation is the law of the place of the act […]«; ähnlich in *Western Union Telegraph Co. v. Brown* [1914] 234 U.S. 542, 547; Justice *Cardozo* in *Loucks* v. *Standard Oil Co. of New York* [1918] 224 N.Y. 99 = 120 N.E. 198; krit. zu dieser Auf- fassung etwa *Binchy*, Irish Conflicts of Law, S. 569: »conclusion expressed as a premise« oder *Rabel*, Con- flict of Laws, II, S. 251 m. w. Nachw.; in den USA wurde diese Theorie längst aufgegeben.

Als sich das zivile Deliktskollisionsrecht im 19. Jahrhundert vom Strafrecht emanzipierte, wurde kaum problematisiert, ob hieraus Konsequenzen zu ziehen waren. Die Geltung der Tatortregel auch im Zivilrecht wurde als »selbstverständlich angesehen«[10]. Das Fehlen einer eigenständigen Begründung wurde in der Literatur geradezu als der »Geburtsfehler« der zivilrechtlichen Deliktskollisionsregel bezeichnet[11].

Die lange Prägung durch das Strafrecht spiegelt sich nicht zuletzt in der Auffassung wider, die deliktsrechtlichen Vorschriften wahrten den *Ordre Public* und dienten wie das Strafrecht der Aufrechterhaltung der öffentlichen Sicherheit und des inneren Friedens am Tatort. Diese Überzeugung und das Fehlen einer spezifisch zivilrechtlichen Begründung findet in der Meinung Ausdruck, die Vorschriften des Deliktsrecht zählten zu den »lois de sûreté et de police« im Sinne des Art. 3 Abs. 1 des Code civil, die von der *französischen Cour de Cassation*[12], dem *belgischen Hof van Cassatie*[13] und der *luxemburgischen* Rechtsprechung[14] noch heute vertreten wird.

## II. Moderne Begründungen

In einigen Ländern wirkten die Einflüsse des Strafrechts im IPR der Delikte bis in die zweite Hälfte des 20. Jahrhunderts fort, und es finden sich selbst in dieser Zeit noch höchstgerichtliche Urteile, die mit Parallelen zum Strafrecht argumentieren[15]. Aus gesamteuropäischer Perspektive betrachtet ist die Dominanz des Strafrechts heute jedoch überwunden. Stellvertretend für den heutigen Stand der Entwicklung stehen etwa Urteile des *belgischen Hof van Cassatie*, der *Cour d'appel d'Anvers* oder des *OLG Wien*, in denen die Gerichte jeweils ausdrücklich festhalten, dass zivilrechtli-

---

[10] *Hohloch*, Deliktsstatut, z.B. S. 260.

[11] *Rohe*, Geltungsgründe, S. 238.

[12] Siehe zur Verortung der Problematik in Art. 3 des Code civil erst unlängst wieder *Cour de Cass. (1re Ch. civ.)* 14. 1. 1997, Rev. crit. 1997, 504: »Vu l'article 3 du code civil; – [...]«; siehe aus der Lit. *Batiffol/Lagarde*, DIP, II, No.557 und Fn. 1; *Bourel*, Conflits de lois, S. 22. – Krit. z.B. *Loussouarn/Bourel*, DIP, No.179: »La réglementation du délit ne rentre pas dans la catégorie des lois de police visées par l'article 3, alinéa 1, du Code civil«; *Pierre Mayer*, DIP, No.678: »L'article 3, alinéa 1 du Code civil ne s'est guère révélé utile.«. Siehe auch *Hohloch*, Deliktsstatut, S. 32f. m. zahlr. Nachw.; *Rohe*, Geltungsgründe, S. 62ff.

[13] *Belgische Hof van Cassatie* 17. 5. 1957, Pas.1957, I, 1111 (*Bologne c. Sainte*), ständige Rspr., siehe etwa *Hof van Cassatie* 30. 10. 1981, Pas.1982, I, 306 (*Groupe Josi c. Faes*); und unlängst *Hof van Cassatie* 29. 4. 1996, Rechtsk. Weekbl. 1996/97, 812 Anm. *Meeusen* (Skiunfall); weitere umfangreiche Nachw. bei *Rigaux/Fallon*, DIP, II, No.1528, die diese Rspr. kritisieren; krit. auch *Erauw*, Beginselen, S.246f.

[14] Siehe *Schockweiler*, DIP luxembourgeois, S. 23, 26, 148.

[15] Siehe etwa das Urteil des *schweizerischen BG* 11. 5. 1950 (*Braendli gegen Copex Expeditionsbedrijf G.A.*), BGE 76 II 110 (112), in dem es zur Anknüpfung der Distanzdelikte heißt, diese könne »heute [...] nicht mehr zweifelhaft sein, nachdem das StGB in Art. 7 Abs. 1 als Begehungsort des Delikts sowohl den Ort der Ausführung als auch denjenigen des Erfolgseintritts festlegt. [...] Es würde zu unerträglichen Widersprüchen führen, wenn man die nämliche Tat bezüglich der Strafbarkeit als an beiden Orten begangen, bezüglich der Verpflichtung zum Schadensersatz als nur an einem Ort begangen betrachten und dementsprechend international verschiedenen Rechten unterstellen müsste«. Erheblich vorsichtiger und zurückhaltender mit solchen Parallelen dagegen schon das *deutsche RG* 18. 10. 1909, RGZ 72, 41 (43).

che Ansprüche ungeachtet parallel verlaufender Strafverfahren und dem dort angewendeten Recht anzuknüpfen sind[16].

Zur Lösung des zivilen Delikts- vom Strafrecht und zur Suche nach eigenständigen Geltungsgründen trug nicht zuletzt die veränderte Rolle bei, die dem zivilrechtlichen Schadensausgleichs im 20. Jahrhundert zukam[17]: Am Übergang vom 19. ins 20. Jahrhundert veränderte sich der Schwerpunkt des materiellen Deliktsrechts und, mit einer gewissen Verzögerung, auch derjenige des Deliktskoordinationsrechts. Statt der Vorsatzdelikte überwogen nun die Fahrlässigkeitstaten und wurden zahlreiche und praktisch wichtige verschuldensunabhängige Haftungsgründe geschaffen[18]. Als neue Akteure betraten die Haftpflichtversicherer die Bühne und der kollektive Schadensausgleich geriet zunehmend ins Blickfeld. Diese Veränderungen im materiellen Deliktsrecht spiegelten sich im Fallmaterial des Internationalen Deliktsrecht wider. Statt der Ansprüche aus außerehelichem Geschlechtsverkehr und Briefdelikten stehen heute – wie eingangs gesehen[19] -- Straßenverkehrsdelikte im Vordergrund, Unfälle im Freizeitbereich, Fälle aus dem internationalen Wirtschaftsrecht, insbesondere Produkthaftungsfälle und Wettbewerbsverstöße, Pressedelikte und Umwelthaftungsfälle. Mit der Haftung für immer fernere Schäden ergaben sich für das IPR neue Probleme der Distanzdelikte. Dies alles machte eine neue, für das Zivilrecht eigenständige Begründung der Tatortregel erforderlich, die im 19. Jahrhundert noch nicht geleistet worden war.

Seither wurden in Europa eine ganze Reihe von Argumenten für die Tatortregel angeführt. In den aktuellen europäischen Gesamtdarstellungen finden sie allerdings kaum noch Erwähnung. Zum Teil wird die Tatortregel einfach vorausgesetzt, zum Teil wird sie mit dem Hinweis auf ihre allgemeine Akzeptanz legitimiert, zum Teil werden einzelne Gründe für ihre Geltung angegeben, und man geht schnell zu speziellen Problemen, insbesondere dem der Distanzdelikte über[20].

---

[16] *Hof van Cassatie*17. 5. 1957 (*Bologne c. Sainte*), Pas.1957 I 1111 (die Vorinstanz hatte wegen der Nähe des Zivil- zum Strafverfahren noch das im Strafverfahren maßgebliche Recht auch im Zivilverfahren angewendet); *Cour d'appel d'Anvers* 4. 2. 1987, Pas.1987 II 66 (in Belgien wurde ein Strafverfahren wegen Ehebruchs eingeleitet; dessen ungeachtet wurden die zivilrechtlichen Ansprüche nach dem niederländischem Heimatrecht der Eheleute beurteilt); *OLG Wien* 17. 9. 1984, IPRE 2/84 (Strafverfahren wegen Körperverletzung in Österreich durchgeführt, zivilrechtliche Ansprüche dessen ungeachtet nach tschechoslowakischem Tatortrecht beurteilt). Siehe aus der Lit. stellvertretend *Strikwerda*, Inleiding, Rn. 179f.; Morris (*McClean*), Conflict of Laws, S. 354; *Loussouarn/Bourel*, DIP, No. 179; *Miaja de la Muela*, DIP, II, S. 395 (*Bouza Vidal*).

[17] Siehe stellvertr. *Loussouarn/Bourel*, DIP, No. 179.

[18] Siehe zu dem Wandel des Fallmaterials im Internationalen Deliktsrecht im 20. Jahrhundert stellvertr. Morris (*McClean*), Conflict of Laws, S. 353; *Strikwerda*, Inleiding, Rn. 180, *Miaja de la Muela*, DIP, II, S. 395 (*Bouza Vidal*); *Ch. von Bar*, IPR, II, Rn. 653; *Hohloch*, Deliktsstatut, S. 53, 109, *Rohe*, Geltungsgründe, S. 238.

[19] S. 123f.

[20] Überlegungen zu den Geltungsgründen der Tatortregel finden sich v.a. in den englischsprachigen Lehrbüchern etwa von Morris (*McClean*), Conflict of Laws, S. 355f., und *Binchy*, Irish Conflict of Laws, S. 567ff.; aus der kontinentaleuropäischen Lit. ausführlicher zu den Geltungsgründen v.a. *Miaja de la Muela*, DIP, II, S. 394ff. (*Bouza Vidal*); ferner (sehr krit.) *Ch. von Bar*, IPR, II, Rn. 655f.; knapper, auf die Frage aber immerhin eingehend die französischen Lehrbücher; ausführlich die Monographien von *Hohloch*, Deliktsstatut, und *Rohe*, Geltungsgründe.

Wird heute nach den Geltungsgründen der Tatortregel gefragt, so ist erstens festzustellen, dass sich diese Regel nicht auf einen einzigen, überragenden und allumfassenden Geltungsgrund zurückführen lässt[21]. Zu ihrer Begründung dienen eine Vielzahl einzelner, einander überschneidender Argumente. Das Fehlen eines solchen hervorragenden Geltungsgrundes dürfte nicht zuletzt auch die Ursache der eingangs schon zitierten Unsicherheiten hinsichtlich der Berechtigung dieser Grundregel sein.

Zweitens sind die Geltungsgründe, die in den verschiedenen Rechtsordnungen für die Tatortregel angeführt werden, unabhängig davon, wie die Haftungsrechte im Einzelnen ausgestaltet sind. Die Tatortregel wird also systemneutral begründet[22]. Die Suche nach ihren Geltungsgründen kann daher ohne weiteres als gesamteuropäische angegangen werden.

## 1. Einzelne Geltungsgründe

Im Einzelnen werden heute folgende Geltungsgründe der Tatortregel genannt[23]:

*a) Beste der denkbaren Lösungen, Neutralität.* Für die Tatortregel wird angeführt, sie sei unter allen in Betracht kommenden Lösungen die beste. Da die Parteien in der Regel vor dem schädigenden Ereignis nicht in Kontakt miteinander stünden und ihre Interessen sich am Tatort erstmals kreuzten, sei der Tatort der einzige Bezugspunkt für die kollisionsrechtliche Anknüpfung[24]; die Anknüpfung an den Tatort werde der Zufälligkeit der deliktischen Interessenkollision der Beteiligten am besten gerecht[25].

Eine wirkliche Alternative gebe es nicht[26]. Trotz des übereinstimmenden Interesses beider Parteien an einer schnellen und kostengünstigen Streiterledigung scheide insbesondere eine ausschließliche Beurteilung nach der *Lex Fori* aus zahlreichen Gründen aus[27]. Gegenüber der Beurteilung des Falles nach dem Recht des Schädigers oder des Geschädigten zeichne sich die Tatortregel durch ihre Neutralität aus[28].

---

[21] So schon *Rabel*, Conflict of Laws, II, S. 251; *Bourel*, Conflits de lois, S. 53.

[22] So auch eines der Ergebnisse der Untersuchung von *Rohe*, Geltungsgründe, S. 217.

[23] Die folgenden Literaturnachweise stehen wiederum stellvertretend für viele.

[24] *Busch*, Ubiquitätsregel, z.B. S. 192.

[25] Nachdrücklich *Busch*, Ubiquitätsregel, z.B. S. 192f.: »Es wäre wichtig, von der inhaltsleeren Negativbedeutung der Zufälligkeit im internationalen Privatrecht wegzukommen, um den Weg frei zu machen für eine Argumentation, die in der Zufälligkeit der Interessenkollision eine Rechtfertigung für die Anknüpfung an den Tatort erblickt«.

[26] Siehe etwa *Batiffol/Lagarde*, DIP, I, No.285: »ce rattachement est, de manière générale, le seul qu'offre objectivement la matière«, II, No.556; in gleichem Sinne z.B. *Machado*, Lições, No.116 (S. 367); ähnlich *Rohe*, Geltungsgründe, S. 236, der davon spricht, »dass Tatortrecht aus faktischen Gründen — mangels Vorliegen anderer Anknüpfungspunkte — häufig zu Recht eingreift«. – Krit. *Hohloch*, Deliktsstatut, S. 267f.

[27] Dazu ausführlich unten, S. 151ff.

*b) Einfachheit, Praktikabilität, Effizienz:* Auch ihre Einfachheit, Praktikabilität und Effizienz spreche für diese Regel. Meist sei es unproblematisch, den Tatort zu bestimmen[29]. Da in Europa meist eine besondere Zuständigkeit des Gerichtes am Tatort bestehe[30], führe die Tatortregel häufig zu einer Anwendung der Lex Fori; die Regel ermögliche so einen Gleichlauf von Zuständigkeit und anwendbarem Recht und erlaube den Gerichten, das bekannte eigene Recht anzuwenden[31]. Daher sei die Anknüpfung an den Tatort in der Regel die am wenigsten aufwendige, kostengünstigste und effizienteste Lösung. Zugleich sei es die Lösung, bei der die fehlerlose Anwendung des materiellen Rechts am wahrscheinlichsten sei. (Garantiert ist der Gleichlauf von internationaler Zuständigkeit und anwendbarem Recht allerdings nicht, da die Klage auch am allgemeinen Gerichtsstand des Beklagten erhoben werden kann und dieser Ort mit dem Tatort nicht identisch sein muss.)

*c) Rechtssicherheit.* In der Vielzahl der Fälle führt die Tatortregel dazu, dass man, sobald man sich im Gebiet eines Landes bewegt, bereits unmittelbar nach und sogar schon vor einer eventuellen unerlaubten Handlung weiß, nach welchem Recht Ansprüche aus einem Haftungsfall zu beurteilen sind[32]. Die meisten anderen Lösungen sind dagegen von Unwägbarkeiten abhängig, etwa der − vor dem schädigenden Ereignis ungewissen − Herkunft der Beteiligten, dem Ort der Registrierung der beteiligten Verkehrsmittel, dem Ort, an dem geklagt wird[33] oder dem ungewissen Ausgang einer Gesamtabwägung aller Umstände[34]. Würde etwa an die Herkunft einer der Parteien angeknüpft, so wäre das maßgebliche Recht für die andere Partei nicht vorhersehbar[35] und es könnte zu Deckungslücken kommen, gegen die möglicherweise nicht angemessen Vorsorge getroffen wurde. Lösungen, die mit der Kombination verschiedener Kriterien arbeiten, sind in der Regel unüber-

---

[28] *Pierre Mayer*, DIP, No.678; *Batiffol/Lagarde*, DIP, II, No.556; *Miaja de la Muela*, DIP, II, S.396 (*Bouza Vidal*); *Meeusen*, Anm. zu Hof van Cassatie 29. 4. 1996, Rechtsk. Weekbl. 1996/97, 812 (814). −Krit. zum Argument der Neutralität *Rohe*, Geltungsgründe, S.236.

[29] *Loussouarn/Bourel*, DIP, No.179 und schon *Rabel*, Conflict of Laws, II, S.253; aus der Rspr. etwa *BGH* 7.7. 1992, BGHZ 119, 137 (*Türkeiurlauber*).

[30] Siehe z.B. Art.5 Ziff. 3 EuGVÜ, Art.46 des französischen Nouv. Code de Proc. Civ, §32 der deutschen ZPO usw.

[31] *Pierre Mayer*, DIP, No.678; vgl. *Ch. von Bar*, DIP, II Rn.655: ein »wichtiger Grund für ihr Beharrungsvermögen«.

[32] Bei mehreren Gerichtsständen setzt dies natürlich voraus, dass die Tatortregel an allen Gerichtsständen befolgt wird.

[33] So bei der Theorie, die das materielle Haftungsrecht des Forums anwenden will, dazu unten, S.151 ff.

[34] Siehe zum Argument der Rechtssicherheit stellvertr. *BGH* 8. 3. 1983, BGHZ 87, 95 (97); aus der Lit. etwa *Miaja de la Muela*, DIP, II, S.396 (*Bouza Vidal*), und − trotz krit. Haltung gegenüber dieser Regel − *Ch. von Bar*, IPR, II, Rn.656; siehe aus der älteren Lit. stellvertr. bereits *C.L. von Bar*, Theorie und Praxis, II, S.115, 118. In der Diskussion der neueren Theorien aus den USA wird in Europa regelmäßig darauf verwiesen, dass für die Tatortregel gerade die große Rechtssicherheit spreche, zu der sie führe. − Krit. zum Argument der Rechtssicherheit *Rohe*, Geltungsgründe, S.223ff., 226, der diesem Argument nur »einen der hinteren Ränge bei der Interessengewichtung« zuweisen möchte; ähnlich schon *Batiffol/Lagarde*, DIP, II, S.556: »L'idee intervient donc, mais à titre subsidiaire«.

[35] Zum »Schädigerheimatrecht als Anknüpfungspunkt« *Rohe*, Geltungsgründe, S.227ff., 262ff.

sichtlich und ihre Ergebnisse schwer zu überschauen. Ansätze, die sich auf Gesamt-
abwägungen stützen[36], gehen einher mit Rechtsunsicherheit.

   *d) Interessen des Tatortstaates an der Durchsetzung der Ziele des inländischen Haftungs-
rechts.* Auch im 20. Jahrhundert ist in Europa die Auffassung verbreitet, der Tatort-
staat könne ein Interesse daran haben, dass Delikte auf seinem Territorium nach sei-
nem Recht beurteilt werden.

   Sei eine Handlung sowohl straf- als auch zivilrechtlich relevant, so könne es zu
Überschneidungen in den Funktionen von Straf- und Zivilrecht kommen. Jeden-
falls in manchen Fällen diene es dem Rechtsfrieden und werde jedenfalls von
Laien erwartet, dass sie einheitlich nach dem Recht des Tatortes beurteilt würden[37].

   Die Konsequenzen eines Deliktes berührten in der Regel in erster Linie den
Staat, auf dessen Territorium sie verursacht wurden[38]. Der Tatortstaat habe ein In-
teresse daran, im Inland verletzte Interessen nach seinen Maßstäben zu schützen.
Neben dem Schadensausgleich sei wichtiger Zweck des Haftungsrechts, die Sozial-
beziehungen der Menschen zu ordnen und Gesetzesverletzungen zu verhindern.
Solche ordnenden und präventiven Effekte gingen auch von zivilrechtlichen Haf-
tungsnormen aus. Zudem würden durch eine Haftungsanordnung oder den Ver-
zicht auf sie individuelle Freiheitsräume gegeneinander abgegrenzt[39]. Um diese Ef-
fekte zu erreichen, sei der einzelne Staat darauf angewiesen, Delikte auf seinem
Territorium unabhängig von der Herkunft der Beteiligten nach seinem Recht zu
beurteilen.

   Jeder Staat sei letztlich nicht nur am intensivsten interessiert, sondern auch am
besten in der Lage, die Verhältnisse und Gegebenheiten auf seinem Territorium zu
regeln und Haftungsnormen zu schaffen, die diesen Verhältnissen angemessen sei-
en. Dabei müsse keineswegs immer der Gedanke abstrakter Gerechtigkeit maßgeb-
lich sein. Vor allem bei der modernen verschuldensunabhängigen Haftung sei aus-
schlaggebend, wie nützlich die Haftungsregelung für die Ordnung der Verhältnisse
im Tatortstaat sei[40].

   Staatliche Ordnungsinteressen seien ferner dort zu vermuten, wo Personen mit
ständigem Aufenthalt im Inland im materiellen Recht durch Haftungshöchstbeträ-
ge oder auf andere Weise vor einer als übermäßig empfundenen Inanspruchnahme
geschützt werden sollen[41].

   Schließlich bestünden in einigen, wirtschaftlich relevanten Teilmaterien des De-
liktsrechts spezielle staatliche Interessen daran, Taten, die sich auf dem eigenen

---

[36] Zu einem solchen Ansatz näher unten, S. 164 ff.

[37] *Rohe*, Geltungsgründe, S. 239 ff., der aber z. B. Straßenverkehrsunfälle hiervon ausnehmen möchte,
S. 254.

[38] *Pierre Mayer*, DIP, No. 678; Cheshire and North *(North/Fawcett)*, PIL (12th ed.), S. 529.

[39] Zur »Abgrenzung von Freiheitsräumen« als sozialer Funktion des Deliktsrechts *Esser/Weyers*,
Schuldrecht, II, BT, Teilband 2, § 53 3.

[40] So schon *L. von Bar*, Theorie und Praxis, II, 1889, S. 118.

[41] *Rohe*, Geltungsgründe, S. 221.

Staatsgebiet auswirken, nach dem eigenen Haftungsrecht zu beurteilen, so insbesondere im Internationalen Wettbewerbsrecht[42].

*e) Parteierwartungen und Parteiinteressen, Gerechtigkeit.* Die Anwendung des Rechts am Tatort entspreche schließlich am besten den legitimen Erwartungen der Parteien und sei für sie die gerechteste und vernünftigste Lösung[43].

Wie schon in den Frühzeiten des Deliktskollisionsrechts, so wird heute argumentiert, jeder habe die Gesetze und Standards des Landes und sozialen Umfeldes zu beachten, in dem er sich aufhalte. Zum Zeitpunkt der Schädigung handle die Person im Geltungsbereich dieses Rechts, den Anforderungen dieses Rechts (aber auch nur dieses Rechts) müssten ihre Handlungen genügen und gerecht werden. Wer sich ins Ausland begebe, nehme die eigenen Haftungsstandards nicht mit, sondern habe sich auf die im Aufenthaltsstaat geltenden Maßstäbe auch der außervertraglichen Haftung einzustellen. Dies werde von den Beteiligten auch allgemein erwartet, akzeptiert und als gerecht empfunden[44].

Der Einzelne habe ein erhebliches Interesse daran, »dass jeder sein Verhalten so einrichtet, wie es der Rechtsordnung des Tatortstaates entspricht«[45]. Er besitzt so einerseits einen sicheren Maßstab für die an ihn gestellten Erwartungen und die eigenen Haftungsrisiken, andererseits erhält er eine sichere Leitlinie für seine Erwartungen bezüglich des Verhaltens und einer möglichen Haftung seiner Mitmenschen[46].

Eine Beurteilung z.B. nach dem Recht der Herkunft eines der Beteiligten statt nach dem Recht des Tatortes sei ungerecht. Würden Personen mit auswärtiger Herkunft nach ihrem Heimatrecht beurteilt und sie von der Haftung ausgenommen oder müssten sie im Gegenteil schärfer als Inländer haften, oder würden Opfer aus dem Ausland anders als inländische Opfer einer unerlaubten Handlung behandelt, so würden sie ein mit dem allgemeinen Rechtsbewusstsein und der Rechtssicherheit unverträgliches Privileg oder eine ebenso unverträgliche Belastung erfahren[47].

Gegen die Beurteilung nach einem anderen als dem Tatortrecht wurde schließlich schon früh eingewandt, es wäre ungerecht und mit der erforderlichen Rechtssicherheit unvereinbar, wenn derjenige, der am Tatort »vollkommen erlaubt« handelt, damit rechnen müsse, »dass irgendein auswärtiger Staat mit Bezug auf einen ihm

---

[42] Zu diesem unten, S. 324 ff.

[43] Siehe (wiederum stellvertr.) Morris (*McClean*), Conflict of Laws, S. 356; Cheshire and North (*North/Fawcett*), PIL (12th ed.), S. 529; »seems eminently reasonable«; *Miaja de la Muela*, DIP, II, S. 396 (*Bouza Vidal*); »innegable justitia«; *von Hein*, Günstigkeitsprinzip, S. 38 f.

[44] In diesem Sinne z.B. *Anton/Beaumont*, PIL, S. 296; Cheshire and North (*North/Fawcett*), PIL (12th ed.), S. 529; siehe auch schon *Rabel*, Conflict of Laws, II, S. 252.

[45] *Kegel/Schurig*, IPR, § 18 IV 1. a).

[46] Vergleiche nur *Miaja de la Muela*, DIP, II, 396 (*Bouza Vidal*) oder *Binchy*, Irish Conflicts of Law, S. 569.

[47] *Anton/Beaumont*, PIL, S. 396; Cheshire and North (*North/Fawcett*), PIL (12th ed.), S. 529; ähnlich *Loussouarn/Bourel*, DIP, No. 179 und *Batiffol/Lagarde*, DIP, II, No. 556; siehe auch schon *L. von Bar*, Theorie und Praxis, II, S. 118. Für eine stärkere Berücksichtigung des Rechts des *Schädigers* bei der Verschuldenshaftung dagegen *Rohe*, Geltungsgründe, S. 227 ff., 236, 252, zu dieser Ansicht im Rahmen der Distanzdelikte unten, S. 206 f.

Angehörigen – dem die Staatsangehörigkeit doch auch nicht immer im Gesicht oder auf dem Rücken geschrieben steht – an diesem Handeln Anstoß nimmt«[48] und an das Verhalten eine Haftung knüpft. Der Schädiger müsse Gelegenheit gehabt haben, sich auf die (haftungsrechtlichen) Anforderungen an sein Handeln einzustellen[49]. Der Geschädigte dagegen müsse darauf vertrauen dürfen, dass seine Rechtsgüter mindestens in dem Umfang geschützt werden, wie dies am Ort ihrer »Belegenheit« zum Zeitpunkt der Schädigung der Fall sei[50]. Die Tatortregel führe zu einer solchen haftungsrechtlichen Gleichbehandlung aller, die im gesellschaftlichen und sozialen Umfeld am Tatort agierten, und sei daher eminent gerecht.

## 2.  Die Geltungsgründe im konkreten Fall

Die genannten Geltungsgründe sollen kurz anhand zweier Standardfälle aus dem europäischen Haftpflichtrecht überprüft werden:

Im ersten Fall kollidieren in England ein von einem Dänen gesteuerter und ein von einem Deutschen gesteuerter Pkw[51]. Die Fahrzeuge sind in den jeweiligen Heimatländern der Fahrer zugelassen und versichert. Dem Verursacher des Unfalles kann kein Verschulden nachgewiesen werden. Der Geschädigte begehrt den Ausgleich von Sach- und leichten Personenschäden.

Im zweiten Fall ereignet sich beim Skifahren (oder beim Bergsteigen)[52] in Österreich ein schwerer Unfall, bei dem ein Schweizer und ein Franzose zu Tode kommen. Einer von beiden hat den Unfall fahrlässig verursacht. Die Angehörigen des anderen verlangen Schmerzensgeld wegen des Verlustes.

Die Tatortregel führt in beiden Fällen dazu, dass weder das Heimatrecht der einen noch der anderen Partei zur Anwendung gelangt, auf *kollisionsrechtlicher* Ebene also keine Partei durch die Geltung des gewohnten Rechts bevorzugt oder benachteiligt wird. Die Tatortregel ist insoweit neutral. Bei solchen reinen Ortsdelikten ist der Tatort leicht zu bestimmen und herrscht über das anwendbare Recht ohne weiteres Klarheit. Das maßgebliche Recht könnte sogar schon vor einem eventuellen Haftpflichtfall vorausgesehen werden, die Parteien also (in beiden Fällen allerdings wohl nur theoretisch) versuchen, sich gegen eventuelle Deckungslücken am Unfallort im Vorhinein zu versichern. Die Beurteilung eines Verkehrsunfalles, der sich in England ereignete, nach englischem und eines Freizeitunfalles, der sich in Österreich zutrug, nach österreichischem Recht wird die Parteien kaum überraschen, wird leicht akzeptiert und nicht als ungerecht empfunden. Die Tatortregel führt in solchen Standardfällen also tatsächlich zu kollisionsrechtlicher Gerechtigkeit.

---

[48]   *L. von Bar*, Theorie und Praxis, II, S. 117, 119; ähnlich schon *Brocher*, Nouveau Traité de DIP, No. 127.

[49]   *Busch*, Ubiquitätsregel, z. B. S. 192.

[50]   *Busch*, Ubiquitätsregel, z. B. S. 192.

[51]   Zur zentralen Bedeutung dieser Fallgruppe für das Internationale Deliktsrecht oben, S. 123 f. mit zahlr. Hinw. auf europäische Leitentscheidungen.

[52]   Siehe zu Unfällen im Freizeitbereich die Nachw. oben, S. 124 f.

Ob die Tatortregel einen Gleichlauf von Zuständigkeit und anwendbarem Recht zur Folge hat und auch insofern zur praktisch effizientesten, einfachsten und kostengünstigsten Lösung führt, hängt davon ab, ob im Streitfall in England oder Österreich geklagt würde oder sich die Geschädigten zu einer Klage im näher gelegenen Wohnsitzstaat des Schädigers entschließen.

Ob tatsächlich Interessen des Tatortstaates an der Durchsetzung des inländischen Haftungsrechts bestehen und welche dies sein sollen, ist bei Unfällen zwischen Personen mit gewöhnlichem Aufenthalt außerhalb des Tatortstaates dagegen ausgesprochen zweifelhaft. Aspekte der Wahrung des Rechtsfriedens und vor allem der Gleichbehandlung mit anderen inländischen Unfällen dürften erst bei Beteiligung mindestens eines Inländers einschlägig werden; der Versorgungsaspekt des Haftungsrechts ist bei ausländischem gewöhnlichen Aufenthalt der Beteiligten sowie angesichts der materiellrechtlichen Standards, die in den für die Beurteilung des Falles in Betracht kommenden ausländischen Haftungsrechten herrschen, für den Tatortstaat ohne Bedeutung.

Insgesamt spricht in Standardfällen aber tatsächlich vieles für die Tatortregel.

## III. Kritik

Dennoch wurde gegen die meisten der genannten Geltungsgründe auch in Europa Kritik vorgebracht[53]:

So wurde die Tatortregel als zu starr und unflexibel angesehen, um den zahlreichen unterschiedlichen Fallkonstellationen der außervertraglichen Haftung gerecht werden zu können[54]. Bei Unfällen auf einer Reise durch mehrere Länder oder bei nur kurzfristigem Aufenthalt im Ausland könne sie zu zufälligen oder sogar willkürlichen Ergebnissen führen, insbesondere wenn beide Parteien aus demselben Heimatland stammten[55]. Die Neutralität der Regel wurde in Frage gestellt, weil sie bei Delikten, die sich über mehrere Länder erstreckten, den sogenannten »Distanzdelikten«, meist doch zur Wahl zwischen dem Heimatrecht des Schädigers und demjenigen des Geschädigten zwinge[56]. Auch gegen das Argument der Einfachheit

---

[53] Überblick etwa bei Morris (*McClean*), Conflict of Laws, S. 356; *Binchy*, Irish Conflicts of Law, S. 569; *Miaja de la Muela*, DIP, II, S. 396ff. (*Bouza Vidal*); zur verbreiteten Kritik in den USA und der Diskussion dort siehe die gesammelten Aufsätze in *Shreve* (Hg.), A Conflict-of-Laws Anthology, Cincinnati/Ohio 1997; ausführlich zur »Krise« des Tatortprinzips« und den Entwicklungen in den USA *Hohloch*, Deliktsstatut, S. 121 ff., 126 ff.

[54] Grundlegend *Morris*, 64 Harv.L.Rev. 881 (884f.); siehe ferner (wiederum stellvertr.) die starke Kritik, die der *spanische* Gesetzgeber hinnehmen musste, als er bei der Reform des Código civil im Jahre 1974 eine Tatortregel ohne Ausnahmen vorsah, dazu unten, S. 368f., m. Nachw. und *Miaja de la Muela*, DIP, II, S. 396f. (*Bouza Vidal*).

[55] Morris (*McClean*), Conflict of Laws, S. 356: »may lead to results which shock one's common sense«; *Binchy*, Irish Conflicts of Law, S. 569; *Miaja de la Muela*, DIP, II, S. 397 (*Bouza Vidal*); aus der Anfangsphase der Diskussion *Morris*, 64 Harv.L.Rev. 881 (z.B. 885); *Binder*, RabelsZ 20 (1955), 401; *Bourel*, Conflits de lois, S. 45f.

[56] *Rohe*, Geltungsgründe, S. 236.

wurden Fallkonstellationen angeführt, in denen sich das Delikt über mehrere Länder ausdehnte und der Tatort durchaus nicht ohne Schwierigkeiten zu bestimmen war[57]. Rechtssicherheit bestehe bei der Tatortregel nur, solange der Tatort feststehe oder zumindest feststellbar sei, was bei reinen Vermögensdelikten und manchen Distanzdelikten nicht unbedingt gewährleistet sei.

Ob ein Gleichlauf von Zuständigkeit und anwendbarem Recht erstrebenswert und im Internationalen Deliktsrecht für die Bestimmung des anwendbaren Haftungsrechts wirklich maßgeblich sein kann, ist höchst fraglich. Hielte man ihn für vorteilhaft, ließe er sich am konsequentesten, zuverlässigsten und ehrlichsten statt durch die Tatortregel durch eine grundsätzliche Anwendung der *Lex Fori* erreichen.

Gegen die Argumentation mit den öffentlichen Interessen des Tatortstaates wurde eingewandt, dass der Tatortstaat keinesfalls immer ein Interesse daran haben muss, dass die zivilrechtlichen Folgen eines Deliktes, das sich auf seinem Territorium ereignete, nach seinem Recht beurteilt werden. Ein solches öffentliches Interesse ist – wie in beiden Beispielsfällen gesehen – insbesondere zweifelhaft, wenn eine unerlaubte Handlung zwischen Personen stattfindet, die sich nur kurzfristig im Inland aufhalten.

Ob ein Staat durch die Geltung des eigenen **Haftungs**rechts in Fällen mit Auslandsberührung tatsächlich Verhaltenssteu**erung bewirkt**, wurde in Frage gestellt und für viele Fälle als bloße Fiktion bezeichnet[58].

Schließlich ließe die Tatortregel die materielle Rechtslage, die in den einzelnen Rechtsordnungen herrsche, außer Betracht. Sie sei zwar an kollisionsrechtlicher Gerechtigkeit orientiert, eine »Ergebnisverantwortung« übernehme sie aber nicht[59].

Diese letzte Kritik lässt sich anhand der Beispielsfälle verdeutlichen. In beiden Fällen ist die Haftung nach dem Tatortrecht zu verneinen, obwohl die Schädiger sowohl nach ihrem eigenen als auch dem Heimatrecht des Geschädigten hätten haften müssen:

Wie im **Kapitel** zur *materiellrechtlichen* Ausgangs**position** im europäischen Haftungsrecht gesehen[60], hängt die Haftung für Verkehrsunfallschäden in England

---

[57] *Morris*, 64 Harv.L.Rev. 881 (887f.); Morris (*McClean*), Conflict of Laws, S. 356; *Binchy*, Irish Conflicts of Law, S. 569; *Miaja de la Muela*, DIP, II, S. 397f. (*Bouza Vidal*).

[58] In diesem Sinne *Binchy*, Irish Conflicts of Law, S. 569; differenzierend *Rohe*, Geltungsgründe, S. 224f.; zu der Frage, ob sich durch Haftungsrecht überhaupt Verhaltenssteuerung bewirken lässt, z.B. Esser/*Weyers*, Schuldrecht, II, BT, Teilband 2, § 53 4. b).

[59] *Ch. von Bar*, IPR, II, Rn. 656. Ausgehend von der Kritik, das IPR übernehme mit der Tatortregel keine Ergebnisverantwortung, schlägt von Bar vor, bei Delikten zwischen Personen, die ihren gewöhnlichen Aufenthalt in anderen Ländern als dem Tatortstaat haben, Ersatz nicht *über* das Maß dessen zu gewähren, was nach den Heimatrechten aller Beteiligter geschuldet wäre. Die Fallbeispiele im Text machen deutlich, dass auch daran zu denken ist, nicht *weniger* zu gewähren, als das, was nach den Heimatrechten geschuldet wäre. Mit einer solchen Lösung ließe sich die Einzelfallgerechtigkeit tatsächlich steigern. Allein: Die Rechtslage und die Aufgabe des Richters würden durch einen solchen doppelten Vorbehalt erheblich komplizierter.

[60] Oben, S. 105 ff.

noch immer vom Verschulden ab. Dagegen würde der Halter (in Deutschland auch der Fahrer) in Dänemark und Deutschland, also in den Heimatländern der Beteiligten des ersten Falles, verschuldensunabhängig haften[61]. Im zweiten Fall, in dem es um die Tötung eines Menschen ging, bestünde sowohl nach dem schweizerischem als auch nach dem französischem Heimatrecht der Beteiligten ein Anspruch der Hinterbliebenen wegen ihrer immateriellen Verluste – nicht dagegen nach dem österreichischen Tatortrecht[62].

Von den *materiellrechtlichen* Ergebnissen her gesehen begünstigt die Anwendung des Tatortrechts in beiden Beispielsfällen also den Schädiger und stellt den Geschädigten schlechter, als er nach den Heimatrechten *beider* Beteiligter gestanden hätte.

Hätte sich der zweite Fall (der folgenschwere Freizeitunfall) dagegen in der Schweiz zwischen einem Österreicher und einem Deutschen ereignet, so stünde den Angehörigen bei Beurteilung nach dem schweizerischen Tatortrecht ein »Angehörigenschmerzensgeld« zu, obwohl ein solches weder nach dem deutschem noch dem österreichischem Heimatrecht der Parteien existiert.

In Europa wurden in den vergangenen zwei Jahrhunderten mehrfach Versuche unternommen, grundsätzliche Alternativen zu der Anknüpfung an den Tatort zu entwickeln. Im Hinblick auf immer wieder geäußerte Kritik an der Tatortregel sollen im folgenden Kapitel die Alternativen und die inzwischen reichen Erfahrungen, die mit ihnen in Europa gewonnen wurden, betrachtet werden. Im europäischen Rechtsunterricht hilft der Blick auf die gewonnenen Erfahrungen, den Wert der Anknüpfung an den Tatort im Vergleich mit denkbaren Alternativen zu ermessen.

---

[61] Siehe §101 des *dänischen* Gesetzes von 1986 über den Straßenverkehr (Bekendtgørelse nr. 58 af 17. 2. 1986 af Færdselslov) und für die verschuldensabhängige Haftung des Fahrers §104 Abs. 2; dazu *Nørgaard/Vagner,* Landesbericht Dänemark, in: *Ch. von Bar* (Hg.), Deliktsrecht in Europa, S. 27 ff.; für Deutschland §§7, 18 des Straßenverkehrsgesetzes.
[62] Siehe für die europäische Rechtslage oben, S. 113 ff. m. w. Nachw.

Der BGH und die drei Oberlandesgerichte hielten zunächst jeweils die Maßgeblichkeit der Ubiquitätslösung fest[147]. Als Handlungsort wurde, wie im schweizerischen, italienischen und estnischen IPR, der Sitz des Produzenten angesehen, wo die Ware hergestellt und von wo aus der Vertrieb organisiert worden war[148]. Als Erfolgsorte galten im Fall des fehlerhaften Fahrrades und der defekten Sicherungsklemme die Unfallorte, an denen die Betroffenen ihre Verletzungen erlitten hatten, und im Falle des unwirksamen Schädlingsbekämpfungsmittels der Ort des Einsatzes des Produktes, bei dem dieses versagt hatte und daher das Eigentum des Verwenders geschädigt wurde[149].

Der Fall der gebrochenen Fahrradgabel wurde nach dem Recht des inländischen »Erfolgsortes« beurteilt, nach dem der Anspruch bereits in vollem Umfang begründet war. In den anderen Fällen hatten die Kläger (ausdrücklich oder stillschweigend) für die Geltung des heimatlichen Rechts optiert, was dreimal zur Anwendung der Lex Fori führte und einmal, nämlich im Falle des OLG München – erstmals im deutschen IPR der Produkthaftung – zur Anwendung des ausländischen (hier: italienischen) Haftungsrechts[150].

*dd) Recht des Marktortes*

In den von den deutschen Gerichten entschiedenen Fällen trat die Rechtsgutverletzung im Land des Erwerbes des Produktes ein. Vom *Ergebnis* her betrachtet gelangten sowohl der BGH als auch das OLG Düsseldorf und das OLG Köln in den genannten Fällen daher jeweils auch zum Recht des *Vertriebs-* und *Erwerbsortes.* (Im Falle des OLG München dürfte es sich um einen Distanzkauf gehandelt haben. Auf die sich dort ergebende spezielle Problematik wird an etwas späterer Stelle zurückzukommen sein[151].)

Nach der Rechtsprechung des *österreichischen OGH* sind internationale Produkthaftungsfälle von vornherein nach dem Recht des Marktes zu beurteilen, für den das Produkt bestimmt war und auf dem es der Geschädigte erworben hat.

In der Leitentscheidung hatte ein deutsches Unternehmen Geräte zur Sterilisation von Fruchtsäften (Plattenwär**maustau**scher) produziert. Die Geräte wurden von der für Österreich zuständigen Gener**alvertret**erin an Händler in Österreich geliefert. Dort erwarb eine

---

[147]  *BGH* 17. 3. 1981, IPRax 1982, 13; *OLG Düsseldorf* 28. 4. 1978, NJW 1980, 533 (534); *OLG Köln* 11. 12. 1991, IPRspr. 1992/53 (S. 110); *OLG München* 9. 8. 1995, IPRspr. 1995/38 (S. 67).

[148]  Zum ersten Aspekt der *BGH* und das *OLG Köln*, zu beiden das *OLG München* (alle vorige Fn.).

[149]  *OLG Düsseldorf*, *BGH* und *OLG München* (Nachw. alle soeben). In prozessualem Zusammenhang ebenso *AG Neustadt* 23. 2. 1984, IPRspr. 1984/133: eine fehlerhaft konstruierte Felge verursacht einen Unfall. »Das Gericht geht davon aus, dass als der Erfolgsort [...] der Unfallort anzusehen ist, da sich an diesem Ort [...] der Reifen von der Felge gelöst hat und dadurch der Unfall herbeigeführt wurde, der einen Totalschaden an dem Fahrzeug bewirkte. [...] Der Schadenserfolg [...] wäre nicht bereits mit dem Erwerb des Pkw eingetreten [...]«.

[150]  Hinzu kommen eine Reihe von Produkthaftungsfällen mit Auslandsberührung, bei denen das Kollisionsrecht von den Gerichten übergangen wurde, siehe hierzu *Wandt*, Int. Produkthaftung Rn. 311ff.

[151]  Unten, S. 289f.

österreichische Herstellerin von Fruchtsaft ein solches Gerät. Da es mit Konstruktions- und Produktionsmängeln behaftet war, wurde der Fruchtsaft nicht ordnungsgemäß sterilisiert und die Käuferin erlitt Produktionsausfälle, für die sie von der deutschen Produzentin Ersatz verlangte.

Der *OGH* führte – obiter dictum – zunächst aus, bei einer unmittelbaren vertraglichen Beziehung zwischen Produzent und Käufer seien deliktische Ansprüche akzessorisch an das Vertragsstatut anzuknüpfen[152]. Seien Produzent und Käufer dagegen nur über eine Veräußerungskette miteinander verbunden, wie dies in concreto der Fall war, gelte für die deliktischen Ansprüche das »Recht des Marktes […], für den das Produkt bestimmt war und an dem es erworben wurde.«

Der Marktort wurde dabei nicht als Handlungsort des Produzenten angesehen (in diesem Fall wäre § 48 Abs. 1 S. 1 des österreichischen IPR-Gesetzes einschlägig gewesen). Der OGH gelangte zur Anknüpfung an den Marktort stattdessen über die Ausweichklausel des § 48 Abs. 1 S. 2 des österreichischen IPR-Gesetzes[153].

Auch aus dem *niederländischen* Recht sind Fälle bekannt, die – jedenfalls im Ergebnis – nach dem Recht des Vertriebs- und Erwerbsortes entschieden wurden, so etwa der Fall *Iglo-Ola B. V.* t. *Akzo Chemie GmbH*:

Das niederländische Unternehmen Iglo-Ola B. V. setzte für den Transport seiner Produkte Kühlwagen ein. Diese wurden von einem anderen niederländischen Unternehmen mit einer Kühlflüssigkeit versehen, die es über einen niederländischen Importeur von der Produzentin, der Akzo Chemie GmbH aus Deutschland, bezogen hatte.
Bei einem der Transporte gelangte **Kühlflüssigkeit** in den **Frachtraum** der **Kühlwagen** und kam mit den transportierten Lebensmitteln in Berührung. Die **Waren** wurden dennoch vermarktet und die Konsumenten erlitten starke Übelkeit, einige verstarben sogar. Die Nachfrage nach Iglo-Produkten ging in den Niederlanden daraufhin stark zurück und stieg erst nach umfangreichen Aufklärungs- und Werbekampagnen wieder an.
Das **niederländische Unternehmen Iglo B. V. verlangte von** der deutschen Produzentin der **Kühlflüssigkeit Schadensersatz, da diese nicht vor dem hohen** toxischen Gehalt der Flüssigkeit gewarnt hatte.

Die *Rechtbank Utrecht* und in zweiter Instanz der *Hof Amsterdam* gelangten in Anwendung des **niederländischen** IPR[154] zur Beurteilung nach niederländischem Recht[155]. In den **Niederlanden** war das Produkt vermarktet und von der Vertragspartnerin der Geschädigten erworben worden[156].

---

[152] Dazu ausführlicher unten, S. 397.

[153] *OGH* 29. 10. 1987, IPRE 2/87 (Fall einer »stärkeren Beziehung« im Sinne des § 48 Abs. 1 S. 2 IPRG) = IPRax 1988, 363 (364); so auch die h.M. in Österreich, Rummel/*Schwimann*, § 48 IPRG Rn. 4 m. w. Nachw.

[154] Nach dem Haager Produkthaftungsübereinkommen wäre ebenso zu entscheiden gewesen, Art. 5 lit. b) (Problem: kein Erwerb durch den Geschädigten selbst) oder jedenfalls Art. 4 lit. a) (Ort der Verletzung und Sitz der geschädigten Person in den Niederlanden).

[155] *Rechtbank Utrecht* 8. 4. 1992 und *Hof Amsterdam* 12. 10. 1995, NIPR 1997 Nr. 92 (allerdings mit sehr knappen Ausführungen zum Koordinationsrecht).

[156] Ob dies oder der Umstand, dass auch die Rechtsgutverletzung in den Niederlanden eingetreten war, letztlich ausschlaggebend war, wird von den Gerichten leider nicht mitgeteilt. *Duintjer Tebbens*, NILR 1981, 65, weist in einer Anmerkung zu zwei anderen Entscheidungen darauf hin: »Where liability

Schließlich sprachen sich auch die *englischen* Gerichte für die Maßgeblichkeit des Marktortes aus, auf dem die Produkte jeweils vertrieben und von den Geschädigten bzw. ihnen nahestehenden Personen erworben worden waren – in der ersten Leitentscheidung jedenfalls im Ergebnis, in der zweiten dann auch ausdrücklich. Die Entscheidungen ergingen jeweils im Rahmen der internationalen Zuständigkeit, für die noch englischen Internationalen Zivilprozessrecht maßgeblich war, wo sich das Delikt im Wesentlichen ereignet hatte. (Im IPR galt nach damaliger Rechtslage die »Double Actionability Rule«[157].) Nachdem seit der Neufassung des englischen Internationalen Deliktsrechts durch den Private International Law Act von 1995 wieder die reine Tatortregel gilt, sind die folgenden Entscheidungen mit ihren Überlegungen zur Verortung des Tatortes für die englische Internationale Produkthaftung noch interessanter geworden:

Im Fall *Distillers Co. (Bio-Chemical) Ltd.* v. *Thompson (by her next friend Arthur Leslie Thompson)*[158] hatte ein englisches Chemieunternehmen Beruhigungsmittel hergestellt, die es über eine australische Vertriebsgesellschaft auf dem dortigen Markt verkaufte. In der Packungsbeilage war das Medikament als harmlos, sicher und ohne jegliche Nebeneffekte bezeichnet worden. Tatsächlich waren mit einer Einnahme des Medikamentes während der Schwangerschaft jedoch erhebliche Gefahren verbunden. Eine Frau erwarb das Medikament in Australien, nahm es während der Schwangerschaft ein und brachte ihre Tochter ohne Arme und mit beeinträchtigtem Augenlicht zur Welt. Die Tochter machte wegen ihrer Gesundheitsschäden gegen den englischen Produzenten der Medikamente Ansprüche aus dem Tort »negligence« geltend.

Der *Privy Council* verortete das Delikt in Australien unter dem Gesichtspunkt, dass die erforderliche Warnung dort hätte erteilt werden müssen und sie dort unterblieben war. Die Anknüpfung an die maßgebliche Unterlassung bereitete allerdings Schwierigkeiten, da argumentiert werden konnte, die Warnung hätte in England in die Packungsbeilage aufgenommen werden müssen. Das Gericht behalf sich damit, die Warnung hätte ebensogut durch Mitteilung an die Verkäufer in Australien erfolgen können, worauf sich die Klägerin berufen dürfe[159]. Der Sache nach handelte es sich bereits in dieser Entscheidung um eine Verortung des Deliktes am bestimmungsgemäßen Vertriebsort, an dem das Produkt mit den unzulänglichen Produktinformationen von der Mutter der Geschädigten erworben worden war.

Die zweite englische Leitentscheidung stammt aus dem Jahre 1980 und erging im Fall *(Jayne Susan) Castree* v. *E R Squibb & Sons Ltd. and another*[160]:

Ein deutsches Unternehmen stellte Zentrifugen her, die es in England von einem dort ansässigen Vertriebsunternehmen vertreiben ließ. Als eine englische Abnehmerin eine Zentrifuge in ihrem Unternehmen in England einsetzte, löste sich diese in ihre Bestandteile auf und verletzte eine Arbeitnehmerin. Die verletzte Arbeitnehmerin verlangte von ihrer Arbeitge-

---

arising from imported products is at stake, the foreign origin of the product appears less weightily for choice of law purposes than its destiny, i.e. the country on whose market it was introduced«.

[157] Zu ihr oben, S. 155 ff.

[158] 19.1.1971 [1971] 1 All ER 694 (*PC*).

[159] 1 All ER 694 (700 f.).

[160] 24.4.1980 [1980] 2 All ER 589 (*CA*).

berin Schadensersatz, und diese begehrte wegen eigener Rückgriffsansprüche im Wege einer »third party notice« eine Einbeziehung des deutschen Produzenten in das Verfahren. Im Rahmen der internationalen Zuständigkeit stellte sich wiederum die Frage nach dem Begehungsort der unerlaubten Handlung. Das deutsche Unternehmen berief sich darauf, dass die Zentrifuge in Deutschland entworfen und hergestellt worden und lediglich die Rechtsgutverletzung in England eingetreten sei. Ein Delikt sei – wenn überhaupt – in Deutschland begangen worden.

Der *Court of Appeal* entschied, maßgeblich sei weder der Ort der Herstellung des Produkts, da es sich hierbei um eine unbeachtliche Vorbereitungshandlung handle (»the mere manufacture of the defective machinery is not […] even the beginning of tort«[161]), noch der Eintrittsort der Rechtsgutverletzung, der in Produkthaftungssachen keinen hinreichenden Anknüpfungspunkt schaffe. Als maßgeblich wurde vielmehr angesehen, wo die defekte Zentrifuge auf den Markt gebracht wurde. Die entscheidende Passage im Urteil lautet: »The substantial wrongdoing in this case alleged to have been committed by the appellants is putting on the English market a defective machine with no warning as to its defects.«[162]

Interessant ist auch die Unterscheidung, die das Gericht zwischen diesem Fall und dem Präjudiz aus dem Fall *George Munroe Ltd.* v. *American Cuanamid and Chemical Corporation*[163] traf, in dem ein inländischer (englischer) Tatort verneint worden war. Der entscheidende Unterschied lag nach Ansicht des Gerichts darin, dass das fehlerhafte Produkt in jenem Fall in den USA hergestellt und auch vermarktet worden war, und allein die Rechtsgutverletzung in England eingetreten war. (»Thus everything which the company had done […] had occurred in America.«)[164] Hier dagegen hatte der Produzent sein Erzeugnis über die Vertriebsgesellschaft in England auf den Markt gebracht und damit den entscheidenden Inlandsbezug hergestellt. Damit sprach der Court of Appeal ein deutliches Bekenntnis zur Maßgeblichkeit des Marktortes aus.

Die englische und schottische Law Commission optierte in ihren vorbereitenden Gutachten zum III. Teil des Private International Law Act von 1995 gegen eine spezielle gesetzliche Regelung zum IPR der Produkthaftung. Nach Inkrafttreten dieses Gesetzes gelten dessen allgemeine Regeln also auch für die Produkthaftung. Nach Sect.11 (2) (a) des Gesetzes ist bei Körperverletzungen zwar grundsätzlich der Ort der Rechtsgutverletzung maßgeblich; da der Erwerbsort und der Ort der Rechtsgutverletzung im selben Staat lagen, wären die Fälle *Distillers* v. *Thompson* und *Castree* v. *Squibb* auf der Ebene des IPR heute wie seinerzeit zu entscheiden. Bei einem Auseinanderfallen des Ortes von Vermarktung und Vertrieb und des Ortes der Rechtsgutverletzung dürfte aber auch heute der Marktort den Ausschlag geben. So wird im Werk von *Dicey and Morris* der Fall, dass ein fehlerhaftes Produkt auf einer Urlaubsreise ins Ausland mitgenommen wird und dort Schaden verur-

---

[161] 2 All ER 589 (592).
[162] 2 All ER 589 (592).
[163] [1944] 1 All ER 386.
[164] 2 All ER 589 (591).

sacht, als Fall für die Ausweichklausel in Sect. 12 des PIL Act 1995 genannt[165]. Statt des Ortes der Rechtsgutverletzung wäre wiederum der Absatzort entscheidend.

### ee) Recht am Sitz des Schädigers

Das Recht am Sitz des Schädigers steht bei der *schweizerischen, italienischen* und *estnischen* Ubiquitätslösung zur Wahl des Geschädigten[166]. In keiner Rechtsordnung werden Produkthaftungsansprüche ausschließlich nach diesem Recht beurteilt.

### ff) Gesamtabwägung aller Umstände

Es war ein internationaler Produkthaftungsfall, in dem der *irische Supreme Court* – obiter dictum – die Ansicht entwickelte, die Entscheidung über das anwendbare Haftungsrecht solle im Wege einer Gesamtabwägung aller Umstände des Einzelfalles erfolgen[167]. Da es im konkreten Fall um die Frage der internationalen Zuständigkeit ging und das Gericht insoweit jeden signifikanten Inlandsbezug ausreichen ließ, konnte der Supreme Court die Frage, wie diese Gesamtabwägung bezüglich des anwendbaren Haftungsrechts aussehen könnte, noch offen lassen.

### d) Ansichten der Literatur (Auswahl)[168]

Die Vielzahl der Lösungen des geltenden Rechts wird durch die in der Literatur anzutreffende Meinungsvielfalt noch deutlich übertroffen. So existiert insbesondere in der deutschen Literatur ein von manchen als verwirrend[169], von anderen als chaotisch[170] bezeichnete Vielzahl an Überlegungen und Vorschlägen, die selbst in der an Meinungsvielfalt gewöhnten deutschen Rechtswissenschaft ihresgleichen sucht.

In Übereinstimmung mit der **deutschen Rechtsprechung** und denjenigen Rechtsordnungen, in denen die Materie in IPR-Gesetzen speziell geregelt wurde, befürworten manche Autoren für das IPR der Produkthaftung eine Ubiquitätslö-

---

[165] Dicey and Morris (Gen. ed: *Collins*), Conflict of Laws, Vol. 2, Rn. 35–100; siehe für dieses Beispiel auch schon Lord *Pearson* in *Distillers* v. *Thompson*, 1 All ER 694 (699). Bei einer Rechtsgutverletzung in einem Land, in dem das Produkt vertrieben wurde, bleibt es dagegen bei der Anknüpfung der Sect. 11 (2) (a) PIL Act 1995; siehe hierfür die Beispiele bei Dicey and Morris (Gen. ed.: *Collins*), Rn. 35–089, Fall 5 und 6, wo der Fall der fehlerhaften Zentrifuge (*Castree* v. *Squibb*) – mit englischer Höflichkeit – als solcher einer Lieferung von England nach Deutschland statt – wie im wirklichen Leben – von Deutschland nach England geschildert wird.

[166] Art. 135 Abs. 1 lit. a) des *schweizerischen* und Art. 63 1. Alt. des *italienischen* IPR-Gesetzes sowie § 166 Abs. 2 der *estnischen* Grundsätze.

[167] *Patrick Grehan* v. *Medical Incorporated and Valley Pines Associates,* [1986] ILRM 627 (638) (*SC*); zu diesem Urteil ausführlicher oben, S. 166f.

[168] Siehe zur Systematisierung der literarischen Vielfalt v.a. *Wandt*, Int. Produkthaftung, Rn. 329ff.

[169] *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 298 (303); *Wandt*, Int. Produkthaftung, Rn. 8: »verwirrende Meinungsvielfalt«, Rn. 323: »ausufernde Meinungsvielfalt«.

[170] *Mayer*, DAR 1991, 84 Fn. 39: »chaotisches Bild«.

sung[171]. Es ist in der Literatur allerdings umstritten, welcher der in Betracht kommenden Orte Handlungsort sein soll[172] und ob ein oder mehrere Handlungsorte nebeneinander als maßgeblich anzusehen sind. Die Unsicherheit, die insofern herrscht, ist groß[173]. Den »Erfolgsort« wollen manche im Rahmen einer Ubiquitätslösung berücksichtigen, andere schlagen ihn als ausschließliches Anknüpfungskriterium vor[174]. Unter den Vertretern beider Auffassungen ist streitig, ob der »Erfolgsort« am Ort der Rechtsgutverletzung zu lokalisieren ist[175], oder ob stattdessen der Marktort – bzw. konkreter: der Ort des bestimmungsgemäßen Vertriebes oder der (mit diesem oft identische) Ort des Erwerbes durch den Endabnehmer – maßgeblich sein soll, wie dies nach den geschilderten nationalen IPR-Gesetzen der Fall ist (im Haager Übereinkommen finden, wie gesehen, sowohl der Ort der Rechtsgutverletzung als auch derjenige des Erwerbes Berücksichtigung)[176].

---

[171] So etwa *Maxl*, JBl. 1992, 156 (166): Wahlrecht zwischen Recht des Herstellers und Recht des Marktortes; *Fawcett*, M.L.R. 1985, 439 (446f.); *Prager*, Produkte-Haftpflicht im IPR, S. 306f., 308f.; aus der deutschen Lit. z.B. MünchKomm/*Kreuzer*, Art. 38 EGBGB Rn. 203 m. w. Nachw. in Rn. 201a und Fn. 672; Staudinger/*von Hoffmann*, Art. 38 EGBGB Rn. 460; *Kropholler*, IPR, § 53 VI 3.; *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 298 (337); differenzierend *von Hein*, Günstigkeitsprinzip, S. 413ff., 419ff., 422, der eine Ubiquitätslösung und ein Wahlrecht zwischen den Rechten am ersten Erwerbsort und dem Ort der Rechtsgutverletzung nur für Ansprüche solcher Produktbenutzer empfiehlt, die nicht Ersterwerber sind.

[172] Nachweise jeweils stellvertr.: Ort der Herstellung der Ware (meist neben anderen Handlungsorten): *Kropholler*, IPR, § 53 VI 3.; MünchKomm/*Kreuzer*, Art. 38 Rn. 203; *Maxl*, JBl. 1992, 166; Sitz oder Hauptniederlassung des Herstellers: *Kropholler*, IPR, § 53 VI 3.; Staudinger/*von Hoffmann*, Art. 38 EGBGB Rn. 461f.; *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 298 (329f.); *Schönberger*, Tatortprinzip, S. 73f.; *Prager*, Produkte-Haftpflicht im IPR, S. 308f.; Ort des Inverkehrbringens der Ware: *Posch*, in: *Schwind* (Hg.), Österreichs Weg, S. 262f.; *Maxl*, JBl. 1992, 156 (166); *Kropholler*, IPR, § 53 VI 3.; *Ch. von Bar*, IPR, II, Rn. 666; MünchKomm/*Kreuzer*, Art. 38 Rn. 203; Erwerbsort: z.B. *Kropholler*, IPR, § 53 VI 3.; *Overstake*, Rev. trim dr. civ. 1972, 485 (529); Ort, an dem das Produkt außer Kontrolle gerät oder seinen Dienst versagt: *Ch. v. Bar*, IPR, II, Rn. 666 (Handlungs- und Erfolgsort in einem).

[173] So schon *Wandt*, Int. Produkthaftung, Rn. 621 m. Nachw.

[174] Für die ausschließliche Anknüpfung etwa *Lüderitz*, IPR, Rn. 301; *Taschner/Frietsch*, Produkthaftungsgesetz, Einführung, Rn. 184.

[175] So *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 298 (337).

[176] Für die Anknüpfung an den Markort bzw. den Vertriebs- oder den Erwerbsort etwa *Duintjer Tebbens*, Int'l. Product Liability, 1979, insbes. S. 323ff., 370ff. (Kapitelüberschrift: »The market as central concept«), 381; aufgrund umfangreicher vergleichender Analysen auch *Kozyris*, Am. J. Comp. L. 1990, 475 (501ff.); *Overstake*, Rev. trim dr. civ. 1972, 485 (529); *Ch. von Bar*, IPR, II, Rn. 666 (Vertriebs- und Erwerbsort, zusätzlich zum Verletzungsort); *Kropholler*, IPR, § 53 VI 3.; *Soergel/Lüderitz*, Art. 38 Rn. 62 (Absatzort); Staudinger/*von Hoffmann*, Art. 38 EGBGB Rn. 465f. (Erwerbsort); *von Hoffmann*, § 11 Rn. 49 (Erwerbsort); *Wandt*, Int. Produkthaftung, Rn. 725: »Anknüpfung an den Marktstaat als spezifische Ausformung der allgemeinen Anknüpfung an den Erfolgsort«, Rn. 1231: »Recht des Staates, in dem das schädigende Produkt an den ersten Endabnehmer vermarktet wurde«, gemeint ist jeweils der Erwerbsort; *Siehr*, RIW 1972, 385; *Sack*, FS Ulmer, 1973, S. 500ff. (Vertriebsort); ebenso Palandt/*Heldrich*, Art. 38 Rn. 17; *Wilde*, in: *von Westphalen* (Hg.), Produkthaftungshandbuch, II, § 100 Rn. 11; für die Anknüpfung an den Markort auch die h.M. in Österreich, etwa *Rummel/Schwimann*, § 48 IPRG Rn. 4a m. zahlr. w. Nachw.; siehe aus der schweizerischen Lit. *Trutmann*, IPR der Deliktsobligationen, S. 167ff. (allerdings unter dem Vorbehalt der Vorhersehbarkeit für den Produzenten); im Wesentlichen auch *Stoll*, FS Kegel, 1977, 127ff.; *ders.*, FS Ferid, S. 410.

282                          *7. Kapitel: Differenzierung nach Fallgruppen*

oder geben ihm die Möglichkeit nachzuweisen, dass der Vertrieb am Erwerbsort
ohne sein Einverständnis erfolgte[218]. Greift dieser Vorbehalt ein, wird eine Alterna-
tive für die Anknüpfung erforderlich. Die kollisionsrechtliche Entscheidung wird
hierdurch insgesamt erheblich komplizierter. Obwohl sich jedenfalls zwei der na-
tionalen Gesetzgeber im Grundsatz ablehnend gegenüber einer Ubiquitätslösung
und einem Wahlrecht des Geschädigten verhalten, sahen sie im Produkthaftungs-
recht offenbar keine andere Möglichkeit, als auf eine Ubiquitätslösung zurückzu-
greifen. Der deutsche Rat für IPR sah, wie erwähnt, »angesichts stark divergieren-
der Meinungen« letztendlich ganz von einer besonderen Empfehlung zur Anknüp-
fung der Produkthaftung ab[219].

Die Ursache für all diese Komplikationen liegt in der durch die hohe Mobilität
vieler Produkte bedingten Problematik von »Drittlandkontakten« und der durch sie
ausgelösten Furcht vor »Zufallsergebnissen«.


### b) Ausweg: Beurteilung nach dem Recht des Erwerbsortes

Der Ausweg aus den Komplikationen könnte darin liegen, der Neigung zur An-
knüpfung an den Marktort zu folgen, die sich bei der europäischen Bestandsauf-
nahme gezeigt hat und die auch in der Literatur vorherrscht, und die Bedenken
aufzugeben, die gegen diese Anknüpfung als *alleiniger* Lösung derzeit noch beste-
hen. Unter dem Erwerbsort ist derjenige Ort zu verstehen, an dem das Produkt im
gewerblichen Handel durch den ersten Endabnehmer erworben wurde[220].

Die Anknüpfung an den Erwerbsstaat weist eine ganze Reihe von Vorzügen auf,
so dass ihre weite europäische Verbreitung nicht verwundert:

Für den *Produzenten* schafft die Anknüpfung an den Erwerbsort Rechtssicher-
heit[221], und das Problem der Vorhersehbarkeit des anwendbaren Rechts ist bei die-
ser Lösung deutlich entschärft: Der Hersteller weiß bei dieser Lösung oft frühzeitig
und schon bei Planung, Produktion und Vertrieb der Ware, auf welches Haftungs-
recht (oder welche Haftungsrechte) er sich einzustellen hat[222]. Anders als bei der
Anknüpfung an den Ort der Rechtsgutverletzung ist bei Maßgeblichkeit des Er-
werbsortes ausgeschlossen, dass der Produzent nach dem Recht eines Staates haftet,
in dem das Produkt überhaupt nicht im Handel war und an den es lediglich von ei-
nem Erwerber oder Besitzer mitgenommen wurde.

Am Erwerbsort setzt der Abnehmer seine Rechtsgüter in der Regel erstmals der
Gefahr einer Schädigung durch das Produkt aus. Der Erwerbsort ist damit gleichsam

---

aller Regel nur solche Rechte, die für den Produzenten vorhersehbar sind, vgl. schon *Wandt*, Int. Pro-
dukthaftung, Rn. 564 und Fn. 12.

[218]  Siehe Art. 7 des Haager Übereinkommens und Art. 135 lit.b) des *schweizerischen*, Art. 63 des *italie-
nischen* und Art. 114 lit.b des *rumänischen* IPR-Gesetzes.

[219]  *von Caemmerer*, in: Vorschläge und Gutachten, S. 22; siehe auch *Lorenz*, IPRax 1988, 373 (374).

[220]  Dies kann auch ein gewerblicher Endabnehmer sein, der das Produkt weiterverarbeitet und hier-
bei Schaden erleidet, vgl. *Duintjer Tebbens*, Int'l. Product Liability, S. 375.

[221]  Vergleiche nur *Saravalle*, Responsabilità del produttore e dip, S. 217; zu den Grenzen sogleich, e).

[222]  Zum entsprechenden Interesse des Herstellers etwa *Fawcett*, Rec. des Cours, Vol. 238 (1993-I),
S. 9 (123f.).

vorverlagerter »Erfolgsort«[223]. Wo sich die Gefahr schließlich realisiert, kann vom Hersteller nicht mehr beeinflusst werden und ist aus seiner Sicht zufällig[224]. Die Anknüpfung an den Erwerbsort ist dagegen weitgehend frei von Zufälligkeiten. Dort wurde die Ware auf dem Markt angeboten, dort kam es zum Kauf. Hersteller, deren Produkte im Ausland vertrieben werden, müssen damit rechnen, dass es dort zu Schäden kommen kann und dass der Geschädigte die Beurteilung nach dem dort geltenden Recht erwartet; gleiches gilt für die Versicherer des Herstellers[225].

Die Anknüpfung an den Erwerbsort besitzt für den Produzenten weitere Vorzüge: Indem diese Lösung Konkurrenten verwehrt, sich gegenüber den Geschädigten auf die eventuell günstigeren Produkthaftungsstandards ihres Heimatlandes zu berufen, vermeidet sie diejenigen Wettbewerbsverzerrungen, die mit dem Herkunftslandprinzip verbunden sein können, und trägt insofern zur Wettbewerbsgleichheit mit anderen Anbietern auf demselben Markt bei. Die Nachteile im Wettbewerb, die mit dem Erwerbslandprinzip verbunden sind[226], sind vergleichsweise gering, so dass dieses Prinzip den Handel im Vergleich mit den denkbaren Alternativen weitestmöglich schont[227].

Unter dem Gesichtspunkt der Rechtssicherheit und Vorhersehbarkeit des anwendbaren Rechts noch günstiger wäre für den Produzenten zwar eine Lösung, die statt an den tatsächlichen Ort des *Erwerbes* an denjenigen Ort anknüpft, an dem der Hersteller das Produkt selbst angeboten oder über Vertragspartner hat vertreiben lassen (*Vertriebsort*). Die Anknüpfung an den Ort des **Vertriebes** durch den Hersteller und seine Vertriebsorganisationen hat gegenüber der **Anknüpfung** an den Erwerbsort aber entscheidende Nachteile:

Fallen Vertriebs- und Erwerbsort auseinander, so ist bei in mehreren Ländern vertriebenen Produkten fraglich, welcher der Vertriebsorte maßgeblich sein soll. Gerade in komplizierteren Konstellationen weist die Anknüpfung an den Vertriebsort somit Schwächen auf und werden wiederum Hilfsanknüpfungen erforderlich.

Der irische Fall *Patrick Grehan* v. *Medical Incorporated and Valley Pines Associates*[228] macht zudem deutlich, dass der Vertriebsort erst bei Kenntnis der Abreden zwischen Hersteller und Händlern zu bestimmen ist. Sollten die Händler die Herzklappen in diesem Fall nur in den USA vertreiben, so lag der »Vertriebsort« allein dort. Waren die Händler dagegen zu einem weltweiten Vertrieb autorisiert, so war jeder Ort des Erwerbes zugleich Vertriebsort. Diese Abhängigkeit des anwendbaren Rechts von internen Vereinbarungen zwischen dem Produzenten und seinen Vertragspartnern schafft Unsicherheit, die mit dem Bedürfnis nach einer

---

[223] So *von Hoffmann*, IPR, §11 Rn. 31.

[224] *Duintjer Tebbens*, Int'l. Product Liability, S. 374; *Saravalle*, Responsabilità del produttore e DIP, S. 216; Staudinger/*von Hoffmann*, Art. 38 Rn. 465.

[225] *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 301.

[226] Zu ihnen oben, I.f).

[227] Ähnlich schon *W.-H. Roth*, RabelsZ 55 (1991), 623 (668); für dieses Ergebnis daher z.B. auch *Duintjer Tebbens*, NILR 1997, 442 (444); *Wandt*, Int. Produkthaftung, z.B. Rn. 734, Rn. 1043ff.; zur Anknüpfung an den Marktort und zum Aspekt der Wettbewerbsgleichheit auch schon *Sack*, FS Ulmer, S. 500ff.; *Siehr*, RIW 1972, 385; Staudinger/*von Hoffmann*, Art. 38 Rn. 465; zur Europarechtskonformität dieser Lösung ausführlich *Höpping*, Auswirkungen der Warenverkehrsfreiheit, S. 156ff. – Gegen die Berücksichtigung des Aspekts der Wettbewerbsgleichheit, weil es im Produkthaftungsrecht um den Schutz des Publikums, nicht die Chancengleichheit der Wettbewerber ginge, *Winkelmann*, Produkthaftung, S. 224.

[228] [1986] ILRM 627, Sachverhalt oben, S. 166.

klaren Anknüpfung im Internationalen Produkthaftungsrecht unvereinbar ist. Statt des Vertriebsortes muss also der Ort des tatsächlichen Erwerbs im gewerblichen Handel maßgeblich sein.

Auch den Interessen und berechtigten Erwartungen des *Erwerbers* wird diese Lösung gerecht: In aller Regel erwirbt der Endabnehmer das Produkt in dem Staat, in dem er seinen gewöhnlichen Aufenthalt hat[229]. Die Geltung des Rechts am Erwerbsort führt dann zur Maßgeblichkeit desjenigen Rechts, das dem Erwerber am vertrautesten ist oder über das er sich jedenfalls am einfachsten und kostengünstigsten Auskunft verschaffen kann. Rechtsirrtümer und andere Nachteile der Geltung ausländischen Rechts (etwa das Versäumen von Verjährungsfristen eines ausländischen Haftungsrechts, welche die europäischen Gerichte im IPR so oft beschäftigen[230]) lassen sich so vermeiden. Die Haftungsfolgen werden bei dieser Lösung also oft nach demjenigen Recht zu bemessen sein, das in der Lebensumwelt des Geschädigten gilt. Indem diese Anknüpfung Verbrauchern die Geltung des Rechts des Erwerbsortes garantiert und sie Herstellern die Berufung auf ein günstigeres Recht ihres Heimatlandes verwehrt, trägt sie zum Verbraucherschutz bei, ohne Produzenten über Gebühr zu belasten.

Erwirbt der Abnehmer das Produkt dagegen im Geltungsbereich einer anderen als seiner heimischen Rechtsordnung, so rechnet er damit, dass der Produzent – wie allen anderen Erwerbern so auch ihm – nach den Standards dieser Rechtsordnung haftet, wenn sich das Produkt als schadensträchtig erweist[231]. Die Anknüpfung an den Erwerbsort entspricht dieser Erwartung und bedeutet auch für den Erwerber Rechtssicherheit. Nimmt der Erwerber das Produkt vom Erwerbsort in ein Drittland (oder auch sein Heimatland) mit, schafft er also selbst einen weiteren Auslandskontakt, so ist dagegen nicht ersichtlich, weshalb der Produzent nach dem Recht dieses weiteren Landes haften und der Erwerber ein entsprechendes berechtigtes Vertrauen besitzen soll[232].

Die Geltung des Rechts des »Erfolgs« statt des Erwerbsortes wäre aufgrund der leichten Beweglichkeit vieler Produkte auch für den Erwerber mit Misslichkeiten verbunden, jedenfalls dann, wenn er das Produkt in ein Land mit niedrigeren Haftungsstandards (etwa ein Urlaubsland) mitnimmt und er dort durch das Produkt Schaden an seiner Person oder seinem Eigentum erleidet.

Ein hoher Produkthaftungsstandard ist nicht kostenlos zu erhalten. Schärfere Haftungsstandards führen zu höheren Kosten für den Hersteller, zu entsprechend höheren Versicherungsprämien und letztlich auch zu höheren Produktpreisen. Er-

---

[229] Siehe die oben angeführten Beispiele aus der europäischen Rspr.; aus der Lit. stellvertr. *Kropholler*, IPR, § 53 VI 3.

[230] Vergleiche oben, S. 117 ff. m. zahlreichen Bsp. und Nachw.

[231] *Fawcett*, Rec. des Cours, Vol. 238 (1993-I), S. 9 (122); Staudinger/*von Hoffmann*, Art. 38 Rn. 465; gegen die Fiktion, der Erwerber eines Produktes aus einem bestimmten Land (»Made in France«) vertraue auf die Geltung der im Herkunfisland geltenden Haftungsstandards, was eine entsprechende Anknüpfung erforderlich mache, überzeugend z.B. *Höpping*, Auswirkungen der Warenverkehrsfreiheit, S. 175 ff.

[232] So z.B. schon *Duintjer Tebbens*, Int'l. Product Liability, S. 377.

wirbt der Abnehmer das Produkt in einem Land mit niedrigen Haftungsstandards (und entsprechend niedrigeren Preisen) und erleidet er in einem anderen Land mit höheren Haftungsstandards einen Schaden, so würde er bei Geltung der dortigen Haftungsstandards gegenüber den anderen Erwerbern einen Vorteil erlangen, für den er keinen entsprechenden Preis entrichtet hat. Reichen die Produkthaftungsstandards am »Erfolgsort« dagegen weniger weit, so entgeht im bei Geltung des dortigen Rechts ein Vorteil, für den er einen Preis gezahlt hat[233].

Die Beurteilung des Falles nach dem Haftungsrecht am Erwerbsort ist Schädiger wie Geschädigtem also gleichermaßen zumutbar[234], sie wird von beiden Seiten – wie sich gezeigt hat: mit guten Gründen – erwartet, und sie wird kaum einmal als ungerecht oder unfair angesehen[235].

Der *Marktortstaat* schließlich hat ein beachtliches Interesse daran, die Sicherheit der auf seinem Territorium in den Verkehr gebrachten Produkte zu regeln. Ausdruck findet dieses Interesse darin, dass das öffentliche Produktsicherheitsrecht für alle auf dem Territorium des Marktstaates in Verkehr gebrachten Produkte gilt, unabhängig von ihrem Herkunftsland (ein Grundsatz, der durch das Herkunftslandprinzip innerhalb der EU nun zwar eine wichtige Ausnahme erfahren hat, die aber von einer Grundangleichung der nationalen Rechte begleitet war und durch diese erst möglich wurde). Ein Grund für die Regelungskompetenz des Marktstaates liegt darin, dass die erforderliche Produktsicherheit von den Gegebenheiten des einzelnen Marktes abhängt und vom Gesetzgeber des Marktstaates am besten beurteilt werden kann. Ein anderer Grund kann darin liegen, dass der einzelne Gesetzgeber die im Inland ansässige Bevölkerung möglichst effektiv vor Produktgefahren schützen will und ihm dies kaum verwehrt werden kann. (Verbindliche Sicherheitsanforderungen des Herstellungslandes für Produkte, die für den Export vorgesehen sind, sind dagegen äußerst selten[236].) Die Sicherheit von Produkten wird aber nicht allein durch das öffentliche Produktsicherheitsrecht, sondern – über dessen präventive Wirkung – auch durch das private Haftungsrecht bestimmt. Nur durch die Geltung des Rechts des Erwerbslandes wird für alle Erwerbsgeschäfte auf dem Territorium des Marktstaates sichergestellt, dass für alle Anbieter die von dem materiellen Recht des Marktortstaates ausgehenden Verhaltensgebote und für alle Erwerber die hiervon ausgehenden Schutz- und Versorgungsstandards maßgeblich sind. Allein die Beurteilung nach dem Haftungsrecht des Marktstaates verwirklicht die Verhalten steuernde Funktion des dort geltenden materiellen Produkthaftungsrechts optimal. (Das Internationale Produkthaftungsrecht widerlegt so eindrucksvoll die These, die Verhalten steuernde Funktion des Haftungsrechts gebiete die Beurteilung nach dem Recht an der Verhaltenszentrale des Schädigers[237]).

---

[233] Zu diesem Aspekt schon *von Hein*, Günstigkeitsprinzip, S. 404 f.

[234] Sie ist insofern »neutral«, vgl. *Saravalle*, Responsabilità del produttore e DIP, S. 217.

[235] Vergleiche die Ergebnisse der Untersuchung von *Drobnig*, in: *von Caemmerer* (Hg.), Vorschläge und Gutachten, S. 301.

[236] Ausführlich *Wandt*, Int. Produkthaftung, Rn. 648 ff. mit Beispielen aus dem deutschen Recht.

[237] Gegen diese These schon oben, S. 219 ff. und – für das Int. Produkthaftungsrecht – *Wandt*, Int. Produkthaftung, Rn. 716 ff.

286                            7 *Kapitel: Differenzierung nach Fallgruppen*

Es spricht somit alles für eine Beurteilung nach dem Recht des Marktortes, konkretisiert auf den Erwerbsort im gewerblichen Handel[238].

c)  Kein Ausweg: Herkunftslandprinzip und (europarechtswidrige) Ubiquitätslösungen

*aa)  Herkunftslandprinzip*

Das Herkunftslandprinzip stellt für das IPR zwar ebenfalls eine europarechtskonforme Lösung dar[239] und kann für den Produzenten mit gewissen Erleichterungen verbunden sein[240]. Es kann für ihn aber auch eine Belastung bedeuten, wenn nämlich die Heimatrechte einzelner Konkurrenten schwächere Haftungsstandards vorsehen und diese sich auf diese schwächeren Standards berufen können[241] oder wenn ihm das Recht seines Herkunftslandes zwar günstiger ist, die Verbraucher den Umstand, dass er als ausländischer Hersteller in geringerem Umfang haftet, bei ihrer Kaufentscheidung aber zu seinen Lasten berücksichtigen[242].

Im geltenden IPR Europas herrscht für die Anknüpfung der Distanzdelikte zwar eine beachtliche Vielfalt an Lösungen. Nirgendwo werden (oder wurden in der Vergangenheit) Distanzdelikte aber ausschließlich an das Herkunftsland des Schädigers angeknüpft – und dies in Hinblick auf die Interessen des Geschädigten mit guten Gründen. Im geltenden IPR der Produkthaftung ist das Herkunftsland des Schädigers nur vereinzelt maßgeblich und dann nur entweder in Verbindung mit einem anderen Anknüpfungspunkt (so im Haager Übereinkommen), oder es steht für den Geschädigten ein weiteres Recht zur Wahl (so im *schweizerischen* und im *italienischem* IPR-Gesetz). Das Herkunftslandprinzip, das dem Produzenten die Möglichkeit eröffnet, sich gegebenenfalls auf die milderen Haftungsstandards seines Herkunftslandes zu berufen, stellt für die Anknüpfung im IPR keine wirkliche Alternative und Perspektive dar[243].

*bb)  Ubiquitätslösungen*

Im Hinblick auf das in Europa bereits geltende IPR der Produkthaftung scheint die Alternative zu einer Anknüpfung an das Recht des Marktortes in erster Linie in Ubiquitätslösungen zu liegen, die dem Geschädigten die Wahl zwischen dem

---

[238] So auch *Wandt*, Int. Produkthaftung, Rn. 712ff.; – kritisch dagegen *W. Lorenz*, RabelsZ 57 (1993), 175 (198) unter Hinweis auf die Beratungen zum Haager Übereinkommen.

[239] Dazu etwa *Höpping*, Auswirkungen der Warenverkehrsfreiheit, S. 103f.

[240] Aus Sicht des Herstellers spricht *für* diese Anknüpfung, dass ein ihm vertrautes Recht zur Anwendung gelangt, ihm die Kosten der Ermittlung verschiedener Rechte erspart bleiben, das Risiko eines Rechtsirrtums minimiert würde, sowie, dass er in allen Fällen mit der Beurteilung nach dem selben Recht rechnen dürfte, siehe zu diesen Aspekten *Höpping*, Auswirkungen der Warenverkehrsfreiheit, S. 148f. und 112ff.

[241] Vergleiche schon *W.-H. Roth*, RabelsZ 55 (1991), 623 (669).

[242] *von Hein*, Günstigkeitsprinzip, S. 432, spricht dann von einem »Pyrrhussieg des Herstellers«.

[243] Ebenso *von Hein*, Günstigkeitsprinzip, S. 432.

Recht am (wiederum stark konkretisierungsbedürftigen) »Handlungsort« und dem Recht am (wie auch immer zu konkretisierenden) »Erfolgsort« eröffnen[244].

Sowohl die Anknüpfung an den »Erfolgs-« als auch diejenige an den »Handlungsort« weisen bei der Produkthaftung jedoch Schwächen auf:

Gegen die Anknüpfung an den *Handlungsort* sind alle Bedenken zu erheben, die generell gegen die Geltung des Rechts am Handlungsort sprechen[245]. Die Anknüpfung an den »*Erfolgsort*« ist der Anknüpfung an den Marktort aus den genannten Gründen unterlegen und wird im geltenden Recht daher nahezu überall relativiert oder gleich durch eine Anknüpfung an den Marktort ersetzt. Handlungs- und »Erfolgsort« taugen für die Anknüpfung im Internationalen Produkthaftungsrecht, wie dargelegt, nur dann, wenn sie jeweils auf den Erwerbsort konkretisiert werden, was in manchen Fallkonstellationen nicht ohne Künstlichkeit möglich ist. Stattdessen sollte gleich an den Erwerbsort angeknüpft werden.

Gegen die ubiquitäre Anknüpfung im Internationalen Produkthaftungsrecht sprechen zudem diejenigen Argumente, die schon im Allgemeinen gegen eine alternative Anknüpfung und die Geltung des strengeren unter mehreren in Betracht kommenden Rechten angeführt wurden[246].

Wenn für die Ubiquitätslösung im Internationalen Produkthaftungsrecht zuweilen angeführt wird, die kollisionsrechtliche Begünstigung des Geschädigten entspreche einer international verbreiteten Begünstigungstendenz im materiellen Produkthaftungsrecht, so ist dies nicht überzeugende Begründung, sondern vage bleibende Reaktion auf die allgemein herrschende Verlegenheit bei der Begründung der Ubiquitätslösung. Im materiellen Recht haben die Regeln der Produkthaftung nicht die Begünstigung des Geschädigten zum Ziel, sondern stellen einen oft schwierigen Kompromiss zwischen den verschiedenen, gegenläufigen Interessen der Beteiligten dar[247].

Ubiquitätslösungen benachteiligen den Produzenten durch die Geltung des strengsten unter mehreren Rechten, ohne dass dies durch die Interessen des Geschädigten oder sonstige Interessen geboten ist. Wie gesehen, wird dem durch ein Produkt Geschädigten die Beurteilung nach dem Recht des Erwerbsortes vollauf gerecht; er hat in aller Regel kein legitimes Interesse an der (alternativen) Anwendung eines anderen Rechts.

Ubiquitätslösungen können den ausländischen Hersteller zwingen, bereits in seine Entscheidung für die Herstellung oder den Export von Waren die Standards mehrerer Rechte einzubeziehen (in der Regel diejenigen an seinem Sitz sowie, kumulativ, diejenigen der potentiellen Absatzmärkte oder möglicher »Erfolgsorte«).

---

[244] Im Rahmen der aktuellen Diskussion über die Auswirkungen der Warenverkehrsfreiheit auf das IPR hat der Vorschlag von Ubiquitätslösungen eine neue Blüte erlebt – allerdings nicht zugunsten des Geschädigten, sondern zugunsten des ausländischen Produzenten. Siehe v.a. *Basedow*, RabelsZ 59 (1995), 1 (49ff.) und näher unten, c), m. w. Nachw.

[245] Oben, S. 214ff., 216ff.

[246] Siehe schon oben, S. 228ff. Zur Rechtsunsicherheit, die mit alternativen Anknüpfungen verbunden ist, speziell für die Produkthaftung stellvertr. *Duintjer Tebbens*, Int'l. Product Liability, S. 367.

[247] Siehe schon *Duintjer Tebbens*, Int'l. Product Liability, S. 364f.