# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ESTADOS UNIDOS MEXICANOS, | |
| Plaintiff, | |
| v. | C.A. NO.: 1:21-cv-11269-FDS |
| SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS MANUFACTURING, INC.; BERETTA U.S.A. CORP; BERETTA HOLDINGS S.P.A.; CENTURY INTERNATIONAL ARMS, INC.; COLT'S MANUFACTURING COMPANY LLC; GLOCK, INC.; GLOCK GES.M.B.H; STURM RUGER & CO., INC.; WITMER PUBPLIC SAFETY GROUP, INC. D/B/A INTERSATE ARMS, | **LEAVE TO FILE GRANTED ON FEBRUARY 3, 2022** |
| Defendants. | |

## BRIEF OF GUN VIOLENCE PREVENTION GROUPS

## AS *AMICI CURIAE* IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO

## DISMISS (D.E. #66)

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

INTEREST OF *AMICI* ..................................................................................................... 2

BACKGROUND ................................................................................................................ 5

ARGUMENT ...................................................................................................................... 9

   I.   Public Nuisance Provides a Flexible Cause of Action to Redress Public Harms. ............. 10

      A.   Courts Apply Public Nuisance to a Variety of Harms, Including Harms Caused by Otherwise Lawful Activity. .......................................................................................... 10

      B.   Massachusetts Public Nuisance Law Proves Similarly Flexible. .................................. 13

   II.   Mexico's Public Nuisance Allegations Overcome a Motion to Dismiss. ........................... 14

   III.  Mexico's Alleged Harms Are Not Too Attenuated. ......................................................... 17

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Att'y Gen. v. Baldwin*,
   361 Mass. 199 (1972) ........................................................................................... 14

*Cheatham v. Shearon*,
   31 Tenn. 213 (1851)............................................................................................... 19

*City of Boston v. Purdue Pharma, L.P.*,
   Nos. 144254, 1884CV02860, 1984CV01733, 2020 WL 977056 (Mass. Sup. Ct. Jan. 29, 2020)
   ................................................................................................................. passim

*City of Boston v. Smith & Wesson Corp.*,
   No. 199902590, 2000 WL 1473568 (Mass. Super. Ct. July 13, 2000)............................ passim

*City of Cincinnati v. Beretta U.S.A. Corp*,
   95 Ohio St. 3d 416 (2002) .................................................................................... 17

*City of Gary ex rel. King v. Smith & Wesson Corp.*,
   801 N.E.2d 1222 (Ind. 2003) ...................................................................... 12, 17, 20

*Commw. v. Kidder*,
   107 Mass. 188 (1871) ........................................................................................... 18

*Commw. v. Purdue Pharma, L.P.*,
   No. 1884CV01808BLS2, 2019 WL 5495866................................................................ 12, 13

*Connerty v. Metro. Dist. Comm'n*,
   398 Mass. 140 (1986) ...................................................................................... 13, 14

*Copithorne v. Framingham Union Hosp.*,
   401 Mass. 860 (1988) ........................................................................................... 20

*Dist. of Columbia* v. *Heller*,
   554 U.S. 570 (2008)............................................................................................... 4

*French v. Connecticut River Lumber Co.*,
   145 Mass. 261 (1887) ........................................................................................... 13

*Georgia v. Tennessee Copper Co.*,
   206 U.S. 230 (1907)......................................................................................... 11, 14

*Hub Theaters, Inc. v. Mass. Port Auth.*,
   370 Mass. 153 (1976) ........................................................................................... 14

*In re MTBE Prod. Liab. Litig.*,
    175 F. Supp. 2d 593 (S.D.N.Y. 2001) ............................................................ 18

*In re Nat'l Prescription Opiate Litig.*,
    MDL No. 2804, 2021 WL 4952468 (N.D. Ohio Oct. 25, 2021) ........................... 12

*Jacobellis v. Ohio*,
    378 U.S. 184 (1964) .......................................................................................... 15

*Jean W. v. Commonwealth*,
    414 Mass. 496 (1993) ........................................................................................ 13

*Jones v. Becerra*,
    No. 20-56174 (9th Cir. filed Jan. 26, 2021) ........................................................ 3

*Jupin v. Kask*,
    447 Mass. 141 (2006) ........................................................................................ 16

*Liber v. Flor*,
    415 P.2d 332 (Colo. 1966) ................................................................................ 19

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ............................................................................................ 4

*Michigan v. U.S. Army Corps of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) ...................................................................... 12, 13

*Missouri v. Illinois*,
    180 U.S. 208 (1901) .......................................................................................... 11

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    (No. 20-843, argued Nov. 3, 2021) ................................................................. 3, 4

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
    515 F.3d 344 (4th Cir. 2008) ............................................................................ 11

*North Dakota v. United States*,
    480 F. Supp. 3d 917 (D.N.D. 2020) ................................................................... 20

*Northridge Co. v. W.R. Grace & Co.*,
    205 Wis. 2d 267 (Wis. App. 1996) .................................................................... 12

*People ex rel. Gallo v. Acuna*,
    14 Cal. 4th 1090 (1997) .................................................................................... 15

*Planned Parenthood League of Massachusetts, Inc. v. Bell*,
    424 Mass. 573 (1997) ................................................................ 13

*State ex rel. Hunter v. Johnson & Johnson*,
    499 P.3d 719 (Okla. 2021) .......................................................... 12

*Stop & Shop Companies, Inc. v. Fisher*,
    387 Mass. 889 (1983) ................................................................ 13

*Strachan v. Beacon Oil Co.*,
    251 Mass. 479 (1925) ................................................................ 14

*Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct.*,
    448 Mass. 15 (2006) .................................................................. 14

*United States v. Carranza*,
    No. 2:10-CR-0532-RLH-GWF, 2011 WL 4007579 (D. Nev. Aug. 5, 2011) ........... 9

*United States v. Soto*,
    No. 6:18-cr-00145-1 (S.D. Tex.) (Dec. 5, 2018) .................................... 9

*Wesson v. Washburn Iron Co.*,
    95 Mass. 95 (1866) ................................................................... 14


**Other Authorities**

Atlantic Firearms LLC,
    *Century WASR-10 Black Widow* ...................................................... 7

Bureau of Alcohol, Tobacco, Firearms and Explosives,
    *Press Release: Government of Mexico Firearms Trace Data* (Mar. 12, 2012) ......... 8

Bureau of Alcohol, Tobacco, Firearms and Explosives,
    *Firearms Trace Data: Mexico 2015–2020,*
    (Mar. 10, 2021) .................................................................... 5, 6

Woodfin L. Butte,
    *Strict Liability in Mexico*, (1970) ................................................ 10

Dan B. Dobbs,
    *The Law of Torts* § 467 (2000) ..................................................... 10

Everytown for Gun Safety,
    *Mass Shootings in America* ....................................................... 8, 9

Keegan Hamilton,
*Mexican Cartels Are Arming Themselves to the Teeth With Powerful US Sniper Rifles*, Vice
News (Aug. 20, 2020) ................................................................................................................ 7

Interpol,
*Indicators of Firearm Trafficking* (2019) ................................................................................ 7

Page Keeton, *et al.*,
*Prosser & Keeton on Torts* § 90, at 643–45 (5th ed. 1984) .................................................... 11

Statement of Tom Diaz, Senior Policy Analyst, Violence Policy Center,
*Money, Guns, and Drugs: Are U.S. Inputs Fueling Violence on the U.S.-Mexico Border?*,
Hearing before the Subcomm. on National Security and Foreign Affairs of the Comm. on
Oversight and Government Reform, 111th Cong. (Mar. 12, 2009) ........................................... 9

Topher McDougal, et al.,
*The Way of the Gun: Estimating Firearms Traffic Across the U.S.-Mexico Border* (March
2013) ......................................................................................................................................... 6

U.S. Dep't of Justice, Office of the Inspector General, *Review of ATF's Project Gunrunner*,
No. I-2011-001 (Nov. 2010) ..................................................................................................... 5

U.S. Gov't Accountability Office,
*Firearms Trafficking: U.S. Efforts to Disrupt Gun Smuggling into Mexico Would Benefit From
Additional Data and Analysis*, GAO-21-322 (Feb. 2021) ........................................................ 6

Violence Policy Center,
*50 Caliber Anti-Armor Sniper Rifles* ........................................................................................ 6

Violence Policy Center,
*Cross-Border Gun Trafficking* (updated 12/09/2021) ............................................................. 7

Violence Policy Center,
*The Glock Pistol: A Favorite of Mass Shooters* (Nov. 2018) ................................................... 8

Violence Policy Center,
*Understanding the Smith & Wesson M&P15 Semiautomatic Assault Rifle* (Feb. 2018)............ 8

William L. Prosser,
*Private Action for Public Nuisance* (1966) .............................................................................. 11

**Statutes**

Mass. Gen. Laws ch. 243 ............................................................................................................. 14

# INTRODUCTION

Defendants—a group of gun manufacturers and a Boston-area gun wholesaler—seek to frame this case as a "clash of national values." MTD Mem. (D.E. #67) at 3. They argue that Plaintiff Estados Unidos Mexicanos ("Mexico" or the "Government") "threaten[s] America's constitutional freedoms" and has attacked the "right to bear arms." *Id.* But they make no mention of our shared values: respect for human life and a desire to live free from gun violence. Defendants threaten these shared values by designing, marketing, and selling their guns in a way that channels them to drug cartels in Mexico.

One of Defendants' main arguments in their Joint Motion is that public nuisance does not apply to their activities. These arguments misstate the law of public nuisance in several significant ways. *Amici* will therefore focus this brief exclusively on public nuisance. Public nuisance provides a remedy to address any substantial and unreasonable interference with a right common to the public, usually affecting the public health, safety, peace, comfort, or convenience. Restatement (Second) Torts § 821B (1979). For centuries, sovereign entities and private plaintiffs have used public nuisance to address an array of public harms. Those harms have included hogpens, fireworks, bad odors, noxious smoke, opioids, the spread of invasive species, and even the rising seas created by climate change. Courts have applied public nuisance to otherwise lawful activity. They have also applied public nuisance to action that creates the opportunity for third parties to commit public harms, even if the third parties' acts are intentional or criminal.

Mexico has alleged that Defendants design, market, distribute, and sell their guns in ways that create a public nuisance. Like noxious smoke cast skyward by a smokestack or excessive amounts of prescription opiates funneled through corrupt pain management clinics, Defendants' unscrupulous sales and distribution practices have channeled their military-style firearms across the U.S.-Mexico border where cartels use those weapons to wreak havoc on the public. Defendants

1

pursue a "head-in-the-sand" strategy. After all, they argue, their U.S. sales comply with federal and state licensing laws. Mexico has alleged that Defendants have violated numerous state and federal statutes. Even if the Court finds that Defendants otherwise follow the law, they can still be held responsible for the effects of otherwise lawful commerce using public nuisance. Defendants are not immune from the foreseeable, and foreseen, downstream repercussions of their actions.

Public or common nuisance is a flexible doctrine meant to protect the public from a wide set of harms. It is certainly capacious enough to recognize the increasing militarization of the U.S. firearms industry and the industry's intentional—and profitable—disregard for the flood of guns from the United States to Mexico. Contrary to Defendants' arguments, Massachusetts courts recognize public nuisance liability in such situations. *See City of Boston v. Smith & Wesson Corp.* ("*Smith & Wesson*"), No. 199902590, 2000 WL 1473568, at *14 (Mass. Super. Ct. July 13, 2000) (denying a motion to dismiss public nuisance claim against gun manufacturers); *see also City of Boston v. Purdue Pharma, L.P.*, Nos. 144254, 1884CV02860, 1984CV01733, 2020 WL 977056, at *5 (Mass. Super. Ct. Jan. 29, 2020) (adopting the reasoning of *Smith & Wesson*). This case represents an appropriate use of public nuisance and *amici* believe the Court should reject Defendants' arguments to the contrary.

## INTEREST OF *AMICI*

*Everytown for Gun Safety* ("Everytown") is the nation's largest gun violence prevention organization, with over eight million supporters. It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed in the wake of the murder of twenty children and six adults in an elementary school in Newtown,

Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws. Everytown's mission includes filing amicus briefs that provide context and doctrinal analysis that might otherwise be overlooked in a broad swath of cases concerning issues of gun violence. *See e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843 (argued Nov. 3, 2021); *Jones v. Becerra*, No. 20-56174 (9th Cir. filed Jan. 26, 2021) (Second Amendment challenge to California law prohibiting sale of firearms to individuals under 21).

The *Violence Policy Center* is a national non-profit educational organization that conducts research on firearms violence and provides information and analysis to policymakers, journalists, researchers, advocates, and the general public. The Violence Policy Center examines the role of firearms in the United States, analyzes trends and patterns in firearms violence, and works to develop policies to reduce gun-related deaths and injuries. In addressing these matters, the Violence Policy Center conducts numerous fact-based studies on a wide range of gun violence issues, which have influenced Congressional and state policymaking on the regulation of firearms. This includes extensive research regarding the trafficking of U.S.-sourced guns to Mexico.

*Giffords Law Center to Prevent Gun Violence* ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, promotes, and defends the laws, policies, and programs

proven to effectively reduce gun violence, including those that address gun trafficking.  Together with its partner organization, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.  Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases before the U.S. Supreme Court involving firearm regulations and constitutional principles affecting gun policy.  *See, e.g.*, *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843 (argued Nov. 3, 2021).

*March For Our Lives Action Fund* ("MFOL") is a non-profit organization of young people from across the country fighting for sensible gun violence prevention policies.  Formed after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL immediately began organizing the largest single day of protest against gun violence in history.  Since then, students seeking to effect change have formed hundreds of MFOL chapters across the country.  MFOL has filed numerous amicus briefs in cases involving firearms regulations.  *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y.*, 590 U.S. ___, 140 S. Ct. 1525 (2020); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843 (argued Nov. 3, 2021).  These young people are motivated to ensure their country's products are not used to perpetuate violence abroad.

*Global Exchange*, a non-profit human rights organization established in 1988, sponsors the Stop U.S. Arms to Mexico project.  Initiated in 2017, Stop U.S. Arms to Mexico conducts original research; collaborates with Mexican and U.S. gun violence victims, arms control and human rights organizations, academics, and health professionals; publishes reports and data; and develops policy proposals regarding the flow of firearms from the United States to Mexico and their impacts.

*Newtown Action Alliance* is a national grassroots organization founded by Newtown residents after the tragic Sandy Hook Elementary School shooting on December 14, 2012, where 20 children and six educators were senselessly gunned down. Newtown Action Alliance are a group of advocates, families of victims and survivors of gun violence, who are working to transform our tragedy into meaningful action to end gun violence. Newtown Action Alliance is dedicated to reversing the escalating gun violence epidemic in this nation through the introduction of smarter, safer gun laws and broader cultural change.

These organizations draw on their collective expertise to file briefs in numerous cases implicating gun violence and trafficking. *Amici* retain significant expertise and interests in the reduction of gun violence and reform of illegal and irresponsible gun industry practices.

## BACKGROUND

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") traces firearms recovered from crime scenes in Mexico to identify their origin.[1] An estimated 70 percent of guns recovered from Mexico that ATF has traced over the last five years were trafficked to Mexico from the United States.[2] The explanation is simple: Defendants provide criminals in Mexico with a ready supply of firearms through the U.S. civilian market. There is a single licensed firearm seller in all of Mexico, compared to over 50,000 in the United States. Exhibit A. Drug traffickers including the cartels "have turned to the United States as a primary source of weapons."[3] In fact, academic researchers estimate that 2.2% of U.S. domestic arms sales are attributable to U.S.-

---

[1] ATF, *Firearms Trace Data: Mexico 2015–2020* (Mar. 10, 2021), https://www.atf.gov/resource-center/firearms-trace-data-mexico-2015-2020#table-1.
[2] *See id.*
[3] U.S. Dep't of Justice, Office of the Inspector General, *Review of ATF's Project Gunrunner* i, No. I-2011-001 (Nov. 2010); https://oig.justice.gov/reports/ATF/e1101.pdf.

Mexico trafficking.[4]  While this may seem a small percentage, the Mexican Government estimates 200,000 U.S.-sourced firearms are trafficked into Mexico every year.[5]

Many of the firearms trafficked into Mexico fit a certain profile: military-style weapons designed for the battlefield.  Gun manufacturers have become increasingly focused on developing and marketing military-style firearms to be sold to the civilian market.  That trend feeds the black market and cartels with the weapons needed to launch sophisticated attacks on military, police, and civilian targets.[6]  Defendants each manufacture, market, and sell military-style or high-capacity weapons that fuel widespread violence in Mexico.

For example, Defendant Barrett manufactures a .50-caliber sniper rifle, the Model 82A1. That sniper rifle, pictured in Exhibit B at 1, can damage helicopters, armored personnel carriers, aircraft, rail tank cars, bulk fuel storage, and concrete bunkers at distances of over a mile.[7]  The company boasts in marketing materials that it "has been proven in combat in every environment from the snow covered mountains, to the desolate deserts, and everything in between."[8]  ATF has reported that .50-caliber rifles alone "account for about 0.5 percent of weapons recovered in Mexico and traced to the United States that were recovered within 3 years of initial purchase."[9] That percentage supports separate records that show the Mexican Army recovered 554 .50-caliber

---

[4] *See* Topher McDougal, et al., *The Way of the Gun: Estimating Firearms Traffic Across the U.S.-Mexico Border* 2 (March 2013).

[5] *See* U.S. Gov't Accountability Office, *Firearms Trafficking: U.S. Efforts to Disrupt Gun Smuggling into Mexico Would Benefit From Additional Data and Analysis* 1, GAO-21-322 (Feb. 2021); https://www.gao.gov/assets/gao-21-322.pdf.

[6] *See id.* at 3.

[7] Violence Policy Center, *50 Caliber Anti-Armor Sniper Rifles*, https://vpc.org/regulating-the-gun-industry/50-caliber-anti-armor-sniper-rifles/.

[8] Barrett, *Model 82A1*, https://barrett.net/products/firearms/model-82a1/.

[9] U.S. Gov't Accountability Office, *supra* note 5, at 4.

firearms from 2010 to 2018.[10]  The short timeframe ATF describes from purchase to recovery for these firearms noteworthy: "The recovery of a crime gun within 2 to 3 years after its initial purchase is considered a short time-to-crime and a significant trafficking indicator."[11]

Defendant Century International Arms imports the WASR-10 and Draco into the United States.  According to analysis of indictments from the Violence Policy Center, AK-type rifles and pistols make up a significant portion of firearms illegally trafficked from the United States to Mexico.[12]  The WASR-10, a Romanian AK-type rifle pictured in Exhibit B at 2, provides cartels with an inexpensive and adaptable firearm that can be altered for fully automatic fire with a handful of replacement parts, allowing a shooter to fire a full magazine of ammunition with a single trigger pull.  Mexico estimates that 30% of seized AK-type rifles have been modified to allow for fully automatic fire.  Compl. ¶ 311.  A Century International Arms retailer "affectionately refer[s] to this mean rifle as the Black Widow."[13]  The Draco AK-type assault pistol, pictured in Exhibit B at 3, accepts standard AK magazines that allow it to fire 30 or more times without reloading.

Defendant Colt produces the AR-15, pictured in Exhibit B at 4, which has been copied and made available by dozens of gun makers over the years, including Defendants Barrett Firearms, Sturm, Ruger & Co., and Smith & Wesson.  This military-style semiautomatic assault rifle, originally produced by ArmaLite, was the basis for the U.S military's M-16 standard service rifle. Compl. ¶ 282.  Defendant Smith & Wesson's take on the AR-15 is the "Military & Police 15," or

---

[10] *See* Keegan Hamilton, *Mexican Cartels Are Arming Themselves to the Teeth With Powerful US Sniper Rifles*, Vice News (Aug. 20, 2020).
[11] Interpol, *Indicators of Firearm Trafficking* at 3 (2019).
[12] *See* Violence Policy Center, *Cross-Border Gun Trafficking* (updated Dec. 9, 202), https://vpc.org/indicted/.
[13] Atlantic Firearms LLC, *Century WASR-10 Black Widow*, https://atlanticfirearms.com/century-wasr-10-black-widow-AK-47-Rifle-ri4313-n-RI4313-N-787450690936.

M&P15, pictured in Exhibit B at 5.[14]  The M&P15 has grown into a critical profit center for the company.[15]  "Law enforcement in Mexico now report that certain types of rifles, such as the AK and AR variants with detachable magazines, are used more frequently to commit violent crime by drug trafficking organizations."[16]  AR-style weapons are designed to provide the user with the look and function of military equipment.  They have the capacity, speed, and reduced recoil needed for a shooter to accurately direct a high volume of bullets over a wide potential kill zone.  Mass shooters have used AR-style weapons in some of the deadliest mass shootings in U.S. history.[17]

Defendants Glock and Beretta produce semiautomatic pistols that are designed to accept high-capacity ammunition magazines.  A Violence Policy Center analysis of public indictments shows that after AK-type rifles, semiautomatic pistols that readily accept high-capacity magazines make up the next-largest segment of trafficked firearms from the United States to Mexico.[18]  High-capacity magazines, pictured as used in Defendants' semiautomatic pistols in Exhibit B at 6–9, hold more than ten rounds, allowing the user to fire at a rapid clip without the need to reload as frequently.  These kinds of semiautomatic pistols have become the dominant firearm product line in the United States, accounting for 85 percent of the handgun market.[19]  An Everytown for Gun Safety analysis found that U.S. mass shootings involving the use of high-capacity magazines "resulted in nearly five times as many people shot on average as those that did not."[20]

---

[14] *See* Violence Policy Center, *Understanding the Smith & Wesson M&P15 Semiautomatic Assault Rifle* 2–6 (Feb. 2018) (describing the introduction of the rifle and its growth in sales).

[15] *See id.*

[16] ATF, *Press Release: Government of Mexico Firearms Trace Data* (Mar. 12, 2012), https://www.hsdl.org/?abstract&did=706915.

[17] *See* Everytown for Gun Safety, *Mass Shootings in America* (citing mass shooting incidents in Las Vegas, Orlando, Newtown, and Sutherland Springs), https://everytownresearch.org/maps/mass-shootings-in-america-2009-2019/.

[18] *See* Violence Policy Center, *supra* note 12.

[19] *See* Violence Policy Center, *The Glock Pistol: A Favorite of Mass Shooters* 3 (Nov. 2018).

[20] Everytown for Gun Safety, *supra* note 17.

This lawsuit does not concern the manufacture and sale of rifles, pistols, or shotguns for use in hunting or for recreational purposes. Rather, defendants manufacture and sell military-style weapons and high-capacity semiautomatic firearms without implementing any safeguards to prevent trafficking, and in fact market the firearms in a manner that facilitates trafficking. The Assistant Director of ATF's Office of Field Operations specifically mentioned many of Defendants' firearms in 2009 testimony to Congress: "drug trafficking organizations have aggressively turned to the U.S. as a source of guns . . . includ[ing] the Barrett 50-caliber rifle, the Colt AR-15 .223-caliber assault rifle, [and] the AK-47[.]"[21] Distributors and dealers with consistent patterns and practice channel these weapons to the black market. *See* Compl. ¶¶ 146– 209, 227–36. For instance, bulk-purchasers traffic weapons to cartels in Mexico. *See, e.g.*, Prop. Compl. at 3–4, *United States v. Soto et al.*, No. 6:18-cr-00145-1 (S.D. Tex.), (Dec. 5, 2018); *United States v. Carranza*, No. 2:10-CR-0532-RLH-GWF, 2011 WL 4007579, at *11 (D. Nev. Aug. 5, 2011). High-profile violent attacks using Defendants' weapons in Mexico highlight the deadly consequences of this trafficking on the Mexican military and public. Compl. ¶¶ 210–26. Despite evidence of trafficking and violence in Mexico resulting from current sales and marketing practices, Defendants have not taken any action to stem the dangerous condition they have created.

## ARGUMENT

Defendants' design, marketing, distribution, and sales decisions have facilitated the trafficking of military-style and high-capacity semiautomatic firearms across the border into Mexico. Cartels use that flood of firearms to terrorize the Mexican public and the Government

---

[21] Statement of Tom Diaz, Senior Policy Analyst, Violence Policy Center, *Money, Guns, and Drugs: Are U.S. Inputs Fueling Violence on the U.S.-Mexico Border?*, Hearing before the Subcomm. on National Security and Foreign Affairs of the Comm. on Oversight and Government Reform, 111th Cong. (Mar. 12, 2009); https://www.govinfo.gov/content/pkg/CHRG-111hhrg57215/html/CHRG-111hhrg57215.htm.

with extortion, kidnapping, and murder. *Id.* ¶¶ 441–89 (describing specific uses of Defendants' firearms). Defendants' activities constitute a classic public nuisance: an unreasonable interference with public health, safety, and order.

Mexico's allegations easily fit within the long history of public nuisance. Courts have adapted and applied public nuisance to redress a variety of harms. Here, Mexico alleges that Defendants' unscrupulous distribution practices have channeled firearms across the U.S.-Mexico border where cartels use those weapons to wreak havoc on the public. Mexico's allegations certainly overcome the low barrier set at the motion to dismiss stage.[22]

I.     **Public Nuisance Provides a Flexible Cause of Action to Redress Public Harms.**

    A. **Courts Apply Public Nuisance to a Variety of Harms, Including Harms Caused by Otherwise Lawful Activity.**

Courts generally follow the Restatement's definition of common law public nuisance: a substantial and unreasonable interference with a right common to the general public, usually affecting the public health, safety, peace, comfort, or convenience. *See* Restatement (Second) Torts § 821B; Dan B. Dobbs, *The Law of Torts* § 467, at 1334 (2000). The doctrine embodies the historical role of courts in equity to "not only prevent nuisances that are threatened" but also to "arrest or abate those in progress, and by perpetual injunction protect the public against them in the future." *Missouri v. Illinois*, 180 U.S. 208, 244 (1901) (citation omitted).

This doctrine holds ancient origins, where the term described the criminal act of infringing on the rights of the Crown. *See* William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L.

---

[22] Mexico argues that Mexican law applies, and in the alternative, that Massachusetts law applies. For purposes of this brief, *amici* will focus on the application of Massachusetts law, but will note that the laws of Mexico and Massachusetts are not clearly in conflict. *See* Woodfin L. Butte, *Strict Liability in Mexico*, 18 Am. J. Comp. L. 805, 817 (1970) (describing application of Article 1913 of the Federal Civil Code of Mexico to impose liability on a store retailing turpentine after a customer dropped a lit match on the floor of the store).

Rev. 997, 998 (1966). Courts have emphasized that a government is specially positioned to challenge private activities affecting the public health because the sovereign, on behalf of the people, should determine "whether [their] mountains shall be stripped of their forests and [their] inhabitants shall breathe pure air." *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907). In certain quantities, with certain effects, perfectly legal activities on one side of a border can create a public nuisance on the other side of that border.

Courts have long read this flexible doctrine to encompass a wide range of harms, including interference with public safety "as in the case of the storage of explosives, the shooting of fireworks in the streets, harboring a vicious dog, or the practice of medicine by one not qualified" or with "the public peace, as by loud and disturbing noises, or an opera performance which threatens to cause a riot[.]" Page Keeton, *et al.*, *Prosser & Keeton on Torts* § 90, at 643–45 (5th ed. 1984) (citations omitted).

That historical practice has continued to this day and adapted to modern circumstances. *See North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 350 (4th Cir. 2008) ("The federal courts have long resolved nuisance claims, including public nuisance claims, through state-law equity actions[.]"). Federal courts have recognized the application of public nuisance to an ever-growing list of harms, including: the dumping of raw sewage, *Missouri v. Illinois*, 200 U.S. at 525; sulfur dioxide wafting across state lines, *Tennessee Copper*, 206 U.S. 230 at 238; opioids, *In re Nat'l Prescription Opiate Litig.*, MDL No. 2804, 2021 WL 4952468, at *3 (N.D. Ohio Oct. 25, 2021); and even the migration of invasive fish, *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 773 (7th Cir. 2011).

Citing a recent Oklahoma Supreme Court decision pertaining to the opioid crisis, Defendants argue that public nuisance cannot apply to firearms because public nuisance cannot

apply to the "manufacturing, marketing, and selling of lawful products." MTD Mem. at 50

(quoting *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 725 (Okla. 2021)). Defendants

fail to acknowledge that the Oklahoma decision applies a severely limited view of public nuisance

that has been broadly rejected by the majority of state courts—a view that the Commonwealth's

courts have *directly rejected* even in the opioid context. *See Commw. v. Purdue Pharma, L.P.*, No.

1884CV01808BLS2, 2019 WL 5495866, at *2, *4–5 (Mass. Super. Sept. 17, 2019) (denying

motions to dismiss by pharmaceutical manufacturers and citing similar cases from Alaska,

Arkansas, Minnesota, New Hampshire, Ohio, Tennessee, and Vermont). Furthermore, public

nuisance is not nearly as limited a doctrine as Defendants suggest.

There is no rule that prevents the application of public nuisance to lawful activity. "[A]

nuisance claim may be predicated on a lawful activity conducted in such a manner that it imposes

costs on others." *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1234 (Ind.

2003) (discussing the application of public nuisance to the sale of firearms). Hogpens, smelting,

and the operation of canals represent lawful activities—but the deleterious *results* of those

otherwise lawful activities can still constitute public nuisance, as courts have repeatedly

acknowledged. Nor is it unusual for a manufacturer to be held liable under public nuisance, as

"manufacturers can be liable for nuisance long after they relinquish ownership or control" over

their products. *Northridge Co. v. W.R. Grace & Co.*, 205 Wis. 2d 267, 282 (Wis. App. 1996).

There is no rule that limits the application of public nuisance to a "traditional pollutant." *Michigan

v. Army Corps*, 667 F.3d at 771. Rather, public nuisance provides a flexible remedy to mitigate

an array of harms. Massachusetts public nuisance law emphasizes the flexible nature of public

nuisance and its application to otherwise lawful activities.

**B. Massachusetts Public Nuisance Law Proves Similarly Flexible.**

In Massachusetts, "[a] nuisance is public when it interferes with the exercise of a public right by directly encroaching on public property or by causing a common injury." *Connerty v. Metro. Dist. Comm'n*, 398 Mass. 140, 148 (1986), *abrogated on other grounds*, *Jean W. v. Commonwealth*, 414 Mass. 496 (1993); *Smith & Wesson*, 2000 WL 1473568, at *13 ("A public nuisance is an 'unreasonable interference with a right common to the general public.'") (quoting Restatement (Second) of Torts § 821B(1)).

Massachusetts courts have applied public nuisance to cover a wide array of potential harms. The decisions show the flexibility of this common law action to address the needs of the sovereign to protect the public. For example, Massachusetts courts have applied public nuisance to: the obstruction of a river, *French v. Connecticut River Lumber Co.*, 145 Mass. 261, 264 (1887); the obstruction of a drawbridge, *Stop & Shop Companies, Inc. v. Fisher*, 387 Mass. 889, 899 (1983); the discharge of raw sewage into Boston Harbor, *Connerty*, 398 Mass. at 148; extraordinarily loud and bothersome protest conduct at an abortion clinic, *Planned Parenthood League of Massachusetts, Inc. v. Bell*, 424 Mass. 573, 585 (1997); the sale of firearms in such a way that fuels a black market, *Smith & Wesson*, 2000 WL 1473568, at *13; and, most recently, to the facilitation of black-market opiate trade by pharmaceutical companies, *City of Boston v. Purdue Pharma, L.P.*, 2020 WL 97705; *Commw. v. Purdue Pharma*, 2019 WL 5495866.

To analyze whether a particular activity unreasonably interferes with a public right, the Commonwealth's courts examine: (1) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience; (2) whether the conduct is proscribed by a statute, ordinance or administrative regulation; or (3) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect,

and, as the actor knows or has reason to know, has a significant effect upon the public right. *Smith & Wesson*, 2000 WL 1473568, at *13–14 (quoting Restatement (Second) of Torts § 821B); *Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct.*, 448 Mass. 15, 34 (2006)..

Massachusetts common and statutory law provide public nuisance as a cause of action to remedy public harm. *Wesson v. Washburn Iron Co.*, 95 Mass. 95, 101 (1866); Mass. Gen. Laws ch. 243. "Public nuisance liability can be based upon conduct that is intentional, and unreasonable or negligent, reckless or ultrahazardous[.]" *Connerty*, 398 Mass. at 149 (citation omitted). Public nuisance liability may arise even though a person complies in good faith with laws and regulations. *Hub Theaters, Inc. v. Mass. Port Auth.*, 370 Mass. 153, 156 (1976); *Strachan v. Beacon Oil Co.*, 251 Mass. 479, 488 (1925). Liability extends to all who join or participate in the creation or maintenance of a public nuisance. *Att'y Gen. v. Baldwin*, 361 Mass. 199, 208 n.3 (1972).

## II. Mexico's Public Nuisance Allegations Overcome a Motion to Dismiss.

Mexico alleges that Defendants' sales and marketing practices constitute a public nuisance. Massachusetts public nuisance law and precedent supports this finding, particularly at the motion to dismiss stage. *See Smith & Wesson*, 2000 WL 1473568, at *14 (denying motion to dismiss public nuisance allegation against gun manufacturers); *City of Boston v. Purdue Pharma, L.P.*, 2020 WL 977056, at *5 (denying motion to dismiss public nuisance allegation against pharmaceutical distributors). Mexico has alleged facts that, when taken as true, state a plausible claim for relief.

The *sine qua non* of public nuisance is interference with a public right. A government "has not only a right to 'maintain a decent society' . . . but an obligation to do so." *People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1102 (1997) (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 199, (1964)). "[A] principal office of the centuries-old doctrine of the 'public nuisance' has been the

maintenance of public order—tranquility, security and protection—when the criminal law proves inadequate." *Id*. Mexico's action falls well within this tradition.

Mexico has adequately alleged particular injuries to itself as a sovereign—injuries that merit special solicitude. Mexico provides detailed descriptions of how Defendants design, manufacture, market, and sell military-style guns that pose a unique threat to the public and law enforcement. Compl. ¶¶ 278–340. Mexico goes on to describe how those guns are trafficked to Mexico through channels allegedly known to Defendants. *Id.* ¶¶ 118–226. Mexico's allegations include statistical analysis showing the relationship between arms sales in the United States and violence in Mexico, *id.* ¶¶ 13, 434–45, descriptions of the types of harms Mexico and its citizens experience, *id.* ¶¶ 446–74, and graphic descriptions of specific instances of gun violence, *id*. ¶¶ 210–26, 475–505. The Government provides evidence of a nearly 20-year rise in violence in Mexico that corresponds with a parallel rise of gun manufacturing and trafficking. *Id.* ¶¶ 434–505. The Government argues that Defendants are on notice to how their activities fuel a black market of firearms that ultimately fuel violence in Mexico. The Government points to specific instances of Defendants' guns used in crimes, government and media reports on gun trafficking, specific instances of gun trafficking, and reports of notorious violent incidents using Defendants' firearms. Compl. ¶¶ 115–226. Through this chain of causation, Defendants' design, manufacture, marketing, and sale of firearms has fueled longstanding and well-documented violence that has interfered with common rights to health, safety, and peace. These facts present a plausible public nuisance claim that should survive a motion to dismiss.

Precedent further supports a public nuisance finding in this case. In *Smith & Wesson*, a Commonwealth trial court denied a motion to dismiss the city's public nuisance claim against multiple firearm manufacturers. *See* 2000 WL 1473568, at *14. In that case, the City of Boston

alleged that it faced high levels of violent crime involving guns manufactured by the defendants in that case, and that "[e]asy movement of firearms from the legal marketplace to unauthorized and illegal users, through an illegal, secondary firearms market, fuel[ed] the gun violence." *Id.* at *1. Boston further alleged that the gun manufacturers "could have taken action to control and prevent the illegal diversion." *Id.* The City also alleged that the gun manufacturers used deceptive marketing to put forward claims that "firearm ownership enhances security and that firearms are safe" despite knowledge that "studies and statistics show that the presence of firearms in the home increases the risk of harm[.]" *Id.* at *3. The trial court concluded that Boston had pled "sufficient facts to state a claim for public nuisance." *Id.* at *14. The trial court's conclusion supports the above public nuisance analysis and favors a rejection of Defendants' motions to dismiss.

Defendants argue that the Court should ignore *Smith & Wesson* and instead look toward *Jupin v. Kask*, 447 Mass. 141 (2006), when applying public nuisance to firearms in Massachusetts. MTD Mem. at 51. In that case, the plaintiff attempted to make a public nuisance claim related to the failure to properly store a *single* firearm in a home. *Jupin*, 447 Mass. at 158. The Supreme Judicial Court rejected that claim in *Jupin* because the "storage of legally acquired firearms in a home is not among nor analogous to 'guidelines as to what is covered by traditional [public nuisance] doctrine.'" *Id.* at 158 (quotation omitted). *Jupin* is irrelevant here, as this case does not involve storage of a single firearm in a home. Rather, it involves gun manufacturers and a gun distributor who design, manufacture, sell, and market weapons of war in such a way that creates a public nuisance. *See City of Boston v. Purdue Pharma, L.P.*, 2020 WL 977056, at *5 (distinguishing *Jupin* and adopting the reasoning of *Smith & Wesson*, because the city had alleged that the defendant distributors "knowingly supplied an illicit opioid market over the course of years").

Other state courts have allowed public nuisance claims to proceed against gun manufacturers, and those cases provide persuasive reasoning. In *City of Cincinnati v. Beretta U.S.A. Corp.* the Ohio Supreme Court overturned a lower court dismissal of a city's public nuisance claim against gun manufacturers. 95 Ohio St. 3d 416, 421 (2002). The court specifically noted the "broad language" of public nuisance, and that such broad language could reasonably encompass allegations that gun manufacturers created "a public nuisance by manufacturing, marketing, distributing, and selling firearms in ways that unreasonably interfere with the public health, welfare, and safety in Cincinnati and that the residents of Cincinnati have a common right to be free from such conduct." *Id.* at 418. In *City of Gary*, the Indiana Supreme Court similarly overturned a lower court dismissal of a city's public nuisance claim against gun manufacturers. 801 N.E.2d at 1241. Gary alleged that the gun manufacturers "intentionally and willingly supply the demand for illegal purchase of handguns" including through turning a blind eye to unlawful straw purchase transactions. *Id.* The Indiana Supreme Court emphasized that a public nuisance determination "turns on whether the activity, even if lawful, can be expected to impose such costs or inconvenience on others that those costs should be borne by the generator of the activity, or the activity must be stopped or modified." *Id.* at 1231.

### III. Mexico's Alleged Harms Are Not Too Attenuated.

Defendants argue that they cannot be held liable because Mexico's harms are too attenuated from Defendants' conduct. MTD Mem. at 40. Defendants conclude that Mexico failed to show proximate cause, particularly in light of third-party actions. *See id.* at 41–43. Defendants' argument fails for two reasons. First, Mexico's public nuisance claim does not rely solely on the actions of third parties. Second, courts have allowed public nuisance claims to continue based on the foreseeability of third-party actions. Defendants should expect that their practices profitably channel firearms to traffickers and cartels—after all, Defendants have done so for decades now.

**A. Mexico's Claim Does Not Rely on the Acts of Third Parties.**

Defendants incorrectly read Mexico's complaint to only state a public nuisance claim that centers on the acts of third parties. Rather, the nuisance that Mexico complains of is a surfeit of easily obtained and highly lethal weapons. This flood creates greater opportunities for criminals and cartels, but the existence of nuisance does not depend on those parties' actions. The nuisance is created by the overabundance of weapons itself, which has resulted in destabilization of many areas of Mexico, loss of civil society, and interference with national life, including increasing numbers of Mexican citizens attempting to flee to the United States. Compl. ¶¶ 466–68, 470. These are foreseeable consequences of Defendants' marketing and sales practices, analogous to the drift of air pollutants or contamination of waters by a gasoline additive. *See, e.g.*, *In re MTBE Prod. Liab. Litig.*, 175 F. Supp. 2d 593, 630 (S.D.N.Y. 2001) (denying motion to dismiss public nuisance claims based on mere presence of product following its intended use).

A public nuisance can exist as inchoate, from the mere existence of a threat—not the carrying out of the threat or occurrence of the risk. This can be seen in cases finding public nuisance from interference with public safety "as in the case of the storage of explosives in the midst of a city or the shooting of fireworks in the public streets." Restatement (Second) of Torts § 821B, cmt. b. "A nuisance at common law may consist in the keeping or manufacture of gunpowder, naphtha, or other explosive or inflammable substances *in such quantities and places* or in such a manner as to be dangerous to the persons and property of the inhabitants of the neighborhood." *Commw. v. Kidder*, 107 Mass. 188, 192 (1871) (emphasis added). Storage of dynamite near a public highway is a public nuisance, even where an explosion is caused by a fire that the storer did not light. *See Liber v. Flor*, 415 P.2d 332, 338 (Colo. 1966). It is the placement of the material and the resulting threat that constituted a nuisance, just as the presence of an

excessive number of military-style weapons, in a country that has largely restricted their ownership, creates the nuisance here. And while public nuisance will not protect against "idle and silly fears, produced by imaginary dangers," *Cheatham v. Shearon*, 31 Tenn. 213, 216 (1851), it will protect against reasonably foreseeable risks. Here, the presence of military-type firearms in Mexico creates the foreseeable threat of military-type incursions that harm Mexico and its people.

*Smith & Wesson* dismissed similar attenuation arguments. There, Boston argued that gun manufacturer sales and distribution practices created and supplied an illegal secondary market in firearms. 2000 WL 1473568, at *14. In response, the gun manufacturers argued that "in order to exercise control to abate the nuisance, they would have to 'identify[] all criminals and disarm[] them—something neither defendants, nor [Boston] with all its statutory and law enforcement resources can do.'" *Id.* at *14 n.62 (brackets in original). The Suffolk Superior Court did not credit this argument. "This argument misses the point of Plaintiffs' allegations. To exercise control to abate the alleged nuisance, Defendants would have to cease maintaining the illegal, secondary market." *Id.* Defendants here similarly miss the mark—the public nuisance of trafficked firearms is not so attenuated from their conduct. Rather, it is the foreseeable consequence of Defendants' sales, marketing, and distribution practices. Those activities are well within Defendants' control.

**B. Public Nuisance Liability Survives the Foreseeable Acts of Third Parties.**

Defendants also argue that the intervening criminal acts of third parties breaks the chain of liability. Defendants' formulation misses a critical exception: "The intervening criminal act of a third party is a superseding cause which breaks the chain of proximate causation *only where the original wrongdoer reasonably could not have foreseen such act*." *Copithorne v. Framingham Union Hosp.*, 401 Mass. 860, 862 (1988) (emphasis added). That articulation is the broadly

accepted formulation of nuisance liability when third party acts are implicated.  *See*, *e.g.*, *North Dakota v. United States*, 480 F. Supp. 3d 917, 935 (D.N.D. 2020) (North Dakota stated a public nuisance claim from damage to its land by protestors); *see also City of Boston v. Purdue Pharma, L.P.*, 2020 WL 97705, at *4 ("that there are other contributing causes does not absolve the Distributor Defendants from liability if they could have reasonably foreseen the result").

The Indiana Supreme Court's decision in *City of Gary* is instructive.  Gary alleged that the manufacturers maintained an "unreasonable chain of distribution" that fueled the black market for firearms.  801 N.E.2d at 1241.  The Indiana Supreme Court noted that the city's complaint reasonably relied upon the "foreseeable laxness of dealers, and employees, and the ingenuity of criminals to ensure that thousands of [firearms] find their way into their expected place in the illegal secondary market."  *Id.* at 1231.  Mexico makes nearly identical allegations here—that Defendants have ignored channels of illicit distribution that profitably channel firearms to Mexico for use by cartels and other criminals.  Mexico points to distributors and dealers with consistent patterns and practices that channel firearms to the black market.  *See* Compl. ¶¶ 146–209, 227–36.  Decades of evidence render this profitable trafficking a foreseeable consequence of Defendants' current design, sales, marketing, and distribution practices.  Nonetheless, Defendants have taken no action to prevent trafficking.   The Court should permit these claims to proceed.

## CONCLUSION

Mexico has stated a viable public nuisance claim.  *Amici* respectfully request that the Court deny Defendants' motions to dismiss.


Dated: February 3, 2022

MARTEN LAW LLP

/s/ James B. Pollack
James B. Pollack, BBO #707616
77 Sleeper Street
Boston, MA 02210
Telephone: (206) 434-0679
Fax: (206) 292-2601
jpollack@martenlaw.com


/s/ Lawson E. Fite
Lawson E. Fite, OSB #055573
(Admitted *pro hac vice*)
1050 S.W. Sixth Avenue, Suite 2150
Portland, OR 97204
Telephone: (503) 243-2200
Fax: (503) 243-2202
lfite@martenlaw.com


*Attorneys for proposed* amici curiae *Everytown for Gun Safety*, *Violence Policy Center*, *Giffords Law Center to Prevent Gun Violence*, *March For Our Lives*, *Global Exchange, and Newtown Action Alliance.*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2022, I filed the foregoing using CM/ECF which caused the parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

Date: February 3, 2022.

*/s/ James B. Pollack*