## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ESTADOS UNIDOS MEXICANOS,<br>*Plaintiff,*<br><br>*v.*<br><br>SMITH & WESSON BRANDS, INC., et al.,<br>*Defendants.* | Civil Action No. 1:21-CV-11269-FDS |

## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY:
### *GUSTAFSON V. SPRINGFIELD*

Plaintiff Government of Mexico submits the attached en banc opinion of the Superior Court of Pennsylvania in *Gustafson v. Springfield*, 2022 WL 3339488 (Pa. Super. Aug. 12, 2022).

The Government contends that PLCAA does not bar its claims because, among other reasons, the injury and the gun misuse occur in Mexico. Confirming the centrality of the place of injury and gun misuse, the *Gustafson* plurality held PLCAA unconstitutional under the Commerce Clause because the injury and misuse occurred intrastate: "[I]ntrastate criminal misuse of firearms and ammunition (and, by extension, any tortious harm to which such intrastate misuse may contribute) are local events" beyond Congress's authority. 2022 WL 3339488 at *11 (per curiam opinion by Kunselman, J.); *id.* *10 (PLCAA impermissibly "regulat[es] events [injury and misuse] that are well-removed from the interstate marketplace").

The dissents in *Gustafson*, while disagreeing with the plurality's constitutional analysis, agreed that PLCAA's focus is on "injury result[ing] from 'the criminal or unlawful misuse' of a [gun]." *Id.* *35 (Murray, J., dissenting); *id.* *37 ("the focus of the PLCAA is on the act, not the

actor"); *id*. *26 (Congress "insulat[ed] the firearms industry from a specific class of lawsuits");
*id*. *21, n. 1 (Olson, J., dissenting) (PLCAA "only stops one extremely narrow category of
lawsuits," quoting legislation's chief sponsor); *id*. *30 (PLCAA "only eliminates certain
identified claims"). The concurrence similarly noted that "the focus of the PLCAA is on the
'volitional act' [of misuse] and the criminal character thereof." *Id*. at *18 (Bender, J.,
concurring).

PLCAA precludes only a narrow category of cases, focused on injury and misuse. Here,
the place of injury and misuse is Mexico, so PLCAA does not apply. *See, e.g.*, Pl. Br. ECF 111,
at 9-13, 14-17, 18-19.

In addition to emphasizing the centrality of the place of injury and gun misuse, the four
judges' conclusion that PLCAA is unconstitutional supports narrowly construing PLCAA's bar.
*See* Pl. Br., ECF 111, at 20 n. 110. The principle of constitutional avoidance applies "whether or
not those constitutional problems pertain to the particular litigant before the Court." *Clark v.
Martinez*, 543 U.S. 371, 380-81 (2005).

Dated: August 26, 2022                                 Respectfully submitted,

                                                       /s/  Steve D. Shadowen
                                                       Steve D. Shadowen (pro hac vice)
                                                       Richard M. Brunell (BBO# 544236)
                                                       Nicholas W. Shadowen (pro hac vice)
                                                       SHADOWEN PLLC
                                                       1135 W. 6th Street, Suite 125
                                                       Austin, TX 78703
                                                       Phone: 855-344-3298
                                                       sshadowen@shadowenpllc.com
                                                       rbrunell@shadowenpllc.com
                                                       nshadowen@shadowenpllc.com

                                                       /s/  Jonathan E. Lowy
                                                       Jonathan E. Lowy (pro hac vice)
                                                       BRADY

840 First Street, N.E. Suite 400
Washington, DC 20002
Phone: 202-370-8104
jlowy@bradyunited.org

**CERTIFICATE OF SERVICE**

I, Steve D. Shadowen, hereby certify that this document was filed with the Clerk of the Court via CM/ECF. Those attorneys who are registered with the Court's electronic filing systems may access this filing through the Court's CM/ECF system, and notice of this filing will be sent to these parties by operation of the Court's electronic filings system.

Dated: August 26, 2022                              Respectfully submitted,

                                                    /s/  Steve D. Shadowen
                                                    Steve D. Shadowen

2022 WL 3339488

Superior Court of Pennsylvania.

Mark and Leah GUSTAFSON, Individually
and as Administrators and Personal
Representatives of the Estate of James
Robert ("J.R.") Gustafson, Appellants

v.

SPRINGFIELD, INC. d/b/a Springfield
Armory and Saloom Department Store
and Saloom Dept. Store, LLC d/b/
a Saloom Department Store, Appellees
The United States of America, Intervenor

No. 207 WDA 2019
|
Argued August 24, 2021
|
Filed: August 12, 2022

Appeal from the Order Entered January 15, 2019, In the Court
of Common Pleas of Westmoreland County, Civil Division,
at No(s): 1126 of 2018, Harry F. Smail, J.

**Attorneys and Law Firms**

Jonathan Elias Lowy, Washington, D.C., for appellants.

Christopher Renzulli, White Plains, NY, for appellees.

Laura Myron, Intervenor, Washington, D.C, for United States
of America.

BEFORE: PANELLA, P.J.; BENDER, P.J.E.; BOWES, J.;
LAZARUS, J; OLSON, J.; DUBOW, J.; KUNSELMAN, J.;
MURRAY, J.; and McCAFFERY, J.

**Opinion**

PER CURIAM:

 **\*1** The order of the trial court sustaining preliminary
objections is reversed, and the case is remanded for further
proceedings. Jurisdiction relinquished.

KUNSELMAN, J. files an opinion in support of the per
curiam order to reverse in which PANELLA, P.J. and
LAZARUS, J. join.

BENDER, P.J.E. files an opinion in support of the per curiam
order to reverse.

DUBOW, J. files an opinion in support of the per curiam order
to reverse.

OLSON, J. files a dissenting opinion in which BOWES and
McCAFFERY, JJ. join, and MURRAY, J. concurs in the
result.

MURRAY, J. files a dissenting opinion in which BOWES,
OLSON and McCAFFERY, JJ. concur in the result.

OPINION IN SUPPORT OF PER CURIAM ORDER TO
REVERSE BY KUNSELMAN, J.:

In this appeal, the Court must decide whether the trial court
erred by finding that a federal statute, the Protection of Lawful
Commerce in Arms Act of 2005, 15 U.S.C. §§ 7901-7903
("PLCAA"), bars a state, product-liablity lawsuit arising from
the shooting death of Mark and Leah Gustafson's 13-year-
old son, James Robert ("J.R.") Gustafson. The Gustafsons
claim PLCAA does not apply to their product-defect claims
or, alternatively, PLCAA is an unconstitutional infringement
upon the sovereign police powers of the fifty states.

This Court is not deciding whether PLCAA represents good
policy or is wise legislation. Nor does this Court consider
whether this statute would be constitutional if the General
Assembly of Pennsylvania adopts it. Finally, the Court today
does not render any opinion regarding an individual's right to
bear arms under the Second Amendment of the Constitution
of the United States or Article I, § 21 of the Constitution of
the Commonwealth of Pennsylvania.

Based on the reasons below, I vote to reverse the Order
dismissing the Gustafsons' case and remand for the
Defendants to file their Answer and New Matter.

**BACKGROUND**

On March 20, 2016, J.R. Gustafson and his 14-year-old friend
visited the Westmoreland County home of Joshua Hudec.[1]
J.R.'s friend obtained Mr. Hudec's semiautomatic handgun.
*See* Gustafsons' Complaint at 5. The friend removed the

handgun's magazine and therefore believed it "was unloaded, because ... there were no adequate indicators or warnings to inform him that a live round remained in the chamber." *Id.* at 6.

[1]     I take these facts from the Gustafsons' complaint, which we must accept as true for purposes of this appeal. *See Mazur v. Trinity Area Sch. Dist.*, 599 Pa. 232, 961 A.2d 96 (2008). The complaint does not indicate what role, if any, Mr. Hudec played in these events.

"Thinking the handgun was unloaded, the boy pulled the trigger." *Id.* The chambered bullet fired and killed J.R. The district attorney charged J.R.'s friend with general homicide, and the friend eventually pleaded delinquent to involuntary manslaughter[2] in juvenile court.

[2]     18 Pa.C.S.A. § 2504(a).

Mark and Leah Gustafson, as Administrators of J.R.'s estate and in their own right as surviving kin, then sued the manufacturer and seller of the handgun (Springfield Armory, Inc. and Saloom Department Store, hereafter "Defendants").[3] The Gustafsons asserted that, under the common law of Pennsylvania, the Defendants were negligent and strictly liable for manufacturing and/or selling a defective handgun that caused their son's death. *See id.* at 13-25. They alleged a design defect, because the gun lacked a safety feature to disable it from firing without the magazine attached. They also alleged inadequate warnings on the handgun to alert the user that a bullet could remain in the chamber after removing the magazine.

[3]     Springfield Armory, which made the handgun and has its principal place of business and incorporation in Illinois, did not contest the trial court's *in personam* jurisdiction. Saloom Department Store, the Pennsylvania corporation that sold the handgun, operates in Westmoreland County. The parties agree they are a "Manufacturer" and a "Seller" as Congress defined those terms in PLCAA.

**\*2**  Seeking to dismiss the action under the Pennsylvania Rules of Civil Procedure, the Defendants filed preliminary objections.[4] The Defendants asserted PLCAA immunized them from liablity, even if they tortiously contributed to J.R.'s death under Pennsylvania law. *See* Preliminary Objections at 5.

[4]     In Pennsylvania, a defendant may challenge the legal sufficiency of a claim by filing a preliminary objection

in the nature of a demurrer. *See* Pa.R.C.P. 1028(a)(4). This is the state equivalent of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

The Gustafsons responded that PLCAA does not apply to their suit. In the alternative, they argued the Act is unconstitutional. Upon learning of the Gustafsons' constitutional attacks against its statute, the United States of America ("the Federal Government") intervened to defend PLCAA. It claimed Congress properly enacted PLCAA under the Commerce Clause and the Bill of Rights.

The trial court concluded PLCAA barred the Gustafsons' suit, upheld the Act as constitutional, sustained the Defendants' preliminary objections, and dismissed the complaint. This timely appeal followed.

Initially, a panel of this Court, in a published opinion, unanimously reversed and declared PLCAA unconstitutional.[5] Upon the Defendants' request, this Court granted *en banc* review and withdrew the panel opinion.

[5]     President Judge Emeritus Bender, Senior Judge Musmanno (retired), and the present author comprised the panel.

The Gustafsons raise two appellate issues:

1. Does [PLCAA] bar [their] claims?

2. Does the United States Constitution permit PLCAA to bar Pennsylvania courts from applying Pennsylvania law to provide [them] civil justice?

Gustafsons' Brief at 3.

Our scope and standard of review are the same for both issues. "When an appellate court rules on whether preliminary objections in the nature of a demurrer were properly sustained, the standard of review is *de novo*, and the scope of review is plenary." *Mazur v. Trinity Area Sch. Dist.*, 599 Pa. 232, 961 A.2d 96, 101 (2008). We affirm an order sustaining preliminary objections "only when, based on the facts pleaded, it is clear and free from doubt that the complainant will be unable to prove facts legally sufficient to establish a right to relief." *Id.* Also, this Court "must accept as true all well-pleaded, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts." *Id.*

## I.

First, I consider whether the language of PLCAA bars the Gustafsons' product-defect lawsuit. When interpreting a federal statute, if its terms are unambiguous, our analysis "begins, and pretty much ends, with the text." *Lomax v. Ortiz-Marquez*, 590 U.S. ——, ——, 140 S. Ct. 1721, 1724, 207 L.Ed.2d 132 (2020).

### A. Qualified-Civil-Liablity Action

PLCAA restricts certain suits from being filed against gun manufacturers and sellers. Under the Act, a "qualified-civil-liability action may not be brought in any federal or state court." 15 U.S.C. § 7902(a). If such an action is filed, PLCAA dictates it "shall be immediately dismissed by the court in which the action was brought or is currently pending." 15 U.S.C. § 7902(b). Thus, if the Gustafsons' lawsuit meets the definition of a "qualified-civil-liablity action," PLCAA requires dismissal. The trial court ruled that this case met the definition and, therefore, dismissed it.

**\*3** A "qualified-civil-liability action" is any:

> civil action or proceeding or administrative proceeding against a manufacturer or seller of a [firearm or ammunition that moved through interstate commerce] for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [that firearm or ammunition] by the [plaintiff] or a third party...."

15 U.S.C. § 7903(5)(A).

Applying that definition here, it is undisputed that the Gustafsons filed a "civil action ... against a manufacturer [and a] seller of a [firearm] for damages ...." 15 U.S.C. § 7903(5)(A). Moreover, the damages they seek resulted, at least in part, from the criminal or unlawful misuse of that firearm by a third party: *i.e.*, the shooter. Under PLCAA, the "term 'unlawful misuse' means conduct that violates a statute, ordinance, or regulation as it relates to the use of a [firearm or ammunition]." 15 U.S.C. § 7903(9). Any unlawful misuse will suffice, even unlawful possession of the gun itself.

For instance, in *Ryan v. Hughes-Ortiz*, 81 Mass.App.Ct. 90, 959 N.E.2d 1000 (2012), a man was returning a Glock to his employer's display case, when the handgun accidentally

discharged and killed him. The administratrix of his estate sued Glock for defectively designing both the gun and the display case that had failed to stop the stray bullet. The plaintiff argued PLCAA did not apply, because the decedent had not "misused" the handgun in any way. 15 U.S.C. § 7903(5)(A). The appellate court disagreed. The court held that the decedent, who was a convicted felon, "misused" the gun merely by possessing it.[6] *See Ryan*, 959 N.E.2d at 1008. Thus, PLCAA applied and immunized Glock from any liability under Massachusetts law.

[6]   18 U.S.C. § 922(g)(1); *see also United States v. Tann*, 577 F.3d 533, 534 (3d Cir. 2009).

Like the shooter in *Ryan*, J.R.'s friend committed a state crime when he fired the gun. Thus, this case also involves "criminal or unlawful misuse" of a gun that meets the general definition of "qualified-civil-liablity action." 15 U.S.C. § 7903(5)(A). That general definition applies.

### B. Product-Defect Exception

Although this case meets the general definition of "qualified-civil-liablity action," the Gustafsons claim it falls within one of PLCAA's six exceptions to that definition.

Those six exceptions are:

> (i) an action brought against a transferor convicted under section 924(h) of Title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;
>
> (ii) an action brought against a seller for negligent entrustment or negligence *per se*;
>
> (iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the [firearm or ammunition], and the violation was a proximate cause of the harm for which relief is sought ...;
>
> (iv) an action for breach of contract or warranty in connection with the purchase of the product;
>
> **\*4** (v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the [firearm or ammunition], when used as intended or in a reasonably foreseeable manner, except that where the discharge of the [firearm or

ammunition] was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or

(vi) an action or proceeding commenced by the Attorney General [of the United States] to enforce the provisions of chapter 44 of Title 18 or chapter 53 of Title 26 [of the United States Code].

*Id.* If a lawsuit fits into one of these exceptions, PLCAA does not compel its dismissal. The Gustafsons assert that their lawsuit comes within exception (v). *See* Gustafson's Brief at 30.

Exception (v) seemingly allows product-defect lawsuits like this one to proceed if the firearm was "used as intended or in a reasonably foreseeable manner ...." 15 U.S.C. § 7903(5)(A) (v). However, it contains a critical caveat. If "the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries, or property damage." *Id.* That caveat renders exception (v) toothless, because *all* criminal offenses require a *volitional* act.[7] Whenever a defective gun causes harm and a crime is involved, exception (v) cannot apply.

[7]  This is basic criminal law. For example, in Pennsylvania, "A person is not guilty of an offense unless his liability is based on conduct which includes a *voluntary* act or the omission to perform an act of which he is physically capable." 18 Pa.C.S.A. § 301(a) (emphasis added). Courts may "not impose criminal liability on a person for an involuntary act." *Commonwealth v. Lamonda*, 52 A.3d 365, 369 (Pa. Super. 2012). *See also Voisine v. United States*, 579 U.S. 686, 693, 136 S.Ct. 2272, 195 L.Ed.2d 736 (2016) (distinguishing between a "volitional" act and "an involuntary motion" when interpreting a federal statute).

This exact scenario occurred in *Adames v. Sheahan*, 233 Ill.2d 276, 330 Ill.Dec. 720, 909 N.E.2d 742 (2009), *cert. denied* sub nom. *Adames v. Beretta U.S.A. Corp.*, 558 U.S. 1100, 130 S.Ct. 1014, 175 L.Ed.2d 634 (2009). There, like here, a teenager found a handgun inside a home. The boy knew the gun was loaded when the magazine was connected, but he thought it was unloaded without it. He removed the magazine, pointed what he thought was an unloaded gun at his friend, jokingly pulled the trigger, and killed him. A juvenile court found the shooter delinquent of involuntary manslaughter and reckless discharge of a firearm.

The victim's parents sued the gun manufacturer for product liability (design defect and failure to warn about a bullet concealed in the chamber). While the case was proceeding, Congress passed PLCAA.

The Supreme Court of Illinois held the general rule of PLCAA applied and dismissed the parents' product-defect lawsuit. It reasoned that the shooter criminally misused the gun, because his actions were state crimes. The fact that the shooter was a juvenile who did not intend the harm was immaterial. *See id.* Rejecting plaintiffs' reliance upon exception (v), the court found the caveat to that exception "requires only that the volitional act constitute a criminal offense. As discussed ... shooting [the victim] constituted a criminal offense." *Id.* at 763, 909 N.E.2d 742. As *Ryan* demonstrates, the criminal act that triggers a "qualified-civil-liability action" under PLCAA will *always* be a volitional act that nullifies exception (v). Thus, the exception will never apply; I find the Gustafsons' argument fails.

### C. Canon of Statutory Construction of Constitutional Avoidance

**\*5**  Next, the Gustafsons urge us to construe PLCAA narrowly. They believe such an interpretation can avoid unconstitutional, federal encroachment into the States' police power – specifically, the law of torts. *See* Gustafsons' Brief at 7-8 (citing *Bond v. United States*, 572 U.S. 844, 134 S.Ct. 2077, 189 L.Ed.2d 1 (2014); and *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)). The crux of the Gustafsons' theory is that, despite the plain language of the statute, Congress did not manifest an unmistakable desire to preempt this particular type of product-liability action. I disagree.

The trial court ruled that the statute cannot be read narrowly, because it found a clear Congressional intent to preempt state tort law. The trial court said the canon of statutory construction of constitutional avoidance applies:

"where an otherwise acceptable construction of a statute would raise serious constitutional problems." *Edward J. DeBartolo Corp. v. FL. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 572, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). In such situations, "the Court will construe the statute to avoid such problems, unless such construction is plainly contrary to the intent of Congress." *Id.*

* * *

[T]he text of [PLCAA] makes manifest Congress's intent to preempt state tort law. Congress explicitly stated in PLCAA that it intended to "prohibit causes of action" as defined in PLCAA to "prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce." 15 U.S.C. § 7901. Throughout PLCAA, Congress unambiguously and without question states its intention to definitively preempt state tort law.

Trial Court Opinion, 1/15/19, at 3-4.

Like the trial court, I would conclude that Congress clearly manifested its intent to upend "the traditional constitutional balance of federal and state power." *Gregory*, 501 U.S. at 464, 111 S.Ct. 2395. Congress desired for PLCAA to supplant the sovereign police powers of the States to regulate their own laws of torts. Critically, the Gustafsons offer no narrower interpretation of PLCAA that would not revamp state tort law, because, as explained below, usurping state tort law was Congress's goal in passing PLCAA.

Hence, I agree with the trial court – the canon of statutory construction of constitutional avoidance does not apply to PLCAA. Federal overreach arises (and will continue to arise) in every PLCAA case.

The Gustafsons' arguments that PLCAA's statutory language does not apply to their lawsuit are meritless.

## II.

The Gustafsons' second issue challenges the constitutionality of PLCAA under the principles of federalism.[8] Federalism divides sovereign authority between the Federal Government and the States, based on the "unique insight [of the Founders] that freedom is enhanced by the creation of two governments, not one." *Alden v. Maine*, 527 U.S. 706, 758, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

[8]  The Gustafsons also challenge PLCAA under the Fifth Amendment, which I decline to address given my decision on their other constitutional theories.

In that system of government, "there is no question that State and local authorities ... enjoy the general power of governing, including all sovereign powers envisioned by the constitution and not specifically vested in the Federal Government." *National Federation of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. ——, ——,

142 S. Ct. 661, 667, 211 L.Ed.2d 448 (2022) (Gorsuch, J., concurring) (some punctuation omitted) ("*OSHA*"). "The Federal Government's powers, however, are not general but limited and divided." *Id.* (citing *McCulloch v. Maryland*, 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (1819)).

**\*6**  In addressing a constitutional challenge under federalism, courts must determine "whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States." *New York v. United States*, 505 U.S. 144, 155, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). As Justice O'Connor explained, this question may be approached in either of two ways:

> In some cases, the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I ... In other cases, the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment ... [T]he two inquiries are mirror images of each other.

*Id.* (citations omitted).

The Federal Government takes the first approach to rebut the instant Tenth Amendment challenge. It avers that PLCAA is authorized by one of the powers delegated to Congress in Article I. *See* Federal Government's Substituted Brief at 7. The Gustafsons take the second approach; they claim that PLCAA invades the province of state sovereignty reserved by the Tenth Amendment. I address each of their approaches in turn.

### A. The Commerce Clause

When confronting a challenge to Congressional authority, the "Federal Government ... must show that a constitutional grant of power authorizes each of its actions." *National Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) ("*Sebelius*"); *see also OSHA*, *supra* (Gorsuch, J., concurring) (accord). Thus, if the Constitution does not explicitly provide Congress with authority to pass a bill, then Congress may not enact it.

The Federal Government claims that Congress had the authority to pass PLCAA under the Commerce Clause. *See* Federal Government's Substituted Brief at 8-11. That clause grants Congress power to "regulate Commerce with foreign Nations, and among the several States ...." U.S. Const. art. I, § 8 cl. 3. The Federal Government believes that "the possibility

of suits against gun manufacturers and sellers 'constitute[s] an unreasonable burden on interstate and foreign commerce.' " Federal Government's Substituted Brief at 8 (quoting 15 U.S.C. § 7901(a)(6)).

In reviewing that Commerce Clause theory, the trial court relied upon *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009), and found that the Commerce Clause permitted PLCAA's enactment. The trial court agreed with the Ninth Circuit "that it is entirely reasonable that PLCAA would have a direct and immediate effect on the regulation of interstate and foreign commerce." Trial Court's Opinion, 1/15/19, at 14. Therefore, the trial court concluded that it was "reasonable for Congress to find that limiting liability in certain situations would directly affect and bolster interstate trade in firearms ...." *Id.* at 14-15.

However, *Ileto* is not a Commerce Clause case. The plaintiffs in *Ileto* did not challenge (and the Ninth Circuit did not consider) Congress's authority to pass PLCAA under the Commerce Clause. Instead, *Ileto* involved a Fifth Amendment challenge to PLCAA's retroactivity provision. *See Ileto*, 565 F.3d at 1141. The Ninth Circuit relied upon the regulation of commerce as Congress's rational basis for enacting PLCAA. Hence, that court did not actually consider whether the Act was a permissible exercise of Commerce Clause authority. Those are two entirely different issues.

**\*7** Unlike *Ileto*, the Gustafsons' challenge is not based on retroactivity under the Fifth Amendment. They bring a facial challenge that PLCAA falls outside Congress's enumerated powers. Thus, I believe *Ileto* neither considered nor decided the issue at hand, and the trial court's reliance upon it was misplaced.

Instead, I turn to the Supreme Court's historical interpretation of the Commerce Clause. Chief Justice Marshall said, "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." *Gibbons v. Ogden*, 22 U.S. 1, 189–90, 9 Wheat. 1, 6 L.Ed. 23 (1824). This definition of commerce ensures the "authority of the Federal Government may not be pushed to such an extreme as to destroy the distinction, which the Commerce Clause itself establishes, between commerce 'among the several States' and the internal concerns of a State." *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937). "That distinction

between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system." *Id.* Congress may not rely upon the Commerce Clause to regulate purely local events.

The Commerce Clause has its limits. The High Court has recognized only three categories of activity that Congress may constitutionally regulate under the Commerce Clause:

[1.] Congress may regulate the use of the channels of interstate commerce.

[2.] Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.

[3.] Congress's commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

*United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (citations omitted).

In PLCAA, Congress asserted that state lawsuits against members of the gun industry are local activities that burden interstate commerce. Therefore, Congress justified its enactment of PLCAA under the third category identified above.

Whether intrastate activities "affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question and can be settled finally only by [the courts]." *Id.* at 557 n.2, 115 S.Ct. 1624. "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Id.*

When a party challenges Congress's Commerce Clause authority, courts must "evaluate the legislative judgment that the activity in question substantially affected interstate commerce ...." *Id.* at 562–63, 115 S.Ct. 1624. This raises a pure question of law. *See id.* To resolve it, courts may not "pile inference upon inference in a manner that would ... convert Congressional Commerce Clause authority to a general police power of the sort held only by the States." *Id.* at 549–50, 115 S.Ct. 1624.

As the Supreme Court of Pennsylvania observed over a century ago: "It is difficult to lay down a definite rule marking the division lines between intrastate [activity] and interstate commerce ... to determine with precision and exactness in each case as it arises whether the injured [person] was or was not engaged in interstate commerce ...." *Hench v. Pennsylvania R.R. Co.*, 246 Pa. 1, 91 A. 1056, 1058 (1914). "To hold the scales evenly balanced, so as not to unduly limit the powers of Congress on one hand, nor yet encroach upon the proper exercise of state jurisdiction on the other, is not an easy task for any court." *Id.* "But there must be a division line at some point in each case, and the facts must be the guide to determine where that line shall be drawn." *Id.* Thus, our jurisprudence demonstrates that Congress may not draw the division lines of its own authority for itself. Otherwise, every federal statute would survive judicial review.

**\*8** Here, the trial court did not analyze whether the intrastate activities that Congress sought to regulate under PLCAA substantially affect interstate commerce. Instead, it blindly accepted Congress's judgment of its own Commerce Clause authority. Merely because Congress titled this Act the Protection of Lawful *Commerce* in Arms Act does not mean it regulates "commerce," as a matter of constitutional law. *See, e.g., Lopez, supra* at 557 n.2, 115 S.Ct. 1624. The trial court's excessive deference licensed Congress to interpret the Constitution, in other words, "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 1 Cranch 137, 2 L.Ed. 60 (1803). Congress has no such power. *Id.*; U.S. Const. art. I, § 1.

Likewise, the Federal Government offers no justification to support the claim that state lawsuits against gun manufacturers and sellers substantially affect interstate commerce. And it cites only one decision[9] analyzing PLCAA under the Commerce Clause – *City of New York v. Beretta U.S.A. Corp.* et al., 524 F.3d 384 (2d Cir. 2008), *cert. denied*, 556 U.S. 1104, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009).

[9]     The Defendants and Federal Government cite six appellate cases upholding the constitutionality of PLCAA. Of those six cases, however, two addressed Fifth Amendment and separation of powers questions. *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1138 (9th Cir. 2009), and *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163 (D.C. 2008). Of the others, three addressed Tenth Amendment concerns, but they simply adopted the analysis of *City of New York v. Beretta U.S.A. Corp.* et al., 524 F.3d 384 (2d Cir. 2008), *cert. denied*, 556 U.S. 1104, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009), without independently analyzing PLCAA's constitutionality. *See Adames v. Sheahan*, 233 Ill.2d 276, 330 Ill.Dec. 720, 909 N.E.2d 742 (2009), *cert. denied* sub nom. *Adames v. Beretta U.S.A. Corp.*, 558 U.S. 1100, 130 S.Ct. 1014, 175 L.Ed.2d 634 (2009); *Estate of Kim v. Cox*, 295 P.3d 380 (Ak. 2013); and *Delana v. CED Sales*, 486 S.W.3d 316 (Mo. 2016). Thus, the only decision that truly analyzed the Commerce Clause and Tenth Amendment Claims was *City of New York*. My review of that case encompasses the analyses of the other courts.

In *City of New York*, the City, former-Mayor Michael Bloomberg, and others filed a lawsuit against several members of the gun industry in federal court. They sought an injunction under New York law based on public nuisance to abate harm resulting from alleged negligent marketing and distribution practices. While the suit was before the district court, Congress passed PLCAA, and the defendants moved for immediate dismissal. The City opposed the motion, claiming that exception (iii) to the definition of "qualified-civil-liability action" excluded the suit from PLCAA's scope. The City also attacked the Act's constitutionality.

The district court refused to dismiss and certified an immediate appeal. In a split decision, the Second Circuit reversed. The panel majority concluded PLCAA applied and that the Act was a valid exercise of Commerce Clause power. Based upon this conclusion, the majority found that PLCAA does not violate the Tenth Amendment.[10]

[10]     The dissent did not address PLCAA's constitutionality. Instead, it wanted to certify the case to the Court of Appeals of New York for interpretation of the underlying New York statute.

On the Commerce Clause issue, the City contended PLCAA regulated intrastate activities which fell outside the three Commerce Clause categories. The City relied upon *Lopez, supra* (declaring a federal statute barring the possession of firearms in school zones unconstitutional, because Congress had regulated intrastate activity too-far removed from the stream of interstate commerce) and *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (declaring part of the Violence Against Women Act, 34 U.S.C. § 12361, unconstitutional, because it criminalized intrastate activity).

**\*9** The Second Circuit disagreed. It held that PLCAA falls within the third category of Commerce Clause regulation, due to the substantial economic effect that lawsuits may

have on the gun industry. The court distinguished *Morrison* and *Lopez*, because it found a closer "connection between the regulated activity and interstate commerce under the [PLCAA]" than existed in the statutes in those cases. *City of New York*, 524 F.3d at 394.

According to the Second Circuit, PLCAA presents "no concerns about Congressional intrusion into truly local matters," because Congress only applied the statute to a firearm or ammunition "that has been shipped or transported in interstate or foreign commerce." *Id.* (emphasis removed) (some punctuation omitted). The court based this holding upon the facts that "there can be no question of the interstate character of the [gun] industry" and that "Congress rationally perceived a substantial effect on *the industry* ...." *Id.* (emphasis added). I find this reasoning unpersuasive considering more recent Supreme Court authority.

Seven years after *City of New York*, when the Supreme Court of the United States decided *National Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012), it rejected the contention that a federal statute's substantial effect on an interstate industry equates to a regulation of local activity that substantially affects interstate commerce. In *Sebelius*, the High Court reviewed the individual mandate[11] of the Affordable Care Act[12] (a.k.a., "Obamacare" or "the ACA").

[11]   *See* 26 U.S.C. § 5000A(a).

[12]   *See* 124 Stat. 119-1025.

The Federal Government defended the ACA's individual mandate under the Commerce Clause and Congress's taxation power.[13] It believed the mandate came "within Congress's [Commerce Clause] power, because the failure to purchase insurance has a substantial and deleterious effect on interstate commerce by creating a cost-shifting problem." *Id.* at 548-49, 132 S.Ct. 2566.

[13]   *See* U.S. Const. art. I, § 8, cl. 1.

The ACA's goals were "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Id.* at 538, 132 S.Ct. 2566. No one questioned the health-insurance industry's interstate character or Congress's ability to regulate it. "We do not doubt that the buying and selling of health-insurance contracts is commerce generally subject to federal regulation." *Id.* at 650, 132 S.Ct. 2566 (Scalia, J., dissenting).

However, Chief Justice Roberts explained that the Founders wrote the Commerce Clause under the presumption that "commerce" meant activity. He observed that courts have "always recognized that the power to regulate commerce, though broad indeed, has limits." *Id.* at 554, 132 S.Ct. 2566 (quotation omitted). In declaring the ACA's individual mandate impermissible under the Commerce Clause, the Chief Justice opined that the mandate did not "regulate *existing commercial activity*." *Id.* at 552, 132 S.Ct. 2566 (emphasis added). Instead, it compelled individuals "to become active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." *Id.*

Writing separately, Justice Scalia (joined by Justices Kennedy, Thomas, and Alito) agreed with the Chief Justice. According to Justice Scalia, "If Congress can reach out and command even those furthest removed from an interstate market to participate in the market, then the Commerce Clause becomes a font of unlimited power, or, in Hamilton's words, 'the hideous monster whose devouring jaws spare neither sex nor age, nor high nor low, nor sacred nor profane.' " *Id.* at 652-53, 132 S.Ct. 2566 (Scalia, J., dissenting) (quoting The Federalist No. 33, p. 202 (C. Rossiter ed. 1961)).

**\*10**   Because the ACA's individual mandate regulated people who were not active participants in the health-insurance market, five Justices held that the Commerce Clause could not sustain the mandate.[14] Congress had sought to command "those furthest removed from an interstate market to participate in the market ...." *Id.* It tried to force those who chose not to participate in the health-insurance market to serve as the industry's financial sureties by mandating that they contribute to the national cost of private health insurance. Thus, the ACA's individual mandate unconstitutionally shifted the costs of health insurance from the industry onto persons who had no existing commercial transactions with that industry.

[14]   The Chief Justice rejected the Federal Government's Commerce Clause theory but accepted its alternative theory and upheld the individual mandate of the ACA under the taxation power. Justices Ginsburg, Breyer, Sotomayor and Kagan joined that part of his opinion.

Congress commits the same constitutional overreach in PLCAA. The Act regulates the inactivity of individuals who may *never* have engaged in a commercial transaction with the gun industry. As this case demonstrates, PLCAA reaches out

and forces J.R. Gustafson and his parents to provide financial support for the gun industry by forgoing their tort claims against its members. It conscripts the Gustafsons to serve as financial sureties for the alleged-tortious acts and omissions of the industry by barring them from filing a lawsuit against its members under the common law of Pennsylvania. Whereas the ACA required uninsured individuals to support the insurance industry on the front end by mandating that they buy health insurance, PLCAA requires the gun industry's tort victims to support that industry on the back end by allowing the industry to retain money it would otherwise owe as damages. PLCAA turns tort victims into indemnifiers of the gun industry.

Critically, neither J.R. nor his parents purchased the gun used to kill him, *i.e.*, they did not engage in commerce of *any* kind.[15] Hence, at the time of J.R.'s death, there was no *existing* commercial activity between the Gustafsons and the gun industry for Congress to regulate. Any relation between Mr. Hudec's gun and interstate commerce had clearly ended by the time he brought the gun into his home for personal use. By regulating events that are well-removed from the interstate marketplace and individuals who never participated in that marketplace, I conclude that Congress exceeded its Commerce Clause authority when it enacted PLCAA.

[15] In her Dissenting Opinion, Judge Olson attempts to distinguish *National Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012), based on her belief that the Gustafsons "chose *to* engage in commercial activity (*i.e.*, litigation) that Congress found substantially affect interstate commerce." Olson Dissent at 19 (emphasis in original). I cannot agree.

Judge Olson offers no analysis or authority to support her claim that litigation is commercial activity. This unprecedented proposition violates the definition of commerce promulgated by the Supreme Court of the United States. *See Gibbons v. Ogden*, 22 U.S. 1, 189-90, 9 Wheat. 1, 6 L.Ed. 23 (1824). It is unfathomable how commerce — the free exchange of goods and services across state lines and intercourse between the parts of the nation — includes litigation — the "process of carrying on a lawsuit," *i.e.*, a "proceeding instituted for the purpose of enforcing a right or otherwise seeking justice." Black's Law Dictionary at 1075, 1663 (10th ed. 2014) (quoting Garner's Dictionary of Legal Usage at 862-63 (3d ed. 2011)). Litigation is not commerce.

And, like the trial court, the Olson Dissent ultimately defers to Congress's assertion that this state litigation

substantially affects interstate commerce. It never demonstrates how the Gustafson's lawsuit "has such a close and substantial relation to interstate commerce that [its] control is essential or appropriate to protect that commerce from burdens and obstructions." *N.L.R.B. v. J&L Steel Corp.*, 301 U.S. at 37, 57 S.Ct. 615 (1937).

*11 Similarly, the High Court determined that Congress exceeded its Commerce Clause authority when it enacted the Gun-Free School Zones Act of 1990. There, Congress attempted to criminalize the possession of a gun near a school. Congress asserted its federal jurisdiction on the grounds that guns near schools would negatively impact education, and therefore the quality of the future workforce, which would substantially affect interstate commerce. In *Lopez*, *supra*, the Supreme Court of the United States rejected Congress's assertion of federal jurisdiction.

There, a criminal defendant, who was convicted under the Gun-Free School Zones Act, challenged the statute's constitutionality. The High Court concluded that Congress could not pass the statute under the Commerce Clause, because there was "no indication that [Lopez], who merely possessed a gun near a school, had *recently* moved in interstate commerce ...." *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624 (emphasis added). Additionally, the statute did not require that Lopez's "possession of the firearm have any *concrete tie* to interstate commerce." *Id.* (emphasis added). Possessing a gun near a school was a local event, too-far removed from interstate commerce to affect that commerce in any substantial way.

PLCAA, like the Gun-Free School Zones Act, is unsustainable; it grants the gun industry immunity regardless of how far removed from interstate commerce the harm arises. As *Lopez* teaches, intrastate criminal misuse of firearms and ammunition (and, by extension, any tortious harm to which such intrastate misuse may contribute) are local events that are too-far removed from interstate commerce to come within Congressional regulation. Without a recent or concrete link between federal legislation and interstate commerce, Congress's reliance upon the Commerce Clause puts every local victim of a crime or tort within federal regulatory reach. However, local crimes (such as involuntary manslaughter) and the law of torts have never been a federal concern. Rather, they are part of the States' sovereign police powers to protect their citizens from harm.

Ignoring this simple truth, the Federal Government would instead have us "pile inference upon inference in a manner

that would ... require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local." *Lopez*, 514 U.S. at 567–68, 115 S.Ct. 1624. Like the Supreme Court in *Lopez*, I am unwilling to find that Congress's Commerce Clause authority extends to an area of law too-far removed from interstate commerce. *See id.* at 568, 115 S.Ct. 1624.

Notwithstanding *Lopez* and *Sebelius*, *supra*, the Federal Government further contends that PLCAA falls within the Commerce Clause, because it only covers guns and ammunition that traveled across state lines. Specifically, the Act applies only to "qualified products," which the act defines as "a firearm, including any antique firearm, or ammunition, or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4) (citations omitted).

While limiting the products covered, the Act does not limit the activity involving those products. PLCAA covers all uses of those products in perpetuity without any recent or "concrete tie to interstate commerce." *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624. The Act immunizes the gun industry from any common-law liability that arises ***anytime*** after the firearm or ammunition has moved through and exited interstate commerce.[16]

[16]    In contrast to PLCAA, an example of a valid statute that constitutionally ties the activity being regulated to interstate commerce is the National Labor Relations Act ("the NLRA"), 29 U.S.C. §§ 151-168. In *J&L Steel Corp.*, *supra*, the Supreme Court ruled that both the NLRA and the National Labor Relations Board's assertion of federal jurisdiction over labor disputes were constitutional, because the NLRA only empowered the Board to act in cases where unfair labor practices are "***affecting commerce.***" 29 U.S.C. § 160(a) (emphasis added). The NLRA did not "impose collective bargaining upon all *industry* regardless of effects upon interstate or foreign commerce." *J&L Steel Corp.*, 301 U.S. at 31, 57 S.Ct. 615 (emphasis added). Instead, the NLRA covered only activities that "may be deemed to burden or obstruct that commerce and, thus qualified, it must be construed as contemplating the exercise of control within constitutional bounds." *Id.*
    Even there, however, the High Court warned Congressional "power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so

indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Id.* "The question is necessarily *one of degree*." *Id.* (emphasis added).

**\*12**  Neither Congress nor the Federal Government provides any explanation for how state civil lawsuits and local torts involving those products burden or obstruct the free flow of interstate commerce. The bill's lead sponsor, Senator Larry Craig, justified PLCAA on the basis that members of the gun industry "had to pay higher and higher legal costs to defend themselves in lawsuit after lawsuit ..." 151 Cong. Rec. S9,218 (daily ed. July 28, 2005).[17]

[17]    I note that research from the Department of Health and Human Services refutes Senator Craig's justification. DHHS has stated, "there is simply no evidence that [pre-PLCAA] lawsuits were poised to eliminate the U.S. firearm industry." Vernick, Rutkow, & Salmon, *Availability of Litigation as a Public Health Tool for Firearm Injury Prevention: Comparison of Guns, Vaccines, and Motor Vehicle*, 97 Am. J. Public Health 1991, 1994 (2007), U.S. Department of Health and Human Services (National Institute of Health) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2040374/ (last visited January 14, 2022).

However, history has shown that litigation against manufacturers and seller of products in other industries does *not* substantially affect the free flow of such products among the several States. The costs of such lawsuits and any damages imposed are ultimately folded into the cost of the products. In this way, tort victims receive compensation, manufacturers produce safer products, and the cost of litigation and subsequent improvements is shared by those who actively participate in the marketplace.

Additionally, the filing of a state lawsuit, in state court, based on state tort law, "is in no sense ***an economic activity*** that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624 (emphasis added). Even though lawsuits cost money and may result in the exchange of money, that monetary exchange is *not* commerce. The money at issue is not transactional; it is lawful compensation for the redress of grievances between citizens under the substantive laws and sovereign power of the States. Even where, as here, the lawsuit involves parties from different states, that

lawsuit does not become interstate commerce. It is interstate litigation.

Our jurisprudence has never recognized that litigation costs justify an assertion of Commerce Clause authority. Litigation costs money for nearly every defendant who must appear in court or at an administrative proceeding, not just the gun industry. Thus, if one accepts Congress's assertion that state litigation affects interstate commerce — or is interstate commerce — simply because money is involved, then *all cases* in state court would instantly come within Congressional control. This assertion, if accepted, would obliterate American federalism as we know it. It would render the 50 several states provinces of the national government, a constitutional system similar to Canada's.

For example, when spouses divorce, litigation ensues to resolve equitable distribution of property, spousal and child support, and child custody. Under Congress's assertion, such domestic litigation could affect interstate commerce, because the parties involved are subject to awards that could negatively affect their finances and property holdings. Like an industry held liable in tort, spouses involved in domestic litigation undoubtedly have their finances impacted. This in turn would affect their purchasing power and their ability to participate in interstate commerce, such as buying a new car, going on an out-of-state vacation, and shopping online. Therefore, if one accepts Congress's litigation-costs-money theory, Congress could easily justify nationalizing family law.

 **\*13**  The same is true for zoning and land-use disputes, as well as property-tax assessments. All these local matters could be nationalized under the theory that they lead to litigation. When people challenge the zoning or tax assessment of their real property, they choose to commence litigation. This costs money. In turn, the litigants' purchasing power is affected in the same manner discussed above, and, in the aggregate, this could substantially impact interstate commerce. Hence, under Congress's assertion, it could regulate zoning, land use, and property-tax assessments.

The examples are endless. Every law or ordinance that any state, county or municipality adopts eventually leads to litigation, where at least one party will suffer a financial detriment. This is especially true in criminal law, where a defendant could lose virtually all ability to engage in commerce. The incarceration of thousands of individuals in state prisons across America substantially impacts interstate commerce due to the prisoners' absence from

the marketplace. Does that mean Congress could regulate criminal litigation by passing a national crimes code? The theory of the Federal Government and the Olson Dissent would suggest it could.

The above hypotheticals are no different than Congress relying on its claim that litigation affects commerce to justify PLCAA and thereby revamp tort law for the gun industry.

Under this breathtakingly expansive theory, it would be "as if federal officers were installed in" the filing offices of every state courthouse "and were armed with the authority to stop" any litigation Congress disfavored. *Murphy v. National Collegiate Athletic Association, Inc.*, 584 U.S. ——, ——, 138 S. Ct. 1461, 1478, 200 L.Ed.2d 854 (2018). "A more direct affront to state sovereignty is not easy to imagine." *Id.* I am unable and unwilling to surrender all of Pennsylvania law and sovereignty to Congress.

Indeed, as Justice Thomas warned in his *Lopez* concurrence, "if taken to its logical extreme, [the substantial-effects test] would give Congress a 'police power' over all aspects of American life." *Lopez*, 514 U.S. at 584, 115 S.Ct. 1624 (Thomas, J., concurring). The Supreme Court has "*always* rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power; our cases are quite clear that there are real limits to federal power." *Id.* (emphasis in original).

Hence, I conclude the trial court erred by accepting Congress's claim that PLCAA regulates interstate commerce. The Federal Government has failed to tie the Act to any local activity that burdens interstate commerce for constitutional purposes. Congress may not regulate those who do not actively participate in commerce with an interstate industry. Nor may it rely upon the Commerce Clause as a catchall to use any eventual economic impact upon an interstate industry as a pretext to legislate on purely state matters.[18]

18      In Judge Murray's Dissenting Opinion, she evaluates the constitutionality of this federal statute by applying the constitutional test for a state statute. *See* Murray Dissent, *infra*, at —— – —— (quoting *Commonwealth v. Snyder*, 251 A.3d 782, 792 (Pa. Super. 2021) (involving a constitutional challenge to a portion of the Pennsylvania Sentencing Code)). A challenger to a state statute must demonstrate that "the statute clearly, palpably, and plainly violates the constitution," *id.*, because "States have broad authority to enact legislation

for the public good — what we have often called a 'police power.' " *Bond v. United States*, 572 U.S. 844, 854, 134 S.Ct. 2077, 189 L.Ed.2d 1 (2014). Unlike state legislatures, however, Congress "lack[s] a police power." *Id.* Thus, the Federal Government "frequently *defends* ... legislation on the ground that the legislation is authorized pursuant to Congress's power to regulate interstate commerce." *Id.* (emphasis added).

Judge Murray's claim that I impermissibly shift the burden to the Federal Government to prove PLCAA's constitutionality mischaracterizes my analysis. *See* Murray Dissent, *infra*, at ——. Instead, I only rebut the Federal Government's *defense* of PLCAA that Congress acted within its commerce-clause authority. Below and on appeal, the Federal Government advanced that defense to the Gustafsons' charge that Congress could not pass PLCAA under either the Tenth Amendment or the Commerce Clause. The Gustafsons made these claims of unconstitutionality before both the trial court and this Court. As such, they have not committed waiver. Moreover, I respectfully suggest that the Murray Dissent repeats the error of the trial court by merely taking Congress's assertion that PLCAA is authorized under the Commerce Clause at face value. *See id.* at —— – ——. Judge Murray acknowledges there are only three categories of activity that Congress may regulate pursuant to the Commerce Clause. *See id.* at ——. However, rather than demonstrate how PLCAA falls within any of them, Judge Murray simply adopts Congress's conclusion "that targeted lawsuits 'constitute an unreasonable burden on interstate and foreign commerce of the United States.' " Murray Dissent at 22 (quoting 15 U.S.C.A. § 7901(a)(6)). Without any analysis, discussion, or evidence of such a burden, Congress, the Federal Government, the trial court, and the Murray Dissent never prove their hypothesis. In their view, lawsuits substantially effect interstate commerce simply because Congress says they do; that reasoning is circular.

The only justification Judge Murray relies on to uphold PLCAA is preemption. *See* Murray Dissent at 21 (stating "Congress has the ability to preempt state statutes under its commerce-clause powers.") My learned colleague conflates the concept of constitutionality with preemption. "Preemption is based on the Supremacy Clause, and that Clause is not an independent grant of legislative power to Congress." *Murphy v. National Collegiate Athletic Association, Inc.*, 584 U.S. ——, ——, 138 S.Ct. 1461, 1479, 200 L.Ed.2d 854 (2018). Instead, the Supremacy Clause is "a rule of decision" to resolve a conflict between two constitutionally enacted laws. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324, 135 S.Ct. 1378, 191 L.Ed.2d 471, (2015).

Before PLCAA (or any federal statute) can preempt state law, the statute "must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do." *Murphy*, 584 U.S. at ——, 138 S. Ct. at 1479. In other words, a statute must be deemed constitutional before concepts of preemption come into play. A preemption analysis presupposes constitutionality.

In short, the Murray Dissent neglects to perform an independent judicial review of Congress's legal assertion that the filing of a state lawsuit, in state court, under state tort law substantially effects interstate commerce. As Chief Justice Roberts made clear, "deference in matters of policy cannot become abdication in matters of law." *National Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2021). Nevertheless, even using Judge Murray's standard of review, the Gustafsons met their "high burden" of showing that PLCAA clearly, palpably, and plainly violates the Constitution of the United States, because Congress exceeded its enumerated powers when it passed this statute, for all the reasons I have explained above.

**\*14** Thus, I would rule that PLCAA is not a valid exercise of Congress's Commerce Clause authority.

### B. The Tenth Amendment

Having rejected the Federal Government's approach to this issue, I now turn to the Gustafsons' argument. They take the second approach in their federalism challenge – namely, they assert PLCAA invades the province of state sovereignty reserved by the Tenth Amendment. That amendment provides, "The powers not delegated to the United States by the Constitution ... are reserved to the States respectively, or to the people." U.S. Constitution amend. X.

The Gustafsons contend PLCAA interferes with the autonomy of States to allocate lawmaking functions between their various branches of state government. *See* Gustafsons' Brief at 34. Their argument stems from exception (iii) to the definition of "qualified-civil-liablity action." Exception (iii) permits lawsuits to proceed if they are based upon violations of state statutes, *i.e.*, a law created by a state legislature. The Act, however, bars such lawsuits if they are based upon violations of the common law, *i.e.*, decisional law created by state judiciaries.

The Gustafsons claim "PLCAA bars states from imposing liability on negligent gun companies if states have chosen to

have their judiciaries establish the relevant liability standards through common law (like Pennsylvania), while allowing identical claims if the states used their legislatures to establish the relevant liability standards." *Id.* (citing 15 U.S.C. §§ 7903(5)(A)(iii)). However, Congress has "no permissible authority to infringe upon a State's decision of which branch of government it chooses to make law." *Id.*

To support their argument, the Gustafsons rely upon *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In *Erie R.R.*, the Supreme Court of the United States said, "Congress has *no power* to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts." *Id.* at 78, 58 S.Ct. 817 (emphasis added).

The Gustafsons argue that, under *Erie R.R.*, Congress may not disfavor the common law and, at the same time, prefer the enactments of state legislatures. In other words, whether States choose to regulate the negligence and product liability of the gun industry by common law or by statute is purely a state concern. The Gustafsons allege Congress unconstitutionally disfavored and extinguished the common law of torts in the States' courts and impermissibly recodified it as federal law.

The Federal Government contends that the Gustafsons' invocation of *Erie R.R.* "is wholly out of place." Federal Government's Brief at 13 n.3. It believes "That case, which stands for the proposition that 'there is no federal general common law,' does not concern the Tenth Amendment." *Id.* (quoting *Erie R.R.* at 78, 58 S.Ct. 817). I conclude the Federal Government is incorrect.

While the Supreme Court did not cite to the Tenth Amendment in *Erie R.R.*, the decision has clear Tenth Amendment implications. *Erie R.R.* is a seminal decision of constitutional law on the allocation of powers between the States and Federal Government. The High Court held that the Constitution "recognizes and preserves the autonomy and independence of the States – independence in their legislative and independence in their judicial departments." *Id.* at 78-79, 58 S.Ct. 817. "Any interference with either, except as thus permitted, is an invasion of the authority of the States ...." *Id.* at 79, 58 S.Ct. 817.

**\*15** *Erie R.R.* declared, "There is no federal general common law." *Id.* at 78, 58 S.Ct. 817. This holding rests upon the constitutional premise at the heart of the Gustafsons'

challenge – namely, that common law (and tort law, in particular) is state law. We have no federal common law, because (1) "Congress has no power to declare substantive rules of common law applicable in a state whether they be ... commercial law or a part of the law of torts. And [(2)] no clause in the Constitution purports to confer such a power upon the federal courts." *Id.*

The Federal Government claims PLCAA does not rewrite the common law for the gun industry, because its six exceptions allow some common-law causes of action to proceed. My review of the six exceptions reveals that the Federal Government is incorrect.[19] When PLCAA applies, it eliminates all common-law-tort claims against the gun industry. Thus, I agree with the Gustafsons' Tenth Amendment claim. Congress aimed the PLCAA-tort-reform bill directly at the common law and expressly disapproved such causes of action while favoring the statutes of state legislatures and its own.

[19] Exception (i) allows suits against a gun-industry "transferor" if under a state or federal criminal statute. *See* 15 U.S.C. § 7903(5)(A)(i). Accordingly, an underlying statutory violation is required for any tort claims to proceed.
Exception (ii) authorizes claims "for negligent entrustment or negligence *per se.*" 15 U.S.C. § 7903(5)(A)(ii). Although typically a common-law tort, negligent entrustment is defined in PLCAA at 15 U.S.C. § 7903(5)(B). Thus, Congress set a *statutory* standard for negligent-entrustment claims against the gun industry. Likewise, negligence *per se* allows cases where the gun industry allegedly violated a statute. *See, e.g., Bumbarger v. Kaminsky*, 311 Pa.Super. 177, 457 A.2d 552, 555 (1983). Hence, only Congress and state legislatures define the duty of care under Exception (ii). Exception (iii) permits actions to proceed if based on "a state or federal statute applicable to the sale or marketing of the product." 15 U.S.C. § 7903(5)(A)(iii). Clearly, this exception is not based upon common-law claims.
Exception (iv) allows lawsuits based on breach of contract and warranty relating to the sale of firearms. 15 U.S.C. § 7903(5)(A)(iv). This exception likewise requires plaintiffs to prove statutory violations, because all 50 States have adopted the Uniform Commercial Code ("the UCC"). Firearms and ammunition are "goods" under the UCC. *See* 13 Pa.C.S.A. § 2105(a); *see also* UCC, Art. II, § 105(a). Thus, the UCC applies to any "action for breach of contract or warranty in connection with the purchase of a qualified product," 15 U.S.C. § 7903(5)(A)(iv), not the common law of assumpsit.

Exception (v) never preserves the common law of product defect. As discussed above, the exception's caveat renders it a nullity.

Finally, Exception (vi) permits the Attorney General of the United States to bring lawsuits based upon "chapter 44 of Title 18 or chapter 53 of Title 26." 15 U.S.C. § 7903(5)(A)(vi). Obviously, this last exception allows no claims at common law, but only suits based on violations of the listed federal statutes.

PLCAA therefore grants total immunity from common-law liability to the gun industry whenever the Acts applies.

Tort law is decidedly a state issue. If courts allow Congress to regulate tort litigation involving these products, it could eventually regulate all litigation. This is not permitted under the Constitution of the United States' principles of federalism. As such, I conclude that Section 7902(b) of PLCAA, which directs courts to dismiss common-law claims that fall within the definition of "qualified-civil-liability action," violates the Tenth Amendment.

 **\*16** Consequently, I would hold that Section 7902(b) of PLCAA is repugnant to the Constitution of the United States and declare PLCAA's dismissal mandate "void." *Marbury*, 5 U.S. at 180.

### C. Severability

Finally, having determined the dismissal mandate of PLCAA (Section 7902) is unconstitutional, I must address the question of severability. *See Seila Law LLC v. C.F.P.B.*, 591 U.S. ——, ——, 140 S. Ct. 2183, 2209, 207 L.Ed.2d 494 (2020) (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 508, 130 S.Ct. 3138, 177 L.Ed.2d 706, (2010)). If Congress would not have enacted a statute's constitutional provisions without its unconstitutional terms, then the constitutional provisions are not severable; the entire statute must be declared unconstitutional. *See id.*

The only portions of PLCAA that do not offend the Constitution are its findings and purposes (in Section 7901) and its definitions (in Section 7903). These provisions have no force on their own. Accordingly, Congress would not have enacted the constitutional provisions of PLCAA standing alone. For this reason, I believe the rest of PLCAA is not severable and would declare the Act unconstitutional in its entirety.

### CONCLUSION

The constitutional safeguards that override PLCAA are the structural pillars of American government. These principles ensure that local matters remain under the local authority of the States, and they prevent the Federal Government from becoming all powerful. While such principles may be "less romantic and have less obvious a connection to personal freedom than the provisions of the Bill of Rights or the Civil War Amendments," *Sebelius*, 567 U.S. at 707, 132 S.Ct. 2566, (Scalia, J. dissenting), federalism is fundamental to liberty. It permits the 50 Experiments in Democracy, which the People perform in their state legislatures and courthouses across this Nation on a daily basis. Congressional tort-reform bills, like PLCAA, have no place in that system; tort law and statutes reforming it are reserved to the States under the Tenth Amendment.

I recognize that state courts do not typically resolve claims involving the constitutionality of federal statutes. However, that is the issue presented by the facts of the case before us. The Gustafsons filed a product-liability lawsuit under Pennsylvania common law, which, but for a federal statute, would have proceeded through our state courts like every other civil action. When their claims were abruptly dismissed under PLCAA, the question of federal law's constitutionality fell squarely before us, and we must answer it. *See, e.g.*, *Robb v. Connolly*, 111 U.S. 624, 637, 4 S.Ct. 544, 28 L.Ed. 542 (1884) (holding that state courts and federal courts coequally share the obligation to decide federal constitutional questions).

Although a Congressional statute would normally preempt state law, preemption only occurs if the statute comports with the Constitution of the United States. *See Marbury*, 5 U.S. at 178. Here, I find the Constitution – the Supreme Law of the Land – did not authorize Congress to pass PLCAA. The Act is an exercise of police power that the Tenth Amendment reserves for the sovereign States. Thus, to discharge my judicial duty to follow the Supreme Law of the Land, I would declare the inferior PLCAA statute void. *See id.* I express no opinion on the merits of the Gustafsons' lawsuit or whether the gun is defective. Likewise, my decision does not implicate the right to bear arms under the federal or Pennsylvania constitutions. I only conclude that, under the Constitution of the United States, the Gustafsons' products-liability lawsuit is a local matter that a jury in Westmoreland County, not Congress, must decide.

**\*17** President Judge Panella and Judge Lazarus join this Opinion.

OPINION IN SUPPORT OF PER CURIAM ORDER TO REVERSE BY BENDER, P.J.E.:

I also vote to reverse the Order dismissing the Gustafsons' case and remand for the Defendants to file their Answer and New Matter. I write separately because I would reverse on both issues presented by the Gustafsons: I find the PLCAA does not apply to the facts of this case, and that the PLCAA is unconstitutional.

I.

For the following reasons, and contrary to Part I of Judge Kunselman's Opinion in Support of *Per Curiam* Order to Reverse ("Judge Kunselman's Opinion"), I would reverse the trial court's order dismissing the Gustafson's lawsuit based on the applicability of the product-defect exception to the PLCAA's definition of a qualified civil liability action ("QCLA"). As is axiomatic,

> [t]he question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Accordingly, our standard of review is to determine whether the complaint adequately states a claim for relief under any theory of law. To evaluate a demurrer under this standard, the court must accept as true all material averments of the complaint and may sustain the demurrer only if the law will not permit a recovery. Where any doubt exists as to whether a demurrer should be sustained, it must be resolved in favor of overruling the demurrer.

*Mistick, Inc. v. N.W. Nat. Cas. Co.*, 806 A.2d 39, 42 (Pa. Super. 2002) (cleaned up).

A.

I agree with Judge Kunselman that this case meets the general definition of a QCLA under the PLCAA.[1] I depart from her analysis with respect to the applicability of the exception to the definition of a QCLA set forth in Section 7903(5)(A)(v). Regarding that exception, the Gustafsons asserted before the trial court that the "discharge of the product" was not "caused by a volitional act that constituted a criminal offense[.]" 15

U.S.C. § 7903(5)(A)(v) (emphasis added). They maintained that the Juvenile Delinquent did not voluntarily discharge the weapon; rather, they posited that, while he may have intentionally pulled the trigger, he did not intend for the gun to discharge, as he believed the weapon was unloaded when its magazine had been removed. Additionally, because this case involved a juvenile offender adjudicated in the juvenile court system, and not in the criminal court, the Gustafsons maintained that even if there was a volitional act within the meaning of Section 7903(5)(A)(v), that act did not constitute a criminal offense within the meaning of the exception.

[1] *See* 15 U.S.C. § 7903(5)(A) ("The term [QCLA] means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party....""). "A [QCLA] may not be brought in any Federal or State court." 15 U.S.C. § 7902(a).

**\*18** The trial court rejected the applicability of Section 7903(5)(A)(v) for the following reasons:

> [The Gustafsons] next argue that the present case falls under the product[-defect] exception as there was no occurrence of a "volitional act that constituted a criminal offense." 15 U.S.C. § 7903(5)(A)(v). [They] first argue a lack of a criminal offense on the part of the Juvenile Delinquent, as "[d]elinquency proceedings are not criminal in nature ... [.]" *In Interest of G.T.*, 409 Pa.Super. 15, 597 A.2d 638, 641 (1991). [Springfield and Saloom] point out that a "delinquent act" is defined under Pennsylvania law specifically as "an act designated a crime under the law of this Commonwealth ... [.]" 42 Pa.C.S.[ ] § 6302[ ]. [Springfield and Saloom] additionally reference the Supreme Court of Illinois case of *Adames v. Sheahan*[, 233 Ill.2d 276, 330 Ill.Dec. 720, 909 N.E.2d 742, 745 (2009),] as being the only case presently adjudicated which has addressed the issue of applying the PLCAA "criminal offense" provision to a minor.

***

The *Adames* case concerned a minor who shot and killed another minor using a handgun belonging to his father. *Id.* at 761, 909 N.E.2d at 763. The minor was adjudicated delinquent through the Illinois juvenile delinquency process, with the court in the juvenile proceeding finding

that the minor committed involuntary manslaughter. *Id.*
The Illinois Supreme Court, when confronted with the
applicability of the "criminal misuse" provision of the
PLCAA, looked to the definition of "criminal" found
in Black's Law Dictionary, which reads: "[h]aving the
character of a crime; in the nature of a crime." *Id.* The
Illinois Supreme Court found that, although the minor
was not charged or adjudicated criminally, he certainly
violated the Illinois Criminal Code based on his juvenile
adjudication. *Id.* The act of shooting and killing another
"was 'in the nature of a crime,' " and thus fell squarely
within the categorization of criminal misuse under the
PLCAA. *Id.* Here, the [c]ourt finds the *Adames* reasoning
persuasive. Although [the Gustafsons] correctly point
out that juvenile proceedings are not criminal in nature,
delinquent acts in Pennsylvania are by definition "act[s]
designated a crime under the law of the Commonwealth of
Pennsylvania." 42 Pa.C.S.[ ] § 6302.

Additionally, the focus of the PLCAA is on the "volitional
act" and the criminal character thereof. As explained
by the *Adames* Court, committing an act amounting to
involuntary manslaughter, whether prosecuted criminally
or not, still amounts to ... committing a criminal act and
is thus applicable under the "criminal misuse" portion
of the PLCAA. The [c]ourt thus declines to adopt [the
Gustafsons'] reading [of the phrase,] "volitional act that
constituted a criminal offense."

Trial Court Opinion, 1/15/19, at 7-8.

The trial court did not specifically address the other aspect of
the Gustafsons' argument for the applicability of the products
liability exception—that the at-issue act was not volitional
in nature. However, a similar argument was also rejected in
*Adames*. The *Adames* Court held that the decision to point a
gun and pull the trigger was volitional, even if the resulting
injuries were not intended. *See Adames*, 330 Ill.Dec. 720,
909 N.E.2d at 763. Here, relying in large part on *Adames*
as well, my learned colleague brushes these arguments aside,
concluding that "[w]henever a defective gun causes harm
and a crime is involved, exception (v) cannot apply[,]"
because "*all* criminal offenses require a *volitional* act." Judge
Kunselman's Opinion at 9 (citing 18 Pa.C.S. § 301) (emphasis
in original).[2] This Court is not compelled to follow *Adames*.
Indeed, I would decline to do so, as I am unpersuaded by the
*Adames* Court's analysis on both points.

[2]   The express terms of Section 301, however, also permit
      criminal liability based on "the omission to perform an

act...." 18 Pa.C.S. § 301. Thus, there are at least some
circumstances where proof of a voluntary act is not
required to prove the commission of a criminal offense.

B.

**\*19**   The product-defect exception to the PLCAA's general
preemption of QCLAs contains a caveat for circumstances
"where the discharge of the product was caused by a volitional
act that constituted a criminal offense." 15 U.S.C. § 7903(5)
(A)(v). It is important to note that Congress, in drafting
the PLCAA, could have easily referred to discharges caused
by 'criminal acts,' or to 'delinquent acts by juveniles,' or
used similarly straightforward language, if they intended
the caveat to encompass any discharge that occurs during
the commission of any crime. I do not believe this Court
can assume that Congress's word choice was accidental or
inconsequential in this regard.

Nevertheless, Judge Kunselman invokes Section 301 of the
Crimes Code in declaring that all criminal offenses arise
necessarily from volitional acts.[3] But Section 301 itself
demonstrates that this is not the case, as criminal offenses may
also be premised on "the omission to perform an act of which
[a person] is physically capable." 18 Pa.C.S. § 301(a). While
an omission to do an act may itself be volitional, it is certainly
not a **volitional act**. Indeed, it is not an act at all. Thus, Judge
Kunselman's rejection of Appellant's attempt to invoke the
product-defect exception, premised on the assumption that a
plea to the commission of a crime (or to the equivalent in a
juvenile court) is necessarily an admission to a "a volitional
act that constituted a criminal offense," is flawed in my view.
15 U.S.C. § 7903(5)(A)(v).

[3]   Judge Kunselman admits her interpretation of this caveat
      to the product-defect exception renders the exception
      "toothless[.]" Judge Kunselman's Opinion at 9.

Instead, I believe the exceptional circumstances of this case
call into question whether the discharge of the firearm was
caused by a volitional act, even though a criminal offense
was committed. In typical circumstances, the intentional act
of pulling a trigger is effectively identical to intentionally
firing the gun, regardless of whether the resulting injury was
intended. However, the factual averments of the Gustafsons
suggest otherwise, as they contend that while the Juvenile
Delinquent's pulling of the trigger was volitional, the firing
of the gun was not, because he believed that the firearm
was not loaded when the magazine was disengaged. I do

not think the relevant criminal act of discharging the gun was volitional, even if it was criminal in nature. This is the essence of the product defect claims at issue: whether the gun could have been made safer such that a person in the Juvenile Delinquent's position would have been deterred from pulling the trigger when he, in fact, did not intend for the gun to discharge. This deterrent effect would be meaningless if the act of pulling the trigger was indistinguishable from the act of firing the gun for purposes of what constitutes a volitional act in the context of the product-defect exception. The Gustafsons provide an illustrative analogy:

> Even if pulling the trigger was "volitional," that does not make a discharge "caused by a volitional act" any more than an explosion would be "caused by [the] volitional act" of answering a cell phone if, unbeknownst to you, terrorists had wired your phone to a remote bomb. In both cases, there was "volition" to engage in a seemingly non-dangerous act, but not to cause an unforeseen dangerous result.

Appellants' Brief at 33.

I agree with the Gustafsons. Here, based upon the factual averments contained in their complaint, there is an atypical disconnect in the chain of causation between pulling the trigger and discharging the weapon that is not present in archetypal criminal use or misuse of a firearm cases that Congress sought to address in the caveat to the product-defect exception. In my view, this distinction is factual, not legal. It is dependent on the specific circumstances of the case before us—issues of fact—that ultimately determine whether the underlying act that constitutes a criminal offense was volitional. It may be true that most criminal cases involving firearms do not involve these idiosyncratic fact patterns. However, based on the unique facts averred by the Gustafsons in this case, I cannot say "with certainty that no recovery is possible" due to preemption by the PLCAA. *Mistick*, 806 A.2d at 42.[4]

---

[4]    I would note that the Juvenile Delinquent's adjudication for involuntary manslaughter does not adequately demonstrate that his adjudication was necessarily predicated on the commission of a volitional act based on a reading of the elements of that offense alone.

    Involuntary manslaughter, which differs from murder in that specific intent and malice are absent, encompasses[ ] the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing

some act lawful in itself, or by the negligent omission to perform a legal duty.

*Commonwealth v. Moore*, 463 Pa. 317, 344 A.2d 850, 853 (1975) (quotation marks omitted).

Because the offense of involuntary manslaughter may be predicated on the negligent failure to perform a legal duty, it is not clear to me that the Juvenile Delinquent was adjudicated delinquent based on his commission of a volitional act, as the definition of that offense encompasses negligently omitting to perform a legal duty that resulted in a death. Thus, even if Appellant did not volitionally fire the gun, he could have committed the offense of involuntary manslaughter by negligently failing to verify if the gun was unloaded when he pulled the trigger under the belief that it would not fire.

## C.

**\*20**    Additionally, Pennsylvania's General Assembly has removed certain criminal acts from the class of criminal offenses, where the distinction between criminal acts that constitute criminal offenses, and criminal acts that do not, is the age of the perpetrator. As argued by the Gustafsons,

> [w]hile PLCAA's general definition of [QCLA] bars actions where harm results from a "criminal or unlawful" misuse of a firearm (15 U.S.C. § 7903(5)(A)), the disqualifying provision in the products liability exception only bars cases involving a "criminal" act. [15 U.S.C.] § 7903(5)(A)(v). When a legislature excludes one term from a list of terms, it is excluding that term from its scope. *Indep. Oil & Gas Ass'n of Pa. v. Bd. Of Assessment Appeals*, 572 Pa. 240, 247, 814 A.2d 180 (2002). Thus, Congress intended to allow products liability claims involving "unlawful" but not "criminal" acts.

> Juvenile offenses—such as the Juvenile Delinquent's involuntary manslaughter adjudication—are "unlawful" but not "criminal," as they are not subject to the criminal justice system. The "discharge" that killed J.R. was therefore not a disqualifying "criminal offense" under [15 U.S.C.] § 7903(5)(A)(v).

Appellants' Brief at 31.

I agree with the Gustafsons. Even assuming that the Juvenile Delinquent's firing of the gun was a volitional act, the product-defect exception only excludes volitional acts of discharging a firearm that "constitute[ ] a criminal offense." 15 U.S.C. § 7903(5)(A)(v). The *Adames* Court reasoned that Billy's commission of a juvenile offense "had the character of a

2022 PA Super 140

crime and was 'in the nature of a crime' and, therefore, was ... criminal...." *Adames*, 330 Ill.Dec. 720, 909 N.E.2d at 761. Thus, the *Adames* Court held that because Billy had ostensibly violated a criminal statute (despite being tried as a juvenile), the underlying act was still criminal and constituted a criminal offense. However, I do not believe that whether the at-issue act was 'in the nature of a crime' is the relevant inquiry. Even if construed as a volitional criminal act, it still did not 'constitute a criminal offense' in Pennsylvania because our General Assembly has determined that certain criminal acts of juveniles should be treated separate and apart from the way we treat criminal offenses generally. Because the Juvenile Delinquent was not tried as an adult in criminal court, the pertinent act of firing the handgun did not constitute a criminal offense under the undisputed facts of this case.

II

On the second issue raised by the Gustafson's, I join part II of Judge Kunselman's Opinion in Support of *Per Curiam* Order to Reverse. I agree with Judge Kunselman's conclusions and supporting analyses that the Protection of Lawful Commerce in Arms Act of 2005, 15 U.S.C. §§ 7901-7903 ("PLCAA"), "is not a valid exercise of Congress's Commerce Clause authority[,]" Judge Kunselman's Opinion at 32, that Section 7902(b) of the PLCAA violates the Tenth Amendment, *id.* at 36, and that the constitutionality of the PLCAA cannot be salvaged by severance of Section 7902(b), *id.* at 37. I find the PLCAA offends the United States Constitution and, therefore, it cannot bar the Gustafson's product-liability lawsuit.

**CONCLUSION**

In sum, I would reverse the trial court's order granting demurrer because I disagree with the court's determination that the product-defect exception did not apply in the circumstances of this case, for the reasons set forth above. I would also reverse because I wholeheartedly agree with Judge Kunselman's determinations that the PLCAA violates the Commerce Clause, that Section 7902(b) of the PLCAA violates the Tenth Amendment, and that Section 7902(b) is not severable, for reasons set forth in her opinion.

OPINION IN SUPPORT OF PER CURIAM ORDER TO REVERSE BY DUBOW, J.:

**\*21** I agree with a majority of this Court that we should reverse the trial court's order sustaining Appellees' Preliminary Objections. I, however, write separately because I respectfully disagree with the reasoning set forth in the Judge Kunselman's Opinion in Support of *Per Curiam* Order to Reverse. ("Judge Kunselman Opinion").

As an initial matter, I respectfully disagree with the conclusion of the Judge Kunselman Opinion that the Protection of Lawful Commerce in Arms Act, 15 U.S.C.A. § 7901 *et seq.* ("PLCAA") is unconstitutional. Rather, I find PLCAA to be constitutional for the reasons discussed in the Dissenting Opinion of the Honorable Judith F. Olson.[1]

[1] I also respectfully disagree with the section of the Judge Kunselman Opinion that finds that PLCAA grants immunity to Appellees in this case.

I, however, would reverse the trial court's order sustaining Appellees' Preliminary Objections because I interpret PLCAA as precluding Appellees from asserting the immunity in this case for the reasons set forth in Sections I.A, I.B, and I.C of President Judge Emeritus Bender's Opinion in Support of *Per Curiam* Order to Reverse.

DISSENTING OPINION BY OLSON, J.:

As I believe that the trial court was correct in dismissing this action, I must respectfully dissent from the Per Curium Order to Reverse.

**I.**

I agree with Part I of Judge Kunselman's Opinion in Support of Per Curium Order to Reverse. Specifically, I believe that the federal statute entitled the Protection of Lawful Commerce in Arms Act of 2005, 15 U.S.C. §§ 7901-7903 ("PLCAA"), bars the product liability lawsuit filed by Mark and Leah Gustafson against the Appellees as a result of the tragic death of their son, J.R. However, I part company with my colleagues who conclude that PLCAA is unconstitutional. Instead, I believe, as the many courts who have considered these constitutional arguments have concluded, that PLCAA is constitutional. Therefore, I would affirm the trial court's order sustaining the Appellees' preliminary objections and dismissing the Gustafsons' complaint with prejudice. I write separately to address the constitutional arguments raised by the Gustafsons.

## II.

### The Enactment of PLCAA

In the late 1990s and early 2000s, an increase in gun violence in the nation's municipalities prompted gun control advocates to seek stricter laws governing the manufacture and sale of firearms. When state legislatures failed to pass such laws, advocates for stricter firearms regulations turned to the courts for redress resulting in an increase of lawsuits being filed against the firearms industry. In light of the increase in such lawsuits and the impact such suits would have on consumers and the marketplace, Congress enacted PLCAA in 2005. The purpose of PLCAA was to prevent lawsuits against "manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended ... for the harm caused by the misuse of firearms by third parties, including criminals". 15 U.S.C. § 7901(a)(3). In the lengthy debates that preceded the passage of PLCAA, Congress highlighted the extensive costs associated with litigation brought against the firearms industry and the impact those costs have on the industry and the consumers. Bankruptcy was perceived as a threat to the industry and the many workers employed therein. 151 Cong. Rec. S9807-01 (daily ed. June 27, 2005) (statement of Sen. Baucus) (the expenses associated with the lawsuits are "a significant drain on the firearms industry, costing jobs and millions of dollars, increasing business operating costs, including skyrocketing insurance costs, and threatening to put dealers and manufacturers out of business"). Moreover, concerns were expressed of the harm that could befall the United States military as domestic gun manufacturers supply the military with necessary firearms. *Id.* Thus, as noted by Senator Larry Craig of Idaho, one of the sponsors of the Act, PLCAA is intended to stop litigation "that attempt[s] to pin the blame and the cost of criminal behavior on businesspeople who are following the law and selling a legal product. In fact, the one consumer product where access is protected by nothing less than our Constitution itself is our firearms, and that is exactly what is at stake [ ]: the right of law-abiding American consumers, American citizens, to have access to a robust and productive marketplace in the effective manufacturing and sale of firearms." 151 Cong. Rec. S9807-01 (daily ed. June 27, 2005) (statement of Sen. Craig).[1]

[1] During the debates, Senator Craig emphasized the limitations imposed by PLCAA as it "is not a gun

industry immunity bill". 151 Cong. Rec. S9807-01 (daily ed. June 27, 2005) (statement of Sen. Craig). "This bill does not create a legal shield for anybody who manufactures or sells a firearm. It does not protect members of the gun industry from every lawsuit or legal action that could be filed against them. It does not prevent them from being sued for their own misconduct. This bill only stops one extremely narrow category of lawsuits, lawsuits that attempt to force the gun industry to pay for the crimes of third parties over whom they have no control." *Id.*

 **\*22** PLCAA specifically sets forth the findings upon which Congress based the passage of the Act. As expressly stated, Congress found, *inter alia*, that the Second Amendment of the United States Constitution protects the rights of individuals to keep and bear arms; lawsuits have been brought against the firearms industry seeking damages for harm caused by the misuse of firearms by third parties, including criminals; and such lawsuits are done for the purpose of having the judicial branch circumvent the legislative branch of government thereby threatening the separation of powers doctrine and the principles of federalism and comity between states. 15 U.S.C. § 7901(a). Thus,

> [t]he possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States.

*Id.* at § 7901(a)(6).

Under PLCAA, "[a] qualified civil liability action[2] may not be brought in any Federal or State court". *Id.* at § 7902(a). However, six exceptions apply to this rule, including "an action for death ... resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death ...". *Id.* at § 7903(5)(A)(v). As Judge Kunselman correctly found, this exception does not apply in this case. *See* Kunselman Opinion at 5-11. Accordingly, PLCAA is applicable to the Gustafsons' claims and, so long as PLCAA is deemed constitutional, will bar said claims.

2
A "qualified civil liability action" is defined in relevant part as "a civil action ... brought by any person against a manufacturer or seller of a qualified product ... for damages ... or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party". 15 U.S.C. § 7903(5)(A). The firearm and ammunition used in this case meet the definition of a "qualified product". *See id.* at § 7903(4).

## Constitutionality of PLCAA

Since its enactment in October 2005, the constitutionality of PLCAA has been challenged in various state and federal courts. Every appellate court that has addressed these issues have found that PLCAA passes constitutional muster.[3]

3
*Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009), *cert. denied*, 560 U.S. 924, 130 S.Ct. 3320, 176 L.Ed.2d 1219 (2010); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008), *cert denied* 556 U.S. 1104, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009); *Delana v. CED Sales, Inc.*, 486 S.W.3d 316 (Mo. 2016); *Estate of Kim v. Coxe*, 295 P.3d 380 (Ak. 2013); *Adames v. Sheahan*, 233 Ill.2d 276, 330 Ill.Dec. 720, 909 N.E. 2d 742 (2009), *cert. denied sub. nom. Adames v. Beretta U.S.A. Corp.*, 558 U.S. 1100, 130 S.Ct. 1014, 175 L.Ed.2d 634 (2009); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163 (D.C. 2008), *cert. denied sub. nom. Lawson v. Beretta U.S.A. Corp.*, 556 U.S. 1104, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009). I note that the United States Supreme Court has denied each of the writs of *certiorari* filed in the cases dealing with the constitutionality of PLCAA. I further note that this Court "is not bound by the decisions of federal courts, other than the United States Supreme Court, or the decisions of other states' courts ... [H]owever, we may use them for guidance to the degree we find them useful and not incompatible with Pennsylvania law." *Eckman v. Erie Ins. Exch.*, 21 A.3d 1203, 1207 (Pa. Super. 2011) (internal citation omitted).

### A. The Commerce Clause

 **\*23**  In their original brief filed with this Court, the Gustafsons devote less than two pages to their argument that Congress had no authority under the Commerce Clause to enact PLCAA. Appellants' Brief at 47-49. In their underdeveloped argument, the Gustafsons argue that the trial court did not explain how its decision "comports with [the] requirement that permissible preemption involve[s] regulation of private actors, not sovereign states – or how

allowing unlimited liability in states with codified liability standards, but no liability in states that rely on common law, is a rational regulation of interstate commerce." *Id.* at 48. Following the order granting *en banc* consideration, the Gustafsons filed a supplemental brief in which they agree with the original panel's finding that the Commerce Clause prohibited Congress from enacting PLCAA; however they clarify their argument as follows:

> PLCAA's constitutional deficiency does not hinge on a finding that litigation is not sufficiently related to commercial activity. PLCAA violates the Commerce Clause because it targets *the states themselves*, rather than any private individuals or any arguably commercial activity, by dictating to the states how they must exercise their lawmaking functions. State decisions on how to distribute lawmaking functions among the branches of state government – namely, whether liability standards should be generated through judicial development of the common law or through legislation – are not commercial activity within the proper ambit of Congress's Commerce Clause authority.

Appellants' Supplemental Brief at 6 (emphasis in original).[4]

4
In her dissenting opinion, Judge Murray suggests that we could find that the Gustafsons waived their argument regarding the Commerce Clause by failing to present "a cogent legal argument on this issue". Dissenting Opinion (Murray, J.) at 18. I agree the argument is underdeveloped, but I do not agree that the issue should be deemed to be waived.

The Gustafsons' argument regarding the Commerce Clause is misplaced. Instead of arguing that Congress lacked authority under the Commerce Clause to regulate interstate and international commerce of firearms, the Gustafsons repackage their argument regarding the Tenth Amendment in terms of the Commerce Clause; *i.e.* state decisions on whether liability standards should be established via common law or through legislation is not commercial activity that may be regulated by Congress. As will be addressed *infra*, this argument is meritless.

Notwithstanding the Gustafson's faulty argument, Judge Kunselman concludes that "PLCAA is not a valid exercise of Congress's Commerce Clause authority". Kunselman Opinion at 32. In reaching this conclusion, Judge Kunselman ignores the cases that have expressly considered the application of the Commerce Clause to PLCAA, and instead, does her own analysis based upon the United State Supreme

Court's "historical interpretation" of the Commerce Clause. *Id.* at 15. I believe that this "historical interpretation" is flawed.

The United States Constitution vests Congress with the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its authority to "regulate Commerce with foreign Nations, and among the several States". U.S. Const. art. I, § 8. In determining whether Congress has authority to pass various pieces of legislation pursuant to the Commerce Clause, the United States Supreme Court acknowledges that "[t]he path of [the Court's] Commerce Clause decisions has not always run smooth". *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). However, "it is now well established that Congress has broad authority under the Clause." *Id.* In assessing Congress' authority under the Commerce Clause, the Supreme Court "afford[s] Congress the leeway to undertake to solve national problems directly and realistically" and the approach to judge whether Congress properly exercised its authority is guided by two principles:

  **\*24** First, Congress has the power to regulate economic activities that substantially affect interstate commerce. This capricious power extends even to local activities that, viewed in the aggregate, have a substantial impact on interstate commerce. [*Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942)] ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, *whatever its nature*, be reached by Congress if it exerts a substantial economic effect on interstate commerce.") (emphasis added)).

Second, we owe a large measure of respect to Congress when it frames and enacts economic and social legislation. *Pension Benefit Guaranty Corporation v. R.A. Gray & Co.*, 467 U.S. 717, 729 [104 S.Ct. 2709, 81 L.Ed.2d 601] (1984) ("[S]trong deference [is] accorded legislation in the field of national economic policy."); *Hodel v. Indiana*, 452 U.S. 314, 326 [101 S.Ct. 2376, 69 L.Ed.2d 40] (1981) ("[The Supreme] Court will certainly not substitute its judgment for that of Congress unless the relation of the subject to interstate commerce and its effect upon it are clearly non-existent."). When appraising such legislation, we ask only (1) whether Congress had a rational basis for concluding that the regulated activity substantially affects interstate commerce, and (2) whether there is a reasonable connection between the regulatory means selected and the asserted ends.

In answering these questions, we presume the statute under review is constitutional and may strike it down only on a plain showing that Congress acted irrationally.

*Id.* at 601-603, 132 S.Ct. 2566 (Ginsberg, J., concurring and dissenting) (some quotation marks, parentheticals, and citations omitted) (emphasis in original); *see also N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937) ("Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control."). Moreover, Congress' power under the Commerce Clause includes the power to regulate "purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce". *Gonzales v. Raich*, 545 U.S. 1, 17, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (Congress had power to regulate the growing and consumption of marijuana that took place entirely within a state). Congress' power under the Commerce Clause also extends to the imposition of restrictions on civil litigation if Congress concludes that the restrictions will promote interstate commerce. *Pierce County v. Guillen*, 537 U.S. 129, 147, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003) (Congress had authority to pass federal statute that barred the use of documents in civil trials that were prepared or collected by state authorities pursuant to a federal program to identify hazardous sections of state highways).

PLCAA was enacted to promote interstate and foreign commerce in firearms. 15 U.S.C. § 7901(a)(6) (the possibility that manufacturers, distributors and sellers of firearms would be held liable in legal actions of the type foreclosed by the Act "constitutes an unreasonable burden on interstate and foreign commerce of the United States"). Courts "must defer" to the finding that the firearms industry operates in interstate and foreign commerce as long as there is a rational basis for the finding. *Preseault v. I.C.C.*, 494 U.S. 1, 17, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990).

The Second Circuit Court of Appeals followed the general guidelines noted above in holding that Congress had authority under the Commerce Clause to enact PLCAA. In *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008), *cert. denied* 556 U.S. 1104, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009), the court noted that there are three general categories of regulation in which Congress is authorized to act under the Commerce Clause: 1) Congress may regulate the channels of interstate commerce; 2) Congress may regulate

2022 PA Super 140

the instrumentalities of interstate commerce; and 3) Congress may regulate "those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.[5]" *Id.* at 393. It is the third category of regulation that is implicated with respect to the enactment of PLCAA. *Id.* Relying on *U.S. v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)[6] and *U.S. v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000)[7], the City of New York argued that the activity that PLCAA seeks to regulate – civil lawsuits against the firearms industry for harm caused by the unlawful acts of third parties – was outside Congress' regulatory power. The Second Circuit rejected this argument, finding that "the connection between the regulated activity and interstate commerce under [PLCAA] is far more direct than that in *Morrison* and *Lopez*." *Id.* at 394 (quotation marks, citations, and corrections omitted). The court went on to explain:

> **\*25** When enacting [ ] PLCAA, Congress explicitly found that the third-party suits that [PLCAA] bars are a direct threat to the firearms industry, whose interstate character is not questioned. Furthermore, [ ] PLCAA only reaches suits that have an explicit connection with or effect on interstate commerce. ... Accordingly, unlike the Gun-Free School Zones Act and Violence Against Women Act, [ ] PLCAA raises no concerns about Congressional intrusion into "truly local" matters. ...
>
> We agree that the firearms industry is interstate – indeed, international – in nature. Of course, we acknowledge that simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so. We also should not and do not express any opinion as to the accuracy of the Congressional findings with respect to [PLCAA]. Nevertheless, due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds. There has been no such showing here. We find that Congress has not exceeded its authority in this case, where there can be no question of the interstate character of the industry in question and where Congress rationally perceived a substantial effect on the industry of the litigation that [PLCAA] seeks to curtail.

*Id.* at 394-395 (citations, corrections, and some quotation marks omitted).

[5]    In further defining the third category of regulation under the Commerce Clause, the Second Circuit Court of

Appeals stated "[a]lthough activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." *City of New York*, 524 F.3d at 393, *quoting N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

[6]    In *Lopez*, the Supreme Court held that Congress exceeded its authority in passing the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A) (1988 & Supp. V), which criminalized the possession of a gun within a school zone. The Supreme Court found that the link between the possession of a gun by a local student in a local school zone and a substantial effect on interstate commerce was weak at best and, therefore, violative of the Commerce Clause.

[7]    In *Morrison*, the federal government argued that gender-motivated violence that prompted the passing of the Violence Against Women Act, 42 U.S.C. § 13981 affected interstate commerce by deterring potential victims from traveling interstate and engaging in interstate business employment. The Supreme Court rejected this argument as there was no basis to connect the initial occurrence of a violent crime against a woman to interstate commerce.

A year after the Second Circuit Court of Appeals found that Congress did not exceed its authority under the Commerce Clause in enacting PLCAA, the Ninth Circuit Court of Appeals likewise upheld the constitutionality of the Act. In *Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009), *cert. denied* 560 U.S. 924, 130 S.Ct. 3320, 176 L.Ed.2d 1219 (2010), Bufford Furrow, who was carrying at least seven firearms which he possessed illegally, shot and injured five people at a summer camp and later that day shot and killed Joseph Ileto. The shooting victims and Mr. Ileto's wife filed a lawsuit pursuant to California common law tort statutes against the manufacturers, marketers, importers, distributors, and sellers of the firearms. Four years after the plaintiffs' lawsuit was filed, Congress passed PLCAA. The defendants sought the dismissal of the lawsuit in light of PLCAA's ban against such actions. The district court dismissed some of the claims against certain defendants but permitted claims against other defendants to proceed. On appeal, the plaintiffs argued that the district court erred in applying PLCAA to the California tort claims brought against the defendants and, alternatively, that PLCAA was unconstitutional. The Ninth Circuit disagreed with the plaintiffs, finding that

PLCAA preempted the California tort claims and PLCAA was constitutional.

**\*26** As to the constitutionality of PLCAA, the plaintiffs argued in part that PLCAA violated the equal protection and substantive due process principles embodied in the Constitution. In rejecting this argument, the Ninth Circuit noted that the plaintiffs faced "an uphill battle" since "barring irrational or arbitrary conduct, Congress can adjust the incidents of our economic lives as it sees fit. Indeed, the Supreme Court has not blanched when settled economic expectations were upset, as long as the legislature was pursuing a rational policy." *Id.* at 1140 (citations, quotation marks, and corrections omitted). The court went on to hold as follows:

> There is nothing irrational or arbitrary about Congress' choice here: It saw fit to "adjust the incidents of our economic lives" by preempting certain categories of cases brought against federally licensed manufacturers and sellers of firearms. In particular, Congress found that the targeted lawsuits "constitute an unreasonable burden on interstate and foreign commerce of the United States" and sought "to prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce". Congress carefully constrained [PLCAA's] reach to the confines of the Commerce Clause.

*Id.* at 1140 (citations and corrections omitted). In relying in part on the Second Circuit Court of Appeals' reasoning in *City of New York* and the District of Columbia Court of Appeals' decision in *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163 (D.C. 2008), *cert. denied sub. nom., Lawson v. Beretta U.S.A. Corp.*, 556 U.S. 1104, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009)[8], the Ninth Circuit explained:

> Plaintiffs disagree with Congress' judgment in this regard. In their view, the firearms industry is subject to relatively few lawsuits compared to other major industries and, in any event, the pending lawsuits could not possibly have an appreciable effect on the firearms industry (and, by extension, on interstate or foreign commerce). We need not tarry long on these considerations, because our only task is to consider whether Congress' chosen allocation was irrational or arbitrary. We have no trouble concluding that Congress rationally could find that, by insulating the firearms industry from a specified set of lawsuits, interstate and foreign commerce of firearms would be affected.

*Ileto*, 565 F.3d at 1140-1141 (citations and quotation marks omitted).

[8]
> In finding PLCAA constitutional, the *District of Columbia* case held in part: "PLCAA ... is reasonably viewed as an adjustment of the burdens and benefits of economic life by Congress, one it deemed necessary in exercising its power to regulate interstate commerce." *District of Columbia*, 940 A.2d at 175 (quotation marks, citations, and corrections omitted).

I agree with the holdings of the Second and Ninth Circuit Courts of Appeal. There is no question that Congress considered the impact that multiple lawsuits filed against manufacturers, distributors, and sellers of firearms have on the industry. The costs associated with those lawsuits and the negative effect damages awards could have on the economic survival of the industry was rationally found to have an impact on interstate and foreign commerce.[9] Congress did not act irrationally or arbitrarily in making this finding but gathered relevant data and considered input from stakeholders before enacting PLCAA.[10] Courts that have considered this issue have not "blindly accepted Congress'[ ] judgment of its own Commerce Clause authority", as Judge Kunselman suggests. Kunselman Opinion at 17. Instead, they followed the Supreme Court's prevailing jurisprudence when analyzing the Act. *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 n.12, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) ("When Congress makes findings on essentially factual issues such as these, those findings are of course entitled to a great deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue.").[11]

[9]
> Judge Kunselman takes exception to Congress' findings that the cost of litigation against the firearms industry has a significant impact on interstate and foreign commerce. Specifically, she states "history has shown that litigation against manufacturers and seller[s] of products in other industries does ***not*** substantially affect the free flow of such products among the several States. The costs of such lawsuits and any damages imposed are ultimately folded into the cost of the products. In that way, tort victims receive compensation, manufacturers produce safer products, and the cost of litigation and subsequent improvements is shared by those who actively participate in the marketplace." Kunselman Opinion at 27 (emphasis in original). Not only does Judge Kunselman fail to cite to any support for these conclusions, but these findings directly conflict with well-established precedent that Congress' factual findings are entitled to great deference.

[10]
> Judge Kunselman implies that Congress had no evidence upon which to conclude that certain defined lawsuits

against the firearms industry had an adverse impact on interstate and foreign commerce. Kunselman Opinion at 26-27. In refutation, I point to the record of the extensive debates of the 109th Congress that took place prior to the enactment of PLCAA.

11    Judge Kunselman criticizes the trial court for not conducting its own analysis as to "whether the intrastate activities that Congress sought to regulate under PLCAA substantially affect interstate commerce." Kunselman Opinion at 17. However, such an analysis would be contrary to Supreme Court dictates. *See Rostker v. Goldberg*, 453 U.S. 57, 72-83, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (critical of the trial court's review of the factual findings and legislative history compiled by Congress prior to enacting the statute, as it was "wrong in undertaking an independent evaluation of this evidence, rather than adopting an appropriately deferential examination of *Congress'* evaluation of that evidence") (emphasis in original).

**\*27** Judge Kunselman dismisses out of hand the holdings of the Second and Ninth Circuit Courts of Appeal. First, she concludes that "*Ileto* is not a Commerce Clause case" and, therefore is irrelevant to the "issue at hand." Kunselman Opinion at 14, 15. I find this puzzling as the above-referenced discussion clearly establishes that, although the plaintiffs in *Ileto* argued that PLCAA violated the substantive due process and equal protection principles under the Fifth Amendment, the Ninth Circuit expressly addressed Congress' authority under the Commerce Clause in enacting PLCAA. *See supra* at **13-15; *see also Ileto*, 565 F.3d at 1140 (declaring: "**Congress carefully constrained [PLCAA's] reach to the confines of the Commerce Clause**. *See, e.g.*, [15 U.S.C.] § 7903(2) (including an interstate- or foreign-commerce element in the definition of a 'manufacturer'); *id.* § 7903(4) (same: 'qualified product'); *id.* § 7903(6) (same: 'seller')") (emphasis added).

Judge Kunselman's rejection of the Second Circuit's *City of New York* decision is even more perplexing. Although she acknowledges that the Second Circuit found that PLCAA did not violate the Commerce Clause, she found the court's "reasoning unpersuasive in light of more recent Supreme Court authority." Kunselman Opinion at 20. Judge Kunselman then relies on the Supreme Court's decision in *National Federation of Independent Business v. Sebelius*, *supra* to conclude that Congress exceeded its authority under the Commerce Clause in enacting PLCAA. I find that her reliance on *Sebelius* is misplaced.

In *Sebelius*, the Supreme Court held that the Patient Protection and Affordable Care Act ("Affordable Care Act") violated the Commerce Clause as the individual mandate provision of the Act required most Americans to maintain health insurance coverage. In finding that Congress lacked authority under the Commerce Clause to enact the Affordable Care Act's individual mandate, the Court found:

> The individual mandate [under the Affordable Care Act] does not regulate existing commercial activity. It instead compels individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce. Construing the Commerce Clause to permit Congress to regulate individuals precisely *because* they are doing nothing would open a new and potentially vast domain to congressional authority. Every day individuals do not do an infinite number of things. In some cases they decide not to do something; in others they simply fail to do it. Allowing Congress to justify federal regulation by pointing to the effect of inaction on commerce would bring countless decisions an individual could *potentially* make within the scope of the federal regulation, and – under the Government's theory – empower Congress to make those decisions for him.

*Sebelius*, 567 U.S. at 552, 132 S.Ct. 2566 (emphasis in original). Thus, the Court held "[t]he Affordable Care Act is ... unconstitutional in part. The individual mandate cannot be upheld as an exercise of Congress's power under the Commerce Clause. That Clause authorizes Congress to regulate interstate commerce, not to order individuals to engage in it." *Id.* at 588, 132 S.Ct. 2566.

In concluding that *Sebelius* controls, Judge Kunselman finds that "Congress commits the same constitutional overreach in PLCAA. The Act regulates the inactivity of individuals who may **never** have engaged in a commercial transaction with the gun industry. As this case demonstrates, PLCAA reaches out and forces J.R. Gustafson and his parents to provide financial support for the gun industry by foregoing their tort claims against its members." Kunselman Opinion at 22 (emphasis in original). I cannot agree with this analysis (and I further note that the Gustafsons do not make this argument). Unlike the Affordable Care Act which was directed at individuals who chose **not** to engage in commercial activity by failing to purchase health insurance, PLCAA is directed at those individuals, like the Gustafsons, who chose **to** engage in commercial activity (*i.e.* litigation) that Congress found substantially affects interstate commerce (a finding to which great deference must be given).[12] PLCAA does not force

anyone to engage in commerce – instead, it prohibits certain limited commercial activities that have a substantial effect on interstate and foreign commerce. Hence, *Sebelius* lends no support to the conclusion that PLCAA violates the Commerce Clause.

12    Judge Kunselman takes exception to my analysis of *Sebelius* by pointing out the difference between litigation and commerce. As she cogently states, "[l]itigation is not commerce." Kunselman Opinion at 23 n. 15. I agree. I do not claim that litigation is commerce. Instead, I, like Congress, conclude that litigation can be an **economic activity** that **affects** commerce. As the Supreme Court has made abundantly clear "[E]ven if [an] activity be local **and though it may not be regarded as commerce**, it may still, whatever its nature, be reached by Congress **if it exerts a substantial economic effect** on interstate commerce." *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (emphasis added). In enacting PLCAA, Congress determined that certain targeted litigation against the gun industry was an activity, "whatever its nature", that exerted "a substantial economic effect on interstate commerce". Moreover, as already noted, we must defer to Congress in enacting economic legislation. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) ("[s]trong deference [is] accorded legislation in the field of national economic policy."). Additionally, Judge Kunselman makes the unfounded claim that, if the costs associated with litigation justify Congressional action under the Commerce Clause, then "*all cases* in state court would instantly come within Congressional control" since "[e]very law or ordinance that any state, county or municipality adopts eventually leads to litigation, where at least one party will suffer a financial detriment." Kunselman Opinion at 28, 29. (emphasis in original). She makes this monumental leap by completely ignoring the limits of Congress' powers under the Commerce Clause. Specifically, Judge Kunselman fails to do the appropriate analysis outlined by the High Court in reaching this untenable conclusion, *i.e.*, whether the hypothetical litigation that arises out of these hypothetical laws "has such a close and substantial relation to interstate commerce that [its] control is essential or appropriate to protect that commerce from burdens and obstructions". *N.L.R.B.*, 301 U.S. at 37, 57 S.Ct. 615.

**\*28** For the foregoing reasons, I conclude that Congress had the authority under the Commerce Clause to enact PLCAA.

**B. The Tenth Amendment**

The Gustafsons argue, and Judge Kunselman agrees, that PLCAA violates the Tenth Amendment by invading the province of state sovereignty. I disagree.

The Tenth Amendment to the United States Constitution provides, "[t]he powers not delegated to the United States by the Constitution ... are reserved to the States respectively, or to the people." U.S. Const., amend. X. The Gustafsons contend that PLCAA violates this amendment because the Act "bars states from imposing liability on negligent gun companies if states have chosen to have their judiciaries establish the relevant liability standards through common law (like Pennsylvania), while allowing identical claims if the states used their legislatures to establish the relevant liability standards. However, Congress has no permissible authority to infringe on a state's decision of which branch of government it chooses to make law." Appellants' Brief at 34-35 (citation omitted). The Gustafsons' argument stems from one of the exceptions to PLCAA's ban on lawsuits against the firearms industry. Specifically, PLCAA permits lawsuits against the firearms industry to proceed if "a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of a product, and the violation was a proximate cause of the harm for which relief is sought". 15 U.S.C. § 7903(5)(A)(iii). The Gustafsons argue (and Judge Kunselman agrees) that this exception eliminates all state common law tort claims against the firearms industry while permitting tort claims to proceed in states which have codified their tort laws; hence, the Act infringes on states' rights to enact their laws the way they see fit in violation of the Tenth Amendment. This analysis fails for several reasons.

First, the Gustafsons' argument – PLCAA allows lawsuits against the firearms industry to proceed in states with codified liability – is inapplicable to the product liability claims brought in this case. The exception to PLCAA's ban on qualified civil liability actions set forth in § 7903(5)(A)(iii) is known as the "predicate" exception and applies **only** to the knowing violation of a statute dealing with the sale or marketing of a firearm. *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274, 1296 (C.D. Cal. 2006), *aff'd* 565 F.3d 1126 (9th Cir. 2009). The predicate exception does not apply to statutes governing the design of firearms. The Gustafsons' claims allege design defects and, therefore, are governed by PLCAA's design defect exception codified in § 7903(5)(A)(v). The design defect exception does not differentiate between manufacturing or design defect claims based upon

product liability statutes or common law. Thus, even if a claimant brought a design defect claim in a state that has codified its product liability laws, the claim would be barred unless the claim fell within PLCAA's design defect exception. As thoroughly addressed by Judge Kunselman in Part I of her opinion, the Gustafsons' design defect claims do not fall within PLCAA's design defect exception. Therefore, even if Pennsylvania codified its product liability laws, the Gustafsons' claims would be barred under PLCAA. *See Ileto*, 565 F.3d at 1137 ("PLCAA preempt[s] ... theories of liability even in jurisdictions ... that have codified such causes of action").

 **\*29**  Even if the predicate exception applied, the Tenth Amendment would not bar the application of the Act to the Gustafsons' claims. As the Tenth Amendment expressly states, "**powers not delegated to the United States by the Constitution** ... are reserved to the States". U.S. Const. amend. X (emphasis added). Here, PLCAA was enacted pursuant to the power to regulate interstate and foreign commerce and that power was expressly delegated to Congress through the Commerce Clause. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. U.S.*, 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Hence, PLCAA cannot be deemed to violate the Tenth Amendment unless it violates the anticommandeering doctrine. *Travieso v. Glock, Inc.*, 526 F. Supp. 3d 533, 549 (D. Ariz. 2021) ("when Congress passes a law pursuant to the enumerated powers delegated to it under the Constitution, the only applicable limitation to it is its anti-commandeering doctrine").

As the United States Supreme Court explained, "[t]he anticommandeering doctrine may sound arcane, but it is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. NCAA*, ––– U.S. ––––, 138 S. Ct. 1461, 1475, 200 L.Ed.2d 854 (2018). Under this doctrine, Congress is prohibited from commandeering state legislatures by requiring them to enact certain laws. *New York v. U.S.*, 505 U.S. at 161, 112 S.Ct. 2408 ("Congress may not simply commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program"). Secondly, the doctrine prohibits Congress from commanding executive branch members of a state to "administer or enforce a federal regulatory program."

*Printz v. U.S.*, 521 U.S. 898, 903, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

Congress had the express authority to enact PLCAA under its enumerated powers granted by the Commerce Clause to regulate interstate and foreign commerce. Thus, the only way PLCAA could violate the Tenth Amendment is if the Act commands state legislatures to enact a particular law or state executive officials to administer a federal law. PLCAA does neither. As the Second Circuit Court of Appeals succinctly noted, "PLCAA does not commandeer any branch of state government because it imposes no affirmative duty of any kind on any of them. [ ] PLCAA therefore does not violate the Tenth Amendment." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008) (quotation marks and citations omitted); *see also Adames v. Sheahan*, 233 Ill.2d 276, 330 Ill.Dec. 720, 909 N.E.2d 742, 765 (2009) ("[B]ecause PLCAA is a valid exercise of the federal power to regulate interstate commerce, Congress has not intruded upon an area of authority traditionally reserved to the states and does not impermissibly commandeer the states or their officials in violation of the [T]enth [A]mendment."). Hence, PLCAA does not run afoul of the Tenth Amendment.[13]

---

[13]     Judge Kunselman relies on *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) to support her conclusion that PLCAA violates the Tenth Amendment as the Act disfavors common law and prefers statutes enacted by state legislatures. Kunselman Opinion at 33-35. *Erie* does not support this holding. *Erie* stands for the proposition that there is no federal general common law. *Erie*, 304 U.S. at 78, 58 S.Ct. 817. *Erie* makes clear that "[s]upervision over either the legislative or the judicial action of the states is in no case permissible **except as to matters by the constitution specially authorized or delegated to the United States**." *Id.* at 79, 58 S.Ct. 817 (emphasis added). Hence, a state is free to make its own common law "providing there is no overriding federal rule which pre-empts state law by reason of federal curbs on trading in the stream of commerce." *Lehman Bros. v. Schein*, 416 U.S. 386, 389, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974). Here, the Constitution specifically authorizes Congress to regulate interstate and foreign commerce; therefore, state law is permissibly preempted.

### C. Fifth Amendment – Due Process

 **\*30**  The Gustafsons argue that PLCAA violates their right to due process guaranteed by the Fifth Amendment[14] because "it

eliminates any remedy for victims of gun industry negligence like [the Gustafsons]" without "providing a reasonable alternative remedy". Appellants' Brief at 39. PLCAA does not violate the Gustafsons' right to due process because 1) they do not have a protected property right in an unvested common law claim[15]; and 2) PLCAA contains exceptions that allow certain claims against the firearms industry to proceed; hence, the industry does not have complete immunity.

[14]    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V.

[15]    It is well established that, although a cause of action is a "species of property", a party's property right in a cause of action does not vest until a final, reviewable judgment is obtained. *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274, 1299, *aff'd* 565 F.3d 1126 (9th Cir. 2009) (citations omitted). Here, the Gustafsons have not obtained a final, reviewable judgment.

The Gustafsons do not assert that they have a protected property right in their unvested common law claim. Instead, they argue solely that, as a result of PLCAA, their access to the courts has been eliminated with no viable alternative. Yet, as the court in *City of New York* cogently stated "PLCAA immunizes a specific type of defendant from a specific type of suit. It does not impede, let alone entirely foreclose, general use of the courts by would-be plaintiffs". *City of New York*, 524 F.3d at 398; *see also Ileto*, 565 F.3d at 1143 ("PLCAA does not completely abolish [p]laintiffs' ability to seek redress. [The Act] preempts certain categories of claims that meet specified requirements, but it also carves out several significant exceptions to the general rule. Some claims are preempted, but many are not."); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 177 n.8 (D.C. 2008) (Congress did not deprive injured persons of all potential remedies); *Estate of Kim v. Coxe*, 295 P.3d 380, 391 (Ak. 2013) (following other courts in concluding that plaintiffs' due process rights were not violated).

As noted by the other courts who have considered this issue, PLCAA does not foreclose all lawsuits against manufacturers and sellers of firearms. To the contrary, it only eliminates certain identified claims. Moreover, PLCAA does not prevent the Gustafsons from suing the young man who shot their son or the homeowner whose gun was used in the shooting. *See Travieso*, 526 F. Supp. 3d at 549 ("Plaintiff may still pursue remedies against the owner of the gun and the actual shooter

who caused him harm; he simply elected not to."). As such, the Gustafsons' rights under the Due Process Clause of the Fifth Amendment have not been violated.

**D. Fifth Amendment – Equal Protection**

The Gustafsons argue that their right to equal protection under the Fifth Amendment has been violated as PLCAA "discriminat[es] between classes of tort plaintiffs without any rational basis." Appellants' Brief at 44. Specifically, they assert "PLCAA creates a discriminatory judicial system in which persons injured by gun industry negligence in states with legislation codifying judicially-created liability standards can recover damages; those harmed on identical facts in states which rely on common law standards cannot recover; and those injured from identical negligence from unlicensed gun sellers or from defectively designed bb guns can recover everywhere". *Id.* The Gustafsons' equal protection argument is similar to their Tenth Amendment argument and likewise fails.

**\*31**    Although the Fifth Amendment does not specifically refer to equal protection, the United States Supreme Court repeatedly has found there to be an "equal protection component of the Due Process Clause of the Fifth Amendment." *U.S. v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). However,

> [w]hether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). As was succinctly stated by the Ninth Circuit Court of Appeals, "barring irrational or arbitrary conduct, Congress can adjust the incidents of our economic lives as it sees fit. Indeed, the Supreme Court has not blanched when settled economic exceptions were upset, as long as the legislature was pursuing a rational policy." *Ileto*, 565 F.3d at 1140 (quotation marks, citations, and corrections omitted). As the Gustafsons concede, we must apply a rational basis review in determining whether PLCAA violates the Fifth Amendment's equal protection clause. Under this standard, "a classification must be upheld against [an] equal

protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quotation marks and citations omitted). In applying this highly deferential standard to PLCAA, it is clear that Congress was pursuing a rational policy by enacting PLCAA. Congress determined that certain lawsuits "threatened constitutional rights, destabilized industry, and burdened interstate commerce. Protecting constitutional rights and interstate commerce is a legitimate purpose and barring certain types of tort suits while allowing others is a rational way to pursue this legitimate purpose." *Estate of Kim*, 295 P.3d at 392 (footnote omitted).

Moreover, as previously noted, the Gustafsons' claims allege design defects and, therefore, are governed by PLCAA's design defect exception codified in § 7903(5)(A)(v). This exception does not differentiate between manufacturing or design defect claims based upon product liability statutes or common law. Even if Pennsylvania codified its product liability laws, the Gustafsons' claims would be barred under PLCAA. *Supra* at ——. Hence, there is no due process violation.

## III.

### Conclusion

I agree with Judge Kunselman that PLCAA applies to the Gustafsons' product liability claims brought against the Appellees. However, I disagree that PLCAA is unconstitutional. Like the other courts that have addressed the constitutionality of this Act, I find that Congress had the express authority under the Commerce Clause to enact PLCAA; nothing in PLCAA commandeers the states' legislative or executive branches in violation of the Tenth Amendment; and there is no infringement of the Gustafsons' rights to due process and equal protection under the Fifth Amendment. Therefore, I would affirm the able trial court's order sustaining the Appellees' preliminary objections and dismissing the Gustafsons' complaint.

Judge Bowes and Judge McCaffery join.

Judge Murray concurs in the result.

DISSENTING OPINION BY MURRAY, J.:

 **\*32** After careful review, I agree with Appellees' argument that the Gustafsons' claims are barred by the federal Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C.A. §§ 7901-7903. I therefore dissent.

### Procedural and Factual History

The facts bear repeating. As the trial court summarized,

> on March 20, 2016, ... then thirteen-year-old [J.R.] Gustafson, was killed by a model XD-9 semi-automatic handgun ("subject handgun") manufactured by [Appellee] Springfield, Inc. ("Springfield") and sold by [Appellee] Saloom Department Store ("Saloom"). J.R. was visiting the home of a friend with another fourteen-year-old friend (the "Juvenile Delinquent") when the Juvenile Delinquent [was given] the unsecured subject handgun in the home. The Juvenile Delinquent believed that the subject handgun was unloaded because the magazine had been removed; however, a live round remained in the chamber. The Juvenile Delinquent pointed the subject handgun at J.R. and pulled the trigger. The subject handgun fired and J.R. was killed. The Juvenile Delinquent subsequently pled guilty to involuntary manslaughter in a delinquency proceeding in juvenile court.

Trial Court Opinion, 1/15/19, at 2.

In addition to initiating the proceeding against the Juvenile Delinquent, the Commonwealth filed criminal charges against three adults in connection with J.R.'s death. Christopher Lewis pled guilty to illegally selling the gun to Joshua Hudec, who pled guilty to child endangerment for leaving the gun unsecured in the home. Brooke Nelson, who was babysitting young children in the home when J.R. was shot, pled guilty to child endangerment, reckless endangerment, and a weapons offense for providing the gun to the Juvenile Delinquent.

In their civil complaint, "comprised of survival and wrongful death claims" against Appellees, the Gustafsons alleged "negligent design and sale as well as negligent warnings and marketing with regard to [the] manufacture and sale of the" handgun. Trial Court Opinion, 1/15/19, at 2. Appellees, in their preliminary objections, argued the Gustafsons failed to plead a valid cause of action because the claims are barred by the PLCAA. I agree.

On August 7, 2018, the Gustafsons replied to the preliminary objections, averring that the PLCAA did not bar their claims, and in the alternative, challenging the constitutionality of the PLCAA. Answer to Preliminary Objections, 8/7/18, at 2-4. The trial court sustained Appellees' preliminary objections and dismissed the Gustafsons' complaint with prejudice. Trial Court Opinion, 1/15/19, at 16. The trial court reasoned that the Juvenile Delinquent's act "amounts to ... committing a criminal act and is thus applicable under the 'criminal misuse' portion of the PLCAA." *Id.* at 8. According to the trial court, the gun was discharged as the result of a volitional act that constituted a criminal offense, even though the discharge was unintentional. *See id.* The trial court concluded, "the PLCAA is in no way in violation of the United States Constitution." *Id.* at 16.

### Standard of Review

As the Pennsylvania Supreme Court has explained,

> [o]ur standard of review in [an] appeal arising from an order sustaining preliminary objections in the nature of a demurrer is *de novo*, and our scope of review is plenary. We recognize a demurrer is a preliminary objection to the legal sufficiency of a pleading and raises questions of law; we must therefore accept as true all well-pleaded, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts. A preliminary objection in the nature of a demurrer should be sustained only in cases that clearly and without a doubt fail to state a claim for which relief may be granted.

 **\*33** *Raynor v. D'Annunzio*, —— Pa. ——, 243 A.3d 41, 52 (2020) (citations omitted).

### The Gustafsons' Claims

In their supplemental brief, the Gustafsons claim the PLCAA infringes on the rights reserved to the states under the Tenth Amendment to the United States Constitution. Gustafsons' Supplemental Brief at 4. The Gustafsons argue the PLCAA exceeds the authority vested in the federal government under the Commerce Clause of the United States Constitution. *Id.* at 5. They assert the PLCAA targets "the states themselves, rather than any private individuals or any arguably commercial activity, by dictating to the states how they must exercise their lawmaking functions." *Id.* at 6.

The Gustafsons further argue that under federalism and statutory construction principles, the PLCAA does not apply to their products liability action. *Id.* at 7. Specifically, the Gustafsons assert there was no disqualifying "criminal" or "volitional" act precluding their tort claims. *Id.* They direct our attention to Congress's narrow reference to "criminal" acts as disqualifying state products liability actions. *Id.* at 11. According to the Gustafsons, Congress intentionally restricted products liability actions involving "criminal" acts, but not "unlawful" acts. *Id.* at 12. The Gustafsons also argue that federalism precedent requires that their action be allowed to proceed. *Id.* at 7.

### I. Does the PLCAA Bar Appellants' Claim?

### Federal Preemption

When addressing questions of express or implied preemption, we begin "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008).

I agree with Judge Kunselman's Opinion in Support of Per Curiam Order to Reverse (Kunselman Op.) that the PLCAA preempts state common law. *See* Kunselman Op. at 11.

> [I]n all preemption cases, and particularly in those in which Congress has legislated ... in a field in which the States have traditionally occupied, ... we start with the assumption that the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth v. Levine*, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (quotation marks omitted).

The doctrine of preemption is grounded in the United States Constitution:

> The Supremacy Clause of the United States Constitution prohibits states from enacting laws that are contrary to the laws of our federal government: "This Constitution and the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl.

2. It is through this clause that the United States Congress may preempt state law.

*Office of Disciplinary Counsel v. Marcone*, 579 Pa. 1, 855 A.2d 654, 664 (2004). If Congress "enacts a law that imposes restrictions or confers rights on private actors," and "a state law confers rights or imposes restrictions that conflict with the federal law," then "the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, — U.S. ——, 138 S. Ct. 1461, 1480, 200 L.Ed.2d 854 (2018).

**\*34** The United States Supreme Court has set forth "two cornerstones" of preemption jurisprudence. *Wyeth*, 555 U.S. at 565, 129 S.Ct. 1187. First, the "ultimate touchstone" is "the purpose of Congress." *Id.* (citation omitted). Second, the Court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," especially when the case involves a "field which the states have traditionally occupied." *Id.* (citation omitted).

The United States Supreme Court recognizes three types of federal preemption:

> (1) [E]xpress preemption, where the federal law includes a provision that expressly preempts the state statute; (2) field preemption, where "Congress has legislated in a field so comprehensively that it has implicitly expressed an intention to occupy the given field to the exclusion of state law[ ]"; and (3) conflict preemption, where the state statute either precludes compliance with the federal law or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]"

*Krentz v. CONRAIL*, 589 Pa. 576, 910 A.2d 20, 31-32 (2006) (quoting *Marcone*, 855 A.2d at 664 (internal citations omitted)).

The United States Supreme Court adheres to "the cardinal rule that a statute is to be read as a whole ... since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (citation omitted).

> Our inquiry into the scope of a statute's pre-emptive effect is guided by the rule that " '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S. Ct. 219, 11 L. Ed. 2d 179 (1963)). Congress may indicate pre-emptive intent

through a statute's express language or through its structure and purpose. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977). If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains.

*Altria Grp.*, 555 U.S. at 76, 129 S.Ct. 538. The purpose and scope of preemption is "primarily [ ] discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Medtronic*, 518 U.S. at 486, 116 S.Ct. 2240.

The parties do not dispute that the PLCAA expressly protects firearms and ammunition sellers from liability for "harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended," while "[p]reserv[ing] and protect[ing] ... State sovereignty[.]" 15 U.S.C.A. §§ 7901(a)(5), (6). As discussed *infra*, the PLCAA's preemption is accomplished pursuant to Congress's constitutional power to regulate interstate commerce. *See* 15 U.S.C.A. § 7901(b)(4) ("The purpose[ ] of this chapter ... [includes the prevention] of such lawsuits to impose unreasonable burdens on interstate and foreign commerce"); *United States v. Lopez*, 514 U.S. 549, 561-62, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (the Commerce Clause authorizes congressional regulation of firearms possession).

Instantly, where there is express preemption, our role is to construe the scope of the preemption, considering the congressional purpose of the statute, as revealed by the text and statutory framework. *Altria Group*, 555 U.S. at 77, 129 S.Ct. 538; *Medtronic*, 518 U.S. at 485-86, 116 S.Ct. 2240. While we factor the presumption against preemption of the states in our analysis, *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240, the presumption is merely one factor in the Court's analysis. It will not override the intended purpose of Congress as revealed by the text and framework of the PLCAA. *Altria Group*, 555 U.S. at 77, 129 S.Ct. 538.

**\*35** The PLCAA expressly bars any civil cause of action, regardless of the underlying theory, when a plaintiff's injury results from the "criminal or unlawful misuse" of a person or a third party, unless a specific exception applies. 15 U.S.C.A. §§ 7902(a), 7903(5)(A). The Gustafsons rely on the PLCAA's purposes section, which states that the PLCAA was passed to "prohibit causes of action for the harm **solely** caused by the criminal or unlawful misuse of firearms." 15

U.S.C.A. § 7901(b)(1) (emphasis added). A similar statement in the PLCAA's findings section decries the "possibility of imposing liability ... for harm that is **solely** caused by others." 15 U.S.C.A. § 7901(a)(6) (emphasis added).

Contrary to the Gustafsons' assertion, the purpose section of the PLCAA does not redefine the plain language of the statute. Rather, we must "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)). We look to the intent of Congress where the language is not "dispositive." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). Here, the PLCAA's statement of purpose does not supplant the PLCAA's express preemption of qualified civil liability actions against firearms sellers, including those raised by the Gustafsons. Where the terms of a statute are unambiguous, judicial inquiry is complete. *Id.*; *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981).

Finally, we are not persuaded by the Gustafsons' reliance on the Supreme Court decisions in *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), and *Bond v. United States*, 572 U.S. 844, 134 S.Ct. 2077, 189 L.Ed.2d 1 (2014). *See* Gustafsons' Supplemental Brief at 20-21. *Gregory* and *Bond* involve **implied** preemption. In both cases, the Supreme Court held that expansive statutory definitions should be narrowly construed to avoid excessive federal intrusion into traditional issues of state concern. *Gregory*, 501 U.S. at 460, 111 S.Ct. 2395; *Bond*, 572 U.S. at 856-57, 861-64, 134 S.Ct. 2077. Instantly, the trial court concluded,

> [t]he present analysis does not even reach the *Gregory* and *Bond* constitutional avoidance doctrine, because the text of the statute makes manifest Congress' intent to preempt state tort law. Congress explicitly stated in the PLCAA that it intended to "prohibit causes of action" as defined in the PLCAA to "prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce." 15 U.S.C. § 7901. Throughout the PLCAA, Congress unambiguously and without question states its intention to definitively preempt state tort law.

Trial Court Opinion, 1/15/19, at 4. Because Congress expressly and unambiguously exercised its constitutionally delegated authority to preempt state law negligence actions against sellers of firearms, there is no need to employ a narrow construction to avoid federalism issues.

## Statutory Interpretation

Alternatively, the Gustafsons maintain their action does not fall under the scope of the PLCAA, stating that it "falls within [the] PLCAA's product liability exception (§ 7032(5)(A)(v)) because there was no disqualifying 'volitional' and 'criminal' act and it falls outside the scope of the general definition of a 'qualified civil liability action' in § 7903(5)(A)."[1] Gustafsons' Supp. Brief at 7; *see also id.* at 7-17.

[1]      As noted, Section 7903(5)(A)(v) exempts product liability cases from the PLCAA except "where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage[.]" 15 U.S.C.A. § 7903(5)(A)(v).

**\*36**  Judge Kunselman disagrees with the Gustafsons, stating "it is undisputed that the Gustafsons filed a civil action against a gun manufacturer and/or seller and the damages arose from the criminal and/or unlawful misuse of a firearm by a third party." Kunselman Op. at 6. Judge Kunselman also concludes this case does not fall within the product liability exception because, "the criminal act that triggers a 'qualified-civil-liability-action' under PLCAA will *always* be a volitional, criminal act that nullifies exception (v)." *Id.* at 10 (emphasis in original).

In his Opinion in Support of Per Curiam Order to Reverse, President Judge Emeritus John Bender (Bender Opinion) disagrees, stating, "I believe the exceptional circumstances of this case call into question whether the discharge of the firearm was caused by a volitional act, even though a criminal offense was committed." Bender Op. at 6. The Bender Opinion accepts the Gustafsons' supposition that while the Juvenile Delinquent committed a volitional act when he pulled the trigger, the **firing** was not volitional, because the Juvenile Delinquent believed the gun was not loaded. *Id.* at 6. The Bender Opinion maintains the deterrence effect of product liability actions "would be meaningless if the act of pulling the trigger was indistinguishable from the act of firing the gun for purposes of what constitutes a volitional act in the context of the product-defection exception." *Id.* at 6-7. The Bender Opinion would find "an atypical disconnect in the chain of the causation between pulling the trigger and discharging the weapon[.]" *Id.* at 7, 82 S.Ct. 585.

The Bender Opinion additionally would determine, even if there was a volitional act, that act was not a crime. *Id.* at 9, 82 S.Ct. 585. The Bender Opinion posits, "because the Juvenile Delinquent was not tried as an adult in criminal court, the pertinent act of firing the handgun did not constitute a criminal offense under the undisputed facts of this case." *Id.* I disagree.

"The construction of a federal statute is a matter of federal law." *Samuel–Bassett v. Kia Motors Am., Inc.*, 613 Pa. 371, 34 A.3d 1, 51 (2011) (citation omitted). "Pursuant to federal rules of statutory construction, the courts consider the particular statutory language, as well as the design of the statute and its purposes in determining the meaning of a federal statute." *Id.* In analyzing a federal statute, "we must first determine whether the statutory text is plain and unambiguous." *Carcieri v. Salazar*, 555 U.S. 379, 387, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009). Where the statute is clear, "We must enforce plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010). "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).

The plain language of the PLCAA concerns a "volitional act"; it includes no *mens rea* requirement and does not reference an actor's acuity or state of mind. The dictionary defines the word "volition" as "the act of using the will; exercise of the will as in deciding what to do [ ] a conscious or deliberate decision or choice[.]" Webster's New World College Dictionary, 1620 (5th ed. 2020). Here, the Juvenile Delinquent acted volitionally in accepting the gun from the babysitter, Brooke Nelson, aiming the gun at J.R., and pulling the trigger.

The Bender Opinion admits, "In typical circumstances, the intentional act of pulling a trigger is effectively identical to intentionally firing the gun, regardless of whether the resulting injury was intended." Bender Op. at 6. The Bender Opinion maintains, "while the Juvenile Delinquent's pulling of the trigger was volitional, the firing of the gun was not, because **he believed** that the firearm was not loaded when the magazine was discharged." *Id.* (emphasis added). However, under the plain language of the PLCAA, the Juvenile Delinquent's "belief" is not germane.

**\*37** The PLCAA uses the word "volitional" not "intentional"; the terms are not interchangeable, and regardless, we may not substitute language chosen by Congress. *See Woodford v. Ins. Dept.*, 243 A.3d 60, 73 (Pa. 2020) (citations omitted) ("When the plain language is clear and unambiguous we must not disregard it in pursuit of the law's spirit. When the text of the statute is ambiguous, then — and only then — do we advance beyond its plain language and look to other considerations to discern [Congress's] intent."). Moreover, the unambiguous language of the PLCAA focuses on whether the "act" was volitional. There is no statutory language qualifying the term "volitional" by the actor's state of mind. The Bender Opinion's attempt to distinguish the pulling of the trigger from the gun firing compels an absurd result. *See Griffin*, *supra* ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). I recognize the Juvenile Delinquent did not intend to kill his friend. However, the Juvenile Delinquent's understanding and intent is not relevant to the application of the PLCAA in this case.

The Bender Opinion would also conclude that, because the Juvenile Delinquent was not an adult, his unlawful act of possessing and firing the gun was not a criminal act for purposes of the PLCAA. Bender Op. at 8-9. Again, I disagree.

The PLCAA requires a "criminal offense"; it does not require a criminal charge or conviction, and does not exempt juveniles. 15 U.S.C.A. § 7903(5)(A)(v). *See Adames v. Sheahan*, 233 Ill.2d 276, 330 Ill.Dec. 720, 909 N.E.2d 742, 761-62 (2009) (applying the PLCAA to a juvenile offender and stating that the PLCAA only requires "criminal or unlawful misuse" of a firearm and "does not contain a requirement that there be criminal intent or a criminal conviction[.]").[2] In *Ryan v. Hughes-Ortiz*, 81 Mass.App.Ct. 90, 959 N.E.2d 1000 (2012), a convicted felon stole two guns; his sister persuaded him to return them, and while doing so, the felon shot himself in the femoral artery. *Ryan*, 959 N.E.2d at 1003. When his estate sued the gun's owner and manufacturer, the Massachusetts Court of Appeals held that the estate's claims were barred by the PLCAA. *Id.* at 1007-08. The court noted that the decedent's possession of the guns was unlawful because he was a convicted felon, and the "PLCAA does not require a criminal conviction in order for an activity to qualify as 'criminal or unlawful misuse.' " *Id.* at 1008.

2    "The decisions of courts of other states are persuasive, but not binding, authority." *Huber v. Etkin*, 58 A.3d 772, 780 n.8 (Pa. Super. 2012) (citation omitted).

In Pennsylvania, a "delinquent act [is] **an act designated a crime under the law of this Commonwealth**, or of another state if the act occurred in that state, or under Federal law[.]" 42 Pa.C.S.A. § 6302 (emphasis added). Thus, **a juvenile can only be adjudicated delinquent if he or she commits a crime**. *See id.* The Legislature does not distinguish adults and juveniles in terms of the **acts** which constitute crimes, only the legal consequences of those acts.

In sum, the focus of the PLCAA is on the act, not the actor. Had Congress intended to exempt crimes committed by juveniles, it could have done so. Under the Bender Opinion's interpretation of the product liability exemption, enforcement of the PLCAA would not be uniform. Rather, it would vary based upon charging decisions of prosecutors — again, an absurd result. *See Griffin*, 458 U.S. at 575, 102 S.Ct. 3245. I view the Bender Opinion's interpretation as inconsistent with the intent of Congress and in conflict with our standard of review. *See Hardt*, 560 U.S. at 251, 130 S.Ct. 2149. I therefore agree with Judge Kunselman's opinion that the product liability exemption does not apply in this case.

## II. Is the PLCAA Constitutional?

### Constitutional Claims

The Gustafsons contend the PLCAA "violates the Tenth Amendment and exceeds Congress's Commerce Clause authority." Gustafsons' Supp. Brief at 4. They also maintain the PLCAA violates the Due Process and Equal Protection Clauses of the Fifth Amendment. Gustafsons' Brief at 39-47. Appellees counter that the PLCAA "easily passes constitutional muster." Appellees' Sub. Brief at 42. The United States as intervenor agrees, stating that the PLCAA "is a valid exercise of Congress's power." United States' Sub. Brief at 8.

 **\*38** Judge Kunselman, while not reaching the Gustafsons' Fifth Amendment claims, agrees with the Gustafsons that the PLCAA violates the Tenth Amendment and exceeds the authority delegated to Congress in the Commerce Clause. Kunselman Op. at 12-36. However, I agree with the Honorable Judith Olson. In her dissenting opinion, she accurately states, "Since its enactment in October 2005, the constitutionality of PLCAA has been challenged in

various state and federal courts. Every appellate court that has addressed these issues have found that PLCAA passes constitutional muster." Diss. of J. Olson at 5-6 (footnote omitted).

Pertinently:

> The constitutionality of a statute presents a "pure question of law," over which our standard of review is *de novo* and our scope of review is plenary. Our Supreme Court has also offered the following discussion of the burden borne by those seeking to invalidate a statutory scheme on constitutional grounds:
>
>> In addressing constitutional challenges to legislative enactments, we are ever cognizant that "[Congress] may enact laws which impinge on constitutional rights to protect the health, safety, and welfare of society," but also that "any restriction is subject to judicial review to protect the constitutional rights of all citizens." We emphasize that "**a party challenging a statute must meet the high burden of demonstrating that the statute clearly, palpably, and plainly violates the Constitution.**"

*Commonwealth v. Snyder*, 251 A.3d 782, 792 (Pa. Super. 2021) (citations omitted, emphasis added).

### The Commerce Clause

The Gustafsons suggest, "Congress has no legitimate authority to enact legislation such as [the] PLCAA." Gustafsons' Brief at 47. They maintain the Commerce Clause "does not empower Congress to regulate the lawmaking functions of states." *Id.* Conversely, the United States maintains "the possibility of suits against gun manufacturers and sellers, 'constitute[s] an unreasonable burden on interstate and foreign commerce.' " United States Sub. Brief at 8 (citation omitted). As Judge Olson cogently notes,

> Instead of arguing that Congress lacked authority under the Commerce Clause to regulate interstate and international commerce of firearms, the Gustafsons repackage their argument regarding the Tenth Amendment in terms of the Commerce Clause; *i.e.* state decisions on whether liability standards should be established via common law or through legislation is not commercial activity that may be regulated by Congress.

Diss. of J. Olson at 7.

The Gustafsons' argument does not come close to meeting their "high burden of demonstrating that the statute clearly, palpably, and plainly violates the Constitution." *Snyder*, 251 A.3d at 792. Likewise, the argument in their supplemental brief is primarily a summarization of this Court's decision from the 3-judge panel, which was withdrawn when the case proceeded to *en banc* review. Gustafsons' Supp. Brief at 5-7.

Rather than finding waiver for the Gustafsons' failure to develop their legal argument,[3] Judge Kunselman impermissibly shifts the burden to the United States to prove the PLCAA's compliance with the Constitution. *See* Kunselman Op. at 12-24; *Snyder*, 251 A.3d at 792. It is not our role to develop an appellant's argument. *See Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007) (*en banc*); *see also Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) ("[I]t is an appellant's duty to present arguments that are sufficiently developed for our review."); *Bombar v. West Am. Ins. Co.*, 932 A.2d 78, 94 (Pa. Super. 2007). The Gustafsons have not presented a cogent legal argument on this issue. Therefore, there is no basis for concluding that the PLCAA exceeds Congress's Commerce Clause authority.

[3]    We have explained,

When an appellant cites no authority supporting an argument, this Court is inclined to believe there is none. *See* Pa. R.A.P. 2119(a) and (b) (requiring an appellant to discuss and cite pertinent authorities); *Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa. Super. 2014) (finding issue waived because the appellant "cited no legal authorities nor developed any meaningful analysis").

*Commonwealth v. Reyes-Rodriguez*, 111 A.3d 775, 781 (Pa. Super. 2015).

***39** Regardless, the Constitution gives Congress the authority to "regulate commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The United States Supreme Court has interpreted this authority broadly to "uph[o]ld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." *Lopez*, 514 U.S. at 559, 115 S.Ct. 1624. Actions of Congress are valid under the Commerce Clause when Congress acts to regulate "economic activity" that "substantially affects interstate commerce[.]" *Id.* at 560, 115 S.Ct. 1624; *accord Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012).

The PLCAA regulates economic activity that substantially affects interstate commerce. *See* 15 U.S.C.A. § 7901(a)(6) (finding the possibility of lawsuits against gun manufacturers and sellers "constitute[ ] an unreasonable burden on interstate and foreign commerce."); *see also Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 392 (Alaska 2013) ("Congress found certain types of tort suits threatened constitutional rights, destabilized industry, and burdened interstate commerce"); *accord City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 394 (2d Cir. 2008).[4] Congress enacted the PLCAA to protect interstate commerce. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("[O]ne State's power to impose burdens on the interstate market ... is not only subordinate to the federal power over interstate commerce, but is also constrained by the need to respect the interests of other States." (citation omitted)).

[4]    "While we recognize that federal court decisions are not binding on this court, we are able to adopt their analysis as it appeals to our reason." *Kleban v. Nat. Union Fire Ins. Co. of Pittsburgh*, 771 A.2d 39, 43 (Pa. Super. 2001) (citation omitted).

In addition, a "nexus to interstate commerce" must be present. *See Lopez*, 514 U.S. at 562, 115 S.Ct. 1624. "[T]he PLCAA only reaches lawsuits that 'have an explicit connection with or effect on interstate commerce.' " *Beretta*, 524 F.3d at 394 (citation omitted). The statute bars tort lawsuits against manufacturers and sellers who manufacture or sell firearms "in interstate or foreign commerce," 15 U.S.C.A. § 7903(2), (6), and where firearms "ha[ve] been shipped or transported in interstate or foreign commerce." *Id.* § 7903(4). The PLCAA does not regulate "truly local" commerce, which is beyond the ambit of the federal government. *Lopez*, 514 U.S. at 568, 115 S.Ct. 1624; *see also Ileto v. Glock, Inc.*, 565 F.3d 1126, 1140 (9th Cir. 2009) (rejecting Equal Protection and Due Process challenges and noting "Congress carefully constrained the Act's reach to the confines of the Commerce Clause").

Moreover, unlike the federal prohibition on state authorization of sports gambling found invalid in *Murphy*, 138 S. Ct. at 1481,[5] the PLCAA governs private conduct through its preemption of select suits within its scope, "brought by any person against a manufacturer or seller of a qualified product[.]" 15 U.S.C.A. § 7903(5)(A).

5        The United States Supreme Court found the PLCAA did not "impose any federal restrictions on private actors." *Murphy* at 1481.

The Gustafsons' contention that the PLCAA does not regulate the conduct of private actors, but instead "dictat[es] to the states how they must exercise their lawmaking functions," lacks merit. Gustafsons' Supp. Brief at 6. Congress has the ability to preempt state statutes under its Commerce Clause powers. *See, e.g.*, *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, ——, 136 S.Ct. 1288, 1299, 194 L.Ed.2d 414 (2016) (citations omitted) (holding on Commerce Clause grounds that Maryland's state energy program was preempted by federal law even where state exercised its "traditional authority over energy retail rates"); *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 480, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013) (citations omitted) (holding on Commerce Clause grounds that lawsuits based on state common law were preempted by federal statute, and stating, "it has long been settled that state laws that conflict with federal law are 'without effect.' ").

 **\*40**   The United States Supreme Court has reinforced Congress's power to preempt, under the Commerce Clause, state statutes, tort laws, and even laws of evidence. *See Riegel*, 552 U.S. at 323, 128 S.Ct. 999 (holding federal law preempts state law negligence and product liability claims); *Pierce County v. Guillen*, 537 U.S. 129, 146, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003) (finding federal statute was not in excess of authority granted to Congress under Commerce Clause; statute "was not intended to be an effort-free tool in litigation against state and local governments."). Accordingly, Congress did not exceed its authority under the Commerce Clause in enacting the PLCAA.

The Commerce Clause gives Congress authority to "regulate the use of the channels of interstate commerce." *Lopez*, 514 U.S. at 558, 115 S.Ct. 1624. The Supreme Court recognizes three categories of activity that Congress may regulate under its commerce power: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce, ... *i.e.*, those activities that substantially affect interstate commerce." *Id.* at 558-59, 115 S.Ct. 1624.

In enacting the PLCAA, Congress determined that targeted lawsuits "constitute[ ] an unreasonable burden on interstate and foreign commerce of the United States," 15 U.S.C.A.

§ 7901(a)(6). Congress acted "[t]o prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce," *id.* § 7901(b)(4). Congress further restricted the PLCAA's reach to the confines of the Commerce Clause. *See, e.g.*, *id.* § 7903(2) (including an interstate- or foreign-commerce element in the definition of a "manufacturer"); *id.* § 7903(4) (including the same restriction to a "qualified product"); *id.* § 7903(6) (including the same restriction to a "seller").

Consequently, Congress — properly exercising its authority — determined that insulating the firearms industry from a specific class of lawsuits protected interstate and foreign commerce. As such, I disagree with the Majority's conclusion that the PLCAA was not a valid exercise of Congress's authority under the Commerce Clause.

**The Tenth Amendment**

The Gustafsons argue the PLCAA violates the Tenth Amendment based on its "severe intrusion on state sovereignty and lawmaking authority." Gustafsons' Brief at 35. Without citing any legal authority, the Gustafsons contend the "PLCAA interferes with the sovereign rights of the states to freely choose how to allocate lawmaking functions between the legislative and judicial branches and how to exercise general police powers reserved solely to the states." Gustafsons' Supp. Brief at 4-5.

Appellees counter:

> The PLCAA was enacted pursuant to the power to regulate interstate and international commerce that was specifically delegated to Congress through the Commerce Clause in Article I, Section 8 of the Constitution. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Accordingly, U.S. Supreme Court precedent holds that a federal statute does not violate the Tenth Amendment unless it commandeers either a state's executive officials or legislative process.

Appellees' Sub. Brief at 54-55.

Similarly, the United States responds,

> the critical inquiry with respect to the Tenth Amendment is whether the PLCAA commandeers the states.... [I]t plainly

does not. The statute simply preempts certain claims while imposing no affirmative duty of any kind or any branch of the state government.

**\*41**  United States' Sub. Brief at 12 (quotation marks and citations omitted).

The Tenth Amendment provides:

> The powers delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the People.

U.S. Const. amend. X. As the United States Supreme Court explained, state and federal governments are not "co-equal sovereigns." *F.E.R.C. v. Mississippi*, 456 U.S. 742, 761, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982).

> While th[e United States Supreme] Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations, there are instances where the Court has upheld federal statutory structures that in effect directed state decisionmakers to take or to refrain from taking certain actions.

*Id.* at 761-62, 102 S.Ct. 2126 (citation omitted).

Judge Kunselman relies on *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) as the sole support for concluding that the PLCAA violates the Tenth Amendment. Judge Kunselman concedes that *Erie R.R.* "did not cite to the Tenth Amendment," Kunselman Op. at 34. *Erie R.R.* is inapposite. Not only does the decision not mention the Tenth Amendment, it does not discuss the Commerce Clause or constitutionality of any federal statute. The case is an outlier — a narrow decision addressing law that **Federal Courts apply in diversity jurisdiction cases**. *See Erie R.R.*, 304 U.S. at 71-80, 58 S.Ct. 817.

Previously, in *Swift v. Tyson*, 41 U.S. 1, 16 Pet. 1, 10 L.Ed. 865 (1842), the Supreme Court held that federal courts, in diversity cases, were not obligated to apply state law, but rather, "general principles and doctrines of commercial jurisprudence." *Id.* at 2. In *Erie R.R.*, the Supreme Court recognized this doctrine was "oft-challenged," and resulted in federal courts applying "general law," when no specific state statutes were at issue. *Erie R.R.*, at 69-70, 58 S.Ct. 817. *Erie R.R.* overruled *Swift*, finding that *Swift* led to inconsistent results and forum-shopping, as litigants attempted to create diversity jurisdiction to remove themselves from state law. *Id.* at 72-75, 58 S.Ct. 817. The Supreme Court held:

> Except in matters **governed by the Federal Constitution or by acts of Congress**, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law.

*Id.* at 78, 58 S.Ct. 817 (emphasis added). Thus, *Erie R.R.* is not applicable.

There is no violation of the Tenth Amendment unless "the PLCAA commandeers the states." *Id.* at 742, 102 S.Ct. 2126. The anti-commandeering rule has two elements. *See Murphy*, 138 S. Ct. at 1471. First, it prohibits Congress from requiring state legislatures to enact particular laws. *See New York*, 505 U.S. at 175-79, 112 S.Ct. 2408 (overturning "take title" provision of the Low-Level Radioactive Waste Policy Act as violating the Tenth Amendment because Congress did not have power to force states to take title of waste properties). Second, Congress may not order executive branch employees of a state or municipality to "administer or enforce a federal regulatory program." *Printz v. U.S.*, 521 U.S. 898, 903, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (declaring a provision of the Brady Act violated the Tenth Amendment because it required state employees to conduct background checks on gun purchasers). However, state courts must enforce federal law. *Id.* at 907, 117 S.Ct. 2365.

**\*42**  Here, the PLCAA does not impose an affirmative duty on states or "commandeer" state officials or the state legislative process. The PLCAA provides immunity for manufacturers and sellers of firearms from claims based on harm caused by third parties. The PLCAA does not create causes of action, but permits states to do so. *See* 15 U.S.C.A. § 7903(5)(C) ("[N]o provision of this Act shall be construed to create a public or private cause of action or remedy."). Thus, the PLCAA does not violate the Tenth Amendment. *Beretta*, *supra* at 306; *Adames*, *supra* at 743, 909 N.E.2d at 763; *cf Printz*, 521 U.S. at 903, 907, 117 S.Ct. 2365; *New York*, 505 U.S. at 178-79, 112 S.Ct. 2408.

## The Fifth Amendment

The Gustafsons argue the PLCAA violates due process because it "extinguishe[s] tort actions without providing a reasonable alternative remedy." Gustafsons' Brief at 39. To succeed in a due process challenge, a plaintiff must demonstrate "depriv[ation] of life, liberty, or property ... without due process of law." U.S. Const. amend. V; *see*

*also Washington v. Glucksberg*, 521 U.S. 702, 719-20, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Due Process Clause of Fifth Amendment includes both a substantive and procedural component). Regarding claims of unconstitutional property taking, the United States Supreme Court has explained: "The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of **vested** property rights[.]" *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 266, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (emphasis added); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) ("The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': [ ]To have a property interest in a benefit, a person clearly must have ... a legitimate claim of **entitlement** to it." (emphasis added; citation omitted)).

Here, the trial court concluded that "a potential tort claim, not yet realized or filed at the time of the enactment of [the PLCAA,] would certainly not constitute a vested property right." Trial Court Opinion, 1/15/19, at 11 (citing *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 88 n.32, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) ("Statutes limiting liability are relatively commonplace and have consistently been enforced by the courts.") (citation omitted), and *In re TMI*, 89 F.3d 1106, 1113 (3d Cir. 1996) ("Under the United States Constitution, legislation affecting a pending tort claim is not subject to 'heightened scrutiny' due process review because a pending tort claim does not constitute a vested right.")).

I agree the Gustafsons cannot establish a due process claim as they lack a vested property right. *See Duke Power Co.*, *supra*; *Ileto*, 565 F.3d at 1141 (rejecting plaintiffs' Fifth Amendment challenge to the PLCAA, stating, "although a cause of action is a species of property, a party's property right in any cause of action **does not vest until a final unreviewable judgment is obtained**." (emphasis added; citation omitted)); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 176-77 (D.C. 2008) (same); *see also Singer v. Sheppard*, 464 Pa. 387, 346 A.2d 897, 903 (1975) (citing *Munn v. Illinois*, 94 U.S. 113, 4 Otto 113, 24 L.Ed. 77 (1877), and stating "due process was not violated when legislative action modified the common law.").

Even if the Gustafsons' tort claim constituted a vested property right, I agree with the trial court that the PLCAA "does not deprive [the Gustafsons] of due process, and is thus

constitutional." Trial Court Opinion, 1/15/19, at 12. As the Ninth Circuit Court of Appeals expressed:

> [T]he PLCAA does not completely abolish [p]laintiffs' ability to seek redress. The PLCAA preempts certain categories of claims that meet specified requirements, but it also carves out several significant exceptions to that general rule. Some claims are preempted, but many are not.... Plaintiffs' ability to seek redress has been limited, but not abolished.

 ***43** *Ileto*, 565 F.3d at 1143 (footnote omitted); *see also* Trial Court Opinion, 1/15/19, at 12 (finding *Ileto* persuasive).

Finally, the Gustafsons argue the PLCAA violates their equal protection rights "guaranteed by the Fifth Amendment, by discriminating between classes of tort plaintiffs without any rational basis." Gustafsons' Brief at 44. The Gustafsons claim the PLCAA "creates a discriminatory judicial system in which persons injured by gun industry negligence in states with legislation codifying judicially-created liability standards can recover damages; those harmed on identical facts in states which rely on common law standards cannot recover[.]" *Id.*

The trial court correctly observed, "In assessing an equal protection claim, the appropriate standard must be utilized, and all parties in this matter agree that rational basis review is the appropriate standard here." Trial Court Opinion, 1/15/19, at 13 (citing *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (under rational basis review, statutorily imposed difference in treatment of two groups "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.")); *see also Heller*, 509 U.S. at 319, 320, 113 S.Ct. 2637 (statutory schemes are "accorded a strong presumption of validity," and "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it" (citation omitted)).

The Pennsylvania Supreme Court explained,

> under the rational basis test, if any state of facts can be envisioned to sustain the classification, equal protection is satisfied. Moreover, courts are free to hypothesize reasons why the legislature created the particular classification at issue and if some reason for it exists, it cannot be struck down, even if the soundness or wisdom in creating the distinction is questioned.

*Commonwealth v. Albert*, 563 Pa. 133, 758 A.2d 1149, 1153 (2000) (citations omitted); *see also FCC v. Beach Comm., Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("[A] legislative choice is not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data.").

Here, the trial court reasoned:

The PLCAA's Findings and Purposes section sets out an ample rational basis for any differential treatment found here. 15 U.S.C. § 7901. Congress cites to its important interests in protecting the Second Amendment rights of American citizens to keep and bear arms, as well as the avoidance of an unreasonable burden on interstate and foreign commerce. 15 U.S.C. § 7901(a)(2); 15 U.S.C. § 7901(a)(6). Congress then expresses its belief that judicial remedies might be used to circumvent the democratic legislative processes, and so gives preference to legislatively enacted remedies over judicially created remedies, subject to certain exceptions. 15 U.S.C. § 7901(a)(7); 15 U.S.C. § 7901(a)(8). This rationale easily passes rational basis review. Even if this Court were to disagree with Congress' logic, "rational-basis review in equal protection analysis 'is not a license for courts to judge

the wisdom, fairness, or logic of legislative choices.' " *Heller* at 319 [113 S.Ct. 2637]. As such, PLCAA cannot be found unconstitutional based on an equal protection analysis.

**\*44** Trial Court Opinion, 1/15/19, at 13. The trial court's reasoning is persuasive. *See, e.g., Ileto*, 565 F.3d at 1140-41 ("We have no trouble concluding that Congress rationally could find that, by insulating the firearms industry from a specified set of lawsuits, interstate and foreign commerce of firearms would be affected."); *District of Columbia*, 940 A.2d at 175 ("the PLCAA ... is reasonably viewed as an adjustment of the burdens and benefits of economic life by Congress, one it deemed necessary in exercising its power to regulate interstate commerce." (citation and brackets omitted)).

For all of the above reasons, I dissent.

Judge Bowes, Judge Olson and Judge McCaffery concur in the result.

**All Citations**

--- A.3d ----, 2022 WL 3339488, 2022 PA Super 140

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.