```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   ESTADOS UNIDOS MEXICANOS,              )
                          Plaintiff,        )
 4                                          )
     vs.                                    )   No. 21-CV-11269-FDS
 5                                          )
     SMITH & WESSON BRANDS, INC., ET AL.,   )
 6                        Defendants.       )
                                            )
 7

 8

 9

10
                    BEFORE THE HONORABLE F. DENNIS SAYLOR
11                 UNITED STATES CHIEF DISTRICT COURT JUDGE
                     MOTION HEARING - BY VIDEOCONFERENCE
12

13

14

15             John Joseph Moakley United States Courthouse
                            One Courthouse Way
16                     Boston, Massachusetts 02210

17
                            April 12, 2022
18                           10:00 a.m.

19

20
                    Kathleen Mullen Silva, RPR, CRR
21                       Official Court Reporter
               John Joseph Moakley United States Courthouse
22                    One Courthouse Way, Room 7209
                       Boston, Massachusetts 02210
23                    E-mail: kathysilva@verizon.net

24           Mechanical Steno - Computer-Aided Transcript

25
```

```
 1   APPEARANCES:

 2           Shadowen PLLC
             Steve D. Shadowen, Esq.
 3           Richard M. Brunell, Esq.
             Tina J. Miranda, Esq.
 4           1135 W. 6th Street, Suite 125
             Austin, Texas 78703
 5           717.903.1177
             and
 6           Jonathan Lowy, Esq.
             840 First Street, N.E., #400
 7           Washington, DC 20005
             202.415.0691
 8           for Plaintiff

 9
             Jones Day
10           Andrew E. Lelling, Esq.
             100 High Street, 21st Floor
11           Boston, Massachusetts 02110
             617.449.6856
12           and
             Jones Day
13           Anthony Dick, Esq.
             Noel J. Francisco, Esq.
14           51 Louisiana Avenue, N.W.
             Washington, DC 20001
15           202.879.7679
             for Smith & Wesson Brands, Inc.
16
             Renzulli Law Firm, LLP
17           Christopher Renzulli, Esq.
             81 Main Street, #508
18           White Plains, New York 10601
             914.285.0700
19           for Glock, Inc.

20           Harrison Law LLC
             Michael L. Rice, Esq.
21           141 West Jackson Boulevard, Suite 2055
             Chicago, Illinois 60604
22           312.638.8781
             and
23           Sugarman, Rogers, Barshak & Cohen
             John G. O'Neill, Esq.
24           101 Merrimac Street, 9th Floor
             Boston, Massachusetts 02114
25           617.227.3030
             for Colt's Manufacturing Co. LLC
```

```
 1          Swanson, Martin & Bell, LLP
            James B. Vogts, Esq.
 2          330 N. Wabash, Suite 3300
            Chicago, Illinois 60611
 3          312.321.9100
            for Sturm Ruger & Co., Inc.
 4
            Cozen O'Connor
 5          Michael B. deLeeuw, Esq.
            Maria Ermakova, Esq.
 6          45 Broadway, Suite 1600
            New York, New York 10006-3792
 7          212.908.1331
            and
 8          Cozen O'Connor
            John Kennedy McDonald, Esq.
 9          1650 Market Street, Suite 2800
            Philadelphia, Pennsylvania 19103
10          215.864.8046
            for Beretta USA Corp.
11
            Pisciotti Lallis Erdreich
12          Ryan Erdreich, Esq.
            30 Columbia Turnpike, Suite 205
13          Florham Park, New Jersey 07932
            973.245.8100
14          and
            Morrison Mahoney LLP
15          Joseph G. Yannetti, Esq.
            250 Summer Street
16          Boston, Massachusetts 02210
            617.439.7585
17          for Century International Arms, Inc.

18          Porter, Porter & Hassinger
            James W. Porter, II, Esq.
19          Richard W. Kinney, III, Esq.
            880 Monclair Road, Suite 175
20          Birmingham, Alabama 35213
            205.322.1744
21          and
            Campbell Conroy & O'Neil, P.C.
22          Trevor J. Keenan, Esq.
            20 City Square, Suite 300
23          Boston, Massachusetts 02129
            617.241.3000
24          for Barrett Firearms Manufacturing, Inc.

25
```

```
 1            Litchfield Cavo LLP
              Daniel Litchfield, Esq.
 2            6 Kimball Lane, Suite 200
              Lynnfield, Massachusetts 01904
 3            781.309.1521
              for Witmer Public Safety Group, Inc.
 4

 5
         Also Present: Alejandro Celorio
 6                      Guillaume Michel

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE CLERK:  Court is now in session in the matter of
Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc., et
al., Civil Action No. 21-11269.

Those in attendance are reminded that photographing,
recording and rebroadcasting of this hearing is prohibited and
may result in sanctions.

Will counsel please identify themselves starting with
the plaintiff

MR. SHADOWEN:  Good morning, Your Honor, Steve
Shadowen on behalf of the Government of Mexico.  Here with me
in our room are Alejandro Celorio, who's the principal legal
advisor to the Government of Mexico.  Also, Guillaume Michel,
who's the legal advisor to the Embassy of Mexico in Washington,
D.C.

THE COURT:  I'm sorry.  I actually can't hear a lot of
what you're saying.  I don't know what the issue is.  Can you
make sure you're speaking into the mic and that everything is
turned up.

MR. SHADOWEN:  Is this better?

THE COURT:  Yes, it is.

MR. SHADOWEN:  So I'll start again.  Steve Shadowen on
behalf of the Government of Mexico.  With us in the room here
are Alejandro Celorio, who's the principal legal advisor to the
Government of Mexico.  Also, Guillaume Michel, who is the legal

1    advisor to the Embassy of Mexico in Washington, D.C.

2            On the camera and from my office, who may have

3    speaking roles, depending on the questions that the judge asks,

4    are Rick Brunell and Tina Miranda.

5            MR. LOWY:  Your Honor, Jonathan Lowy, also for the

6    government.

7            THE COURT:  Good morning.

8            MR. LELLING:  Your Honor, I'll start with counsel for

9    Smith & Wesson and then I'll hand it off to Glock, I think.

10           I'm Andrew Lelling.  Along with me is Noel Francisco

11   and Anthony Dick.  We represent Smith & Wesson Brands in this

12   case.

13           And, again, I'll hand it off to counsel for Glock.

14           MR. RENZULLI:  Good morning, Your Honor.  Christopher

15   Renzulli here on behalf of defendant Glock, Inc.

16           I'll hand it off to Colt's.

17           MR. RICE:  Good morning, Your Honor.  Michael Rice on

18   behalf of defendant Colt's Manufacturing Co. LLC, and I believe

19   John O'Neill is also going to be here, but not speaking on

20   behalf of Colt's.

21           MR. VOGTS:  Good morning, Your Honor.  James Vogts on

22   behalf of Sturm Ruger & Company, Incorporated.

23           THE COURT:  Good morning.

24           MR. deLEEUW:  Good morning.  Michael deLeeuw on behalf

25   of Beretta USA.  With me also is John McDonald and Maria

```
 1   Ermakova.  I don't know that I'll be addressing the Court.  It
 2   depends on the court's questions.  Thank you.
 3              THE COURT:  Good morning.
 4              MR. ERDREICH:  Good morning, Your Honor.  It's
 5   Ryan Erdreich on behalf of Century International Arms, and I
 6   believe Joseph Yannetti is on as well.
 7              MR. PORTER:  Good morning, Your Honor.  Can you hear
 8   me?
 9              THE COURT:  Yes.
10              MR. PORTER:  This is Jim Porter.  I'm counsel for
11   Barrett.  And I'm here with Warren Kinney and Trevor Keenan.
12              THE COURT:  Good morning.
13              MR. LITCHFIELD:  Good morning, Your Honor.  My name is
14   Daniel Litchfield.  I'm here on behalf of Witmer Public Safety
15   Group.
16              THE COURT:  Good morning.  Is that everyone?
17              MR. LELLING:  I think that's everyone, Your Honor.
18              THE COURT:  All right.  This is a hearing on the
19   various outstanding motions to dismiss.
20              I'll ask everyone who is not actually speaking to mute
21   yourself and then remember to unmute when the time comes to
22   talk.  It looks like we don't have a perfectly stable
23   connection here.  There are a lot of people on this call.  So
24   if you see me going like this, it means I'm having trouble or
25   you're breaking up.
```

1          The counsel representing the plaintiff, I was able to

2    hear you, but I was straining a little bit, so I will ask you

3    to make sure you are as close to a microphone as possible under

4    the circumstances to make sure we can all hear you.

5          There's a lot of ground to cover here, and I would

6    like to do this in a time period of no more than an hour and a

7    half.  I have read the papers, and I'm not going to rule from

8    the bench.  So, you know, use your time prudently.

9          The parties have proposed a timetable that begins with

10   the joint motion to dismiss on 12(b)(1) and 12(b)(6) grounds,

11   and obviously that will be the principal focus.  I also want to

12   make sure that we have time for the other motions as well.

13         So let's get into it.  I may not -- I'm not going to

14   set times in advance because I'm not quite sure how this is

15   going to go, but I may ask some of you to wrap up or be

16   reasonably concise in terms of your presentation.

17         So let's start there.  Who's taking the lead?

18   Mr. Lelling, is that you?

19         MR. LELLING:  I am, Your Honor.  Thank you.  As you

20   said, I think we're going to start with sort of a highlight

21   reel on the joint motion to dismiss by both sides and then move

22   on to personal jurisdiction issues and then Unfair Trade

23   Practice Act claims.

24         THE COURT:  All right.  And I'll hear the other side's

25   response when you get to a breaking point.  I don't want to

1    hear all, whatever, six or seven motions, whatever the number

2    is, at once.  So go ahead.

3          MR. LELLING:  Right.  Thank you, Your Honor.

4          Essentially what's happening here, Your Honor, is that

5    the Mexican Government is using the court as a tool to

6    circumvent diplomatic or even legislative channels in a dispute

7    between bordering countries, United States and Mexico.  And the

8    two central defects of Mexico's complaint reflect that fact.

9          Mexico's case fails at the threshold for two separate

10   reasons.  One is that Mexico cannot establish standing even to

11   the constitutional minimum in Article III.  And even aside from

12   that, the Protection of Lawful Commerce In Arms Act, which I'm

13   going to call PLCAA during this hearing, bars the suit at

14   inception, including all claims that Mexico wants to bring.

15         As to the first basis, standing, the connection

16   between the alleged harms to the Government of Mexico and the

17   defendant's conduct is so attenuated and speculative that

18   Mexico cannot establish a case or controversy under Article

19   III.

20         Mexico, interestingly, essentially concedes this

21   because it has to.  It is, in fact, the core theory of Mexico's

22   case.  So look at attenuation, and here there's obviously a lot

23   of overlap, you know, on the Venn diagram between proximate

24   causation issues and standing.  Here you have a case in which

25   guns are manufactured in the United States.  They go to

1   wholesalers, wholesalers to retailers, maybe to more than one

2   retailer.  Then a buyer, who may or may not be a straw

3   purchaser, from a buyer to who knows how many people.  Then

4   they're smuggled over the U.S. border into Mexico where they go

5   through who knows how many acquirers, end up in the hands of an

6   end user who shoots somebody.  But we're not done yet.  It's

7   not the victim of the shooting or that person's estate that is

8   before the court as plaintiff.  It is the Government of Mexico

9   asserting derivative harm.

10          So this is far more attenuated than can possibly

11  sustain standing in the case and, again, shows lack of probable

12  cause.  But I think more importantly than the Article III

13  standing in that context is that the claims are also

14  speculative.  There are several facts that are in Mexico's

15  complaint that make this point.

16          So about two percent of guns manufactured by the

17  defendants even go to Mexico.  That's from the complaint at

18  paragraph 435.  Many of the guns in Mexico are not made in the

19  United States.  And in fact, less than half of the guns

20  recovered in Mexico were even manufactured by a defendant in

21  this case.  And the odds of any one defendant having

22  manufactured one of these guns is about 10 percent or less.

23          So by Mexico's estimate, this leaves about 6 million

24  guns in Mexico that no defendant in this case made.  And in

25  light of the approximately 16,000 gun-related homicides in

1   Mexico each year, that leaves approximately 400 guns available

2   in Mexico for any one shooting that no defendant manufactured.

3          Now, under Supreme Court and First Circuit law, what

4   we would have to conclude is that the alleged harms to Mexico

5   are not fairly traceable to the conduct of the defendants.

6   This standard has real teeth especially in the First Circuit.

7   The Court need go no farther than the *Dantzler* decision in

8   2020, which involved one link that was deemed too speculative

9   between the conduct of defendant and the claimed harm to

10  plaintiff in that case, and I won't go through the facts of

11  *Dantzler* unless the court wants me to.  It's supported by other

12  cases in the First Circuit like *Katz*.

13         If the Court is looking for a case discussing the

14  standing issue in the firearms context, *Ganim* in 2000 or 2001

15  before the Connecticut Supreme Court.  Now, that's under state

16  standards for standing but they are similar enough.  *Ganim*

17  involved the City of Bridgeport, Connecticut, two hours from

18  here by car, alleging claims almost perfectly analogous to what

19  Mexico is saying here, that the City of Bridgeport incurred

20  derivative costs because of the conduct of the gun

21  manufacturers in selling and marketing of firearms.

22         As to the second point, Your Honor, the applicability

23  of PLCAA, much has been made of the issue of whether PLCAA

24  applies extraterritorially and so to the claims in this case.

25  But that is to misapprehend the question I think a little bit.

1          PLCAA does one thing.  It immunizes U.S. gun

2     manufacturers and sellers from liability based on unlawful

3     misuse of its products by other people.  The statutory purposes

4     in 7901 actually describe that as an abuse of the legal system.

5     It achieves this goal by simply barring that kind of civil

6     action in federal and state courts in the United States.  The

7     statute says "may not be brought."

8          Okay.  So in light of that, if you have a case where

9     there's an international and domestic element to the underlying

10    facts and you're trying to figure out if the federal statute

11    will apply, we look to *RJR Nabisco* and to cases like *Morrison*.

12         Now, *RJR Nabisco* lays out a two-step test in this

13    context.  One is does the statute clearly indicate, is there a

14    clear affirmation in the statute that Congress intended

15    extraterritorial effect, extraterritorial coverage.  If not,

16    are we nonetheless really dealing with a domestic application

17    of the statute.

18         Now, PLCAA does apply extraterritorially, meaning it

19    meets the first prong of the *RJR Nabisco* test, but the Court

20    doesn't need to go there because this is obviously a domestic

21    application of the statute.  I can cover prong one if the Court

22    wants me to do that, but this issue is decided by prong two.

23         In this case Mexico has sued U.S.-based gun

24    manufacturers and a seller in a U.S. court for making a lawful

25    product in the United States which is then sold in the United

1    States with the goal of U.S. end users.  Again, as Mexico

2    itself concedes, 98 percent of the weapons that these

3    defendants manufacture or sell do not go to Mexico.  So under

4    *RJR* and the *Morrison* decision just before that where the

5    statutory focus is on an event that happened here, the statute

6    applies.  Here the statutory focus is filing a qualified civil

7    action in federal or state court.  So to quote *RJR Nabisco*, "If

8    conduct relevant to the statute's focus happened in the United

9    States, the case involves a permissible domestic application

10   even if other conduct occurred abroad."  That is this case.

11           Now, as the Court sort of thinks about this issue, I

12   think the *Morrison* decision from a few years ago is especially

13   instructive here.  I won't sort of bore you with all the

14   details, but in *Morrison* basically what happens is there's a

15   mortgage fraud in Florida.  But the purchase and sale of the

16   relevant security happens on a foreign exchange and the Supreme

17   Court needed to decide that Section B of the '34 Act applied.

18   The court decides that the core feature of Section 10, and so

19   Rule 10b-5 of the '34 Act, is the purchase and sale of the

20   security.  Where did that happen?  It happened somewhere else.

21   So the statute does not apply.

22           Here you have the opposite.  The core feature of PLCAA

23   is the filing of a qualified civil action in a U.S. court.

24   That is what has happened here.  So PLCAA applies.

25           Now, if the Court's curious about the first prong,

1   PLCAA does have extraterritorial coverage, if the Court wants
2   to address that point.  Both *RJR Nabisco* and earlier cases make
3   clear that the statute does not need to explicitly say we,
4   Congress, intend this statute to apply abroad.  "An express
5   statement of extraterritoriality is not essential."  That's a
6   quote from *RJR Nabisco*.  You can derive it from context.  I
7   think what's very important to understand the nature of the
8   statute which is that, unlike most statutes that come up in
9   these cases dealing with extraterritoriality, this is not an
10  offensive statute.  This is a defensive one.  This isn't a
11  question of whether we are imposing U.S. law on conduct that
12  occurred abroad.  It's the reverse.  It's imposing conduct that
13  occurred abroad on U.S. law.  The statute is designed to
14  immunize certain parties from certain kinds of lawsuits like
15  this one.
16        Look at this way:  Under Mexico's theory as to the
17  extraterritorial applicability of PLCAA, they would have to
18  argue that Congress intended this robust statutory immunity to
19  apply if an independent criminal actor shot somebody in San
20  Diego but not if he zips over the border and shoots somebody in
21  Tijuana.  So shoot somebody in San Diego, you're immune under
22  the statute.  Shoot somebody in Tijuana, you're not immune
23  under the statute.  We would submit that that is an absurd
24  result in the posture of a defensive statute.  So I think under
25  either prong it's pretty clear that PLCAA applies here.

1          Now, within that discussion -- this will be my final

2    point and I'll wrap up.  Within that discussion of PLCAA

3    applicability looms large the question of whether the

4    plaintiff's claims meet the predicate exception.  There are

5    other exceptions involved, negligence per se and negligent

6    entrustment, but a lot of the heat and light is on the

7    applicability of the predicate exception in PLCAA to -- mostly

8    to Unfair Trade Practice Act claims and some other claims.  So

9    I just want to address that very briefly.

10         All of plaintiff's claims fail to meet the predicate

11   exception.  And even if they did allege claims under federal or

12   state statutes that could meet the parameters of the exception,

13   there is no proximate causation.  I think it's important to

14   note that PLCAA itself requires proximate causation.  That

15   would be the application of federal proximate cause law, not

16   the proximate cause law of any given state.  Mexico cannot meet

17   that standard.

18         But as to the first part of it, unfair trade practice

19   laws, like Chapter 93A or the Connecticut Unfair Trade Practice

20   Act, do not fall within the exception.  There are a few reasons

21   for this and obviously some courts have addressed this.

22         First the plain language.  I realize that this swims

23   against the tide a little bit in that courts recently have

24   addressed the issue of whether the language in the predicate

25   exception is ambiguous or not.  I would submit to you it is not

 1    ambiguous.  And it's a pretty easy analysis.

 2            First, it says what it says, which is that what fits

 3    within the predicate exception is federal or state statutes

 4    applicable to sale and marketing of firearms, of the product.

 5    That means federal or state laws that are explicitly

 6    applicable, that are targeting the firearms industry.  How do

 7    we know this?  Because Congress provides two illustrations in

 8    the body of the exception and both of those illustrations

 9    involve laws specifically applicable to the firearms industry.

10    Now, I've seen no decision addressing the obvious question of

11    why is Congress providing the illustrations.  Congress is

12    providing the illustrations to make clear what kinds of federal

13    or state laws it is talking about.

14            There's also the purpose of PLCAA, which is stated

15    pretty starkly in 7901, which is to prevent civil liability for

16    firearms manufacturers when civil liability rests on the

17    independent criminal or other misuse of a properly functioning

18    firearm.

19            That's all the statute does.  In light of the

20    statutory purpose, I think that informs what "applicable" must

21    mean.  And in light of the statutory purpose, meaning

22    essentially the immunity statute, we would define the exception

23    narrowly instead of broadly given the chance.

24            As a corollary to that textually, there's only two

25    ways to read federal or state law and statutes applicable to

the sale or marketing of product.  "Applicable" can mean capable of being applied.  That is obviously false, because it would immediately swallow the statute.  Any federal or state statute could be applied.  This point has been made by any number of courts:  *Ileto* in the Ninth Circuit, *City of New York* in the Second Circuit.  Even *Soto* in Connecticut makes that point and that is obviously true.

But if that's not the proper textual reading, all you are left with is the textual reading that the defendants are proffering, which is that "applicable" means federal or state statutes that are explicitly applicable specifically to the firearms industry.

What *Soto* tries to do, and obviously *Soto* is a significant decision here, is it tries to establish a middle ground.  It spends a lot of pages in what is a very close decision, it was 4/3, spends a lot of pages trying to establish that the middle ground is justifiable when it's really not.  The middle ground would require courts to impose themselves where Congress didn't go, which is in the picking and choosing between laws that would apply.

And I would urge the Court not to do that.  *Soto* makes some key analytical errors that I think, with all respect to that court, render its final holding incorrect.  A key one being that very early in *Soto's* analysis, it looks to whether firearm-specific marketing laws even existed at the time PLCAA

1    was passed in 2005.  It finds none.  And so asks rhetorically,

2    well, then when PLCAA says federal and state statutes

3    applicable to the sale and marketing of guns, what can

4    "marketing" mean?  Congress must have intended preexisting

5    state laws, general consumer protection laws.  But that is

6    incorrect.  As we say in our brief and we cite them, there were

7    actual multiple existing state laws specifically targeting the

8    marketing of firearms when PLCAA was passed.  But from that

9    error proceeds much of *Soto's* analysis.

10         I think *Soto* also misreads the statute as generally

11   exempting marketing laws when, in fact, it's only exempting

12   marketing laws applicable to or tied to the sale of firearms.

13         So at the end of the day, Your Honor, I don't think

14   the predicate exception can be read as including these sort of

15   consumer protection claims despite plaintiff's efforts.

16         I think with that I will wrap up, unless there's

17   anything specific to these arguments that the Court wants to

18   hear about.  If not, I would hand it off to plaintiff's

19   counsel.

20         THE COURT:  All right.  Thank you.  All right.

21         Who's taking the lead for plaintiff?

22         MR. SHADOWEN:  Your Honor, Steve Shadowen on behalf of

23   the Government of Mexico.

24         On this motion to dismiss the complaint the

25   allegations, the well-pleaded allegations must be accepted as

1    true and they are true.  The defendants actively facilitate

2    trafficking of their guns to the cartels and other criminals in

3    Mexico.  The defendants know of the systematic straw purchases,

4    bulk sales, repeat sales that are the lifeblood of the cartels.

5    The defendants know that the sales are of military style

6    assault weapons that are the weapons of choice of the cartels.

7    The defendants intentionally make these military style weapons

8    easily convertible into fully automatic machine guns, and about

9    a third of the assault weapons that are trafficked into Mexico

10   are, in fact, converted into automatic machine guns.

11            THE COURT:  Let me ask you a question.  If the concern

12   here is -- or if -- if the issue is military style weapons --

13   first off, would this -- would your approach apply equally to

14   other criminal organizations, let's say MS-13 or the Mafia?  In

15   other words, the government of El Salvador could sue to recover

16   MS-13 costs or the government of Italy could sue to recover

17   Mafia-related costs, if your theory is correct?

18            MR. SHADOWEN:  I believe there would be no bar to

19   those claims if they can meet the requirements that we meet

20   here, including proximate cause and so forth, they would -- and

21   if their law gives them a claim that they can pursue in the

22   United States, yes, it would.

23            THE COURT:  All right.  And what about terror

24   organizations?  Could the Government of Israel or Ireland sue

25   concerning Hamas or the IRA if American firearms were used?

1          MR. SHADOWEN:  I'd have to -- I haven't given that

2     thought, Your Honor.  I don't know the answer to that.  As we

3     have styled our case, we say that we -- that PLCAA does not bar

4     it because of three main things:  The injury occurs in Mexico,

5     the gun misuse occurs in Mexico, and the plaintiff is the

6     Government of Mexico.  So I think that this case can be

7     narrowed down to when those three circumstances are met to

8     avoid PLCAA, and in addition to meet whatever requirements

9     there are in the substantive law of the foreign nation.

10         THE COURT:  But I want to understand sort of the

11    implications of your argument, whether there's any logical

12    stopping point, because it seems to me that your argument does

13    not depend on the fact that there's an organization that

14    exists.

15         So let's say that a single person, as happened I think

16    about a week ago, begins shooting civilians on the streets of

17    Tel Aviv, if it turns out that that's a Smith & Wesson firearm

18    or an American-manufactured firearm that was converted to

19    military type use, does that mean the Government of Israel

20    could sue Smith & Wesson in the United States courts?  In other

21    words, does this have to be tied to an organization, an illegal

22    organization?  Wouldn't it apply equally to acts of individuals

23    committed abroad?

24         MR. SHADOWEN:  Our claim and our argument, as we

25    framed it, is dependent upon the plaintiff being a sovereign

1 nation.

2       THE COURT:  Right.  So the Government of Israel sues

3 and says, "Hey, Smith & Wesson, this is your fault.  You

4 manufactured these guns."

5       MR. SHADOWEN:  In addition, our complaint is styled

6 and our arguments are styled and are limited to instances in

7 which there is a systematic repeated trafficking of guns into

8 the foreign jurisdiction of which these defendants have

9 knowledge and in which they actively participate.  Those are

10 the fundaments of our case.

11       THE COURT:  But the statute doesn't talk in those

12 terms.  In other words, if you're right, what prevents -- I

13 don't know -- a single bank robbery or carjacking in Rio de

14 Janeiro -- the Government of Brazil suing the gun manufacturer?

15 Your distinction seems to be grounded in the statute or the

16 Constitution, and it seems to me if what you're saying is

17 permissible, then that's permissible as well.  Let me give you

18 maybe the most extreme example of all.

19       If the concern is military type weapons, you know, if

20 Ukrainians are using United States manufactured military

21 weapons or Smith & Wesson revolvers, for that matter, to defend

22 themselves, can the Government of Russia come in and say, "You

23 have caused us harm, U.S. arms manufacturers, by manufacturing

24 these goods and they've killed Russian soldiers and therefore

25 we're suing for damages?"  I mean, why not if your theory is

1    right?

2         MR. SHADOWEN:  Other judicial doctrines would clearly

3    come into play at that point.  Act of state doctrine, the

4    political question doctrine, all sorts of other doctrines that

5    simply are not at play here in this case.

6         And, to return for a moment to the question of

7    systemic trafficking of the weapons, it may be true that

8    someone could avoid PLCAA with a single claim of a single

9    instance, but they also need a substantive claim to bring.  And

10   I doubt that in many circumstances they would be able to meet

11   the criteria of the substantive law that they are invoking.  To

12   get to the manufacturers, as opposed to just getting to the

13   immediate traffickers, the straw purchasers, you must

14   establish, and we will establish, that these gun manufacturers

15   are on notice of systemic repeated trafficking and actively

16   facilitate it and do it for profit.  That's what distinguishes

17   our case.  And these other instances of military use and so

18   forth, Your Honor, these other judicial doctrines would almost

19   certainly come into play at that point.

20        The defendants do raise certain arguments in their

21   reply brief with respect to the applicability of the

22   presumption against extraterritoriality.  With the Court's

23   permission I would like to touch on each of those very briefly

24   because this is our only opportunity to do so.

25        As the Court is aware, we rely principally on the

1    Supreme Court decisions in *Small* and *RJR Nabisco*.  The

2    defendants try to avoid the clear implications of those

3    decisions on a number of grounds, and I'd like to just tick

4    through them and give you our response to those arguments.

5          Defendants say in their reply brief the PLCAA

6    references to foreign commerce are more numerous or somehow

7    different than the references to foreign commerce in the other

8    cases where the Supreme Court has said that references to

9    foreign commerce are not sufficient to overcome the presumption

10   against extraterritoriality.  I would point the Court to the

11   *EEOC v. Arabian American Oil Company*.  That case cites the

12   *McCulloch* decision, which involves the National Labor Relations

13   Act, 29 U.S.C. 151 to 168.  The NLRA uses the term "foreign

14   commerce" or "interstate and foreign commerce" to define labor

15   organizations, to define the covered industries, to define the

16   scope of the bargaining obligation, to define the scope of the

17   enforceability of contracts, to determine the questions that

18   are appropriate for representation contests, and to define the

19   scope of the effective disputes.  Those are all in sections of

20   29 U.S.C. 158(b)(4), 158(d), 158(e), 159(c)(1) and 160(a).

21         The defendants say that PLCAA defines a protected

22   dealer by reference as including someone who's engaged in

23   interstate or foreign commerce, and therefore that necessarily

24   includes an exporter.  That's exactly the sort of use of the

25   term "foreign commerce" that the Supreme Court has emphatically

1    and repeatedly rejected.  It's even more important here to

2    understand why that isn't appropriate.

3          If you look at -- the defendants say Section

4    7903(6)(B) defines a dealer with reference to those who are

5    engaged in interstate or foreign commerce that necessarily

6    includes exporters.  But the immediately preceding definition

7    in the statute, 7903(6)(A), specifically includes a definition

8    of importer.  So if the defendants are right that the

9    definition of dealer includes exporter because it refers to

10   foreign commerce, it would also necessarily include an

11   importer, rendering the immediately preceding definition

12   absolutely surplusage.  And more generally PLCAA refers to

13   manufacturing and importing repeatedly but never refers to

14   exporting, and I draw the Court's attention to Section

15   7901(a)(4), 7901(a)(5) and 7901(b)(1).

16         The defendants say that the decision in *Small* preceded

17   the modern two-step extraterritoriality test, and that's true

18   that it did.  However, the Supreme Court in *Kiobel v. Royal*

19   *Dutch Petroleum*, 569 U.S. 108 at page 118, extensively

20   discusses, quotes and cites the decision in *Small* for the

21   modern rules with respect to extraterritoriality.

22         The defendants say PLCAA does not preclude this claim

23   because the Government of Mexico could bring the claim in its

24   own court in Mexico.  And the defendants say, therefore, this

25   case is not simply the flip side of *RJR Nabisco*, where the

1    court applied the presumption against extraterritoriality to

2    the term "injury" in RICO's claim-granting provision.  But the

3    fact of the matter is that the practicalities of modern

4    international litigation would mean that denying a U.S. forum

5    for this claim would create every bit as much a potential for

6    international friction as would recognizing the claim in *RJR*

7    *Nabisco*.

8            To take just two examples:  There are difficulties in

9    establishing personal jurisdiction.  More importantly, a large

10   part of the relief that we seek in this case is injunctive

11   relief.  We need to get that injunctive relief from a U.S.

12   court.

13           More broadly, the United States has recognized since

14   its founding the important obligation that it has to keep its

15   courts open to foreign sovereigns to litigate cross-border

16   litigation in U.S. courts.  Alexander Hamilton refers to that

17   obligation in Federalist 82.  The Constitution embodies it in

18   Article III, Section 2, Clause 1, where it grants diversity

19   jurisdiction for claims brought by foreign sovereigns, and that

20   jurisdiction has been included in our statutes ever since the

21   Judiciary Act of 1789.

22           Obviously more recently *RJR Nabisco* specifically

23   pointed to the ability of foreign sovereigns to litigate cross-

24   border tort claims under their law in U.S. courts as a reason

25   why the court there would not construe the term "injury" to

1    encompass injury incurred abroad.  And more broadly, *RJR*

2    *Nabisco* notes very strenuously that the presumption against

3    extraterritoriality applies regardless of the nature of the

4    federal statute at issue, whether it just grants jurisdiction,

5    whether it governs conduct, or whether here it has to do with

6    injuries incurred abroad.

7         And lastly, Your Honor, I want to address the

8    defendants' reliance on *WesternGeco* with respect to determining

9    the focus of the statute.  They try to avoid *Small* and *RJR*

10   *Nabisco* by saying that the focus of PLCAA is protecting U.S.

11   manufacturers.  Well, *Small* and *RJR Nabisco* apply the

12   presumption or an assumption against extraterritoriality to the

13   individual terms of the statute, even if it's determined that

14   applying the statute generally is a permissible domestic

15   application.

16        But there's two key propositions in *WesternGeco* that

17   are determinative here to show that the focus of this statute

18   is not as the defendants say.  Proposition number one is that

19   related provisions of the statute need to be considered

20   together.  Here that means that 7902(a)'s preclusion of

21   qualified civil liability actions obviously has to be

22   considered in connection with the definition of a qualified

23   civil action, which is in 7903(5)(A).

24        The second proposition, *WesternGeco* says when the

25   court is analyzing these separate provisions together, the

1    court must determine the focus of each of the sections.  And

2    you'll look in vain in the defendants' briefing or in their

3    argument today for them to articulate what the focus of Section

4    7903(5)(A) is.  They don't say because if they say and they say

5    truthfully, they lose, because it's clear as a bell that the

6    focus of 7903(5)(A) is injury and gun misuse.  Those are the

7    key terms in that provision and it's absolutely clear here that

8    both the injury and the gun misuse occur in Mexico.

9          So the focus of that provision is on those terms.  The

10   conduct relevant to those terms occurs abroad.  So applying

11   PLCAA here would not be a permissible domestic application.

12         And I think with that, Your Honor, I will turn

13   matters -- let's see -- yes, Mr. Lowy's going to address --

14   unless you have more questions for me, Mr. Lowy is going to

15   address the exceptions to PLCAA even if PLCAA generally were to

16   apply.

17         THE COURT:  All right.  Go ahead.

18         MR. LOWY:  Thank you, Your Honor.

19         To begin to address your question about MS-13 and

20   supplying terrorists, the facts in our case are not just that

21   defendants' guns are used in crime but there are very pointed

22   specific allegations that defendant have long had knowledge of

23   trafficking to the Mexican cartels and they've chosen conduct

24   that facilitates trafficking.

25         Let me give you a concrete example from our complaint.

1   We explain how the defendants utilized one gun dealer, and it's

2   one of many, who supplied more than 650 guns to the cartels

3   even after being told that the purchasers planned to bring the

4   guns to Mexico and the dealer advised a purchaser how to

5   structure sales to evade authorities.

6          Some of those guns from defendants were recovered

7   after the killing of a Mexican police chief near the border.

8   Now, defendants know of those sorts of practices.  They know of

9   those dealers.  If they don't know exactly who they are, they

10  can easily find out and actually do know many of them and they

11  have chosen to continue to supply them.  Their policy is

12  literally that if you were to provide all of that information I

13  just told you about their dealer, their response would be, I'm

14  going to continue to supply them all the guns they want at the

15  border unless and until ATF yanks their license.  And while

16  defendants know, and we allege this, that that rarely happens

17  and when it does happen, it takes years, under established law

18  there is liability there.  There is standing.  There is

19  proximate cause.

20         And you wouldn't know it from defendants' briefs and

21  arguments, but over the past 20 years there have been dozens of

22  lawsuits against gun dealers, distributors, manufacturers, many

23  of them after PLCAA was enacted, for causing gun crimes through

24  their sales practices, and virtually every case has rejected

25  defendants' major arguments, most finding those arguments not

1    even worth considering.

2         In fact, of those dozens of cases over the past 20

3    years, not a single one was dismissed for lack of standing.  So

4    to begin briefly on standing, there is for good reason that

5    these courts have not dismissed cases against these defendants

6    for lack of standing.  Again, you have to reach back to the

7    *Ganim* case 21 years ago in Connecticut.  For one, they can't

8    contest that we can establish the first two prongs of standing,

9    a concrete injury that is redressable, and also the fact that

10   the case was brought by the government does not change that

11   analysis, because the Supreme Court recognized in *Pfizer v.*

12   *Government of India* that foreign sovereigns are on equal

13   footing with domestic litigants to seek redress.  So their only

14   attack is on the causation prong of standing, which they

15   concede is a lesser standard than proximate cause.

16        Now, our allegations satisfy proximate cause.  They

17   certainly satisfy causation.  So for one, what we need to

18   establish causation for standing purposes is cause in fact.  In

19   the example that I just gave, Your Honor, there is no serious

20   question that defendants were cause in fact of that injury.

21   They chose to supply this corrupt dealer.  They chose to allow

22   his corrupt practices.  They could have cut off the dealer.  In

23   fact, they were told by the U.S. Department of Justice to stop

24   supplying dealers like that and to stop allowing bulk sales

25   like that.  But they defied the U.S. Department of Justice

1  years ago.

2          So it was completely in defendants' control that those

3  guns were trafficked.  That is cause.  That constitutes

4  standing.  And the government is the best and maybe the only

5  party who can seek redress for some or all of its damages, such

6  as damage to government property and the costs expended to stop

7  illegal gun trafficking and possession, as well as the

8  injunctive relief that it seeks to stop the flood of crime guns

9  across the border.

10          So defendants have to argue that there's some other

11  doctrine that prevents standing.  They argue that there is a

12  third-party harm doctrine under which the causation element of

13  standing can't be satisfied if the injury results in any way

14  from a third party or has too many intervening steps or

15  multiple criminal acts.  That is not the law.

16          The Supreme Court in *Department of Commerce v. New

17  York* held that there is proximate cause of harm resulting from

18  third parties who "will likely act in predictable ways even if

19  they do so unlawfully."  We allege that and more, that

20  defendants recast variants of this incorrect argument.  They

21  claim that the drug cartels are independent actors who could

22  and would cause the same harm regardless of what defendants did

23  because there are a lot of other guns in Mexico.  Well, for

24  one, if there are a lot of other guns around were a defense,

25  every single lawsuit against a gun manufacturer or dealer in

1    the United States would be dismissed on those grounds; and not

2    a single court has ever accepted that argument.

3          We also allege that the cartels did react and do react

4    in predictable ways to defendants' conduct.  So they are not

5    independent actors under Department of Commerce.

6          And there is absolutely no basis on the pleadings to

7    reject our allegation that if the cartels did not supply -- if

8    the defendants did not supply the cartels the more than 340,000

9    guns each year that they supply across the border, the cartels

10   would have less fire power and there would be less gun crime.

11   They can attempt to rebut that on summary judgment at trial but

12   not on a motion to dismiss where you have well-pled allegations

13   and more, allegations documented by -- including by post-trial

14   findings of fact from a federal judge.  And the complaint also

15   shows how increases in U.S. guns are directly correlated to

16   increased homicides in Mexico.  And, again, we quote the U.S.

17   Department of Justice telling defendants that if they sold guns

18   more responsibly, they could significantly contribute to public

19   safety.  And what that means is defendants would reduce crime

20   guns and gun crimes if they simply acted lawfully and

21   reasonably.  That supports the allegation as well.  Granted,

22   that was towards the United States market, but the same applies

23   across the border.

24          There's been a mountain of case law that has found

25   that the governmental injuries are not just fairly traceable to

1    the gun manufacturers' practices but proximately caused by that

2    conduct.  The closest Massachusetts authority is *City of Boston*

3    *v. Smith & Wesson* in which Judge Hinkle considered very similar

4    claims brought by a governmental entity against many of these

5    defendants and correctly rejected all of their arguments

6    about -- that governmental costs are too remote or attenuated

7    or derivative or that intervening criminal acts cut off

8    liability.

9         And while defendants reach for the *Ganim* case in

10   Connecticut, it's the *City of Boston* that represents the weight

11   of authority.  The *City of Boston* case was agreed with by the

12   Supreme Court of Indiana in *Gary*, the Supreme Court of Ohio in

13   *Cincinnati*, the Northern District of Ohio in *White*, the Eastern

14   District of New York in *City of New York*, the New Jersey

15   Superior Court in *James,* and in many other cases brought by

16   individual victims of gun crimes.  None of these cases were

17   dismissed for lack of standing.

18        And by the way, even *Ganim* made a point to say that it

19   was not considering any claim that the city suffered direct

20   harm, such as harm to municipal property, and we allege that

21   here.  So even *Ganim* does not support their position.

22        Second, PLCAA does not bar these claims.

23        THE COURT:  Before we get there, would it make a

24   difference -- suppose all the gun manufacturers had the

25   identical numbers of sales nationwide but they were distributed

1    more evenly.  In other words, I'm inferring that you're saying

2    that the sales in, I don't know, El Paso or San Diego or

3    Brownsville or whatever are disproportionately higher,

4    therefore showing that they know what's going across the

5    border.  But suppose those sales were made in Oklahoma City or

6    Denver or St. Louis, would that make a difference?  In other

7    words, is your case dependent on disproportionate sales near

8    the border?

9         MR. LOWY:  Your Honor, it's certainly not dependent.

10   In fact, there are examples that we have in the complaint from

11   other locations outside of the border.  It's relevant, but

12   other key facts are who are these dealers, what are their

13   practices?  I mean, the fact is what the federal government

14   told them to do and what they should be doing is not supplying

15   dealers where they've got a track record of breaking the law,

16   of supplying kinds of crime guns.  They should not be allowing

17   someone to come into the store and say, "I want 30 assault

18   weapons and I can't give you a good reason why," or 50-caliber

19   sniper rifles that shoot down helicopters, which are some of

20   the weapons that they're selling.

21        So it goes to who is selling and what are their

22   practices.  That's extremely relevant, as well as where are the

23   guns located.

24        THE COURT:  All right.  Let's talk about PLCAA.

25        MR. LOWY:  Your Honor, as defense counsel explained,

1    the predicate exception, which is Section 7903(5)(A)(iii),

2    explicitly allows actions like this in which the defendant

3    knowingly violates a law applicable to the sale and marketing

4    of firearms and thereby causes harm.  Among the dozens of cases

5    that have construed PLCAA's predicate exception, they all

6    recognize that if there's a well-pled allegation that a

7    defendant violated a firearms law that caused harm, there is no

8    basis under PLCAA to dismiss the case.

9         They have no cases to the contrary of that.  We allege

10   that defendants violated several gun laws and thereby caused

11   harm.  You don't even have to get to the argument that they

12   talked about regarding the *Soto* case.  We can get to it a

13   little bit.  But their main argument is that their supply and

14   distribution of guns, like supplying that corrupt gun dealer

15   that I talked about, creates accomplice liability.  They are at

16   best willfully blind that they're aiding illegal gun sales and

17   possession.  That exact theory was upheld by the Court of

18   Appeals of Indiana in the *City of Gary* in 2007 where the court

19   found exactly that, that that theory made defendants out as

20   accomplices and that they violated gun laws, as well as a state

21   public nuisance law, and therefore they lost all protection

22   under PLCAA and all claims were allowed.

23        In 2019 there was another appeal in that case --

24        THE COURT:  Let me stop.

25        Doesn't that make PLCAA basically completely hollow?

1   In other words, doesn't that exception basically eliminate

2   nearly all of the immunity that PLCAA purportedly provides to

3   gun dealers?

4         MR. LOWY:  Respectfully, Your Honor, absolutely not.

5         What Congress made clear, and this is throughout the

6   findings and purposes of PLCAA, is that what they were

7   concerned about were activist judges, they call it maverick

8   judges, making common law.  And PLCAA is all about curtailing

9   the authority of judges to expand common law.  At the same

10  time, they were embracing legislatures and they allow

11  legislatures to create liability standards or for courts to

12  rely on legislative enacted standards.

13        Now, there is absolutely no dispute, Your Honor -- I

14  don't think defendants will dispute -- that if they violated

15  the laws that we say they violated -- and by this I mean the

16  Gun Control Act for aiding and abetting illegal sales -- that

17  that constitutes a predicate exception under PLCAA.  I think

18  they would agree with that.  They disagree that we make out

19  that case, but they would agree that that is a predicate law

20  and that's what we're talking about with this first theory, and

21  that's what the *City of Gary*, the Court of Appeals in the *City*

22  *of Gary* accepted as a predicate violation, and based on those

23  allegations in 2007 the Court of Appeals of Indiana reached the

24  same decision in 2019.  The Supreme Court in Indiana denied

25  review of each decision.  And by the way, the Supreme Court of

1    Indiana earlier, before PLCAA, held that these allegations

2    supported finding violations of the Gun Control Act.  And

3    courts have held similarly in cases brought by individuals, and

4    for good reason, because this theory of accomplice liability

5    was upheld by the United States Supreme Court in the direct

6    sales case on weaker facts.

7         I mean, direct sales involved, as defendants would put

8    it, the lawful sale of a lawful product to a lawful licensed

9    seller.  There it was morphine sold by a drug manufacturer to a

10   licensed doctor.  But like here, and the Supreme Court

11   explained this, the product like guns had a known illegal

12   market and the manufacturer had noticed that bulk sales might

13   indicate diversion.  But it was willfully blind to the risk

14   that the product would be illegally sold.  The manufacturer was

15   convicted of criminally conspiring with the doctor's illegal

16   sales and had no specific knowledge, by the way, what the

17   doctor was doing.  These were mail orders.  It was just

18   responding to mail orders of this doctor, but their practice

19   was to continue to supply.  The Supreme Court affirmed.  And

20   similar principles have been applied to hold opioid

21   manufacturers liable.

22        Defendants' major response to this is, one, to

23   mischaracterize our allegations and say that just because they

24   know that some of their guns can be misused to commit crime,

25   that's not a basis of liability; but that's not our claim.  We

1    allege, like direct sales, they know how criminals are getting

2    their guns, they could stop and they choose to be willfully

3    blind to the facts.

4         They also claim, and they did here today, that most of

5    their guns are lawfully sold.  But that's no excuse for

6    knowingly supplying criminals with some of your guns.  I assume

7    that that was true in direct sales, and I assume it's true in

8    the opioid cases as well.  You're still liable for the wrong

9    you do.  It was obvious in direct sales that those transactions

10   were intended for the criminal market but we allege the same

11   thing and, in fact, stronger because in direct sales, the

12   Department of Justice told manufacturers stop doing some of

13   these bulk sales and it actually followed that advice.  They

14   still got convicted.  Here defendants have completely defied

15   what federal law enforcement has told them to do and, of

16   course, we're in a far less demanding standard.

17        So, again, every case that has been faced with

18   credible allegations of violations of gun law has found the

19   predicate exception prevents dismissal.  They cite no cases to

20   the contrary.  The cases that they cite either did not involve

21   a credible allegation that a law was violated or they involved

22   a law that codified the common law or codified public nuisance

23   but not gun laws.

24        And then briefly we allege another predicate

25   violation.  We don't need to, but we do, and that is the fact

1   that they make their guns in defiance of ATF Ruling 82-8, its
2   construction of federal law, which says that you can't make
3   guns that can be easily -- you can't sell to the general public
4   guns that can easily be converted to automatic weapons.  That
5   argument has been considered by two courts.  They both agreed
6   that that's a valid argument and it constitutes a predicate
7   violation.  That's the *Parsons* case and the *Goldstein* case.
8   They have, again, no cases that have rejected that argument.
9   They just argue it's implausible because ATF has not enforced
10  this interpretation.  But whether or not law enforcement
11  chooses to enforce a law doesn't determine whether it exists or
12  what it means.

13          And by the way, the definition is not implausible.  If
14  defendants were right, they could sell guns where there was a
15  little perforated piece that you'd just snap off and, in fact,
16  you could go to YouTube with instructions on how to do it and
17  you'd have yourself a machine gun, and that's okay because
18  that's not the way they made the gun.  That clearly isn't
19  right, and that's what ATF was getting at.

20          They also say that the Supreme Court has rejected that
21  argument in the *Staples* case.  That's clearly incorrect.  And
22  the *Parsons* court explains that the *Staples* case was all about
23  mens rea.  There was no question that the gun was a machine
24  gun.  The only question was whether the defendant knew it was a
25  machine gun.  The court did not define what a machine gun is

1   and it certainly did not reject ATF's rule that these guns are

2   machine guns.

3        So you don't have to get to the argument of how broad

4   is the predicate exception because those are undisputable

5   predicate violations.  But Your Honor, if you get to the

6   argument that they violated state unfair business practices

7   laws in Massachusetts and Connecticut, we explain in our brief

8   why *Soto* was correct.  Those are predicate violations.  That's

9   the most logical reading of the statute.  Defendants

10   essentially, as the *Soto* court said, are trying to put new

11   words into the statute that aren't there.  And, again, no court

12   has held that unfair business practice laws or consumer

13   protection laws are not predicate statutes.  The only cases

14   that they cite on this principle are either *Ileto*, which

15   involved a codification of the common law, or *New York City*,

16   which involved public nuisance, or cases where there was no

17   predicate violation.

18        As I explained, Your Honor, this does not swallow the

19   statute.  It is in keeping with the purpose of the statute and,

20   by the way, and the state Attorney General's amicus brief goes

21   into this, the principles of federalism and the presumption

22   against preemption require the Court to construe PLCAA's

23   restrictions on state tort law narrowly, not expansively.  I

24   don't think you need those principles, but if you do, they

25   weigh in our favor again.  And the *Soto* court recognized that

1    as well.

2           Finally, Your Honor, the defendants challenge

3    proximate cause.  And to begin, they have not even argued that

4    there is no proximate cause under Mexican law, which governs

5    here, but even if Massachusetts law applies, proximate cause is

6    a jury question in *City of Boston*, *Jupin*, and supporting

7    authority from out of state, like *Gary* and *Cincinnati* and *White*

8    all reject defendants' arguments and establish that they can be

9    deemed a cause of harm that foreseeably results from their

10   conduct.

11          In their reply defendants sort of shift gears and

12   claim that PLCAA imports a federal proximate cause standard.

13   You will note that they cite no cases that support this idea

14   because there are none.  No court has accepted it.

15          And they couldn't because under *Erie Railroad*, there

16   is no federal common law.  Federal law can create actions with

17   proximate cause as a standard, but PLCAA explicitly does not

18   create a cause of action.  It says so.  It just bars certain

19   state common law actions and allows others.  So Massachusetts

20   or Mexican law applies.  But regardless, we satisfy defendants'

21   invented federal standard too.

22          In the First Circuit there are many cases.  *Neurontin*

23   is one where the court held that as a matter of law they

24   rejected the argument that there's no proximate cause because

25   there are too many steps in the causal chain and also explained

 1    that the burden is on the defendant to rebut the causal

 2    inference when the plaintiff establishes that injury

 3    foreseeably results from defendants' conduct.  That's not our

 4    burden, certainly not on the pleadings.

 5            Defendants argue that we can't suffer injuries from

 6    the injury to our citizens, but that isn't what we're claiming.

 7    We're claiming the injuries suffered by the government.  They

 8    claim apportioning damages is unworkable, but that will be

 9    defendants' burden later on.  It is not our burden on the

10    pleadings and it has no application to the injunctive relief

11    that we seek.

12            They suggest they can't be liable unless they directly

13    engage in or facilitate violence in Mexico.  The fact that they

14    choose to use foreseeable intermediaries to supply their

15    ultimate customers and do their dirty work does not insulate

16    them from liability and there is absolutely no rule stating

17    that their duty or their liability stops at the border.  And,

18    again, the Government of Mexico is on equal footing as a

19    domestic litigant per Pfizer.

20            At bottom they're arguing that they can escape

21    accountability for harm that they foreseeably and continually

22    cause through their deliberate and unlawful actions.  That

23    wholly contradicts fundamental principles of foreseeability and

24    accountability that are central to causation under

25    Massachusetts law and all other common law, indeed determining

1  that wrongful conduct is part of the proximate cause analysis.

2         Finally, Your Honor, defendants resort to some sky is

3  falling rhetoric.

4         (Court reporter interrupts due to technical

5  disruption.)

6         MR. LOWY:  Your Honor, this case is not an attack on

7  the Second Amendment, the gun industry or American values.  We

8  simply want defendants to basically do what the United States

9  government has asked them to do, responsibly sell their guns to

10 supply law-abiding people, not criminals.  And the cartels have

11 no Second Amendment rights, nor is there a constitutional right

12 to supply them.

13        In sum, defendants invite this Court to reject the

14 well pled allegations of the complaint, to contradict the most

15 on point Massachusetts authority, *City of Boston* and numerous

16 cases that follow it, contradict all courts that have

17 considered our primary PLCAA arguments about the predicate

18 exception, and invent novel rules of proximate cause and

19 standing that would entitle them to continue to unlawfully

20 cause harm without accountability or redress.  We ask that the

21 Court resist that invitation.

22        While there are some aspects of our case that are

23 novel, the principles on which it relies are established law.

24 Virtually every argument they make they can make again at

25 summary judgment and trial when this Court has the benefit of a

1    full factual record.  We are entitled to make that record and

2    to present that evidence in court.  We simply ask to be

3    provided that opportunity.

4          We rely on our briefs for our other arguments unless

5    there are any other questions.

6          THE COURT:  All right.  Thank you.  All right.

7          Mr. Lelling, quick reply?

8          MR. LELLING:  Unless there are specific points from

9    plaintiff's argument that the Court is curious about, I'm

10   sensitive to the fact that many of the defendants have

11   important personal jurisdiction arguments.  I don't want to eat

12   up all of our remaining time without them having the

13   opportunity to address that.

14         THE COURT:  All right.

15         All right.  Who is going to be handling the 12(b)(2)

16   argument?

17         MR. RENZULLI:  Your Honor, Christopher Renzulli here.

18   I appreciate your time.  I will be brief as you've already told

19   us that you've read all the papers.

20         For purposes of the next few minutes, I'm speaking on

21   behalf of the out-of-state defendants.  That would be Glock,

22   Baretta, Barrett, Century, Colt's and Ruger.

23         I think one of the most important issues here came up

24   in a letter that we provided to the Court on April 1st.  We put

25   together the schedule of what the batting order was going to

1    be.  The reason why we put this portion of the hearing after

2    the 12(b)(6) is because, Your Honor, if you determine that the

3    complaint doesn't have merit and you will dismiss it on

4    12(b)(6) grounds, well, you never have to get to these issues.

5    You don't have to get to the issue of jurisdiction.  If the

6    Court does want to go down that road, I point out a couple of

7    quick things from the papers.

8            The plaintiffs have not shown their properly

9    documented evidentiary proofs as required.  The plaintiffs have

10   shown conclusory allegations, far-fetched inferences in the

11   pleadings.  This is all language coming from the First Circuit.

12   They have not put forward the specific facts necessary for the

13   Court to have jurisdiction.

14           But in looking at the due process analysis, the Court

15   obviously looks at the three prongs, relatedness, purposeful

16   availment, reasonableness, and it's all in the papers.  I point

17   out a couple of things.  I point to Attorney Lelling and his

18   analysis of the five, six, seven different hands that a firearm

19   must go through before there was any alleged harm in Mexico.

20   And I also point to the statements of plaintiff's counsel

21   today.  Plaintiff's counsel said number one, Your Honor, the

22   injury occurred in Mexico.  Number two, the gun was used in

23   Mexico.  And number three, the plaintiffs are located in

24   Mexico.  Those are all significant, obviously, for the

25   relatedness inquiry and the language from *Ford Motor Company*,

1    which both sides agree is controlling in this case.

2          But *Ford* showed that there was jurisdiction because --

3    with the foreign state because the plaintiffs were injured in

4    that foreign state with the defendant's cars.  The injury was

5    there.  The plaintiffs were located there.  We don't have that

6    here.

7          What's also instructive for the Court is that the

8    court -- the Supreme Court looked at alternative places to

9    determine whether or not relates to analysis would fit.  The

10   plaintiffs in our case obviously are trying to expand "relates

11   to" beyond what the Supreme Court requires.  But they looked at

12   a couple of states.  They looked at Washington and North

13   Dakota.  Those were the states where the vehicles were

14   originally sold, and the court found, well, there's no real

15   personal jurisdiction there.  Isn't that, in fact, what Mexico

16   is doing here?  They're saying, well, some of these guns were

17   originally first sold in the Commonwealth.

18         So I think that *Ford* is instructive.  *Bristol Meyers*

19   obviously, Your Honor, is very instructive as well, certainly

20   on the gun-related issues.

21         The Lucy Allen report, not too much to talk about

22   there, Your Honor.  It doesn't advance the ball anywhere.  It

23   doesn't have any relevance to this personal jurisdiction

24   inquiry; and even if, Your Honor, some of the defendants'

25   firearms were originally sold to Massachusetts distributors

1  before being legally sold to retailers and consumers down the

2  road and then ultimately illegally trafficked into the country

3  of Mexico by criminal third parties, that does nothing to

4  establish any kind of personal jurisdiction in this case.

5      The second prong, purposeful availment, I just point out

6  that part of that inquiry includes foreseeability.  Was it

7  foreseeable to the defendants that they be subject to

8  jurisdiction in the Commonwealth for harms to non-residents

9  that occurred outside the Commonwealth?

10      Reasonable inquiry is the third prong.  Reasonable minds

11  can differ on the five different prongs.  I think in our papers

12  we argue why the balance would tip in favor of the out-of-state

13  defendants.  Nonetheless, the Court doesn't have to go there

14  either, because plaintiffs must succeed on all three prongs.

15      In some of the opposition papers, the plaintiffs ask for

16  some jurisdictional discovery.  Your Honor, I think it's in

17  about in two sentences in there.  I don't think that they

18  seriously are looking for jurisdictional discovery.  I think

19  they haven't shown they've been diligent.  They haven't shown

20  there's a colorable claim.  As Your Honor pointed out in the

21  *Tomtom* case, even where they've shown that diligence and

22  colorable claims for jurisdiction, the court still has

23  discretion to decide whether or not discovery is required.

24      I finish where I started.  None of this would be relevant

25  if the Court is inclined to dismiss this case on 12(b)(6)

 1    grounds.  It could do it without having to jump through the

 2    hoops of determining whether or not there's jurisdiction.

 3        Your Honor, if there's no questions, I appreciate your

 4    time here today.

 5            THE COURT:  All right.  Thank you.

 6            Who's going to respond for the plaintiff?

 7            MS. MIRANDA:  Your Honor, Tina Miranda for the

 8    Government.  I'm cognizant of our time.  With the exception of

 9    a very brief response to the argument the defendants made

10    regarding the application of *Ford*, we're going to rest on the

11    briefing on the issue of personal jurisdiction.

12            But with respect to *Ford*, the defendants pointed out

13    the court in that case looked at alternative forums for

14    jurisdiction, for a specific jurisdiction, and rejected a

15    finding of specific jurisdiction in what they claim is a

16    similar situation, but that's not really what's happening here.

17            What the court rejected in *Ford* was finding specific

18    jurisdiction in a products liability case where the only

19    connection to the forum was the sale of the vehicle to a former

20    owner who was not a party in the case.  What's happening in

21    this case, unlike in *Ford*, the defendants' initial sales of

22    their weapons are connected, strongly so, to the illegal

23    conduct.

24            So this case is about the defendants' failure, as

25    we've spoken earlier, to monitor and discipline its

1    distribution system in a way that promotes or prevents --

2    apologies -- prevents the rampant trafficking of its weapons

3    into Mexico.

4          So the defendants' initial sales of these weapons in

5    Massachusetts to the distributors and dealers go to the heart

6    of the Government's case.  What you have are national gun

7    manufacturers who systematically targeted and served the gun

8    market in Massachusetts.  You have two large national gun

9    wholesalers and a multitude of other dealers who are at home

10   here in Massachusetts to whom and through whom the defendants

11   sell their weapons.  And the Government has alleged and

12   produced evidence through the expert report of Lucy Allen, and

13   those facts are considered true here at this stage of the

14   pleadings, to show that the weapons that the defendants sell in

15   Massachusetts or some of the weapons they sell in Massachusetts

16   are trafficked into Mexico.  So these initial sales in

17   Massachusetts are actually a critical link in the distribution

18   chain that the Government alleges the defendants failed to

19   monitor.  So clearly the defendants' sales here is totally

20   unrelated or unlike the forum contacts that the court rejected

21   in *Ford*.

22         So the defendants say that we're not really interested

23   in discovery.  That is actually not true.  The Government feels

24   like we have strongly pled our case of jurisdiction, but should

25   the Court be interested in more, the Government is happy to

1    submit a short formal order requesting the discovery, setting

2    out in detail the discovery that we seek and from whom.

3           If the Court has no more questions, then we'll rest on

4    our briefing.

5           THE COURT:  All right.  Thank you.

6           Let me hear now from counsel for Colt on the

7    Connecticut discussion.

8           MR. RICE:  Your Honor, Michael Rice for Colt.  I too

9    will try to keep this brief.  I think the papers really do

10   address the arguments, but the claim that is asserted under the

11   Connecticut Unfair Trade Practices Act is essentially that Colt

12   promotes its products in a way to promote the illegal use of

13   those products such that these -- that it's immoral advertising

14   that would violate the Act.

15          In short, we would submit that this case is controlled

16   and the outcome related to Mexico's case is controlled by the

17   *Ganim* case, which you've heard discussion of, from the Supreme

18   Court in Connecticut in 2001, in which the City of Bridgeport

19   and its mayor brought remarkably similar claims against a

20   number of manufacturers, including Colt, about their

21   advertising and a number of other claims.

22          The court in *Ganim* concluded that in looking at the

23   question of standing, which also overlapped with the question

24   of proximate cause, that the plaintiff lacked standing there

25   because the harms that they claim are too remote from the

1  defendants' misconduct and are too derivative of the injuries

2  to others.

3          And in its opposition to Colt's motion, the Government

4  concedes, in fact, that the *Ganim* decision found that municipal

5  harms were too indirectly linked to advertising to allow a

6  CUTPA claim.  And they also concede that the claims in *Ganim*

7  included allegations that the advertising that was the subject

8  of the claims in that case targeted and encouraged a class of

9  dangerous criminals, much like the claims that they assert here

10  that Colt's advertising targets and promotes the use by

11  criminals.  So we would suggest that, based simply on the

12  concessions that the Government has made in its brief, that

13  *Ganim* is controlling.

14          Now, the Government does try to suggest the type of

15  advertising that it is complaining about here is different than

16  what was in *Ganim*.  Two responses.  One, we've already --

17  they've already acknowledged that the same type of advertising

18  was at issue in *Ganim*.  But two, they don't explain or make any

19  effort to explain why that difference, even if it was a

20  different kind of advertising claim, why that difference would

21  matter on the issue of remoteness or the derivative nature of

22  the injuries.  They would still be just as remote.  They would

23  still be seeking derivative recovery.

24          Finally, as Mr. Lowy mentioned, the Government

25  includes allegations -- at least an allegation of direct injury

1    to government property.  They also point to allegations about

2    federal police officers and such that were shot.  But those are

3    not direct.  Those are still derivative injuries related to the

4    shooting of other individuals.

5            But as to -- in paragraph 464 of the complaint, the

6    Government does make allegations about damage to military

7    aircraft, police aircraft and vehicles and security equipment.

8    But nowhere in the complaint does the Government make any

9    effort to tie any of that property damage, which is arguably

10    the only direct claim of injury that they have, to Colt, much

11    less to Colt's advertising.  In fact, in *Ganim*, when the

12    plaintiffs in that case suggested that they could state similar

13    direct property damage type claims, the court dropped a

14    footnote and said even if you did assert those kinds of claims,

15    you'd still face the same issues regarding the remoteness of

16    the conduct from the injuries that are alleged.

17            Indeed, Mexico's claims here of a direct injury are

18    much different than what was in *Soto* where you had retailer

19    sale to mother, firearm used to commit that horrible act.  Here

20    you have all of the links in the chain and they're still there

21    between the sales about which Mexico complains and the damage

22    to the property that they complain.

23            So even if it's not indirect or derivative, it's still

24    too remote under the *Ganim* decision to survive.  So for those

25    reasons, we would suggest that Mexico's claims under the

1   Connecticut Unfair Trade Practices Act cannot be allowed to go

2   forward and we ask they be dismissed.

3          Thank you, Your Honor.

4          THE COURT:  All right.  Thank you.

5          All right.  Who's going to respond?

6          MR. LOWY:  Very quickly, Your Honor.

7          The *Ganim* case mostly concerned misleading advertising

8   about the risks of guns, very little about the marketing of

9   assault weapons.  The *Soto*, the subsequent *Soto* decision is a

10  far more definitive authority as to the marketing of assault

11  weapons, which is the focus of our claim.

12         Also, Ms. Rice addresses, but *Ganim* does say very

13  clearly at the outset that it was not considering direct harm.

14  I recognize there was that footnote, but the preamble of the

15  case is clear that it was not considering what the decision

16  would be if there was direct harm such as property damage, and

17  that is what we allege here.

18         Finally, Your Honor, the purported holes in our

19  evidence will be filled and should be filled in discovery and

20  tested on summary judgment but not on the motion to dismiss.

21         Other than that, we will rely on our briefs.

22         THE COURT:  Thank you.

23         And then for Smith & Wesson on Chapter 93A.

24         MR. DICK:  Your Honor, Anthony Dick, Jones Day for

25  Smith & Wesson.  I will be very brief.

1          I just wanted to specifically address the Chapter 93A

2     claims which are asserted uniquely against Smith & Wesson.

3     Just three quick points on those, Your Honor.  In our opening

4     brief, as we explained, there's no state or federal court that

5     has ever interpreted Chapter 93A to prohibit or impose

6     liability on advertisements of the type at issue here.  Those

7     are advertisements for concededly lawful products that are

8     truthful and non-misleading and do not say a single word,

9     depict or mention any unlawful or unsafe activity, and that's

10    what we have here.  So there's no court, state or federal, that

11    has ever read Massachusetts law to impose liability on that

12    type of advertisement.

13         The second point, Your Honor, since this is a federal

14    court sitting in diversity, there's clear precedent from the

15    First Circuit and elsewhere saying that a federal court should

16    not innovate under state law, should not be expanding state law

17    to prohibit conduct that the state courts themselves have not

18    done.  That's exactly what would happen here.  This would be a

19    radical and unprecedented expansion of Massachusetts consumer

20    protection law.  We would urge the court not to do that in this

21    case.  If anything, state courts should consider these types of

22    arguments for expanding state law in the first instance.

23         And the third point, Your Honor, for similar reasons

24    reading state law in this way should not be done because it

25    would flagrantly violate the First Amendment.  There's never

1   been a First Amendment case that has found advertising for

2   lawful products unprotected when they don't depict or mention

3   any unlawful activity, they're entirely truthful and

4   non-misleading.

5          You can look at paragraph 324 of the complaint.  The

6   advertisements are produced there.  There's just not a single

7   word or depiction of anything unlawful, untruthful or

8   misleading.  So imposing liability on those types of

9   advertisements would violate the First Amendment.  That's a

10  reason not to read the statute to cover and prohibit these

11  types of cases.  And all of this, of course, is if you even get

12  to these claims, which I really don't think the Court needs to

13  do because of the PLCAA standing issues that Mr. Lelling has

14  covered.

15         So if there are no further questions on that, Your

16  Honor, I will rest on those points.

17         THE COURT:  All right.  Response?

18         MR. BRUNELL:  This is Mr. Brunell here.  Very, very

19  quickly.

20         There's nothing innovative or unusual about having

21  liability for unethical advertising of dangerous products for

22  illegal purposes.  Of course, that's what the *Soto* court held;

23  and the *Soto* unfair trade practices statute is similar to

24  Massachusetts.  So it's hardly a leap for Massachusetts to

25  follow *Soto*.

1        And on the First Amendment issue, the *Soto* case

2   addresses that.  Other courts cited in our brief also reject

3   the First Amendment arguments with respect to unfair trade

4   practice claims like this.

5        Otherwise, we'll rest on the brief.

6        THE COURT:  Okay.  I think last up, we'll hear from

7   counsel for Witmer.

8        MR. LITCHFIELD:  Good morning, Your Honor.  My name is

9   Daniel Litchfield.  I represent Witmer Public Safety Group

10  d/b/a Interstate Arms.

11       Our focus is very briefly on choice of law, why

12  Mexican law does not apply here.  I seek to supplement

13  co-counsel and their comments and arguments, not to replace

14  them.

15       The allegations against Witmer are that it is a

16  Massachusetts company, that it acquired Interstate Arms in

17  2018, that Interstate Arms was incorporated in Massachusetts

18  for decades, that Interstate Arms continues to do business in

19  Massachusetts in Middlesex County under the name Interstate

20  Arms at the same place as before with the same Massachusetts

21  personnel.  That's paragraph 40.

22       The allegations are that Witmer acts as a distributor.

23  It's not one of the manufacturing defendants which are defined

24  as such in paragraph 11, among other paragraphs in the

25  complaint.  It's the only distributor named in this complaint.

1          Plaintiff focuses on alleged defects in design but

2     Witmer, of course, is not a manufacturing defendant.  There is

3     a grab of a portion of the Web page for Interstate Arms that's

4     at paragraph 330.  And it reflects that Interstate Arms sells

5     to law enforcement, that it has a special sales organization to

6     sell to law enforcement, and that is indeed the principal focus

7     of its entire business, is to service first responders, police,

8     fire and medical.

9          It's alleged that Witmer regularly made purchases in

10    Middlesex County from the various co-defendant manufacturing

11    defendants.  Again, nothing about Mexico there.  It is alleged

12    at paragraph 41 that Witmer is, quote, "At home in

13    Massachusetts."  All of these alleged facts in the complaint

14    show how Mexican law does not apply and should not apply to

15    Witmer.

16         They certainly relate to Witmer's expectations about

17    the applicability of Mexican law or relatedly the applicability

18    of Massachusetts law.  They relate to other factors that have

19    been brought out in the briefing that relate to the choice of

20    law analysis.

21         Should Massachusetts law apply, this will have

22    significant effects on Witmer.  Certainly it will cement the

23    place of PLCAA as applicable and there will be special

24    significance that there's no negligence per se in Massachusetts

25    law, and that is yet asserted in one of the counts and also as

1    an asserted exception to PLCAA.

2              So for all of those reasons, we would ask that the

3    motion to dismiss be granted.  We join in the arguments made by

4    able co-counsel, and I thank the Court for the time.

5              THE COURT:  Thank you.  And who's going to respond?

6              MR. SHADOWEN:  I would also thank you for the time and

7    generosity the Court has given us with the time.  I will keep

8    this very, very brief.

9              We will end where we began, and that is with the

10   defendants simply putting on blinkers as to what the

11   allegations of the complaint are.  Yes, Witmer is located in

12   Massachusetts.  But the complaint alleges in painstaking detail

13   that all of the defendants, including Witmer, actively

14   facilitate the trafficking, systematically, repeatedly, of

15   their guns into Mexico.  There are two U.S. Supreme Court cases

16   that say the general rule of thumb is that the place of the

17   injury, that's whose law applies.  So we take that as the

18   basis.  That's essentially the presumption under Massachusetts

19   choice of law rules, that the place of injury applies; and the

20   Court allowed us to file a surreply brief specifically on the

21   choice of law issue.  So I think that's been discussed fairly

22   well and we'll stop right there, unless the Court has any

23   questions.

24             THE COURT:  All right.  Thank you, everyone, and thank

25   you particularly for getting us in under the time period that

1    I've allotted.  It was well argued all the way around; and I

2    will take all the pending motions under advisement.  Thank you,

3    all.

4             COUNSEL:  Thank you, Your Honor.  Thank you, Judge.

5    (Proceedings adjourned at 11:29 a.m.)

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken April 12, 2022 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    9/30/22

16

17   Kathleen Mullen Silva, RPR, CRR                 Date
     Official Court Reporter
18

19

20

21

22

23

24

25