## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ESTADOS UNIDOS MEXICANOS,     ) | |
|     ) | |
| Plaintiff,     ) | |
|     ) | **Civil Action No.** |
| v.     ) | **21-11269-FDS** |
|     ) | |
| SMITH & WESSON BRANDS, INC., et al.,     ) | |
|     ) | |
| Defendants.     ) | |

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

**SAYLOR, C.J.**

This lawsuit involves claims against seven gun manufacturers and one wholesaler alleging the illegal trafficking of guns into Mexico. The plaintiff is the government of Mexico.

In January 2022, six defendants—Sturm, Ruger & Company; Barrett Firearms Manufacturing, Inc.; Glock Inc.; Colt's Manufacturing Company LLC; Century International Arms, Inc.; and Beretta U.S.A. Corp.—moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. On September 30, 2022, the Court denied those motions as moot because it had determined that the complaint failed to state a claim upon which relief could be granted under Fed. R. Civ. P. 12(b)(6) as to all defendants. The First Circuit has since reversed that decision. *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511 (1st Cir. 2024).[1]  In light of the First Circuit's decision, defendants' motions have been renewed.

---

[1] Defendants have petitioned for a writ of certiorari, which as of this writing remains pending. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, No. 23-1141 (U.S. April 18, 2024).

The core question for jurisdictional purposes is whether Mexico's claims against the six moving defendants "arise" from their business transactions in Massachusetts.  *See* Mass. Gen. Laws ch. 223A, § 3(a).  As to those defendants, the connection of this matter to Massachusetts is gossamer-thin at best.  The government of Mexico is obviously not a citizen of Massachusetts.  None of the six moving defendants is incorporated in Massachusetts, and none has a principal place of business in Massachusetts.  There is no evidence that any of them have a manufacturing facility, or even a sales office, in Massachusetts.   None of the alleged injuries occurred in Massachusetts.  No Massachusetts citizen is alleged to have suffered any injury.  And plaintiff has not identified any specific firearm, or set of firearms, that was sold in Massachusetts and caused injury in Mexico.

Furthermore—and despite the generous use of the word "defendants" throughout—the complaint does not actually allege the existence of a joint enterprise, joint venture, or civil conspiracy among the various defendants.  There is no question, therefore, that personal jurisdiction must be proved separately as to each of the six moving defendants.

At its core, plaintiff's jurisdictional theory is based on statistical probabilities.  Its reasoning may be characterized as follows:  (1) each of the six moving defendants sold firearms to distributors and retailers in each of the 50 states; (2) each of the six defendants sold some (undetermined) number of firearms to Massachusetts-based distributors or retailers; (3) some (undetermined) number of the firearms that were sold by each of the six defendants nationwide were illegally trafficked to Mexico; (4) some (undetermined) number of the firearms that were trafficked to Mexico caused injury there; and therefore (5) at least *some* of the firearms sold by *each* of the six defendants to Massachusetts entities *must have* caused injuries in Mexico.

In an attempt to provide some evidentiary substance to that argument, plaintiff has submitted the report of Lucy Allen, an economist, who sought to estimate the number of firearms manufactured by defendants that were trafficked into Mexico after a Massachusetts sale.  To do so, she relied upon two principal datasets:  a set that recorded the manufacturer of certain firearms recovered in Mexico between 2010 and 2021, and a "trace and recovery" dataset created by the Bureau of Alcohol, Tobacco and Firearms ("ATF") concerning firearms recovered in Mexico between 1989 and 2001.  She then used that data to estimate the number of firearms that she believes were likely trafficked into Mexico after a Massachusetts sale over the last ten years. As explained below, however, that report is problematic in multiple respects—beginning with the fact that Congress has prohibited the use of the ATF data in any civil action, and thus a critical foundation of her opinion must be disregarded.  Furthermore, her opinion stops short of estimating the number of firearms manufactured by each defendant that actually caused an injury in Mexico—a critical link to connect defendants' business in Massachusetts to plaintiff's claims. Under the circumstances, her opinion is not sufficient to prove the necessary jurisdictional nexus.

In short, plaintiff has been unable to muster sufficient proof to establish a sufficient relationship between the claimed injuries and the business transactions of any of the six defendants in Massachusetts.  Nor does the Court have the authority to relax the requirements of personal jurisdiction, even in cases involving claims against unpopular or controversial parties. Whether plaintiff might be able to establish personal jurisdiction over any of the six defendants in a state where it is actually located—or that otherwise has some reasonable connection to the pleaded claims—is not a question before this Court.  For now, it is enough to say that plaintiff cannot do so here.  Accordingly, and for the following reasons, defendants' motions to dismiss will be granted.

# I.     Background

Except where otherwise noted, the following facts are undisputed.[2]

## A.     Factual Background

### 1.     The Parties

Estados Unidos Mexicanos ("Mexico") is a foreign nation.  (Compl. ¶ 30).

Barrett Firearms Manufacturing, Inc.; Beretta U.S.A. Corp.; Century International Arms, Inc.; Colt's Manufacturing Company, LLC; Glock, Inc.; and Sturm, Ruger & Co., Inc. are manufacturers and sellers of firearms.  (*Id.* ¶¶ 31-39).

As relevant here, Barrett is incorporated and has a principal place of business in Tennessee; Beretta is incorporated and has a principal place of business in Maryland; Century Arms is incorporated in Vermont and has a principal place of business in Florida; Glock is incorporated and has a principal place of business in Georgia; and Ruger is incorporated in Delaware and has a principal place of business in Connecticut.  (*Id.* at 9-11).  Colt is a limited-liability company with one member (Colt CZ Group North America, Inc.), which is incorporated in Kansas and has a principal place of business in Connecticut.  (ECF No. 210).

Witmer Public Safety Group, Inc., currently doing business as "Interstate Arms," is a Boston-area wholesaler of firearms.  (Compl. ¶ 40).  All defendant manufacturers, except Barrett, use Interstate Arms to sell guns for resale to dealers throughout the United States.  (*Id.* ¶¶ 1, 31-40).  Barrett's authorized dealer in Massachusetts is the Natick Outdoor Store.  (*Id.* ¶ 32).

### 2.     Defendants' Alleged Knowledge of Unlawful Trafficking of Guns to Mexico

According to the complaint, defendants are aware of the harmful effects that their actions

---

[2] The facts alleged in the complaint are set forth in greater detail in the Court's prior memorandum and order on defendants' joint motion to dismiss.  *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 633 F. Supp. 3d 425, 432-38, ECF No. 174 (D. Mass. 2022).

have in Mexico.  (*Id.* ¶¶ 115-226).  Specifically, it alleges that gun dealers utilize various

practices that enable them to traffic guns to Mexico and that defendants are aware of those

practices.  (*Id.* ¶ 118).

      For example, the complaint alleges that defendants know that the gun dealers to which

they sell engage in conduct such as "straw sales, multiple sales, repeat sales, and other business

practices that supply traffickers who arm the drug cartels."  (*Id.*).  It also alleges that both public

news reports and government sources put defendants on notice of those practices and of the

specific dealers that routinely cross guns into Mexico utilizing those tactics.  (*Id.* ¶¶ 119-22).

      According to the complaint, defendants willfully refuse to utilize the resources available

that would make the distribution and sale of firearms safer.  (*Id.* ¶¶ 121-23).  For example, it

alleges that defendants could use ATF trace data to obtain more detailed information about

which dealers contribute to the illegal Mexican gun market but choose not to.  (*Id.* ¶¶ 123, 125).

Instead, defendants allegedly capitalize on ATF's inability to monitor the entire industry and sell

to unscrupulous dealers.  (*Id.* ¶¶ 126-30).

      The complaint alleges that defendants intentionally allow the continued unlawful

trafficking of guns into Mexico.  (*Id.* ¶¶ 209; 377-95).  Specifically, it alleges that the flow of

guns into the illegal market is a "feature" and not a "bug."  (*Id.* ¶ 384).  According to the

complaint, defendants have received at least $170 million annually from such sales.  (*Id.* ¶ 389).

It also alleges that research from the University of San Diego suggests that almost half of all

licensed gun dealers would be forced to close if not for gun trafficking into Mexico.  (*Id.* ¶ 395).

### 3.     <u>Defendants' Alleged Conduct in Massachusetts</u>

      The complaint alleges that defendants engage in multiple practices that are contrary to

their obligations as manufacturers or sellers of dangerous goods.  (*Id.* ¶¶ 227-376).  In

Massachusetts specifically, it asserts that five of the moving defendants imposed the "policies

and practices by which it sells its guns to Interstate Arms in [Massachusetts]; and by which Interstate Arms must sell those guns to dealers throughout the U.S.," and that those practices "resulted in guns that each of them sold to [distributors] in [Massachusetts] being trafficked into Mexico and used in criminal activities there, causing the harm about which [plaintiff] complains[.]"  (*Id.* ¶¶ 42, 45).  The complaint repeats essentially the same allegations about Barrett's activities and transactions with Natick Outdoor Sales in Massachusetts.  (*Id.* ¶ 45).

The complaint also alleges that ten other gun dealers in Massachusetts "sold guns that were traced to crimes in Mexico[,]" and that those dealers sold guns that were manufactured and distributed by "some or all of the [d]efendants."  (*Id.* ¶ 43).

### 4.  Report of Lucy P. Allen

In support of its opposition to the present motions, plaintiff has submitted the report of Lucy P. Allen, an economist working for the National Economic Research Associates Economic Consulting ("NERA") group.  (Pl. Ex. 1, ECF No. 108-1 ("Allen Report")).

In her report, Allen seeks to estimate the number of firearms that were manufactured by defendants involved in a sale in Massachusetts and subsequently trafficked into Mexico.  (*Id.* ¶ 19).  To make that calculation, she begins with two estimates of weapons trafficked from the United States into Mexico per year—200,000 as estimated by the U.S. Government Accountability Office in 2021, compared with 730,000 as estimated by the Brookings Institution in 2008.  (*Id.* ¶ 10).[3]  The report then relies on two principal datasets:  (1) data recording the manufacturers of firearms "recovered" in Mexico between 2010 and 2021 ("recovery data"); and (2) trace and recovery data from the Bureau of Alcohol, Tobacco, Firearms, and Explosives

---

[3] Allen admits that she did not undertake any independent study to determine which estimate is more accurate or, it might be inferred, whether either of them was accurate at the time of the report.  (*Id.* ¶ 11).  Many statistics that Allen purports to rely on also conflict with those alleged in the complaint.  (*e.g.*, Compl. ¶ 438 (alleging that "between 342,000 and 597,000 of Defendants' guns are likely trafficked into Mexico every year")).

concerning firearms recovered from Mexico between 1989 and 2001 ("ATF data").  (*Id.* ¶ 1).
The report does not disclose any specifics of either of those underlying datasets.  It also does not
define what the "recovery process" in Mexico would lead a firearm to be included in that data.[4]

As to the ATF data, Allen further identified certain firearms with "a sale linked to
Massachusetts," which she defined as either being traced to a Federal Firearms License ("FFL")
in Massachusetts or to one of two national firearms distributors based in Massachusetts.  (*Id.*
¶ 16).[5]  The report asserts that 24.5 percent of the recovered firearms manufactured by Smith &
Wesson, and 5.7 percent of those attributed to "all other manufacturers," were linked to a sale in
Massachusetts.  (*Id.* ¶ 17).  The report does not apportion the latter statistic among any specific
entities, nor does it identify any specific manufacturer other than Smith & Wesson.  (*Id.*).

Using both datasets, Allen appears to reduce the estimated proportion of recovered
firearms attributable to each movant (based on the recovery data) with a flat 5.7 percent estimate
of their sales linked to Massachusetts (based on the ATF data).  (*Id.* ¶ 19).  She then applies that
combined percentage to the number of firearms estimated to be trafficked from the United States
into Mexico each year (either 200,000 or 730,000).  (*Id.*).  According to the report, the result of
that calculation is an approximate number of each of the moving defendants' firearms trafficked
from the United States to Mexico with a sale linked to Massachusetts over the last ten years.
(*Id.*).  It does not indicate whether any of those firearms caused (or likely caused) an injury in
Mexico, or attempt to estimate that number.

---

[4] There is no indication that a "recovered" firearm was necessarily either illegally trafficked into Mexico from the United States or was involved in any unlawful activity there.

[5] Although the report categorizes weapons sold to Massachusetts-based distributors Interstate Arms and Camfour Inc. as "linked to Massachusetts," there is no indication that any weapons sold to those distributors ever entered Massachusetts during the relevant period.  (*See id.* ¶ 16).

For example, Allen estimated that defendant Glock manufactured 2.0 percent of the firearms recovered in Mexico between 2011 and 2020.  (*See id.* at 9).  That percentage was then reduced using the 5.7 percent of traced firearms connected to a sale in Massachusetts manufactured by "all manufacturers" other than Smith & Wesson.  That combined percentage was then applied to the total weapons purportedly trafficked from the United States to Mexico over ten years based on the two estimates of annual trafficking (200,000 or 730,000).  (*Id.*).  Allen's final estimate is that Glock manufactured between 2,263 and 8,259 firearms that were both linked to a sale in Massachusetts and were later trafficked into Mexico from 2011 through 2020.  (*Id.*).  She does not render an opinion as to what percentage of Glock's firearms actually or likely caused an injury in Mexico.

### 5.  Alleged Injuries to the Mexican Government

The complaint alleges "massive" injury to the Mexican government as a result of defendants' conduct.  (Compl. ¶ 446).

The complaint alleges that an estimated 342,000-597,000 guns sold by defendants are smuggled illegally into Mexico from the United States each year.  (*Id.* ¶¶ 437-38).  It also states that Mexico now ranks third in the world for number of gun-related deaths.  (*Id.* ¶ 453).

The complaint alleges a direct link between the increasing violence in Mexico and defendants' conduct.  (*Id.* ¶¶ 434-45).  It specifically suggests a correlation between the increase in gun manufacturing in the United States after the federal ban on assault-weapons expired in 2004 and (1) the number of illegal guns within Mexico, (2) the Mexican homicide rate, and (3) the increased use of guns for homicide.  (*Id.* ¶¶ 440-44).

### B.  Procedural Background

The complaint asserts nine counts, seven of which are against all defendants.  In November 2021, all defendants moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1)

and 12(b)(6) for lack of Article III standing and failure to state a claim upon which relief can be granted, asserting that all claims were barred by the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. §§ 7901-03 *et seq.*—a statute that shields the firearm industry from certain types of civil liability.  Barrett, Ruger, Century Arms, Glock, Colt, and Beretta also moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.

On September 30, 2022, the Court granted the motions to dismiss the complaint for failure to state a claim, principally on the ground that PLCAA barred Mexico's claims.  The Court denied the motions to dismiss under Rule 12(b)(2) for lack of personal jurisdiction as moot.  On appeal, the First Circuit held that the complaint plausibly asserts a claim that is not barred by the PLCAA, and thus dismissal based on that statute was in error.  *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 526-32, 538 (1st Cir. 2024).  Defendants' motions to dismiss under Rule 12(b)(2) have been renewed and are before the court.

## II.   <u>Legal Standard</u>

The plaintiff bears the burden of establishing that the court has personal jurisdiction over a defendant.  *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002).  Where, as here, the court considers a motion to dismiss under Fed. R. Civ. P. 12(b)(2) without first holding an evidentiary hearing, the *prima facie* standard applies.  *See United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001).

Under that standard, the court takes the plaintiff's "properly documented evidentiary proffers as true and construe[s] them in the light most favorable to [the plaintiff's] jurisdictional claim."  *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016).  The plaintiff may not "rely on unsupported allegations in its pleadings."  *Id.* (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 134 (1st Cir. 2006)) (alteration omitted).  Instead, the plaintiff "must put forward 'evidence of specific facts' to demonstrate that jurisdiction exists."  *Id.*

9

(quoting *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995)).  In

other words, plaintiffs cannot "rely solely on conclusory averments but must adduce evidence of

specific facts." *Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 54 (1st Cir. 2020).  Facts offered

by the defendant "become part of the mix only to the extent that they are uncontradicted." *Astro-*

*Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009) (quoting *Adelson v. Hananel*,

510 F.3d 43, 48 (1st Cir. 2007)).

The exercise of personal jurisdiction over a defendant must be authorized by statute and

accord with the due-process requirements of the U.S. Constitution.  *See A Corp.*, 812 F.3d at 58

(citing *Daynard*, 290 F.3d at 52).  Consistent with those requirements, a court may exercise

either general or specific jurisdiction.  *See Baskin-Robbins Franchising LLC v. Alpenrose Dairy,*

*Inc.*, 825 F.3d 28, 35 (1st Cir. 2016).

> Specific jurisdiction exists when there is a demonstrable nexus between a
> plaintiff's claims and a defendant's forum-based activities.  General jurisdiction
> exists when the litigation is not directly founded on the defendant's forum-based
> contacts, but the defendant has nevertheless engaged in continuous and systematic
> activity, unrelated to the suit, in the forum state.

*Swiss Am. Bank*, 274 F.3d at 618 (citations and quotations omitted).

## III.   <u>Analysis</u>

Plaintiff contends that this court has personal jurisdiction over the six moving defendants

because each of them sold firearms in Massachusetts to resellers and—because of their allegedly

unlawful distribution practices—some of those guns were trafficked into Mexico for criminal

purposes.  Each of the six defendants contends that plaintiff has not shown that its business

activities in Massachusetts was a but-for cause of the alleged injuries, as required by the long-

arm statute, nor that those activities are sufficiently "related to" the pleaded claims, as required

by constitutional due process.

A.      **Massachusetts Long-Arm Statute**

A federal court can assert specific personal jurisdiction over an out-of-state defendant in a diversity case only if the state long-arm statute so allows and the exercise of jurisdiction comports with the requirements of constitutional due process.  *Daynard*, 290 F.3d at 52.

The Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, "'imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process' and thus . . . courts are to begin with 'a determination under the long-arm statute' before 'considering the constitutional question.'"  *Mojtabai v. Mojtabai*, 4 F.4th 77, 85 (1st Cir. 2021) (quoting *SCVNGR, Inc. v. Punchh, Inc.*, 478 Mass. 324, 326 (2017)).  "The requirements of [the long-arm statute] may not be circumvented by restricting the jurisdictional inquiry to due process considerations."  *SCVNGR*, 478 Mass. at 329-30.

The Massachusetts long-arm statute authorizes personal jurisdiction in eight specified circumstances.  *See* Mass. Gen. Laws ch. 223A, § 3.  As relevant here, the statute provides that the court "may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . . transacting any business in this commonwealth."  Mass. Gen. Laws ch. 223A, § 3(a).[6]

For jurisdiction to exist under § 3(a), the complaint must allege sufficient facts to satisfy two elements:  (1) the "defendant must have transacted business in Massachusetts," and (2) "the plaintiff's claim must have arisen from the transaction of business by the defendant."  *Baskin-Robbins*, 825 F.3d at 34 n.3 (quoting *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767 (1994)).

---

[6] Although defendants discuss several other provisions of the long-arm statue, plaintiff only contends that the court has jurisdiction under § 3(a).  (*See* Pl. Beretta Opp'n at 8-12, ECF No. 99).  Because plaintiff bears the burden of establishing personal jurisdiction, the Court will analyze the claims under only that subsection.  *See Alianza Americas v. DeSantis*, 2024 WL 1381926, at *9 n.12 (D. Mass. Mar. 29, 2024).

The requirement that a defendant has "transacted business" is construed "in a generous manner" and the inquiry focuses on whether it "attempted to participate in the Commonwealth's economic life." *United Elec., Radio, and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992). Here, the complaint alleges that each of the six moving defendants engaged in business transactions by "making substantial sales" in Massachusetts to its distributors and retailers, including Interstate Arms. (*E.g.*, Compl. ¶ 39). Plaintiff has provided evidence—mostly advertising taken from defendants' websites—that lists distributors or retailers of defendants' products in Massachusetts. (*See* Shadowen Decl. at 1-10, ECF No. 108).

Defendants do not appear to dispute that they "transact business" in Massachusetts by selling guns to distributors and retailers here. Plaintiff has therefore met its burden to show that defendants have transacted business in Massachusetts for the purposes of § 3(a). The critical question therefore becomes whether plaintiff's claims against each out-of-state defendant "arise from" its transactions within the Commonwealth.

A claim "arises from a defendant's transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State." *Tatro*, 416 Mass. at 771. Courts must therefore consider "whether the transacted business was a 'but-for' cause of the harm alleged in the claim." *Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015); *see also Pettit v. AngioDynamics, Inc.*, 2021 WL 4441261, at *5 (D. Mass. Sept. 28, 2021). A transaction may constitute a "but-for" cause if it was "the first step in a train of events that result[ed] in the personal injury." *Tatro*, 416 Mass. at 770.

The complaint here broadly alleges three steps in the causal chain connecting defendants to plaintiff's injuries: (1) each of the six defendants sold guns to companies in Massachusetts using improper distribution practices; (2) some of those guns were trafficked from Massachusetts

into Mexico; and (3) some of those guns were used in criminal activities there, resulting in the alleged injuries. But plaintiff has failed to put forth any evidence that joins each of those links to support their critical claim—that is, that the guns sold in Massachusetts were the same guns that ultimately caused plaintiff's injuries.

As an initial matter, it is not even clear that the allegations in the complaint are sufficient to meet the requirements of the long-arm statute. The complaint asserts that the products of the six moving defendants account for 38 percent of all the recovered guns linked to crimes in Mexico. (Compl. ¶ 434). But even assuming the validity of that statistic, the complaint also alleges that those persons committing violence in Mexico have access to thousands of other firearms, either from other manufacturers in the United States or elsewhere. (*Id.* ¶¶ 434-35).

Similarly, although the complaint alleges that defendants engaged in improper distribution practices, it does not claim that those practices were limited to its transactions with Massachusetts. Indeed, the proffered instances of the alleged improper practices, without exception, occurred outside of Massachusetts. For example, the complaint includes several examples of "straw sales" occurring in Texas, Arizona, and Illinois, but none of those sales or alleged trafficking operations took place in, or are even alleged to be connected to, any of defendants' activities in Massachusetts. (*Id.* at 37-55).

Even more tenuously, the complaint asserts that "some or all" of the six moving defendants sold some weapons to individual dealers in Massachusetts, and that some weapons sold by those dealers—although not necessarily those supplied by the six defendants—were illegally trafficked to Mexico. (*Id.* ¶ 43). Plaintiff has provided no specific proof to support that claim. But even crediting the bare allegation, nothing in the complaint connects any of the specific transactions of the six defendants with those individual dealers to any of the specific

guns that caused harm in Mexico.  Without any such connection, there is no basis to assert

personal jurisdiction under the Massachusetts long-arm statute, because none of the transactions

with Massachusetts is alleged to be a but-for cause of any of plaintiff's injuries.  *Cf. Doucet v.*

*FCA US*, 492 Mass. 204, 209-10 (2023) (finding personal jurisdiction authorized under § 3(a)

where plaintiff had established that the automobile at issue had been placed "into the stream of

commerce in Massachusetts" before eventually being sold and causing injury in New

Hampshire); *Tatro*, 416 Mass. at 771-72 (finding the requirements of § 3(a) satisfied where, but

for defendant's solicitation of business in Massachusetts *and* its specific agreement to provide

hotel accommodations in California, plaintiff would not have been injured).

  In support of its claims of personal jurisdiction, plaintiff has submitted a report prepared

by Lucy Allen, an economist, that purports to connect certain firearms sold in Massachusetts to

those that caused plaintiff's injuries.  (Pl. Ex. 1, ECF No. 108-1).  That report, however, is rife

with serious problems.

  First, the report suffers from a fundamental legal defect.  One of the two critical sets of

data Allen relies on to form her conclusions—the ATF trace data—has been precluded by

Congress from use in any civil action.  Beginning in 2003, Congress attached riders to

appropriations bills for the U.S. Department of Justice, which have come to be called the "Tiahrt

Rider" (named for its congressional sponsor).  Among other things, the Tiahrt Rider prohibited

the use of funds for the ATF to release firearm trace data to the public through the Freedom of

Information Act ("FOIA").  Pub. L. No. 108-7, § 644, 117 Stat. 11, 473-74 (2003).  That

provision was subsequently the subject of several further amendments, each becoming more

restrictive, many of which reacted to conflicting decisions by various courts.  *See City of New*

*York v. Beretta U.S.A. Corp.*, 429 F. Supp. 2d 517 (E.D.N.Y. 2006); *City of Chicago v. U.S.*

*Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms*, 423 F.3d 777 (7th Cir. 2005); *see also* Angela Jacqueline Tang, *Taking Aim at Tiahrt*, 50 Wm. & Mary L. Rev. 1787, 1807-15 (2009).  In 2006, the rider was amended to include a limitation on the admissibility or use of the ATF trace data in civil litigation.  *See* Pub. L. No. 109-108, 119 Stat. 2290, 2296 (2005).

The last version of the rider was passed in 2012, noting that it would apply "during the current fiscal year and in each fiscal year thereafter."  Pub. L. No. 112-55, 125 Stat. 552, 609 (2011).  As relevant here, the 2012 rider instructs that "all" ATF firearm trace data

> shall be inadmissible in evidence, and shall not be used, relied on, or disclosed in any manner, nor shall testimony or other evidence be permitted based on the data, in a civil action in any State (including the District of Columbia) or Federal court or in an administrative proceeding other than a proceeding commenced by the [ATF] . . . .

*Id.* at 610.

That prohibition has three limited exceptions, which generally allow the ATF to share its trace data with law-enforcement officials and to disclose general aggregate statistics.  *Id.*  But none of those exceptions apply to Allen's proposed use of the data here.  Following Congress's command, therefore, Allen was not permitted to rely on the ATF data in forming the conclusions contained in the report.  Excising the proscribed data from the report entirely invalidates its calculations, and thus vitiates its conclusions.

Second, even overlooking the impermissible use of the ATF data, the statistics relied on by the report do little to establish the required nexus.  As an initial matter, neither of the two principal datasets—the ATF data and the recovery data—are clearly connected to plaintiff's claims.  There is no indication whether the weapons "recovered" in Mexico (and then recorded in either of those datasets) were either illegally trafficked there from the United States, or were in any way involved in plaintiff's alleged injuries.  Without any such link, it is unclear why the number of "recovered" firearms is an appropriate proxy for "injury-causing" firearms.

Those datasets are also substantially disparate in time—the ATF data is for the period from 1989 through 2001, and the recovery data from 2010 through 2021.  (Allen Report at 5-8). Allen also seems to suggest that her estimates are more likely to be lower than the reality because she extrapolated the ATF data using information about the number of background checks conducted in Massachusetts.  But the report does not disclose detailed results of that analysis, making it impossible to validate her assessment.  (*Id.* at 7-9).  Moreover, the number of background checks conducted in a particular state bears, at best, a tangential relationship to the number of guns sold in that state, and without more evidence linking the two, extrapolating ten years of data on that basis is questionable at best.

Moreover, every conclusion in the complaint relies on two estimates of the number of guns trafficked from the United States into Mexico—200,000 as estimated by the U.S. Government Accountability Office in 2021, compared with 730,000 as estimated by the Brookings Institution in 2008.  (*Id.* ¶ 10).  Even setting aside the large gulf between those two estimates, the report itself disclaims any understanding of their accuracy.  (*Id.* ¶ 11).  The report thus appears to lack a reliable starting point from which to extrapolate any estimate.

Third, even if all of the data on which Allen purports to rely is accurate, its lack of granular detail poses a particular challenge in establishing independent jurisdictional facts as to each of the six moving defendants.  Critically, the report uses the ATF data to suggest that 5.7 percent of the firearms recovered in Mexico attributable to "all other manufacturers" (that is, other than Smith & Wesson) have a link to a Massachusetts sale.  (*Id.* ¶ 17).  But that statistic does nothing to establish any specific connection to any specific defendant.  Presumably, some manufacturers have higher sales than others; indeed, it would be entirely possible that *none* of a particular defendant's weapons were part of that 5.7 percent of firearms with a purported link to

Massachusetts.  Nonetheless, Allen proceeds to apply a flat 5.7 percent figure to each of the six defendants without any apparent evidentiary basis.  Without the underlying data, it is impossible to validate the process by which Allen came to any of her conclusions as to each of those defendants, let alone do so with the specificity required to evaluate whether the exercise of personal jurisdiction is appropriate.

Finally, the report's conclusions themselves fail to achieve plaintiff's purpose.  At its core, the report essentially suggests that some number of guns recovered in Mexico *could* have once been connected to Massachusetts.  But an expert's hypothesis that there *could* be a weapon that was both sold in Massachusetts and trafficked into Mexico is not the equivalent of specific evidence that such a firearm actually exists.  It ignores any intervening steps that might have occurred between the hypothetical sale in Massachusetts and the recovery in Mexico, which could include a host of actions by intermediate third parties, the passage of significant periods of time, or any number of other factors that would substantially attenuate the recovered weapon's nexus to Massachusetts.  And Allen does not render an opinion on the last and vital step of the causal chain—associating the "recovered firearms," which permeate her conclusions, with any of plaintiff's injuries.  While one may assume, as a matter of logic, that some subset of those firearms might have been used for unlawful purposes that in turn might have related to the claims alleged here, those suppositions are not sufficient establish a jurisdictional nexus.

In sum, the Allen report is inadequate to support the assertion of personal jurisdiction under the requirements of the Massachusetts long-arm statute.  It does not provide a reliable basis on which to conclude that injuries caused in Mexico by guns sold by companies located in Tennessee, Maryland, Georgia, and other states arise out of the transaction of business by those companies in Massachusetts.

Plaintiff has thus failed to meet its burden to produce any specific and plausible allegations, or any specific evidence, that the claims at issue arose from transactions in Massachusetts by the six moving defendants.  The requirements of the long-arm statute are therefore not satisfied.

Although the Court's finding that the Massachusetts long-arm statute does not reach the six moving defendants is a sufficient basis to grant the present motions, in the interests of completeness the Court will proceed to consider whether the assertion of personal jurisdiction would accord with constitutional due process.  *See Kingston v. AngioDynamics, Inc.*, 2021 WL 3022320, at *6 (D. Mass. July 16, 2021).

### B.    Constitutional Due Process

#### 1.    General Jurisdiction

"A court may assert general jurisdiction over foreign [state] corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  "The paradigmatic examples of locales in which a defendant corporation is considered at home are its state of incorporation and the state that houses its principal place of business."  *Chen*, 956 F.3d at 57.  Otherwise, to be "at home" in a foreign state, a corporation must have affiliations with that state so substantial that it is "comparable to a domestic enterprise in that State."  *Daimler AG v. Bauman*, 571 U.S. 117, 133 n.11 (2014).  Such jurisdiction will exist only in an "exceptional case."  *See id.* at 139 n.19.

None of the moving defendants is subject to the exercise of general jurisdiction in Massachusetts.  Each is a firearms manufacturer that is incorporated and has a principal place of business in other states, or is owned by members based in other states.  The complaint does not allege that any of them pays any taxes in Massachusetts, has a registered agent in the state, or

18

maintains a Massachusetts office or address.  Instead, it simply alleges that each defendant

"regularly conducts business in this district, including by regularly making substantial sales to

[a distributor] in Middlesex County."  (*E.g.*, Compl. ¶ 32).  That statement cannot alone establish

that any of the movants maintain continuous affiliations with Massachusetts that are so

substantial or entrenched that it could be considered comparable to a Massachusetts company.

Accordingly, there is no basis for asserting general jurisdiction over movants.[7]

### 2.   Specific Jurisdiction

Due process requires that a defendant over whom a court seeks to exercise specific

jurisdiction has maintained "minimum contacts" with the state "such that the maintenance of the

suit does not offend traditional notions of fair play and substantial justice."  *International Shoe*

*Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Ford Motor Co. v. Montana Eighth Jud.*

*Dist. Ct.*, 592 U.S. 351, 358 (2021).  That standard requires "a demonstrable nexus between the

complaint's claims and the activities in the forum."  *PREP Tours, Inc. v. Am. Youth Soccer Org.*,

913 F.3d 11, 18 (1st Cir. 2019) (quotation marks omitted).  The minimum-contacts analysis has

three prongs—relatedness, purposeful availment, and reasonableness:

> First, the plaintiff's claim must directly arise from or relate to the defendant's
> activities in the forum.  Second, the defendant's forum-state contacts must
> "represent a purposeful availment of the privilege of conducting activities in that
> state."  Third, the exercise of specific jurisdiction in the forum must be reasonable
> under the circumstances.

*Chen*, 956 F.3d at 59 (citing *Scottsdale Cap. Advisors v. The Deal, LLC*, 887 F.3d 17, 20 (1st

Cir. 2018)) (citations omitted).  "Failure to make any one of these showings dooms any effort to

establish specific personal jurisdiction."  *Scottsdale Cap.*, 887 F.3d at 20.

---

[7] Plaintiff appears to concede that the exercise of general jurisdiction is unwarranted, as it addressed only specific jurisdiction in its memoranda.

a.    <u>**Relatedness**</u>

"To satisfy the relatedness prong, [plaintiff] must show a nexus between [its] claim and the defendants' forum-based activities." *Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 160 (1st Cir. 2022).  In other words, "[t]he plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." *Ford Motor*, 592 U.S. at 359 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255, 262 (2017)).  For tort claims, the relatedness inquiry "focuses on whether the defendant's in-forum conduct caused the injury or gave rise to the cause of action." *Swiss Am. Bank*, 274 F.3d at 622.  The question is disjunctive; a claim may either have a direct causal relationship to a defendant's in-forum activities, or it may be sufficiently related to those activities to justify subjecting a defendant to personal jurisdiction there. *See Ford Motor*, 592 U.S. at 362 (discussing the distinction between the "arise out of" and "relate to" components of the relatedness inquiry); *see also Nowak v. Tak How Invs.*, 94 F.3d 708, 716 (1st Cir. 1996).

Here, the six moving defendants do not dispute that they conduct certain business activities in  Massachusetts.  The issue, however, is whether plaintiff's claims arise from or relate to those transactions.  To solve that problem, the burden is on plaintiff to establish one of two things:  either (1) the Massachusetts transactions of the six moving defendants caused plaintiff's injuries; or (2) those transactions are sufficiently "related to" plaintiff's claims such that personal jurisdiction is constitutionally permissible. *See id.*

As to causation, as discussed, plaintiff has failed to produce any specific fact—or even a reasonably specific factual allegation—that any of the activities in Massachusetts of any of the six defendants are causally tied to the alleged injuries in Mexico.  Although the Allen report and the complaint both suggest that some firearms sold in Massachusetts may have eventually caused an injury in Mexico, the mere chance of a nexus between a forum and a claim, without more, is

too attenuated to establish that such a nexus exists. *See Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir. 2008) ("There must be more than just an attenuated connection between the contacts and the claim . . . ."); *Nowak*, 94 F.3d at 715-16 (holding that the appropriate causation standard between a defendant's activities and a plaintiff's claim is a proximate-cause relationship).

Without a direct causal relationship, to prevail on the relatedness prong plaintiff must show that its claims nonetheless "relate to" the activities of each of the moving defendants in Massachusetts. *See Ford Motor*, 592 U.S. at 362 (discussing the distinction between the "arise out of" and "relate to" components of the relatedness inquiry). Although the Supreme Court and the First Circuit have not explicitly enumerated the factors relevant to whether a claim is sufficiently "related to" a defendant's in-forum activities to authorize personal jurisdiction in that forum, they have provided some guideposts.

In *Bristol-Myers Squibb*, a group of consumers (some of whom were not California residents) sued an out-of-state pharmaceutical company in California state court. 582 U.S. at 259. The company challenged the court's personal jurisdiction over it as to the nonresident plaintiffs' claims because those claims were not sufficiently related to the company's activities in California. *Id.* at 256-60. The Supreme Court determined that the non-California plaintiffs had failed to establish personal jurisdiction over defendants in California in part because they "did not allege that they obtained [the drug at issue] through California physicians or from any other California source; nor did they claim that they were injured by [that drug] or were treated for their injuries in California." *Id.* at 259, 264-65; *see also Ford Motor*, 592 U.S. at 369 ("We found jurisdiction improper in *Bristol-Myers* because the forum State, and the defendant's activities there, lacked any connection to the plaintiffs' claims.").

21

More recently, in *Ford Motor*, several plaintiffs brought products-liability lawsuits against an out-of-state automobile manufacturer in their respective state courts for injuries sustained from car accidents in those states.  592 U.S. at 356.  Ford's activities in the forum states included advertising and marketing, and it fostered ongoing relationships with its cars' owners, no matter where they had originally purchased their vehicles.  *Id.* at 365.  Ford challenged the exercise of personal jurisdiction in the courts of those states, reasoning that although it conducted substantial activities in the states at issue, none of those activities directly caused plaintiffs' injuries.  *Id.* at 356-57.  The Supreme Court concluded that plaintiffs had established personal jurisdiction over nonresident automobile manufacturers because, in part,

> the plaintiffs [were] residents of the forum States.  They used the allegedly defective products in the forum States.  And they suffered injuries when those products malfunctioned in the forum States.  In sum, each of the plaintiffs brought suit in "the most natural State—based on an 'affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that took place'" there.

*Id.* at 370 (quoting *Bristol-Myers Squibb*, 582 U.S. at 264).  At the same time, the court rejected the notion that a court could have jurisdiction over any "nationwide corporation" without regard to any nexus between the forum, the defendant, and the claim.  *Id.* at 362 n.3 (dismissing the idea that "a California court could hear a claim against Ford [a Delaware corporation based in Michigan] brought by an Ohio plaintiff based on an accident occurring in Ohio involving a car purchased in Ohio").

The First Circuit recently analyzed an application of *Ford Motor* to the "relatedness" element.  *Cappello v. Restaurant Depot*, 89 F.4th 238, 245-47 (1st Cir. 2023).  There, the court considered whether the plaintiff had established personal jurisdiction in New Hampshire over an out-of-state wholesaler and distributor of allegedly contaminated lettuce that the plaintiff had eaten in New Jersey, allegedly causing a serious infection.  *Id.* at 241-42.  The plaintiff

contended that because the defendants had sold some of its lettuce in New Hampshire, and because he was injured by the defendant's lettuce, albeit in New Jersey, personal jurisdiction over the defendant could be established in New Hampshire. *Id.* at 244-45.

The First Circuit concluded that the district court lacked personal jurisdiction. In doing so, it rejected the theory that "the *Ford* test is satisfied because 'the *type of product* that [plaintiff] was injured by is *the type of product* that [defendant] reaps a benefit from in its business contacts in New Hampshire.'" *Id.* at 246. It then distinguished *Ford Motor* on several grounds, deciding that many of the substantial differences between the automobile and produce markets made personal jurisdiction appropriate in the former case, but not the latter. *Id.* It concluded that the plaintiff had "proffer[ed] no evidence that [the defendant's] New Hampshire contacts included contacts—retail consumption of a salad outside the forum state—like those from which this lawsuit arose." *Id.*

Plaintiff cannot meet its burden to show that its claims are sufficiently "related to" the Massachusetts activities of any one of the six moving defendants. Plaintiff was not harmed in Massachusetts, nor were a significant part—or possibly any—of the acts that gave rise to plaintiff's claims committed in Massachusetts. *See Bristol-Myers Squibb*, 582 U.S. at 259, 264-65; *Ford Motor*, 592 U.S. at 370. Plaintiff has submitted no evidence to support the supposition that any product ever obtained in Massachusetts caused any portion of its injuries. Plaintiff has also suffered no ramifications from the alleged injuries in Massachusetts. As in *Bristol-Myers Squibb*, the fact that an allegedly injurious act by one or more of the six defendants (negligent distribution) may have occurred in Massachusetts is not enough to confer personal jurisdiction when plaintiff is neither a Massachusetts citizen nor suffered its injuries here. *See id.* at 370 (quoting *Bristol-Myers Squibb*, 582 U.S. at 264).

Were personal jurisdiction to be authorized in these circumstances, it would mean that a Massachusetts court could hear virtually any claim against a nonresident manufacturer brought by a foreign plaintiff based on injuries suffered in that foreign jurisdiction. *Cf. id.* at 362 n.3.  At best, plaintiff has alleged that the type of products sold by the six moving defendants in Massachusetts are the same type of products that caused its injuries in Mexico.  That is not a sufficient basis to assert personal jurisdiction.  *See Cappello*, 89 F.4th at 246.  It is true that plaintiff's claims generally concern the distribution practices of defendants, and the six defendants do maintain distribution contacts in Massachusetts "like those" from which those claims might arise.  *See id.*  But that allegedly common subject matter, standing alone, cannot by itself support a nexus between the claims at issue and Massachusetts.

Plaintiff relies on *Ford Motor* for the proposition that because each of the six defendants are alleged to have "systematically serve[d] the gun market" by "making substantial sales," and "marketing and advertising its products," they are subject to personal jurisdiction here.  (Compl. ¶¶ 42, 45).  In plaintiff's view, because each of the six served the Massachusetts market, and some of the allegedly negligent distribution practices occurred here, its claims are sufficiently related to their connections to Massachusetts.

That approach ignores the necessary connection to plaintiff itself.  That connection was, at least in part, established in *Ford Motor* because those plaintiffs were injured in the relevant forum.  *See Ford Motor*, 592 U.S. at 370; *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 288 (1980) (car-accident victims injured in forum state).  But in *Bristol-Myers Squibb*, plaintiffs failed to establish that connection, because they were not.  *See Bristol-Myers Squibb*, 582 U.S. at 259; *see also Cappello*, 89 F.4th at 245-47 (plaintiff injured in New Jersey).  Indeed, the court in *Ford Motor* declined to address a situation where the plaintiff was injured in

a different state to the one where defendant had established contacts.  *See Ford Motor*, 592 U.S. at 365 ("Contrast a case, which we do not address, in which [the defendant] marketed the models in only a different State or region.").  Instead, its holding was clear:  "When a company . . . serves a market for a product in a State *and that product causes injury in the State to one of its residents*, the State's courts may entertain the resulting suit."  *Id.* at 355 (emphasis added).

While plaintiff does make the general allegation that each of the six defendants engaged in negligent-distribution practices, that allegation alone is not the basis of their claim.  Rather, as it must, the claim alleges *both* that defendants engaged in unlawful conduct *and* that plaintiff was injured by it.  Although the analysis primarily focuses on a defendant's actions, establishing a nexus for personal jurisdictional requires "a *strong* 'relationship among the defendant, the forum, and the *litigation*.'"  *Id.* at 365 (quoting *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 (1984)) (emphasis added); *see also Bristol-Myers Squibb*, 582 U.S. at 263; *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 289 (1st Cir. 1999) ("Questions of specific jurisdiction are always tied to the particular claims asserted.").  No such relationship exists here.

Accordingly, plaintiff's claims are not sufficiently related to any of the connections of the six moving defendants to Massachusetts to satisfy the guarantees of constitutional due process.

### b.   Purposeful Availment

A defendant will purposefully avail itself of the forum state's economic activities if it has "'deliberately target[ed] its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior.'"  *Baskin-Robbins*, 825 F.3d at 36 (quoting *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 555 (1st Cir. 2011)).  The "'key focal points' are the voluntariness of the defendants' relevant Massachusetts contacts and the foreseeability of the defendants falling subject to

25

Massachusetts's jurisdiction." *Copia Commc'ns v. AMResorts, L.P.*, 812 F.3d 1, 5 (1st Cir. 2016) (quoting *Adelson*, 510 F.3d at 48).

Here, the complaint plainly alleges that each of the six defendants conducted business in Massachusetts, and that their business could foreseeably have led to their being subject to suit here.  Even so, because none of that business was sufficiently related to plaintiff's claims, whether it could amount to purposeful availment of the Massachusetts market is irrelevant.

        **c.**      **<u>Reasonableness</u>**

The "gestalt" factors address the reasonableness and fairness of subjecting the defendant to the court's jurisdiction by analyzing

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Adelson*, 510 F.3d at 51 (quoting *United Elec.*, 960 F.2d at 1088).

Here, the only non-neutral factor seems to be the adjudicatory interest of the forum state. There are no specific Massachusetts statutory claims asserted against any of the six moving defendants; plaintiff is not a Massachusetts citizen; not one of defendants is a Massachusetts citizen; no injury occurred in Massachusetts; and no Massachusetts citizen is alleged to have suffered any injury.  Other than the actual act of distribution, the conduct alleged to constitute the actionable negligence presumably occurred at the separate corporate headquarters or offices of the six separate defendants.  There does not appear to be any Massachusetts interest in the claims beyond the general interest of ensuring those transacting business in the state do so lawfully.  But that general interest is already accounted for by the long-arm statute, the requirements of which (as discussed) are not satisfied.  Although the reasonableness factors may account for the fact

that plaintiff is a foreign government, it does not follow that its claims may be asserted in any forum, notwithstanding a lack of nexus between the forum and the asserted claims.

In short, the reasonableness factors do not support asserting personal jurisdiction over any of the six moving defendants.

### C.    **Jurisdictional Discovery**

Plaintiff alternatively requests jurisdictional discovery if the Court determines that it has not met its burden to show that personal jurisdiction is warranted.

It is well-established that "a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of *in personam* jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." *Swiss Am. Bank*, 274 F.3d at 625 (citing *Sunview Condo. Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964 (1st Cir. 1997)).  In determining whether plaintiff has diligently made out a "colorable case" of personal jurisdiction, the Court must determine whether they have "present[ed] facts to the court which show why jurisdiction would be found if discovery were permitted." *Swiss Am. Bank*, 274 F.3d at 625.

Here, plaintiff has not come close to meeting its burden to show a "colorable case" for personal jurisdiction.  It has made no real showing as to what, if any, information that might likely be gleaned from limited jurisdictional discovery that could change the conclusion that the assertion of personal jurisdiction over the six defendants fails to meet either the Massachusetts long-arm statute or the requirements of constitutional due process.  Accordingly, its request for discovery to cure the identified jurisdictional deficiencies is denied.

IV.     **Conclusion**

For the foregoing reasons, the motions of defendants Barrett Firearms Manufacturing, Inc.; Beretta U.S.A. Corp.; Century International Arms, Inc.; Colt's Manufacturing Company, LLC; Glock, Inc.; and Sturm, Ruger & Co., Inc. to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) are GRANTED.

**So Ordered.**

<div style="margin-left: 50%;">

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court
</div>

Dated: August 7, 2024